**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NUMBER HOLDINGS, INC. *et al.*,[1] | ) | Case No. 24-10719 (JKS) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |
| | ) | |
| | ) | |

**DECLARATION OF CHRISTOPHER J. WELLS**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND**
**FIRST DAY MOTIONS OF NUMBER HOLDINGS, INC.**
**AND ITS AFFILIATED DEBTORS AND DEBTORS IN POSSESSION**

I, Christopher J. Wells, declare under penalty of perjury:

1.      I am the Chief Restructuring Officer ("CRO") of Number Holdings, Inc. ("Number Holdings"), a Delaware corporation (together with the above-captioned debtors and debtors in possession, the "Debtors" and together with their non-Debtor affiliates, the "Company"). In addition to being CRO since April of 2024, since mid-February 2024 I have been part of the restructuring team at Alvarez & Marsal North America, LLC ("A&M NA") that has been working with the Company. Among other functions, I have been responsible for liquidity management and forecasting, evaluation of various strategic alternatives, developing the capital needs of the "Right Sizing Plan" (discussed below), providing due diligence materials to potential third party capital providers and buyers, working with various lender and noteholder advisors, and assisting with budget formulation, negotiation of debtor-in-possession financing, operational planning,

---

[1]      The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: (i) Number Holdings, Inc. (1463); (ii) 99 Cents HoldCo LLC (3987); (iii) 99 Cents Only Stores LLC (1605); (iv) 99 Cents Only Stores Texas, Inc. (1229); (v) 99 Cents PropCo LLC (7843); and (vi) Bargain Wholesale LLC (8030). The Debtors' principal offices are located at 1730 Flight Way, Suite 100, Tustin, CA 92782.

liquidation planning, and contingency planning. As such, I am familiar with the Company's business, financial condition, day-to-day operations, and books and records. Accordingly, unless otherwise indicated, the facts set forth in this Declaration are based on my personal knowledge, my discussions with other members of the Debtors' senior management and other personnel, my review of business records maintained in the regular course of business and other relevant documents, or my opinion based on my experience, knowledge, and information concerning the Debtors' operations and financial condition. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

2.      I am also a Managing Director with A&M NA and have extensive experience in operational and financial analysis, financial forecasting, cash management, insolvency work, and debt restructuring. I have advised or served in management positions, including as CRO and Chief Financial Officer (CFO), in connection with numerous turnaround engagements and bankruptcy proceedings, including, among others, serving as CRO of Katerra, CRO of Kona Grill, and Interim CFO of Real Mex during their chapter 11 proceedings, and providing advisory services to Envision Healthcare, Washington Mutual and Denbury Resources in connection with their bankruptcy proceedings.

3.      I have been employed with A&M NA since April 2002 and was promoted to Managing Director in December 2013. I have a bachelor's degree with majors in finance, accounting, and entrepreneurship from the University of Arizona. I am a Certified Public Accountant in the State of Arizona, a Chartered Financial Analyst, and a Certified Insolvency and Restructuring Advisor.

4.      On February 26, 2023, Number Holdings and its operating subsidiary, 99 Cents Only Stores LLC ("99 Cents Only"), engaged Alvarez & Marsal Consumer and Retail Group, LLC

("A&M CRG") to provide advice and support with respect to the implementation of a "Transformation Plan" (discussed in more detail below) to drive Company growth and improve efficiency and profitability.  On November 1, 2023, and again on February 12, 2024, Number Holdings and 99 Cents Only amended their engagement with A&M CRG to allow for the engagement of personnel from A&M NA, an affiliate of A&M CRG, to provide advice with respect to cash management and financial restructuring matters, among other matters.

5.      On April 7, 2024 (the "Petition Date"),[2] the Debtors commenced these cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code").  I am generally familiar with the Debtors' day-to-day operations, business and financial affairs, and the circumstances leading up to these Chapter 11 Cases.

6.      I submit this declaration (the "Declaration") to assist the Court and other parties in interest in understanding the circumstances that led to the commencement of these Chapter 11 Cases and in support of the relief sought in the "first day" motions and applications filed with the Court (collectively, the "First Day Motions")[3] contemporaneously with this Declaration.  I am authorized to submit this Declaration on behalf of the Debtors.

7.      I am familiar with the contents of each First Day Motion (including the exhibits to such motions) and believe the relief sought in each First Day Motion will allow the Debtors to achieve a "smooth landing" in the Chapter 11 Cases and minimize the potential adverse effects from the commencement of these Chapter 11 Cases, which I believe will in turn help the Debtors maximize the value of these estates for their stakeholders.  Further, it is my belief that the relief

---

[2]    Certain of the Debtors voluntary petitions were filed on the docket shortly after midnight (ET) on April 8, 2024.

[3]    Capitalized terms used but not defined in this Declaration have the meanings ascribed to them in the First Day Motions.

sought in the First Day Motions is in each case narrowly tailored and necessary to achieve the goals identified above, and, accordingly, best serves the interests of the Debtors' estates and their stakeholders.

**Preliminary Statement**



8.      The Company operates over 370 "extreme value" retail stores in California, Arizona, Nevada and Texas under the business names "99¢ Only Stores" and "The 99 Store."  The Company offers its customers a wide array of quality products—from everyday household items, to fresh produce, deli, and other grocery items, to an assortment of seasonal and party merchandise—many of which are still priced at or below 99.99 cents.  The Company's stores are primarily located in urban areas and underserved communities, many of which lack close access to traditional grocery stores.

9.      Like many other retailers, the last several years have been extremely difficult for the Company.  The Company has weathered adverse industry trends, increased competition, the COVID-19 pandemic, escalating theft and crime, record-high inflation, and resulting increases in operating costs, including increases in the cost of labor associated with significant increases in the minimum wage (particularly in California, where the majority of the Company's stores are located), all of which have had a significant impact on its bottom line and its ability to continue to operate as an extreme value retailer.

10.      In recent years, the Company has battled these headwinds by taking a series of actions aimed to improve its balance sheet (frequently with the aid of its equity sponsors), while

continuing to offer its customers a wide product assortment at value prices. For example, in December of 2017, the Company completed a deleveraging exchange offer of its outstanding high yield notes that extended the maturity of these notes. In order to support this transaction, the Company's equity sponsors agreed to exchange Company high yield notes they held for new Company preferred equity with a dividend payable in-kind, as a result of which these equity sponsors took a step-down in priority and spared the Company the expense of a dividend payable in cash. In the same year, to support the Company's successful effort to extend the maturity of its syndicated term loan, the Company's equity sponsors agreed that their holdings in this term loan would be subordinated and receive payments of interest in-kind, instead of in cash. These transactions reduced the Company's cash interest expense and extended its debt maturity runway.

11.     At the same time, the Company initiated new strategies aimed to achieve enhanced profitability at its stores, including a "refresh" program that involved upgrading the interior and exterior of many of its stores to increase customer satisfaction and drive sales growth and store efficiency. It also conducted an extensive national search to recruit executive talent with substantial experience in the consumer retail space. This effort resulted in the appointment of a new Chief Executive Officer, who was given a mandate to drive increased profitability and improved performance.

12.     In July of 2019, the Company successfully completed an out-of-court restructuring that involved an exchange of debt for equity and an equity rights offering backstopped by one of the Company's equity sponsors. These transactions reduced the Company's significant debt load and interest expense, and extended its debt maturity runway.

13.     In early 2020, in the midst of these efforts, the COVID-19 pandemic began to spread across the country. COVID-19 restrictions were especially complex in California, as the

Company complied with varied requirements across numerous counties and local jurisdictions. Compliance with those requirements, along with addressing employee and customer safety led to both reduced customer foot-traffic in the stores and a corresponding dramatic decline in the Company's sales. Faced with these difficulties, the Company refinanced its debt and sought to raise new capital to shore up its balance sheet, and was successful in securing an injection of $200 million in new equity capital from third-party investors and the Company's equity sponsors, allowing it to further reduce its debt load and improve liquidity.

14.     But despite weathering the pandemic, the Company was soon challenged by the record levels of inflation that followed, which resulted in significant increases in the Company's cost of doing business, including higher costs for merchandise, distribution, transportation, and employee wages. At the same time, the Company experienced ever-increasing inventory shrinkage, due primarily to elevated levels of theft and crime in the areas in which it operates. The Company had no choice but to pass on to its customers some of the resulting costs, in the form of higher prices, which was met by significant customer resistance and reduced customer traffic. This resistance was exacerbated as the percentage of merchandise priced at 99.99 cents or less decreased from nearly 65% in 2020 to below 50% in 2023.

15.     In 2023, the Company embarked again on several initiatives designed to overcome the financial challenges that it and other similar value retailers were facing. In February of 2023, the Company appointed Michael Simoncic, a retail industry veteran with over 25 years of experience leading retail and consumer improvement initiatives, as its Interim Chief Executive Officer. The Company also retained A&M CRG to assist the Company with the implementation of a "Transformation Plan" focused on re-energizing and optimizing the Company's "extreme-value" business model, while improving capital-efficiency and right-sizing operations. This

Transformation Plan involved, among other things, streamlining the Company's real estate footprint, reorganizing the Company's corporate structure, implementing a targeted reduction in the Company's workforce, improving pricing and assortment offerings, and improving the in-store customer experience by "screaming extreme value," including through prominently displaying signage for brand name products at low prices.



16.     While the Company pursued the Transformation Plan diligently, ultimately it did not generate the intended results, and by late 2023, it became apparent that the pursuit of the Transformation Plan alone might not allow the Company to generate sufficient cash to meet the ever-growing costs to sustain operations and weather all the other macro-economic headwinds affecting its business.

17.     In September of 2023, the Company engaged the investment bank Jefferies LLC ("Jefferies") to provide advice and assistance with respect to a potential transaction to address the Company's highly leveraged balance sheet.    After facing further operating losses and disappointing fourth quarter results, in early 2024, Jefferies' mandate was broadened to include an evaluation of a wider set of alternatives.    From the beginning of 2024 and through the Petition Date, the Company, together with its advisors, considered and exhaustively pursued a range of possible options, including (i) seeking to raise financing from new financing sources and existing stakeholders; (ii) soliciting interest in strategic combinations; (iii) attempting to market and sell all

or a portion of its assets and/or operations to third parties; (iv) exploring a plan to close a portion (but not all) of its stores, with a view towards restructuring around a smaller, more profitable footprint (referred to in this Declaration as the "Right Sizing Plan"), and (v) negotiating with its stakeholders around potential in- and out-of-court restructuring options that would enable the Company to continue as an operating business.  The Company went to great lengths to pursue all such options, including by engaging with dozens of potential buyers and lenders.  And the Company's board of directors (the "Board") worked with the Company's advisors to continually evaluate the Company's liquidity position to ensure that the Company could continue to operate with sufficient runway to pursue a value maximizing transaction that would preserve operations and most importantly—jobs.

18.     As part of these efforts, Jefferies contacted 32 prospective buyers—including 20 prospective strategic buyers—about a potential combination transaction or asset sale.  The Company executed non-disclosure agreements (NDAs) with 16 of them, who were then provided access to a virtual data room to evaluate the investment opportunity.

19.     As part of a separate but simultaneous track, the Company, with the assistance of Jefferies, also reached out to the Company's existing stakeholders and third parties about a potential financing to support a restructuring that would enable the Company to continue as an operating business, such as the Right Sizing Plan, either outside of or in connection with a chapter 11 filing.  Representatives of the Company flew from California to New York in early February to meet in-person with representatives of an ad hoc group of holders of the 2026 Notes about such potential financing and restructuring solution, which was followed by a series of successive regular meetings to update the ad hoc group's advisors, the provision of extensive due diligence information to such ad hoc group, the exchange of transaction term sheets with such ad hoc group

and other regular engagement with such ad hoc group around a range of potential alternatives involving the Company.

20.     The Company also discussed at length with the ad hoc group of holders of the 2026 Notes a potential bridge financing intended to support the Company's liquidity position, but those discussions did not ultimately materialize in a transaction.

21.     The Company also met with other creditor constituencies, and Jefferies separately reached out to 24 potential third party lenders about a potential financing to support a going concern restructuring solution.

22.     Unfortunately, despite these exhaustive efforts, during the first quarter of 2024, the Company's liquidity position continued to rapidly deteriorate, and time was not on the Company's side.  By March 2024, a substantial and increasing number of the Company's vendors had tightened trade terms and shifted to cash-on-demand.  As the Company struggled to pay rent timely, several of its landlords sent "pay or quit" default notices.  By mid-March, the Company's liquidity became so constrained that the Company had no choice but to intensify its contingency planning efforts, as the prospects for effectuating a going concern solution (whether through a restructuring or a strategic transaction) appeared increasingly dim.  In connection therewith, the Company retained Hilco Merchant Resources, LLC to assist with store closing sales of their inventory and furniture, fixtures, and equipment (FF&E) (the "Store Closing Sales").  After exploring all alternatives, it was with great disappointment that on April 4, 2024, the Company announced it would be closing all of its 371 store locations in order to preserve liquidity and maximize value for all of its stakeholders.  During that week and over the course of the weekend that followed, the Company continued extensive negotiations with multiple potential providers of debtor-in-possession financing, resulting from the solicitation of debtor-in-possession financing

which commenced in March of 2024.  This competitive process resulted in two mature proposals, each of which was improved over the course of multiple rounds of arms' length and spirited negotiation.  As a result, the Debtors have obtained a proposed debtor-in-possession financing ("DIP Facility") of $35.5 million in new money loans contemplated to be provided by TC Lending, LLC (the "DIP Lender") (an entity affiliated with Sixth Street Specialty Lending, Inc., (formerly, TPG Specialty Lending, Inc.)).  Further information about the DIP Facility is set forth in the Finger Declaration[4] filed along with the DIP Motion (defined below).

23.    The Company intends to use these Chapter 11 Cases to continue to market all of its assets, which in addition to its inventory and FF&E, consist primarily of real estate, leasehold interests, and intellectual property, in an effort to maximize value for its stakeholders.  The Debtors believe the liquidity provided by the DIP Facility will enable the Debtors to complete the Store Closing Sales and other asset sales in a manner that maximizes recoveries for the Debtors' estates and stakeholders.

24.    To further familiarize the Court with the Debtors, their business, the circumstances leading to these cases, and the relief the Debtors are seeking in the First Day Motions, I have organized this Declaration into five sections.  The *first* section provides an overview of the Debtors' history and business.  The *second* section offers detailed information on the Debtors' prepetition capital structure.  The *third* section provides an overview of the circumstances leading to the commencement of the Chapter 11 Cases.  The *fourth* section discusses the objective of the Chapter 11 Cases.  Finally, the *fifth* section summarizes the relief requested in, and the legal and factual bases supporting, the First Day Motions.

---

[4]    *Declaration of Jeffery Finger in Support of the Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Them to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, (V) Granting Adequate Protection, and (VI) Granting Related Relief* (the "Finger Declaration").

I.      **Overview of Debtors' History and Business**

  A.  **The Debtors' History**

25.     The Company opened its first store in 1982 and expanded from there, opening hundreds of stores over the next several decades across several states in the Southwestern United States that focused on selling merchandise primarily at a price point of 99.99 cents or less.

  B.  **Retail Operations**

26.     As of the Petition Date, the Company has approximately 10,874 employees and operates 371 stores, located in California (265 stores), Texas (46 stores), Arizona (39 stores) and Nevada (21 stores).  The Company also has five distribution centers, with four located near Los Angeles, California and one located in Katy, Texas.  The following map depicts the footprint of the Company's retail and distribution-center locations:





27.     The Company offers a wide variety of merchandise at attractive prices, including national brands and other products available as everyday offerings and closeout "treasure hunts."

The Company differentiates itself from traditional dollar stores by offering a wider assortment of food and grocery items, including frozen, dairy, deli and a full fresh produce offering.

28.     The major product categories at the Company's stores consist of:

- Fresh merchandise, which includes fresh produce, dairy, bread, tortillas, deli, and frozen.

- Grocery merchandise, which includes beverages, candies, cookies, grocery-breakfast, grocery-canned, and other snacks.

- Consumables products, which includes baby products, food storage, health & beauty, household cleaning, pet supplies, picnic supplies, and soft lines.

- General merchandise and seasonal, which includes bath & bedding, electronics, hardware & audio, home décor, kitchenware, party supplies, plastics, seasonal, stationary, and toys & recreation.

29.     The Company's stores are on average approximately 20,000 square feet, which is larger than the typical dollar store chain, and allows the Company to provide a fun, exciting "treasure hunt" experience.

**C. Warehousing and Distribution**

30.     The Company's California-based warehousing and distribution facilities are located next to the Long Beach and Los Angeles port systems, the rail yards in the City of Commerce, and the major California interstate arteries.  This enables quick turnaround of time-sensitive products and provides warehousing capabilities for one-time closeout purchases and seasonal or holiday items.  The Company's distribution center in the Houston area has both dry and cold storage capacity, and services the Company's Texas operations.

31.     The Company's primary distribution practice is to have merchandise delivered from its vendors to its warehouses and then shipped to its store locations.  Select product categories are delivered directly to the Company's stores.

**D.  Wholesale Operation**

32.     The Company also sells merchandise through its Bargain Wholesale division to retailers, distributors, and exporters.  Wholesale operations accounted for approximately 1.8% of the Company's total sales in the first three quarters ended October 27, 2023.

**E.  Employees**

33.     As of the Petition Date, the Company employs approximately 10,874 employees, consisting of approximately 390 full-time salaried, 3,807 full-time hourly, and 6,677 part-time hourly employees (collectively, the "Employees").  The Employees are spread across (i) the Company's corporate headquarters, located in Tustin, California, (ii) the Company's five (5) distribution centers, and (iii) its retail stores.

**F.  Prepetition Corporate Structure**

34.     A chart showing the Company's organizational structure as of the Petition Date is attached hereto as **Exhibit A**.

35.     As reflected in that chart, Number Holdings owns (i) 100% of the equity interests in 99 Cents Only, the principal operating company within the Company's corporate enterprise, and (ii) 100% of the equity interests in non-debtor 99 Cents Only Foundation (the "Foundation"), a charitable foundation with no active business or operations. Number Holdings is a holding company with no active business or operations and has no holdings in any businesses or entities other than 99 Cents Only and the Foundation.

36.     99 Cents Only owns 100% of the equity interests in (i) 99 Cents Only Stores Texas, Inc., the principal operator of the Company's Texas operations, (ii) 99 Cents HoldCo LLC ("HoldCo"), a holding company with no active business or operations, and (iii) Bargain Wholesale LLC ("Bargain Wholesale"), a holding company with no active business or operations.

37.     HoldCo owns 100% of the equity interests in 99 Cents PropCo LLC ("PropCo"), a holding company with no active business or operations.  PropCo holds certain real estate assets, including those that serve as the collateral for the PropCo Promissory Note, as described in more detail below.

38.     Bargain Wholesale owns 100% of the equity interests in non-debtor BW Global Logistics (Hong Kong) Ltd., a Hong Kong company that supports the Company's importing and sourcing of goods to be sold in its stores.

## II.     The Debtors' Prepetition Capital Structure[5]

### A.  The Debtors' Debt Obligations

39.     The Debtors have incurred and/or issued debt through (i) a first lien asset based revolving credit facility, (ii) senior secured notes, and (iii) a secured promissory note.  A summary of these debt facilities is provided below:

| Funded Debt | Maturity | Interest Rates | Principal Amount Outstanding |
|---|---|---|---|
| **ABL Facility**<br>   Revolving Loans | May 8, 2025 | Term SOFR + adjustment + margin<br>or<br>Base Rate + margin | $38,200,000 |
| FILO Facility | May 8, 2025 | Term SOFR + adjustment + 8.50%<br>or<br>Base Rate + 7.50% | $25,000,000 |
| Letters of Credit | May 8, 2025 | Term SOFR + adjustment + margin<br>or<br>Base Rate + margin | $25,732,858 |
| | | *Total ABL Facility:* | *$88,932,858* |
| **2026 Notes** | January 15, 2026 | 7.500% | $350,000,000 |
| **PropCo Promissory Note** | May 6, 2024 | 10.00% | $18,000,000 |
| ***TOTAL*** | | | ***$456,932,858*** |

---

[5]     The following summary is qualified in its entirety by reference to the operative documents, agreements, schedules and exhibits.

(1)    <u>ABL Facility</u>

40.    99 Cents Only is the borrower under an asset-based revolving credit facility (the "<u>ABL Facility</u>") including a "first-in last-out" term loan facility (the "<u>FILO Facility</u>"), incurred pursuant to that certain Credit Agreement, dated as of January 13, 2012 (as amended, modified, supplemented or restated from time to time, the "<u>ABL Facility Credit Agreement</u>"), among the borrower, Number Holdings, Royal Bank of Canada, as administrative agent and issuer (the "<u>ABL Facility Agent</u>"), Sixth Street Specialty Lending, Inc., (formerly, TPG Specialty Lending, Inc.), as FILO agent, and the lenders from time to time party thereto (the "<u>ABL Lenders</u>").

41.    As of the Petition Date, approximately $38.2 million in borrowings were drawn under the ABL Facility and approximately $25 million were outstanding under the FILO Facility. The ABL Facility allowed for the issuance of letters of credit ("<u>Letters of Credit</u>") to support its obligations to landlords, sureties, and other counterparties.  There are approximately $25.7 million in undrawn letters of credit issued as of the Petition Date, reducing the amount available under the ABL Facility on a dollar-for-dollar basis.  Availability under the ABL Facility Credit Agreement is capped by a borrowing base, which is calculated based on certain percentages of the value of the Debtors' inventory and credit card receivables.  As of the Petition Date, the aggregate outstanding principal balance under the ABL Facility is approximately $63.2 million, plus approximately $25.7 million of undrawn letters of credit.

42.    All obligations under the ABL Facility are guaranteed by Number Holdings and 99 Cents Only Stores' direct and indirect 100% owned domestic subsidiaries (other than PropCo, HoldCo, Bargain Wholesale and the Foundation, and subject to other customary exclusions) (collectively, the "<u>Credit Facilities Guarantors</u>").  The ABL Facility is secured by substantially all of 99 Cents Only Stores' assets and the assets of the Credit Facility Guarantors, including a first

priority security interest in certain current assets, a second priority pledge of all of 99 Cents Only Stores' equity interests and the equity interests in the Credit Facilities Guarantors (other than Number Holdings), and a second priority security interest in certain other fixed assets.

43.     The maturity date for the ABL Facility, including the FILO Facility, is May 8, 2025.

(2)     2026 Notes

44.     On December 20, 2020, 99 Cents Only Stores issued $350 million in aggregate principal amount of notes (the "2026 Notes") pursuant to an indenture, dated as of December 22, 2020 (the "2026 Notes Indenture"), among 99 Cents Only Stores, the guarantors thereunder, and Wilmington Trust, National Association, as trustee.

45.     The 2026 Notes are fully and unconditionally guaranteed, jointly and severally, on a senior secured basis (the "Notes Guarantees") by Number Holdings' and 99 Cents Only Stores' direct and indirect 100% owned domestic subsidiaries (other than PropCo, HoldCo, Bargain Wholesale and the Foundation, and subject to other customary exclusions).  The 2026 Notes and the Notes Guarantees are secured (i) on a first-priority basis by the Notes Priority Collateral (as defined in the 2026 Notes Indenture, comprising equity, fixed assets, investment property, and intercompany indebtedness, except to the extent such indebtedness constitutes ABL Priority Collateral (described below)) and identifiable proceeds of Notes Priority Collateral, and (ii) on a second-priority basis by the ABL Priority Collateral (as defined in the 2026 Notes Indenture, primarily comprising current assets (i.e., including, without limitation, accounts, cash, cash equivalents, deposit/securities accounts, and inventory) and identifiable proceeds of ABL Priority Collateral, in each case subject to certain exceptions.

(4)    PropCo Promissory Note

46.    On August 3, 2023, PropCo entered into a Secured Promissory Note (the "PropCo Promissory Note") in favor of RCB Equities #1, LLC ("RCB"), pursuant to which RCB provided a loan (the "PropCo Loan") to PropCo in the principal amount of $21.0 million.

47.    The PropCo Promissory Note was funded on August 4, 2023 (the "Funding Date"). The PropCo Promissory Note initially bore interest at the rate of 9.0% per annum, payable in arrears in monthly installments of interest beginning on September 1, 2023.  The outstanding principal balance on the PropCo Promissory Note was initially due and payable on the date that is three months after the Funding Date, which date was extended by three months upon payment by PropCo to RCB prior to such maturity date of an extension fee in the amount of 2% of the then-outstanding principal balance of the PropCo Promissory Note.  On February 5, 2024, PropCo and RCB entered into a Loan Modification and Extension Agreement with respect to the PropCo Loan under which (i) PropCo agreed to make a principal payment of $3.0 million to RCB, leaving a remaining principal balance of $18.0 million, (ii) PropCo agreed to pay an extension fee to RCB in the amount of 3% of the remaining principal balance, (iii) PropCo agreed to pay interest on the remaining principal balance in the amount of 10.0% per annum starting February 5, 2024, and (iv) the maturity date of the PropCo Promissory Note was extended to May 6, 2024.

48.    The obligations of PropCo under the PropCo Promissory Note are secured by deeds of trust over twelve parcels of real property owned by PropCo.

**B.  The Debtors' Common and Preferred Stock**

49.    As of the Petition Date, Number Holdings has two classes of common stock and six classes of preferred stock outstanding.  A summary of this common and preferred stock is provided below:

| Type/Class of Stock | Liquidation Preference | Quarterly Dividend Entitlement | Amount Outstanding |
|---|---|---|---|
| **Common Stock** <br> Class A Common Stock | N/A | N/A | 11,542,288,492 |
| Class B Common Stock | N/A | N/A | 11,542,288,492 |
| **Preferred Stock** <br> Series AA-1 Preferred Stock | $202,479,827 | Cash rate: 9.61% per annum and <br> Cash/PIK rate: 2.51% per annum | 187,312 |
| Series AA-2 Preferred Stock | $22,798,099 | Cash rate: 9.00% per annum and <br> Cash/PIK rate: 3.15% per annum | 20,680 |
| Series A Preferred Stock | $59,555,789 | Cash/PIK rate: 12.5% per annum | 1,020,000,000 |
| Series B Preferred Stock | $50,472,692 | Cash rate: 10% per annum or <br> Cash/PIK rate: 12.5% per annum | 2,155,326,141 |
| Series Z Preferred Stock | $18,598,772 | Cash/PIK rate: 12.5% per annum | 12,688 |
| Series Y Capital Stock | N/A | N/A | 24,187 |

(1)     Common Stock

50.     Number Holdings has 11,542,288,492 shares of Class A Common Stock and 11,542,288,492 shares of Class B Common Stock outstanding.  The Class A Common Stock and the Class B Common Stock are junior to all other existing and future preferred stock of Number Holdings.

(2)     Preferred Stock

51.     Number Holdings has 187,312 shares of Series AA-1 Preferred Stock outstanding with a liquidation preference of approximately $202.5 million.  The Series AA-1 Preferred Stock is pari passu with the Series AA-2 Preferred stock and Series Z Preferred Stock and senior to all other existing and future common and preferred stock of Number Holdings.

52.     Number Holdings has 20,680 shares of Series AA-2 Preferred Stock outstanding with a liquidation preference of approximately $22.8 million.  The Series AA-2 Preferred Stock is

pari passu with the Series AA-1 Preferred Stock and Series Z Preferred Stock and senior to all existing and future common and preferred stock of Number Holdings.

53.     Number Holdings has 1,020,000,000 shares of Series A Preferred Stock outstanding with a liquidation preference of approximately $59.6 million.  The Series A Preferred Stock is senior to the Series B Preferred Stock, the Class A Common Stock, the Class B Common Stock, and all other existing and future common stock of Number Holdings.

54.     Number Holdings has 2,155,326,141 shares of Series B Preferred Stock outstanding with a liquidation preference of approximately $50.5 million.  The Series B Preferred Stock is senior to the Class A Common Stock, the Class B Common Stock, and all other existing and future common stock of Number Holdings.

55.     Number Holdings has 12,688 shares of Series Z Preferred Stock outstanding with a liquidation preference of approximately $18.6 million.  The Series Z Preferred Stock is pari passu with the Series AA-1 Preferred Stock and Series AA-2 Preferred Stock and senior to all other existing and future common and preferred stock of Number Holdings.

56.     Number Holdings has 24,187 shares of Series Y Capital Stock outstanding.  The Series Y Capital Stock is senior to the Class A Common Stock, Class B Common Stock, and all other existing and future common stock of Number Holdings.

**III.     <u>Events Leading to the Chapter 11 Cases</u>**

57.     As noted above, the last several years have presented significant and lasting challenges in the retail environment, including reduced foot-traffic, shifting consumer demand, rising levels of shrink, persistent inflationary pressures, and other macroeconomic headwinds. These challenges were compounded by, among other things, the COVID-19 pandemic and related restrictions, record level inflation, and subsequent increases in costs and wages that the Company has had difficulty passing on to its customers through price increases.  In recent years, the

Company did everything it could to try to overcome these challenges, including by engaging in multiple out-of-court restructuring and recapitalization transactions and implementing new and innovative business strategies.  Ultimately, however, these efforts simply could not be implemented with the speed and turnaround success that was necessary to overcome the hurdles the Company faced—i.e., to allow the Company to generate sufficient cash to overcome its year over year losses and sustain ongoing business operations.  The Company went to great lengths to try to maximize value for its stakeholders by exploring all options, including by hiring an investment banker to market the Company's assets, solicit proposals for financing, exploring alternatives assuming a reduction of the Company's footprint, pursuing in- and out-of-court restructuring options, and engaging with dozens of potential buyers and lenders.  In the end, however, the Company concluded that commencing Store Closing Sales for all of its stores and filing these Chapter 11 Cases was the best way to maximize value for its stakeholders.

### A.  Impact of Adverse Industry Trends and Competition

58.     The discount retail industry is highly competitive.  In recent years, the Company has faced increased competition across multiple market segments, including from local, regional and national supermarket retailers, convenience stores, retail drug chains, national general merchandisers and discount retailers, membership clubs, warehouse stores, big box retailers, "click and collect," and on-line retailers.  Some of the Company's competitors have expanded and remodeled aggressively in recent years and the Company has been disadvantaged by limited financial flexibility and inability to devote greater resources to pursue new store growth.  Additionally, some of the Company's competitors have greater resources and purchasing power than the Company, making it increasingly difficult for the Company to compete while maintaining solid profit margins.

**B. Combatting Adverse Industry Trends by Implementing New Strategies and Successfully Completing a Restructuring Transaction in July of 2019**

59.     In an attempt to combat these adverse industry trends, in 2017 and 2018, the Company undertook a number of strategic initiatives, including completing a restructuring transaction in December of 2017 to facilitate the ongoing rollout of a "refresh" program in many of its stores.  This restructuring transaction involved, among other things, the Company's equity sponsors exchanging Company high yield notes they held for new Company preferred equity with a dividend payable in-kind, a result of which these equity sponsors took a step-down in priority and spared the Company the expense of a dividend payable in cash.  This restructuring transaction involved, among other things, an exchange of debt for equity by the Company's equity sponsors to induce other debt holders to participate in the restructuring.  This refresh program involved, among other things, (i) upgrading store facilities' interior and exterior and improving cleanliness, (ii) broadening the Company's merchandise assortment, in-stock and fresh grocery offerings, including added refrigeration equipment and fixtures, (iii) elevating customer service, (iv) implementing targeted marketing campaigns to attract and retain new customers, and (v) lowering shelf heights from 78 inches to 54 inches to create a more open and pleasant shopping experience. By the end of the fiscal year 2018,[6] the Company had completed 71 store refreshes across three markets – San Diego, Phoenix and Las Vegas.  While it required significant capital expenditures to "refresh" each store, the refreshes generally resulted in significant increases in both customer satisfaction and profitability.

60.     Notwithstanding these efforts and the initial success of the refresh program, the increasingly competitive landscape of the discount retail industry continued to take its toll.  The

---

[6]     The Company's fiscal year is from the beginning of March through the end of January.

Company struggled to turn a profit and suffered operating losses of approximately $22.5 million in 2017 and $7 million in 2018.

61.     With reduced cash on hand, in the first half of 2019, the Company made a strategic decision to cut down on capital expenditures by delaying the pace of store refreshes as well as new store openings.  The Company continued to focus on cost containment while simultaneously implementing other strategic initiatives dedicated to merchandising improvements, supply chain efficiency, and operational effectiveness.

62.     With continuing operating losses and decreased liquidity to support its operations, the Company faced the prospect of defaulting on certain of its outstanding loan obligations.  After months of hard-fought negotiations, the Company completed an out-of-court restructuring in July of 2019.  The restructuring transactions, among other things, included an exchange of certain loans for common and preferred shares and an equity rights offering backstopped by one of the Company's equity sponsors, which significantly reduced the Company's debt load and its corresponding interest expense.

**C.  Impact of the COVID-19 Pandemic**

63.     With a significant reduction in its funded debt obligations and its business operations trending towards profitability, the Company was positioned for success at the start of 2020.  But less than two months into the year, in March of 2020, the World Health Organization announced that infections of COVID-19 had become a pandemic, and the U.S. government declared a national emergency, as did a number of U.S. state governments.  Although the Company's stores were allowed to remain open as a designated essential retailer, the Company experienced significant disruptions to its business as a result of COVID-19 related restrictions, most notably in California, where the Company has a high geographic concentration.  Restrictions such as "shelter in place" orders, border closures, mandated social distancing, regulatory required

metering of customers at store entrances, and reduction in store hours led to lower customer traffic, consolidation of customer shopping trips, and reduced sales. COVID-19 related restrictions also reduced the number of available closeouts, which impacted the Company's product assortment. While the Company prioritized the health and safety of its customers – including by, among other things, enhancing cleaning protocols, modifying store operating hours, designating elderly shopping hours, social distancing, providing personal protective equipment and hand sanitizer to employees, implementing employee temperature checks, and installing plexiglass barriers at registers – all of this came at a cost. By the end of 2020, the Company had incurred COVID-19 related expenses of approximately $15.2 million primarily associated with additional payroll-related expenses, incremental cleaning and safety costs at its facilities and stores, and costs for protective equipment and supplies. On top of this, with the slowdown in construction, the implementation of remote work, and the closure of small businesses in the Company's shopping centers, the Company began to lose a significant number of its "grab-and-go" customers who regularly purchased a small number of items, such as energy drinks, produce and snacks, on their way to and from home and work or while patronizing small businesses near the Company's stores. These "grab-and-go" customers in large part did not return even after many of the COVID-19 restrictions were later lifted.

**D. Restructuring Transactions in December of 2020**

64.    Towards the end of 2020, with its financial performance improving and interest rates still at historic lows, the Company had an opportunity to receive an injection of new capital to support operations, further reduce its debt load, and extend runway on its debt at favorable interest rates. To that end, on December 22, 2020, 99 Cents Only and Number Holdings completed a series of restructuring transactions that involved, among other things, (i) the issuance of the 2026 Notes in aggregate principal amount of amount of $350 million, and (ii) an equity investment from

third-party investors and the Company's equity sponsors of $200 million through the issuance of common and preferred stock.  Proceeds from these transactions were used to, among other things, (i) pay down the full $468.4 million outstanding under a term loan facility due in 2022, (ii) fund the redemption in full of $11.8 million outstanding under certain notes due in 2022, and (iii) prepay $7.5 million of the outstanding borrowings under the FILO Facility.

**E.  Record Inflation, Increased Cost Pressures, and Continued Inventory Shrinkage in 2021 through 2023**

65.     With a new equity injection, a further reduced debt load and its business operations trending towards profitability, the Company was once again positioned for success at the start of 2021.  But just as some of the negative impacts of the pandemic began to subside, inflation began to rise at historic rates, leading to significant increases in the Company's cost of doing business, including the cost of merchandise, distribution, transportation, and employee wages.  On top of this, the Company's stores also began to suffer from significant increases in inventory shrinkage in 2022 and to an even greater extent in 2023, primarily due to elevated rates of theft.

66.     Although the Company reluctantly had no choice but to pass on these significant increases in operating costs to its customers by raising prices, the decision to raise prices has continually been met with customer resistance.  This resistance was exacerbated as the percentage of merchandise priced at 99.99 cents or less at its stores – the vast majority of which are named "99¢ Only Stores"—decreased from nearly 65% in 2020 down to approximately 57% in 2021, 52% in 2022, and below 50% in 2023.  The Company made efforts to rebrand in recent years, including by renaming several dozen of its "refreshed" stores as "The 99 Store."  The Company also launched "The 99 Store" mobile app to, among other things, provide customers with more personalized offers that increase savings.  These efforts, however, have been largely unsuccessful

in overcoming customer resistance to price increases across the entirety of the Company's several hundred stores.

67.     In early 2023, the Company initiated the Transformation Plan intended to drive growth and improve capital-efficiency and profitability, including by, among other things, streamlining the Company's real-estate footprint, reorganizing the Company's corporate structure, implementing a targeted reduction of the Company's workforce, improving pricing and assortment offerings, and enhancing the in-store customer experience by "screaming extreme value."  In furtherance of this Transformation Plan, on February 26, 2023, Number Holdings, on behalf of itself, 99 Cents Only, and A&M CRG entered into an engagement letter providing for, among other things, the engagement of A&M CRG to support the implementation of the Transformation Plan.

68.     In connection with the Transformation Plan, the Company reduced its workforce by approximately 15% at the Company's headquarters.  At the same time, and also in connection with the Transformation Plan, the Company began a push to further develop relationships with, and purchase products from, national brands, with an emphasis on purchasing inventory at closeout prices.  These efforts allowed the Company to further enhance its strategic initiatives to improve in-store customer experience, including its initiative to roll out weekly "Deal Drops," which involved the Company's stores "screaming extreme value" to customers by prominently displaying signage for national brand merchandise at low prices.  An example of one such "Deal Drop" with front-of-store placement can be seen in the below image:



69.     While the Transformation Plan and other strategic initiatives showed promise, and certain of the Company's stores showed increased profitability, the Company was ultimately unable to reverse the macro-economic and other business challenges that were eating into its overall bottom line.

70.     Exacerbating the situation was the fact that on February 11, 2023, the Company's distribution center in Katy, Texas experienced an ammonia release while the landlord's third-party contractor was performing services related to the facility's ammonia refrigeration.  Although the release did not result in any personal injury, it did cause property damage, loss of product, and the temporary closure of the facility.  The portions of the distribution center servicing chilled products, dry (ambient) products, and frozen products did not resume normal business operations until late May 2023, September 2023, and October 2023, respectively.  The Company recorded total charges

of approximately $18.3 million in the first three quarters ended October 27, 2023, in connection

with the ammonia release and resulting temporary shutdown of the facility, primarily attributable

to third-party remediation costs, inventory transportation costs, and inventory damage.

71.    The Company suffered operating losses of approximately $60.6 million in 2021,

$30.8 million in 2022 (not including a goodwill and trade name impairment of $121 million), and

$59.9 million in the first three quarters ended October 27, 2023 (not including a gain on disposal

of property and equipment of approximately $167.8 million).[7]

### F. Exploration of Strategic Alternatives

72.    With operating losses continuing to mount, in September of 2023, the Company

retained Jefferies to provide advice and assistance with respect to a potential restructuring

transaction.  But following further operating losses, by late 2023/early 2024, it became clear that

in a matter of months the Company could run out of cash to pay interest on its more than $450

million in outstanding debt obligations and otherwise timely pay vendors and landlords to maintain

its business operations.  The Company went to great lengths to evaluate and pursue all reasonably

available strategic alternatives.  Among other things, Jefferies began advising and assisting the

Company with respect to the exploration of strategic alternatives, including a potential sale of all

or part of its assets either outside of or in connection with a chapter 11 filing.

---

[7]    Notably, other discount retailers have likewise continued to struggle in the face of the same macro-economic challenges as the Company.  Just recently, on March 13, 2024, Dollar Tree, a publicly traded discount retailer and direct competitor of the Company, announced that it would close nearly 1,000 stores.  *See* Will Feuer, *Owner of Family Dollar to Close 1,000 Stores*, WALL ST. J. (Mar. 13, 2024), https://www.wsj.com/business/retail/dollar-tree-books-more-than-2-billion-in-charges-plans-to-close-about-600-stores-in-first-half-47ae9b94.  Two days later, it was reported that after recent earnings calls, the share prices of Dollar Tree and Dollar General, another publicly traded discount retailer and direct competitor of the Company, had dropped by 14% and 5.1%, respectively.  *See* Jinjoo Lee, *Dollar Stores Get Devalued as Low-Income Consumers Struggle*, WALL ST. J. (Mar. 13, 2024), https://www.wsj.com/business/retail/dollar-stores-get-devalued-as-low-income-consumers-struggle-be6d3aa7.  Similar to the Company, these companies reported experiencing a rough economic environment due to inflation and increased theft, among other factors.  *See Id.*

73.     In February and March of 2024, Jefferies initiated a preliminary marketing process contacting 32 prospective buyers, including 20 prospective strategic buyers and 12 private equity companies.  The Company executed non-disclosure agreements (NDAs) with 16 of them, who were then provided access to a virtual data room to evaluate the purchase opportunity.  Though the Company received four indications of interest, given the Company's liquidity constraints, as well as because certain of these were not actionable due to the inability to achieve key stakeholder consents, there was insufficient time for the Company to implement a strategy to fully explore the possibilities outside of a chapter 11 process.  The Company believes that a sale process conducted through chapter 11 will enable a further pursuit of a value maximizing result for the benefit of all of its stakeholders.

**G.  Decision to Wind-Down All Operations**

74.     At the same time that the Company was exploring a potential sale of all or a portion of the Company's assets, it was also considering whether to, outside of and/or in connection with a chapter 11 filing, raise financing to support a going concern restructuring, including a potential wind-down of a significant number of its less profitable stores while continuing to operate its more profitable stores (the "Right Sizing Plan").

75.     In furtherance of this potential path, the Company, with the assistance of Jefferies, reached out to an ad hoc group of holders of the 2026 Notes.  Representatives of the Company flew from California to New York in early February to meet in-person with representatives of this ad hoc group about a potential financing and a going concern restructuring solution.  The meeting lasted hours and involved a break-out session to facilitate the advancement of dialogue, and was followed by a series of successive regular meetings to update the ad hoc group's advisors, the provision of extensive due diligence information to such ad hoc group, the exchange of transaction term sheets with such ad hoc group and other regular engagement with such ad hoc group around

a range of potential alternatives involving the Company.  Unfortunately, neither these efforts nor separate discussions with the Company's other creditor constituencies culminated in a transaction.

76.     Around the same time that these discussions were occurring, Jefferies separately solicited proposals for a potential financing to support the Right Sizing Plan or another going concern restructuring solution from 24 potential third party lenders.  The Company signed NDAs with 9 of them, and the Company received an indication of interest from one of them.  However, as the month of March progressed, the Company eventually determined that the Right Sizing Plan and other going concern restructuring solutions were not feasible without a significant amount of additional capital that was simply not supported by the Company's capital structure.

77.     With this strategy off the table, and securing an executable proposal with a strategic buyer on a going concern basis still not available, the Company made the difficult determination that initiating a wind-down of the business in order to immediately preserve liquidity and pursuing Company-wide store closings was the only viable path to maximizing value for its stakeholders.

78.     On March 29, 2024, the Company retained Hilco Merchandise Resources, LLC ("Hilco Merchandise") and Hilco Real Estate, LLC ("Hilco Real Estate") to advise the Company with respect to a potential Company-wide wind-down.  On April 4, 2024, the Company announced that it would commence an orderly wind-down of its business, and on April 5, 2024, the Company announced the commencement of the store closing sales at all of its 371 stores.

79.     Within days of the announcement of the store closing sales, the mounting pressure from vendors, landlords, and service providers refusing to provide service, threatening to commence litigation, and seeking to terminate leases forced the Debtors to commence these cases to continue their efforts to sell their assets in the most value maximizing way with the breathing space offered by chapter 11.

**IV.**   **Commencement of the Chapter 11 Cases and Their Objectives**

80.    In connection with the decision to wind-down the Company's operations, on April 7, 2024, the Board voted to commence a voluntary case for relief under chapter 11 of the Bankruptcy Code for each Debtor.  The key purpose of these Chapter 11 Cases, for which the relief sought in First Day Motions is vital, is to wind-down the Debtors' operations to pursue a sale process in as quick and efficient a manner as possible to obtain the greatest value available to distribute to the Debtors' creditors.

**A.  Proposed DIP Financing**

81.    To support the Debtors efforts in chapter 11, the Company has secured a DIP Facility in the total amount of $60.8 million, of which $35.5 is new money from the DIP Lender. The immediate access to additional liquidity will ensure that the Debtors are able to continue to operate during these Chapter 11 Cases and maximize the value of their estates for the benefit of all parties in interest.

82.    As set forth in greater detail in the DIP Motion (defined below) and the DIP Declaration, the Debtors, with the assistance of their advisors, undertook a comprehensive marketing process to solicit proposals for debtor-in-possession financing.  This included reaching out to over 20 potential third party lenders that the Debtors had reached out to in connection with prior solicitations for financing, as well as the Debtors' existing lenders.

83.    After round-the-clock, hard-fought negotiations, with multiple bidders in a process characterized by a vigorous competitive dynamic, the Debtors reached an agreement with the DIP Lender to provide the DIP Facility.

### B.  Going Out of Business Sales

84.    As previously noted, the Debtors, in consultation with their advisors, determined that it was in the best interest of the Debtors to close and wind down all 371 of their stores.  By the Store Closing Motion filed contemporaneously herewith, the Debtors seek authority to continue to conduct going out of business sales (the "Store Closing Sales") of certain inventory and FF&E at all 371 stores, as well as implement the Store Closing Procedures (as defined in the Store Closing Motion and further discussed in Section V below).  The Debtors expect all Store Closing Sales to be completed and the stores and its 5 distribution centers vacated by May 31, 2024.  Hilco Merchandise has already started facilitating this process, and the Debtors are seeking authority from the Court to retain them so they can continue doing so until they complete the process.

### C.  Asset Sale Process

85.    In addition to seeking authority to conduct the Store Closing Sales and close their stores and distribution centers, the Debtors intend to seek authority to sell all or substantially all of their other assets, which consist primarily of real estate, leasehold interests, and intellectual property, pursuant to a bidding procedures and sale motion (the "Bidding Procedures and Sale Motion").  The Bidding Procedures and Sale Motion will contemplate an open, competitive bidding process for all or any portion of the Debtors' assets on a timeline consistent with the Debtors' Store Closings.  The Debtors also intend to seek authority from the Court to retain Jefferies to continue their existing efforts to market all or material portions of the Debtors' assets, including by marketing to the 32 strategic and private equity prospective buyers that Jefferies had contacted prepetition, as well as additional third parties.  The Debtors are also intend to seek authority from the Court to retain Hilco Real Estate to market the Debtors' individual real estate

and leasehold interests, which is necessary to enable the Debtors to sell any such assets that are

not sold as part of a larger transaction facilitated by Jefferies.

## V.    <u>First Day Motions</u>

86.    Concurrently with its chapter 11 petitions, the Debtors are filing the following First

Day Motions:

   a.   Debtors' Motion for Entry of an Order (I) Directing Joint Administration of Chapter 11 Cases and (II) Granting Related Relief (the "<u>Joint Administration Motion</u>");

   b.   Debtors' Motion for Entry of an Order (I) Authorizing Them to Redact Certain Personal Identification Information and (II) Granting Related Relief (the "<u>Redaction Motion</u>")

   c.   Debtors' Application for an Order Appointing Kroll Restructuring Administration LLC as Their Claims and Noticing Agent (the "<u>Section 156(c) Application</u>");

   d.   Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Them to (A) Continue to Operate Their Cash Management System and Maintain Existing Bank Accounts, (B) Pay Related Fees and Credit Cards, (C) Utilize Existing Business Forms, and (D) Engage in Intercompany Transaction, (II) Granting Administrative Priority Status to Intercompany Claims and (III) Granting Related Relief (the "<u>Cash Management Motion</u>");

   e.   Debtors' Motion for Entry of Interim and Final Orders (I) Establishing Notice and Hearing Procedures for Trading in Equity Securities and (II) Setting Record Dates for Notice and Potential Sell-Down Procedures with Respect to Trading in Claims (the "<u>NOL Motion</u>")

   f.   Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Them to (A) Continue Certain Compensation and Benefits Programs and (B) Satisfy Related Prepetition Obligations, and (II) Granting Certain Related Relief (the "<u>Wages Motion</u>").

   g.   Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing them to (A) Maintain Insurance Policies and Surety Bonds and Honor Obligations Thereunder, and (B) Renew, Amend, Supplement, Extend, or Purchase New Insurance Policies and Surety Bonds, and (III) Granting Related Relief (the "<u>Insurance Motion</u>");

h.  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of Certain Taxes and Fees and (II) Granting Related Relief (the "<u>Taxes Motion</u>");

i.  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Payment of PACA/PASA Claims, Critical Vendors, Lien Claims and Foreign Claimants and (II) Granting Related Relief (the "<u>Trade Claims Motion</u>");

j.  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Them to Maintain Certain Customer Programs for a Limited Period of Time and to Honor Related Prepetition Obligations and (II) Granting Related Relief (the "<u>Customer Programs Motion</u>");

k.  Debtors' Motion for Entry of Interim and Final Orders (I) Prohibiting Utility Companies from Altering, Refusing, or Discontinuing Services; (II) Approving Proposed Adequate Assurance of Payment for Utility Services; (III) Approving Proposed Procedures for Resolving Additional Assurance Requests; and (IV) Granting Related Relief (the "<u>Utilities Motion</u>");

l.  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing the Debtors to Assume Consulting Agreement; (II) Authorizing Store Closing Sales and Approving Related Procedures; (III) Authorizing Customary Bonuses; and (IV) Granting Certain Related Relief (the "<u>Store Closing Motion</u>");

m.  Debtors' Motion for Entry of an Order (I) Authorizing and Approving Procedures For Rejection, Assumption, and Assignment of Executory Contracts and Unexpired Leases, (II) Authorizing Abandonment of Certain Personal Property, and (III) Granting Related Relief (the "<u>Contract Rejection and Assumption Procedures Motion</u>");

n.  Debtors' First Omnibus Motion for an Order (I) Authorizing Them to (A) Reject Certain Unexpired Leases and Executory Contracts Effective as of April 8, 2024 and (B) Abandon Certain Property, and (II) Granting Related Relief (the "<u>Omnibus Lease Rejection Motion</u>"); and

o.  Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Them to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, (V) Granting Adequate Protection, and (VI) Granting Related Relief (the "<u>DIP Motion</u>").

87.  As noted above, the relief sought in the various First Day Motions would allow the Debtors to facilitate the efficient administration of these Chapter 11 Cases.

88.  I have reviewed each of the First Day Motions or had their contents explained to me, and I believe the Debtors would suffer immediate and irreparable harm absent the granting of

the relief sought in the First Day Motions.  In my opinion, approval of the relief sought in the First Day Motions will be critical to maximizing the value of the Debtors' estates and would best serve the Debtors' estates and creditors' interests.

89.     Several of the First Day Motions request authority to pay certain prepetition claims. I am told by the Debtors' advisors that rule 6003 of the Federal Rules of Bankruptcy Procedure provides, in relevant part, that the Court shall not consider motions to pay prepetition claims during the first 21 days following the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and irreparable harm."  In light of this requirement, the Debtors have limited their request for immediate authority to pay prepetition claims to those circumstances where the failure to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.

90.     Below is a brief discussion of the Debtors' First Day Motions and an explanation of why, in my belief, such motions are critical to the successful prosecution of these Chapter 11 Cases.  More fulsome descriptions of the facts regarding the Debtors' operations, and the bases for the relief requested in the First Day Motions, can be found in each relevant First Day Motion.

**A.  Joint Administration Motion**

91.     Pursuant to the Joint Administration Motion, the Debtors seek entry of an order directing the joint administration of their chapter 11 cases for procedural purposes only and granting certain related relief.  Given the integrated nature of the Debtors' operations, I believe that the joint administration of these cases will provide significant administrative convenience and cost savings to the Debtors without harming the substantive rights of any party in interest.  Joint administration will also allow parties in interest to monitor these cases with greater ease and efficiency.

92.     Given that many of the motions, hearings, and orders in these cases will affect each

Debtor, the entry of an order directing joint administration of these cases should reduce costs by

avoiding duplicative filings and objections that would be required absent such relief, as well as

ease the administrative burdens on the Court by allowing the Debtors' cases to be administered as

a single joint proceeding instead of seven independent chapter 11 cases.    Further, joint

administration of these cases will allow the parties in interest to monitor these cases with greater

ease and efficiency.    Accordingly, on behalf of the Debtors, I respectfully submit that the Joint

Administration Motion should be approved.

**B.  Redaction Motion**

93.     Pursuant to the Redaction Motion, the Debtors seek entry of an order authorizing

them to seal and redact certain personal information from the pleadings and other documents to be

filed in these cases and granting certain related relief.  I believe it is appropriate to authorize the

Debtors to redact certain personal information from any paper filed or to be filed with the Court in

these chapter 11 cases, including the Creditor Matrix, because such information can be used, among

other things, to perpetrate identity theft or locate survivors of domestic violence, harassment, or

stalking.  I understand that the risk is not merely speculative.  In at least one chapter 11 case, the

abusive partner of a debtor's employee exploited the publicly accessible information in a document

filed in the case to track the employee to her new, non-public address, forcing her to move again for

her safety.[8]

94.     I understand the Debtors will provide an unredacted version of the Creditor Matrix

and any other filing redacted pursuant to the proposed order to the Court, the U.S. Trustee, counsel

---

[8]    The incident is described in further detail in the "creditor matrix motion" filed in *In re Charming Charlie Holdings Inc.*, No. 19-11534 (MFW) (Bankr. D. Del. July 11, 2019), Docket No. 4.

to the official committee of unsecured creditors appointed in these chapter 11 cases (if any), and any party in interest upon a request to the Debtors or to the Court that is reasonably related to these chapter 11 cases.  I also understand the Debtors will distribute to their current employees any notices received at the Debtors' corporate headquarters that are intended for such employee.  Accordingly, on behalf of the Debtors, I respectfully submit that the Redaction Motion should be approved.

### C.  Section 156(c) Application

95.    Pursuant to the Section 156(c) Application, the Debtors request entry of a retention order appointing Kroll Restructuring Administration LLC ("Kroll") as the Claims and Noticing Agent for the Debtors and their chapter 11 cases, including assuming full responsibility for the distribution of notices and the maintenance, processing, and docketing of proofs of claim filed in the Debtors' Chapter 11 Cases.  The Debtors' selection of Kroll to act as the Claims and Noticing Agent has satisfied the Court's *Protocol for the Employment of Claims and Noticing Agents under 28 U.S.C. § 156(c)*, in that the Debtors have obtained and reviewed engagement proposals from at least two other court-approved claims and noticing agents to ensure selection through a competitive process.  Moreover, I believe, based on all engagement proposals obtained and reviewed, that Kroll's rates are competitive and reasonable given Kroll's quality of services and expertise.  The terms of Kroll's retention are set forth in an engagement agreement; *provided, however*, that the Debtors are seeking approval solely of the terms and provisions as set forth in the Section 156(c) Application and the proposed retention order.

96.    I believe that given Kroll's experience in noticing, claims administration, solicitation, balloting and facilitating other administrative aspects of chapter 11 cases and experience in matters of this size and complexity, the distribution of notices and the processing of claims will be expedited, and the Clerk will be relieved of the administrative burden of processing what may be an overwhelming number of claims.

97.     By separate application, the Debtors will seek authorization to retain and employ Kroll as administrative advisor in these chapter 11 cases pursuant to section 327(a) of the Bankruptcy Code because the administration of these chapter 11 cases will require Kroll to perform duties outside the scope of 28 U.S.C. § 156(c).

98.     Accordingly, on behalf of the Debtors, I respectfully submit that the Section 156(c) Application should be approved.

### D.  Cash Management Motion

99.     In the ordinary course of business, the Debtors utilize an integrated and centralized Cash Management System, consisting of depository, disbursement, payroll, and other accounts, allowing the Debtors to efficiently collect and concentrate cash receipts from their approximately 371 stores and their distribution center showroom and make necessary disbursements.  The Cash Management System is specifically tailored to the Debtors' operational needs and enables the Debtors to, among other things, accurately forecast and report their cash flow requirements and monitor the collection and disbursement of funds to and from the Bank Accounts.  The Cash Management System is essential to the efficient operation of the Debtors' business in the ordinary course and any disruption to the Cash Management System is likely to materially impair the Debtors' ability to continue operations of their stores and to maximize the value of their estates.

100.    As of the Petition Date, the Debtors maintain 10 primary Bank Accounts, each of which is maintained at Wells Fargo Bank, N.A., an authorized depository under the U.S. Trustee Guidelines.  Money circulates in, out, and between the Bank Accounts in a variety of manners, including checks, drafts, wire transfers, and ACH transfers.  Additional detail regarding the Cash Management System, including a summary diagram of the system, is provided in the Cash Management Motion.

101.    In the Cash Management Motion, the Debtors seek authorization to continue to operate their Cash Management System, as well as honor any prepetition obligations related thereto (including Bank Fees and Other Fees) in the ordinary course of business, maintain existing Business Forms, and continue to engage in Intercompany Transactions.  The Debtors also request that the Court grant administrative expense status to Intercompany Claims.

102.    I believe that the relief requested in the Cash Management Motion is necessary and appropriate in order to avoid significant interruptions to the operation of the Debtors' businesses. I believe that authorizing the Debtors to continue operating their Cash Management System, pay Bank Fees and Other Fees, maintain existing Business Forms, and continue engaging in Intercompany Transactions is essential to the Debtors' operational stability and the success of these cases.  In my opinion, this relief will facilitate the Debtors' operation in chapter 11 by, among other things, avoiding administrative inefficiencies and expenses associated with disrupting this system, by minimizing delays in the payment of postpetition obligations, thereby ensuring the efficient administration of these Chapter 11 Cases, and by maximizing the value of the Debtors' estates.  Accordingly, on behalf of the Debtors, I respectfully submit that the Cash Management Motion should be approved.

### E.  NOL Motion

103.    The Debtors estimate that, as of the close of their most recent tax year, they had approximately $244 million of consolidated NOL carryforwards and approximately $240 million of 163(j) Carryforwards for federal income tax purposes.  The Debtors further estimate that they may generate additional Tax Attributes in the current tax year, including during the pendency of these Chapter 11 Cases.  The Tax Attributes, which include net operating losses, 163(j) Carryforwards, and other tax attributes such as foreign tax credits, business tax credits, and capital

loss carryforwards, are potentially of significant value to the Debtors because they may offset future federal taxable income or federal tax liability in future years.

104.    Accordingly, pursuant to the NOL Motion, the Debtors seek entry of interim and final orders establishing certain procedures that would preserve the value of the Tax Attributes for the benefit of the Debtors' estates.  Specifically, the Debtors are seeking to establish procedures with respect to (i) trading of the equity securities of Number Holdings, Inc. or any beneficial interests therein (collectively, the NH Stock); (ii) restricting the ability of shareholders that are, or were, 50% Shareholders to claim a deduction for the worthlessness of their NH Stock for any tax year ending before the Debtors' emergence from chapter 11 protection; and (iii) trading in claims against the Debtors.

105.    I believe that implementation of the proposed procedures is necessary to avoid an irrevocable loss or reduction in the availability of the Tax Attributes and the irreparable harm which could be caused by unrestricted trading in the NH Stock or claims against the Debtors and the Debtors' resulting inability to offset taxable income with the Tax Attributes.  Accordingly, I believe that the relief requested is in the best interests of the Debtors' estates and creditors, and on behalf of the Debtors, I respectfully submit that the NOL Motion should be approved.

**F.  Wages Motion**

106.    As of the Petition Date, the Debtors employ approximately 10,864 individuals Employees, as well as, a number of Contract Workers.

107.    Pursuant to the Wages Motion, the Debtors seek entry of interim and final orders authorizing them to (i) maintain, and continue to honor their obligations under, Employee Compensation, Contract Worker Compensation, Director Compensation, Payroll Service Fees, Deductions, Payroll Taxes, the 401(k) Plan, Expense Reimbursements, Bonus Programs, and

Employee Benefits Programs (each as defined and described in detail in the Wages Motion) as they may be modified, amended, or supplemented from time to time, in the ordinary course of business, and (ii) pay related amounts incurred or accrued prepetition.

108.    The Debtors believe that, as of the Petition Date, (i) there are approximately $6,300,000 in accrued but unpaid Employee Wages, (ii) they owe approximately $4,000,000 on account of the Contract Worker Compensation, (iii) they owe approximately $2,100,000 of Withholding Obligations were accrued but unpaid, (iv) they owe approximately $350,000 in 401(k) Deductions and Contributions; (v) they owe approximately $100,000 in outstanding Expense Reimbursements, which will become due within 30 days following the Petition Date, (vi) a total of approximately $2,100,000 is outstanding on account of the Medical Plans, (vii) approximately $75,000 is outstanding on account of the Dental Plans, (viii) approximately $20,000 is outstanding on account of the Vision Plans, (ix) approximately $1,500 is outstanding on account of administrative fees for the HSA and FSA, (x) they owe $350 in account of administrative fees for the COBRA plans; (xi) they owe Unum Group approximately $84,000 in accrued but unpaid Employee premiums on account of the Supplemental Health Benefits, (xii) approximately $12,000 is outstanding on account of accrued and unpaid obligations related to the various employee assistance and advocacy programs, (xiii) there is approximately $96,000 in administrative fees related to Life and A&D Insurance; (xiv) there is approximately $10,000 in accrued but unremitted obligations related to the Disability Benefits, and (xv) there is approximately $36,000 in accrued and outstanding obligations on account of various Supplemental Assistance Programs, which will become due and owing within the first 30 days following the Petition Date.  In addition, the Debtors estimate that, as of the Petition Date, approximately $7,600,000 in accrued PTO is outstanding.  I understand that the Debtors are required under applicable law to pay the amount of

PTO accrued but unused by Employees upon their last day working.  The aggregate amount of prepetition obligations the Debtors are seeking to pay pursuant to the Wages Motion is $22,894,850.

109.    For the avoidance of doubt, the Debtors are not seeking to make any payments on account of prepetition Employee Wages to any individual Employee in excess of the statutory cap of $15,150.  Similarly, the Debtors are not seeking to make any payments on account of prepetition Contract Worker Compensation to any individual Contract Worker in excess of the statutory cap of $15,150.  Furthermore, the Debtors are not seeking authority to make any bonus payments to any insiders (as that term is defined in section 101(31) of the Bankruptcy Code).

110.    For the foregoing reasons, I believe that the relief requested in the Wages Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to continue to operate their businesses during these Chapter 11 Cases.  Accordingly, on behalf of the Debtors, I respectfully submit that the Wages Motion should be granted.

**G.  Insurance Motion**

111.    In the ordinary course of business, the Debtors maintain various Insurance Policies, which provide coverage for, among other things, (i) automobile liability, (ii) directors' and officers' liability, (iii) fiduciary liability, (iv) pollution liability, (v) general liability, (vi) excess liability, (vii) umbrella liability, (viii) marine and stock throughput liability, (ix) foreign liability, (x) property liability, (xi) terrorism liability, (xii) executive risk liability, (xiii) business travel liability, and (xiv) workers' compensation and employee injuries.  Further, the Debtors maintain (i) four Surety Bonds for the benefit of the State of California related to their worker's compensation obligations, (ii) a Surety Bond for the benefit of the U.S. Bureau of Customs &

Border Protection, and (iii) a Surety Bond for the benefit of the Southern California Edison Company.

112.    I believe the Insurance Policies and Surety bonds are essential to the preservation of the Debtors' business and property.  I further believe the Insurance Policies and Surety Bonds provide coverage that is typical in scope and amount for businesses that are similarly situated within the Debtors' industry and that the premiums for such Insurance Policies and Surety Bonds are reasonable.  I am also informed by counsel that, in some cases, the coverage and bonding may be required by law, regulation, or contract.

113.    The Debtors directly pay the premiums on certain of their Insurance Policies.  For the twelve (12) months preceding the Petition Date, the Debtors paid approximately $3,350,000 in Direct Insurance Premiums in the aggregate.  I am informed that the Debtors do not owe any amounts on account of Direct Insurance Premiums as of the Petition Date.  The Debtors finance their remaining Insurance Policies through two Premium Financing Agreements with First Insurance Funding.  The Premium Financing Instalments total approximately $412,431 per month, which includes interest on the outstanding unreimbursed premiums.  The Debtors estimate that approximately $1,735,000 will be payable under the remaining terms of the Premium Financing Agreements, approximately $412,431 of which will become due during the first 30 days of these Chapter 11 Cases.

114.    The Debtors employ Aon Risk Insurance Services West, Inc. and Edgewood Partners Insurance Center as Insurance Brokers to assist them in obtaining comprehensive insurance coverage by providing access to specific insurance markets and expertise in certain lines and types of coverage and aiding with the procurement and negotiation of the Insurance Policies on advantageous terms.  The Insurance Brokers are paid for their services through standard

commissions that are factored into the premium amounts under the Insurance Policies. The Debtors estimate that, as of the Petition Date, they do not owe any amounts to the Insurance Brokers on account of their respective Insurance Brokerage Fees.

115.    Insurance is essential for the Debtors' day-to-day operations: without sufficient coverage, the Debtors run the risk of, among other harms, incurring financial responsibility and legal liability beyond their ability to pay. Accordingly, the Debtors seek entry of interim and final orders authorizing them to (i) continue honoring obligations under their Insurance Policies and Surety Bonds, as well as renewing, supplementing, modifying, extending, reducing or purchasing new or additional insurance coverage in the ordinary course of business and (ii) pay prepetition obligations related to the foregoing. I believe that the relief requested in the Insurance Motion is necessary and appropriate and in the best interests of the Debtors and their estates. Accordingly, on behalf of the Debtors, I respectfully submit that the Insurance Motion should be approved.

**H. Taxes Motion**

116.    The Debtors seek entry of interim and final orders (i) authorizing, but not directing, them to satisfy, pay, or use credits to offset, the Taxes and Fees that arose prior to the Petition Date (whether due and owing before or after the Petition Date), including all Taxes subsequently determined by audit or otherwise to be owed for periods prior to the Petition Date and to satisfy, pay, or use credits to offset any postpetition amounts that become due to the Taxing Authorities in the ordinary course of business during these cases, and (ii) granting related relief.

117.    The Debtors collect, withhold, incur, pay, and/or use credits to offset a variety of Taxes and Fees, including, without limitation, sales and use taxes, income and franchise taxes, property taxes, regulatory and business licenses, taxes and fees and import charges. These Taxes

and Fees are assessed by and remitted to various taxing, licensing, and other regulatory Authorities (the "Taxing Authorities").

118.     As of the Petition Date, the Debtors estimate that they have accrued approximately $20,980,000 in unpaid Taxes and Fees, approximately $17,840,000 of which will become due and payable within the thirty (30) days following the Petition Date.

119.     The Debtors believe that any failure to pay the Taxes and Fees could materially disrupt the Debtors' business operations in several ways, including (but not limited to): (a) the Taxing Authorities may initiate Audits of the Debtors, which would unnecessarily divert the Debtors' attention from these Chapter 11 Cases; (b) the Taxing Authorities may attempt to suspend the Debtors' operations, file liens, seek to lift the automatic stay, and/or pursue other remedies that will harm their estates; and (c) in certain instances, the Debtors' directors and officers could be subject to claims of personal liability, which would likely distract those key individuals from their duties related to the Debtors' Chapter 11 Cases.  Additionally, Taxes and Fees not paid on the due date as required by law may result in fines and penalties, the accrual of interest, and/or give rise to priority claims under section 507(a)(8) of the Bankruptcy Code.  Finally, the Debtors also collect and hold certain outstanding tax liabilities in trust for the benefit of the applicable Authorities, and these funds may not constitute property of the Debtors' estates.  Risking any of these negative outcomes is unnecessary and could be extremely detrimental to the Debtors' efforts to maximize value for their estates.

120.     Accordingly, the Debtors seek authority to pay, in their reasonable discretion, the Taxes and Fees (and corresponding Assessments) in the ordinary course as they become due.

### I.  Trade Claims Motion

121.    The Debtors seek entry of interim and final orders: authorizing, but not directing, them to pay in the ordinary course of business, certain prepetition PACA/PASA Claims, Critical Vendors, Lien Claims and Foreign Claimants (collectively, the "Trade Claims"). The Debtors intend to pay only those Trade Claims that, as determined in their business judgment and discretion, are held by persons or entities (the "Trade Claimants") that are critical to maintaining the Debtors' retail operations and maximizing stakeholder value.  The essential Goods and Services provided by the Trade Claimants help facilitate the Debtors retail business, receipt of which will help ensure that the Debtors are able to continue to operate their retail locations as required during these Chapter 11 Cases.  The Debtors seek authority to pay the Trade Claims in the ordinary course of business, pursuant to the terms under which such claim arose in an amount not to exceed $17,380,000 on an interim basis and $22,380,000 on a final basis.

122.    PACA/PASA Claims. The Debtors believe that some of the fresh goods sold in their stores qualify as goods sold under the Perishable Agricultural Commodities Act of 1930 ("PACA").[9]  Under PACA, applicable suppliers ("PACA/PASA Claimants") are beneficiaries of a statutory trust in the applicable inventory, derivatives and proceeds therefrom.  Additionally, the Debtors believe the continuous delivery of the Goods supplied by the PACA/PASA Claimants is critical to the Debtors' ability to maximize revenue at their stores for the benefit of these estates.  Given these considerations, the Debtors believe it is in the best interests of the estates to continue to pay the PACA/PASA Claims and the Debtors seek authority to pay PACA/PASA Claims in the

---

[9]    The Debtors do not believe that any of the current vendors are Packers and Stockyards Act of 1921 claimants ("PASA Claimants"), however, out of abundance of caution, the Debtors have included references to PASA and PASA Claimants herein.

ordinary course of business, pursuant to the terms of any contracts under which such claim arose in an amount not to exceed $10,300,000 on an interim and final basis.

123.    <u>Critical Vendors</u>. The Debtors' business and path in Chapter 11 requires them to rely heavily on certain vendors and service providers (collectively, the "<u>Critical Vendors</u>") to continue the delivery of key inventory, and to ensure the safe and effective operation of the Debtors' retail stores.  Many of the Critical Vendors are the sole provider of certain Goods or Services or have specific requisite knowledge and experience with the Debtors' business or store locations.  Attempting to replace such Critical Vendors on short notice would prove catastrophic to the Debtors' value maximization efforts in these Chapter 11 Cases.  This is especially true with respect to certain vendors who are responsible for security, operations, and maintenance of the Debtors' 371 stores.  Accordingly, to maximize value for the Debtors' estates, it is essential that the Debtors maintain their business relationships with the Critical Vendors.

124.    The Debtors have determined that paying prepetition claims owing to the Critical Vendors (the "<u>Critical Vendor Claims</u>") is the most effective way to ensure that the Critical Vendors continue providing critical Goods and Services during these chapter 11 cases.  Without the ability to make such payments, the Debtors face the significant and very real possibility that the Critical Vendors will refuse to continue delivering Goods or providing Services that are essential to maximizing the value of the Debtors' estates.

125.    <u>Critical Vendor Selection</u>.  To identity which relationships are essential during these Chapter 11 Cases, the Debtors looked at a variety of factors, including:

- whether a vendor is a sole—or limited—source supplier of Goods or Services critical to the Debtors' business operations;

- whether alternative vendors are available that can provide similar Goods or Services on equal (or better) terms and, if so, whether the Debtors would be able to continue operating while transitioning thereto;

- the importance of such Goods to driving retail foot traffic and revenues;

- the degree to which replacement costs (including pricing, transition expenses, professional fees, and lost sales or future revenue) exceed the amount of a vendor's prepetition claim;

- whether an agreement exists which could compel a vendor to continue performing on prepetition terms;

- whether certain specifications or contract requirements prevent, directly or indirectly, the Debtors from obtaining Goods or Services from alternative sources;

- whether failure to pay all or part of a particular vendor's claim could cause the vendor to refuse to ship Goods or provide critical Services postpetition; and

- whether failure to pay a particular vendor could result in contraction of trade terms as a matter of applicable non-bankruptcy law or regulation.

126. Through this process, the Debtors identified those vendors they believe are essential to the Debtors' value maximization efforts. The Debtors believe that jeopardizing their relationships with any of the entities identified as Critical Vendors would impose a severe strain on the Debtors' business operations and would likely result in significant revenue loss. Even a temporary interruption of the provision of the Critical Vendors' Goods and Services would impede the Debtors' operations, and the cumulative impact of such interruptions could have a catastrophic adverse effect on the Debtors and the ability to maximize the value of the Debtors' estates during this critical period. The Debtors seek authority to pay Critical Vendor Claims in the ordinary course of business, pursuant to the terms of any contracts under which such claim arose in an amount not to exceed $5,000,000 on an interim basis and $8,000,000 on a final basis.

127. Lien Claimants. The Debtors rely on and routinely transact with a network of (i) reputable common carriers, movers, and shippers (collectively, the "Shippers") that transport their Goods and (ii) warehousemen, bailees, storage facilities and services, and loading and unloading services (collectively, the "Warehousemen") that store the Goods. Additionally, the

Debtors routinely transact with third-party contractors to assist with on-site repairs and maintenance at their corporate headquarters, distribution centers and stores (the "Third Party Contractors" and, together with the Shippers and Warehousemen, the "Lien Claimants").

128.    In the event prepetition claims of the Lien Claimants (the "Lien Claims") remain unpaid, Lien Claimants may assert liens on the Goods in their possession under applicable non-bankruptcy law and/or refuse to deliver or release such Goods (even where payment for the Goods themselves has already been made) or otherwise impede the Debtors' use of their property until their claims are satisfied and their liens redeemed.  In order to maintain access to and preserve the value of the Goods essential to the continued operation of the Debtors' stores, the Debtors seek authority to honor outstanding invoices on account of the Lien Claims.  The Lien Claimants' possession (and retention) of the Debtors' Goods and withholding of Services, as applicable, would disrupt the Debtors' operations and affect the Debtors' ability to efficiently administer these Chapter 11 Cases.  The cost of such disruption to the Debtors' estates in many cases is likely to be greater than the applicable Lien Claims.  Therefore, the Debtors seek authority to pay Lien Claims in the ordinary course of business, pursuant to the terms of any contracts under which such claim arose in an amount not to exceed $2,000,000 on an interim basis and $4,000,000 on a final basis.

129.    Foreign Claimants.  Through the operations of non-debtor BW Global Logistics (Hong Kong) Ltd., 99 Cents transacts business with a limited group of foreign vendors ("Foreign Claimants").  While the process of winding down the Hong Kong operations is ongoing, certain Foreign Claimants may be owed de minimis amounts. To the extent such amounts remain unpaid, the Foreign Claimants may take legal action against the Debtors outside the United Sates, which would be time consuming and costly to defend and consume estate resources.  Therefore, the Debtors request authority to pay the Foreign Claims as they become due and payable where they

believe, in their business judgment, that the benefits to their estates from making such payments will exceed the costs, in an amount not to exceed $80,000 on an interim and final basis.

130.    <u>Customary Trade Terms Condition</u>.  In return for the payment of the prepetition Trade Claims, the Debtors propose that (i) they may condition payment on the applicable parties agreeing to continue to provide Goods and Services on the terms that existed in the prior twelve-month period and (ii) the applicable party agree not to file or assert any liens related to any prepetition amounts.

**J.  Customer Programs Motion**

131.    <u>Consistent</u> with industry practice, the Debtors have traditionally offered various programs to their customers.  Although the Debtors are discontinuing certain of these programs that involve cash outlays, they wish, in consultation with their advisors, to continue two of these programs described below (the "<u>Customer Programs</u>") for a period of two weeks following the commencement of the Store Closing Sales.  Accordingly, pursuant to the Customer Programs Motion, the Debtors seek entry of interim and final orders authorizing the Debtors to continue the Customer Programs, including honoring certain prepetition obligations related thereto, until April 19, 2024.

132.    The Debtors wish to continue their Gift Card Program, under which their customers can use their prepaid and non-expiring gift cards to purchase the Debtors' merchandise.  They estimate that, as of the Petition Date, there are outstanding gift cards redeemable for approximately $2.7 million.

133.    The Debtors have traditionally maintained a return, refund, and exchange program. The Debtors do not intend to accept exchanges or returns of goods (for cash refund, store credit, or otherwise) purchased on or after April 5, 2024.  However, the Debtors seek to continue

(i) accepting exchanges of goods purchased prior to April 5, 2024 until April 19, 2024, and (ii) honoring store credit issued to customers prior to April 5, 2024, until April 19, 2024.

134.    I believe that continuing the Customer Programs for a period of two weeks following the commencement of the Store Closing Sales will draw customers to the Debtors' stores and help generate greater revenue for the benefit of the Debtors' estates and creditors.  Continuing these programs does not require any additional cash outlay from the Debtors.  Accordingly, I believe that the relief requested in the Customer Programs Motion is in the best interest of the Debtors' estates and creditors and, on behalf of the Debtors, I respectfully submit that the Court should approve the Customer Programs Motion.

**K.  Utilities Motion**

135.    In connection with operating their business in the ordinary course, the Debtors need electricity, telephone, water and sewage, gas, internet, waste disposal, and similar services (collectively, the "Utility Services") provided by utility companies (the "Utility Companies"). Pursuant to the Utilities Motion, the Debtors seek entry of interim and final orders: (i) prohibiting Utility Companies from altering, refusing, or discontinuing Utility Services to the Debtors; (ii) approving the Proposed Adequate Assurance, which consists of establishing a segregated bank account for the sole benefit of the Utility Companies and funding it, within twenty (20) business days after entry of the Interim Order, with approximately $1,176,310, which is sufficient to cover one half of the Debtors' average aggregate monthly costs for Utility Services, less the amount of the prepetition deposits held by some of the Utility Companies; and (iii) approving the proposed streamlined procedures for resolving requests for additional assurance.

136.    Uninterrupted access to the Utility Services is essential to the Debtors' ability to operate in chapter 11 and maximize the value of their estates for the benefit of their creditors.  Any

interruption of the Utility Services, for even a brief period, would disrupt the Debtors' day-to-day operations. I believe this disruption could seriously impact the Debtors' efforts to maximize value during their time in chapter 11, which in turn could adversely impact creditor recoveries. Moreover, and importantly, interruption of certain of the Utility Services would quickly and materially affect the Debtors' perishable goods inventory, such as their produce and frozen foods. Therefore, it is critical that Utility Services continue uninterrupted during these cases. Accordingly, on behalf of the Debtors, I respectfully submit that the Court should approve the Utilities Motion.

### L. Store Closing Motion

137.    Pursuant to the Store Closing Motion, the Debtors seek entry of interim and final orders: (a) authorizing the Debtors to assume certain portions of that certain Consulting and Marketing Services Agreement for Multiple Asset Categories (the "Consulting Agreement"), with Hilco Merchant Resources, LLC (the "Agent")[10] (b) authorizing the continuation of the sales of all of the goods, located in the Stores or otherwise available on the date the Sales commence, including perishables and other fast-turning inventory (collectively, the "Merchandise"), by means of "store closing", "sale on everything", "going out of business", "everything must go", or similar sales (the "Merchandise Sales") and the Store Closings (as defined below); (c) authorizing the sale of the furniture, fixtures, and equipment located in the Stores or otherwise located under the Debtors' control (the "FF&E" and, together with the Merchandise, the "Store Closure Assets" and the sale of the FF&E, together with the Merchandise Sales, the "Store Closing Sales"); (d)

---

[10]    The portions of the Consulting Agreement that the Debtors seek to assume pursuant to the Motion are those relating solely to the Retail Services (as defined below) to be performed by the Agent. In a separate application, filed contemporaneously herewith, the Debtors are seeking authority to retain Hilco Real Estate LLC to perform other services covered by the Consulting Agreement that relate to the disposition of the Debtors' owned and leased real property interests.

approving the Store Closure Sale Guidelines (defined below); (e) authorizing customary compensation enhancement in the form of wage increases to non-insider employees who remain employed during the duration of the Store Closing Sales and the Store Closings (defined below); and (e) granting certain related relief.

138.    ***Store Closing Sales and Store Closings.***  Prior to the Petition Date, the Debtors, with the assistance of their advisors, engaged in an extensive review of each of their retail stores to, among other things, determine what stores could potentially be closed to eliminate their ongoing negative impact on the Debtors' financial performance.  Also prior to the Petition Date, the Debtors, with the assistance of their advisors, considered alternative options to maximize value for their stakeholders, either outside of or in connection with a chapter 11 process, including (i) selling all or a portion of their assets to a third party, (ii) closing their least profitable stores, which would still require a further restructuring transaction with their key stakeholders, or (iii) closing all of their stores as part of a complete wind-down of their operations.  Ultimately this process resulted in the Debtors determining that, given the Debtors' liquidity constraints, the best and only feasible option for the Debtors to maximize value for their stakeholders was to commence a wholesale closing of the Stores and a winddown of their operations.

139.    In furtherance thereof, the Debtors have determined that, in order to maximize the value to their estates, by April 30, 2024, they will close approximately 125 Stores (the "Initial Store Closings") and by May 31, 2024 they will close the remaining approximately 246 Stores (the "Final Store Closings", and together, the "Store Closings").[11]  The Debtors began the Store Closing Sale on April 5, two days before commencing these Chapter 11 Cases.

---

[11]    Notwithstanding the commencement of the Store Closings, if any person or entity expresses an interest in purchasing one or more of the leases governing the Debtors' occupancy of the Stores together with the related Closure Assets, the Debtors may, in their business judgment, discontinue the Store Closing with respect to such Store and pursue such alternative sale.

140.     ***Consulting Agreements.*** The Debtors conducted a fulsome process to identify third party experts with the requisite experience, capabilities, and expertise to evaluate the Debtors' real estate interests, conduct the Store Closing Sales, and prepare the Stores for turnover to the applicable landlords or third parties, all on terms that would maximize recoveries to their estates. In consultation with their advisors, the Debtors determined that the Agent had presented the best proposal, based on the Agent's logistical capabilities, resources, and experience in performing large-scale going out of business sales in a controlled process.  Further, the Agent is already in the process of liquidating inventory at most of the Closing Stores.  The Store Closings are critical for the Debtors to efficiently administer their estates during the pendency of these Chapter 11 Cases, and assumption of the Consulting Agreements will allow the Debtors to continue to conduct the Store Closing Sales and Store Closings in an efficient, controlled manner that will maximize value for the Debtors' estates.

141.     ***Store Closure Sale Guidelines.*** The Debtors seek approval of streamlined procedures (the "<u>Store Closure Sale Guidelines</u>") to sell the Store Closure Assets, in each case free and clear of liens, claims, and encumbrances with proceeds thereof distributed in accordance with the Debtors' DIP orders.  The Store Closure Sale Guidelines are substantially similar to sale guidelines approved in retail bankruptcies around the United States.  The Debtors also seek approval of the Store Closure Sale Guidelines to provide newspapers and other media in which the Sales may be advertised with comfort that the Debtors are conducting the Store Closing Sales in compliance with applicable law and with the Bankruptcy Court's approval.

142.     ***Liquidation Sale Laws and Dispute Resolution Procedures***. Certain states in which the Debtors operate stores have or may have licensing or other requirements governing the conduct of store closing, liquidation, or other inventory clearance sales, including, without

limitation, state, provincial, and local laws, statutes, rules, regulations, and ordinances (collectively, the "Liquidation Sale Laws") which hamper the Debtors' ability to maximize value in selling their inventory.  Subject to the Court's approval, the Debtors intend to conduct the Store Closings in accordance with the Store Closure Sale Guidelines, and to the extent such guidelines conflict with the Liquidation Sale Laws, the Store Closure Sale Guidelines shall control.

143. Additionally, for the purpose of orderly resolving any disputes between the Debtors and any Governmental Units (as defined in section 101(27) of the Bankruptcy Code) arising due to the Store Closure Sale Guidelines and the alleged applicability of any Liquidation Sale Laws, the Debtors respectfully request that the Court authorize the Debtors to implement the Dispute Resolution Procedures.  The Debtors have determined, in the exercise of their reasonable business judgment and in consultation with their advisors, that the Store Closure Sale Guidelines and Dispute Resolution Procedures will provide the best, most efficient, and most organized means of selling the Store Closure Assets to maximize the value of the Debtors' estates.

144. ***Sale Compensation Enhancement Program.*** The Debtors are requesting the authority, but not the obligation, to pay and provide compensation enhancements in the form of increased hourly wages or increased weekly salary, as applicable depending on the employee's position with the Debtors, to certain non-insider employees who remain in the employ of the Debtors during the Store Closing Sales (the "Sale Compensation Enhancement Program").

145. The Debtors believe that the Sale Compensation Enhancement Program will motivate employees during the Store Closing Sales and will enable the Debtors to retain those employees necessary to successfully complete the Store Closing Sales.  Participants in the Sale Compensation Enhancement Program are those whose services will be necessary at the store-level in order to successfully complete the Store Closing Sales and, absent the Sale Compensation

Enhancement Program, may have little to no incentive to remain employed with the Debtors during this period.

146.    Payments under the program are made exclusively to non-insiders and the Compensation Enhancement Program is expected to continue through May 31, 2024, subject to employment through the applicable Termination Date.  Full-time hourly store associates (*e.g.*, cashiers/stockers) are eligible to receive an additional $2.00 per hour worked on the basis of a 40-hour work week (total $80 per week) during the Sale Term, payable through the Debtors' normal payroll cycle.  Full-time salaried employees (e.g., keyholders, assistant managers, store managers and district managers) will be eligible to receive a weekly pay increase that will be paid on a weekly basis during the Sale Term through the Debtors' normal payroll cycle.  The amount of the weekly pay increase for full time salaried employees will range between an additional $150 to $500 per week worked during the Sale Term, based on their position at the Debtors.  In addition, given the location of the Debtors' stores, the need to provide field-level asset protection has become critical to the Store Closing Sales.  In just the first few days of the Store Closing Sales it became apparent that looting would be a significant risk and would require employees on the ground prepared to make repairs to store windows and secure the Debtors' stores.  In light of the additional work needed by certain of the Debtors' field asset protection managers, the Debtors' determined to provide those individuals with a weekly pay increase of on average of $1,000, depending on the employee, their role, and existing compensation.

147.    The Debtors expect that the total aggregate cost of the Sale Compensation Enhancement Program will be approximately $3.7 million, assuming one hundred percent of the eligible employees remain employed through the duration of the Store Closing Sales at every Closing Store.  Providing such non insider bonus benefits is critical to ensuring that key employees

that will be affected by the reduction in the Debtors' work force due to the Store Closings will continue to provide critical services to the Debtors during the ongoing Store Closing Sales and Store Closings process. This will increase the likelihood of successful Store Closing Sales and Store Closings process and encourage store management to provide uninterrupted leadership during this challenging period.

148.     I believe that the Store Closing Sales and Store Closings represent the most efficient and appropriate means of maximizing the value of the Store Closure Assets, while balancing the potentially competing concerns of other parties in interest.  Delay in approving the continuance of the Store Closings would diminish the recovery tied to monetization of the Store Closure Assets for a number of reasons, including paying unnecessary postpetition rent at many of the Stores, which would use scarce funds that would otherwise go to other creditors.  Thus, the Debtors will realize an immediate benefit in terms of financial liquidity upon the sales of the Store Closure Assets and the termination of operations at the Closing Stores.

149.     I believe that the relief requested in the Store Closing Motion is in the best interests of the Debtors' estates, their creditors, and all other parties in interest, and will enable the Debtors to efficiently administer their estates during the pendency of these Chapter 11 Cases. Accordingly, on behalf of the Debtors, I respectfully submit that the Store Closing Motion should be approved.

### M. Contract Rejection and Assumption Procedures Motion

150.     The Debtors are party to thousands of contracts, which include, among other agreements, contracts with vendors for the supply of goods and services, contracts related to the operation of the Debtors' businesses, and leases with respect to real and personal property.[12]  The

---

[12]     Over 330 of the Contracts may be considered leases of non-residential real property subject to section 365(d)(4) of the Bankruptcy Code.

Debtors are in the process of evaluating all of the contracts to determine whether such contracts should be (i) rejected, as they are burdensome to the Debtors' estates, or (ii) assumed and assigned to third parties (including those that the Debtors may assume as amended following consensual negotiations with the applicable counterparties), as they are valuable to the Debtors' estates. This analysis is well underway, and a process has been commenced to market the Debtors' non-residential real property leases as well as the Debtors' other assets.

151.    Pursuant to the Contract Rejection and Assumption Procedures Motion, the Debtors seek entry of an order (i) authorizing and approving certain procedures for rejecting, assuming, and assigning executory contracts and unexpired leases, and (ii) authorizing the Debtors to abandon their personal property located on or installed in the leased premises that are subject to a rejected contract. Absent the approval of these procedures, the Debtors would be required to file separate motions to reject or assume and assign individual contracts, which I believe would result in substantial costs to, and administrative burdens on the Debtors' estates. Moreover, absent an expedited process for approval, the Debtors would be forced to carry the costs of the contracts and leases beyond the period for which they provide any benefit to the estates.

152.    Accordingly, I believe approval of these procedures will reduce costs and burdens, and is essential to the execution of Debtors' chapter 11 strategy while minimizing disruption to business operations.

**N. Omnibus Lease Rejection Motion**

153.    The Debtors seek entry of an order authorizing them to reject, effective as of April 8, 2024 (the "Rejection Date"), certain unexpired leases and executory contracts, abandon certain personal property, and granting related relief. I understand that the Debtors have three (3) leases which are "dark," *i.e.*, were never moved into or have been closed for some time. The Debtors,

together with their proposed real estate advisors Hilco Real Estate, LLC, believe that these leases are (i) not likely to be sold given the amount of time they have been sitting dark without successfully finding a buyer to date and (ii) the costs of marketing these leases is outweighed by the administrative rent obligations that could be incurred by carrying such leases during the course of the marketing process.  In addition, the Debtors have one broker agreement for owned real property that has not been sold to date.  Accordingly, the Debtors have determined, in their business judgment, that rejection of these leases and the broker agreement identified on Schedule 1 to the proposed order (collectively, the "Rejected Contracts") is beneficial to their estates and creditors and seek authority to reject them, effective as of the Rejection Date.

154.    It is my belief that rejection of the Rejected Contracts is a proper exercise of the Debtors' business judgment, is in the best interests of the Debtors' estates, and should be approved. The Debtors no longer have use for the Rejected Contracts as (i) the premises are vacant and do not provide value to the Debtors' estates and (ii) the broker has failed to secure a buyer for the applicable property to date.  Continuing to perform their obligations under the Rejected Contracts would impose significant unnecessary burdens on the Debtors and their estates without any commensurate benefit.  The relief requested herein will allow the Debtors to avoid the incurrence of administrative rent and unrelated charges under section 365(d)(3) of the Bankruptcy Code.  It is my understanding that the Debtors intend to serve this motion on each counterparty to the Rejected Contracts, putting them on notice of the Debtors' intent to reject their respective Rejected Contracts *nunc pro tunc* and surrender possession of the respective premises (along with the turnover of keys or key and alarm codes) as applicable.

155.    I also believe it is necessary, and in the Debtors' best interests, to abandon certain of the Debtors' personal property located in the relevant stores.  It is my understanding that the

Debtors do not believe that any personal property remains, but to the extent they have left any property at the leased premises, it is of inconsequential value and of no benefit to the Debtors' estates.  Further, it is to the best of the Debtors' knowledge that abandonment of the remaining property would not be in violation of any state or local statutes or regulations reasonably designed to protect the public health or safety.  The Court should thus authorize the Debtors to abandon the remaining property as of the Rejection Date.

156.    Accordingly, on behalf of the Debtors, I respectfully submit that the Omnibus Lease Rejection Motion should be approved.

**O.  DIP Motion**

157.    The DIP Facility includes (i) a $35.5 million multi-draw new money term loan (the "DIP Term Loan") and (ii) upon entry of the Final Order, a roll-up of $25.3 million (the "Roll-Up Amount") of Prepetition FILO Loans on a cashless dollar-for-dollar basis into loans under the DIP Facility, provided by the Debtors' Prepetition FILO Lender (in its capacity as lender under the DIP Facility, the "DIP Lender").  Through the DIP Facility, the Debtors will obtain access to (in addition to Cash Collateral) $35.5 million of new money over two draws as follows:  (x) an initial $20.5 million draw (the "Initial Draw") made available to the Debtors upon the Court's entry of the Interim Order and (y) $15 million upon the Court's entry of the Final Order.  The DIP Facility contains milestones that provide for an efficient and value-maximizing chapter 11 sale and wind-down process.

158.    As described above, the Debtors have an immediate need for liquidity.  As of the week ending April 5, 2024, the Company had approximately $18.7 million of cash, and $0 availability under the Prepetition ABL given increasing reserves.  At the same time, the Company had over $170 million in open accounts payable.

159.     Like many other retailers, the last several years have been extremely difficult for the Company.  The Company has weathered adverse industry trends, increased competition, the COVID-19 pandemic, escalating theft and crime, record-high inflation, and resulting increases in operating costs, including increases to the cost of labor associated with significant increases in the minimum wage (particularly in California, where the majority of the Company's stores are located), all of which have had an enormous impact on its bottom line and ability to continue operations as an extreme value retailer.

160.     By late 2023/early 2024, it became clear that in a matter of months the Company could run out of cash to pay interest on its more than $450 million in outstanding debt obligations and otherwise timely pay vendors and landlords to maintain its business operations.  The Company went to great lengths to evaluate all possible strategic alternatives.  Among other things, Jefferies began advising and assisting the Company with respect to exploring strategic alternatives, including a potential sale of all or part of its assets either outside of or in connection with a chapter 11 filing.  In addition, I and other A&M restructuring professionals began advising the Company on its cash position and liquidity forecasting.  In connection with that analysis, I had a substantial number of discussions and meetings with the Company's management team and advisors regarding the quantum of capital needed and the potential forms that a financing or restructuring could take.

161.     Based on our analysis, those discussions and meetings, my experience in restructuring, and my familiarity with the Debtors and their operations, absent immediate access to the DIP Facility to meet their near-term needs, I do not believe it would be possible to administer these chapter 11 cases, to continue the Store Closing Sales, or run a value maximizing sale process. In addition, without the DIP Facility in place, I do not believe that the Prepetition ABL Agent

would have consented to the Debtors' use of Cash Collateral, which is equally critical to the Debtors' operations.

162.    Further, I understand that, based on the current expectations and timeline memorialized in the DIP Term Sheet, procuring $35.5 million in new money financing under the DIP Facility plus having access to Cash Collateral should be sufficient to fund the Debtors' operations as well as forecasted administrative costs during these Chapter 11 Cases.

163.    Without funds available from the DIP Facility and access to Cash Collateral, I believe the Debtors could face a value-destructive interruption to their business and lose support from important stakeholders.  Rather than executing Store Closing Sales, the Debtors might be forced to promptly suspend their operations. I believe that this, in turn, would hinder the Debtors' ability to maximize the value of their estates, and the Debtors would be forced to discontinue their operations, to the detriment of all stakeholders.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

Dated:  April 8, 2024

/s/ Christopher J. Wells
Christopher J. Wells
Chief Restructuring Officer
Numbers Holdings, Inc.