**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NUMBER HOLDINGS, INC., *et al.*,[1] | ) | Case No. 24-10719 (JKS) |
| | ) | |
| Debtors. | ) | (Joint Administration Requested) |
| | ) | |
| | ) | **Re: D.I. 17** |
| | ) | |

**DECLARATION OF JEFFREY FINGER IN SUPPORT OF THE
DEBTORS' MOTION FOR ENTRY OF INTERIM AND FINAL ORDERS
(I) AUTHORIZING THEM TO (A) OBTAIN POSTPETITION FINANCING AND
(B) UTILIZE CASH COLLATERAL, (II) GRANTING LIENS AND SUPERPRIORITY
ADMINISTRATIVE EXPENSE CLAIMS, (III) MODIFYING THE AUTOMATIC STAY,
(IV) SCHEDULING A FINAL HEARING, (V) GRANTING ADEQUATE
PROTECTION, AND (VI) GRANTING RELATED RELIEF**

I, Jeffrey Finger, declare under penalty of perjury as follows:

1.      I am a Managing Director and Co-Head of U.S. Debt Advisory & Restructuring at Jefferies, LLC ("Jefferies"), an investment banking and financial advisory firm with principal offices located at 520 Madison Avenue, New York, New York 10022, as well as at other locations worldwide.  I am over the age of 18 years and authorized to submit this declaration (the "Declaration").

2.      In September 2023, the above-captioned debtors (the "Debtors"), engaged Jefferies to provide advice and assistance with respect to a potential out-of-court restructuring transaction. In early 2024, Jefferies began advising and assisting the Company with an evaluation of a wider range of strategic alternatives.  Jefferies has worked closely with the Debtors' management and

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: (i) Number Holdings, Inc. (1463); (ii) 99 Cents Only Stores LLC (1605); (iii) 99 Cents Only Stores Texas, Inc. (1229); (iv) 99 Cents PropCo LLC (7843); (v) 99 Cents HoldCo LLC (3987); and (vi) Bargain Wholesale LLC (8030).  The Debtors' principal offices are located at 1730 Flight Way, Suite 100, Tustin, CA 92782.

other advisors in evaluating these alternatives, among others. Through these efforts, the Jefferies team has become familiar with the Debtors' business operations, capital structure, and liquidity needs. I anticipate that the Debtors will, within the first thirty days of these Chapter 11 Cases, file an application to employ and retain Jefferies as their investment banker.

3.      I submit this Declaration in support of the *Debtors' Motion for Entry of Interim and Final Orders (I) Authorizing Them to (A) Obtain Postpetition Financing and (B) Utilize Cash Collateral, (II) Granting Liens and Superpriority Administrative Expense Claims, (III) Modifying the Automatic Stay, (IV) Scheduling a Final Hearing, (V) Granting Adequate Protection, and (VI) Granting Related Relief* (the "Motion"), filed contemporaneously herewith.[2] Through the Motion, the Debtors seek, among other things, approval of the DIP Facility, consisting of (a) a new money term loan in an aggregate principal amount of $35.5 million (the "DIP Term Loan") and (b) the "roll-up" of up to $25.3 million, plus all interest accrued following the Petition Date, of Prepetition FILO Obligations (the "Roll-Up Amount").[3]

4.      Except as otherwise indicated, all statements in this Declaration are based on my personal knowledge of the Debtors' operations and finances, my review of relevant documents, information provided to me by Jefferies employees working with me or under my supervision, information provided to me by, or discussions with, the members of the Debtors' management team or their other advisors, or my experience as a restructuring professional. I am not being compensated for this testimony other than through payments received by Jefferies as a professional proposed to be employed and retained by the Debtors in these Chapter 11 Cases. If called upon to testify, I could and would testify to the facts set forth herein.

---

[2]     Capitalized terms used but not defined herein have the meanings ascribed to them in the Motion.

[3]     The material terms of the DIP Facility are set forth in further detail in the Motion. For the avoidance of doubt, any description of the DIP Facility herein or in the Motion is qualified in its entirety by reference to the DIP Documents.

## Background and Qualifications

5.      Jefferies provides a broad range of corporate advisory services to its clients including, without limitation, services relating to the following: (i) financial advice, (ii) mergers, acquisitions, and divestitures, (iii) special committee assignments, (iv) capital raising, and (v) corporate restructurings.  Jefferies and its senior professionals have extensive experience in the reorganization and restructuring of distressed companies, both out of court and in chapter 11 proceedings.  Jefferies has advised debtors, creditors and equity constituencies, and purchasers in numerous reorganizations in the United States and worldwide.  Since 2007, Jefferies has been involved in over 250 restructurings representing over $550 billion in restructured liabilities.

6.      I have advised both companies and creditors in financial restructurings and distressed mergers and acquisitions, raised capital for troubled companies, and represented debtors and creditor constituencies in bankruptcy proceedings.  Before joining Jefferies in 2016, I was a partner in the financial restructuring group of Centerview Partners LLC, which I joined in 2012.  Prior to joining Centerview Partners LLC, I was a managing director at Miller Buckfire & Co., a boutique investment bank where I focused on financial restructurings from 2001 to 2011.  I have an MBA from the University of Chicago Booth School of Business and a BA from the University of Michigan.

## The DIP Financing

### I.      The Debtors' Need for Liquidity

7.      I understand that information regarding the Debtors' cash needs leading up to the commencement of these Chapter 11 Cases and the need for the relief requested in the Motion is addressed in detail in the *Declaration of Christopher J. Wells in Support of Chapter 11 Petitions and First Day Motions of Number Holdings, Inc. and Its Affiliated Debtors and Debtors in*

*Possession* (the "<u>First Day Declaration</u>") that is being filed contemporaneously with the Motion and this Declaration.  Key issues highlighted therein include increased competition in the Debtors' business segments, continued impact of COVID-19 and its disruptions to the Debtors' operations, the effect of global inflation on inventory pricing, the significant burden of debt service payments, and other issues that have impacted the Debtors' liquidity position.

8.      I understand that, as described in the First Day Declaration, the Debtors' management team and their advisors have determined that the Debtors would not be able to fund their remaining operations and the administrative costs of these Chapter 11 Cases, without access to debtor-in-possession financing.  Further, I understand that, based on the current expectations and timeline memorialized in the DIP Term Sheet, procuring $35.5 million in new money financing under the DIP Facility, having access to Cash Collateral, and proceeds from the anticipated asset sales should be sufficient to fund the Debtors' orderly wind-down and Sale Processes as well as administrative costs during these Chapter 11 Cases.

9.      I understand that without funds available from the DIP Facility and access to Cash Collateral, the Debtors could face a value-destructive interruption to their orderly wind-down process and lose support from important stakeholders.  Rather than executing Store Closing Sales, the Debtors might be forced to promptly suspend their operations.

## II.     The Debtors' Efforts to Obtain Postpetition Financing

10.     Following sustained operating losses in fiscal year 2024, the Debtors concluded that they could run out of cash to pay interest on their more than $456 million in outstanding debt obligations and otherwise pay vendors to maintain their business operations in a matter of months. To address this situation and protect the interests of the Company's stakeholders, Jefferies began advising and assisting the Debtors with respect to, among other things, exploring strategic

alternatives, including a potential sale of all or part of its assets either outside of or in connection with a bankruptcy filing. This included outreach and efforts to obtain necessary financing and to facilitate a restructuring, including extensive negotiations with the *Ad Hoc* Group, Prepetition ABL Lenders, and Prepetition FILO Lender regarding a potential restructuring transaction. These negotiations culminated in the execution of the DIP Term Sheet with the Prepetition FILO Lender on April 7, 2024.

11.    Prior to the execution of the DIP Term Sheet, in February and March of 2024, Jefferies had contacted a total of 32 prospective buyers, including 20 prospective strategic buyers and 12 financial investors with regards to a potential sale transaction. The Debtors executed non-disclosure agreements ("NDAs") with 16 of them, each of whom was provided access to a virtual data room to evaluate the purchase opportunity.

12.    However, by the end of March 2024, the marketing process had not resulted in actionable proposals acceptable to the Debtors' key creditor constituencies nor interest from buyers who could demonstrate financial wherewithal to acquire the Debtors' operations as a going concern. After carefully evaluating each of the proposals the Debtors did receive, the Debtors determined that none could be feasibly pursued given the limited liquidity available and lack of support from key creditor constituencies.

13.    In parallel with the marketing process, as the Debtors' liquidity continued to deteriorate, the Debtors and Jefferies explored whether to, outside of and/or in connection with a chapter 11 bankruptcy, (i) wind-down a significant number of its less profitable stores while continuing to operate its more profitable stores or (ii) wind-down all approximately 371 of their stores. To provide the incremental liquidity runway needed to continue exploring the former path as well the marketing process described above, Jefferies initiated contact with 24 potential third-

party lenders to solicit a short-term out-of-court "bridge" financing facility, executed NDAs with 10 of them, and received one indication of interest (IOI) of which the terms were not feasible to pursue in the Debtors' judgment.  Accordingly, the Debtors determined that the winding-down of their stores in a chapter 11 proceeding was the only viable path to maximize the value of their business.

14.     To fund the wind-down, Jefferies undertook a marketing process to solicit proposals for debtor-in-possession financing.  This included reaching out to 23 potential third party lenders with expertise in special situations and chapter 11 financing including parties discussed in the preceding paragraph, with a total of 13 parties executing NDAs, as well as reaching out to the Debtors' existing lenders.  All parties with executed non-disclosure agreements were provided access to the virtual data room.

15.     Discussions with potential third-party lenders focused primarily on a debtor-in-possession financing structure under which the lenders would provide DIP financing commitments. Given that the Debtors had a number of real properties not encumbered by existing liens, Jefferies solicited proposals for all structural alternatives, including financings secured by a senior lien on unencumbered assets and junior or *pari passu* liens on ABL Priority Collateral, Notes Priority Collateral and PropCo Collateral (given that the Debtors' prepetition secured lenders and the *Ad Hoc* Group expressed an unwillingness to consent to priming liens on their prepetition collateral in favor a third party lender).  While several parties expressed interest and conducted due diligence, only one third-party lender submitted a proposal, for an approximately $22 million net new money investment.  The Debtors determined that the third-party lender's proposal was not sufficient to fund a chapter 11 process.

16.     In parallel with this third-party DIP marketing process, Jefferies and the Debtors' other advisors engaged in negotiations of DIP financing proposals from stakeholders throughout the Debtors' existing capital structure, including the Prepetition FILO Lender, the Prepetition ABL Lenders, and certain of the Prepetition Noteholders (including the *Ad Hoc* Group).  Both the Prepetition FILO Lender and the *Ad Hoc* Group made offers to provide postpetition financing that were eventually significantly improved through the competitive process and rigorous negotiations conducted by Jefferies and other Debtors' advisors.

17.     Ultimately, the Debtors determined to move forward with the Prepetition FILO Lender's proposed DIP Facility for a number of reasons, including (i) the Prepetition ABL Lenders support of that proposal and willingness to consent to the use of Cash Collateral, (ii) understanding that the proposal provides sufficient liquidity to fund the Chapter 11 Cases based on the Approved Budget, (iii) the all-in cost of capital being more competitive than the *Ad Hoc* Group's offer, (iv) a significantly smaller Roll-Up Amount of up to $25.3 million, plus all interest accrued following the Petition Date, resulting in a materially lower administrative claim than the up to $72 million roll-up claim under the *Ad Hoc* Group proposal.  In addition, the Prepetition FILO Lender's proposal contemplates no roll-up of the prepetition facility until the entry of the Final Order that may result in less of a roll-up, subject to the outcome of the Store Closing Sales.

18.     Based on the discussions that I observed and participated in, the negotiations with both the Prepetition FILO Lender and the Ad Hoc Group were conducted at arm's length over several rounds beginning at the end of March 2024 and continuing until the eve of the Petition Date.  These negotiations centered around, among other things, the terms and conditions of the DIP Facility, including sizing, milestones and covenants, the maturity thereof, the proposed "roll-up," the interest rate, minimum cash balances, and the fees to be paid in connection with the DIP

Facility.  Based on my experience with debtor-in-possession financing transactions, as well as my involvement in the financing solicitation process described herein, I believe that these negotiations resulted in the best currently available financing option for the Debtors, taken as a whole, given the facts and circumstances of these Chapter 11 Cases.

19.    Thus, the Debtors and their directors, in consultation with Jefferies and the Debtors' other advisors, determined that the proposed DIP Facility was the best financing proposal then available to them under the circumstances and that it would be imprudent to attempt to conduct the Chapter 11 Cases without access to the DIP Facility on the terms thereof.

**III. Terms of the Proposed DIP Facility**

20.    As noted in the Motion, the proposed DIP Facility consists of (i) a senior secured superpriority debtor-in-possession multi-draw term loan in an aggregate principal amount of approximately $35.5 million, of which (a) $20.5 million will be made available by the DIP Lender following entry of the Interim Order and (b) $15 million will be made available by the DIP Lender subject to entry of the Final Order (as well as other terms and conditions to be set forth in the DIP Credit Agreement) and (ii) an up to 0.7-to-1 roll-up of up to $25.3 million, plus all interest accrued following the Petition Date, of Prepetition FILO Obligations effective upon the entry of the Final Order.  The DIP Facility matures up to 130 days after the Petition Date and all amounts outstanding under the DIP Facility shall be due and payable in full on the Maturity Date.

21.    The economic terms of the proposed DIP Facility are more fully described in the Motion.  Certain of the key terms of the DIP Credit Agreement are that: (i) interest accrues at a rate of SOFR + 7.5% *per annum* under the DIP Term Loan, with an additional 2.0% *per annum* during an occurrence of an event of default, which amounts are payable in cash, (ii) the obligations are secured by liens on substantially all of the Debtors' assets, including a first priority lien on its

unencumbered assets including unencumbered real property and junior liens on Prepetition ABL Priority Collateral,[4] Notes Priority Collateral, and PropCo Collateral, (iii) include an upfront commitment of 2.00% and an exit fee of 2.00%, and (iv) the obligations under the DIP Facility are guaranteed by each of the Debtors.

22.    In accordance with the DIP Orders and the Approved Budget, proceeds of the DIP Facility will be used to (i) fund working capital needs and general corporate purposes, (ii) pay the costs and expenses (including professional fees) of administering the Chapter 11 Cases, and (iii) make any disbursements approved by the Court.

### IV.    The Proposed DIP Facility Is the Best Financing Option Available to the Debtors

23.    Jefferies was closely involved in the Debtors' review of the principal economic terms of the proposed DIP Facility and related restructuring negotiations.  As set forth in the Motion, the intent of the proposed DIP Facility is to fund the Debtors' remaining operations and effectuate an orderly wind-down of their estates by providing them with necessary liquidity to administer these Chapter 11 Cases.

24.    Based on my experience with debtor-in-possession financing transactions and my involvement in the efforts to secure postpetition financing for the Debtors, I believe that the proposed DIP Facility, taken as a whole, is the best financing option currently available to the Debtors under the facts and circumstances of these Chapter 11 Cases and is superior to the financing proposed by the *Ad Hoc* Group.

25.    First, the proposed DIP Facility will provide the Debtors with access to the amount of capital that the Debtors, in consultation with their advisors, believe is necessary to effectively

---

[4]    The relative priority of the liens of the DIP Secured Parties and the Prepetition ABL/FILO Secured Parties on Prepetition ABL Priority Collateral remains under discussion.

and efficiently administer these Chapter 11 Cases, wind-down their operations, execute the Store Closing Sales, and sell their remaining assets.

26.     Second, the proposed DIP Facility was subject to a third-party marketing process, outreach to stakeholders within the Debtors' capital structure, bidding between the DIP Lenders and the *Ad Hoc* Group, and arm's-length negotiations between the Debtors and the DIP Lenders described above.  The "roll-up," fees and rates to be paid under the proposed DIP Facility are integral components of the overall terms of the proposed DIP Facility and were required by the DIP Lenders as consideration for the extension of postpetition financing.  Specifically, the DIP Facility Roll-Up Amount is provided on an up to 0.7-to-1 basis, in stark contrast to up to 2-to-1 offer proposed by the *Ad Hoc* Group.  Moreover, the DIP Facility requires lower fees than the financing proposed by the *Ad Hoc* Group.  So, while the Debtors, with the assistance of their advisors, including Jefferies, solicited and considered other sources of postpetition financing to determine whether the Debtors could obtain such postpetition financing on superior terms, the Debtors were unable to obtain other committed DIP financing on more favorable terms.

27.     Third, based on the feedback received through the DIP marketing process, while the Debtors had unencumbered real estate assets, I understand that those assets were insufficient on their own to secure a financing of this type and structure in an amount sufficient to fund these Chapter 11 Cases.

28.     Finally, I believe that the principal economic terms proposed under the DIP Facility, (*i.e.*, pricing, fees, interest rate, roll-up, and default rate), taken as a whole, are within the range that I have observed in other recent debtor-in-possession financings of this type.  In my view, based on the discussions I observed, the economic terms of the DIP Facility were negotiated at arm's

length and are, taken as a whole, generally consistent with the cost of debtor-in-possession financings in comparable circumstances.

29.    Accordingly, based on my experience with debtor-in-possession financing transactions and my involvement in the marketing and negotiation of the postpetition financing alternatives for the Debtors, it is my belief that the proposed DIP Facility offers the best currently available financing option to the Debtors under the facts and circumstances of these Chapter 11 Cases.

[*Remainder of page left intentionally blank*]

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: April 8, 2024                    */s/ Jeffrey Finger*

Jeffrey Finger