## **Exhibit B**

**Purchase Agreement**

**ASSET PURCHASE AGREEMENT**

by and among

**[99 CENTS ONLY STORES LLC**

**AND THE OTHER SELLERS NAMED HEREIN],**

as Seller,

and

**DOLLAR TREE STORES, INC.,**

as Buyer

[_____], 2024

# TABLE OF CONTENTS

**PAGE**

ARTICLE 1       Definitions ...................................................................................................1

   Section 1.1       Definitions ............................................................................................... 1

ARTICLE 2       Agreement; Purchase Price ...........................................................................7

   Section 2.1       Agreement to Sell and Purchase the Designation Rights ................................. 7
   Section 2.2       Payments ................................................................................................ 8
   Section 2.3       Agreement to Assign the Designated Leases ................................................ 8
   Section 2.4       Cure Costs .............................................................................................. 8

ARTICLE 3       Deposit.........................................................................................................8

   Section 3.1       Deposit.................................................................................................... 8

ARTICLE 4       Election to Assume/Take Assignment of Designated Leases ...........................8

   Section 4.1       Election................................................................................................... 8
   Section 4.2       Seller's Obligations During Designation Rights Period.................................... 9
   Section 4.3       Assumption.............................................................................................. 10

ARTICLE 5       Personal Property/Trade Fixtures .................................................................11

   Section 5.1       Removal .................................................................................................. 11

ARTICLE 6       Inspection and Confidentiality .....................................................................11

   Section 6.1       Access..................................................................................................... 11
   Section 6.2       Confidentiality......................................................................................... 12

ARTICLE 7       Conditions Precedent, Casualty Damage or Condemnation ...........................12

   Section 7.1       Conditions Precedent For Lease Assignment Closings Favoring Buyer. ......... 12
   Section 7.2       Conditions Precedent Favoring the Seller ..................................................... 13
   Section 7.3       Risk of Casualty and Condemnation. ........................................................... 13

ARTICLE 8       Representations, Warranties and Covenants ..................................................14

   Section 8.1       Buyer Representations............................................................................... 14
   Section 8.2       Seller Representations ............................................................................... 18
   Section 8.3       Seller's Actual Knowledge........................................................................ 20
   Section 8.4       Notice of Breach....................................................................................... 20

ARTICLE 9       Bankruptcy Court Matters ...........................................................................21

   Section 9.1       Bankruptcy Court Matters ......................................................................... 21

# TABLE OF CONTENTS
### (continued)

**PAGE**

ARTICLE 10    Lease Assignment Closings.................................................................22

Section 10.1    Time and Place of Lease Assignment Closings. ............................. 22
Section 10.2    Seller's Deliveries ........................................................................ 23
Section 10.3    Buyer's Deliveries ........................................................................ 23
Section 10.4    Closing Costs................................................................................ 23

ARTICLE 11    No Real Estate Commission...........................................................24

ARTICLE 12    Default.............................................................................................25

Section 12.1    Buyer Default ............................................................................... 25
Section 12.2    Seller Default................................................................................ 25
Section 12.3    Breach of Representations. ........................................................... 26

ARTICLE 13    Intentionally Omitted .....................................................................27

ARTICLE 14    Intentionally Omitted .....................................................................27

ARTICLE 15    Miscellaneous .................................................................................27

Section 15.1    Entire Agreement ......................................................................... 27
Section 15.2    Binding on Successors and Assigns .............................................. 27
Section 15.3    Assignment by Buyer ................................................................... 27
Section 15.4    Waiver .......................................................................................... 27
Section 15.5    Governing Law; Jurisdiction ........................................................ 27
Section 15.6    Counterparts ................................................................................. 28
Section 15.7    Notices.......................................................................................... 28
Section 15.8    Time Periods................................................................................. 29
Section 15.9    Modification of Agreement ........................................................... 29
Section 15.10   Further Instruments ...................................................................... 29
Section 15.11   Descriptive Headings; Word Meaning ........................................... 29
Section 15.12   Time of the Essence ..................................................................... 30
Section 15.13   Construction of Agreement .......................................................... 30
Section 15.14   Limitations on Liability................................................................ 30
Section 15.15   Severability................................................................................... 30
Section 15.16   Joint and Several .......................................................................... 30

Exhibits and Schedules

Exhibit 1:                 Form of Assumption and Assignment Order

Schedule A:             Leases (including May Rent and Cure Costs)

## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** (this "Agreement") is dated as of [__], 2024 (the "Effective Date") by and among (a) [**99 CENTS ONLY STORES LLC**, a California limited liability company (the "Company"), and [OTHER SELLER ENTITIES (IF ANY)] ([together with the Company, individually or collectively, as the context may require,] "Seller"), and (b) **DOLLAR TREE STORES, INC.**, a Virginia corporation (together with its permitted designees, successors and assigns, "Buyer").

## RECITALS

A.     Commencing on April 7, 2024 (the "Petition Date"), the Company, [each other Seller] and certain of their respective Affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court" and such bankruptcy proceeding, the "Bankruptcy").

B.     Each applicable Seller is the owner of the tenant's or lessee's interest in those certain real property leases briefly described (and noted as belonging to it) on Schedule A (all of Seller's right, title and interest in, to and under such real property leases, each a "Lease" and collectively the "Leases") relating to certain store locations (the address of which, May Rent and anticipated cure costs also noted on such Schedule A for each applicable Lease) operated, or previously operated, by the Company or any of its Affiliates (each a "Store" and collectively the "Stores").

C.     Pursuant to an order issued by the Bankruptcy Court which is consistent with the terms of this Agreement, which approves the transactions contemplated herein pursuant to section 363 of the Bankruptcy Code, and which order is otherwise in form and substance satisfactory to Buyer in its sole discretion (such order, the "Sale Order"), Buyer desires to purchase from Seller, and Seller desires to sell to Buyer, subject to and upon the terms and conditions contained in this Agreement, the Designation Rights.

D.     Upon issuance of the Sale Order, the Designation Rights shall be granted to Buyer and pursuant thereto, upon the terms and conditions set forth herein, Buyer shall have the right to acquire, or designate an Assignee to acquire, and Seller agrees to assume and assign to Buyer or an Assignee, the Designated Leases upon the issuance of an Assumption and Assignment Order and otherwise on the terms and conditions set forth herein.

**NOW, THEREFORE,** in consideration of the mutual promises hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE 1

## Definitions

**Section 1.1    Definitions**.  Capitalized terms used in this Agreement shall have the meanings set forth below:

NAI-1539877164v16

"Advisors" shall mean, with respect to any Person, any directors, officers, employees, investment bankers, financial or other professional advisors, accountants, agents, attorneys, consultants or other representatives of such Person.

"Affiliate" shall mean, respect to any Person, any other Person that, directly or indirectly, Controls, is Controlled by or is under common Control with such Person. The term "**Affiliated**" shall have the correlative meaning.

"Agreement" shall mean this Agreement, including all Exhibits and Schedules attached hereto, as the same may be amended, modified or supplemented from time to time in writing by Seller and Buyer.

"Approved Engineer" shall mean an architect, insurance examiner, contractor or engineer engaged by Seller and approved by Buyer (which approval shall not be unreasonably withheld, conditioned or delayed).

"Assignee" shall mean an Affiliate of Buyer designated by Buyer to take an assignment of a Designated Lease, by written notice to Seller, which designation can be made by Buyer in its sole and absolute discretion.

"Assumption and Assignment Notice" shall mean a notice provided by Seller to each landlord with respect to a Designated Lease made in accordance with and pursuant to the terms set forth in the Assumption and Assignment Order.

"Assumption and Assignment Order" shall have the meaning set forth in Section 9.2.

"Bankruptcy Code" shall mean Title 11, United States Code, 11 U.S.C. §§ 101-1532.

"Bankruptcy Court" shall have the meaning set forth in Recital A.

"Broker" shall have the meaning set forth in Article 11.

"Business Day" shall mean any day of the week other than (a) Saturday and Sunday, (b) a day on which banking institutions in the State of New York are obligated or authorized by law or executive action to be closed to the transaction of normal banking business, or (c) a day on which governmental functions in New York, New York or the State of New York are interrupted because of extraordinary events such as hurricanes, power outages, declarations of national or local emergency or acts of terrorism.

"Buyer" shall have the meaning set forth in the preamble of this Agreement.

"Buyer Assumption Notice" shall have the meaning set forth in Section 4.1.

"Buyer Representations" shall have the meaning set forth in Section 8.1.

"Buyer Representatives" shall have the meaning set forth in Section 6.1.

"Carrying Costs" means, with respect to any Store, all expenses related to utilities, property taxes and assessments, insurance policies maintained as set forth in Section 4.2(d), property loss (beyond any applicable insurance proceeds and so long as Seller or the landlord under the relevant Lease, as applicable, has maintained all applicable insurance policies as provided by this Agreement and the Leases and including, other than with respect to any Store that Buyer or an Assignee is not taking an assignment of, the amount of any deductible allocated to such loss) and the continuation of existing levels of maintenance in the manner and to the extent existing as of the Petition Date, or required under the Lease, which are not included in May Rent, and which expenses are attributable to the period commencing May 1, 2024 and ending on the earlier of: (i) the Lease Assignment Closing for such Store or (ii) one (1) day after the effective date of rejection of the Lease applicable to such Store, so long as Seller has promptly filed a motion to reject such Lease, which shall contain an effective date of rejection that is acceptable to Buyer, upon the earlier of: (x) the date that Buyer notifies Seller in accordance with the terms hereof that it does not desire to assume such Lease or (y) the Expiration Date. In addition, Carrying Costs shall include an amount equal to June Rent with respect to the applicable amounts due to such landlords.

"Cash Consideration" shall mean Two Million Five Hundred Thousand and No/100 Dollars ($2,500,000.00).

"Code" shall mean the Internal Revenue Code of 1986, and all amendments thereto and all regulations issued thereunder.

"Consequential Damages" shall mean, with respect to an indemnified matter, consequential, speculative or similar special damages incurred by the indemnified party.

"Control" shall mean, with respect to any Person, (a) the ownership of more than fifty percent (50%) of the Equity Interests of such Person or (b) the power (whether or not exercised) to elect a majority of the directors or managers of such Person or to exercise voting control of such Person or to otherwise direct or cause the direction of the management and policies of such Person through the ownership of Equity Interests, whether by contract or otherwise. The terms "Controlled by", "Controlling" and "under common Control with" shall have their respective correlative meanings.

"Cure Costs" shall have the meaning set forth in Section 2.4.

"Deposit" shall have the meaning set forth in Section 3.1.

"Designated Leases" shall mean the Leases designated by Buyer pursuant to the provisions of Section 4.1.

"Designation Rights" shall mean the exclusive right to irrevocably, subject to the express provisions herein, select, identify and designate (on one or more occasions) Leases as Designated Leases in respect of which Buyer, or its Assignee, will, subject to the terms and conditions provided for in this Agreement and the Sale Order, acquire all of Seller's right, title and interest in and to the applicable Designated Leases, together with all of Seller's right, title and interest in and to certain related assets as set forth in Article 4.

"Designation Rights Period" shall mean, with respect to any Lease, the period commencing on the date that the Sale Order becomes a final, nonappealable order and ending on the date which is the earliest of (i) the date on which such Lease is assumed and assigned to Buyer or an Assignee, (ii) the date on which Seller has received a notice from Buyer that Buyer has elected not to designate such Lease as a Designated Lease (an "Undesignated Lease"), and (iii) the Expiration Date (or, to the extent the landlord with respect to the applicable Lease consents to the extension of the deadline for assumption or rejection of such Lease to a later date, such later date as is reasonably acceptable to Buyer).

"Designated Store" shall mean a Store that is the subject of a Designated Lease.

"DIP Credit Agreement" shall mean that certain Senior Secured Super-Priority Debtor-in-Possession Term Loan Credit Agreement by and among (a) 99 Cents Only Stores LLC, as borrower, (b) Number Holdings, Inc., and each of its subsidiaries (other than 99 Cents Only Stores LLC, 99 Cents Only Foundation, and BW Global Logistics (Hong Kong) Ltd.) as guarantors, (c) TC Lending, LLC, as administrative agent, and (d) the lenders party thereto from time to time.

"Dollars" and the sign "$" mean the lawful money of the United States of America.

"Effective Date" shall have the meaning set forth in the Preamble of this Agreement.

"Environmental Laws" shall any and all federal, state, municipal and local laws, statutes, ordinances, rules, regulations, binding guidance or policies, orders, decisions, determinations, decrees or judgments, whether statutory or common law, as amended from time to time, now or hereafter in effect, or promulgated, pertaining to pollution, the environment, natural resources, public health and safety and industrial hygiene (in each case, as the same relate to Hazardous Substances), including the management, use, generation, manufacture, labeling, registration, production, storage, release, discharge, spilling, leaking, emitting, injecting, escaping, abandoning, dumping, disposal, handling, treatment, removal, decontamination, cleanup, transportation or regulation of or exposure to any Hazardous Substance, including the Industrial Site Recovery Act, the Clean Air Act, the Clean Water Act, the Toxic Substances Control Act, the Comprehensive Environmental Response Compensation and Liability Act, the Resource Conservation and Recovery Act, the Federal Insecticide, Fungicide, Rodenticide Act, the Safe Drinking Water Act and the Occupational Safety and Health Act (as it relates to Hazardous Substances).

"Equity Interests" shall mean, with respect to any Person, any and all shares, interests, participations or other equivalents, including limited liability company interests or membership interests (however designated, whether voting or nonvoting), of equity of such Person, including, if such Person is a partnership, partnership interests (whether general or limited) and any other interests or participations that confer on a Person the right to receive a share of the profits and losses of, or distributions of assets of, such partnership.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"Expiration Date" shall have the meaning set forth in Section 4.1.

"Final Closing Statement" shall have the meaning set forth in Section 10.4(b).

"Governmental Authorities" shall mean, collectively, any government, court, regulatory or administrative agency, commission or authority or other governmental instrumentality, federal, state, municipal or local, domestic, foreign or multinational entity or body having jurisdiction over (a) the Person in question or (b) the applicable Store or any part thereof.

"Hazardous Materials" shall mean each and every element, compound, chemical mixture, emission, contaminant, pollutant, material, waste or other substance (including radioactive substances, whether solid, liquid or gaseous) which is defined, determined or identified as hazardous or toxic under any Environmental Law or for which liability or standards of care or a requirement for investigation or remediation are imposed under, or that are otherwise subject to, any Environmental Law, including, without limitation, asbestos, asbestos containing materials, urethane, polychlorinated biphenyls, any petroleum product, petroleum derived products and/or its constituents or derivatives, and any caustic, flammable or explosive materials. Without limiting the generality of the foregoing, the term shall mean and include:

(a)    "hazardous substances" as defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Superfund Amendment and Reauthorization Act of 1986, or Title III of the Superfund Amendment and Reauthorization Act, each as amended, and regulations promulgated thereunder; excluding, however, common maintenance and cleaning products of a type and in a quantity regularly found at properties with a standard of operation and maintenance comparable to the applicable Store;

(b)    "hazardous waste" and "regulated substances" as defined in the Resource Conservation and Recovery Act of 1976, as amended, and regulations promulgated thereunder;

(c)    "hazardous materials" as defined in the Hazardous Materials Transportation Act, as amended, and regulations promulgated thereunder;

(d)    "chemical substance or mixture" as defined in the Toxic Substances Control Act, as amended, and regulations promulgated thereunder; and

(e)    "hazardous materials" as defined under all applicable environmental protection statutes of each state and municipality in which the Demised Premises are located.

"June Rent" shall mean an amount equal to (i) the base rent plus (ii) CAM, taxes and insurance charges, all in amounts calculated in the same manner as such amounts were used in the definition of May Rent, for all Leases for which the Seller has not received direction from the Buyer to either assume and assign to a third-party or reject prior to 5:00 pm (ET) on May 29, 2024,to the extent such amounts are due (x) to the applicable landlords of the Leases with respect to such amounts due to such landlords and (y) as a result of any delay caused by Buyer which would prevent the assumption and assignment to a third-party or rejection of such Lease in an orderly manner to be deemed effective prior to the date such amounts are due.

"Laws and Regulations" shall mean, collectively, all present and future building, fire, sanitary, zoning, environmental, housing and other statutes, laws, ordinances, codes, orders, restrictions, resolutions, requirements, rules and regulations of all Governmental Authorities having

jurisdiction with respect to the Leases or Stores or any thereof, including, without limitation, landmark designations and all zoning variances and special exceptions, if any.

"Lease" or "Leases" shall have the meaning set forth in Recital B.

"Lease Assignment Closing" shall mean the consummation of the assignment of any Designated Leases as contemplated pursuant to the terms of this Agreement.

"Lease Assignment Closing Date" shall have the meaning set forth in Section 4.1.

"Losses" shall mean, with respect to a particular indemnified matter, any and all claims, demands, causes of action, losses, liabilities, costs and expenses (including reasonable attorneys' fees, court costs and disbursements) arising from or in connection with such matter, but excluding in all cases Consequential Damages.

"made available to Buyer" (or words to similar effect herein) shall mean that the applicable information or documentation has been posted to any virtual data room for the transactions contemplated by this Agreement to which Buyer or its Affiliates have been given access as of the applicable date or otherwise.

"May Rent" shall mean an amount equal to (i) the base rent as shown in the column identified as "May Rent (Base)" on Schedule A plus (ii) the charges shown on Schedule A in the columns as "CAM", "TAXES", "INSUR", "OTHER", "SALES TAX" and "CREDITS/DEBITS" for all Leases (whether or not Buyer elects to assume, or designate the assumption of, any such Leases).

"NDA" shall have the meaning set forth in Section 6.2.

"OFAC" shall mean the Office of Foreign Assets Control of the Department of Treasury.

"Ordinary Course" shall mean the ordinary and usual course of operations of a Store, consistent with past practice and taking into account the preparation, commencement and pendency of the Bankruptcy.

"Parties" shall mean, collectively, Seller and Buyer.

"PDF" shall have the meaning set forth in Section 15.6.

"Person" shall mean any individual, estate, trust, partnership, limited liability company, limited liability partnership, corporation, governmental agency or other legal entity and any unincorporated association.

"Petition Date" shall have the meaning set forth in Recital A.

"Preliminary Closing Statement" shall have the meaning set forth in Section 10.4(b).

"Purchase Price" shall mean the Cash Consideration and the Cure Costs.

"Remaining Lease Carrying Cost Reimbursement Date" shall mean (i) with respect to any Lease for which Seller has received a notice from Buyer that Buyer has elected not to designate such Lease as a Designated Lease, the date that is one (1) day after the effective date of an order issued by the Bankruptcy Court either (x) rejecting the Lease applicable to such Store, or (y) approving the assumption of the Lease by Seller and the assignment of the Lease to a third-party, or (ii) for Leases that are not covered by (i) above, the Expiration Date.

"Sale Order" shall have the meaning set forth in Recital C.

"Seller" shall have meaning set forth in the preamble of this Agreement.

"Seller Failure" shall have the meaning set forth in Section 12.2(a).

"Seller Parties" shall mean Seller, its Affiliates and its and their direct and indirect owners, agents, officers, directors, trustees, Advisors, brokers, managers, members, partners, employees, representatives, principals, Affiliates, contractors, attorneys, accountants and other consultants, or the successors and assigns of any of the foregoing parties.

"Seller Representations" shall mean the representations and warranties of Seller expressly set forth in Section 8.2.

"Seller's Actual Knowledge" shall have the meaning set forth in Section 8.3.

"State" shall mean the state or commonwealth in which each Store is located.

"Store" or "Stores" shall have the meaning set forth in Recital B.

"Trade Fixtures" shall mean any racking, shelving, checkout counters, partitions, office furniture and window treatments.

"Undesignated Lease" shall have the meaning set forth in the definition of "Designation Rights Period".

## ARTICLE 2

## Agreement; Purchase Price

**Section 2.1    Agreement to Sell and Purchase the Designation Rights**.    In consideration of the payment of the Purchase Price and the other payments as made and identified in Section 2.2 below and for other good and valuable consideration, effective immediately upon the entry of the Sale Order, and without any further action of Seller or any other Person, Seller hereby (i) grants to Buyer the Designation Rights and (ii) agrees to sell, assign, transfer and convey, at Buyer's option, the Designated Leases to Buyer, and Buyer hereby (A) accepts such grant of the Designation Rights and (B) agrees to purchase, acquire, accept and assume, as applicable, the Designated Leases from Seller, subject to and in accordance with the terms and conditions of this Agreement. For the avoidance of doubt, the sale, transfer, assignment and conveyance of the Designation Rights provided for herein shall not effectuate a sale, transfer,

assignment or conveyance of any Lease or any related assets of Seller to Buyer or an Assignee, which shall only be effectuated on a Lease Assignment Closing. Buyer acknowledges that Seller has or shall decline to reject the Leases in connection with the Bankruptcy in reliance upon Buyer's agreement to purchase the Designated Rights upon the terms set forth in this Agreement.

Section 2.2    **Payments**.  The following amounts shall be paid by Buyer to Seller as consideration for the purchase and sale of the Designation Rights as follows: upon entry of the Sale Order, (i) Buyer shall pay to Seller an amount equal to the Cash Consideration less the amount of the Deposit, and at such time the full amount of the Cash Consideration (which includes the Deposit) shall be deemed released to and earned by Seller, and (ii) the May Rent shall be released to Seller from escrow, which Seller shall pay directly to the applicable landlords of the Leases with respect to the applicable amounts due to such landlords or, if Seller has already paid such amounts, shall be retained by Seller as reimbursement thereof.

Section 2.3    **Agreement to Assign the Designated Leases**.  Effective immediately upon the entry of the Sale Order, but subject to the entry of any applicable Assumption and Assignment Order, Seller hereby agrees to sell, assign, transfer and convey, at Buyer's option, the Designated Leases to Buyer, or an Assignee, and Buyer, or such Assignee, shall purchase, acquire, accept and assume the Designated Leases from Seller, subject to and in accordance with the terms and conditions of this Agreement.

Section 2.4    **Cure Costs**.  With respect to each Designated Lease, on the Lease Assignment Closing Date relating to such Designated Lease, Buyer shall pay to Seller for further payment to the applicable landlord for such Designated Lease an amount equal to the cure costs approved by the Bankruptcy Court (adjusted to the extent such amounts differ from the amounts as shown in the column identified as "Cure" on Schedule A as a result of an agreement between Buyer and the applicable landlord) for such Designated Lease (the "Cure Costs").

## ARTICLE 3

## Deposit

Section 3.1    **Deposit**.  Seller acknowledges that Buyer has paid into escrow an amount equal to Two Hundred Fifty Thousand and No/100 Dollars ($250,000.00) (the "Deposit").

## ARTICLE 4

## Election to Assume/Take Assignment of Designated Leases

Section 4.1    **Election**.  Subject to the terms and conditions of this Agreement, any Assumption and Assignment Order and the requirements of section 365(b) of the Bankruptcy Code, by no later than May 31, 2024 (the "Expiration Date"), Buyer may, by written notice to Seller (a "Buyer Assumption Notice"), designate one or more of the Leases for assumption and assignment, in Buyer's sole and absolute discretion, which can be exercised with respect to any number, or none, of the Leases prior to the Expiration Date. Such notice shall provide the following information: (i) the Lease being assumed and assigned and (ii) the identity of the Assignee, if any. Buyer (or its Assignee) shall have the exclusive right to take an assignment of

any Leases and to negotiate with the landlords with respect thereto (it being understood that, upon written notification by Buyer to Seller that Buyer will not elect to have a Lease assigned to it, Seller shall have the right to then reject or assign such Lease to another party). The Designation Rights shall terminate upon [12:00 p.m. ET on] the Expiration Date. Within one (1) Business Day following the date of Seller's receipt of a Buyer Assumption Notice, Seller shall file with the Bankruptcy Court and serve on the applicable lessor(s) and other appropriate notice parties (as applicable) an appropriate notice and shall seek entry by the Bankruptcy Court of an Assumption and Assignment Order in respect of the Designated Lease or Designated Leases subject to such Buyer Assumption Notice. The Parties agree to close the assumption and assignment of any Designated Leases on the first (1st) Business Day after an Assumption and Assignment Order is entered by the Bankruptcy Court (each, as applicable, a "Lease Assignment Closing Date").

**Section 4.2    Seller's Obligations During Designation Rights Period**.  During the Designation Rights period, Seller shall be obligated as follows:

(a)    Subject to reimbursement by Buyer to Seller as provided in Section 10.4 below, Seller shall pay when due any and all Carrying Costs with respect to each Store as required under the related Lease in such amounts as are required under the terms of the applicable Lease and any other applicable agreement to which Seller or any of its Affiliates is a party pertaining to such Store. Seller shall not pay any amount due from Seller pursuant to any provision of this Agreement using any security deposit associated with any Store, Lease or other related agreement.

(b)    During the Designation Rights Period, Seller shall not, and shall not solicit any other Person to, (A) sell, transfer, assign, convey, lease, license, mortgage, pledge or otherwise encumber any Store, related Lease or related asset (other than with respect to any Undesignated Lease and its related Store), (B) modify, amend or replace any Lease in any fashion (provided that, in consultation with the DIP Agent, Seller shall use commercially reasonable efforts to comply with all instructions from Buyer as to the renewal (or lack of renewal) of each Lease that comes up for renewal), (C) enter into any new leases or related agreements with respect to any Store (other than the applicable Store with respect to any Undesignated Lease), (D) grant or terminate any other interests in any Store, related Lease or related asset (other than with respect to any Undesignated Lease and its related Store) or (E) seek or obtain an order approving rejection of a Lease unless Buyer has delivered a written notification to Seller that Buyer will not elect to have such Lease assigned to it.

(c)    During the Designation Rights Period, Seller shall provide Buyer with full access to a data room containing complete copies of all Leases (including, without limitation, all material notices delivered by any Person pursuant thereto or in connection therewith to the extent in Seller's or any of its Affiliates' possession or control) and shall respond promptly to any reasonable requests by Buyer for further information regarding the Leases of the Stores.

(d)    During the Designation Rights Period, Seller shall bear the risk of loss or damage to the Stores and Seller shall continue all insurance policies with respect to the Stores, including, but not limited to, comprehensive public liability, casualty and umbrella liability insurance and all other insurance required to be maintained under any Lease, until the end of the Designation Rights Period (unless Buyer has delivered a written notification to Seller that Buyer will not elect to have

such Lease assigned to it) in such amounts as it currently has in effect or, if greater, in such amounts as required under any Lease.

(e)    During the Designation Rights Period, Seller shall use commercially reasonable efforts to cause the landlords under the Leases (but shall not be required to bring an action against any such landlord) to maintain the insurance policies that are required under the Leases with respect to the Stores and the shopping centers in which the Stores are located.

(f)    During the Designation Rights Period, Seller shall continue to perform repairs and maintenance and provide security services at the Stores in the manner and to the extent in place as of the Petition Date or required under the Leases.

(g)    During the Designation Rights Period, Seller shall use commercially reasonable efforts to cause the landlords under the Leases (but shall not be required to bring an action against any such landlord) to perform such parties' covenants, agreements and obligations under the Leases (including repair and maintenance obligations) with respect to the Stores and the shopping center in which the Stores are located.

### Section 4.3    <u>Assumption.</u>

(a)    With respect to any Designated Lease:

    (i)    Buyer and Seller shall each use commercially reasonable efforts to accomplish, and shall fully cooperate with each other in, the resolution of any objections to the proposed assumption and assignment of such Lease and related assets, provided that Seller shall have no requirement to contribute to any Cure Costs or Carrying Costs as provided by <u>Section 10.4(a)</u>, and, provided further, that Buyer shall use commercially reasonable efforts to cause any Assignee to use such efforts as required; and

    (ii)    Buyer shall have no liability or obligations, other than for the payment of May Rent (provided that the amounts paid hereunder to Seller for May Rent have been distributed to the applicable landlords), Cure Costs and Carrying Costs as provided by <u>Section 10.4(a)</u>, with respect to any liabilities, claims, damages or other obligations of any Seller under such Lease or otherwise with respect to the Store subject to such Lease (including with respect to any related assets sold, transferred, assigned and conveyed together with such Lease), to the extent arising through and including the Lease Assignment Closing Date.

(b)    Each Party shall bear its own costs and expenses of obtaining entry of an Assumption and Assignment Order and otherwise implementing the sale, transfer, assignment, conveyance and delivery of the applicable Lease and related assets to the applicable Assignee, including, without limitation, the filing and prosecution of any motions or other papers with respect to the same.

## ARTICLE 5

### Personal Property/Trade Fixtures

**Section 5.1**  **Removal**.  Prior to each Lease Assignment Closing, and except as may be further negotiated by Seller and Buyer, Seller shall remove all of its inventory from the applicable Store.  In addition, if, prior to each Lease Assignment Closing, Seller does not remove Trade Fixtures in any applicable Designated Store located in a state other than California, such Trade Fixtures shall be deemed abandoned to Buyer or the applicable Assignee effective upon the Lease Assignment                                                                                                            Closing.

### Inspection and Confidentiality

**Section 6.1**  **Access**.    Buyer, personally or through its authorized agents or representatives (the "Buyer Representatives"), shall have the right at its own expense, from the Effective Date through the applicable Lease Assignment Closing Date, to enter into any Store and to make such investigations, including appraisals, engineering studies, soil tests, environmental studies and underwriting analyses, as Buyer deems necessary or advisable, subject to the following conditions and limitations: (a) such entry and investigations shall be conducted at reasonable times and upon forty-eighty hours' prior written notice to Seller; (b) a representative of Seller shall have the right to be present during such entry or investigations; (c) such entry or investigations shall be subject to the rights of any tenants or other counterparties under Leases and neither Buyer nor any Buyer Representatives shall interfere with the use, occupancy or enjoyment of the Stores by any such Persons or their respective employees, contractors, customers or guests; (d) neither Buyer nor Buyer Representatives shall damage such Stores or any portion thereof; (e) unless Seller agrees otherwise, before Buyer or Buyer Representatives conduct any investigations or inspections of such Stores, including inspections of building systems or any invasive testing or inspections, Buyer or Buyer Representatives, as applicable, shall deliver to Seller a certificate of insurance naming Seller as an additional insured, evidencing commercial general liability insurance (including property damage, bodily injury and death) issued by an insurance company having a rating of at least "A-/VII" by A.M. Best Company, with limits of at least $3,000,000 per occurrence and $5,000,000 in the aggregate for bodily or personal injury or death; (f) without Seller's prior written consent, which Seller may give or withhold in its sole and absolute discretion, Buyer shall not perform any invasive testing at, on or around such Stores, including, without limitation, any Phase II exams, soil borings or other invasive tests; (g) Buyer shall use commercially diligent efforts to perform all on-site due diligence reviews on an expeditious and efficient basis; and (h) Buyer shall indemnify, hold harmless and defend the Seller Parties from and against all Losses resulting from or relating to any entry and/or inspections conducted by Buyer or Buyer Representatives, including, without limitation, Losses incurred in making any and all repairs necessitated to cure any damage to such Stores resulting from such activities but excluding Losses from the mere discovery of conditions existing as of the time of inspection. The foregoing indemnification obligation shall survive the applicable Lease Assignment Closing or termination of this Agreement.

**Section 6.2    Confidentiality**.  The Parties acknowledge that Buyer or its applicable Affiliates have executed a joinder to a certain non-disclosure agreement in favor of Seller or its Affiliates in connection with the transactions contemplated by this Agreement (the "NDA").

## ARTICLE 7

### Conditions Precedent, Casualty Damage or Condemnation

**Section 7.1    Conditions Precedent For Lease Assignment Closings Favoring Buyer**.

(a)    Buyer's obligations under this Agreement with respect to any Lease Assignment Closings are subject to the timely fulfillment of the conditions set forth in this Section 7.1 on or before any Lease Assignment Closing Date. Each condition may be waived in whole or in part only by written notice of such waiver from Buyer to Seller:

(i)    Seller shall have executed and delivered to Buyer all instruments and documents required to be delivered to Buyer at Lease Assignment Closing under this Agreement;

(ii)    Seller shall have performed and complied in all material respects with all of the other terms of this Agreement to be performed and complied with by it prior to or at a Lease Assignment Closing;

(iii)    subject to Section 8.4, on any Lease Assignment Closing Date, the Seller Representations as applicable to the Designated Leases which are the subject of any such Lease Assignment Closing Date, shall be true, complete and accurate, in all material respects, on and as of the Effective Date and on and as of the Lease Assignment Closing Date as if then remade on and as of the Lease Assignment Closing Date, except that Seller shall not be deemed to have breached the foregoing condition precedent by reason of: (A) changes that are: (1) caused by the acts or omissions of Buyer or any Buyer Representatives, (2) a result of the ownership or operation of Stores in the Ordinary Course occurring after the Effective Date and that did not arise by reason of a breach of any covenant made by Seller under this Agreement; or (3) caused by matters that are outside of the reasonable control of Seller and that did not arise by reason of a breach of any covenant made by Seller under this Agreement; or (B) casualty or condemnation (which shall be governed exclusively by Section 7.3);

(iv)    There shall not be in effect any Order by a Governmental Authority of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by the applicable Lease Assignment Closings; and

(v)    The Bankruptcy Court shall have entered an Assumption and Assignment Order with respect to the applicable Designated Lease and such order shall be a final, nonappealable order and Seller shall have provided an Assumption and Assignment Notice to each applicable landlord in accordance with the terms and conditions of the Assumption and Assignment Order.

(b)    If the conditions precedent in favor of Buyer set forth above in Section 7.1(a) are not satisfied in all material respects as of a Lease Assignment Closing Date, Buyer may elect in its

sole discretion not later than the Lease Assignment Closing Date, and as its sole remedy, either to: (i) waive such condition and proceed with the Lease Assignment Closing as contemplated by this Agreement (without any reduction in the Purchase Price), it being agreed by Seller that Buyer shall have the option to elect to waive the failure of a condition as to less than all of the Designated Leases with respect to such Lease Assignment Closing and that Buyer's obligation to proceed with any such Lease Assignment Closing under this Agreement shall be with respect to those of the Designated Leases where such conditions were either timely fulfilled, or were waived in writing by Buyer; (ii) terminate Buyer's obligation to close the transactions contemplated with respect to such Lease Assignment Closing; or (iii) to the extent such failure is the result of a Seller default hereunder beyond applicable notice and cure periods expressly provided for herein, exercise its rights and remedies under <u>Section 12.2</u>.

(c)     Buyer acknowledges and agrees that its obligation to perform under this Agreement and consummate any Lease Assignment Closing is not contingent upon Buyer's ability to obtain any (i) governmental or quasi-governmental approval of changes or modifications in use or zoning, (ii) modification of any existing land use restrictions, or (iii) consents to assignments of any service contracts or other agreements which Buyer requests.

**Section 7.2     <u>Conditions Precedent Favoring the Seller</u>**.    Seller's obligations with respect to any Lease Assignment Closings are expressly subject to the timely fulfillment of the conditions set forth in this <u>Section 7.2</u> on or before any Lease Assignment Closing Date. Each condition may be waived in whole or part only by written notice of such waiver from Seller to Buyer, it being agreed by Buyer that Seller may elect to waive the failure of a condition as to one or more of the Designated Leases, in which event, Buyer shall have the obligation to proceed to Lease Assignment Closing under this Agreement with respect to those of the Designated Leases where such conditions were either timely fulfilled, or were waived in writing by Seller:

(a)     Buyer shall have executed and delivered to Seller all instruments and documents required to be delivered by Buyer at Lease Assignment Closing under this Agreement;

(b)     Buyer shall have performed and complied in all material respects with all of the terms of this Agreement to be performed and complied with by Buyer prior to a Lease Assignment Closing;

(c)     The Buyer Representations shall be true, accurate and complete in all material respects on and as of the Effective Date and on and as of the Lease Assignment Closing Date as if then remade on and as of the Lease Assignment Closing Date; and

(d)     The Bankruptcy Court shall have entered an Assumption and Assignment Order and such order shall be a final, nonappealable order.

**Section 7.3     <u>Risk of Casualty and Condemnation</u>**.

(a)     If, during the Designation Rights Period, all or any part of any Store (other than a Store (x) that has already been the subject to a Lease Assignment Closing or (y) for which Seller has received a notice from Buyer that Buyer has elected not to designate the Lease related to such Store as a Designated Lease) is damaged by fire or other casualty or becomes the subject of any

eminent domain proceedings, (i) Seller shall promptly give notice to Buyer of such fact and thereafter, promptly following Seller's receipt thereof, (x) with respect to any casualty, an estimate of the cost and time to restore prepared by an Approved Engineer and a summary of the obligations of the landlord and tenant under the applicable Lease with respect to such casualty and (y) with respect to any condemnation, to the extent to which the Store will be affected by such condemnation and a summary of the landlord and tenant under the applicable Lease with respect to such condemnation and (ii) Buyer may, at Buyer's option and in its sole discretion, (x) if such casualty or condemnation could reasonably be expected to (1) adversely affect the operation of the applicable Store, (2) require Buyer or the Assignee to incur restoration costs and expenses (other than in a de minimis amount) or (3) trigger any party's right to terminate the applicable Lease pursuant to its terms, remove the Designated Lease relating to such Designated Store from the Leases being assigned and assumed on any Lease Assignment Closing Date and proceed to such Lease Assignment Closing in accordance with the terms hereof with no reduction in the Purchase Price or (y) proceed with the Lease Assignment Closing with such Designated Lease included; provided, however, that Buyer shall participate with Seller in the adjustment and settlement of such casualty insurance claim and Seller shall assign to Buyer at such Lease Assignment Closing all of Seller's right, title and interest in and to the insurance proceeds payable on account of such damage (net of collection costs and costs of repair with respect to such casualty reasonably incurred by Seller), including without limitation, rental interruption insurance with respect to periods following the Lease Assignment Closing.

## ARTICLE 8

### Representations, Warranties and Covenants

**Section 8.1    Buyer Representations**.    Subject to the limitations set forth in this Agreement, Buyer hereby represents and warrants to, and covenants with, Seller as follows (the "Buyer Representations"):

(a)    Buyer acknowledges that it is an experienced and sophisticated operator of retail discount variety stores similar to the Stores and that, prior to the Effective Date, it has had a full and complete opportunity to (i) review all information and documentation relating to the Stores and Leases made available to Buyer by or on behalf of Seller and (ii) conduct such other investigations, examinations, inspections and analyses of the Stores as Buyer has deemed necessary or appropriate. Buyer further acknowledges that, except for the Seller Representations, Buyer has not relied upon any statements, representations or warranties by any Seller Party or any agent of any Seller Party, including Broker;

(b)    Buyer acknowledges and agrees that, upon the Lease Assignment Closing for a Designated Lease, it is agreeing to take such assignment subject to the Designated Lease and the Designated Store being in **"AS IS, WHERE IS" AND "WITH ALL FAULTS, LIABILITIES AND DEFECTS, LATENT OR OTHERWISE, KNOWN OR UNKNOWN"** basis condition with respect to all facts, circumstances, conditions and defects (and Seller shall have no obligation to determine or correct any such facts, circumstances, conditions or defects and Buyer assumes the full risk of any loss or damage occasioned by any fact, circumstance, condition or defect pertaining to such Designated Leases and Designated Stores), and, subject to Section 7.3 of this Agreement,

loss by casualty or condemnation excepted, with no right of set-off or, except as expressly set forth herein, reduction in the Purchase Price, and that, except for the Seller Representations, such sale shall be without representation or warranty of any kind, express or implied, including any warranty of income potential, operating expenses, uses, merchantability or fitness for a particular purpose, and Seller does hereby disclaim and renounce any such representation or warranty. Buyer specifically acknowledges that, except as expressly provided in the Seller Representations, Buyer is not relying on, either directly or indirectly, any representations or warranties of any kind whatsoever, express or implied, from Seller, any other Seller Party or any other Person as to any matters concerning the Designated Leases and Designated Stores, including, without limitation: (i) the income from or value of any Designated Lease; (ii) any income to be derived from any Designated Store; (iii) the suitability of any Designated Store or Designated Lease for any and all activities and uses which Buyer may conduct thereon, including the possibilities for further development or construction thereon; (iv) the habitability, merchantability, marketability, profitability or fitness for a particular purpose of any Designated Store or any improvements thereon; (v) the manner, quality, state of repair or lack of repair of any Designated Store (including the roof, foundation, HVAC systems or any other component of such Designated Store or any improvements thereon); (vi) the nature, quality or condition of, including with respect to water conditions, soil, geological or geotechnical condition (including soil expansiveness, corrosivity or stability, or seismic, hydrological, geological and topographical conditions and configurations, including, without limitation, any opinions or conclusions of any soils engineer(s) retained to perform geotechnical and/or soils studies or to oversee any soils engineering aspects of developing any Designated Store); (vii) the compliance of or by Seller, any Designated Store, or its operation with any Laws and Regulations; (viii) the manner or quality of the construction or materials incorporated into any Designated Store; (ix) compliance with Environmental Laws or land use laws, rules, regulations, orders, codes or requirements, including the Americans with Disabilities Act of 1990; (x) the presence or absence of radon gas, methane gas, asbestos any other Hazardous Materials at, on, under or adjacent to any Designated Store; (xi) the conformity of any improvements to any plans or specifications, including, without limitation, any plans and specifications that may have been or may be provided to Buyer; (xii) the conformity of any Designated Store to past, current or future applicable zoning or building requirements; (xiii) deficiency of any shoring; (xiv) deficiency of any drainage; (xv) the fact that all or a portion of any Designated Store may be located on or near an earthquake fault line or in or near an earthquake or seismic hazard zone; (xvi) the existence of vested land use, zoning or building entitlements affecting any Designated Store; (xvii) water rights or the availability of or access to water; (xviii) the presence or suitability of any utilities or availability thereof; (xix) the completeness or accuracy of any information provided to Buyer by the Seller Parties or their agents; (xx) any knowledge that any Seller Party may have relating to the any Designated Store or Designated Lease that is has, or has not, shared with Buyer; and/or (xxi) any other matter relating to any Designated Store or to the development, construction, operation, leasing or sale of any Designated Store. Buyer acknowledges that to the extent required to be operative, the disclaimers and warranties contained herein are "conspicuous" disclaimers for purposes of any applicable law, rule, regulation or order. Buyer further acknowledges and agrees that, except for the Seller Representations (as the same may be updated at any applicable Lease Assignment Closing), no Seller Party is under any duty to make any affirmative disclosures or inquiry regarding any matter which may or may not be known to Seller or any of the other Seller Parties, and Buyer, for itself and for its successors and assigns, hereby expressly waives and releases each of the Seller

Parties from any such duty that otherwise might exist; <u>provided</u>, <u>however</u>, that the foregoing provision shall not prevent Buyer from relying on the Seller Representations, subject to the limitations and conditions relating thereto set forth in this Agreement;

(c)     Except as expressly provided below in this <u>Section 8.1(c)</u>, Buyer, for Buyer and Buyer's successors and assigns, irrevocably and unconditionally releases the Seller Parties from, and irrevocably and unconditionally waives all claims and liabilities against the Seller Parties for or attributable to, the following:

(i)     any and all statements or opinions heretofore or hereafter made, or information furnished, by or on behalf of the Seller Parties to Buyer or any of Buyer's agents or representatives (other than to the extent that the same constitute fraud or a breach of Seller Representations as and when such Seller Representations were made); and

(ii)     any and all Losses of any kind or nature whatsoever, whether known, unknown, foreseen or unforeseen, attributable to the Designated Leases, whether arising or accruing before, on or after any applicable Lease Assignment Closing and whether attributable to events or circumstances which have heretofore or may hereafter occur, including all Losses with respect to the structural, physical or environmental condition of the Designated Stores including claims or liabilities relating to the presence, discovery or removal of any Hazardous Materials in, at, under or about the Designated Store and any other matters described in <u>Section 8.1(b)</u>;

Buyer acknowledges and agrees that (A) Buyer may hereinafter discover facts different from or in addition to those now (or as of any applicable Lease Assignment Closing) known to Buyer, (B) except for fraud, Buyer's agreement to release, acquit and discharge the Seller Parties as set forth herein shall remain in full force and effect notwithstanding the existence or discovery of any such additional or different facts, (C) Buyer knowingly waives any rights, privileges and benefits under any federal, state or local law which may negatively impact the validity or enforceability of any part of the releases set forth in this Agreement, (D) upon the completion of any applicable Lease Assignment Closing, the Seller Parties shall be deemed, with respect to the Designated Leases that were the subject of the Lease Assignment Closing, to have satisfied all of their respective obligations, covenants and liabilities in this Agreement and in any documents executed by the Seller Parties in connection herewith other than those obligations of the Seller that, by the express terms of this Agreement, survive the applicable Lease Assignment Closing (in which case such survival shall be subject to the limitations set forth in this Agreement) and (E) Buyer irrevocably covenants never to commence or prosecute, or to collude with others to commence or prosecute, against any Seller Party any action or proceeding based upon any claim covered by the foregoing release;

<u>provided</u>, <u>however</u>, that the foregoing releases and waivers set forth in this <u>Section 8.1(c)</u> are not intended and shall not be construed to affect or impair any rights or remedies that Buyer may have against Seller as a result of fraud or a breach of any of the Seller Representations, or of any covenant of Seller expressly set forth in this Agreement, subject to the terms and limitations on the Seller's liability as expressly set forth elsewhere in this Agreement.

Buyer understands the legal significance of the foregoing provisions and acknowledges and agrees that the provisions of <u>Section 8.1(b)-(c)</u> were a material factor in Seller's agreement to complete

the transactions contemplated by this Agreement and Seller's acceptance of the Purchase Price and that Seller is unwilling to consummate the transactions contemplated by this Agreement unless the Seller Parties are expressly released as set forth in Section 8.1(b)-(c).

The releases contained in Section 8.1(b)-(c) and elsewhere in this Agreement include claims of which Buyer is presently unaware or which Buyer does not presently suspect to exist, which, if known by Buyer, would materially affect Buyer's release of the Seller Parties. Buyer specifically waives the provisions of any law of any state, territory or jurisdiction the import of which is as follows:

A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

Notwithstanding anything to the contrary in this Agreement, the provisions of Section 8.1(b)-(c) shall survive any Lease Assignment Closing with respect to the Designated Leases that are the subject thereof or termination of this Agreement.

(d)     Buyer is a corporation, duly formed, validly existing and in good standing under the Laws and Regulations of the Commonwealth of Virginia. This Agreement constitutes the valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms, subject to general principles of equity and to bankruptcy, insolvency, reorganization, moratorium or other similar laws presently or hereafter in effect affecting the rights of creditors or debtors generally. Buyer has the power to enter into, execute and deliver this Agreement and to perform its obligations hereunder.

(e)     There are no actions, suits or proceedings pending or, to the knowledge of Buyer, threatened, against or affecting Buyer which, if determined adversely to Buyer, would adversely affect its ability to perform its obligations pursuant to the terms of this Agreement.

(f)     Neither (i) the execution, delivery or performance of this Agreement by Buyer nor (ii) compliance herewith (A) conflicts or will conflict with or results or will result in a breach of or constitutes or will constitute a default under (1) the charter documents or by-laws of Buyer, (2) to the best of Buyer's knowledge, any law or any order, writ, injunction or decree of any court or Governmental Authority, or (3) to the best of Buyer's knowledge, any agreement or instrument to which Buyer is a party or by which it is bound or (B) results in the creation or imposition of any lien, charge or encumbrance upon its property pursuant to any such agreement or instrument.

(g)     No authorization, consent or approval of any Governmental Authority (including courts) is required for the execution and delivery by Buyer of this Agreement or the performance of its obligations pursuant to the terms of this Agreement.

(h)     Buyer is currently (i) in compliance with, and shall at all times during the term of this Agreement remain in compliance with, the regulations of OFAC and any statute, executive order (including Executive Order 13224, dated September 24, 2001 and entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism") or regulations relating thereto, and (ii) not listed on, and shall not during the term of

this Agreement be listed on, the Specially Designated Nationals and Blocked Persons List maintained by OFAC and/or any other similar list maintained by OFAC or any other Governmental Authority pursuant to any authorizing statute, executive order or regulation. Buyer has taken, and shall continue to take until all of the Lease Assignment Closings have occurred, such measures as are required by applicable law to ensure that funds used to pay to Seller the Purchase Price are derived (A) from transactions that do not violate United States law nor, to the extent such funds originate outside the United States, do not violate the laws of the jurisdiction in which they originated and (B) from permissible sources under United States law and to the extent such funds originate outside the United States, under the laws of the jurisdiction in which they originated.

(i)      Buyer's rights under this Agreement do not, and its acquisition of any Designated Leases shall not, constitute "plan assets" within the meaning of 29 C.F.R. Section 2510.3-101, because one or more of the following circumstances is true:

(i)      Equity interests in Buyer are publicly offered securities, within the meaning of 29 C.F.R. Section 2510.3-101(b)(2);

(ii)      Less than twenty-five (25%) percent of all equity interests in Buyer are held by "benefit plan investors" within the meaning of 29 C.F.R. Section 2510.3-101(f)(2); or

(iii)      Buyer qualifies as an "operating company", "venture capital operating company" or a "real estate operating company" within the meaning of 29 C.F.R. Section 2510.3-101(c), (d) or (e);

(j)      Buyer is not a "governmental plan" within the meaning of Section 3(32) of ERISA and the execution of this Agreement and the purchase of any Designated Leases by Buyer is not subject to state statutes regulating investments of and fiduciary obligations with respect to governmental plans.

(k)      Buyer has not (i) filed any petition in bankruptcy or made any assignment for the benefit of creditors, (ii) filed any petition seeking reorganization or arrangement or other action under Federal or State bankruptcy laws wherein Buyer is named a debtor, or (iii) received written notice of any such petition or action filed or initiated against it.

(l)      Buyer has, or will have, as and when due pursuant to the terms of this Agreement, cash on hand sufficient to pay all other amounts required to be paid by Buyer pursuant to this Agreement.[1]

The representations and warranties of Buyer contained in this <u>Section 8.1</u> shall survive the applicable Lease Assignment Closings, but only to the extent provided in <u>Section 12.3(b)</u>.

   **Section 8.2   <u>Seller Representations</u>**.      Subject to the limitations set forth in this Agreement, Seller hereby represents and warrants to Buyer as of the Effective Date as follows (the "<u>Seller Representations</u>"):

---

[1] NTD: To be modified as applicable to reflect Buyer's equity and/or debt commitments.

(a)      Seller is a limited liability company/corporation, duly formed, validly existing and in good standing under the laws of the State of California. Seller has the power to enter into, execute and deliver this Agreement and to perform all duties and obligations imposed upon it hereunder.

(b)      Seller's execution and delivery of this Agreement and performance of its obligations hereunder have been duly authorized by all necessary action on the part of Seller, and do not violate or conflict with Seller's organizational documents, any judgment, decree or order of any court applicable to or affecting Seller, breach the provisions of or constitute a default under any material contract to which Seller is a party or by which Seller is bound, or violate or conflict with any Laws and Regulations applicable to Seller.

(c)      There is no action, suit, litigation, hearing or administrative proceeding pending or, to Seller's Actual Knowledge, threatened against Seller or any Designated Store or with respect to any Designated Lease in any court, administrative bureau or other regulatory setting, that, if determined adversely to Seller, would reasonably be expected to materially and adversely affect Seller's ability to perform its obligations pursuant to the terms of this Agreement.

(d)      Seller is not a "foreign person" as such term is defined in Section 1445(e)(3) of the Code.

(e)      Seller is currently (i) in compliance with, and shall at all times during the term of this Agreement remain in compliance with, the regulations of the OFAC and any statute, executive order (including Executive Order 13224, dated September 24, 2001 and entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism"), or regulations relating thereto and (ii) not listed on, and shall not during the term of this Agreement be listed on, the Specially Designated Nationals and Blocked Persons List maintained by OFAC and/or any other similar list maintained by OFAC or any other Governmental Authority pursuant to any authorizing statute, executive order or regulation.

(f)      Seller has delivered or made available to Buyer true and complete (in all material respects) copies of all Leases, and the May Rent and anticipated Cure Costs noted on <u>Schedule A</u> for each applicable Lease are, to the Knowledge of Seller, true and accurate. Except as a result of the Bankruptcy or as a result of the failure to pay to any applicable Landlord any amounts that are identified as Cure Costs in <u>Schedule A</u>, neither Seller nor, to the Knowledge of Seller, any other party thereto is in default under any of the Leases in any material respect. Each Lease is in full force and effect and is enforceable against each party thereto in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity). Notwithstanding anything to the contrary herein, the termination of any Lease between the Effective Date and the applicable Lease Assignment Closing by any party thereto other than Seller or its Affiliates shall not constitute a default by Seller or otherwise affect the obligations of Seller to sell, and Buyer to buy, the remainder of the Designated Leases in accordance with the terms hereof.

(g)     Seller is not a party to any service contracts with respect to the Designated Leases that will be binding on Buyer from and after any applicable Lease Assignment Closing.

(h)     There are no condemnation or eminent domain proceedings pending, or to Seller's Actual Knowledge, threatened in writing against any Store.

(i)     Neither Seller nor any entity that would be considered a single employer with Seller or Seller under Code Section 414(b) or Code Section 414(c) maintains, contributes to, or otherwise has incurred any liability with respect to any "employee benefit plan" within the meaning of Section 3(3) of ERISA with respect to persons who are or were employed at any Store or otherwise perform or performed services at any Store.

The representations and warranties of Seller contained in this <u>Section 8.2</u> shall survive the applicable Lease Assignment Closings, but only to the extent provided in <u>Section 12.3(b)</u>.

**Section 8.3**   <u>**Seller's Actual Knowledge**</u>.

(a)     Whenever a representation is qualified by the phrase "to Seller's Actual Knowledge", "to Seller's knowledge" or words of similar import, the accuracy of such representation shall be based solely on the actual (as opposed to constructive or imputed) knowledge of those senior executives of the Company which have principal oversight over the Company's and its subsidiaries' owned and leased real properties, without investigation or inquiry. Buyer acknowledges that nothing herein shall impose any liability on or create any duties running from such Persons to Buyer and Buyer agrees that no such Persons shall have any personal or other liability under this Agreement or in connection with the transactions contemplated by this Agreement.

**Section 8.4**   <u>**Notice of Breach**</u>.

(a)     To the extent that, before the Effective Date, Buyer obtained actual knowledge that any of the Seller Representations are inaccurate, untrue or incorrect in any way, such representations and warranties shall be deemed modified to reflect such actual knowledge as of the Effective Date. For purposes of this Agreement, Buyer shall be deemed to have actual knowledge that any representation or warranty contained herein is inaccurate, untrue or incorrect to the extent that: (i) Buyer or any of its Affiliates has actual knowledge of any fact or information which is inconsistent with such representation or warranty at the time such representation or warranty was made; and/or (ii) any written materials delivered to Buyer or any of its Affiliates prior to the Effective Date contain information inconsistent with any such representations and warranties. As of any Lease Assignment Closing Date, with respect to any Designated Leases that are the subject of such Lease Assignment Closing Date, Buyer shall also be deemed to have actual knowledge that any representation or warranty contained herein is inaccurate, untrue or incorrect to the extent that: (A) any written materials delivered to Buyer or any of its Affiliates thereof from and after the Effective Date, but prior to such Lease Assignment Closing Date, contain information inconsistent with any such representations and warranties and (B) Buyer or any of its Affiliates has actual knowledge of any fact or information which is inconsistent with such representation or warranty at the time such representation or warranty was made.

(b)        If, after the Effective Date but prior to any Lease Assignment Closing Date, with respect to any Designated Leases that are the subject of such Lease Assignment Closing Date, Buyer or any Affiliate thereof first obtains actual knowledge that any of the Seller Representations made herein is untrue, inaccurate or incorrect in any material respect, Buyer shall give Seller written notice thereof within five (5) Business Days of obtaining such actual knowledge (but, in any event, prior to such Lease Assignment Closing Date). In such event, Seller shall have the right (but not the obligation) to attempt to cure such misrepresentation or breach and shall, at its option, be entitled to a reasonable adjournment of such Lease Assignment Closing Date (not to exceed forty-five (45) days in the aggregate with all other adjournment rights exercised by Seller hereunder) for the purpose of such cure. If Seller elects to attempt to so cure but is unable to so cure any misrepresentation or breach of warranty, or elects not to cure the same, then Buyer, as its sole remedy for any and all such materially untrue, inaccurate or incorrect representations or warranties, shall elect within five (5) Business Days thereafter either to (i) waive such misrepresentations or breaches of representations and warranties and consummate the assignment of the Designated Leases which are the subject of such Lease Assignment Closing Date, without any reduction of or credit against the Purchase Price, (ii) if such misrepresentation or breach affects less than all of the Designated Leases, elect to remove such Designated Lease from the Leases being assigned on such Lease Assignment Closing Date and consummate the assignment of the Designated Leases with respect to the rest of the Designated Leases being assigned on such Lease Assignment Closing Date without any reduction of or credit against the Purchase Price, or (iii) terminate this Agreement with respect to Buyer's obligation to take an assignment of all Designated Leases that were subject to such Lease Assignment Closing by written notice given to Seller on such Lease Assignment Closing Date (or prior to such Lease Assignment Closing Date if Seller elects not to cure the same), in which event this Agreement shall be terminated with respect to such Designated Leases and, thereafter, no Party shall have any further rights or obligations hereunder except as provided in any section hereof that by its terms expressly provides that it survives any termination of this Agreement.

## ARTICLE 9

### Bankruptcy Court Matters

Section 9.1    **Bankruptcy Court Matters**.

(a)        Each Party shall use commercially reasonable efforts to (i) obtain the Sale Order and (ii) obtain an order or orders approving the assumption by Seller and assignment to Buyer or an Assignee of any Designated Lease, which order shall be in substantially the form of Exhibit 1 attached hereto (a "Assumption and Assignment Order").

(b)        Buyer shall promptly take all actions reasonably requested by Seller to assist in obtaining the Sale Order, any Assumption and Assignment Order and any other order of the Bankruptcy Court reasonably necessary in connection with the transactions contemplated by this Agreement, in each case as promptly as practicable, including furnishing affidavits, financial information or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of Buyer and its Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things, providing necessary assurances of performance by

Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under the Bankruptcy Code, as well as demonstrating Buyer's ability to pay and perform or otherwise satisfy all obligations and liabilities to be assumed by Buyer in connection with any Designated Lease at any Lease Assignment Closing. Upon issuance of any Assumption and Assignment Order, Seller shall promptly provide, prior to each applicable Lease Assignment Closing, an Assumption and Assignment Notice to each applicable landlord in form and substance as required and pursuant to the terms of the Assumption and Assignment Order.

(c)     Seller having fully marketed the Leases, the sale will proceed as a private sale and will not be subject to auction. Notwithstanding that, if another bidder for the Leases emerges prior to the entry of the Sale Order and Seller enters into an alternative transaction to sell the Designation Rights to such other bidder, Seller agrees to utilize best efforts to seek approval of reimbursement of all actual fees and expenses incurred by Buyer in connection with the transactions contemplated by this Agreement, including, but not limited to, providing for such reimbursement in any motion to approve any proposed order approving an alternative transaction in place of the transactions contemplated by this Agreement.

(d)     Buyer shall appear formally or informally in the Bankruptcy Court if reasonably requested by Seller or required by the Bankruptcy Court in connection with the transactions contemplated by this Agreement.

(e)     Buyer shall provide adequate assurance of future performance as required under the Bankruptcy Code for the Designated Leases. Buyer agrees that it will take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Designated Leases, such as furnishing affidavits, financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's and its Affiliates' Advisors available to testify before the Bankruptcy Court.

(f)     Seller's obligations under this Agreement and in connection with the transactions contemplated by this Agreement are subject to entry of and, to the extent entered, the terms of any applicable orders of the Bankruptcy Court (including, without limitation, the entry of the Sale Order and, as applicable, any Assumption and Assignment Order). Nothing in this Agreement shall require the Seller or any of its Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

## ARTICLE 10

### Lease Assignment Closings

**Section 10.1  Time and Place of Lease Assignment Closings**.

(a)     Each Lease Assignment Closing shall take place commencing at 11:00 a.m. (ET) on a Lease Assignment Closing Date, with any amounts due and payable herein received by 3:00 p.m. (ET) by Seller, TIME BEING OF THE ESSENCE, subject to the Seller's and Buyer's right to adjourn any Lease Assignment Closing as expressly permitted under this Agreement.

**Section 10.2  Seller's Deliveries**.  By not later than 5:00 p.m. (ET) on any Lease Assignment Closing Date, Seller shall deliver or cause to be delivered to Buyer each of the following items, each executed by Seller, if necessary, and acknowledged to the extent appropriate:

(a)      a Final Closing Statement for the applicable Designated Stores;

(b)      all security codes and master keys to any portion of the applicable Designated Stores, to the extent in Seller's possession; and

(c)      such other documents as may be required by the express terms of this Agreement to be delivered by Seller and such other customary conveyance documents, certificates, deeds and other instruments as Buyer may reasonably require to carry out the assignment of the applicable Designated Leases as contemplated by this Agreement and as are customary in like transactions in the State in which any applicable Designated Store is located.

**Section 10.3  Buyer's Deliveries**.  By not later than 5:00 p.m. (ET) on any Lease Assignment Closing Date, Buyer shall deliver to Seller, each of the following items, each executed, if necessary, by Buyer or an Assignee and acknowledged to the extent appropriate:

(a)      As provided by Section 2.4, the Cure Costs applicable to the Designated Leases being assigned to Buyer, adjusted by an amount equal to the adjustments and prorations reflected on the Final Settlement Statement as provided by Section 10.4(b), wired to Seller in immediately available funds.

(b)      a Final Closing Statement for the applicable Designated Stores; and

(c)      such other documents as may be required by the express terms of this Agreement to be delivered by Buyer and such other customary documents, certificates and other instruments as Seller may reasonably require to carry out the assignment of the Designated Leases as contemplated by this Agreement and as are customary in like transactions in the State in which any applicable Designated Store is located.

**Section 10.4  Closing Costs**.

(a)      **Reimbursement of Carrying Costs**.  Buyer shall reimburse Seller for all Carrying Costs, on a Store-by-Store basis, as follows: (i) with respect to any Designated Store, on the Lease Assignment Closing Date for such Designated Store, (ii) with respect to any Lease for which Seller has received a notice from Buyer that Buyer has elected not to designate such Lease as a Designated Lease, on the date that is one (1) day after the effective date of an order issued by the Bankruptcy Court either (x) rejecting the Lease applicable to such Store, or (y) approving the assumption of the Lease by Seller and the assignment of the Lease to a third-party, or (iii) for Leases that are not covered by (i) or (ii) above, on the Expiration Date. The foregoing reimbursements shall be paid by wire transfer of immediately available funds.

(b)      **Preliminary and Final Closing Statements**.  All reimbursements to be made under the foregoing provisions of this Section 10.4 shall be made on the basis of a written closing

statement, which Seller shall endeavor to provide to Buyer at least three (3) Business Days prior to each Lease Assignment Closing Date or the Remaining Lease Carrying Cost Reimbursement Date, as applicable (the "Preliminary Closing Statement"), showing the amount due to Seller for reimbursement of Carrying Costs provided for in this Section 10.4. On or prior to the applicable Lease Assignment Closing Date or the Remaining Lease Carrying Cost Reimbursement Date, Seller and Buyer shall jointly agree upon any adjustments to be made to the Preliminary Closing Statement in accordance with the terms of this Agreement and, upon the final determination of such adjustments, Seller and Buyer shall each execute the final closing statement (the "Final Closing Statement") which shall reflect the amount due to Seller for reimbursement of Carrying Costs. The amounts agreed to by Seller and Buyer in the Final Closing Statement shall be conclusive and binding on the Parties hereto, except for any items that are not capable of being determined at the time the Final Closing Statement is agreed to by Seller and Buyer, which items shall be determined and paid in the manner set forth in the Final Closing Statement. Prior to and following the applicable Lease Assignment Closing or Remaining Lease Carrying Cost Reimbursement Date, each Party shall provide the other with such information as the other shall reasonably request in order to finalize the Final Closing Statement. Notwithstanding anything in this Agreement to the contrary, any claim for any adjustment under this Section 10.4 will only be valid if made in writing with specificity and only if made on or before the date that is sixty (60) days after any applicable Lease Assignment Closing Date or Remaining Lease Carrying Cost Reimbursement Date.

(c) **Closing Costs**.

(i) Seller shall pay Seller's own advisors' and attorneys' fees; and

(ii) Unless any expense or cost under Section 12.2(a) becomes due and payable by Seller under this Agreement, Buyer shall pay (i) all due diligence costs incurred by Buyer in connection with the transactions contemplated by this Agreement, and (ii) Buyer's own advisors' and attorneys' fees.

(d) **Survival**. The terms of this Section 10.4 shall survive the applicable Lease Assignment Closing or the Remaining Lease Carrying Cost Reimbursement Date, as applicable.

## ARTICLE 11

## No Real Estate Commission

Seller shall be obligated to pay any real estate commissions and/or brokerage fees to [Hilco or Jeffries] (the "Brokers") in connection with the transactions contemplated by this Agreement in accordance with separate written agreements between Seller and Brokers. Each Party represents and warrants to the other Party that (a) it dealt with no broker other than the Brokers and (b) no other brokerage fee or real estate commission is or shall be due or owing in connection with the transactions contemplated by this Agreement as a result of the acts of the representing Party. Each Party hereby indemnifies and holds the other Party harmless from any and all Losses incurred by reason of any breach of the foregoing representations and warranties by such representing Party. Seller shall further indemnify and hold Buyer harmless from and against all Losses which may arise by reason of any claim asserted by any Broker in connection with this Agreement or any

Broker's representation of Seller. The provisions of this <u>Article 11</u> shall survive all of the Lease Assignment Closings or the termination of this Agreement.

## ARTICLE 12

## <u>Default</u>

**Section 12.1  <u>Buyer Default</u>** .  If a Lease Assignment Closing is not consummated due to Buyer's failure to perform its obligations under this Agreement, which failure is not cured within three (3) Business Days after written notice from Seller of such failure, then Seller shall be entitled to terminate this Agreement as it relates to the Designated Leases that were the subject of such Lease Assignment Closing upon written notice, in which case the Parties shall have no further obligations to each other with respect to the Designated Leases that were the subject of such Lease Assignment Closing; <u>provided</u>, <u>however</u>, that this <u>Section 12.1</u> is intended only to liquidate and limit Seller's right to damages arising due to Buyer's failure to consummate any Lease Assignment Closing in accordance with the terms of this Agreement and shall not limit the obligations of Buyer or Seller that survive the termination of this Agreement. If Buyer is in default of its obligations under this Agreement prior to the payment of the Cash Consideration to Seller as provided in <u>Section 2.2</u> and Buyer fails to cure such default within three (3) Business Days after written notice from Seller of such failure, then Seller shall be entitled to terminate this Agreement upon written notice to Buyer, in which case Seller shall be entitled to retain the Deposit as liquidated damages and the Parties shall have no further obligations to each other with respect to this Agreement.

<u>Seller Default</u>.

(a)      If, in the absence of a Buyer default, a Lease Assignment Closing is not consummated because of a failure by Seller to perform its obligations in accordance with the terms of this Agreement (a "<u>Seller Failure</u>"), which Seller Failure is not cured by Seller within three (3) Business Days after written notice from Buyer, then Buyer may, as its sole and exclusive remedy at law or in equity, either: (i) terminate this Agreement with respect to the Designated Leases that were the subject of such Lease Assignment Closing by giving written notice thereof to the Seller, in which event (A) to the extent Seller willfully refused to consummate the assignment of the Designated Leases as contemplated by this Agreement following satisfaction by Buyer of all conditions precedent to Seller's obligation to proceed to such Lease Assignment Closing, Seller shall reimburse Buyer for all of Buyer's reasonable out-of-pocket costs and expenses actually incurred in connection with the assignment of the Designated Leases as contemplated by such Lease Assignment Closing and this Agreement and (B) the Parties shall have no further obligations to each other except for those obligations which expressly survive the termination of this Agreement; (ii) waive such Seller Failure and consummate the assignment of the Designated Leases that were the subject of such Lease Assignment Closing as contemplated by this Agreement; or (iii) specifically enforce Seller's obligation to consummate the assignment of the Designated Leases that were the subject of such Lease Assignment Closing as contemplated by this Agreement (and, in connection with such election, Seller hereby waives any requirement for the securing or posting of any bond by Buyer in connection with the pursuit of such remedy); <u>provided</u>, <u>however</u>, that (1) as a condition precedent to Buyer's election to bring an action for

specific performance as the result of such Seller Failure hereunder, Buyer must commence such action within fifteen (15) days after the occurrence of such breach and (B) Buyer agrees that its failure timely to commence such an action for specific performance within such fifteen (15) day period shall be deemed a waiver by it of its right to commence such an action. If Seller is in default of its obligations under this Agreement prior to the payment of the Cash Consideration to Seller as provided in Section 2.2 and Seller fails to cure such default within three (3) Business Days after written notice from Buyer of such failure, then Buyer shall be entitled to terminate this Agreement upon written notice to Seller, in which case the Deposit shall be returned to Buyer as liquidated damages and the Parties shall have no further obligations to each other with respect to this Agreement.

(b)      Notwithstanding the foregoing or anything herein to the contrary: if a Lease Assignment Closing is not consummated because of a Seller Failure or Seller's inability to timely cure any such Seller Failure as provided in Section 12.2(a) above, and such Seller Failure is a result of any actions or omissions of Buyer or any Affiliate of Buyer, then Buyer shall be deemed to have elected to proceed pursuant to Section 12.2(a)(ii) with respect to such Seller Failure (and such Seller Failure shall not constitute a default by Seller hereunder).

(c)      This Section 12.2 is intended only to limit Buyer's right to damages arising due to Seller's failure to consummate the assignment of the Designated Leases as contemplated by this Agreement and shall not limit the obligations of Seller that survive the termination of this Agreement.

Section 12.3  **Breach of Representations**.

(a)      Each of the Seller Representations and Buyer Representations and the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to any Lease Assignment Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate as to any applicable Designated Store and Designated Lease effective immediately as of a Lease Assignment Closing with respect to such Designated Store and Designated Lease such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in Contract, in tort or at law or in equity) may be brought in respect thereof after such Lease Assignment Closing. Each covenant and agreement that explicitly contemplates performance after an applicable Lease Assignment Closing, will, in each case and to such extent, expressly survive such Lease Assignment Closing in accordance with its terms, and if no term for such survival is specified, then for [one (1) year] following such applicable Lease Assignment Closing Date, unless such covenant and agreement cannot be performed within such [one (1) year period], in which case such covenant or agreement shall survive sixty days after the last day it can be performed, and nothing in this Section 12.3 will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Notwithstanding this Section 12.3 or any other provision of this Agreement, nothing in this Section 12.3 or any other provision in this Agreement shall limit any right or remedies available to Buyer in respect of a claim for fraud.

(b)      The provisions of this Section 12.3 shall survive each Lease Assignment Closing, as applicable.

**ARTICLE 13**

**Intentionally Omitted**

**ARTICLE 14**

**Intentionally Omitted**

**ARTICLE 15**

**Miscellaneous**

**Section 15.1** **Entire Agreement**.  This Agreement constitutes the entire agreement among the Parties with respect to the transactions contemplated by this Agreement, and it supersedes all prior discussions, understandings or agreements among Parties. All Exhibits and Schedules attached hereto are a part of this Agreement and are incorporated herein by reference.

**Section 15.2** **Binding on Successors and Assigns**.  This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns.

**Section 15.3** **Assignment by Buyer**.  Without the prior written consent of Seller (which may be granted or withheld in Seller's sole and absolute discretion), Buyer shall not, directly or indirectly, assign this Agreement or any of its rights hereunder. Notwithstanding the foregoing, the Parties understand, agree and acknowledge that Buyer may designate an Assignee to take assignment of any Designated Lease so long as such Assignee has complied with the requirements of adequate assurance as set forth in Section 9.2(e).

**Section 15.4** **Waiver**.  The excuse or waiver of the performance by a Party of any obligation of the other Party under this Agreement shall only be effective if evidenced by a written statement signed by the Party so excusing or waiving. No delay in exercising any right or remedy shall constitute a waiver thereof, and no waiver by any Party of the breach of any covenant of this Agreement shall be construed as a waiver of any preceding or succeeding breach of the same or any other covenant or condition of this Agreement.

**Section 15.5** **Governing Law; Jurisdiction**.

(a)    This Agreement and all documents executed and delivered in connection herewith shall be construed in accordance with the internal laws of the State of Delaware without regard to the principles of choice of law or conflicts of law.

(b)    In recognition of the benefits of having any disputes with respect to this Agreement resolved by an experienced and expert person, the Parties hereby agree that any suit, action or proceeding, whether claim or counterclaim, brought or instituted by any party hereto on or with respect to this Agreement or which in any way relates, directly or indirectly, to this Agreement or any event, transaction or occurrence arising out of or in any way connected with this Agreement, any Store, or the dealings of the parties with respect thereto, shall be tried only by a court and not

by a jury. **EACH PARTY HEREBY EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION OR PROCEEDING**.

(c)     Each of the Parties hereby: (i) irrevocably submits itself to the exclusive jurisdiction of the Bankruptcy Court, and the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement or any other transaction related documents contemplated hereby and to decide any claims or disputes which may arise or result from, or be connected with, this Agreement or any other transaction related documents contemplated hereby, any breach or default hereunder or thereunder, or the transactions contemplated hereby or thereby; (ii) agrees that any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the Parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court, provided, however, that if the Bankruptcy Case has closed, the Parties hereby unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the District of Delaware sitting in New Castle County or the courts of the State of Delaware sitting in New Castle County and any appellate court from any thereof, for the resolution of any such claim or dispute; (iii) waives, and agrees not to assert, by way of motion, as a defense or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court; and (iv)consents to service of process by registered mail at the address set forth in, and in accordance with, <u>Section 15.7</u>, for any Proceeding to which this <u>Section 15.5</u> applies.  The provisions of this <u>Section 15.5</u> shall survive all of the Lease Assignment Closings or termination of this Agreement.

**Section 15.6  <u>Counterparts</u>**. This Agreement may be executed (including with electronic signature) in multiple counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument. The exchange of signature pages by facsimile or Portable Document Format ("<u>PDF</u>") transmission shall constitute effective delivery of such signature pages.  Signatures of the Parties transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes.

**Section 15.7  <u>Notices</u>**.  All notices, demands or other communications given hereunder shall be in writing and shall be deemed to have been duly delivered (a) upon the delivery (or refusal to accept delivery) by messenger or overnight express delivery service (or, if such date is not on a Business Day, on the Business Day next following such date), or (b) upon the delivery of a PDF via email transmission on a Business Day (or, if such date is not on a Business Day, on the Business Day next following such date), addressed as follows:

**To Seller**:              [_]


with a copy to:        Milbank LLP
                        55 Hudson Yards
                        New York, New York 10001
                        Attention: [_____]

Email:  [_____]

**To Buyer**:                        Dollar Tree Stores, Inc.
                                     500 Volvo Parkway
                                     Chesapeake, VA 23320
                                     Attention: Todd Littler, Senior Vice-President –
                                     Real Estate Leasing
                                     Email: tlittler@dollartree.com

with a copy to:                      Dollar Tree Stores, Inc.
                                     500 Volvo Parkway
                                     Chesapeake, VA 23320
                                     Attention: Deborah Miller
                                     Email: dmiller@dollartree.com

with a copy to:                      Jones Day
                                     901 Lakeside Avenue
                                     Cleveland, OH 44114
                                     Attention: Heather Lennox, Esq.
                                     Email: hlennox@jonesday.com

Any address or name specified above may be changed by notice given to the addressee by the other Party in accordance with this Section 15.7. The inability to deliver notice because of a changed address of which no notice was given as provided above, or because of rejection or other refusal to accept any notice otherwise appropriately given as provided above, shall be deemed to be the receipt of the notice as of the date of such inability to deliver or rejection or refusal to accept. Any notice to be given by any Party hereto may be given by the counsel for such Party.

Section 15.8  **Time Periods**.  Any reference in this Agreement to the time for the performance of obligations or elapsed time shall mean consecutive calendar days, months or years, as applicable. In the event the time for performance of any obligation hereunder expires on a day that is not a Business Day, the time for performance shall be extended to the next Business Day.

Section 15.9  **Modification of Agreement**.  No modification of this Agreement shall be deemed effective unless in writing and signed by all Parties.

Section 15.10 **Further Instruments**.  Each Party, promptly upon the request of the other, shall execute and have acknowledged and delivered to the other any and all further instruments reasonably requested or appropriate to evidence or give effect to the provisions of this Agreement and which are consistent with the provisions of this Agreement.

Section 15.11 **Descriptive Headings; Word Meaning**.  The descriptive headings of the paragraphs of this Agreement are inserted for convenience only and shall not control or affect the meaning or construction of any provisions of this Agreement. Words such as "herein",

"hereinafter", "hereof" and "hereunder" when used in reference to this Agreement, refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires. The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, unless the context otherwise requires. The word "including" shall not be restrictive and shall be interpreted as if followed by the words "without limitation."

Section 15.12 **Time of the Essence**.  TIME IS OF THE ESSENCE TO THIS AGREEMENT AND TO ALL DATES AND TIME PERIODS SET FORTH HEREIN, INCLUDING, WITHOUT LIMITATION, EACH PARTY'S OBLIGATION TO CONSUMMATE ANY LEASE ASSIGNMENT CLOSING ON THE APPLICABLE LEASE ASSIGNMENT CLOSING DATE, AS SAME MAY BE ADJOURNED AND/OR EXTENDED PURSUANT TO THE EXPRESS TERMS OF THIS AGREEMENT.

Section 15.13 **Construction of Agreement**.  This Agreement shall not be construed more strictly against one Party than against the other merely by virtue of the fact that it may have been prepared primarily by counsel for one of the Parties, it being recognized that the Parties have contributed substantially and materially to the preparation of this Agreement.

Section 15.14 **Limitations on Liability**.  Notwithstanding anything to the contrary in this Agreement, (a) subject to any additional limitations on Seller Parties' liability set forth elsewhere in this Agreement, in no event shall any of the Seller Parties (other than Seller) or any of the direct or indirect owners of any of the Seller Parties (including Seller) have any personal liability under this Agreement and (b) subject to any additional limitations on Buyers' liability set forth elsewhere in this Agreement, in no event shall any of the direct or indirect owners of Buyer have any personal liability under this Agreement. The acceptance by Seller of the payments by Buyer of any funds due in connection with any Lease Assignment Closing and the delivery by Seller of any Assumption and Assignment Notice relating to such Lease Assignment Closing shall constitute full performance of all of Seller's obligations hereunder with respect to the Designated Leases and the Designated Stores other than those obligations of Seller, if any, that by the express terms hereof are to survive any Lease Assignment Closing.

Section 15.15 **Severability**.  The Parties hereto intend and believe that each provision in this Agreement comports with all applicable local, state and federal laws and judicial decisions. If, however, any provision in this Agreement is found by a court of law to be in violation of any applicable local, state or federal law, statute, ordinance, administrative or judicial decision or public policy, or if in any other respect such a court declares any such provision to be illegal, invalid, unlawful, void or unenforceable as written, then it is the intent of all Parties hereto that, consistent with and with a view towards preserving the economic and legal arrangements among the Parties hereto as expressed in this Agreement, such provision shall be given force and effect to the fullest possible extent, and that the remainder of this Agreement shall be construed as if such illegal, invalid, unlawful, void or unenforceable provision were not contained herein, and that the rights, obligations and interests of the parties under the remainder of this Agreement shall continue in full force and effect.

Section 15.16 **Joint and Several**.  If Seller or Buyer consists of more than one person or entity, the constituent parties of Seller or Buyer, as the case may be, shall be jointly and severally

liable for the obligations of Seller or Buyer, as the case may be, under this Agreement and the other documents to be executed and delivered by Seller or Buyer at any Lease Assignment Closing.

[The balance of this page has intentionally been left blank. Signature pages follow.]

**IN WITNESS WHEREOF**, Seller and Buyer have executed this Agreement as of the Effective Date.

**SELLER**:

[_____], a [California limited liability company/Delaware corporation]

By: _____
Name:
Title:

[Signatures continue on following page.]

**BUYER:**

**DOLLAR TREE STORES, INC.**, a Virginia corporation

By:   _____
         Name:
         Title:

NAI-1539877164v16

## **EXHIBIT 1**

## **FORM OF ASSUMPTION AND ASSIGNMENT ORDER**

[See Attached]

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |  |
|---|---|---|
| In re: | ) ) ) ) | Chapter 11 |
| NUMBER HOLDINGS, INC., *et al.*,[1] | ) ) | Case No. 24-10719 (JKS) |
| Debtors. | ) ) ) ) ) | (Jointly Administered) |

**ORDER APPROVING ASSUMPTION**
**AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES**
**DESIGNATED IN DEBTORS' FIRST NOTICE OF ASSUMPTION AND ASSIGNMENT**

Pursuant to the *Order (I) Approving the Purchase Agreement Among Debtors and Buyer, (II) Authorizing the Sale of Designation of Rights to Certain Leases Free and Clear of Liens, Claims, Interests, and Encumbrances, (III) Approving Assignment and Assumption Procedures for the Designated Leases and (IV) Granting Related Relief* (the "Sale Order");[2] and this Court having jurisdiction over this matter under 28 U.S.C. § 1334; and this Court having found that this is a core proceeding under 28 U.S.C. § 157(b) and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue of this proceeding in this district is proper under 28 U.S.C. §§ 1408 and 1409; and this Court having found that the relief requested is in the best interests of the Debtors' estates, their creditors, and other parties in interest; and the Debtors having properly filed and served the [•] (the "Assumption

---

[1]     The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: (i) Number Holdings, Inc. (1463); (ii) 99 Cents Only Stores LLC (1605); (iii) 99 Cents Only Stores Texas, Inc. (1229); (iv) 99 Cents PropCo LLC (7843); (v) 99 Cents HoldCo LLC (3987); and (vi) Bargain Wholesale LLC (8030).  The Debtors' principal offices are located at 1730 Flight Way, Suite 100, Tustin, CA 92782.

[2]     Capitalized terms not defined herein have the meaning attributed to them in the Sale Order.

1

Notice") to each applicable party as set forth in <u>Schedule 1</u> attached hereto (the "<u>Assumption Schedule</u>"), in accordance with the terms of the Sale Order; and due and proper notice of the Sale Order and Assumption Notice having been provided to each applicable counterparty, and it appearing that no other notice need be provided; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY ORDERED THAT**:

1.      The Real Property Leases (defined below) listed in the Assumption Schedule are assumed and assigned to Dollar Tree Stores, Inc. (or its designee) (the "<u>Assignee</u>"), effective as of the Lease Assignment Date (defined below), pursuant to the terms and conditions set forth in this Order, the Sale Order and that certain Asset Purchase Agreement, dated as of [•], 2024, by among the Assignee and [**99 Cents Only Stores LLC**], which is hereby approved in its entirety and is incorporated herein by reference.

2.      Pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, the assignment of any Real Property Lease shall:

     a.  be free and clear of:

       i.   all liens and

       ii.  any and all claims (as that term is defined in section 101(5) of the Bankruptcy Code), obligations, demands, guaranties of or by the Debtors, debts, rights, contractual commitments, restrictions, interests and matters of any kind and nature, whether arising prior to or subsequent to the commencement of these chapter 11 cases, and whether imposed by agreement, understanding, law, equity or otherwise (including, without limitation, claims and encumbrances (A) that purport to give to any party a right or option to effect any forfeiture, modification, or termination of the interest of any Debtor or Assignee, as the case may be, in the Real Property Lease, or (B) in respect of any taxes); and

     b.  constitute a legal, valid and effective transfer of such Real Property Lease and vest the Assignee with all rights, titles, and interests to the applicable Real Property Lease.

For the avoidance of doubt, except as modified by this Order all provisions of the applicable assigned Real Property Lease, including any provision limiting future assignment, shall be binding on the Assignee.

3.      Pursuant to section 365(b)(1)(A) and (B) of the Bankruptcy Code, on the effective date (the "<u>Lease Assignment Date</u>") of the assignment of any unexpired lease of nonresidential real property (each a "<u>Real Property Lease</u>"), which shall occur on the later of the date listed in Schedule 1 and the date of entry of this Order, the Assignee shall within five (5) business days of receiving ACH / wire instructions and a W-9 from the landlord matching the landlord of record pay to the applicable landlord all undisputed cure amounts set forth in Schedule 1 attached hereto (the "<u>Cure Amounts</u>") with respect to each such Real Property Lease. The Cure Amounts represent any and all amounts accrued and owed under the Real Property Lease through the Lease Assignment Date and represent Assignee's sole payment obligation on behalf of the applicable Debtor's outstanding liabilities. Assignee's sole obligation with respect to the Cure Amounts shall be to pay such amounts and any other amounts agreed upon between the applicable Debtor and Assignee. The Assignee shall assume the obligations of the applicable Debtor(s) under each such Real Property Lease arising from and after the applicable Lease Assignment Date, including, for the avoidance of doubt, (i) amounts owed under each assigned Real Property Lease that accrue after the Lease Assignment Date, such as common area maintenance, insurance, taxes, and similar charges; (ii) any regular or periodic adjustment or reconciliation of charges under each assigned Real Property Lease which accrue after the Lease Assignment Date; (iii) other obligations, including indemnification obligations, that arise on or after the Lease Assignment Date, for amounts that accrue or are related to underlying incidents that occur after the Lease Assignment Date; and (iv) any post-assignment obligations under the assigned Real Property Leases.

4.      Upon assumption and assignment of any Real Property Lease and the payment of any Cure Amounts, if applicable, (a) the Debtors and their estates shall be relieved of any liability for breach of such Real Property Lease occurring after the applicable Lease Assignment Date pursuant to section 365(k) of the Bankruptcy Code; and (b) except for the Assignee's obligation to pay the applicable Cure Amount, the Real Property Lease landlord is hereby barred and permanently enjoined from asserting against the Debtors and the Assignee any default, claim or liability existing, accrued, arising or relating to the Real Property Lease for the period prior to the Lease Assignment Date.  Further, Assignee shall have no liability for claims or causes of action (whether known or unknown) including third-party tort claims that arose prior to the Lease Assignment Date or for incidents that occurred prior to the Lease Assignment Date and all other persons and entities holding such claims against the Debtors or the Real Property Lease for the period prior to the Lease Assignment Date, are hereby forever barred, estopped, and permanently enjoined from asserting or pursuing such claims against the Assignee, its affiliates, successors or assigns, its property or the Real Property Lease.

5.      Any provision in any Real Property Lease that purports to declare a breach or default as a result of a change or transfer of control or any interest in respect of the Debtors is unenforceable (but only in connection with the assignment of a Real Property Lease pursuant to the Order on Assumption and Rejection Procedures and this Order), and all Real Property Leases shall remain in full force and effect notwithstanding assignment thereof. No sections or provisions of any Real Property Lease, that in any way purport to,

    a.  prohibit, restrict or condition the Debtors' assignment of such Real Property Lease (including, but not limited to, continuous operation covenants, use restrictions or the conditioning of such assignment on the consent of the non-debtor party to such Real Property Lease);

b.   provide for the cancellation or modification of the terms of the Real Property Lease based on the filing of a bankruptcy case, the financial condition of the Debtors or similar circumstances, such as those prohibited by section 365(e) of the Bankruptcy Code;

c.   provide for additional payments (e.g., so called "profit" sharing/splitting), penalties, fees, charges or other financial accommodations in favor of the non-debtor third party to such Real Property Lease upon assignment thereof; or

d.   provide for any rights of first refusal on a landlord's part, or any recapture or termination rights in favor of a landlord, or any right of a landlord to take an assignment or sublease from a tenant,

shall have any force or effect with respect to the grant and honoring of the designation rights provided for in the Asset Purchase Agreement, dated as of [•], 2024, by and among the Debtors and the Assignee (the "Agreement"), because they constitute unenforceable anti-assignment provisions under section 365(f) of the Bankruptcy Code and/or are otherwise unenforceable under section 365(e) of the Bankruptcy Code, but only in connection with the assignment of a Real Property Lease pursuant to the Agreement.

6.      Upon the assumption and assignment of a Real Property Lease to the Assignee under the provisions of this Order, no default shall exist under the Real Property Lease, and no counterparty to the Real Property Lease shall be permitted to declare a default by any Debtor or otherwise take action against the Assignee or the Debtors as a result of any Debtor's financial condition, bankruptcy or failure to perform any of its obligations under the Real Property Lease. Upon assumption and assignment of any Real Property Lease pursuant to the Assumption Procedures, the Assignee shall enjoy all of the rights and benefits under each such Real Property Lease as of the applicable Lease Assignment Date.

7.      Subject to an applicable landlord's right to object pursuant to the Order on Assumption and Rejection Procedures, notwithstanding any provision in any Real Property Lease

that purports to prohibit, restrict or condition such action, upon the assumption and assignment of such Real Property Lease to Assignee in accordance with the terms of the Order on Assumption and Rejection Procedures,

    a.  Assignee shall be authorized to:

        i.  use the applicable store, subject to section 365(b)(3) of the Bankruptcy Code, upon consummation of the assumption and assignment of such Real Property Lease to Assignee for Assignee's operation under the name Dollar Tree for use as a retail variety store selling general merchandise including food and beverages ("Assignee's Permitted Use"), and Assignee shall not be prevented from doing so by any recorded or unrecorded restriction, or exclusive granted by landlord,

       ii.  operate such store under the Assignee's trade name or any other trade name which the Assignee owns or is authorized to use (including any of the Debtors' trade names, if applicable),

     iii.  make such alterations and modifications to the applicable store (including signage, together with appropriate changes to existing tenant signage in the respective shopping center or mall, including storefront signs, panels on all pylons, monuments, directional and other ground and off-premises signs where the Debtors are presently represented) deemed necessary by the Assignee as are necessary or desirable for the Assignee to conform such store to the Assignee's typical retail store consistent with Assignee's Permitted Use, submit and execute all building and signage permit applications without further consent of any party upon production of a copy of this Order, and any conditions grandfathered for the benefit of the Debtors shall be grandfathered for the benefit of Assignee,

     iv.  remain "dark" with respect to such store after such assumption and assignment until the date that is necessary to permit Assignee to remodel, restock, re-fixture, change signage and/or until completion of the work described in clause (iii) above (so long as such date is not more than one hundred fifty (150) days after the applicable Lease Assignment Date or such longer period as may be allowed under the lease) or such later date as may be reasonably required for the restoration of such store,

      v.  self-insure any of its insurance obligations under the Real Property Lease so long as Assignee shall have at all times a net worth of at least Fifty Million Dollars ($50,000,000); *provided*, however, to the extent any obligation cannot be self-insured any required insurance may be satisfied by both general and umbrella coverage, and

> vi. exercise, utilize or take advantage of any renewal options and any other current or future rights, benefits, privileges, and options granted or provided to the Debtors under such Real Property Lease (including all of the same which may be described or designated as, or purport to be, "personal" to the Debtors or to a named entity in such Real Property Lease or to be exercisable only by the Debtors or by a named entity or an entity operating under a specific trade name), and
>
> b. any reference in the Real Property Lease to the Debtors shall hereinafter mean Assignee.

8.     Upon payment of the Cure Amounts with respect to any Real Property Lease, the applicable landlord shall be forever barred and enjoined from asserting against the Debtors, their estates and the Assignee any claim in connection with: (a) any breach or default, monetary or non-monetary, existing and which accrued prior to the Lease Assignment Date with respect to the Real Property Lease, or (b) any objection to the assumption and assignment of such Real Property Lease, whether or not such non-debtor party filed a proof of claim.

9.     The Debtors are authorized to take any action necessary to implement the terms of this Order and the assumption and assignment without further order from this Court. All persons that are currently in possession of the premises leased under the Real Property Lease are hereby directed to surrender possession of the premises to the Assignee as of the entry of this Order and the effective date of assignment as set forth in the Assumption Schedule.

10.     All recording officers are authorized to strike recorded encumbrances, claims, liens and other interests against the Real Property Lease recorded prior to the date of this Order. To the extent permitted by applicable law, a certified copy of this Order may be filed with the appropriate recording officers to evidence cancellation of any recorded encumbrances, claims, liens and other interests against the Real Property Lease recorded prior to the date of this Order. All recording officers are hereby authorized to accept for filing any and all of the documents and instruments

7

necessary and appropriate to consummate the transactions contemplated by the Agreement and this Order. Utility providers are directed not to discontinue service and to cooperate with the transfer of utilities to Assignee without any transfer fees. Assignee's liability for such utility usage commences as of the Lease Assignment Date; *provided*, for the avoidance of doubt, that this Order does not affect the Debtors' liability, if any, for utility charges incurred before the Lease Assignment Date.

11.     The Assignee and its affiliates, successors and assigns shall not be deemed or considered to:

   a.  be a legal successor, or otherwise be deemed a successor to any of the Debtors,

   b.  have, *de facto* or otherwise, merged with or into any or all Debtors, or

   c.  be a continuation or substantial continuation, or be holding itself out as a mere continuation, of any of the Debtors or their respective estates, businesses or operations, or any enterprise of the Debtors, in each case by any law or equity, and the Assignee has not assumed nor is it in any way responsible for any liability or obligation of the Debtors or the Debtors' estates except as expressly set forth herein and in the Assumption and Assignment Agreement.

12.     The Assignee and its affiliates, successors and assigns shall have no successor, transferee or vicarious liability of any kind or character, including, under any theory of foreign, federal, state or local antitrust, environmental, successor, tax, ERISA, assignee or transferee liability, labor, product liability, employment, de facto merger, substantial continuity or other law, rule regulation or doctrine, whether known or unknown as of the Lease Assignment Date, now existing or hereafter arising, whether asserted or unasserted, fixed or contingent, liquidated or unliquidated with respect to the Debtors or any obligations of the Debtors arising prior to the Lease Assignment Date, including liabilities on account of any taxes or other governmental authority fees, contributions or surcharges, in each case arising, accruing or payable under, out of, in connection with, or in any way relating to, the operation of the Real Property Lease prior to the

Lease Assignment Date or arising based on actions of the Debtors taken after the Lease Assignment Date.

13.     The Assignee is a "good faith purchaser," within the meaning of section 363(m) of the Bankruptcy Code, of the Real Property Leases and is entitled to all of the benefits and protections afforded by section 363(m) of the Bankruptcy Code. The parties will be acting in good faith if they proceed to consummate the assignment at any time after entry of this Order. This order is effective immediately, notwithstanding Bankruptcy Rules 6004(h), 6006(d), and any similar provision of law.

14.     Any and all property located on or in the leased premises after the Lease Assignment Date of the applicable Real Property Lease shall be deemed abandoned pursuant to section 554 of the Bankruptcy Code, as is, effective as of the Lease Assignment Date. As of the Lease Assignment Date, the Assignee or its designee may, in its sole discretion and without further notice to any party or order of the Court, utilize and/or dispose of such abandoned property without further notice or liability to the Debtors or third parties and, to the extent applicable, the automatic stay is modified to allow such disposition. The rights of the counterparty to each Real Property Lease to assert claims for the disposition of the abandoned property are reserved, as are all parties' rights to object to such claims.

15.     This Court shall retain jurisdiction to resolve any dispute arising from or related to this Order.

Schedule 1

Assumption Schedule

| Debtor Name | Contract Counterparty | Counterparty Address | Description of Contract | Store No. | Store Address | Assignee | Cure Amount | Assumption Date |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

## **SCHEDULE A**

Leases

[See Attached]

| ST # | Name of Store | Location of Store | City | County | Region | Stat | Zip | May Rent (Base) | CAM | TAXES | INSUR | OTHER | SALES TAX | CREDITS/DEBITS | Cure |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 0035 | Santa Monica | 2801 Pico Blvd | Santa Monica | Los Angeles | SOCAL | CA | 90405 | $ 16,449.15 | | | | | | | $19,003.70 |
| 0040 | NH-Lankershim | 4304 Lankershim | North Hollywood | Los Angeles | SOCAL | CA | 91602 | $ 22,300.00 | | | | | | | $27,107.43 |
| 0044 | Walnut Park | 2566 E. Florence | Huntington Park | Los Angeles | SOCAL | CA | 90255 | $ 13,105.95 | | | | | | | $32,435.40 |
| 0045 | San Pedro | 938 S. Gaffey | San Pedro | Los Angeles | SOCAL | CA | 90731 | $ 19,237.50 | | | | | | | $26,851.39 |
| 0095 | Oceanside | 1036 Mission Ave | Oceanside | San Diego | SOCAL | CA | 92054 | $ 18,467.90 | $2,432.47 | $4,186.32 | $694.42 | | | | $25,781.11 |
| 0100 | Anaheim | 2270 E. Lincoln Ave | Anaheim | Orange | SOCAL | CA | 92806 | $ 17,630.67 | $5,338.07 | $2,517.07 | $543.50 | $467.09 | | | $26,496.40 |
| 0116 | Phoenix | 1240 Indian School | Phoenix | Maricopa | AZ | AZ | 85014 | $ 21,328.75 | | | | | $618.53 | | $0.00 |
| 0128 | Bakersfield - Ming | 4200 Ming Ave | Bakersfield | Kern | CECAL | CA | 93309 | $ 26,193.12 | $136.40 | | | | | | $58,918.81 |
| 0134 | Riverside - Magnolia | 9915 Magnolia Ave | Riverside | Riverside | SOCAL | CA | 92503 | $ 22,364.75 | $5,043.00 | $5,939.00 | $357.00 | | | | $33,703.75 |
| 0171 | Henderson - Marks | 520 Marks St. #C | Henderson | Clark | NV | NV | 89014 | $ 27,133.56 | $1,972.48 | $2,677.68 | $1,002.69 | | | | $226.73 |
| 0192 | Vacaville | 551 Peabody Road | Vacaville | Solano | NOCAL | CA | 95687 | $ 15,470.00 | $844.95 | $2,853.99 | $949.25 | | | | $20,118.19 |
| 0201 | Concord | 4665 Clayton Road | Concord | Contra Costa | NOCAL | CA | 94521 | $ 18,527.52 | | | | | | | $18,527.52 |
| 0203 | Phoenix - Tatum | 12805 N. Tatum Blvd. | Phoenix | Maricopa | AZ | AZ | 85032 | $ 16,651.94 | $3,026.24 | | | | $570.67 | | $0.00 |
| 0207 | Glendale - 67th | 20165 N. 67th Avenue | Glendale | Maricopa | AZ | AZ | 85308 | $ 22,876.56 | $4,101.65 | $3,615.75 | $1,032.60 | | $1,075.30 | | $32,701.86 |
| 0208 | Salinas | 102 E. Laurel Drive | Salinas | Monterey | NOCAL | CA | 93906 | $ 21,047.69 | | | | | | | $48,646.82 |
| 0209 | Sacramento - Folsom | 8387 Folsom Blvd. | Sacramento | Sacramento | NOCAL | CA | 95826 | $ 20,408.66 | $1,787.23 | $5,028.43 | $318.04 | | | | $27,542.36 |
| 0216 | Palm Desert | 72845 A & B Highway 111 | Palm Desert | Riverside | SOCAL | CA | 92260 | $ 26,510.40 | | | | | | | $53,020.80 |
| 0226 | Pomona - Arrow | 628 E Arrow Hwy | Pomona | Los Angeles | SOCAL | CA | 91767 | $ 12,760.41 | $3,107.73 | $2,332.41 | $466.07 | | | | $18,666.62 |
| 0235 | Fresno - McKinley | 1520 N. First Street | Fresno | Fresno | CECAL | CA | 93703 | $ 16,404.75 | $2,620.42 | $3,377.22 | $1,210.94 | | | | $23,613.33 |
| 0258 | Oildale | 1121 Olive Drive | Bakersfield | Kern | CECAL | CA | 93308 | $ 20,735.00 | $2,239.20 | $1,532.28 | $528.05 | | | | $0.00 |
| 0275 | Pinole | 620 San Pablo Ave. | Pinole | Contra Costa | NOCAL | CA | 94564 | $ 11,955.60 | $2,723.61 | $4,232.69 | $309.20 | | | | $19,221.10 |
| 0283 | Wilmington | 401 W Anaheim St | Wilmington | Los Angeles | SOCAL | CA | 90744 | $ 21,635.27 | | | | | | | $42,179.68 |
| 0287 | San Diego-Market | 2611 Market St. | San Diego | San Diego | SOCAL | CA | 92101 | $ 20,832.70 | | | | | | | $20,832.70 |
| 0306 | Gilbert | 750 N. Gilbert Road | Gilbert | Maricopa | AZ | AZ | 85233 | $ 15,229.17 | $1,458.50 | $1,284.69 | $282.46 | | $432.64 | | $18,687.46 |
| 0314 | Lake Havasu City | 1795 Kiowa Blvd. | Lake Havasu City | Mohave | AZ | AZ | 86403 | $ 14,991.66 | $309.79 | $1,820.53 | $909.92 | | | | $18,031.90 |
| 0315 | North Hollywood - Laurel Canyo | 6309 Laurel Canyon Blvd. | North Hollywood | Los Angeles | SOCAL | CA | 91606 | $ 16,224.00 | | | | | | | $23,247.63 |
| 0322 | Phoenix - 43rd & Bell | 4204 W Bell Rd | Phoenix | Maricopa | AZ | AZ | 85308 | $ 10,395.00 | $1,608.42 | $2,661.12 | $332.61 | $0.00 | | | $14,997.15 |
| 0336 | Duarte | 1327 E. Huntington Dr. | Duarte | Los Angeles | SOCAL | CA | 91010 | $ 15,961.37 | $664.31 | $2,034.53 | $729.65 | | | | $19,389.86 |
| 0339 | Santa Barbara | 424 State Street | Santa Barbara | Santa Barbara | SOCAL | CA | 93010 | $ 32,704.75 | | | | | | | $32,704.75 |
| 0346 | Reno-Virginia | 5695 S Virginia St | Reno | Washoe | NV | NV | 89502 | $ 19,627.89 | $1,374.00 | $1,794.00 | $202.00 | | | | $22,997.89 |
| 0353 | Atascadero-ECR | 7101 El Camino Real | Atascadero | San Luis Obispo | CECAL | CA | 93422 | $ 14,835.70 | | | | | | | $35,314.81 |
| 0358 | Rohnert Park | 425 Rohnert Park Expressway | Rohnert Park | Sonoma | NOCAL | CA | 94928 | $ 19,053.33 | | | | | | | $19,053.33 |
| 0359 | Thousand Oaks | 950 E Avenida de los Arboles | Thousand Oaks | Ventura | SOCAL | CA | 91360 | $ 16,831.17 | $2,300.00 | | | | | | $19,131.17 |
| 0363 | Santa Fe Springs | 11550 Telegraph Rd | Santa Fe Springs | Los Angeles | SOCAL | CA | 90670 | $ 22,892.01 | $3,516.26 | $3,962.35 | $547.39 | | | | $30,918.01 |
| 0373 | Laveen | 3610 W Baseline Rd | Laveen | Maricopa | AZ | AZ | 85339 | $ 10,737.50 | $2,093.26 | $4,416.36 | $195.54 | | $505.84 | | $17,948.50 |
| 0381 | Oxnard-Rose | 4917 S Rose Ave | Oxnard | Ventura | SOCAL | CA | 93033 | $ 9,211.13 | $3,835.76 | $2,416.43 | $571.69 | | | | $16,035.01 |
| 0382 | Ramona-Main | 1326 Main Street | Ramona | San Diego | SOCAL | CA | 92065 | $ 20,115.33 | $2,060.60 | $1,893.76 | $1,142.97 | | | | $25,212.66 |
| 0387 | Casa Grande-Florence | 1683 E Florence Blvd | Casa Grande | Pinal | AZ | AZ | 85122 | $ 18,367.00 | $3,077.00 | $2,668.00 | $317.00 | | $515.87 | | $22,944.87 |
| 0388 | Scottsdale-Indian Bend | 8940 E Indian Bend Rd | Scottsdale | Maricopa | AZ | AZ | 85250 | $ 15,214.58 | $2,304.23 | $1,768.20 | $563.26 | | $575.66 | | $20,425.93 |
| 0391 | Carson City - William | 2080 E William St | Carson City | Carson City | NV | NV | 89706 | $ 12,768.91 | $813.07 | $654.31 | $494.76 | | | | $14,731.05 |
| 0393 | Bakersfield -Centennial | 8200 Centennial Plaza Way | Bakersfield | Kern | SOCAL | CA | 93312 | $ 18,000.00 | | | | | | | $40,245.59 |
| 0399 | Sun Valley | 8429 Laurel Canyon Blvd | Sun Valley | San Fernando | SOCAL | CA | 91352 | $ 24,521.99 | $3,772.83 | $3,143.48 | $1,972.80 | | | | $73,691.45 |
| 0401 | San Luis Obispo - Madonna | 1308 Madonna Rd | San Luis Obispo | San Luis Obispo | SOCAL | CA | 93405 | $ 19,693.00 | $2,525.11 | $2,763.22 | $714.88 | | | | $25,696.21 |
| 0410 | Vallejo - Sonoma | 3684 Sonoma Blvd | Vallejo | Solano | NOCAL | CA | 94590 | $ 23,504.04 | $3,185.99 | $3,877.98 | $2,019.33 | | | | $36,955.42 |
| 0412 | Moreno Valley - Cottonwood | 22985 Cottonwood Ave | Moreno Valley | Riverside | SOCAL | CA | 92553 | $ 15,016.68 | | | | | | $ 232.50 | $15,382.35 |
| 0413 | Sonora - Mono | 740 Mono Way | Sonora | Toulumne | CECAL | CA | 95370 | $ 17,823.30 | $1,526.00 | $1,794.00 | $325.00 | | | | $21,468.30 |
| 0421 | Las Vegas - Eastern | 380 S Eastern Ave, Suite 109-E | Las Vegas | Clark | NV | NV | 89123 | $ 17,122.00 | $2,786.57 | $1,344.48 | $352.83 | | | | $21,605.88 |
| 0431 | Riverside-Magnolia/Castle | 11160 Magnolia Ave | Riverside | Riverside | SOCAL | CA | 92505 | $ 12,150.00 | $1,504.49 | $2,301.74 | $489.33 | | | | $16,445.56 |
| 0433 | Tracy - Grant Line | 2888 W Grant Line Rd | Tracy | San Joaquin | SOCAL | CA | 95304 | $ 17,805.98 | $1,997.67 | $3,314.81 | $328.18 | | | | $23,446.64 |
| 0444 | Palm Springs - Sunrise | 102 S Sunrise Way | Palm Springs | Riverside | SOCAL | CA | 92262 | $ 24,751.38 | $2,936.09 | $4,715.92 | $628.93 | | | | $33,032.32 |
| 0447 | Livermore-Railroad | 1490 Railroad Avenue | Livermore | Alameda | NOCAL | CA | 94550 | $ 28,875.00 | $3,061.61 | $2,310.00 | $400.33 | | | | $34,646.94 |
| 2814 | Houston-Kirkwood/Bissonnet | 11873 Bissonet | Houston | Harris | HOUSTON | TX | 77099 | $ 15,926.00 | $1,152.00 | $2,500.00 | $801.34 | | | | $0.00 |
| 2874 | Houston - Tidwell | 5550 North Freeway | Houston | Harris | HOUSTON | TX | 77076 | $ 13,311.71 | $2,092.20 | $4,378.98 | $285.30 | | | | $20,068.19 |
| 2876 | Mesquite-Towne | 3330 N Galloway Ave | Mesquite | Dallas | DALLAS | TX | 75150 | $ 10,724.00 | $1,095.11 | $939.29 | $733.18 | | | | $13,491.58 |
| 2877 | Katy - Fry | 3111 N Fry Rd | Katy | Harris | HOUSTON | TX | 77449 | $ 7,938.47 | $1,497.74 | $3,734.33 | $401.02 | | | | $0.00 |
| 2881 | Humble - FM 1960 | 216 FM 1960 | Humble | Harris | HOUSTON | TX | 77338 | $ 11,387.50 | $1,118.58 | $1,118.58 | $559.29 | | | | $0.00 |
| 2883 | Houston - Stella Link | 9333 Stella Link Rd | Houston | Harris | HOUSTON | TX | 77025 | $ 12,372.75 | $585.34 | $2,834.99 | $708.75 | | | | $0.00 |
| 2885 | Arlington - Pioneer | 908 E. Pioneer Pkwy | Arlington | Tarrant | DALLAS | TX | 76010 | $ 14,702.50 | $3,130.10 | $1,043.88 | $514.59 | | | | $0.00 |
| | | | | | | | | $1,040,814.65 | $92,756.08 | $107,782.80 | $24,936.09 | $467.09 | $4,294.51 | $232.50 | $1,323,544.11 |

| | |
|---|---|
| Total of May Rent (Base), CAM, TAXES, INSUR, OTHER, SALES TAX, and CREDITS/DEBITS | $1,271,283.72 |
| Total Cure | $1,323,544.11 |