# IN THE UNITED STATES BANKRUPTCY COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NUMBER HOLDINGS, INC. *et al.*,[1] | Case No. 24-10719 (JKS) |
| Debtors. | (Jointly Administered) |
| | **Hearing Date:** To be determined |
| | **Objection Deadline:** To be determined |

### DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) AUTHORIZING THE DEBTORS TO ENTER INTO THE STALKING HORSE APA, (II) APPROVING THE RELATED BID PROTECTIONS; AND (III) GRANTING RELATED RELIEF

The above-captioned debtors and debtors in possession (the "Debtors" and, together with their non-Debtor affiliates, "99 Cents") respectfully state the following in support of this motion (the "Motion"):

### Background

1. On April 7, 2024 (the "Petition Date"),[2] the Debtors commenced these cases (the "Chapter 11 Cases") by filing voluntary petitions for relief under chapter 11 of title 11 of the United States Code (as amended, the "Bankruptcy Code"). The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. These Chapter 11 Cases have been

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: (i) Number Holdings, Inc. (1463); (ii) 99 Cents Only Stores LLC (1605); (iii) 99 Cents Only Stores Texas, Inc. (1229); (iv) 99 Cents PropCo LLC (7843); (v) 99 Cents HoldCo LLC (3987); and (vi) Bargain Wholesale LLC (8030). The Debtors' principal offices are located at 1730 Flight Way, Suite 100, Tustin, CA 92782.

[2] Certain of the Debtors' voluntary petitions were filed on the docket shortly after midnight (ET) on April 8, 2024.

consolidated for procedural purposes only and are being administered jointly. On April 19, 2024, the Office of the United States Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") in these cases pursuant to 11 U.S.C. § 1102 [Dkt. No. 203].

2. The Debtors operated approximately 371 extreme value retail stores in California, Arizona, Nevada, and Texas under the business names "99¢ Only Stores" and "The 99 Store." The Debtors' stores offered their customers a wide array of quality products—from everyday household items, to fresh produce, deli, and other basic grocery items, to an assortment of seasonal and party merchandise—much of which is still priced at or below 99.99 cents. Headquartered in Tustin, California, the Debtors employed over 10,800 part-time and full-time individuals, as of the Petition Date.

3. The Debtors commenced these Chapter 11 Cases to implement a timely and efficient process to maximize the value of the Debtors' estates for the benefit of all stakeholders. Through these cases, the Debtors intend to continue an orderly and value-maximizing wind down of their inventory, while conducting a marketing and sale process for their remaining assets on a timeline consistent with their store closures.

4. For further information about the Debtors, their business operations, and the circumstances that have led to the filing of these Chapter 11 Cases, the Debtors refer to the *Declaration of Christopher J. Wells in Support of Chapter 11 Petitions and First Day Motions of Number Holdings, Inc. and Its Affiliated Debtors and Debtors in Possession* [Dkt No. 18] (the "First Day Declaration").

**Background Relevant to the Motion**

5. At a hearing held on the April 9, 2024 (the "First Day Hearing"), the Debtors sought and obtained interim approval of their Store Closings and Store Closing Sales for the sale of their

2

merchandise and FF&E at all of their 371 stores and 5 distribution centers pursuant to the terms of the *Interim Order (I) Authorizing the Debtors to Assume Consulting Agreement, (II) Authorizing Store Closing Sales and Approving Related Procedures, (III) Authorizing Customary Compensation Enhancement, and (IV) Granting Certain Related Relief* [Dkt No. 151]. The Debtors, with the assistance of their advisors, have closed approximately 1/3 of the stores and all of the distribution centers by the end of April, and plan to close the remaining stores by the end of May. Accordingly, the Debtors also sought and obtained approval of certain procedures for the rejection and assumption and assignment of their non-residential real property leases (the "Leases") pursuant to that certain *Final Order (I) Authorizing and Approving Procedures for Rejection and Assumption and Assignment of Executory Contracts and Unexpired Leases, (II) Authorizing Abandonment of Certain Personal Property, and (III) Granting Related Relief* [Dkt No. 438] (the "Lease Rejection/Assumption and Assignment Procedures"). The Lease Rejection/Assumption and Assignment Procedures will allow the Debtors to exit their Leases on a timeline that will permit the Debtors to minimize the additional cost of administrative rent once the stores are dark.

6. On April 16, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order Approving (I)(A) Bidding Procedures in Connection with the Sale of Substantially all of the Debtors' Remaining Assets, (B) Assumption and Assignment Procedures, (C) Form and Manner of Notice of Sale Hearing, Assumption Procedures, and Auction Results; (II) Auction and Sale Hearing Dates; (III)(A) Debtors' Entry into One or Multiple Asset Purchase Agreements, (B) Sale(s) Free and Clear of all Encumbrances, and (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* [Dkt No. 171] (the

"Bidding Procedures Motion").[3] At a hearing held on May 8, 2024, the Court approved the proposed bid procedures (the "Bidding Procedures"), which were subsequently entered by order of the court [Dkt. No. 463].

### The Stalking Horse APA

7.  Following the filing of the Bidding Procedures Motion, and as contemplated therein, the Debtors have continued to pursue the marketing of all their assets with a view towards maximizing value. As part of this process, the Debtors and their advisors have engaged with numerous potential bidders regarding any stalking horse proposals for all or a portion of the Assets. As more fully described in the Stalking Horse Declaration, Ollie's Bargain Outlet, Inc. and OBO Ventures, Inc. (individually and collectively, the "Stalking Horse Bidder") emerged as the bidder whose bid (the "Stalking Horse Bid") was the highest or otherwise best bid for the identified Assets. Accordingly, on May 9, 2024, the Debtors agreed, subject to the Court's approval, to enter into the agreement attached to the Stalking Horse Order (as defined below) as **Exhibit 1** (including all exhibits and schedules related thereto, the "Stalking Horse APA") for the purchase and sale of the assets identified in the Stalking Horse APA (the "Purchased Assets").

8.  Pursuant to Local Rule 6004-1(c), certain of the key terms of the Stalking Horse APA are highlighted in the chart below:[4]

| MATERIAL TERMS OF THE STALKING HORSE APA ||
|---|---|
| **Stalking Horse Bidder** | Ollie's Bargain Outlet, Inc. and OBO Ventures, Inc. |
| **Purchased Assets** | Stalking Horse Bidder proposes to acquire: (i) the applicable tenant's leasehold interest in the following eight (8) Leasehold Interests; (ii) and a fee simple interest in each of the three (3) Owned Real Properties; and (iii) the furniture, fixtures, equipment and merchandise, if any, |

---

[3] Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Bidding Procedures Motion and the Stalking Horse APA (as defined below), as applicable.

[4] This summary is provided for the convenience of the Court and parties in interest. To the extent there is any conflict between this summary and the Stalking Horse APA, the Stalking Horse APA governs in all respects.

| MATERIAL TERMS OF THE STALKING HORSE APA | |
|---|---|
| | remaining at each location at the time of Closing (collectively, as defined in the Stalking Horse APA, the "Property"):<br><br>*Leasehold Interests*<br><br>| Seller Store # | Address | City | County | State |<br>|---|---|---|---|---|<br>| 2804 | 4980 N. Highway 6 | Houston | Harris | TX |<br>| 2817 | 2516 Avenue H | Rosenberg | Fort Bend | TX |<br>| 2831 | 1420 Loop 336 | Conroe | Montgomery | TX |<br>| 2840 | 3632 Frankford Rd. | Dallas | Denton | TX |<br>| 2843 | 10702 Easttex Freeway | Houston | Harris | TX |<br>| 2872 | 4849 FM 1960 W | Houston | Harris | TX |<br>| 2878 | 2346 W Nolana Ave | McAllen | Hidalgo | TX |<br>| 2879 | 401 E Camp Wisdom Rd | Duncanville | Dallas | TX |<br><br>*Owned Real Property*<br><br>| Seller Store # | Address | City | County | State |<br>|---|---|---|---|---|<br>| 2806 | 7130 FM 1960 Road | Humble | Harris | TX |<br>| 2815 | 4100 Fairmont Pkwy | Pasadena | Harris | TX |<br>| 2839 | 2942 Thousand Oaks Drive | San Antonio | Bexar | TX |<br><br>(Stalking Horse APA Recitals A-D, Schedules A-C). |
| **Summary of Transaction and Consideration** | As set forth more fully in the Stalking Horse APA, in consideration of the payment of the Purchase Price by Buyer to Seller and for other good and valuable consideration, Seller shall sell, assign, transfer and convey the Property to Buyer, and Buyer shall purchase, acquire, accept and assume the Property from Seller. (Stalking Horse APA § 2.1). The aggregate Base Purchase Price for the Property shall be Fourteen Million Six Hundred Thousand and No/100 Dollars ($14,600,000.00) plus Cure Amounts. (Stalking Horse APA § 2.2). |
| **Bid Protections** | Break Up Fee equal to 3% of the Base Purchase Price, which equals Four Hundred Thirty-Eight Thousand and no/100 Dollars ($438,000). (Stalking Horse APA § 1, 12.1).<br><br>If an Auction is conducted: (i) the initial overbid must be a minimum of Five Hundred Eighty-Eight Thousand and no/100 Dollars ($588,000), which sum is comprised of the amount of the Break Up Fee, plus an initial incremental overbid amount of One Hundred Fifty Thousand and no/100 Dollars ($150,000); and (ii) any subsequent incremental overbids must be a minimum amount of Fifty Thousand and no/100 Dollars ($50,000), subject to increase based on agreement among Seller and Buyer. (Stalking Horse APA § 9.2) |
| **Deposit** | One Million Four Hundred Sixty Thousand and No/100 Dollars ($1,460,000.00) (Stalking Horse APA § 3.1) |

| MATERIAL TERMS OF THE STALKING HORSE APA ||
|---|---|
| **Closing Conditions and Deadlines** | As set forth more fully in the Stalking Horse APA:<br><br>(i)      The Bankruptcy Court shall have entered the Sale Order on the docket on or before May 23, 2024.<br><br>(ii)     The Sale Order shall have become a Final Order by June 7, 2024.<br><br>(iii)    The Stalking Horse Approval Order shall be in form and substance acceptable to Buyer, in Buyer's reasonable discretion and as of the date such order is entered on the docket, and shall include the designation of Buyer as the Stalking Horse Bidder for the Property, approving this Agreement as the stalking horse agreement, and approving the Bid Incentives, as such terms are approved by Buyer in Buyer's sole discretion) but in no event may any changes to the Stalking Horse Approval Order materially increase the risks to Buyer;<br><br>(iv)    The Stalking Horse Approval Order shall be entered on the docket on or before May 15, 2024, and the Bid Procedures Order shall be entered on the docket on or before May 10, 2024.<br><br>(v)     The Stalking Horse Approval Order and Bid Procedures Order shall have each become a Final Order by the date of the Sale Hearing.<br><br>(viii)  Seller shall have executed and delivered to Buyer, or deposited in escrow with Escrow Agent, all instruments and documents required to be delivered to Buyer at Closing under this Agreement.<br><br>(ix)    Seller shall have performed and complied in all material respects with all of the other terms of this Agreement to be performed and complied with by it prior to or at the Closing.<br><br>(x)     Subject to Section 8.4, on the Scheduled Closing Date, the Seller Representations shall be true, complete and accurate, in all material respects, on and as of the Effective Date and on and as of the Scheduled Closing Date as if then remade on and as of the Closing Date, except that Seller shall not be deemed to have breached the foregoing condition precedent by reason of:  (A) changes that are:  (1) caused by the acts or omissions of Buyer or any Buyer Representatives, (2) a result of the ownership or operation of the Property in the Ordinary Course occurring after the Effective Date and that did not arise by reason of a breach or default made by Seller under this Agreement; or (3) caused by matters that are outside of the reasonable control of Seller and that did not arise by reason of a breach or default made by Seller under this Agreement; or (B) casualty or condemnation (which shall be governed exclusively by Section 7.3 and Section 7.4, respectively).<br><br>(Stalking Horse APA § 7.1(a)) |
| **Relief from Bankruptcy Rule 6004(h)** | The Debtors are seeking a waiver of the 14-day stay under Bankruptcy Rule 6004(h) pursuant to this order. |

**The Bid Protections**

9.     The Stalking Horse APA contemplates the following bid protections for the Stalking Horse Bidder (the "Bid Protections"):

- a breakup fee in the amount of $438,000, which is equal to approximately 3% of the Base Purchase Price (the "Breakup Fee"), payable in the event the Debtors consummate an alternative Transaction(s) with respect to the Purchased Assets;
- an Initial Incremental Overbid of $150,000.
- Subsequent Incremental Overbid of $50,000.

### Relief Requested

10. By this motion (the "Motion"), the Debtors seek entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Stalking Horse Order") (i) authorizing them to enter into the Stalking Horse APA; (ii) approving the Bid Protections; and (iii) granting certain related relief.

11. In support of the Motion, the Debtors submit the Declaration of Paul Shin of Jefferies, LLC (the "Stalking Horse Declaration").

### Jurisdiction and Venue

12. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* of the United States District Court for the District of Delaware, dated as of February 29, 2012.

13. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2), and the Debtors consent, pursuant to rule 9013-1(f) of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), to the entry of a final order by this Court in connection with this Motion to the extent that it is later determined that this Court, absent consent of the parties, cannot enter final orders or judgments in connection herewith consistent with Article III of the United States Constitution.

14. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

15. The bases for the relief requested herein are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 9014, and Rule 6004-1 of the Local

Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

**Basis for Relief**

**I.    The Court Should Authorize the Debtors to Enter Into the Stalking Horse APA**

16.    The Debtors incorporate herein by reference the detailed discussion in the Bidding Procedures Motion of the standard courts have employed to determine the appropriateness of stalking horse asset purchase agreements in circumstances similar to the Chapter 11 Cases under section 363(b) of the Bankruptcy Code. *See* Bidding Procedures Motion, ¶¶ 23-27; 35-49.

17.    The Debtors will continue the marketing process pursuant to the Bidding Procedures, including conducting an auction for the Assets currently scheduled to take place on or before May 21, 2024.  This process will allow the Debtors to maximize the value of their estate for the benefit of all of their stakeholders. Entering into the Stalking Horse APA will establish a floor for other interested bidders to submit superior offers for the Purchased Assets in accordance with the terms of the Bidding Procedures Order, as well as ensure that the Stalking Horse Bidder remains committed to the bid reflected in the Stalking Horse APA.

18.    The Debtors and the Stalking Horse Bidder negotiated the Stalking Horse APA in good faith and at arm's length. For the reasons set forth herein and in the Bidding Procedures Motion, the Debtors, in the exercise of their business judgment, believe that entering into the Stalking Horse APA will enable them to maximize the value of the Purchased Assets for the benefit of their estates and stakeholders.

**II.    The Bid Protections Are Fair, Market-Based, and an Essential Component of the Stalking Horse Bid and Should Be Approved**

19.    The Debtors are also seeking authority to offer the Bid Protections to the Stalking Horse Bidder. Approval of the Bid Protections will enable the Debtors to secure an adequate floor

for the Purchased Assets and insist that competing bids be materially higher or otherwise better than the Stalking Horse Bid—a clear benefit to the Debtors' estate.

20. The use of a stalking horse in a public auction process is a customary practice in large chapter 11 cases, as the use of a stalking horse bid is, in many circumstances, the best way to maximize value by "establish[ing] a framework for competitive bidding and facilitat[ing] a realization of that value." *Off. Comm. Of Unsecured Creditors v. Interforum Holding LLC*, 2011 WL 2671254, at *1 n.1 (E.D. Wisc. July 7, 2011). As a result, stalking horse bidders frequently require a break-up fee and expense reimbursement and, in many cases, other forms of bid protections as an inducement for "setting the floor at auction, exposing its bid to competing bidders, and providing other bidders with access to the due diligence necessary to enter into [definitive documentation]." *Id.* (internal citation omitted). Thus, the use of bid protections has become an established practice in this and other Districts.

21. Indeed, courts have acknowledged that bid protections "may be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking." *In re 995 Fifth Ave. Assocs., L.P.*, 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (citation and quotations omitted); *see also In re Reliant Energy Channelview LP*, 594 F.3d 200, 206-07 (3d Cir. 2010) (holding that a breakup fee could preserve estate value by assuring that a bidder adhered to its bid rather than abandon it in the event the bankruptcy court required an auction for the relevant asset); *In re Women First Healthcare, Inc.*, 332 B.R. 115, 121 (Bankr. D. Del. 2005) ("The Third Circuit has expressly recognized as an administrative claim a stalking-horse bidder's claim for a break-up fee and expense reimbursement if granting such a claim provides a benefit to the estate . . ."); *Integrated Res.*, 147 B.R. 650, 659–61 (S.D.N.Y. 1992) (noting that bid protections can prompt bidders to commence negotiations and

"ensure that a bidder does not retract its bid" and that "[b]reak-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets . . . In fact, because the directors of a corporation have a duty to encourage bidding, break-up fees can be *necessary* to discharge the directors' duties to maximize value.") (emphasis in original).

22. The Break-Up Fee and Expense Reimbursement are "actually necessary to preserve the value of the estate." *In re O'Brien Env't Energy, Inc.*, 181 F.3d 527, 535 (3d Cir. 1999). The Debtors negotiated the Bid Protections in good faith and on an arm's-length basis, and the Debtors believe that the aggregate amount of the Bid Protections is reasonable and appropriate in light of the size and nature of the transaction at issue and the time and efforts that have been and will be expended by the Stalking Horse Bidder. Moreover, the Bid Protections were necessary to secure the Stalking Horse Bidder's willingness to enter into the Stalking Horse APA. The Stalking Horse Bidder was unwilling to submit its bid, let alone permit the Stalking Horse APA to be subject to higher or otherwise better offers, without the Bid Protections. Moreover, it is likely that any bidder would agree to act as a stalking horse bidder without bid protections. Accordingly, if the Court does not authorize the Debtors to offer the Bid Protections, the Debtors may lose the opportunity to obtain the highest or otherwise best offer for Purchased Assets and would certainly lose the downside protection afforded by the existence of a stalking horse bidder.

23. The Debtors believe, in the exercise of their business judgment, that offering the Bid Protections will enhance the ultimate recovery they would ultimately be able to provide to their creditors. Payment of the Bid Protections will not diminish the Debtors' estate because the Debtors will incur the obligation to pay the Bid Protections only if they receive a higher or better offer for the Purchased Assets from a third party, which exceeds the consideration provided under

the Stalking Horse APA by at least the aggregate of the Bid Protections and the Incremental Overbid.

24. Courts in this jurisdiction routinely approve similar bid protections where a proposed break-up fee or reimbursement provides a benefit to the estate and grant administrative expense status (including superpriority administrative expense status) to bid protections that become due under the terms of a stalking horse purchase agreement. *See, e.g.*, *In re Timber Pharms., Inc.*, Case No. 23-11878 (JKS) (Bankr. D. Del. Dec. 15, 2023) [D.I. 126] (approving designation of stalking horse bidder and break-up fee and the expense reimbursement as allowed super-priority administrative expense claims); *In re Virgin Orbit Holdings, Inc.*, Case No. 23-10405 (KBO) (Bankr. D. Del. May 22, 2023) [D.I. 326] (same); *In re Am. Eagle Del. Holding Co., LLC*, No. 22-10028 (JKS) [D.I. 146] (same); *In re Ector Cnty. Energy Ctr., LLC*, No. 22-10320 (JTD) (Bankr. D. Del. May 6, 2022) [D.I. 136] (same); *In re Makeup Liquidating Holdings, LLC*, No. 22-10050 (JKS) (Bankr. D. Del. Jan. 28, 2022) (D.I. 90) (same).

25. Accordingly, the Debtors believe that the Bid Protections are reasonable and similar to bid protections previously approved by this Court and other courts in this District.

### Waiver of Bankruptcy Rule 6004(a) and 6004(h)

26. To implement the foregoing, the Debtors seek a waiver of the notice requirements under Bankruptcy Rule 6004(a) and the fourteen (14) day stay of an order authorizing the use, sale, or lease of property under Bankruptcy Rule 6004(h). As set forth above, the relief requested herein is essential to prevent immediate and irreparable damage to the Debtors' operations, going concern value, and their efforts to pursue a resolution to these chapter 11 cases.

### Notice

27. The Debtors will provide notice of this Motion to the following parties or their respective counsel: (i) the U.S. Trustee; (ii) counsel to the Committee; (iii) counsel to the DIP

Agent, the DIP Lender, and the FILO Agent; (iv) counsel to the ABL Facility Agent; (v) Wilmington Trust, National Association, as Trustee and Notes Collateral Agent pursuant to 2026 Notes Indenture; (vi) counsel to the *Ad Hoc* Group of 2026 Noteholders; (vii) counsel to certain 2026 Noteholders; (viii) RCB Equities #1, LLC, as lender pursuant the PropCo Promissory Note; (ix) the United States Securities and Exchange Commission; (x) the Internal Revenue Service; (xi) the state attorneys general for all states in which the Debtors conduct business; (xii) the United States Attorney's Office for the District of Delaware; and (xiii) any party that has requested notice pursuant to Bankruptcy Rule 2002 (collectively, the "Notice Parties"). In light of the nature of the relief requested herein, the Debtors respectfully submit that such notice is sufficient, and no other or further notice is required or necessary.

*[Remainder of page intentionally left blank]*


WHEREFORE, the Debtors respectfully request that this Court enter the Stalking Horse Order, substantially in the form attached hereto, and grant such other relief as this Court deems appropriate under the circumstances.

| | |
|---|---|
| Dated: May 9, 2024<br>Wilmington, Delaware | **MORRIS, NICHOLS, ARSHT & TUNNELL LLP**<br><br>*/s/ Jonathan M. Weyand*<br>Robert J. Dehney, Sr. (No. 3578)<br>Matthew O. Talmo (No. 6333)<br>Jonathan M. Weyand (No. 6959)<br>Erin L. Williamson (No. 7286)<br>1201 N. Market Street, 16th Floor<br>P.O. Box 1347<br>Wilmington, Delaware 19899-1347<br>Telephone:   (302) 658-9200<br>Facsimile:   (302) 658-3989<br>Email:         rdehney@morrisnichols.com<br>                   mtalmo@morrisnichols.com<br>                   jweyand@morrisnichols.com<br>                   ewilliamson@morrisnichols.com<br><br>- and -<br><br>**MILBANK LLP**<br><br>Dennis F. Dunne, Esq. (admitted *pro hac vice*)<br>Michael W. Price, Esq. (admitted *pro hac vice*)<br>Lauren C. Doyle, Esq.  (admitted *pro hac vice*)<br>Brian Kinney, Esq. (admitted *pro hac vice*)<br>55 Hudson Yards<br>New York, New York 10001<br>Telephone:   (212) 530-5000<br>Facsimile:   (212) 530-5219<br>Email:         ddunne@milbank.com<br>                   mprice@milbank.com<br>                   ldoyle@milbank.com<br>                   bkinney@milbank.com<br><br>*Co-Counsel for Debtors in Possession* |