## Exhibit A

**Proposed Order**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| NUMBER HOLDINGS, INC. *et al.*,[1] | ) | Case No. 24-10719 (JKS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: D.I. __** |
| | ) | |

## ORDER (I) AUTHORIZING THE DEBTORS TO ENTER
## INTO THE STALKING HORSE APA, (II) APPROVING THE
## RELATED BID PROTECTIONS; AND (III) GRANTING RELATED RELIEF

Upon the motion (the "Motion")[2] of the above-captioned Debtors, seeking entry of an order, pursuant to sections 105(a), 363, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 9014, and Local Rule 6004-1, (i) authorizing the Debtors to enter into the Stalking Horse APA in connection with the sale of certain of its assets, (b) approving the related Bid Protections; and (iii) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* of the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the notice of the Motion and of the

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: (i) Number Holdings, Inc. (1463); (ii) 99 Cents Only Stores LLC (1605); (iii) 99 Cents Only Stores Texas, Inc. (1229); (iv) 99 Cents PropCo LLC (7843); (v) 99 Cents HoldCo LLC (3987); and (vi) Bargain Wholesale LLC (8030). The Debtors' principal offices are located at 1730 Flight Way, Suite 100, Tustin, CA 92782.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

opportunity to be heard at the hearing thereon were appropriate under the circumstances and that no other notice need be provided; and this Court having reviewed the Motion and the Stalking Horse Declaration and having heard the statements and argument in support of the relief requested at a hearing, if any, before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at any Hearing establish just cause for granting the requested relief on a final basis; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT**:

A.      The Debtors' notice of the Motion, the Hearing, and entry of this Order was sufficient under the circumstances and complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the applicable Local Rules.[3] A reasonable opportunity to object or be heard regarding the relief provided herein has been afforded to parties in interest.  Accordingly, no other or further notice of the Motion or the entry of this Order is necessary or required.

B.      The bases for the relief requested in the Motion are: (i) sections 105, 363, 365, 503, and 507 of the Bankruptcy Code; (ii) Bankruptcy Rules 2002(a)(2), 6004, 6006, 9007, and 9014; and (iii) Local Rule 6004-1.

C.      The Debtors have articulated good and sufficient reasons for this Court to: (i) authorize the Debtors to enter into the Stalking Horse APA in connection with the sale of certain of its Assets, (ii) approve the related Bid Protections; and (iii) grant related relief.  The best

---

[3]    The findings of fact and the conclusions of law stated herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. To the extent any finding of fact shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law shall be determined to be a finding of fact, it shall be so deemed.

interests of the Debtors, their estates, creditors, and other parties in interest will be served by such approval and authorization.

D.     The Stalking Horse APA, including the Bid Protections, were negotiated at arm's length and in good faith by the Debtors and the Stalking Horse Bidder and are fair, appropriate, and reasonably designed to promote participation in and active bidding at the Auction to ensure that the highest or otherwise best value is generated for the Purchased Assets. The Debtors and their advisors engaged in a robust and extensive marketing process prior to the commencement of these Chapter 11 Cases, and the Bid Procedures are designed to continue that robust process.

E.     The Bid Protections are: (i) an actual and necessary cost of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a) of the Bankruptcy Code; (ii) commensurate to the real and substantial benefits conferred upon the Debtors' estates by the Stalking Horse Bidder; (iii) reasonable and appropriate in light of the size and nature of the proposed transaction, the commitments that have been made by the Stalking Horse Bidder for the benefit of the Debtors' estates, the Stalking Horse Bidder's lost opportunities resulting from the time spent pursuing the sale of the Purchased Assets and the commitment of capital in connection therewith, the condition of the Purchased Assets, and the efforts that have been and will be expended by the Stalking Horse Bidder; (iv) reasonably tailored to encourage bidding for the Purchased Assets by providing a baseline of value, increasing the likelihood of competitive bidding at the Auction, and facilitating participation of other bidders in the sale process, thereby increasing the likelihood that the Debtors will receive the best possible price and terms for the Purchased Assets; and (v) a condition to and necessary to induce the Stalking Horse Bidder to continue to pursue the Sale and to continue to be bound by the Stalking Horse APA.

F.       The Stalking Horse APA provides the Debtors the opportunity to sell the Purchased Assets in a manner designed to preserve and maximize their value and provide a floor for a further marketing and auction process, to the benefit of the Debtors' estates, their creditors, and all other stakeholders. Designation of the Stalking Horse Bidder as a "stalking horse bidder" and the Stalking Horse APA as a "stalking horse agreement" is in the best interests of the Debtors' estates and their creditors and reflects a sound exercise of their business judgment.

G.       The Bid Protections are an essential inducement and condition of the Stalking Horse Bidder's entry into, and continuing obligations under, the Stalking Horse APA. Unless it is assured that the Bid Protections will be available, the Stalking Horse Bidder is unwilling to remain obligated under the Stalking Horse APA (including the obligations to maintain its committed offer while such offer is subject to higher or otherwise better offers). The Bid Protections induced the Stalking Horse Bidder to submit a bid that will serve as a minimum floor bid for the Purchased Assets on which the Debtors, their creditors and other bidders at the Auction can rely. The Stalking Horse Bidder has provided a material benefit to the Debtors and their creditors by increasing the likelihood that the best possible purchase price for the Purchased Assets will be realized. Accordingly, the Bid Protections are reasonable and appropriate and represent the best method for maximizing the value of the Purchased Assets.

H.       The Stalking Horse Bidder is a third-party purchaser and is unrelated to any of the Debtors. Neither the Stalking Horse Bidder, nor any of its affiliates, subsidiaries, officers, directors, members, partners, or principals, or any of their respective representatives, successors, or assigns is an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

4

I.        The legal and factual bases set forth in the Motion establish just cause for the relief granted herein. Entry of this Order is in the best interests of the Debtors and their estates, creditors, interest holders, and all other parties in interest.

**IT IS HEREBY ORDERED THAT:**

1.        The Motion is granted as set forth herein.

2.        All objections to the Motion or the relief provided herein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby overruled and denied on the merits.

3.        The Stalking Horse Bidder is deemed a Qualified Bidder, and the Stalking Horse Bid as set forth in the Stalking Horse APA is deemed a Qualified Bid.

4.        The Debtors are authorized to designate Ollie's Bargain Outlet, Inc. and OBO Ventures, Inc.as the Stalking Horse Bidder and enter into the Stalking Horse APA (including all schedules, exhibits, and other ancillary documents thereto), subject to higher or otherwise better offers at the Auction in accordance with the Bidding Procedures. The Debtors are authorized to enter into the Stalking Horse Order and perform all of their obligations under the Stalking Horse APA intended to be performed prior to entry of the Sale Order, subject to the terms of the Bidding Procedures.  To the extent the Debtors have not yet executed the Stalking Horse APA, the Debtors shall execute the Stalking Horse APA within one business day of the date hereof.

5.        To the extent that this Order is not entered on the docket at least one business day before the Bid Deadline, then: (i) Stalking Horse Bidder shall be permitted to terminate this Agreement in accordance with Section 12.1(a)(v) of the Stalking Horse APA; (ii) Debtors shall extend the Bid Deadline for Stalking Horse Bidder to a date that is the later of (x) two (2) business days after the Bid Deadline or (y) 2 business days after the hearing date originally scheduled for

the entry of the Stalking Horse Approval Order; and (iii) Stalking Horse Bidder may submit an alternate Bid for the Property, which bid shall be deemed a Qualified Bid.

6.      In accordance with the Bidding Procedures Order, in the event the Stalking Horse Bidder is not the Successful Bidder, to the extent the Stalking Horse Bid is the next highest or best bid after the Successful Bid, the Stalking Horse Bidder shall serve as the Backup Bidder for the Purchased Assets. If the Stalking Horse Bidder has not been notified by the Debtors that it is a Backup Bidder at the conclusion of the Auction, the Stalking Horse Bidder shall not be the Backup Bidder and the Stalking Horse APA shall terminate.

7.      The Debtors are authorized to pay the Bid Protections as provided in the Stalking Horse APA, the Bidding Procedures Order, and this Order. The Bid Protections shall be allowed as administrative expense claims in the Chapter 11 Cases. The Debtors are authorized to pay any and all amounts owing to the Stalking Horse Bidder on account of the Bid Protections.

8.      The Break-Up Fee is approved in the amount of Four Hundred Thousand Thirty-Eight and no/100 Dollars ($438,000).  The Break-Up Fee shall be paid pursuant to the terms of the Stalking Horse APA out of the proceeds of the purchase price of the Successful Bidder prior to payment of any net proceeds to the Debtors' secured creditors.

9.      No person or entity other than the Stalking Horse Bidder shall be entitled to any expense reimbursement, break-up fees, "topping," termination, or other similar fee or payment, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with this court any request for expense reimbursement or any fee of any nature, whether by virtue of section 503(b) of the Bankruptcy Code or otherwise.

10.      In accordance with the Bidding Procedures Order, upon entry of this Order, each bid for the Purchased Assets will only constitute a Qualified Bid if the consideration provided is

equal to at least the following: (a) the consideration set forth in the Stalking Horse APA; *plus* (b) the amount of the Break Up Fee, which is $438,000; *plus* (c) the amount of the Initial Incremental Overbid which is $150,000.

11.    If the Debtors receive one or more Qualified Bids for the Property, other than the Stalking Horse Bidder's Bid for such Property, if any, the Debtors will conduct the Auction to determine the Successful Bidder with respect to such Property.  If the Debtors do not receive a Qualified Bid for the Property (other than the Stalking Horse Bidder's Bid for such Property), the Debtors shall designate the Stalking Horse Bidder's Bid for such Property as the Successful Bid for such Property and file a notice of cancellation of the Auction with respect to the Property at the time of such designation.

12.    Notwithstanding anything to the contrary in the Motion, the Bidding Procedures Motion or the Bidding Procedures Order: (i) all Incremental Overbids made at the Auction for the Property shall be made and received on an open basis, and all material terms of each such Incremental Overbid shall be fully disclosed to Stalking Horse Bidder and all other Qualified Bidders who submitted Bids on such Property; (ii)  the Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Starting Bid, all applicable Incremental Overbids, and the Successful Bid; (iii) the Stalking Horse Bidder shall be permitted to credit bid the amount of the Break Up Fee in the event the Stalking Horse makes an Incremental Overbid; and (iv) if the Stalking Horse Bidder is the Successful Bidder in any subsequent round(s) of bidding, it shall be entitled to a credit against the purchase price in the amount of the Break Up Fee.

13.    In connection with the Sale of the Property, without the Stalking Horse Bidder's prior written consent, the Debtors shall not in any manner amend, supplement, or modify the

Bidding Procedures in a manner that materially impairs or effects the ability of the Stalking Horse Bidder to increase its Bid.

14.     Entry of this Order shall not prejudice any of the relief provided by the Bidding Procedures Order, unless explicitly stated herein.  However, in the event of a conflict between this Order and the Bidding Procedures Order, this Order shall control.

15.     Failure to timely file an objection to the relief sought in the Motion shall forever bar the assertion of any objection to such relief or the consummation of the sale of the Purchased Assets to the Stalking Horse Bidder, including, without limitation, for purposes of section 363(f) of the Bankruptcy Code.

16.     Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed:  (i) an admission as to the amount of, basis for, or validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any other party's right to dispute any claim; (iii) a promise or requirement to pay any particular claim; (iv) an admission that any particular claim is of a type described in the Motion; (v) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (vi) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (vii) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.

17.     The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby modified with respect to the Debtors to the extent necessary, without further order of the Court, to allow the Stalking Horse Bidder to (i) deliver any notice provided for in the Stalking Horse APA, including, without limitation, a notice terminating the Stalking Horse APA in accordance with the

terms thereof, and (ii) take any and all actions permitted under the Stalking Horse APA in accordance with the terms and conditions thereof.

18.     The requirements set forth in Local Rule 6004-1 are hereby satisfied, modified, or waived.

19.     Notwithstanding Bankruptcy Rule 6004(h), the terms of this Order shall be effective and enforceable immediately upon its entry.

20.     The Debtors are authorized to take all actions that are necessary and appropriate to effectuate the relief granted in this Order.

21.     This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

## **Exhibit 1**

Stalking Horse Agreement

**ASSET PURCHASE AGREEMENT**

by and among

**99 CENTS ONLY STORES LLC**

**AND THE OTHER SELLERS NAMED HEREIN,**

as Seller,

and

**OLLIE'S BARGAIN OUTLET, INC. AND OBO VENTURES, INC.**

as Buyer

May 9, 2024

## TABLE OF CONTENTS

**Page**

ARTICLE 1        Definitions ........................................................................................3

    Section 1.1        Definitions .....................................................................3

ARTICLE 2        Agreement; Purchase Price ...........................................................10

    Section 2.1        Agreement to Sell and Purchase ..................................10
    Section 2.2        Purchase Price ..............................................................10
    Section 2.3        Allocation of Purchase Price ........................................10
    Section 2.4        Indivisible Economic Package ......................................11
    Section 2.5        Independent Consideration ...........................................11

ARTICLE 3        Deposit ..........................................................................................12

    Section 3.1        Deposit .........................................................................12

ARTICLE 4        Title and Survey ............................................................................12

    Section 4.1        Permitted Title Exceptions ...........................................12
    Section 4.2        Title Insurance ..............................................................13

ARTICLE 5        Intentionally Omitted ....................................................................14

ARTICLE 6        Inspection; Confidentiality; Assumption and Assignment of Contracts ...........14

    Section 6.1        Access ...........................................................................14
    Section 6.2        Confidentiality .............................................................15
    Section 6.3        Assumption and Assignment of Contracts ...................16

ARTICLE 7        Conditions Precedent, Casualty Damage or Condemnation .............18

    Section 7.1        Conditions Precedent Favoring Buyer ..........................18
    Section 7.2        Conditions Precedent Favoring the Seller.....................20
    Section 7.3        Risk of Casualty ...........................................................20
    Section 7.4        Risk of Condemnation ..................................................21

ARTICLE 8        Representations, Warranties and Covenants ..................................22

    Section 8.1        Buyer Representations ..................................................22
    Section 8.2        Seller Representations ...................................................26
    Section 8.3        Seller's Actual Knowledge ...........................................29
    Section 8.4        Notice of Breach ...........................................................30

ARTICLE 9        Covenants of Seller; Bankruptcy Court Matters ...........................30

    Section 9.1        Covenants of Seller ......................................................30
    Section 9.2        Bankruptcy Court Matters.............................................31

ARTICLE 10      Closing ..........................................................................................33

    Section 10.1        Time and Place of Closing ...........................................33
    Section 10.2        Seller's Deliveries ........................................................33
    Section 10.3        Buyer's Deliveries.........................................................34

168693.00002/135492369v.6

Section 10.4      Apportionments ................................................................35
Section 10.5      Closing Costs ..................................................................37

ARTICLE 11      Real Estate Commission .............................................................37

ARTICLE 12      Termination and Default .............................................................38

Section 12.1      Buyer's Termination Rights and Remedies ...........................38
Section 12.2      Mutual Termination by the Parties........................................39
Section 12.3      Seller's Termination Rights Following Buyer Default .......................39
Section 12.4      Breach of Representations ...................................................40

ARTICLE 13      Intentionally Omitted .............................................................42

ARTICLE 14      Escrow Account .................................................................42

Section 14.1      Escrow Account ...............................................................42
Section 14.2      Taxes ............................................................................42

ARTICLE 15      Miscellaneous...................................................................42

Section 15.1      Entire Agreement .............................................................42
Section 15.2      Binding on Successors and Assigns......................................42
Section 15.3      Assignment by Buyer ........................................................42
Section 15.4      Waiver ...........................................................................43
Section 15.5      Governing Law; Jurisdiction................................................43
Section 15.6      Counterparts ...................................................................43
Section 15.7      Notices...........................................................................44
Section 15.8      Attorneys' Fees ................................................................45
Section 15.9      Income Tax Matters ..........................................................45
Section 15.10     Time Periods ...................................................................45
Section 15.11     Modification of Agreement..................................................45
Section 15.12     Further Instruments ..........................................................45
Section 15.13     Descriptive Headings; Word Meaning....................................45
Section 15.14     Time of the Essence ..........................................................45
Section 15.15     Construction of Agreement ..................................................45
Section 15.16     Limitations on Liability ......................................................46
Section 15.17     Severability ....................................................................46
Section 15.18     Joint and Several ..............................................................46
Section 15.19     No Successor Liability .......................................................46

168693.00002/135492369v.6

<u>Exhibits and Schedules</u>

Exhibit A:        Form of Deed
Exhibit B:        Form of Bill of Sale
Exhibit C:        Form of Omnibus Assignment
Exhibit D-1:    Form of Assignment and Assumption of Assigned Lease
Exhibit E:        Form of FIRPTA Certificate
Exhibit F:        Form of Seller Closing Update Certificate
Exhibit G:        Form of Buyer Closing Update Certificate
Exhibit H:        Form of Notice to Landlords under each Assigned Lease
Exhibit I:         Form of Title Affidavit

Schedule A:          Property Address(es) (Owned Real Properties)
Schedule B-1 to B-3:  Legal Description(s) (Owned Real Properties)
Schedule C:          Assigned Leases
Schedule D:          Intentionally Deleted.
Schedule E:          Intentionally Deleted.
Schedule F:          Allocated Purchase Price
Schedule G:          Required Removal Exceptions in Title
Schedule H:          List of Lease Documents (for Assigned Leases)
Schedule I:           Sale Order
Schedule J:          Form of Stalking Horse Approval Order
Schedule K:          Escrow Terms

168693.00002/135492369v.6

## ASSET PURCHASE AGREEMENT

This **ASSET PURCHASE AGREEMENT** (this "Agreement") is dated as of the "Effective Date" (as hereinafter defined) by and among (a) **99 CENTS ONLY STORES LLC**, a California limited liability company (the "Company"), and **99 CENTS ONLY STORES TEXAS, INC.**, a Delaware corporation (together with the Company, individually or collectively, as the context may require, "Seller" or "Sellers"), and (b) **OLLIE'S BARGAIN OUTLET, INC**., as the intended buyer of the Leasehold Interests (hereinafter defined) and **OBO VENTURES, INC**., as the intended buyer of the Owned Property (hereinafter defined), each a Pennsylvania corporation (together with its permitted designees, successors and assigns, individually or collectively as the context may require, "Buyer").

## RECITALS

A.      On April 7, 2024 (the "Petition Date"), the Company, [each other Seller] and certain of their respective Affiliates filed voluntary petitions for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court" and such bankruptcy proceeding, the "Bankruptcy").

B.      99 CENTS ONLY STORES TEXAS, INC. is the owner of those certain real properties briefly described (and noted as being owned by it) on Schedule A, which real properties consist(s) of: (i) the land more particularly described in Schedules B-1 through B-3 ([collectively,] the "Land") and (ii) all of Seller's right, title and interest in, to and under all of the following:

1.      strips and gores of land within or adjoining the Land, land lying in the bed of any street to the center line thereof, and privileges, prescriptive rights or rights of adverse possession, rights of way, easements and other rights appurtenant to or used in connection with the ownership and operation of the Land, including, without limitation, any air or development and zoning rights or privileges and easements relating to, affecting or appurtenant to the Land or any portion thereof (the "Appurtenances");

2.      buildings and improvements erected on the Land (the "Improvements"; each Land, together with the related the Improvements and Appurtenances, an "Owned Real Property"; and each Owned Real Property, collectively, the "Owned Real Properties");

3.      Personal Property;

4.      all warranties and guaranties relating to the Owned Real Properties, including without limitation any roof warranties applicable thereto;

5.       all site plans, architectural renderings, plans and specifications, as-built drawings, floor plans and other similar plans or diagrams relating to the Owned Real Properties;

6.  all consents, authorizations, variances, licenses, permits and certificates of occupancy, if any, issued by any Governmental Authorities with respect to the Owned Real Properties;

7.  All oil, gas and all other minerals underlying the Land and that may be produced and mined therefrom, including, without limitation, any right of Seller to mineral interests, royalty interests, leasehold interests, and production payment interests; and

8.  To the extent assignable, all intangible property associated with the Owned Real Properties, including, without limitation, trademarks, logos, trade or business names, copyrights, mailing lists, internet domain names, promotional materials, business licenses and telephone numbers, if any, owned by or licensed to Seller and used by Seller with respect to its ownership, leasing and/or use or operation of the Owned Real Properties (collectively, the "Intangible Property");

all of the foregoing, including, for the avoidance of doubt, the Land, collectively, the "Owned Property").

C.    99 Cents Only Stores Texas, Inc. is also the owner of the tenant's or lessee's interest in the Assigned Leases (all of Seller's right, title and interest in, to and under such Assigned Leases, collectively, the "Leasehold Interests"; and the Leasehold Interests, together with the Owned Property, collectively, the "Property").

D.    Buyer desires to purchase, accept and assume from Seller, and Seller desires to sell, convey, assign and transfer to Buyer, subject to and upon the terms and conditions contained in this Agreement, the Property pursuant to a Sale Order (as herein defined), which Sale Order shall have become a Final Order.

**NOW, THEREFORE,** in consideration of the mutual promises hereinafter set forth and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereby agree as follows:

## ARTICLE 1

### Definitions

**Section 1.1    Definitions**.    Capitalized terms used in this Agreement shall have the meanings set forth below:

"Adjusted Purchase Price Balance" shall mean the Purchase Price less the Deposit, as such amount shall be adjusted to reflect the pro-rations contemplated in Section 10.4 of this Agreement and any other adjustments or credits required by this Agreement.

"Adjustment Date" shall have the meaning set forth in Section 10.4(a).

"Administrative Claim" means a Claim arising under sections 503(b), 507(a)(2), 507(b) or 1114(e)(2) of the Bankruptcy Codde.

2

"Advisors" shall mean, with respect to any Person, any directors, officers, employees, investment bankers, financial or other professional advisors, accountants, agents, attorneys, consultants, or other representatives of such Person.

"Affiliate" shall mean, respect to any Person, any other Person that, directly or indirectly, Controls, is Controlled by or is under common Control with such Person. The term "**Affiliated**" shall have the correlative meaning.

"Agreement" shall mean this Agreement, including all Exhibits and Schedules attached hereto, as the same may be amended, modified, or supplemented from time to time in writing by Seller and Buyer.

"Allocated Purchase Price" shall have the meaning set forth in Section 2.2.

"Alternate Transaction" means a transaction or series of related transactions pursuant to which (a) Seller accepts a Qualified Bid, as defined in the Bidding Procedures, other than that of Buyer, as the highest or best offer for all or any portion of the Property, or (b) Seller sells, transfers, leases or otherwise disposes of, directly or indirectly, including through an asset sale, stock sale, merger, reorganization or other similar transaction (by Seller or otherwise), including pursuant to a stand-alone plan of reorganization or refinancing, all or any portion of the Property in a transaction or series of transactions to a party or parties other than Buyer; or (c) the Bankruptcy Court confirms a plan that keeps all or any portion of the Property with Seller.

"Assigned Lease(s)" shall mean those certain real property leases to which Seller is a party, as tenant thereunder, as more particularly described on Schedule C and Schedule H (each an "Assigned Lease and collectively, the "Assigned Leases").

"Assignment and Assumption of Lease" shall mean an Assignment and Assumption of Lease with respect to each Assigned Lease in the form attached hereto as Exhibit D-1.

"Auction" means the auction for the sale of Seller's Property conducted by Seller pursuant to the Bid Procedures Order.

"Bankruptcy Code" shall mean Title 11, United States Code, 11 U.S.C. §§ 101 et seq.

"Bankruptcy Court" shall have the meaning given to such term in Recital A.

"Base Purchase Price" shall have the meaning given to such term in Section 2.2.

"Bidding Incentives" means the Break-Up Fee.

"Bidding Procedures" shall have the meaning ascribed thereto in the Bid Procedures Order, as modified by the Stalking Horse Approval Order.

"Bid Procedures Order" shall mean the order approving Sellers' proposed bidding procedures and scheduling a Sale Hearing for May 23, 2024 at 10 AM, which order was filed in the Bankruptcy at docket number 463.

3

"Bill of Sale" shall mean a bill of sale in the form attached hereto as Exhibit B.

"Break-Up Fee" shall mean three percent (3%) of the Base Purchase Price.

"Break-Up Fee Credit" shall have the meaning given to such term in Section 12.1(b).

"Business Day" shall mean any day of the week other than (a) Saturday and Sunday, (b) a day on which banking institutions in the State of Texas are obligated or authorized by law or executive action to be closed to the transaction of normal banking business, or (c) a day on which governmental functions in Texas or the State of Texas are interrupted because of extraordinary events such as hurricanes, power outages, declarations of national or local emergency or acts of terrorism.

"Buyer" has the meaning set forth in the preamble of this Agreement.

"Buyer Representations" shall have the meaning set forth in Section 8.1.

"Buyer Representatives" shall have the meaning set forth in Section 6.1.

"Buyer Closing Update Certificate" shall mean a certificate in substantially the form of Exhibit G attached hereto.

"Buyer's Intended Use" shall mean, collectively, to operate Ollie's Bargain Warehouse (including the retail sale of goods as sold in the majority of Buyer's other "Ollie's Bargain Outlet" stores) or, at Buyer's sole discretion, such other use or non-use as may be permitted under the applicable Assigned Leases.

"Buyer's Related Parties" shall mean, collectively, the directors, officers, employees and partners of Buyer, Buyer's lender or potential lender, investors, attorneys, consultants, insurers and accounting firms.

"Claim" means a "claim" as defined in section 101(5) of the Bankruptcy Code, whether arising before or after the Petition Date.

"Closing" shall mean the consummation of the Transaction pursuant to the terms of this Agreement.

"Closing Date" shall have the meaning set forth in Section 10.1(b).

"Code" shall mean the Internal Revenue Code of 1986, and all amendments thereto and all regulations issued thereunder.

"Consequential Damages" shall mean, with respect to an indemnified matter, consequential, speculative or similar special damages incurred by the indemnified party.

"Consultation Parties" shall mean, collectively: (a) the official committee of unsecured creditors and its counsel, (b) the DIP Lenders and their counsel, (c) Royal Bank of Canada, as ABL Facility Agent, and its counsel, (d) Sixth Street Specialty Lending, Inc., as FILO Agent, and its

counsel; (e) the Ad Hoc Group of 2026 Noteholders, and its counsel; and (f) solely with respect to the sale of PropCo Priority Collateral (as defined in the Interim DIP Order entered in the Bankruptcy), RCB Equities #1, LLC, as lender pursuant to the PropCo Promissory Note, and its counsel.

"Control" shall mean, with respect to any Person, (a) the ownership of more than fifty percent (50%) of the Equity Interests of such Person or (b) the power (whether or not exercised) to elect a majority of the directors of such Person or to exercise voting control of such Person or to otherwise direct or cause the direction of the management and policies of such Person through the ownership of Equity Interests, whether by contract or otherwise.  The terms "Controlled by", "Controlling" and "under common Control with" shall have their respective correlative meanings.

"Cure Amounts" means all amounts, costs and expenses (including real estate taxes, percentage rents, CAM charges or other charges) required by the Bankruptcy Court to cure all defaults under the Assigned Leases so that they may be sold and assigned to Buyer pursuant to Section 363 and 365 of the Bankruptcy Code.

"Deed" shall mean a special warranty deed or its equivalent conveying each Owned Real Property from Seller to Buyer in the form attached hereto as Exhibit A.

"Deposit" shall have the meaning set forth in Section 3.1(a).

"DIP Agent" shall mean the DIP Agent under the post-petition financing order approved by the Bankruptcy Court found at Docket number 134.

"DIP Credit Agreement" shall mean the DIP Credit Agreement approved pursuant to the post-petition interim financing order entered by the Bankruptcy Court, found at docket number 134.

"Dollars" and the sign "$" mean the lawful money of the United States of America.

"Effective Date" shall mean the date on which this Agreement is fully executed by both Buyer and Seller after the Stalking Horse Approval Order has been entered on the docket.

"Environmental Laws" shall any and all federal, state, municipal and local laws, statutes, ordinances, rules, regulations, binding guidance or policies, orders, decisions, determinations, decrees or judgments, whether statutory or common law, as amended from time to time, now or hereafter in effect, or promulgated, pertaining to pollution, the environment, natural resources, public health and safety and industrial hygiene (in each case, as the same relate to Hazardous Substances), including the management, use, generation, manufacture, labeling, registration, production, storage, release, discharge, spilling, leaking, emitting, injecting, escaping, abandoning, dumping, disposal, handling, treatment, removal, decontamination, cleanup, transportation or regulation of or exposure to any Hazardous Substance, including the Industrial Site Recovery Act, the Clean Air Act, the Clean Water Act, the Toxic Substances Control Act, the Comprehensive Environmental Response Compensation and Liability Act, the Resource Conservation and Recovery Act, the Federal Insecticide, Fungicide, Rodenticide Act, the Safe Drinking Water Act and the Occupational Safety and Health Act (as it relates to Hazardous Substances).

168693.00002/135492369v.6

"Equity Interests" shall mean, with respect to any Person, any and all shares, interests, participations or other equivalents, including membership interests (however designated, whether voting or nonvoting), of equity of such Person, including, if such Person is a partnership, partnership interests (whether general or limited) and any other interests or participations that confer on a Person the right to receive a share of the profits and losses of, or distributions of assets of, such partnership.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

"Escrow Agent" shall have the meaning set forth in the notice section of this Agreement.

"Existing Environmental Report(s)" shall mean that certain Environmental Site Assessment Phase I dated February 25, 2003, prepared by Environmental Resource Consultants (ERC) as Project #030226 covering the Owned Property at 7130 FM 1960 Road, Humble, Texas, and any other previous environmental report in Seller's possession for any of the Owned Property.

"Excluded Items" shall mean:  (a) cash located at, or on deposit in accounts relating to, any Property; (b) materials relating to Seller's marketing efforts for the sale of the Property, including communications with other potential purchasers; (c) financial statements and tax returns; (d) internal analyses, projections, memoranda or other similar materials; (c) employee files, (d) appraisals, (e) intellectual property; (f) software; (g) submissions relating to Seller's obtaining of internal authorizations; and (d) attorney and accountant work product and all other materials subject to any legal privilege in favor of Seller.

"Extended Outside Closing Date" shall have the meaning set forth in Section 12.1(a)(iv).

"Final Closing Statement" shall have the meaning set forth in Section 10.4(d).

"Final Order" shall mean an order of the Bankruptcy Court, the operation or effect of which has not been vacated, stayed, amended, reversed and/or modified, and as to which (a) the time to appeal, petition for certiorari, or motion for argument or rehearing has expired and as to which no appeal, petition for certiorari, or motion for re-argument or rehearing shall then be pending, or (b) in the event that an appeal, writ for certiorari, re-argument or rehearing thereof has been sought, such order or judgment shall have been affirmed by the highest court to which an appeal, petition for certiorari or re-argument or rehearing was sought and the time to take any further appeal, petition for certiorari, or motion for re-argument or rehearing shall have expired.

"FIRPTA Certificate" shall mean a certificate in substantially the form of Exhibit H attached hereto.

"Governmental Authorities" shall mean, collectively, any government, the Bankruptcy Court and any other court of competent jurisdiction, regulatory or administrative agency, commission or authority or other governmental instrumentality, federal, state, municipal or local, domestic, foreign or multinational entity or body having jurisdiction over (a) the Person in question or (b) the applicable Property or any part thereof.

"Hazardous Materials" shall mean each and every element, compound, chemical mixture, emission, contaminant, pollutant, material, waste or other substance (including radioactive

substances, whether solid, liquid or gaseous) which is defined, determined or identified as hazardous or toxic under any Environmental Law or for which liability or standards of care or a requirement for investigation or remediation are imposed under, or that are otherwise subject to, any Environmental Law, including, without limitation, asbestos, asbestos containing materials, urethane, polychlorinated biphenyls, any petroleum product, petroleum derived products and/or its constituents or derivatives, and any caustic, flammable or explosive materials.  Without limiting the generality of the foregoing, the term shall mean and include:

(a)     "hazardous substances" as defined in the Comprehensive Environmental Response, Compensation and Liability Act of 1980, the Superfund Amendment and Reauthorization Act of 1986, or Title III of the Superfund Amendment and Reauthorization Act, each as amended, and regulations promulgated thereunder; excluding, however, common maintenance and cleaning products of a type and in a quantity regularly found at properties with a standard of operation and maintenance comparable to the applicable Property;

(b)     "hazardous waste" and "regulated substances" as defined in the Resource Conservation and Recovery Act of 1976, as amended, and regulations promulgated thereunder;

(c)     "hazardous materials" as defined in the Hazardous Materials Transportation Act, as amended, and regulations promulgated thereunder;

(d)     "chemical substance or mixture" as defined in the Toxic Substances Control Act, as amended, and regulations promulgated thereunder; and

(e)     "hazardous materials" as defined under all applicable environmental protection statutes of each state and municipality in which the Demised Premises are located.

"Improvements" has the meaning set forth in the Recitals of this Agreement.

"Land" has the meaning set forth in the Recitals of this Agreement.

"Laws" or "Laws and Regulations" shall mean, collectively, all present and future building, fire, sanitary, zoning, environmental, housing and other statutes, laws, ordinances, codes, orders, restrictions, resolutions, requirements, rules and regulations of all Governmental Authorities having jurisdiction with respect to the Real Property or any part thereof, including, without limitation, landmark designations and all zoning variances and special exceptions, if any.

"Lease" means any leases, subleases, occupancy agreements and other similar agreements demising or granting an interest in space at any applicable real property.

"Lien" shall mean adverse interests, security interests, claims, liens, pledges, options, warrants, judgments, encumbrances, charges, voting trusts, voting agreements, proxies or other similar arrangements, restrictions or legal or equitable limitations (other than Permitted Exceptions).

"Losses" shall mean, with respect to a particular indemnified matter, any and all claims, demands, causes of action, losses, liabilities, costs and reasonable expenses (including reasonable

7

attorneys' fees, court costs and disbursements) arising from or in connection with such matter, but excluding in all cases Consequential Damages.

"made available to Buyer" (or words to similar effect herein) shall mean that the applicable information or documentation has been posted to any virtual data rooms for the Transaction to which Buyer or its affiliates have been given access as of the applicable date or otherwise (i.e. Intralinks and Box), and specifically excluding any information contained therein which is applicable to any other property or site other than the Property.

"Material Casualty" shall mean any damage or destruction to all or any portion of the Owned Real Property that was not caused by Buyer or any agent or affiliate thereof that: (a) would cost in the aggregate five percent (5%) or more of the Allocated Purchase Price to repair and restore in the certified opinion of an architect, insurance examiner, contractor or engineer engaged by Seller and approved by Buyer (which approval shall not be unreasonably withheld, conditioned or delayed) (an "Approved Engineer"); or (b) otherwise (in each case, on a permanent basis) either (i) materially limits or materially restricts ingress and egress to and from such Owned Real Property, or (ii) reduces the current parking or other characteristic at the Owned Real Property such that the Owned Real Property is no longer compliant with Laws and Regulations pertaining to zoning.

"Material Condemnation" shall mean any taking by eminent domain of all or any portion of the Owned Real Property (or a duly noticed hearing being held by a Governmental Authority relating to a pending taking of all or any portion of the Owned Real Property in the exercise of the power of eminent domain) that: (a) includes any portion of the principal building comprising the Improvements on such Owned Real Property; (b) results in an award that is five percent (5%) or more of the Allocated Purchase Price; or (c) otherwise (in each case, on a permanent basis) either (i) materially limits or materially restricts ingress and egress to and from such Owned Real Property, or (ii) reduces the current parking or other characteristic at the Owned Real Property such that the Owned Real Property is no longer compliant with Laws and Regulations pertaining to zoning.

"New Phase I Reports" shall mean, collectively: (i) Phase I Environmental Site Assessment dated April 18, 2024, prepared by EBI Consulting, as EBI Project No. 013436-PR (Thousand Oaks); (ii) Phase I Environmental Site Assessment dated April 18, 2024, prepared by EBI Consulting, as EBI Project No. 013399-PR (Pasadena)); and (iii) Phase I Environmental Site Assessment dated April 19, 2024, prepared by EBI Consulting, as EBI Project No. 013398-PR (Humble).

"OFAC" shall mean the Office of Foreign Assets Control of the Department of Treasury.

"Omnibus Assignment" shall mean an Omnibus Assignment (Contracts and Other Property Rights) pertaining to the Property in the form attached hereto as Exhibit C.

"Ordinary Course" shall mean the ordinary and usual course of operations of the Owned Real Property, consistent with past practice and taking into account the preparation, commencement and pendency of the Bankruptcy.

"Outside Closing Date" shall mean June 14, 2024.

"<u>Parties</u>" shall mean, collectively, Seller and Buyer.

"<u>Permit(s)</u>" means any approval, permit, license, order, registration, certificate, variance, concession, authorization, grant, consent, exemption or similar right issued, granted, given or otherwise obtained from or by any Governmental Authority, under the authority thereof or pursuant to any applicable Law, useable or useful in the operation of the use or enjoyment or benefit of the Property.

"<u>PDF</u>" shall have the meaning set forth in <u>Section 15.6</u>.

"<u>Permitted Exceptions</u>" shall have the meaning set forth in <u>Section 4.1</u>.

"<u>Person</u>" shall mean any individual, estate, trust, partnership, limited liability company, limited liability partnership, corporation, governmental agency or other legal entity and any unincorporated association.

"<u>Personal Property</u>" shall mean all fixtures, equipment, machinery, furniture, furnishings, fittings and other articles of personal property (including, without limitation, supplies, signage, inventory remaining at the Property as of Closing and tenant files and other books and records) that are (a) attached or affixed to, or located on, or used or employed in connection with, any Owned Real Property and the use, maintenance, ownership or operation thereof and (b) owned by Seller.

"<u>Pre-Closing Period</u>" shall have the meaning set forth in <u>Section 9.1(a)</u>.

"<u>Preliminary Closing Statement</u>" shall have the meaning set forth in <u>Section 10.4(d)</u>.

"<u>Property</u>" shall have the meaning set forth in <u>Recital C</u>.

"<u>Property Taxes</u>" shall have the meaning set forth in <u>Section 10.4(b)</u>.

"<u>Purchase Price</u>" shall have the meaning set forth in <u>Section 2.2</u>.

"<u>Required Removal Exceptions</u>" shall have the meaning set forth in <u>Section 4.2(d)</u>.

"<u>Required Title Coverages</u>" shall have the meaning set forth in Section 7.1(a)(xii).

"<u>Sale Motion</u>" shall mean Sellers' Motion For Entry of an Order Approving (I)(A) Bidding Procedures in Connection With the Sale of Substantially All of the Debtors' Remaining Assets, (B) Assumption and Assignment Procedures, (C) Form and Manner of Notice of Sale Hearing, Assumption Procedures, and Auction Results; (II) Auction and Sale Hearing Dates; (III)(A) Debtors' Entry Into One or Multiple Asset Purchase Agreements, (B) Sale(s) Free and Clear of All Encumbrances, and (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief filed with the Bankruptcy Court on April 16, 2024.

"<u>Sale Hearing</u>" shall have the meaning set forth for such term in the Bidding Procedures.

"Sale Order" shall mean an order issued by the Bankruptcy Court which is substantially in the form of Schedule I attached hereto, provided that any modifications or updates to such form shall be subject to Buyer's approval in its reasonable discretion but in no event may any changes to the Sale Order materially increase the risks to Buyer.

"Scheduled Closing Date" shall mean the fifteenth (15TH) day following entry of the Sale Order on the docket, or such later date as (x) Buyer and Seller agree to in writing, or (y) results from Buyer's and/or Seller's exercise, if any, of any express adjournment rights under this Agreement.

"Seller" has the meaning set forth in the preamble of this Agreement.

"Seller Failure" has the meaning set forth in Section 12.1(c).

"Seller Parties" shall mean Seller, its Affiliates and its and their direct and indirect owners, agents, officers, directors, trustees, Advisors, brokers, managers, members, partners, employees, representatives, principals, Affiliates, contractors, attorneys, accountants and other consultants, or the successors and assigns of any of the foregoing parties.

"Seller Representations" shall mean the representations and warranties of Seller expressly set forth in Section 8.2.

"Seller's Actual Knowledge" shall have the meaning set forth in Section 8.3.

"Seller Closing Update Certificate" shall mean a certificate in substantially the form of Exhibit F attached hereto.

"Service Contract" means any written or oral service or maintenance contract or agreement in connection with the Property.  For the avoidance of doubt and for all purposes under this Agreement, the term "Service Contract" shall not include any Assigned Leases or any document that is a Permitted Exception, each of which are separately defined in this Agreement.

"Stalking Horse Approval Order" shall mean an order: (i) issued by the Bankruptcy Court which is consistent with the terms of this Agreement, which approves the Buyer as a Stalking Horse Bidder, approves the Break-Up Fee and approves this Agreement as the Stalking Horse APA (as defined in the Bidding Procedures) for the Property, (ii) which is substantially in the form attached as Schedule J hereto ("Form of Stalking Horse Approval Order"), and (iii) which is otherwise in form and substance satisfactory to the DIP Agent, reasonably satisfactory to Seller, and satisfactory to Buyer in Buyer's sole and absolute discretion.

"Stalking Horse Bidder" shall have the meaning ascribed to it the Bidding Procedures.

"State" shall mean the state or commonwealth in which the Owned Real Property is located.

"Surveys" shall mean:  (i) ALTA/NSPS Land Title Survey of 2942 Old Thousand Oaks Drive, San Antonio, TX 78247 prepared by EBI Consulting dated 04/22/2024 and designated as Project Number 013436-PR; (ii) ALTA/NSPS Land Title Survey of 7130 Farm to Market 1960

Road, Humble, TX 77346 prepared by EBI Consulting dated 04/18/2024 and designated as Project Number 013398-PR; and (iii) ALTA/NSPS Land Title Survey of 4100 Fairmount Parkway, Pasadena, TX 77504 prepared by EBI Consulting dated 04/23/2024 and designated as Project Number 013399-PR.

"Title Commitment" shall mean each title commitment for an Owned Real Property made available to Buyer by or on behalf of Seller in connection with the Transaction prior to the Effective Date and issued by the Title Company.

"Title Company" shall mean Chicago Title Insurance Company. Buyer and Seller have agreed that notwithstanding any other term hereof to the contrary, Chicago Title having an address at 711 Third Avenue, 8th Floor, New York, NY 10017, Attn: Mario Varano and Joe Benlevi shall handle and coordinate all underwriting decisions for purposes of Buyer obtaining Title Policies under this Agreement and the coordination of all documents for Closing, and Chicago Title Insurance Company having an address at 10 South LaSalle Street, Suite 3100, Chicago, IL 60603 Attn: Eric Anderson shall be the Escrow Agent for purposes of holding the Deposit under this Agreement and for purposes of funding at Closing.

"Transaction(s)" shall mean the transactions contemplated by the Sale Order and this Agreement.

## ARTICLE 2

### Agreement; Purchase Price

**Section 2.1     Agreement to Sell and Purchase**. In consideration of the payment of the Purchase Price by Buyer to Seller and for other good and valuable consideration, Seller shall sell, assign, transfer and convey the Property to Buyer, and Buyer shall purchase, acquire, accept and assume the Property from Seller, subject to and in accordance with the terms and conditions of this Agreement.

**Section 2.2     Purchase Price**. The aggregate Purchase Price for the Property shall be Fourteen Million Six Hundred Thousand and No/100 Dollars ($14,600,000.00) (the "Base Purchase Price"), plus up to $69,090.16 on account of Cure Amounts, as the same may be adjusted pursuant to Section 12.1(b) with respect to the Break-Up Fee Credit (collectively, the "Purchase Price"), which Purchase Price is the sum of the purchase price allocated to each applicable portion of the Property on Schedule F attached hereto (each such allocated purchase price, an "Allocated Purchase Price"). Subject to the adjustments and apportionments as hereinafter set forth, the Purchase Price shall be paid to Seller (by and through Escrow Agent) on the Closing Date by wire transfer of immediately available federal funds to an account designated by Seller prior to Closing.

**Section 2.3     Allocation of Purchase Price**. At Closing, the entire Purchase Price shall be allocated to the Property and, in connection therewith and in furtherance thereof: (a) the Parties agree that the value of the Personal Property that is included in the Transaction contemplated by this Agreement is *de minimis*, and no part of the Purchase Price is allocable thereto; and (b) the Parties agree that the portion of the Purchase Price allocated to each applicable portion of the Property shall be the Allocated Purchase Price for such portion of the Property (provided however,

11

that with respect to the Assigned Leases, the Purchase Price shall be reduced by an amount to be agreed upon in writing by Buyer and Seller to address any Partial Termination hereunder as to any Assigned Lease(s) (such agreement, an "Adjustment Agreement").

**Section 2.4** **Indivisible Economic Package; Partial Termination**.  Except to the extent any Party exercises its right expressly set forth in this Agreement to terminate this Agreement with respect to a particular portion of the Property (a "Partial Termination"), Buyer has no right to purchase, and Seller has no obligation to sell, less than all of the Property, it being the express agreement and understanding of Buyer and Seller that, as a material inducement to Seller and Buyer to enter into this Agreement, Buyer has agreed to purchase, and Seller has agreed to sell, all of the Property, subject to and in accordance with the terms and conditions hereof. In addition, the Parties acknowledge that this Agreement is intended to effect the transfer of title to all the properties constituting the Property, and notwithstanding any reference in this Agreement to any singular property, building or parcel or any other similar reference implying that this Agreement relates to only one property, this Agreement shall be construed to relate to the transfer of title to the properties constituting the Owned Real Property and transfer of Leasehold Interests with respect to the Assigned Leases (so that, provisions relating to the delivery of the deed, bill of sale, and so forth, shall be construed to require a separate deed or lease assignment agreement, as applicable, for each such property rather than a single deed or lease, as well as separate bills of sale and the like), and the covenants, representations and warranties provided by Seller shall be construed to be given by each individual Seller solely as to itself and the property that it owns, but unless otherwise expressly set forth in this Agreement, all other references to the Property, Land, Personal Property, or Improvements shall be deemed to refer to all of the Property, Land, Personal Property, or Improvements in the aggregate.

Notwithstanding the foregoing or anything herein to the contrary, the parties agree that with respect to any Partial Termination of this Agreement if permitted under the express terms hereof, the following terms shall apply: (i) any  return of the Deposit to Buyer in connection therewith shall mean the proportional share of the Deposit applicable to the portion of the Property so terminated (which shall be determined by multiplying the Deposit by a fraction, the numerator of which is the Allocated Purchase Price of the Property so terminated, and the denominator of which is the Purchase Price for all Property), (ii) any reference to the Parties having no further rights or obligations to each other following such Partial Termination shall mean solely with respect to the Property so terminated (other than any rights that expressly survive termination in this Agreement) and (iii) the total Purchase Price for the Property not subject to such Partial Termination shall be automatically reduced by the Allocated Purchase Price of the asset(s) subject to Partial Termination.

**Section 2.5** **Independent Consideration**.  Notwithstanding anything contained herein to the contrary, should this Agreement terminate for any reason and Buyer be entitled to a return of the Deposit, One Hundred Dollars ($100.00) ("Independent Consideration") of the Deposit shall be non-refundable and shall be paid over to and retained by Seller as Independent Consideration for the execution and delivery of this Agreement and for the inspection rights granted to Buyer herein.  Buyer hereby acknowledges that any refund of the Deposit provided in this Agreement shall be reduced by the Independent Consideration.

12

## ARTICLE 3
## Deposit

**Section 3.1** **Deposit**.

(a)     Within one (1) Business Day following the Effective Date, Buyer shall deposit with Escrow Agent, by wire transfer of immediately available funds, One Million Four Hundred Sixty Thousand and No/100 Dollars ($1,460,000.00) (together with any interest earned thereon (the "Deposit"). If Buyer fails to timely deliver the Deposit to Escrow Agent, this Agreement shall, at Seller's written election, terminate and be null and void. Escrow Agent, Buyer and Seller shall be subject to the terms and conditions more particularly set forth on the attached Schedule K ("Escrow Terms").

(b)     If the Closing occurs, the Deposit (or applicable portion thereof, in the event there was any Partial Termination of this Agreement prior to Closing), shall be released to Seller and credited against the Purchase Price. If the Agreement is sooner terminated in accordance with the terms of this Agreement, the Deposit (or portion thereof with respect to a Partial Termination) shall be disbursed as provided in this Agreement. The Deposit shall, once delivered, be a "hard deposit" and shall be non-refundable to Buyer except as otherwise expressly provided in this Agreement.

## ARTICLE 4

## Title and Survey

**Section 4.1** **Permitted Title Exceptions**. Seller shall transfer the Owned Properties subject only to the following (collectively, the "Permitted Exceptions"):

(a)     all present and future building, zoning and other restrictions, regulations, requirements, laws, ordinances, resolutions and orders of any State, municipal, Federal or other governmental authority, including without limitation all boards, bureaus, commissions, departments and bodies thereof, now or hereafter having or acquiring jurisdiction over the Property or the use or improvement thereof;

(b)     all matters (other than Required Removal Exceptions) disclosed in any Title Commitment or in the Surveys, in each case, made available to Buyer prior to the Effective Date, but subject in any event to the terms of this Section 4.1);

(c)     real estate taxes, water charges, sewer rents and other utilities, to the extent not yet due and payable, subject to the adjustments provided for herein;

(d)     the Assigned Leases;

(e)     any matters that are or have been created by Buyer or any Buyer Representatives; and

If, following the Effective Date but on or prior to Closing, there shall be any non-Permitted Exceptions: not previously set forth in the Title Commitments or Surveys made available to Buyer

as of the Effective Date which could reasonably be expected to adversely affect the Property (or a portion thereof) or the ability to develop, lease, sell, finance, operate or otherwise deal with the Property (or a material portion thereof) following the Closing (in each case, other than to a de minimis extent); or (y) is a monetary Lien (but, at Seller's election, Seller may credit Buyer at Closing the amount of such monetary Lien, in which case the same shall be a Permitted Exception), and if Buyer does not agree to take subject to such non-Permitted Exception, Buyer shall have the right to notify Seller thereof, in which event the Closing Date shall be automatically adjourned on a day for day basis such that there is at least a five (5) Business Day period following Buyer's notice, to allow Seller to either adjourn Closing for up to thirty (30) days to cure such non-Permitted Exception or provide written notice to Buyer prior to Closing of its election not to cure the same, and if Seller so elects not to cure the same, or the same is not cured within such adjournment period, Buyer shall have the right to terminate this Agreement in full (or in part, with respect to the portion of the Owned Property so impacted by the non-Permitted Exception), and receive its Deposit (or portion thereof with respect to a Partial Termination), whereupon this Agreement shall terminate as to all or a portion of the Property, as applicable, and with respect to the Property so terminated, the parties shall have no further rights or obligations to each other than those that expressly survive termination.

**Section 4.2    Title Insurance**.

(a)    **Title Policy**.  At Closing, Buyer may elect to obtain (i) an owner's policy of title insurance for itself (or its permitted assigns) and/or (ii) a lender's policy of title insurance for any applicable lender to Buyer or its affiliates, and Seller agrees that it shall reasonably cooperate with Buyer, at no material out-of-pocket cost to Seller (other than with respect to Seller's clearance of any Required Removal Exception, which shall be at Seller's sole cost), in connection therewith, including, without limitation, by delivering the owner's affidavit in the form attached hereto as Exhibit I (which shall be subject to the approval of the Title Company) and other similar documentation and organizational documents of Seller, and any other document required by the Title Company to remove any Required Removal Exceptions from Buyer's Title Policy; provided, however, (A) the issuance of any such title insurance policy shall not be a condition to Buyer's obligation to proceed to Closing hereunder (as more particularly described in this Agreement), and (B) any such owner's or lender's title insurance policy shall be at Buyer's sole cost and expense. For the avoidance of doubt, Buyer's obligation to proceed to Closing hereunder shall not be subject to any financing contingency.

(b)    **Required Removal Exceptions**.  Notwithstanding anything to the contrary set forth in this Agreement, Seller agrees to remove (or cause to be removed) from title to the Owned Real Properties the following ("Required Removal Exceptions"): (i) all existing mortgages, deeds of trust, deeds to secured debt and other liens, judgments and security interests encumbering any Owned Real Property and securing obligations of Seller or any of its Affiliates for borrowed money (or as to mechanic's liens, for work commissioned by or with the written consent of Seller or any of its Affiliates or Seller Parties); (ii) any title encumbrance or exception voluntarily recorded against any Owned Real Property by (or with the written consent of) Seller or any of its Affiliates after the Effective Date in violation of the terms of this Agreement; and (iii) the specific exceptions set forth on Schedule G attached hereto ("Required Removal Exceptions in Title").  If Seller fails to remove a Required Removal Exception on or prior to Closing, subject to any adjournment rights of Seller provided in this Article, Buyer shall have the right to exercise

its rights pursuant to Section 12.1(c) with respect to all or a portion of the Property (if in part, solely with respect to the Owned Real Property impacted by Seller's failure), by delivering written notice to Seller within five (5) days after Buyer becomes aware of such failure.

(c)     **Other Liens and Violations**.  Subject to any other express terms of this Agreement, in no event shall Seller be responsible for taking any action with respect to any liens or violations with respect to the Property other than Required Removal Exceptions ("Other Liens"), all of which shall be assumed by Buyer as of Closing; provided, however, that if any such Other Lien (i) is not a Permitted Exception and (ii) has been liquidated and reduced to a monetary amount and can be cured by the payment thereof (together with any related fine or other penalty), then (A) for the avoidance of doubt, the same shall not affect the Parties' obligations hereunder to proceed to Closing in accordance with the provisions hereof and (B) unless Seller elects in its sole and absolute discretion to cure (and does so cure) such Violation at or prior to Closing, Buyer shall receive a credit against the Adjusted Purchase Price Balance in the amount required to effect such cure of the applicable Other Liens.

## ARTICLE 5

## Intentionally Omitted

## ARTICLE 6

## Inspection; Confidentiality; Assumption and Assignment of Contracts

**Section 6.1     Access**.     Buyer, personally or through its authorized agents or representatives (the "Buyer Representatives"), shall have the right, from the Effective Date through the Closing Date, to enter upon any Owned Real Property and to make such investigations, including appraisals, engineering studies, soil tests, environmental studies and underwriting analyses, as Buyer deems necessary or advisable, subject to the following conditions and limitations:  (a) such entry and investigations shall be conducted at reasonable times and upon twenty-four hours' prior written notice to Seller, which can be via electronic mail to [_____][1]; (b) a representative of Seller shall have the right to be present during such entry or investigations (provided however, Seller's failure to respond to Buyer's initial request or to ultimately be present shall not prohibit Buyer from proceeding with such investigation where initial notice was provided in accordance with this Agreement); and (c) such entry or investigations shall be subject to the rights of any tenants or other counterparties under Leases and neither Buyer nor any Buyer Representatives shall interfere with the use, occupancy or enjoyment of the Property by any such Persons or their respective employees, contractors, customers or guests; (d) neither Buyer nor Buyer Representatives shall damage such Owned Real Property or any portion thereof; (e) unless Seller agrees otherwise, before Buyer or Buyer Representatives conduct any investigations or inspections of such Owned Real Property, including inspections of building systems, the Improvements or any invasive testing or inspections, Buyer or Buyer Representatives, as applicable, shall deliver to Seller a certificate of insurance naming Seller as an additional insured, evidencing commercial general liability insurance (including property damage, bodily injury and death) issued by an insurance company having a rating of at least "A-/VII" by

---

[1] NTD: Seller to provide contact prior to Closing.

168693.00002/135492369v.6

A.M. Best Company, with limits of at least $3,000,000 per occurrence and $5,000,000 in the aggregate for bodily or personal injury or death]; (f) without Seller's prior written consent, which Seller may give or withhold in its sole and absolute discretion, Buyer shall not perform any invasive testing at, on or around such Owned Real Property, including, without limitation, any Phase II exams, soil borings or other invasive tests; (g) Buyer shall use commercially diligent efforts to perform all on-site due diligence reviews on an expeditious and efficient basis; and (h) Buyer shall indemnify, hold harmless and defend the Seller Parties from and against all Losses resulting from or relating to any entry and/or inspections conducted by Buyer or Buyer Representatives, including, without limitation, Losses incurred in making any and all repairs necessitated to cure any damage to such Owned Real Property resulting from such activities but excluding Losses from the mere discovery of conditions existing as of the time of inspection, and excluding Losses arising from the negligence or willful misconduct of Seller or any Seller Parties. The foregoing indemnification obligation shall survive the Closing or termination of this Agreement for a period of one (1) year following Closing or termination of this Agreement. During the pendency of this Agreement, subject to Section 6.2, Buyer shall also have the right to request access to Seller's books and records for the purpose of examining reasonable financial and operating data with respect to the financial condition of the Property (and making copies thereof as Buyer may require), and to conduct non-invasive, walk-through inspections with respect to all leased premises under the Assigned Leases, in each case, upon providing the same extent of notice to Seller as set forth above for the Owned Real Properties.  Seller agrees to reasonably cooperate with Buyer to permit access to and facilitate communications with any landlords under the Assigned Leases, upon Buyer's prior request (it being understood however, that if any landlord under any Assigned Lease files an objection in the Bankruptcy case referred to herein, Buyer shall be permitted to directly communicate with such landlord).

**Section 6.2    Confidentiality**.

(a)    The Parties acknowledge that Buyer or its applicable Affiliates entered into a certain non-disclosure agreement in favor of Seller or its Affiliates in connection with the Transaction (the "NDA"). The terms of the NDA are hereby deemed terminated and superseded by the provisions of this Section 6.2.

(b)    Buyer agrees to keep all materials made available to Buyer by Seller in connection with the transactions contemplated by this Agreement (other than information which is a matter of public record or is provided in other sources readily available to the public) strictly confidential; provided, however, that such materials may be disclosed to: (i) Buyer's Related Parties who need to know such information for the purpose of evaluating a possible purchase of the Property, or otherwise, (ii) to any party if required by law or court order, or (iii) in connection with the prosecution or defense of any dispute arising under this Agreement.

(c)    If Buyer is the successful bidder for the Property, Buyer shall have the right to issue a press release with respect thereto, including, without limitation (if Buyer so elects), references to Seller, the addresses of the Property, and the Purchase Price.  Except for the press release permitted by the preceding sentence, neither Buyer nor Seller shall issue any other press release respecting the Transactions without the prior written consent of the other party hereto, which consent shall not be unreasonably withheld, conditioned or delayed.

168693.00002/135492369v.6

(d)      The provisions of this <u>Section 6.2</u> shall survive the Closing or earlier termination of this Agreement for a period of one (1)-year after the date of Closing or earlier termination, as applicable.

**Section 6.3      <u>Assumption and Assignment of Service Contracts</u>**.

All Service Contracts applicable to the Owned Property, and all Service Contracts applicable to the property subject to the Assigned Leases which have been entered into by Seller or any Seller Parties, shall be rejected by Seller in the Bankruptcy effective as of the date of Closing, such that such Service Contracts are terminated at Seller's sole cost effective as of the date of Closing; and in no event shall Buyer assume any Service Contracts (or any modifications thereto which are entered into by Seller after the Effective Date) or liabilities or costs thereunder at Closing. This Section 6.3 shall survive Closing.

# <u>ARTICLE 7</u>

## <u>Conditions Precedent, Casualty Damage or Condemnation</u>

**Section 7.1      <u>Conditions Precedent Favoring Buyer</u>**.

(a)      Buyer's obligations under this Agreement are subject to the timely fulfillment of the conditions set forth in this <u>Section 7.1</u> on or before the Scheduled Closing Date (or such earlier date, as expressly set forth below).  Each condition may be waived in whole or in part only by written notice of such waiver from Buyer to Seller:

(i)      The Bankruptcy Court shall have entered the Sale Order on the docket on or before May 23, 2024.

(ii)      The Sale Order shall have become a Final Order by June 7, 2024.

(iii)      The Stalking Horse Approval Order shall be in form and substance acceptable to Buyer, in Buyer's reasonable discretion and as of the date such order is entered on the docket, and shall include the designation of Buyer as the Stalking Horse Bidder for the Property, approving this Agreement as the stalking horse agreement, and approving the Bid Incentives, as such terms are approved by Buyer in Buyer's sole discretion) but in no event may any changes to the Stalking Horse Approval Order materially increase the risks to Buyer.

(iv)      The Stalking Horse Approval Order shall be entered on the docket on or before May [15], 2024 and the Bid Procedures Order shall be entered on the docket on or before May [10], 2024.

(v)      The Stalking Horse Approval Order and Bid Procedures Order shall have each become a Final Order by the date of the Sale Hearing.

(viii)      Seller shall have executed and delivered to Buyer, or deposited in escrow with Escrow Agent, all instruments and documents required to be delivered to Buyer at Closing under this Agreement.

(ix)    Seller shall have performed and complied in all material respects with all of the other terms of this Agreement to be performed and complied with by it prior to or at the Closing.

(x)    subject to Section 8.4, on the Scheduled Closing Date, the Seller Representations shall be true, complete and accurate, in all material respects, on and as of the Effective Date and on and as of the Scheduled Closing Date as if then remade on and as of the Closing Date, except that Seller shall not be deemed to have breached the foregoing condition precedent by reason of:  (A) changes that are:  (1) caused by the acts or omissions of Buyer or any Buyer Representatives, (2) a result of the ownership or operation of the Property in the Ordinary Course occurring after the Effective Date and that did not arise by reason of a breach or default made by Seller under this Agreement; or (3) caused by matters that are outside of the reasonable control of Seller and that did not arise by reason of a breach or default made by Seller under this Agreement; or (B) casualty or condemnation (which shall be governed exclusively by Section 7.3 and Section 7.4, respectively).

(b)    If one or more conditions precedent in favor of Buyer set forth above in Section 7.1(a) are not satisfied in all material respects as of the Scheduled Closing Date (or such earlier date, where the conditions listed above require by their terms an event to occur prior to a date specified that is not the Scheduled Closing Date), Buyer may elect in its sole discretion not later than the Scheduled Closing Date, and as its sole remedy, either to:  (i) waive such condition and proceed with the Closing as contemplated by this Agreement (without any reduction in the Purchase Price); (ii) terminate this Agreement in full or in part (and if in part, solely with respect to the portion of the Property impacted by the failure of such condition) by written notice thereof to Seller, in which event the Deposit (or portion thereof with respect to a Partial Termination) shall be returned to Buyer and, except for those obligations which expressly survive the termination of this Agreement, the Parties shall have no further obligations or liabilities to each other hereunder with respect to the portion of the Property so terminated; or (iii) at Buyer's sole election, extend the Scheduled Closing Date for a period not to exceed thirty (30) days to allow Seller additional time to satisfy such condition(s) (and if so extended, Seller agrees to use commercially efforts to continue to attempt to satisfy such condition(s)).  With respect to any condition that must by its terms be achieved by a date that is earlier than the Scheduled Closing Date, if, as of the Business Day immediately following such earlier date, such condition has not yet been fulfilled, in Buyer's sole discretion, Buyer shall have the right to exercise its remedies under this Section 7.1 immediately and shall not be required to wait until the Scheduled Closing Date for such exercise. Notwithstanding the foregoing or anything herein to the contrary, to the extent any failure of a condition is the result of a Seller default hereunder beyond applicable notice and cure periods expressly provided for herein, Buyer may exercise any of its rights and remedies under Section 12.1(c).

(c)    Buyer acknowledges and agrees that its obligation to perform under this Agreement and consummate the Closing is not contingent upon Buyer's ability to obtain any (i) governmental or quasi-governmental approval of changes or modifications in use or zoning, (ii) modification of any existing land use restrictions, or (iii) consents to assignments of any service contracts or other agreements which Buyer requests.

168693.00002/135492369v.6

**Section 7.2** **Conditions Precedent Favoring the Seller**. Seller's obligations under this Agreement are expressly subject to the timely fulfillment of the conditions set forth in this Section 7.2 on or before the Scheduled Closing Date. Each condition may be waived in whole or part only by written notice of such waiver from Seller to Buyer, it being agreed by Buyer that Seller may elect to waive the failure of a condition as to one or more of the Properties, in which event, Buyer shall have the obligation, subject to the other terms and conditions of this Agreement, to proceed to Closing under this Agreement with respect to those of the Properties where such conditions were either timely fulfilled, or were waived in writing by Seller.

(a)    Buyer shall have delivered the Adjusted Purchase Price Balance to Escrow Agent;

(b)    Buyer shall have executed and deposited in escrow with Escrow Agent, all instruments and documents required to be delivered by Buyer at the Closing under this Agreement;

(c)    Buyer shall have performed and complied in all material respects with all of the terms of this Agreement to be performed and complied with by Buyer prior to or at the Closing;

(d)    The Buyer Representations shall be true, accurate and complete in all material respects on and as of the Effective Date and on and as of the Closing Date as if then remade on and as of the Closing Date; and

(e)    The Bankruptcy Court shall have entered the Sale Order on the docket.

**Section 7.3** **Risk of Casualty**.

(a)    If, prior to the Closing Date, all or any part of the Improvements are damaged by fire or other casualty, Seller shall promptly give written notice to Buyer of such fact and thereafter, promptly following Seller's receipt thereof, an estimate of the cost and time to restore prepared by an Approved Engineer.

(b)    If, prior to the Closing Date, a Material Casualty occurs, Buyer may, at Buyer's option and in its sole discretion, elect to either (i) terminate this Agreement and receive a return of the Deposit (or the proportional share thereof based on Allocated Purchase Price) with respect to the Owned Real Property that is affected by such Material Casualty; it being agreed by Buyer that any such termination shall not affect Buyer's obligation to purchase the Owned Property unaffected by such Material Casualty and the Leasehold Interests and that, in such event, Seller and Buyer shall proceed to Closing with respect to the Leasehold Interests and such unaffected Owned Property and the Purchase Price shall be reduced by the Allocated Purchase Price for the affected Owned Property, or (ii) proceed to Closing in accordance with the terms hereof with no reduction in the Purchase Price.

(c)    In the event of a fire or other casualty that is not a Material Casualty, or if there is a Material Casualty and Buyer elects to proceed pursuant to Section 7.3(b)(ii), (i) Buyer shall proceed to Closing in accordance with the terms hereof with no reduction in the Purchase Price, (ii) Buyer shall have the right to participate with Seller in the adjustment and consent, with respect to any settlement of such casualty insurance claim and (iii) Seller shall assign to Buyer at

19

Closing all of Seller's right, title and interest in and to the insurance proceeds payable on account of such damage (net of collection costs and costs of repair with respect to such casualty reasonably incurred by Seller), including without limitation, rental interruption insurance with respect to periods following Closing and a credit to Buyer for any uninsured or deductible amounts.  With respect to any Material Casualty, Buyer shall be deemed to have elected to proceed under Section 7.3(b)(ii) unless, within ten (10) Business Days from the occurrence of such Material Casualty, Buyer provides Seller with written notice that Buyer elects to terminate this Agreement with respect to the Property pursuant to Section 7.3(b)(i).

(d)     Whether or not the Property or any portion thereof is located in the State of New York, this Section 7.3 is an express agreement to the contrary of Section 5-1311 of the New York General Obligations Law or any Laws and Regulations providing for an allocation of risk among parties to a contract.

### Section 7.4     Risk of Condemnation.

(a)     If, prior to the Closing Date, eminent domain proceedings are commenced against all or any part of the Property, or shall be the subject of a duly noticed hearing held by a Governmental Authority relating to a pending taking in the exercise of the power of eminent domain, Seller shall promptly give written notice to Buyer of such fact.

(b)     If, prior to the Closing Date, a Material Condemnation occurs, Buyer may, at Buyer's option and in its sole discretion, elect to either (i) terminate this Agreement and receive a return of the Deposit (or the proportional share thereof based on Allocated Purchase Price) with respect to the Owned Property that is affected by such Material Condemnation; it being agreed by Buyer that any such termination shall not affect Buyer's obligation to purchase the Owned Property unaffected by such Material Condemnation and the Leasehold Interests and that, in such event, Seller and Buyer shall proceed to Closing with respect to such Leasehold Interests and unaffected Owned Property and the Purchase Price shall be reduced by the Allocated Purchase Price for the affected Owned Property; or (ii) proceed to Closing in accordance with the terms hereof without reduction in the Purchase Price.

(c)     In the event of a condemnation by right of eminent domain that is not a Material Condemnation, or if there is a Material Condemnation and Buyer elects to proceed under Section 7.4(b)(ii), (i) Buyer shall proceed to Closing in accordance with the terms hereof (without reduction in the Purchase Price) and (ii) Seller shall assign to Buyer on the Closing Date all condemnation awards and proceeds payable as a result of such condemnation (net of collection costs reasonably incurred by Seller). With respect to any Material Condemnation, Buyer shall be deemed to have elected to proceed under Section 7.4(b)(ii) unless, within ten (10) days from the occurrence of such Material Condemnation, Buyer provides Seller with written notice that Buyer elects to terminate this Agreement with respect to the Property pursuant to Section 7.4(b)(i).

(d)     Whether or not the Property or any portion thereof is located in the State of New York, this Section 7.4 is an express agreement to the contrary of Section 5-1311 of the New York General Obligations Law or any Laws and Regulations providing for an allocation of risk among parties to a contract.

20

## ARTICLE 8

### Representations, Warranties and Covenants

**Section 8.1    Buyer Representations**.    Subject to the limitations set forth in this Agreement, Buyer hereby represents and warrants to, and covenants with, Seller as follows (the "Buyer Representations"):

(a)    Buyer acknowledges that, it has or will have a full and complete opportunity to (i) review all information and documentation relating to the Property made available to Buyer by or on behalf of Seller and (ii) conduct such other investigations, examinations, inspections and analyses of the Property as Buyer has deemed necessary or appropriate.    Buyer further acknowledges that, except for the Seller Representations and any document executed by Seller and delivered to Buyer at Closing (all of the foregoing collectively, the "Seller Statements"), Buyer has not relied upon any statements, representations or warranties by any Seller Party or any agent of any Seller Party, including Broker;

(b)    Buyer acknowledges and agrees that it is purchasing the Property subject to the Property being in **"AS IS, WHERE IS" AND "WITH ALL FAULTS, LIABILITIES, AND DEFECTS, LATENT OR OTHERWISE, KNOWN OR UNKNOWN"** basis condition with respect to all facts, circumstances, conditions and defects (and subject to the express terms of this Agreement, Seller shall have no obligation to determine or correct any such facts, circumstances, conditions or defects and subject to the terms of this Agreement, Buyer assumes the full risk of any loss or damage occasioned by any fact, circumstance, condition or defect pertaining to the Property), and, subject to Section 7.3 and Section 7.4 of this Agreement with respect to the Owned Property, loss by casualty or condemnation excepted, with no right of set-off or, except as expressly set forth herein, reduction in the Purchase Price, and that, except for the Seller Statements, such sale shall be without representation or warranty of any kind, express or implied, including any warranty of income potential, operating expenses, uses, merchantability or fitness for a particular purpose, and Seller does hereby disclaim and renounce any such representation or warranty.    Buyer specifically acknowledges that, except as expressly provided in the Seller Statements, Buyer is not relying on, either directly or indirectly, any representations or warranties of any kind whatsoever, express or implied, from Seller, any other Seller Party or any other Person as to any matters concerning the Property, including, without limitation:  (i) the income from or value of the Property; (ii) any income to be derived from the Property; (iii) the suitability of the Property for any and all activities and uses which Buyer may conduct thereon, including the possibilities for further development of the Property or construction thereon; (iv) the habitability, merchantability, marketability, profitability or fitness for a particular purpose of the Property or any improvements thereon; (v) the manner, quality, state of repair or lack of repair of the Property (including the roof, foundation, HVAC systems or any other component of the Property or any improvements thereon); (vi) the nature, quality or condition of the Property, including with respect to water conditions, soil, geological or geotechnical condition (including soil expansiveness, corrosivity, or stability, or seismic, hydrological, geological and topographical conditions and configurations, including, without limitation, any opinions or conclusions of any soils engineer(s) retained to perform geotechnical and/or soils studies or to oversee any soils engineering aspects of developing the Property); (vii) the compliance of or by Seller, the Property, or its operation with any Laws and Regulations; (viii) the manner or quality of the construction or materials

21

incorporated into the Property; (ix) compliance with Environmental Laws or land use laws, rules, regulations, orders, codes or requirements, including the Americans with Disabilities Act of 1990; (x) the presence or absence of radon gas, methane gas, asbestos any other Hazardous Materials at, on, under, or adjacent to the Property; (xi) the conformity of any improvements to any plans or specifications, including, without limitation, any plans and specifications that may have been or may be provided to Buyer; (xii) the conformity of the Property to past, current or future applicable zoning or building requirements; (xiii) deficiency of any shoring; (xiv) deficiency of any drainage; (xv) the fact that all or a portion of the Property may be located on or near an earthquake fault line or in or near an earthquake or seismic hazard zone; (xvi) the existence of vested land use, zoning or building entitlements affecting the Property; (xvii) water rights or the availability of or access to water; (xviii) the presence or suitability of any utilities or availability thereof; (xix) the completeness or accuracy of any information provided to Buyer by the Seller Parties or their agents; (xx) any matters relating to the leases or the tenants; (xxi) any knowledge that any Seller Party may have relating to the Property that is has, or has not, shared with Buyer (unless the same would result in the breach of a Seller Representation); and/or (xxii) any other matter relating to the Property or to the development, construction, operation, leasing or sale of the Property.  Buyer acknowledges that to the extent required to be operative, the disclaimers and warranties contained herein are "conspicuous" disclaimers for purposes of any applicable law, rule, regulation or order. Buyer further acknowledges and agrees that, except for the Seller Statements (as the same may be updated at Closing), no Seller Party is under any duty to make any affirmative disclosures or inquiry regarding any matter which may or may not be known to Seller or any of the other Seller Parties, and Buyer, for itself and for its successors and assigns, hereby expressly waives and releases each of the Seller Parties from any such duty that otherwise might exist; provided, however, that the foregoing provision shall not prevent Buyer from relying on the Seller Statements, subject to the limitations and conditions relating thereto set forth in this Agreement;

(c)     Except as expressly provided below in this Section 8.1(c) and in the Seller Statements, Buyer, for Buyer and Buyer's successors and assigns, irrevocably and unconditionally releases the Seller Parties from, and irrevocably and unconditionally waives all claims and liabilities against the Seller Parties for or attributable to, the following:

(i)     any and all statements or opinions heretofore or hereafter made, or information furnished, by or on behalf of the Seller Parties to Buyer or any of Buyer's agents or representatives (other than to the extent that the same constitute a breach of Seller Representations); and

(ii)     any and all Losses of any kind or nature whatsoever, whether known, unknown, foreseen or unforeseen, attributable to the Property, whether arising or accruing before, on or after the Closing and whether attributable to events or circumstances which have heretofore or may hereafter occur, including all Losses with respect to the structural, physical, or environmental condition of the Property including claims or liabilities relating to the presence, discovery or removal of any Hazardous Materials in, at, under or about the Property and any other matters described in Section 8.1(b);

Buyer acknowledges and agrees that (A) Buyer may hereinafter discover facts different from or in addition to those now (or as of the Closing) known to Buyer, (B) Buyer's agreement to release, acquit and discharge the Seller Parties as set forth herein shall remain in full force and effect

notwithstanding the existence or discovery of any such additional or different facts, (C) Buyer knowingly waives any rights, privileges and benefits under any federal, state or local law which may negatively impact the validity or enforceability of any part of the releases set forth in this Agreement and (D) upon the completion of the Closing, the Seller Parties shall be deemed to have satisfied all of their respective obligations, covenants and liabilities in this Agreement and in any documents executed by the Seller Parties in connection herewith other than those obligations of the Seller that, by the express terms of this Agreement, survive the Closing (in which case such survival shall be subject to the limitations set forth in this Agreement);

provided, however, that the foregoing releases and waivers set forth in this Section 8.1(c) are not intended and shall not be construed to affect or impair any rights or remedies that Buyer may have against Seller as a result of:  (i) a breach of any of the Seller Representations, or of any covenant of Seller expressly set forth in this Agreement, subject to the terms and limitations on the Seller's liability as expressly set forth elsewhere in this Agreement, (ii) any third party tort claims occurring during Seller's period of ownership of the Property, and (iii) any criminal or fraudulent acts of Seller.

Buyer understands the legal significance of the foregoing provisions and acknowledges and agrees that the provisions of Section 8.1(b)-(c) were a material factor in Seller's agreement to complete the Transaction and Seller's acceptance of the Purchase Price and that Seller is unwilling to consummate the Transaction unless the Seller Parties are expressly released as set forth in Section 8.1(b)-(c).

The releases contained in Section 8.1(b)-(c) and elsewhere in this Agreement include claims of which Buyer is presently unaware or which Buyer does not presently suspect to exist, which, if known by Buyer, would materially affect Buyer's release of the Seller Parties.  Buyer specifically waives the provisions of any law of any state, territory or jurisdiction the import of which is as follows:

> A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor.

Notwithstanding anything to the contrary in this Agreement, the provisions of Section 8.1(b)-(c) shall survive the Closing or termination of this Agreement.

Each Buyer is a corporation duly formed, validly existing and in good standing under the Laws and Regulations of the Commonwealth of Pennsylvania.  This Agreement constitutes the valid and legally binding obligation of Buyer, enforceable against Buyer in accordance with its terms, subject to general principles of equity and to bankruptcy, insolvency, reorganization, moratorium or other similar laws presently or hereafter in effect affecting the rights of creditors or debtors generally.  Buyer has the power to enter into, execute and deliver this Agreement and to perform its obligations hereunder.

(d)    There are no actions, suits or proceedings pending or, to the knowledge of Buyer, threatened, against or affecting Buyer which, if determined adversely to Buyer, would adversely affect its ability to perform its obligations pursuant to the terms of this Agreement.

168693.00002/135492369v.6

(e)     Neither (i) the execution, delivery or performance of this Agreement by Buyer nor (ii) compliance herewith (A) conflicts or will conflict with or results or will result in a breach of or constitutes or will constitute a default under (1) the charter documents or by-laws of Buyer, (2) to the best of Buyer's knowledge, any law or any order, writ, injunction or decree of any court or Governmental Authority, or (3) to the best of Buyer's knowledge, any agreement or instrument to which Buyer is a party or by which it is bound or (B) results in the creation or imposition of any lien, charge or encumbrance upon its property pursuant to any such agreement or instrument.

(f)     No authorization, consent or approval of any Governmental Authority (including courts) is required for the execution and delivery by Buyer of this Agreement or the performance of its obligations pursuant to the terms of this Agreement.

(g)     Buyer is currently (i) in compliance with, and shall at all times during the term of this Agreement remain in compliance with, the regulations of OFAC and any statute, executive order (including Executive Order 13224, dated September 24, 2001 and entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism") or regulations relating thereto, and (ii) not listed on, and shall not during the term of this Agreement be listed on, the Specially Designated Nationals and Blocked Persons List maintained by OFAC and/or any other similar list maintained by OFAC or any other Governmental Authority pursuant to any authorizing statute, executive order or regulation. Buyer has taken, and shall continue to take until Closing, such measures as are required by applicable law to ensure that funds used to pay to Seller the Purchase Price are derived (A) from transactions that do not violate United States law nor, to the extent such funds originate outside the United States, do not violate the laws of the jurisdiction in which they originated and (B) from permissible sources under United States law and to the extent such funds originate outside the United States, under the laws of the jurisdiction in which they originated.

(h)     Buyer has not (i) filed any petition in bankruptcy or made any assignment for the benefit of creditors, (ii) filed any petition seeking reorganization or arrangement or other action under Federal or State bankruptcy laws wherein Buyer is named a debtor, or (iii) received written notice of any such petition or action filed or initiated against it.

(i)     Buyer has, or will have on the Closing Date, cash on hand sufficient to pay the Adjusted Purchase Price and all other amounts required to be paid by Buyer at Closing pursuant to this Agreement.

The representations and warranties of Buyer contained in this <u>Section 8.1</u> shall survive the Closing, but only to the extent provided in <u>Section 12.4</u>.

<u>**Section 8.2**</u>     <u>**Seller Representations**</u>.  Subject to the limitations set forth in this Agreement, Seller hereby represents and warrants to Buyer as of the Effective Date and as of Closing, as follows (the "<u>Seller Representations</u>"):

(a)     Seller is a limited liability company or corporation, respectively as set forth in the preamble of this Agreement, duly formed, validly existing and in good standing under the laws of the State of California and Delaware, respectively.  Seller has the power to enter into,

168693.00002/135492369v.6

execute and deliver this Agreement and to perform all duties and obligations imposed upon it hereunder.

(b)     Seller's execution and delivery of this Agreement and performance of its obligations hereunder have been duly authorized by all necessary action on the part of Seller, and do not violate or conflict with Seller's organizational documents, any judgment, decree or order of any court applicable to or affecting Seller, breach the provisions of or constitute a default under any material contract to which any Seller is a party or by which Seller is bound, or violate or conflict with any Laws and Regulations applicable to Seller.

(c)     There is no action, suit, litigation, hearing or administrative proceeding pending or, to Seller's Actual Knowledge, threatened against Seller or the Owned Real Property in any court, administrative bureau, or other regulatory setting.  With respect to the Leasehold Interests, to Seller's Actual Knowledge, there is no action, suit, litigation, hearing or administrative proceeding pending or threatened against Seller or the premises leased by Seller under the Assigned Leases.

(d)     Seller is not a "foreign person" as such term is defined in Section 1445(e)(3) of the Code.

(e)     Seller is currently (i) in compliance with, and shall at all times during the term of this Agreement remain in compliance with, the regulations of the OFAC and any statute, executive order (including Executive Order 13224, dated September 24, 2001 and entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism"), or regulations relating thereto and (ii) not listed on, and shall not during the term of this Agreement be listed on, the Specially Designated Nationals and Blocked Persons List maintained by OFAC and/or any other similar list maintained by OFAC or any other Governmental Authority pursuant to any authorizing statute, executive order or regulation.

(f)     No Owned Real Property or Assigned Lease is subject to any ground lease, master lease or sublease.

(g)     To Seller's Actual Knowledge, each Owned Real Property and each property subject to an Assigned Lease is either conforming or legal non-conforming for purposes of all applicable zoning Laws.  Seller has obtained all applicable Permits for both the Owned Property, and with respect to each property subject to the Assigned Leases, has obtained all Permits to the extent required in connection with Seller's use and occupancy of the Leasehold Interests, in each case, to the extent required by applicable Laws and given Seller's current retail use of such Property.

(h)     Seller has delivered or made available to Buyer true and complete (in all material respects) copies of all Assigned Leases and no guarantor is currently being required by the applicable landlord under any of the Assigned Leases (except as set forth therein).  A true and complete list of all documents comprising the Assigned Leases is set forth on Schedule H attached hereto (the "List of Lease Documents").  Except as a result of the Bankruptcy, neither Seller nor, to the Knowledge of Seller, any other party thereto has sent or received a written notice of default under any of the Assigned Leases, which default remains uncured or unwaived.  All Assigned

Leases are in full force and effect and except as set forth on Schedule H, there are no other promises or agreements which would be binding upon Buyer following Closing with respect to the Assigned Leases.  Seller (i.e. 99 Cents Only Stores Texas, Inc.) is the tenant under each Assigned Leases and has conferred no rights upon any third party to use or occupy the leased premises described therein (by way of license, sublease or otherwise).  The actual and current use by Seller of each leased premises subject to the Assigned Lease complies with the permitted use provisions under each Assigned Lease.  Except as may be removed by the Sale Order, Seller has not otherwise encumbered or otherwise transferred its interests under the Assigned Leases. With respect to the Assigned Leases, Seller has not received any written notice from the applicable landlord thereunder requiring it to relocate to a different location, or to otherwise remodel or cause any other repairs or maintenance to the property occupied thereunder. Seller has good and valid leasehold title to each Leasehold Interest, and such interest is not subject to any encumbrance which would have a material and adverse effect on the use and occupancy of such leased premises thereunder as it is currently being used for retail purposes. To Seller's Actual Knowledge, no audit or contest brought by Seller as to operating expenses or CAM is currently pending with respect to any of the Assigned Leases.  No percentage rent has been due to landlords under the Assigned Leases [other than in connection with the Leasehold Interest having site #_____ in years _____ in the amount of _____ for X year(s).[2]

(i)     With respect to the Assigned Leases, the landlords thereunder have been given notice of the Sale Motion, this Agreement, and notice of Cure Amounts with respect to such leases and the Notice of the Sale Hearing and objection deadlines.  All lienholders on the Property have been given notice of the Sale Motion, Sale Order, and the Property is being sold to Buyer free and clear of all of such liens.  All persons who have performed work at any portion of the Property within the last six (6) months prior to the Effective Date have been given notice of the Sale Motion and have been paid in full prior to the Effective Date.

(j)     Except for routine maintenance and repairs in the Ordinary Course (which will be fully paid for by Seller at or prior to Closing), there is no ongoing work contracted for by Seller, or with Seller's consent, or contracted for by any Seller Parties that is either currently being performed at any portion of the Property, or which has been performed within the last six (6) months prior to the Effective Date.  Seller has not received any notice of lien from any contractor asserting a right to file a mechanic's or materialmen's lien on any portion of the Property.  To Seller's Actual Knowledge, no landlord under any of the Assigned Leases has commenced any construction at the leased premises which has not been paid for in full.

(k)     With respect to the Assigned Leases, Seller shall deliver each premises leased thereunder to Buyer (or its designee under this Agreement) free and clear of any other occupants.  Seller shall use reasonable efforts to deliver possession in broom clean condition (except that all inventory, fixtures, furnishings and equipment shall remain in each leased premises and shall be transferred to Buyer as part of the Property), reasonable wear and tear excepted, and the same shall be free of any and all subleases and rights of possession under Section 365(h) of the Bankruptcy Code.  Any personal property of Seller's which is located at the premises subject to the Assigned Leases that is not removed by Seller as of Closing shall be deemed abandoned and conveyed to Buyer, and Buyer may dispose of and/or retain same without liability to Seller.  Seller

---

[2] NTD: Seller to complete specific info on percentage rent rep prior to Closing.

agrees to leave at each such leased premises all HVAC, fire protection, security or other equipment which is currently located thereat and is necessary or desirable for the use or operation of such premises.

(l) No leasing or brokerage commissions are or will be due or payable to any person or entity with respect to the Property which has not been paid.

(m) Seller has delivered or made available to Buyer true and complete (in all material respects) copies of all Service Contracts. Except for (i) the Service Contracts, all of which will be rejected by Seller in the Bankruptcy, (ii) Assigned Leases and (iii) Permitted Exceptions, Seller is not a party to any other executory contract or unexpired lease with respect to the Owned Real Property or Assigned Leases that will be binding on Buyer from and after Closing.

(n) There are no condemnation or eminent domain proceedings pending, or to Seller's Actual Knowledge, threatened in writing against any Owned Property. To Seller's Actual Knowledge, there are no condemnation or eminent domain proceedings pending, or threatened in writing against any party or property subject to the Assigned Leases.

(o) Neither Seller nor Seller nor any entity that would be considered a single employer with Seller or Seller under Code Section 414(b) or Code Section 414(c) maintains, contributes to, or otherwise has incurred any liability with respect to any "employee benefit plan" within the meaning of Section 3(3) of ERISA with respect to persons who are or were employed at the Property or otherwise perform or performed services at the Property.

(p) There are no persons employed by Seller at the Property in connection with the operation or maintenance of the Property who will be binding upon Buyer after the Closing.

(q) Seller has not granted any option, right of first offer, right of first refusal or any other similar right in favor of any Person with respect to the purchase or lease of any Owned Property (or any portion thereof).

(r) Seller has not received any written notice from any Governmental Authority relating to any violation or alleged violation of any governmental codes, ordinances, laws, rules or regulations affecting the Owned Real Property or the property subject to the Assigned Leases, which violation remains uncured or unwaived.

(s) Seller has not given or received any written notice of any breach or default with respect to any declaration of easements, reciprocal easement agreement, covenants, conditions, restrictions or similar type document applicable to the Property (collectively, "Title Documents"), where such breach or default remains uncured. Seller is not in receipt of any invoice from a third party that is due but has not yet been paid under any Title Documents, and to the extent any amount is due and remains outstanding at Closing, Seller will provide Buyer with all reasonable backup invoice information at Closing and either credit Buyer at Closing for such outstanding amount (to the extent allocable to the period prior to Closing), or pay the same at Closing.

(t) No tax appeals are pending or have been filed with respect to the Owned Real Property. Seller has not received from any Governmental Authority or other entity having

27

authority to impose such assessments, any written notice of actual or threatened special assessments or reassessments of the Property.

(u)     To Seller's Actual Knowledge, all Improvements on any Owned Property, including without limitation, the mechanical systems, HVAC systems, plumbing, electrical, security, utility and sprinkler systems, are in good operating condition, ordinary wear and tear excepted, are reasonably sufficient for the operation thereof for its current use, and to the Seller's Actual Knowledge, there are no material structural or other physical defects or deficiencies in the condition of such Improvements.

(v)     There are no other agreements to sell (except for this Agreement), lease, or sublease all or any portion of the Property (other than the Assigned Leases).

(w)     To Seller's Actual Knowledge, no new certificate of occupancy, resale certificate or similar requirement is required by any applicable Governmental Authority that would be triggered by the transfer of any Owned Real Property or assignment of any Leasehold Interest to Buyer at Closing;

(x)     In addition to the New Phase 1 Reports, the Existing Environmental Reports are all of the environmental reports in Seller's possession regarding the Property, and to Seller's Actual Knowledge, correct and complete copies of the New Phase 1 Reports and Existing Environmental Reports have been delivered to Buyer.

The representations and warranties of Seller contained in this Section 8.2 shall survive the Closing, but only to the extent provided in Section 12.4.

**Section 8.3     Seller's Actual Knowledge**.

(a)     Whenever a representation is qualified by the phrase "to Seller's Actual Knowledge", "to Seller's knowledge" or words of similar import, the accuracy of such representation shall be based solely on the actual (as opposed to constructive or imputed) knowledge of Jesse Allen, as the senior executive of the Company who has principal oversight over the Company's and its subsidiaries' owned and leased real properties. Buyer acknowledges that nothing herein shall impose any liability on or create any duties running from such Person to Buyer and Buyer agrees that no such Person shall have any personal or other liability under this Agreement or in connection with the Transaction.

**Section 8.4     Notice of Breach**.

(a)     To the extent that, before the Closing, Buyer obtained actual knowledge that any of the Seller Representations are inaccurate, untrue, or incorrect in any material way and Buyer nonetheless proceeds to Closing without objection to Seller, Buyer shall have no right to bring any misrepresentation claim following Closing against Seller.  For all purposes under this Agreement, Buyer's actual knowledge (or Buyer's knowledge, or similar phrase) shall mean the actual knowledge of Kelly Lane Martin, provided however, in no event shall Seller be entitled to assert any cause of action against Kelly Lane Martin nor shall Kelly Lane Martin have any personal liability whatsoever for any matter under or related to this Agreement.

28

(b)      If, after the Effective Date but prior to the Scheduled Closing Date, Buyer or any Affiliate thereof first obtains actual knowledge that any of the Seller Representations made herein is untrue, inaccurate or incorrect in any material respect, Buyer shall give Seller written notice thereof within five (5) Business Days of obtaining such actual knowledge (but, in any event, prior to the Scheduled Closing Date). In such event, Seller shall respond to Buyer in writing within five (5) Business Days of receipt of Buyer's notice (and the Scheduled Closing Date shall be adjourned on a day for day basis to accommodate such Seller response period) as to whether Seller elects to attempt to cure such breach, or if Seller elects not to cure such breach (in the latter event, entitling Buyer to the remedies set forth below in this Section).  If Seller elects to attempt to cure such breach or misrepresentation, Seller shall be entitled to a reasonable adjournment of the Scheduled Closing Date (not to exceed thirty (30) days in the aggregate with all other adjournment rights exercised by Seller hereunder) for the purpose of such cure.  If Seller notifies Buyer by written notice that Seller elects to attempt to so cure but is unable to so cure any misrepresentation or breach of warranty, or elects by written notice to Buyer not to cure the same, then Buyer, as its sole remedy for any and all such materially untrue, inaccurate or incorrect representations or warranties, shall elect within five (5) Business Days thereafter either to:   (i) waive such misrepresentations or breaches of representations and warranties and consummate the Transaction without any reduction of or credit against the Purchase Price or (ii) terminate this Agreement in its entirety by written notice given to Seller on the Scheduled Closing Date (or prior to the Scheduled Closing Date if Seller elects not to cure the same), in which event this Agreement shall be terminated, the Deposit shall be returned to Buyer, and, thereafter, no Party shall have any further rights or obligations hereunder except as provided in any section hereof that by its terms expressly provides that it survives any termination of this Agreement, or terminate this Agreement in part (in the event such misrepresentation is limited to a particular portion of the Property) and proceed to Closing on the remaining Property, subject to the terms of this Agreement.  Notwithstanding the foregoing or anything herein to the contrary, in the event of any intentional misrepresentation by Seller, Buyer shall have all of its remedies under Section 12.1(c).

## ARTICLE 9

### Covenants of Seller; Bankruptcy Court Matters

**Section 9.1      Covenants of Seller**.  Except as (a) required by applicable Laws and Regulations, (b) expressly contemplated herein or (c) required, authorized or restricted pursuant to the Bankruptcy Code, any order of the Bankruptcy Court in connection with the Bankruptcy or the DIP Credit Agreement, between the Effective Date and the Closing Date or earlier termination of this Agreement (the "Pre-Closing Period"):

(a)      Seller shall use commercially reasonable efforts to carry on business with respect to the Property in the Ordinary Course.

(b)      Within one (1) Business Day following the full execution of this Agreement, Seller shall move the Bankruptcy Court for entry of the Stalking Horse Approval Order for the Property.  To the extent that the Stalking Horse Approval Order is not entered on the docket at least one Business Day before the Bid Deadline (as defined in the Bidding Procedures), or to the extent the Bankruptcy Court denies or otherwise declines to enter the Stalking Horse Approval Order at any hearing scheduled by the Bankruptcy Court, then: (i) Buyer shall be

permitted to terminate this Agreement in accordance with Section 12.1(a)(v); (ii) Seller shall extend the Bid Deadline for Buyer to a date that is the later of (x) two (2) Business Days after the Bid Deadline or (y) 2 Business Days after the hearing date originally scheduled for the entry of the Stalking Horse Approval Order; and (iii) Buyer may submit an alternate Bid for the Property, which bid shall be deemed a Qualified Bid, as defined in the Bidding Procedures.

(c)     To the extent the Seller receives any other bids or offers for all or a portion of the Property on or before the Bid Deadline, as defined in the Bidding Procedures, (or after the deadline), Seller shall deliver such bids to the Buyer as and when received.

(d)     Seller shall not terminate, surrender or reject any Assigned Lease or Service Contract (except with respect to Service Contracts, Seller shall be subject to the terms of Section 6.3 of this Agreement requiring rejection and termination as of Closing).

(e)     Seller shall not grant any Lien on the Property.

(f)     Seller shall not enter into any new Service Contract or modify existing Service Contracts with respect to the Property (to the extent such modifications would be binding on the Property or Buyer following Closing).

(g)     Seller shall not enter into any new lease or occupancy agreement for any portion of the Property or enter into any amendment or modification of the Assigned Leases.

(h)     Promptly upon its receipt, Seller shall provide Buyer with a copy of any written notice of any litigation, violation, or default under any agreement to which it is a party with respect to the Property.

(i)     To the extent that following the Effective Date, there is any casualty or condemnation at the premises (including receipt of a pending or threatened condemnation) leased by Seller under the Assigned Leases, Seller shall give Buyer prompt written notice thereof and agrees not to exercise any rights under any such Assigned Lease with respect thereto (including without limitation agreeing to any settlement of insurance claim or proceeds, granting consent or entering into negotiations with landlord or other agent or insurer of landlord, or termination of any Assigned Lease), without, in each case, obtaining the prior written consent of Buyer, which shall not be unreasonably withheld, conditioned, or delayed.  Seller agrees to reasonably cooperate with Buyer to address Buyer's desire to participate directly in any of the foregoing.

(j)     With respect to any leased premises subject to the Assigned Leases, Seller shall not "go dark" or cease its operations in violation of the applicable Assigned Lease(s), and to the extent Seller does "go dark" or cease its operations (whether or not permitted by the Assigned Lease(s)), Seller shall provide Buyer with at least two (2) Business Days' prior written notice thereof.

(k)     Seller shall not cause or create any mechanic's lien or materialmen's lien on any portion of the Property, and shall not engage any contractor (or consent to the engagement of any contractor) who could have a right to file a mechanic's or materialmen's lien other than for maintenance or repairs in the Ordinary Course, which will be paid by Seller in full prior to Closing.

168693.00002/135492369v.6

(l)     If an Auction is conducted: (i) the initial overbid must be a minimum of Six Hundred Eight-Eight Thousand and 00//100 Dollars ($688,000), which sum is comprised of the amount of the Break-Up Fee, plus an initial incremental overbid amount of Two Hundred Fifty Thousand and 00//100 Dollars ($250,000); and (ii) any subsequent incremental overbids must be a minimum amount of Fifty Thousand and 00//100 Dollars ($50,000), subject to increase based on agreement among Seller and Buyer.

**Section 9.2    Bankruptcy Court Matters.**

(a)     Buyer and Seller shall take all actions as may be reasonably necessary to cause each of the Sale Order, Bid Procedures Order and Stalking Horse Approval Order to be issued, entered by the specific dates set forth in Section 7.1 of this Agreement, and become a Final Order.

(b)     Intentionally Omitted.

(c)     Buyer shall promptly take all actions reasonably requested by Seller to assist in obtaining the Sale Order and any other order of the Bankruptcy Court reasonably necessary in connection with the Transaction, in each case as promptly as practicable, including furnishing affidavits, financial information (subject to Buyer's right to request a reasonable NDA if Buyer requires the same from any third party), or other documents or information for filing with the Bankruptcy Court and making such employees and Advisors of Buyer and its Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things, providing necessary assurances of performance by Buyer under this Agreement and demonstrating that Buyer is a "good faith" purchaser under the Bankruptcy Code, as well as demonstrating Buyer's ability to pay and perform or otherwise satisfy all obligations and liabilities to be assumed by Buyer in connection with the Property at Closing.

(d)     Buyer shall appear formally or informally in the Bankruptcy Court if reasonably requested by Seller or required by the Bankruptcy Court in connection with the Transaction.

(e)     Buyer shall provide adequate assurance of future performance as required under the Bankruptcy Code for the Assigned Leases. Buyer agrees that it will take all actions reasonably required to assist in obtaining a Bankruptcy Court finding that there has been an adequate demonstration of adequate assurance of future performance under the Assigned Leases, such as furnishing affidavits, financial information and other documents or information for filing with the Bankruptcy Court and making Buyer's Advisors available to testify before the Bankruptcy Court.

(f)     With respect to all or a portion of the Property that is subject to this Agreement, Seller shall not amend, supplement or modify the Bidding Procedures in a manner that impairs or affects Buyer's ability to increase its bid for all or a portion of the Property without Buyer's prior written consent, to be granted or withheld in Buyer's sole discretion.

(g)     Seller's obligations under this Agreement and in connection with the Transactions are subject to entry of and, to the extent entered, the terms of any applicable orders of the Bankruptcy Court (including, without limitation, the entry of the Sale Order). Nothing in

31

this Agreement shall require the Seller or any of its Affiliates to give testimony to or submit a motion to the Bankruptcy Court that is untruthful or to violate any duty of candor or other fiduciary duty to the Bankruptcy Court or its stakeholders.

(h)     If the Sale Order, or any other orders of the Bankruptcy Court relating to this Agreement or the transactions contemplated hereby shall be appealed by any Person (or if any petition for certiorari or motion for reconsideration, amendment, clarification, modification, vacation, stay, rehearing or reargument shall be filed with respect to the Bid Procedures Order, the Sale Order, or other such order), subject to rights otherwise arising from this Agreement, Sellers shall use commercially reasonable efforts to prosecute such appeal, petition or motion and obtain an expedited resolution of any such appeal, petition or motion.

(i)     If the landlord under any Assigned Lease files an objection (in a Court pleading or writing delivered to Seller and/or Buyer) to the approval of the Agreement based upon the fact that Buyer's Intended Use of the applicable leased premises under any Assigned Leases will not comply with the provisions of Section 365 of the Bankruptcy Code, among other things, in that the same violates certain restrictions contained in the applicable Assigned Lease or other leases in a Shopping Center, including any radius provisions, then such objection must be either withdrawn, overruled by the Bankruptcy Court or settled on terms satisfactory to Buyer or Buyer may thereafter terminate this Agreement upon written notice to Seller (in full or in part), whereupon the Deposit (if termination is in full, and a portion thereof, if termination is a Partial Termination) shall be promptly refunded to Buyer and the parties shall have no further rights to each other with respect to the Property or portion thereof so terminated, except to the extent any obligation expressly survives termination.

## **ARTICLE 10**

### **Closing**

**Section 10.1    Time and Place of Closing**.

(a)     The Closing shall take place by escrow deliveries to Escrow Agent with the Adjusted Purchase Price Balance received by 4:00 p.m. (EST), with Escrow Agent, on the Scheduled Closing Date, TIME BEING OF THE ESSENCE, subject to Seller's and/or Buyer's right to adjourn the Closing as expressly permitted under this Agreement.

(b)     The date on which the Closing shall actually occur under this Agreement is referred to herein as the "Closing Date".

**Section 10.2    Seller's Deliveries**.  By not later than 5:00 p.m. (EST) on the Business Day immediately preceding the Closing Date, Seller shall deliver or cause to be delivered to the Title Company (for recording or delivery to Buyer, as applicable, upon the completion of Closing) each of the following items, each executed by Seller and acknowledged to the extent appropriate:

(a)     a Deed for each Owned Real Property, in form sufficient for recording;

32

(b)    any MUD notice in a form reasonably acceptable to Buyer, Seller and Title Company, as required in Texas in connection with any applicable Owned Real Property located in a MUD district;

(c)    a Bill of Sale for the Personal Property;

(d)    an Omnibus Assignment;

(e)    an Assignment and Assumption of Lease for each Assigned Lease;

(f)    a notice to each landlord under the applicable Assigned Lease, in the form attached as Exhibit H;

(g)    the Seller Closing Update Certificate, in the form attached hereto as Exhibit ; reaffirming the Seller Representations as of the Closing Date (subject to the rights of Seller to update such representations and warranties as set forth in Section 7.1(a)(iii)); Notwithstanding the foregoing or anything set forth herein to the contrary, the Seller Closing Update Certificate shall be delivered to Buyer within three (3) Business Days prior to the Scheduled Closing Date.

(h)    the Final Closing Statement;

(i)    the FIRPTA Certificate;

(j)    Intentionally omitted;

(k)    Intentionally omitted;

(l)    all security codes and master keys to any portion of the Property, to the extent in Seller's possession which shall be transferred to Buyer outside of escrow and on or prior to Closing; and

(m)    Seller's complete lease files with respect to each Assigned Lease (including all maintenance records, annual reconciliations, tax bills, plans, research and correspondence) (which shall be transferred to Buyer outside of escrow and on or prior to Closing).

(n)    such other documents as may be required by the express terms of this Agreement to be delivered by Seller and such other customary conveyance documents, certificates, deeds and other instruments as Buyer may reasonably require to carry out the Transaction and as are customary in like transactions in the State in which any applicable Owned Property is located.

**Section 10.3    Buyer's Deliveries**. By not later than 5:00 p.m. (EST) on the Business Day immediately preceding the Scheduled Closing Date (except in the case of the funds to be deposited by Buyer pursuant to Section 10.3(a) below, as to which delivery shall be on the Scheduled Closing Date), Buyer shall deliver to the Escrow Agent (for delivery to Seller upon the completion of Closing), each of the following items, each executed by Buyer and acknowledged to the extent appropriate:

33

(a)    immediately available federal funds sufficient to pay the Adjusted Purchase Price Balance (subject to apportionments and adjustments as set forth herein) and Buyer's share of all escrow costs and closing expenses, which funds, together with the Deposit, shall be released to Seller and credited against the balance of the Purchase Price at Closing;

(b)    an Omnibus Assignment;

(c)    an Assignment and Assumption of Lease for each Assigned Lease;

(d)    a notice to each landlord under the applicable Assigned Lease, in the form attached as Exhibit H;

(e)    the Buyer Closing Update Certificate. Notwithstanding the foregoing or anything set forth herein to the contrary, the Seller Closing Update Certificate shall be delivered to Buyer within three (3) Business Days prior to the Scheduled Closing Date;

(f)    the Final Closing Statement; and

(g)    such other documents as may be required by the express terms of this Agreement to be delivered by Buyer and such other customary documents, certificates and other instruments as Seller or the Title Company may reasonably require to carry out the Transaction and as are customary in like transactions in the State in which any applicable Owned Property is located.

**Section 10.4    Apportionments**.

(a)    **Adjustments and Prorations**.  The following items shall be apportioned or adjusted between Seller and Buyer as of 11:59 p.m. (EST) on the day immediately preceding the Closing Date (the "Adjustment Date") on the basis of the actual number of days of the month which shall have elapsed as of the Closing Date and based upon the actual number of days in the month in which the Closing occurs and a 365-day year, and otherwise as set forth in this Section 10.4, in all cases such that Seller shall be charged with the economic benefits and burdens of being a beneficial owner of the Property through and including the day preceding the Closing Date, and Buyer shall be charged with the economic benefits and burdens of being a beneficial owner of the Property on and after the Closing Date:

(i)    Real estate taxes and assessments for the Owned Real Properties, it being understood that final tax bills for 2024 may not have been issued as of the date of Closing, and to the extent that is the case and in consideration thereof, Buyer and Seller agree to prorate real estate taxes based on 105% of the last ascertainable tax bills which are available as of the Closing Date;

(ii)    Utility charges for the Owned Real Properties;

(iii)    Common assessments, Property assessments, if any, arising under any Permitted Exceptions, and such other charges, if any, to be prorated under Title Documents pursuant to Section 8.2(r) of this Agreement;

34

(iv)     All rents (except percentage rents, which shall be addressed as hereinafter described in this Section 10.4(a)(iv)), including without limitation, and any additional charges and expenses under the Assigned Leases;  Upon the Closing Date and with respect to the period from and after the Closing Date, Buyer shall be responsible for, and shall pay, rent and other obligations and charges as and when due under the Assigned Leases to the applicable landlord in accordance with the terms of the applicable Assigned Lease.  Provided that Seller provides Buyer with reasonable evidence of Seller's pre-payment, Buyer also agrees to reimburse Seller for any rent (or other Lease Charges) paid by Seller to the landlords for any period subsequent to the Closing Date.  With respect to percentage rents under any Assigned Leases, percentage rent attributable to Seller's sales prior to the Closing Date shall not be imputed against Buyer provided that Buyer shall be liable for percentage rent for the portion of calendar year 2024 remaining after the Closing Date for a partial calendar year as if the term of the Assigned Lease began on the Closing Date (and Buyer shall not be liable to pay any percentage rent based upon sales that occurred prior to the Closing Date).  Notwithstanding the foregoing or anything herein to the contrary, provided that Closing occurs under this Agreement, at Closing, Buyer shall provide a credit to Seller for the actual amounts Seller paid (which payment shall be reasonably evidenced by Seller to Buyer) to landlords under the Assigned Leases for all base rent and CAM charges due under the Assigned Leases for the month of June, 2024 (it being understood however, that no credit shall be due to Seller with respect to any Assigned Lease that on or prior to Closing is the subject of any Partial Termination under this Agreement);

(v)     Year-end true-ups of CAM or operating expenses under the Assigned Leases for 2024 payable in 2025 shall be allocated on the Closing Date as a credit to Buyer based upon 105% of the final CAM or operating expense amounts paid by Seller under the Assigned Leases in 2023 (but after any subsequent true-up adjustment made between Seller and landlords under the Assigned Leases) and thereafter, Buyer agrees to pay all true-ups for 2024 that may be billed by landlords under any Assigned Leases in 2025;

(vi)     Buyer hereby agrees to pay all costs, if any, necessary to cure any defaults under the Assigned Leases, as contemplated by Section 365(b)(1)(A) of Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101-1532 up to and not exceeding $69,090.16 in the aggregate with respect to all Assigned Leases  (the "Cure Amount Cap") prior to the Closing Date (and Seller shall be liable for all Cure Amounts in excess of the Cure Amount Cap, which excess amount shall be a credit to Buyer against the Purchase Price at Closing). Upon satisfaction of the Cure Amounts specified in the Sale Order subject to the Cure Amount Cap, if any, Seller shall be barred from asserting any additional Cure Amounts or other claims, with respect to the Assigned Leases, that arose, accrued or came due, on or before the Closing Date.  For the avoidance of doubt, Buyer shall have no obligation for any tenant indemnification claims that could arise against Seller after the Closing Date and which relate to the period through the Closing Date, which claims remain the obligations of the Seller;

(vii)     All other reasonable and customary operating expenses with respect to the Owned Real Properties; and

(viii)     such other items with respect to each Owned Real Property as are customarily apportioned in real estate closings of commercial properties in the State in which such Owned Real Property is located.

The foregoing prorations shall be paid by means of an adjustment to the balance of the Purchase Price payable pursuant to <u>Section 2.1</u>, which adjustment shall be an increase in the event of a net amount due to Seller, or a decrease in the event of a net amount due to Buyer, in either case resulting in the Adjusted Purchase Price Balance.  Subject to the adjustments and prorations set forth in this <u>Section 10.4</u>, in no event shall Buyer be entitled to any interest in any working capital in the legal or beneficial possession or control of the Seller.

        (b)      **Preliminary and Final Closing Statements**.  All pro-rations and payments to be made under the foregoing provisions of this <u>Section 10.4</u> shall be made on the basis of a written closing statement, which Seller shall endeavor to provide to Buyer at least three (3) Business Days prior to the Scheduled Closing Date (the "<u>Preliminary Closing Statement</u>") showing the net amount due either to Seller or Buyer as a result of the adjustments and pro-rations provided for in this <u>Section 10.4</u>.  On or prior to the Scheduled Closing Date, Seller and Buyer shall jointly agree upon any adjustments, pro-rations and/or additions to be made to the Preliminary Closing Statement in accordance with the terms of this Agreement and, upon the final determination of such adjustments, pro-rations and/or additions, Seller and Buyer shall each execute the final closing statement (the "<u>Final Closing Statement</u>") which shall reflect the net amount due to Seller after such adjustments, pro-rations and/or additions. The adjustments, pro-rations and determinations agreed to by Seller and Buyer in the Final Closing Statement shall be conclusive and binding on the Parties hereto, except for any items that are not capable of being determined at the time the Final Closing Statement is agreed to by Buyer and Seller, which items shall be determined and paid in the manner set forth in the Final Closing Statement and subject to further re-proration following Closing in accordance with the terms of this Section.  Prior to and following the Closing, each Party shall provide the other with such information as the other shall reasonably request in order to finalize any such post-Closing adjustments.  Notwithstanding anything in this Agreement to the contrary, any claim for any adjustment under this <u>Section 10.4</u> will only be valid if made in writing with specificity and only if made on or before the date that is sixty (60) days after the Closing Date.

        (c)      **Survival**.  The terms of this <u>Section 10.4</u> shall survive the Closing.

**<u>Section 10.5</u>    <u>Closing Costs</u>**.

        (a)      Seller shall pay (i) Seller's own attorneys' fees; (ii) to the extent that it is customary in the jurisdiction in which any applicable portion of the Property is located for a seller to pay the same, any recording fees payable in connection with recording a Deed.

        (b)      Buyer shall pay (i)  the cost of owner's or lender's title insurance policy and all other due diligence costs incurred by Buyer elects in connection with the Transaction, (ii) to the extent that it is customary in the jurisdiction in which any applicable portion of the Property is located for a buyer to pay the same, any recording fees payable in connection with recording a Deed, (iii) the cost of recording any memorandum of an Assigned Lease that Buyer elects to record after Closing and (iv) Buyer's own attorneys' fees.

        (c)      All other customary purchase and sale closing costs shall be allocated among the Parties in accordance with local custom in the jurisdiction in which each applicable portion of the Property is located, it being acknowledged by the Parties that the Transaction is

168693.00002/135492369v.6

exempt from transfer taxes (or transfer taxes are not imposed) pursuant to applicable Laws and Regulations.

(d)    The provisions of this Section 10.5 shall survive the Closing.

## ARTICLE 11

### Real Estate Commission

Seller shall be obligated to pay any real estate commissions and/or brokerage fees to Hilco or Jeffries (the "Brokers") in connection with the Transaction in accordance with separate written agreements between Seller and Brokers.  Each Party represent and warrant to the other Party that (a) it dealt with no broker other than the Brokers and (b) no other brokerage fee or real estate commission is or shall be due or owing in connection with the Transaction as a result of the acts of the representing Party. Each Party hereby indemnify and hold the other Party harmless from any and all Losses incurred by reason of any breach of the foregoing representations and warranties by such representing Party.  Seller shall further indemnify and hold Buyer harmless from and against all Losses which may arise by reason of any claim asserted by any Broker in connection with this Agreement or any Broker's representation of Seller. The provisions of this Article 11 shall survive the Closing or the termination of this Agreement.

## ARTICLE 12

### Termination and Default

### Section 12.1    Buyer's Termination Rights and Remedies.

(a)    Buyer's Termination Rights (Other than in connection with an Alternate Transaction and Seller Default).  In addition to any other express provisions of this Agreement, this Agreement may be terminated by Buyer in full (except with respect to 12.1(a)(i) below, in which event this Agreement may be terminated by Buyer in full or in part, and if in part, with respect to a portion of the Property so affected by the termination event) prior to the Closing upon the occurrence of any one of the following and upon written notice thereof to Seller (except with respect to 12.1(a)(iv) below which shall not require notice) at least one (1) Business Day prior to the then Scheduled Closing Date):

(i)    if the Closing shall not have occurred by the Outside Closing Date, Buyer may either terminate this Agreement in accordance with this Section 12.1(a) or, if the Sale Order has not yet become a Final Order entered on the docket by the Outside Closing Date, Buyer may elect to extend the Closing Date upon providing written notice to Seller within one (1) Business Day prior to the then Scheduled Closing Date, which notice shall include an adjourned date for Closing (the "Extended Outside Closing Date") that is not more than fifteen (15) days following the entry on the docket of such Final Order, in which event, and notwithstanding any other provision of this Agreement to the contrary, all base rent and CAM charges due under the Assigned Leases for the month of June, 2024 (through and including the Extended Outside Closing Date) shall be paid by Buyer as a credit to Seller at Closing (if and only if Closing occurs and provided Seller has provided Buyer with reasonable evidence of such rent payments, it being

understood that no credit shall be due to Seller with respect to any Assigned Lease that on or prior to Closing is the subject of any Partial Termination under this Agreement).

(ii)    if, prior to the Closing, (x) Sellers seek to have the Bankruptcy Court enter an order dismissing, or converting the Bankruptcy case into a case under Chapter 7 of the Bankruptcy Code or appointing a trustee in the Bankruptcy case or appointing a responsible officer or an examiner with enlarged powers relating to the operation of Seller' business (beyond those set forth in Section 1106(a)(3) or (4) of the Bankruptcy Code) under Bankruptcy Code Section 1106(b), or such an order of dismissal, conversion or appointment is entered for any reason, or (y) the Bankruptcy case contemplated in this Agreement shall be converted into a case under chapter 7 of the Bankruptcy Code or dismissed.

(iii)    if any Claim regarding this Agreement or the Transactions contemplated herein is brought by any Person against any of Buyer, any of Buyer's Related Parties or any of their affiliated or related Persons prior to the expiration of the applicable period in which such Claim could be brought.

(iv)    automatically and without any action or notice by Seller to Buyer, or Buyer to Seller, immediately upon the issuance of an Order, decree, or ruling by a Governmental Authority to permanently restrain, enjoin or otherwise prohibit the Closing;

(v)    if the Stalking Horse Approval Order is not entered on the docket at least one (1) Business Day before the Bid Deadline (as defined in the Bidding Procedures), or to the extent the Bankruptcy Court denies or otherwise refuses to enter the Stalking Horse Approval Order at any hearing scheduled by the Bankruptcy Court.

In the event Buyer terminates this Agreement pursuant to this Section 12.1(a), the Deposit shall be promptly returned to Buyer, this Agreement (in full or in part, as applicable) shall terminate except for any provisions that expressly survive termination.  Notwithstanding the foregoing, in the event any event in 12.1(a)(i)-(v) arises from a default by Seller, Buyer shall have all applicable default remedies pursuant to Section 12.1(c) below.

(b)    Buyer's Termination Rights in connection with an Alternate Transaction.

In addition to any other express provisions of this Agreement, this Agreement may be terminated by Buyer in full or, at Buyer's election, in part, effecting a Partial Termination with respect to a portion of the Property) prior to the Closing upon the occurrence of any one of the following and upon written notice thereof to Seller prior to the then Scheduled Closing Date:

(i)    subject to the terms of the Stalking Horse Approval Order, upon the approval by the Bankruptcy Court of an Alternate Transaction; or

(ii)    if Sellers propose, sponsor, or support a stand-alone plan of reorganization, liquidation, or refinancing that contemplates an Alternate Transaction.

In the event Buyer terminates this Agreement pursuant to this Section 12.1(b), the Deposit shall be promptly returned to Buyer (or applicable portion thereof in the event of a Partial Termination), this Agreement (in full or in part, as applicable) shall terminate except for any provisions that

168693.00002/135492369v.6

expressly survive termination, and Seller shall pay Buyer the Break-Up Fee, provided that any such Break Up-Fee due to Buyer under this Section 12.1(b) shall be payable to Buyer at the closing for the Alternate Transaction.  Notwithstanding the foregoing, in the event that Buyer makes one or more overbids at any auction in accordance with the Bidding Procedures, Buyer shall be entitled to deduct the Break-Up Fee from the applicable purchase price at the time of Closing under this Agreement ("Break-Up Fee Credit").  Any obligation to pay the Break-Up Fee hereunder shall be absolute and unconditional; such payment shall constitute an administrative expense of Seller's estates under sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code and shall be payable as specified herein, and not subject to any defense, claim, counterclaim, offset, recoupment, or reduction of any kind whatsoever. Seller and Buyer agree that the Bidding Incentives were a material inducement to Buyer to enter into this Agreement and to consummate the transactions contemplated hereby and shall be payable as specified herein and not subject to any defense, claim, counterclaim, offset, recoupment, or reduction of any kind whatsoever.

(c)    Buyer's Rights following a Seller Default.  If, in the absence of a Buyer default beyond applicable notice and cure periods, the Closing is not consummated because of a failure by Seller to perform its obligations in accordance with the terms of this Agreement or Seller otherwise breaches any covenant of this Agreement (any of the foregoing, a "Seller Failure"), which Seller Failure is not cured by Seller within three (3) Business Days after written notice from Buyer, then Buyer may, as its sole and exclusive remedy at law or in equity, either: (i) terminate this Agreement in full or in part, at Buyer's election, by giving written notice thereof to the Seller, in which event (A) the Deposit (or applicable portion thereof with respect to a Partial Termination) will promptly be returned to the Buyer, and (B) the Parties shall have no further obligations to each other except for those obligations which expressly survive the termination of this Agreement; (ii) waive such Seller Failure and consummate the Transaction contemplated hereby in accordance with the terms of this Agreement; or (iii) specifically enforce Seller's obligation to consummate the Transaction (or at Buyer's election, to specifically enforce the portion of the Transaction which is the subject of Seller's default) in accordance with the terms and conditions of this Agreement (and, in connection with such election, Seller hereby waives any requirement for the securing or posting of any bond by Buyer in connection with the pursuit of such remedy); provided, however, that (1) as a condition precedent to Buyer's election to bring an action for specific performance as the result of such Seller Failure hereunder, Buyer must commence such action within thirty (30) days after the occurrence of such breach and (B) Buyer agrees that its failure timely to commence such an action for specific performance within such thirty (30) day period shall be deemed a waiver by it of its right to commence such an action.

This Section 12.1(c) is intended only to limit Buyer's right to damages arising due to Seller's Failure (beyond any applicable notice and cure periods) and shall not limit the obligations of Seller that survive the termination of this Agreement.

**Section 12.2    Mutual Termination by the Parties.**  This Agreement may be terminated by Seller and Buyer in full or in part prior to the Closing if Seller and Buyer mutually consent in writing to the early termination of this Agreement (or a Partial Termination) with respect to a portion of the Property at least one (1) Business Day prior to the then Scheduled Closing Date. In the event Seller and Buyer terminate this Agreement pursuant to this Section 12.2, the Deposit (or portion thereof with respect to any Partial Termination) shall be promptly returned to Buyer, and

168693.00002/135492369v.6

with respect to the portion of (or all) of the Property so terminated, this Agreement shall terminate except for any provisions that expressly survive termination.

This Section 12 and the rights and obligations created hereunder, shall survive termination of this Agreement.

**Section 12.3    Seller's Termination Rights following Buyer Default**.  If, in the absence of a default by Seller beyond applicable notice and cure periods, the Closing is not consummated due to Buyer's failure to perform its obligations under this Agreement, which failure is not cured within three (3) Business Days after written notice from Seller of such failure, then Seller shall be entitled to terminate this Agreement (which termination shall be, at Seller's election in its sole and absolute discretion, be in full or in part with respect to the portion of the Property subject to Buyer's default) upon written notice, in which case (a) the Deposit (or portion thereof with respect to a Partial Termination) shall be delivered to Seller as liquidated damages for Buyer's breach of this Agreement, it being agreed between the Parties that the actual Losses to Seller in the event of such breach are impractical to ascertain and the amount of the Deposit is a reasonable estimate thereof and (b) upon such termination, this Agreement shall terminate and the Parties shall have no further obligations to each other with respect to the Property or otherwise; provided, however, that this Section 12.3 is intended only to liquidate and limit Seller's right to damages arising due to Buyer's failure to purchase the Property in accordance with the terms of this Agreement and shall not limit the obligations of Buyer or Seller that survive the termination of this Agreement. Seller hereby agrees that except as expressly set forth in Section 12.2 and 12.3 it is waiving all other rights and remedies against Buyer, including without limitation specific performance.

**Section 12.4    Breach of Representations**.

Each of the Seller Representations and Buyer Representations and the other terms of this Section 12.4, the covenants and agreements (to the extent such covenant or agreement contemplates or requires performance by such Party prior to the Closing) of the Parties set forth in this Agreement or in any other document contemplated hereby, or in any certificate delivered hereunder or thereunder, will terminate effective immediately as of the Closing such that no claim for breach of any such representation, warranty, covenant or agreement, detrimental reliance or other right or remedy (whether in Contract, in tort or at law or in equity) may be brought in respect thereof after the Closing. Each covenant and agreement that explicitly contemplates performance after the Closing, will, in each case and to such extent, expressly survive the Closing in accordance with its terms, and if no term for such survival is specified, then for one (1) year following the Closing Date, and nothing in this Section 12.6 will be deemed to limit any rights or remedies of any Person for breach of any such surviving covenant or agreement. Notwithstanding this Section 12.6, nothing in this Section 12.6 shall limit any right or remedies available to Buyer in respect of a claim for fraud.

The provisions of this Section 12.4 shall survive the Closing.

## ARTICLE 13

## Intentionally Omitted

168693.00002/135492369v.6

## ARTICLE 14

### Escrow Account

**Section 14.1    Escrow Account**.  The funds represented by the Deposit may be, but shall not be required to be, held in escrow by Escrow Agent in an interest-bearing bank account with the customary bank approved by Escrow Agent.  The Deposit shall be applied against the Purchase Price and become the property of Seller upon the occurrence of the Closing in accordance with the terms of this Agreement.

**Section 14.2    Taxes**.  Unless Seller retains the deposit pursuant to Section 12.2, Buyer shall pay all taxes on and with respect to the Deposit.

## ARTICLE 15

### Miscellaneous

**Section 15.1    Entire Agreement**.  This Agreement constitutes the entire agreement among the Parties with respect to the Transaction, and it supersedes all prior discussions, understandings or agreements among Parties, including without limitation, in any prior letters of intent among the Parties.  All Exhibits and Schedules attached hereto are a part of this Agreement and are incorporated herein by reference.

**Section 15.2    Binding on Successors and Assigns**.  This Agreement shall be binding upon and inure to the benefit of the Parties hereto and their respective successors and assigns, including as to the Seller, any subsequently appointed liquidating trustee, plan administrator or fiduciary, chapter 11 or chapter 7 trustee, or any other estate fiduciary.

**Section 15.3    Assignment by Buyer**.  Without the prior written consent of Seller (which may be granted or withheld in Seller's sole and absolute discretion), Buyer shall not, directly or indirectly, assign this Agreement or any of its rights hereunder.  Notwithstanding the foregoing, Buyer may assign (or partially assign, to one or more entities) its rights under this Agreement, without the consent of Seller, to an Affiliate, corporation, partnership or other entity in which either entity comprising Buyer owns and controls a greater than 50% economic and managerial interest, provided assignee assumes in writing all of the obligations of Buyer to be performed under this Agreement in a form reasonably acceptable to Seller and an original of such fully executed assignment and assumption agreement is delivered to Seller at least five (5) days prior to Closing. No assignment of this Agreement shall relieve Buyer from any of its obligations set forth herein arising prior to or after the effective date of the assignment. The provisions of this Section shall survive the Closing or termination of this Agreement. With respect to each Assigned Lease, Buyer shall have the right to designate one or more assignees (or if Buyer so elects without Seller's consent and without any additional assignment, to one of the entities constituting Buyer under this Agreement) to take assignment of each Leasehold Interest, provided such assignee(s) is an Affiliate of Buyer and provided Buyer gives Seller five (5) days' notice of such assignee(s) prior to Closing.  Notwithstanding the foregoing, Buyer may elect, in its sole discretion to have either entity constituting Buyer become the grantee for the Owned Real Property at Closing, which shall not require Seller's consent or any additional assignment of this Agreement.

41

**Section 15.4**   **Waiver**.   The excuse or waiver of the performance by a Party of any obligation of the other Party under this Agreement shall only be effective if evidenced by a written statement signed by the Party so excusing or waiving.  No delay in exercising any right or remedy shall constitute a waiver thereof, and no waiver by any Party of the breach of any covenant of this Agreement shall be construed as a waiver of any preceding or succeeding breach of the same or any other covenant or condition of this Agreement.

**Section 15.5**   **Governing Law; Jurisdiction**.

(a)   This Agreement and all documents executed and delivered in connection herewith shall be construed in accordance with the internal laws of the State of Texas without regard to the principles of choice of law or conflicts of law.

(b)   In recognition of the benefits of having any disputes with respect to this Agreement resolved by an experienced and expert person, the Parties hereby agree that any suit, action, or proceeding, whether claim or counterclaim, brought or instituted by any party hereto on or with respect to this Agreement or which in any way relates, directly or indirectly, to this Agreement or any event, transaction, or occurrence arising out of or in any way connected with this Agreement, the Property, or the dealings of the parties with respect thereto, shall be tried only by a court and not by a jury.  **EACH PARTY HEREBY EXPRESSLY WAIVES ANY RIGHT TO A TRIAL BY JURY IN ANY SUCH SUIT, ACTION, OR PROCEEDING**.

(c)   Each of the Parties: (i) irrevocably submits itself to the jurisdiction of the Bankruptcy Court for the purpose of any suit, action or other proceeding arising out of or based upon this Agreement or the subject matter hereof or any documents delivered in connection herewith, provided that if the Bankruptcy Court is unwilling or unable to hear any such suit, action or proceeding, then the courts of the State of Texas, sitting in Harris County, and the United States District Court for the Southern District of Texas, shall have  exclusive jurisdiction; (ii) waives, and agrees not to assert, by way of motion, as a defense or otherwise, in any such suit, action or proceeding, any claim that it is not subject personally to the jurisdiction of the above named courts, that its property is exempt or immune from attachment or execution, that the suit, action or proceeding is brought in an inconvenient forum, that the venue of the suit, action or proceeding is improper or that this Agreement or the subject matter hereof may not be enforced in or by such court; and (iii) consents to service of process by registered mail at the address to which notices are to be given if personal service is not with the exercise of reasonable efforts possible. The provisions of this Section 15.5 shall survive the Closing or termination of this Agreement.

**Section 15.6**   **Counterparts**.   This Agreement may be executed in multiple counterparts, each of which shall be deemed an original and all of which, taken together, shall constitute one and the same instrument.  The exchange of signature pages by facsimile or Portable Document Format ("PDF") transmission shall constitute effective delivery of such signature pages.  Signatures of the Parties transmitted by facsimile or PDF shall be deemed to be their original signatures for all purposes.

**Section 15.7**   **Notices**.   All notices, demands or other communications given hereunder shall be in writing and shall be deemed to have been duly delivered (a) upon the delivery (or refusal to accept delivery) by messenger or overnight express delivery service (or, if such date is not on a

42

Business Day, on the Business Day next following such date), or (b) upon the delivery of a PDF via email transmission on a Business Day (or, if such date is not on a Business Day, on the Business Day next following such date), addressed as follows:

**To Seller**:        [ ]

with a copy to:        Milbank LLP
                       55 Hudson Yards
                       New York, New York 10001
                       Attention: [                    ]
                       Email: [                    ]

**To Buyer**:

                       6295 Allentown Blvd., Suite 1
                       Harrisburg, PA 17112
                       Attention:  Robert Helm, CFO & Jim Comitale, SVP
                       General Counsel
                       Email: rhelm@ollies.us; jcomitale@ollies.us

with a copy to:

                       Blank Rome LLP
                       One Logan Square
                       Philadelphia, PA 19103
                       Attention:  Regina Kelbon Esq. and Josef Mintz, Esq.
                       Email:  regina.kelbon@blankrome.com;
                       josef.mintz@blankrome.com

**To Escrow Agent**:   Chicago Title Insurance Company
                       10 South LaSalle Street
                        Suite 3100, Chicago, IL 60603
                       Attn: Eric Anderson
                       Email: eric.anderson@ctt.com

Any address or name specified above may be changed by notice given to the addressee by the other Party in accordance with this Section 15.7.  The inability to deliver notice because of a changed address of which no notice was given as provided above, or because of rejection or other refusal to accept any notice otherwise appropriately given as provided above, shall be deemed to be the receipt of the notice as of the date of such inability to deliver or rejection or refusal to accept.  Any notice to be given by any Party hereto may be given by the counsel for such Party.

**Section 15.8    Attorneys' Fees**.  In the event of a judicial or administrative proceeding or action by one Party against the other Party with respect to the interpretation or enforcement of this Agreement, the prevailing Party shall be entitled to recover reasonable out-of-pocket costs and expenses, including reasonable attorneys' fees and expenses, whether at the investigative, pretrial, trial or appellate level.  The prevailing Party shall be determined by the court based upon an

43

assessment of which Party's major arguments or position prevailed.  The provisions of this <u>Section 15.8</u> shall survive the Closing or termination of this Agreement.

**Section 15.9**   **Income Tax Matters**.  The Parties hereto hereby agree that Escrow Agent shall act as "the person responsible for closing" the Transaction pursuant to Section 6045(e) of the Code and shall prepare and file all informational returns, including IRS Form 1099-S, and shall otherwise comply with the provisions of Section 6045(e) of the Code.

**Section 15.10** **Time Periods**.   Any reference in this Agreement to the time for the performance of obligations or elapsed time shall mean consecutive calendar days, months, or years, as applicable.  In the event the time for performance of any obligation hereunder expires on a day that is not a Business Day, the time for performance shall be extended to the next Business Day.

**Section 15.11** **Modification of Agreement**.  No modification of this Agreement shall be deemed effective unless in writing and signed by all Parties.

**Section 15.12** **Further Instruments**.  Each Party, promptly upon the request of the other, shall execute and have acknowledged and delivered to the other or to Escrow Agent, as may be appropriate (but not creating any obligations additional to those otherwise imposed by this Agreement), any and all further instruments reasonably requested or appropriate to evidence or give effect to the provisions of this Agreement and which are consistent with the provisions of this Agreement.

**Section 15.13** **Descriptive Headings; Word Meaning**.  The descriptive headings of the paragraphs of this Agreement are inserted for convenience only and shall not control or affect the meaning or construction of any provisions of this Agreement.   Words such as "herein", "hereinafter", "hereof" and "hereunder" when used in reference to this Agreement, refer to this Agreement as a whole and not merely to a subdivision in which such words appear, unless the context otherwise requires.  The singular shall include the plural and the masculine gender shall include the feminine and neuter, and vice versa, unless the context otherwise requires.  The word "including" shall not be restrictive and shall be interpreted as if followed by the words "without limitation."

**Section 15.14** **Time of the Essence**.   TIME IS OF THE ESSENCE TO THIS AGREEMENT AND TO ALL DATES AND TIME PERIODS SET FORTH HEREIN, INCLUDING, WITHOUT LIMITATION, EACH PARTY'S OBLIGATION TO CONSUMMATE THE CLOSING ON THE APPLICABLE SCHEDULED CLOSING DATE, AS SAME MAY BE ADJOURNED AND/OR EXTENDED PURSUANT TO THE EXPRESS TERMS OF THIS AGREEMENT.

**Section 15.15** **Construction of Agreement**.  This Agreement shall not be construed more strictly against one Party than against the other merely by virtue of the fact that it may have been prepared primarily by counsel for one of the Parties, it being recognized that the Parties have contributed substantially and materially to the preparation of this Agreement.

**Section 15.16** **Limitations on Liability**.  Notwithstanding anything to the contrary in this Agreement, (a) subject to any additional limitations on Seller Parties' liability set forth elsewhere

168693.00002/135492369v.6

in this Agreement, in no event shall any of the Seller Parties (other than Seller) or any of the direct or indirect owners of any of the Seller Parties (including Seller) have any personal liability under this Agreement and (b) subject to any additional limitations on Buyers' liability set forth elsewhere in this Agreement, in no event shall any of the direct or indirect owners of Buyer have any personal liability under this Agreement.  Without limiting, negating or modifying any of the express conditions to Closing or deliverables required under this Agreement by Seller, the acceptance of the Deed by the Buyer shall constitute full performance of all of Seller's obligations hereunder with respect to the Owned Real Properties, other than those obligations of Seller, if any, that by the express terms hereof are to survive the Closing.

**Section 15.17** **Severability**.  The Parties hereto intend and believe that each provision in this Agreement comports with all applicable local, state and federal laws and judicial decisions. If, however, any provision in this Agreement is found by a court of law to be in violation of any applicable local, state, or federal law, statute, ordinance, administrative or judicial decision, or public policy, or if in any other respect such a court declares any such provision to be illegal, invalid, unlawful, void or unenforceable as written, then it is the intent of all Parties hereto that, consistent with and with a view towards preserving the economic and legal arrangements among the Parties hereto as expressed in this Agreement, such provision shall be given force and effect to the fullest possible extent, and that the remainder of this Agreement shall be construed as if such illegal, invalid, unlawful, void, or unenforceable provision were not contained herein, and that the rights, obligations, and interests of the parties under the remainder of this Agreement shall continue in full force and effect.

**Section 15.18** **Joint and Several**.  If Seller or Buyer consists of more than one person or entity, the constituent parties of Seller or Buyer, as the case may be, shall be jointly and severally liable for the obligations of Seller or Buyer, as the case may be, under this Agreement and the other documents to be executed and delivered by Seller or Buyer at the Closing.  In addition, a default by one or more constituent parties of Seller or Buyer, as the case may be, shall be deemed a default by Seller or Buyer, as the case may be.

**Section 15.19** **No Successor Liability**.  The parties hereto intend that, upon the Closing, Buyer shall not be deemed to:  (a) be the successor of or successor employer (as described under COBRA and the applicable regulations thereunder) to Sellers, including with respect to any collective bargaining agreement and any Employee Benefit Plans, (b) have *de facto* or otherwise, merged with or into Seller; (c) be a mere continuation or substantial continuation of Seller or the enterprise(s) of Seller; or (d) be liable for any acts or omissions of Seller in the operation of the Property. Without limiting the generality of the foregoing, and except as otherwise specifically provided in the Agreement, the parties hereto intend that Buyer shall not be liable for any Liens against any Seller or any of its Affiliates, and that Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the Closing Date or whether fixed or contingent, existing or hereafter arising, with respect to the Property or any liabilities of any Seller arising on or prior to the Closing Date. The parties hereto agree that a provision substantially in the form of, and with comparable effect (to the extent permitted by law), to this Section 15.19 shall be reflected in the Sale Order.

[The balance of this page has intentionally been left blank.  Signature pages follow.]

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the Effective Date.


**SELLER**:                          **99 CENTS ONLY STORES TEXAS, INC.**, a Delaware corporation

By: _____

Name: Christopher Wells

Title: CRO

IN WITNESS WHEREOF, the parties have executed this Agreement effective as of the Effective Date.

**SELLER**:                              **99 CENTS ONLY STORES LLC**, a California limited
                                         liability company

                                         By:
                                         Name:  Christopher Wells
                                         Title:  CRO

**BUYER:**

**OLLIE'S BARGAIN OUTLET, INC.**, a
Pennsylvania corporation

By: _Robert Helm_
Name: Robert Helm
Title: Chief Financial Officer


**OBO VENTURES, INC.**, a Pennsylvania
corporation

By: _Robert Helm_
Name: Robert Helm
Title:   Chief Financial Officer


[Signatures continue on following page.]

[99 Cents – Signature Page to Asset Purchase Agreement]

**EXHIBIT A**

[SUBJECT TO REVIEW BY TITLE COMPANY]

**WHEN RECORDED RETURN TO:**

_____
_____
_____

**NOTICE OF CONFIDENTIALITY RIGHTS: IF YOU ARE A NATURAL PERSON, YOU MAY REMOVE OR STRIKE ANY OR ALL OF THE FOLLOWING INFORMATION FROM ANY INSTRUMENT THAT TRANSFERS AN INTEREST IN REAL PROPERTY BEFORE IT IS FILED FOR RECORD IN THE PUBLIC RECORDS:  YOUR SOCIAL SECURITY NUMBER OR YOUR DRIVER'S LICENSE NUMBER.**

**SPECIAL WARRANTY DEED**

| | | |
|---|---|---|
| THE STATE OF TEXAS | § | |
| | § | KNOW ALL PERSONS BY THESE PRESENTS: |
| COUNTY OF _____ | § | |

FOR VALUABLE CONSIDERATION, the receipt and adequacy of which are hereby acknowledged, [_____], a [_____] ("Grantor"), hereby grants, bargains, sells and conveys to [_____], a [_____] ("Grantee"), that certain real property located in the County of _____, State of Texas, more particularly described on Exhibit A attached hereto and incorporated herein by this reference (the "Land"), together with Grantor's right, title and interest in and to the fixtures and improvements located on the Land, if any (the "Improvements"), all oil, gas and all other minerals underlying the Land and that may be produced and mined therefrom, including, without limitation, any right of Seller to mineral interests, royalty interests, leasehold interests, and production payment interests (collectively, the "Oil, Gas, and Mineral Rights") and together with all strips and gores of land within or adjoining the Land, land lying in the bed of any street to the center line thereof, and privileges, prescriptive rights or rights of adverse possession, rights of way, easements and other rights appurtenant to or used in connection with the ownership and operation of the Land, including, without limitation, any air or development and zoning rights or privileges and easements relating to, affecting or appurtenant to the Land or any portion thereof (the "Appurtenances"); (the Land, Improvements, Oil, Gas, and Mineral Rights and Appurtenances collectively referred to as the "Property").

This conveyance is being made by Grantor and accepted by Grantee subject only to those certain title exceptions (the "Permitted Exceptions") set forth in Exhibit B attached hereto and made a part hereof for all purposes, but only to the extent that such exceptions are valid, existing, and, in fact, affect the Property.

TO HAVE AND TO HOLD the Property, together with, all and singular, the rights and appurtenances thereto in anywise belonging, to Grantee and Grantee's successors and assigns forever; and subject to the Permitted Exceptions, Grantor does hereby bind Grantor and Grantor's

Exhibit A

successors and assigns to warrant and forever defend, all and singular, the Property unto the Grantee and Grantee's successors and assigns, against every person whomsoever lawfully claiming or to claim the same, or any part thereof by, through or under Grantor, but not otherwise, subject to the Permitted Exceptions.

Ad valorem taxes for the year of this deed have been prorated; accordingly, by its acceptance of this Deed, Grantee assumes responsibility to pay all ad valorem taxes on the Property for such year and all subsequent years.

Grantee's mailing address:    _____

_____

_____

_____

Executed as of this _____ day of _____, 202_.

**GRANTOR:**

[_____],

a _____

By: _____

Name:

Title:

STATE OF _____

COUNTY OF _____

This instrument was acknowledged before me on _____, 20___ by _____, as _____ of _____, a _____, on behalf of said entity.

[seal]

_____

Notary Public, State of _____

Exhibit A

**EXHIBIT A**

**LEGAL DESCRIPTION OF PROPERTY**

[to be attached]

168693.00002/135492369v.6

**EXHIBIT B**

**PERMITTED EXCEPTIONS**

168693.00002/135492369v.6

## EXHIBIT B

## FORM OF BILL OF SALE

      KNOW ALL MEN BY THESE PRESENTS, that _____, a _____, a [California limited liability company/Delaware corporation] ("**Seller**"), in consideration of Ten Dollars ($10.00) and other good and valuable consideration paid by_____, a _____ ("**Buyer**"), the receipt and sufficiency of which are hereby acknowledged, hereby sells, conveys, assigns, transfers, delivers and sets over to Buyer all of Seller's right, title and interest, if any, in and to all Personal Property (as such term and all other capitalized terms used and not otherwise defined herein are defined in that certain Asset Purchase Agreement between Seller, as seller, and [Buyer], as buyer, dated as of _____ __, 202[_] (the "**Purchase Agreement**")) attached or affixed to, or located on, or used or employed in connection with, the Owned Real Property and excluding the Excluded Items.

      TO HAVE AND TO HOLD the same unto Buyer, its successors and assigns to and for its and their own use and behalf forever.

      Buyer agrees to pay all sales taxes payable by reason of the transfer to Buyer of said Personal Property.

      BUYER ACKNOWLEDGES THAT THE PERSONAL PROPERTY IS HEREBY SOLD, ASSIGNED, TRANSFERRED AND CONVEYED TO BUYER ON AN "AS IS", "WHERE IS", "WITH ALL FAULTS" BASIS, WITHOUT ANY REPRESENTATION, WARRANTY, GUARANTY, PROMISE, PROJECTION OR PREDICTION WHATSOEVER WITH RESPECT TO SUCH PERSONAL PROPERTY, WHETHER ORAL OR WRITTEN, EXPRESS OR IMPLIED, OR ARISING BY OPERATION OF LAW, INCLUDING, WITHOUT LIMITATION, ANY WARRANTY OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE, EXCEPT FOR SELLER'S EXPRESS REPRESENTATIONS SET FORTH IN THE PURCHASE AGREEMENT.

This Bill of Sale may be executed in any number of counterparts which, when taken together, shall constitute a single binding instrument.  Execution and delivery of this Bill of Sale by transmission of a signed signature page by facsimile or PDF shall be sufficient for all purposes and shall be binding on any Person who so executes.

### [SIGNATURE PAGES TO FOLLOW]

**IN WITNESS WHEREOF**, Seller and Buyer have executed this Bill of Sale as of this _____ day of _____, 202[__].

SELLER:

**[SELLER ENTITY]**, a [California limited liability company/Delaware corporation]

By:_____
Name:_____
Title:_____

168693.00002/135492369v.6

BUYER:

**[BUYER ENTITY]**, a [_]

By:_____

Name:_____

Title:_____

168693.00002/135492369v.6

## EXHIBIT C

## FORM OF OMNIBUS ASSIGNMENT

THIS OMNIBUS ASSIGNMENT (CONTRACTS AND OTHER PROPERTY RIGHTS) (this "Assignment"), is made and entered into as of the ___ day of _____, 202[__] (the "Effective Date") by _____, a [California limited liability company/Delaware corporation], ("Assignor") for the benefit of _____, a _____ ("Assignee").  All capitalized terms used and not otherwise defined herein are defined in that certain Asset Purchase Agreement between Assignor, as seller, and [Assignee], as buyer, dated as of [_____], 202[__] (the "Purchase Agreement").

## W i t n e s s e t h:

For Ten Dollars ($10.00), and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby and assigns to Assignee all of Assignor's right, title and interest in, to and under:  (a) all consents, authorizations, variances, licenses, Permits and certificates of occupancy, if any, issued by any Governmental Authorities with respect to the Property; (b) to the extent assignable, all intangible property associated with the Owned Real Property, including, without limitation, trademarks, logos, trade or business names, copyrights, mailing lists, internet domain names, promotional materials, business licenses and telephone numbers, if any, owned by or licensed to Seller and used by Seller with respect to its ownership, leasing and/or use or operation of the Owned Real Property; (c) all warranties, and guaranties relating to the Owned Real Property; (d) all site plans, architectural renderings, plans and specifications, as-built drawings, floor plans and other similar plans or diagrams relating to the Owned Real Property; (collectively, the "Assigned Property"). [NTD: Conform Assigned Property to Final wording in APA]

TO HAVE AND TO HOLD unto Assignee and its successors and assigns to its and their own use and benefit forever.

THIS ASSIGNMENT IS MADE ON AN "AS-IS, WHERE-IS, WITH ALL FAULTS" BASIS, WITHOUT RECOURSE AND WITHOUT ANY REPRESENTATION OR WARRANTY (EXPRESS OR IMPLIED) WHATSOEVER EXCEPT FOR THE REPRESENTATIONS OF SELLER EXPRESSLY SET FORTH IN THE PURCHASE AGREEMENT.

This Assignment is binding on, and inures to the benefit of, the parties hereto and their respective successors and assigns.

This Assignment may be executed in any number of counterparts which, when taken together, shall constitute a single binding instrument.  Execution and delivery of this Assignment by transmission of a signed signature page by facsimile or PDF shall be sufficient for all purposes and shall be binding on any Person who so executes.

## [SIGNATURE PAGE TO FOLLOW]

Exhibit C

168693.00002/135492369v.6

IN WITNESS WHEREOF, Assignor has executed this Assignment as of the date first above written.

**ASSIGNOR:**

_____, a [California limited liability company/Delaware corporation]


By: _____

Name: _____

Title: _____

Exhibit C

168693.00002/135492369v.6

## EXHIBIT D-1

## FORM OF ASSIGNMENT AND ASSUMPTION OF LEASE

THIS ASSIGNMENT AND ASSUMPTION OF LEASE (this "Assignment") is made and entered into as of [_], 2024 (the "Effective Date"), by and between **99 CENTS ONLY STORES LLC**, a California limited liability company ("Assignor"), and [_], a [_] (together with its successors and assigns, "Assignee").

## RECITALS:

WHEREAS, pursuant to that certain [Lease], dated as of [_], by and between [_] ("Landlord"), as landlord, and Assignor, as tenant, (as amended by _____ [NTD: Specify all Lease Amendments], collectively, the "Lease"), Assignor leases those certain premises described therein from Landlord (the "Premises"). Capitalized terms that are used and not defined in this Assignment shall have the meanings given to them in the Lease.

WHEREAS, pursuant to that certain [_____ Order] issued by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court"), attached hereto as Exhibit A (the "Order"), Assignor is authorized to assign to Assignee, and Assignee wishes to assume from Assignor the Lease.

NOW, THEREFORE, in consideration of the mutual covenants and promises herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor and Assignee hereby agree as follows:

1.    **Assignment and Assumption.**

(a)    Assignor hereby grants, conveys, transfers and assigns unto Assignee, effective as of the Effective Date, all of Assignor's right, title and interest in, to and under the Lease, to have and to hold the same unto Assignee forever, subject to all the terms, covenants and conditions thereof.

(b)    Assignee hereby (i) accepts this Assignment and (ii) assumes, as of the Effective Date, all rights, obligations and liabilities of Assignor under the Lease which accrue or arise or come due from and after the Effective Date.

2.    **Miscellaneous.**

(a)    This Assignment shall be construed and enforced in accordance with the substantive laws of the State of Texas, without regard to any choice of laws or conflicts of laws principles thereof, as though the entire Assignment were to be fully performed within the State of Texas.

(b)    Assignor and Assignee shall hereafter execute and deliver any additional instruments reasonably required to carry out the intent and purpose of this Assignment.

1

(c)     This Assignment may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which, when so executed and delivered, shall be an original, but all such counterparts shall together constitute but one and the same instrument.

(d)     Whenever in this Assignment either of the parties hereto is referred to, such reference shall be deemed to include the heirs, executors, personal representatives, successors and assigns of such party, and all grants, covenants, promises, agreements, terms, representations, warranties, provisions and conditions which are contained in this Assignment shall bind and insure to the benefit of the respective heirs, executors, personal representatives, successors and assigns of the applicable parties hereto.

(e)     This Assignment may be amended, modified or supplemented only by an instrument in writing signed by Assignor and Assignee.

[Signature page follows]

2

**IN WITNESS WHEREOF**, Assignor and Assignee have duly executed this Assignment as of the day and year first written above.

**ASSIGNOR:**

**99 CENTS ONLY STORES LLC**, a California limited liability company


By: _____
Name:
Title:


**ASSIGNEE:**

[_], a [_]


By: _____
Name:
Title:


[end of signatures]

**EXHIBIT A**

[Attached.]

**EXHIBIT E**

**FORM OF FIRPTA CERTIFICATE**

[_____], 202[_]

      Section 1445 of the Internal Revenue Code of 1986, as amended (the "Code"), provides that a transferee of a U.S. real property interest must withhold tax if the transferor is a foreign person. For U.S. tax purposes (including Section 1445), the owner of a disregarded entity (which has legal title to a U.S. real property interest under local law) will be the transferor of the property and not the disregarded entity. To inform _____, as the transferee, that withholding of tax is not required upon the disposition of a U.S. real property interest by [SELLER ENTIT(Y)/(IES)], a [California limited liability company/Delaware corporation] ("Seller"), the undersigned hereby certifies under penalties of perjury the following on behalf of Seller:

      (a)     Seller is not a foreign corporation, foreign partnership, foreign trust or foreign estate (as those terms are defined in the Code and Treasury Regulations);

      (b)     Seller is [not] a disregarded entity as defined in Treasury Regulations Section 1.1445-2(b)(2)(iii);

      (c)     Seller's U.S. employer identification number is [_____]; and

      (d)     Seller's office address is [_____].

      Seller understands that this certification may be disclosed to the Internal Revenue Service [by and that any false statement contained herein could be punished by fine, imprisonment or both.

      Under penalties of perjury I declare that I have examined this certification and, to the best of my knowledge and belief, it is true, correct, and complete, and I further declare that I have authority to sign this document on behalf of Seller.

**Seller:**

**[SELLER ENTIT(Y)/(IES)]**,
a [California limited liability company/Delaware corporation]

By: _____
Name:
Title:

DATE: _____

168693.00002/135492369v.6

## EXHIBIT F

## FORM OF SELLER CLOSING UPDATE CERTIFICATE

Pursuant to that certain Asset Purchase Agreement dated as of [_____], 202[_] (the "Agreement") by and among **[SELLER ENTIT(Y)/(IES)]**, a [California limited liability company/Delaware corporation] ("Seller") and **[BUYER ENTITY]**, a [_] ("Buyer") and subject to and in accordance with the terms and provisions thereof, Seller hereby certifies to Buyer that, as of the date hereof, the representations and warranties made by it in Section 8.2 of the Agreement continue to be true and correct [except for the following: _____].

**Seller:**

**[SELLER ENTIT(Y)/(IES)]**,
a [California limited liability company/Delaware]

By: _____
Name:
Title:

DATE: _____

## <u>EXHIBIT G</u>

## <u>FORM OF BUYER CLOSING UPDATE CERTIFICATE</u>

      Pursuant to that certain Asset Purchase Agreement dated as of [_____], 202[_] (the "<u>Agreement</u>") by and among **[SELLER ENTIT(Y)/(IES)]**, a [California limited liability company/Delaware corporation] ("<u>Seller</u>") and **[BUYER ENTITY], [_]** ("<u>Buyer</u>") and subject to and in accordance with the terms and provisions thereof, Buyer hereby certifies to Seller that, as of the date hereof, the representations and warranties made by Buyer in <u>Section 8.1</u> of the Agreement continue to be true and correct [except for the following: _____].

      **Buyer:**

      **[BUYER ENTITY]**,
      a [California limited liability company/Delaware corporation]


      By: _____
      Name:
      Title:


      DATE: _____

168693.00002/135492369v.6

## <u>EXHIBIT H</u>

## <u>NOTICE TO LANDLORDS UNDER ASSIGNED LEASES</u>

### FORM OF NOTICE TO LANDLORD
### OF
### [_____] PREMISES

Lease dated _____ by and between _____ and _____ for the premises known as: _____, as amended by _____ (collectively, the Lease)

Dear Landlord:

In accordance with that certain Sales Order dated _____, 2024 issued by the United States Bankruptcy Court for the District of Delaware, certain assets, including the leased premises subject to the Lease, has been sold to New Tenant (as hereinafter defined). Accordingly, please be advised that the above referenced Lease has been assigned by [_____] ("Prior Tenant"), to [_____] ("New Tenant") as of _____, 2024.

Subject to the terms of the Sale Order, New Tenant has assumed all of the obligations under the Lease accruing from and after this day.

Until further notice, all correspondence and notices shall be directed shall be paid to New Tenant at the following address:

Exhibit H

Dated: _____.

**PRIOR TENANT:**                    **[_____],**

a [STATE and FORM OF ENTITY]

By: **[_____]**, a [STATE and FORM
OF ENTITY]

By:        _____

Name:

Title:

**NEW TENANT**:

Exhibit H

EXHIBIT I

FORM OF TITLE AFFIDAVIT

[Attached hereto on the following pages]

Exhibit I

168693.00002/135492369v.6

**<u>TITLE AFFIDAVIT</u>**
dated as of _____/_____/24

.

---

**Seller/Grantor/Owner:**
* ("*")
**Title Insurer:**
Chicago Title Insurance Company ("CTIC") and coinsurers (if any)
**CTIC-NY-Master #:**
24___
**Commitment #:**
_____ issued by CTIC
**Premises, each as legally described in respective Commitment:**
See SCHEDULE OF PROPERTIES

---

**Certifications:**

The undersigned hereby certifies the following to Title Insurer (as to its respective estate and/or interest in the Premises):

**Mechanics Liens:**

All labor, services or materials rendered or furnished within the last 150 days with regard to the Premises or with regard to the construction or repair of any building or improvements on the Premises have been completed and paid for in full.

**Possession:**

To the actual knowledge of the undersigned:

The undersigned's possession of the Premises has been peaceable and undisturbed; and

The undersigned's title to the Premises has never been disputed or questioned.

**Unrecorded Easements:**

To the actual knowledge of the undersigned:

There are no easements or claims of easements not shown by the public records.

**Tenants/Parties in Possession:**

There are no tenants or other parties who are in possession or have the right to be in possession of said Premises.

**Options to purchase or rights of first refusal:**

The undersigned has not granted (and has no knowledge of) any unrecorded outstanding OTP, ROFR or ROFO affecting the Premises.

Exhibit I

**Taxes/Assessments:**

All taxes, assessments, water rents and/or charges, sewer rents and/or charges, sewer hook-up charges, electricity, fire service, gas charges, common charges (i.e. condominium or association charges or dues) and other municipal charges that would constitute a lien and be currently due and payable have been (or will be) duly paid by the undersigned in the ordinary course of business.

**Pending Contracts/Agreements:**

But for the instant transaction, there are no pending contracts or agreements for the sale, disposition or finance of all or part of the Premises.

**Broker:**

The undersigned has not entered into any agreement with any real estate broker for the payment of a commission or similar fee relating to the purchase, sale or lease of the Premises.

**Covenants & Restrictions:**

To the actual knowledge of the undersigned:

The undersigned has received no written notice of past or present violations of any effective covenants, conditions or restrictions set forth in the Commitment (the "CC&Rs") which have not been cured; and

Notwithstanding:

Any charge or assessment provided for in any of the CC&Rs will be duly paid in the ordinary course of business.

**Bankruptcy:**

No proceedings in bankruptcy or receivership have been instituted by or against the undersigned (or its constituent entities) which are now pending, nor has the undersigned (or its constituent entities) made any assignment for the benefit of creditors which is in effect as to said Premises.

**Gap Indemnification:**

Between the most recent available Effective Date of the Commitment based on pre-closing continuation search(es) and the date of recording of the Insured Instrument(s) (hereinafter, the "Gap Period"), the undersigned has not taken or allowed and will not take or allow any action to encumber or otherwise affect title to the Premises.  In the event of any lien, encumbrance or other matter affecting title to the Premises in the Gap Period arising as a result of an act of the undersigned, the undersigned hereby indemnifies and holds Title Insurer harmless against any and all loss or damage sustained as a result thereof and further undertakes to take all necessary steps to discharge any such lien, encumbrance or other matter in a manner reasonably satisfactory to Title Insurer.  The undersigned makes the foregoing assertion, indemnification and undertaking to induce Title Insurer to provide so-called "Gap Coverage" in its policy / policies of title insurance.

**Further Assurances:**

The undersigned hereby undertakes and agrees to fully cooperate with Title Insurer in correcting any errors in the execution and acknowledgment of the Insured Instrument(s).

**Counterparts:**

This document may be executed in counterparts.

Exhibit I

168693.00002/135492369v.6

**Inducement and Indemnification:**

The undersigned provides this document to induce Title Insurer to insure title to said Premises well knowing that it will do so only in complete reliance upon the matters asserted hereinabove and further, will indemnify and hold Title Insurer harmless against any loss or damage sustained as a result of any inaccuracy in the matters asserted hereinabove.

SEE ANNEXED SIGNATURE PAGE(s)

Exhibit I

SIGNATURE PAGE

_____

By:      _____

        Name:   _____

        Title:    _____

_____

By:      _____, general partner / its member / manager

        By:    _____

        Name:   _____

        Title:    _____

Subscribed and sworn to on \_\_\_\_\_/\_\_\_\_\_/24

_____

Notary Public

Exhibit J

**SCHEDULE OF PROPERTIES**
SEE ANNEXED

Exhibit J

## SCHEDULE A

Property Address(es) (Owned Real Properties)

1.      Houston-Atascocita Site:  7130 FM 1960, Humble, Texas

2.      Pasadena – Fairmont Site:  4100 Fairmont Parkway, Pasadena, Texas

3.      Thousand Oaks Site:  2942 Old Thousand Oaks Dr., San Antonio Texas

168693.00002/135492369v.6

## SCHEDULE B-1

Legal Description(s) (Owned Real Properties)

Site Name:  Houston – Atascocita
Site Number:  2806
Property Address:  7130 FM 1960 Road, Humble, Texas

Being a 2.3613 acre tract of land located in the David Harris Survey, Abstract No, 26, Harris County, Texas, and being out of Block 1, of Restricted Reserve "A", Atascocita Del Norte Shopping Center according to the plat recorded in Volume 322, Page 36 of the Harris County Map Records. Said tract being more particularly described as follows:

COMMENCING at a 5/8-inch iron rod found marking the southwest corner of said Atascocita Del Norte Shopping Center and located on the northwesterly right of way of Atascocita Road (70 feet wide);

THENCE, North 02° 35' 09" East, 307.21 feet along the west line of said Atascocita Del Norte Shopping Center, leaving said northwesterly line of Atascocita Road to a 5/8-inch iron rod found marking the southwest corner and POINT OF BEGINNING of the herein described tract;

THENCE, North 02° 35' 09" East, 253.83 feet continuing along the west line of said Atascocita Del Norte Shopping Center to a 5/8-inch iron rod found for the northwest corner of the herein described tract;

THENCE, South 87° 24' 51" East, 450.00 feet leaving said west line of said Atascocita Del Norte Shopping Center to a 5/8-inch iron rod found for the northeast corner of the herein described tract;

THENCE, South 02° 35' 09" West, 221.33 feet to a 5/8-inch iron rod found for the corner;

THENCE, North 87° 24' 51" West, 349.75 feet to a point for corner; T

HENCE, South 02° 35' 09" West, 32.50 feet to a point for corner;

THENCE, North 87° 24' 51" West, 100.25 feet to the POINT OF BEGINNING.

together with all easements and rights created in that Declaration of Restrictions and Grant of Easements dated December 9, 1983, recorded under Harris County Clerk's File No. J391967, as amended by that certain Amendment No. 1 to Declaration of Restrictions and Grant of Easements dated July 26, 1985 and recorded under Harris County Clerk's File No. K157370, as further amended by Amendment No. 2 to Declaration of Restrictions and Grant of Easements dated September 18, 1992 and recorded under Harris County Clerk's File No. N879553, as further amended by that certain Amendment No. 3 to Declaration of Restrictions and Grant of Easements dated June 18, 1993 and recorded under Harris County Clerk's File No. P296473, and as further amended by that certain Amendment No. 4 to Declaration of Restrictions and Grant of Easements dated December 28, 1994, and recorded under Harris County Clerk's File No. R212367.

Schedule B-1

## SCHEDULE B-2

Site Name:  Fairmont
Site Number:  2815
Property Address:  4100 Fairmont Pkwy, Pasadena, Texas

A METES AND BOUNDS description of a 3.233 acre (154,747 square foot, square footage is based on the mathematical closure of the courses and distances shown herein) tract of land located in the H.C. Burnett Survey, Abstract No. 1065, Harris County, Texas, and being a portion of that land described in deed recorded under Harris County Clerk's File No. K-855748 and being more particularly described as follows:

COMMENCING at a point marking the most northerly cutback corner at the intersection of the south right-of-way line of Fairmont Parkway (120-foot wide) with the easterly right-of-way line of Burke Road (variable width), and described in Clerk's File No. C-115841 of the Harris County Deed Records;

THENCE, North 87°29'39" East, 135.88 feet along said south right-of-way line of Fairmont Parkway to a cut "X" In concrete set marking the northeasterly corner of a called 0.5041 acre tract of land conveyed to Bourne and Seneff Investments as recorded in Clerks File No. N-458522 of the Harris County Deed Records. Said corner also being the POINT OF BEGINNING of the herein described tract;

THENCE, North 87°29'39" East, 238.97 feet continuing along said south right-of-way line of Fairmont Parkway to a cut "X" in concrete set marking the beginning of a tangent curve to the right;

THENCE, 39.26 feet along the arc of said curve and south right-of-way line of Fairmont Parkway to the right having a radius of 108.92 feet, a central angle of 02°04'17", a long chord bearing North 88°31'48" East, 39.20 feet to a cut "X" in concrete set marking the most northeasterly corner of the herein described tract;

THENCE, South 02°30'21" East, 469.29 feet leaving said south right-of-way line of Fairmont Parkway to a 1/2-inch iron rod found marking the most southeasterly corner of the herein described tract; THENCE, South 87°29'39" West, 256.00 feet along the south line of the herein described tract and being also the north line of a called 11.8135 acre tract as conveyed to Balcor Equity Properties XII as recorded in Clerk's File No. K-741697 of the Harris County Deed Records, to a cut "X" set in concrete being the most southwesterly corner of the herein described tract and being located in the aforementioned easterly right-of-way line of Burke Road;

THENCE, North 23°21'12" West, 316.22 feet along said easterly right-of-way line of Burke Road to a cut "X" in concrete set for corner, said point also being the most southwesterly corner of the aforementioned 0.5041 acre tract;

THENCE, North 87°29'39" East, 90.32 feet leaving said easterly right-of-way line of Burke Road to a "P-K" nail set marking the most southeasterly corner of said 0.5041 acre tract and being an interior corner of the herein described tract;

Schedule B-2

THENCE, North 02°30'21" West, 174.48 feet to the POINT OF BEGINNING, CONTAINING 3.233 acres of land in Harris County, Texas.

168693.00002/135492369v.6

**SCHEDULE B-3**

Site Name:  Fairmont
Site Number:  2839
Property Address:  2942 Thousand Oaks Drive, San Antonio, Texas

Lot 4, Block 15, New City Block 13732, LEGACY OAKS BUSINESS PARK, a subdivision in the City of San Antonio, Bexar County, Texas, according to the map or plat thereof recorded in Volume 9559, Page 35, of the Deed and Plat Records of Bexar County, Texas, and as amended in Volume 9583, Page 17, of the Deed and Plat Records of Bexar County, Texas.

168693.00002/135492369v.6

## SCHEDULE C

Assigned Leases

| Seller Store # | Address | City | County | State |
|---|---|---|---|---|
| 2804 | 4980 N. Highway 6 | Houston | Harris | TX |
| 2817 | 2516 Avenue H | Rosenberg | Fort Bend | TX |
| 2831 | 1420 Loop 336 | Conroe | Montgomery | TX |
| 2840 | 3632 Frankford Rd. | Dallas | Denton | TX |
| 2843 | 10702 Easttex Freeway | Houston | Harris | TX |
| 2872 | 4849 FM 1960 W | Houston | Harris | TX |
| 2878 | 2346 W Nolana Ave | McAllen | Hidalgo | TX |
| 2879 | 401 E Camp Wisdom Rd | Duncanville | Dallas | TX |

## **SCHEDULE D**

**INTENTIONALLY DELETED.**

168693.00002/135492369v.6

## **SCHEDULE E**

INTENTIONALLY DELETED.

168693.00002/135492369v.6

**SCHEDULE F**

**ALLOCATED PURCHASE PRICE**

| Store # | Address | City | State | Allocation |
|---------|---------|------|-------|------------|
| 2806 | 7130 FM 1960 | Humble | TX | $3,600,000 |
| 2815 | 4100 Fairmont Parkway | Pasadena | TX | $3,300,000 |
| 2839 | 2942 Old Thousand Oaks Dr. | San Antonio | TX | $2,900,000 |

Allocation for Assigned Leases on Schedule C: $4,800,000

168693.00002/135492369v.6

## SCHEDULE G

## REQUIRED REMOVAL EXCEPTIONS IN TITLE

1.  **With regards to the property located at 4100 Fairmount Parkway, Pasadena, TX 77504:**

    a.  Notice of State Tax Lien recorded in Document No. 2019-344656, Official Public Records, Harris County, Texas, against 99 Cents Only Stores Texas, Inc., in the amount of $3,133.13, plus costs.

2.  **As to the Owned Property located at 7130 Farm to Market 1960 Road, Humble, TX 77346**:

    a.  Notice of State Tax Lien recorded in Document No. 2019-344656, Official Public Records, Harris County, Texas, against 99 Cents Only Stores Texas, Inc., in the amount of $3,133.13, plus costs.

    b.  Mechanic's and Materialman's Lien Claim Affidavit dated 12-14-2022, recorded in Document No. 2022-587359, Official Public Records, Harris County, Texas, executed by Factory Builder Stores, claiming a lien on the property in the amount of $4,073.45.

168693.00002/135492369v.6

## **SCHEDULE H**

## **LIST OF LEASE DOCUMENTS**

#2804 – 4980 N. Highway 6, Houston, TX

1) Master Lease dated May 7, 1979, by and between Schneider-Moore Partnership No. 2, a Texas general partnership (as Landlord) and Lucky Stores, Inc., a California corporation (as Tenant)
2) Agreement dated December 18, 1981, by and between Pheonix Mutual Life Insurance Company (as Lender) and Lucky Stores, Inc. (as Lucky)
3) Assignment and Assumption Agreement dated November 15, 1991, by and between Lucky stores, Inc. (as Assignor), H. E. Butt Grocery Company, a Texas corporation (as Assignee) and West Junction, Ltd., a Texas limited partnership (as Master Landlord)
4) First Amendment to Lease dated November 15, 1991, by and between West Junction, Ltd. (as Landlord), and H. E. Butt Grocery Company (as Tenant)
5) Short Form of Lease dated February 3, 1998, by and between West Junction, Ltd. (as Landlord) and H. E. Butt Grocery Company (as Tenant)
6) Consent of the General Partners of HEB Grocery Company, LP dated July 26, 2001
   a. Contract to Sell Real Property and Assign Leases dated March 14, 2003, between HEB Grocery Company, LP and 99 Cents Only Stores Texas, Inc.
7) Guarantee of Assignment and Assumption of Lease and Restrictive Covenant Agreement dated March 31, 2003, by and between HEB Grocery Company, LP (as Assignor) and 99 Cents Only Stores Texas, Inc. (as the Subsidiary Corporation)
8) Second Amendment to Lease dated October 1, 2009, by and between KBP Group III, LP, a Texas limited partnership (as successor in interest to Weingarten/Lufkin, Inc., a Texas corporation, the successor in interest to West Junction, Ltd., the successor in interest to Schneider-Moore Partnership No 2) (as Landlord) and 99 Cents Only Stores Texas, Inc. (as Tenant)
9) Third Amendment to Lease dated September 14, 2011, by and between KBP Group III, LP (as Landlord) and 99 Cents Only Stores Texas, Inc. (as Tenant)
10) Subordination Agreement, Acknowledgement of Lease Assignment, Attornment and Non-Disturbance Agreement dated July 8, 2016, by and between 6 Keith Harrow LLC, a Texas limited liability company (as Landlord), as successor-in-interest to KBP Group III, LLC, 99 Cents Only Stores Texas, Inc. (as Tenant) and Wells Fargo Bank, N.A. (as Lender)

#2817 – 2516 Avenue H, Rosenberg, TX

1) Lease Contract dated July 29, 2003, by and between Rosenberg, Ltd., a Texas limited partnership (as Landlord) and 99 Cents Only Stores Texas, Inc. (as Tenant)
2) Guaranty of Lease dated July 29, 2003, by and between 99¢ Only Stores, a California corporation (the Parent Corporation) and Rosenberg, Ltd. (as Landlord)
3) Memorandum of Lease dated August 20, 2003, by and between Rosenberg, Ltd. (as Landlord) and 99 Cents Only Stores Texas, Inc. (as Tenant)
4) Rent Commencement Letter dated January 26, 2004, by and between Rosenberg, Ltd. (as Landlord) and 99 Cents Only Stores Texas, Inc. (as Tenant)
5) First Amendment to Lease by and between Rosenberg Plaza Associates, L.P., successor to Rosenberg, Ltd. (as Landlord) and 99 Cents Only Stores Texas, Inc. (as Tenant)
6) Second Amendment to Lease Contract dated December 1, 2009, by and between Rosenberg Plaza Associates, L.P. (as Landlord) and 99 Cents Only Stores Texas, Inc. (as Tenant)
7) Third Amendment to Lease Contract dated October 21, 2014, by and between Rosenberg Plaza Associates, L.P. (as Landlord) and 99 Cents Only Stores Texas, Inc. (as Tenant)

168693.00002/135492369v.6

#2831 – 1420 Loop 336, Conroe, TX

1) Lease Contract dated March 16, 2004, by and between Weingarten Realty Investors, a Texas limited partnership (as Landlord) and 99 Cents Only Stores Texas, Inc. (as Tenant)
   a. Addendum to Lease dated March 16, 2004, by and between Weingarten Realty Investors (as Landlord) and 99 Cents Only Stores Texas, Inc. (as Tenant)
2) Guaranty of Lease dated March 16, 2004, by and between 99¢ Only Stores, a California corporation (as Parent Corporation) and Weingarten Realty Investors (as Landlord)
3) Renewal Letter dated September 25, 2009, by and between Weingarten Realty Investors (as Landlord) and 99 Cents Only Stores Texas, Inc. (as Tenant)
4) First Amendment to Lease dated August 10, 2006, by and between Weingarten Realty Investors (as Landlord) and 99 Cents Only Stores Texas, Inc. (as Tenant)
5) Second Amendment to Lease dated October 10, 2022, by and between American National Insurance Company, a Texas corporation, successor to Weingarten Realty Investors (as Landlord) and 99 Cents Only Stores Texas, Inc. (as Tenant)

#2840 – 3632 Frankford Rd., Suite 100, Dallas, TX

1) Lease dated June 24, 2004, by and between Frankford Dallas, LLC, a Texas limited liability company (as Landlord) and 99 Cents Only Stores Texas, Inc. (as Tenant)
2) First Amendment to Lease dated August 15, 2006, by and between Frankford Dallas, LLC (as Landlord) and 99 Cents Only Stores Texas, Inc. (as Tenant)
3) Letter Agreement – Modification to Common Area dated July 10, 2010, by and between MAF Shopping Center Associates, LLC, successor to Frankford Dallas, LLC (as Landlord) and JPMorgan Chase Bank National Association (as Licensee)
4) Second Amendment to Lease dated September 1, 2011, by and between MAF Shopping Center Associates, LLC (as Landlord) and 99 Cents Only Stores Texas, Inc. (as Tenant)
5) Third Amendment to Lease dated August 16, 2016, by and between MAF Shopping Center Associates, LLC (as Landlord) and 99 Cents Only Stores Texas, Inc. (as Tenant)

#2843 – 10702 Easttex Freeway, Houston, TX

1) Lease dated August 1, 2006, by and between Northeast Marketplace, Ltd., a Texas limited partnership (as Landlord) and 99 Cents Only Stores Texas, Inc.
2) Subordination, Attornment and Non-Disturbance Agreement dated August 1, 2006, by and between Northeast Marketplace, Ltd. (as Landlord), 99 Cents Only Stores Texas, Inc. (as Tenant) and Amegy Bank of Texas, N.A. (as Bank)

#2872 – 4849 FM 1960 West, Houston, TX

1) Lease Contract dated September 28, 2011, by and between WRI-AEW Lone Star Retail Portfolio, LLC, a Delaware limited liability company (as Landlord) and 99 Cents Only Stores Texas, Inc. (as Tenant)
2) Guaranty of Lease dated September 28, 2011, by and between 99¢ Only Stores (as Parent Corporation) and WRI-AEW Lone Star Retail Portfolio (as Landlord)
3) Memorandum of Lease dated September 28, 2011, by and between WRI-AEW Lone Star Retail Portfolio, LLC (as Landlord) and 99 Cents Only Stores Texas, Inc. (as Tenant)
4) Consent Letter dated December 21, 2017, by and between WRI-AEW Lone Star Retail Portfolio, LLC (as Landlord) and 99 Cents Only Stores Texas, Inc. (as Tenant)

#2878 – 2346 W Nolana Ave., McAllen, TX

Schedule H

1) Lease dated June 6, 2013, by and between Nolana St, LLC, a Texas limited liability company (as Landlord) and 99 Cents Only Stores Texas, Inc. (as Tenant)
2) Memorandum of Lease dated June 6, 2013, by and between Nolana St, LLC (as Landlord) and 99 Cents Only Stores Texas, Inc. (as Tenant)
3) Confirmation Agreement dated November 19, 2013, by and between 99 Cents Only Stores Texas, Inc. (as Tenant) and Nolana St, LLC (as Landlord)
4) Subordination, Attornment and Nondisturbance Agreement dated June 6, 2013, by and between 99 Cents Only Stores Texas, Inc. (as Tenant) and Lone Star National Bank, N.A. (as Lender)
5) Acknowledgement of Commencement dated November 27, 2013, by and between Nolana St, LLC (as Landlord) and 99 Cents Only Stores Texas, Inc. (as Tenant)
6) Letter Agreement dated April 24, 2020, by and between Nolana St, LLC (as Landlord) and 99 Cents Only Stores Texas, Inc. (as Tenant)

#2879 – 401 E Camp Wisdom Road, Duncanville, TX

1) Lease dated September 19, 2013, by and between B.H. Industrial LLC, a California limited liability company (as Landlord) and 99 Cents Only Stores Texas, Inc. (as Tenant)
2) Letter Agreement dated July 23, 2015, by and between B.H. Industrial LLC (as Landlord) and 99 Cents Only Stores Texas, Inc. (as Tenant)

Schedule H

# SCHEDULE I

FORM OF SALE ORDER

[ATTACHED HERETO ON THE FOLLOWING PAGES]

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| NUMBER HOLDINGS, INC., *et al*., | Case No. 24-10719 (JKS) |
| Debtors. [1] | (Jointly Administered) |
| | **Related Docket No. 171, ___** |

**ORDER (A) APPROVING THE SALE OF CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS; (B) AUTHORIZING THE DEBTORS TO ASSUME, ASSIGN AND SELL CERTAIN NON-RESIDENTIAL REAL PROPERTY LEASES; AND (C) GRANTING RELATED RELIEF**

Upon the motion [Docket No. 171] (the "Motion") of the above-captioned debtors and debtors in possession (the "Debtors") pursuant to sections 105(a), 363, 365, 503, 507, 1107, and 1108 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002 and 6004 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 2002-1 and 6004-1 of the Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules") for entry of an order approving (I)(A) Bidding Procedures in connection with the Sale of substantially all of the Debtors' remaining assets, (B) assumption and assignment procedures, (C) form and manner of notice of Sale Hearing, assumption procedures, and Auction results; (II) Auction and Sale Hearing dates; (III)(A) Debtors' entry into one or multiple asset purchase agreements, (B) Sale(s) free and clear of all encumbrances, and (C) assumption and assignment of certain executory contracts and unexpired leases; and (IV) granting related relief, all as contemplated in the Order Approving (I)(A) Bidding

---

[1]   The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: (i) Number Holdings, Inc. (1463); (ii) 99 Cents Only Stores LLC (1605); (iii) 99 Cents Only Stores Texas, Inc. (1229); (iv) 99 Cents PropCo LLC (7843); (v) 99 Cents HoldCo LLC (3987); and (vi) Bargain Wholesale LLC (8030). The Debtors' principal offices are located at 1730 Flight Way, Suite 100, Tustin, CA 92782.

Procedures in Connection With the Sale of Substantially All of the Debtors' Remaining Assets, (B) Assumption and Assignment Procedures, (C) Form and Manner of Notice of Sale Hearing, Assumption Procedures, and Auction Results; (II) Auction and Sale Hearing Dates; (III)(A) Debtors' Entry Into One or Multiple Asset Purchase Agreements, (B) Sale(s) Free and Clear of All Encumbrances, and (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief [Docket No. 463] (as may be amended, supplemented or modified) (the "Bid Procedures Order"), entered by this Court on May 9, 2024, and the [*Order (I) Authorizing the Debtors To Enter Into the Stalking Horse APA, (II) Approving the Related Bid Protections; and (III) Granting Related Relief*] [Docket No. ●] (the "Stalking Horse Approval Order")[2] entered by this Court on May ●, 2024; [and the Auction having taken place on [DATE], in accordance with the Bid Procedures Order and the Stalking Horse Approval Order; and Ollie's Bargain Outlet, Inc. and OBO Ventures, Inc. having been chosen as the Successful Bidder (collectively, the "Successful Bidder" or the "Buyer") for the Property;[3] and the Debtors party to the APA (as defined below) (the "Sellers") having agreed to enter into and consummate the Asset Purchase Agreement attached hereto as **Exhibit A** with the Buyer (the "APA"); and the Debtors having filed a notice of successful bidder on [●] with respect to the Assets [Docket No. ●] (the "Sale Notice"); and the hearing to approve the sale (the "Sale" or "Sale Transaction") pursuant to the APA (the "Sale Approval Hearing") having been held on [●] in accordance with the Bid Procedures Order; and this Court having found that proper and adequate notice of the Motion and the relief requested therein has been provided in accordance with the Bid Procedures Order, the Stalking Horse Approval Order, the Bankruptcy Rules, and the

---

[2]   Capitalized terms used but not defined herein shall have the meaning ascribed to them in the Bid Procedures Order and, as applicable, the Stalking Horse Approval Order.

[3]   As used herein, Property shall have the meaning ascribed to it in the APA.

Local Rules, and that, except as otherwise ordered herein, no other further notice is necessary; and upon the record at the Sale Approval Hearing and all of the proceedings before this Court; and this Court having reviewed any objections asserted at the Sale Approval Hearing and having found and determined that the relief sought at the Sale Approval Hearing, and entry of this Order, is in the best interests of the Sellers, the Sellers' estates, their creditors, and all other parties in interest; therefore, after due deliberation thereon and sufficient cause appearing that entry of this Order is necessary and appropriate, and notice having been given as necessary, this Court makes the following Findings of Fact and Conclusions of Law:

## <u>FINDINGS OF FACT AND CONCLUSIONS OF LAW</u>

A.      **Findings and Conclusions:** The findings and conclusions set forth herein and in the record of the Sale Approval Hearing are based upon the evidentiary record before the Court and constitute this Court's findings of fact and  conclusions of law under Rule 52 of the Federal Rules of Civil Procedure, as made applicable herein by Bankruptcy Rules 7052 and 9014.  To the extent any of the following conclusions of law constitute findings of fact, or *vice versa*, they are adopted as such.

B.      **Jurisdiction, Venue and Core Proceeding:** This Court has jurisdiction over these chapter 11 cases pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* from the United States District Court for the District of Delaware, dated as  of February 29, 2012.  The matters covered by this Order are core proceedings under 28 U.S.C. § 157(b)(2). Venue is proper in this district and before this Court pursuant to 28 U.S.C. §§ 1408 and 1409. Venue in this district and before this Court was proper as of the Petition Date and continues to be proper.  This Court may enter a final order with respect to the Motion, the Sale, the Sale

Transaction, and all related relief, in each case, consistent with Article III of the United States Constitution.

C.     **Statutory Predicates.**  The statutory predicates for the relief sought in the Motion are sections 105(a), 363, 365, 503, 507, 1107 and 1108 of the Bankruptcy Code, Rules 2002, 6004, 6006, 9008, and 9014 of the Bankruptcy Rules and Rules 2002-1 and 6004-1 of the Local Rules. The consummation of the Sale Transaction contemplated by the Motion, the APA, and this Order, and the assumption and assignment or transfer, as applicable, of the Assigned Leases (as defined in the APA) are legal, valid, and properly authorized under  the cited provisions of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules, and all of the applicable requirements of such sections and rules have  been complied with in respect of such transactions.

D.     **Sufficiency of Notice.**  As evidenced by the affidavits of service filed with this Court, proper, timely, adequate, and sufficient notice of the Motion, the Stalking Horse Supplement, the hearing to consider approval of the Bidding Procedures (the "Bid Procedures Hearing"), the Bid Procedures, the Stalking Horse Supplement, the Stalking Horse Approval Order, the Assumption and Assignment Procedures, the proposed assumption and assignment of the Assigned Leases, the Auction, the Sale Approval Hearing, the Sale, the Sale Transaction, and all transactions contemplated therein or in connection therewith, and all deadlines related thereto, was given under the particular circumstances and no further notice need be provided.

E.     **Actual Notice.**  Actual written notice of the Motion, the Bid Procedures Hearing, the Bidding Procedures, the Stalking Horse Supplement, the Stalking Horse Approval Order, the proposed assumption and assignment of Assigned Leases, the Auction, the Sale Approval Hearing, the Sale, the Sale Transaction and all transactions contemplated therein or in connection therewith, and all deadlines related thereto has been given to  all interested persons and entities, including,

without limitation: (i) the DIP Agent, the DIP Lender, the FILO Agent, the ABL Facility Agent, Wilmington Trust, National Association, as Trustee and Notes Collateral Agent pursuant to 2026 Notes Indenture, the *Ad Hoc* Group of 2026 Noteholders, and RCB Equities #1, LLC, as lender pursuant to the Propco Promissory Note, (collectively, the "<u>Secured Parties</u>"), and each of their counsel; (ii) counsel to the Official Committee of Unsecured Creditors (the "<u>Committee</u>"); (iii) the Office of The United States Trustee; (iv) the counterparty to each unexpired lease and executory contract to be assumed and assigned or transferred, as applicable, pursuant to this Order, and each of their counsel (if known); (v) all persons known or reasonably believed to have asserted an interest in the Property; (vi) the Attorney General in the State of Texas where the Property is located; (vii) all federal, state, and local taxing authorities in the State of Texas where the Property is located; (viii) all parties who have asserted or could assert liens against the Property; (ix) all parties who have performed work or services at the respective locations of the Property within the past six months; (x) all parties included on the Debtors' consolidated creditor matrix; and (xi) any other party that has filed a request for notices with this Court (collectively, the "<u>Notice Parties</u>").

      F.    **Extensive Efforts by Debtors.** The Sellers have worked with their counsel, their professional advisors, and other advisors, as well as, as applicable, the Consultation Parties, to implement a viable Sale Transaction that would allow them to maximize the value of the Property. The Sale Transaction for the Property that is the subject of this Order is the result of the Sellers' extensive efforts in seeking to maximize recoveries to the Debtors' estates, for the benefit of all of the Debtors' creditors.

      G.    **Business Justification.** The Sellers have demonstrated good, sufficient, and sound business purposes and justifications for, and compelling circumstances to promptly consummate, the Sale Transaction contemplated by the APA and related documents, including, without

limitation, the assumption, assignment, and/or transfer of the Assigned Leases pursuant to sections 105, 363, and 365 of the Bankruptcy Code, prior to and outside of a plan of reorganization, and such action is an appropriate exercise of the Sellers' business judgment and in the best interests of the Sellers, their estates, and their creditors.  Such business reasons include, but are not limited to, the fact that: (i) there is substantial risk of depreciation of the value of the Property if the Sale is not consummated promptly; (ii) the Sale Transaction contemplated by the APA presents the best opportunity to maximize the value of the Property; and (iii) unless the Sale is concluded expeditiously as provided for in this Order and pursuant to the APA, potential creditor recoveries may be substantially diminished.

H.    **Bid Procedures Order.** On May __, 2024, this Court entered the Bid Procedures Order approving, among other things, Bid Procedures for the sale  of substantially all or portions of the Debtors' Assets and the procedures for the assumption and assignment or transfer of any executory contract and unexpired leases of non-residential real property.  The Bid Procedures provided a full, fair, and reasonable opportunity for any entity to make an offer to purchase the Debtors' Assets, and a full, fair, and reasonable opportunity for any counterparty to any unexpired lease or executory contract to object to any proposed Cure Payment, assumption and assignment or transfer of its applicable unexpired lease or executory contract, and the Buyer's adequate assurance of future performance.  The Debtors and the Buyer have complied with the Bid Procedures Order and the Bid Procedures in all respects.

I.    **Stalking Horse Approval Order.**  On May __, 2024, this Court entered the Stalking Horse Approval Order approving, among other things, the Buyer as the Stalking Horse Bidder and the Bid Protections (as defined therein).  The Debtors and the Buyer have complied with the Stalking Horse Approval Order in all respects.

J.      **Adequate Marketing; Highest or Best Offer.** As demonstrated by (i) the testimony and other evidence proffered or adduced at the Sale Approval Hearing, and (ii) the representations of counsel made on the record at the Sale Approval Hearing, (a) the Sellers have adequately marketed the Property and conducted the Sale process in compliance with the Bid Procedures Order in good faith and in a fair and open manner; (b) the Sale Process and the Bid Procedures were non-collusive, duly noticed, and provided a full, fair, reasonable, and adequate opportunity for any interested party to conduct due diligence and make an offer to purchase the Property, and submit higher and better offers for the Property than the Buyer's Successful Bid; (c) the consideration provided by the Buyer in the APA constitutes the highest and best offer for the Property; (d) the consideration is fair and reasonable consideration for the Property and constitutes reasonably equivalent value under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, or the District of Columbia; (e) the Sale will provide a greater recovery to the Sellers' creditors and estates with respect to the Property than would be provided by any other available alternative; (f) taking into consideration all relevant factors and circumstances, no other entity has offered to purchase the Property for greater economic value to the Sellers or their estates than the Buyer; and (g) the Sellers' determination that the APA constitutes the highest or best offer  for the Property, maximizes value for the Debtors' estates, and constitutes a valid and sound exercise of the Sellers' business judgment.  There is no legal or equitable reason to delay Closing of the Sale Transaction contemplated by the APA.

K.      **Opportunity to Object.**  A reasonable opportunity to object or be heard with respect to the Motion, and all relief requested therein has been afforded to all interested parties.

L.      **Property of the Estate.**  The Property is property of the Sellers' estates and title thereto is vested in the Sellers' estates.

999998.02553/135556393v.1

M.    **Sale in Best Interests.**  The actions to be taken by the Sellers and the Buyer are appropriate under the circumstances of these Chapter 11 Cases and are in the best interests of the Sellers, their estates, their creditors, and other parties in interest.  Approval of the APA and the Sale Transaction set forth therein, and all related transactions at this time is in the best interests of the Sellers, their creditors, their estates, and all other parties in interest.

N.    **Arm's-Length Sale.**  The APA, the Sale, the Sale Transaction, and any transactions contemplated therein and associated therewith were negotiated, proposed, and entered into by the Sellers and the Buyer without collusion, in good faith, and from arm's-length bargaining positions.  Neither the Sellers, their insiders and affiliates, the Secured Parties, and their affiliates, nor the Buyer have engaged in any conduct that would cause or permit the APA, the Sale, or any part of the Sale Transaction to be avoided under section 363(n) of the Bankruptcy Code.

O.    **Good Faith Buyer.**  The Buyer has proceeded in good faith in all respects, is a good faith buyer under section 363(m) of the Bankruptcy Code and, as such, is entitled to all of the protections afforded thereby, including in the event this Order or any portion thereof is reversed or modified on appeal.  In particular, (i) Buyer recognized that the Sellers were free to deal with any other party interested in purchasing the Property; (ii) Buyer in no way induced or caused the chapter 11 filings by the Sellers or other Debtors; (iii) Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (iv) no common identity of directors, managers, officers, or controlling stockholders exist between Buyer, on the one hand, and any of the Sellers or other Debtors, on the other hand; (v) Buyer complied with the Bid Procedures and all provisions of the Bid Procedures Order; and (vi) all payments to be made by Buyer in connection with the Sale Transaction have been disclosed.

8

P.    **Corporate Authority.** The Sellers (i) have full corporate power and authority to execute the APA and all other documents contemplated thereby, and the Sale Transaction and Sale of the Property have been duly and validly authorized by all necessary corporate action of the Sellers, (ii) have all of the corporate power and authority necessary to consummate the transactions contemplated by the APA, (iii) have taken all corporate action necessary to authorize and approve the APA and the consummation by the Sellers of the transactions contemplated thereby, and (iv) need no consents or approvals, other than those expressly provided for in the APA, subject to the waiver of such consents or approvals to the extent provided in the APA and as may be permitted under applicable law.

Q.    **Free and Clear Findings Required by the Buyer.**  The Buyer would not have entered into the APA and would not consummate the Sale if the Sale of the Property to the Buyer were not, pursuant to section 363(f) of the Bankruptcy Code, free and clear of all Encumbrances subject to the terms hereof.[4]   A sale of the Property other than one free and clear of all

---

[4]    As used herein, "Encumbrance" and "Encumbrances" include all of the following, in each case, to the extent against or with respect to the Debtors, or in, on, or against, or with respect to any of the Property: liens (including as defined in section 101(37) of the Bankruptcy Code, and whether consensual, statutory, possessory, judicial, or otherwise), claims (as defined in section 101(5) of the Bankruptcy Code) ("Claims"), debts (as defined in section 101(12) of the Bankruptcy Code), encumbrances, obligations, liabilities, demands, guarantees, actions, suits, defenses, deposits, credits, allowances, options, rights, restrictions, limitations, contractual commitments, mechanics liens, materialmen's liens or interests of any kind or nature whatsoever, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to, on, or subsequent to, the commencement of these Chapter 11 Cases, and in each case, whether imposed by agreement, understanding, law, equity, or otherwise, including, but not limited to: (i) mortgages, security deeds, deeds of trust, pledges, charges, security interests, levies, hypothecations, encumbrances, easements, servitudes, leases, subleases, licenses, rights-of-way, encroachments, restrictive covenants, restrictions on transferability, voting, sale, transfer or other similar restrictions, rights of setoff (except for setoffs validly exercised before the Petition Date, or preserved in a timely filed proof of claim or motion filed with the Court), rights of use or possession, conditional sale arrangements, deferred purchase price obligations, profit sharing interest, or any similar rights; (ii) all Claims, including, without limitation, all rights or causes of action (whether in law or equity), proceedings, warranties, guarantees, indemnities, rights of recovery, setoff (except for setoffs validly exercised before the Petition Date, or preserved in a timely filed proof of claim or motion filed with the Court), indemnity or contribution, obligations, demands, restrictions, indemnification claims, or liabilities relating to any act or omission of the Debtors or any other Person, consent rights, options, contract rights, damages arising from the rejection of a contract with the Debtors, covenants, and interests of any kind or nature whatsoever (known or

9

Encumbrances would yield substantially less value for the Sellers' estates, with less certainty, than the Sale as contemplated. Therefore, the Sale contemplated by the APA free and clear of all Encumbrances subject to the terms hereof is in the best interests of the Sellers, their estates, their creditors, and all other parties in interest.

R.     **Assumption and Assignment of Unexpired Leases and Executory Contracts.**

Pursuant to sections 363 and 365 of the Bankruptcy Code, the Debtors are authorized to assume all Assigned Leases[5] and assign such Assigned Leases to the Buyer or transfer such Assigned Leases to the Buyer, as applicable. To the extent a Cure Amount is owed to the counterparty of

---

unknown, matured or unmatured, accrued, or contingent and regardless of whether currently exercisable), whether arising prior to or subsequent to the commencement of these Chapter 11 Cases, and whether imposed by agreement, understanding, law, equity, or otherwise; (iii) all debts, liabilities, obligations, contractual rights and claims, including labor, employment, and pension claims; (iv) any rights that purport to give any party a right or option to effect any forfeiture, modification, right of first offer or first refusal, or consents, or termination of the Debtors' or the Successful Bidder(s)' interest in the Property, or any similar rights; (v) any rights under labor or employment agreements; (vi) any rights under pension, multiemployer plan (as such term is defined in section 3(37) or section 4001(a)(3) of the Employment Retirement Income Security Act of 1974 (as amended, "ERISA")), health or welfare, compensation or other employee benefit plans, agreements, practices, and programs, including, without limitation, any pension plans of the Debtors or any multiemployer plan to which the Debtors have at any time contributed to or had any liability or potential liability; (vii) any other employee claims related to worker's compensation, occupation disease, or unemployment or temporary disability, including, without limitation, claims that might otherwise arise under or pursuant to (a) ERISA, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Age Discrimination and Employment Act of 1967 and the Age Discrimination in Employment Act, each as amended, (g) the Americans with Disabilities Act of 1990, (h) the Consolidated Omnibus Budget Reconciliation Act of 1985, as amended, including, without limitation, the requirements of Part 6 of Subtitle B of Title I of ERISA and Section 4980B of the Internal Revenue Code of any similar state law, (i) state discrimination laws, (j) state unemployment compensation laws or any other similar state laws, (k) any other state or federal benefits or claims relating to any employment with the Debtors or any of their predecessors, or (l) the WARN Act (29 U.S.C. §§ 2101, et seq.) or any state or other laws of similar effect; (viii) any bulk sales or similar law; (ix) any tax statutes or ordinances or other laws of similar effect, including, without limitation, the Internal Revenue Code of 1986, as amended, and any taxes arising under or out of, in connection with, or in any way relating to the operation of the Property before the closing of a Sale; (x) any unexpired and executory contract or unexpired lease to which the Debtors are a party that is not an Assigned Lease; (xi) any other excluded liabilities under the Purchase Agreement; and (xii) Encumbrances arising under or in connection with any acts, or failures to act, of the Debtors or any of their predecessors, affiliates, or subsidiaries, including, but not limited to, Encumbrances arising under any doctrines of successor liability (to the greatest extent permitted by applicable law), or transferee or vicarious liability, violation of the Securities Act, the Exchange Act, or other applicable securities laws or regulations, breach of fiduciary duty, or aiding or abetting breach of fiduciary duty, or any similar theories under applicable law or otherwise.

5     Notwithstanding the name of the Debtors listed on any Assigned Lease, the Assigned Leases identified in the APA are deemed assumed and assigned or transferred, as applicable, by the applicable Debtors party to the APA.

any Assigned Lease (the "Contract Counterparty"), the applicable Cure Amount will be paid by the Buyer in accordance with this Order and the APA, subject to the Cure Amount Cap (as defined in the APA) and to the extent the Cure Amount is excess of the Cure Amount Cap, Buyer shall deduct such amount from the Base Purchase Price (as defined in the APA).  There are no outstanding defaults by the Debtors, offsets or Encumbrances on the Property covered by an Assigned Lease except as will be cured by the payment by Buyer in accordance with this Order and the APA, subject to the Cure Amount Cap (as defined in the APA).  The Buyer has provided adequate assurance of future performance to any Contract Counterparty as required by section 365(b)(1)(C), 365(f)(2)(B) and 365(b)(3) of the Bankruptcy Code.  Each of the Assigned Leases are in full force and effect and have not been further modified or amended, and the Sellers have validly exercised all rights to option terms under the Assigned Leases with respect to which the time for exercise has passed.  Buyer's Intended Use (as defined in the APA) of the Property as it relates to the Assigned Leases will not breach any of the provisions of the Assigned Leases or, if the applicable Assigned Lease is within a shopping center, Buyer's Intended Use will not breach any other lease in such shopping center, and the Sellers' assignment of the Assigned Leases to Buyer will not violate any radius clauses contained in any of the Assigned Leases.  Buyer's placement of its signs on the Property (in similar sizes, colors and names utilized by Buyer in its other stores) covered by the Assigned Leases in substantially the same location as those of the Sellers, and in such form and manner which is in accordance with applicable law, will not breach any of the provisions of the Assigned Leases.  None of the provisions of the Assigned Leases that purport to prohibit, restrict or condition the Sellers' assignment of the Assigned Leases shall have any force or effect with respect to the assignment authorized by this Order, and no Contract Counterparties shall have any right to cancel the Assigned Leases or increase the rent or impose

999998.02553/135556393v.1

any penalty by reason of such assignment.  The stores at the Property covered by an Assigned Lease may "go dark" until the later of [●], or one hundred eighty (180) days after the Closing Date of the assignment of the Assigned Lease ("Go Dark Period").  To the extent required under the APA, any "going dark" or continuous operating restrictions and/or other related restrictions in the Lease are unenforceable anti-assignment clauses under Sections 365(f)(1) and (3) of the Bankruptcy Code.  Any portions of the Assigned Lease which permit the Contract Counterparty to cancel the remaining terms of the Assigned Lease if the Sellers discontinue the operation of the stores are invalid *ipso facto* clauses under Section 365(e) of the Bankruptcy Code, and such Contract Counterparty shall not have the right to cancel the Assigned Lease or increase the rent or impose any penalty by reason of such discontinuation due to the Sellers' cessation of operations, the assignment of the Assigned Lease to Buyer or the interruption of business activities at the Property in order to enable Buyer to perform remodeling work.  Nothing contained herein shall constitute a limitation on Buyer's ability to go dark beyond [●], or one hundred eighty (180) days after the Closing Date of the assignment of the Lease to the extent the Lease does not contain a going dark or continuous operating clause.  Buyer's performance and completion of remodeling work shall not constitute a default under the provisions of any Assigned Lease nor give the Contract Counterparty the right to cancel the remaining terms of the Assigned Lease.  The performance and completion by Buyer of alterations to the Property to adapt and equip such Property for use and occupancy by Buyer, and if performed in accordance with the Assigned Lease and applicable building and zoning codes and regulations, consistent with the parties' respective obligations under the Assigned Leases, will neither breach any of the provisions of the Assigned Leases nor give the Contract Counterparties the right to cancel the remaining terms of the Assigned Leases.  In accordance with the Bidding Procedures and the terms of this Order, following the

999998.02553/135556393v.1

Closing, Buyer shall be fully and irrevocably vested with all of the Sellers' right, title and interest in and under the Assigned Leases in connection with the Property, free and clear of any Encumbrances, and each Assigned Lease shall be fully enforceable by Buyer in accordance with its respective terms and conditions. Following assignment or transfer of the Assigned Leases to Buyer, the Sellers shall be relieved from any further liability with respect to such Assigned Leases.

S.      **No Pre-Closing Liability for Assigned Leases.**   The Assigned Leases being assigned to Buyer are an integral part of the Sale Transaction and, accordingly, their assumption and assignment or transfer, as applicable, is reasonable and an enhancement to the value of the Debtors' estates.  To the extent any Assigned Lease is not an executory contract within the meaning of section 365 of the Bankruptcy Code, it shall be transferred to Buyer in accordance with the terms of the APA and  Buyer shall have no liability or obligation for any (i) defaults or breaches under such agreement that relate to acts or omissions that occurred in the period, or otherwise arose, prior to the Closing Date and (ii) claims, counterclaims, offsets, or defenses (whether contractual or otherwise, including, any right of recoupment) with respect to such Assigned Lease, that relate to any acts or omissions that arose or occurred prior to the Closing Date. For the avoidance of doubt, the Seller is not liable under any of the Assigned Leases for any Cure Amounts and the Debtors and their estates shall be released, pursuant to section 365(k) of the Bankruptcy Code, from any liability under the Assigned Leases occurring after such assignment.

T.      **Binding and Valid Transfer.**   The transfer of the Property to the Buyer will be a legal, valid, and effective sale and transfer of the Property and will vest the Buyer with all right, title, and interest of the Sellers to the Property free and clear of all Encumbrances, and any liabilities of the Sellers, except as otherwise expressly set forth in the APA or in this Order.  All liens, including any liens granted by any order approving debtor-in-possession financing, and any

13

liens granted in favor of any Secured Party, as applicable shall be released solely as against the Property upon receipt by the Sellers of the Purchase Price, which amount once paid shall be indefeasible and not subject to disgorgement for any reason.  For avoidance of doubt, all liens, including without limitation, any liens of the Secured Parties, shall attach to the proceeds (both cash and non-cash) attributable to the Property pursuant to the Sale (if any).

U.    **Satisfaction of Standards of Section 363(f).**  The Sellers may sell the Property free and clear of all Encumbrances of any kind or nature whatsoever, because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied. Those holders of Encumbrances who did not object,  or  who withdrew their objections, to the Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code. Holders of Encumbrances on the Property are adequately protected by having their Encumbrances attach to the proceeds (both cash and non-cash) of the Sale of the Property attributable to such Encumbrances, subject to the terms of such Encumbrances, with the same validity, force, and effect, and in the same order of priority, that such Encumbrances had against the Property immediately prior to Closing, subject to any claims and defenses that Sellers or the Debtors may possess with respect thereto.

V.    **Consideration for Transfer of Property Free and Clear**.  Buyer would not have entered into the APA if the transfer of the Property were not free and clear of all Encumbrances as set forth in the APA and this Order, or if in the future Buyer would or could be liable for any such Encumbrances.  The total consideration to be provided under the APA reflects Buyer's reliance on this Order to provide, pursuant to sections 105(a) and 363(f) of the Bankruptcy Code, that, upon the Closing, Buyer has title to, interest in and possession of the Property free and clear of all Encumbrances subject to the terms hereof.

W.    **No *Sub Rosa* Plan**.  The Sale, Sale Transaction, the APA, and the other transactions contemplated thereby neither impermissibly restructure the rights of the Sellers' creditors nor impermissibly dictate a liquidating chapter 11 plan for the Sellers, and therefore do not constitute a *sub rosa* chapter 11 plan.

X.    **Assets Assignable**.  To the maximum extent possible under the Bankruptcy Code, each and every provision of the documents governing the Property or applicable non-bankruptcy law that purports to prohibit, restrict, or condition, or could be construed as prohibiting, restricting, or conditioning assignment of any of the Property, if any, has been or will be satisfied or is otherwise unenforceable under section 365 of the Bankruptcy Code.

Y.    **Necessity of Order.**  The Buyer would not have entered into the APA and would not consummate the Sale Transaction contemplated therein without all of the relief provided for in this  Order (including, but not limited to, that the sale and transfer of the Assets to Buyer be free and clear  of all Encumbrances).  The Sellers have demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the transactions contemplated by the APA, including, without limitation the Sale Transaction and the assumption and assignment of the applicable Assigned Leases prior to, and outside of, a chapter 11 plan because, among other things, the Debtors' estates will suffer irreparable harm if the relief requested is not granted.  The consummation of the Sale Transaction pursuant to this Order and the APA is necessary for the Sellers to (i) comply with the terms of the Final DIP Order, including the milestones set forth therein, and (ii) maximize the value of their estates for the benefit of all creditors.

Z.    **Final Order.** This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  The Court expressly finds the time is of the essence in consummating the

transactions contemplated by the APA, and accordingly, cause exists to waive the stays contemplated in Bankruptcy Rules 6004(h) and 6006(d), and to immediately implement this Order and expressly directs entry of judgment as set forth herein.

AA.    **Best Interests.** Entry of this Order is in the best interests of the Sellers, the Sellers' estates, their creditors, and all other parties in interest.

## ORDER

Based on the foregoing Findings of Fact and Conclusions of Law, it is hereby **ORDERED, ADJUDGED, AND DECREED** as follows:

1.    **Findings of Fact and Conclusions of Law.**    The above-referenced findings of fact and conclusions of law are hereby incorporated by reference as though fully set forth herein and shall constitute findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable herein by Bankruptcy Rule 9014.  To the extent that any finding of fact shall be determined to be a conclusion of law, it shall be deemed so, and *vice versa*.

2.    **Motion Granted.**  The Motion is granted with respect to the Sale Transaction contemplated by the APA, and the relief requested therein with respect to the Sale is granted and approved in its entirety, as set forth herein.

3.    **Objections Are Overruled.**  Except for any objections to adequate assurance of future performance by any Contract Counterparty that are contemplated to be heard at a subsequent hearing in accordance with the Bidding Procedures, all objections, reservations of rights regarding, or other responses to the Motion with respect to the Sale Transaction for the Property being approved pursuant to this Order, or the relief requested therein, the APA, all other ancillary agreements, the Sale Transaction, the entry of this Order or to the relief granted herein that have not been withdrawn, waived, settled, or not otherwise resolved pursuant to the terms hereof, if any,

16

hereby are denied and overruled on the merits with prejudice. All persons and entities that failed to timely object to the Motion are deemed to have consented to the relief granted herein for all purposes.

4. **Approval.** The APA (as modified herein or as may be modified subsequently in compliance with the terms of this Order), and all the terms and conditions thereof, is approved. Pursuant to sections 105, 363, and 365 of the Bankruptcy Code, the Sellers are authorized to perform their obligations under, and comply with the terms of, the APA and consummate the Sale and the related transactions pursuant to, and in accordance with, the terms and conditions of the APA and this Order. The Sellers are authorized to execute and deliver, and empowered to perform under, consummate, and implement, the APA and the Sale Transaction contemplated therein, together with all additional instruments and documents that the Sellers or the Buyer deem necessary or appropriate to implement the APA and effectuate the Sale Transaction contemplated therein, and to take all further actions as may reasonably be required by the Buyer for the purpose of assigning, transferring, granting, conveying, and conferring to the Buyer the Property free and clear of any and all Encumbrances as may be necessary or appropriate to their performance of their obligations under the APA. The Buyer shall not be required to seek or obtain relief from the stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or related documents. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the provisions of this Order. All furniture, fixtures, equipment and inventory remaining in the Property on or after the Closing Date shall be deemed transferred to Buyer (without further order of the Court or documentation from the Sellers) free and clear of liens, claims and Encumbrances.

5.      **Notice**.  Notice of the Motion, the Bid Procedures Hearing, the Bidding Procedures, the Stalking Horse Supplement, the Stalking Horse Approval Order, the assumption and assignment of the Assigned Leases to Buyer, the Auction, the Sale Approval Hearing, the Sale, all transactions contemplated therein or in connection therewith, including the Sale Transaction, all deadlines related thereto, and the relief granted in this Order was fair, sufficient, proper, and equitable under the circumstances and complied in all respects with sections 102(1) and 363 of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, the Bid Procedures Order, the Stalking Horse Approval Order, the Bidding Procedures, and the procedural due process requirements of the United States Constitution.

6.      **Assumption and Assignment of Unexpired Leases and Executory Contracts.** Pursuant to section 365 and 363, as applicable, of the Bankruptcy Code, the Sellers are authorized to assume the Assigned Leases and assign or otherwise transfer such Assigned Leases to the Buyer. To the extent a Cure Amount is owed to a Contract Counterparty, the applicable Cure Amount will be paid by the Buyer up to the Cure Amount Cap (or if disputed, escrowed) on or before Closing of the Sale subject to and in accordance with the APA.  Any objection of any Contract Counterparty to the assumption or assignment or transfer of any Assigned Leases, any Cure Amount, or seeking further adequate assurance of future performance than that provided in the APA, to the extent not otherwise resolved by agreement, contemplated to be heard after the Sale Approval Hearing in accordance with the Bidding Procedures, or by separate order of this Court, is hereby overruled. There shall be no accelerations, assignment fees, increases, or any other fees charged to Buyer or Sellers as a result of the assignment of the Property or the assumption and assignment of the Assigned Leases.  Disputed Cure Amounts escrowed pursuant to the APA and this Order shall be held in escrow and disbursed to satisfy the payment of Cure Amounts only upon agreement of the

Sellers, the Buyer and the applicable Contract Counterparty, or upon further order of this Court. Upon payment of the Cure Amount, the Sellers shall be released by the applicable Contract Counterparty from any and all claims and causes of action of any nature whatsoever based on, arising from or relating to the Assigned Leases and the Buyer shall have no liability for such claims or causes of action. In the event the aggregate Cure Amounts exceed the Cure Amount Cap, any such excess amounts will be deducted from the Base Purchase Price (as defined in the APA) paid by the Buyer to the Seller.

7.    **Certain Provisions of Assigned Leases Deemed Invalid**.  Except as otherwise agreed between any Contract Counterparty and Buyer, nothing in this Order shall be deemed to annul or vary any provision of any Assigned Lease other than the following provisions (the "Invalid Provisions"):

a.    a provision that the Court has found prohibits, restricts or conditions the assignment of such Assigned Lease;

b.    a provision prohibiting Buyer's Intended Use (as defined in the APA) of the premises;

c.    a provision unreasonably prohibiting necessary alterations to the premises or signage required to convert the premises to Buyer's Intended Use;

d.    a provision commonly referred to as a "going dark" or "continuous operations" provision, providing in substance for a forfeiture of the Assigned Lease or an increase in rent or other penalty by reason of the Sellers' cessation of retail operations before the assignment, and/or any delay by Buyer in reestablishing retail operations after the assignment, to the extent any such provision does not permit Buyer to "go dark" until the

999998.02553/135556393v.1

later of: (i) [●] or (ii) one hundred eighty (180) days after the Closing Date (as defined in the APA) of the assignment of the Assigned Lease, or such later time, when the particular facts and circumstances of a given store warrant additional time, which circumstances shall include, without limitation, the age and condition of the shopping center (as applicable), the ability to obtain any permits and documents necessary to complete construction, the location of the premises in the shopping center (as applicable), the shape of the premises to be assigned, the demographics of the shopping center's location and the overall quality of the shopping center and its existing tenants(as applicable);

e.      a provision conditioning assignment on consent of the applicable Contract Counterparty, or requiring payment to the Contract Counterparty as the price of assignment;

f.      a provision effecting forfeiture or a modification of any of tenant's rights or obligations presently in effect under the Assigned Lease upon an assignment by the Sellers of the Assigned Lease;

g.      a provision conditioning the Sellers' ability to assign its leasehold rights in any Assigned Lease upon any terms not otherwise required under the Bankruptcy Code;

h.      a provision restricting Buyer's ability to place reasonable signage on the Property;

i.      a provision requiring the use of a certain tradename;

999998.02553/135556393v.1

      j.      a provision regarding minimum sales revenues required to be satisfied at the premises covered by any Assigned Lease; and

      k.      any radius provisions set forth in the Assigned Lease to the extent applicable to any existing stores of Buyer located near the Sellers' premises.

None of the Invalid Provisions shall apply to Buyer in any respect and, without limiting the generality of the foregoing, no violation by the Sellers or Buyer of the Invalid Provisions shall constitute an event of default under any Assigned Lease.

8.      **Transfer of Security and Other Deposits**.  To the extent provided for in the APA, any and all of the Sellers' security deposits, or other security held by landlords, lessors, and other Contract Counterparties to the Assigned Leases are being transferred and assigned to, and shall be the property of, the Buyer from and after the Closing, which transfer and assignment of security deposits, other deposits, or security shall satisfy in full the requirements of section 365(l) of the Bankruptcy Code for all Assigned Leases assumed and assigned pursuant to this Order or the APA.[6]  Except as expressly set forth in the APA, the Sellers shall have no responsibility for the payment of any Cure Amounts.

9.      **Percentage Rent**.  Any provision in any Assigned Lease regarding percentage rent to the extent of Seller's sales prior to the Closing Date shall not be imputed against Buyer provided that Buyer shall be liable for percentage rent for the portion of calendar year 2024 remaining after the Closing Date for a partial calendar year as if the term of the Assigned Lease began on the Closing Date (and Buyer shall not be liable to pay any percentage rent based upon sales that

---

[6]      The deposits referenced herein and being transferred pursuant to the APA do not include any Good Faith Deposits made by other potential bidders for Assets of the Debtors other than the Property.

occurred prior to the Closing Date) and no percentage rent is due and owing for the period prior to the Closing Date.

10.    **Binding Effect of Order.**  This Order shall be binding  in  all respects upon (i) all known and unknown creditors of, and holders of equity security interests in, the Debtors, including any holders of Encumbrances; (ii) the Buyer; (iii) the Debtors; (iv) the Property; (v) the Committee; (vi) any trustee(s) appointed in the Debtors' Chapter 11 Cases or upon a conversion to cases under chapter 7 of the Bankruptcy Code; and (vii) all successors and assigns of each of the foregoing, and this Order shall not be subject to amendment or modification and the APA shall not be subject to rejection.

11.    **Injunction.**  All persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability of the Sellers to transfer the Property to the Buyer in accordance with the APA and this Order. Following the Closing, all persons (including, but not limited to, the Sellers and the other Debtors, creditors, investors, current and former employees and shareholders, administrative agencies, governmental units, secretaries of state, federal, state, and local officials, including those maintaining any authority relating to any environmental, health and safety laws, and the successors and assigns of each of the foregoing) holding Encumbrances in the Property or against the Sellers and the other Debtors in respect of the Property of any kind or nature whatsoever shall be, and hereby are, forever barred, estopped, and permanently enjoined from asserting, prosecuting, or otherwise pursuing  any Encumbrances of any kind or nature whatsoever against the Buyer or any affiliate of the Buyer or any of its respective property, successors and assigns, or the Property, as an alleged successor or on any other grounds.  No person shall assert, and the Buyer and the Property shall not be subject to, any defaults, breaches, counterclaims, offsets, defenses (whether contractual or otherwise, including,

without limitation, any right of recoupment), liabilities, claims, Encumbrances and interests, or basis of any kind or nature whatsoever to delay, defer, or impair any right of the Buyer under, or with respect to, any Property, with respect to any act or omission that occurred prior to the Closing or with respect to any other agreement or any obligation of the Sellers or the other Debtors that is not an assumed liability under the APA.

12.    **General Assignment.**  Upon the Closing, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance, and transfer of the Sellers' interests in the Property and a bill of sale transferring good and marketable title in the Property to the Buyer free and clear of all Encumbrances.  Each and every federal, state, and local governmental agency, quasi-agency, or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the Sale Transaction contemplated under the APA.  Any party which did not object to the Sale within the time set forth in the notice thereof is deemed to consent to the Sale and the Seller's assumption and assignment of the Assigned Leases and the satisfaction of the requirements of Section 365 of the Bankruptcy Code.

13.    **Transfer Free and Clear.** Upon the Closing, pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, the Property, including the Assigned Leases, shall be transferred to the Buyer in accordance with the APA, and such transfer shall be free and clear of all Encumbrances of any person, including, without limitation, all such Encumbrances specifically enumerated in this Order or as otherwise set forth on Schedule ___ of the Title Report issued by _____ which is attached hereto as **Exhibit B**, whether arising by agreement, by statute, or otherwise and whether occurring or arising before, on, or after the Petition Date, whether known or unknown, occurring or arising prior to such transfer, with all such Encumbrances

attaching to the proceeds (both cash and non-cash) of the Sale of the Property attributable to such Encumbrances subject to the terms of such Encumbrance with the same validity, force, and effect and in the same priority, that such Encumbrances had against the Property immediately prior to Closing, subject to any claims and defenses that Sellers or the Debtors may possess with respect thereto.

14.     **Licenses and Permits**.  To the greatest extent available under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration, and governmental authorization or approval of the Sellers with respect to the Property, and all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been, and hereby are, deemed to be transferred to the Buyer as of the Closing Date. To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any grant, permit, or license relating to the operation of the Property sold, transferred, assigned, or conveyed to the Buyer on account of the filing or pendency of these chapter 11 cases or the consummation of the Sale Transaction.  Contract Counterparties shall cooperate and expeditiously execute and deliver, within ten (10) days of any reasonable requests of Buyer, any instruments, applications, consents or other documents which may be required by any public or quasi-public authority or other party or entity, for the purpose of obtaining any permits, approvals or other necessary documents required for the alteration, opening and operating of the properties as contemplated under the APA.

15.     **Valid Transfer.**  The transfer of the Property to the Buyer pursuant to the APA constitutes a legal, valid, and effective transfer of the Property and shall vest the Buyer with all right, title, and interest of the Sellers in and to the Property free and clear of all Encumbrances of any kind or nature whatsoever.

24

16.    **Exculpation and Release.**  Neither the Buyer nor any of its affiliates, successors, and assigns, nor any of its professionals, shall have, or incur any liability to, or be subject to any action by, the Debtors or any of their predecessors, successors, or assigns, arising out of the negotiation, investigation, preparation, execution, or delivery of the APA and the entry into and consummation of the Sale Transaction, except as expressly provided in the APA and this Order. Neither the Debtors nor any of their affiliates, successors, and assigns, nor any of their professionals, shall have, or incur any liability to, or be subject to any action by, the Buyer or any of its predecessors, successors, or assigns, arising out of the negotiation, investigation, preparation, execution, or delivery of the APA and the entry into and consummation of the Sale Transaction, except as expressly provided in the APA and this Order.

17.    **Direction to Release Interests.**  Upon the Closing, each of the Debtors' creditors and any other holder of an Encumbrance is authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release its Encumbrance in the Property, if any, as such Encumbrance may have been recorded or may otherwise exist.  If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing an Encumbrance in all or any portion of the Property being sold pursuant to the Sale Transaction and the APA shall not have delivered to the Debtors prior to the Closing, (or such other time as reasonable under the circumstances and agreed in writing among the Buyer and Sellers), in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of all Encumbrances, which such person or entity has with respect to all or any portion of the Property being sold pursuant to the Sale Transaction and the APA, then (i) the Sellers are authorized to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with

25

respect to all or any portion of the Property being sold pursuant to the Sale Transaction and the APA, and (ii) the Buyer is authorized to file, register, or otherwise record a certified copy of this Order, which shall constitute conclusive evidence of the release of all Encumbrances of any kind or nature whatsoever in the Property being sold pursuant to the Sale Transaction and the APA. Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA, including, without limitation, recordation of this Order. This Order shall be binding upon and shall govern the acts of all persons including without limitation, all filing agents, filing officers, title agents, title companies,recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who maybe required to report or insure any title or state of title in or to any of such assets or other property interests.

18.    **No Interference.**  Following the Closing, no holder of any Encumbrance in the Property shall interfere with the Buyer's title to, or use and enjoyment of, the Property being sold pursuant to the Sale Transaction and the APA based on, or related to, any such Encumbrance, or based on any actions the Debtors may take in these Chapter 11 Cases.

19.    **Surrender of Possession.**  All persons or entities that are currently, or as of the Closing, may be, in possession of some or all of the Property are hereby directed to surrender possession of the Property to the Buyer at the Closing, unless the Buyer otherwise agrees.

20.    **Standing**. The APA shall be in full force and effect, regardless of any Seller's lack of good standing in any jurisdiction in which such Seller is formed or authorized to transact business.

21.    **Post-Closing Actions and Transactions.**  The Sellers and the Buyer, and each of their respective officers, employees, and agents, will be authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Sellers or the Buyer deem necessary or appropriate to implement and effectuate the terms of the APA, the Sale Transaction contemplated therein and this Order.

22.    **Sale is Self-Executing**.  The Sale is self-executing, and neither the Sellers nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments to effectuate, consummate, and implement the provisions of this Order.

23.    **No Discriminatory Treatment.**  To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Property  sold, transferred, or conveyed to the Buyer on account of the filing or pendency of these Chapter 11 Cases or the consummation of the transactions contemplated by the APA.

24.    **No Successor Liability.**   Neither the Buyer, its present or contemplated members, partners, officers, directors or shareholders, its successors or permitted assigns, or any of the foregoing's respective affiliates, agents, officials, personnel, representatives, or advisors, shall have any liability for any Encumbrance that arose or occurred prior to the Closing, or otherwise may be asserted against the Sellers or other Debtors or is related to the Property prior to the Closing.  The Buyer is not and shall not be deemed a "successor" to the Sellers or other Debtors or their estates; the Buyer has not, *de facto* or otherwise, merged with or into the Sellers or other

27

Debtors; the Buyer does not have any common law or successor liability in relation to any matter, including without limitation, employment plans; the Buyer is not liable for any liability or Encumbrance against the Sellers or other Debtors or any of the Sellers' or other Debtors' predecessors or affiliates (other than those transferred to the Buyer pursuant to the Sale); and the Buyer is not an alter ego or mere continuation or substantial continuation of the Sellers or other Debtors or the enterprise of the Sellers or other Debtors under any theory of law or equity as a result of any action taken in connection with the APA, the Sale Transaction or any transactions or documents ancillary thereto or contemplated thereby or in connection with the acquisition of the Property.  Without limiting the foregoing, the Buyer shall not have any successor, transferee, derivative, or vicarious liabilities of any kind or character for any claims, including, without limitation, under any theory of successor or transferee liability, *de facto* merger or continuity, environmental, tax, labor and employment, products, or antitrust liability, whether known or unknown as of the Closing Date, now existing or hereafter arising, asserted or unasserted, fixed or contingent, liquidated or unliquidated.

25.    Effective upon the Closing Date, all persons and entities are forever prohibited and enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral, or other proceeding, against the Buyer, its past, present, or contemplated members, partners, officers, directors or shareholders, or its successors or permitted assigns, or any of the foregoing's respective affiliates, agents, officials, personnel, representatives, or advisors, or their respective assets, including, without limitation, the Property, with respect to any claim against the Debtors, including, without limitation, the following actions: (a) commencing or continuing any action or other proceeding pending or threatened against the Debtors as against the Buyer, its past, present, or contemplated members, partners,

999998.02553/135556393v.1

officers, directors or shareholders, its successors or permitted assigns, or their respective assets, including, without limitation, the Property, (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Debtors as against the Buyer, its past, present, or contemplated members, partners, officers, directors or shareholders, its successors or permitted assigns, or their respective assets, including, without limitation, the Property, (c) creating, perfecting, or enforcing any lien, claim, interest, or encumbrance against the Debtors as against the Buyer, its past, present, or contemplated members, partners, officers, directors or shareholders, its successors or permitted assigns, or their respective assets, including, without limitation, the Property, (d) asserting any setoff, right of subrogation, or recoupment of any kind for any obligation of any of the Debtors as against any obligation due the Buyer, its past, present, or contemplated members, partners, officers, directors or shareholders, its successors or permitted assigns, or their respective assets, including, without limitation, the Property, (e) commencing or continuing any action, in any manner or place, that does not comply, or is inconsistent with, the provisions of this Order, or the agreements or actions contemplated or taken in respect thereof, or (f) revoking, terminating, or failing or refusing to renew any license, permit, or authorization to operate any of the Property or conduct any of the businesses operated with the Property assets; provided, however, that nothing in this Order shall prevent a counterparty to an Assigned Lease from seeking to enforce the Buyer's obligations under the APA as it relates to such counterparty, subject to any claims and defenses the Buyer may have with respect thereto.

26.    Except as may be expressly provided for in the APA or this Order, the Buyer shall not have any obligation or responsibility for any liability of any of the Sellers or their estates arising under or related to the Property or otherwise. Without limiting the generality of the foregoing, and except as may be expressly provided for in the APA or this Order, the Buyer shall not be liable for

any liens, claims, encumbrances, or other interests of any kind or nature against any of the Sellers or their estates or any of their predecessors or affiliates, and the Buyer shall have no successor, transferee, or vicarious liabilities of any kind or character, including, without limitation, liabilities based on any theory of antitrust, environmental, tax, successor, or transferee liability, labor law, de facto merger, or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, asserted or unasserted, liquidated or unliquidated, with respect to any of the Sellers or their estates or any obligations of any of the Sellers or their estates arising prior to the Closing Date.

27.     Without limiting the generality of the foregoing, none of the Buyer, its affiliates, its past, present or contemplated members, partners, officers, directors or shareholders, or the Property, shall have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly, any liens, claims, encumbrances, or other interests relating to any U.S. federal, state, or local income tax liabilities, including, without limitation, any such tax liabilities that are attributable to the recapture of an excess loss account under Treasury Regulation Section 1.1502-19 (or any similar provision of state or local tax law), that the Debtors or any of them are or may be obligated for or incur in connection with consummation of the transactions contemplated by the APA, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts.

28.     This Order (a) shall be effective as a determination that, on or prior to the Closing Date, all liens, claims, encumbrances, and other interests of any kind or nature whatsoever existing as to the Sellers and their estates with respect to the Property have been unconditionally released and terminated and the Property shall have been transferred to the Buyer free and clear of all liens,

claims, interests and encumbrances, and that the transfers and conveyances described in this Order have been effected, and (b) shall be binding upon and govern the acts of all entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register, or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Property.

29.    Each and every federal, state, and local governmental agency or department is authorized to accept any and all documents and instruments necessary or appropriate to consummate the transactions contemplated by the APA, including, without limitation, the Sale Transaction and the assumption and assignment of the Assumed Contracts.

30.    **Fair Consideration.**  The consideration provided by the Buyer for the Property under the APA shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state (and including under the Uniform Voidable Transactions Act), territory, possession, or the District of Columbia.  The Sale may not be avoided under section 363(n) of the Bankruptcy Code.  The APA was not entered into, and the Sale is not being consummated, for the purpose of hindering, delaying, or defrauding creditors of the Sellers or other Debtors underthe Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia, or any other applicable law.  Neither the Sellers nor the Buyer have entered into the APA or any agreement contemplated thereby or are consummating the Sale with any fraudulent or otherwise improper purpose, including, without limitation, to evade any pension liabilities.  No other person or entity or group

999998.02553/135556393v.1

of persons or entities has offered to purchase the Property for an amount that would provide greater value to the Sellers and their estates than the value provided by the Buyer.  This Court's approval of the Motion and the APA is in the best interests of the Debtors, their estates, their creditors, and all other parties in interest.

31.    **No Modification by Subsequent Orders or Plan Provisions**.  Nothing contained in any chapter 11 plan confirmed in the Debtors' chapter 11 cases, any order confirming any such plan, or in any other order entered in these chapter 11 cases (including any order entered after any conversion of any of these chapter 11 cases to a case under chapter 7 of the Bankruptcy Code) or any related proceeding subsequent to entry of this Order shall modify, alter, conflict with, or derogate from, the provisions of the APA or this Order.

32.    **Retention of Jurisdiction.** This Court retains jurisdiction, pursuant to  its statutory powers under 28 U.S.C. § 157(b)(2), to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the APA, all amendments thereto, and any waivers and consents thereunder, including, but not limited to, retaining jurisdiction to (i) compel delivery of the Property to the Buyer; (ii) interpret, implement, and enforce the provisions of this Order and the APA; (iii) protect the Buyer, any of the Buyer's affiliates, or any agent of the foregoing, against any Encumbrances against the Sellers or other Debtors or the Property of any kind or nature whatsoever; and (iv) enter any order under sections 363 and 365 of the Bankruptcy Code.

33.    **Good Faith Buyer.**  The transactions contemplated by the APA are undertaken by the Buyer without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and, accordingly, the reversal or modification on appeal of the authorization provided in this Order to consummate the transactions shall not affect the validity of the transactions (including the assumption and assignment of the Assigned Leases) nor the transfer of

the Property owned by the Sellers to the Buyer free and clear of all Encumbrances pursuant to the APA, unless the authorization or the Sale Transaction is stayed pending appeal.  The Buyer is a buyer in good faith of the Property and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.  In particular, (i) Buyer recognized that the Sellers were free to deal with any other party interested in purchasing the Property; (ii) Buyer in no way induced or caused the chapter 11 filings by the Sellers or the other Debtors; (iii) Buyer has not violated section 363(n) of the Bankruptcy Code by any action or inaction; (iv) no common identity of directors, managers, officers or controlling stockholders exist between Buyer, on the one hand, and any of the Sellers or the other Debtors, on the other hand; (v) Buyer complied with the Bidding Procedures and all provisions of the Bid Procedures Order and the Stalking Horse Approval Order; and (vi) all payments to be made, and all other material agreements or arrangements entered into or to be entered into by Buyer in connection with the Sale Transaction have been disclosed.  The Sellers and the Buyer will be acting in good faith if they proceed to consummate the Sale at any time after entry of this Order.

34.    **No Bulk Law Application.**  No bulk sales law or similar law shall apply in any way to the transactions contemplated by the Sale, the APA, the Motion, and this Order.

35.    **Inconsistencies with Prior Orders, Pleadings or Agreements**.  To the extent this Order is inconsistent with any prior order or filing with respect to the Motion in these Chapter 11 Cases, the terms of this Order shall govern and any prior orders shall be deemed amended or otherwise modified to the extent required to permit consummation of the Sale Transaction.  To the extent there is any inconsistency between the terms of this Order and the terms of the  APA (including all ancillary documents executed in connection therewith), the terms of this Order shall govern.

33

36.     **Failure to Specify Provisions.**  The failure to specifically include any particular provision of the APA or other related documents in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the APA and all other related documents be authorized and approved in their entirety pursuant to this Order.

37.     **Non-Material Modifications.**  The APA and any related agreements, documents, or other instruments may be modified, amended, or supplemented by the parties thereto and in accordance with the terms thereof, without further order of this Court, provided that any such modification, amendment, or supplement does not have any adverse effect on the Sellers' estates; *provided, further*, that the Sellers shall provide any such modification, amendment, or supplement to the Secured Parties and the Committee no less than one day prior to execution of such modification, amendment, or supplement; *provided further,* that after Closing, the final versions of the APA and any related agreements, documents or other instruments (as modified, amended or supplemented) shall be filed with the Court.  Notwithstanding anything to the contrary set forth in this Order, the APA, any ancillary agreement or related agreement, document or other  instrument, any amendments, modifications, supplements to or waivers of any obligations or rights of the parties thereto that could adversely impact or affect the rights of the Secured Parties shall require the prior written consent of such Secured Parties.

38.     **No Stay of Order.**  Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d), this Order shall not be stayed for fourteen (14) days after its entry and shall be effective immediately upon entry, and the Sellers and the Buyer are authorized to close the Sale Transaction immediately upon entry of this Order.  Time is of the essence in closing the Sale Transaction referenced herein, and the Sellers and the Buyer intend to close the Sale Transaction as soon as practicable.  This Order is a final order and the period in which an appeal must be filed

shall commence upon the entry of this Order.   Any party objecting to this Order must exercise due diligence in filing an appeal and pursuing a stay, or risk its appeal being foreclosed as moot.

      39.    **Headings.**  Headings utilized in this Order are for convenience of reference only, and do not constitute a part of this Order for any other purpose.

      40.    **Time Periods.** All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

      41.    **Non-severability.**  The provisions of this Order are non-severable and mutually dependent.

999998.02553/135556393v.1

# EXHIBIT A

**Asset Purchase Agreement**

999998.02553/135556393v.1

## EXHIBIT B

**Title Report**

SCHEDULE J

FORM OF STALKING HORSE APPROVAL ORDER


[Attached hereto on the following pages]

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| NUMBER HOLDINGS, INC. *et al.*,[1] | ) Case No. 24-10719 (JKS) |
| | ) |
| Debtors. | ) (Jointly Administered) |
| | ) |
| | ) **Re: D.I. __** |
| | ) |

**ORDER (I) AUTHORIZING THE DEBTORS TO ENTER**
**INTO THE STALKING HORSE APA, (II) APPROVING THE**
**RELATED BID PROTECTIONS; AND (III) GRANTING RELATED RELIEF**

Upon the motion (the "Motion")[2] of the above-captioned Debtors, seeking entry of an order, pursuant to sections 105(a), 363, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, and 9014, and Local Rule 6004-1, (i) authorizing the Debtors to enter into the Stalking Horse APA in connection with the sale of certain of its assets, (b) approving the related Bid Protections; and (iii) granting related relief, all as more fully set forth in the Motion; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334 and the *Amended Standing Order of Reference* of the United States District Court for the District of Delaware, dated February 29, 2012; and this Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) and that this Court may enter a final order consistent with Article III of the United States Constitution; and this Court having found that venue in this district is proper pursuant to 28

---

[1]    The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: (i) Number Holdings, Inc. (1463); (ii) 99 Cents Only Stores LLC (1605); (iii) 99 Cents Only Stores Texas, Inc. (1229); (iv) 99 Cents PropCo LLC (7843); (v) 99 Cents HoldCo LLC (3987); and (vi) Bargain Wholesale LLC (8030).  The Debtors' principal offices are located at 1730 Flight Way, Suite 100, Tustin, CA 92782.

[2]    Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Motion.

U.S.C. §§ 1408 and 1409; and this Court having found that the notice of the Motion and of the opportunity to be heard at the hearing thereon were appropriate under the circumstances and that no other notice need be provided; and this Court having reviewed the Motion and the Stalking Horse Declaration and having heard the statements and argument in support of the relief requested at a hearing, if any, before this Court (the "Hearing"); and this Court having determined that the legal and factual bases set forth in the Motion and at any Hearing establish just cause for granting the requested relief on a final basis; and upon all of the proceedings had before this Court; and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY FOUND AND DETERMINED THAT**: [3]

A.       The Debtors' notice of the Motion, the Hearing, and entry of this Order was sufficient under the circumstances and complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the applicable Local Rules.[4] A reasonable opportunity to object or be heard regarding the relief provided herein has been afforded to parties in interest.  Accordingly, no other or further notice of the Motion or the entry of this Order is necessary or required.

B.       The bases for the relief requested in the Motion are: (i) sections 105, 363, 365, 503, and 507 of the Bankruptcy Code; (ii) Bankruptcy Rules 2002(a)(2), 6004, 6006, 9007, and 9014; and (iii) Local Rule 6004-1.

---

[3]    The findings of fact and the conclusions of law stated herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. To the extent any finding of fact shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law shall be determined to be a finding of fact, it shall be so deemed.

[4]    The findings of fact and the conclusions of law stated herein shall constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052. To the extent any finding of fact shall be determined to be a conclusion of law, it shall be so deemed, and to the extent any conclusion of law shall be determined to be a finding of fact, it shall be so deemed.

999998.02553/135549240v.2

C.      The Debtors have articulated good and sufficient reasons for this Court to: (i) authorize the Debtors to enter into the Stalking Horse APA in connection with the sale of certain of its Assets, (ii) approve the related Bid Protections; and (iii) grant related relief.  The best interests of the Debtors, their estates, creditors, and other parties in interest will be served by such approval and authorization.

D.      The Stalking Horse APA, including the Bid Protections, were negotiated at arm's length and in good faith by the Debtors and the Stalking Horse Bidder and are fair, appropriate, and reasonably designed to promote participation in and active bidding at the Auction to ensure that the highest or otherwise best value is generated for the Purchased Assets. The Debtors and their advisors engaged in a robust and extensive marketing process prior to the commencement of these Chapter 11 Cases, and the Bid Procedures are designed to continue that robust process.

E.      The Bid Protections are: (i) an actual and necessary cost of preserving the Debtors' estates within the meaning of sections 503(b) and 507(a) of the Bankruptcy Code; (ii) commensurate to the real and substantial benefits conferred upon the Debtors' estates by the Stalking Horse Bidder; (iii) reasonable and appropriate in light of the size and nature of the proposed transaction, the commitments that have been made by the Stalking Horse Bidder for the benefit of the Debtors' estates, the Stalking Horse Bidder's lost opportunities resulting from the time spent pursuing the sale of the Purchased Assets and the commitment of capital in connection therewith, the condition of the Purchased Assets, and the efforts that have been and will be expended by the Stalking Horse Bidder; (iv) reasonably tailored to encourage bidding for the Purchased Assets by providing a baseline of value, increasing the likelihood of competitive bidding at the Auction, and facilitating participation of other bidders in the sale process, thereby increasing the likelihood that the Debtors will receive the best possible price and terms for the

3

Purchased Assets; and (v) a condition to and necessary to induce the Stalking Horse Bidder to continue to pursue the Sale and to continue to be bound by the Stalking Horse APA.

F.      The Stalking Horse APA provides the Debtors the opportunity to sell the Purchased Assets in a manner designed to preserve and maximize their value and provide a floor for a further marketing and auction process, to the benefit of the Debtors' estates, their creditors, and all other stakeholders. Designation of the Stalking Horse Bidder as a "stalking horse bidder" and the Stalking Horse APA as a "stalking horse agreement" is in the best interests of the Debtors' estates and their creditors and reflects a sound exercise of their business judgment.

G.      The Bid Protections are an essential inducement and condition of the Stalking Horse Bidder's entry into, and continuing obligations under, the Stalking Horse APA. Unless it is assured that the Bid Protections will be available, the Stalking Horse Bidder is unwilling to remain obligated under the Stalking Horse APA (including the obligations to maintain its committed offer while such offer is subject to higher or otherwise better offers). The Bid Protections induced the Stalking Horse Bidder to submit a bid that will serve as a minimum floor bid for the Purchased Assets on which the Debtors, their creditors and other bidders at the Auction can rely. The Stalking Horse Bidder has provided a material benefit to the Debtors and their creditors by increasing the likelihood that the best possible purchase price for the Purchased Assets will be realized. Accordingly, the Bid Protections are reasonable and appropriate and represent the best method for maximizing the value of the Purchased Assets.

H.      The Stalking Horse Bidder is a third-party purchaser and is unrelated to any of the Debtors. Neither the Stalking Horse Bidder, nor any of its affiliates, subsidiaries, officers, directors, members, partners, or principals, or any of their respective representatives, successors,

or assigns is an "insider" of the Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

I.      The legal and factual bases set forth in the Motion establish just cause for the relief granted herein. Entry of this Order is in the best interests of the Debtors and their estates, creditors, interest holders, and all other parties in interest.

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted as set forth herein.

2.      All objections to the Motion or the relief provided herein that have not been withdrawn, waived, or settled, and all reservations of rights included therein, are hereby overruled and denied on the merits.

3.      The Stalking Horse Bidder is deemed a Qualified Bidder, and the Stalking Horse Bid as set forth in the Stalking Horse APA is deemed a Qualified Bid.

4.      The Debtors are authorized to designate Ollie's Bargain Outlet, Inc. and OBO Ventures, Inc.as the Stalking Horse Bidder and enter into the Stalking Horse APA (including all schedules, exhibits, and other ancillary documents thereto), subject to higher or otherwise better offers at the Auction in accordance with the Bidding Procedures. The Debtors are authorized to enter into the Stalking Horse Order and perform all of their obligations under the Stalking Horse APA intended to be performed prior to entry of the Sale Order, subject to the terms of the Bidding Procedures.  To the extent the Debtors have not yet executed the Stalking Horse APA, the Debtors shall execute the Stalking Horse APA within one business day of the date hereof.

5.      To the extent that this Order is not entered on the docket at least one business day before the Bid Deadline, then: (i) Stalking Horse Bidder shall be permitted to terminate this Agreement in accordance with Section 12.1(a)(v) of the Stalking Horse APA; (ii) Debtors shall

5

extend the Bid Deadline for Stalking Horse Bidder to a date that is the later of (x) two (2) business days after the Bid Deadline or (y) 2 business days after the hearing date originally scheduled for the entry of the Stalking Horse Approval Order; and (iii) Stalking Horse Bidder may submit an alternate Bid for the Property, which bid shall be deemed a Qualified Bid.

6.      In accordance with the Bidding Procedures Order, in the event the Stalking Horse Bidder is not the Successful Bidder, to the extent the Stalking Horse Bid is the next highest or best bid after the Successful Bid, the Stalking Horse Bidder shall serve as the Backup Bidder for the Purchased Assets. If the Stalking Horse Bidder has not been notified by the Debtors that it is a Backup Bidder at the conclusion of the Auction, the Stalking Horse Bidder shall not be the Backup Bidder and the Stalking Horse APA shall terminate.

7.      The Debtors are authorized to pay the Bid Protections as provided in the Stalking Horse APA, the Bidding Procedures Order, and this Order. The Bid Protections shall be allowed as administrative expense claims in the Chapter 11 Cases. The Debtors are authorized to pay any and all amounts owing to the Stalking Horse Bidder on account of the Bid Protections.

8.      The Break-Up Fee is approved in the amount of Four Hundred Thousand Thirty-Eight and no/100 Dollars ($438,000).  The Break-Up Fee shall be paid pursuant to the terms of the Stalking Horse APA out of the proceeds of the purchase price of the Successful Bidder prior to payment of any net proceeds to the Debtors' secured creditors.

9.      No person or entity other than the Stalking Horse Bidder shall be entitled to any expense reimbursement, break-up fees, "topping," termination, or other similar fee or payment, and by submitting a bid, such person or entity is deemed to have waived their right to request or to file with this court any request for expense reimbursement or any fee of any nature, whether by virtue of section 503(b) of the Bankruptcy Code or otherwise.

6

10.    In accordance with the Bidding Procedures Order, upon entry of this Order, each bid for the Purchased Assets will only constitute a Qualified Bid if the consideration provided is equal to at least the following: (a) the consideration set forth in the Stalking Horse APA; *plus* (b) the amount of the Break Up Fee, which is $438,000; *plus* (c) the amount of the Initial Incremental Overbid which is $150,000.

11.    If the Debtors receive one or more Qualified Bids for the Property, other than the Stalking Horse Bidder's Bid for such Property, if any, the Debtors will conduct the Auction to determine the Successful Bidder with respect to such Property.  If the Debtors do not receive a Qualified Bid for the Property (other than the Stalking Horse Bidder's Bid for such Property), the Debtors shall designate the Stalking Horse Bidder's Bid for such Property as the Successful Bid for such Property and file a notice of cancellation of the Auction with respect to the Property at the time of such designation.

12.    Notwithstanding anything to the contrary in the Motion, the Bidding Procedures Motion or the Bidding Procedures Order: (i) all Incremental Overbids made at the Auction for the Property shall be made and received on an open basis, and all material terms of each such Incremental Overbid shall be fully disclosed to Stalking Horse Bidder and all other Qualified Bidders who submitted Bids on such Property; (ii)  the Debtors shall maintain a written transcript of all Bids made and announced at the Auction, including the Starting Bid, all applicable Incremental Overbids, and the Successful Bid; (iii) the Stalking Horse Bidder shall be permitted to credit bid the amount of the Break Up Fee in the event the Stalking Horse makes an Incremental Overbid; and (iv) if the Stalking Horse Bidder is the Successful Bidder in any subsequent round(s) of bidding, it shall be entitled to a credit against the purchase price in the amount of the Break Up Fee.

7

13.     In connection with the Sale of the Property, without the Stalking Horse Bidder's prior written consent, the Debtors shall not in any manner amend, supplement, or modify the Bidding Procedures in a manner that materially impairs or effects the ability of the Stalking Horse Bidder to increase its Bid.

14.     Entry of this Order shall not prejudice any of the relief provided by the Bidding Procedures Order, unless explicitly stated herein.  However, in the event of a conflict between this Order and the Bidding Procedures Order, this Order shall control.

15.     Failure to timely file an objection to the relief sought in the Motion shall forever bar the assertion of any objection to such relief or the consummation of the sale of the Purchased Assets to the Stalking Horse Bidder, including, without limitation, for purposes of section 363(f) of the Bankruptcy Code.

16.     Notwithstanding the relief granted in this Order and any actions taken pursuant to such relief, nothing in this Order shall be deemed:  (i) an admission as to the amount of, basis for, or validity of any claim against the Debtors; (ii) a waiver of the Debtors' or any other party's right to dispute any claim; (iii) a promise or requirement to pay any particular claim; (iv) an admission that any particular claim is of a type described in the Motion; (v) a request or authorization to assume, adopt, or reject any agreement, contract, or lease pursuant to section 365 of the Bankruptcy Code; (vi) an admission as to the validity, priority, enforceability, or perfection of any lien on, security interest in, or other encumbrance on property of the Debtors' estates; or (vii) a waiver of any claims or causes of action which may exist against any entity under the Bankruptcy Code or any other applicable law.

17.     The automatic stay pursuant to section 362 of the Bankruptcy Code is hereby modified with respect to the Debtors to the extent necessary, without further order of the Court, to

allow the Stalking Horse Bidder to (i) deliver any notice provided for in the Stalking Horse APA, including, without limitation, a notice terminating the Stalking Horse APA in accordance with the terms thereof, and (ii) take any and all actions permitted under the Stalking Horse APA in accordance with the terms and conditions thereof.

18.    The requirements set forth in Local Rule 6004-1 is hereby satisfied, modified, or waived.

19.    Notwithstanding Bankruptcy Rule 6004(h), the terms of this Order shall be effective and enforceable immediately upon its entry.

20.    The Debtors are authorized to take all actions that are necessary and appropriate to effectuate the relief granted in this Order.

21.    This Court retains jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

999998.02553/135549240v.2

**Exhibit 1**

**Stalking Horse Agreement**

999998.02553/135549240v.2

SCHEDULE K

ESCROW TERMS

[ATTACHED HERETO ON THE FOLLOWING PAGES]



# CHICAGO TITLE AND TRUST COMPANY
**10 SOUTH LASALLE STREET, #3100, CHICAGO, ILLINOIS 60603**

**Chicago Title and Trust Company Contact Information**

Refer to:
Phone no.:
Fax no:
Email:

**ESCROW TRUST INSTRUCTIONS**

ESCROW TRUST NO.:                    DATE:

To: **Chicago Title and Trust Company, Escrow Trustee:**

**Customer Identification:**

**Party 1:**  99 Cents Only Stores LLC, a California limited liability company

**Party 2:   OLLIE'S BARGAIN OUTLET, INC. AND OBO VENTURES, INC.**

**Property Address:  see APA between Party 1 and 2**

**Project Reference:**  99 Cents Only Stores Bankruptcy Sale

**Proposed Disbursement Date:**

**Purpose for Escrow:**

**Deposits:**

**Delivery of Deposits:**

"Deposit" shall mean the sum of: $1,460,000

Upon completion of the Auction the Seller will notify the Escrow Trustee in writing of the winning bidder(s). Upon receipt of the Seller's notice the non-winning bidder(s) shall have their deposits returned pursuant to their separate written instructions.

In no case shall the above mentioned deposit be surrendered except as stated above, or upon the receipt of an order signed by the parties hereto, their respective legal representatives or assigns, or in accordance with a court order as described below, or in the event a single party hereto, Party 1 or Party 2, makes a wirtten request to Escrow Trustee for disbursement of the deposit (or portion thereof), Escrow Trustee shall be permitted to release the deposit (or portion thereof) if it receives no written objection from the other party hereto who did not make such request within five (5) Business Days following the actual receipt of the requisitioning party's request.

**Billing Instructions:**

A $100.00 fee will be deducted from the non-winning bidder's deposit amount to cover the costs associated with the return of the deposit via check or wire transfer.

**Standard Provisions:**

**Disclaimer Re: Validity of Documentation:**

In its capacity as Escrow Trustee, Escrow Trustee shall not be responsible for the genuineness or validity of any security, instrument, document or item deposited with it and shall have no responsibility other than to faithfully follow the instructions contained herein, and shall not be responsible for the validity or enforceability of any security interest of any party and it is fully protected in acting in accordance with any written instrument given to it hereunder by any of the parties hereto and reasonably believed by Escrow Trustee to have been signed by the proper person. Escrow Trustee may assume that any person purporting to give any notice hereunder has been duly authorized to do so.

**Written Notice**

All notices and demands required or permitted to be made hereto shall be made to the Escrow Trustee in writing and delivered by overnight delivery service or email. All notices required to be served by the Escrow Trustee pursuant to instructions hereto shall be in writing and delivered to the respective parties hereto at the addresses shown herein by overnight delivery service or email, if email addresses have been provided for the parties hereto.

**Amendments or supplemental instructions**

The escrow trust instructions ("instructions") may only be amended from time to time by all parties hereto by written amendment deposited with Escrow Trustee. All amendments or supplemental instructions, properly executed, shall be considered the same as the instructions.

**Execution**

These escrow trust instructions are governed by and are to be construed under the laws of the state of Illinois. The escrow trust instructions, amendments or supplemental instructions hereto, may be executed in counterparts, each of which shall be deemed an original and all such counterparts together shall constitute one and the same instrument.

**Limitations of duties of Escrow Trustee**

Escrow Trustee shall have no duties or responsibilities other than those expressly set forth herein. Escrow Trustee shall have no duty to enforce any obligation of any person to make any delivery or to enforce any obligation of any person to perform any other act. Escrow Trustee shall be under no liability to the other parties hereto or to anyone else by reason of any failure on the part of any party hereto or any maker, guarantor, endorser or other signatory of any document or any other person to perform such person's obligations under any such document. Except for amendments to this agreement hereinafter referred to and except for the instructions given to Escrow Trustee by the parties hereto in accordance with these escrow instructions, Escrow Trustee shall not be obligated to recognize any agreement between any or all of the persons referred to herein.

It is understood and agreed that the duties of Escrow Trustee are purely ministerial in nature. Escrow Trustee shall not be liable to the other parties hereto or to anyone else for any action taken or omitted by it, or any action suffered by it to be taken or omitted, in good faith and in the exercise of reasonable judgment, except for acts of willful misconduct or gross negligence. Escrow Trustee may rely conclusively and shall be protected in acting upon any order, notice, demand, certificate, opinion or advice of counsel(including counsel chosen by Escrow Trustee), statement, instrument, report or other paper or document)not only as to its due execution and the validity and effectiveness of its provisions, but also as to the truth and acceptability of any information which is reasonably believed by Escrow Trustee to be genuine and to be signed or presented by the proper person or persons. Except as specifically set forth herein , Escrow Trustee shall not be bound by any notice or demand, or any waiver, modification, termination or rescission of this agreement or any of the terms hereof, unless evidenced by a final judgment or decree of a court of competent jurisdiction in the state of illinois or a federal court in

Page 2

such state, or a writing delivered to Escrow Trustee signed by the proper party or parties and, if the duties or rights of Escrow Trustee are affected, unless it shall give its prior written consent thereto.

**Disputes/Circumstances Not Contemplated:**

If any dispute arises with respect to the disbursement of any funds on deposit or if circumstances arise that were not contemplated or described in the original escrow agreement, and Escrow Trustee is unsure as to its duties as a result, Escrow Trustee may continue to hold said funds until either in receipt of a joint order from the parties or a court order directing payment.  In such instance, Escrow Trustee may elect to commence an action in interpleader and in conjunction therewith remit the Escrow Deposit to a court of competent jurisdiction pending resolution of such dispute, and the parties hereto hereby indemnify and hold harmless Escrow Trustee for any action taken by it in good faith in the execution of its duties hereunder.  The parties further agree that the cost of any such action shall be deducted from the Escrow Deposit prior to disbursement to the parties.

**Execution:**

These escrow trust instructions are governed by and are to be construed under the laws of the state of Illinois. The escrow trust instructions, amendments or supplemental instructions hereto, may be executed in counterparts, each of which shall be deemed an original and all such counterparts together shall constitute one and the same instrument.

**Resignation Of Escrow Trustee:**

Escrow Trustee may resign as Escrow Trustee hereunder upon giving thirty (30) days' prior written notice to that effect to each of the parties to this Agreement. In such event, the successor Escrow Trustee shall be selected and approved by the parties hereto, which approval will not be unreasonably withheld or unduly delayed. Such party that will no longer be serving as Escrow Trustee shall deliver, against receipt, to such successor Escrow Trustee, the Transfer Documents, if any, held by such party, to be held by such successor Escrow Trustee pursuant to the terms and provisions of this Agreement. If no such successor has been designated on or before the effective date of such party's resignation, the current Escrow Trustee shall continue until such successor is appointed; provided, however, its sole obligation thereafter shall be to safely keep all documents and instruments then held by it and to deliver the same to the person, firm or corporation designated as its successor or until directed by a final order or judgment of a court of competent jurisdiction in the State of Illinois or a Federal court in such State, whereupon Escrow Trustee shall make disposition thereof in accordance with such order or judgment. If no successor Escrow Trustee is designated and qualified within thirty (30) days after Escrow Trustee's resignation is effective, such party that will no longer be serving as Escrow Trustee may apply to any court of competent jurisdiction for the appointment of a successor Escrow Trustee

**<u>Signature Page Follows</u>**

| **PARTY 1:** | **PARTY 2:** |
|---|---|
| Name:  99 Cents Stores Only LLC | Name: |
| By:  Christopher Wells | By: |
| Address:  One E. Washington St., Suite 1110<br>            Phoenix, AZ  85004 | |
| Phone: | Phone: |
| Fax: | Fax: |
| Email:  cwells@alvarezandmarsal.com | Email: |
| Signature: | Signature: |
| **Legal Representative:** | **Legal Representative:** |
| Name: | Name: |
| By: | By: |
| Address: | Address: |
| Phone: | Phone: |
| Fax: | Fax: |
| Email: | Email: |
| Signature: | Signature: |

| Accepted:   Chicago Title and Trust Company, Escrow Trustee |
|---|
| By: |
| Signature: |
| Date: |