## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| NUMBER HOLDINGS, INC., *et al.*,[1] | Case No. 24-10719 (JKS) |
| Debtors. | (Jointly Administered) |
| | Related Docket No.: 344 & 482 |

### LIMITED OBJECTION OF SGISMFEDERAL, LLC TO NOTICE OF POTENTIAL ASSUMPTION OF EXECUTORY CONTRACTS OR UNEXPIRED LEASES AND CURE AMOUNT

SGISMFederal, LLC ("SGFED") hereby submits the following limited objection (the "Objection") to that *Notice of Potential Assumption Of Executory Contracts Or Unexpired Leases* [Dkt. No. 344] (the "Notice") filed by Debtors, Number Holdings, Inc., *et al.* (collectively, the "Debtors") on May 2, 2024, and that *Amended Notice of Potential Assumption of Executory Contracts or Unexpired Leases and Cure Amounts* ("Amended Notice") [Dkt No. 482], filed on May 10, 2024, and states as follows:

### BACKGROUND

1. SGFED is the owner of the commercial real property located at 2709 E. Main Street, Ventura, California 93003 (the "Premises").

2. Debtors (or the "Tenant") are the lessee party to a 'triple-net' lease agreement for the Premises. **Exhibit A** attached hereto is a copy of the original lease dated February 16, 2017. The lease was subsequently amended on March 16, 2017, which is included in the attachment to Exhibit A. Also attached to Exhibit A is that *Assignment And Assumption Of Lease* dated

---

[1] The Debtor entities in these chapter 11 cases, along with the last four digits of each Debtor entity's federal tax identification number, are: Number Holdings, Inc. (1463); 99 Cents HoldCo LLC (3987); 99 Cents Only Stores LLC (1605); 99 Cents Only Stores Texas, Inc. (1229); 99 Cents PropCo LLC (7843); and Bargain Wholesale LLC (8030). The Debtors' service address is 1730 Flight Way, Suite 100, Tustin, CA 92782.

December 10, 2019, establishing SGFED as the successor-in-interest to Niki Main Street, LP, identified in the Lease as the former landlord (collectively, the "Lease").

3.      The Lease terminates on January 31, 2030. *See* Lease at 2, lines 10-17.

4.      On April 8, 2024, Debtors each filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Code"), which matter is pending before the U.S. Bankruptcy Court for the District of Delaware.

5.      On April 10, 2024, SGFED paid $29,510.10 to the County of Ventura Tax Collector (Bill No. 202301024897) (the "Payment Receipt"). A copy of the Payment Receipt is attached hereto as **Exhibit B**.

## OBJECTION TO THE PROPOSED CURE AMOUNT

6.      Attached to the Notice as Schedule 1 is a list of contracts which the Debtors propose to assume. Under Item No. 225, Debtors identified SGFED as the counterparty to the lease agreement described as "Store #124" (all caps in original). The cure amount listed is $27,761.07 (the "**Cure Amount**"). *See* Notice at 2; *see also* Schedule 1 attached thereto, Item No. 225.

7.      Similarly, attached to the Amended Notice as Schedule 1 is a list of contracts which Debtors propose to assign. Under Item No. 179, Debtors identify SGFED as the counterparty to the lease agreement described as "Store #124," with the same Cure Amount previously listed, $27,761.07. *See* Amended Notice at 2, n.4; *see also* Schedule 1 attached thereto, Item No. 179.[2]

8.      SGFED does not object to Debtors' proposal to assume and assign their interest in the Lease. Rather, SGFED objects to the Debtors' proposed Cure Amount of $27,761.07 in Schedule 1 in the Notice and Amended Notice.

---

[2]      Both the Notice and Amended Notice identify "99 Cents Only Stores LLC" as the Assuming Party.

9.      11 U.S.C. § 365(d)(3) provides, in pertinent part, that "[t]he trustee shall timely perform all the obligations of the debtor, except those specified in section 365(b)(2), arising from and after the order for relief under any unexpired lease of nonresidential real property, until such lease is assumed or rejected . . .".  *See* 11 U.S.C. § 365(d)(3).  Debtors have the burden to show that they have satisfied the requirements under 11 U.S.C. § 365.  *See In re Thane Int'l, Inc.*, 586 B.R. 540, 546 (Bankr. D. Del. 2018) ("The debtor has the burden to show that a contract is assumable and that Section 365 has been met.").  Specifically, "[a]ssumption requires the trustee to cure all defaults or to provide 'adequate assurance' that such defaults will be promptly cured." *Id.* (citing 11 U.S.C. § 365(b)(1)(A)).

10.     Further, as provided under Article Four of the Lease ("Other Charges Payable By Tenant"), Debtors are obligated to pay all applicable taxes during the lease term, through and until January 30, 2030, which remains in full force and effect.  *See* Lease at 4-5.

11.     Here, the Lease was in default as of the Petition Date.   However, the Cure Amount proposed by the Debtors does not include any of the tax liability incurred in relation to the Lease of the Premises.  *See In re Montgomery Ward Holding Corp.*, 268 F.3d 205, 212 (3d Cir. 2001) ("Montgomery Ward's lease obligation to reimburse CenterPoint for tax payments arose post-order and prior to rejection. Under § 365(d)(3), Montgomery Ward's obligation must be fulfilled not in part, but in full.")

12.     Therefore, at least $57,272.27 must be paid to SGFED to cure the full amount of the default under 11 U.S.C.§ 365(d)(3).  *See also In re* Cukierman, 265 F.3d 846, 851 (9th Cir. 2001).  As evidenced by the Payment Receipt dated April 10, 2024, the difference of $29,511.20 owed by Debtors under the Lease represents the tax payment by SGFED to the County of Ventura Treasurer for 2023 taxes.

13.     Moreover, in an effort to resolve the issue without filing this Objection, SGFED's counsel reached out to clarify the incorrect cure amount.  An initial communication is documented in the email dated Friday, May 3, 2024, notifying Debtors' counsel of the recent tax payment made by SGFED, and the full amount of $57,272.27 owed.  Attached as **Exhibit C** is the email correspondence from Byron Z. Moldo to Mr. Matthew Talmo dated May 3, 2024.  Unfortunately, the Debtors' counsel did not respond to this initial email, or any follow-up communications.

14.     Lastly, attorneys' fees due under the Lease are compensable.  *See In re Crown Books Corp.*, 269 B.R. 12, 18 (Bankr. D. Del. 2001) ("[T]he Landlords were seeking to collect sums due them under their Leases.  Such rights are not contrary to the Code, but are expressly preserved by the Code."); *see also In re Williams*, 2011 WL 2533046, at *1 (Bankr. D. Del. June 24, 2011) ("It is beyond cavil that attorneys' fees incurred because of actions taken to enforce the underlying lease or contract may be properly recoverable as part of a cure payment if such lease or contract provides for attorneys' fees.")

15.     Here, Section 12.15 of the Lease further provides that the non-defaulting party is entitled to recover attorneys' fees and costs incurred in initiating any action to enforce the terms of the Lease.  *See* Lease at 16, lines 42-52.  SGFED reserves the right to file a supplemental statement of attorneys' fees and costs incurred as a result of filing this Objection, and any related proceedings, hearings, or filings required prior to any final determination of this dispute.

**<u>RESERVATION OF RIGHTS</u>**

16.     SGFED hereby expressly reserves all of its rights under the Lease concerning any obligations of the Debtors and/or any proposed assignee as tenant.  This reservation includes, but is not limited to, SGFED's rights to claim any due amounts, including rent, and charges related to monetary defaults such as accrued real estate taxes, utility charges, unsatisfied liens, and insurance

premiums, as well as charges for non-monetary defaults, which may include obligations related to maintenance, indemnification, environmental responsibilities, and other similar duties of the Debtors and/or any proposed assignee.

17.     SGFED reserves the right to amend or supplement the cure amount for any items not yet billed and/or unknown costs (or those that cannot yet be determined), as well as amounts that were due prior to the date the Lease is assumed and assigned.  SGFED further reserves all rights to raise further objections, as necessary, or appropriate, in relation to any motion or request to assign or assign the Lease.

WHEREFORE, SGFED hereby requests that any final order approving any assumption or assignment of the Lease incorporate this objection and correct the cure amount set forth above, as $57,272.27, and that SGFED be granted such other or further relief, as just and appropriate under the circumstances.

DATED:  May 14, 2024

ERVIN COHEN & JESSUP LLP

*/s/ Byron Z. Moldo*
Byron Z. Moldo (California State Bar No. 109652)
Chase A. Stone (California State Bar No. 335228)
9401 Wilshire Blvd., 12th Floor
Beverly Hills, California 90212-2974
Telephone: (310) 281-6354
Facsimile:  (310) 859-2325
Email: bmoldo@ecjlaw.com
        cstone@ecjlaw.com

*Counsel to SGISMFederal LLC*

EXHIBIT "A"

## 99¢ ONLY STORES
## AMENDED AND RESTATED SINGLE TENANT FORM LEASE (TRIPLE NET)
## (2709 E. MAIN STREET, VENTURA, CA)

THIS LEASE (this "LEASE"), dated for reference purposes only as the 16th day of February, 2017, is made and executed by and between NIKI MAIN STREET, LP, a California limited partnership (the "LANDLORD"), and 99 CENTS ONLY STORES LLC, a California limited liability company (the "TENANT"), and amends, restates in its entirety, and replaces that certain lease dated as of September 11, 2000 (together with any existing amendments and/or supplements thereto, the "ORIGINAL LEASE"), between LANDLORD (as successor in interest to Larry A. Reid, as Trustee of the Larry A. Reid Living Trust dated February 19, 2004) (as Landlord) and 99 Cents Only Stores LLC (as Tenant), for the lease of the same premises which are the PREMISES under this LEASE. Effective upon the COMMENCEMENT DATE (defined in Section 1.04), LANDLORD and TENANT desire to amend and restate the ORIGINAL LEASE in its entirety on the terms and conditions set forth in this LEASE. Accordingly, effective upon the COMMENCEMENT DATE, (i) this LEASE amends and restates the ORIGINAL LEASE in its entirety, and (ii) the ORIGINAL LEASE shall thereafter have no further force or effect and shall be superseded in its entirety and replaced in all respects by this LEASE. LANDLORD and TENANT hereby agree as follows:

## ARTICLE ONE:  BASIC TERMS

This Article One contains the Basic Terms of this LEASE between the LANDLORD and TENANT named above. Other Articles, Sections and Paragraphs of this LEASE referred to in this Article One explain and define the Basic Terms and are to be read in conjunction with the Basic Terms. In the event of any conflict or contradiction between this Article One and such other Articles, Sections and Paragraphs of this LEASE, such other Articles, Sections and Paragraphs shall control and supersede the provisions of this Article One in regards to such conflict or contradiction.

Section 1.01   **Landlord's Address.**

c/o The Niki Group, LLC
11260 El Camino Real, Suite 220
San Diego, CA 92130
Attention: David Trakman
Telephone: (858) 546-1562

Section 1.02   **Tenant's Address.**

4000 East Union Pacific Avenue
Commerce, CA 90023
Attention: Real Estate Department
Telephone: (323) 980-8145

With a copy to:

99 Cents Only Stores LLC
4000 East Union Pacific Avenue
Commerce, CA 90023
Attention: General Counsel

Section 1.03   **Premises.**

(a)     The demised premises (the "PREMISES") consists of all of the following: (i) the improved land commonly known as 2709 E. Main Street, Ventura, California, which consists of approximately 20,300 square feet, the legal description of which is attached hereto as Exhibit "A" (the "LAND"); (ii) the building containing approximately 16,500 square feet of ground floor area (the "BUILDING") and any and all other improvements located on the LAND, including, without limitation, the parking areas and driveways thereon; and (iii) any and all other privileges, easements, rights of way and other rights and appurtenances related to the ownership of the LAND, including, but not limited to, all rights of use of any signs on or about the LAND intended for the benefit of the owner or occupant of the PREMISES and any perpetual cross easements for ingress, egress and deliveries. LANDLORD represents and warrants to TENANT that LANDLORD owns the PREMISES and LANDLORD has the authority to enter into this LEASE without the consent of any other person or party.

(b)     LANDLORD hereby represents and warrants to TENANT that TENANT, its customers, employees and invitees shall have free use of the parking outline/shaded on Exhibit "A-1" attached hereto (the "PARKING LOT"). Notwithstanding anything to the contrary contained in this LEASE, in the event that, at any time during the LEASE TERM, (i) TENANT or its customer, employees or invitees do not have free use of the PARKING LOT,

1  or (ii) the City of Ventura takes away the PARKING LOT, then TENANT shall have the right to
2  terminate this LEASE by written notice to LANDLORD, in which event neither party shall have
3  any further obligations hereunder except with respect to any obligations which have theretofore
4  accrued and except as otherwise specifically provided herein. In the event that TENANT shall
5  terminate the LEASE pursuant to this Section 1.03(b), then LANDLORD shall immediately
6  return to TENANT any advance rent or other advance payments made by TENANT to
7  LANDLORD which apply to time periods after the effective date of the termination of this
8  LEASE.
9
10         Section 1.04  **Lease Term.**  The "INITIAL LEASE TERM" shall (a) begin on the date
11  on which this LEASE is mutually executed and delivered (the "COMMENCEMENT DATE"),
12  and (b) end on January 31, 2030, unless sooner terminated in accordance with this LEASE.
13  TENANT shall have the option to extend the LEASE TERM beyond the INITIAL LEASE
14  TERM as set forth in Section 2.02. The INITIAL LEASE TERM plus all EXTENDED TERMS
15  (defined in Section 2.02) exercised by TENANT pursuant to Section 2.02 are hereinafter referred
16  to collectively as the "LEASE TERM."
17
18         Section 1.05  **Permitted Uses.**  The "PERMITTED USES" are (A) the retail sales of
19  general merchandise, including, without limitation, food, beer and wine for off-premises
20  consumption and all other products sold in 99¢ Only Stores retail stores from time to time,
21  and/or (B) any other legal use, and for business offices and storage in connection with (A) or (B)
22  above and such other uses related or incidental to (A) or (B) above, consistent with all laws,
23  federal, state or local, and with any applicable regulation of any government body and for any
24  other legal use or purpose.
25
26         Section 1.06  **Prepaid Rent. INTENTIONALLY OMITTED**
27
28         Section 1.07  **Brokers.**  Neither LANDLORD nor TENANT is represented by a broker
29  in connection with this LEASE.
30
31         Section 1.08  **Rent and Other Charges Payable by Tenant.**
32
33         (a)  **Base Rent.**  Beginning on the COMMENCEMENT DATE, TENANT
34  shall pay the applicable amounts set forth in Article Three as rent for the PREMISES. All
35  references in this LEASE to "BASE RENT" shall mean monthly rent payable pursuant to
36  Section 3.01 unless the reference is expressly to annualized BASE RENT in which event the
37  reference shall mean the monthly BASE RENT in effect for such year multiplied by twelve (12).
38  The BASE RENT shall be subject to adjustment during the EXTENDED TERMS in accordance
39  with Section 3.01.
40
41         (b)  **Other Periodic Payments.**  (i) REAL PROPERTY TAXES (See Section
42  4.02); (ii) Utilities (See Section 4.03); (iii) Insurance Costs (See Section 4.04); (iv) Maintenance,
43  Repairs and Alterations (See Article Six).
44
45         Section 1.09  **Exhibits.**  The following exhibits are attached to and made a part of this
46  LEASE:
47
48                Exhibit "A"   Legal Description of Land
49                Exhibit "A-1" Parking Lot
50                Exhibit "B"   Form of Memorandum of Lease
51                Exhibit "C"   Declarations
52
53  **ARTICLE TWO: LEASE TERM**
54
55         Section 2.01  **Lease of Premises For Lease Term**.  LANDLORD leases the
56  PREMISES to TENANT and TENANT leases the PREMISES from LANDLORD for the
57  LEASE TERM. The LEASE TERM is for the period stated in Section 1.04 and shall begin and
58  end on the dates specified in Section 1.04, unless the beginning or end of the LEASE TERM is
59  changed under any provision of this LEASE.
60
61         Section 2.02  **Right to Extend Lease Term.**  TENANT shall have the right to extend
62  the LEASE TERM, on the terms and provisions set forth in this LEASE, for four (4) additional
63  periods of five (5) years each (each, an "EXTENDED TERM" and collectively, the
64  "EXTENDED TERMS") following expiration of the INITIAL LEASE TERM by giving written
65  notice of exercise to LANDLORD by no later than the date which is one hundred eighty (180)
66  days prior to the expiration of the INITIAL LEASE TERM, or the then current EXTENDED
67  TERM, as the case may be (the "EXERCISE DATE"); provided, however, TENANT'S option to
68  extend may be exercised by TENANT on the express condition that, at the time of the exercise,
69  TENANT shall not be in default of any monetary obligation under this LEASE beyond
70  applicable notice and cure periods; provided further, however: (a) if such express condition is
71  not satisfied at the time TENANT exercises any such option to extend, LANDLORD shall give
72  TENANT notice of such non-satisfaction within ten (10) business days after delivery of

1    TENANT'S exercise notice, and if LANDLORD fails to timely give notice of such non-
2    satisfaction, then LANDLORD shall be deemed to have waived such express condition and
3    TENANT'S exercise shall be valid and effective; and (b) if LANDLORD does timely give
4    TENANT notice of the existence of such uncured monetary default and TENANT cures such
5    monetary default prior to the EXERCISE DATE, then TENANT shall have the right to re-
6    exercise such extension option by delivering a new exercise notice to LANDLORD by no later
7    than the EXERCISE DATE. Notwithstanding anything to the contrary in Section 12.04, any
8    notices of exercise delivered by TENANT pursuant to this Section 2.02 shall be deemed duly
9    served or delivered upon electronically confirmed receipt of facsimile transmission or an
10   electronic mail reply by LANDLORD'S representative, provided that TENANT shall deliver a
11   copy of any such notice of exercise by one of the other methods set forth in Section 12.04 within
12   one (1) business day after the facsimile transmission or electronic mail of the same. All terms
13   and conditions of this LEASE shall apply during each of the EXTENDED TERMS, except that
14   the BASE RENT during each such EXTENDED TERM shall be subject to increase as set forth
15   in Section 3.01.
16
17       Section 2.03   **Delivery of Premises.**   LANDLORD shall deliver possession of the
18   PREMISES to TENANT upon the COMMENCEMENT DATE, and as used in this LEASE, the
19   "DELIVERY DATE" shall mean and refer to the COMMENCEMENT DATE.
20
21       Section 2.04   **Holding Over.**   If TENANT does not vacate the PREMISES upon the
22   expiration or earlier termination of this LEASE and LANDLORD thereafter accepts rent from
23   TENANT, TENANT'S occupancy of the PREMISES shall be a "month-to-month" tenancy,
24   subject to all of the terms of this LEASE applicable to a month-to-month tenancy, except that the
25   monthly BASE RENT payable during such month-to-month tenancy shall increase as follows:
26   (a) during the first two months after the expiration or earlier termination of this LEASE, the
27   monthly BASE RENT shall be equal to one hundred ten percent (110%) of the monthly BASE
28   RENT that was payable during the last full month prior to the expiration or earlier termination of
29   this LEASE; and (b) commencing with the third month and thereafter, the monthly BASE RENT
30   shall be equal to one hundred twenty percent (120%) of the monthly BASE RENT that was
31   payable during the last full month prior to the expiration or earlier termination of this LEASE.
32
33   **ARTICLE THREE:  BASE RENT**
34
35       Section 3.01   **Time and Manner of Payment.**   Beginning on the COMMENCEMENT
36   DATE and continuing on the first day of each calendar month thereafter, TENANT shall pay
37   LANDLORD the BASE RENT, in advance.  BASE RENT and other rent due and payable under
38   this LEASE shall be payable to LANDLORD at LANDLORD'S address set forth in
39   Section 1.01, unless and until LANDLORD authorizes and directs otherwise by written notice to
40   TENANT at least ten (10) days prior to the effective date of such notice. BASE RENT for any
41   partial month shall be prorated based on the actual number of days in the calendar month
42   involved. BASE RENT during the LEASE TERM shall be payable as set forth below:

| PERIOD | ANNUALIZED BASE RENT | MONTHLY BASE RENT |
|---|---|---|
| YEARS 1 THROUGH 2 OF INITIAL LEASE TERM | $308,000.00 | $25,666.67 |
| YEARS 3 THROUGH 7 OF INITIAL LEASE TERM | $320,320.00 | $26,693.33 |
| YEAR 8 THROUGH EXPIRATION OF INITIAL LEASE TERM | $333,132.80 | $27,761.07 |
| EXTENDED TERM 1 | $346,458.11 | $28,871.51 |
| EXTENDED TERM 2 | $360,316.44 | $30,026.37 |
| EXTENDED TERM 3 | $374,729.09 | $31,227.42 |
| EXTENDED TERM 4 | $389,718.26 | $32,476.52 |

58       Section 3.02   **Rent Commencement Date.**   TENANT shall commence to pay rent on
59   the COMMENCEMENT DATE.
60
61       Section 3.03   **Termination; Advance Payments.**   Upon termination of this LEASE
62   under Article Seven (Damage or Destruction), Article Eight (Condemnation) or any other
63   termination not resulting from a DEFAULT (defined in Section 10.01) by TENANT, and after
64   TENANT has vacated the PREMISES in the manner required by this LEASE, LANDLORD
65   shall immediately refund or credit to TENANT (or TENANT'S successor) the unused portion of
66   any security deposit (if any), any advance rent or other advance payments made by TENANT to
67   LANDLORD which apply to any time periods after the effective date of the termination of this
68   LEASE and any and all reasonable out-of-pocket expenses incurred by TENANT in connection
69   with this transaction.
70
71
72

**ARTICLE FOUR:  OTHER CHARGES PAYABLE BY TENANT**

Section 4.01    **Additional Rent**.  All charges payable by TENANT other than BASE RENT are called "ADDITIONAL RENT."  Unless this LEASE provides otherwise, TENANT shall pay all ADDITIONAL RENT then due with the next monthly installment of BASE RENT. The term "rent" shall mean BASE RENT and ADDITIONAL RENT.

Section 4.02    **Property Taxes**.

(a)    **Payment of Real Property Taxes**.  LANDLORD shall provide TENANT with each real property tax bill issued for the PREMISES during the LEASE TERM at least twenty (20) days prior to the date on which payment of such tax bill is due and, subject to Section 12.20, and except as otherwise hereinafter provided, TENANT shall pay all REAL PROPERTY TAXES (defined in Section 4.02(b)) assessed against the PREMISES during the LEASE TERM directly to the taxing authority before the date upon which penalties for late payment of taxes would begin to accrue thereon.  TENANT shall submit evidence of such payment to LANDLORD and shall be responsible for any penalties incurred if payment is not made by TENANT prior to delinquency (excluding, however, any penalties arising due to LANDLORD failing to timely provide TENANT with the tax bill).  If TENANT fails to timely pay such REAL PROPERTY TAXES directly to the taxing authority and LANDLORD therefore pays them, then TENANT shall be required to reimburse LANDLORD for the REAL PROPERTY TAXES so paid by LANDLORD, together with any and all interest, fines and penalties paid by LANDLORD as a result of TENANT'S failure to timely pay.  Notwithstanding the foregoing, LANDLORD shall pay the last tax bill issued during the LEASE TERM for such REAL PROPERTY TAXES if such tax bill covers a period of time following the expiration or earlier termination of the LEASE TERM, as the case may be, and, subject to Section 12.20, TENANT shall reimburse LANDLORD for its share thereof, prorated on a daily basis.  The payment of all REAL PROPERTY TAXES by TENANT hereunder shall include any fees, taxes or assessments against, or as a result of, any tenant improvements installed on the PREMISES by or for the benefit of TENANT.

(b)    **Definition of "Real Property Taxes."**  As used in this LEASE, "REAL PROPERTY TAXES" shall mean all real property taxes due and applicable during the LEASE TERM which are assessed by any lawful authority against the PREMISES, less any rebates, credits or abatements which are granted or agreed upon by such lawful authority with respect to the PREMISES.  In the event that a new special assessment district (the "NEW SPECIAL ASSESSMENT DISTRICT") is proposed or enacted during the LEASE TERM, LANDLORD shall, immediately upon receipt of notice thereof, notify TENANT of such NEW SPECIAL ASSESSMENT DISTRICT and shall either (i) assign to TENANT LANDLORD'S right to vote on, or contest, such NEW SPECIAL ASSESSMENT DISTRICT, or (ii) if LANDLORD cannot legally assign such rights to TENANT, vote on or contest such NEW SPECIAL ASSESSMENT DISTRICT, as TENANT shall direct.  In no event shall LANDLORD voluntarily elect or vote in favor of any such NEW SPECIAL ASSESSMENT DISTRICT.  Notwithstanding anything to the contrary in this LEASE, the term "REAL PROPERTY TAXES" shall not include any of the following: (A) any assessment for highway, street or traffic control improvements, sanitary or storm sewers, utilities or for other off-site improvements of any nature made in connection with any agreement entered into by LANDLORD with any governmental authority in connection therewith (unless LANDLORD entered into such agreement with TENANT'S prior consent, which consent may be withheld in TENANT'S sole and absolute discretion); (B) any income, profits (including gross profits), franchise, gift, estate, inheritance, succession, conveyance, transfer, sales, transaction, excise, capital or other tax assessments upon LANDLORD or the rent payable under this LEASE; (C) any increase in real property taxes due to more than one (1) sale, transfer or change of ownership of the PREMISES (or any portion thereof) in any seven (7) year period during the LEASE TERM; provided, however, notwithstanding the foregoing or anything to the contrary elsewhere in this LEASE, (i) REAL PROPERTY TAXES shall include the increase in real property taxes due to the sale/transfer of the PREMISES to the LANDLORD originally named herein (which sale/transfer occurred prior to the COMMENCEMENT DATE), and (ii) in no event whatsoever shall TENANT have any obligation to pay for (and REAL PROPERTY TAXES shall not include) any increase in real property taxes due to any sale, transfer or change of ownership of the PREMISES (or any portion thereof) occurring during the first three (3) years of the INITIAL LEASE TERM; (D) any interest, fine or penalty for late payment or nonpayment by LANDLORD of REAL PROPERTY TAXES (specifically excluding, however, any such interest, fine or penalty resulting from TENANT'S failure to timely pay the REAL PROPERTY TAXES directly to the taxing authority in accordance with the provisions hereinabove); (E) any administrative charges or management fees; or (F) any costs incurred by LANDLORD to contest or challenge REAL PROPERTY TAXES (unless such contest or challenge is pursuant to TENANT'S request).  If TENANT directly and fully pays any tax bill pursuant to Section 4.02(a) and such tax bill includes any amount which is otherwise expressly excluded from REAL PROPERTY TAXES pursuant to this Section 4.02(b), including, without limitation, any increase in real property taxes excluded pursuant to the terms of item (C) above, then TENANT shall have the right to deduct/offset such excluded amount(s) from RENT next due and payable under this LEASE; however, TENANT'S failure to deduct/offset

1  such excluded amount(s) from RENT next due and payable under this LEASE shall not be
2  deemed a waiver of TENANT'S right to deduct/offset such excluded amount(s) from RENT due
3  and payable under this LEASE.

5       (c)    **Personal Property Taxes**. TENANT shall pay all taxes charged against
6  trade fixtures, furnishings, equipment or any other personal property belonging to TENANT.
7  TENANT shall try to have personal property taxes assessed separately from the PREMISES. If
8  any of TENANT'S personal property is taxed with the PREMISES, TENANT shall pay
9  LANDLORD the taxes for the personal property within fifteen (15) days after TENANT receives
10 a written statement from LANDLORD for such personal property taxes.

12      (d)    **Right to Contest**. TENANT shall have the right to contest, or to cause
13 LANDLORD to contest, the REAL PROPERTY TAXES, and TENANT shall be entitled to the
14 full amount of any refund obtained hereunder for any period of time during which TENANT was
15 responsible for payment of REAL PROPERTY TAXES under this Section 4.02, less any
16 reasonable out of pocket costs incurred by LANDLORD to collect said refund. LANDLORD
17 shall, immediately upon receipt thereof, provide TENANT with copies of any notices from the
18 county assessor's office of the county in which the PREMISES is located (including all notices
19 of changes assessed value) in order to allow TENANT to review same and timely pursue
20 TENANT'S rights, as provided for in this Section 4.02(d), to contest REAL PROPERTY
21 TAXES.

23      Section 4.03    **Utilities**. TENANT shall pay, directly to the appropriate supplier, the cost
24 of all natural gas, heat, light, power, sewer service, telephone, water, refuse disposal and other
25 utilities and services supplied to the PREMISES. LANDLORD shall not cause any services or
26 utilities provided to the PREMISES to be jointly metered with any other property located outside
27 the PREMISES. TENANT shall be responsible for any so-called "turn on" fees for the utilities.

29      Section 4.04    **Insurance Policies.**

31      (a)    **Commercial General Liability Insurance**. During the LEASE TERM,
32 TENANT shall maintain (at TENANT'S sole cost and expense) a policy of commercial general
33 liability insurance (sometimes known as broad form comprehensive general liability insurance)
34 insuring TENANT against liability for bodily injury, property damage (including loss of use of
35 property) and personal injury arising out of the operation, use or occupancy of the PREMISES.
36 TENANT shall include LANDLORD and the holder of any mortgage or deed of trust
37 encumbering the PREMISES (if any) (but only after TENANT is given written notice thereof) as
38 an additional insured pursuant to an endorsement to such policy. The amount of such insurance
39 shall be Two Million Dollars ($2,000,000.00) per occurrence. The liability insurance obtained
40 by TENANT under this Section 4.04(a) shall: (i) be primary to any similar insurance carried by
41 LANDLORD with respect to occurrences at the PREMISES during the LEASE TERM, and
42 LANDLORD'S insurance shall be considered excess insurance only with respect thereto; and
43 (ii) include cross-liability coverage or contain cross-liability endorsements providing such
44 coverage.

46      (b)    **Property Insurance**. During the LEASE TERM, TENANT shall
47 maintain (at TENANT'S sole cost and expense) policies of special form casualty insurance in the
48 name of LANDLORD and TENANT, as their interests may appear, covering the BUILDING
49 and other improvements on the LAND, which policy shall name the holder of any mortgage or
50 deed of trust encumbering the PREMISES (if any) (but only after TENANT is given written
51 notice thereof), at its interest may appear, as a loss payee under such policy. The limits for such
52 insurance shall be for the full replacement value of the property so insured, as such amount may
53 be mutually agreeable to LANDLORD and TENANT from time to time. Such policy shall
54 provide protection against all perils included within the classification of fire, extended coverage,
55 vandalism, malicious mischief, special extended perils (all risk), sprinkler leakage and any other
56 perils which TENANT deems reasonably necessary (provided, however, TENANT shall not
57 have any obligation to maintain earthquake and/or flood insurance). Neither LANDLORD nor
58 TENANT shall do or permit anything to be done which invalidates any such insurance policies.

60      (c)    **General Insurance Provisions**. If any insurance which TENANT is
61 required to maintain under this LEASE shall be cancelled by the carrier thereof, then TENANT
62 shall deliver to LANDLORD a copy of the insurance carrier's cancellation notice (by facsimile
63 or electronic mail, followed by paper mail) within three (3) business days after TENANT'S
64 receipt thereof, together with evidence of replacement coverage. If TENANT fails to deliver any
65 policy of insurance (or certificate or renewal) to LANDLORD required under this LEASE within
66 thirty (30) days following written request from LANDLORD for such evidence of insurance,
67 LANDLORD may obtain such insurance, in which case LANDLORD shall immediately notify
68 TENANT and, subject to Section 12.20, TENANT shall reimburse LANDLORD for the cost of
69 such insurance within fifteen (15) days after receipt of a statement that indicates the cost of such
70 insurance. TENANT shall maintain all insurance required under this LEASE with companies
71 holding a "General Policy Rating" of B+ or better, as set forth in the most current issue of "Best
72 Key Rating Guide". LANDLORD and TENANT acknowledge the insurance markets are rapidly

1  changing and that insurance in the form and amounts described in this Section 4.04 may not be
2  available in the future. If at any time during the LEASE TERM, TENANT is unable to maintain
3  the insurance required under this LEASE, TENANT shall nevertheless maintain insurance
4  coverage which is customary and commercially reasonable in the insurance industry for
5  TENANT'S type of business, as that coverage may change from time to time. Neither party
6  hereto makes any representation to the other that the limits or forms of coverage of insurance
7  specified in this Section 4.04 is adequate to cover the other party's properties, business
8  operations or obligations under this LEASE. At TENANT'S option, TENANT may provide the
9  coverages required under this Section 4.04 through so-called blanket policies of insurance, and
10 TENANT may in its sole discretion determine the deductible amounts maintained under the
11 policies of insurance required under this Section 4.04.
12
13          (d)    **Waiver of Subrogation.**    Unless prohibited under any applicable
14 insurance policies maintained, LANDLORD and TENANT each hereby waive any and all rights
15 of recovery against the other, or against the officers, employees, agents or representatives of the
16 other, for loss of or damage to its property or the property of others under its control, if such loss
17 or damage is covered by any insurance policy in force (whether or not described in this LEASE)
18 at the time of such loss or damage. LANDLORD and TENANT shall give notice to their
19 respective insurance carriers of this mutual waiver of subrogation.
20
21          Section 4.05  **Declarations.**
22
23          (a)    LANDLORD represents and warrants to TENANT that, to the best of
24 LANDLORD'S knowledge there are no agreements or other arrangements made with
25 neighboring property owners, or other parties, that affect the PREMISES, or portions thereof, or
26 conflict with TENANT'S rights or LANDLORD'S obligations hereunder, except those
27 agreements listed on Exhibit "D" attached hereto (collectively, the "DECLARATIONS").
28 LANDLORD represents and warrants that (i) the DECLARATIONS, as described in Exhibit
29 "D", have not been modified or amended, (ii) LANDLORD has not granted its consent to any
30 matter requiring its consent under the DECLARATIONS, (iii) LANDLORD has not waived any
31 provisions of the DECLARATIONS, (iv) LANDLORD is not aware of any defaults, breaches or
32 violations of any provisions of the DECLARATIONS, (v) LANDLORD is not in violation of
33 any of the provisions of the DECLARATIONS, (vi) the DECLARATIONS are binding
34 agreements in full force and effect, and (vii) no provisions of the DECLARATIONS conflict
35 with or interfere with LANDLORD'S obligations or TENANT'S rights under this LEASE and
36 LANDLORD hereby assumes full responsibility for any and all such conflicting or interfering
37 provisions. LANDLORD agrees that during the LEASE TERM it shall not, without the prior
38 written consent of TENANT, (1) waive any provisions of the DECLARATIONS, (2) grant its
39 consent for any matter requiring LANDLORD'S consent under the DECLARATIONS, or
40 (3) modify or amend any of the DECLARATIONS. LANDLORD shall immediately send
41 TENANT copies of all notices, requests for changes, consents, waivers or any material
42 correspondence made or received under the DECLARATIONS. Upon TENANT'S request,
43 LANDLORD shall take all reasonable actions to cooperate with TENANT in connection with
44 any request by TENANT for modifications, consents, waivers or any other matter in connection
45 with the DECLARATIONS.
46
47          (b)    Additionally, during the LEASE TERM, LANDLORD shall not change or
48 permit others to change, in any manner whatsoever, the size, location, nature and/or use of the
49 PREMISES or any portion thereof, without TENANT'S prior written consent in each instance,
50 which consent may be withheld by TENANT in its sole and absolute discretion. In addition,
51 during the LEASE TERM, LANDLORD shall not enter into any agreements or other
52 arrangements that (i) affect the PREMISES or any portion thereof, or (ii) conflict with
53 TENANT'S rights or LANDLORD'S obligations under this LEASE, without TENANT'S prior
54 written consent in each instance, which consent may be withheld by TENANT in its sole and
55 absolute discretion.
56
57 **ARTICLE FIVE: USE OF PREMISES**
58
59          Section 5.01  **Permitted Uses.**    TENANT may use the PREMISES for the
60 PERMITTED USES; provided, however, TENANT shall have no claim against LANDLORD
61 for damages and the validity of this LEASE shall not be affected in any manner whatsoever
62 (subject, however, to the provisions of Sections 5.02, 6.03 and 6.04 and Articles Seven and
63 Eight), should the use and occupancy of the PREMISES for the PERMITTED USES be
64 prohibited or impaired by reason of the following (specifically excluding, however, any of the
65 following resulting from any act or omission of LANDLORD): (i) any law, ordinance or
66 regulation of federal, state, county or municipal governments; (ii) any act of any governmental or
67 quasi-governmental authority with jurisdiction over the PREMISES; or (iii) any matters of
68 record existing at the COMMENCEMENT DATE. LANDLORD shall cooperate (at no cost
69 to LANDLORD) with TENANT in obtaining a beer and wine sales permit. LANDLORD shall
70 not during the LEASE TERM, grant any restrictions or exclusives, which in any way now or
71 hereafter will limit TENANT'S ability to sell any specific product or assortment of products
72 which are now or may hereafter be sold as of the date of this LEASE at any of TENANT'S other

1  locations or otherwise limit TENANT'S use of the PREMISES for any of the purposes permitted
2  under this LEASE. TENANT has no obligation under this LEASE to operate its business at the
3  PREMISES during the LEASE TERM.

5  Section 5.02  **Manner of Use.**

7  (a)  TENANT shall not cause or permit the PREMISES to be used in any way
8  which constitutes a violation of any law, ordinance, or governmental regulation or order or which
9  constitutes a nuisance or waste. TENANT shall obtain and pay for all permits required for
10 TENANT'S occupancy of the PREMISES and shall promptly take all actions necessary to
11 comply with all applicable statutes, ordinances, rules, regulations, orders and requirements
12 regulating the following: (i) the specific use by TENANT of the PREMISES; and (ii) any
13 alterations, additions or improvements made to the PREMISES by TENANT.

15 (b)  Notwithstanding the foregoing or anything to the contrary elsewhere in
16 this LEASE, if (i) any condition exists at the PREMISES as of the COMMENCEMENT DATE
17 that is of such a nature that a governmental or quasi-governmental authority with jurisdiction
18 over the PREMISES, if it had knowledge of the presence of such condition as of the
19 COMMENCEMENT DATE, would require the alteration, improvement and/or correction of
20 such condition in order to cause the PREMISES to comply with applicable statutes, ordinances,
21 rules, regulations, orders and requirements existing as of the COMMENCEMENT DATE (an
22 "EXISTING NON-CONFORMING CONDITION"), and (ii) such EXISTING NON-
23 CONFORMING CONDITION is not due to (A) the specific use by TENANT of the
24 PREMISES, or (B) any alterations, additions or improvements made to the PREMISES by
25 TENANT, then LANDLORD shall promptly correct such EXISTING NON-CONFORMING
26 CONDITION at LANDLORD'S own cost and expense.

28 (c)  If a NEW NON-CONFORMING CONDITION (defined below) exists at
29 any time during the LEASE TERM, then TENANT shall, at its own cost and expense, and
30 without any right of reimbursement from LANDLORD (unless the work is required because of
31 the acts or omissions of LANDLORD or its employees, agents or contractors), effect such
32 alterations and repairs to the PREMISES as necessary to correct the NEW NON-
33 CONFORMING CONDITION. As used in this LEASE, a "NEW NON-CONFORMING
34 CONDITION" shall mean and refer to any condition first arising at the PREMISES after the
35 COMMENCEMENT DATE where (i) such condition is not the result of the specific use by
36 TENANT of the PREMISES nor any alterations, additions or improvements made to the
37 PREMISES by TENANT, and (ii) such condition is of such a nature that a governmental or
38 quasi-governmental authority with jurisdiction over the PREMISES, if it had knowledge of the
39 presence of such condition during the LEASE TERM, would require the alteration, improvement
40 and/or correction of such condition in order to cause the PREMISES to comply with applicable
41 statutes, ordinances, rules, regulations, orders and requirements existing during the LEASE
42 TERM. Notwithstanding the foregoing or anything to the contrary elsewhere in this LEASE, in
43 the event that (A) a NEW NON-CONFORMING CONDITION arises during the last two (2)
44 years of the INITIAL LEASE TERM or any EXTENDED TERM and the cost to correct such
45 NEW NON-CONFORMING CONDITION exceeds three (3) months of BASE RENT, or (B) a
46 NEW NON-CONFORMING CONDITION arises at any time during the LEASE TERM and the
47 cost to correct such NEW NON-CONFORMING CONDITION exceeds twelve (12) months of
48 BASE RENT, then TENANT may instead terminate this LEASE by giving LANDLORD notice
49 thereof within ninety (90) days after TENANT first becomes aware of the NEW NON-
50 CONFORMING CONDITION, which termination shall be effective as of the later of (1) the date
51 which is thirty (30) days after TENANT'S delivery of such termination notice, or (2) the last day
52 that TENANT can legally use the PREMISES without commencing correction of such NEW
53 NON-CONFORMING CONDITION. In the event TENANT elects to exercise its termination
54 right under this Section 5.02, LANDLORD shall have the right to elect to correct such NEW
55 NON-CONFORMING CONDITION by giving TENANT notice thereof within ten (10) business
56 days after TENANT delivers its termination notice, in which event (Y) TENANT'S termination
57 notice shall be null and void, and (Z) LANDLORD shall promptly correct such NEW NON-
58 CONFORMING CONDITION at LANDLORD'S own cost and expense, except that
59 LANDLORD'S reasonable out-of-pocket costs for such correction may be amortized over the
60 useful life thereof, and TENANT shall be liable only for that portion of such amortized costs
61 which is applicable to the remaining LEASE TERM.

63 Section 5.03  **Signs.** TENANT shall have the right, to the maximum extent permitted by
64 law, without LANDLORD'S consent and at TENANT'S sole cost and expense, to: (a) install any
65 signage that TENANT desires to install at the PREMISES, whether on the LAND and/or the
66 BUILDING; and (b) use any and all signage now existing at the PREMISES. TENANT'S
67 SIGNAGE shall be made, installed, and maintained in a professional manner. Upon TENANT'S
68 request, LANDLORD shall (at no cost to LANDLORD) use reasonable efforts to obtain any
69 required approvals from governmental agencies in connection with any signs desired to be
70 installed by TENANT. LANDLORD shall not change any sign program or criteria filed with the
71 local government without TENANT'S prior written consent. LANDLORD shall indemnify and
72 defend TENANT against any and all claims asserted by any non-governmental third parties

claiming that any of TENANT'S signage rights under this LEASE violate or are prohibited by any agreement entered into by LANDLORD. LANDLORD shall not have any right to change any signage at the PREMISES during the LEASE TERM or erect any new signage at the PREMISES during the LEASE TERM without TENANT'S prior consent (which consent may be withheld in TENANT'S sole and absolute discretion). For a period of sixty (60) days following the end of the LEASE TERM, TENANT shall be permitted to place two signs not to exceed twenty (20) square feet in area, in prominent places visible from the exterior of the PREMISES informing the public of TENANT'S relocation and other similar information.

Section 5.04   **Indemnity.**

(a)   **Tenant**. Except for losses, damages and claims arising out of the acts or omissions of LANDLORD or LANDLORD'S agents, contractors or employees or otherwise waived pursuant to Section 4.04(d), TENANT shall indemnify LANDLORD against and hold LANDLORD harmless from any and all costs, claims, demands or liability arising from:

(i)   TENANT'S use of the PREMISES;

(ii)   the conduct of TENANT'S business or anything else done by TENANT or permitted by TENANT to be done in or about the PREMISES;

(iii)   any DEFAULT by TENANT under this LEASE; or

(iv)   any misrepresentation or breach of warranty by TENANT under this LEASE.

TENANT shall defend LANDLORD against any such cost, claim or liability at TENANT'S expense with counsel reasonably acceptable to LANDLORD.

(b)   **Landlord**. Except for losses, damages and claims to the extent arising out of the acts or omissions of TENANT or TENANT'S agents, contractors or employees or otherwise waived pursuant to Section 4.04(d), LANDLORD shall indemnify TENANT against and hold TENANT harmless from any and all costs, claims, demands or liability arising from:

(i)   LANDLORD'S ownership of the PREMISES;

(ii)   the conduct of LANDLORD or anything else done by LANDLORD or permitted by LANDLORD to be done in or about the PREMISES;

(iii)   any breach or default in the performance of LANDLORD'S obligations under this LEASE; or

(iv)   any misrepresentation or breach of warranty by LANDLORD under this LEASE.

LANDLORD shall defend TENANT against any such cost, claim or liability at LANDLORD'S expense with counsel reasonably acceptable to TENANT.

Section 5.05   **Landlord's Access.** LANDLORD or its agents may enter the PREMISES at reasonable times to inspect the PREMISES; or for any other purpose LANDLORD deems reasonably necessary. LANDLORD shall give TENANT reasonable prior notice (but in no event less than two (2) business days prior notice) of such entry, except in the case of an emergency.

Section 5.06   **Quiet Possession.** So long as TENANT is not in DEFAULT under this LEASE, TENANT may occupy and enjoy the PREMISES for the full LEASE TERM, subject to the provisions of this LEASE.

Section 5.07   **Exclusivity.** TENANT shall have the exclusive right to operate a general merchandise store at the PREMISES. For so long as TENANT is operating a general merchandise store at the PREMISES (provided that any closure due to remodeling, damage and destruction, eminent domain, repairs, the existence or abatement of HAZARDOUS MATERIALS, shall not be considered a failure to so operate), LANDLORD hereby agrees to not allow any tenant or occupant at any LANDLORD CONTROLLED PROPERTY (defined below) located within a one mile radius of the PREMISES to operate a general merchandise store, provided that the foregoing restriction shall not apply to any general merchandise stores being operated upon execution of this LEASE at LANDLORD CONTROLLED PROPERTY now owned by LANDLORD or its affiliate or being operated at a LANDLORD CONTROLLED PROPERTY hereafter acquired by LANDLORD or its affiliate prior to such acquisition. As used herein, "LANDLORD CONTROLLED PROPERTY" shall mean and refer to any property now or hereafter owned by LANDLORD or an affiliate of LANDLORD (i.e., a party controlling, controlled by, or under common control with, LANDLORD).

## ARTICLE SIX:   CONDITION OF PREMISES; MAINTENANCE, REPAIRS AND ALTERATIONS

Section 6.01   **Condition of Premises.**  LANDLORD shall have no obligation to provide or pay for any improvement, remodeling or refurbishment work or services related to the improvement, remodeling or refurbishment of the PREMISES, and LANDLORD has made no representation or warranty regarding the PREMISES, including, without limitation, the condition thereof.  TENANT shall accept the PREMISES in their "as-is," "where-is" condition (with all faults) and "as-built" configuration on the DELIVERY DATE.

Section 6.02   **Exemption of Landlord from Liability.**  Except to the extent that same shall be the result of (i) the negligence or willful misconduct of LANDLORD or of LANDLORD'S agents, contractors or employees, or (ii) LANDLORD'S failure to perform its obligations under the terms of this LEASE, or (iii) any misrepresentations made by LANDLORD herein, LANDLORD shall not be liable for any damage or injury to the person, business (or any loss of income therefrom), goods, wares or property of TENANT, TENANT'S employees, invitees, clients, customers or any other person in or about the PREMISES, whether such damage or injury is caused by or results from: (a) theft, fire, steam, electricity, water, gas or rain; (b) the breakage, leakage, obstruction or other defects of pipes, sprinklers, wires, appliances, plumbing, air conditioning or lighting fixtures or any other cause; or (c) conditions arising in or about the PREMISES, or from other sources or places or from new construction or repair of the PREMISES.

Section 6.03   **Landlord's Maintenance Obligations.**  Subject to, and without limitation or waiver of, the provisions of this Section 6.03, Sections 5.02 and 6.04, and Articles Seven and Eight, LANDLORD shall, at its sole cost and expense and without right of reimbursement by TENANT, keep all structural elements of the PREMISES in good order, condition and repair. LANDLORD shall make repairs under this Section 6.03 within a reasonable time after receipt of written notice from TENANT of the need for such repairs.  If LANDLORD fails to commence to meet any obligation under this LEASE, including without limitation this Section 6.03, within a reasonable amount of time after TENANT'S notice thereof (not exceeding fifteen (15) days, except in the case of an emergency or dangerous condition, in which event no notice shall be required), or if once commenced, if LANDLORD shall fail to diligently and expeditiously prosecute the performance of such obligation(s) to completion, then TENANT may, but shall not be obligated to do so, and without waiving any other rights or remedies provided hereunder or by law, perform any portion of LANDLORD'S obligations and deduct all reasonable amounts expended in connection therewith from TENANT'S subsequent financial obligations to LANDLORD.  Additionally, to the extent any necessary repairs and/or maintenance for which TENANT is responsible under Section 6.04 arise as a result of any acts or omissions of LANDLORD or its employees, agents or contractors, then LANDLORD shall reimburse TENANT for all reasonable amounts expended by TENANT in connection therewith within thirty (30) days after receipt of a written demand therefor (together with reasonable evidence supporting the amounts set forth in such demand), and if LANDLORD fails to timely reimburse TENANT for such amounts, TENANT may deduct such amounts from the rental next due and payable under this LEASE until TENANT is fully reimbursed for such amounts.

Section 6.04   **Tenant's Maintenance Obligations.**   Except as provided in this Section 6.04, Sections 5.02 and 6.03, and Articles Seven and Eight, TENANT shall perform normal maintenance required to keep all portions of the PREMISES (excepting structural elements of the PREMISES, which shall be LANDLORD'S responsibility under Section 6.03), in good order, condition and repair (excepting (i) ordinary wear and tear, (ii) damage by fire or other casualty, and (iii) repair, maintenance and restoration obligations which are the express obligation of LANDLORD under this LEASE or necessitated by the negligent acts or omissions of LANDLORD or its employees, contractors or agents).  In addition, TENANT shall during the LEASE TERM, at its sole cost and expense, have all rubbish removed from the PREMISES. TENANT shall fulfill all of TENANT'S obligations under this Section 6.04, except as otherwise provided, at TENANT'S expense.   If TENANT fails to maintain, repair or replace the PREMISES as required by this Section 6.04, LANDLORD may, upon fifteen (15) days' prior notice to TENANT (except that no notice shall be required in the case of an emergency), enter the PREMISES and perform such maintenance or repair (including replacement, as needed) on behalf of TENANT; provided that TENANT has not begun such repairs prior to LANDLORD'S entry upon the PREMISES to perform such work.  In the event that LANDLORD performs such work on behalf of TENANT, then, subject to Section 12.20, TENANT shall reimburse LANDLORD for reasonable costs incurred in performing such maintenance or repair for which TENANT is responsible promptly upon demand.

Section 6.05   **Alterations, Additions, and Improvements.**  Subject to applicable laws, TENANT shall have the right, during the LEASE TERM, to make any alterations, additions or improvements (whether structural or non-structural) to the PREMISES that TENANT may desire, without the necessity of any consent of LANDLORD, provided that all such alterations, additions and improvements shall be done in a good and workmanlike manner and in conformity

1 with all applicable laws and regulations. Upon completion of any such work and within a
2 reasonable time after LANDLORD provides TENANT with a notice so requesting, TENANT
3 shall provide LANDLORD with copies of "as built" plans, copies of all constructions contracts,
4 and proof of payment for all labor and materials, to the extent that the same are available to
5 TENANT. TENANT shall pay, when due, all claims for labor or materials furnished to
6 TENANT in connection with any alterations or improvements made to the PREMISES by
7 TENANT, which claims are or may be secured by any mechanic's or materialman's lien against
8 the PREMISES. TENANT shall not suffer or permit any mechanic's or materialman's lien to be
9 placed against the PREMISES with respect to any alterations or improvements made to the
10 PREMISES by TENANT, and in case of any such lien attaching to the PREMISES, TENANT
11 shall cause it to be released and removed of record (by payment, statutory bond or other lawful
12 means) within thirty (30) days after TENANT has notice of such lien.
13
14 Section 6.06 **Condition upon Termination.** Upon the termination of this LEASE,
15 TENANT shall surrender the PREMISES to LANDLORD, broom clean and with any alterations,
16 additions and improvements made by TENANT in as good condition as existing on the
17 COMMENCEMENT DATE, ordinary wear and tear and damage by casualty and condemnation
18 excepted. TENANT shall not be obligated to repair any damage which LANDLORD is required
19 to repair under Article Seven or elsewhere under this LEASE. All alterations, additions and
20 improvements shall become LANDLORD'S property and shall be surrendered to LANDLORD
21 upon the expiration or earlier termination of this LEASE, except that TENANT may remove, at
22 any time during the LEASE TERM, any of TENANT'S trade fixtures, machinery, equipment
23 and/or personal property. TENANT shall repair, at TENANT'S expense, any damage to the
24 PREMISES caused by the removal of any such trade fixtures, machinery, equipment and/or
25 personal property.
26
27 **ARTICLE SEVEN: DAMAGE OR DESTRUCTION**
28
29 Section 7.01 **Restoration of Premises.** TENANT shall notify LANDLORD in writing
30 immediately upon the occurrence of any known damage to the BUILDING or other
31 improvements on the PREMISES. In the event of any damage or destruction to the BUILDING
32 or other improvements on the PREMISES, this LEASE shall remain in effect (unless terminated
33 pursuant to Section 7.02), TENANT shall be entitled to all insurance proceeds pertaining to such
34 damage or destruction (and LANDLORD shall assign all of its rights and interest in such
35 proceeds to TENANT and shall cause any other party with an interest in such proceeds to assign
36 its right and interest in such proceeds to TENANT), and TENANT shall, subject to applicable
37 laws, undertake to repair the damage and restore the BUILDING or other improvements, as
38 applicable, to a quality similar to the quality that existed prior to such damage or destruction.
39 Such repair and restoration shall commence within a reasonable time after the occurrence of such
40 damage or destruction and shall be continued diligently to the completion thereof. In the event
41 the insurance proceeds are insufficient to complete the restoration or repair, TENANT shall pay
42 the deficiency. Any repairs or restoration by TENANT pursuant to this Section 7.01 shall
43 constitute alterations, additions or improvements to the PREMISES and shall therefore be
44 subject to the provisions of Section 6.05.
45
46 Section 7.02 **Tenant's Right to Terminate.** Notwithstanding the provisions of
47 Section 7.01 or anything to the contrary elsewhere in this LEASE, if MATERIAL DAMAGE
48 (defined below) occurs during the INITIAL LEASE TERM or any EXTENDED TERM, then
49 TENANT shall have the right to terminate this LEASE by giving LANDLORD notice thereof
50 within ninety (90) days after the occurrence of such damage or destruction. As used herein,
51 "MATERIAL DAMAGE" shall be deemed to have occurred if: (a) the PREMISES are damaged
52 or destroyed during the last two (2) years of the INITIAL LEASE TERM or any EXTENDED
53 TERM, and either (i) more than twenty-five percent (25%) of the BUILDING is untenantable as
54 a result of such damage or destruction, or (ii) more than twenty-five percent (25%) of
55 TENANT'S operations are materially impaired as a result of such damage or destruction, or
56 (iii) the cause of such damage or destruction is not covered by the insurance policies which
57 TENANT is obligated to maintain under Section 4.04(b) or otherwise carried by TENANT and
58 the cost of repairing such damage (as determined by a licensed contractor reasonably acceptable
59 to LANDLORD and TENANT) exceeds three (3) months of BASE RENT payable by TENANT
60 under the terms of this LEASE for the three (3) month period following the date of such damage
61 and destruction; or (b) in TENANT'S reasonable opinion, repairs and restoration cannot be
62 completed within such period of time that would allow TENANT to reopen and operate its
63 business at the PREMISES for a period of at least two (2) years before the then existing
64 INITIAL LEASE TERM or EXTENDED TERM, as applicable, would expire (when such repairs
65 and restoration are made without the payment of overtime or other premiums). In the event
66 TENANT elects to terminate this LEASE pursuant to this Section 7.02, (1) this LEASE shall be
67 deemed terminated effective as of the last day of the calendar month first occurring thirty (30)
68 days after TENANT delivers its termination notice, and (2) TENANT shall assign to
69 LANDLORD all of TENANT'S rights and interest in any and all insurance proceeds pertaining
70 to damage or destruction of the PREMISES (excluding, however, any proceeds pertaining to
71 trade fixtures, furnishings, equipment or any other personal property belonging to TENANT,
72 which proceeds shall belong to TENANT).

Section 7.03  **No Reduction or Abatement of Rent.** If the PREMISES or any portion thereof are damaged or destroyed and this LEASE is not terminated pursuant to Section 7.02, there shall be no abatement of or reduction in the rent payable during the period of such damage, repair and/or restoration; provided, however, notwithstanding the foregoing, in the event such damage or destruction was caused by the negligence or willful misconduct of LANDLORD or its employees, agents or contractors, then the rent payable during the period reasonably required to complete such repair and/or restoration (including a reasonable time for TENANT to reopen the PREMISES) (the "ABATEMENT PERIOD") shall be reduced in proportion to the amount of square footage of the PREMISES damaged or destroyed (unless, however, TENANT determines in its reasonable business judgment that it is impossible or impractical to operate its business at the PREMISES in the ordinary course in that portion of the PREMISES not so damaged or destroyed, in which event all rent shall abate during the ABATEMENT PERIOD).

## ARTICLE EIGHT:  CONDEMNATION

If all or any portion of the PREMISES is taken under the power of eminent domain (all of which are called "CONDEMNATION"), this LEASE shall terminate as to the part so taken on the date the condemning authority takes title or possession, whichever occurs first. LANDLORD shall have no right to enter into any agreement to transfer any portion of the PREMISES or any interest therein in lieu of CONDEMNATION without the prior written consent of TENANT (which consent may be withheld in TENANT'S sole and absolute discretion). In the event any MATERIAL CONDEMNATION (defined below) occurs during the INITIAL LEASE TERM, then TENANT shall have the right to terminate this LEASE by giving LANDLORD notice thereof within ninety (90) days after the occurrence of such CONDEMNATION. As used herein, a "MATERIAL CONDEMNATION" shall mean and refer to any CONDEMNATION where (1) more than twenty percent (20%) of the floor area of the BUILDING is taken, or (2) more than thirty percent (30%) of the parking area within the PARKING LOT is taken, or (3) TENANT'S ability to load and unload merchandise at the PREMISES is materially adversely affected as a result of such CONDEMNATION, or (4) ingress to and egress from the PREMISES is materially adversely effected, or (5) TENANT'S signage existing at the PREMISES prior to such CONDEMNATION is materially adversely affected thereby. Should any CONDEMNATION occur during any EXTENDED TERM, then TENANT shall have the right to terminate this LEASE by giving LANDLORD notice thereof within ninety (90) days after the occurrence of such CONDEMNATION. In the event TENANT elects to terminate this LEASE pursuant to this Article Eight, this LEASE shall be deemed terminated effective as of the last day of the calendar month first occurring thirty (30) days after TENANT delivers its termination notice, and (2) LANDLORD shall be entitled to the entire award or payment in connection with such CONDEMNATION (the "CONDEMNATION PROCEEDS"); provided, however, that TENANT shall be entitled to any award for, or to bring an action for a separate award for, the following: (i) loss of or damage to trade fixtures, furnishings, equipment and any other personal property belonging to TENANT; (ii) the value of the remaining leasehold estate (i.e., the leasehold bonus value) as of the date the condemning authority takes title or possession; (iii) relocation expenses incurred by TENANT as a result of such taking; and (iv) loss of business and good will. In the event TENANT does not elect to terminate this LEASE as a result of a partial CONDEMNATION, then this LEASE shall remain in effect as to the portion of the PREMISES not taken, there shall be no abatement of or reduction in the rent payable under this LEASE as a result of such CONDEMNATION, and TENANT shall be entitled to receive all CONDEMNATION PROCEEDS with respect to the damage to TENANT'S leasehold interest and also with respect to the damage to the PREMISES (which CONDEMNATION PROCEEDS shall include, without limitation and to the fullest extent allowed by law, compensation for there not being any abatement of or reduction in the rent payable under this LEASE as a result of such CONDEMNATION), and LANDLORD shall assign all of its rights and interest in such CONDEMNATION PROCEEDS to TENANT and shall cause any other party with an interest in such CONDEMNATION PROCEEDS to assign its right and interest in such CONDEMNATION PROCEEDS to TENANT. Upon receipt of such CONDEMNATION PROCEEDS, TENANT shall promptly make the repairs or alterations (if any) to the PREMISES made necessary by such CONDEMNATION to the extent of such CONDEMNATION PROCEEDS. Should the cost of such repairs or alterations be less than the CONDEMNATION PROCEEDS so assigned to TENANT, then TENANT shall be entitled to retain the remaining balance thereof.

## ARTICLE NINE:  ASSIGNMENT AND SUBLETTING

During the LEASE TERM, TENANT shall have the right, without LANDLORD'S consent, to assign this LEASE or sublet all or part of the PREMISES. In the event of any such assignment or subletting, TENANT shall not be released of liability under this LEASE; provided, however, TENANT shall be released from all liability under this LEASE in the event of an assignment of this LEASE to an assignee having a net worth (excluding goodwill) in excess of One Hundred Fifty Million Dollars ($150,000,000.00), provided such assignee assumes TENANT'S obligations under this LEASE from TENANT arising from and

after the date of the assignment. Promptly following any such assignment or subletting, TENANT shall notify LANDLORD of the name and address of such sublessee or assignee. Any such subletting or assignment shall be subject to all of the terms of this LEASE, including, without limitation, any restrictions pertaining to the use of the PREMISES. LANDLORD agrees that in the event of any subletting to a subtenant having a net worth (excluding goodwill) in excess of Twenty Five Million Dollars ($25,000,000), LANDLORD shall promptly, upon request, enter into a Non-Disturbance and Attornment Agreement in a form reasonable acceptable to LANDLORD and such subtenant.

## ARTICLE TEN: DEFAULTS; REMEDIES

Section 10.01 **Defaults.** The occurrence of any of the following shall be deemed to be a "DEFAULT" under this LEASE:

(a) TENANT'S failure to pay rent or any other charge due within five (5) business days following written notice from LANDLORD that such sum is past due;

(b) TENANT'S failure to perform any of TENANT'S non-monetary obligations under this LEASE for a period of thirty (30) days after written notice from LANDLORD of such failure; provided that if more than thirty (30) days are required to complete such performance, TENANT shall not be in DEFAULT if TENANT commences such performance within the thirty (30) day period and thereafter diligently pursues its completion;

(c) if TENANT makes a general assignment or general arrangement for the benefit of creditors;

(d) if a petition for adjudication of bankruptcy or for reorganization or rearrangement is filed by or against TENANT and is not dismissed within sixty (60) days;

(e) if a trustee or receiver is appointed to take possession of substantially all of TENANT'S assets located at the PREMISES or of TENANT'S interest in this LEASE and possession is not restored to TENANT within sixty (60) days; or

(f) if substantially all of TENANT'S assets located at the PREMISES or of TENANT'S interest in this LEASE is subjected to attachment, execution or other judicial seizure which is not discharged within sixty (60) days.

All notices which are sent to TENANT pursuant to the terms of this LEASE which are prerequisite to a DEFAULT shall be ink signed and shall contain the words "**NOTICE OF DEFAULT**" in prominent, bold all cap letters in order to be effective.

Section 10.02 **Remedies.** On the occurrence of any DEFAULT by TENANT, LANDLORD may, at any time thereafter, with or without notice or demand and without limiting LANDLORD in the exercise of any right or remedy which LANDLORD may have:

(a) Terminate TENANT'S right to possession of the PREMISES by any lawful means, in which case this LEASE shall terminate and TENANT shall immediately surrender possession of the PREMISES to LANDLORD; provided, however, LANDLORD shall not have the right to terminate this LEASE due to a non-monetary DEFAULT by TENANT unless TENANT has failed to cure such non-monetary DEFAULT within thirty (30) days after a second written notice from LANDLORD specifying the non-monetary DEFAULT. In such event, LANDLORD shall, subject to Section 12.20, be entitled to recover from TENANT all damages incurred by LANDLORD by reason of TENANT'S DEFAULT, including:

(i) the worth at the time of the award of the unpaid BASE RENT, ADDITIONAL RENT and other charges which LANDLORD had earned at the time of the termination;

(ii) the worth at the time of the award of the amount by which the unpaid BASE RENT, ADDITIONAL RENT and other charges which LANDLORD would have earned after termination until the time of the award exceeds the amount of such rental loss that TENANT proves LANDLORD could have reasonably avoided;

(iii) the worth at the time of the award of the amount by which the unpaid BASE RENT, ADDITIONAL RENT and other charges which TENANT would have paid for the balance of the LEASE TERM after the time of award exceeds the amount of such rental loss that TENANT proves LANDLORD could have reasonably avoided; and

(iv) any other amount necessary to compensate LANDLORD for all the detriment proximately caused by TENANT'S DEFAULT under this LEASE or which in the ordinary course of things would be likely to result therefrom, including, but not limited to, any

costs or expenses LANDLORD incurs in maintaining or preserving the PREMISES after such DEFAULT, the cost of recovering possession of the PREMISES, expenses of reletting, including necessary renovation or alteration of the PREMISES, LANDLORD'S reasonable attorneys' fees incurred in connection therewith, and any real estate commission paid or payable.

As used in subparts (i) and (ii) above, the "worth at the time of the award" is computed by allowing interest on unpaid amounts at the rate of ten percent (10%) per annum, or such lesser amount as may then be the maximum lawful rate. As used in subpart (iii) above, the "worth at the time of the award" is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of the award, plus one percent (1%).

(b)    Maintain TENANT'S right to possession, in which case this LEASE shall continue in effect whether or not TENANT has abandoned the PREMISES. In such event, LANDLORD shall be entitled to enforce all of LANDLORD'S rights and remedies under this LEASE, including the right to recover the rent as it becomes due (but LANDLORD shall have the obligation to use commercially reasonable efforts to mitigate its damages).

(c)    Notwithstanding any other provision of this LEASE, LANDLORD hereby waives the benefit of any statutory, decisional or other right or rule which would permit LANDLORD to obtain possession of the PREMISES prior to entry of a judgment of a court of competent jurisdiction (which may be a judgment obtained following any summary proceeding in unlawful detainer or otherwise) awarding possession of the PREMISES to LANDLORD.

(d)    Notwithstanding anything to the contrary contained herein, LANDLORD hereby waives any statutory right to a lien on any personal property or fixtures contained at the PREMISES that LANDLORD may have.

Section 10.03 **Landlord's Default.** In the event that LANDLORD shall fail to perform any obligation required to be performed by it as set forth in this LEASE, and such failure shall continue for a period of thirty (30) days after receipt of written notice from TENANT specifying such failure, then LANDLORD shall be in default hereunder, provided that, if the nature of LANDLORD'S obligation is such that more than thirty (30) days are required for performance, then LANDLORD shall not be in default if LANDLORD commences performance within such 30 day period and thereafter diligently prosecutes same to completion. In the event that LANDLORD shall be in default under the terms of this LEASE, then TENANT shall have the right, in addition to any other remedies it may have at law or in equity, to (i) remedy any default by LANDLORD under this LEASE and deduct from the next payments of rent due under this LEASE any amounts incurred by TENANT in so remedying any such default by LANDLORD, or (ii) terminate this LEASE upon written notice thereof to LANDLORD.

Section 10.04 **Cumulative Remedies.** The exercise of any right or remedy hereunder by either party under this Article Ten shall not prevent such party from exercising any other right or remedy hereunder.

Section 10.05 **Interruption Event**. Notwithstanding anything to the contrary in this LEASE, in the event that: (i) TENANT is prevented from using either the entirety of the BUILDING or the surface parking area within the PARKING LOT or a material portion thereof such that the remaining portion of the BUILDING or applicable parking area available for TENANT'S use is not sufficient to allow TENANT to effectively operate its store at the PREMISES because of (A) the negligent acts of LANDLORD or its employees, agents or contractors, (B) any construction, repair, maintenance or alteration performed by LANDLORD after the DELIVERY DATE, (C) LANDLORD'S failure to perform any repair, maintenance or alteration required to be performed by LANDLORD under this LEASE (if any), and/or (D) the presence of HAZARDOUS MATERIALS (defined in Section 12.19) in, on, or around the PREMISES in violation of applicable laws, regulations, ordinances, and codes which poses a material health risk to TENANT'S employees or customers at the PREMISES caused by LANDLORD or its employees, agents or contractors (each such set of circumstances as set forth in such clauses (A) - (D) of this item (i) shall be referred to as an "INTERRUPTION EVENT"); (ii) TENANT does not operate its store at the PREMISES; (iii) after TENANT ceases to conduct its business at the PREMISES, TENANT notifies LANDLORD of such INTERRUPTION EVENT in writing (the "INTERRUPTION NOTICE"); (iv) such INTERRUPTION EVENT does not arise as a result of the negligent acts of TENANT or its employees, agents or contractors; (v) such INTERRUPTION EVENT is not caused by a fire or other casualty (in which event the provisions of Article Seven shall apply); and (vi) such INTERRUPTION EVENT continues for more than seventy-two (72) hours after TENANT'S delivery of the INTERRUPTION NOTICE; then the RENT shall abate in its entirety until such INTERRUPTION EVENT ceases to exist. In the event that the INTERRUPTION EVENT continues for more than thirty (30) days after TENANT'S delivery of the INTERRUPTION NOTICE, then TENANT shall have the right to terminate this LEASE at any time thereafter but prior to the date the INTERRUPTION EVENT ceases to exist; provided, however, if the nature of the INTERRUPTION EVENT is such that the same is capable of being corrected but more than thirty (30) days are required to complete such correction, then LANDLORD shall be given

such longer period as is needed to complete correction so long as LANDLORD commences action to correct within such 30-day period and thereafter diligently pursues the same to completion, during which period TENANT'S termination right shall be stayed, but the abatement of RENT shall continue in effect.

Section 10.06 **Late Charges.** TENANT hereby acknowledges that late payment of rent by TENANT will cause LANDLORD to incur costs not contemplated by this LEASE, the exact amount of which will be extremely difficult to ascertain. Accordingly, if any installment of rent or any other sum due by TENANT pursuant to the terms of this LEASE shall not be received by LANDLORD within ten (10) business days after notice that such amount is past due and delinquent (which notice may not be delivered unless and until such delinquency has actually occurred), then TENANT shall pay to LANDLORD a one-time late charge equal to five percent (5%) of such delinquent amount. The parties hereby agree that such late charge represents a fair and reasonable estimate of the costs LANDLORD will incur by reason of late payments by TENANT. Acceptance of such late charge by LANDLORD shall in no event constitute a waiver of TENANT'S DEFAULT with respect to such delinquent amount (to the same remains unpaid), nor prevent LANDLORD from exercising any of the other rights and remedies granted hereunder.

## ARTICLE ELEVEN: PROTECTION OF LENDERS

Section 11.01 **Subordination.** LANDLORD shall have the right to subordinate this LEASE to any ground lease, deed of trust or mortgage encumbering the PREMISES, any advances made on the security thereof and any renewals, modifications, consolidations, replacements or extensions thereof, whenever made or recorded; provided that the holder of such encumbrance enters into a non-disturbance agreement with TENANT in a form which is reasonable and acceptable to TENANT. In the event that TENANT is provided with a non-disturbance agreement in a form reasonably acceptable to TENANT, then TENANT shall cooperate with LANDLORD and any lender which is acquiring a security interest in the PREMISES or this LEASE and shall execute such further commercially reasonable documents and assurances as such lender may reasonably require, provided that TENANT'S obligations under this LEASE shall not be increased in any material way (the performance of ministerial acts shall not be deemed material), nor shall TENANT'S rights under this LEASE be (i) reduced, diminished or limited, or (ii) otherwise affected in any material way. TENANT'S right to quiet possession of the PREMISES during the LEASE TERM shall not be disturbed so long as TENANT is not in DEFAULT under this LEASE. LANDLORD represents and warrants to TENANT that LANDLORD has no outstanding obligations which are secured by the PREMISES and no portion of the PREMISES is subject to any ground lease, and LANDLORD shall indemnify, defend, protect and hold TENANT harmless from any and all losses, damages, costs and expenses (including, without limitation, reasonable attorneys' fees) arising from LANDLORD'S breach of the foregoing representation and warranty.

Section 11.02 **Attornment.** If LANDLORD'S interest in the PREMISES is acquired by any ground lessor, beneficiary under a deed of trust, mortgagee, or purchaser at a foreclosure sale, TENANT shall attorn to the transferee of or successor to LANDLORD'S interest in the PREMISES and recognize such transferee or successor as LANDLORD under this LEASE, provided that TENANT was previously given a non-disturbance agreement in a form reasonably acceptable to TENANT in connection with such ground lease, deed of trust or mortgage, as the case may be.

Section 11.03 **Signing of Documents.** TENANT shall sign and deliver any commercially reasonable instrument or documents necessary or appropriate to evidence any such attornment or subordination or agreement to do so.

Section 11.04 **Estoppel Certificates.** Upon the written request of either party hereto, the other party shall execute, acknowledge and deliver to the requesting party a written statement certifying:

(a)     that none of the terms or provisions of this LEASE have been changed (or if they have been changed, stating how they have been changed);

(b)     that this LEASE has not been canceled or terminated;

(c)     the then current amount and the last date of payment of the BASE RENT and, if applicable, ADDITIONAL RENT and other charges and the time period covered by such payment;

(d)     that the requesting party is not, to the certifying party's knowledge, in default under this LEASE (or, if the requesting party is claimed to be in default, stating why); and

(e)     that this LEASE is in full force and effect.

Such statement shall be delivered to the requesting party within thirty (30) days after receipt of such request. The requesting party may give any such statement to any prospective purchaser of the PREMISES (or of all or any part of TENANT'S business or interest in the PREMISES or this LEASE, as the case may be) or encumbrancer of the PREMISES. Such purchaser or encumbrancer may rely conclusively upon such statement as true and correct.

## ARTICLE TWELVE: MISCELLANEOUS PROVISIONS

Section 12.01 **Severability.** A determination by a court of competent jurisdiction that any provision of this LEASE or any part thereof is illegal or unenforceable shall not cancel or invalidate the remainder of such provision or this LEASE, which shall remain in full force and effect.

Section 12.02 **Interpretation.** The captions of the Articles or Sections of this LEASE are to assist the parties in reading this LEASE and are not a part of the terms or provisions of this LEASE. Whenever required by the context of this LEASE, the singular shall include the plural and the plural shall include the singular. The masculine, feminine and neuter genders shall each include the other. No provision of this Agreement is to be interpreted for or against either party because that party or that party's legal representative drafted such provision. As used in this LEASE, "business day" shall mean and refer to a day on which both federally-insured banks and governmental offices are all open for business.

Section 12.03 **Incorporation of Prior Agreements; Modifications.** This LEASE is the only agreement between the parties pertaining to the lease of the PREMISES and no other agreements are effective. All amendments to this LEASE shall be in writing and signed by all parties. Any other attempted amendment shall be void.

Section 12.04 **Notices.** All notices required or permitted under this LEASE shall be in writing and shall be personally delivered, sent by nationally recognized overnight carrier, or sent by certified mail, return receipt requested, postage prepaid. Notices to TENANT shall be delivered to the address specified in Section 1.02. Notices to LANDLORD shall be delivered to the address specified in Section 1.01. In addition, the parties may each designate, in writing, up to one (1) additional person at a time during the LEASE TERM to whom simultaneous notice shall be given by the other party. All notices shall be effective upon delivery. Either party may change its notice address, or the notice address for the additional person whom it has designated as hereinabove provided, upon written notice to the other party; provided, however, in no event shall either party be permitted to designate a post office box as its notice address and each party's notice address shall at all times be a physical address. Notwithstanding anything to the contrary contained herein, notices shall not be deemed delivered for purposes of this Section 12.04 if sent by facsimile, electronic mail or any other electronic means.

Section 12.05 **Waivers.** All waivers must be in writing and signed by the waiving party. LANDLORD'S failure to enforce any provision of this LEASE or its acceptance of rent shall not be a waiver and shall not prevent LANDLORD from enforcing that provision or any other provision of this LEASE in the future.

Section 12.06 **No Recordation.** Neither party shall record this LEASE without prior written consent from the other party; however, concurrently with the execution of this LEASE, the parties shall enter into a memorandum of this LEASE in the form attached hereto as Exhibit "B" (the "MEMORANDUM OF LEASE"). The party requiring the recording of such MEMORANDUM OF LEASE shall pay the applicable recording fees.

Section 12.07 **Binding Effect; Choice of Law.** This LEASE binds and inures to the benefit of any party who legally acquires any rights or interest in this LEASE from LANDLORD or TENANT. However, LANDLORD shall have no obligation to TENANT'S successor unless the rights or interests of TENANT'S successor are properly acquired in accordance with the terms of this LEASE. The laws of the state in which the PREMISES is located shall govern this LEASE.

Section 12.08 **Corporate Authority; Partnership Authority.** If LANDLORD or TENANT is a corporation, each person signing this LEASE on behalf of such party represents and warrants that he has full authority to do so (without the consent or approval of any other person or entity) and that this LEASE binds the corporation. If LANDLORD or TENANT is a partnership, each person or entity signing this LEASE for such party represents and warrants that he or it is a general partner of the partnership, that he or it has full authority to sign for the partnership (without the consent or approval of any other person or entity) and that this LEASE binds the partnership and all general partners of the partnership. If LANDLORD or TENANT is a limited liability company, each person or entity signing this LEASE for such party represents and warrants that he or it is a manager or authorized member of the company, that he or it has full authority to sign for the company (without the consent or approval of any other person or entity) and that this LEASE binds the company.

Section 12.09 **Execution of Lease.** This LEASE may be executed in counterparts and, when all counterpart documents are executed, the counterparts shall constitute a single binding instrument. Either party may deliver its signature to this LEASE by telecopy or electronic mail and any party who receives an executed signature page from another party by telecopy or electronic mail may rely upon said signature as if it was a signed original; however, a party who delivers its executed signature page by telecopy or electronic mail shall, upon the other party's request, thereafter deliver its executed original to the other party.

Section 12.10 **Survival.** All representations and warranties of LANDLORD and TENANT expressly set forth in this LEASE shall survive the termination of this LEASE.

Section 12.11 **Confidentiality.** The parties hereto shall keep this LEASE and all documents delivered pursuant to this LEASE strictly confidential, except as deemed reasonably necessary for bona fide lenders, prospective purchasers, governmental entities, accountants, legal advisers, etc.

Section 12.12 **Right of First Offer to Lease. INTENTIONALLY OMITTED**

Section 12.13 **Consent/Duty to Act Reasonably.** All requests for consent or approval required or permitted under this LEASE shall be made in writing and in reasonable detail and otherwise in the manner required for notices hereunder. No such requests for consent or approval shall be unreasonably refused, conditioned or delayed. Any refusal of any such request for consent or approval shall also be made in writing and otherwise in the manner required for notices hereunder and shall identify, in reasonable detail, the reasons for such refusal. Without affecting the generality of this Section 12.13, unless otherwise specifically stated in this LEASE, if any such request for consent or approval shall not be refused within ten (10) business days after the making thereof, then such consent or approval shall be deemed granted. LANDLORD and TENANT shall act reasonably and in good faith and take no action which might result in the frustration of the reasonable expectations of a sophisticated lessor or lessee concerning the benefits and use enjoyed under this LEASE.

Section 12.14 **Brokers.** Each of the parties represents and warrants to the other that it has dealt with no broker, other than as set forth in Section 1.07, in connection with this LEASE, and, insofar as it knows, no other broker or other person is entitled to any commission or fee in connection with this LEASE. LANDLORD represents and warrants to TENANT that TENANT shall have no responsibility regarding any agreement made between LANDLORD and any broker and that TENANT shall have no responsibility for the payment of any commission or fee. Each of the parties hereby indemnifies the other against any commission or fee such indemnifying party may have incurred in connection with this LEASE.

Section 12.15 **Legal Proceedings.** If TENANT shall be in DEFAULT under this LEASE or if LANDLORD shall be in breach or default under this LEASE, such party (the "DEFAULTING PARTY") shall reimburse the other party (the "NONDEFAULTING PARTY") upon demand for any costs or expenses that the NONDEFAULTING PARTY reasonably incurs in connection with any breach or default of the DEFAULTING PARTY under this LEASE, whether or not suit is commenced or judgment entered. Such costs shall include actual legal fees and costs incurred for the negotiation of a settlement, enforcement of rights or otherwise. Furthermore, if any action for breach of or to enforce the provisions of this LEASE is commenced, the court in such action shall award to the prevailing party, a reasonable sum as attorneys' fees and costs. The losing party in such action shall pay such attorneys' fees and costs upon final determination of the dispute.

Section 12.16 **Tenant Allowances.** Within thirty (30) days after the COMMENCEMENT DATE, LANDLORD will provide TENANT with a fixed amount equal to Three Hundred Sixty Thousand Dollars ($360,000.00) as a tenant improvement allowance ("TI ALLOWANCE"); provided, however, it is hereby understood and agreed that TENANT has no obligation whatsoever to use the TI ALLOWANCE for tenant improvements. If the TI ALLOWANCE is not paid by LANDLORD within said 30-day period, then TENANT shall have the right, in addition to any other remedies it may have at law or in equity, to deduct the unpaid amount of TI ALLOWANCE, together with interest thereon at the rate of ten percent (10%) per annum from the due date thereof until paid in full, from the BASE RENT and ADDITIONAL RENT due under this LEASE until the TI ALLOWANCE and applicable interest thereon are fully recovered.

Section 12.17 **Successors and Assigns.** All agreements, covenants, rights and liabilities contained herein shall be binding upon and shall inure to the benefit of the respective parties hereto, and their several respective heirs, executors, administrators, successors and assigns.

Section 12.18 **Early Termination. INTENTIONALLY OMITTED**

Section 12.19 **Hazardous Materials**.

(a) As used in this LEASE, the term "HAZARDOUS MATERIALS" means any flammable items, explosives, radioactive materials, and any other substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "toxic substances" or similar term now or subsequently regulated under any applicable federal, state or local laws or regulations including, without limitation, petroleum-based products, paints, solvents, lead, cyanide, DDT, printing inks, acids, pesticides, ammonia compounds and other chemical products, asbestos, PCBs, and similar compounds, and any other products and materials which are subsequently found to have adverse effects on the environment or the health and safety of persons.

(b) Except as otherwise provided herein, TENANT shall not cause (or permit its agents, employees or contractors to cause) any HAZARDOUS MATERIAL to be generated, produced, brought upon, used, stored, treated or disposed of in, on or about the PREMISES, without the prior written consent of LANDLORD, which shall not be unreasonably withheld. In addition, TENANT shall not cause or permit an underground storage tank to be installed under the PREMISES without the prior written consent of LANDLORD, which consent shall be in LANDLORD'S sole and absolute discretion. Notwithstanding anything to the contrary contained herein, TENANT shall be permitted to store, use and dispose of, at the PREMISES, such HAZARDOUS MATERIALS which are incidental and customary to the operation of TENANT'S business, or which TENANT sells as a matter of course at other 99¢ Only Stores, provided that TENANT shall comply with all applicable laws, rules and regulations in the storage, use and disposal of such HAZARDOUS MATERIALS. TENANT shall indemnify and hold LANDLORD, its agents and employees, harmless from any and all costs, liabilities, claims, expenses, penalties, and damages of any kind, including, but not limited to, reasonable attorneys' fees and the cost of any investigation, remediation, restoration, cleanup and/or abatement, which is necessary as a result of HAZARDOUS MATERIALS being generated, produced, brought, used, stored, treated or disposed of, on or at the PREMISES during the LEASE TERM (specifically excluding, however, any HAZARDOUS MATERIALS generated, produced, brought, used, stored, treated or disposed of, on or at the PREMISES by LANDLORD or its employees, agents or contractors); provided, however, TENANT shall not have any obligation to indemnify LANDLORD nor any liability under this LEASE with respect to any HAZARDOUS MATERIALS at or under the PREMISES as a result of underground migration from adjacent properties not caused by TENANT or its employees, agents or contractors.

(c) LANDLORD represents and warrants that (i) LANDLORD has no knowledge of any HAZARDOUS MATERIALS in, on or about the PREMISES, and (ii) LANDLORD has not caused or permitted, and shall not cause or permit, any HAZARDOUS MATERIALS to be brought onto the PREMISES. LANDLORD shall indemnify and hold TENANT and TENANT'S agents and employees harmless from any and all costs, liabilities, claims, expenses, penalties, and damages of any kind including, but not limited to, attorneys' fees and the cost of any investigation, remediation, restoration, cleanup and/or abatement which is necessary as a result of LANDLORD'S violation of this Section. In addition, LANDLORD shall: (i) be responsible (at no cost to TENANT) for the abatement of any HAZARDOUS MATERIALS in, on or about the PREMISES arising from any act or omission of LANDLORD (including LANDLORD'S predecessors in interest) or their employees, agents or contractors or otherwise existing in, on or about the PREMISES as of the date hereof (except to the extent caused by TENANT or TENANT'S agents or employees); and (ii) indemnify, defend (with counsel reasonably acceptable to TENANT) and hold TENANT and TENANT'S agents, employees, contractors and invitees harmless from any damage to TENANT'S and its agents', employees', contractors' and invitees' property and all other out of pocket expenses incurred by any of them (including, without limitation, reasonable attorneys' fees) and/ or claims against any of them by third parties, arising out of the existence of such HAZARDOUS MATERIALS. In the event that TENANT closes its business at the PREMISES as a result of the existence of HAZARDOUS MATERIALS in, on or about the PREMISES caused by any act or omission of LANDLORD (including LANDLORD'S predecessors in interest) or their employees, agents or contractors or the work associated therewith, then TENANT shall not be required to pay rent until such abatement is complete.

(d) The obligations under this Section 12.19 shall survive the expiration or earlier termination of this LEASE.

Section 12.20 **Limitation on Payments by Tenant.** Notwithstanding anything to the contrary contained in this LEASE, in no event shall TENANT be required to pay to LANDLORD any amounts which TENANT would otherwise be obligated to pay hereunder if LANDLORD notifies TENANT of such amounts more than twelve (12) months after LANDLORD had knowledge that the obligation for such amounts shall have accrued.

Section 12.21 **Sale Of The Premises.** In the event that LANDLORD shall desire to sell or transfer only a portion of the PREMISES during the LEASE TERM and the

1    MEMORANDUM OF LEASE has not been recorded prior thereto, LANDLORD shall cause the
2    MEMORANDUM OF LEASE to be recorded prior to the completion of such sale or transfer.
3
4    Section 12.22 **Right of First Offer to Purchase**. LANDLORD hereby grants to
5    TENANT a continuing right of first offer to purchase all or any portion of the PREMISES on the
6    following terms and conditions (the "RIGHT OF FIRST OFFER"):
7
8    (a)    If LANDLORD should at any time during the LEASE TERM (i) desire to
9    sell all or any portion of the PREMISES to a third party, or (ii) receive an unsolicited third party
10   offer to purchase all or any portion of the PREMISES which LANDLORD desires to accept,
11   then LANDLORD shall first give written notice (an "OFFER NOTICE") to TENANT of the
12   terms and conditions that LANDLORD would be willing to accept for the sale of all or the
13   applicable portion of the PREMISES (including, without limitation, a description of the real
14   property which is the subject of the OFFER NOTICE (the "OFFER AREA"), the purchase price,
15   any financing terms, due diligence period, closing date, apportionment of closing costs, etc.),
16   provided that in the case of clause (ii) (i.e., receipt an unsolicited third party offer), the terms and
17   conditions set forth in the OFFER NOTICE shall be the same as those in the offer from the third
18   party and LANDLORD shall simply include a copy of the offer from such third party.
19
20   (b)    TENANT shall have fifteen (15) business days from receipt of the OFFER
21   NOTICE (the "EXERCISE PERIOD") to exercise its RIGHT OF FIRST OFFER by delivering
22   notice thereof to LANDLORD (the "EXERCISE NOTICE"). Delivery of such EXERCISE
23   NOTICE shall obligate TENANT to purchase the OFFER AREA on the date which is sixty (60)
24   days after delivery of the EXERCISE NOTICE (or any earlier date mutually agreed upon by
25   LANDLORD and TENANT) and otherwise on the applicable terms and conditions set forth in
26   the OFFER NOTICE. In the event TENANT wishes to counter the terms set forth in the OFFER
27   NOTICE, then TENANT shall deliver its written counteroffer to LANDLORD within the
28   EXERCISE PERIOD, in which event LANDLORD shall be prohibited from selling the OFFER
29   AREA to any third party while LANDLORD and TENANT remain in purchase and sale
30   negotiations (which period shall not exceed sixty (60) days after TENANT'S delivery of its
31   counteroffer (the "NEGOTIATION PERIOD")). In the event the parties mutually agreed upon
32   terms and conditions for the sale of the OFFER AREA during the NEGOTIATION PERIOD,
33   then the parties shall enter into a commercially reasonable purchase agreement setting forth such
34   terms and conditions. If TENANT fails to deliver an EXERCISE NOTICE or a written
35   counteroffer during the EXERCISE PERIOD, then TENANT shall be deemed to have elected to
36   not exercise its RIGHT OF FIRST OFFER.
37
38   (c)    In the event (i) TENANT shall elect (or be deemed to have elected) to not
39   exercise its RIGHT OF FIRST OFFER, or (ii) the parties fails to reach mutual agreement on the
40   terms and conditions for the sale of the OFFER AREA during the NEGOTIATION PERIOD,
41   then TENANT shall conclusively be deemed to have waived its RIGHT OF FIRST OFFER as to
42   the purchase of the OFFER AREA and LANDLORD shall be free to sell the OFFER AREA to
43   any third party on any terms that LANDLORD desires so long as such sale closes within two
44   hundred seventy (270) days after the occurrence of clause (i) or (ii), whichever is applicable. In
45   the event such sale fails to close within such 270-day period; provided, however, the RIGHT OF
46   FIRST OFFER shall continue in full force and effect as to any sale subsequent to such 270-day
47   period.
48
49   (d)    Notwithstanding anything in this LEASE to the contrary, in exercising this
50   RIGHT OF FIRST OFFER, TENANT shall not be obligated to pay any sum attributable to any
51   structures or improvements on the OFFER AREA that may have been paid for by TENANT
52   (excluding any interior leasehold improvements made by TENANT), which sum shall be
53   mutually agreed upon by the parties.
54
55   (e)    If LANDLORD is an entity, then any attempted transfer of a controlling
56   interest in LANDLORD to an unaffiliated and unrelated third party (rather than a transfer of the
57   PREMISES) shall be deemed the equivalent of a transfer of the fee interest in the PREMISES for
58   purposes of this Section 12.22, and shall therefore trigger TENANT'S RIGHT OF FIRST
59   OFFER hereunder.
60
61   Section 12.23 **Force Majeure**. Other than for LANDLORD'S and TENANT'S
62   obligations under this LEASE that can be performed by the payment of money, whenever a
63   period of time is herein prescribed for action to be taken by either party hereto, such party shall
64   not be liable or responsible for, and there shall be excluded from the computation of any such
65   period of time, any delays due to any of the following events (a "FORCE MAJEURE EVENT"):
66   (i) Acts of God, (ii) strike or other such labor difficulties not caused by the negligent or willful
67   act or omission of the party seeking relief due to a FORCE MAJEURE EVENT, its agents,
68   employees, contractors, etc. and not specific to any labor issue existing only at the PREMISES,
69   (iii) extraordinary weather conditions greatly exceeding norms for the greater metropolitan area
70   where the PREMISES are located, or (iv) extraordinary scarcity of or inability to obtain supplies,
71   parts or employees to furnish such services with no practical alternatives therefor. The party
72   seeking relief due to a FORCE MAJEURE EVENT shall provide the other party with written

notice of the occurrence of the FORCE MAJEURE EVENT promptly after the occurrence thereof, and shall comply with its respective obligation(s) as soon as the cause for the delay has been eliminated.

Section 12.24 **Financial Statements**. Within thirty (30) days following LANDLORD'S request (but in no event more than one time per year), TENANT shall send LANDLORD its most current, unaudited financial statement; provided, however, if TENANT is a publicly-traded company and its financial statement is generally available to the public, then in no event shall TENANT have any obligation to comply with this Section 12.24.

[REMAINDER OF PAGE LEFT BLANK; LEASE CONTINUES ON NEXT PAGE]



Section 12.25 **Leasehold Mortgages**. TENANT shall have the right, from time to time upon prior written notice to LANDLORD, but without the further consent of LANDLORD, to convey or encumber TENANT'S leasehold estate and interest in the PREMISES or any part thereof by mortgage, deed of trust or similar financing instrument in favor of an entity generally recognized in the real estate industry as an institutional lender engaged in the business of real estate financing. No leasehold mortgagee shall be deemed an assignee or transferee of this LEASE so as to require such leasehold mortgagee to assume the performance of any of the covenants or agreements on the part of TENANT to be performed hereunder. If the leasehold mortgagee shall require that LANDLORD deliver a customary estoppel as part of the leasehold mortgagee's financing arrangement with TENANT, LANDLORD shall execute, acknowledge and deliver such estoppel (subject to any changes that LANDLORD may reasonably request). LANDLORD shall not be required to subject its fee estate and interest in the PREMISES to the lien of any leasehold financing or mortgage sought or obtained by TENANT.

IN WITNESS WHEREOF, LANDLORD and TENANT have executed this LEASE as of the respective dates set forth below.

**"LANDLORD":**    NIKI MAIN STREET, LP,
a California limited partnership

By:
Name: David Tiakman
Title: Authorized Signer

Date: February 17, 2017

**"TENANT":**    99 CENTS ONLY STORES LLC,
a California limited liability company

By:
Felicia Thornton
Chief Financial Officer and Treasurer

By:
Jesse D. Allen
Senior Vice President
Real Estate

Date: February 23, 2017

**99¢ ONLY STORES**
**STANDARD SINGLE TENANT FORM LEASE (TRIPLE NET)**
**(2709 E. MAIN STREET, VENTURA, CA)**

## EXHIBIT "A"

### LEGAL DESCRIPTION OF LAND

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF VENTURA, IN THE COUNTY OF VENTURA, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

Parcel 1:

A part of Cassandra Street, now abandoned, and a part of Lots 1, 31, 32, 33 and 34 of Helen Park Tract, in the City of San Buenaventura, County of Ventura, State of California, as per Map recorded in Book 15, Page 48 and 49 of Maps, in the office of the County Recorder of said Ventura County, and more particularly described as follows:

Beginning at the point of intersection of the center line of said Cassandra Street with the Northeasterly line of East Main Street, as delineated upon the above described map; thence, from said point of beginning,

1st: North 51° 00' West 50.48 feet along the Northeasterly line of said East Main Street to a point; thence, at right angles,

2nd: North 39° 00' East 165.00 feet to a point; thence, at right angles,

3rd: South 51° 00' East 116.50 feet to a point; thence, at right angles,

4th: South 39° 00' West 165.00 feet to a point in the Northeasterly line of said East Main Street; thence, along same,

5th: North 51° 00' West 66.02 feet to the point of beginning.

Parcel 2:

A part of Lots 2 and 33 of Helene Park Tract, in the City of San Buenaventura, County of Ventura, State of California, as per Map recorded in Book 15, Page 48 and 49 of Maps, in the office of the County Recorder of said Ventura County, and more particularly described as follows:

Beginning at a point in the Westerly line of said Lot 2 from which a point in the Southeasterly line of Foothill Road, 60.00 feet wide, as delineated from the above described map, at the Northwest corner of said Lot 2, bears North 10° 34' West 105.00 feet distant; thence, from said point of beginning,

1st: South 10° 34' East 60.16 feet along the Westerly line of said Lots 2 and 33 to a point; thence,

2nd: North 39° 00' East 62.73 feet to a point; thence,

3rd: North 10° 34' West 19.38 feet to a point; thence,

4th: South 79° 33' West 47.75 feet to the point of beginning.

TOGETHER WITH the rights to use and maintain the Southeasterly wall of the building located on Parcel 1, above described, on land adjoining on the Southeast, as provided in Party Wall Agreement, recorded June 17, 1949, Book 877, Page 419 of Official Records.

EXCEPT therefrom that portion of the land granted to the City of San Buenaventura in the document recorded August 10, 1970, Book 3702, Page 381 of Official Records, described as follows:

Standard Single Tenant Form Lease (Triple Net)
0124 Ventura - Main St.
2-16-2017 Final [SALC-CMM]

EXHIBIT "A"
Page 21 of 33

Initials

That portion of Helene Park Tract, in the City of San Buenaventura, County of Ventura, State of California, as per Map recorded in Book 15, Page 48 of Miscellaneous Records, in the office of the County Recorder of said Ventura County, described as follows:

Beginning at a point in the Westerly line of Lot 2 of said Helene Park Tract, said point being distant North 10° 34' West 5.00 feet from the Southwesterly corner of said Lot 2; thence,

1st: North 10° 34' West along said Westerly line 10.00 feet to the Westerly terminus of the 4th course of Parcel 2 of that land conveyed to B. C. Dohn, by document recorded in Book 898, Page 329 of Official Records; thence, along the boundary of said Parcel 2 by the following 2 courses,

2nd: North 79° 33' East 47.75 feet; thence,

3rd: South 10° 34' East 10.00 feet to a point on a line parallel with and distant 5.00 feet Northerly, as measured at right angles, of the Southerly line of said Lot 2; thence,

4th: South 79° 33' West along said parallel line 47.75 feet to the point of beginning.

APN:  077-0-011-350

[END EXHIBIT "A"]

Standard Single Tenant Form Lease (Triple Net)
0124 Ventura - Main St.
2-16-2017 Final [SALC-CMM]

EXHIBIT "A"
Page 22 of 33

Initials

**99¢ ONLY STORES**
**STANDARD SINGLE TENANT FORM LEASE (TRIPLE NET)**
**(2709 E. MAIN STREET, VENTURA, CA)**

**EXHIBIT "A-1"**

**PARKING LOT**



[END EXHIBIT "A-1"]

Standard Single Tenant Form Lease (Triple Net)
0124 Ventura - Main St
2-16-2017 Final [SALC-CMM]

EXHIBIT "A-1"
Page 23 of 33

Initials: _____  _____

**99¢ ONLY STORES**
**STANDARD SINGLE TENANT FORM LEASE (TRIPLE NET)**
**(2709 E. MAIN STREET, VENTURA, CA)**

**EXHIBIT "B"**

**FORM OF MEMORANDUM OF LEASE**

RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:

99 Cents Only Stores LLC
4000 East Union Pacific Avenue
Commerce, CA 90023
Attention: Real Estate Department

THE AREA ABOVE IS RESERVED FOR RECORDER'S USE

**MEMORANDUM OF LEASE**

This MEMORANDUM OF LEASE is made and executed as of the ___ day of February, 2017, by and between NIKI MAIN STREET, LP, a California limited partnership ("Landlord"), and 99 CENTS ONLY STORES LLC, a California limited liability company (the "Tenant"), with reference the following facts:

WITNESSETH:

That in consideration of Ten Dollars ($10.00) and the rents, covenants, and conditions more particularly set forth in that certain 99¢ Only Stores Amended and Restated Standard Single Tenant Form Lease (Triple Net) dated as of February ___, 2017, by and between Landlord and Tenant (the "Lease"), the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant do hereby covenant, promise, and agree as follows:

1. Landlord hereby leases to Tenant and Tenant hereby leases from Landlord, upon the terms and conditions set forth in the Lease (all of which are expressly incorporated herein by this reference), those certain premises (the "Premises") commonly known as 2709 E. Main Street, Ventura, California, which Premises are more particularly described on Exhibit A attached hereto and incorporated herein by this reference.

2. Landlord and Tenant now desire to execute, acknowledge and deliver this Memorandum of Lease to be recorded in the Official Records of Ventura County, California (the "Official Records").

3. The initial term of the Lease (a) commenced on the later of the (i) date on which the Lease was mutually executed and delivered, or (ii) the date on which Landlord first acquired the Premises as evidenced by recordation of a grant deed to Landlord, and (b) shall end on January 31, 2030, and Tenant shall have the right to extend the term of the Lease, on the terms and provisions set forth in the Lease, for four (4) additional periods of five (5) years each. The respective rights and obligations of Landlord and Tenant with respect to the Premises and/or under the Lease are set forth in the Lease.

4. Anyone interested in the Lease or the Premises is instructed to contact Landlord and/or Tenant at the following addresses:

Landlord:          c/o MNG Real Estate Investments, LLC
                   11260 El Camino Real, Suite 220
                   San Diego, CA 92130
                   Attention: David Trakman
                   Telephone: (858) 546-1562

Tenant:

99 Cents Only Stores LLC
4000 East Union Pacific Avenue
Commerce, CA 90023
Attention: Real Estate Department
Telephone: (323) 980-8145

5.      Tenant has a right of first offer to purchase all or any portion of the Premises, subject to the applicable terms and conditions set forth in the Lease.

6.      This Memorandum of Lease is executed solely for purposes of recordation in the Official Records in order to give notice of the provisions of the Lease, and this Memorandum of Lease shall not be deemed or construed in any way whatsoever to define, limit or modify the Lease or any provision thereof or the respective rights or obligations of the parties thereunder.

7.      This Memorandum of Lease may be executed in counterparts, each of which shall be an original, but such counterparts shall together constitute but one and the same instrument.

**[SIGNATURES FOLLOW ON NEXT PAGE]**

**99¢ ONLY STORES**
**STANDARD SINGLE TENANT FORM LEASE (TRIPLE NET)**
**(2709 E. MAIN STREET, VENTURA, CA))**

[SIGNATURE PAGE]

IN WITNESS WHEREOF, LANDLORD and TENANT have executed this MEMORANDUM OF LEASE effective as of the date first written above.

**"LANDLORD":**     NIKI MAIN STREET, LP,
a California limited partnership

By: _____
Name: _____
Title: _____

**"TENANT":**     99 CENTS ONLY STORES LLC,
a California limited liability company

By: _____
Jesse D. Allen
Senior Vice President
Real Estate

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

**STATE OF CALIFORNIA** )
) SS.
**COUNTY OF SAN DIEGO** )

On February _____, 2017, before me, _____, a notary public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
NOTARY PUBLIC
State of California

Standard Single Tenant Form Lease (Triple Net)
0124 Ventura - Main St.
2-16-2017 Final [SALC-CMM]

EXHIBIT "B"
Page 27 of 33

Initials: _____ _____

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

**STATE OF CALIFORNIA** )
) SS.
**COUNTY OF LOS ANGELES** )

On February ___, 2017, before me, _____, a notary public, personally appeared Jesse D. Allen, who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
NOTARY PUBLIC
State of California

Standard Single Tenant Form Lease (Triple Net)
0124 Ventura - Main St
2-16-2017 Final [SALC-CMM]

EXHIBIT "B"
Page 28 of 33

Initials: _____  _____

**99¢ ONLY STORES**
**STANDARD SINGLE TENANT FORM LEASE (TRIPLE NET)**
**(2709 E. MAIN STREET, VENTURA, CA)**

## EXHIBIT A TO MEMORANDUM OF LEASE

### Legal Description of Premises

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE CITY OF VENTURA, IN THE COUNTY OF VENTURA, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

Parcel 1:

A part of Cassandra Street, now abandoned, and a part of Lots 1, 31, 32, 33 and 34 of Helen Park Tract, in the City of San Buenaventura, County of Ventura, State of California, as per Map recorded in Book 15, Page 48 and 49 of Maps, in the office of the County Recorder of said Ventura County, and more particularly described as follows:

Beginning at the point of intersection of the center line of said Cassandra Street with the Northeasterly line of East Main Street, as delineated upon the above described map; thence, from said point of beginning,

1st: North 51° 00' West 50.48 feet along the Northeasterly line of said East Main Street to a point; thence, at right angles,

2nd: North 39° 00' East 165.00 feet to a point; thence, at right angles,

3rd: South 51° 00' East 116.50 feet to a point; thence, at right angles,

4th: South 39° 00' West 165.00 feet to a point in the Northeasterly line of said East Main Street; thence, along same,

5th: North 51° 00' West 66.02 feet to the point of beginning.

Parcel 2:

A part of Lots 2 and 33 of Helene Park Tract, in the City of San Buenaventura, County of Ventura, State of California, as per Map recorded in Book 15, Page 48 and 49 of Maps, in the office of the County Recorder of said Ventura County, and more particularly described as follows:

Beginning at a point in the Westerly line of said Lot 2 from which a point in the Southeasterly line of Foothill Road, 60.00 feet wide, as delineated from the above described map, at the Northwest corner of said Lot 2, bears North 10° 34' West 105.00 feet distant; thence, from said point of beginning,

1st: South 10° 34' East 60.16 feet along the Westerly line of said Lots 2 and 33 to a point; thence,

2nd: North 39° 00' East 62.73 feet to a point; thence,

3rd: North 10° 34' West 19.38 feet to a point; thence,

4th: South 79° 33' West 47.75 feet to the point of beginning.

TOGETHER WITH the rights to use and maintain the Southeasterly wall of the building located on Parcel 1, above described, on land adjoining on the Southeast, as provided in Party Wall Agreement, recorded June 17, 1949, Book 877, Page 419 of Official Records.

EXCEPT therefrom that portion of the land granted to the City of San Buenaventura in the document recorded August 10, 1970, Book 3702, Page 381 of Official Records, described as follows:

Standard Single Tenant Form Lease (Triple Net)
0124 Ventura - Main St
2-16-2017 Final [SALC-CMM]

EXHIBIT "B"
Page 29 of 33

Initials

That portion of Helene Park Tract, in the City of San Buenaventura, County of Ventura, State of California, as per Map recorded in Book 15, Page 48 of Miscellaneous Records, in the office of the County Recorder of said Ventura County, described as follows:

Beginning at a point in the Westerly line of Lot 2 of said Helene Park Tract, said point being distant North 10° 34' West 5.00 feet from the Southwesterly corner of said Lot 2; thence,

1st: North 10° 34' West along said Westerly line 10.00 feet to the Westerly terminus of the 4th course of Parcel 2 of that land conveyed to B. C. Dohn, by document recorded in Book 898, Page 329 of Official Records; thence, along the boundary of said Parcel 2 by the following 2 courses,

2nd: North 79° 33' East 47.75 feet; thence,

3rd: South 10° 34' East 10.00 feet to a point on a line parallel with and distant 5.00 feet Northerly, as measured at right angles, of the Southerly line of said Lot 2; thence,

4th: South 79° 33' West along said parallel line 47.75 feet to the point of beginning.

APN:  077-0-011-350

[END EXHIBIT "B"]

Standard Single Tenant Form Lease (Triple Net)
0124 Ventura - Main St.
2-16-2017 Final [SALC-CMM]

EXHIBIT "B"
Page 30 of 33

Initials: _____

**99¢ ONLY STORES**
**STANDARD SINGLE TENANT FORM LEASE (TRIPLE NET)**
<u>(2709 E. MAIN STREET, VENTURA, CA)</u>

**EXHIBIT "C"**

**DECLARATIONS**

1. Covenants, conditions and restrictions, dated April 26, 1949, by and between R.&S. Development Company, M.E. McReary, H.H. Sharman, Walter H. Rolapp, Bess Foster Rhiner, Van B. Foster, Jr., and Constance M. Foster (collectively, "Owners), recorded June 17, 1949, in Book 877, Page 355 of Official Records; and

2. Party wall agreement dated May 1, 1949, by Development Corporation and Walter H. Rolapp, recorded June 17, 1949 in Book 877, Page 419 of Official Records.

[END EXHIBIT "C"]

Standard Single Tenant Form Lease (Triple Net)
0124 Ventura - Main St.
2-16-2017 Final [SALC-CMM]

EXHIBIT "C"
Page 31 of 33

Initials: _____

## FIRST AMENDMENT TO LEASE
## (2709 E. MAIN STREET, VENTURA, CA)

THIS FIRST AMENDMENT TO LEASE (this "<u>Amendment</u>"), dated for reference purposes as March 14, 2017, is hereby entered into by and between NIKI MAIN STREET, LP, a California limited partnership ("<u>Landlord</u>"), and 99 CENTS ONLY STORES LLC, a California limited liability company ("<u>Tenant</u>"), with reference to the following facts:

A.    Landlord and Tenant are parties to that certain lease dated February 16, 2017 (the "<u>Original Lease</u>"), pursuant to which Tenant currently leases premises commonly known 2709 E. Main Street, Ventura, California.  Any capitalized terms used but not defined in this Amendment shall have the meaning set forth in the Original Lease.

B.    Landlord and Tenant desire to enter into this Amendment to amend the Original Lease as set forth hereinbelow.  As used in this Amendment, the "<u>Lease</u>" shall mean and refer to the Original Lease, as amended by this Amendment.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.    <u>TI Allowance</u>.  Section 12.16 of the Original Lease is hereby deleted in its entirety and replaced with the following:

"Section 12.16    **Tenant Allowance.**    By no later than April 10, 2017, LANDLORD will provide TENANT with a fixed amount equal to Three Hundred Sixty Thousand Dollars ($360,000.00) as a tenant improvement allowance ("TI ALLOWANCE"); provided, however, it is hereby understood and agreed that TENANT has no obligation whatsoever to use the TI ALLOWANCE for tenant improvements.  If the TI ALLOWANCE is not paid by LANDLORD by April 10, 2017, then TENANT shall have the right, in addition to any other remedies it may have at law or in equity, to deduct the unpaid amount of TI ALLOWANCE, together with interest thereon at the rate of ten percent (10%) per annum from the due date thereof until paid in full, from the BASE RENT and ADDITIONAL RENT due under this LEASE until the TI ALLOWANCE and applicable interest thereon are fully recovered."

2.    <u>Entire Agreement; No Further Modifications</u>.  The Lease contains the entire agreement between the parties with regard to Tenant's lease of the Premises.  Except as set forth in this Amendment, all the terms and provisions of the Original Lease shall apply and shall remain unmodified and in full force and effect.  To the extent any provisions of this Amendment conflict with any provisions of the Original Lease, the provisions of this Amendment shall prevail.

3.    <u>Counterpart Signatures</u>.  This Amendment may be executed in counterparts, each of which shall be deemed an original and all of which counterparts taken together shall constitute but one and the same instrument.  The parties hereto hereby agree that (a) either party may

D.T

deliver its signature to this Amendment by telecopy or electronic mail, (b) copies of this Amendment signed and delivered by means of faxed or emailed pdf signatures shall have the same force and effect as copies hereof signed and delivered with original signatures, and (c) the parties may rely upon faxed or emailed pdf signatures as if such signatures were originals.

4. <u>Authority</u>. Each party hereby represents and warrants that it has the full right and authority to execute and deliver this Amendment and each person signing on behalf of such representing party is authorized to do so.

5. <u>Submission</u>. Submission of this instrument for examination or signature by either party hereto shall not constitute an offer nor a representation or warranty of any kind by the other party, and this instrument shall not be effective as an amendment to the Original Lease or otherwise unless and until the same is fully signed and delivered by both parties.

**IN WITNESS WHEREOF**, this Amendment has been executed and delivered as of the later date set forth below.

**LANDLORD:**

NIKI MAIN STREET, LP,
a California limited partnership

By: _____
Name: _Genevieve Hedrick_____
Title: _Authorized Signer_____


Date:   March _16_, 2017


**TENANT:**

99 CENTS ONLY STORES LLC,
a California limited liability company


By: _____
       Jesse D. Allen
       Senior Vice President
       Real Estate


Date:   March _____, 2017


Page 2 of 2

First Amendment to Lease
0124 Ventura – Main St.
3.14.2017 [SALC-CMM]

D.T

## ASSIGNMENT AND ASSUMPTION OF LEASE

This Assignment of Lease (this "Assignment") is executed on this 10ᵗʰ day of December 2019, by and between Niki Main Street, LP, a California limited partnership (the "Assignor") having its principal place of business at c/o The Niki Group, LLC, 11720 El Camino Real, Suite 250, San Diego, CA 92130, and SGISMFederal, LLC, a California limited liability company (the "Assignee") having its principal place of business at 12100 Wilshire Blvd., Suite 1050, Los Angeles, CA 90035, with reference to the following facts:

## R E C I T A L S

A. Assignor is the owner of that certain real property located at 2709 E. Main Street, Ventura, CA as more particularly described in Exhibit A attached hereto (the "Property"), and the landlord under that certain Amended and Restated Single Tenant Form Lease (Triple Net) dated February 16, 2017 (as amended, the "Lease"), between Assignor and 99 Cents Only Stores LLC, a California limited liability company, for the Property.

B. On or about the date hereof, Assignor will convey all of its right, title and interest in and to the Property to Assignee, including but not limited to all of Assignor's right, title and interest in and to the Lease for the Property.

C. Assignor and Assignee desire to enter into this Assignment to confirm the assignment by Assignor to Assignee of all of Assignor's right, title and interest in and to the Lease and to confirm Assignee's assumption of Assignor's obligations under the Lease effective as of the Effective Date.

NOW THEREFORE, in consideration of the mutual covenants of the parties herein, and for good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1. <u>Assignment by Assignor</u>.  Assignor hereby transfers and assigns to Assignee all of Assignor's right, title and interest in and to the Lease, effective as of the Effective Date.

2. <u>Acceptance and Assumption by Assignee</u>.  Assignee hereby accepts the foregoing assignment and transfer and specifically assumes and agrees to perform and observe each and every covenant, agreement and condition to be performed or observed by "Landlord" under the Lease, from and after the Effective Date.

3. <u>Governing Law</u>.  This Assignment is made and entered into in the State of California and shall be interpreted, construed and enforced in accordance with the laws of the state in which the Property is located.

4. <u>Binding Effect</u>.  This Assignment shall apply to, bind, and inure to the benefit of Assignor and Assignee, and their respective heirs, legal representatives, successors and assigns.

5. <u>Counterparts and Facsimile</u>. This Assignment may be executed in one or more counterparts, each of which shall be an original, but all of which shall together constitute one instrument.  Facsimile copies shall be deemed originals.

6.    <u>Further Assurances</u>.  Assignor and Assignee shall, at either's reasonable request and without further consideration, execute and deliver such further instruments, as either may reasonably be required to further evidence this assignment and the transactions related hereto.

[Signatures on Following Page]

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment and Assumption of Lease as of the date first above written.

**ASSIGNOR:**

**Niki Main Street, LP,**
a California limited partnership

By:    The Niki Group, LLC,
       a California limited liability company
       Its: General Partner


       By: _____
           Genevieve Hedrick, Manager


**ASSIGNEE:**

**SGISMFederal, LLC,**
a California limited liability company

By: _____
    Michael Shanfeld, Member

IN WITNESS WHEREOF, Assignor and Assignee have executed this Assignment and Assumption of Lease as of the date first above written.

**ASSIGNOR:**

**Niki Main Street, LP,**
a California limited partnership

By:    The Niki Group, LLC,
       a California limited liability company
       Its: General Partner

By: _____
      Genevieve Hedrick, Manager


**ASSIGNEE:**

**SGISMFederal, LLC,**
a California limited liability company

By: _____
      Michael Shanfeld, Member

**Exhibit "A"**

**Legal Description**

Real property in the City of Ventura, County of Ventura, State of California, described as follows:

PARCEL 1:

A PART OF CASSANDRA STREET, NOW ABANDONED, AND A PART OF LOTS 1, 31, 32, 33 AND 34 OF HELENE PARK TRACT, IN THE CITY OF SAN BUENAVENTURA, COUNTY OF VENTURA, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 15, PAGES 48 AND 49 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID VENTURA COUNTY AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT THE POINT OF INTERSECTION OF THE CENTER LINE OF SAID CASSANDRA STREET WITH THE NORTHEASTERLY LINE OF EAST MAIN STREET, AS DELINEATED UPON THE ABOVE DESCRIBED MAP; THENCE FROM SAID POINT OF BEGINNING.

1ST: NORTH 51° 00' WEST 50.48 FEET ALONG THE NORTHEASTERLY LINE OF SAID EAST MAIN STREET TO A POINT; THENCE AT RIGHT ANGLES,

2ND: NORTH 39° 00' EAST 165.00 FEET TO A POINT; THENCE AT RIGHT ANGLES,

3RD: SOUTH 51° 00' EAST 116.50 FEET TO A POINT; THENCE AT RIGHT ANGLES,

4TH: SOUTH 39° 00' WEST 165.00 FEET TO A POINT IN THE NORTHEASTERLY LINE OF SAID EAST MAIN STREET; THENCE ALONG SAME,

5TH: NORTH 51° 00' WEST 66.02-FEET TO THE POINT OF BEGINNING.

PARCEL 2:

A PART OF LOTS 2 AND 33 OF HELENE PARK TRACT, IN THE CITY OF SAN BUENAVENTURA, COUNTY OF VENTURA, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 15, PAGES 48 AND 49 OF MAPS, IN THE OFFICE OF THE COUNTY RECORDER OF SAID VENTURA COUNTY , AND MORE PARTICULARLY DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE WESTERLY LINE OF SAID LOT 2 FROM WHICH A POINT IN THE SOUTHEASTERLY LINE OF FOOTHILL ROAD. 60.00 FEET WIDE, AS DELINEATED FROM THE ABOVE DESCRIBED MAP, AT THE NORTHWEST CORNER OF SAID LOT 2, BEARS NORTH 10° 34' WEST 105.00 FEET DISTANT; THENCE FROM SAID POINT OF BEGINNING,

1ST: SOUTH 10° 34' EAST 60.16 FEET ALONG THE WESTERLY LINE OF SAID LOTS 2 AND 33 TO A POINT; THENCE,

2ND: NORTH 39° 00' EAST 62.73 FEET TO A POINT; THENCE,

3RD: NORTH 10° 34' WEST 19.38 FEET TO A POINT; THENCE,

4TH: SOUTH 79° 33' WEST 47.75 FEET TO THE POINT OF BEGINNING.

TOGETHER WITH THE RIGHTS TO USE AND MAINTAIN THE SOUTHEASTERLY WALL OF THE BUILDING LOCATED ON PARCEL 1, ABOVE DESCRIBED, ON LAND ADJOINING ON THE SOUTHEAST, AS PROVIDED IN PARTY WALL AGREEMENT RECORDED JUNE 17,1949, IN BOOK 877, PAGE 419 OF OFFICIAL RECORDS.

EXCEPT THEREFROM THAT PORTION OF THE LAND GRANTED TO THE CITY OF SAN BUENAVENTURA IN THE DOCUMENT RECORDED AUGUST 10, 1970 RECORDED IN BOOK 3702, PAGE 381 OF OFFICIAL RECORDS, DESCRIBED AS FOLLOWS:

THAT PORTION OF HELENE PARK TRACT, IN THE CITY OF SAN BUENAVENTURA, COUNTY OF VENTURA, STATE OF CALIFORNIA, AS PER MAP RECORDED IN BOOK 15, PAGE 48 OF MISCELLANEOUS RECORDS IN THE OFFICE OF THE COUNTY RECORDER OF SAID VENTURA COUNTY, DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT IN THE WESTERLY LINE OF LOT 2 OF SAID HELENE PARK TRACT, SAID POINT BEING DISTANT NORTH 10° 34' WEST 5.00 FEET FROM THE SOUTHWESTERLY CORNER OF SAID LOT 2; THENCE,

1ST: NORTH 10° 34' WEST ALONG SAID WESTERLY LINE 10.00 FEET TO THE WESTERLY TERMINUS OF THE 4TH COURSE OF PARCEL 2 OF THAT LAND CONVEYED TO B.C. DOHN BY DOCUMENT RECORDED IN BOOK 898, PAGE 329 OF OFFICIAL RECORDS; THENCE, ALONG THE BOUNDARY OF SAID PARCEL 2 BY THE FOLLOWING 2 COURSES,

2ND: NORTH 79° 33' EAST 47.75 FEET; THENCE,

3RD: SOUTH 10° 34' EAST 10.00 FEET TO A POINT ON A LINE PARALLEL WITH AND DISTANT 5.00 FEET NORTHERLY, AS MEASURED AT RIGHT ANGLES, OF THE SOUTHERLY LINE OF SAID LOT 2; THENCE,

4TH: SOUTH 79° 33' WEST ALONG SAID PARALLEL LINE 47.75 FEET TO THE POINT OF BEGINNING.

PARCEL 3:

A NON-EXCLUSIVE EASEMENT OVER PARKING AS CREATED BY A "DECLARATION OF ESTABLISHMENT of CONDITIONS, COVENANTS, RESERVATIONS, LIENS AND CHARGES" DATED APRIL 26, 1946, SUBJECT TO THE TERMS AND PROVISIONS PROVIDED THEREIN, RECORDED JUNE 17, 1949 AS BOOK 877, PAGE 375 OF OFFICIAL RECORDS.

APN: 077-0-011-350

EXHIBIT "B"

**Receipt Number:** 10449858

**County of Ventura Treasurer - Tax Collector**

**Payment Date:** 04/10/2024 12:12:31.313

**Payment Receipt**

**Agent/Area:** System

**Confirmation Number:** H7VDWWWQA

**Tax Charges:**

| Bill Number | Inst. | Tax Year | Property Number | Charge Type | Tax Amount | Previous Payments | Amount Paid | Balance Due |
|---|---|---|---|---|---|---|---|---|
| 202301024897 | 2 | 2023 | 077-0-011-350 | Tax: | $29,510.10 | | | |
| | | | | Delinquent Penalty: | $0.00 | | | |
| | | | | Cost: | $0.00 | | | |
| | | | | Collection Fee: | $0.00 | | | |
| | | | | Redemption Fee: | $0.00 | | | |
| | | | | Monthly Interest: | $0.00 | | | |
| | | | | 506 Interest: | $0.00 | | | |
| | | | | Total Installment Charges: | $29,510.10 | $0.00 | $29,510.10 | $0.00 |
| | | | | Total Charges: | $29,510.10 | $0.00 | $29,510.10 | $0.00 |

**Payment(s) Received:**

| Mode | Check Number | Name | Amount |
|---|---|---|---|
| eCheck | | Shanfeld, Michael | $29,510.10 |
| | | Amount Received: | $29,510.10 |
| | | Service Fee: | $1.10 |
| | | Change: | $0.00 |
| | | **TOTAL PAID:** | $29,511.20 |

# EXHIBIT "C"

**From:** Byron Moldo
**Sent:** Friday, May 3, 2024 9:13 AM
**To:** Matthew Talmo <mtalmo@morrisnichols.com>
**Subject:** Number Holdings, Inc.

Matthew, I represent SGISMFEDERAL, LLC, the owner of real property located at 2709 E. Main Street, Ventura, CA 93003 which is debtor's store #124.

My client and I received and reviewed the Notice of Potential Assumption of Executory Contracts or Unexpired Leases and Cure Amounts ("Notice") that was filed with the court on May 2, 2024. Schedule 1 to the Notice lists my client's lease as item #225 on page 20. I've attached a complete copy of Schedule 1 for your easy reference. The purpose of this communication is to inform you and the debtor that the cure amount listed of $27,761.07 is incorrect. The correct cure amount is $57,272.27. The difference of $29,511.20 consists of a recent payment of taxes by my client. A copy of the payment receipt issued by the County of Ventura Treasurer – Tax Collector on April 10, 2024 is attached.

I would like to avoid filing an objection to the Notice. Please confirm by no later than May 9, 2024 that the cure amount for item #225 listed in Schedule 1 attached to the Notice will be amended to reflect the proper cure amount of $57,272.27.

If you have any questions, please contact me. Byron

---

**Byron Z. Moldo, Esq.**

ERVIN COHEN & JESSUP LLP

9401 Wilshire Boulevard, 12th Floor ǀ Beverly Hills, CA 90212-2974
(310) 281-6354 *(t)* ǀ (310) 887-6802 *(f)*
www.ecjlaw.com ǀ bmoldo@ecjlaw.com ǀ About me ǀ LinkedIn

---

The information contained herein is confidential and privileged attorney-client information or work product intended only for the individual or entity to whom it is addressed. Any unauthorized use, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify me immediately.



## CERTIFICATE OF SERVICE

I, Byron Z. Moldo, hereby certify that on the May 14, 2024, a true and correct copy of the foregoing was served via the Court's CM/ECF system on all parties authorized to receive electronic notice in this case, and upon the parties listed below via electronic mail (where e-mail addresses are listed) and first-class mail (where indicated):

FIRST CLASS MAIL
Milbank LLP
55 Hudson Yards
New York, NY 10001
Attn: Dennis F. Dunne, Michael W. Price, Lauren C. Doyle, Brian Kinney, James McIntyre
Email: ddunne@milbank.com; mprice@milbank.com; ldoyle@milbank.com;
      bkinney@milbank.com; jmcintyre@milbank.com

Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street, 16th Floor
P.O. Box 1347
Wilmington, DE 19899-1347
Attn: Robert J. Dehney, Sr., Matthew O. Talmo, Jonathan M. Weyand; Erin L. Williamson
Email: rdehney@morrisnichols.com; mtalmo@morrisnichols.com;
      jweyand@morrisnichols.com; emorrison@morrisnichols.com

The Office of the United States Trustee
for the District of Delaware
844 King Street, Suite 2207
Lockbox 35
Wilmington, DE 19801
Attn: Rosa Sierra-Fox
Email: rosa.sierra-fox@usdoj.gov

Pachulski Stang Ziehl & Jones LLP
919 N. Market Street, 17th Floor
PO Box 8705
Wilmington, DE 19801-80705
Attn: Bradford J. Sandler, Robert J. Feinstein, Steven W. Golden; Colin R. Robinson
Email: bsandler@pszjlaw.com; rfeinstein@pszjlaw.com; sgolden@pszjlaw.com;
      crobinson@pszjlaw.com;

/ / /

/ / /

1

Proskauer Rose LLP
11 Times Square
New York, NY 10036
Attn: David M. Hillman, and Megan R. Volin
Email: dhillman@proskauer.com; mvolin@proskauer.com

DATED:  May 14, 2024

**ERVIN COHEN & JESSUP LLP**

*/s/ Byron Z. Moldo*
Byron Z. Moldo (California State Bar No. 109652)
Chase A. Stone (California State Bar No. 335228)
9401 Wilshire Blvd., 12th Floor
Beverly Hills, California 90212-2974
Telephone: (310) 281-6354
Facsimile:  (310) 859-2325
Email: bmoldo@ecjlaw.com
        cstone@ecjlaw.com

*Counsel to SGISMFederal LLC*