**<u>EXHIBIT A</u>**

## LEASE CONTRACT

THIS LEASE CONTRACT entered into by and between WRI-AEW LONE STAR RETAIL PORTFOLIO, LLC, a Delaware limited liability company, with principal place of business in Houston, Harris County, Texas, hereinafter called "Landlord"; and 99 CENTS ONLY STORES TEXAS, INC., a Delaware corporation, hereinafter called "Tenant". Attached to this LEASE CONTRACT is an ADDENDUM which is annexed hereto and incorporated by reference herein and made a part hereof for all purposes.

### WITNESSETH:

### ARTICLE I

### Premises

Section 1.01. Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord the leased premises (the "Leased Premises"; and sometimes referred to as the "Premises") commonly known as 4849 FM 1960 West, Houston, TX 77069 being a portion of a one-story building which contains approximately 20,000 square feet of floor area, situated substantially in the location which is shown outlined or hatched on the plat designated Exhibit "A", which is annexed hereto and incorporated by reference herein and made a part hereof for all purposes, such building being located on part of the tract of property described in Exhibit "B", which is annexed hereto and incorporated by reference herein and made a part hereof for all purposes. The land described in Exhibit "B" (as may be reduced or increased from time to time as designated by Landlord, subject, however, to the restrictions set forth in this Lease) and any existing and future buildings, parking area, sidewalks, service area and other improvements now existing or hereafter erected thereon are sometimes herein referred to as the "Shopping Center". Landlord reserves the right to place in, under, or over the Leased Premises pipes, wires, lines, and facilities serving other areas of the Shopping Center provided such right is exercised in a manner which does not disrupt, impede, prevent or otherwise unreasonably interfere with Tenant's conduct of its business at the Leased Premises.

Section 1.02. The parties intend that the floor area of the Leased Premises be approximately 20,000 square feet. Following delivery of the Leased Premises to Tenant, Tenant may measure the floor area. If the floor area is less than 20,000 square feet, then Minimum Rent and all other amounts due under this Lease which are based on square footage shall be pro-rated and adjusted, provided that in no event shall the rent or any other amount payable by Tenant thereby increase as a result of the floor area of the Leased Premises being greater than 20,000. In determining all other measurements used within this Lease, areas shall be measured from the exterior face of all exterior walls and the center of all partition walls which separate any other building or portion of a building located within the Shopping Center from any interior area. Walls separating a building or a portion of a building from a mall and corridor walls shall be deemed to be exterior walls of such building or portion of a building.

### ARTICLE II

### Construction Work

Section 2.01. The Leased Premises shall be constructed in accordance with the Construction Rider attached hereto and incorporated by reference herein for all purposes.

### ARTICLE III

### Term

Section 3.01. The term of this Lease shall commence on the date of this Lease, and the term of this Lease shall terminate on the January 31st first following the tenth (10th) anniversary of the Rent Commencement Date (as defined in the Addendum), unless sooner terminated in accordance with the terms and conditions hereinafter set forth. Tenant shall have the option to extend the term of this Lease pursuant to and in accordance with the terms and conditions set forth in Paragraph 12 of the Addendum. At the request of Landlord from time to time made, Tenant will execute one or more memoranda or letters stating the commencement and termination dates of the Lease.


626

ARTICLE IV

Rental

Section 4.01.  As "Minimum Rent", Tenant covenants and agrees to pay to Landlord in Houston, Harris County, Texas, at P.O. Box 924133, Houston, TX 77292-4133, or at such other address as Landlord may from time to time designate in writing, the sum of Thirteen Thousand Three Hundred Thirty Three and 33/100 Dollars ($13,333.33) (based on $8.00 per square foot of floor area in the Leased Premises per annum) multiplied by the first sixty (60) full calendar months following the Rent Commencement Date (as defined in the Addendum) in the term of this Lease [plus a pro rata portion thereof for any partial month occurring during the month in which the Rent Commencement Date occurs if the Rent Commencement Date be other than the first day of a calendar month]; plus Fourteen Thousand One Hundred Sixty-Six and 67/100 Dollars ($14,166.67) (based on $8.50 per square foot of floor area in the Leased Premises per annum) multiplied by the remaining number of full calendar months in the term of this Lease. All such Minimum Rent payments shall be made on the first day of each calendar month, monthly in advance, for each and every month in the term of this Lease; provided, however, if the Rent Commencement Date does not occur on the first day of a calendar month, then Tenant will, in lieu of a full month's Minimum Rent, pay in advance a pro rata portion of such sum as Minimum Rent for such partial month.  Tenant's Minimum Rent obligations assume: (i) that the square footage of the Premises is 20,000 square feet (if the square footage is less, then the Minimum Rent and the Tenant's pro rata share of Common Area Operating Costs, Taxes and Insurance Premiums shall each be adjusted proportionately).

Section 4.02.  All Minimum Rent and other sums ("Additional Rent") hereunder provided to be paid by Tenant shall be due and payable by Tenant without demand, deduction, abatement or off-set except as expressly provided herein.  Failure by Tenant to timely pay Additional Rent may be treated by Landlord as a failure to pay Minimum Rent. All Minimum Rent and all Additional Rent shall be prorated to exclude any periods prior to the Rent Commencement Date and all periods subsequent to the expiration or sooner termination of the term of this Lease pursuant to the terms of this Lease. Any amount of Minimum Rent or Additional Rent paid by Tenant with respect to periods subsequent to the expiration or sooner termination of the term of this Lease shall be refunded by Landlord to Tenant promptly following the expiration or sooner termination of the term of this Lease.  If Landlord either (i) terminates the Lease or (ii) terminates Tenant's right to possession of the Leased Premises without terminating the Lease following an Event of Default, then all past due rent and other past due payments shall bear interest from the date due until paid at the lesser of (i) the rate of ten percent (10%) per annum, or (ii) the highest non-usurious rate per annum permitted by applicable law.

ARTICLE V

Utilities

Section 5.01.    Commencing upon tender of possession of the Leased Premises to Tenant, Tenant will at its own cost and expense pay for all water, sanitary sewer, gas, electricity and other utilities used in the Leased Premises and will save and hold Landlord harmless from any charge or liability for same. Such payments shall be made directly to the supplier of any utility separately metered to the Leased Premises. Landlord shall provide at its expense separate meters for all of such utilities to the Leased Premises, and no services to any portion of the Common Area nor to any other leasable area in the Shopping Center shall be included in the utilities metered to the Tenant. With respect to utilities provided to the Common Area, the same shall be metered separately from any and all leasable areas. Tenant will, upon request of Landlord, from time to time during the term hereof, furnish to Landlord copies of Tenant's water and sanitary sewer bills.

Section 5.02. Except as expressly provided in this Section 5.02, no interruption or malfunction of any utility services (including, without limitation, interruption of such utilities as a result of the enactment or promulgation, regardless of the ultimate validity or enforceability thereof, of any federal, state or local law, statute, ordinance, decree, order, guideline or regulation now or hereafter enacted or promulgated by any governmental, quasi-governmental, regulatory or executive authority), unless caused by Landlord's intentional acts, shall constitute an eviction or disturbance of Tenant's use and possession of the Leased Premises or a breach by Landlord of any of its obligations hereunder or render Landlord liable for any damages (including, without limitation, consequential or special damages) or entitle Tenant to be relieved from any of its obligations hereunder (including the obligation to pay rent) or grant Tenant any right of off-set or recoupment.  In the event of any such interruption of any such



services, Landlord shall use reasonable, diligent and good faith efforts to cause such service to be timely restored in any circumstances in which such interruption is caused by Landlord's fault, and in all other cases shall cooperate with Tenant's efforts to obtain immediate restoration of such service. Notwithstanding any term or provision to the contrary contained herein, in the event that such utility services are interrupted due to the negligence of Landlord or Landlord's employees, agents or contractors or Landlord's failure to perform any repair, maintenance or alteration required to be performed by Landlord under this Lease, and such interruption continues for a period longer than twenty-four (24) hours following Tenant having given notice of such interruption to Landlord, then to the extent that Tenant cannot and does not conduct its business in the Leased Premises due to such interruption, Minimum Rent and additional charges shall abate until such interrupted utility services have been restored.

ARTICLE VI

Use

Section 6.01. Tenant may use the Leased Premises solely for the following purposes: (a) for the retail sale of general merchandise, including beer and wine for off premises consumption (including, without limitation, all merchandise and types of merchandise and types of items sold in 99¢ Only Stores locations from time to time), for business offices in connection therewith and such other uses related or incidental thereto, and (b) for any other retail use or purpose; provided that any such use set forth above (i) complies with all laws, federal, state or local, and with any applicable regulation of any government body, and (ii) does not: (x) violate any existing exclusive use clauses granted to tenants in the Shopping Center, as set forth on Exhibit "F", annexed hereto and incorporated by reference herein and made a part hereof for all purposes, or (y) violate any future exclusive use clauses granted to tenants in the Shopping Center, provided Landlord complies with the requirements of Paragraph 10 of the Addendum, or (z) violate any existing prohibited uses or other restrictions that affect the Shopping Center, as set forth on Exhibit "G". Tenant will not use or permit use of the Leased Premises for any other purpose without the written consent of Landlord. Landlord agrees to fully cooperate with Tenant in obtaining a beer and wine sales permit, at Tenant's expense. So long as Tenant has not through its use of the Leased Premises violated an "exclusive" use granted by Landlord to another occupant of the Shopping Center which pursuant to the terms of this Lease is imposed on Tenant, Landlord shall indemnify and defend Tenant against any and all claims asserted by third parties claiming infringement of exclusivity in the Shopping Center.

Nothing in this Lease shall be construed as a covenant by Tenant of continuous operations and Tenant has no obligation under this Lease to continuously operate its business in the Premises. Notwithstanding the foregoing, but subject to Force Majeure (for purposes of this paragraph, "Force Majeure" shall include other comparable causes beyond the control of Tenant), within one hundred eighty (180) days from the Tender Date (as defined in the Addendum), Tenant shall open for business for one (1) business day as a regular 99¢ Only Store that is substantially similar to a majority of the stores operated by Tenant and its parent, 99¢ Only Stores, a California corporation ("Parent"), as of the date of this Lease. Thereafter, if Tenant ceases conducting business in the Leased Premises for a period longer than one hundred twenty (120) consecutive days [other than for the remodeling thereof once every five (5) years, or as a result of a casualty or condemnation, or due to an event of Force Majeure], Landlord shall have the right (without obligation) at any time thereafter (so long as Tenant has not resumed conducting business in the Leased Premises) to terminate this lease by giving Tenant thirty (30) days' written notice ("Termination Notice"). Notwithstanding the foregoing, Landlord's Termination Notice shall be null and void and of no further force and effect if: (a) within said 30-day period, Tenant gives Landlord written notice ("Tenant's Notice") that Tenant intends to reopen the Leased Premises for business within ninety (90) days from Tenant's receipt of the Termination Notice, and (b) Tenant, or a permissible or permitted assignee or sublessee of Tenant who has complied in all respects with the terms of this Lease, actually re-opens for business in the Leased Premises within said 90-day period. If Tenant (or an assignee or sublessee of Tenant as stated above) fails to re-open for business in the Leased Premises within said 90-day period, then Landlord shall have the right to terminate the Lease at any time thereafter by giving Tenant ten (10) days' written notice (which notice may not be overridden). Upon such termination, neither Landlord nor Tenant shall have any further liability hereunder except for matters that accrued on or prior to the date of termination. Following a resumption of business in the Leased Premises, Tenant shall continue to have the right to cease doing business in the Leased Premises, and Landlord shall continue to have the right to terminate this Lease in the manner set forth above, but Tenant shall not have the right to override Landlord's termination unless, upon each such resumption of business in the Leased Premises, Tenant operates [subject to interruptions for the remodeling thereof



once every five (5) years, or as a result of a casualty or condemnation, or due to an event of Force Majeure], for a period of at least two (2) years with no interruption in excess of one week.

Tenant, at its own expense, will comply with all Federal, State, municipal and other laws, codes, ordinances, rules and regulations (collectively, the "Law") applicable to the Leased Premises and the business conducted therein by Tenant when performing Tenant's work in the Leased Premises pursuant to the Construction Rider and throughout the term of this Lease. In addition, after the date Tenant opens for business in the Leased Premises, Tenant, at its own expense, will comply with all changes in the Law applicable to the Leased Premises and the business conducted therein by Tenant, but nothing in this paragraph modifies the repair and maintenance provisions of this Lease. In addition, Tenant, at its own expense will install, remove and alter such fixtures, equipment and facilities in, and make such alterations to, the Leased Premises as may be necessary to comply with the Law; provided, however, Tenant shall have no obligation to make alterations to the structure of the Leased Premises and/or utilities serving other portions of the Shopping Center or which affect the fire/life/safety portions of the building of which the Leased Premises are a part or which otherwise pertain to items which Landlord is responsible to repair and maintain pursuant to the provisions of this Lease (all of which shall be Landlord's responsibility) unless such compliance is a result of Tenant's particular use of the Leased Premises (i.e., for other than general retail use) or construction performed by Tenant in the Leased Premises. Tenant will maintain the Leased Premises in a clean and sanitary condition including providing for the removal of garbage, trash and other waste; and will furnish and maintain not less than one fire extinguisher in the Leased Premises. Tenant will not engage in any activity or permit any nature of construction by Tenant or any other condition at the Leased Premises which would cause Landlord's fire and extended coverage insurance to be canceled, or the rate therefor increased (or at Landlord's option will upon demand pay any such increase, but Tenant's conduct of its business within the Premises in conformance with the provisions of this Lease shall be permitted without additional charge of any kind to Tenant); will comply with such safety recommendations and loss prevention and loss reduction recommendations as Landlord or Landlord's insurance carriers (or both) may, from time to time, request, but no such request shall require Tenant to make any improvements to the Premises nor will the same cause Tenant to change the manner or method of conducting its business so long as the same is in compliance with all applicable laws; will not conduct any auction or bankruptcy or fire or "lost-our-lease" or "going-out-of-business" or similar sale; will not make any unlawful use of the Leased Premises or permit any unlawful use thereof; will not use any loudspeaker, phonograph, radio or sound amplifier heard outside the Leased Premises; and will not commit any act which is a nuisance.

Section 6.02.  Tenant shall be responsible, at its sole cost and expense, for the removal of its trash and rubbish.

Section 6.03.  Intentionally omitted.

Section 6.04.  Landlord hereby represents and warrants to Tenant that Tenant's rights of use of the Leased Premises as described in this Lease, including (without limitation) the use clause set forth in this Lease, are permitted under all documents of record in the Official Public Records of Real Property of Harris County, Texas, without the consent of any person other than:  (a) Landlord, if the further consent of Landlord is expressly required pursuant to the terms of this Lease, or (b) any applicable governmental or quasi-governmental entity with respect to permits, licenses, consents and the like.

ARTICLE VII

Common Area

Section 7.01.  A.  Landlord will provide a "Common Area" (as hereinafter defined) in the Shopping Center and make necessary repairs thereto, and, except when prevented from doing so by causes beyond its control, Landlord will also provide lighting in the parking area in the Shopping Center from dusk until the later of (i) 10:00 o'clock P.M. or (ii) one-half hour after the closing hour of tenants occupying ninety percent (90%) of the floor area of all stores in the Shopping Center. Tenant, its employees, customers and invitees shall have the non-exclusive use, along with others, of the Common Area.  Notwithstanding the foregoing, Landlord shall have the right to designate parking within the Common Area for use by Tenant and its employees.  If Landlord elects to institute such a program, Landlord will notify Tenant in advance, and thereafter, Tenant and its employees may have the non-exclusive use, along with other tenants and their employees, of only that available parking space from time to time specifically designated by Landlord for such use (and neither Tenant nor its employees shall use any other parking space in the Shopping Center), and (ii) to effectuate this provision, Tenant will,



within ten (10) days after written request from Landlord, furnish to Landlord the automobile license numbers of any or all automobiles owned or used by Tenant or its employees. If Landlord elects to institute such a program, Landlord shall impose the same parking restrictions on the employees of all other tenants and occupants of the Shopping Center (including, without limitation, the employees of Landlord) and shall enforce the same against such employees of others in the same manner as provided under this Lease with respect to Tenant's employees. In the event of the failure by Tenant's employees to park in the space specifically designated by Landlord from time to time for such use, Landlord shall have the right, at Landlord's option, to tow off any such automobile parked in violation of the terms hereof. Tenant agrees to indemnify and hold Landlord harmless from all claims, suits, actions, damages, liability and claims (including costs and expenses of defending against all the aforesaid with counsel of Tenant's selection) arising (or alleged to arise) as a result of any claim brought against Landlord by an employee of Tenant as a result of Landlord towing any vehicle owned or used by one of Tenant's employees when such vehicle is parked in violation of the provisions of this paragraph. The non-exclusive usage rights to the Common Area herein granted to Tenant shall constitute a non-exclusive license existing during the term of this Lease but not thereafter. Landlord shall have the right, from time to time, to establish, modify and enforce rules and regulations with respect to the Common Area and to police same. Subject to the provisions of the Addendum with respect to the Common Area and the Protected Area, Landlord shall have the right, from time to time, to change the arrangement, layout and/or size of the Common Area (but not the Protected Area), and to do and perform such other acts in the Common Area as Landlord shall, in its good faith judgment, determine to be advisable; provided, however, that Landlord shall at all times: (i) provide a Common Area for parking and other purposes commonly associated with retail shopping centers, and (ii) maintain compliance with all parking ratios required by all applicable governmental authorities. Landlord shall have no duty or obligation to prevent or attempt to prevent or terminate any usage of the Common Area or any other portion of the Shopping Center by picketers, public action groups or other persons advocating any cause, whether or not such usage is permitted under the Constitution and laws of the United States or State of Texas or other laws. There shall be no charge to customers for use of the parking at the Shopping Center.

B.    For purposes of this Lease, the phrase "Common Area" includes the aforesaid customer's parking area, employees' parking area, service drives and service roads, traffic islands, landscaped areas, loading and service areas, sidewalks, roofs, gutters and downspouts, sprinkler risers serving all or any buildings located in the Shopping Center, electrical gutters serving all or any buildings located in the Shopping Center, and such other portion or portions of the Shopping Center (not leased or rented or held by Landlord for the purposes of being leased or rented to other tenants) as may from time to time be designated or treated by Landlord as part of the Common Area, as well as drainage facilities and lighting facilities servicing any one or more of the aforesaid areas.

Section 7.02.    Tenant will at all times keep all merchandise and displays within the Leased Premises and will not at any time display any merchandise or offer it for sale or (other than during essential loading or unloading operations on the sidewalk in front of the Leased Premises ["Front Loading Area"] and in the Service Area, as depicted on Exhibit "A" attached to the Lease) permit it to be on adjacent sidewalks or at any other point outside the Leased Premises. Landlord shall enforce the same restriction against all other tenants and other occupants of the Shopping Center who are subject to such a restriction. Tenant will not in any other way use or obstruct such sidewalks or other area outside the Leased Premises, except as expressly permitted under this Lease.

Section 7.03.    Tenant will not load or unload any trucks or permit any trucks serving the Leased Premises, whether owned by Tenant or not, to be located or unloaded in the Shopping Center except on Tenant's Service Area and, subject to the terms of this Section 7.03, the Front Loading Area.  Tenant shall have the right to use the Front Loading Area: (i) for periodic loading and unloading of merchandise delivered from typical box trucks, (ii) provided there is at all times pedestrian access over and across the sidewalk in front of the Leased Premises (except for the temporary interruption to the extent reasonably necessary for the initial installation of Tenant's shopping cart storage facilities in accordance with Section 7.04 below), for the storage of Tenant's shopping carts, and (iii) in extraordinary circumstances where the Service Area is inaccessible or otherwise inadequate (in Tenant's reasonable judgment), for the purpose of unloading Tenant's delivery trucks.  In no event shall the trucks making deliveries through the Front Loading Area be permitted to park for extended periods of time anywhere within the parking area of the Common Area or impede access over and across the parking drives or aisles except on a temporary basis as is reasonably necessary, nor shall the deliveries unreasonably interfere with pedestrian access over and across the sidewalks in the Common Area.  All trucks making deliveries to the Front Loading Area shall be immediately unloaded and moved to a location which does not impede

GSG

the drives and/or aisles. Tenant shall have the exclusive use of Tenant's Service Area and Landlord shall not modify Tenant's Service Area.

Section 7.04. Tenant shall be permitted, at its cost and expense, to install, maintain and modify shopping cart storage within that area shown on Exhibit "A" as "Cart Corral Area" and, subject to the terms and conditions of Section 7.03 above, the Front Loading Area. Tenant shall be responsible for repairing and maintaining the Tenant's shopping cart storage facilities except to the extent required as a result of damage caused by Landlord or its agents, employees or contractors, which damage shall be promptly repaired by Landlord. Except to the extent arising as a result of any act or omission of Landlord or its agents, employees or contractors or property damage to which the waiver of subrogation provisions apply, Tenant shall indemnify and hold Landlord harmless from any damage or third party claim resulting from the presence of the cart corral in the Common Area.

Section 7.05. Nothing in this Article or elsewhere in this Lease shall be construed as constituting the Common Area, or any part thereof, as part of the Leased Premises.

ARTICLE VIII

Assignment and Subletting

Section 8.01. Except as set forth in the Addendum, Tenant shall not assign this Lease or sublease the Leased Premises or any part thereof or mortgage, pledge or hypothecate its leasehold interest or grant any concession or license within the Leased Premises or sublease any operating department therein, and any attempt to do any of the foregoing shall be void and of no effect.

Section 8.02. If this Lease be assigned Landlord may nevertheless collect rent from the assignee, and apply the net amount collected to the rent payable hereunder, but no such transaction or collection of rent or application thereof by Landlord shall be deemed a waiver of these provisions or a release of Tenant from the further performance by Tenant of its covenants, duties and obligations hereunder.

ARTICLE IX

Repair and Maintenance

Section 9.01. Landlord, at its sole cost and expense, shall keep or cause to be kept in good order, repair and condition, and replace if so required, throughout the term of this Lease, the following: (a) the foundations of the Leased Premises; (b) the roof of the Leased Premises (inclusive of the roof membrane) in a water tight condition; (c) the floor slab of the Leased Premises; (d) all other structural portions of the Leased Premises; (e) all water, sewer, electric and gas connections to the building (exclusive of utility lines located within the boundaries of the Leased Premises); and (f) the fire sprinkler system within the building (except that Tenant shall be responsible for individual sprinkler drops and sprinkler heads, as well as monitoring). Items (a), (b), (c) and (d) directly above, may not be included in Common Area Operating Costs or otherwise charged to Tenant under this Lease. Landlord shall be responsible for the periodic maintenance of the items set forth in this paragraph, but shall not be obligated to commence particular repairs or replacement of specific items until Tenant has notified Landlord of a condition or circumstance necessitating such repair or replacement. Notwithstanding the foregoing provisions, if repair or replacement of the items described in this paragraph are necessitated by any breach by Tenant or its employees or agents of its obligations under this Lease or by the intentional misconduct of Tenant or its employees or agents (other than for matters within the scope of the damage and destruction provisions of this Lease or the waiver of subrogation provisions of this Lease), then (in any of such events) Landlord shall not be required to repair or replace such item(s). Further, Landlord shall not be required to maintain, repair or replace any alterations or additions to the existing structural elements of the Leased Premises (for example, but not by way of limitation, the Demising Wall) made by Tenant in connection with Tenant's Work (as defined in the Construction Rider).

Section 9.02. Subject to the provisions of Section 9.01 and Articles XI and XIX, Tenant, at its sole cost and expense, shall maintain in good condition and repair all interior, non-structural portions of the Leased Premises [exclusive of: (a) the foundations of the Leased Premises; (b) the roof of the Leased Premises (inclusive of the roof membrane) in a water tight condition; (c) the floor slab of the Leased Premises; (d) all other structural portions of the Leased Premises; (e) all water, sewer, electric and gas connections to the building (exclusive of utility lines located within the boundaries of the Leased



GSG

Premises); (f) the fire sprinkler system within the building (except that Tenant shall be responsible for individual sprinkler drops and sprinkler heads, as well as monitoring)], as well as all floor covering, heating and air conditioning equipment (whether any such equipment is roof mounted or otherwise affixed outside the Leased Premises), electrical equipment and fixtures, plumbing fixtures and equipment, wiring and plumbing lines (including that within walls or ceiling or under flooring or floor covering), doors, door frames, molding, trim, windows, window frames, closure devices and hardware. Tenant will also replace all broken or cracked plate glass and glass windows (unless caused by an event within the scope of Articles XI or XIX or by the intentional misconduct of Landlord or its employees). Except for the initial work to be undertaken by Tenant as described in the Construction Rider, Tenant shall not make, or permit to be made, any penetration in the roof of the building of which the Leased Premises are a part without Landlord's prior written consent, which consent shall not be unreasonably withheld or delayed; however, Tenant shall be responsible for all rooftop flashing around the rooftop air conditioning unit. In the event that any such roof penetration is required in connection with any repairs, maintenance, renewals or replacements required to be made by Tenant hereunder, upon Tenant's written request, Landlord promptly shall designate two or more contractors whom Tenant may hire to perform such roof penetration at Tenant's cost.

If either Landlord or Tenant considers necessary any repairs, maintenance, or replacements to the Leased Premises required by the provisions of this Lease to be made or provided by the other, then such party shall request in writing that the other party make such repairs or perform such maintenance or provide such renewal or replacements to the Leased Premises, and, upon such party's failure or refusal to do so promptly (i.e. to commence such repair, maintenance or replacement within thirty (30) days following such written request and thereafter to complete the same with all due diligence in a reasonable amount of time, and in any event in case of an emergency, then immediately and irrespective of whether the party in a position to perform such maintenance, repair, or replacement shall have requested the obligated party to perform), the requesting party shall have the right (but shall not be obligated), either itself or through a third party contractor, to make such repair, perform such maintenance or provide such replacement (the party obligated to perform such work hereby waiving any damage caused thereby including, without limitation, any damage caused by any such third party contractors engaged to perform such work); thereupon the party obligated to perform such work will, at the other party's election, on demand pay (or reimburse the other party for) the cost thereby incurred by the other party. For these purposes an "emergency" shall be deemed to exist if, in the good faith judgment of respectively, Landlord or Tenant, prompt action is needed in order to prevent death, bodily injury or: (a) in the case of Landlord, property damage to the structural portions of the Leased Premises, or (b) in the case of Tenant, material interference with the conduct of Tenant's business in the Leased Premises. Any such sum which Tenant becomes liable to pay to or reimburse Landlord for hereunder may be treated by Landlord as a portion of the rental due and owing by Tenant to Landlord with the next succeeding installment of Minimum Rent due hereunder, for purposes of determining Landlord's remedies in the event of any failure by Tenant to pay such sum to Landlord contemporaneous with the next succeeding installment of Minimum Rent due hereunder, and any such sum which Landlord becomes obligated to pay to or reimburse Tenant for hereunder may be deducted by Tenant from the next Minimum Rent and Additional Rent payment obligations due hereunder, subject to the limitation set forth below. If Landlord makes any such repairs, performs any such maintenance, or provides any such renewal or replacement to the Leased Premises, or undertakes to do so (or engages any third party contractors to do so), then except for the intentional misconduct or gross negligence of Landlord, its employees or its contractors, Landlord shall not be liable to Tenant for all loss or damage that may occur to Tenant's merchandise, fixtures or other property or to Tenant's business incident to such action by Landlord. If Tenant makes any such repairs, performs any such maintenance, or provides any such renewal or replacement to the Leased Premises, or undertakes to do so (or engages any third party contractors to do so), then except for the intentional misconduct or gross negligence of Tenant, its employees or its contractors, Tenant shall not be liable to Landlord for any loss or damage that may occur to the Leased Premises, the Shopping Center or the value of Landlord's tangible and intangible property interests located in or about the Shopping Center incident to such action by Tenant. Notwithstanding the other provisions of this paragraph: (a) the maximum amount that Tenant may deduct from the Minimum Rent and Additional Rent due under this Lease pursuant to this paragraph with respect to any single event of required repair, maintenance or replacement shall not exceed an amount equal to two (2) months of Minimum Rent at the rate at which Minimum Rent is payable as of the date of the making of such repair, maintenance or replacement, but such limitation shall not preclude Tenant from seeking recovery through legal action for all other amounts expended by Tenant pursuant to the provisions of this paragraph; and (b) Landlord shall not have any self-help action of either the nature described in this paragraph or otherwise if the alleged failure by Tenant to maintain, repair or replace some item or portion of the Premises pertains to a portion of the Premises solely located within the outer walls of the



GSG

Premises and the same: (i) does not violate applicable law; (ii) does not pose the threat of injury or death to persons; and (iii) does not pose the threat of damage to the building of which the Leased Premises are a part.

Section 9.03.  Tenant will not commit waste. Upon termination of this Lease, Tenant will surrender and deliver up the Leased Premises to Landlord broom-clean and in the same condition in which they existed at the commencement of this Lease, excepting only (i) ordinary wear and tear, (ii) damage or destruction within the scope of the provisions of Articles XI or XIX of this Lease, (iii) repair, maintenance and restoration obligations which are the express obligation of Landlord under the provisions of this Lease or which are otherwise necessitated by the intentional misconduct of Landlord or its employees, contractors or agents or a breach of Landlord's obligations under this Lease. Upon termination of this Lease, Tenant will also surrender to Landlord all keys to the Leased Premises at the place stated herein for the payment of rent and inform Landlord, in writing, of all combinations on locks, safes and vaults, if any, at the Leased Premises.

Section 9.04.  Landlord, upon not less than 5 days prior written notice (except in the event of an emergency) will have a right to enter the Leased Premises during business hours only (except in the case of an emergency) to inspect the condition thereof, and, to the extent and only to the extent permitted pursuant to the provisions of Section 9.02 above: to make necessary repairs and improvements, or to repair or maintain pipes, wires, and other facilities serving other premises in the Shopping Center; provided however, such right shall not be exercised in a manner which would unreasonably interfere with Tenant's conduct of its business at the Leased Premises.

Section 9.05.  Should any mechanic's liens or other liens or affidavits claiming liens be filed against the Leased Premises or the Shopping Center or any portion thereof or interest therein, for any reason whatsoever by reason of acts or omissions taken by or at the direction of Tenant, including any contractor of Tenant or any such contractor's subcontractor or any laborer performing labor or materialman furnishing materials at or for the Leased Premises at the direction of Tenant, or by reason of any specially fabricated materials, whether or not placed at the Leased Premises, if ordered by or at the direction of Tenant, Tenant shall cause the same to be cancelled and discharged of record by payment, bonding or otherwise, within thirty (30) days after notice by Landlord, or at such earlier time as is necessary to prevent the foreclosure thereof.

ARTICLE X

Additions and Fixtures

Section 10.01.  Except as set forth in the Addendum and except as set forth below, other than with respect to the original alterations which may be made by Tenant pursuant to the Construction Rider, Tenant will make no alterations or additions to the Leased Premises without the prior written consent of Landlord. Tenant may, without Landlord's consent, make non-structural, interior alterations or additions; provided that, in doing so, Tenant shall comply with all Federal, State, municipal and other laws, codes, ordinances, rules and regulations applicable to work to be performed in the Leased Premises. At such time as Tenant requests written consent of Landlord, if required, Tenant shall submit plans and specifications for such alterations or additions. Following completion of any additions or alterations the cost of which equals or exceeds $25,000.00, upon written request of Landlord, Tenant will supply Landlord with the as-built plans and specifications for such alterations or additions.

Section 10.02.  Tenant shall remove "Removable Trade Fixtures", as hereinafter defined, (excluding, all components of the HVAC system; ducts, conduits, wiring and pipes; paneling or other wall covering; and floor covering), and, in addition to other applicable provisions of this Lease regarding such removal, the following shall apply:  (1) such removal must be made prior to the termination of the term of this Lease; (2) Tenant must not be in default of any obligation or covenant under this Lease at the time of such removal; and (3) such removal must be effected without damage to the Leased Premises or the building of which the Leased Premises are a part and Tenant must promptly repair all damage caused by such removal. For the purposes hereof, the phrase "Removable Trade Fixtures" means the following:  all of Tenant's signs, tables, chairs, desks, racks, merchandisers and displayers, standards, wall brackets, hang-rods, shelves, mirrors, marking equipment, cash registers and other business machines. All plumbing and electrical wiring connections exposed as a result of the removal of Tenant's Removable Trade Fixtures shall be capped by Tenant in a safe and workmanlike manner.



Section 10.03. Tenant shall pay the full amount of all taxes, assessments, impositions, levies, charges, excises, fees, licenses and other sums levied, assessed, charged or imposed by any governmental authority or other taxing authority upon all alterations, additions, fixtures (including Removable Trade Fixtures), inventory and other property installed or placed or permitted at the Leased Premises by Tenant. Within thirty (30) days after notice from Landlord, Tenant shall furnish Landlord a true copy of receipts evidencing such payment received by Tenant from the governmental authority or other taxing authority assessing such charges.

Tenant will also pay all insurance premiums assessed or levied upon any alterations, additions, fixtures or property installed in the Leased Premises by the Tenant and all insurance related to Tenant's use, occupancy and operations within the Leased Premises and the Shopping Center, all to the extent of and subject to each and all of the provisions of the Addendum.

ARTICLE XI

Fire and Destruction of Premises

Section 11.01. If at any time when twelve (12) full calendar months or more remain in the lease term, the Leased Premises should be destroyed or damaged by fire or other risk covered by Landlord's fire and extended coverage insurance, the extent of such damage is less than twenty-five percent (25%) of the then replacement cost of the Leased Premises above the foundation then, except for replacement or repair of the floor covering, Landlord will be obligated to repair and reconstruct the damaged portion of the Leased Premises to substantially the condition in which they existed at the time of Landlord's tender of possession of the Leased Premises to Tenant. If the Leased Premises should be destroyed or damaged by fire or any other risk other than as provided in the immediately preceding sentence, then Landlord shall have the election to terminate this Lease or to repair and reconstruct the Leased Premises, and Landlord will notify Tenant of its election within thirty (30) days after receipt of written notice from Tenant of such damage or destruction. If Landlord does not elect to terminate by written notice delivered to Tenant within such period of time, then Landlord shall be deemed to have elected to repair and restore the Leased Premises as described in this Section. If Landlord does elect within said period to terminate this Lease, then within thirty (30) days following receipt of said notice from Landlord, Tenant may elect to exercise any remaining option to extend the term of this Lease, and Landlord will thereafter repair and reconstruct the Leased Premises as described in this Section. If Tenant fails to timely exercise any remaining option to extend the term of this Lease, or if there are no remaining options to extend the term of this Lease, then Landlord's election to terminate the Lease shall be binding on Tenant. Upon such termination, neither Landlord nor Tenant shall have any further liability hereunder except for matters that accrued on or prior to the date of termination.

Section 11.02. Notwithstanding that the Leased Premises may not be destroyed or damaged by fire or other risk, in the event that other buildings containing fifty percent (50%) or more of the ground floor building area of the Shopping Center shall be damaged or destroyed by fire or other risk, whether or not covered by Landlord's fire and extended coverage insurance, Landlord shall have the election to terminate this Lease or to continue this Lease in full force and effect, and Landlord will notify Tenant of Landlord's election within sixty (60) days after receipt of written notice by Landlord of such other damage or destruction; provided, however, that Landlord may make such election to terminate only if concurrent with such election by Landlord, Landlord terminates all other leases and occupancies of all tenants and occupants in the Shopping Center and delivers evidence thereof to Tenant. If Landlord elects to rebuild a retail shopping center similar in nature (but not necessarily in configuration) to the existing Shopping Center, then neither Landlord nor Landlord's successor in interest shall thereafter lease the Leased Premises (or space comparable to the Leased Premises) to any other person without first offering the same to Tenant on the exact same terms and conditions (including rent and remaining balance of the term of the Lease and options to extend the term of this Lease) as existed on the date of the damage and destruction event that gave rise to the Landlord's termination right. Assuming Tenant accepts Landlord's offer, Tenant shall not be required to open for business in the Leased Premises until the entire Shopping Center has been fully restored with buildings comprising not less than 75% of the square footage in existence as of the date of the damage and destruction event giving rise to such termination by the Landlord. The covenants contained in this paragraph shall expressly survive any termination of the leasehold estate evidenced and created hereby.

Section 11.03. In any circumstances described above where Landlord is either obligated to repair and restore the Leased Premises, or where Landlord elects to repair and restore the Leased Premises, this Lease shall continue in full force and effect, and such repairs will be made by Landlord



656

with all due diligence, subject to delays caused by governmental restrictions, strikes, lockouts, shortages of labor or material, acts of God, war or civil commotion, fire, unavoidable casualty, inclement weather or any other comparable cause beyond the control of Landlord (all of the aforesaid causes for delay being herein sometimes referred to as "Force Majeure"); provided, however, that Force Majeure shall not include Landlord's financial inability. Minimum Rent and all Additional Rent shall abate proportionately during the period and to the extent that the Leased Premises are unfit for use by Tenant and not actually used by Tenant in the conduct of its business. In addition, up to ten percent (10%) of the Minimum Rent payable per month shall be equitably abated (in an amount to be agreed upon in good faith by Landlord and Tenant), during a period and to the extent: (i) the Common Area is affected, either by damage to it or by its use for construction and repair, and such condition has a material and adverse impact on the Leased Premises; (ii) pedestrian and vehicular access to the Leased Premises, including the Service Area and Front Loading Area, is materially and adversely affected; and (iii) visibility of Tenant's signs, including those located on any monument sign, is materially and adversely affected.

## ARTICLE XII

### Liability and Indemnity

Section 12.01. Except only as to (i) injury, death or property damage proximately caused by the sole negligence of Landlord for which Landlord is legally liable, or for the intentional misconduct of Landlord, or (ii) property damage to which the waiver of subrogation provisions contained in this Lease apply, Tenant agrees to indemnify and hold Landlord and Landlord's employees harmless from all losses, claims, suits, actions, damages, and liability (including costs and expenses of defending against all of the aforesaid) arising (or alleged to arise) from any act or omission of Tenant or Tenant's agents, employees, assignees, sublessees, or contractors or arising from any injury to or death of any person or persons or damage to or destruction of the property of any person or persons occurring in or about the Leased Premises or Tenant's Service Area or damage to or destruction of the property of any person or persons as a result of Tenant's cart corral in the Common Area, and Tenant assumes responsibility for the condition of the Leased Premises, Tenant's Service Area and the cart corral, and agrees to give Landlord written notice in the event of any damage, defect or disrepair therein. Tenant agrees to use and occupy the Leased Premises and place its fixtures, equipment, merchandise and other property therein at its own risk and hereby releases Landlord and its agents from all claims for any damage or injury to the full extent permitted by law, except for damage to property or death or injury to person arising out of Landlord's breach of its obligations under this Lease or Landlord's intentional misconduct.

Section 12.02. Tenant agrees to take out and maintain at all times during the lease term a policy of fire and extended coverage insurance on its alterations, additions, fixtures, equipment, merchandise, Removable Trade Fixtures and other property placed at the Leased Premises (including but not limited to, the rooftop HVAC unit and plate glass). Such policy shall contain a full replacement cost endorsement. In the event that Tenant sustains a loss by reason of fire or other casualty which is covered (or could have been covered) by a fire and extended coverage insurance policy, and such fire or casualty is caused in whole or in part by acts or omissions of Landlord, its agents, servants or employees, then Tenant agrees to look solely to its insurance proceeds (if any); and Tenant shall have no claim or right of recovery against Landlord, or the agents, servants or employees of Landlord; and no third party shall have any claim or right of recovery by way of subrogation or assignment or otherwise. To the extent that Tenant fails to take out or maintain the aforesaid fire and extended coverage insurance policy, such failure shall be a defense to any claim asserted by Tenant against Landlord by reason of any loss sustained by Tenant due to fire or other casualty, notwithstanding that such loss might have been proximately caused solely by the negligence of Landlord. Such insurance policy shall contain a loss payable clause designating Tenant and Landlord as loss payees as their respective interests may appear. Tenant shall be responsible for the safety and personal well being of Tenant's employees, both within the Leased Premises and in the Common Area. Tenant agrees that Landlord shall not be responsible or liable to Tenant for injury, death or damage or loss occasioned by the acts or omissions of persons occupying any other part of the Shopping Center or occasioned by the condition of the Shopping Center or property of any other occupant of any part of the Shopping Center or the acts or omissions of any other person or persons present at the Shopping Center who are not occupants of any part thereof, whether or not such persons are present with the knowledge or consent of Landlord. If at any time Tenant is a publicly held entity and has a net worth of not less than One Hundred Million Dollars ($100,000,000), Tenant may elect to self insure with respect to the property damage elements within the scope of this Section 12.02.

G56

Section 12.03.   Tenant will take out and maintain, at its own cost and expense, commercial general liability insurance coverage in a minimum amount of $2,000,000 combined single limit, which commercial general liability policy shall include (i) coverage for bodily injury and death, property damage and products liability coverage; (ii) contractual liability coverage insuring the obligations of Tenant under the terms of this Lease; and (iii) fire legal liability coverage with respect to the Leased Premises and the building of which they are a part in the amount of at least $25,000.00. Such policy shall name Landlord (and any of its affiliates, subsidiaries, successors and assigns designated in writing by Landlord) and Tenant as the insureds.

If Tenant is engaged in any way in the sale of alcoholic beverages, either for consumption of alcoholic beverages on the premises or off the premises, Tenant will also maintain liquor liability insurance with the limits of not less than $1,000,000.00 each common cause and $1,000,000.00 aggregate. If written on a separate policy from the commercial general liability policy, such policy shall name Landlord (and any of its affiliates, subsidiaries, successors and assigns designated by Landlord) as an additional insured. Such policy shall contain a cross liability endorsement or severability provision.

Section 12.04.   The policies of insurance required to be maintained by Tenant under the terms of this Lease are referred to in this Section 12.04 in the singular as a "Required Policy" and in the plural as "Required Policies". All Required Policies shall be in a form and with a company as described in the Addendum and shall be endorsed so as to be non-cancellable with respect to Landlord and not subject to material change except upon thirty (30) days prior written notice to Landlord given in the manner set forth in Article XXIII, below. Tenant agrees to deliver to Landlord a duplicate original or certificate of each Required Policy upon tender of possession of the Leased Premises to Tenant and in the event Landlord shall have tendered such possession of the Leased Premises to Tenant but Tenant shall not have delivered a duplicate original or certificate of any Required Policy, then, at Landlord's election, Tenant shall not be permitted to enter into possession or occupy the Leased Premises until such time as such duplicate originals or certificates are so delivered to Landlord (but the Leased Premises shall be deemed "tendered" to Tenant for all other purposes under this Lease, including, without limitation, the commencement of the term of this Lease and accrual of rent). At all times during the lease term (and prior thereto and subsequent thereto under the circumstances stated in the succeeding sentence), upon Landlord's written request, Tenant shall cause a duplicate original or a certificate of all Required Policies to be deposited with Landlord. If Tenant fails to have a duplicate original or certificate of any Required Policy on deposit with Landlord at any time during the lease term (and prior thereto in the event of any entry into possession by Tenant prior to the commencement date of the lease term or subsequent to the termination date hereof in the event of a holdover), and if within twenty (20) days after Landlord's written request for the same, it or they are not delivered to Landlord, then Landlord shall have the right (but no obligation) to take out and maintain such Required Policy, and if Landlord does so and gives notice thereof to Tenant, then Tenant shall be obligated to pay Landlord the amount of the premium applicable to such Required Policy within five (5) days following any such notice from Landlord. Any failure of Tenant to make such payment to Landlord may be treated by Landlord as a default by Tenant in the payment of Minimum Rent required to be paid by Tenant hereunder.

ARTICLES XIII and XIV - Intentionally Deleted

ARTICLE XV

Removal of Tenant's Property

Section 15.01.   In the event that Landlord shall have taken possession of the Leased Premises pursuant to the authority hereinafter granted in connection with an Event of Default or for any other lawful reason, Landlord shall have the right to keep in place and use all of the furniture, fixtures and equipment at the Leased Premises, including that which is owned by or leased to Tenant, at all times prior to any foreclosure thereon by Landlord or repossession thereof by any lessor thereof or third party having a lien thereon. Landlord shall also have the right to remove from the Leased Premises and Shopping Center (without the necessity of obtaining a distress warrant, writ of sequestration or other legal process) all or any portion of such furniture, fixtures, equipment and other property located thereon and place same in storage at any premises within the county in which the Leased Premises are located or dispose of same in any manner acceptable to Landlord; and in such event, Tenant shall be liable to Landlord for commercially reasonable costs incurred by Landlord in connection with such removal, storage and/or disposal. So long as the Tenant under this Lease is 99 Cents Only Stores Texas, Inc. [or 99¢ Only Stores, a California corporation (the "Parent"), or any other entity which is wholly owned by Parent or which wholly owns Parent], but not thereafter, Landlord hereby waives the benefit of any



statute or rule of law (present or future) permitting the Landlord to change the locks on the Leased Premises or otherwise "lock out" Tenant in the event of an alleged default prior to the entry of the order of a court adjudicating Tenant to be in default under this Lease.

## ARTICLE XVI

### Default, Remedies and Determination of Damages

Section 16.01.   Each of the following acts or omissions of Tenant or occurrences shall constitute an "Event of Default":

(a)   Failure or refusal by Tenant to timely pay Minimum Rent, Additional Rent or any other sum within five (5) days after Landlord's written notice to Tenant that the same has not been paid following the date the same is due; provided, however, that Tenant shall be obligated to pay Landlord, as additional rent, Five Hundred and No/100 Dollars ($500.00) for each written notice in excess of two (2) that must be given to Tenant in any calendar year; or

(b)   Failure or refusal by Tenant to comply with the obligations of Tenant regarding (i) use of the Leased Premises pursuant to Article VI hereof or (ii) assignment of this Lease or subletting of the Leased Premises pursuant to Article VIII and the Addendum hereof within ten (10) days of written notice; or

(c)   Failure or refusal by Tenant to timely perform or observe any other covenant, duty or obligation of Tenant under this Lease; provided, however, notwithstanding the occurrence of such Event of Default, Landlord shall not be entitled to exercise any of the remedies provided for in this Lease or by law unless such Event of Default continues beyond the expiration of thirty (30) days following written notice to Tenant of such Event of Default, which period of thirty (30) days shall be extended for such period as may reasonably be required to effect a cure of such matter provided that within said thirty (30) day period following written notice Tenant has commenced the cure of the same and, subject to Force Majeure, diligently pursues the same to completion; or

(d)   Intentional abandonment of the Leased Premises (Tenant is not obligated to conduct its business in the Leased Premises and failure to do so is agreed not to constitute abandonment by itself); or

(e)   The entry of a decree or order for relief by a court having jurisdiction over Tenant or any guarantor of Tenant's obligations hereunder in an involuntary case under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of Tenant or any guarantor of Tenant's obligations hereunder or for any substantial part of either of said parties' property, or ordering the winding-up or liquidation of either of said parties' affairs, provided that such decree or order for relief is not dismissed and the case pertaining thereto is not dismissed within thirty (30) days after Tenant first receives notice of the same; or

(f)   The commencement by Tenant or any guarantor of Tenant's obligations hereunder of a voluntary case under the federal bankruptcy laws, as now constituted or hereafter amended, or any other applicable federal or state bankruptcy, insolvency or other similar law, or the consent by either of said parties to the appointment of a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) of any substantial part of the property of Tenant or any guarantor of Tenant's obligations hereunder, or to the taking possession of any such property by any such functionary or the making of any assignment for the benefit of creditors by either Tenant or any guarantor of Tenant's obligations hereunder, or the failure of Tenant or any guarantor of Tenant's obligations hereunder generally to pay its debts as such debts become due, or the taking of corporate action by any corporate Tenant or any corporate guarantor of Tenant's obligations hereunder in furtherance of any of the foregoing.

Section 16.02.   This Lease and the term and estate hereby granted and the demise hereby made are subject to the limitation that if and whenever any Event of Default shall occur, after such notice, if any, as is provided in Section 16.01, Landlord may, at its option, in addition to all other rights and remedies given hereunder or by law or equity, do any one or more of the following:

(a)    Terminate this Lease or terminate Tenant's right to possession of the Leased Premises without terminating the Lease, in which event, Tenant shall immediately surrender possession of the Leased Premises to Landlord; or

(b)    Enter upon and take possession of the Leased Premises and expel or remove Tenant and any other occupant therefrom, with or without having terminated the Lease; or

(c)    Alter locks and other security devices at the Leased Premises as provided under Section 93.002 of the Texas Property Code; provided, however, that Landlord hereby agrees to waive such right for so long as the Tenant under this Lease is 99 Cents Only Stores Texas, Inc. (or Parent, or any other entity which is wholly owned by Parent or which wholly owns Parent], but not thereafter. In the event Landlord exercises its rights to alter the locks at the Leased Premises, Landlord shall only be required to provide Tenant with a new key during Landlord's regular business hours, provided that in no event shall Landlord be required to provide Tenant a new key until such time as Tenant cures all defaults under the Lease and, if required by Landlord, Tenant pays to Landlord as a Security Deposit an amount equal to twice the monthly Minimum Rent and Additional Rent due hereunder.

Exercise by Landlord of any one or more remedies hereunder granted or otherwise available shall not be deemed to be an acceptance of surrender of the Leased Premises by Tenant, whether by agreement or by operation of law, it being understood that such surrender can be effected only by the written agreement of Landlord and Tenant. All claims for trespass or damages by reason of such re-entry and/or repossession and/or alteration of locks or other security devices are hereby waived, as are all claims for trespass or damages by reason of any distress warrant, forcible detainer proceedings, sequestration proceedings or other legal process. So long as the Tenant under this Lease is 99 Cents Only Stores Texas, Inc. (or Parent, or any other entity which is wholly owned by Parent or which wholly owns Parent), Landlord hereby agrees that Landlord will not re-enter the Leased Premises except pursuant to a judgment obtained in forcible detainer proceedings or other legal proceedings.

Notwithstanding any provision to the contrary contained herein, upon the occurrence of an Event of Default in payment of rent, Landlord shall not be obligated to give any notice (written or oral) to vacate the Leased Premises prior to Landlord's instituting proceedings in Forcible Entry or Detainer, Tenant hereby waiving (to the extent legally permissible) any and all notices to vacate, demand or demand for possession, required under statutory or common law, Tenant hereby agreeing that such proceedings in Forcible Entry or Detainer may be instituted by Landlord at any time a default in payment of rent remains uncured. Notwithstanding the prior provisions set forth in this paragraph, Landlord may not commence any such proceeding without first notifying Tenant of any such alleged default in writing as required by this Lease, and permitting the time specified by this Lease for Tenant's cure of such alleged default.

Section 16.03.    In the event Landlord elects to terminate the Lease by reason of an Event of Default, then (except as otherwise provided in the succeeding paragraph) notwithstanding such termination, Tenant shall be liable for and shall pay to Landlord, at Houston, Harris County, Texas, the sum of all rent and other indebtedness accrued to the date of such termination, plus, as damages, an amount equal to the present value (computed as of the date of any such termination using a discount factor equal to six percent [6 %] per annum) of the difference between the amount stated in (1) hereafter and the amount stated in (2) hereafter as follows: (1) the total Minimum Rent plus the Common Area Payment, Tax Payment and Insurance Payment (using such sums, if any, for the year of such termination as the basis for determining the amount thereof which would have been due each year thereafter for the remaining portion of the lease term had it not been terminated), all such rent and other charges being computed for the remaining portion of the lease term (had such term not been terminated by Landlord prior to the date of expiration stated in Article III), and (2) the then fair market rental value of the Leased Premises for such period.

In the event Landlord elects to terminate this Lease by reason of an Event of Default, in lieu of exercising the rights of Landlord under the preceding paragraph, or in the event Landlord elects to terminate Tenant's right to possession of the Leased Premises without terminating this Lease, Landlord may instead hold Tenant liable for all rent and other indebtedness accrued to the date of such termination, plus such rent and other indebtedness as would otherwise have been required to be paid by Tenant to Landlord during the period following termination of the lease term (or Tenant's right to possession of the Leased Premises, as the case may be) measured from the date of such termination by



GSh

Landlord until the date which would have been the date of expiration of the term as stated in Article III (had Landlord not elected to terminate the Lease or Tenant's right to possession on account of such Event of Default) diminished by any net sums thereafter received by Landlord through reletting the Leased Premises during said period (after deducting expenses incurred by Landlord as provided in the succeeding paragraph). Actions to collect amounts due by Tenant provided for in this paragraph of Section 16.03 may be brought from time to time by Landlord during the aforesaid period, on one or more occasions, without the necessity of Landlord's waiting until expiration of such period. If Landlord elects the remedy described in this paragraph, Landlord shall make a reasonable effort to relet the Leased Premises. Landlord shall not in any event be required to give any preference or priority to the leasing of the Leased Premises over any other space that Landlord may have available in the Shopping Center. Landlord shall not be required to: (i) take any instruction or advice given by Tenant regarding reletting the Leased Premises; (ii) accept any proposed tenant unless such tenant has a credit worthiness acceptable to Landlord in its sole discretion; (iii) accept any proposed tenant unless such tenant leases the entire Leased Premises upon terms and conditions satisfactory to Landlord in its sole discretion (after giving consideration to all expenditures by Landlord for tenant improvements, broker's commissions and other leasing costs); or (iv) consent to any assignment or sublease for a period which extends beyond the expiration of the current term or which Landlord would not otherwise be required to consent to under the provisions of this Lease. Tenant agrees that Landlord shall not be liable, nor shall Tenant's obligations hereunder be diminished, because of Landlord's failure to relet the Leased Premises or collect rent due with respect to such reletting, so long as Landlord makes a reasonable effort to relet the Leased Premises.

In all cases involving an Event of Default, Tenant shall also be liable for and shall pay to Landlord at Houston, Harris County, Texas, in addition to any sum provided to be paid above: (i) the reasonable costs of removing and storing Tenant's or other occupant's property, the costs of repairing the Leased Premises, and all reasonable expenses incurred by Landlord in enforcing Landlord's remedies; and (ii) reasonable broker's fees incurred by Landlord in connection with reletting the whole or any part of the Leased Premises, and costs of altering, reconfiguring (but not out of the ordinary remodeling) or otherwise putting the Leased Premises into condition acceptable to a new tenant or tenants (the "Relet Costs"); provided, however, the addition of the Relet Costs set forth in (ii) above shall not increase Tenant's liability to Landlord beyond the liability for which Tenant would have been liable had the Leased Premises not been relet (hereinafter collectively referred to as the "Costs").

If Landlord receives any payments from the reletting of the Leased Premises, any such payments shall first be applied to the Costs. In no event shall Tenant be entitled to any excess of rent (or rent plus other sums) obtained by reletting over and above the rent herein reserved.

Section 16.04   In any action or proceeding to enforce any provision hereof which proceeds to final judgment in a court of law, the prevailing party shall be entitled to reasonable attorneys' fees.

Section 16.05.   In the event of any default by Landlord, Tenant's exclusive remedy (other than the self help rights described in Section 9.02) shall be an action for damages (Tenant hereby waiving the benefit of any laws granting it a lien upon the property of Landlord and/or upon rent due Landlord), but prior to any such action Tenant will give Landlord written notice specifying such default with particularity, and, provided Landlord commences the cure thereof within thirty (30) days (except in an emergency, in which event Landlord shall immediately commence such cure after notice thereof) from Tenant's written notice and thereafter diligently pursues the completion thereof, Landlord shall thereupon have a reasonable period to cure any such default. Unless and until Landlord fails so to commence to cure any default (within thirty (30) days except in the event of an emergency) after such notice or having so commenced thereafter fails to exercise reasonable diligence to complete such curing, Tenant shall not have any remedy or cause of action by reason thereof; provided, however, that the provisions of Section 9.02 permitting Tenant self help rights under certain circumstances shall prevail over any contrary or ambiguous provisions of this Section. All obligations of Landlord hereunder will be construed as independent covenants, not conditions; and all such obligations will be binding upon Landlord only during the period of its possession of the Shopping Center and not thereafter.

Section 16.06.   Tenant hereby acknowledges that late payment by Tenant to Landlord of rent or any other sums due under this Lease will cause Landlord to incur various expenses not contemplated by this Lease, the exact amount of which are presently difficult to ascertain. Accordingly, if any payment of Minimum Rent or any other sum due from Tenant under this Lease shall not be received by Landlord within the cure period provided in Section 16.01(a) above, then, in addition to such required payment, Tenant shall also pay to Landlord a "Late Charge" equal to five cents ($0.05) for each One Dollar

656

($1.00) so past due. Landlord and Tenant agree that such Late Charge represents a fair and reasonable estimate of the expenses that Landlord will incur by reason of such late payment by Tenant. Acceptance of such Late Charge by Landlord shall not constitute a waiver of Tenant's default with respect to any such past due amounts, nor prevent Landlord from exercising any other rights and remedies granted to Landlord under this Lease or at law or in equity. Such Late Charge shall constitute additional rental payable by Tenant under this Lease and is in addition to, and separate from, the Minimum Rent and other charges payable under this Lease by Tenant.

## ARTICLE XVII

### Non-Waiver

Section 17.01. Neither acceptance of rent (or any portion thereof) or any other sums payable by Tenant hereunder (or any portion thereof) by Landlord nor failure by Landlord or Tenant to complain of any action, non-action or default of the other shall constitute a waiver as to any breach of any covenant or condition contained herein nor a waiver of any of either party's rights hereunder. Waiver by either party of any right for any default of the other shall not constitute a waiver of any right for either a prior or subsequent default of the same obligation or for any prior or subsequent default of any other obligation. Except as otherwise expressly provided in this Lease, no right or remedy of either party hereunder or covenant, duty or obligation of any party hereunder shall be deemed waived unless such waiver be in writing, signed by an authorized officer or other authorized representative of the party against whom such waiver may be asserted.

## ARTICLE XVIII

### Landlord-Tenant Relation

Section 18.01. The relation created by this Lease Contract is that of landlord and tenant, and no other.

## ARTICLE XIX

### Eminent Domain

Section 19.01. If there shall be taken during the term of this Lease all of the Leased Premises, by any authority having the power of eminent domain, then and in that event, the term of this Lease shall cease and terminate, and the date of such termination shall be the first to occur of: (a) either the date upon which possession shall be tendered to such authority by Landlord; or (b) the date upon which possession is taken by such authority; or (c) the date upon which any action taken or threatened by such authority materially interferes with Tenant's use and enjoyment of the Leased Premises for the purposes permitted under this Lease. If a lesser part of the Leased Premises should be so taken, or if any portion of the Protected Area is taken, or if the Monument Sign of which Tenant has a right of use is taken and not replaced with a sign of the same or equivalent size and prominence (or to the maximum size and prominence approved by local governmental authorities, if local ordinances will not permit the same or equivalent size and prominence), then either Tenant or Landlord may elect to terminate this Lease, but if neither party elects to terminate this Lease, the Minimum Rent and Additional Rent shall be reduced in proportion to the area of the Leased Premises so taken or in proportion to the extent to which the conduct of Tenant's business is materially and adversely affected if no portion of the Leased Premises is taken but some portion of the Protected Area or the Common Area is taken or the said monument sign is taken and not replaced. When any such reduction in Minimum Rent and Additional Rent has been computed by Landlord, Landlord shall notify Tenant as to the amount of such Minimum Rent and Additional Rent and such sum shall be due and payable by Tenant to Landlord in accordance with the provisions of Article IV. At the request of either party, the other party will execute a letter or other memorandum setting forth the amount of such Minimum Rent and Additional Rent payable by Tenant. If neither party has elected to terminate this Lease, then upon Landlord's collection of the entire sum due and payable by such authority to Landlord by way of compensation and damages, Landlord shall restore the remaining portion of the Leased Premises so as to constitute such portion an enclosed building, with such nature of building improvements and facilities as Landlord furnished to Tenant when Landlord delivered physical possession of the Leased Premises to Tenant. Such restoration work shall be performed by Landlord within a reasonable period of time with reasonable allowances for Force Majeure. Neither the restoration work, if any, by Landlord with respect to the Leased Premises nor the restoration work, if any, by Landlord with respect to any other portion of the Shopping Center shall

constitute an eviction or disturbance of Tenant's use and possession of the Leased Premises or Shopping Center or a breach by Landlord of any of its obligations hereunder or render Landlord liable for damages or entitle Tenant to be relieved from any of its obligations hereunder (with the exception of the aforesaid proportionate reduction in Minimum Rent) or grant Tenant any right of off-set or recoupment.

Section 19.02. Landlord and Tenant shall each have the right to pursue independent claims with the condemning authority to recover any compensation or damages to which they may be entitled under Texas eminent domain law.

Section 19.03. If this Lease should be terminated under any provision of this Article, rental and other sums due and payable by Tenant hereunder shall be payable up to the date that possession is taken by the taking authority, and Landlord will refund to Tenant an equitable portion of any such rental and other sums paid in advance but not yet earned by such date.

Section 19.04. In the event that any authority having the power of eminent domain requests that Landlord convey to such authority all or any portion of the Shopping Center or all or any portion of the Leased Premises, Landlord shall have the right to make a voluntary conveyance to such authority of all or any portion of the Shopping Center or all or any portion of the Leased Premises whether or not proceedings have been filed by such authority; and in the event of any such voluntary conveyance, it shall nevertheless for all purposes hereunder be deemed that there has been a taking by such authority of the property voluntarily conveyed by Landlord. Accordingly, all of the provisions of Sections 19.01 and 19.02 and 19.03 hereof shall be applicable notwithstanding such voluntary conveyance.

## ARTICLE XX

### Holding Over

Section 20.01. If Tenant does not vacate the Premises upon the expiration or earlier termination of the Lease, Tenant's occupancy of the Premises will be a "month-to-month" tenancy, subject to all of the terms of this Lease applicable to a month-to-month tenancy, including the payment of all Minimum Rent and Additional Rent, except that the Minimum Rent payable by Tenant shall be as follows: (i) during the first month of such month-to-month tenancy, 125% of the Minimum Rent in effect as of the expiration of the Lease Term, and (ii) during each succeeding month of such month-to-month tenancy, 150% of the Minimum Rent in effect as of the expiration of the Lease Term. The above described tenancy from month-to-month may be terminated by either party upon thirty (30) days notice to the other.

Section 20.02. Any rent due after notice has been given is to be calculated according to Section 20.01 on a prorata basis. If upon notice of termination by Landlord, Tenant tenders rent in excess of the amount due and payable pursuant to the formula in Section 20.01, and Landlord accepts such payment, the acceptance of such payment will not operate as a waiver by Landlord of the notice of termination, unless such waiver is in writing and signed by Landlord. Any such excess amounts tendered and accepted shall be promptly refunded by Landlord, after deducting therefrom any amounts owed Landlord.

## ARTICLE XXI

### Landlord's Mortgagee

Section 21.01. Subject to the execution and recordation of a commercially reasonable form of non-disturbance agreement in favor of Tenant by the holder of any security interest prior in interest to the leasehold estate created and evidenced by this Lease, Tenant agrees that its interest under this Lease shall be subordinate to any mortgage, deed of trust or similar device now or hereafter placed upon the Leased Premises or all or any portion of the Shopping Center by Landlord if the mortgagee or beneficiary under said deed of trust or lender for whose benefit any other security device is created so elects, and, upon notice to Tenant of such election, Tenant will execute any instruments required to evidence such subordination. Likewise, such mortgagee or beneficiary under said deed of trust or lender for whose benefit any other security device is created may elect, by notice to Tenant, to make this Lease superior to such mortgage or deed of trust or other security device; and in the event of any such election, Tenant will execute any instruments required to evidence such superiority.

Section 21.02. For purposes of this Article, the term "Landlord's Mortgagee" means any party holding a mortgage or deed of trust on the Leased Premises or any part thereof or all or any portion of

GSh

the Shopping Center (provided such portion includes the Leased Premises) who has given Tenant written notice that such party holds such lien or deed of trust together with notice of the post office address of such Landlord's Mortgagee. A lien held by a Landlord's Mortgagee on the Leased Premises or any portion thereof or Shopping Center or any portion thereof is herein referred to as a "Landlord's Mortgage".

Section 21.03.    Landlord and Tenant shall execute and deliver to each other, at such time or times as either Landlord or Tenant may request, a certificate stating:

(a)    Whether or not the Lease is in full force and effect;

(b)    Whether or not the Lease has been modified or amended in any respect, and submitting copies of such modifications or amendments, if any;

(c)    Whether or not there are any existing defaults under this Lease to the knowledge of the party executing the certificate, and specifying the nature of such defaults, if any; and

(d)    Such other information as may be reasonably requested (but no covenants shall properly be included).

The aforesaid certificate(s) shall be delivered to Landlord or Tenant, as the case may be, promptly upon receipt of a written request therefor, but in no event more than fifteen (15) days following receipt of such request. Any and all requested forms shall be transmitted by e-mail in MS Word or other agreed upon format. Failure by either party to timely deliver such certificate(s) shall constitute an Event of Default hereunder and entitle such party to exercise any remedies permitted under the terms of this Lease.

### ARTICLE XXII

### Additional Rent

Section 22.01.    In addition to and separate from the Minimum Rent, Tenant shall pay to Landlord as additional rent a "Common Area Payment", "Tax Payment", and "Insurance Payment" (as such quoted terms are defined in the Addendum). For purposes of this Lease, the following terms shall have the hereinafter indicated meaning:

A.    The phrase "Common Area Operating Costs" shall mean, for each calendar year (or portion thereof) during the term of this Lease, except as modified by the Addendum, the aggregate of all costs, expenses and liabilities of every kind or nature paid or incurred by Landlord (to the extent that Landlord, in its good faith judgment, regards it as reasonably necessary or appropriate to provide the services and materials hereafter referred to and to pay and incur the costs, expenses and liabilities hereafter referred to) in connection with: sweeping, cleaning, removing debris from, maintaining, restriping, repairing and resurfacing the Common Area; lighting the Common Area (including replacement of bulbs and ballasts, and painting, repairing and maintaining of light standards); providing project identification signs; providing signs and/or personnel for assisting in traffic control and management at the Common Area; constructing, operating and repairing and maintaining any on-site or off-site utilities necessary for the operation of the Common Area; providing and maintaining planting and landscaping with respect to the Common Area; repairing and maintaining utility lines in the Common Area which do not exclusively serve one tenant; operating any loudspeakers or other equipment supplying music; utilities charges for any services to the Common Area; exterminating and pest control in and about the Common Area; periodic repainting of exterior walls, fascias and parapets of the buildings in the Shopping Center (including steam cleaning, sandblasting, filling holes and graffiti-removal procedures), exclusive of any other premises, if any, whose exterior walls are painted by tenants; repairing, maintaining and replacing, if necessary, sprinklers and sprinkler risers serving the buildings in the Shopping Center and repairing, maintaining and replacing, if necessary, overhead canopies in the Common Area at the Shopping Center (including, without limitation, lighting and tile); repairing and maintaining sidewalks in the Common Area (including, without limitation, periodic steam cleaning thereof); all other costs and expenses of every kind or nature paid or incurred by Landlord relative to operating, managing and equipping the Common Area, except as restricted by the Addendum, plus an administrative fee not to exceed ten percent (10%) of the foregoing costs, exclusive of utilities (and insurance and taxes, as insurance and taxes are not included in Common Area Operating Costs). Any Capital Item shall be amortized over its useful life, and Tenant shall be liable only for its pro rata

share of that portion of the amortized cost which is applicable to the remaining Lease Term. For purposes hereof, the term "Capital Item" shall mean any capital expenditure in excess of $10,000.00 that is ordinarily capitalized under generally accepted accounting principles consistently applied.

B.    The word "Taxes", as used herein, shall mean all taxes, assessments, impositions, levies, charges, excises, fees, licenses and other sums (whether now existing or hereafter arising, whether foreseen or unforeseen and whether under the present system of real estate taxation or some other system), levied, assessed, charged or imposed by any governmental authority or other taxing authority or which accrue on the Shopping Center for each calendar year (or portion thereof) during the term of this Lease, and all penalties, interest and other charges (with respect to Taxes) payable by reason of any delay in or failure or refusal of Tenant to make timely payment as required under this Lease. The term "Taxes" includes all amounts collected by any taxing authority, whether classified as ad valorem taxes or non-ad valorem assessments, and shall include, without limitation, any tax payable by Landlord pursuant to V.T.C.A., Tax Code, Section 171.0001, et seq. (herein called the "Texas Margin Tax"), as such statute may be amended or recodified from time to time, that is reasonably allocable to the Shopping Center ("Shopping Center TMT"). In no event shall the word "Taxes" be deemed to include any of Landlord's income taxes or the estate, inheritance, or gift taxes of any party "Landlord". If, in addition to or in lieu of the Texas Margin Tax, there is hereafter adopted any nature of sales tax or use tax or other tax on rents or other sums received by Landlord under this Lease (herein referred to as "Rent Sales Tax"), then in addition to all rent and other payments to be made by Tenant as provided above, Tenant will also pay Landlord a sum equal to the amount of such Rent Sales Tax. The term "Rent Sales Tax" shall not include any income taxes applicable to Landlord. Tenant waives any rights it may have pursuant to statutory or common law to protest the appraised value of the Shopping Center or to appeal the same and all rights to receive notices of reappraisal as set forth in Sections 41.413 and 42.015 of the Texas Tax Code.

C.    The phrase "Insurance Premiums" shall mean the total annual insurance premiums actually paid on all fire and extended coverage insurance, boiler insurance, public liability and property damage insurance, rent insurance and other insurance which, from time to time, may at Landlord's election be carried by Landlord with respect to the Shopping Center (including but not limited to the insurance required to be carried by Landlord pursuant to the Addendum) during any applicable calendar year (or portion thereof) occurring during the term of this Lease. Landlord shall have the right to have all or any part of such insurance written under a "blanket policy".

## ARTICLE XXIII

### Notice

Section 23.01.  Any notice which may or shall be given under the terms of this Lease shall be in writing and shall be either delivered by hand or sent by United States Registered or Certified Mail, adequate postage prepaid, or by commercial courier, if for Landlord to its General Counsel (or in the event of hand delivery to any person on whom service may be made), addressed to his attention, at 2600 Citadel Plaza Drive, Suite 125, Houston, Texas 77008, with a copy to General Counsel at P.O. Box 924133, Houston, Texas 77292-4133, if for Tenant, to it at 4000 E. Union Pacific Avenue, City of Commerce, California 90023; attention: Real Estate Department. Either party's address may be changed from time to time by such party by giving notice as provided above, except that the Leased Premises may not be used by Tenant as the sole notice address and each party must specify a street address, not merely a post office box. No change of address of either party shall be binding on the other party until notice of such change of address is given as herein provided. A post office receipt for registration of such notice or signed return receipt shall be conclusive that such notice was delivered in due course of mail if mailed as provided above. For purposes of the calculation of various time periods referred to herein, notice delivered by hand shall be deemed received when delivered to the place for giving notice to a party referred to above and notice mailed in the manner provided above shall be deemed completed upon the earlier to occur of (i) actual receipt as indicated on the signed return receipt, or (ii) three (3) days after posting as herein provided, or for courier on the date such courier notes the same has been delivered. All notices to Landlord or Tenant pursuant to which Landlord or Tenant claims a default or Event of Default on the part of the other party must specify in the "re" line, in all capital letters: "NOTICE OF DEFAULT;    [LANDLORD OR TENANT (as the case may be)] IS NOTIFIED OF A DEFAULT UNDER THE LEASE". Finally, any written notice addressed as provided hereinabove, shall constitute sufficient notice for all purposes under this Lease.



GS6

ARTICLE XXIV

Tenant's Signs

Section 24.01. Any interior sign which is not designed or reasonably calculated to be seen from outside the Leased Premises may be placed and displayed by Tenant, without Landlord's further consent, so long as such sign is professionally prepared and consistent with interior signs generally used in 99¢ Only Stores. Tenant shall cause Tenant's exterior sign to be placed on a time clock and photoelectric cell device such that the electricity illuminating such sign shall keep Tenant's electric signs on from dusk until 11:00 o'clock P.M., every day during the lease term.

ARTICLE XXV

Terminology and Miscellaneous

Section 25.01. With respect to terminology in this Lease, each number (singular or plural) shall include all numbers, and each gender (male, female or neuter) shall include all genders. If any provision of this Lease shall ever be held to be invalid or unenforceable, such invalidity or unenforceability shall not affect any other provisions of the Lease, but such other provisions shall continue in full force and effect.

The titles of the Articles in this Lease shall have no effect and shall neither limit nor amplify the provisions of the Lease itself. This Lease shall be binding upon and shall accrue to the benefit of Landlord, its successors and assigns, and Tenant, its successors and assigns (or heirs, executors, administrators and assigns, as the case may be); however, this clause does not constitute a consent by Landlord to any assignment by Tenant, but instead refers only to those instances in which an assignment by Tenant is hereafter made in strict compliance with Article VIII above, or in the case of a deceased natural person Tenant, refers to the instances previously referred to in this sentence and also circumstances in which title to Tenant's leasehold estate under this Lease passes, after the demise of Tenant, pursuant to Tenant's will or the laws of intestate succession. The words "hereof," "herein," "hereunder," "hereinafter" and the like refer to this entire instrument, not just to the specific article, section or paragraph in which such words appear.

Section 25.02. The remedies of each party hereunder shall be deemed cumulative and no remedy shall be deemed to be in exclusion of any other. Except as may be otherwise herein expressly provided, in all circumstances under this Lease where prior consent or permission of one party ("first party") is required before the other party ("second party") is authorized to take any particular type of action, such party shall act in a commercially reasonable manner unless as to the particular matter this Lease expressly states that the first party may grant or withhold its consent in its sole and exclusive determination.

Section 25.03. With respect to all of the terms, covenants and conditions of this Lease, time is of the essence.

Section 25.04. The obligation of Tenant to pay all rent and other sums hereunder provided to be paid by Tenant and the obligation of Tenant to perform Tenant's other covenants and duties hereunder constitute independent, unconditional obligations to be performed at all times provided for hereunder, save and except only when an abatement thereof or reduction therein is hereinabove expressly provided for and not otherwise. Tenant waives and relinquishes all rights which Tenant might have to claim any nature of lien against or withhold, or deduct from or off-set against any rent and other sums provided hereunder to be paid Landlord by Tenant except as expressly set forth in this Lease.

Section 25.05. Under no circumstances whatsoever shall Landlord ever be liable hereunder for consequential damages or special damages other than in the event of the intentional misconduct of Landlord (which intentional conduct may not be "deemed" or "imputed"); and all liability of Landlord for damages for breach of any covenant, duty or obligation of Landlord hereunder may be satisfied only out of the interest of Landlord in the Shopping Center (including proceeds therefrom) existing at the time any such liability is adjudicated in a proceeding as to which the judgment adjudicating such liability is non-appealable and not subject to further review. The term "Landlord" shall mean only the owner, for the time being of the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall thereupon be released and discharged from all



GSG

covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the lease term upon each new owner for the duration of such owner's ownership.

Section 25.06.    All monetary obligations of Landlord and Tenant (including, without limitation, any monetary obligation of Landlord or Tenant for damages for any breach of the respective covenants, duties or obligations of Landlord or Tenant hereunder) are performable exclusively in Houston, Harris County, Texas, and Landlord and Tenant hereby submit to the exclusive jurisdiction of the State of Texas. This Lease shall be construed in accordance with the laws of the State of Texas, and Harris County, Texas, shall be the venue for any litigation arising from this Lease.

Section 25.07.    Tenant has inspected the Leased Premises and accepts them in their existing condition, on an "As-Is" basis, subject to performance by Landlord and Landlord of its obligations under the Construction Rider, if any, attached hereto and other express provisions, if any of this Lease. Tenant hereby waives and relinquishes any right to assert, as either a claim or a defense, that Landlord is bound to perform or is liable for the non-performance of any implied covenant or implied duty of Landlord not expressly set forth herein. Tenant waives any implied warranty of Landlord that the Leased Premises are suitable for their intended commercial purpose. Tenant agrees to perform all of its Lease obligations (including without limitation, the obligation to pay rent), notwithstanding an alleged breach by Landlord of any such implied warranty. Tenant agrees that Landlord shall incur no liability to Tenant by reason of any defect in the Leased Premises, whether apparent or latent; provided, however, that this provision shall not constitute a waiver of any of Landlord's obligations or Tenant's rights under other provisions of this Lease.

Section 25.08.    If this Lease is executed by more than one person or entity as "Tenant", each such person or entity shall be jointly and severally liable hereunder. It is expressly understood that any one of the parties who have executed this Lease as "Tenant" (herein individually referred to as "Signatory") shall be empowered to execute any modification, amendment, exhibit, floor plan, or other document ("Future Instrument") and bind each of the Signatories who has executed this Lease regardless of whether each Signatory, in fact, executes such Future Instrument.

Section 25.09.    Upon written request, Tenant shall provide to Landlord, within fourteen (14) days of such request, a copy of its most recent financial statement including both a balance sheet and income statement, unless Tenant is a publicly traded entity. Such request may be made by Landlord from time to time during the Lease Term, but not more often than annually.

Section 25.10.    Attached hereto as Exhibit "X" and incorporated herein by reference is a copy of the Lease Commission Agreement, if any, which pertains to this Lease.

## ARTICLE XXVI

### Tenant's Bankruptcy

Section 26.01.    Landlord and Tenant agree that if Tenant ever becomes the subject of a voluntary or involuntary bankruptcy, reorganization, composition, or other similar type proceeding under the Federal Bankruptcy Laws, as now enacted or hereafter amended, then "adequate protection" of Landlord's interest in the Leased Premises pursuant to the provisions of Sections 361 and 363 (or their successor sections) of the Bankruptcy Code, 11 U.S.C. Paragraph 101 et seq, (such Bankruptcy Code as amended from time to time being herein referred to as the "Bankruptcy Code") prior to assumption and/or assignment of the Lease by Tenant shall include, but not be limited to all (or any part) of the following: The continued payment by Tenant of all Minimum Rent and all other sums due and owing under this Lease; the performance of all other covenants and obligations under this Lease by Tenant;

Section 26.02.    Landlord and Tenant agree that if Tenant ever becomes the subject of a voluntary or involuntary bankruptcy, reorganization, composition or other similar type proceeding under the Federal Bankruptcy Laws, as now enacted or hereafter amended, then "adequate assurance of future performance" by Tenant and/or any assignee of Tenant pursuant to Bankruptcy Code Section 365 (or its successor section) will include (but not be limited to) payment of an additional, new security deposit in the amount of three (3) times the then-current monthly Minimum Rent payable hereunder.

GS 6

Section 26.03.  Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code (including notice to Landlord, entry of the Assignment Order by the Bankruptcy Court, and receipt by Landlord of the cure payment), shall be deemed without further act or deed to have assumed all of the obligations of Tenant arising under this Lease on and after the effective date of such assignment.  Any such assignee shall, upon demand by Landlord, execute and deliver to Landlord an instrument confirming such assumption of liability.

Section 26.04.  This is a lease of real property in a "shopping center" within the meaning of Section 365(b)(3) of the Bankruptcy Code.

Section 26.05.  Notwithstanding anything in this Lease to the contrary, all amounts payable by Tenant to or on behalf of Landlord under this Lease, whether or not expressly denominated as "rent", shall constitute "rent" for the purposes of Section 502(b)(6) of the Bankruptcy Code.  The foregoing shall not diminish Landlord's post-petition administrative claims as otherwise permitted under the Bankruptcy Code.

Section 26.06.  If this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code, any and all monies or other considerations payable or otherwise to be delivered in connection with such assignment shall be paid or delivered to Landlord, shall be and remain the exclusive property of Landlord and shall not constitute property of Tenant or of the Estate of Tenant within the meaning of the Bankruptcy Code.  Any and all monies or other considerations constituting Landlord's property under the preceding sentence not paid or delivered to Landlord shall be held in trust by Tenant for the benefit of Landlord and shall be promptly paid to or turned over to Landlord.

Section 26.07.  If Tenant assumes this Lease and proposes to assign the same pursuant to the provisions of the Bankruptcy Code (the "Bankruptcy Code") to any person or entity who shall have made a bona fide offer to accept an assignment of this Lease on terms acceptable to the Tenant, then notice of such proposed offer/assignment, setting forth (i) the name and address of such person or entity, (ii) all of the terms and conditions of such offer, and (iii) the adequate assurance to be provided Landlord to assure such person's or entity's future performance under this Lease, including, without limitation, the assurance referred to in Section 365(b)(3) of the Bankruptcy Code, shall be given to Landlord by Tenant no later than twenty (20) days after receipt by Tenant, but in any event no later than ten (10) days prior to the date that Tenant shall make application to a court of competent jurisdiction for authority and approval to enter into such assumption and assignment, and Landlord shall thereupon (in addition to all other rights under the Bankruptcy Code) have the prior right and option, to be exercised by notice to Tenant given at any time prior to the effective date of such proposed assignment, to accept an assignment of this Lease upon the same terms and conditions and for the same consideration, if any, as the bona fide offer made by such persons or entity, less any brokerage commissions which may be payable out of the consideration to be paid by such person for the assignment of this Lease.

Section 26.08.  Nothing contained herein shall diminish Landlord's rights under the Bankruptcy Code including but not limited to prior notice of any motions for assumptions and/or assignments of this Lease.

## ARTICLE XXVII

### Condition of Lease

Section 27.01.  The parties hereby acknowledge that the Leased Premises are currently occupied by a third party tenant ("Third Party Tenant").  Landlord hereby represents that the lease between Landlord and the Third Party Tenant ("Third Party Lease") for the Leased Premises expires by its terms on November 30, 2011.  Landlord shall use diligent, good faith efforts regain exclusive possession of the Leased Premises from the Third Party Tenant on or before February 1, 2012 and will not extend the term of the Third Party Lease beyond December 31, 2011.  In the event that, despite using diligent, good faith efforts to do so, (A) Landlord fails to terminate the Third Party Lease and regains exclusive possession of the Leased Premises from the Third Party Tenant on or before February 1, 2012, then Tenant may terminate this Lease Contract upon seven (7) days prior written notice to Landlord at any time prior to the date Landlord terminates the Third Party Lease and regains exclusive possession of the Leased Premises from the Third Party Tenant; and (B) Landlord fails to terminate the Third Party Lease and regain exclusive possession of the Leased Premises from the Third Party Tenant on or before February 29, 2012, then Landlord may terminate this Lease Contract upon seven (7) days prior written notice to Tenant at any time prior to the date Landlord terminates the Third Party Lease and regains exclusive



GSG

possession of the Leased Premises from the Third Party Tenant. Upon terminating the Third Party Lease and regaining exclusive possession of the Lease Premises from the Third Party Tenant, Landlord shall promptly give Tenant written notice thereof. Notwithstanding the foregoing, should Tenant exercise its right of termination and Landlord thereafter terminates the Third Party Lease, regains exclusive possession of the Leased Premises from the Third Party Tenant and so notifies Tenant in writing before the expiration of the seven (7) day period, then Tenant's notice of termination shall be rendered null and void.

Notwithstanding the foregoing, should Landlord terminate the Lease as a result of its inability to regain exclusive possession of the Leased Premises from the Third Party Tenant, then Landlord shall reimburse to Tenant its out of pocket costs and expenses incurred in negotiating this Lease and preparing plans up to a maximum payment of $25,000.

EXECUTION PAGE FOLLOWS IMMEDIATELY

ARTICLE XXVIII

Entire Agreement

Section 28.01.    This instrument, consisting of twenty-two (22) pages and an Addendum to Lease, Construction Rider, Monument Sign Rider #1, Monument Sign Rider #2, Exhibit "A", Exhibit "B", Exhibit "C", Exhibit C-1, Exhibit "D", Exhibit "E-1", Exhibit "E-2", Exhibit "F", Exhibit "G", Exhibit "H", and Exhibit "X" constitutes the entire agreement between Landlord and Tenant; no prior written or prior or contemporaneous oral promises or representations shall be binding.  The submission of this Lease for examination by Tenant and/or execution thereof by Tenant does not constitute a reservation of or option for the Leased Premises and this Lease shall become effective only upon execution by all parties hereto and delivery of a fully executed counterpart hereof by Landlord to Tenant.  This Lease shall not be amended, changed or extended except by written instrument signed by both parties hereto.

EXECUTED in multiple counterparts, each of which shall have the force and effect of an original, this the 28th day of September, 2011. For purposes hereof, facsimile signatures shall be binding on the parties, provided that each party promptly delivers original documents to the other.

"LANDLORD"

WRI-AEW LONE STAR RETAIL PORTFOLIO, LLC,
a Delaware limited liability company

By:    Weingarten Realty Investors,
a Texas real estate investment trust,
Its Manager

By: _____
Name: Jeffrey A. Tucker
Title: Sr. Vice President/General Counsel

"TENANT"

99 CENTS ONLY STORES TEXAS, INC.,
a Delaware corporation

By: _____
Jeff Gold, President

By: _____
Greg George, Director, Real Estate

Execution Page to Shopping Center Lease

**Addendum to Lease**

This Addendum is attached to and made a part of that certain lease affecting premises commonly known as 4849 FM 1960 West, Houston, TX 77069, as more particularly described in said lease (defined in the said lease and herein as the "Leased Premises" or the "Premises"), which lease is dated for reference purposes as of September 48, 2011 (the "Lease") by and between WRI-AEW LONE STAR RETAIL PORTFOLIO, LLC, with principal place of business in Houston, Harris County, Texas ("Landlord") and 99 CENTS ONLY STORES TEXAS, INC., a Delaware corporation ("Tenant"). Terms used in this Addendum shall have the same meaning as set forth in the Lease unless otherwise defined in this Addendum. If there is any contradiction or ambiguity between the terms, covenants and conditions set forth in the Lease and those set forth in this Addendum, the terms, covenants and conditions set forth in this Addendum shall govern and control.

1.    Guaranty. Each and all of the obligations of Tenant under the Lease shall be guaranteed by 99¢ Only Stores, a California corporation (the "Guarantor"). Attached hereto as Exhibit "H" and incorporated herein is the form of Guaranty required to be executed and delivered to Landlord by the Guarantor, which Guaranty shall be delivered concurrent with the execution and delivery of this Lease.

2.    Tender Date and Delivery Date. The "Tender Date" shall be the date upon which all of the following have occurred:

    (i)    Landlord delivers to Tenant true and complete copies of all documents affecting title to the Leased Premises or the Shopping Center;

    (ii)    Tenant has received a signed Subordination and Non-Disturbance Agreement in a commercially reasonable form from any then existing mortgagees;

    (iii)    Landlord delivers to Tenant a signed memorandum of lease, which Tenant may cause to be recorded in the official records of the County in which the Shopping Center is located;

    (iv)    Landlord tenders possession of the Premises, free of all other occupancies, with each item of Landlord's Work described in Exhibit B complete, including all specified common area work; and

    (v)    Landlord has given Tenant at least 30 days' advance notice of the satisfaction of Landlord's Delivery Obligations (i) - (v).

The Landlord anticipates that the Tender Date will occur on or before March 1, 2012 ("Anticipated Delivery Date"). If for any reason the Tender Date does not occur on or before March 11, 2012 (the "Outside Tender Date") (subject to delays caused by Force Majeure, as defined in the Lease), then the Construction Period (defined below) shall be extended by two (2) additional days for each day past the Outside Tender Date that the Tender Date does not occur. For example, if the Tender Date occurs on March 13, 2012, then the Construction Period shall be extended by four (4) additional days.  If for any reason the Tender Date does not occur on or before April 16, 2012, then as Tenant's sole and exclusive remedy, Tenant shall have the right to terminate this Lease by giving prior written notice to Landlord at any time prior to the occurrence of the Tender Date. Notwithstanding the foregoing, should the Tender Date occur within seven (7) days after the date on which Tenant delivers its notice of termination, then Tenant's notice of termination shall be rendered null and void. In the event the Lease is terminated pursuant to this Paragraph 2, then Landlord shall reimburse to Tenant its out of pocket costs and expenses incurred in negotiating this Lease and preparing plans up to a maximum payment of $25,000.

The "Delivery Date" shall be the later of the following dates to occur:  (i) the date upon which Tenant receives all desired governmental approvals and permits for the build-out, use and operation of the Leased Premises; or (ii) the Tender Date. If the Delivery Date occurs during a "Delivery Blackout Period" (as hereinafter defined), then Tenant, at Tenant's sole election, may delay the Delivery Date to the first day following the Delivery Blackout Period. The "Delivery Blackout Period" shall be defined as the period beginning on October 15 and ending on the next following January 31.

GS6

3.   Rent Commencement Date and Construction Period. Tenant's obligation to pay Minimum Rent and other charges under the Lease (all of which are referred to in the Lease as "Additional Rent") shall commence on the first day following the end of the Construction Period (which date shall be referred to as the "Rent Commencement Date"). The term "Construction Period" means the period beginning on the Tender Date and ending on the earlier of the following dates: (a) the date which is one hundred twenty (120) days after the Delivery Date (as defined in Paragraph 2 above); or (b) the date which is one hundred eighty (180) days after the Tender Date (as defined in Paragraph 2 above). If the Rent Commencement Date would occur during an Opening Blackout Period (as hereinafter defined), then, unless Tenant opens for business during the Opening Blackout Period, the Rent Commencement Date shall be delayed until the first day immediately following the Opening Blackout Period in question. The term "Opening Blackout Period" shall be defined as the following: (i) 15 days prior to and including Thanksgiving; (ii) 30 days prior to and including Christmas; (iii) 15 days prior to and including Easter; and (iv) 15 days prior to and including Memorial Day. If Tenant elects to open for business during an Opening Blackout Period, then the Rent Commencement Date shall be defined as the date upon which Tenant opens for business.

4.   Protected Area and Additional Provisions Regarding Common Area. Exhibit "A" to the Lease (the "Site Plan") shows the Shopping Center, a portion of which is marked "Protected Area" (the "Protected Area"). Landlord shall not change, or permit others to temporarily or permanently change, the size, location, nature and use of any of the Protected Area; nor the size (either horizontal or vertical dimensions) or location of structures within the perimeter of the Protected Area; nor any signs within the perimeter of the Protected Area or, subject to Landlord's limited right to reduce the number of parking spaces in the Shopping Center as a whole as set forth below, vehicle parking spaces in the Protected Area (including, without limitation, any changes to the striping, curbing, landscaping, or directional signage); nor change any portion of the Common Area located within the perimeter of the Protected Area, including (without limitation) conversion of any portion of the Common Area included in the Protected Area into leasable areas; nor take nor permit to be taken any action within the Protected Area which would limit, reduce or impede (i) the visibility of the Premises from adjoining areas of the Shopping Center or adjoining streets, or (ii) pedestrian or vehicular access to and from the Premises; nor change the character or design of the portion of the Shopping Center contained within the Protected Area without Tenant's prior written consent in each instance, which Tenant may withhold in its sole and absolute discretion, unless such change is required to comply with applicable law in which event Tenant's consent shall not be unreasonably withheld or delayed. Notwithstanding the foregoing, with respect to ingress and egress points from the Shopping Center, Landlord shall only be required to provide during the term of this Lease two (2) curb cuts from the Shopping Center to Breck Street and two (2) curb cuts from the Shopping Center to FM 1960.

Within the balance of the Common Area of the Shopping Center, Landlord shall not take or permit any action to be taken which would limit, reduce or impede (i) direct access to the "Service Area" (as shown on the Site Plan) from Breck Street and from FM 1960, or (ii) the vehicular or pedestrian access to the Leased Premises and/or Service Area; and Landlord shall not reduce or permit others to reduce the number of parking spaces within that portion of the Shopping Center west of Breck Street (including the Protected Area) below a ratio of four (4) spaces for every one thousand (1,000) square feet of leasable space in that portion of the Shopping Center west of Breck Street. Except as shown on Exhibits "F" and "G" to the Lease and as set forth in the Recorded Documents, Landlord represents and warrants to Tenant that there are no agreements or other arrangements made with neighboring property owners, other tenants of the Shopping Center, or other parties, that affect the Premises, the Common Area, or the Shopping Center, or portions thereof, which conflict with Tenant's rights or Landlord's obligations hereunder, including but not limited to: the use of vehicle parking spaces, the maintenance of asphalt, concrete, landscaping or other areas without structures, future development, utility services, security, vehicular or pedestrian access or egress, signage, drainage, advertising or Tenant's use of the Common Area. Notwithstanding any other provision of this Lease, Landlord may temporarily close any portion of the Common Area, but only as necessary to perform any acts in the Common Area as are necessary to meet Landlord's obligations: (i) under this Lease, (ii) under other leases in the Shopping Center, and (iii) to comply with Law; provided that (1) Landlord gives Tenant a minimum of ten (10) days written notice thereof, (2) Landlord takes all reasonable actions to avoid so doing during any of Tenant's peak business periods (October 1 to January 3 of any year and the fifteen (15) day period ending on Easter, Valentine's Day, Memorial Day, Independence Day and Labor Day), and (3) Landlord takes all reasonable



GSG

actions to minimize any detrimental effects to Tenant's business operations at the Premises as a result of such closure. Landlord shall not permit any carnivals, fireworks stands, Christmas Tree sales, telephones, kiddy rides, vending machines, ATMs, recycling centers or machines or any such or similar activities in the Protected Area at any time, except for the rights expressly granted Tenant under this Lease. Subject to the provisions of this Lease applicable to alterations, additions, and improvements of the Premises, Tenant may change Tenant's Service Area to facilitate Tenant's receipt of merchandise provided that Tenant obtains Landlord's prior written consent, which shall not be unreasonably withheld.

Upon prior written notice to Landlord and subject to Landlord's approval as to size and location, which approval shall not be unreasonably withheld or delayed, Tenant, at Tenant's election, shall have the right to install, at Tenant's sole cost and expense, a cart retention system in the Common Area utilizing wires or other embedded objects as a means of perimeter control, provided that Tenant shall repair any damage caused by such installation. Further, prior to the expiration of the term of this Lease, Tenant shall disconnect the cart retention system so that the cart retention system is no longer operable. Landlord hereby consents to Tenant's plan for the cart retention system as shown on Exhibit "I" attached hereto.

Landlord hereby represents to Tenant that Tenant shall have (i) exclusive use of Tenant's Service Area (depicted on Exhibit "A"), and (ii) exclusive use of the existing utility services at the Leased Premises. Landlord shall not modify Tenant's Service Area.

5.     Additional Provisions Regarding Common Area Maintenance. Landlord shall maintain and operate the Common Area in good order, condition and repair, comparable with high quality shopping centers in the county in which the Premises is located. In no event shall Tenant have any responsibility for the payment of any marketing, advertising, or promotional expenses. Should Landlord utilize any affiliates of Landlord or any companies affiliated to Landlord (any such affiliate or affiliated company hereinafter referred to as "Landlord's Affiliate") to provide any item(s) of Common Area Operating Costs, the amounts charged by any such Landlord's Affiliate shall not exceed the amount which is customarily charged by unaffiliated professional providers of the same service(s) to shopping centers which are similar to the Shopping Center in the same geographic area as the Shopping Center. Tenant hereby acknowledges and agrees that Landlord utilizes its Affiliate, Weingarten Realty Management Company, to manage the Shopping Center.

Notwithstanding anything to the contrary contained herein, Common Area Operating Costs shall not include the following:

(i)     Supervision or management salaries or similar fees, except that Landlord may include in the Common Area Operating Costs charged to Tenant an amount equal to 10% of all other Common Area Operating Costs, exclusive of utilities (and taxes and insurance, as taxes and insurance are not included in Common Area Operating Costs);

(ii)    Security costs or other similar fees, unless Tenant expressly agrees thereto in writing;

(iii)   Depreciation of real property or improvements which form part of the Common Areas;

(iv)    Repairs, replacements or improvements made prior to the date hereof except for repairs replacements or improvements that were amortized over their useful lives;

(v)     Repairs arising from defects in the initial construction of the Shopping Center;

(vi)    Repairs necessitated by the negligence of Landlord and which are required to cure violations of laws in effect on the date hereof;



(vii)   Payments of principal and interest and amortization of indebtedness or any cost of financing or refinancing, depreciation or ground rent;

(viii)  Compensation paid to officers or executives of Landlord who are not directly involved in the management of the Shopping Center;

(ix)    Costs incurred by Landlord in connection with the leasing of space in the Shopping Center, including, without limitation, commissions and advertising and promotional expenses;

(x)     Legal fees, other than those incurred by Landlord in the filing, institution or prosecution of any application or proceeding filed or instituted by Landlord in order to reduce real property taxes;

(xi)    The cost of repairs or replacements incurred by reason of fire or other casualty or condemnation to the extent that either (1) Landlord is compensated therefor through proceeds of insurance or condemnation awards; or (2) Landlord failed to obtain insurance against fire or casualty as required under the terms of this Lease;

(xii)   The cost of initial construction or completion of the Common Area or any part of the Shopping Center;

(xiii)  Any portion of amounts paid to any firm or entity affiliated with Landlord for services or materials, to the extent such amount exceeds the then existing market rates for the same services or materials in the same geographic location;

(xiv)   Except as otherwise expressly provided in the Lease (including this Addendum), expenditures made by Landlord which are in the nature of capital improvements;

(xv)    Costs arising from any cleanup, repair or remediation of "Hazardous Materials" [as defined in Section 18(a)] to the extent that such action is attributable to the presence, use, generation, storage, release or disposal of Hazardous Materials on, under or in the Shopping Center (unless caused by the acts of Tenant or Tenant's agents, employees, contractors or sublessees);

(xvi)   Legal expenses incurred by Landlord in enforcing and/or negotiating the terms of any lease for space in the Shopping Center;

(xvii)  The cost of any work or service performed for, or facilities furnished to, any other tenant in the Shopping Center at such tenant's cost;

(xviii) The amount of any judgement applicable to the operation, ownership or maintenance of the Shopping Center and all costs associated with the defense of such action;

(xix)   The amount of any rent paid by Landlord to a ground lessor;

(xx)    Any license, permit and inspection fees, consulting, legal and accounting fees or similar fees and other costs incurred by Landlord in connection with the ownership, operations and leasing of the Shopping Center;

(xxi)   The cost of rubbish removal for rubbish generated within the premises of all other tenants or occupants of space within the Shopping Center (except that Common Area Operating Costs shall



include the cost of rubbish removal of rubbish generated within the Common Area);

(xxii)   The cost of maintaining the Common Area of any portion of the Shopping Center which is enclosed;

(xxiii)   The cost of funds borrowed by Landlord; and

(xxiv)   The entire amount of the costs charged by any of Landlord's Affiliates for any items of Common Area Operating Costs if Landlord fails to disclose to Tenant the use of such Landlord's Affiliate.

6.   Loading. See Paragraph 4 above.

7.   <u>Common Area Operating Costs, Taxes and Insurance Premiums -- Tenant's Share and Payment</u>. Landlord shall take all reasonable actions to minimize (to the extent reasonably possible) the Common Area Operating Costs (and each component thereof). The foregoing sentence shall not in any way affect any of Landlord's obligations, including maintenance of the Common Areas as otherwise provided in the Lease.

At least 30 days prior to the Rent Commencement Date and on other occasions if Landlord so elects, during the Lease Term, Landlord shall provide a written notice to Tenant setting forth in reasonable detail Landlord's best estimate of all Common Area Operating Costs, Taxes and Insurance Premiums (which, taken together, are referred to in this Lease as the "Operating Expenses") for the ensuing calendar year (which may be based on the Actual Operating Expenses for the then current calendar year) and Tenant's share thereof, and such supporting documentation as Tenant may reasonably request ("Estimated Operating Expenses"). Subject to the other provisions of this Lease, Tenant shall thereafter pay on a monthly basis Tenant's pro rata share of the Estimated Operating Expenses (prorated for any fractional periods) with each subsequent monthly installment of Minimum Rent.

"Tenant's share" as applied to Common Area Operating Costs, Taxes (except for the Shopping Center TMT, as defined in Section 22.01.B of the Lease) and Insurance Premiums means a sum calculated by multiplying Common Area Operating Costs, Taxes (except for the Shopping Center TMT) and Insurance Premiums (as the case may be) by a fraction, the <u>numerator</u> of which is the ground floor area (in square feet) of the Leased Premises and the <u>denominator</u> of which is the aggregate leasable ground floor area (in square feet) in all buildings in the Shopping Center on the first day of January for the calendar year for which any calculation referred to in this Paragraph is being made. For any period less than twelve (12) full calendar months, a pro rata portion of the resulting product shall be calculated to determine Tenant's share. Notwithstanding the foregoing, Tenant's share shall never exceed twenty percent (20%).

"Tenant's share" as applied to the Shopping Center TMT means <u>twenty percent (20%)</u> of an amount equal to (i) the ratio of (A) total rents and other amounts paid by Tenant to Landlord pursuant to this Lease during a measurement period on which a Texas Margin Tax (as defined in Section 22.01.B of the Lease) report is based to (B) total rents and other related amounts received by Landlord from all Shopping Center tenants during that period, multiplied by (ii) the Shopping Center TMT.

If any third party tenant in the Shopping Center is (i) maintaining portions of the Common Area, and/or (ii) paying real estate taxes based on a separate rendering of said tenant's premises, and/or (iii) maintaining its own policies of insurance for the types of insurance identified in Article XXII, then as to Common Area Operating Costs and/or Taxes and/or Insurance Premiums (as the case may be), the term "Tenant's share" shall be amended by adjusting the denominator of the fraction referenced hereinabove by excluding therefrom the ground floor area (in square feet) of any premises in the Shopping Center leased to each such tenant.

Commencing on the Rent Commencement Date, Tenant shall pay to Landlord, along with its payment of Minimum Rent: (i) estimated Common Area Operating Costs in the amount of $1,516.67 per month (the "Common Area Payment"); (ii) estimated Taxes in the amount of $3,066.67 per month (the "Tax Payment"); and (iii) estimated Insurance Premiums in the amount



of $1,350.00 per month (the "Insurance Payment"). Unless and until there is an increase in amounts paid by Landlord for Common Area Operating Costs, and/or Taxes and/or Insurance Premiums, Tenant shall pay its Common Area Payment, Tax Payment, and Insurance Payment monthly in advance for each and every month during the term of this Lease (charges for any partial month to be pro-rated).

Within ninety (90) days after the end of each calendar year during the Lease Term and within ninety (90) days of the expiration of the Lease Term, Landlord shall provide a written notice to Tenant setting forth in reasonable detail Landlord's calculation of all Operating Expenses for the prior calendar year and Tenant's share thereof, and such supporting documentation as Tenant may reasonably request in writing ("Actual Operating Expense Notice"). Landlord shall indicate the total amount of Estimated Operating Expenses paid by Tenant for such period on such Actual Operating Expense Notice, and Tenant shall pay (in a lump sum) any shortfall (if the Estimated Operating Expenses paid by Tenant were less than Tenant's pro-rata share of the Actual Operating Expenses for such period) as set forth in any such Actual Operating Expense Notice to Landlord within fifteen (15) days after receipt thereof, except that Tenant may object to any costs included therein which Tenant, in good faith and in reasonable detail, objects by written notice to Landlord within said 15-day period. If the Estimated Operating Expenses paid by Tenant exceed Tenant's pro-rata share of the Actual Operating Expenses for such period as set forth herein and in such Actual Operating Expense Notice, then such overpayment shall be credited to any of Tenant's subsequent payment obligations to Landlord under this Lease, if any, and if any credit remains unapplied as of the expiration or earlier termination of the Lease Term, then such amounts shall be paid in a lump sum to Tenant by Landlord within thirty (30) days. In the event that Landlord shall not provide Tenant with an Actual Operating Expense Notice within ninety (90) days after the end of the calendar year in question, Tenant shall not be required to continue paying its pro rata share of Operating Expenses (even though Tenant's share shall continue to accrue) until such time as Tenant has received a copy of said Actual Operating Expense Notice, at which time, Tenant shall, within thirty (30) days after receipt of a copy of said Actual Operating Expense Notice, subject to the foregoing, pay to Landlord any accrued, but unpaid amounts of Operating Expenses due and owing from Tenant. Notwithstanding the foregoing, for the last month of the term of this Lease, as the same may be extended, the maximum amount payable by Tenant for Operating Expenses shall be one-twelfth of the maximum amount payable by Tenant for the last month of the last full calendar year of the term of this Lease, as so extended.

8.      Limitations on Common Area Operating Costs. For the first full calendar year following calendar year 2012 (the "Base Year"), Tenant's share of Common Area Operating Costs (estimated and actual) shall not exceed an amount equal to the product of: (a) 12 times the average monthly Common Area Operating Costs payable by Tenant during the Base Year; multiplied by (b) 105%; thereafter, during each subsequent calendar year of the entire term of this Lease, including any extensions of the term of this Lease, the Common Area Operating Costs payable by Tenant (estimated and actual) shall not exceed 105% of the amount payable by Tenant with respect to the immediate prior calendar year; provided, however, that said five percent (5%) annual cap on Tenant's share of Common Area Operating Costs shall be compounded annually. For example, if Common Area Operating Costs increase by 3% during the first full calendar year following the Base Year, then Tenant's share of Common Area Operating Costs shall not exceed an amount equal to the product of: (a) 12 times the average monthly Common Area Operating Costs payable by Tenant during the Base Year; multiplied by (b) 103%. However, if Common Area Operating Costs increase by 8% during the second full calendar year following the Base Year, then Tenant's share of Common Area Operating Costs shall not exceed an amount equal to the product of: (a) 12 times the average monthly Common Area Operating Costs payable by Tenant during the first full calendar year following the Base Year; multiplied by (b) 107%. That is, the unused 2% during the first full calendar year following the Base Year may be carried forward and utilized to increase the 5% cap in a future calendar year. This limitation on Common Area Operating Costs shall exclude that portion of Common Area Operating Costs consisting of charges for utilities.

9.      Audit and Cut Off on Operating Expenses Claims. Landlord shall maintain at its headquarters in Houston, Texas, commercially reasonable and detailed records concerning all components of Operating Expenses for at least twenty four (24) months following the completion of each calendar year. Tenant shall have the right to audit such records, provided that such audit may not be conducted (i) during the months of January through April of any calendar year, or (ii) by a person or entity who is being compensated on a contingency fee basis. If any such audit



reveals an overpayment of Operating Expenses by Tenant, Landlord shall promptly refund said overpayment to Tenant. In addition, if any such audit reveals errors in Landlord's favor exceeding three percent (3%), then Landlord shall also reimburse Tenant for the cost of the audit. If Landlord fails to bill Tenant for any amount included within Operating Expenses within 18 months after the cost or charge with respect to such amount was paid or incurred by Landlord, then Tenant notwithstanding any other provision of this Lease shall have no obligation to pay its share or any portion of such component of Operating Expenses.

10.    Assignment and Subletting. Without the prior consent of Landlord: (a) so long as Tenant's parent corporation is a publicly traded company, Tenant may assign its interest in this Lease, or any portion thereof, or sublet the Premises, or any portion thereof, to its parent corporation, or to any entity owned or controlled, in whole or in part, by its parent corporation, by Tenant or by any entity owned directly or indirectly by its parent corporation; and (b) Tenant may assign or sublease its interest in the Lease or the Premises, or any portion thereof, to any regional or national retailer with 25 or more stores in operation as of the date of such assignment or subletting. Any assignment or subletting shall: (y) not conflict with the primary use of any then existing tenant in the Shopping Center who occupies at least 15,000 square feet of floor area if the assignment or sublease will result in a change in use of the Leased Premises from the retail sale of general merchandise (including, without limitation, all merchandise and types of products sold in 99¢ Only Stores locations from time to time), and (z) be subject to: (i) the use clause set forth in Section 6.01 of the Lease; (ii) compliance with law; (iii) and all of the other provisions of this Lease including, without limitation, the provisions of this paragraph pertaining to future agreements between Landlord and other parties pertaining to the "exclusive" use of portions of the Shopping Center for particular uses ("Permitted Assignments"). Notwithstanding the foregoing, in no event shall Tenant be permitted to use a series of one or more Permitted Assignments to "spin-off" this Lease to independent third parties. As an example of the foregoing, Tenant shall not assign this Lease to an affiliate corporation whose assets consist solely of this Lease and the rights granted herein and thereafter sell the stock of such affiliate corporation to an independent third party. The result of what would otherwise be two; independent Permitted Assignments would become a transfer of this Lease to an independent third party that does not satisfy the definition of Permitted Assignment. Any such transfer is prohibited by the terms of this Paragraph 10. All other assignments and subleases of the Lease or Premises or any portion thereof shall be subject to Landlord's prior written consent which will not unreasonably be withheld or delayed.

Notwithstanding that the prior express written permission to any of the aforesaid transactions may have been obtained, or in the event of a Permitted Assignment, the following shall apply: (1) in the event of an assignment, contemporaneously with the granting of Landlord's aforesaid consent, or prior to the effective date of a Permitted Assignment, Tenant shall cause the assignee to expressly assume in writing and agree to perform all of the covenants, duties, and obligations of Tenant hereunder, and such assignee shall be jointly and severally liable therefor along with Tenant and Guarantor; (2) a signed counterpart of all such instruments relative thereto executed by all parties to such transaction (with the exception of Landlord) shall be submitted by Tenant to Landlord within ten (10) days of execution of the same (it being understood that no such instrument other than evidence of a Permitted Assignment shall be effective without the written consent of Landlord); and (3) except as hereinafter set forth, in any case where Landlord consents to an assignment or subletting or in the event of a Permitted Assignment, the undersigned Tenant and the Guarantor will nevertheless remain directly and primarily liable for the performance of all of the covenants, duties, and obligations of Tenant hereunder (including, without limitation, the obligation to pay all rent and other sums herein provided to be paid), and Landlord shall be permitted to enforce the provisions of this instrument against the undersigned Tenant, the Guarantor, and/or any assignee without demand upon or proceeding in any way against any other person; provided, however, notwithstanding the foregoing or anything to the contrary in this Lease, in the event the assignee has a net worth (based upon generally accepted accounting principles) equal to or greater than One Hundred Million Dollars ($100,000,000.00), then upon the date that the assignee assumes the obligations under this Lease, Tenant and the Guarantor shall be released from obligations accruing after the effective date of such assignment.

Landlord has previously granted to the following respective tenants in the Shopping Center the following respective exclusives (and except as so stated Landlord represents and warrants to Tenant that it has not granted, and has no actual knowledge of any claim of, any exclusive right of use of any portion of the Shopping Center by any person): See Exhibit "F"

attached hereto and incorporated herein for all purposes. So long as such respective leases have not terminated or expired, Tenant agrees that neither it nor any assignee nor sublessee of its interest under the Lease or in and to the Premises (hereinafter referred to collectively as the "Parties in Interest", and individually as a "Party in Interest") will violate such exclusives. Notwithstanding this paragraph, but subject to the conditions set forth below, Landlord acknowledges and agrees that the conduct by Tenant of its business as a retail general merchandise store under the name 99¢ Only Stores in a manner conducted in substantially all of its 99¢ Only Stores will not constitute a violation of this Lease or a violation of any such exclusive for purposes of Tenant's obligations under this Lease.

If Landlord grants any exclusive in the Shopping Center from and after the date of execution and delivery of this Lease, the same shall be binding on Tenant and its assigns or sublessees only if: (a) Tenant is given written notice of the same, detailing the name of the tenant, the portion of the Shopping Center such tenant is intended to occupy, the date of the lease, and the exact language of the lease granting such exclusive, such notice to be given promptly following such grant of such exclusive to such party; (b) the exclusive granted to such third party is for the primary use of such party's premises and not a secondary or incidental use; (c) the party in whose favor such exclusive is granted leases and occupies premises in the Shopping Center which consist of a ground floor area equal in size to not less than sixty-five percent (65%) of the ground floor area of Tenant's Premises leased pursuant to this Lease; and (d) such grant of such exclusive does not: (i) violate any of the Use Restrictions affecting the Shopping Center as described in Section 15 of this Addendum; (ii) purport to grant any exclusive use within the scope of the business operations of 99¢ Only Stores (i.e., the retail sale of general merchandise as its primary use) as the same may exist from time to time, and such grant of any such exclusive use must be made expressly subject to the right of 99¢ Only Stores to operate a general merchandise store within the Premises; (iii) violate any exclusive use granted to Tenant pursuant to this Lease; or (iv) purport or have the effect of prohibiting or limiting Tenant (or any assignee or subtenant of Tenant approved by Landlord pursuant to this Section 10, or for which Landlord's approval is not required) from (A) selling (1) any food, beverages or other grocery products for off-premises consumption, or (2) any other products which are the subject of such future exclusive use if such other products may reasonably be included within categories of products offered for sale in a majority of Tenant's stores in Texas (excluding, however, any of such stores in which Tenant may not legally or contractually sell such products, such as, but without limitation, stores in which Tenant does not have a license to sell such products or stores in which Tenant is prohibited under its lease from selling such products as a result of exclusives existing prior to Tenant's lease) at any time prior to the date on which Landlord delivers written notice to Tenant of such future exclusive use, or (B) thereafter selling the products which are the primary products sold by the tenant to whom such future exclusive use is granted (e.g., books if the future exclusive use is a bookstore) so long as the size of the sales floor area dedicated by Tenant for the sale of such products does not exceed 1,500 square feet; and (e) such exclusive use pertains to premises located within that portion of the Shopping Center to the west of Breck Street.

Even if all of the foregoing conditions (a) through (e) inclusive are met, and thus the applicable future exclusive applies to Tenant's use of the Premises, nonetheless Tenant will not be in breach of its obligations under this Lease unless Tenant's primary use of the Premises, and not merely an incidental use of the Premises by Tenant, is within the scope of the future exclusive granted by Landlord in favor of a third party and which meets all of said conditions (a) through (e).

11.    Exclusive. So long as Tenant is open and operating its business in the Premises and the primary purpose of such business is a general merchandise retail store, and there has not occurred an "Event of Default" (as defined in Article XVI of the Lease), Landlord agrees that it will not, after the date hereof, directly lease space in that portion of the Shopping Center located on the west side of Breck Street to any other tenant (i) whose primary business will be a general merchandise retail store, or (ii) who uses in its name and signage "99"; 98; "Dollar" (except for any use of the word "Dollar" by a retailer or service provider – e.g. 'Dollar Rent A Car' – the primary business of which is not the sale of general merchandise) or "99¢". This limitation shall not apply to (i) present tenants (or their assignees or sublessees) whose leases may not prohibit such use or (ii) any tenant leasing space in the portion of the Shopping Center located on the east side of Breck Street. Tenant expressly acknowledges and agrees that the term "general merchandise retail store" does not apply to conventional grocery stores, drug stores, or stores such as Big Lots, Ross, Marshall's or T. J. Maxx. If, at any time during the term of the Lease,

Tenant should cease operating its business at the Premises [except for temporary cessations of operations for remodeling once every five (5) years, or on account of condemnation or casualty, or by reasons of Force Majeure, as defined in the Lease], then the provisions of this Paragraph 11 limiting Landlord's right to lease space in the Shopping Center for the purpose set forth above shall be immediately rendered null and void. Further, in the event any third party shall commence any anti-trust or restraint of trade action or lawsuit as a result of this agreement, this provision shall be rendered null and void and Tenant shall indemnify and hold Landlord harmless for all costs and expenses incurred, including attorneys' fees, in defending such action.

12.    Options to Extend Term. Tenant shall have the right to extend the term of the Lease, on the terms and provisions set forth in this Lease for two (2) additional periods of five (5) years each (the "Extended Terms") following expiration of the initial term of this Lease by giving written notice of exercise to Landlord at least one hundred eighty (180) days prior to the expiration of the Initial Lease Term, or the then current Extended Term, as the case may be. If, as of the date of Landlord's receipt of any such notice of exercise, Landlord believes that Tenant is in default of the Lease, then: Landlord shall notify Tenant in writing of the existence of such claimed default, specifying in detail the nature of such default, regardless of whether or not Landlord has previously notified Tenant of such claimed default; and unless Tenant within the cure period provided herein for a monetary or a non-monetary default (as the case may be), cures the same (or, where applicable pursuant to this Lease, commences and diligently prosecutes the cure of the same), then Tenant's exercise shall be of no force or effect whatsoever. The Minimum Rent payable during each month of the First Extended Term, if any, shall be $15,000.00 per month (based on $9.00 per square foot of floor area in the Leased Premises per annum). The Minimum Rent payable during each month of the Second Extended Term shall be $16,666.67 (based on $10.00 per square foot of floor area in the Leased Premises per annum).

13.    Tax Payment Additional Limitations. The provisions of this paragraph apply to all Tax Payment obligations of Tenant under the Lease, including both Tax Payment obligations with respect to the Premises and Tenant's share of payment obligations pursuant to this Lease with respect to taxes affecting the Common Area. Under no circumstance shall Tenant be required to pay: (a) any amount which is the result of a new assessment district formed in which the Landlord and/or the owner of the Shopping Center voluntarily vote for or consent to the imposition of any levy (including without limitation, any bonded indebtedness) related to the construction or maintenance of facilities related to the development, re-development or capital construction or modification of any portion of the Shopping Center or the surrounding streets, other than a tax or assessment imposed as a result of a general city-wide election in which individual voters participate without reference to the portion of the city in which they reside; (b) income, profits, including gross profits, franchise, gift, estate, inheritance, succession, conveyance, transfer, sales, transaction, excise, capital or other tax assessments upon Landlord or the rent payable under this Lease (except for the Shopping Center TMT and the Rent Sales Tax defined in the Lease Contract); (c) any property tax applicable to a so called "pad site" or "out parcel" which is separately assessed and paid for by the tenant(s) of said "pad site" or "out parcel", or land/improvements not within the boundaries of the Shopping Center; or (d) any interest, fine or penalty for late payment or nonpayment by Landlord of taxes (unless solely the result of Tenant's non-payment or delinquent payment of the Tax Payment obligations owed by Tenant pursuant to this Lease.

14.    Additional Provisions Regarding Insurance.  During the Lease Term, Landlord shall maintain policies of fire and extended coverage insurance covering all buildings and improvements within the Shopping Center, in such amounts as Landlord's mortgagees shall require, or if no mortgagee exists, then in such amounts as are commercially reasonable for a shopping center of the size and quality of the Shopping Center. Such policies shall provide protection against all perils included within the classification of fire, extended coverage, vandalism, malicious mischief, special extended perils (all risk), sprinkler leakage and any other perils which Landlord deems reasonably necessary. Landlord shall not obtain insurance for Tenant's fixtures or equipment or building improvements installed by Tenant on the Premises. Tenant shall not do or permit anything to be done which invalidates any such insurance policies. During the Lease Term, Landlord shall maintain, in full force and effect, general public liability insurance, insuring against liability for injury or death to persons and loss of or damage to property occurring in, on or about the Shopping Center, in an amount equal to not less than $2,000,000.00 per occurrence. Such insurance shall also provide contractual coverage of Landlord's liability to Tenant under the indemnification provisions of this Lease and shall name Tenant as an additional insured. Landlord



shall, upon Tenant's request, provide Tenant with a certificate(s) of insurance evidencing all coverage required by this Lease to be maintained by Landlord. All insurance required to be carried by Landlord or Tenant shall be with an insurance carrier admitted to do business in Texas having a Best rating of B+ or better. Landlord and Tenant acknowledge the insurance markets are rapidly changing and that insurance in the form and amounts described in this Lease may not be available in the future. If at any time during the Lease Term, Tenant is unable to maintain the insurance required under the Lease, Tenant shall nevertheless maintain insurance coverage which is customary and commercially reasonable in the insurance industry for Tenant's type of business, as that coverage may change from time to time. Landlord and Tenant each hereby, on behalf of themselves and all present and future insurance carriers, waive any and all rights of recovery against the other, or against the officers, employees, agents or representatives of the other, for loss of or damage to its property or the property of others under its control, if such loss or damage is covered by any insurance policy in force (whether or not described in this Lease) at the time of such loss or damage. Upon obtaining the required policies of insurance, Landlord and Tenant shall give notice to the insurance carriers of this mutual waiver of subrogation. In the event that Landlord sustains a loss by reason of fire or other casualty which is covered (or could have been covered) by a fire and extended coverage insurance policy, and such fire or casualty is caused in whole or in part by acts or omissions of Tenant, its agents, servants or employees, then Landlord agrees to look solely to its insurance proceeds (if any); and Landlord shall have no claim or right of recovery against Tenant, or the agents, servants or employees of Tenant; and no third party shall have any claim or right of recovery by way of subrogation or assignment or otherwise. To the extent that Landlord fails to take out or maintain the aforesaid fire and extended coverage insurance policy, such failure shall be a defense to any claim asserted by Landlord against Tenant by reason of any loss sustained by Landlord due to fire or other casualty, notwithstanding that such loss might have been proximately caused solely by the negligence of Tenant.

15.  **Use Restrictions.** Subject to leases in the Shopping Center which exist as of the date of this Lease, no portion of the Shopping Center may be used for any of the following:

(1)  nude (or partially nude) bars, nightclubs or theaters of any kind,

(2)  massage parlor; provided, however, Landlord may lease space to establishments providing therapeutic massages by licensed massage professionals such as Massage Envy, spas and chiropractors,

(3)  pornographic book stores,

(4)  escort services,

(5)  bail bonds or pawn shops; provided, however, Landlord may lease space to reputable jewelry only pawn shops,

(6)  the sale of used or second hand products of any kind; provided, however, that Landlord may lease space to high-end resale stores that sell "like new" merchandise and are fixtured in a first class manner.

(7)  tattoo parlors,

(8)  pornographic video stores,

(9)  any use of a questionable moral character,

(10)  indoor swap meets,

(11)  bowling alley; library; church; auditorium; museum; automobile sales; banquet facility; bar (except in connection with a restaurant); disco; nightclub; hotel; manufacturing; warehouse or other industrial use (except incidental to other permitted uses)

(12)  bingo parlor, off-track betting parlor or other gambling facility

(13)  marijuana dispensary

(14)  facility for the sale of drug paraphernalia

Subject to leases in the Shopping Center which exist as of the date of this Lease, no portion of the Shopping Center on the west side of Breck Street may be used for any of the following:

(1)  any movie theater;



(2)    gymnasium (except for one exercise facility such as, but not limited to, Any Time Fitness or Curves not to exceed 4,000 square feet);

(3)    automobile repair;

(4)    any entertainment facility (such as Chuck E Cheese, Discovery Zone, Tutor Time, or Leaps and Bounds);

(5)    or trade or vocational school (except for scholastic tutoring facilities occupying less than 2,000 square feet of space such as Kumon and /or Sylvan Learning Centers; or

(6)    any offices excepting (i) offices incidental to retail uses, and (ii) offices providing services to the general public and customarily found in similar shopping centers (including, but not limited to, banking for finance services, real estate or securities brokerage services, financial or tax planning services, accounting, insurance or legal services, optical, medical or dental services, urgent care facilities, travel agencies, and governmental services offices).

16.    <u>Alterations, Additions, and Improvements</u>. Tenant's alterations and improvements to the Premises prior to opening the Premises to the public for the conduct of its business are governed by the provisions of the Construction Rider attached to and a part of this Lease. Tenant's subsequent alterations, additions and improvements are governed by the provisions of Section 10.01 of the Lease and this Addendum. All such alterations, additions, and improvements shall be done in a good and workmanlike manner, in conformity with all applicable laws and regulations.

Both with respect to any work performed by or at Tenant's direction in or about the Premises prior to Tenant opening the same to the public for business, and with respect to any subsequent alterations, additions or improvements made by Tenant or at Tenant's direction pursuant to the provisions of this paragraph, Tenant will pay when due all claims for labor and material furnished to the Premises. Tenant will give Landlord at least twenty (20) days' prior written notice of the commencement of any work on the Premises, regardless of whether Landlord's consent to such work is required. Landlord may elect to record and post notices of non-responsibility on the Premises.

17.    <u>Additional Provisions Regarding Damage and Destruction</u>. If the Shopping Center is totally destroyed, or more than 35% of the buildings in the Shopping Center are destroyed, whether or not insured against and whether or not the Premises are partially or totally destroyed, Tenant may elect to terminate this Lease by giving Landlord notice thereof within thirty (30) days following the date of such casualty, in which event this Lease shall cease and terminate as of the date of such casualty.

18.    <u>Hazardous Materials</u>.

(a)    As used in this Lease, the term "Hazardous Material" means any flammable items, explosives, radioactive materials, and any other substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "toxic substances" or similar term now or subsequently regulated under any applicable federal, state or local laws or regulations including, without limitation, petroleum-based products, paints, solvents, lead, cyanide, DDT, printing inks, acids, pesticides, ammonia compounds and other chemical products, asbestos, PCBs, and similar compounds, and any other products and materials which are subsequently found to have adverse effects on the environment or the health and safety of persons.

(b)    Except as otherwise provided herein, Tenant shall not cause or permit any Hazardous Material to be generated, produced, brought upon, used, stored, treated or disposed of in or about the Premises, the Shopping Center or the property on which the Shopping Center is located by Tenant, its agents, employees, contractors, sublessees or invitees without the prior written consent of Landlord, which shall not be unreasonably withheld. In addition, Tenant shall not cause or permit an underground storage tank to be installed under the Premises or the Shopping Center without the prior written consent of Landlord, which consent shall be in Landlord's sole and absolute discretion. Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to store, use and dispose of, in the Premises, such Hazardous Materials which are incidental and customary to the operation of Tenant's business, or which



Tenant sells as a matter of course at other 99¢ Only Stores, provided that Tenant shall comply with all applicable laws, rules and regulations in the storage, use and disposal of such Hazardous Materials. Tenant shall indemnify and hold Landlord, its agents and employees, harmless from any and all costs, liabilities, claims, expenses, penalties, and damages of any kind including, but not limited to, attorneys' fees and the cost of any investigation, remediation, restoration, cleanup and/or abatement which is necessary as a result of Tenant's violation of this Section.

(c)     Landlord represents and warrants that, Landlord has not caused or permitted, and shall not cause or permit, any Hazardous Materials to be brought onto the Premises or the Shopping Center in violation of Law except as used by tenants in the ordinary course of their business and in compliance with all applicable laws for doing so. Landlord shall indemnify and hold Tenant and Tenant's agents and employees harmless from any and all costs, liabilities, claims, expenses, penalties, and damages of any kind including, but not limited to, attorneys' fees and the cost of any investigation, remediation, restoration, cleanup and/or abatement which is necessary as a result of Landlord's violation of this Section. In addition, Landlord (i) shall be responsible (at no cost to Tenant) for the abatement of any Hazardous Materials from the Shopping Center for which Tenant is not responsible, including, without limitation, any migration of Hazardous Materials onto, upon or under the Premises which is not caused by Tenant; and (ii) shall indemnify and hold Tenant and Tenant's agents and employees harmless from any damage to Tenant's property and all other out of pocket expenses or claims by third parties, arising out of the existence of such Hazardous Materials. In the event that Tenant closes its business in the Premises as a result of the existence of Hazardous Materials in the Premises or the work associated therewith, then, provided that the existence thereof is not caused by Tenant, then Tenant shall not be required to pay Minimum Rent or Tenant's share of Additional Rent until such abatement is complete.

(d)     The obligations under this paragraph shall survive the expiration or earlier termination of this Lease.

19.     Representations and Warranties and Survival. Landlord represents and warrants to Tenant: (a) it owns fee title to the Shopping Center; (b) upon execution and delivery of this Lease, the same will be binding on Landlord in accordance with its terms; (c) Landlord has no knowledge of: (i) any written notice from any governmental agency that the Premises are in violation of any law, regulation or code; and (ii) any claim in writing or oral from any governmental agency that the Premises or the Shopping Center are subject to any existing environmental condition or are contaminated by any "hazardous substance" in violation of any applicable state, federal or local law or regulation. Tenant represents and warrants to Landlord that upon execution of this Lease the same will be binding on Tenant in accordance with its terms. The foregoing and all other express representations and warranties of Landlord and Tenant set forth in this Lease shall survive the termination of this Lease.

20.     Confidentiality. The parties hereto shall keep this Lease and all documents delivered pursuant to this Lease strictly confidential, except as deemed reasonably necessary for bona fide lenders, prospective purchasers, governmental entities, accountants, legal advisers, etc. Landlord shall have the right to disclose Tenant's use clause, its exclusive use clause, and its Shopping Center use restrictions to prospective tenants in the Shopping Center.

21.     Brokers. Each of the parties represents and warrants to the other that it has dealt with no broker in connection with this Lease, and, insofar as it knows, no broker or other person is entitled to any commission or fee in connection with this Lease, except that Tenant has dealt with NewQuest Properties (Matt Reed) whose brokerage commission, in accordance with a separate written agreement between Landlord and said broker, will be paid by Landlord. Except for the brokerage arrangement expressly described in this paragraph (with respect to which Tenant will have no responsibility) each of the parties hereby indemnifies the other against any commission or fee such indemnifying party may have incurred in connection with this Lease.

22.     Binding Arbitration; Waiver of Jury Trial; Attorneys' Fees. The parties agree that all disputes arising out of or in connection with this Lease will be determined exclusively by binding arbitration, except for disputes involving the monthly payment of Minimum Rent and all Additional Rent due under this Lease (but not year-end adjustments of Operating Expenses). Any such arbitration shall be conducted before the closest office of Judicial Arbitration and Mediation Services ("JAMS") to the Premises as of the date such arbitration is brought. If JAMS is not in



656

existence as of the date such dispute is brought, then the parties shall arbitrate the matter before the closest office of the American Arbitration Association. The arbitration shall be conducted in accordance with the rules (including rules pertaining to procedure and discovery) maintained by the arbitrator as of the commencement of such arbitration. The parties intend that to the maximum extent permitted under the law that such arbitration shall be the final and binding resolution of all matters brought before the arbitrator.  EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PARAGRAPH 22, THE PARTIES EXPRESSLY WAIVE THE RIGHT TO A JURY TRIAL TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAW. The arbitrator may award such costs of enforcement, including arbitration fees and attorneys' fees, as the arbitrator determines to be just and reasonable, to the prevailing party in such dispute. At the inception of the dispute each party shall deposit one-half of any required initial deposit required by the arbitrator with the arbitrator.

Landlord Initials: _____    Tenant Initials: _____

23.    Additional Provisions Regarding Signs.  Tenant may install any legal signage on the walls, façade and tower of the Premises that comply with Landlord's sign criteria for the Shopping Center.  Tenant will have the right to place (i) a two-sided panel on Landlord's existing monument sign structure on the corner of FM 1960 and Veterans Memorial Parkway (the "FM 1960/Veterans Sign") in the space currently occupied by China Star Buffet and (ii) a two-sided panel on Landlord's existing monument sign structure located on FM 1960 (the "FM 1960 Sign") in the space currently used by DSW. The locations of such sign structures are shown on Exhibit "A" attached hereto.  Tenant to pay a monthly electrical fee of $25.00 per month for the FM 1960/Veterans Sign.

Notwithstanding anything to the contrary contained herein, Landlord hereby approves (i) Tenant's fascia sign as shown on Exhibit "E-1", and (ii) the design of Tenant's monument sign panels as shown on Exhibit "E-2", which exhibits are attached hereto and hereby incorporated herein, subject only to Tenant obtaining all necessary governmental permits. Landlord will assist Tenant (but without cost to Landlord) in Tenant's effort to obtain any required approvals from governmental agencies in connection with the Tenant's signage.  Tenant may periodically install banners (grand opening, etc.), pennants and other signage customarily used in connection with the operation of Tenant's stores, but if any such banner, pennant or other signage is to remain in place for longer than seven (7) consecutive days once in every quarter, then such signage shall be subject to Landlord's prior written consent. Between execution of this Lease and delivery of possession of the Premises to Tenant, Tenant may place temporary banners and/or signs on the Premises advertising that Tenant's business is 'coming soon' to that location.   Notwithstanding anything to the contrary contained in the sign criteria for the Shopping Center, any replacements from time to time by Tenant of its fascia signage may be as large as reflected on Exhibit "E-1".

24.    Additional Miscellaneous Provisions.  Neither party shall record this Lease. However, concurrent with the execution of this Lease, Landlord and Tenant shall execute a "Short Form" memorandum (mutually agreeable in form and content to both Landlord and Tenant) of this Lease which Tenant, at its expense, may then cause to be recorded in the Official Records of Harris County, Texas. This Lease may be executed in counterparts and, when all counterpart documents are executed, the counterparts shall constitute a single binding instrument.

25.    Construction Rider. The Construction Rider attached to this Lease is a material element of the Lease.

FINAL PAGE FOLLOWS IMMEDIATELY

GSG

In Witness Whereof, the parties have initialed this Addendum to Lease to confirm it is a part of the Lease. Lease executed as of the day and year first set forth in the Lease.

Landlord: _____    Tenant: _____



GS6

<u>CONSTRUCTION RIDER</u>

This Construction Rider is attached to and forms a part of that certain Lease Contract (the "Lease Contract") dated ~~September 28~~          , 2011, between **WRI-AEW LONE STAR RETAIL PORTFOLIO, LLC,** as "Landlord" and **99 CENTS ONLY STORES TEXAS, INC.**, as "Tenant".

Section 1.01.  Tenant agrees that it has examined the Leased Premises and accepts the same in their present physical condition on an "AS-IS" basis without any nature of construction work performed by Landlord except for the work described on Exhibit "D" attached hereto. Such acceptance by Tenant includes, but is not limited to, the air conditioning and heating system, light fixtures, and floor covering. Landlord hereby represents to Tenant that Tenant shall have (i) exclusive use of Tenant's Service Area (depicted on Exhibit "A"), and (ii) exclusive use of the existing utility services at the Leased Premises. Any work, construction or installations desired by Tenant shall be the sole obligation and at the sole cost of Tenant and shall only be made with Landlord's prior written consent, except to the extent such consent is not required pursuant to the terms of the Lease. Landlord or its agents have made no representations or promises with respect to the Leased Premises or the buildings of which the Leased Premises form a part except as set forth in the Lease of which this Construction Rider is a part. Nothing contained in this Section 1.01 or elsewhere in the Lease of which this Construction Rider is a part as to Tenant accepting the Leased Premises in as-is condition shall be deemed to limit or waive any obligations or representations of Landlord expressly set forth the Lease of which this Construction Rider is a part.

Landlord hereby represents to Tenant the following: (i) Landlord has remediated all asbestos containing materials in the Leased Premises required by applicable law to be remediated; (ii) the Leased Premises have not less than .04 amps/sf @ 277/480V, 3-phase, 4-wire electrical service with main disconnect and meter box. Tenant shall have the right to conduct a moisture test of the Leased Premises ("Moisture Test"). The Allowance described in Section 1.04 hereinbelow shall be increased by an amount equal to the lesser of (i) the cost of the Moisture Test or (ii) $2,000.00. Additionally, if the Moisture Test reveals that the moisture content in the floor is in excess of 5 lbs per 1,000 square feet for twenty-four (24) hours using the calcium chloride method, then the Allowance shall be increased by $6,600.00 ($0.33 psf) for additional glue to compensate for the moisture content in the floor.

Section 1.02.  Tenant may construct improvements at the Leased Premises only upon satisfying the following "conditions precedent": (i) that Landlord and Tenant shall have mutually agreed in writing upon plans and specifications to be utilized by Tenant ("Tenant's Plans"), and (ii) that Tenant has tendered to Landlord: a true copy of a "Building Permit" (meaning all required governmental, regulatory authority and other permits, consents and letters of utility availability) for the work of Tenant and its contractors, and certificates of all insurance required to be obtained by Tenant pursuant to the Lease Contract; provided, however, in the event that the Lease Contract is in full force and effect but Tenant has not provided Landlord with a Building Permit on or before May 15, 2012, Landlord may, in addition to other remedies which may then be available to Landlord, cancel and terminate the Lease Contract by notice to Tenant given at any time thereafter. Upon any such cancellation and termination by Landlord, Landlord and Tenant shall each respectively be released from all further liability under the Lease Contract, irrespective of what costs or expenses either of such parties shall have incurred prior to any such cancellation and termination. On a best efforts basis, Tenant shall (i) apply for a Building Permit within five (5) business days after Landlord and Tenant have mutually agreed in writing on Tenant's Plans, and (ii) diligently pursue its issuance at the earliest possible time. If Tenant is unable to obtain a Building Permit within sixty (60) days after Landlord and Tenant have mutually agreed in writing on Tenant's Plans, then Landlord shall have the right to pursue and obtain such Building Permit on Tenant's behalf, at Tenant's expense.

Landlord hereby agrees to review Tenant's plans and specifications and respond with comments, if any, within three (3) business days of receipt thereof. If Landlord has not approved or responded with comments within said three (3) business day period, then Landlord will be deemed to have approved Tenant's plans and specifications provided Tenant's plans and specifications were accompanied by a letter notifying Landlord's construction representative of the consequences of failing to respond within such three (3) business day period. Landlord hereby represents to Tenant that, other than Landlord and applicable governmental or quasi-governmental entities, no other party (including adjoining property owners) has any right of review or approval of Tenant's plans and specifications.

Section 1.03.  Upon satisfaction of the conditions precedent set forth in Section 1.02 (and provided Landlord has tendered possession of the Premises to Tenant, free of all other occupancies),



GS6

Tenant shall enter the Leased Premises and Tenant will perform such construction work and provide and install such materials as are provided in Tenant's plans and specifications (hereinafter referred to as Exhibit "C", but need not be attached to the Lease Contract), attached to this Lease Contract (collectively, "Tenant's Work"). Tenant will also provide and install all other interior work, trade equipment, furniture, fixtures and effects of every description necessary or appropriate for Tenant's business (excepting any work which is the express responsibility of Landlord under the provisions of the Lease) and all such items to be provided and installed by Tenant shall be new and modern and of first-class quality. Subject to force majeure, in the event Tenant fails to commence construction on or before five (5) business days after the later of: (i) the date on which Tenant receives its Building Permit, or (ii) the date on which Landlord tenders possession of the Leased Premises to Tenant (free of all other occupancies), then such failure shall constitute a default under the Lease if such failure is not cured within five (5) business days after Landlord delivers written notice of default to Tenant.

Section 1.04. A. Upon full completion of construction of the improvements by Tenant in accordance with Exhibit "C" and the sign criteria, if any, Landlord shall pay to Tenant (or, at Landlord's option, Landlord may pay Tenant and the general contractor and/or one or more subcontractors) as an "Allowance", the lesser of (i) Tenant's actual "Building Improvement Costs" (as hereinafter defined) or (ii) the sum of Two Hundred Thousand and No/100 Dollars ($200,000.00) (based upon $10.00 per square foot times 20,000 square feet contained in the Leased Premises) toward Building Improvement Costs with respect to the Leased Premises, provided that Tenant has furnished to Landlord the following (on forms to be furnished by Landlord where applicable):

(1) A certificate of occupancy (or other certificates evidencing inspection and acceptance of all of Tenant's construction by appropriate government authorities);

(2) A copy of Tenant's contract with the general contractor performing such work, which contract shall contain a schedule of values totaling the full amount of the contract. In the event that Tenant has acted as its own general contractor, Tenant must have entered into written subcontracts with all parties who furnished labor and/or materials totaling more than Five Hundred and No/100 Dollars ($500.00) and copies of such subcontracts must be furnished to Landlord;

(3) Tenant's affidavit, in the form attached hereto as Exhibit "C-1", that such construction has been completed to its satisfaction and in accordance with Exhibit "C", which affidavit shall also state the total Building Improvement Costs itemized in reasonable detail;

(4) A lien wavier from the General Contractor in the form prescribed by law in a form sufficient to fully release all lien rights under the laws of the State of Texas;

(5) Certificate of substantial completion from Tenant's architect or engineer certifying that such construction work has been fully completed in accordance with Exhibit "C";

(6) Notice from Tenant to Landlord that Tenant has opened for business at the Leased Premises and execution by Tenant and delivery to Landlord of a commencement letter, if any, indicating the commencement and termination dates of the lease term;

(7) Delivery to Landlord of certificates or duplicate originals of all insurance which Tenant is required to carry under the terms of the Lease;

(8) Payment by Tenant to Landlord of such Minimum Rent and other sums as shall have come due between the commencement date of the lease term and the date upon which Tenant makes application for payment of its Allowance (but in all events, not less than Minimum Rent for the first month of the lease term); and

(9) Delivery to Landlord of one (1) set of as-built plans for the Leased Premises.

Tenant must submit the foregoing items and apply for the Allowance, if at all, no later than one hundred eighty (180) days following the Rent Commencement Date, and in the event Tenant fails to do so, Landlord shall not thereafter be obligated to fund the Allowance or any portion thereof. Landlord agrees to pay the Allowance to Tenant within thirty (30) days after compliance by Tenant with all requirements set forth in Section 1.04.(A) above. In the event Landlord fails or refuses to pay the Allowance within such thirty (30) day period, and such failure or refusal continues for a period of ten



GSG

(10) days after receipt of written notice from Tenant, then Tenant shall be permitted to offset the amount of the Allowance against Minimum Rent otherwise payable by Tenant under the Lease.

B.   The phrase "Building Improvement Costs", as used herein, means the total reasonable costs paid by Tenant to all contractors furnishing labor and materials for erection and improvement of those items constructed in accordance with Exhibit "C".

"Building Improvement Costs" shall not include any sum paid or liability incurred by Tenant for: any brokerage or finder's fee or similar fee; any sum which is paid pursuant to a liability incurred prior to the date of the Lease Contract; or any item of "Removable Trade Fixtures" (as defined in Article X of the Lease Contract).

C.   Landlord may, if Landlord elects, withhold ten percent (10%) of the sum payable by Landlord to Tenant pursuant to Section 1.04.A. hereof for a period of thirty (30) days following the satisfaction of all requirements of Section 1.04.A.  If Landlord itself shall have constructed for Tenant any improvements at the Leased Premises beyond the improvements heretofore provided to be constructed by Landlord, Landlord may withhold from the sum payable by Landlord to Tenant pursuant to Section 1.04.A. hereof the amount owing to Landlord by Tenant for all such work and likewise, Landlord may withhold any other amount for which Tenant is then indebted to Landlord.

Section 1.05.   At all times while Tenant is constructing the improvements at the Leased Premises and installing its trade equipment, furniture and fixtures, Tenant shall not interfere with the conducting of business at the Shopping Center.  Tenant shall comply with said reasonable requests of Landlord as Landlord might make for the purpose of avoiding such interference.  If at any time during the course of Tenant's work at the Leased Premises the storefront of the Leased Premises is not fully secure, Tenant shall construct a barricade of plywood or other material approved by Landlord to secure the Leased Premises and adjoining lease spaces.

Section 1.06.   In connection with any construction of improvements at the Leased Premises by Tenant, the following shall apply:

Tenant shall take out and maintain (or cause the contractor under its construction contract(s) to take out and maintain) Commercial General Liability insurance in a minimum amount of $2,000,000.00 combined single limit.  Said liability insurance shall name Landlord as an additional insured with Tenant (and shall contain a cross-liability endorsement) and shall be non-cancellable with respect to Landlord except upon thirty (30) days' notice to Landlord given in the same manner as provided in the Lease Contract (or, at the request of Landlord, shall be in the form of a separate liability policy in which Landlord alone is the named insured).  Tenant shall also take out and maintain (or cause the contractor under its construction contract(s) to take out and maintain) all builder's risk insurance to the full insurable value of improvements constructed and materials stored at the Leased Premises.  Said builder's risk insurance shall name Landlord as an additional insured and shall be non-cancellable with respect to Landlord.  Tenant shall take out (or cause contractor under its construction contract(s)) to take out and maintain Workers' Compensation and Employers Liability in a minimum amount of $500,000 bodily injury for each accident, $500,000 bodily injury by disease for each employee, and $500,000 bodily injury disease aggregate and provide a waiver of subrogation for the Tenant and Landlord.  Certificates of all such insurance shall be delivered by Tenant to Landlord within five (5) days following Tenant's entering into any such construction contract(s) (but in all events prior to Tenant or Tenant's general contractor commencing construction).

Section 1.07.   With respect to any labor performed or materials furnished by Tenant at the Leased Premises, the following shall apply:  All such labor shall be performed and materials furnished at Tenant's own cost, expense and risk.  Labor and materials used in the installation of Tenant's furniture and fixtures, and in any other work on the Leased Premises performed by Tenant, will be subject to Landlord's prior written approval.  Any such approval of Tenant's labor shall constitute a revocable license authorizing Tenant to permit such labor to enter upon the Shopping Center and Leased Premises prior to the commencement of the lease term for so long as Tenant's labor does not interfere with labor utilized by Landlord or any other tenant.  With respect to any contract for any such labor or materials, Tenant acts as a principal and not as the agent of Landlord.  Tenant agrees to indemnify and hold Landlord harmless from all claims (including costs and expenses of defending against such claims) arising or alleged to arise from any act or omission of Tenant or Tenant's agents, employees, contractors, subcontractors, laborers, materialmen or invitees or arising from any bodily injury or property damage



GSG

occurring or alleged to have occurred incident to Tenant's work at the Leased Premises. Tenant shall have no authority to place any lien upon the Leased Premises or any interest therein nor in any way to bind Landlord; and any attempt to do so shall be void and of no effect. Landlord expressly disclaims liability for the cost of labor performed or materials furnished by Tenant. If, because of any actual or alleged act or omission of Tenant, any lien, affidavit, charge or order for the payment of money shall be filed against Landlord, the Leased Premises or any portion thereof or interest therein, whether or not such lien, affidavit, charge or order is valid or enforceable, Tenant shall, at its own cost and expense, cause same to be discharged of record by payment, bonding or otherwise no later than fifteen (15) days after notice to Tenant of the filing thereof, but in all events, prior to the foreclosure thereof. All of Tenant's construction at the Leased Premises shall be performed in strict compliance with the working drawings, all applicable building codes and other legal requirements and in a good and workmanlike manner satisfactory to Landlord's Architect and in such manner as to not cause Landlord's fire and extended coverage insurance to be canceled or the rate therefor increased.

Section 1.08. All improvements constructed by Tenant at the Leased Premises (excepting only Removable Trade Fixtures installed by Tenant) shall, immediately upon such construction, become and remain the property of Landlord; and Tenant shall have no right, title or interest (including lien interest) therein, except only as Tenant under the provisions of the Lease Contract. The aforesaid improvements, if constructed by Tenant, are not intended as any nature of rent or compensation to Landlord.

Section 1.09. Subject to delays caused by governmental restrictions, strikes, lockouts, shortages of labor or material, acts of God, war or civil commotion, fire, unavoidable casualty, inclement weather or any other cause beyond the reasonable control of Tenant (including, without limitation, delays caused by Landlord or its employees, agents or contractors) (collectively, "Force Majeure Delays"), Tenant agrees that its construction at the Leased Premises will be completed in accordance with Exhibit "C" within the later of the following (the "Completion Period"): (i) one hundred twenty (120) days after Tenant's receipt of its Building Permit; or (ii) one hundred eighty (180) days after the Tender Date. If Tenant shall not have so completed such construction by the Completion Period (plus additional time if Tenant's failure so to complete is due to Force Majeure Delay), then such failure shall constitute a default under the Lease if such failure is not cured within thirty (30) days after Landlord delivers written notice of default to Tenant.

Section 1.10. Upon completion of construction of such improvements, Tenant shall deliver to Landlord one (1) set of as-built plans for the Leased Premises.

Section 1.11. Any modifications or alterations to the Leased Premises made by or on behalf of Tenant and involving the sprinkler system serving the Leased Premises shall be performed by (i) Landlord or its contractors at Tenant's cost, or (ii) Tenant's contractor or subcontractor at Tenant's cost, provided that Tenant obtains Landlord's prior written consent to any such contractor or subcontractor. Tenant shall pay the cost of any such work (or reimburse Landlord therefor) within thirty (30) days after delivery to Tenant of a statement therefor, provided that the amount paid by Tenant to Landlord may be included in the definition of Building Improvement Costs for which Landlord disburses the Allowance.



<u>MONUMENT SIGN RIDER #1</u>

      This Monument Sign Rider #1 is attached to and forms a part of that certain Lease Contract (the "Lease Contract") dated _September 28_, 2011, between WRI-AEW LONE STAR RETAIL PORTFOLIO, LLC, as "Landlord," and 99 CENTS ONLY STORES TEXAS, INC., a Delaware corporation, as "Tenant."

      Section 1.01.  Landlord hereby grants to Tenant the exclusive right during the term of this Lease to place a two-sided panel on Landlord's existing monument sign structure located on the corner of Veterans Memorial Parkway and FM 1960 in Landlord's North Oaks Shopping Center at Houston, Texas, provided that the then current local sign ordinances so permit and subject to the following conditions stated herein. The location of Tenant's sign on the monument sign structure is depicted on the Monument Exhibit attached hereto and incorporated herein for all purposes.

      (1)    Intentionally omitted.

      (2)    Provided that the conditions of the foregoing paragraph have been satisfied, then Tenant shall contract, at Tenant's sole cost and expense, with either _____ or _____ for the construction and installation of the sign on the monument sign structure. Subject to Force Majeure, in the event Tenant fails to have such sign installed within six (6) months after opening for business in the Leased Premises, then such failure shall constitute a default under the Lease.

      Section 1.02.  Tenant's right to maintain its sign on Landlord's monument sign structure shall be subject to the following conditions:

      (1)    Tenant's sign has been installed according to the provisions set forth in Section 1.01 hereof,

      (2)    Tenant pays, within ten (10) days of receipt of any invoice therefor, (i) its pro rata portion of the costs of repairing, replacing and maintaining the sign structure and the costs of permits, insurance and/or taxes, if any, for such monument sign structure and (ii) the costs to repair or replace Tenant's lamps, ballasts and/or electrical wiring (either of such costs [(i) or (ii)] shall be referred to herein as "Monument Costs").

      (3)    Tenant pays, monthly in advance along with its payment of Minimum Rent, a "Utility Charge" representing Tenant's proportionate share of the utility costs for the monument sign. Tenant's initial Utility Charge shall be the sum of <u>Twenty-Five and 00/100 Dollars ($25.00)</u> per month for the monument sign, which amount shall be subject to adjustment from time to time thereafter.

      (4)    Tenant repairs or replaces any damage to its sign face or "can" within thirty (30) days of receipt of written notice from Landlord stating that such sign is in need of repair or replacement. Landlord, in its sole discretion, shall determine when and to what extent the sign face needs to be replaced or repaired.

      In the event Tenant should fail to timely pay its Utility Charges, its pro rata share of Monument Costs, or fail to repair or replace its sign, as applicable, within the time provided hereinabove, such failure shall constitute a default under the Lease. If Tenant fails to cure any such default within the applicable notice and cure period, then in addition to all of Landlord's other rights and remedies under the Lease, Landlord shall have the right, at its option, to repair or replace such sign or remove same from the monument sign structure. Tenant agrees to pay, upon demand, all costs and expenses incurred by Landlord in the repair, replacement or removal of Tenant's sign. In the event Landlord should elect to remove Tenant's sign (whether in lieu of repairing or replacing or because of Tenant's failure to pay for such repair or replacement), then in addition to Tenant's being obligated to reimburse Landlord for all costs and expenses in connection therewith, Tenant's right to have its monument sign maintained upon Landlord's monument sign structure shall, upon such removal, become null and void.

      Section 1.03.  At the termination of the lease term or upon termination of Tenant's right to possession of the Leased Premises as provided in the Lease, Tenant shall remove the faces of such sign and the "can" portion of the sign shall become the property of Landlord. In the event Tenant fails to

GSG.

remove the sign face within one (1) week after termination of the lease term or termination of Tenant's right to possession of the Leased Premises, Landlord shall have the right to remove such sign and Tenant shall reimburse Landlord for all costs and expenses of such removal which shall be in addition to any other sum which may be due and owing to Landlord at such time.

Section 1.04.    Tenant agrees that if at any time Landlord shall remove Tenant's sign from Landlord's monument sign structure in accordance with the terms of this Monument Sign Rider, the disposal of such sign shall be at the discretion of Landlord, and Tenant agrees to hold Landlord harmless from any act arising out of such disposal, and further agrees that it shall have no cause of action against Landlord for any loss occasioned thereby.

Section 1.05.    If there shall be taken during the term of the Lease so much of the Common Area such that removal of the monument sign structure shall be required by the condemning authority, all sums awarded or agreed upon between Landlord and the condemning authority for the taking of the monument sign structure and sign thereon, whether as damages or as compensation, will be the property of Landlord and Tenant will have no interest in any such award.

656

<u>MONUMENT SIGN RIDER #2</u>

This Monument Sign Rider #2 is attached to and forms a part of that certain Lease Contract (the "Lease Contract") dated *September 28*, 2011, between **WRI-AEW LONE STAR RETAIL PORTFOLIO, LLC,** as "Landlord," and **99 CENTS ONLY STORES TEXAS, INC.,** a Delaware corporation, as "Tenant."

Section 1.01. Landlord hereby grants to Tenant the exclusive right during the term of this Lease to place a two-sided panel on Landlord's existing monument sign structure located on FM 1960 in Landlord's North Oaks Shopping Center at Houston, Texas, provided that the then current local sign ordinances so permit and subject to the following conditions stated herein. The location of Tenant's sign on the monument sign structure is depicted on the Monument Exhibit attached hereto and incorporated herein for all purposes.

    (1)    Intentionally omitted.

    (2)    Provided that the conditions of the foregoing paragraph have been satisfied, then Tenant shall contract, at Tenant's sole cost and expense, with either _____ or _____ for the construction and installation of the sign on the monument sign structure. Subject to Force Majeure, in the event Tenant fails to have such sign installed within six (6) months after opening for business in the Leased Premises, then such failure shall constitute a default under the Lease.

Section 1.02. Tenant's right to maintain its sign on Landlord's monument sign structure shall be subject to the following conditions:

    (1)    Tenant's sign has been installed according to the provisions set forth in Section 1.01 hereof,

    (2)    Tenant pays, within ten (10) days of receipt of any invoice therefor, (i) its pro rata portion of the costs of repairing, replacing and maintaining the sign structure and the costs of permits, insurance and/or taxes, if any, for such monument sign structure and (ii) the costs to repair or replace Tenant's lamps, ballasts and/or electrical wiring (either of such costs [(i) or (ii)] shall be referred to herein as "Monument Costs").

    (3)    Tenant repairs or replaces any damage to its sign face or "can" within thirty (30) days of receipt of written notice from Landlord stating that such sign is in need of repair or replacement. Landlord, in its sole discretion, shall determine when and to what extent the sign face needs to be replaced or repaired.

In the event Tenant should fail to timely pay its pro rata share of Monument Costs, or fail to repair or replace its sign, as applicable, within the time provided hereinabove, such failure shall constitute a default under the Lease. If Tenant fails to cure any such default within the applicable notice and cure period, then in addition to all of Landlord's other rights and remedies under the Lease, Landlord shall have the right, at its option, to repair or replace such sign or remove same from the monument sign structure. Tenant agrees to pay, upon demand, all costs and expenses incurred by Landlord in the repair, replacement or removal of Tenant's sign. In the event Landlord should elect to remove Tenant's sign (whether in lieu of repairing or replacing or because of Tenant's failure to pay for such repair or replacement), then in addition to Tenant's being obligated to reimburse Landlord for all costs and expenses in connection therewith, Tenant's right to have its monument sign maintained upon Landlord's monument sign structure shall, upon such removal, become null and void.

Section 1.03. At the termination of the lease term or upon termination of Tenant's right to possession of the Leased Premises as provided in the Lease, Tenant shall remove the faces of such sign and the "can" portion of the sign shall become the property of Landlord. In the event Tenant fails to remove the sign face within one (1) week after termination of the lease term or termination of Tenant's right to possession of the Leased Premises, Landlord shall have the right to remove such sign and Tenant shall reimburse Landlord for all costs and expenses of such removal which shall be in addition to any other sum which may be due and owing to Landlord at such time.

Section 1.04.  Tenant agrees that if at any time Landlord shall remove Tenant's sign from Landlord's monument sign structure in accordance with the terms of this Monument Sign Rider, the disposal of such sign shall be at the discretion of Landlord, and Tenant agrees to hold Landlord harmless from any act arising out of such disposal, and further agrees that it shall have no cause of action against Landlord for any loss occasioned thereby.

Section 1.05.  If there shall be taken during the term of the Lease so much of the Common Area such that removal of the monument sign structure shall be required by the condemning authority, all sums awarded or agreed upon between Landlord and the condemning authority for the taking of the monument sign structure and sign thereon, whether as damages or as compensation, will be the property of Landlord and Tenant will have no interest in any such award.

**Exhibit "A"**



**VETERANS MEMORIAL DRIVE**

FM 1960/Veterans Sign →

F.M. 1960

■■ Service Area

▨ Protected Area
(Includes Service Area)

■ Cart Corral

**BRECK STREET**

"Leased Premises"
Approx.: 20,000sf.
4849 FM 1960 West
Houston, Texas

FM 1960 Sign →

The "Leased Premises" as shown hereon is for 99 Cents Only Stores Texas, Inc.

Subject to the terms of the Lease, any future construction by the Landlord within the Shopping Center will not affect the validity of the Lease covering the Leased Premises. Subject to the terms of the Lease , Landlord may elect to change the location, size, layout, or other details of any buildings, or Common Area in the Shopping Center and/or to construct other buildings in the Shopping Center and such changes will not affect the validity of the Lease covering the Leased Premises.

The post office address designated hereon, if any, is subject to change at any time.

DATE: 07-27-2011
REV.: 08-10-2011
REV.: 09-14-2011
REV.: 09-20-2011

| INITIAL | Floor No: |
|---------|-----------|
|         | B00 |
|         | Unit No: |
|         | WAA |
|         | Project No: |
|         | 0105 |

[END EXHIBIT "A"]

## EXHIBIT "B"

**RESERVE B:**

Being a parcel of land out of that certain 40.00 acre tract of land conveyed to Weingarten Markets Realty Company by Claud B. Hamill by deed dated January 5, 1973 and recorded under Harris County Clerk's File No. D-775122; said parcel of land being more particularly described by metes and bounds as follows:

BEGINNING at a 5/8 inch iron rod at the Northwest corner of said 40.00 acre tract in the Southeasterly right-of-way line of F. M. Highway 1960 (based on a width of 100.00 feet);

THENCE North 55° 56' 10" East, along the Northwesterly line of said 40.00 acre tract, and the Southeasterly right-of-way line of said F. M. Highway 1960, 473.17 feet, more or less, to a point for corner;

THENCE South 34° 03' 50" East, 228.00 feet, more or less, to a point for a corner;

THENCE North 55° 56' 10" East, 175.00 feet, more or less, to a point for a corner;

THENCE South 34° 03' 50" East, 577.13 feet, more or less, to a point for corner on the Southeasterly line of said 40.00 acre tract, same being the Northwesterly line of Fountainhead Subdivision, Section One, the plat of which is recorded in Volume 207, Page 19 of the Harris County Map Records;

THENCE South 55° 56' 10" West, along the Southeasterly line of said 40.00 acre tract, 380.00 feet to a 5/8 inch iron rod for corner;

THENCE North 33° 55' 59" West, 119.51 feet to a 5/8 inch iron rod for corner;

THENCE South 56° 04' 01" West, 270.00 feet to a 5/8 inch iron rod for corner;

THENCE North 33° 55' 59" West, along the Northwesterly line of said 40.00 acre tract, 685.00 feet to the PLACE OF BEGINNING.

Plus

**RESERVE A:**

Being 17.350 acres of land out of Unrestricted Reserve "A", Block One, Stuebner Forest, the plat of which is recorded in Volume 221, Page 43 of the Harris County Map Records. Said 17.350 acre tract being more particularly described by metes and bounds as follows:

BEGINNING at a 5/8 inch iron rod at the intersection of the Southeasterly right-of-way line of F. M. Highway 1960 (based on a width of 100.00 feet) with the Southwesterly right-of-way line of Stuebner Airline Road (based on a width of 90 00 feet), same being the most Northerly corner of said Unrestricted Reserve "A";

THENCE South 78° 58' 21" East, along the Southwesterly right-of-way line of said Stuebner Airline Road, 14.12 feet to a 5/8 inch iron rod for corner;

THENCE South 33° 52' 51" East, continuing along the Southwesterly right-of-way line of said Stuebner Airline Road 636.14 feet to a 5/8 inch iron rod for corner and the beginning point of a curve to the left;

THENCE Southeasterly, continuing along the Southwesterly right-of-way line of said Stuebner Airline Road, along the arc of said curve to the left having a chord of South 34° 16' 37" East, 158.99 feet, a radius of 11,509.16 feet, a central angle of 00° 47' 29", a distance of 158.99 feet to a 5/8 inch iron rod for corner at the most Easterly corner of said Unrestricted Reserve "A";

THENCE South 55° 56' 10" West, along the Southeasterly line of said Unrestricted Reserve "A", 1,002.96 feet to a 5/8 inch iron rod for corner;

THENCE North 34° 03' 50" West, 364.00 feet to a 5/8 inch iron rod for corner;

THENCE North 55° 56' 10" East, 117.71 feet to a 5/8 inch iron rod for corner;

THENCE North 34° 03' 50" West, 441.13 feet to a 5/8 inch iron rod for corner on the Southeasterly right-

Exhibit "B"



GSG.

of-way line of said F. M. Highway 1960;

THENCE North 55° 56' 10" East, along the Southeasterly right-of-way line of F. M. Highway 1960, 876.72 feet to the PLACE OF BEGINNING, containing 17.350 acres (755,744 square feet) of land, more or less;

AND

Being 0.9171 acres of land out of Unrestricted Reserve "A", Block One, Stuebner Forest, the plat of which is recorded in Volume 221, Page 43 of the Harris County Map Records, said 0.917 acre tract being more particularly described by metes and bounds as follows;

BEGINNING at a 5/8 inch iron rod at the intersection of the Southeasterly right-of-way line of FM Highway 1960 (based on a width of 100.00 feet) with the Northeasterly right-of-way line of Breck Street (based on a width of 60.00 feet);

THENCE North 55° 56' 10" East, along the Southeasterly right-of-way line of said F. M. Highway 1960, 190.00 feet to a 5/8 inch iron rod for corner;

THENCE South 34° 03' 50" East, 200.00 feet to a 5/8 inch iron rod for corner;

THENCE South 55° 56' 10" West, 200.00 feet to a 5/8 inch iron rod for corner an the Northeasterly right-of-way line of said Breck Street;

THENCE North 34° 03' 50" West, along the Northeasterly right-of-way line of said Breck Street, 190.00 feet to a 5/8-inch iron rod for corner;

THENCE North 10° 56' 10" East, 14.14 feet to the PLACE OF BEGINNING containing 0.917 acres (39,949 square feet) of land, more or less

AND

Being 9.183 acre of land out of Unrestricted Reserve "A", Block One, Stuebner Forest, the plat of which is recorded in Volume 221, Page 43 of the Harris County Map Records Said 9.183 acre tract being more particularly described by metes and bounds as follows:

BEGINNING at a 5/8 inch iron rod at the most Southerly corner of said Unrestricted Reserve on the Northeasterly right-of-way line of Breck Street (based on a width of 60.00 feet), said point also being on the Northwesterly line of Fountainhead Subdivision, Section One, the plat of which is recorded in Volume 207, Page 19 of the Harris County Map Records;

THENCE North 34°03'50" West, along the Northeasterly right-of-way line of said Breck Street, 605.13 feet to a 5/8 inch iron rod for corner;

THENCE North 55°56'10" East, 200.00 feet to a 5/8 inch iron rod for corner;

THENCE North 34°03'50" West, 200.00 feet to a 5/8 inch iron rod for corner on the Southeasterly right-of-way line of F. M. Highway 1960 (based on a width of 100.00 feet);

THENCE North 55°56'10" East, along the Southeasterly right-of-way line of said F. M. Highway 1960, 399.71 feet to a 5/8 inch iron rod for corner;

THENCE South 34°03'50" East, 441.13 feet to a 5/8 inch iron rod for corner;

THENCE South 55°56'10" West, 117.71 feet to a 5/8 inch iron rod for corner;

THENCE South 34°03'50" East, 364.00 feet to a 5/8 inch iron rod for corner on the Southeasterly line of said Unrestricted Reserve "A" and the Northwesterly line of said Fountainhead Subdivision, Section One;

THENCE South 55°56'10" West, along the Southeasterly line of said Unrestricted Reserve "A", 482.00 feet to the PLACE OF BEGINNING, containing 9.183 acres (399,998 square feet) of land, more or less.

[END EXHIBIT "B"]



EXHIBIT "C"

**Tenant's Plans and Specifications**

**Need not be attached to the Lease**

[END EXHIBIT "C"]

656

GBP
4/1/84

Rev. 11/09/93

EXHIBIT "C-1"

## TENANT'S AFFIDAVIT

STATE OF _____ {
                           {
COUNTY OF _____ {

     BEFORE ME, the undersigned authority, personally appeared _____, who, being by me duly sworn, states as follows:

### I.

     I am the duly constituted representative of _____ (TENANT NAME), the Tenant under and by virtue of a Lease Contract with Weingarten Realty Investors for a certain premises in _____ Shopping Center located in _____ (CITY), _____ (STATE).

### II.

     As an inducement to Landlord to pay Tenant the sum of _____ (AMOUNT DUE) as a construction "Allowance" (as defined in the Lease), I do hereby certify as follows:

(a)    The construction of the Leased Premises has been completed to Tenant's satisfaction and in strict accordance with the plans and specifications mutually agreed upon as provided in the Lease.

(b)    The total amount paid by Tenant for all construction work is the sum of $_____.

(c)    Tenant opened for business at the Leased Premises on , _____.

     SIGNED this _____ day of _____, 20____.

                       _____
                       Tenant's Name

                       By: _____
                            Authorized Agent

STATE OF _____ {
                           {
COUNTY OF_____ {

     SWORN TO AND SUBSCRIBED before me this _____ day of _____, 20____.

                       _____
                       Notary Public, State of _____
                       Print Name: _____
                       My Commission Expires: _____

| INITIAL |
|---------|
| TENANT |
| |
| LANDLORD |

**[END EXHIBIT "C-1"]**



Exhibit "D"

Landlord's Work

If the hazardous materials report reveals that asbestos-containing materials ("ACM"), hazardous materials or mold is present in the Premises (including roof) then Landlord shall, at its sole cost and expense, undertake corrective measures as specified by Tenant to remove said material and obtain a follow up report that reports that the Premises (including roof) free of all hazardous materials, including all ACM and mold. A report indicating that the Premises is free of all hazardous material is a condition for Delivery.

Landlord to install a new a new roof to be completed at least 60 days prior to Tenant's opening for business.

Landlord, at its sole cost and expense, shall:

(I)    submit and receive Tenant's approval for Landlord's work;

(ii)    (iv) separate existing electrical service and provide the Premises with not less than 0.04 amps/SF @277/480 V – (800 Amp electrical service) 3 phase, 4-wire electrical service with main disconnect and meter box, common area utilities must be separately metered from all utilities for any rentable space in the Shopping Center; Landlord to install a new 2" water line with a 1-1/2" water meter.  Sprinkler system is shared by Anna's Linens.

(iii)    Slab to be "as is"

(iv)    provide space on the pylon, monument and directional signs for Tenant's sign faces; Tenant shall have the right to install it's sign on the existing monument sign on FM 1960 in the space currently used by DSW.  Tenant also shall have the right to install it's sign on the monument at FM 1960 & Veterans in the space currently occupied by China Star Buffet.  Tenant to pay electrical fee of $25.00 per month per sign with monthly pylon use fee to be waived.

(v)    Landlord to provide drawings and elevations in possession of Landlord.

[END EXHIBIT "D"]

EXHIBIT "E-1"

Tenant's fascia signage

(Six Pages Attached)

G♪G



Exhibit "E-1"



## SIGN ON ENTRY
## ELEVATION SIGN A

**COLORS:**

Trim & letter returns: Black
Faces: 7328 White
Vinyl Overlays: 3m Cobalt Blue #3630-157,
3m Mulberry #3630-118, 3m Holly Green #3630-76

**GENERAL SPECIFICATIONS:**

5" deep flush mount channel letters with
internal illumination. (Neon or LED)
3/16" acrylic faces with vinyl overlays







Exhibit "E-1"

GSG



SIGNS A,B,C,D,E ON ENTRY ELEVATION




Exhibit "E-1"



09-28-2011 Final
Lease Contract/Houston - FM 1960 - 0342
Page 58 of 76

Exhibit "E-1"



SIGN ON SIDE
ELEVATION SIGN F

7'-10"

5'-0"

**GENERAL SPECIFICATIONS:**
5" deep flush mount channel letters with
internal illumination. (Neon or LED)
3/16" acrylic faces with vinyl overlays

**COLORS:**
Trim & letter returns: Black
Faces: 7328 White
Vinyl Overlays: 3m Cobalt Blue #3630-157,
3m Mulberry #3630-118, 3m Holly Green #3630-76



SIGN F - SIDE ELEVATION FACING FM 1960

[END EXHIBIT "E-1"]



**EXHIBIT "E-2"**

Tenant's monument panels

(Three Pages Attached)





SIGN H
CORNER
PYLON



COLORS:

Faces: 7328 White
Vinyl Overlays: 3m Cobalt Blue #3630-157,
3m Mulberry #3630-118, 3m Holly Green #3630-76

GENERAL SPECIFICATIONS:

Reface (1) double sided sign section with
3/16" Lexan lettered with translucent
vinyl graphics

Note: Tenant to occupy top position on sign
both sides

Exhibit "E-2"

GSG

## SIGN G

**GENERAL SPECIFICATIONS:**
Reface (1) double sided sign section with 3"16" Lexan lettered with translucent vinyl graphics

**Note:** Tenant to occupy top position on sign both sides

**COLORS:**
Faces: 7328 White
Vinyl Overlays: 3m Cobalt Blue #3630-157,
3m Mulberry #3630-118, 3m Holly Green #3630-76



[END EXHIBIT "E-2"]

GSG

**EXHIBIT "F"**

**EXCLUSIVE USE CLAUSES OF EXISTING TENANTS IN
NORTH OAKS SHOPPING CENTER**

1.    <u>AAA</u> – LL shall not lease space in the Shopping Center to any other tenant whose primary business will be a travel agency or an insurance agency

2.    <u>AMERICAN GENERAL FINANCIAL</u> –Landlord agrees that it will not lease space in the Shopping Center to any other tenant whose primary business will be the operation of a general loan services office.

3.    <u>ANNA'S LINENS</u> – Landlord will not lease space in the Shopping Center to any tenant whose primary business will be the retail sale of linens. The foregoing shall not apply to (i) any tenant, present or future who sells linens on an incidental basis (defined for the purposes hereof as having a floor area for the sale of linens not exceeding 800 square feet), or (ii) any tenants, present or future, occupying space in excess of 15,000 square feet of floor area.

4.    <u>AUTO INSURANCE DISCOUNTERS</u> – Landlord shall not lease space to any other tenant whose primary business will be operation of a business selling auto insurance.

5.    <u>BATTERIES PLUS</u> – Landlord will not lease space in the Shopping Center to any other tenant whose primary business will be the sale of batteries.

6.    <u>CAYENNES HOT WINGS</u> – Landlord shall not lease space to any other tenant for the operation of a restaurant primarily serving prepared chicken wings. This limitation shall not apply to: (i) any tenant, present or future, who may offer prepared chicken wings as an incidental menu item, so long as the primary business of such tenant is not the sale of prepared chicken wings, or (ii) any tenant, present or future, who may sell several varieties of chicken (by way of example, but not limitation, the type of restaurant operated by "Church's", "KFC", or "Popeye's", "Hooters", "Buffalo Wild Wings" or "Wingstop").

7.    <u>HALF PRICE BOOKS</u> - Landlord will not lease space to any other tenant whose primary business will be the sale of new and used books.

8.    <u>HOBBY LOBBY</u> - Landlord will not lease space to any other tenant whose primary business will be the retail sale arts and crafts supplies or fabrics. This limitation shall not apply to present tenants (or their assignees or sublessees) whose leases may not prohibit such use or to any tenant who may incidentally sell any of the foregoing provided such tenant does not derive more than 10% of its gross revenue from the sale of the arts and crafts supplies or fabrics.

No part of the SC shall be used for any of the following purposes: (i) funeral home or mortuary, (ii) tattoo parlor or body piercing establishment, or (iii) adult video store and/or adult book store primarily catering to prurient interests, (iv) house of worship; (v) a hotel or motor inn, or any residential use; (vi) massage parlor provided, however, therapeutic massages and massages offered by licensed massage therapists shall be permitted; (vii) a so-called "head" shop, off-track betting, gambling or gaming facility; (viii) car wash, automobile repair work or automotive service (except as incidental to an automobile parts store), automobile body shop, automobile, boat, trailer or truck leasing or sales where more than 3 vehicles for sale or lease are stored at the SC at any one time; (ix) tavern, bar or night club in which the sale of alcoholic beverages exceeds 50% of the revenues of the business; (x) amusement park, carnival except that video and arcade games offered incidental to a restaurant shall be permitted; (xi) dance hall, disco, nightclub; (xii) any manufacturing use; (xiii) animal raising facility (except incidental to a full-line retail pet supply operation or a veterinary clinic); (xiv)junk yard; (xv) drilling for and/or removal of subsurface substances, dumping, disposal, incineration or reduction of garbage or refuse, other than in enclosed receptacles intended for such purposes; or (xvi) any use which constitutes a public or private nuisance or produces objectionable noise or vibration.

9.    <u>CICI'S PIZZA</u> - Landlord shall not lease space to a tenant for the operation of a restaurant offering pizza for on/off premises consumption ("Competing Business"). This provision does not apply to present or future tenant whose leases may not prohibit the operation

of a Competing Business, or any tenant, present or future, (i) who may sell pizza for on or off premises consumption on an incidental basis or (ii) any restaurant specializing in Italian food (but not primarily pizza) that may include pizza on its menu.

10.    LT BLINDS – Landlord will not lease space to any other tenant occupying less than 10,000 who sells window drapes and/or window blinds.

11.    SMOOTHIE KING - Landlord will not lease space to any other tenant whose primary business will be the sale of Smoothie King type drinks for on and off premises consumption. This limitation shall not apply to (i) present tenants (or their assignees or sublessees) whose leases may not prohibit such use; or (ii) any tenant, present or future who may occupy 3,000 s.f. or more of space in the Shopping Center.

12.    MARDEL'S CHRISTIAN BOOKSTORE – Landlord will not lease space in the Shopping Center to any other tenant whose primary business will be the retail sale of Christian books, Christian music, Christian videos and Christian DVD's, pre-recorded Christian video tapes and discs and Bibles (hereinafter "Exclusive Items"). The foregoing does not apply to present tenants (or their assignees or sublessees) or to any tenant who may incidentally sell any of the Exclusive Items so long as such tenant does not derive more than ten percent (10%) of its gross revenue from the sale of the Exclusive Items.

No part of the Shopping Center shall be used for any of the following purposes: (i) funeral home or mortuary, (ii) tattoo parlor or body piercing establishment, or (iii) adult video store and/or adult book store primarily catering to prurient interests, (iv) house of worship; (v) a hotel or motor inn, or any residential use; (vi) massage parlor provided, however, therapeutic massages and massages offered by licensed massage therapists shall be permitted; (vii) a so-called "head" shop, off-track betting, gambling or gaming facility; (viii) car wash, automobile repair work or automotive service (except as incidental to an automobile parts store), automobile body shop, automobile, boat, trailer or truck leasing or sales where more than 3 vehicles for sale or lease are stored at the Shopping Center at any one time; (ix) tavern, bar or night club in which the sale of alcoholic beverages exceeds 50% of the revenues of the business; (x) amusement park, carnival except that video and arcade games offered incidental to a restaurant shall be permitted); (xi) dance hall, disco, nightclub; (xii) any manufacturing use; (xiii) animal raising facility (except incidental to a full-line retail pet supply operation or a veterinary clinic); (xiv)junk yard; (xv) drilling for and/or removal of subsurface substances, dumping, disposal, incineration or reduction of garbage or refuse, other than in enclosed receptacles intended for such purposes; or (xvi) any use which constitutes a public or private nuisance or produces objectionable noise or vibration.

None of the Shopping Center shall be used for any purpose except (a) businesses providing retail sales and services and the incidental offices related thereto, (b) financial institutions (c) service shops, (d) offices providing services to the general public and customarily found in similar shopping centers (e.g., banking for finance services, real estate or securities brokerage services, financial or tax planning services, accounting, insurance or legal services, optical, medical or dental services or travel agencies, governmental services offices, professional offices.

None of the Shopping Center shall be used for any of the following purposes: (i) package store primarily selling liquor and/or beer and wine, (ii) a bowling alley, (iii) a "second hand" store whose principal business is selling used merchandise; provided, however, a store selling used goods typically found in a similar shopping center such as antiques stores, vintage clothing stores and stores selling estate merchandise, "upscale merchandise", consignment merchandise or recycled, but like-new merchandise shall be permitted and a regional or national pawn shop such as, by way of example, but not limitation, EZ Pawn or Super Pawn shall be permitted, (iv) flea market, (v) theater, (vi) billiard parlor, (vii) night club, (viii) health club, exercise studio or health spa; provided, however, Landlord may lease to a health club, fitness center or exercise facility which occupies less than four thousand (4,000) square feet and is located at least 300 feet from the nearest demising wall of the Leased Premises, (ix) amusement center such as an arcade, virtual reality, laser tag or game room unless such use is approved in writing by the Tenant except that arcade games offered incidental to a restaurant shall be permitted.

13.    TJ MAXX – Landlord agrees that the Shopping Center shall not be used for any so-called "flea market" or non-retail purposes (repairs, alterations and offices incidental to retailing,

Exhibit "F"

GSS

and banks and small loan offices and insurance sales offices, not being deemed nonretail), or for any entertainment purposes within one hundred fifty (150) feet of the Demised Premises such as a bowling alley, auditorium, skating rink, theater, cinema, bar (unless within a restaurant), night club, discotheque, amusement gallery, poolroom, health club, massage parlor or off-track betting club, except as existing on the date hereof and any replacement of any existing on the date hereof, and except for one health club not exceeding fifteen thousand (15,000) square feet of floor area with its entrance over one hundred fifty (150) feet from the Demised Premises. The term "flea market" shall include any business primarily selling used or second-hand merchandise but shall not include any business defined by, the trade as an antique store. The foregoing prohibition against massage parlors shall not preclude the operation of a chiropractic office or a business engaged in therapeutic massages, such as Massage Envy.

14.    EDIBLE ARRANGEMENTS – Landlord will not lease space in the Shopping Center to any other tenant that sells arrangements and gift baskets made with fresh fruit and vegetables (hereafter a "Competing Business"). This limitation shall not apply to: (i) present tenants (or their assignees or sublessees) whose leases may not prohibit such use, or (ii) any tenant occupying 10,000 square feet or more of space in the Shopping Center.

15.    HONEY BAKED HAM  - Landlord will not to lease to any other T whose primary use is sale of "spiral sliced hams or turkeys".

16.    BIG LOTS – _Landlord shall not permit any part of the Shopping Center at any time during the Lease Term to be used for any unlawful purpose or for operation of spa (meaning hot tubs, Jacuzzis or baths in private rooms available for rent to the general public) or bingo parlor. No space leased to a tenant at the Shopping Center engaged in health, recreational or entertainment-type activities which occupies 3,000 square feet or more of leasable area, nor any bowling alley or skating rink, shall have a customer entrance located within a 200 foot radius of any customer entrance to the Premises. For purposes of this Lease, a recreational or entertainment-type activity does not include a restaurant. No space leased to a tenant at the Shopping Center engaged in health, recreational or entertainment-type activities occupying less than 3,000 square feet of leasable area shall have a customer entrance within a 100 foot radius of any customer entrance to the Premises. Landlord may permit not in excess of Fifteen Percent (15%) of the leasable space of the Shopping Center to be occupied for office purposes by retail offices such as are typically found in shopping centers in the Greater Houston Metropolitan Area; provided, however, that any such office uses occupying less than 2,900 square feet each shall not be included in determining the Fifteen Percent (15%) limitation. However, in no event shall all offices (whether retail or non-retail) occupy Twenty-Five Percent (25%) or more of the leasable space at the Shopping Center which limitation may be modified from time to time by industry standards of shopping center management in the Southwestern United States and further provided that in no event shall non-retail offices occupy more than 12 ½%) of leasable space in the Shopping Center. Landlord shall not permit any part of the Shopping Center to be used for office purposes except as permitted in this Paragraph.

17.    RITZ CAMERA – Landlord will not lease space to another tneant whose business is film processing & retail sale & rental of cameras.  The foregoing does not apply to any tenant occupying 10,000 square feet of space or more.

18.    TAJ MAJAL IMPORTS – Landlord will not lease space to another tenant whose primary business is the sale of groceries, spices and food products which are imported from Pakistan and India.

19.    STAPLES  - No part of the Shopping Center shall be used for the sale or leasing of equip. (including computers and telecommunications equip.), furniture or supplies for business or office (including home office) use, or the provision of business or office services (including copying, printing, telecommunications, packing, shipping and business equip. repair services) (collectively, the "Exclusive Goods").  The Exclusive shall not prohibit any tenant (its assignee or subtenants) under a lease existing on the date of this Lease (including the renewals and extensions) from using space occupied by it for any use permitted under such tenant's lease as of the date hereof, nor prohibit the replacement of a tenant existing as of the date hereof with a tenant located in the same space and operating the same use as operated as of the date hereof, nor prohibit any future tenant from selling, leasing or providing the Exclusive Goods and Services incidental to such tenant's primary business in no more than an aggregate of 5% of such tenant's

Exhibit "F"

sales floor area. The foregoing shall not preclude the operation of a (i) so-called consumer electronics store or computer superstore in excess of 20,000 s.f., either of which sells computers and computer related accessories (so long as the aforesaid 5% restriction is not violated in any respect other than in connection with computers and computer related accessories), (ii) full line furniture store which sells office furniture as an incidental part of its business (so long as the aforesaid restriction is not violated by more than 10% of such store's floor area), (iii) drug store, grocery store drug store or grocery store (so long as the aforesaid restriction is not violated by more than 10% of such store's floor area), (iv) book store (so long as the aforesaid 5% restriction is not violated in any respect other than in connection with books), (v) Target, Kohls or Home Depot or (vi) the operation of one cell phone store. Further, Section 5.2.1 shall not preclude the operation of a store such as Apple Computer or Radio Shack (substantially as such retailing concepts are operated as of the date hereof).

No part of the Center shall be used for any of the following: (i) bowling alley, skating rink, miniature golf or other sports or recreational facility (however, such facilities which are for demonstration or display purposes and are incidental to a retail operation shall be permitted); (ii) house of worship, library, reading room or school (provided, however, the foregoing shall not prohibit incidental customer training by tenants in the Center or prohibit scholastic tutoring facilities such as Kumon and/or Sylvan Learning Centers); (iii) gallery (unless same does not exceed 2,000 square feet); movie theatre, auditorium, meeting hall, hotel or motor inn (except that a movie theater, auditorium and/or meeting hall may be located in that portion of the Center labeled "Theater" on Exhibit A), (iv) any residential use or day-care facility; (v) massage parlor (but not precluding legitimate therapeutic massages or those offered as an incidental service to a full service beauty salon or chiropractor), adult entertainment facility, adult bookstore, a so-called "head" shop, off-track betting, gambling, gaming or check cashing facility (unless said check cashing facility is not in excess of 1,500 square feet); (vi) car wash, automobile repair work or automotive service (but not precluding a full-line auto parts retailer or gasoline pumps operated in conjunction with a grocery store), automobile body shop, automobile, motorcycle, boat, trailer or truck leasing or sales, or laundromat (however. Landlord may lease to an automobile leasing facility which does not store more than 15 cars in the Common Facilities at any one time, provided same is not located in the area identified as the Restricted Area on Exhibit A); (vii) tavern or bar which derives more than 50% of its gross revenues from the sale of alcoholic beverages for on premises consumption,, amusement park, carnival, banquet facility, dance hall, disco, nightclub, or other entertainment facility including video games, virtual reality or laser tag room or facility, pool hall, arcade, indoor children's recreational facility or other amusement center (provided the foregoing shall not prohibit the operation of video games in connection with the operation of a restaurant, such as, by way of example, but not limitation, Chuck E Cheese, provided such restaurant is not otherwise restricted or prohibited hereunder) (viii) any manufacturing or warehouse use (except incidental to a retail operation); (viii) funeral parlor, animal raising, boarding or storage (except incidental to a full-line retail pet supply operation [such as Petco or Petsmart] which may be located anywhere in the Center, or incidental to a stand alone veterinary clinic which does not exceed 1,000 square feet of space and does not board pets overnight and is not located immediately adjacent to the Premises), pawn shop, flea market or swap meet, junk yard; (x) except as may be required by law, drilling for and/or removal of subsurface substances, dumping, disposal, incineration or reduction of garbage or refuse, other than in enclosed receptacles intended for such purposes; (xi) any facility related to the occult sciences, such as palm readers, astrologers, fortune tellers, tea leaf readers or prophets; (xii) frozen food lockers or milk distribution center; (xiv) any employment center wherein workers congregate for their day-work; or (xv) any use which constitutes a public or private nuisance or produces objectionable noise or vibration.

20.  STARBUCKS – Landlord may not lease to another tenant that sells: (a) whole or ground beans, or (b) espresso or espresso-based coffee beverages except on an "incidental basis" , i.e., as long as such sales do not collectively exceed 5% of another tenant's Gross Sales and such tenant does not devote more than 10 s.f. of floor area (excl. aisle space) for display of such products. Exclusive does not apply to existing tenant not so prohibited or any future tenant who occupies 10,000 square feet or more or any full service, sit down restaurant.

21.  MATSU JAPANESE RESTAURANT– Landlord will not lease to any other restaurant which primarily serves Oriental food.

Exhibit "F"

22.   <u>THE FISH PLACE RESTAURANT</u> –   Landlord will not lease space in the Shopping Center to any other tenant whose "primary business" (as hereinafter defined) will be the operation of a fast-food/quick-serve style seafood restaurant (hereinafter a "Competing Business"). As used herein "primary business" shall be deemed to mean a fast-food/quick-serve restaurant that derives twenty five percent (25%) or more of its total annual revenue from the sale of seafood menu items.  This limitation shall not apply to: (i) present tenants (or their assignees or sublessees) whose leases may not prohibit such use, (ii) any varied-menu type restaurant which offers seafood as part of an overall menu regardless of the percentage of such tenant's total annual revenue derived from the sale of seafood (by way of example, but not limitation, restaurants such as "Chili's", "Cheddars", "Champs", "Texas Roadhouse", "Logan's Roadhouse"), (iii) any "full-service" (as hereinafter defined) seafood restaurant, or (iv) a buffet or cafeteria style restaurant occupying 5,000 square feet or more of space in the Shopping Center.  For purposes of this Section 6.05, a "full-service" restaurant is defined as a seated-style restaurant offering table service by waitstaff.

23.   <u>TAXES USA</u> –   Landlord will not lease space in the Shopping Center to any other tenant whose primary business will be a tax preparation business.

**[END EXHIBIT "F"]**

EXHIBIT "G"

## RESTRICTIONS ON USE CLAUSES IN LEASES OF EXISTING TENANTS IN NORTH OAKS SHOPPING CENTER AFFECTING THE PREMISES

1.    HOBBY LOBBY -  No part of the SC shall be used for any of the following purposes: (i) funeral home or mortuary, (ii) tattoo parlor or body piercing establishment, or (iii) adult video store and/or adult book store primarily catering to prurient interests, (iv) house of worship; (v) a hotel or motor inn, or any residential use; (vi) massage parlor provided, however, therapeutic massages and massages offered by licensed massage therapists shall be permitted; (vii) a so-called "head" shop, off-track betting, gambling or gaming facility; (viii) car wash, automobile repair work or automotive service (except as incidental to an automobile parts store), automobile body shop, automobile, boat, trailer or truck leasing or sales where more than 3 vehicles for sale or lease are stored at the SC at any one time; (ix) tavern, bar or night club in which the sale of alcoholic beverages exceeds 50% of the revenues of the business; (x) amusement park, carnival except that video and arcade games offered incidental to a restaurant shall be permitted); (xi) dance hall, disco, nightclub; (xii) any manufacturing use; (xiii) animal raising facility (except incidental to a full-line retail pet supply operation or a veterinary clinic); (xiv)junk yard; (xv) drilling for and/or removal of subsurface substances, dumping, disposal, incineration or reduction of garbage or refuse, other than in enclosed receptacles intended for such purposes; or (xvi) any use which constitutes a public or private nuisance or produces objectionable noise or vibration.

2.    MARDEL'S CHRISTIAN BOOKSTORE – No part of the Shopping Center shall be used for any of the following purposes:  (i)  funeral home or mortuary, (ii) tattoo parlor or body piercing establishment, or (iii) adult video store and/or adult book store primarily catering to prurient interests, (iv) house of worship; (v) a hotel or motor inn, or any residential use; (vi) massage parlor provided, however, therapeutic massages and massages offered by licensed massage therapists shall be permitted; (vii) a so-called "head" shop, off-track betting, gambling or gaming facility; (viii) car wash, automobile repair work or automotive service (except as incidental to an automobile parts store), automobile body shop, automobile, boat, trailer or truck leasing or sales where more than 3 vehicles for sale or lease are stored at the Shopping Center at any one time; (ix) tavern, bar or night club in which the sale of alcoholic beverages exceeds 50% of the revenues of the business; (x) amusement park, carnival except that video and arcade games offered incidental to a restaurant shall be permitted); (xi) dance hall, disco, nightclub; (xii) any manufacturing use; (xiii) animal raising facility (except incidental to a full-line retail pet supply operation or a veterinary clinic); (xiv)junk yard; (xv) drilling for and/or removal of subsurface substances, dumping, disposal, incineration or reduction of garbage or refuse, other than in enclosed receptacles intended for such purposes; or (xvi) any use which constitutes a public or private nuisance or produces objectionable noise or vibration.

None of the Shopping Center shall be used for any purpose except (a) businesses providing retail sales and services and the incidental offices related thereto, (b) financial institutions (c) service shops, (d) offices providing services to the general public and customarily found in similar shopping centers (e.g., banking for finance services, real estate or securities brokerage services, financial or tax planning services, accounting, insurance or legal services, optical, medical or dental services or travel agencies, governmental services offices, professional offices.

None of the Shopping Center shall be used for any of the following purposes: (i) package store primarily selling liquor and/or beer and wine, (ii) a bowling alley, (iii) a "second hand" store whose principal business is selling used merchandise; provided, however, a store selling used goods typically found in a similar shopping center such as antiques stores, vintage clothing stores and stores selling estate merchandise, "upscale merchandise", consignment merchandise or recycled, but like-new merchandise shall be permitted and a regional or national pawn shop such as, by way of example, but not limitation, EZ Pawn or Super Pawn shall be permitted, (iv) flea market, (v) theater, (vi) billiard parlor, (vii) night club, (viii) health club, exercise studio or health spa; provided, however, Landlord may lease to a health club, fitness center or exercise facility which occupies less than four thousand (4,000) square feet and is located at least 300 feet from the nearest demising wall of the Leased Premises, (ix) amusement center such as an arcade, virtual reality, laser tag or game room unless such use is approved in writing by the Tenant except that arcade games offered incidental to a restaurant shall be permitted.

GSb

3.   TJ MAXX – Landlord agrees that the Shopping Center shall not be used for any so-called "flea market" or non-retail purposes (repairs, alterations and offices incidental to retailing, and banks and small loan offices and insurance sales offices, not being deemed nonretail), or for any entertainment purposes within one hundred fifty (150) feet of the Demised Premises such as a bowling alley, auditorium, skating rink, theater, cinema, bar (unless within a restaurant), night club, discotheque, amusement gallery, poolroom, health club, massage parlor or off-track betting club, except as existing on the date hereof and any replacement of any existing on the date hereof, and except for one health club not exceeding fifteen thousand (15,000) square feet of floor area with its entrance over one hundred fifty (150) feet from the Demised Premises. The term "flea market" shall include any business primarily selling used or second-hand merchandise but shall not include any business defined by, the trade as an antique store.  The foregoing prohibition against massage parlors shall not preclude the operation of a chiropractic office or a business engaged in therapeutic massages, such as Massage Envy.

4.   BIG LOTS – Landlord shall not permit any part of the Shopping Center at any time during the Lease Term to be used for any unlawful purpose or for operation of spa (meaning hot tubs, Jacuzzis or baths in private rooms available for rent to the general public) or bingo parlor. No space leased to a tenant at the Shopping Center engaged in health, recreational or entertainment-type activities which occupies 3,000 square feet or more of leasable area, nor any bowling alley or skating rink, shall have a customer entrance located within a 200 foot radius of any customer entrance to the Premises. For purposes of this Lease, a recreational or entertainment-type activity does not include a restaurant. No space leased to a tenant at the Shopping Center engaged in health, recreational or entertainment-type activities occupying less than 3,000 square feet of leasable area shall have a customer entrance within a 100 foot radius of any customer entrance to the Premises. Landlord may permit not in excess of Fifteen Percent (15%) of the leasable space of the Shopping Center to be occupied for office purposes by retail offices such as are typically found in shopping centers in the Greater Houston Metropolitan Area; provided, however, that any such office uses occupying less than 2,900 square feet each shall not be included in determining the Fifteen Percent (15%) limitation. However, in no event shall all offices (whether retail or non-retail) occupy Twenty-Five Percent (25%) or more of the leasable space at the Shopping Center which limitation may be modified from time to time by industry standards of shopping center management in the Southwestern United States and further provided that in no event shall non-retail offices occupy more than 12 ½%) of leasable space in the Shopping Center. Landlord shall not permit any part of the Shopping Center to be used for office purposes except as permitted in this Paragraph.

5.   STAPLES - No part of the Center shall be used for any of the following: (i) bowling alley, skating rink, miniature golf or other sports or recreational facility (however, such facilities which are for demonstration or display purposes and are incidental to a retail operation shall be permitted); (ii) house of worship, library, reading room or school (provided, however, the foregoing shall not prohibit incidental customer training by tenants in the Center or prohibit scholastic tutoring facilities such as Kumon and/or Sylvan Learning Centers); (iii) gallery (unless same does not exceed 2,000 square feet), movie theatre, auditorium, meeting hall, hotel or motor inn (except that a movie theater, auditorium and/or meeting hall may be located in that portion of the Center labeled "Theater" on Exhibit A), (iv) any residential use or day-care facility; (v) massage parlor (but not precluding legitimate therapeutic massages or those offered as an incidental service to a full service beauty salon or chiropractor), adult entertainment facility, adult bookstore, a so-called "head" shop, off-track betting, gambling, gaming or check cashing facility (unless said check cashing facility is not in excess of 1,500 square feet); (vi) car wash, automobile repair work or automotive service (but not precluding a full-line auto parts retailer or gasoline pumps operated in conjunction with a grocery store), automobile body shop, automobile, motorcycle, boat, trailer or truck leasing or sales, or laundromat (however. Landlord may lease to an automobile leasing facility which does not store more than 15 cars in the Common Facilities at any one time, provided same is not located in the area identified as the Restricted Area on Exhibit A); (vii) tavern or bar which derives more than 50% of its gross revenues from the sale of alcoholic beverages for on premises consumption,, amusement park, carnival, banquet facility, dance hall, disco, nightclub, or other entertainment facility including video games, virtual reality or laser tag room or facility, pool hall, arcade, indoor children's recreational facility or other amusement center (provided the foregoing shall not prohibit the operation of video games in connection with the operation of a restaurant, such as, by way of example, but not limitation, Chuck E Cheese, provided such restaurant is not otherwise restricted or prohibited hereunder) (viii) any manufacturing or warehouse use (except incidental to a retail

Exhibit "G"

operation); (viii) funeral parlor, animal raising, boarding or storage (except incidental to a full-line retail pet supply operation [such as Petco or Petsmart] which may be located anywhere in the Center, or incidental to a stand alone veterinary clinic which does not exceed 1,000 square feet of space and does not board pets overnight and is not located immediately adjacent to the Premises), pawn shop, flea market or swap meet, junk yard; (x) except as may be required by law, drilling for and/or removal of subsurface substances, dumping, disposal, incineration or reduction of garbage or refuse, other than in enclosed receptacles intended for such purposes; (xi) any facility related to the occult sciences, such as palm readers, astrologers, fortune tellers, tea leaf readers or prophets; (xii) frozen food lockers or milk distribution center; (xiv) any employment center wherein workers congregate for their day-work; or (xv) any use which constitutes a public or private nuisance or produces objectionable noise or vibration.

[END EXHIBIT "G"]

4849 FM 1960 West, Houston, TX 77069

## EXHIBIT "H"

### GUARANTY OF LEASE

The undersigned, 99¢ ONLY STORES, a California corporation (the *"Parent Corporation"*), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby irrevocably and unconditionally guarantees for the benefit of WRI-AEW LONE STAR RETAIL PORTFOLIO, LLC, (*"Landlord"*) each and all of the obligations of 99 Cents Only Stores Texas, Inc., a Delaware corporation (the *"Subsidiary Corporation"*) as tenant under that certain lease dated for reference purposes as of _____, 2011 by and between Landlord and Subsidiary Corporation, as tenant, with respect to certain premises located in the **North Oaks Shopping Center, 4849 FM 1960 West, Houston, TX 77069**, more fully described in **Exhibit "A"** attached hereto and hereby incorporated herein (the *"Lease"*).

1.      The obligations guaranteed by Parent Corporation shall include, without limitation, (a) the payment of all rent and other sums due and payable by the tenant under the Lease, and any extensions, renewals or modifications thereof, as and when the same become due, and (b) the performance by the tenant under the Lease, and any extensions, renewals or modifications thereof, off all of the covenants, terms and conditions of the Lease. This is a guaranty of payment and performance and not merely of collection.

2.      The obligations of Parent Corporation hereunder are independent of, and may exceed, the obligations of the Subsidiary Corporation. A separate action or actions may, at Landlord's option, be brought and prosecuted against Parent Corporation, whether or not any action is first or subsequently brought against the Subsidiary Corporation, or whether or not the Subsidiary Corporation is joined in any such action, and Parent Corporation may be joined in any action or proceeding commenced by Landlord against The Subsidiary Corporation arising out of, in connection with or based upon the Lease.

3.      Parent Corporation authorizes Landlord, without notice to or demand of Parent Corporation, and without affecting Parent Corporation's liability hereunder, from time to time to (a) consent to any extensions, accelerations or other changes in the time for any payment provided for in the Lease, consent to any other alteration of any covenant, term or condition of the Lease in any respect, or consent to any assignment, subletting or reassignment of the Lease; (b) take and hold security for any payment provided for in the Lease or for the performance of any covenant, term or condition of the Lease, or exchange, waive or release any such security; and (c) apply such security and direct the order or manner of sale thereof as Landlord in its discretion may determine. Notwithstanding any termination, renewal, extension or holding over of the Lease, this Guaranty shall continue until all of the covenants and obligations on the part of the Subsidiary Corporation performed have been fully and completely performed by the Subsidiary Corporation and Parent Corporation shall not be released of any obligation or liability hereunder so long as there is any claim against the Subsidiary Corporation arising out of the Lease that has not been settled or discharged in full.

4.      Parent Corporation waives any and all defenses to its obligations under this Guaranty, including without limitation, any right to (a) require Landlord to proceed against the Subsidiary Corporation or any other person or entity or pursue any other remedy in Landlord's power whatsoever; (b) complain of delay in the enforcement of Landlord's rights under the Lease; (c) require Landlord to proceed against or exhaust any security held from the Subsidiary Corporation or Parent Corporation, or (d) require Landlord to pursue any other remedy in Landlord's power that Parent Corporation cannot itself pursue and that would lighten its burden. Until the obligations of the Subsidiary Corporation under the Lease have been fully satisfied, Parent Corporation shall have no right of subrogation and waives any right to proceed against the Subsidiary Corporation for reimbursement, as well as any right to enforce any remedy which Landlord now has or may hereafter have against the Subsidiary Corporation and waives any benefit of, and any right to participate in any security now or hereafter held by Landlord. If any amount is paid to Parent Corporation on account of subrogation of its rights at a time when the Subsidiary Corporation's obligations under the Lease have not been paid in full, such amount shall be held in trust for Landlord. Parent Corporation waives any defense arising by reason of any disability or other defense of the Subsidiary Corporation or by reason of the cessation from any cause whatsoever of the liability of the Subsidiary Corporation. Parent Corporation waives all demands upon and notices to the Subsidiary Corporation and to Parent Corporation, including, without limitation, demands for performance, notices and nonperformance, notices of nonpayment and notices of acceptance of this Guaranty.

Initials



GSG

4849 FM 1960 West, Houston, TX 77069

5.      The liability of Parent Corporation hereunder shall in no way be affected by, and this Guaranty shall remain in full force and effect notwithstanding, (a) the appointment of a receiver to take possession of all or substantially all of the assets of the Subsidiary Corporation, or any assignment by the Subsidiary Corporation for the benefit of creditors, or any action taken or suffered by the Subsidiary Corporation under any insolvency, bankruptcy, reorganization, moratorium or other debtor relief act or statute, whether now existing or hereafter amended or enacted, or the disaffirmance of the Lease in any such action or otherwise, (b) the assignment or transfer of the Lease by the Subsidiary Corporation unless the Subsidiary Corporation is expressly released by Landlord from liability under the Lease, or (c) the cessation of the liability of the Subsidiary Corporation from any cause whatsoever other than by agreement of Landlord.

6.      The liability of Parent Corporation under this Guaranty shall continue until the expiration of all periods within which any amount at any time paid on account of the obligations guaranteed hereby may be required to be restored or returned by Landlord upon the bankruptcy, insolvency or reorganization of the Subsidiary Corporation, any other Parent Corporation or any other person. If any amount at any time paid on account of the obligations guaranteed hereby is required to be restored or returned by Landlord as a result of any such bankruptcy, insolvency or reorganization, Parent Corporation shall be liable under this Guaranty with respect to such amount as if such amount was never paid.

7.      If at any time Landlord makes demand under this Guaranty, it shall send written notice of such demand, including particulars of the nature of the claim and the amount claimed to be due, to Parent Corporation at 4000 Union Pacific Avenue, City of Commerce, California 90023, Attention:  Real Estate Department, or such other address as Parent Corporation may notify Landlord, or it successor as landlord under the Lease, at the notice address specified in the Lease, from time to time. Any notice to Parent Corporation shall be delivered either in person, by expedited courier, or by pre-paid certified or regular United States Mail with return receipt required.

8.      Neither this Guaranty nor either any rights of Landlord may be assigned in whole or in part to any person whatsoever other than: (a) the successor in interest as to both privity of estate and privity of contract to Landlord under the Lease; and/or (b) as collateral security, to any mortgagee of record of the real property described in <u>Exhibit "A"</u>, or any portion thereof if and only if said real property is owned by the landlord under the Lease; <u>provided however</u>, in either or both such instances that concurrent with any such assignment of any interest under this Guaranty the assignor shall notify the Parent Corporation in writing at the notice address specified in this Guaranty, or at such subsequent address as may be specified in accordance with the provisions of this Guaranty: (i) of the name and address of any such assignee; (ii) the interest assigned and the date of such assignment; and (iii) whether the assignee is a lender. In no event shall Parent Corporation have the right to assign its obligations under this Guaranty.

9.      This Guaranty shall be governed and controlled by the laws of the State of California.

10.      Any claim, action, lawsuit, dispute or other proceeding commenced against Parent Corporation and/or arising out of or in relation to this Guaranty shall be commenced, and shall be prosecuted and maintained, if at all, as a reference proceeding pursuant to Section 638 of the California Code of Civil Procedure in the Superior Court in and for the County of Los Angeles, California. Any such action shall be referred to the closest office to the court in which such action is filed of Judicial Arbitration and Mediation Services, Inc. ("JAMS") or, if JAMS is no longer conducting reference proceedings in the State of California, then before the American Arbitration Association.  In either event, the arbitration conducted by JAMS or the American Arbitration Association pursuant to the reference proceeding shall be a mandatory, final and binding arbitration. The applicable rules of evidence, discovery and procedures then maintained by JAMS (or the American Arbitration Association if JAMS no longer conducts reference proceeding arbitrations in the State of California) for commercial disputes shall apply to any proceeding involving this Guaranty. The payment of fees, and the awarding of attorneys fees and costs of enforcement, shall also be determined by the then applicable rules of JAMS (or the American Arbitration Association if JAMS is then no longer conducting reference proceeding arbitrations in the State of California).

By entering into this Guaranty, the parties also recognize and agree that the mandatory, binding arbitration shall be before a single arbitrator, without a jury and without any right to trial by jury, and thus, by entering into this Guaranty, the parties are waiving the right to a jury trial for all matters that must be arbitrated under this Guaranty. Each party acknowledges IT IS GIVING UP THE RIGHT TO A JURY TRIAL and further acknowledges that it has had the opportunity to consult with an attorney of its own selection prior to signing this Guaranty.

Initials

Exhibit "H"



GSG

4849 FM 1960 West, Houston, TX 77069

11.    In the event of any legal or equitable proceeding to enforce any of the terms or conditions of this Guaranty, or any alleged disputes, breaches, defaults or misrepresentations in connection with any provision of this Guaranty, the prevailing party in such proceeding shall be entitled to recover its reasonable costs and expenses, including, without limitation, reasonable attorneys' fees and costs of defense paid or incurred in good faith.

12.    If any of the provisions of this Guaranty shall contravene or be held invalid under the laws of any jurisdiction, this Guaranty shall be construed as if not containing those provisions, and the rights and obligations of the parties hereto shall be construed and enforced accordingly.

13.    This Guaranty includes and sets forth the entire agreement between Parent Corporation and Landlord with respect to the subject matter of this Guaranty. This Guaranty may only be modified by a writing executed by Parent Corporation. It may not be modified by the Subsidiary Corporation.

In Witness Whereof, this Guaranty has been executed as of the day and year first set forth above.

"Parent Corporation"
99¢ Only Stores,
a California corporation

By: _____
      Jeff Gold, Its President


Each and all of the terms, covenants and conditions of the foregoing Guaranty are hereby accepted and agreed to including, without limitation, the provisions pertaining to mandatory and binding arbitration and waiver of jury trial set forth in the Guaranty. This Guaranty fully satisfies any obligation of the Subsidiary Corporation to provide a guaranty to Landlord under the Lease.

"Landlord"

**WRI-AEW LONE STAR RETAIL PORTFOLIO, LLC,**

by: Weingarten Realty Investors


By: _____
Name: _____
Title: _____


**[END EXHIBIT "H"]**

Initials



Exhibit "I"



99 CENT ONLY
NORTH OAKS
HOUSTON, TX

| OUTDOOR CONTAINMENT INSTALLATION KEY | |
|---|---|
| ⊠ | Central Transmitter |
| – – – – | Twisted Pair (Non Locking) |
| ═══ | Locking Cable (Single Cut) |
| ═══ | Locking Cable (Double Cut) |
| ▢ | Parking Lot Sign |
| ▭ | Striping |

[END EXHIBIT "I"]

## Exhibit "X"

July 27, 2011            **COMMISSION AGREEMENT**        P-0105-537  L9900C001
JW/jb

This Commission Agreement ("Agreement") is between Landlord and Broker as defined below and sets forth the agreement between them regarding payment of any commissions earned in connection with the Lease Contract ("Lease") between Landlord and the Tenant for the Premises noted below.

Landlord:    WRI-AEW Lone Star Retail Portfolio, LLC
Broker:      NewQuest Properties
Tenant:      99 Cents Only Stores Texas, Inc.
Premises:    4849 FM 1960 West, Houston, TX 77069

1.   Landlord shall pay Broker the following Commission as full and complete consideration for all services rendered by or through Broker in regards to the Lease. No modification of the Lease or subsequent renewal will serve to modify the amount of the Commission to be earned by Broker.

     Total Commission ("Commission") to be paid:     $60,000    ($3/sf)

2.   Provided the Lease is signed within 180 days of the date of this Agreement, the Commission noted above shall be due from Landlord to Broker. The obligation shall be personal to Landlord and no lien on any Landlord property shall accrue. Broker hereby waives any lien rights that may be available to them under the laws of all applicable jurisdictions. However, Broker retains all rights to sue Landlord for collection of any Commission due.

3.   The Commission shall be payable as follows:
     ½ upon the later of a) execution of the Lease or b) removal of all contingencies, if any, in the Lease, or c) the execution of this Agreement

     ½ upon the later of a) Tenant opening for business in the Premises or b) Tenant's payment of a full month's rent not including any amounts paid with the initial deposits

     Payment of the Commission shall be due within fifteen (15) days after the later of the dates defined immediately above, or receipt of an invoice from Broker. Notwithstanding the above, repayment of any Commission paid by Landlord shall be due immediately from Broker to Landlord if the Lease does not commence or Tenant does not open for business to the public per the terms of the Lease.

4.   Landlord may transfer the obligation for payment described herein if ownership of the Premises is transferred prior to payment of the Commission, so long as the transferee assumes all obligations of this Agreement. Broker may not transfer to any extent their rights and obligations hereunder without the prior written consent of Landlord.

5.   Landlord and Broker acknowledge that Broker is the sole broker that will be due Commissions for the Lease. Broker shall indemnify Landlord and Landlord for claims by any other party for any fee or commission claimed in addition to the Commissions.

Weingarten Realty Investors is an unincorporated trust organized under the Texas Real Estate Investment Trust Act. Neither the shareholders of the trust, nor its trust managers, officers, employees or other agents are personally, corporately or individually liable for any debt, act or obligation of the trust, and all persons having claims of any kind against the trust must look solely to the property of the trust for the enforcement of their rights.

     THE SUBMISSION OF THIS DOCUMENT FOR EXAMINATION AND/OR EXECUTION HEREOF SHALL NOT BECOME EFFECTIVE ONLY UPON EXECUTION BY ALL PARTIES HERETO AND DELIVERY OF A FULLY EXECUTED COUNTERPART BY LANDLORD TO THE OTHER PARTIES HERETO.

     EXECUTED In multiple counterparts, each of which shall have the force and effect of an original, on this the __8th__ day of __August__ 2011.

WRI-AEW LONE STAR RETAIL PORTFOLIO, LLC,
a Delaware limited liability company

By:   Weingarten Realty Investors,
     a Texas real estate investment trust
     Its Manager

By: _____
Name:   **Patrick Manchi**
Title:   **VP, Regional Leasing Director**
ADDRESS:   P. O. Box 924133
         Houston, Texas 77292-4133

         **LANDLORD**

NEWQUEST PROPERTIES

By: _____
Name:   H. Dean Lane, Jr.
Title:   Partner
ADDRESS:   8807 W. Sam Houston Pkwy. N. Suite 200
         Houston, TX - 77040

         **BROKER**

---

**W-9**    **Request for Taxpayer Identification Number and Certification**

Name:   Home Asset Inc.
Business name:   NewQuest Properties

Address:   8827 W. Sam Houston Pkwy N. Ste 200
     Houston, TX 77040

**Part I**   Taxpayer Identification Number (TIN)

**Part II**   Certification

Sign Here: _____    Date ▶ 5-23-11

[END EXHIBIT "X"]

4849 FM 1960 West, Houston, TX 77069

## GUARANTY OF LEASE

The undersigned, 99¢ ONLY STORES, a California corporation (the *"Parent Corporation"*), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby irrevocably and unconditionally guarantees for the benefit of **WRI-AEW LONE STAR RETAIL PORTFOLIO, LLC,** (*"Landlord"*) each and all of the obligations of 99 Cents Only Stores Texas, Inc., a Delaware corporation (the *"Subsidiary Corporation"*) as tenant under that certain lease dated for reference purposes as of **September 28, 2011** by and between Landlord and Subsidiary Corporation, as tenant, with respect to certain premises located in the **North Oaks Shopping Center, 4849 FM 1960 West, Houston, TX 77069,** more fully described in **Exhibit "A"** attached hereto and hereby incorporated herein (the *"Lease"*).

1.    The obligations guaranteed by Parent Corporation shall include, without limitation, (a) the payment of all rent and other sums due and payable by the tenant under the Lease, and any extensions, renewals or modifications thereof, as and when the same become due, and (b) the performance by the tenant under the Lease, and any extensions, renewals or modifications thereof, off all of the covenants, terms and conditions of the Lease. This is a guaranty of payment and performance and not merely of collection.

2.    The obligations of Parent Corporation hereunder are independent of, and may exceed, the obligations of the Subsidiary Corporation. A separate action or actions may, at Landlord's option, be brought and prosecuted against Parent Corporation, whether or not any action is first or subsequently brought against the Subsidiary Corporation, or whether or not the Subsidiary Corporation is joined in any such action, and Parent Corporation may be joined in any action or proceeding commenced by Landlord against The Subsidiary Corporation arising out of, in connection with or based upon the Lease.

3.    Parent Corporation authorizes Landlord, without notice to or demand of Parent Corporation, and without affecting Parent Corporation's liability hereunder, from time to time to (a) consent to any extensions, accelerations or other changes in the time for any payment provided for in the Lease, consent to any other alteration of any covenant, term or condition of the Lease in any respect, or consent to any assignment, subletting or reassignment of the Lease; (b) take and hold security for any payment provided for in the Lease or for the performance of any covenant, term or condition of the Lease, or exchange, waive or release any such security; and (c) apply such security and direct the order or manner of sale thereof as Landlord in its discretion may determine. Notwithstanding any termination, renewal, extension or holding over of the Lease, this Guaranty shall continue until all of the covenants and obligations on the part of the Subsidiary Corporation performed have been fully and completely performed by the Subsidiary Corporation and Parent Corporation shall not be released of any obligation or liability hereunder so long as there is any claim against the Subsidiary Corporation arising out of the Lease that has not been settled or discharged in full.

4.    Parent Corporation waives any and all defenses to its obligations under this Guaranty, including without limitation, any right to (a) require Landlord to proceed against the Subsidiary Corporation or any other person or entity or pursue any other remedy in Landlord's power whatsoever; (b) complain of delay in the enforcement of Landlord's rights under the Lease; (c) require Landlord to proceed against or exhaust any security held from the Subsidiary Corporation or Parent Corporation, or (d) require Landlord to pursue any other remedy in Landlord's power that Parent Corporation cannot itself pursue and that would lighten its burden. Until the obligations of the Subsidiary Corporation under the Lease have been fully satisfied, Parent Corporation shall have no right of subrogation and waives any right to proceed against the Subsidiary Corporation for reimbursement, as well as any right to enforce any remedy which Landlord now has or may hereafter have against the Subsidiary Corporation and waives any benefit of, and any right to participate in any security now or hereafter held by Landlord. If any amount is paid to Parent Corporation on account of subrogation of its rights at a time when the Subsidiary Corporation's obligations under the Lease have not been paid in full, such amount shall be held in trust for Landlord. Parent Corporation waives any defense arising by reason of any disability or other defense of the Subsidiary Corporation or by reason of the cessation from any cause whatsoever of the liability of the Subsidiary Corporation. Parent Corporation waives all demands upon and notices to the Subsidiary Corporation and to Parent Corporation, including, without limitation, demands for performance, notices and nonperformance, notices of nonpayment and notices of acceptance of this Guaranty.

5.    The liability of Parent Corporation hereunder shall in no way be affected by, and this Guaranty shall remain in full force and effect notwithstanding, (a) the appointment of a receiver to take possession of all or substantially all of the assets of the Subsidiary Corporation, or any

Initials:

4849 FM 1960 West, Houston, TX 77069

assignment by the Subsidiary Corporation for the benefit of creditors, or any action taken or suffered by the Subsidiary Corporation under any insolvency, bankruptcy, reorganization, moratorium or other debtor relief act or statute, whether now existing or hereafter amended or enacted, or the disaffirmance of the Lease in any such action or otherwise, (b) the assignment or transfer of the Lease by the Subsidiary Corporation unless the Subsidiary Corporation is expressly released by Landlord from liability under the Lease, or (c) the cessation of the liability of the Subsidiary Corporation from any cause whatsoever other than by agreement of Landlord.

6.      The liability of Parent Corporation under this Guaranty shall continue until the expiration of all periods within which any amount at any time paid on account of the obligations guaranteed hereby may be required to be restored or returned by Landlord upon the bankruptcy, insolvency or reorganization of the Subsidiary Corporation, any other Parent Corporation or any other person.  If any amount at any time paid on account of the obligations guaranteed hereby is required to be restored or returned by Landlord as a result of any such bankruptcy, insolvency or reorganization, Parent Corporation shall be liable under this Guaranty with respect to such amount as if such amount was never paid.

7.      If at any time Landlord makes demand under this Guaranty, it shall send written notice of such demand, including particulars of the nature of the claim and the amount claimed to be due, to Parent Corporation at 4000 Union Pacific Avenue, City of Commerce, California 90023, Attention:  Real Estate Department, or such other address as Parent Corporation may notify Landlord, or it successor as landlord under the Lease, at the notice address specified in the Lease, from time to time.  Any notice to Parent Corporation shall be delivered either in person, by expedited courier, or by pre-paid certified or regular United States Mail with return receipt required.

8.      Neither this Guaranty nor either any rights of Landlord may be assigned in whole or in part to any person whatsoever other than:  (a) the successor in interest as to both privity of estate and privity of contract to Landlord under the Lease; and/or (b) as collateral security, to any mortgagee of record of the real property described in **Exhibit "A"**, or any portion thereof if and only if said real property is owned by the landlord under the Lease; provided however, in either or both such instances that concurrent with any such assignment of any interest under this Guaranty the assignor shall notify the Parent Corporation in writing at the notice address specified in this Guaranty, or at such subsequent address as may be specified in accordance with the provisions of this Guaranty:  (i) of the name and address of any such assignee; (ii) the interest assigned and the date of such assignment; and (iii) whether the assignee is a lender.  In no event shall Parent Corporation have the right to assign its obligations under this Guaranty.

9.      This Guaranty shall be governed and controlled by the laws of the State of California.

10.     Any claim, action, lawsuit, dispute or other proceeding commenced against Parent Corporation and/or arising out of or in relation to this Guaranty shall be commenced, and shall be prosecuted and maintained, if at all, as a reference proceeding pursuant to Section 638 of the California Code of Civil Procedure in the Superior Court in and for the County of Los Angeles, California.  Any such action shall be referred to the closest office to the court in which such action is filed of Judicial Arbitration and Mediation Services, Inc. ("JAMS") or, if JAMS is no longer conducting reference proceedings in the State of California, then before the American Arbitration Association.  In either event, the arbitration conducted by JAMS or the American Arbitration Association pursuant to the reference proceeding shall be a mandatory, final and binding arbitration. The applicable rules of evidence, discovery and procedures then maintained by JAMS (or the American Arbitration Association if JAMS no longer conducts reference proceeding arbitrations in the State of California) for commercial disputes shall apply to any proceeding involving this Guaranty.  The payment of fees, and the awarding of attorneys fees and costs of enforcement, shall also be determined by the then applicable rules of JAMS (or the American Arbitration Association if JAMS is then no longer conducting reference proceeding arbitrations in the State of California).

By entering into this Guaranty, the parties also recognize and agree that the mandatory, binding arbitration shall be before a single arbitrator, without a jury and without any right to trial by jury, and thus, by entering into this Guaranty, the parties are waiving the right to a jury trial for all matters that must be arbitrated under this Guaranty.  Each party acknowledges IT IS GIVING UP THE RIGHT TO A JURY TRIAL and further acknowledges that it has had the opportunity to consult with an attorney of its own selection prior to signing this Guaranty.

11.     In the event of any legal or equitable proceeding to enforce any of the terms or conditions of this Guaranty, or any alleged disputes, breaches, defaults or misrepresentations in connection with any provision of this Guaranty, the prevailing party in such proceeding shall be

4849 FM 1960 West, Houston, TX 77069

entitled to recover its reasonable costs and expenses, including, without limitation, reasonable attorneys' fees and costs of defense paid or incurred in good faith.

12.    If any of the provisions of this Guaranty shall contravene or be held invalid under the laws of any jurisdiction, this Guaranty shall be construed as if not containing those provisions, and the rights and obligations of the parties hereto shall be construed and enforced accordingly.

13.    This Guaranty includes and sets forth the entire agreement between Parent Corporation and Landlord with respect to the subject matter of this Guaranty. This Guaranty may only be modified by a writing executed by Parent Corporation. It may not be modified by the Subsidiary Corporation.

In Witness Whereof, this Guaranty has been executed as September 28, 2011.

"Parent Corporation"
99¢ Only Stores,
a California corporation

By: _____
        Jeff Gold, Its President


Each and all of the terms, covenants and conditions of the foregoing Guaranty are hereby accepted and agreed to including, without limitation, the provisions pertaining to mandatory and binding arbitration and waiver of jury trial set forth in the Guaranty. This Guaranty fully satisfies any obligation of the Subsidiary Corporation to provide a guaranty to Landlord under the Lease.

"Landlord"

**WRI-AEW LONE STAR RETAIL PORTFOLIO, LLC,**

by: Weingarten Realty Investors

By: _____
Name: Jeffrey A. Tucker
Title: Vice President/General Counsel