# EXHIBIT 3

# TABLE OF CONTENTS

**Section**

1. Definitions
   A. Common Areas
   B. Dates
   C. Exhibits
   D. Demised Premises
   E. Shopping Center

2. Demise

3. Term
   A.   Original Term
   B.   Option to Extend Term

4. Use and Operation

5. Rent
   A. Fixed Minimum Rent
   B. Utilities Charge and Exterior Lighting
   C. Percentage Rent
   D. Common Area Charges and Cap
   E. Real Estate Taxes
   F. Tenant Improvement Allowance
   G. Matters of Record

6. Alterations

7. Maintenance, Repairs and Initial Build Out

8. Signs

9. Fixtures

10. Governmental Regulations

11. Indemnification

12. Insurance
    A. Tenant
    B. Landlord

13. Fire Rebuilding and Altering

14. Force Majeure

15. Injunction

16. Warranty of Title by Landlord; Representations

17. Quiet Enjoyment

18. Mortgage and Estoppel Certificates

19. Default

20. Condemnation

21. Mutual Waiver of Subrogation

22. Assignment and Subletting

23. Surrender and Holdover

24. Notices

1

25.   Legality

26.   Binding Obligations

27.   No Recordation

28.   Real Estate Broker's Commission

29.   No Waiver, Laches or Accord and Satisfaction

30.   Hazardous Materials

31.   Titles and Entire Agreement

32.   Waiver of Claims

33.   Reasonable Consent

34.   Co-Tenancy

35.   No Presumption against Drafter

36.   Submission of Lease

37.   Interlineation

38.   Time of the Essence

39.   Tenant's Audit Rights

40.   Attorney Fees

41.   Waiver of Jury Trial

42.   Real Estate Investment Trust

43.   Prohibited Persons

44.   Independent Covenants

## LEASE AGREEMENT

This Lease Agreement ("Lease"), shall be made effective the 4 day of September, 2009, by and between Weingarten Realty Investors, a real estate investment trust ("Landlord"), whose mailing address is 2600 Citadel Plaza Drive, Suite 125, Houston, TX 77008, Attn: General Counsel, and PNS Stores, Inc., a California corporation, doing business as Big Lots ("Tenant"), whose mailing address is 300 Phillipi Road, Department 10061, Columbus, Ohio 43228-0512.

## WITNESSETH:

### 1. DEFINITIONS:

For purposes of this Lease, these terms are defined as follows:

A.     Common Areas:  The term "Common Areas" as used herein shall mean the improved portion of the Shopping Center not occupied by building area as shown on the site plan, including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas, Shopping Center signs, and parking lot lighting poles and light fixtures of the Shopping Center which shall be collectively referred to as Common Areas.  Expressly excluded from the definition of Common Areas are the roof and all structural portions of the Shopping Center.

Landlord shall maintain the Common Areas and Landlord agrees not to change such Common Areas in a manner which would materially, adversely impair the visibility of or accessibility to the Demised Premises.  Tenant shall comply with the reasonable rules and regulations which are prescribed from time to time by Landlord with respect to the Common Areas, provided, such rules and regulations do not adversely affect Tenant's business operation and do not conflict with the terms of this Lease.  Tenant, or any employees or agents of Tenant shall not fence, block, allow property to remain in or upon or otherwise obstruct the Common Areas; provided, however, Tenant shall be permitted to place one (1) drop/storage trailer in the receiving area of the Demised Premises in the area identified as "Drop/Storage Trailer" on Exhibit "A", and does not materially interfere with the business operations of the other tenants of the Shopping Center and/or the rear service drives of the Shopping Center, and (ii) does not violate any local codes/ordinances or restrictions currently in effect at the Shopping Center.  Landlord shall not construct any buildings and shall not alter the parking field or the ingress and egress to the receiving area of the Demised Premises in the area identified as the "No Change Area" as crosshatched on Exhibit "A", attached hereto.

B.     Dates: Landlord and Tenant agree, upon the request of either party, to confirm in writing, the dates contained in this Section along with other key dates contained in this Lease following execution of this Lease.

1)     Landlord shall notify Tenant if and when construction progress and procedures shall permit any part of Tenant's Work (as defined below) to be done simultaneously with Landlord's Work, and upon such notice, Tenant shall have the right to enter upon the Demised Premises for such purposes.  The date of such entry shall be the "Tenant Entrance Date" and shall not be construed as an acceptance of or possession of the Demised Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof.  Tenant, its agents, employees, and contractors will not interfere with or delay Landlord's Work pursuant to Exhibit C.  Tenant hereby agrees to indemnify Landlord against any injury, and loss or damage which may occur to any person as a result of any of the Tenant's Work or installations made in the Demised Premises,

3

except for the negligence of Landlord, its employees, agents, or contractors. Prior to any early entry by Tenant, Tenant shall provide Landlord with proof of insurance coverages described in this Lease.

2)      The "Tenant Possession Date" shall be the later of (i) the date Landlord tenders possession of the Demised Premises to Tenant with all construction required to be performed by Landlord pursuant to Exhibit C ("Landlord's Work") Substantially Completed, or (ii) the date on which Tenant receives all permits from the applicable governing authority for its construction and signage at the Demised Premises. Tenant will submit its plans for permits within ninety (90) days of full execution of this Lease and thereafter, diligently pursue obtaining such permits.  Landlord will cooperate fully with Tenant in obtaining said permits.. Landlord shall use the form shown on Exhibit E, which may be sent via facsimile, to deliver possession of the Demised Premises.  Said form shall be executed by Tenant and returned to Landlord if possession has been given.  Possession of the Demised Premises shall not be deemed to have been given to Tenant unless Landlord has Substantially Completed Landlord's Work and the Demised Premises complies with all laws, ordinances, regulations and building restrictions other than those which cannot be complied with until the completion of Tenant's Work. Any upgrades and/or alterations to the Shopping Center that are not part of the Demised Premises, but are required by the governing authority to be completed as a condition of Tenant obtaining a certificate of occupancy for the initial "Permitted Use" (as defined below) will be completed by Landlord at its sole expense. As of the mutual execution of this Lease, all provisions of this Lease shall be applicable except as to Tenant's obligations with regard to payments due hereunder which shall take effect as of the Rent Commencement Date.

"Substantial Completion" shall mean the date on which Landlord or its architect notifies Tenant in writing that Landlord has substantially completed Landlord's Work in the Demised Premises, with the exception of any Punch-List Items (as defined below). Within a reasonable period of time after Substantial Completion and Landlord's tender of possession of the Demised Premises to Tenant, Landlord and Tenant shall agree on a final punch-list of items to be completed (collectively, "Punch-List"). Landlord's contractor shall use reasonable efforts to complete or repair the items set forth on the Punch-List within thirty (30) days thereafter.

3)      The "Rent Commencement Date" shall be the  earlier of  (ii) the date which is one hundred twenty (120) days after the Tenant Possession Date; or (B) the date on which Tenant opens for business in the Demised Premises.  Notwithstanding anything in this Section 1.B(3) to the contrary, the Rent Commencement Date will never be delayed beyond the date when Tenant opens for business within the Demised Premises.

4)      The "Term Commencement Date" shall be the earlier of (i) the date Tenant opens for business; or (ii) the Rent Commencement Date.

5)      Landlord anticipates tendering possession of the Demised Premises to Tenant with Landlord's Work Substantially Complete on or prior to November 15, 2009.  Subject to Landlord and Tenant executing this Lease by September 4, 2009, if Landlord fails to tender possession of the Demised Premises to Tenant by January 2, 2010, then Tenant may terminate this Lease by written notice to Landlord.  In no event shall Tenant be obligated to accept possession of the Demised Premises prior to November 15, 2009.  Landlord and Tenant agree that, subject to "Force Majeure" [strikes (which are beyond the reasonable control of Landlord), fire or other casualty, acts of God, riots or war only] (as defined below), if Landlord fails to deliver possession of the Demised Premises to Tenant by January 2, 2010, the damages suffered by Tenant, though great and irreparable, are difficult or impossible to accurately ascertain. Therefore,

4

commencing upon January 3, 2010, and continuing for each and every day Landlord is delayed in delivering possession to Tenant on or prior to January 15, 2010, subject to Force Majeure, and without waiving any other remedy available to Tenant under this Lease, at law, or in equity, including the rights provided in Section 7 of this Lease, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $2,500.00 per day.  Commencing upon January 16, 2010, and continuing for each and every day Landlord is delayed in delivering possession to Tenant, subject to Force Majeure, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $5,000.00 per day.  If Landlord shall fail to pay such liquidated damages within ten (10) days after receipt of an invoice therefore, Tenant shall have the right to deduct such amount with interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York (or any successor thereto) annually, from the next installments(s) of Rent due under this Lease until such amount is recouped.

6)    Notwithstanding anything to the contrary, in the event Landlord does not deliver possession of the Demised Premises with Landlord's Work Substantially Completed by June 30, 2010, Tenant will not be required to accept possession until February 7, 2011.  The period of time between July 1, 2010 and February 7, 2011 will be the "Optional Blackout Period".  In the event Landlord offers possession during the Optional Blackout Period, and Tenant elects to accept possession of the Demised Premises in the Optional Blackout Period, then effective upon the date of such election, the liquidated damages, as provided in (and subject to) subparagraph 5 above, shall cease to accrue for periods subsequent to the date Tenant makes such election.  In the event Landlord offers possession during the Optional Blackout Period, but Tenant elects not to accept possession of the Demised Premises during the Optional Blackout Period, no liquidated damages, as provided in (and subject to) subparagraph 5 above, shall accrue during such Optional Blackout Period.  In addition, in the event Landlord has not offered delivery of possession to Tenant by February 7, 2011, then Tenant may terminate this Lease by delivery of a termination notice at any time after February 7, 2011, provided Landlord has not tendered delivery of possession of the Demised Premises to Tenant prior to the date Tenant sends the aforesaid termination notice.

7)    In the event Landlord offers possession of the Demised Premises during the Optional Blackout Period, and Tenant elects to accept possession in the Optional Blackout Period, unless Tenant opens for business, the Rent Commencement Date will not begin until the later of: (i) the later of ninety (90) days after delivery of possession of the Demised Premises by Landlord or ninety (90) days after Tenant has received all its construction permits and approvals; or (ii) February 7, 2011. Notwithstanding anything in this Section 1.B.7. to the contrary, the Rent Commencement Date will never be delayed beyond the date when Tenant opens for business within the Demised Premises.

C.    Exhibits:  The following Exhibits are attached to and made a part of this Lease by reference hereto:

1)    Exhibit A -    Site Plan of Shopping Center

2)    Exhibit A – 1  Tennant's Drawing of the Demised Premises

3)    Exhibit B -    Legal Description of Shopping Center

4)    Exhibit C -    Landlord Work

5

5)     Exhibit C-1 - Plans and Specifications

6)     Exhibit D -   Tenant Building Sign Specifications

7)     Exhibit D – 1 Tenant Pylon Sign Location

8)     Exhibit E -   Delivery of Possession Letter

9)     Exhibit F -   Exclusive/Prohibited Use Provisions

10)    Exhibit G -   Remeasurement Rider

D.          Demised Premises:   The "Demised Premises" shall be the storeroom, indicated on Exhibit A, which storeroom shall have approximately 31,502 square feet of ground floor area with a minimum width of one hundred twenty (120) feet of frontage for the Demised Premises. Tenant's Drawing of the Demised Premises is attached hereto as Exhibit A-1 and is deemed approved by the parties hereto.  Within ninety (90) days after the Tenant Possession Date, Tenant shall have the opportunity, at Tenant's sole cost and expense, to have the Demised Premises remeasured by an architect or engineer of Tenant's choosing, for a determination of the Demised Premises exact square footage, measured in accordance with the BOMA standard, and provide the Landlord with written notice of its findings.  Tenant shall provide notice to Landlord prior to such remeasurement and afford Landlord the opportunity to be present during such remeasurement. Except as otherwise provided herein, should the findings of such remeasurement differ from the square footage of the Demised Premises by an amount greater than 100 square feet, then all aspects of Rent and Additional Rent shall be adjusted accordingly.  Upon performing such remeasurement, should the findings thereof differ from the square footage of the Demised Premises by an amount greater than 100 square feet, then the Landlord and Tenant shall complete the Remeasurement Rider attached hereto as Exhibit G and shall exchange such Remeasurement Rider with each other. Notwithstanding the foregoing, Tenant shall not be obligated to pay Rent or Additional Rent on any space in excess of 31,502 square feet (although said excess space shall be deemed a part of the Demised Premises) nor accept possession of any space under 27,000 square feet in size, and, if Tenant elects not to accept possession of such space that is under 27,000 square feet in size, Tenant shall terminate this Lease.

E.          Shopping Center:  Landlord's "Shopping Center" is described in Exhibit B attached hereto and made a part hereof, which said description encompasses the area shown on Exhibit A, the address of which is the Montgomery Plaza Shopping Center, I-45 @ Loop 336 West, 1400-1424 Loop 336 West, Conroe, Texas 77304.  Landlord represents that the gross leasable area of the Shopping Center as of the date of this Lease is approximately 300,000 square feet.

F.          Gross Sales:   The term "Gross Sales" shall mean (1) the aggregate gross amount of all sales made in or from the Demised Premises during any Lease Year or Partial Lease Year and (2) charges for all services rendered in or from the Demised Premises during any Lease Year or Partial Lease Year.  Such sales, charges, and receipts shall include those of Tenant and Tenant's sublessees. The following shall be deducted from Gross Sales to the extent same are included in the above computation:   (1) sales taxes, excise taxes and any similar tax specifically charged to and paid by customers and directly remitted to the taxing authority; (2) merchandise returned or exchanged at the Demised Premises; (3) income from stamp machines and public telephones; (4) bad debts on credit sales and bad checks;   (5) sales of merchandise to employees at a discount; (6) insurance proceeds; (7) non point-of-purchase, electronic-commerce transactions initiated at the Demised Premises and consummated on the internet; (8) credit card company finance or service charges;   (9) proceeds from vending machines located in the Demised Premises; and (10) merchandise transferred to a warehouse or another store of Tenant, provided such transfers are made solely for the convenient operation of Tenant's business and not for the purpose of depriving

6

Landlord of the benefit of a sale which would otherwise be made at, in, or from the Demised Premises. Tenant shall retain all Gross Sales records for three (3) years after preparation, and Landlord shall have the right to inspect all Gross Sales records at all reasonable times. Within fifteen (15) days after the end of each month of the Term and, within thirty (30) days after the end of each Lease Year, Tenant will deliver to Landlord a statement, certified by Tenant to be accurate and complete, setting forth the amount of Gross Sales made during such month (or Lease Year, as the case may be), itemized in reasonable detail.

**2.      DEMISE:**

Landlord, in consideration of the Rent and Additional Rent to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided, hereby leases to Tenant, and Tenant hereby leases from Landlord, the Demised Premises together with all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto during the Term and for the use hereinafter provided. Landlord further grants to Tenant, its employees, agents, customers and invitees, a non-exclusive use of the Common Areas to be shared with the other tenants and occupants of the Shopping Center and their respective employees, agents, customers, and invitees.

**3.      TERM:**

A.      Original Term:   The original term of this Lease shall be for a period commencing on the Term Commencement Date as defined in Article 1.B(4) above and ending January 31, 2015 (the "Original Term"). Upon the expiration or earlier termination of this Lease, Landlord and Tenant shall be released from all liability, under this Lease, thereafter accruing, except as otherwise provided herein. The "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the Term hereof. If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be a "Partial Lease Year." If this Lease is terminated on a date other than January 31st of any year, the period between the February 1st immediately preceding the termination date and the actual termination date shall be a "Partial Lease Year". Tenant's obligations to pay Rent and Additional Rent shall commence on the Rent Commencement Date. As used herein, "Term" shall mean the Original Term, any Option Terms, and any other extended period.

B.      Option to Extend Term:   Landlord hereby grants to Tenant the option to extend the Term of this Lease for three (3), five (5) year option terms, consecutively referred to as "First Option Term", "Second Option Term", and "Third Option Term" at the Fixed Minimum Rent as specified below. The First Option Term shall commence at the end of the Original Term of this Lease, the Second Option Term shall commence at the end of the First Option Term, and the Third Option Term shall commence at the end of the Second Option Term, each upon the same terms and conditions as contained in this Lease except as provided herein. If Tenant is then in possession of the Demised Premises and not in default of this Lease beyond any applicable notice and cure periods, Tenant may elect to exercise each option by giving the Landlord written notice at least six (6) full calendar months prior to the expiration of the immediately preceding Original Term or the previous Option Term as applicable. Upon receipt of each such notice, this Lease will be extended for the period specified herein without the necessity for the execution of any further instrument and upon the same terms, conditions, covenants, and agreements as are contained in this Lease, except that the Fixed Minimum Rent for each Option Period will be as set forth herein. If Tenant neglects to exercise timely any Option Period, Tenant's right to exercise such Renewal Option shall be null and void and without further force and effect. Tenant acknowledges that a failure to properly exercise the First Option Term as provided hereinabove, shall render Tenant's options for the Second Option Term and Third Option Term null and void and without further force and effect; and a failure to properly exercise the Second Option Term as provided hereinabove,

7

shall render Tenant's options for the Third Option Term null and void and without further force and effect.

4. **USE AND OPERATION:**

A. **Permitted Uses.** Subject to the ECR and Exhibit F, Tenant shall have the right to use and occupy the Demised Premises for the purpose of the sale of general merchandise, home and home office furniture, furniture accessories, appliances, toys, seasonal merchandise, furnishings, health and beauty products, food (including frozen food) ("Permitted Use"), and for any other lawful retail purpose subject only to existing restrictions and exclusive uses as described in this Lease. Subject to the ECR and Exhibit F, Landlord represents and warrants to Tenant, as of the effective date of this Lease, that no exclusive covenants or restrictions granted to existing Shopping Center tenants shall restrict Tenant's use of the Demised Premises for the initial Permitted Use. Landlord represents and warrants to Tenant that all exclusive use provisions granted by Landlord, or any predecessor of Landlord, to existing tenants in the Shopping Center are attached hereto and incorporated herein as Exhibit F. Landlord agrees to indemnify, defend and hold harmless Tenant for any and all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation reasonable attorney fees and court costs) associated with a breach of the forgoing representations and warranties.

So long as Tenant is open and operating its business in the Demised Premises for the initial Permitted Use (as provided above), except for tenants (and their successors and assigns) open and operating for business in the Shopping Center as of the effective date of this Lease, no dollar store operation in excess of 10,000 square feet of floor area or closeout store ("Competing Business") may be permitted in the Shopping Center during the Original Term of this Lease or any Option Terms or extensions thereof. In addition to the foregoing, a "Competing Business" shall include, without limitation the following business operations: Marc's, Fred's, Super 10, Maxway, Mazel, Odd Job, Amazing Savings, Ocean State Job Lot, Grossman's Bargain Outlet, Greenbacks, Kings Discount, Building 19, National Wholesale Liquidators, and Ollies Bargain Outlet. Notwithstanding the foregoing, the parties acknowledge that 99 Cent Only is an existing tenant in the Shopping Center whose premises occupy more than 10,000 square feet. If 99 Cent Only (a) assigns its lease, or subleases its premises, to a dollar store or (b) vacates its premises and Landlord subsequently leases such premises to a dollar store ("replacement dollar store tenant"), then in any such event, such assignee, sublessee or replacement dollar store tenant shall not be deemed a Competing Business notwithstanding the fact that such premises are being operated for the purpose of a dollar store and occupy more than 10,000 square feet of floor area of the Shopping Center ("99 Cent Exception"). If Tenant determines that Landlord has violated the provisions of this second grammatical paragraph of Section 4.A (as same pertains to a Competing Business only), Tenant shall give Landlord written notice of such violation ("Competing Business Violation"), and Landlord shall have thirty (30) days from receipt of the notice within which to cure the Competing Business Violation. If such Competing Business Violation is not cured within such thirty (30) day period, then Tenant, as its exclusive remedy, shall have the right to pay, in lieu of the Rent stated in the Lease, an amount equal to fifty percent (50%) of the Rent otherwise payable under the terms of the Lease (hereinafter "Reduced Rent") until the Competing Business Violation has been cured. Nothing contained herein shall be deemed to reduce the amounts payable by Tenant as Additional Rent during any period that Tenant has the right to pay Reduced Rent. Notwithstanding the terms of this paragraph, Tenant shall have no remedy for a violation hereof if another tenant or occupant of the Shopping Center violates a provision of its lease or license agreement regarding the use of its premises ("Rogue Tenant Violation"); provided Landlord, within thirty (30) days after receipt of written notice from Tenant advising Landlord of such Rogue Tenant Violation, commences and diligently pursues good faith efforts to enforce its rights under such lease or license agreement in order to cause Rogue Tenant Violation to cease; provided, further, if said violation does not cease within 365 days after Landlord's receipt of written notice from Tenant advising Landlord of such Rogue Tenant Violation, Tenant shall have the right to terminate the Lease at any time thereafter by delivering termination notice to Landlord while such Rogue Tenant

Violation continues; provided, however, such notice must be given, if at all, prior to the date Landlord cures such Rogue Tenant Violation.

For purposes of clarification, a "dollar store" shall include by way of illustrative example, without limitation, the following business operations: 99 Cent Only, Dollar Tree and Dollar General. Dollar stores shall not be deemed a Competing Business unless said dollar store occupies more than 10,000 square feet of floor area of the Shopping Center (except for the 99 Cent Exception). Tenant acknowledges that even in the event that 99 Cent Only (or its successors, assigns or replacements) is open and operating in the Shopping Center, Landlord may lease space to another dollar store and same shall not be deemed a Competing Business; provided such other dollar store does not occupy more than 10,000 square feet in the Shopping Center. Further, a "closeout store" shall not include any branded or private label fashion apparel (including footwear) outlet closeout stores, such stores to include by way of illustrative example, without limitation, the following business operations: Talbot's outlet, Nine West outlet, Nordstrom Rack, TJ Maxx and Ross Dress for Less. The parties acknowledge and agree that branded or private label fashion apparel (including footwear) outlet closeout stores shall not be deemed a Competing Business.

Tenant agrees when possible, to operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and between the hours of 11:00 A.M. and 6:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the Term of this Lease.

So long as Tenant has opened for business in the Demised Premises fully stocked, staffed and fixtured for at least one (1) day within one (1) year after the Tenant Possession Date, Tenant may close the Demised Premises, at any time thereafter, in Tenant's reasonable discretion; provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder. In the event that Tenant closes the Demised Premises under this Section and fails to reopen the Demised Premises within ninety (90) days thereafter, Landlord may terminate this Lease upon thirty (30) days' notice to Tenant, if Tenant (or a permitted assignee or subtenant of Tenant) has not reopened for business as of the date of the notice, in which event Tenant shall be released from all further liability hereunder.

Tenant agrees to keep the Demised Premises in a clean, neat, healthful, aesthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises free of debris, trash, garbage, refuse (except that reasonable amounts may be kept temporarily in closed containers in places directed by Landlord), vermin, insects or pests by virtue of having regular pest extermination, loud or constant noises, and excessive vibrations. Tenant further agrees not to burn trash or garbage in the Shopping Center; commit waste in the Demised Premises or Shopping Center; cause or permit pipes, lines, conduits, fixtures or appliances in the Demised Premises to be ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair.

Tenant shall be responsible, at its sole cost and expense, for the removal of its trash and rubbish. In the event Landlord has established or should establish a common trash and rubbish removal or disposal program at the Shopping Center, Tenant shall participate in such program.

The Demised Premises shall not be used in any manner or occupied for any purpose constituting a fire hazard or so as to increase the cost of Landlord's hazard insurance over the normal cost of such insurance, absent that use, for the type and location of the building of which the Demised Premises are a part.

Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right to (i) store shopping carts and baskets in the Common Areas immediately adjacent to the Demised Premises in the area identified as "Cart Area" on Exhibit "A"; and (ii) use the Common Areas on the sidewalk immediately adjacent to the Demised Premises for the periodic outdoor sale and display of merchandise (on the sidewalk in front of the Demised Premises), provided that (a) Tenant may not have more than eight (8) such

9

periodic outdoor sales per calendar year for a duration of not more than fourteen (14) consecutive days each, (b) such sales shall be subject to any applicable governmental laws relating to same, (c) no outdoor displays of merchandise may remain outside the Demised Premises during periods that Tenant is not open for business; (d) if any other tenant has a bona fide objection to such outdoor sales on the grounds that it violates such tenant's lease, then Tenant shall have no further right to use the sidewalk for sales purposes; (e) such use does not unreasonably interfere with pedestrian traffic; and (f) Tenant agrees to indemnify and hold Landlord harmless for all costs, claims and liabilities arising out of such use.

**B.      Prohibited Uses.**      Except for existing tenants, and their successors and assigns, Landlord shall not lease any space, or permit any use any where in the Shopping Center, and Tenant shall not use the Demised Premises or Common Areas, or any part thereof: (i) to conduct or advertise any auction, bankruptcy, fire, distress, liquidation, sheriff's or receiver's sale on or from the Demised Premises (unless pursuant to court order); (ii) for an auditorium, activity facility, or meeting hall; (iv) for any self storage facilities;; (iii) for any industrial type use (e.g., manufacturing, warehousing, processing, assembly, plating); (iv) to conduct any activity which may make void or voidable or increase the premium on any insurance coverage on the Shopping Center or parts thereof; (v) for the operation of a bath house, adult book or adult video store, or for the sale, rental or exhibition of pornographic material and/or display in storefront windows or in areas within the Demised Premises which are visible from outside of the Demised Premises, any sign, product or advertising material which is or is for pornographic or "adult" material; (vi) in a manner which is a public or private nuisance including any which creates undue noise, sound, vibration, litter or odor; (vii) for any establishment which features any form of "adult entertainment"; (viii) for a roller or skating rink, skateboard or other rink or arena, billiard parlor, bowling alley,; (ix) for lodging, including a hotel, motor inn, apartments or condominiums; (x) for vehicle, including automobile, truck, trailer, R.V. or boat dealer (or other similar enterprise), sales, leasing, display or repair [other than for retail office functions relating to such operations and provided that any rental cars are limited to not more than twelve (12) rental cars and same are parked outside the  Restricted Areas]; (xi) for a funeral parlor or mortuary; (xii) for a mobile home or trailer court; (xiii) for any dumping, disposing, recycling, incineration or reduction on a large-scale commercial basis of refuse and recyclables (exclusive of collection in appropriately screened areas of refuse and recyclables resulting from normal day to day operations in the locations designated by Landlord from time to time); (xiv) for any separately demised newsstand; (xv) for an off-track betting business, bingo, lottery (other than incidental sales of lottery tickets) or similar "games of chance" sales or facility; (xvi) for the placement of any aerial or antenna on the roof or exterior walls of the Demised Premises, other than an aerial or antenna for Tenant's own use; (xvii) for the display of billboards or large advertisements whether free-standing , painted upon or affixed to the exterior of any structure; (xviii) for any astrology, palm reading, tarot card or other like service or facility; (xix) for the use of a "call center" or (xx) for the use as a "head shop" selling drug paraphernalia. All of the foregoing uses are sometimes collectively referred to herein as the **"Prohibited Uses"**.

Notwithstanding anything to the contrary provided above, Landlord may lease tenant space in the Shopping Center for the following uses, provided that space leased for any such uses shall not be located within the area identified as "Restricted Area" on Exhibit A of this Lease: (a) to sell so-called "Army and Navy", surplus or previously worn or used goods, as those terms are generally used at this time and from time to time hereafter; (b) for medical or health-oriented facilities or offices  (unless same occupies 2,000 square feet of floor area or less in the Restricted Area as shown on Exhibit A as space #28); (c) for automotive, tire, gasoline or oil service centers; (d) for governmental use or office or social service functions or facilities (unless same occupies 5,000 square feet of floor area or less in the Restricted Area); (e) for the operation of a massage parlor such as "Massage Envy"; (f) for a night club or discotheque, tavern, bar, cocktail lounge or restaurant; (g) for an amusement center, arcade, health spa, health club, exercise club, gymnasium or similar operation; (h) for a retail laundry or retail dry cleaning operation; (i) for a day care center or school; (j) for a pet shop or veterinary hospital, animal boarding, training or raising facility; (k) for vehicle leasing, provided, however, that vehicles available for lease shall not be parked or stored in the Restricted Area; or (j) for the display of

10

billboards or large advertisements whether free-standing, painted upon or affixed to the exterior of any structure, provided, however that the display of billboards or large advertisements shall no be placed in the No Change Area.

Notwithstanding anything to the contrary contained herein, the restrictions and Prohibited Uses as provided in this Section 4.B. shall not apply to any areas designated as "Unrestricted Area" on Exhibit "A" with the exception of Subsections (v), (vi), (vii), (xi), (xii), (xiii), or (xx).

## 5. RENT AND CONSTRUCTION ALLOWANCE:

From the Rent Commencement Date during the Term hereof, Tenant does hereby covenant and agree to pay to the Landlord in lawful money of the United States at the address of Landlord at P.O. Box 924133, Houston, Texas 77292-4133, or at such other place as Landlord may from time to time direct in writing, Fixed Minimum Rent (sometimes referred to as "Rent") along with all other charges due from Tenant to Landlord under this Lease ("Additional Rent"). The Rent and Additional Rent for any partial month shall be pro rated based on the actual number of days in such month.

A.    Fixed Minimum Rent: During the Original Term of this Lease, the sum of Two Hundred Twelve Thousand Six Hundred Thirty-eight and 50/100 Dollars ($212,638.50) per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of Seventeen Thousand Seven Hundred Nineteen and 88/100 Dollars ($17,719.88).

All the terms and conditions of this Lease shall apply during the Option Terms except that (1) each option to extend the Term shall terminate when exercised; (2) the Fixed Minimum Rent applicable for the First Option Term shall be the sum of Two Hundred Thirty-four Thousand Fifty-nine and 86/100 Dollars ($234,059.86) per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of Nineteen Thousand Five Hundred Four and 99/100 Dollars ($19,504.99). The Fixed Minimum Rent applicable for the Second Option Term shall be the sum of Two Hundred Fifty-seven Thousand Three Hundred Seventy-one and 34/100 Dollars ($257,371.34) per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of Twenty-One Thousand Four Hundred Forty-seven and 61/100 Dollars ($21,447.61). The Fixed Minimum Rent applicable for the Third Option Term shall be the sum of Two Hundred Eighty-two Thousand Eight Hundred Eighty-seven and 96/100 Dollars ($282,887.96) per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of Twenty-Three Thousand Five Hundred Seventy-four and 00/100 Dollars ($23,574.00).

B.    Utilities Charge: Landlord shall provide Tenant with access to all utilities necessary to conduct business in the Demised Premises. Landlord shall provide separate utility meters from local distribution company, which shall accurately reflect Tenant's usage. Tenant shall be solely responsible for and shall promptly pay for all direct  public utility and private services rendered or furnished to or for the benefit of Tenant and to the Demised Premises during the Term hereof including water, sewer, gas, electricity, telephone, and trash, based on the use of such utilities. Tenant shall at all times have the right, in its sole discretion, to select the particular utility providers for the Demised Premises so long as said utility is available to the Demised Premises.

Landlord and Tenant acknowledge and agree that, as of the date hereof, Landlord is not a utility supplier for any utilities serving the Demised Premises, but is providing separated utilities and separate meters as part of Landlord's Work in accordance with Exhibit C. However, in the event Landlord should become a utility supplier for any utilities, and Tenant allows Landlord to supply any utilities as provided herein below, then Landlord shall provide Tenant with access to such

11

utilities necessary to conduct business in the Demised Premises. Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished to or for the benefit of Tenant and to the Demised Premises during the Term hereof including water, sewer, gas, electricity, telephone, and trash, together with all applicable pass through taxes, levies, or other appropriate charges based on the use of such utilities. Landlord shall provide and maintain separate utility submeters for water/sewer, electricity, and gas, which shall accurately reflect Tenant's usage. All such meters shall be a type that is utility billing grade, with Ansi standard, and the water meter type shall comply with ANSI/AWWA Standard C700, latest revision. Each meter shall be tested on a minimum five (5) year frequency, unless otherwise requested by Tenant. If no problems are found during requested test, Tenant shall reimburse Landlord for the reasonable expense. Such meter shall have sealed register and a minimum of available characters to match up with respective tenants' use. The schedule for reading the meter shall reflect that of the master meter account from the public utility, and billing shall include a copy of the master meter invoice. In the event Tenant permits Landlord to supply any utility to Tenant, the rate charged for such service shall not exceed the lesser of (i) the bulk rate paid by Landlord, (ii) the applicable rate (consumer or bulk) which Tenant otherwise would pay as a direct customer of the public, municipal or other utility company providing such service. In the event any utility service to the Demised Premises provided by Landlord shall be interrupted for a period of more than twenty-four (24) consecutive hours as a result of the acts or negligence of Landlord, its agents, contractors or employees, or as a result of Landlord's failure or refusal to make repairs, then to the extent that Tenant cannot and does not conduct its business in the Demised Premises due to such interruption, Rent and Additional Rent shall abate upon the expiration of such twenty-four (24) hour period until such services are fully restored. Notwithstanding the foregoing, Tenant shall have the right, at any time and from time to time, to install and operate devices for check metering (monitoring) for utility supply and use. Installation shall be the cost and responsibility of the Tenant. The monitoring equipment can be installed at any time during the lease Term. Tenant reserves the right to leave monitoring equipment in place indefinitely. Landlord agrees to recalculate utilities and services based on findings by Tenant's monitoring data. Landlord shall provide Tenant written notice of such adjustment. In no event shall Tenant be charged an amount greater than the rate that would be charged by the utility company, if service were furnished directly to the Demised Premises.

C.      Intentionally Deleted.

D.      Common Area Charges and Cap:  Throughout the Term of this Lease, Landlord shall be responsible for the following:

(i)     operating, maintaining, refurbishing, repairing, replacing, improving and lighting the Common Areas and all other non-leasable areas and facilities located in the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees;

(ii)    operating, maintaining, refurbishing, repairing, replacing, improving and lighting the service areas, garbage and refuse disposal facilities, Shopping Center maintenance and storage room, loading area and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center;

(iii)   operating, maintaining, refurbishing, repairing, replacing, improving and lighting appropriate parking area entrances, exit and directional markers, Shopping Center signs, and other traffic control signs as are reasonably required to effect the site plan;

(iv)    providing security, lighting and policing, if necessary as reasonably determined by Landlord, and on-site and off-site traffic control in the Common Area only;

12

(v)  maintaining all paved surfaces in a smooth condition, free of potholes (in the event of any potholes, Landlord shall repair same in a timely manner), with the type of material as originally used or a substitute equal in quality; restriping and repainting as required to keep same clearly visible and appropriately marked; and

(vi)  cleaning, sweeping, and snow and ice removal as needed. Landlord agrees to deposit snow accumulation in an area that will not interfere with Tenant's store entrance and designated parking areas.

Landlord's costs shall be the expenses incurred by Landlord in performing the above enumerated items as well as those costs incurred refurbishing, repairing, maintaining, replacing, and improving (but less the amount of any insurance proceeds, or condemnation awards), lighting, line painting, landscaping, including irrigation thereof), and total compensation and benefits (including premiums for worker's compensation and other insurance) paid to or on behalf of on-site employees, to the extent such employees perform work in the maintenance of the Common Areas, all charges for water, sewer and other utilities used or consumed in the Common Areas,  licenses and permit fees, and parking area levies, constructing, operating, repairing and maintaining any necessary on-site or off-site utilities, operating, repairing and maintaining any necessary on or off-site detention ponds, retention ponds, or other surface and storm water drainage facilities that serve the Shopping Center, utilities charges, repairing and maintaining utility lines which do not exclusively serve one tenant, overhead canopies, sprinklers and sprinkler risers in the Common Areas, sidewalks (including steam cleaning), exterminating and pest control in and about the Common Area (collectively, "Common Area Charges"). Notwithstanding anything to the contrary herein, excluded from such Common Area Charges shall be all capital expenditures (as defined by generally accepted accounting principles consistently applied), any depreciation of the Shopping Center, insurance deductibles, uninsured retentions, reserves and any administrative, management or related fees.

Subject to the CAM Cap (defined below), after the Rent Commencement Date, Tenant agrees to pay to Landlord a pro rata share of such Common Area Charges. Tenant's pro rata share of such Common Area Charges shall be the product obtained by multiplying said Common Area Charges by a fraction, the numerator of which is the leasable ground floor area (in square feet) of the Demised Premises and the denominator of which is the gross leasable area (in square feet) in all buildings of the Shopping Center. In calculating Tenant's pro rata share, the ground floor area (in square feet) leased to any Shopping Center tenant which is solely responsible for performance of all items included as part of Common Area Charges shall be deducted from the gross leasable area of the Shopping Center. In no event shall there be any duplication of expenses.

On the first day of each calendar month during that portion of the Term hereof falling within the first Lease Year, or Partial Lease Year as the case may be, Tenant shall pay to Landlord, in advance, as an estimated payment on account of Tenant's pro rata share of such Common Area Charges an amount equal to its estimated monthly pro rata share of Common Area Charges as reasonably determined by Landlord based on the Common Area Charges in the Shopping Center during the prior year.

After the first Lease Year, or Partial Lease Year as the case may be, Tenant shall continue to pay an estimated amount of Tenant's pro rata share of such Common Area Charges on the first day of each month in advance without demand and without any setoff or deduction (except as set forth herein). Such Common Area Charges may be adjusted and revised by Landlord after the end of each Lease Year or Partial Lease Year as the case may be, during the Term hereof on the basis of the actual Common Area Charges for the immediately preceding Lease Year.  Upon Landlord's furnishing to Tenant a statement setting forth such

revised Common Area Charges, Tenant shall pay to Landlord such revised estimated share in equal monthly installments, each such installment to be a sum equal to one-twelfth (1/12th) of such revised estimated Common Area Charges in advance on the first day of each calendar month thereafter until the next succeeding revision in such estimate.

Within one hundred twenty (120) days following each Lease Year or Partial Lease Year, as the case may be, Landlord shall furnish to Tenant a written statement in reasonable detail showing the total Common Area Charges for such Lease Year or Partial Lease Year, the amount of Tenant's pro rata share thereof, and payments made by Tenant with respect thereto. Upon request by Tenant, Landlord shall furnish copies of actual paid invoices and other documentation as Tenant may reasonably request for such Common Area Charges as stated herein.

If Tenant's pro rata share of such Common Area Charges exceeds Tenant's payment with respect to any Lease Year, or Partial Lease Year, as the case may be, Tenant shall pay to Landlord the deficiency within thirty (30) days after the date of the furnishing of the statement from Landlord; if Tenant's payments exceed Tenant's share of the Common Area Charges, and Tenant is not in default hereunder beyond any applicable notice and cure periods or otherwise indebted to Landlord, Landlord shall credit such excess against the next Rent payments due; provided, if such overpayment is for the last Lease Year, Landlord shall refund to Tenant the amount of such overpayment after Tenant has fully performed all of its obligations under this Lease, and has vacated the Demised Premises in accordance with the provisions of this Lease. In the event Tenant is indebted to Landlord for any reason whatsoever, Landlord may deduct such amount owed from such overpayment.

Common Area Charges Cap:. Notwithstanding anything to the contrary contained herein, Tenant's pro rata share of Common Area Charges shall be capped at (**$0.85**) per square foot of the Demised Premises for the first full Lease Year and Partial Lease Year of the Original Term. Thereafter, Tenant's Common Area Charges during any Lease Year, shall not increase by more than three percent (3%) per annum (on a cumulative basis) above that amount of Common Area Charges payable by Tenant for the previous Lease Year (the "CAM Cap").

"Cumulative Cap" allows the Landlord to carry forward unused increases when actual CAM costs rise at uneven rates. For instance, If a CAM cap is 5 percent, but actual costs rise only three (3) percent in the first year, the additional two (2) percent could be applied to the second year so that if actual costs rose by seven (7) percent in that second year, the Landlord could recover the entire increase.

E.  Real Estate Taxes: Landlord shall pay all real property taxes which may be levied or assessed by any lawful authority against the land and improvements in the Shopping Center or against Landlord in respect of the land and improvements in the Shopping Center (hereinafter referred to as "Real Estate Taxes"). Excluded from such Real Estate Taxes for Tenant shall be the amount of any special assessments or impositions. Tenant shall pay to Landlord its pro rata share of Real Estate Taxes paid by Landlord. Tenant's pro rata share of such Real Estate Taxes shall be the product obtained by multiplying said Real Estate Taxes by a fraction, the numerator of which shall be the leasable ground floor area (in square feet) of the Demised Premises and the denominator of which shall be the gross leasable ground floor area (in square feet) of all buildings in the Shopping Center. In calculating Tenant's pro rata share, the ground floor area area (the actual square footage of such space) leased to any Shopping Center tenant which is solely responsible for payment of Real Estate Taxes shall be deducted from the gross leasable area of the Shopping Center, and the taxes allocated to said tenant shall be deducted from the total Real Estate Taxes for the Shopping Center. If the Rent Commencement Date or the expiration date of this Lease shall fall on a date other than the beginning (or ending, as the case may be) of a tax year, a proper apportionment of said Real Estate Taxes for the year shall be made.

14

Tenant shall pay to Landlord Tenant's pro rata share of Real Estate Taxes within thirty (30) days after Tenant's receipt of an invoice therefor specifically showing the amount of Real Estate Taxes levied or assessed against the Shopping Center and Tenant's pro rata share thereof along with a copy of the Real Estate Tax bill issued by the taxing authority. Landlord shall provide Tenant with copies of actual bills for Real Estate Taxes, documentation evidencing allocation of Real Estate Taxes to the Demised Premises and to all Shopping Center parcel(s) and other documentation as Tenant may reasonably request, promptly upon receipt of tax bills from taxing authorities. Tenant shall not be required to make more than two (2) such payments in any Lease Year or Partial Lease Year. Landlord represents that the Real Estate Taxes for the 2009 tax year is estimated to be approximately $0.98 per square foot per annum.

Interest and/or penalties for late payment shall not be included in determining Real Estate Taxes. Further, if a discount of said Real Estate Tax bills is received for prompt payment, Tenant's pro rata share of Real Estate Taxes shall be based upon the discounted amount. Tenant's pro rata share shall be reduced to the extent of abatements, refunds or rebates granted to Landlord.

In the event Landlord (or any affiliate of Landlord) no longer owns the Shopping Center, if Tenant deems any Real Estate Taxes payable by Tenant hereunder, or any part thereof, to be illegal or excessive, Tenant may contest the same by proper proceedings commenced at its own expense and in good faith. Landlord agrees to render to Tenant all assistance reasonably possible in connection therewith, including the joining in, and signing of, any protest or pleading which Tenant may deem it advisable to file. If such proceedings are resolved against Tenant, Tenant shall pay its pro rata share of all Real Estate Taxes, and all penalties and interest thereon, found to be due and owing. Tenant shall indemnify Landlord against any loss or damage by reason of such contest, including all costs and expenses thereof during the pendency of any such proceeding, and shall fully protect and preserve the title and rights to Landlord, as well as Tenant's leasehold estate in and to the Demised Premises.

In determining the amount, if any, payable by Tenant in accordance with this Section, the amount of Real Estate Taxes assessed against any buildings, additions to buildings or improvements constructed after the assessment day for Real Estate Taxes for the year of Term commencement which are not in replacement of buildings damaged or destroyed by fire or other casualty shall be deducted from the Real Estate Taxes for the Shopping Center, and the gross leasable area of any such new buildings, additions or improvements shall be deducted from the gross leasable area of the Shopping Center prior to computation of Tenant's pro rata share of any increase hereunder. Landlord shall use commercially reasonable efforts to cause any such new construction to be separately assessed.

Notwithstanding anything to the contrary contained herein, Tenant shall not be obligated to contribute toward an increase in Real Estate Taxes resulting from the sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements or a reassessment resulting therefrom. This provision shall include, and Tenant shall not be obligated to contribute toward any increase in Real Estate Taxes resulting from a transaction which, in accordance with the applicable authority having jurisdiction, constitutes a sale, conveyance, change in ownership or other transfer. Notwithstanding the foregoing, this provision shall not apply to any sale, conveyance, change in ownership or other transfer by the Landlord identified herein to the first immediate successor in interest.

Tenant shall pay all taxes assessed against its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes, lease taxes, and other governmental charges arising in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business.

15

F.    <u>Tenant Improvement Allowance</u>: Landlord shall pay to Tenant an amount equal to Fifteen Dollars ($15.00) times the number of square feet of leasable ground floor area within the Demised Premises, as determined pursuant to Section 1.D. above ("Tenant Improvement Allowance") within thirty (30) days after the later to occur of : (a) Tenant opening for business in the Demised Premises, : (b) Tenant providing Landlord with all lien waivers from Tenant's contractors and subcontractors who have performed/supplied more than $5,000.00 worth of labor/materials for the Demised Premises: and (c) Tenant providing Landlord with a copy of the certificate of occupancy for the Demised Premises. For illustrative purposes only, if the total square footage of the Demised Premises were 31,502 square feet, then the amount of the Tenant Improvement Allowance paid to Tenant would equal $472,530.00 (i.e. $15.00 x 31,502 square feet). If said Tenant Improvement Allowance is not paid to Tenant by Landlord within thirty (30) days after the later to occur of (a), (b) and (c) above, Landlord shall, in addition, pay to Tenant interest on said amount at an annual rate of two percent (2%) above the prime rate established by the Chase Bank (or any successor thereto) from the due date to the date of payment, and Tenant may deduct such sum from subsequent installments of Rent hereunder until such sum is fully paid.

Landlord and Tenant both agree that the Tenant Improvement Allowance shall not be used towards the purchase of inventory. Landlord and Tenant recognize and agree that to the extent that the Tenant Improvement Allowance is spent for the purpose of constructing or improving long term real property at the Demised Premises, then Landlord and Tenant agree that the Tenant Improvement Allowance shall be "qualified lessee construction allowance" as defined in Reg. Sec. 1.110-1(b) of the Internal Revenue Code. Landlord and Tenant agree to comply with the reporting requirements of Reg. Sec. 1.110-1(c) of the Internal Revenue Code.

G.    <u>MOR</u>: Landlord and Tenant acknowledge that Shopping Center and this Lease are subject to certain Easements, Covenants and Restrictions dated January 21, 1983, by and between Exeter Investment Company and Wal-Mart Properties, Inc. (as predecessor-in-interest to Landlord), under County Clerk's File No. 8303552 of the Real Property Records in Montgomery County, Texas, as amended (the "ECR"), and certain other matters of record (collectively, "MOR"), provided that Landlord has delivered to Tenant copies of all such MOR prior to the date of this Lease. To the extent that the MOR allocates Real Estate Taxes, utility expenses, insurance expenses, Common Area Charges and any other expenses or charges ("Charges") in connection with the Shopping Center (as defined in this Lease) or the shopping center (as defined in the MOR) differently than in the Lease, or to the extent the aforesaid Charges are calculated or defined differently than as in this Lease, the Lease shall control as between Landlord and Tenant. In no event shall Tenant be obligated to pay more for Charges than as agreed to under this Lease, or to pay for any other expense or item which Tenant has not agreed to pay for pursuant to the terms of this Lease. Landlord agrees that any payments required be made under the MOR, or Charges in excess of what Tenant as agreed to pay under the Lease, are to be made by Landlord without reimbursement from Tenant. Landlord agrees to indemnify, defend and hold harmless Tenant from any and all demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation reasonable attorney fees and court costs) arising out of any violation by Tenant of the MOR to the extent it conflicts with the Lease as stated above and/or results in (i) Charges to Tenant that are more than as agreed to under this Lease or (ii) other expenses or items which Tenant has not agreed to pay for pursuant to the Lease. Landlord further agrees that it will, at all times and upon request of Tenant, use commercially reasonable efforts to enforce the maintenance obligations and casualty obligations of other owners under the MOR, and Landlord agrees not to consent to any uses prohibited by the MOR or this Lease in the Shopping Center.

**6.    <u>ALTERATIONS</u>:**

Tenant shall have the right to make interior, non-structural changes, additions, and alterations inside the Demised Premises without consent from Landlord, provided that such work shall not affect the exterior or structural parts of the building of which they are a part; that such are done in good and workmanlike manner; that permits therefor from all public authorities, as required, are obtained and paid for; that all cost and expense arising from such undertaking as well as all damages occasioned in connection therewith shall be paid by Tenant; that all such changes shall at the end of this Term remain the property of Landlord, unless Landlord otherwise agrees in writing, and that Tenant shall promptly remove any mechanic's lien placed on the Demised Premises resulting therefrom.

7. **MAINTENANCE, REPAIRS AND INITIAL BUILD OUT:**

Tenant agrees to make, at Tenant's sole cost and expense, all repairs (including replacements as required in Tenant's reasonable judgment) necessary to keep the interior portions of the Demised Premises in good order, repair and operation, except those which the Landlord is required to make pursuant to this Section 7 or Sections 13 and 20 of this Lease. The interior portions of the Demised Premises shall include (without limitation) each of the following: (i) interior faces of the exterior walls, (ii) ceilings, (iii) floor coverings, (iv) non structural portions of the storefront including doors, windows, window frames and plate glass, (v) heating, ventilating and air conditioning system (HVAC) exclusively serving the Demised Premises and (vi) the electrical, plumbing, sprinkler and other mechanical systems and equipment exclusively serving the Demised Premises, but only to the extent such electrical, plumbing, sprinkler and mechanical systems and equipment are located inside the interior surface of the exterior or demising walls of the Demised Premises and not located within the floor slab of the Demised Premises (except to the extent Tenant installs any electrical, plumbing, sprinkler and mechanical systems and equipment at the Demised Premises, in which event Tenant shall be responsible, at Tenant's sole cost and expense, for keeping same in good order, repair and operation, regardless of the location).

Landlord agrees, at Landlord's sole cost and expense, to make all repairs and replacements necessary to keep the exterior and structural portions of the Demised Premises in good order, repair and operation except those repairs and replacements the Tenant is required to make pursuant to this Section 7. The exterior and structural portions of the Demised Premises shall include (without limitation) each of the following: (i) exterior walls of the Demised Premises and exterior faces thereof, (ii) the roof, (iii) gutters, downspouts and roof drainage system; (iv) foundations and floor slabs; (v) all structural members of the building of which the Demised Premises is a part; (vi) canopy (if any), (vii) marquee lights or rear or side floodlights, (viii) electrical, plumbing, sprinkler and other mechanical systems and equipment (whether or not exclusively serving the Demised Premises) located outside the interior surface of the exterior or demising walls and/or within the floor slab of the Demised Premises (except to the extent Tenant installs any electrical, plumbing, sprinkler and mechanical systems and equipment at the Demised Premises, in which event Tenant shall be responsible, at Tenant's sole cost and expense, for keeping same in good order, repair and operation, regardless of the location).

Notwithstanding the foregoing, Landlord hereby expressly warrants to Tenant that all items constituting Landlord's Work (as provided on Exhibit "C") and required to be kept by Tenant in good order/repair, maintenance, and operation including, without limitation, all fire alarm and fire suppression systems as may be required by applicable law, will be in place at the Demised Premises and will be in good operating condition, as of the Tenant Possession Date. Tenant shall notify Landlord of any defects within ninety (90) days after the date Tenant opens for business by providing Landlord with written notice of such items not in operating condition. Landlord shall, within thirty (30) days from such notice, put such inoperative items listed on the punch list in operating condition, and, thereupon, Landlord's obligation under this warranty shall terminate. If Landlord fails to perform such work within such thirty (30) day period, Tenant shall have the right to perform such work and charge the Landlord the reasonable cost thereof. Should Landlord refuse to reimburse Tenant for such costs within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost from the next installment of Rent until such amount is recaptured in full.

If Landlord fails to commence and diligently complete the making of any repairs within thirty (30) days after receipt from Tenant of written notice of the need for such repairs (or such additional time to complete such repairs as is reasonably necessary if such repairs reasonably require more than thirty (30) days, provided Landlord has commenced and is diligently pursuing same to completion), Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof. If the repair is necessary to end, mitigate, or avert an emergency and if Landlord, after receiving confirmation from Tenant of such necessity, fails to commence repair as soon as reasonably possible, Tenant may do so at Landlord's cost, without waiting thirty (30) days. Should Tenant perform repairs pursuant to this grammatical paragraph, Landlord shall and does hereby indemnify, defend and hold harmless Tenant for costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation reasonable attorney fees and court costs), warranties and obligations arising out of or in any way connected with such repair work; provided, however, that this indemnification shall not apply to injury, damage or death caused by the negligence of Tenant or Tenant's authorized representatives. In performing any such repairs pursuant to this grammatical paragraph, Tenant shall use reputable contractors and perform all such repairs in a first class and workmanlike manner. Should Landlord fail or refuse to reimburse Tenant the reasonable cost of any such repair work within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost from the next Rent payment(s) owing until such amount is recaptured in full.

Any reservation of a right by Landlord or Tenant to enter upon the Demised Premises and to make or perform any repairs, alterations, or other work, in, to, or about the Demised Premises which, in the first instance, is the other party's obligation pursuant to the Lease, shall not be deemed to: (i) impose any obligation on Landlord or Tenant to do so; (ii) render Landlord or Tenant liable to the other party or any third party for failure to do so; or (iii) relieve Landlord or Tenant from any obligation to indemnify the other party as otherwise provided elsewhere in the Lease.

## 8.  SIGNS:

Tenant, at its sole cost and expense, shall have the right to place, suffer or erect signs, awnings, canopies or decorations on the exterior walls of the Demised Premises; provided Tenant obtains Landlord's prior written approval for such signs, awnings, canopies or decorations, which approval shall not be unreasonably withheld, conditioned or delayed, except for typical signage used by Big Lots stores in the state where the Demised Premises is located as depicted in Exhibit D and approved by Landlord prior to or simultaneously with its execution of this Lease.   Tenant agrees to maintain such sign(s) in good condition and repair, save and defend Landlord free of all cost, expense, loss, or damage which may result from the erection, maintenance, and existence of the same. Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to utilize its standard window signs, its pre-opening signs, building signs, and pylon sign panels as are used in a majority of Tenant's stores in the State where the Demised Premises is located.  Landlord covenants and warrants that it has approved Tenant's Sign Specifications attached hereto as part of Exhibit D prior to or simultaneously with its execution of this Lease.

Landlord shall ensure that Shopping Center pylons and/or monument signs ( collectively "Pylon") (i) are fit for Tenant's intended use including, without limitation, are properly wired, maintained and constructed; and (ii) conform to all requirements of any authorities having jurisdiction.

Landlord agrees that Tenant shall have the right to install and maintain its sign panels on the existing Pylons on the space as indicated on Exhibit D-1 attached hereto.  Landlord grants Tenant a right of first refusal, subject only to the rights currently granted to existing tenants in the Shopping Center, to occupy a proportionately sized panel, within a one-half (1/2) portion, on any Pylon at the Shopping Center which is subsequently constructed during the Term of this Lease.  Landlord shall notify Tenant in writing of such availability, and Tenant shall have thirty (30) days to accept the available Pylon space.  Tenant shall, at its own expense, obtain the necessary permits and comply with

18

applicable local codes and ordinances for Tenant's signs. Once Tenant's sign panels and/or Tenant's Pylon sign are installed, Tenant shall not be required to remove, replace, change, or alter such signs and Landlord shall not remove, replace or diminish the size of Tenant's signs, nor charge Tenant a separate fee to be on said Pylon sign(s).

During the Original Term, Option Terms or extensions of this Lease, Landlord shall not install any structure, sign or landscaping within the No Change Area or take any other action within the No Change Area which will materially obstruct or interfere with the visibility or legibility of Tenant's signs.

## 9.   FIXTURES:

Tenant agrees to furnish and install, at Tenant's expense, all trade fixtures or equipment required by Tenant.  At the end of the Term, Tenant shall remove all removable trade fixtures or equipment, but shall repair any damage to the Demised Premises caused by or resulting from such removal, reasonable wear and tear excepted, and shall deliver the Demised Premises to Landlord in broom clean condition.  Should Tenant have installed lighting fixtures, and/or HVAC equipment, the parties agree that they are not trade fixtures or equipment and they may not be removed since they became the property of the Landlord when affixed.  For the benefit of Tenant's employees and customers, Tenant shall be entitled to place vending machines and equipment (including, but not limited to public telephones and stamp machines) in the Demised Premises and adjacent areas thereto.  Tenant shall be responsible for maintaining said machines and equipment in good condition and shall indemnify Landlord for any liability arising from the use of said machines and equipment.

## 10.   GOVERNMENTAL REGULATIONS:

As of the Tenant Possession Date, Landlord agrees the Demised Premises shall conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord shall promptly cause it to conform at all times unless such is necessitated by changes, alterations or additions made by Tenant.  Landlord shall provide Tenant with a complete set of "as built" drawings in the event they are required by local, state or federal code, or otherwise required pursuant to this Lease.  Landlord agrees to make all repairs, alterations, additions, or replacements to the Demised Premises required by any law, statute, ordinance, order or regulation of any governmental authority; to keep the Demised Premises equipped with all fire and safety appliances, devices, equipment and applications so required, including, but not limited to, smoke and fire alarms, sprinkler system and ; to procure any licenses and permits required; and to comply with the orders and regulations of all governmental authorities, including all requirements as set forth in the Americans with Disabilities Act, as provided hereinbelow.

Notwithstanding any term or provision to the contrary contained in this Lease, the obligations of Landlord and Tenant with respect to changes in laws and ordinances, including but not limited changes to Title III of the Americans with Disabilities Act (collectively, the "Law"), as the same may be amended from time to time, shall be governed by this Section 10.  From and after the Tenant Possession Date, Tenant shall be responsible for ensuring that the interior of the Demised Premises are in compliance with the Law at all times, and Tenant shall make, at Tenant's cost and expense, any and all alterations and additions to the interior of the Demised Premises (including any entrance and exit doors of the Demised Premises) that may be necessary from time to time to keep or bring the Demised Premises into compliance with the Law.  Tenant shall indemnify and hold Landlord harmless from all claims, suits, actions, damages and liability (including costs and expenses of defending against the aforesaid) arising from Tenant's failure to discharge its responsibilities under this Section 10.  From and after the Tenant Possession Date, Landlord shall be responsible for ensuring that the Common Area of the Shopping Center and the exterior and structural portions of the Demised Premises are in compliance with the Law at all times, and Landlord shall make, at Landlord's cost and expense, all alterations and additions to (a) the Common Area (both structural and non-structural) and (b) the exterior of the Demised Premises (but limited to the structural items for which Landlord has maintenance responsibilities under the Lease) that may be necessary from time to time to keep or bring the Common Area and the Demised

Premises into compliance with the Law. Landlord shall indemnify and hold Tenant harmless from all claims, suits, actions, damages and liability (including costs and expenses of defending against the aforesaid) arising from Landlord's failure to discharge its responsibilities under this Section 10.

**11.    INDEMNIFICATION:**

Tenant, its successors and assigns, agrees to indemnify, defend and hold harmless Landlord from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises caused by the negligent acts or omissions to act or willful misconduct of Tenant or Tenant's employees, contractors and agents, or by the failure of Tenant, or Tenant's employees, assignees, sublessees, contractors and agents to fulfill Tenant's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Tenant and Landlord or Tenant and a third party unrelated to Tenant, except Tenant's assignees, sublessees, contractors, agents or employees, Tenant's duty to indemnify, defend and hold harmless Landlord shall be in proportion to Tenant's allocable share of the joint negligence or willful misconduct. Landlord, its successors and assigns, agrees to indemnify, defend and hold harmless Tenant from any liability for injury to, or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises and Common Areas caused by defects therein, the negligent acts or omissions to act or willful misconduct of Landlord, or Landlord's employees, contractors and agents, or by the failure of Landlord, or Landlord's employees, contractors and agents, to fulfill Landlord's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Landlord and Tenant or Landlord and a third party unrelated to Landlord, except Landlord's agents or employees, Landlord's duty to indemnify, defend and hold harmless Tenant shall be in proportion to Landlord's allocable share of the joint negligence or willful misconduct.

Landlord and Tenant agree to notify their respective insurance carriers of the indemnity and hold harmless agreement contained in this Section.

The provisions of this Section 11 shall survive termination of this Lease.

**12.    INSURANCE:**

A.    <u>Tenant</u>: Tenant agrees to carry at its own expense, throughout this Lease, commercial general liability insurance covering the Demised Premises and Tenant's use thereof which insurance shall include coverage for bodily injury and death and property damage, and shall include Landlord (and any of its affiliates, subsidiaries, successors and assigns designated by Landlord) as an additional insured, with minimums limits of the following:    One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and to deposit said certificate of insurance with Landlord prior to the Tenant Possession Date.

Tenant shall have the option to self-insure for all plate glass, inventory, equipment, fixtures and improvements.

B.    <u>Landlord</u>: Landlord shall at all times carry insurance covering all improvements located in the Shopping Center, including the Demised Premises, except for Tenant's trade fixtures, furnishings and inventory against perils normally covered under special form "All Risk" insurance, including the perils of earthquake and flood, in an amount not less than eighty percent (80%) of the full replacement value of all the improvements located in the Shopping Center, including the Demised Premises and shall name Tenant as an additional insured as its interest may appear. Landlord shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Landlord shall at all times carry commercial general liability insurance covering the Common Areas, which insurance shall include Tenant as an

20

additional insured, with minimum limits of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.   Notwithstanding anything contained in this Lease to the contrary, Landlord shall be solely responsible for any and all deductibles and/or self-insured retentions.

Insurance carried by Landlord or Tenant may be carried under blanket insurance policies covering other properties so long as the limits of liability are not thereby reduced

In addition to the payment of Fixed Minimum Rent, Tenant shall, after the Rent Commencement Date, on an annual basis, pay Tenant's pro rata share of the premiums paid by Landlord for maintaining the commercial general liability insurance (but not umbrella or excess insurance) and casualty insurance policies referred to herein, for the Term hereof (the "Insurance Costs").  Upon Landlord's payment of its Insurance Costs, Landlord shall furnish Tenant with an invoice for Tenant's pro rata share thereof, as well as copies of such insurance premium bills, evidence that such have been paid by the Landlord, the type of insurance plan used and any other documentation reasonably requested by Tenant regarding the method of computing said premium and Insurance Costs, such documents herein referred to in the aggregate as ("Insurance Documentation").  Within thirty (30) days of Tenant's receipt of the required Insurance Documentation, Tenant shall pay Landlord, Tenant's pro rata share of the Insurance Costs paid by Landlord. Tenant's pro rata share of such Insurance Costs shall be the product obtained by multiplying said Insurance Costs by a fraction, the numerator of which is the leasable ground floor area (in square feet) of the Demised Premises and the denominator of which is the gross leasable area (in square feet) of all buildings in the Shopping Center.  Landlord covenants that there shall be no duplication of costs between this Section and any other Section of this Lease.   Landlord represents that Landlord's premiums for the insurance required to be carried by Landlord pursuant to this Section 12.B is estimated to be approximately $0.35 per square foot per annum for the 2009 calendar year.

In the event Landlord (or any affiliate of Landlord) no longer owns the Shopping Center, if Tenant is able to secure an "All Risk Property" insurance policy or policies with the same coverages and with adequate limits, similar deductible levels, and equivalent AM Best financial ratings as the policy or policies carried by Landlord, as described above at a lower cost than that obtained by Landlord, Landlord may either elect to use the policy or policies secured by Tenant or credit to Tenant the difference in the premium cost between Landlord's policy and that premium quote secured by Tenant.

In the event that the premiums on policies required to be carried by Landlord pursuant to this section are increased due to the use or occupancy of another tenant in the Shopping Center, such increase shall be deducted from the calculation stated above in the determination of Tenant's pro rata share of such insurance.  Tenant shall not be responsible for any increase in the payments toward such insurance cost.

13.   **FIRE REBUILDING AND ALTERING:**

A.   If the Demised Premises, any permanent additions or leasehold improvements thereto, and/or any buildings or other improvements located within the Shopping Center shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other casualty during the Term hereof, Landlord shall repair and restore the same to a condition substantially similar to the condition existing immediately prior to such casualty, but in compliance with all regulations by authority having jurisdiction as of the date of restoration. During any period of repair or casualty, the Rent and Additional Rent herein provided for in this Lease shall abate entirely in case the whole premises are

untenantable or if Tenant determines in good faith it cannot economically and does not conduct business from the undamaged portion of the Demised Premises. In the event of a casualty which damages only a portion of the Demised Premises and Tenant continues to operate in the remaining portion of the Demised Premises, Rent and Additional Rent shall be reduced based on the square footage of the Demised Premises which is not used by Tenant. Said abatement or reduction shall cease when the Demised Premises, or said portion of the Demised Premises (as the case may be), are restored to tenantable condition.

B.      Notwithstanding that the Demised Premises may not be destroyed or damaged by fire or other risk, in the event that other buildings containing fifty percent (50%) or more of the ground floor building area (in square feet) of the Shopping Center shall be damaged or destroyed by fire or other risk, whether or not covered by Landlord's fire and extended coverage insurance, Landlord shall have the election to terminate this Lease (provided that Landlord also terminates the leases of all similarly situated tenants in the Shopping Center) or to continue this Lease in full force and effect, and Landlord will notify Tenant of Landlord's election within sixty (60) days after such other damage or destruction.

C.      In the event the Demised Premises or a substantial portion of the Shopping Center, because of such damage or destruction, are not repaired and restored to tenantable condition within two hundred seventy (270) days from the date of such casualty, Tenant may, at its option, terminate this Lease by giving sixty (60) days prior written notice to Landlord and thereupon Tenant shall be released from all future liability and obligations under this Lease; provided, however, such notice must be given, if at all, prior to the date Landlord completes the required repairs.

D.      If the Demised Premises are damaged or destroyed during the last year of the Original Term or any Option Terms or extensions of this Lease, to the extent of more than one-third (1/3) of the ground floor area thereof, Landlord or Tenant shall have the right to terminate this Lease by written notice to the other party given within sixty (60) days following such casualty.

E.      In any circumstances described above where Landlord is either obligated to repair and restore the Demised Premises, or where Landlord elects to repair and restore the Demised Premises, this Lease shall continue in full force and effect, and such repairs will be made by Landlord within a reasonable time thereafter, subject to delays caused by Force Majeure.

**14.    FORCE MAJEURE:**

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or thing, Landlord or Tenant shall not be liable or responsible for any delays due to strikes, riots, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of Landlord or Tenant (financial inability excepted), and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed (all of the aforesaid causes for delay being herein sometimes referred to as "Force Majeure"). This provision shall not apply to a delay in the initial delivery of possession of the Demised Premises except to the extent such a delay is caused by strikes (which are beyond the reasonable control of Landlord), fire or other casualty, acts of God, riots or war.

**15.    INJUNCTION:**

In addition to all other remedies, Tenant or Landlord is entitled to obtain a restraining order and/or injunction against all violations, actual, attempted or threatened of any covenant, condition, or provision of this Lease.

**16.    WARRANTY OF TITLE BY LANDLORD; REPRESENTATIONS:**

Landlord hereby warrants, represents, and covenants to Tenant that as of the date hereof to Landlord's knowledge:  (a) at the time of the execution by Landlord of this Lease,

22

Landlord is the sole owner in fee simple and absolute of the Demised Premises; (b) at the time of the execution by Landlord of this Lease, Landlord has good and marketable fee simple title to the Demised Premises free and clear of all liens and encumbrances except taxes not yet due and payable and other exceptions of title which have been approved in writing by Tenant; (c) Landlord does warrant and will defend the title of the Demised Premises, and will indemnify, defend and hold harmless Tenant against all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation reasonable attorney fees and court costs) which Tenant may suffer by reason of any lien, encumbrance, restriction or defect in the title or description of the Demised Premises not approved by Tenant; (d) Landlord has full right and power to execute this Lease and to lease the Demised Premises for the Term provided in this Lease; (e) the Demised Premises is properly zoned for Tenant's use and operation as set forth in this Lease, Landlord is not aware of any intent to change the current zoning, and construction of the Demised Premises complies with all local planning or zoning commission plans or orders; and (f) Landlord is not in default under any of the terms of any restriction, easement, covenant or agreement of record, and no notice has been received by Landlord or given by Landlord of any default under any restriction, easement, covenant or agreement of record that has not been cured, and there are no circumstances that with the passage of time or giving of notice would be a default by Landlord under any restriction, easement, covenant or agreement of record.

In case Landlord does not have the title and rights, or breaches the aforesaid representations, as provided in the first grammatical paragraph of this Section 16, and Tenant is dispossessed of the Demised Premises and provided Tenant shall have given written notice of same to Landlord, then to the extent Tenant cannot and does not conduct its business at the Demised Premises due to such dispossession, Rent and Additional Rent shall abate for each day that Tenant cannot and does not conduct business at the Demised Premises due to same. Tenant's abatement of Rent and Additional Rent shall continue until the earlier of: (i) the earlier of (a) the date upon which such violation is cured or (b) the date upon which Tenant conducts business at the Demised Premises; or (ii) the date which is six (6) full calendar months following the first month in which such abatement commenced. Within thirty (30) days after the expiration of such six (6) month period, Tenant shall elect either: (a) to terminate this Lease effective upon thirty (30) days notice to Landlord; or (b) to keep this Lease in effect and resume payment of full Rent and Additional Rent notwithstanding such violation. Time is of the essence with respect to the exercise of this option. In the event Tenant fails timely to give notice of termination, Tenant shall be deemed to have elected to resume payment of full Rent and Additional Rent and all rights under this second grammatical paragraph of this Section 16 shall be rendered null and void regardless of the breach of the aforesaid representations. Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation reasonable attorney fees and court costs) in any dispute made by any party claiming that Landlord does not have full right and power to execute this Lease, or arising out of a breach of the above representations, in the event Tenant is dispossessed of the Demised Premises.

Landlord covenants that Landlord shall not amend, modify or terminate any restriction, covenant or agreement of record, nor enter into any new or other restriction, covenant or agreement of record affecting the Shopping Center, nor permit any other entity to do so, without obtaining the prior written consent of Tenant, if said amendment, modification, termination or new agreement limits Tenant's rights or expands Tenant's obligations as set forth under this Lease. Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation reasonable attorney fees and court costs) in any dispute made by any party arising out of a breach of the above covenant.

17. **QUIET ENJOYMENT:**

Provided that Tenant is not in default under this Lease beyond applicable notice and cure periods, Landlord hereby covenants, warrants, and agrees that Tenant's use and enjoyment of the Demised Premises will not be disturbed during the Original Term of this Lease and any Option Terms or extensions. Tenant's covenant to pay Rent and

23

Additional Rent and Landlord's covenant of quiet enjoyment shall be dependent covenants.

18.   **MORTGAGE AND ESTOPPEL CERTIFICATES:**

Tenant accepts this Lease subject and subordinate to any recorded mortgage lien presently existing or hereafter created upon the Demised Premises or Shopping Center; provided, that as a condition to such subordination, Tenant and the holder of any mortgage lien shall enter into a mutually satisfactory subordination, non-disturbance, and attornment agreement which shall include a covenant by the mortgagee not to disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods.  Landlord shall not be required to incur any cost or expense in connection with the obtaining of such agreement other than normal mail costs, and Landlord shall have no liability to Tenant arising out of the refusal of Landlord's mortgagee to execute any such agreement. If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any first mortgage on the Demised Premises, Tenant shall be bound to the transferee, under the terms, covenants and conditions of this Lease for the balance of the Term remaining, including any options or extensions, with the same force and effect as if the transferee were Landlord under this Lease, and Tenant agrees to attorn to the transferee, including the first mortgagee under any such mortgage if it be the transferee, as its Landlord.

Upon request in writing from Landlord, Tenant agrees to execute, acknowledge, and deliver to Landlord, or to the holder of the mortgage lien on the Demised Premises, a certificate stating the following facts; provided that such facts are true and ascertainable: (i) this Lease constitutes the entire agreement between Landlord and Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect), and is in full force and effect; (ii) the dates to which the Rent, Common Area Charges and Additional Rent hereunder have been paid; (iii) the Tenant is occupying the Demised Premises; (iv) Tenant knows of no default under the Lease by the Landlord (or if there is a default, specifying the nature of such default) and there is no offset which Tenant has against Landlord; and (v) such other information as may be reasonably requested.

19.   **DEFAULT:**

A.      If Tenant shall be adjudicated a bankrupt, or if a trustee or receiver of Tenant's property be appointed, or if Tenant shall make an assignment for the benefit of creditors, or if default shall at any time be made by Tenant in the payment of the Rent reserved herein, or any installment thereof for more than ten(10) days after receipt by Tenant of written notice of such default from the Landlord or if there shall be default in the performance of any other covenant, agreement, condition, rule or regulation herein contained or hereafter established on the part of the Tenant for thirty (30) days after receipt by Tenant of written notice of such default from the Landlord (provided that if the default is of such a nature that it cannot reasonably be cured within thirty (30) days, Tenant shall be permitted such additional time to cure the default as is reasonably necessary, provided Tenant shall have commenced to cure such default during such thirty (30) day period and diligently complete same), this Lease, if the Landlord so elects, shall thereupon become null and void, and the Landlord shall have the right to reenter or repossess the Demised Premises, either by force, summary proceedings, surrender or otherwise, and dispossess and remove therefrom the Tenant or other occupants thereof and their effects, without being liable to any prosecution therefor. Neither bankruptcy, insolvency, an assignment for the benefit of creditors, nor the appointment of a receiver shall affect this Lease or permit its termination so long as the covenants on the part of the Tenant to be performed shall be performed by Tenant or some party claiming under Tenant.  In such case, the Landlord may, as its option, relet the Demised Premises or any part thereof, as the agent of the Tenant, and the Tenant shall pay the Landlord the amount by which the rent reserved herein for the balance of the Term shall exceed the reasonable Rent value of the Demised Premises for the same period as the same becomes due.  In

24

no event shall Landlord be entitled to accelerate any amount due under this Lease following a default by Tenant. Rather, such amount shall remain payable monthly as they would have come due under this Lease. Landlord shall be obligated to mitigate its damages by using commercially reasonable efforts to find a replacement tenant to lease the Demised Premises. All rights and remedies of Landlord herein created, or remedies otherwise existing at law or in equity are cumulative, and the exercise of one or more rights or remedies shall not preclude or waive the right of the Landlord to exercise any other remedy available to it under this Lease, at law, or in equity. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Landlord shall deem desirable.

B.    If Landlord shall fail to pay any taxes, assessments, insurance premiums, mortgage interest or amortization or any other charges accruing against the Demised Premises, or the Shopping Center of which the Demised Premises may be a part, or fail to perform any of the conditions or covenants hereof on its part to be performed, Tenant may give written notice of such default to Landlord and if Landlord shall not within thirty (30) days thereafter cure such default (or if the default cannot be cured within thirty (30) days, if Landlord shall not within such period commence such cure and thereafter diligently complete the same), then Tenant shall have the right, at its option, to cure such default and the amount expended by it therefor, may be deducted by Tenant from Rent thereafter to become due until such amount is recaptured in full. Tenant shall, upon request, submit to Landlord receipted bills showing payment of all the aforesaid items. It is further provided, however, that in the event of urgent situations which shall include, but not be limited to, defects and failures in the sprinkler systems, the Tenant shall promptly notify the Landlord, or its duly appointed agent, orally or by facsimile, and upon the failure of the Landlord to promptly correct, or take necessary steps to correct such urgency then Tenant shall have the right to correct the same and be reimbursed as hereinabove provided. In the event the Demised Premises shall be rendered untenantable by reason of Landlord's failure to perform any obligation described herein following any applicable notice and cure periods as provided under the terms of this Lease, including without limitation Landlord's failure to make repair, all Rent and Additional Rent due hereunder shall wholly abate until Landlord shall have satisfactorily performed such obligation; in addition, Tenant shall have the right to perform such obligations at the expense of Landlord as hereinabove provided. All rights and remedies of Tenant herein created, or remedies otherwise existing at law or in equity are cumulative, and the exercise of one or more rights or remedies shall not preclude or waive the right of the Tenant to exercise any other remedy available to it under this Lease, at law, or in equity. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable.

20.   **CONDEMNATION:**

A.   If the whole of the Demised Premises or the Shopping Center is acquired or condemned by, or transferred by any authority having the power of eminent domain, then and in that event, the Term shall cease and terminate, and the date of such termination shall be, at Landlord's election, either the date upon which possession shall be tendered to such authority by Landlord or the date upon which possession is taken by such authority.

B.   If a portion of the Demised Premises is acquired or condemned by, or transferred by any authority having the power of eminent domain and Tenant, in Tenant's reasonable business judgment, determines that the portion of the Demised Premises remaining after the taking will be insufficient to continue Tenant's business at substantially the same scope as existed prior to the taking, then Tenant may terminate this Lease by notice to Landlord effective as of the date possession of the Demised Premises is transferred to the condemning authority.

C.   Whether or not any portion of the Demised Premises may be taken by such authority, Landlord may nevertheless elect to terminate this Lease or to continue this Lease in effect

25

in the event any portion of any building in the Shopping Center or more than fifty percent (50%) of the Common Area of the Shopping Center be taken by such authority.

D. In the event a taking occurs and this Lease is not terminated as provided above, then Landlord will promptly restore, at Landlord's sole cost and expense, the Demised Premises, if applicable, affected by the taking to a condition substantially comparable to their condition immediately preceding the taking, less the portion lost in the taking. In such event, this Lease will continue in full force and effect, except that from and after the taking (a) Fixed Minimum Rent will be reduced in proportion to the reduction, if any, in the square footage of gross leaseable area in the Demised Premises as a result of the taking, and (b) Common Area Charges, Real Estate Taxes and Insurance will be adjusted to reflect the change in size, if any, of the Demised Premises, the Shopping Center and the improvements on the Shopping Center as a result of the taking.

E. All sums awarded or agreed upon between Landlord and the condemning authority for the taking of the fee or the leasehold estate, whether as damages or as compensation, shall be the property of Landlord. Tenant hereby assigns to Landlord all proceeds, whether by way of compensation or damages, for loss of the leasehold interest by reason of such taking. Any amounts specifically awarded or agreed upon by Tenant and the condemning authority for the taking of Tenant's removable trade fixtures and the unamortized cost of Tenant's leasehold improvements based upon straight line depreciation and a five (5) year amortization period shall be the property of Tenant. Further, Tenant shall have the right to pursue in Tenant's own name any separate remedy Tenant may have against the condemning authority for relocation expenses, loss of business, or other non-real estate related awards; provided, however, that Landlord shall not be liable to Tenant for any such amounts in connection with such takings and no amount shall decrease the amount of the award otherwise due Landlord for the taking of the fee simple interest in the Shopping Center. Landlord shall not be liable to Tenant for any such amounts in connection with such taking.

21. **MUTUAL WAIVER OF SUBROGATION:**

Notwithstanding anything to the contrary contained in this Lease, Landlord and Tenant hereby release the other from any and all liability or responsibility to the other or anyone claiming through or under them by way of subrogation or otherwise for any loss or damage to property covered by insurance then in force, even if such loss is by fire or other casualty caused by the fault or negligence of the other party or anyone for whom such party may be responsible. Landlord and Tenant further agree, if necessary, to obtain applicable endorsements for said insurance policies required to effect the waiver of subrogation set forth herein.

Landlord and Tenant each shall indemnify, defend and hold harmless the other against any loss or expense resulting from failure to obtain such insurance subrogation waivers.

The provisions of this Section 21 will survive termination of this Lease.

22. **ASSIGNMENT AND SUBLETTING:**

Tenant shall have the right at any time to sublet the Demised Premises or any part thereof or to assign this Lease without Landlord's consent; provided, that no such subletting or assignment shall relieve Tenant of any of its obligations hereunder. Each sublease or assignment shall be subject and subordinate to the rights of Landlord under this Lease and to any renewal, amendment or modification thereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof. Any subletting or assignment shall not violate existing use restrictions and Prohibited Uses or violate any exclusive use granted to any existing tenant of the Shopping Center, provided said other tenant is not a Competing Business, and Landlord agrees to provide Tenant with copies of all tenant exclusives and restrictions at the Shopping Center within thirty (30) days after written request of Tenant. If Landlord fails to provide said exclusives and restrictions within said thirty (30) days, Tenant may proceed with said assignment or subletting regardless of any exclusives and restrictions granted to other tenants of the Shopping Center, subject to the terms of this

26

Lease and the Prohibited Uses, the ECR and the exclusives and restrictions described on Exhibit F.

In the event Tenant desires to assign or sublet all or a portion of the Demised Premises, Tenant shall notify Landlord at least 30 days in advance of its intent to assign or sublet ("Notice"). Upon receipt of the Notice, Landlord shall have the right to terminate this Lease by written notice to Tenant ("Termination Notice"), which said Termination Notice must be received by Tenant within sixty (60) days after Landlord's receipt of the Notice ("Recapture Right"). If Tenant does not receive the Termination Notice within sixty (60) days after Landlord's receipt of the Notice, Landlord's Recapture Right shall be deemed irrevocably waived, and otherwise null and void, with respect to the particular assignment or subletting that is the subject of the Notice, and Tenant shall be permitted to proceed with said assignment or subletting (but shall be under no obligation to do so). If Landlord timely exercises its Recapture Right, such termination shall be effective ninety (90) days after Tenant's receipt of the Termination Notice ("Termination Date"), and from and after such Termination Date, neither party shall have any further liability or obligation to the other under this Lease, except as otherwise expressly provided herein. Landlord shall have no Recapture Right with respect to a Related Party Assignment (defined below), and Tenant shall not be required to give Landlord Notice of a Related Party Assignment. Tenant may license or permit a portion or portions of the Demised Premises to be used for concessions, leased or licensed in connection with or as part of the operation of Tenant, and Landlord shall have no Recapture Right with respect to same, nor shall Tenant be required to provide Landlord Notice of same.

Notwithstanding anything contained in this Lease to the contrary, Tenant may assign this Lease or sublet the Demised Premises without notice to Landlord so long as such assignment or subletting is to a parent, subsidiary or other affiliate of Tenant, or is in connection with a merger or consolidation of the same or, is in connection with the sale of all or substantially all of the assets, stock, or an operating division of Tenant (collectively "Related Party Assignment"). The parties agree that the transfer, assignment or hypothecation of any stock or interest of Tenant shall not be deemed an assignment or transfer of this Lease or Tenant's interest in and to the Demised Premises within the meaning and provisions of this Section so long as the common stock of either Tenant or Tenant's parent is traded in the over-the-counter market or is listed on a national stock exchange. In no event shall Tenant be permitted to use a series of one or more Related Party Assignments to "spin-off" this Lease to independent third parties. As an example of the foregoing, Tenant shall not assign this Lease to an affiliate corporation whose assets consist solely of this Lease and the rights granted herein and thereafter sell the stock of such affiliate corporation to an independent third party. The result of what would otherwise be two (2) independent permitted transactions would become a transfer of this Lease to an independent third party in violation of this third grammatical paragraph of this Section 22.

23.  **SURRENDER AND HOLDOVER:**

When the tenancy herein created terminates, Tenant agrees to surrender the Demised Premises to Landlord in broom clean condition, ordinary wear and tear and damage by fire and other casualty excepted. Tenant agrees to remove all of its trade fixtures with the exception of lighting fixtures and HVAC equipment whether or not attached to the Demised Premises.

If Tenant shall remain in possession of the Demised Premises after expiration of the Original Term or any Option Term, Tenant shall be deemed to be occupying the Demised Premises as a tenant from month-to-month, subject to all the covenants and obligations of this Lease, except that as liquidated damages by reason of such holding over, the monthly amounts payable by Tenant under this Lease shall be increased to one hundred twenty-five percent (125%) of the monthly amounts payable in the last month of the Term. Such month-to-month tenancy may be terminated by either party upon thirty (30) days notice to the other. Any rent due after notice has been given is to be calculated according to this Section prorated for any partial month of holdover. If Tenant tenders rent pursuant to the formula in this Section, and Landlord accepts such payment, the acceptance of such

payment will not operate as a waiver by Landlord of the notice of termination, unless such waiver is in writing and signed by Landlord.

### 24. NOTICES:

Whenever any demand, request, approval, consent or notice ("notice") shall or may be given by one party to the other, notice shall be addressed to the parties at their respective addresses as specified in the opening paragraph of this Lease and delivered by (i) a nationally recognized overnight express courier, or (ii) registered or certified mail return receipt requested, or (iii) via facsimile, provided a copy of said notice is sent in accordance with (i) or (ii), within two (2) business days following facsimile transmission. For purposes of the calculation of various time periods referred to herein, notice delivered by nationally recognized overnight express courier shall be deemed received when delivered to the recipient's notice address and notice delivered by certified mail shall be deemed received when delivered to the recipient's notice address upon the earlier to occur of: (a) actual receipt as indicated on the signed return receipt; (b) the date of first attempted delivery; or (c) three (3) days after posting as herein provided. Any written notice actually received by the addressee, shall constitute sufficient notice for all purposes under this Lease regardless of the delivery method. Either party may, at any time, change its notice address by giving the other party notice, in accordance with the above, stating the change and setting forth the new address.

### 25. LEGALITY:

Should any one or more of the clauses of this Lease be declared void or in violation of the law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest extent of the law. The terms of this Lease shall be interpreted under the substantive laws of the State where the Demised Premises is located, without regard to choice of law rules of that state.

Landlord represents it is an unincorporated trust organized under the Texas Real Estate Investment Trust Act, validly existing and in good standing under the laws of Texas. Tenant represents it is a corporation duly organized, validly existing and in good standing under the laws of California. Landlord and Tenant each represent and warrant to the other that the individual executing this Lease on their behalf are each duly authorized to so execute and deliver this Lease.

### 26. BINDING OBLIGATIONS:

This Lease and all rights and duties hereunder shall inure to the benefit of and shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors and assigns.

### 27. NO RECORDATION:

If requested by the Tenant, Landlord will execute a recordable memorandum of lease in form reasonably acceptable to Landlord. Tenant may record such memorandum at its expense. Tenant shall provide Landlord with a copy of such recorded memorandum of lease.

Neither party shall record this Lease.

### 28. REAL ESTATE BROKER'S COMMISSION:

Tenant and Landlord covenant and represent to each other that no parties are entitled to be paid a fee or commission in connection with the transaction contemplated by this Lease. If any individual or entity shall assert a claim to a finder's fee or commission as a broker or a finder, then the party who is alleged to have retained such individual or entity shall defend, indemnify and hold harmless the other party from and against any such claim and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon.

**29.    NO WAIVER, LACHES OR ACCORD AND SATISFACTION:**

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance of the same or of any other covenant or condition hereof. No payment by Tenant or receipt by Landlord of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or prejudice to Landlord's right to recover the balance of such Rent or pursue any remedy provided for in this Lease or available at law or in equity.

**30.    HAZARDOUS MATERIAL:**

Landlord represents and warrants that to Landlord's knowledge, the Demised Premises do not presently contain any Hazardous Materials which are above actionable levels and required to be remediated by applicable law.    "Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos, pcb, mold, fungus, bacteria, etc.) which, now or in the future, is determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety, or property and/or the use and/or disposal of which is regulated by any governmental authority. Upon discovery of any Hazardous Materials which are above actionable levels and required to be remediated by applicable law in, on, under or around the Demised Premises at any time during the Original Term of this Lease or any options or extensions thereof, which Hazardous Materials which are above actionable levels and required to be remediated by applicable law is determined to have been in existence on the Demised Premises prior to the Tenant Possession Date, or is determined to have been placed thereon by Landlord, Landlord's agents, contractors, or employees or a tenant or occupant of Landlord's, during the Original Term of this Lease or any options or extensions, Landlord shall promptly, at Landlord's sole cost and expense, remediate such Hazardous Material in compliance with all EPA, governmental laws and regulations, and Landlord shall indemnify, defend and hold harmless Tenant, except for the negligence or willful misconduct of Tenant, Tenant's agents, contractors or employees, with respect to all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation reasonable attorney fees and court costs) related to such Hazardous Materials.    If Landlord shall be required to remove any Hazardous Materials which are above actionable levels from the Demised Premises or perform work in the Demised Premises related to any such Hazardous Materials, and in the event Tenant is unable to conduct business during the removal process, all Rent and Additional Rent due under this Lease shall abate during the period of time necessary to complete such work.

Throughout the Original Term of this Lease or any Option Terms or extensions, Tenant shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials which are above actionable levels on, under, in, above, to, or from the Demised Premises other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders. Tenant shall indemnify Landlord, except for the negligence or willful misconduct of Landlord, Landlord's agents, contractors, or employees, with respect to all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation reasonable attorney fees and court costs) related to such Hazardous Materials, from any release of Hazardous Materials from the Demised Premises directly caused by Tenant while in possession, or elsewhere if caused by Tenant or persons acting under Tenant. The within covenants shall survive the expiration or earlier termination of the Term or any extensions thereof.

**31.    TITLES AND ENTIRE AGREEMENT:**

All marginal titles are for reference and convenience only and do not form a part of this Lease. This Lease and Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings

29

between Landlord and Tenant concerning the Demised Premises. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

## 32.    WAIVER OF CLAIMS:

Notwithstanding anything to the contrary contained herein, in the event there is (i) a year-end adjustment; (ii) an adjustment resulting from an error in the calculation of any Rent payable by Tenant under the Lease; (iii) any other sum payable to Landlord pursuant to the terms of this Lease, including without limitation, Tenant's pro rata share of Common Area Charges, Insurance charges, Real Estate Taxes or any charges to Tenant for electrical and heating and air conditioning service, which results in an amount owed by Tenant, Landlord shall notify Tenant of any amount owed within one (1) year after the expiration of the Lease Year in which such payments or adjustments are applicable. If Landlord does not notify Tenant of such amount owed within said one (1) year period, Landlord's claim to such amount owed shall be deemed waived and discharged.

## 33.    REASONABLE CONSENT:

Except as otherwise provided herein, if the consent, approval or permission of either party is required or desired by the other party hereunder, such party agrees that it shall not unreasonably or arbitrarily withhold or delay or condition such consent, approval or permission.

## 34.    CO-TENANCY:

So long as Tenant is opening and operating its business in the Demised Premises for the Permitted Use, then in the event Academy (its successors, assigns or replacements) should cease operation (other than for reason of an "Excused Discontinuance" as hereinafter defined), then the following shall apply:

(A)    In the event that within twelve (12) months from the date of closing of Academy ("Co-Tenancy Cure Period"), at least sixty percent (60%) of the total square feet of ground floor area occupied by Academy ("Academy Space") is leased to another retail type tenant and such tenant is open for business, then no rights shall accrue to Tenant hereunder.

(B)    If, however, at least sixty percent (60%) of the Academy Space is not re-leased prior to the expiration of the Co-Tenancy Cure Period, then commencing on the day immediately following the expiration of the Co-Tenancy Cure Period, as its exclusive remedy, shall have the right to pay, in lieu of the Fixed Minimum Rent stated in the Lease, an amount equal to fifty percent (50%) of the Fixed Minimum Rent otherwise payable under the terms of the Lease (hereinafter "Substitute Rent") until at least sixty percent (60%) of the Academy Space is leased to another retail type tenant and such tenant is open for business; provided, however, the payment of such Substitute Rent shall not continue in effect for longer than twelve (12) months, and after twelve (12) months of the payment of Substitute Rent, Tenant must elect to either (i) terminate this Lease upon ninety (90) days' prior written notice to Landlord, or (ii) keep this Lease in effect and to again commence payment of Fixed Minimum Rent and all Additional Rent at the rates provided in this Lease. Time is of the essence. If Tenant fails to give Landlord written notice of termination within sixty (60) days after expiration of the twelve (12) month Substitute Rent period, Tenant will be deemed to have elected to keep this Lease in effect and recommence the payment of Fixed Minimum Rent and all Additional Rent at the rates provided in the Lease. Nothing contained herein shall be deemed to reduce the amounts payable by Tenant as Additional Rent during any period that Tenant has the right to pay Substitute Rent.

In the event Tenant terminates this Lease as provided herein, Tenant shall vacate the Demised Premises and remove only its merchandise and removable trade fixtures and repair any damage caused thereby on or before the expiration of the aforesaid ninety (90) day period (the "Co-Tenancy Effective Date of Termination"). In no event may Tenant remove the leasehold improvements made to the Demised Premises, including, but not limited to, the HVAC system and lighting fixtures. Upon the Co-Tenancy Effective Date

of Termination, this Lease shall terminate and the parties shall have no further obligations to one another pursuant to the Lease except for obligations which accrued prior to said Co-Tenancy Effective Date of Termination.

(C)    The term "Excused Discontinuances" as used hereinabove shall mean:  (1) fire or other casualty damage to the space occupied by Academy or its contents; (2) acts of God, such as flood, hurricane, tornado, earthquake; (3) strikes, lockouts, boycotts, picketing, or the threat of any of the foregoing, or any other situation or circumstances of a like nature commonly referred to as "labor difficulties" or "labor trouble"; (4) riot, insurrection, war, civil disturbance, demonstrations, or the threat of any of the foregoing.

### 35.    NO PRESUMPTION AGAINST DRAFTER:

Landlord and Tenant understand, agree and acknowledge that:  (i) this Lease has been freely negotiated by both parties; and (ii) that, in any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or conditions there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

### 36.    SUBMISSION OF LEASE:

The submission by Tenant to Landlord of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Demised Premises, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Lease by facsimile machine, the signing party intends the copy of this authorized signature printed by the receiving facsimile machine to be its original signature.

### 37.    INTERLINEATION:

Whenever in this Lease any printed portion has been stricken, and initialed by both parties hereto, whether or not any relative provision has been added, this Lease shall be construed as if the material so stricken was never included herein and no inference shall be drawn from the material so stricken which would be inconsistent in any way with the construction or interpretation which would be appropriate if such material were never contained herein.

### 38.    TIME OF THE ESSENCE:

Time is of the essence of all conditions of this Lease in which time is an element.

### 39.    TENANT'S AUDIT RIGHTS:

If Tenant wishes to challenge the accuracy or validity of Real Estate Taxes, Common Area Charges, Insurance Costs, or any other sums or Additional Rent payable by Tenant to Landlord herein, or if Tenant is not satisfied with Landlord's written statement(s) with respect to Common Area Charges, Real Estate Taxes, Insurance Costs or any other Rent or Additional Rent charges payable pursuant to the terms of this Lease, or wishes to challenge the accuracy or validity of any items therein, it shall give Landlord notice of its dissatisfaction, and Tenant shall be entitled, upon thirty (30) days prior written notice to Landlord, to an audit of Landlord's books and records in accordance with generally accepted accounting principles to be made by Tenant's representatives, who shall not be compensated on a contingent fee basis.  Tenant's inspection of a particular calendar year shall be conducted, if at all, within twenty four (24) months after the end of the calendar year in question; and Tenant shall have the right to inspect the records for a particular calendar year only one time.  If such audit reveals any overpayment by Tenant, the amount of such overpayment shall be promptly refunded to Tenant.  If such audit shows that any statement rendered by Landlord is overstated by more than five percent (5%),

Landlord shall pay to Tenant, in addition to any overpayment, the reasonable costs of such audit (but in no event more than $1,500.00). If any amount payable hereunder is not paid by Landlord within thirty (30) days after invoice therefor, Tenant may offset the amount thereof against the next Rent payments due from Tenant to Landlord hereunder until recaptured in full. Any overpayments not refunded to Landlord or Tenant in full prior to the end of the then current Original Term or Option Term shall be refunded to such party in cash prior to the end of that Original Term or Option Term, regardless of whether Tenant remains in possession of the Demised Premises thereafter. Provided Tenant's audit request complies with the terms of this Section 39, if Landlord refuses to allow said audit, until such time as Landlord allows such audit, Tenant shall be obligated to pay Landlord only Fifty Percent (50%) of such Common Area Charges, Real Estate Taxes, Insurance Costs or Additional Rent charges payable pursuant to the terms of this Lease as Tenant paid Landlord for the immediately preceding Lease Year. Tenant shall keep confidential any information obtained as a result of such audit.

## 40. ATTORNEYS FEES:

In the event either Landlord or Tenant is required to enforce the provisions of this Lease, then the prevailing party shall be entitled to court costs and reasonable attorney's fees from the non-prevailing party. This provision applies to court costs and reasonable attorney's fees incurred in any trial and/or appellate courts, and which costs and fees shall be paid upon demand therefore. For purposes of this provision, "prevailing party" shall mean the party obtaining substantially all the relief sought on each and every issue upon which the suit is originally filed.

## 41. WAIVER OF JURY TRIAL:

The parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease.

## 42. REAL ESTATE INVESTMENT TRUST:

Weingarten Realty Investors (the "trust") is an unincorporated trust organized under the Texas Real Estate Investment Trust Act. Neither the shareholders of the trust, nor its trust managers, officers, employees or other agents are personally, corporately or individually liable for any debt, act, omission or obligation of the trust, and all persons having claims of any kind against the trust must look solely to the property of the trust for the enforcement of their rights.

## 43. PROHIBITED PERSONS:

To the best of Tenant's knowledge, Tenant is currently in compliance with, and covenants to Landlord that Tenant shall at all times during the Term (including any extension thereof) remain in compliance with, the regulations of the Office of Foreign Assets Control ("OFAC") of the U.S. Department of Treasury (including those named on OFAC's Specially Designated Nationals and Blocked Persons List) and any statute, executive order (including, but not limited to, Executive Order 13224, dated September 24, 2001 and entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism"), or other governmental, regulatory, or administrative action relating thereto.

## 44. INDEPENDENT COVENANTS:

The obligation of Tenant to pay all rent and other sums hereunder provided to be paid by Tenant and the obligation of Tenant to perform Tenant's other covenants and duties hereunder constitute independent, unconditional obligations to be performed at all times provided for hereunder, except as otherwise provided in this Lease.

**IN TESTIMONY WHEREOF**, the Landlord and Tenant have caused this Lease to be signed as of the respective acknowledgment dates set forth below:

Signed and acknowledged in the presence of:

Witnesses As To Landlord:       **LANDLORD:   WEINGARTEN REALTY INVESTORS**
                                **a Texas real estate investment trust**

By: _____

Title: _____
Mark D. Stout
Vice President /
Associate General Counsel

KMB
Legal
KMB

Witnesses As To Tenant:       **TENANT:     PNS STORES, INC., a California**
                              **corporation**

By: _____
Charles W. Haubiel II
Title: Senior Vice President – Legal & Real Estate, General
Counsel and Corporate Secretary

**Acknowledgements appear on immediately following page.**

**Landlord's Acknowledgement**

**STATE OF** *TEXAS*

**COUNTY OF** *HARRIS*

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, Weingarten Realty Investors by, Mark D. Stout its Vice President who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Houston, Texas this 4 day of September, 2009.



Terri Edwards
Notary Public

TERRI EDWARDS
Notary Public
STATE OF TEXAS
My Comm. Exp. 03-16-2013

**Tenant's Acknowledgement**

**STATE OF OHIO**

**COUNTY OF FRANKLIN**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **PNS Stores, Inc.**, by Charles W. Haubiel II, its Senior Vice President – Legal & Real Estate, General Counsel and Corporate Secretary who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Columbus, Ohio, this 1 day of September 2009.

Notary Public

KARLENE YAMAMOTO
Notary Public, State of Ohio
My Commission Expires 2/20/2012

34



STATE HIGHWAY LOOP 336

NORTH

INTERSTATE HIGHWAY 45

"Leased Premises"
Approx.: 31,502 sf
1404 Loop 336 West
Conroe, Texas 77304

■ Cart Area

☐ Drop/Storage Trailer

▨ No Change Area

▦ Restricted Area

▨ Unrestricted Area

SPACE 28

The "Leased Premises" as shown hereon is for    **PNS Stores, Inc.**

Subject to the terms of the Lease, any future construction by the Landlord within the Shopping Center will not affect the validity of the Lease covering the Leased Premises. Subject to the terms of the Lease, with the exception of the "No Change Area", Landlord may elect to change the location, size, layout, or other details of any buildings, or Common Area in the Shopping Center and/or to construct other buildings in the Shopping Center and such changes will not affect the validity of the Lease covering the Leased Premises.

The post office address designated hereon, if any, is subject to change at any time.

DATE: 04-06-2009
REV.: 08-03-2009

# EXHIBIT "A"
## MONTGOMERY PLAZA



| INITIAL | Floor No: |
|---|---|
| | A00 |
| | Unit No: |
| | A0A |
| PREPARED BY: | Project No: |
| EYA | 0165 |

# EXHIBIT A-1

## TENANT'S DRAWING OF DEMISED PREMISES



# EXHIBIT A- 1

## TENANT'S DRAWING OF DEMISED PREMISES



# EXHIBIT A-1

## TENANT'S DRAWING OF DEMISED PREMISES



# EXHIBIT A-1

## TENANT'S DRAWING OF DEMISED PREMISES



**EXHIBIT A- 1**

**TENANT'S DRAWING OF DEMISED PREMISES**



# EXHIBIT B

## LEGAL DESCRIPTION OF SHOPPING CENTER

Being a 20.906 acre (910,649 square foot) tract of land in the W.S. Allen Survey, Abstract No. 2, Conroe, Montgomery County, Texas, and being the remainder of Unrestricted Reserve "A", all of Unrestricted Reserves "C" and "D" of a plat of Montgomery Park Subdivision as recorded in Cabinet C, Sheet 152-B of the Montgomery County Map Records and said 20.906 acre tract being more particularly described by metes and bounds as follows with all bearings based on said plat:

BEGINNING at a 3/4 inch iron pipe found marking the northeast corner of said Unrestricted Reserve "A", the southeast corner of a called 19.596 acre tract of land conveyed to Conroe Church of Christ, Inc. as recorded in Montgomery County Clerk's File Number 8911900, and being on the west right-of-way line of Interstate Highway 45, variable width, and being the northeast corner of the herein described tract;

THENCE South 22 degrees 46 minutes 31 seconds East, along the west right-of-way line of said Interstate Highway 45, a distance of 39.72 feet to a point marking an angle point in the herein described, from which a found "X" in concrete bears North 50 degrees 07 minutes East, 0.19 feet;

THENCE South 18 degrees 33 minutes 07 seconds East, continuing along the west right-of-way line of said Interstate Highway 45, a distance of 700.00 feet to a 3/4 inch iron pipe found marking an angle point in the herein described tract;

THENCE South 14 degrees 50 minutes 50 seconds East, continuing along the west right-of-way line of said Interstate Highway 45, a distance of 201.00 feet to a 5/8 inch iron rod with cap set marking an angle point in the herein described tract;

THENCE South 11 degrees 28 minutes 44 seconds West (Called South 11 degrees 30 minutes 15 seconds West), continuing along the west right-of-way line or said Interstate Highway 45, a distance of 467.08 feet (Called 466.84 feet), to a 5/8 inch iron rod found marking the southeast corner of the herein described tract and being on the north right-of-way line of State Highway Loop 336, variable width;

THENCE South 70 degrees 54 minutes 09 seconds West, along the north right-of-way line of said State Highway Loop 336, a distance of 194.12 feet to a point marking an angle point in the herein described tract, from which a found "X" in concrete bears South 41 degrees 08 minutes East, 0.25 feet;

THENCE South 66 degrees 21 minutes 53 seconds West, continuing along the north right-of-way line of said State Highway Loop 336, a distance of 118.55 feet to a 5/8 inch iron rod found marking an angle point in the herein described tract;

THENCE South 72 degrees 23 minutes 55 seconds West, continuing along the north right-of-way line of said State Highway Loop 336, a distance of 260.10 feet to a 3/4 inch iron pipe found marking the southwest corner of the herein described tract and being the southeast corner of a tract of land conveyed to Wal-Mart Stores, Inc. as recorded in Montgomery County Clerk's File Number 9115394;

THENCE North 16 degrees 08 minutes 59 seconds West, along the east line of said Wal-Mart Stores, Inc. tract, a distance of 30.70 feet to a point marking an angle point in the herein described tract, from which a found concrete nail bears North 29 degrees 40 minutes West, 0.31 feet;

THENCE South 73 degrees 51 minutes 01 seconds West, continuing along the east line of said Wal-Mart Stores, Inc. tract, a distance of 8.50 feet to an "X" in concrete found marking an angle point in the herein described tract;

THENCE North 16 degrees 09 minutes 38 seconds West (called North 16 degrees 08 minutes 59 seconds West), continuing along the east line of said Wal-Mart Stores, Inc. tract, a distance of 326.78 feet (called 326.45 feet), to a point marking an angle point in the herein described tract, from which a found 3/4 inch iron pipe bears South 01 degrees 57 minutes East, 0.15 feet;

| INITIAL |
| TENANT |
| LANDLORD |

THENCE North 73 degrees 41 minutes 06 seconds East, continuing along the east line of said Wal-Mart Stores, Inc. tract, a distance of 8.43 feet to a point in the herein described tract, from which a found 60d nail bears South 20 degrees 24 minutes East, 0.17 feet;

THENCE North 16 degrees 19 minutes 28 seconds West, continuing along the eastline of said Wal-Mart Stores, Inc. tract, a distance of 120.96 feet to a point marking an angle point in the herein described tract, from which a found "X" in concrete bears North 14 degrees 17 minutes East, 0.17 feet;

THENCE North 73 degrees 40 minutes 32 seconds East, continuing along the east line of said Wal-Mart Stores, Inc. tract, a distance of 11.20 feet to a point marking an angle point in the herein described tract, from which a found "X" in concrete bears North 06 degrees 11 minutes West, 0.13 feet;

THENCE North 16 degrees 19 minutes 28 seconds West, continuing along the east line of said Wal-Mart Stores, Inc. tract, a distance of 22.00 feet to a point marking an angle point in the herein described tract, from which a found "X" in concrete bears North 03 degrees 17 seconds West, 0.12 feet;

THENCE South 73 degrees 40 minutes 32 seconds West, continuing along the eastline of said Wal-Mart Stores, Inc. tract, a distance of 11.20 feet to an "X" in concrete found marking an angle point in the herein described tract;

THENCE North 16 degrees 19 minutes 28 seconds West, continuing along the eastline of said Wal-Mart Stores, Inc. tract, a distance of 102.50 feet to a 3/4 inch iron pipe found marking an angle point in the herein described tract and being the northeast corner of said Wal-Mart Stores, Inc. tract and being on the south line of Unrestricted Reserve "E" of Montgomery Park Subdivision as recorded in Cabinet D, Sheet 126-B of the Montgomery County Map Records;

THENCE North 73 degrees 41 minutes 06 seconds East, along the south line of said Unrestricted Reserve "E", a distance of 0.20 feet to a 3/4 inch iron pipe found marking an angle point in the herein described tract and being the southeast corner of said Unrestricted Reserve "E";

THENCE North 28 degrees 41 minutes 06 seconds East, along the east line of said Unrestricted Reserve "E", a distance of 169.71 feet to an "X" in concrete found marking an angle point in the herein described tract;

THENCE North 16 degrees 18 minutes 54 seconds West, continuing along the east line of said Unrestricted Reserve "E", a distance of 258.43 feet to a 3/4 inch iron pipe found marking an angle point in the herein described tract;

THENCE North 28 degrees 41 minutes 06 seconds East, continuing along the east line of said Unrestricted Reserve "E", a distance of 113.14 feet to an "X" in concrete found marking an angle point in the herein described tract;

THENCE North 16 degrees 18 minutes 54 seconds West, continuing along the east line of said Unrestricted Reserve "E", a distance of 260.41 feet to a 5/8 inch iron rod with cap set marking an angle point in the herein described tract;

THENCE North 28 degrees 41 minutes 06 seconds East, continuing along the east line of said Unrestricted Reserve "E", a distance of 87.13 feet to a 5/8 inch iron rod with cap set marking the northwest corner of the herein described tract and being on the south line of said Conroe Church of Christ tract;

THENCE North 73 degrees 41 minutes 06 seconds East, along the south line of said Conroe Church of Christ tract, a distance of 500.00 feet to the POINT OF BEGINNING and containing 20.906 acres (910,649 square feet) of land.

P0165 Montgomery Plaza SC
Exhibit "B"
Revised 12/2/02 CC/ji
Page 2 of 6

SAVE AND EXCEPT:

Being a 0.0148 acre (646 square feet) parcel of land out of the William S. Allen Survey, Abstract No. 2, Montgomery County, Texas, being out of Reserve "D" Replat of Montgomery Park Subdivision, as recorded in Cabinet E, Sheet 125-B of the Montgomery County Map Records (M.C.M.R.) and out of a 20.906 acre tract conveyed to Weingarten Realty Investors, a Texas Real Estate Investment Trust, by deed dated June 9, 1993, as recorded under Clerk's File No. 9329980 of the Official Public Records of Real Property of Montgomery County (O.P.R.R.P.M.C.), said 0.0148 acre parcel being more particularly described as follows: (All bearings and coordinates are based on the Texas State Plane Coordinates System, Central Zone, North American Datum 1983 (1993 Adjustment), all distances and coordinates shown are surface and may be converted to grid by multiplying by a combined scale factor of 0.999970).

COMMENCING at an "X" in concrete found at the most southwesterly corner of Tract D-1 of said Reserve "D," and the northwesterly corner of Tract D-2 of said Reserve "D"; thence as follows:

SOUTH 80 degrees 22 minutes 32 seconds EAST, a distance of 155.32 feet along the common boundary of said Tract D-1 and said Tract D-2 to the southeast corner of said Tract D-1, and the northeast corner of said Tract D-2;

NORTH 09 degrees 50 minutes 45 seconds EAST, a distance of 138.61 feet along the easterly line of said Tract D-1 and the existing westerly right-of-way line of Interstate Highway 45 (IH 45) (width varies) to a Texas Department of Transportation (TxDOT) aluminum disk set on a 5/8-inch iron rod, and being the POINT OF BEGINNING of the herein described parcel, having a Texas State Plane Coordinate Value of X = 3,827,524.29, Y = 10,119,089.69;

1.)    THENCE, NORTH 01 degrees 33 minutes 50 seconds WEST, a distance of 108.53 feet along the proposed west right-of-way line of IH 45 (width varies), same being the Access Denial Line to a Texas Department of Transportation (TxDOT) aluminum disk set on a 5/8-inch iron rod in the existing west right-of-way line of IH 45, and the north corner of the herein described parcel;

2.)    THENCE, SOUTH 15 degrees 04 minutes 30 seconds EAST, a distance of 50.95 feet along said existing west right-of-way line of IH 45 and said easterly line of Tract D-1 to an angle point for an easterly corner of the herein described parcel;

3.)    THENCE, SOUTH 09 degrees 50 minutes 45 seconds WEST, a distance of 60.17 feet along said existing west right-of-way line of IH 45 and said easterly line of Tract D-1 to the POINT OF BEGINNING, containing 0.0148 acre (646 square feet) of land.

AND

TRACT ONE:

5.436 acres of land out of the W.S.. Allen Survey, Abstract 2, and being a part of Reserve "A", Montgomery Park Subdivision, as shown on plat thereof recorded in Cabinet C, Sheet 152 B, Plat Records of Montgomery County, the subject 5.436 acres being more particularly described by metes and bounds as follows:

BEGINNING at a 3/4-inch galvanized iron pipe set for corner on the Northerly right-of-way line of State Highway Loop 336, being the Southeasterly corner of Reserve "B" of said Montgomery Park Subdivision;

THENCE, N 16° 18' 54" W, with the Easterly line of Reserve "B", a distance of 150.40 feet to a 3/4-inch galvanized iron pipe set for the Northeasterly corner of said Reserve "B";

THENCE, S 73° 41' 06" W, with the Northeasterly line of Reserve "B", a distance of 150.00 feet to a 3/4 inch galvanized iron pipe set for the Northwesterly corner of Reserve "B", and being the most Westerly Southwest corner of Reserve "A";

THENCE, N 16° 18' 54" W, with the Westerly line of Reserve "A", a distance of 451.98 feet to a 3/4-inch galvanized iron pipe set for the Northwesterly corner of Reserve "A";

THENCE, N 73° 41' 06" E, with the Northerly line of Reserve "A", a distance of 434.80 feet to a 3/4-inch galvanized iron pipe set for corner;

THENCE, S 16° 19' 28" E, a distance of 102.50 feet to an "X" set in concrete for corner;

THENCE, N 73° 40' 32" E, a distance of 11.20 feet to an "X" set in concrete for corner;

THENCE, S 16° 19" 28" E, a distance of 22.00 feet to an "X" set in concrete for corner;

THENCE, S 73° 40' 32" W, a distance of 11.20 feet to an "X" set in concrete for corner;

THENCE, S 16° 19' 28" E, a distance of 120.96 feet to a 60d nail set for corner;

THENCE, S 73° 41' 06" W, a distance of 8.43 feet to a 3/4-inch galvanized iron pipe set for corner;

THENCE, S 16° 08' 59" E, a distance of 326.45 feet to an "X" set in concrete for corner;

THENCE, N 73° 51' 01" E, a distance of 8.50 feet to an "X" set in concrete for corner;

THENCE, S 16° 08' 59" E, a distance of 30.70 feet to a 3/4-inch galvanized iron pipe set for corner on the Northerly right-of-way line of State Highway Loop 336;

THENCE, S 72° 17' 40" W, with the Northerly line of State Highway Loop 336, a distance of 21.57 feet to a 3/4-inch galvanized iron pipe set for corner;

THENCE, S 73° 51' 10" W, with the Northerly line of State Highway Loop 336, a distance of 262.32 feet to the POINT OF BEGINNING and containing 5.436 acres of land.

AND

TRACT 2:

0.197 acre of land out of the W.S. Allen Survey, Abstract 2, and being a part of that certain 90.398-acre tract described in Deed Records of Montgomery County, Texas, in Volume 1115, Page 211, said 0.197-acre tract being more particularly described by metes and bounds as

P0165 Montgomery Plaza SC
Exhibit "B"
Revised 12/2/02 CC/ji
Page 4 of 6

follows:

COMMENCING at a 3/4-inch galvanized iron pipe set for corner on the Northerly right-of-way line of State Highway Loop 336, and being the Southeasterly corner of Reserve "B", Montgomery Park Subdivision, as shown on plat thereof recorded in Cabinet C, Sheet 152 B, Plat Records of Montgomery County, Texas;

THENCE, N 16° 18' 54", with the Easterly line of Reserve "B", a distance of 150.40 feet to a 3/4-inch galvanized iron pipe set for the Northeasterly corner of Reserve "B";

THENCE, S 73° 41' 06" W, with the Northerly line of Reserve "B", a distance of 150.00 feet to a 3/4-inch galvanized iron pipe set for the true POINT OF BEGINNING for the herein described tract;

THENCE. S 73° 41' 06" W, a distance of 0.43 feet to a point for corner in a curve, from which the center of curvature bears N 72° 16' 07" E, 300.00 feet;

THENCE, in a Northwesterly direction along a curve to the right having a central angle of 00° 12' 00", a radius of 300.00 feet, an arc length of 1.05 feet to a point of reverse curve;

THENCE, in a Northwesterly direction along a curve to the left having a central angle of 05° 30' 03", a radius of 2,000.00 feet, an arc length of 192.02 feet to a point of tangency;

THENCE, N 23° 01' 56" W, a distance of 261.25 feet to a point for corner;

THENCE, N 73° 41' 06" E, a distance of 44.29 feet to a 3/4-inch galvanized iron pipe set for the most Westerly Northwest corner of Reserve "A", Montgomery Park Subdivision;

THENCE, S 16° 18' 54" E, with the Westerly line of Reserve "A", a distance of 451.98 feet to the POINT OF BEGINNING and containing 0.197 acre of land

AND

Being 0.516 acre of land in the W.S. Allen Survey, A-2, Montgomery County, Texas and being all of Unrestricted Reserve "B", Montgomery Park Subdivision, a subdivision, map of which is recorded in Cabinet C, Sheet 152-B and 153A, Montgomery County Map Records, said 0.516 acre being described more particularly as follows:

BEGINNING at a ½" iron rod found in the North Right of Way line of State Highway Loop 336, for the Southeast corner of the herein described tract, the Southwest corner of the Weingarten Realty Investors called Tract 1, 5.436 acres as described in instrument recorded under County Clerk's File Number 9847114, Montgomery County Real Property Records, same being the Southwest corner of Unrestricted Reserve "A", Montgomery Park Subdivision;

THENCE S. 73° 51' 10" W., along the North line of Loop 336, for a distance of 134.12 feet (plat call S. 73° 51' 10" W., 134 feet) to a ½" iron rod found for corner;

THENCE N. 77° 29' 32" W., continuing along the North line of Loop 336, for a distance of 18.18 feet, (plat call N. 78° 04' 14" W., 18.16 feet) to a "X" found scribed in concrete for the Southwest corner of the herein described tract, same being the Southeast corner of Montgomery Park Subdivision, Reserves E, F, G, H-1, H-2, I-1, I-2, & J, a subdivision, map of which is recorded in Cabinet D, Sheet 126-B, Montgomery County Map Records, said "X" being in the East right-of-way line of Westview Blvd. dedicated by plat recorded in Cabinet D, Sheet 126-B, Montgomery County Map Records;

THENCE N. 16° 21' 17" W., along the East Right of Way line of said Westview Blvd. for a distance of 141.23 feet, (plat call N. 16° 18' 54" W., 141.41 feet) to a ½" iron rod set with a cap stamped "Jeff Moon RPLS 4639" for the Northwest corner of the herein described tract, a Lower Northwest corner of said Unrestricted Reserve "A", the Lower Northwest corner of the said 5.436 acre tract, the Southeast corner of the Weingarten Realty Investors called Tract 2, 0.197

acre as described by instrument recorded under County Clerk's File Number 9847114, Montgomery County Real Property Records;

THENCE N. 73° 39' 39" E., along a Lower North line of the 5.436 acre tract, a Lower North line of Unrestricted Reserve "A", for a distance of 150.00 feet (plat call and 5.436 acre call N. 73° 41' 06" E 150.00 feet) to a 60d nail found inside a ¾" iron pipe for the Northeast corner of the herein described tract, an inside corner of Unrestricted Reserve "A", an inside corner of the 5.436 acre tract;

THENCE S. 16° 22' 15" E., along an inside line of Unrestricted Reserve "A", an inside line of the 5.436 acre tract for a distance of 150.45 feet (plat call S. 16° 18' 54" E, 150.39' and 5.436 acre call S. 16° 18' 54" E., 150.40 feet) to the POINT OF BEGINNING and containing in all 0.516 acre of land.

EXHIBIT "B"

P0165 Montgomery Plaza SC
Exhibit "B"
Revised 12/2/02 CC/ji
Page 6 of 6

# EXHIBIT C

## LANDLORD WORK

### AMENDED CONSTRUCTION EXHIBIT "C" 4/08/2009
### LANDLORD'S WORK
### FORMER GOODY'S
### CONROE, TX

**The following work is subject to the review of the Big Lots Director of Construction:**

**STOREFRONT:** The exterior storefront shall have an "ANCHOR" type exterior facade acceptable to Tenant. Any work required to change existing storefront to satisfy tenant's acceptability is tenant's cost. Storefront/Exterior façade is existing.

ANY STRUCTURAL WORK WILL BE THE RESPONSIBILITY OF THE LANDLORD. (RD) 4-8-09

**GLASS:** The Landlord will replace all broken and damaged glass and remove all materials blocking or covering windows and glass doors on the exterior of the building.

**UTILITIES:** The Landlord will provide separate utilities and provide separate meters adequate for Tenant's intended use. The Tenant will have a minimum 600 amps for 480v service and will include all existing circuit panels, transformers, switch gear and connected throughout the demised premises to existing electrical supplies, lighting, HVAC and all other electrical supplied systems any changes to existing electrical system will be at tenants cost.

✳ ✳

**PLUMBING, ELECTRICAL, SPRINKLER &: FIRE SYSTEMS:** All plumbing, electrical, mechanical, and sprinkler equipment to be in good working condition. Landlord to provide Tenant with sprinkler system certification stating the system has been inspected and is in good working and up to existing codes.

**INTERIOR LIGHTING:** Existing lighting will be in good working condition. Tenant to be responsible for replacement of light bulbs and ballasts.

**EXTERIOR LIGHTING:** All exterior lighting shall be operational and working including pole lights, entrance/exiting lighting, building lights, etc. All exterior parking lot lighting is to be on a separately metered house panel in the Landlord's name.

**FLOORING:** The Landlord will remove any hazardous materials from tiles, mastic, and any other flooring materials.

**ROOF:** The roof shall be professionally inspected and certified to be in good condition and free of leaks. Repairs per inspection shall be made prior to possession.

**RESTROOMS:** The existing restrooms will be in good working condition.

**RECEIVING AREA:** The Tenant shall have exclusive use of the dock area, which shall remain unobstructed.

**PARKING LOT:** Parking lot shall be good condition - paved, patched, sealed and striped – adequate for customer parking and Tenant's use.

**PESTS:** Prior to lease Commencement, Premises to be professionally inspected for pestilence and termites. The Tenant is to be provided with a certified report that the Demised Premises is pest free. Otherwise, the Landlord will make the space pest free.

t
master.xc

✳ ✳ Tenant is responsible at Tenant's sole cost and expense to coordinate with the City of Conroe, Texas, for the installation of the water meter at the Demised Premises.

**SIGNAGE:**    To be approved and attached to the lease prior to lease execution.

The Tenant will have the right to use its color and logo (see exhibit) on the building sign(s) at the maximum size per code and on the pylon(s).  The Landlord is to ensure the existing pylon meets all codes and zoning ordinances in order for Tenant to place its panel on the pylon. Tenant to have marquee signage on the pylon (the former Goody's panels).

**DRAWINGS:**    The Landlord will provide the Tenant with "as built" drawings or a floor plan of the Demised Premises.  If Landlord has access to these documents.  Tenant acknowledges receipt of the JC Penney Drawings which are the only drawings in possession of Landlord.  Goody's may have made some changes to the premises not reflected on the drawings.

**HAZ MATS:**    The Landlord will be responsible for the removal of any and all hazardous materials.

**POSSESSION**    All above work will be completed before the Tenant Possession Date.
**DATE:**

Landlord agrees the Demised Premises conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord will promptly have them conform at all times unless such is necessitated by changes, alterations, or additions made by Tenant.



**EXHIBIT D**

**TENANT BUILDING SIGN SPECIFICATION**

**TENANT SIGN SPECIFICATION**

# BIG LOTS

## LOGOS
## WITH
## SPECIFICATIONS
## for exterior signage

**If you need additional information that is
not contained in this packet contact:**

Mike Stiles 614-278-6805
Michael Neu 614-278-6868



02/2007

## EXHIBIT D

### TENANT BUILDING SIGN SPECIFICATION

### TENANT SIGN SPECIFICATION

## BIG LOTS - THE LOGO

The logo can be used in either of the shown versions (stacked or horizontal)
with the stacked logo being the preferred version.
The logo proportions cannot be distorted nor colors changed.*

### Stacked Logo
This is the preferred way to present the logo.

File Name: BLst2C.eps

**BIG LOTS**™

### Horizontal Logo

File Name: BLh2C.eps

**BIG LOTS**™

 **BIG LOTS AND TRADE MARK**
100% BLACK

 **EXCLAMATION**
PANTONE 021 ORANGE
PROCESS MIX - 50% MAGENTA, 100% YELLOW

*See: Boxed Sign or Awning One Color.

**EXHIBIT D**

**TENANT BUILDING SIGN SPECIFICATION**

**TENANT SIGN SPECIFICATION**

# BOXED SIGN OR AWNING
To be used as pylon sign or a boxed sign.

## Boxed Stacked
This is the preferred way to present the logo.

File Name: BLst2C.eps



## Boxed Horizontal

File Name: BLh2C.eps



| SIGN SPECIFICATIONS: | SIGN SPECIFICATIONS: |
|---|---|
| **BIG LOTS AND TRADE MARK** | **EXCLAMATION** |
| BLACK | MATCH TO PANTONE 021 ORANGE |

**EXHIBIT D**

**TENANT BUILDING SIGN SPECIFICATION**

**TENANT SIGN SPECIFICATION**

# BOXED SIGN OR AWNING WITH ONE COLOR

To be used as pylon sign or a boxed sign, when landlord requires that only one color be used. Color can be changed to the color required by shopping center (otherwise use color shown).

## Boxed Stacked

This is the preferred way to present the logo.



File Name: BLst1C.eps

## Boxed Horizontal

File Name: BLh1C.eps



**SIGN SPECIFICATIONS:**

**BIG LOTS, TRADE MARK & EXCLAMATION**

MATCH TO PANTONE 021 ORANGE

## EXHIBIT D

### TENANT BUILDING SIGN SPECIFICATION

### TENANT SIGN SPECIFICATION

## Stacked Logo

# INDIVIDUAL LED ILLUMINATED CHANNELED LETTERS

### This is the preferred way to present the sign.

File Name: BLst1C.eps



### STANDARD SIZE CHARACTERISTICS

| Ⓐ | Ⓑ | Ⓒ | Ⓓ | Ⓔ | Ⓕ | Ⓖ |
|---|---|---|---|---|---|---|
| 2'-6" | 2'-0" | 3'-9" | 7'-4" | 5'-0" | 11" | 4½" |
| 3'-0" | 2'-6" | 4'-8" | 9'-1" | 6'-2" | 13" | 5½" |
| 4'-0" | 3'-0" | 5'-8" | 10'-10" | 7'-4" | 17½" | 6½" |
| 4'-6" | 3'-6" | 6'-6" | 12'-10" | 8'-9" | 19½" | 7½" |
| 5'-0" | 4'-0" | 7'-0" | 14'-10" | 9'-7" | 21½" | 8½" |

### SIGN SPECIFICATIONS: BIG LOTS

CUSTOM FABRICATED 7" ALUMINUM CHANNELED LETTERS FINISHED BLACK

FACES .150" ACRYSTEEL #2119 ORANGE WITH 2" ORANGE TRIM CAP RETAINERS

INTERNALLY ILLUMINATED WITH RED LED LIGHTING SYSTEM
LED POWER SUPPLY, REMOTE MOUNTING BEHIND WALL

### SIGN SPECIFICATIONS: EXCLAMATION

CUSTOM FABRICATED 7" ALUMINUM CHANNELED LETTER FINISHED BLACK

FACES .150" ACRYSTEEL #2119 ORANGE WITH OPAQUE WHITE VINYL OUTLINE AND WHITE TRIM CAP RETAINER

INTERNALLY ILLUMINATED WITH RED LED LIGHTING SYSTEM
LED POWER SUPPLY, REMOTE MOUNTING BEHIND WALL

**NOTE:** Fabrication and installation per UL specifications.
Install in accordance with N.E.C..
All signage equipped with disconnect switches.

## EXHIBIT D

### TENANT BUILDING SIGN SPECIFICATION

### TENANT SIGN SPECIFICATION

## Horizontal Logo
# INDIVIDUAL LED ILLUMINATED
# CHANNELED LETTERS

File Name: BLh1C.eps



### STANDARD SIZE CHARACTERISTICS

| Ⓐ | Ⓑ | Ⓒ | Ⓓ | Ⓔ |
|---|---|---|---|---|
| 2'-0" | 12'-3" | 2'-10" | 9" | 4½" |
| 2'-6" | 15'-1" | 3'-6" | 11" | 5½" |
| 3'-0" | 17'-9" | 4'-3" | 13" | 6½" |
| 3'-6" | 20'-7" | 4'-11" | 15½" | 7½" |
| 4'-0" | 23'-3" | 5'-8" | 17½" | 8½" |
| 4'-6" | 26'-1" | 6'-4" | 19½" | 9½" |
| 5'-0" | 28'-10" | 7'-0" | 21½" | 10½" |
| 6'-0" | 34'-4" | 8'-6" | 26" | 13" |

### SIGN SPECIFICATIONS:
### BIG LOTS

CUSTOM FABRICATED 7" ALUMINUM CHANNELED
LETTERS FINISHED BLACK

FACES .150" ACRYSTEEL #2119 ORANGE
WITH 2" ORANGE TRIM CAP RETAINERS

INTERNALLY ILLUMINATED WITH RED LED
LIGHTING SYSTEM
LED POWER SUPPLY, REMOTE MOUNTING
BEHIND WALL

### SIGN SPECIFICATIONS:
### EXCLAMATION

CUSTOM FABRICATED 7" ALUMINUM CHANNELED
LETTER FINISHED BLACK

FACES .150" ACRYSTEEL #2119 ORANGE WITH
OPAQUE WHITE VINYL OUTLINE AND WHITE
TRIM CAP RETAINER

INTERNALLY ILLUMINATED WITH RED LED
LIGHTING SYSTEM
LED POWER SUPPLY, REMOTE MOUNTING
BEHIND WALL

**NOTE:** Fabrication and installation per UL specifications.
Install in accordance with N.E.C.
All signage equipped with disconnect switches.

**EXHIBIT D**

**TENANT BUILDING SIGN SPECIFICATION**

**TENANT SIGN SPECIFICATION**

## DO NOT STRETCH LOGOS HORIZONTALLY OR VERTICALLY!



## DO NOT RE-TYPESET IN A "SIMILAR" FONT STYLE!

## EXHIBIT D - 1

### TENANT PYLON PANEL LOCATION

[Note:  The Big Lots' pylon panels will occupy those currently designated on this Exhibit D-1 as "Goody's Family Clothing".]

Pylon located at the corner of Loop 336 and I-45:

## EXHIBIT D - 1

### TENANT PYLON PANEL LOCATION



## EXHIBIT D - 1

### TENANT PYLON PANEL LOCATION

[Note:  The Big Lots' pylon panels will occupy those currently designated on this Exhibit D-1 as "Goody's Family Clothing".]

Pylon located at the corner of Loop 336 and I-45:

**EXHIBIT D - 1**

**TENANT PYLON PANEL LOCATION**



**EXHIBIT E**

**DELIVERY OF POSSESSION LETTER**

Date: _____

To:    _____(insert Tenant)
          via facsimile:  (614) 278-6546

From: _____ (insert Landlord, name of contact person and **LANDLORD'S FEDERAL TAXPAYER IDENTIFICATION NUMBER – RENT WILL NOT BE PAID WITHOUT SUCH INFORMATION)**


RE: _____ (insert Shopping Center, City/State of Demised Premises)


You are hereby notified that all work required of Landlord pursuant to the Lease dated _____ has been Substantially Completed.  Accordingly, possession of the Demised Premises is hereby delivered to Tenant.  You may pick up the keys at
_____
_____.


If you have any questions, please feel free to contact me at _____.

Thank You.


**LANDLORD:**

**WEINGARTEN REALTY INVESTORS**
a Texas real estate investment trust


By:_____

Title:_____


**TENANT:**

**PNS STORES, INC., a California corporation**


By:_____

Title: _____

# EXHIBIT F

# EXCLUSIVE/PROHIBITED USE PROVISIONS

**99 Cents Only Stores Texas, Inc. (d/b/a 99¢ Only Stores)**
**Exclusive:**
Landlord shall not lease space in the Shopping Center to another tenant whose primary business is a general merchandise retail store or who uses in its name and signage "99"; "98"; "Dollar" (except for any use of the word Dollar by a retailer or service provider - e.g. "Dollar Rent A Car" - the primary business of which is not the sale of general merchandise) or "99¢". This limitation shall not apply to present tenants whose leases may not prohibit such use. Tenant agrees that the term "general merchandise retail store" does not apply to conventional grocery stores, drug stores, or stores such as Big Lots, Ross, Marshall's or TJ Maxx.
**Prohibited Uses:**
No portion of the Shopping Center may be used for any of the following: (1) nude (or partially nude) bars, nightclubs or theaters of any kind; (2) massage parlors; (3) pornographic book stores; (4) escort services, (5) bail bonds or pawn shops, (6) the sale of used or second hand products of any kind; provided, that Landlord may lease space to high end resale stores that sell "like new" merchandise and are fixtured in a first class manner; (7) tattoo parlors; (8) pornographic video stores; (9) any use of a questionable moral character; (10) indoor swap meets; (11) any movie theater; gymnasium (except a health club may be located in the I-45 Area depicted on Ex "A"), bowling alley; library; church; auditorium; museum; automobile repair (except that an oil and/or lube and/or tune-up and/or discount tire business may be located on any pad in the Shopping Center but not pads 1 and 2 at the same time); automobile sales; banquet facility; bar (except in connection with a restaurant); disco; nightclub; hotel; manufacturing; warehouse or other industrial use (except incidental to other permitted uses); entertainment facility (such as Chuck E Cheese, Discover Zone, Tutor Time, or Leaps and Bounds); or trade or vocational school (except that trade or vocational schools may be located in the I-45 Area depicted on Ex "A");or (12) any high volume buffet style restaurant; provided, however, that LL may lease to (i) one such restaurant whose LP does not exceed 3,000 s.f. in the area designated as "RED" on Ex "A"; and (ii) one or more of such restaurants whose LP does not exceed 7,500 s.f. each in the area designated as "GREEN" on Ex "A".

**Academy, Ltd. (d/b/a Academy Sports & Outdoors)**
**Exclusive:**
Landlord shall not lease space in the Shopping Center to another tenant whose primary business is the business of selling sporting goods, licensed sports apparel or footwear. The incidental sale of such items in connection with the overall business of another tenant shall not be deemed a violation of the Lease ["incidental" defined as the less than 5% of tenant's gross sales and less than 500 s.f. of tenant's display area (inclusive of allocable aisle space)]. The exclusive against the sale of footwear shall not be construed to prohibit tenants such as Larry's Shoes or Payless ShoeSource or any other shoe store which, in Tenant's reasonable opinion is comparable to the foregoing, provided, however, that the foregoing exception to the exclusive shall be limited to one (1) such shoe store within the Shopping Center. Additionally, the exclusive shall not be construed to prohibit the operation of a "junior department store" within the Shopping Center such as TJ Maxx, Ross, Marshall's, Palais Royal or other junior department stores which in Tenant's reasonable opinion, is comparable to the foregoing and shall not apply to existing tenants.

**Anna's Linens Inc. (d/b/a Anna's Linens)**
**Exclusive:**
Landlord will not lease space in the Shopping Center to Bed, Bath & Beyond, Linens & Things, or any other tenant whose primary business will be the retail sale of linens ("Competing Business"). A tenant whose primary business is the retail sale of linens means that more than 50% of such tenant's sales area (exclusive of adjoining aisle space) is devoted to blankets, bedspreads, comforters, sheets, towels and pillows. Exclusive does not apply to existing tenants (or their assignees or sublessees) whose leases do not prohibit such use.

**Conn Appliances, Inc. (d/b/a Conn's)**
**Prohibited Uses:**
Landlord agrees that it will not lease space to the west of the Leased Premises to any other tenant whose derives more than 35% of its revenue from the sale of alcoholic beverages. Limitation shall not apply to present tenants (or their assignees and sublessees) whose leases may not prohibit such use. Landlord agrees that, once it acquires title to the Yellow area, it will not lease any portion of the Yellow Area for the operation of a full service, sit-down restaurant whose food service is primarily served to the customers' tables by waiters or waitresses.

**Schneringer, Jesse O. (d/b/a Dr. Jesse Schneringer D.C., PA)**
**Exclusive:**
Landlord will not directly lease space in the Shopping Center to any other tenant whose primary business will be the operation of a chiropractic office (hereinafter a "Competing Business"). This limitation shall not apply to: (i) present tenants (or their assignees or sublessees) whose leases may not prohibit such use, or (ii) any tenant, present or future occupying 2,500 or more square feet of space.

**Juan J. Rodriguez and Rubi Rodriguez (d/b/a El Bosque)**

**Exclusive:**
Landlord agrees that it will not lease space in the Shopping Center to any other tenant whose primary business will be the operation of a Mexican-style restaurant ("Competing Business"). This limitation shall not apply to present tenants (or their assignees or sublessees) whose leases may not prohibit such use or any tenant, present or future, who may offer Mexican-style food as a menu item on an incidental basis and not as its primary business.

## NEW GFC TX, L.P. (d/b/a Goody's Family Clothing)
**Prohibited Uses:**
No portion of the Shopping Center may be used for: amusement park, carnival, sporting events, for any manufacturing purpose, for commercial or professional offices in excess of twenty-five percent (25%) of the gross leasable area of the Shopping Center (medical & dental offices and retail service offices such as tax preparers, insurance companies, banks and offices incidental to retail facilities shall be permitted and not included in the 25% limitation), for the sale of cars parked at the Shopping Center or the sale or repair of boats, sale of trailers or mobile homes, lumber yard (except in connection with a retail home improvement store such as Lowe's or Home Depot), off-track betting establishment, flea-market (antique or craft mall is permitted), massage parlor (beauty salon and chiropractor shall be permitted), tattoo or body piercing facility, or for the operation of a pornographic business. Also, no part of the Shopping Center outlined in "Red" may be used for: a bowling alley, skating rink, bar (defined as more than 50% alcoholic beverages), meeting hall, banquet facility, entertainment facility, disco or other dance hall, nightclub establishment, or repair of cars, video arcade or other game parlor, pool hall, billiard parlor, amusement center or health club (provided a personal trainer offering fitness classes in less than 5,000 square feet is not prohibited), or a non-retail use which is not normally found in similar shopping centers.

## Monarch Dental Associates, L.P. (d/b/a Monarch Dental)
**Exclusive:**
Landlord agrees it will not lease to a dental clinic. Exclusive does not apply to present tenants whose leases do not prohibit operation of same.

## David M. Boeckman and David Awalt (d/b/a Montgomery Vision Center)
**Exclusive:**
Landlord will not lease to any other tenant whose primary business is the operation of an optometrist's office selling prescription eyewear. Exclusive does not apply to present tenants or any tenant who may sell non-prescription eyewear.

## Rent-Way, Inc. (d/b/a Rent-A-Center)
**Prohibited Uses:**
Landlord agrees that it will not lease space in the Shopping Center to any tenant whose business is of an adult, prurient nature such as illegitimate massage parlors or modeling studios, "head shops" or other stores primarily selling illegal drug related items, or any business whose primary business is the retail sale of pornographic materials.

## Spec's Family Partners, Ltd. (d/b/a Spec's Liquor)
Landlord shall not lease space in the Shopping Center to any other tenant whose primary business is the sale of distilled spirits for off-premises consumption ("Competing Business") This limitation shall not apply to present tenants (or their assignees or sublessees) whose leases may not prohibit the operation of a Competing Business.

## Subway Real Estate Corp. (d/b/a Subway)
**Exclusive:**
Landlord will not directly lease space in the Shopping Center to any other tenant whose primary business will be the operation of a restaurant selling submarine or deli-style sandwiches, or to a tenant operating the business known as Pepperoni's Piazza (hereinafter "Competing Business"). This limitation shall not apply to (i) present tenants (or their assignees or sublessees) whose leases may not prohibit such use, or (ii) any tenant occupying 3,000 square feet or more of space in the Shopping Center.

**EXHIBIT G**

**REMEASUREMENT RIDER**

This Rider dated _____ ___, 200__ is attached to and made a part of the Lease dated
(the "Lease") by and between _____ ("Landlord"),
and PNS STORES, INC., a California corporation, ("Tenant").

      Notwithstanding anything in the Lease to the contrary, the following provisions shall apply:

1.     Demised Premises: (Section 1(D)) = _____.

2.     A.    Fixed Minimum Rent—Original Term (Section 5(A)):
        _____ annually; _____ per month.

3.     A.    Fixed Minimum Rent--First Option (Section 5(A)):
        _____ annually;_____per month.

4.     A.    Fixed Minimum Rent—Second Option (Section 5(A)):_____
        _____annually; _____per month.

5.     A.    Fixed Minimum Rent—Third Option (Section 5(A)):
        _____ annually;_____    _____per month.