**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| In re:<br><br>NUMBER HOLDINGS, INC., *et al.*,<br><br>Debtors. | ) Chapter 11<br>)<br>) Case No. 24-10719 (JKS)<br>)<br>) (Jointly Administered)<br>)<br>) Re D.I. 471, 481, 552, 722, 744, 749 |

**AMERICAN NATIONAL INSURANCE COMPANY'S FIRST AMENDED
MOTION FOR STAY OF *ORDER (A) APPROVING THE SALE OF CERTAIN
ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND
OTHER INTERESTS; (B) AUTHORIZING THE DEBTORS TO ASSUME, ASSIGN
AND SELL THAT CERTAIN NON-RESIDENTIAL REAL PROPERTY LEASE WITH
RESPECT TO THE ASSET PURCHASE AGREEMENT BETWEEN OLLIE'S
BARGAIN OUTLET, INC. AND OBO VENTURES, INC AND DEBTORS WITH
RESPECT TO STORE #2831, THE MONTGOMERY PLAZA LEASEHOLD; AND (C)
GRANTING RELATED RELIEF* PENDING APPEAL**

AMERICAN NATIONAL INSURANCE COMPANY ("American National" or
"Landlord"), by and through its undersigned counsel, moves this Court for entry of an order
granting a stay pending appeal of the Court's *Order (A) Approving the Sale of Certain Assets Free
and Clear of Liens, Claims, Encumbrances, and Other Interests; (B) Authorizing the Debtors to
Assume, Assign and Sell that Certain Non-Residential Real Property Lease With Respect to the
Asset Purchase Agreement Between Ollie's Bargain Outlet, Inc. and OBO Ventures, Inc. and
Debtors With Respect to Store #2831, the Montgomery Plaza Leasehold; and (C) Granting Related
Relief* (the "Order") (D.I. 744) and for related relief, (this "Motion for Stay"), and respectfully
states:

70920590\2

**INTRODUCTION**[1]

1.      American National moves this Court for a stay pending appeal of the Court's Order.[2] American National is entitled to the shopping center protections afforded by Section 365(b)(3).

2.      The lease assignment authorized by the Order could harm American National by costing it hundreds of thousands of dollars in lost revenues and litigation expenses, in addition to a loss of control of its property beyond what is contemplated by the Code.  This harm will become irreparable if the Order is not stayed, because of the operation of 363(m).

3.      As more fully briefed below, American National is likely to succeed on the merits because: (1) this assignment clearly disrupts the tenant mix and balance,  (2) Texas law commands a reading of the 99 Cent Exception back into the Big Lots Lease, which when read with the American National Lease (Debtor's lease) expressly prohibits assignment to Ollies, and (3) the successor and assigns language was limited to affiliates.

**PROCEDURAL BACKGROUND**

4.      On April 16, 2024, the Debtors filed the *Debtors' Motion for Entry of an Order Approving (I)(A) Bidding Procedures in Connection with the Sale of Substantially All of the Debtors' Remaining Assets, (B) Assumption and Assignment Procedures, (C) Form and Manner of Notice of Sale Hearing, Assumption Procedures, and Auction Results; (II) Auction and Sale Hearing Dates; (III)(A) Debtors' Entry into One or Multiple Asset Purchase Agreements, (B)*

---

[1] Capitalized terms not otherwise defined in the "Introduction" section shall have the meanings given below.
[2] (Or, in the alternative, requests the Court reconsider its Order and American National seeks to leave to file such motion for reconsideration for the same reasons).

70920590\2

*Sale(s) Free and Clear of All Encumbrances, and (C) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases; and (IV) Granting Related Relief* (D.I. 171).

5.       On May 9, 2024, the Court entered an order (D.I. 463) granting certain relief sought by the Debtors including, among other things, approval of the Debtors' proposed bidding procedures and procedures governing the assumption and assignment of unexpired leases.   On May 15, 2024, the Court entered the *Order (I) Authorizing the Debtors to Enter into the Stalking Horse APA, (II) Approving the Related Bid Protections, and (III) Granting Related Relief* (D.I. 562).

6.       On May 15, 2024, American National filed an objection (D.I. 552) to the Debtors' assignment of that certain non-residential real property lease for the premises located at 1406 E. Loop 336 West, Conroe, Texas 77304 (the "American National Lease") to Ollie's Bargain Outlet, Inc. and OBO Ventures, Inc. (together, "Ollie's"), which it later amended (D.I. 602).   American National's objection was based on certain protections related to the assignment of leases of Shopping Centers under section 365(b)(3) of the Bankruptcy Code.

7.       On May 22, 2024, the Debtors filed the *Notice of Successful Bidder and Backup Bidder with Respect to the Auction of the Debtors' Assets* (D.I. 637) naming Ollie's as the Successful Bidders with respect to certain of the Debtors' assets, including with respect to the American National Lease.

8.       The Court held a hearing on May 23, 2024 (the "Hearing") to consider, among other things, American National's objection to the Debtors' proposed assignment of the American National Lease to Ollie's.   At the Hearing, the Court overruled the objections by American National, and stated its opinion into the record, and on May 29, 2024 entered the Order (DI. 744).

**RELEVANT FACTS**

9.        American National is the owner of non-residential property located at 1406 E. Loop 336 West, Conroe, Montgomery County, Texas 77304 (the "Property"), commonly known as the Montgomery Plaza Shopping Center.  The Property includes a 315,708 square foot single structure with a mixed tenant lineup, including Academy, Conn's, and PNS Stores, Inc. d/b/a Big Lots ("Big Lots"), and a shared common parking lot.

10.        The Property is a shopping center, as contemplated by section 365(b)(3) of the Bankruptcy Code.  American National is the single owner of the Property, and is the landlord of all tenants who occupy the Property.  *See*, Exhibit 1, Hearing Transcript, testimony of Scott Webb at the Hearing.  The Property contains a common parking area used by all tenants.  *Id.*  The Property has been developed as a shopping center—called the Montgomery Plaza Shopping Center, with a purposeful selection of its tenants and maintenance of a particular tenant mix, as reflected by the testimony and in the two lease agreements at issue in this matter.  *Id.*  The tenants at the Property jointly particulate in trash removal and other maintenance.  *Id.*

11.        On or about March 16, 2004, American National's predecessor in interest to the Property, Weingarten Realty Investors, as landlord, and 99 Cents Only Stores Texas, Inc. as tenant executed a Lease Contract for 24,050 square feet of retail space in the Property (i.e., the American National Lease).  *See*, attached Exhibit 2, the American National Lease.

12.        On or about September 4, 2009, American National's predecessor in interest to the Property, Weingarten Realty Investors, as landlord, and Big Lots, as tenant, executed a Lease Contract for approximately 31,502 square feet of retail space in the Property (the "Big Lots Lease").  *See*, attached Exhibit 3, the Big Lots Lease.

70920590\2

13.    Texas substantive law controls the interpretation of both the American National Lease and the Big Lots Lease.  *See*, Exhibit 2 at 19 ("This Lease shall be construed in accordance with the laws of the State of Texas, and Montgomery County, Texas, shall be the venue for any litigation arising from this Lease.") and Exhibit 3 at ("The terms of this Lease shall be interpreted under the substantive laws of the State where the Demised Premises is located, without regard to choice of law rules of that state."), respectively.

### JURISDICTION & VENUE

14.    The Court has jurisdiction to hear this matter pursuant to 28 U.S.C. § 1334.

15.    Venue is proper before this Court pursuant to 28 U.S.C. Sections 1408 and 1409.

### ARGUMENT & AUTHORITIES

**I.    Standard for Motion for Stay Pending Appeal.**

16.    Bankruptcy Rule 8007 authorizes this Court to grant a "stay of a judgment, order, or decree of the bankruptcy court pending appeal." Fed. R. Bankr. P. 8007.  American National now respectfully requests that the Court use its discretion to prevent a forfeiture of American National's rights on appeal, by granting a stay of the Order.  The Third Circuit recognizes that "a myriad of circumstances can occur that would necessitate the grant of a stay pending appeal in order to preserve a party's position." *In re Highway Truck Drivers & Helpers Local Union No. 107*, 888 F.2d 293, 298 (3d Cir. 1989).  "The granting of a motion for stay pending appeal is discretionary with the court." *See, In re Trans World Airlines, Inc.*, 2001 WL 1820325, at *2–3 (Bankr. D. Del. Mar. 27, 2001).

17.    In considering whether to grant a stay pending appeal, courts consider the following four factors: (1) whether the appellant has made a strong showing of the likelihood of success on the merits; (2) will the appellant suffer irreparable injury absent a stay; (3) would a stay

substantially harm other parties with an interest in the litigation; and (4) whether a stay is in the public interest. *See, e.g.*, *Republic of Phil. v. Westinghouse Electric Corp.*, 949 F.2d 653, 658 (3d Cir.1991).

18.     "In order not to ignore the many gray shadings stay requests present, courts 'balance[e] them all' and 'consider the relative strength of the four factors.'" *In re Revel AC*, Inc., 802 F.3d 558, 568 (3d Cir. 2015) (internal citations omitted).  In *In re Revel AC*, the Third Circuit also cited to 16A Charles Alan Wright et al., Federal Practice and Procedure § 3954 (4th ed. 2008) as authority on this point, which provides: "The four factors should be balanced; thus, for example, if the balance of harms tips heavily enough in the stay applicant's favor then the showing of likelihood of success need not be as strong, and vice versa." *Id.*  (Footnotes omitted in original).

19.     The Supreme Court has stated that the "most critical" factors, are the first two: (1) the showing of likelihood of success and (2) that the movant will suffer irreparable harm. *Id.*  The Third Circuit has stated that whether the movant will suffer irreparable harm "is arguably the more important piece of the stay analysis." *In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015).

II.    **Standard of Review on Appeal.**

20.     Courts reviewing bankruptcy courts' decisions on appeal review "the Bankruptcy Court's legal determinations *de novo*, its factual findings for clear error, and its exercises of discretion for abuse thereof." *In re TK Holdings, Inc.*, 653 B.R. 33, 40 (D. Del. 2023).  *De novo* means "the court's inquiry is not limited to or constricted by the record, nor is any deference due the conclusion under review." *See*, *Luby v. Teamsters Health, Welfare, & Pension Tr. Funds*, 944 F.2d 1176, 1184 (3d Cir. 1991) (Internal citations and punctuation omitted.).  "A factual finding is clearly erroneous 'when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'"

*United States v. Murray*, 821 F.3d 386, 391 (3d Cir. 2016).  In reviewing mixed questions of facts and law, courts are not limited to the clearly erroneous standard, and exercise a mixed standard of review.  *See, Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 641–42 (3d Cir. 1991), *as amended* (Oct. 28, 1991).

### III.    American National has more than a reasonable chance of winning on appeal.

21.    American National has a "reasonable chance, or probability, of winning" on appeal. *In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015).  The Third Circuit has held that "a sufficient degree of success for a strong showing exists if the moving party has 'a reasonable chance, or probability, of winning.'" *In re Revel AC, Inc.*, 802 F.3d 558, 568 (3d Cir. 2015); *See, also, Singer Mgmt. Consultants, Inc. v. Milgram*, 650 F.3d 223, 229 (3d Cir. 2011) (en banc).  The Third Circuit has further defined this, holding that a movant *does not need to show* that the likelihood of winning on appeal is "more likely than not." *Id*.  Particularly important in the bankruptcy context, is the accord the Third Circuit has given other courts' analysis on this front, that recognized the "trouble with a 'strict probability requirement is [ ] it leads to an exaggeratedly refined analysis of the merits at an early stage in the litigation.'" *Id.* (citing *Wash. Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 844 (D.C.Cir.1977)).

22.    Other courts have pointed out that to show a reasonable chance of winning on appeal, "does not require the trial court to change its mind or conclude that its determination on the merits was erroneous." *Accord*, *Realvirt LLC v. Lee*, 220 F. Supp. 3d 704, 705–06 (E.D. Va. 2016) (quoting *United States v. Fourteen Various Firearms*, 897 F. Supp. 271, 273 (E.D. Va. 1995)), *U.S. Home Corp. v. Settlers Crossing, LLC*, 2015 WL 3973071, at *6 (D. Md. June 29, 2015), and *United States v. $1,026,781.61 in Funds from Florida Capital Bank*, 2013 WL 781930, at *1 (C.D. Cal. Mar. 1, 2013).  Rather, "the question with respect to the first factor is whether 'the

issues presented on appeal could be rationally resolved in favor of the party seeking the stay.'" *Realvirt LLC,* 220 F. Supp. 3d at 706.  In this case, there is a reasonable chance that they could be rationally resolved in favor of the party seeking the stay.

**A. Section 365(b)(3) applies here and American National is entitled to the heightened creditor protections and considerations it requires.**

23.     A debtor in possession may assign an executory contract or unexpired lease only if (A) it assumes the contract or lease in accordance with Section 365 and (B) there is adequate assurance of future performance by the assignee. 11 U.S.C. § 365(f)(2).  This assurance is necessary to protect the rights of the non-debtor party to the contract or lease, because assignment relieves the trustee and the estate from liability arising from a post-assignment breach.  11 U.S.C. § 365(k); *In re Rickel Home Centers, Inc.*, 209 F.3d 291, 299 (3d Cir. 2000).  Where the leased premises are in a shopping center, the assignee must meet the heightened definition of adequate assurance of future performance in Section 365(b)(3) to ensure that "[t]he essential terms of a debtor's lease in a shopping center [are] not ... changed in order to facilitate assignment." *In re Rickel Home Centers,* at 209 F.3d at 299.

24.     It is undisputed that the Property is a Shopping Center, invoking the application of the protections afforded to landlords and other tenants by Section 365(b)(3) of the Bankruptcy Code.  Section 365(b)(3) provides, *inter alia*, that adequate assurance of future performance of a lease of real property in a shopping center, includes adequate assurance – …

> (C) that assumption or assignment of such lease is subject to ***all*** the provisions thereof, including (but not limited to) provisions such as a radius, location, use, or exclusivity provision, ***and*** will not breach any such provision contained in any other lease, financing agreement, or master agreement relating to such shopping center; ***and***

> (D) that assumption or assignment of such lease will not disrupt ***any*** tenant mix or balance in such shopping center.

70920590\2

Importantly, *each* of the provisions of 365(b)(3) must be met (note the conjunction "and" between (C) and (D) above). Congress created "independent requirements" "for actual assurance of future performance when it passed § 365(b)(3) – four separate independent requirements, over and above those set out in § 365(f) – each of which needs to be met before a bankruptcy court can approve the assignment of a shopping center lease." *In re Sears Holdings Corp.*, 613 B.R. 51, 76 (S.D.N.Y.), *order vacated on reh'g on other grounds (i.e., 363(m)),* 616 B.R. 615 (S.D.N.Y. 2020), *vacated and remanded on other grounds,* 2023 WL 7294833 (2d Cir. Nov. 6, 2023). Here, the assignment of the American National Lease to Ollies' violates both 365(b)(3)(C) and (D) by, among other things, (1) violating the "use" and "assignment" provisions of the American National Lease, (2) violating the various "use" and "exclusive use" provisions of the Big Lots Lease, and (3) by disrupting the tenant mix and balance of the Property. American National now seeks a stay pending appeal to enforce these provisions and to avoid the irreparable harm it will experience as a result of the Order.

**Section 365(b)(3) was not properly applied here.**

25.      The Court did not require that the terms of the American National Lease and the Big Lots Lease be complied with completely, it only required "substantial compliance"— seemingly, in direct contravention of the express language of the statute. The Court also determined that an insubstantial disruption of tenant mix and balance was permitted under the Code—this too appears to be in direct contravention of the express language of the statute.

26.      Citing *In re Joshua Slocum Ltd.*, 922 F.2d 1081 (3d Cir. 1990) (hereinafter "*Slocum*"), this Court determined that:

> Congress did not envision literal compliance with all lease provisions; however, insubstantial disruptions in tenant mix, and other insubstantial breaches in other leases and agreements, are contemplated and allowed.

70920590\2

-   Exhibit 1 at 96:12-16.

27.     The Third Circuit in *Slocum* did indeed provide:

> Even under the tightly drawn definition of "adequate assurance" in the shopping center context, Congress did not envision literal compliance with all lease provisions; insubstantial disruptions in, inter alia, tenant mix, and insubstantial breaches in other leases or agreements were contemplated and allowed.

28.     But the Court's reliance on *Slocum* for this proposition is wrong here. The legislative history and a closer examination of the authority the Third Circuit relied on in *Slocum* says otherwise. *Slocum* cites to four cases as its authority for its "substantial" compliance proposition.[3] The four cases are all from the United States Bankruptcy Court of the Southern District of New York and all were decided before 1984 when Section 365(b)(3) was amended.[4]

29.     Importantly, in understanding the *Slocum* decision, these cited cases were interpreting a *prior* version of the statute that read:

> (C) that assumption or assignment of such lease will not breach *substantially* any provision, such as a radius, location, use, or exclusivity provision, in any other lease, financing agreement, or master agreement relating to such shopping center; and
>
> (D) that assumption or assignment of such lease will not disrupt *substantially* any tenant mix or balance in such shopping center.
>
> - PUBLIC LAW 95-598—NOV. 6, 1978 92 STAT. 2575 (Emphasis added.)
>
> *See*, Exhibit 4, comparing the 1978 statute with the current law.

30.     This language is strikingly different from how the statute reads today—deleting "substantially," inserting "all" in (C), and adding compliance with other tenant exclusive use

---

[3] The *Slocum* court also cites the statute, before citing to: *In re Fifth Ave. Originals*, 32 B.R. 648 (Bankr. S.D.N.Y. 1983), *In re Peterson's Ltd., Inc.*, 31 B.R. 524 (Bankr. S.D.N.Y. 1983), *In re TSW Stores of Nanuet, Inc.*, 34 B.R. 299, 304 (Bankr. S.D.N.Y. 1983), and *Matter of U. L. Radio Corp.*, 19 B.R. 537, 544 (Bankr. S.D.N.Y. 1982).
[4] *Id.* sans statute.

70920590\2

provisions.  In fact, the law was amended to stop the very application of the law that occurred here.

31.    In introducing the amending bill in 1984, Senator Orrin Hatch declared:

> The bankruptcy code currently provides that when a shopping center lease is assumed or assigned, assurances must be given that the lease provisions will not be substantially breached and that the tenant mix will not be substantially disrupted. Unfortunately, courts have misapplied [sections 365(b)(3)(C) and (D)] in ways which have deprived shopping centers and their tenants of the protections which Congress intended to provide them. This bill would delete the word "substantially" from [section 365(b)(3)(C) and (D)], thus requiring that any clause in the lease be adhered to.

-    June 29, 1984 *Congressional Record—Senate* page 20089.

32.    Senator Hatch further stated:

> The bill also makes clear that the special shopping center protections contained in subsection (b)(3) apply to all assignments of shopping center leases, whether or not there has been a default of the lease. The bill also makes clear that a shopping center lease assumption or assignment is subject to all the provisions of the lease to be assumed or assigned and that the provisions of the lease to be assumed or assigned must not be breached, in addition to not breaching provisions of other leases, financing agreements or master agreements relating to the shopping center.

-    *Id.*

33.    Without question, Congress intended all provisions to apply and no disruption to tenant mix and balance—the use of the "substantial" standard dilutes the statue's protections and does not properly apply the law.

**B. Therefore, the Court did not properly address American National's 365(b)(3)(D) objection nor make necessary factual determinations.**

34.    The assignment of the American National Lease to Ollie's disrupts the tenant mix and balance of the Property.  This is in violation of Section 365(b)(3)(D), and therefore this assignment is prohibited under the Code.  *Matter of Federated Dep't Stores, Inc.*, 1991 WL 302860 (Bankr. S.D. Ohio Dec. 3, 1991) (discussing addition of new that "will disrupt the tenant balance" of the shopping center "as those terms were envisioned by Congress when it passed 11 U.S.C. §

365(b)(3) . . . . to protect landlords and their tenants from the damage caused by bankrupt tenants.").

35.     The Debtors and the Court focused almost entirely on the 365(b)(3)(C) violations and not on the disruption to tenant mix and balance.  Other than stating on the record that the Code only required no "substantial" disruption—which as discussed above is no longer the law—the Court made no overt considerations as to how or why it made its "tenant mix and balance" determinations.  The Court also stated that it was without sufficient evidence to determine whether Ollie's is a "dollar store" or a "close out store" as contemplated by the Big Lots Lease.[5] Id. at 97:21-25.

36.     However, there was more than adequate evidence presented and in the record to make this determination.  American National offered sworn testimony from Scott Webb ("Webb") at the Hearing.  *See* Exhibit 1.  Webb testified that he had over twenty-five years of experience managing leases and negotiating lease terms.  *Id.*  He also testified that he was responsible for the American National Lease in American National's real property portfolio.  *Id.*  He testified that American National "purposefully place[s] tenants in a mix that will optimize . . . the foot traffic" and income of a shopping center.  *Id.* at 37:20-13.  He affirmed that American National has attempted to maintain the particular mix of tenants in its management of the Property.  *Id.* at 35:16-19.  Indeed, the Court acknowledged that there were tenant mix provisions in the Big Lots Lease.  Exhibit 1 at 97:19-20 (Referring to lease provisions, according to the Court "applicable in other circumstances imposing restrictions on tenant mix.").  In the statement of assurances served on American National, Ollie's used the word "closeout" thirty-eight times to represent and describe

---

[5] The Court also stated that that it was not necessary to make this determination because of its interpretation of Section 4(a) of the Big Lots Lease. Id. at 97:21-24.

itself—it did not once use the word "dollar store" in that document. In addition, evidence from Ollie's public Website was admitted that asserted: "Ollie's is America's largest retailer of ***closeout*** merchandise and excess inventory."

37.     Not only was the Court informed of the tenant mix disruption by Webb, but it also was informed by the leases themselves. The Big Lots Lease distinguishes between "dollar stores" and "closeout stores." It is understood from the Lease itself, that one dollar store over 10,000 square feet is allowed—the 99 Cent Store—but more than one such store, or the addition of any closeout store, is not permitted and disrupts the tenant mix and balance. The Big Lots Lease provides that as long as Big Lots is open and operating, "no dollar store operation in excess of 10,000 square feet of floor area or closeout store ("Competing Business") may be permitted in" the Property. Exhibit 2 at 8. Thus, there is a distinction between "dollar stores" and "closeout stores." The Big Lots Lease expressly provides that Competing Business shall include, without limitation, a number of closeout stores, including Ollie's. *Id.*

38.     However, there is an exception for dollar stores over 10,000 square feet—the 99 Cent Exception (to be more fully discussed below). The 99 Cent Exception provides:

> [T]he parties acknowledge that 99 Cent Only is an existing tenant in the Shopping Center whose premises occupy more than 10,000 square feet. If 99 Cent Only (a) assigns its lease, or subleases its premises, to a dollar store or (b) vacates its premises and Landlord subsequently leases such premises to a dollar store ("replacement dollar store tenant"), then in any such event, such assignee, sublessee or replacement dollar store tenant shall not be deemed a Competing Business notwithstanding the fact that such premises are being operated for the purpose of a dollar store and occupy more than 10,000 square feet of floor area of the Shopping Center ("99 Cent Exception").

39.     Tellingly, the above provides no exception for any "closeout store." While the terms "dollar store" and "closeout store" are not definitively defined, the Big Lots Lease offers:

70920590\2

For purposes of clarification, a "dollar store" shall include by way of illustrative example, without limitation, the following business operations: 99 Cent Only, Dollar Tree and Dollar General. Dollar stores shall not be deemed a Competing Business unless said dollar store occupies more than 10,000 square feet of floor area of the Shopping Center (except for the 99 Cent Exception). Tenant acknowledges that even in the event that 99 Cent Only (or its successors, assigns or replacements) is open and operating in the Shopping Center, Landlord may lease space to another dollar store and same shall not be deemed a Competing Business; provided such other dollar store does not occupy more than 10,000 square feet in the Shopping Center. Further, a "closeout store" shall not include any branded or private label fashion apparel (including footwear) outlet closeout stores, such stores to include by way of illustrative example, without limitation, the following business operations: Talbot's outlet. Nine West outlet, Nordstrom Rack, TJ Maxx and Ross Dress for Less. The parties acknowledge and agree that branded or private label fashion apparel (including footwear) outlet closeout stores shall not be deemed a Competing Business.

40.     It is clear, that the parties intended no allowance for any closeout store, or for Ollie's, without American National's consent (the Court did not address the limitations on any assignment by the 99 Cents Store as provided for in the American National Lease).  American National is not contending that its consent is required post-petition under the Code.  Rather such references to consent and assignment inform and evidence the meaning of the term "successors and assigns" under these leases, and inform and evidence the meaning of tenant mix and balance intended by the Parties.

41.     It is clear, that even if the exception that the Debtors' claim applies for "successors and assigns" did apply—which it doesn't for the reasons stated below—this assignment still violates Section 365(b)(3)(D) because it disrupts the tenant mix bargained for the by American National, Big Lots, and even the Debtor as reflected in the leases.  *See*, Exhibits 2 and 3.  The parties did not intend for a "closeout store" to ever be located at the property.  *Slocum* does provide a relevant citation to the legislative history of the Bankruptcy Reform Act of 1978 that explains the significance of tenant mix and balance:

70920590\2

> A shopping center is often a carefully planned enterprise, and though it consists of numerous individual tenants, the center is planned as a single unit . . . . *[T]enant mix in a shopping center may be as important to the lessor as the actual promised rental payments, because certain mixes will attract higher patronage of the stores in the center*. . . .

> - *In re Joshua Slocum Ltd.*, 922 F.2d 1081, 1089 (3d Cir. 1990) (Emphasis Added).

And this is precisely what Webb testified to.

42.    Courts opining on this section have offered examples of its application, independent of part (C) and "use" or "exclusive use" clauses. Some have said that subsection (D) would operate "for example, in the case where a landlord had sought to protect a bargained for mix of tenants through restraints on assignment reflecting the bargain: *e.g.,* conditioning the right to assign and sublet on non-disruption of tenant mix regardless of the absence of operative exclusivity clauses in the leases of other tenants." *In re Ames Dep't Stores, Inc.*, 1991 WL 94422 (Bankr. S.D.N.Y. Jan. 2, 1991). Here, there were such restrictions on assignment. The American National Lease provides, *inter alia*, regarding assignment:

> Except as set forth in the Addendum, Tenant shall not assign this Lease or sublease the Leased Premises or any part thereof or mortgage, pledge or hypothecate its leasehold interest or grant any concession or license within the Leased Premises or sublease any operating department therein, and any attempt to do any of the foregoing shall be void and of no effect.

> Exhibit 2 at Art. VIII.

The Addendum provides, among other things:

> Without the prior consent of Landlord: (a) so long as Tenant's parent corporation is a publicly traded company, Tenant may assign its interest in this Lease, or any portion thereof, or sublet the Premises, or any portion thereof, to its parent corporation, or to any entity owned or controlled, in whole or in part, by its parent corporation, by Tenant or by any entity owned directly or indirectly by its parent corporation; and (b) Tenant may assign or sublease its interest in the Lease or the Premises, or any portion thereof, to any regional or national retailer with 25 or more stores in operation as of the date of such assignment or subletting. Any assignment or subletting

15

shall: ***(y) not conflict with the primary use of any then existing tenant in the Shopping Center who occupies at least 15,000 square feet of floor area***, and (z) be subject to: (i) the use clause set forth in Section 6.01 of the Lease; (ii) compliance with law; (iii) and all of the other provisions of this Lease including, without limitation, ***the provisions of this paragraph pertaining to future agreements between Landlord and other parties pertaining to the "exclusive" use of portions of the Shopping Center for particular uses ("Permitted Assignments"). Notwithstanding the foregoing, in no event shall Tenant be permitted to use a series of one or more Permitted Assignments to "spin-off" this Lease to independent third parties. As an example of the foregoing, Tenant shall not assign this Lease to an affiliate corporation whose assets consist solely of this Lease and the rights granted herein and thereafter sell the stock of such affiliate corporation to an independent third party. The result of what would otherwise be two; independent Permitted Assignments would become a transfer of this Lease to an independent third party.*** Any such transfer is prohibited by the terms of this Paragraph 10. **Exhibit 2**, *99 Cent Store Lease* 28 of 66 (Page 6 of Addendum) (Emphasis Added).

43.    Despite Section 365(f), American National is entitled to the benefits it bargained for and protection under the Code 365(b)(3). The Court did not consider the limitations on assignment provided in for 365(b)(3) (D) American National Lease. See, *In re TSW Stores of Nanuet, Inc.*, 34 B.R. 299, 307 (Bankr. S.D.N.Y. 1983) ("The level of competition between stores in a shopping center must be considered, especially in connection with the fact that the success or failure of individual tenants may affect the landlord and the other tenants in the center."). Thus, separate and apart from the use provisions, this assignment violates the tenant mix and balance in the Property. The only evidence before the Court, clearly demonstrates that there was to be no Ollie's or closeout store at the Property; this assignment disrupts the tenant mix and the tenant balance of the Property and should be rejected and withdrawn. *See, e.g.*, *Matter of Federated Dep't Stores, Inc.*, 1991 WL 302860 (Bankr. S.D. Ohio Dec. 3, 1991) ("[T]he word "mix" implies that issues will focus on the inclusion or exclusion of a store in the array or mix of [stores] . . . . [and the] word "balance" implies issues focusing on the location and relationship of tenants in the mix.").

70920590\2

**C. Under Texas law, the controlling substantive law, Debtors and Ollie's misinterpret the Big Lots Lease.**

44.     At the hearing, the Court stated from the bench:

> [H]ere the lease between the [landlord, American National,] and Big Lots states, so long as the tenant, Big Lots, is open and operating its business in the demised premise for the initial permitted use, except for tenants, which would here include 99 Cents, and their successors and assigns open and operating for business in a shopping center as of the effective date of this lease, meaning the Big Lots lease, no Dollar Store operation in excess of 10,000 square feet of floor area or closeout store, a competing business, may be permitted in the shopping center during the original term of this lease, or any operation terms or extension thereof. **Exhibit 1** at 96:17-97:03.

> Here, 99 Cents was open and operating at the time Big Lots entered into the lease with the landlord. Additionally, the proposed sale to Ollie's would result in Ollie's being a successor and assignee of 99 Cents. Consequently, this proposed assignment to Ollie's does not violate the use restriction in the Big Lots lease. **Exhibit 1** at 97:6-97:11.

> The Court continues, determining that, the 99 Cent Store "fall[s] under the exception of successors and assigns in the first sentence of the paragraph. The lease specifically permits 99 cents to have successors and assigns, *and there's no limiting language on who 99 Cents can assign to, despite other provisions within the lease applicable in other circumstances imposing restrictions on tenant mix*. **Exhibit 1** at 97:15-97:20 (Emphasis added).

45.     Texas substantive law controls the interpretation of both leases before the Court. See, *supra*. ¶ 10. Under Texas law, an interpretation is unreasonable "if it would strip a provision of meaning." *Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 99 F.3d 695, 706 (5th Cir. 1996). "It is a long-established rule that '[n]o one phrase, sentence, or section [of a contract] should be isolated from its setting and considered apart from the other provisions.'" *Canutillo Indep. Sch. Dist. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 99 F.3d 695, 707 (5th Cir. 1996). The Texas Supreme Court has long held that it is "bound to read all parts of a contract together to ascertain the agreement of the parties." *Forbau*, 876 S.W.2d at 133. The contract **must be considered as a whole, and each part of the contract should be given effect**. *Id.* Here, Debtors'

70920590\2

and Ollie's interpretation would render the 99 Cent Exception entirely superfluous and thus violate interpretative tenets of Texas law leading to an absurd result: effectively saying, '99 Cent Store can assign the lease to whomever it wants without any restrictions and can also assign it to a dollar store over 10,000 square feet.  This make no sense.

46.    As discussed at length above, the Big Lots Lease contains an expressly defined "99 Cent Exception."  The 99 Cent Exception deals with an assignment of the 99 Cent Only Store or the subsequent leasing by the landlord in the event that 99 Cent Only Store vacates its premises. This Court determined that the 99 Cent Store "fall[s] under the exception of successors and assigns in the first sentence of the paragraph. The lease specifically permits 99 cents to have successors and assigns, *and there's no limiting language on who 99 Cents can assign to, despite other provisions within the lease applicable in other circumstances imposing restrictions on tenant mix*. **Exhibit 1** at 97:15-97:20 (Emphasis added).  Then why is there a 99 Cent Store Exception?  This is in direct contravention of the Texas law that has long-held that a contract ***must be considered as a whole, and each part of the contract should be given effect***.

47.    The "successors and assigns" language, however, does still have meaning when read with the 99 Cent Exception—because, it could assign with certain consents of the landlord and it could assign without consent to an affiliate or successor.

**D.  Debtors and Ollie's Led the Court Away from the American National Lease.**

48.    The successors and assigns language was intended to allow 99 Cent to assign to a non-third party affiliate or successor.  *See*, *supra*, American National Lease provisions regarding assignment.  American National believes that this Court would have come to a different conclusion had Debtors discussed this language, rather than arguing there were no limitations whatsoever on assignment, and had the Court considered the Big Lots Lease in the context of the American

18

National Lease.  The meaning of "successor and assigns" of tenants "open and operating its business . . . as of the effective date of the [Big Lots Lease]" was informed by, and limited by, the American National Lease.  The American National Lease contains express prohibitions and limitations on who 99 Cents Only Stores Texas, Inc. could assign its lease to and, most relevant here, prohibits the assignment of its lease to Ollie's.  The American National Lease prohibited assignation to an "independent third party."  In other words, the use of the "successors and assigns" in the Big Lots Lease did not remove all of the limitations on assignment imposed in the American National Lease.  Moreover, 99 Cents Only Texas, Inc. could not assign this lease to an independent third party, but rather to an affiliate.[6]  Debtors' interpretation, adopted by the Court on this point, renders superfluous the 99 Cent Exception in the Big Lots Lease.  If 99 Cent Only Store could assign its lease to anyone, simply by virtue of being an existing tenant open and operating on the effective date of the Big Lots Lease, there would be no need for any additional language discussing an exception for 99 Cent Only Store to "assign its lease" "to a dollar store," because their described exception would already apply.  Thus, the Court's interpretation renders the 99 Cent Exception completely superfluous.

49.    In distilled form, the Court's reading of the lease is – Tenant may assign its lease to whomever it wishes.  Notwithstanding the foregoing, Tenant may assign its lease to a dollar store.  This reading is unreasonable under Texas law.  Therefore, American National has a reasonable likelihood of success on appeal.

---

[6] American National respectfully requests the Court to reconsider its decision in light of this language and this Motion. Federal Rule of Bankruptcy Procedure 9024 incorporates Rule 60(b) of the Federal Rules of Civil Procedure and allows bankruptcy courts, like district courts, to reconsider earlier orders in the case of mistake, inadvertence, surprise, excusable neglect, newly discovered evidence, or any other reason that justifies relief. *See In re Lower Bucks Hosp.*, 571 Fed App'x 139, 143 (3d Cir. 2014). Here, this limited additional briefing addresses a question of the Court during the Hearing and justice, equity, and fairness justifies a consideration of this information and evidence, prior to rendering the Order.

**E.  The Big Lots Lease Expressly Prohibits Ollie's**

50.     As described above, Ollie's is expressly defined, without limitation, as a Competing

Business in the Big Lots Lease.  The Big Lots Lease provides:

> In addition to the foregoing, a 'Competing Business' ***shall*** include, ***without
> limitation*** the following business operations: Marc's, Fred's, Super 10,
> Maxway, Mazel, Odd Job, Amazing Savings, Ocean State Job Lot,
> Grossman's Bargain Outlet, Greenbacks, Kings Discount, Building 19,
> National Wholesale Liquidators, and ***Ollies Bargain Outlet***. (Emphasis
> added).
>
> Exhibit 3 at 8 (emphasis added).

Moreover, Ollie's was not a tenant of the Property "open and operating for business in the

[Property] as of the effective date of the [Big Lots Lease]," September 4th, 2009.  *Exhibit 1* at

43:14-16. Ollie' was not a "successor or assign" of 99 Cents Only Stores Texas, Inc. "open and

operating for business in the [Property] as of the effective date of the [Big Lots Lease]," September

4th, 2009.  *Id.* at 43:17-20.  As a matter of law, the parties to the Big Lots Lease did not intend for

Ollie's to become a tenant so long as Big Lots was there and in compliance with its lease. Under

Texas law, "[w]hen construing a contract, the court's primary concern is to give effect to the written

expression of the parties' intent." *Forbau v. Aetna Life Ins. Co.*, 876 S.W.2d 132, 133 (Tex. 1994).

51.     For all of these reasons, American National has reasonably likely to succeed on

appeal, and this stay should be granted.

**IV.     American National will suffer irreparable harm if no stay is granted.**

52.     Irreparable harm is an injury that "'cannot be redressed by a legal or equitable

remedy following a trial.'" *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck

Consumer Pharms. Co.*, 290 F.3d 578, 595 (3d Cir. 2002) (quoting *Instant Air Freight Co. v. C.F.

Air Freight*, 882 F.2d 797, 801 (3d Cir. 1989)).  This standard is satisfied where a movant for stay

"demonstrates a significant risk that he or she will experience harm that cannot adequately be

70920590\2

compensated after the fact by monetary damages.'" *Guardian Life Ins. Co. of Am. v. Estate of Cerniglia*, ⸺ F. App'x ⸺, 2011 WL 3203693, at *3 (3d Cir. July 28, 2011) (quoting *Adams v. Freedom Forge Corp.*, 204 F.3d 475, 484-85 (3d Cir. 2000)); *see also Flowserve Corp. v. Burns Int'l Servs. Corp.*, 423 F. Supp. 2d 433, 439 (D. Del. 2006).

53.     Here, this assignment will place American National in apparent breach of its lease with third party tenant Big Lots.  As a result of this apparent breach, Big Lots will be able to pay half rent for up to a year and then have the option to terminate its lease.  Exhibit 3, Big Lots Lease, ("If such Competing Business Violation is not cured within such thirty (30) day period, then Tenant, as its exclusive remedy, shall have the right to pay, in lieu of the Rent stated in the Lease, an amount equal to fifty percent (50%) of the Rent otherwise payable under the terms of the Lease (hereinafter "Reduced Rent") until the Competing Business Violation has been cured.").  In addition, the Big Lots Lease provides for a Rogue Tenant Violation, which if not cured by American National within 365 days, could allow Big Lots an early termination right under the Big Lots Lease. This leaves potential for American National to suffer *hundreds of thousands* of dollars in damages, not even including the potential devaluing of the Property.  Moreover, this is on top of the irreparable harm of being unable to reverse Ollie's possession.

54.     Moreover, the American National Lease to be assigned to Ollie's under the order would also provide an indemnification to Ollie's for any action brought by Big Lots against Ollie's as a Rogue Tenant. Exhibit 2 at 4 ("So long as Tenant has not through its use of the Leased Premises violated an "exclusive" use granted by Landlord to another occupant of the Shopping Center which pursuant to the terms of this Lease is imposed on Tenant, Landlord shall indemnify and defend Tenant against any and all claims asserted by third parties claiming infringement of exclusivity in the Shopping Center.").

55.     In addition, while this issue has been recently contested, it appears that the application of 363 (m) may render American National's appeal moot.  Thus, the order of this Court would be effectively unappealable absent a stay, meaning that American National would have <u>no</u> remedy for monetary damages or otherwise, if the Order is not stayed.  When "the denial of a stay pending appeal risks mooting any appeal of significant claims of error, the irreparable harm requirement is satisfied." *See*, *In re Los Angeles Dodgers LLC*, 465 B.R. 18, 36 (D. Del. 2011). As the Third Circuit has stated, "[c]ertainly, the fact that the decision on the stay may be dispositive of the appeal ... is a factor that an appellate court must consider" in determining whether irreparable harm will result from the denial of a stay.  *Id.*

56.     And as the Court can see from the above, the proposed assignment (1) negates the negotiated provisions of other tenants' leases and American National, (2) negates the terms of the lease negotiated between the 99 Cent Store and American National, and (3) leaves American National exposed to dramatically reduced rent from Big Lots as a direct result and exposed to the potential extensive litigation liability from Big Lots and against it and against third parties as a result of indemnification provisions.  Thus, American National could be harmed for more than the $600,000 proposed for this lease.

57.     Without a stay, American National will suffer irreparable harm without any recourse.

**V.     A stay pending appeal would not substantially harm other interested parties.**

58.     In contrast to the harm experienced by American National, the other parties will not be substantially harmed by a stay pending appeal.  Here, a separate form of order was created regarding the other proposed assignments and a value was allocated to the assignment of this lease (Cite).  Thus, for example, (1) the Debtor gets a financial infusion, (2) Ollie's can adjust down the

22

consideration for this lease and will receive the other lease assignments from the other order, and (3) this issue can be resolved on appeal in a relatively short period of time. *See, e.g., In re Los Angeles Dodgers LLC*, 465 B.R. at 34 (finding preserving the status quo for a short time would not unduly burden nonmoving parties); *In re Finova Grp., Inc.*, 2007 WL 3238764, at *2 (concluding that a 90 day delay will not result in harm to the nonmoving parties). Moreover, the material risk to the other stakeholders is immaterial compared to the risks and harms facing American National. Moreover, Debtors can still reject the lease and Ollie's can reduce its consideration accordingly.

**VI.    The Public Interest favors staying the Order.**

59.    The public interest "lies" with staying the Order. American National is attempting to protect its contractual rights, under both the American National Lease and the Big Lots Lease, and "[t]he public has an interest in seeing that parties oblige by their contractual obligations and are not allowed to skirt such obligations at another's expense." *Rex Medical L.P. v. Angiotech Pharmaceuticals (US), Inc.*, 754 F. Supp. 2d 616, 626 (S.D.N.Y. 2010) (granting injunctive relief); *see also Siemens Bldg. Techs., Inc. v. Camac*ho, 168 F. Supp. 2d 425 (E.D. Pa. 2001) (granting injunctive relief and stating that, "[a]s a general matter, it is in the public interest to enforce valid contractual obligations and to protect legitimate business interests."). The Third Circuit also recognizes that Bankruptcy courts "cannot use [their] equitable power to avoid a clearly enforceable contractual term." *See*, *In re Tel. Warehouse, Inc.*, 124 Fed. Appx. 724, 725 (3d Cir. 2005).

60.    The Public Interest is not harmed, and is in fact supported, by the granting of stay pending appeal under the facts and law present here.

WHEREFORE, American National Insurance Company respectfully requests that the Court enter an order: (i) reconsidering the Order entirely, and either ruling in American National's favor or allowing for additional briefing; and/or (ii) staying the Order pending appeal; and (iii) granting to American National all other and further relief to which it may be justly entitled.

Respectfully submitted,

**COZEN O'CONNOR**

Dated:  May 30, 2024

*/s/ Simon E. Fraser*
Simon E. Fraser (No. 5335)
1201 N. Market Street, Suite 1001
Wilmington, DE 19801-1147
T:  302-295-2000 / F: 302-295-2013
sfraser@cozen.com

**GREER, HERZ & ADAMS, LLP**
Tara B. Annweiler
Texas State Bar No. 00783547
tannweiler@greerherz.com
Marc D. Young
myoung@greerherz.com
Texas State Bar No. 24098650
One Moody Plaza, 18th Floor
Galveston, Texas 77550
P: 409.797.3200
F: 409.766.6424

ATTORNEYS FOR AMERICAN
NATIONAL INSURANCE COMPANY

70920590\2