# EXHIBIT 1

1              UNITED STATES BANKRUPTCY COURT
                  DISTRICT OF DELAWARE
2

3  IN RE:                        .  Chapter 11
                                 .  Case No. 24-10719 (JKS)
4  NUMBER HOLDINGS, INC.,        .
   *et al.,*                     .  (Jointly Administered)
5                                .
                                 .  Courtroom No. 3
6                                .  824 North Market Street
                                 .  Wilmington, Delaware 19801
7          Debtors.              .
                                 .  Thursday, May 23, 2024
8  . . . . . . . . . . . . . . .  10:00 a.m.

9                 TRANSCRIPT OF HEARING
          BEFORE THE HONORABLE J. KATE STICKLES
10             UNITED STATES BANKRUPTCY JUDGE

11  APPEARANCES:

12  For the Debtors:         Andrew Leblanc, Esquire
                             MILBANK LLP
13                           1850 K Street, NW
                             Suite 1100
14                           Washington, DC 20006

15                           Brian Kinney, Esquire
                             MILBANK LLP
16                           55 Hudson Yards
                             New York, New York 10001

17

18
   (APPEARANCES CONTINUED)
19
   Audio Operator:          Madaline Dungey, ECRO
20

21  Transcription Company:   Reliable
                             The Nemours Building
22                           1007 N. Orange Street, Suite 110
                             Wilmington, Delaware 19801
23                           Telephone: (302)654-8080
                             Email:  gmatthews@reliable-co.com
24
   Proceedings recorded by electronic sound recording,
25  transcript produced by transcription service.

1  APPEARANCES (CONTINUED):

2  For the U.S. Trustee:      Rosa Sierra-Fox, Esquire
                              OFFICE OF THE UNITED STATES TRUSTEE
3                             844 King Street, Suite 2207
                              Lockbox 35
4                             Wilmington, Delaware 19801

5  For Ollie's Bargain
   Outlet:                    Josef Mintz, Esquire
6                             BLANK ROME LLP
                              1201 North Market Street
7                             Suite 800
                              Wilmington, Delaware 19801
8
                              John Lucian, Esquire
9                             BLANK ROME LLP
                              One Logan Square
10                            130 North 18th Street
                              Philadelphia, Pennsylvania 19103
11
   For Landlords:             Laurel D. Roglen, Esquire
12                            BALLARD SPAHR LLP
                              919 North Market Street
13                            11th Floor
                              Wilmington, Delaware 19801
14
                              Ivan Gold, Esquire
15                            ALLEN MATKINS LECK GAMBLE
                                MALLORY & NATSIS LLP
16                            TCW Tower
                              865 S Figuero Street
17                            Suite 2800
                              Los Angeles, California 90017
18
   For Red Hill Village:      Aaron Applebaum, Esquire
19                            DLA PIPER LLP (US)
                              1201 North Market Street
20                            Suite 2100
                              Wilmington, Delaware 19801
21
   For Mira Mesa
22 Shopping Center West
   LLC:                       William Hazeltine, Esquire
23                            SULLIVAN HAZELTINE ALLINSON LLC
                              919 North Market Street
24                            Wilmington, Delaware 19801

25

```
 1   APPEARANCES (CONTINUED):

 2   For the Committee:          Steven Golden, Esquire
                                 PACHULSKI STANG ZIEHL & JONES LLP
 3                               780 Third Avenue
                                 34th Floor
 4                               New York, New York 10017

 5   For KRG Houston New
     Forest, LLC:                Lucian Murley, Esquire
 6                               SAUL EWING LLP
                                 1201 North Market Street
 7                               Suite 2300
                                 Wilmington, Delaware 19801
 8
     For Oracle Limberlost
 9   Shopping Center, LLC:       Benjamin Keenan, Esquire
                                 ASHBY & GEDDES, P.A.
10                               500 Delaware Avenue
                                 8th Floor
11                               Wilmington, Delaware 19801

12   For Burlington:             Matthew Ward, Esquire
                                 WOMBLE BOND DICKINSON (US) LLP
13                               1313 North Market Street
                                 Suite 1200
14                               Wilmington, Delaware 19801

15   For ALDI, Inc.:             James Rossow, Jr., Esquire
                                 RUBIN & LEVIN, P.C.
16                               135 North Pennsylvania Street
                                 Suite 1400
17                               Indianapolis, Indiana 46204

18   For Kimco:                  Rachel Mersky, Esquire
                                 MONZACK MERSKY & BROWDER, P.A.
19                               1201 North Orange Street
                                 Suite 400
20                               Wilmington, Delaware 19801

21   For Unexpired Lease
     Counterparty:               Alexandra Thomas, Esquire
22                               CHOATE, HALL & STEWART LLP
                                 Two International Place
23                               Boston, Massachusetts 02110

24

25
```

```
 1   APPEARANCES (CONTINUED):

 2   For American National
     Insurance Company:        Simon Fraser, Esquire
 3                             COZEN O'CONNOR
                               1201 North Market Street
 4                             Suite 1001
                               Wilmington, Delaware 19801
 5
                               Marc Young, Esquire
 6                             GREER, HERZ & ADAMS, LLP
                               One Moody Plaza
 7                             18th Floor
                               Galveston, Texas 77550
 8
     For CSIM/Franklin
 9   Family Partnership:       Paige Topper, Esquire
                               SAUL EWING LLP
10                             1201 North Market Street
                               Suite 2300
11                             Wilmington, Delaware 19801

12   For the DIP Lender:       Megan Volin, Esquire
                               PROSKAUER ROSE LLP
13                             Eleven Times Square
                               Eighth Avenue & 41st Street
14                             New York, New York 10036

15   For Navins Fund:          Jeffrey Waxman, Esquire
                               MORRIS JAMES LLP
16                             500 Delaware Avenue
                               Suite 1500
17                             Wilmington, Delaware 19801

18

19

20

21

22

23

24

25
```

1                              <u>INDEX</u>

2   <u>MOTIONS</u>:                                           <u>PAGE</u>

3
    Agenda
4   Item 5: Debtors' Motion for Entry of an Order       6
            Approving (I)(A) Bidding Procedures in
5           Connection with the Sale of Substantially
            All of the Debtors' Remaining Assets, (B)
6           Assumption and Assignment Procedures, (C)
            Form and Manner of Notice of Sale Hearing,
7           Assumption Procedures, and Auction
            Results; (II) Auction and Sale Hearing
8           Dates; (III)(A) Debtors' Entry into One or
            Multiple Asset Purchase Agreements, (B)
9           Sales(s) Free and Clear of All Encumbrances,
            and (C) Assumption and Assignment of
10          Certain Executory Contracts and Unexpired
            Leases; and (IV) Granting Related Relief
11          (D.I. 171, filed 4/16/24)

12          Court's Ruling:                            104

13
    <u>EXAMINATION</u>:                                       <u>PAGE</u>
14
        <u>WILLIAM SCOTT WEBB</u>
15      Direct examination by Mr. Young                 32
        Cross-examination by Mr. Lucian                 47
16      Redirect examination by Mr. Young               58

17
    <u>DECLARATIONS</u>:                                      <u>PAGE</u>
18
    1) Matt Tabloff                                     11
19
    2) Paul Shin                                        12
20

21  <u>EXHIBITS</u>:                                          <u>PAGE</u>

22  American National - Exhibits 1 through 3            32

23

24

25

1          (Proceedings commenced at 10:09 a.m.)

2               THE COURTROOM DEPUTY:  All rise.

3               THE COURT:  Good morning. Please be seated.

4               This is Judge Stickles.  We are on the record in

5    Number Holdings, Case No. 24-10719.

6               I will hear from debtors' counsel.

7               MR. LEBLANC:  Good morning, Your Honor.

8               THE COURT:  Good morning.

9               MR. LEBLANC:  Andrew Leblanc of Milbank on behalf

10   of 99 Cents and its affiliated debtors-in-possession.

11              Your Honor, today marks the culmination of the

12   efforts of the company and its advisors that began well

13   before the petition date. On April 16th 99 Cents filed a bid

14   procedures and sale motion seeking approval of the bidding

15   procedures for the sale of substantially all of the company's

16   assets that were not being sold pursuant to the store closing

17   procedures previously authorized by Your Honor.

18              On May 9th the Court entered the bidding

19   procedures order at Docket No. 463.  Pursuant to the process

20   set forth in the bidding procedures, 99 Cents received 150

21   indications of interest for various portions of the assets

22   which included 44 owned properties, hundreds of leases and

23   the company's intellectual property.

24              We subsequently received over 75 bids for the

25   assets.  One of those bids, Your Honor, was the stalking

1  horse bid of Ollie's, which Your Honor approved our

2  designation of Ollie's as the stalking horse bidder on May

3  15th, that docket entry was at No. 562.  The company and its

4  advisors conducted an auction on May 21st. The auction was

5  entirely done virtually with the first portions taking place

6  on Hilco's online platform and then the process concluding in

7  a Zoom environment.

8         The company and its advisors worked closely with

9  the advisors to our consultation parties to evaluate the bids

10  that were received and determine the highest and best bid for

11  each asset.  The end result is the process that are the

12  proposed sales for which we are seeking approval today, Your

13  Honor, which in the aggregate represent over $170 million of

14  value to the company.

15         So, Your Honor, we are here today seeking approval

16  of that sale and that is the purpose for the hearing.  We

17  submitted an agenda and I think, Your Honor, there is some

18  contested issues and we will take that in the order in a

19  moment, but that is the purpose for which we are here today

20  simply to get approval that sale order.  As I mentioned, our

21  view is that this was a very successful auction.  We raised,

22  as I said, $170 million which compares very favorably to the

23  initial indications of interest and --

24         THE COURT:  What is the breakdown of the $170

25  million for the multiple sales?  You have four transactions,

1  proposed transactions, what is the breakdown?

2          MR. LEBLANC:  Your Honor, I know -- I am not sure

3  that I have the breakdown for each of them, but one of my

4  colleagues may be able to give that to me.  I know that the

5  Ollie's one is the stalking horse bid, the $14.6 million.

6          THE COURT:  I know those two. I was curious the

7  breakdown for the multiple -- not Ollie's, not the

8  designation.  The other two, what is the breakdown?

9          MR. LEBLANC:  Your Honor, there is -- I think

10  there's 44 different purchasers; supporting two, minus

11  Ollie's and the Dollar Tree acquisition. So, 42 different

12  purchasers, but I am looking at my colleagues to get that for

13  you.

14      (Pause)

15          MR. LEBLANC:  I apologize for the delay, Your

16  Honor.  So, the Dollar Tree designation rights constitute $13

17  million; that is one of the two that Your Honor said you were

18  familiar with.  The 21 lease assignments that are not part of

19  the stalking horse bid constitute $2,464,863.  The Ollie's

20  stalking horse bid is $14.6 million.  Then the sale of the 41

21  owned properties is $137,334,320.

22          THE COURT:  Thank you.

23          MR. LEBLANC:  So, Your Honor, those are the sales,

24  obviously, that occurred on the auction date.  We had the

25  prior transactions that Your Honor had approved in connection

1  with the Dollar Tree designation rights and the grocery

2  outlet April leases were an additional $2.75 million which

3  brings the grand total in the sales process, not just from

4  the auction, to just over $170 million in the aggregate.

5           One note, Your Honor, as contemplated by the

6  bidding procedures with respect to all transactions involving

7  leases other then the stalking horse bid, resolution of cure

8  objections and the filing resolution of adequate assurance

9  information will occur after this hearing.  We will bring any

10  unresolved issues and we will work to resolve them all, Your

11  Honor, but any unresolved issues we will bring back to Your

12  Honor and have provided that we might not close those lease

13  assignments until those issues are resolved.  So, that is not

14  a today issue.

15           THE COURT:  That is June 4th, correct?

16           MR. LEBLANC:  Yes, Your Honor.  Exactly.

17           Your Honor, what I would propose to do is there

18  are four different forms of order.  What I propose to do is

19  offer our evidence in connection with the proceedings and

20  then I will yield the podium to Mr. Kinney who is going to

21  handle the first of the forms of order, the Dollar Tree one,

22  so we can resolve that and get them on their way.  Then we

23  will turn to the one with respect to the Ollie's lease

24  assignment and American National.

25           THE COURT:  Is that the only pending objection

1  today?

2          MR. LEBLANC:  The only pending objection today,

3  Your Honor, I think -- my colleagues will go over the forms

4  of order.  There is the American National one and then Mr.

5  Kinney is going to raise -- there is a landlord.

6          MR. KINNEY:  Yes, Your Honor.  We're also have

7  received an informal -- sorry, Brian Kinney from Milbank.  We

8  also received an informal objection from one of our

9  landlords.  We believe that is still live.  So, that will be

10 heard in connection with the proposed form of relief sale

11 order.

12         THE COURT:  Okay.

13         MR. LEBLANC:  Your Honor, we have two declarations

14 that we filed on the docket.  The first is a declaration by

15 Matt Tabloff in support of the debtors' motion.  That was

16 filed at Docket No. 669.

17         THE COURT:  That is in support of designation

18 rights only, is that correct?

19         MR. LEBLANC:  That is -- I believe that is

20 correct, Your Honor.

21         THE COURT:  Okay.

22         MR. LEBLANC:  Yes, Your Honor.  That is just in

23 connection with the (indiscernible).  So, Your Honor, we

24 would offer that declaration as Mr. Tabloff's direct

25 testimony and he's available for cross-examination if anyone

1  wishes.

2        THE COURT:  Does anyone object to the admission

3  into evidence of the Tabloff declaration at Docket 669 in

4  support of sale of the designation rights?

5        (No verbal response)

6        THE COURT:  Okay.  I hear no one. I see no hands

7  on Zoom.

8        Does anybody wish to cross-examine the declarant

9  regarding the content of his declaration?

10        (No verbal response)

11        THE COURT:  I hear no one. I see no hands on Zoom.

12  The declaration is admitted uncontroverted.

13        (Tabloff declaration received into evidence)

14        MR. LEBLANC:  Thank you, Your Honor.

15        The next declaration is Exhibit No. 671 and this

16  is the declaration of Paul Shin, of Jefferies, in connection

17  with the remainder of the sales, Your Honor.  Mr. Shin is

18  available for cross-examination. He is here in the courtroom.

19  We would offer Document No. 671 as Mr. Shin's direct

20  testimony in this case.

21        THE COURT:  Does anyone object to entry into

22  evidence of the Shin declaration at Docket 671 in support of

23  multiple asset purchase agreements?

24        (No verbal response)

25        THE COURT:  I hear no one. I see no hands on Zoom.

1          Does anyone wish to cross-examine the declarant

2   regarding the content of his declaration?

3          (No verbal response)

4          THE COURT:  Okay.  Hearing no one or seeing no

5   hands on Zoom, that declaration is admitted uncontroverted.

6          (Shin declaration received into evidence)

7          MR. LEBLANC:  That concludes our evidentiary

8   presentation, Your Honor.  What I would propose to do is we

9   were going to -- if it would please the Court, we would

10  handle the Dollar Tree order first and then we will turn next

11  to the --

12         THE COURT:  Before we get there, I just want to

13  confirm that some of these orders were just filed and, in

14  fact, one of them I was handed before I came on the bench. I

15  haven't even looked at it yet, a blackline.  I just want to

16  make sure that parties in interest have had an opportunity to

17  review these orders.

18         MR. LEBLANC:  We believe they have, Your Honor.

19  We have been coordinating with the parties throughout. I know

20  just as we walked in the courtroom there is, what I believe

21  to be, knits that were raised to us.  So, I have no doubt

22  that there will be some changes.  When we talk about the

23  Ollie's transaction, Your Honor, we are going to work

24  subsequent to -- assuming Your Honor enters an order --

25  agrees to enter the order, we are going to separate out the

1  Ollie's transaction with respect to the one piece of property

2  -- the one lease that is objected to, we are going to treat

3  that in a separate order and then have the other seven leases

4  and three owned properties that Ollie's is transacting for

5  treated in one order. It won't require a separate APA.  We

6  just want to have a clean separation between those.

7            THE COURT:  Understood.

8            MR. LEBLANC:  So, we will do that subsequent to

9  the proceeding and we will do it under certification of

10  counsel and submit that to the Court.  We have been trying to

11  keep everybody updated, Your Honor, and, obviously, if people

12  have comments we are happy to take them and then provide it

13  to Your Honor under certificate of counsel at some point

14  subsequent to today.

15            THE COURT:  I think Ms. Sierra-Fox wants to be

16  heard.

17            MS. SIERRA-FOX:  Yes, Your Honor.  May I be heard?

18            THE COURT:  Yes, please.

19            MS. SIERRA-FOX:  Your Honor, I did -- on behalf of

20  the U.S. Trustee Rosa Sierra-Fox.  I did begin reviewing the

21  orders and in particular started with the Dollar Tree order

22  yesterday afternoon. I am still working through the orders on

23  behalf of the U.S. Trustee.  So, throughout the hearing I

24  will be -- I have a couple of comments.

25            THE COURT:  I have comments too and certainly feel

1    free to raise any issues you have as we work through them or

2    if we need to take a break for someone to look at an order we

3    will.

4              MS. SIERRA-FOX:  Yes, Your Honor.  Thank you.

5              THE COURT:  Mr. Kinney.

6              MR. KINNEY:  Thank you, Your Honor.  For the

7    record Brian Kinney of Milbank on behalf of 99 Cents and its

8    affiliated debtors.

9              Your Honor, yesterday we filed at Docket No. 663 a

10   proposed order including the purchase agreement amongst

11   debtors and buyer authorizing the sale of designation rights,

12   determining leases free and clear of liens, claims, and

13   encumbrances, and approving assignment and assumption

14   procedures of the designated leases and granting related

15   relief.

16             Your Honor, this is the Dollar Tree order that we

17   have been referring to.  Your Honor, in connection with the

18   sale process, prior to the auction, the debtors received a

19   bid from Dollar Tree as evidenced in Mr. Tabloff's

20   declaration.  In consultation with our consultation parties -

21   -- in extensive consultation with our consultation parties

22   the debtors determined that the proposal which Dollar Tree

23   made was an extremely beneficial offer to the estates.  The

24   debtors commenced the process, basically, to value check that

25   proposal.

1          Your Honor, the Dollar Tree proposal provides for

2    the purchase of designation rights for 112 of our lease

3    locations and the consideration for that as well as for the

4    debtors' intellectual property is $13 million.  There is an

5    agreement also to purchase the fixtures, furniture and

6    equipment related to those locations for an amount in excess

7    of $1.7 million.

8          THE COURT:  Is that the debtors' FF&E?

9          MR. KINNEY:  It is, Your Honor.  It is the

10   debtors' FF&E.  There is no landlord FF&E.  That is the

11   debtors.

12         THE COURT:  Or no third-party FF&E?

13         MR. KINNEY:  It's not third-party FF&E.  We

14   returned the third-party FF&E the debtors are in possession

15   of and the (indiscernible) in those stores.

16         UNIDENTIFIED SPEAKER:  Your Honor, may I ask

17   counsel to speak into the mic.  We can't hear him back here.

18   Sorry to interrupt.

19         MR. KINNEY:  Is this better?  First time I have

20   ever been told that I was inaudible.

21         THE COURT:  Actually, no offense, I don't think

22   its you.  I think it's the vent above their heads back there

23   that makes it very difficult to hear. I have one behind me

24   too, so, yes.  Give me a thumb's up if you can't hear him.

25         MR. KINNEY:  Your Honor, the Dollar Tree proposal

1   also included an additional benefit to the estate. It

2   included an agreement to pay June rent for the locations and

3   it also provided that if fewer than 95 of the locations were,

4   in fact, designated for assumption additional payment of

5   $25,000 per location to the debtors.

6           This bid, however, was conditioned on the debtors

7   designating them the successful bidder prior to the auction

8   and removing the assets from the auction. The debtors

9   commenced an extensive process of reaching out to all parties

10  that have expressed an interest in those lease locations

11  prior to as part of the process to see if they were willing

12  to increase their bids. The net result of that, Your Honor,

13  is that while we did get some interest to increase those

14  bids, which (indiscernible) for all the individual bids still

15  paled in comparison with what Dollar Tree was offering on

16  this designation rights bid.

17          THE COURT:  And that was in consultation with your

18  consultation parties?

19          MR. KINNEY:  It was, Your Honor.  There was

20  extensive consultation with both the committee and with our

21  DIP lenders.  So, after those discussions we determined

22  Dollar Tree the successful bidder for those assets, removed

23  them from the auction, and we are here today to proceed with

24  an order approving those designation rights.

25          As Your Honor may remember, we had entered a

1  designation rights order with respect to a set of our April

2  leases in Dollar Tree earlier in this process and the order

3  that we filed is redlined against that earlier order.  So,

4  the order that we have at 663 also attached a redline of the

5  initial Dollar Tree designation rights order for the ease of

6  the parties.  They kept largely to that same form.

7  Obviously, there was some amendments to not only reflect the

8  passage of time, but also the inclusion of the intellectual

9  property at this time and the specifics of the bid.

10 Otherwise, we kept to the earlier form.

11          Your Honor, as Ms. Sierra-Fox noted, she has

12 provided informal comments. They are not reflected in the

13 form of order that we submitted.

14          THE COURT:  I just want to make sure I'm on the

15 right page.  The latest order is 663, correct?

16          MR. KINNEY:  Correct.

17          THE COURT:  Okay.

18          MR. KINNEY:  6631 is the current order, 6632 was

19 the blackline.

20          THE COURT:  The blackline which is what I was

21 working off of.

22          MR. KINNEY:  We are working to incorporate Ms.

23 Sierra-Fox's comments and we will, under COC after the

24 hearing, submit a blackline reflecting those changes that we

25 have agreed to with the Office of the United States Trustee.

1           THE COURT:  Okay.  Let me ask: Does anyone want to

2   be heard with respect to the proposed sale or Docket No. 663,

3   the proposed order?

4           MR. GOLDEN:  Good morning, Your Honor.  Steve

5   Golden of Pachulski Stang Ziehl & Jones, proposed counsel to

6   the committee.

7           I just wanted to confirm further to Your Honor's

8   question that we were consulted as part of this and we agree

9   and think it's a good result of the estate.

10          Thank you, Your Honor.

11          THE COURT:  Thank you.  I appreciate your comment.

12          MR. KEENAN:  Good morning, Your Honor.  May I

13  please the Court Ben Keenan, Ashby & Geddes, for Oracle

14  Limberlost Shopping Center LLC, which is a landlord with

15  leases subject to the proposed order at 663.

16          The proposed order was filed under -- the notice

17  of successful bidder was filed at No. 638.  I just wanted to

18  make a clarification, Your Honor and just explain to the

19  Court the issue I have. In reviewing this last night and this

20  morning the proposed sale order is pursuant to the general

21  sale procedures under (indiscernible) entered at 463, but it

22  also references the designation rights. Those are two

23  separate tracks and that is what gave me a concern.

24          THE COURT:  Understood.

25          MR. KEENAN:  I did have a chance to thank debtors'

1 | counsel and Dollar Tree's counsel was kind enough to explain
2 | this before the hearing. I think just filing an amended
3 | clarification to --

4 |      THE COURT:  Where are you referring to
5 | specifically?

6 |      MR. KEENAN:  What the different procedures are?

7 |      THE COURT:  No.  I understand the different
8 | procedures. I actually see them as two bifurcated events.
9 | So, I guess I am asking more specifically what is your
10 | concern vis-à-vis the order.

11 |      MR. KEENAN:  What I have done is I will tell you
12 | my understanding and Dollar Tree's counsel can correct me if
13 | I'm wrong.  Dollar Tree is under the -- under this proposed
14 | sale order is purchasing a new set of designation rights for
15 | these (indiscernible) Oracle.  Its similar, but its not
16 | identical.  That is why I wanted (indiscernible) procedures
17 | for the designation right period.

18 |      Dollar Tree will have a chance to inform the
19 | debtors of leases they wish to potentially assume and assign.
20 | Notice will be issued.  Counterparties will have a chance to
21 | respond just as they have under the existing designation
22 | rights procedures.  Dollar Tree's counsel explained to me
23 | that one section of that is the core objection deadline,
24 | which ran on May 14th, will continue to uphold. So, other
25 | than that the --

1          THE COURT:  Okay.  What does that mean?

2          MR. KEENAN:  That means there -- that under the

3   sale procedures, under Docket 463, there is what's called a

4   contract objection deadline which is, essentially, a cure

5   objection deadline that was on May 14th.  That will continue

6   to hold and parties that didn't respond before that will not

7   have a chance at a cure objection.

8          THE COURT:  Will have a new chance?

9          MR. KEENAN:  Will not.

10          THE COURT:  Oh, okay.  So, those cure objections

11   were due and many were filed. I have looked at every one of

12   them.  They will be heard on June 4th unless otherwise

13   resolved in advance, which we are hopeful that many will be

14   resolved.

15          MR. KEENAN:  Right, but, otherwise, the

16   designation rights procedures will hold under the previous

17   designation order. That will be the procedures that will

18   govern counterparties rights.  Subject to that clarification,

19   Oracle does not object and (indiscernible).

20          THE COURT:  Mr. Kinney.

21          MR. KINNEY:  Your Honor, again, for the record,

22   Brian Kinney of Milbank.

23          That is correct, the order at 663 is not approving

24   the assumption and assignment of any individual lease.  It is

25   approving the sale of the intellectual property, but with

1  respect to the leases it's just approving a sale of the

2  designation rights and implementation of the designation

3  rights procedures which provide for subsequent notice and an

4  opportunity to object to the assumption and assignment based

5  on adequate assurance grounds.  Again, as noted, since we did

6  notice all of these locations with their cure amounts there

7  is not an additional chance to object to the cure amount, but

8  there is to the adequate assurance and (indiscernible).

9           MR. KEENAN:  Thank you, Your Honor.

10           THE COURT:  Mr. Applebaum.

11           MR. APPLEBAUM:  Good morning, Your Honor.  Aaron

12  Applebaum, DLA Piper, on behalf of Red Hill Village LLC,

13  which is also a minority.

14           I think this is mostly a tag along to the prior

15  comments which we did file an objection which is Docket No.

16  609.  Our lease does appear to be listed as part of the

17  Dollar Tree sale.  My clients want to make sure that our

18  rights are preserved on the record with respect to the cure

19  amounts that is not being addressed today.  Assumption and

20  assignment is conditioned on resolution of the cure amount

21  and any adequate assurance objection that we might file by

22  the May 30th deadline.

23           Thank you, Your Honor.

24           THE COURT:  Mr. Kinney.

25           MR. KINNEY:  That is confirmed.

1           THE COURT:  Thank you.

2           Mr. Murley.

3           MR. MURLEY:  Good morning, Your Honor.  Luke

4   Murley of Saul Ewing for KRG Houston New Forest.

5           I rise to confirm that our cure objection can be

6   heard on June 4th and that is not prejudiced.  I also want to

7   point out practical issues that we don't yet have adequate

8   assurance information. I believe the deadline was yesterday.

9   We will continue to coordinate with the other side, but our

10  ability to respond on adequate assurance is contingent on

11  actually getting information.

12          THE COURT:  Could you, Mr. Kinney, address the

13  status of adequate assurance?

14          MR. KINNEY:  Your Honor, to the extent that

15  adequate assurance information did not get served yet we will

16  make sure that it gets served today.  When our first batch

17  went out yesterday, I just need to verify (indiscernible) but

18  also for this process the adequate assurance information will

19  occur after the designation.

20          Again, this is not being assumed today so its not

21  subject to the adequate assurance deadline to the sale order.

22  Its subject to the adequate assurance deadlines in the

23  designation procedures.  So, that information would be

24  transmitted when the lease is designated and the objection is

25  not due until after that designation occurs.

1          THE COURT:  Maybe you should insert a footnote in
2  this order stating that.

3          MR. MURLEY:  I'm sorry, Your Honor.

4          THE COURT:  I'm suggesting to the debtor that
5  perhaps they insert a footnote in the order clarifying that
6  because I am not certain, having read the order, that that is
7  abundantly clear.  Of course, I'm not living it like you're
8  living it, but --

9          MR. KINNEY:  Your Honor, that is perfectly fine.
10  We will insert an express clarification with respect to the
11  adequate assurance for the designation of properties.

12          THE COURT:  Okay.  Does anyone else wish to be
13  heard with respect to the sale of designation rights?

14          MR. GOLD:  A quick clarification, please, Your
15  Honor.

16          THE COURT:  Yes.  Mr. Kinney, he is asking for a
17  clarification. I just want to make sure -- I'm sorry, I
18  didn't mean to interrupt you, but I am putting you on the
19  spot.

20          Go ahead, Mr. Gold.

21          MR. GOLD:  Yes.  Good morning, Your Honor. Ivan
22  Gold of Allen Matkins for a member of the debtors' landlords.

23          We have 11 leases that are part of the designation
24  rights transaction.  Just a clarification, Your Honor, it's
25  my understanding, as we talk about June 4th, that is for the

1  other tranches of leases because, otherwise, we would be

2  adjudicating cures prior to the designation rights.  So,

3  while we're adding footnotes that might not be another bad

4  one for us to add so you are not issuing advisory rulings on

5  cures that are being negotiated.

6           THE COURT:  Yeah, I misspoke. They are not

7  necessarily ripe at that point.

8           MR. KINNEY:  Your Honor, we can further adjourn

9  for any leases that are not part of one of the other -- that

10 is not part of the other transaction today we will either

11 further adjourn those cure objections or in some cases those

12 cure objections had become moot because the debtors are in

13 the process of rejecting those leases.  So, we will update

14 and work with the landlords to adjourn those cure objections

15 till after the designation --

16          THE COURT:  Thank you.  And utilizing charts with

17 respect to your cure objections is very efficient.

18          MR. KINNEY:  Thank you, Your Honor.

19          THE COURT:  Does anyone else wish to be heard with

20 respect to the designation rights sale or the proposed form

21 of order?

22     (No verbal response)

23          THE COURT:  So, I don't know -- did the U.S.

24 Trustee want to put their comments on the record?  Are these

25 comments that --

1        MS. SIERRA-FOX:  Rosa Sierra-Fox on behalf of the

2   U.S. Trustee.

3        Your Honor, with the Dollar Tree order our

4   comments were relatively minor.

5        THE COURT:  Okay.

6        MS. SIERRA-FOX:  So, I don't think that is

7   necessary.  We have already agreed on those changes.  So, we

8   are fine with our resolution.

9        THE COURT:  Thank you.

10       Okay.  So, having heard no one -- no further

11  objection, based on the record that's been made and the

12  resolution of all objections I'm prepared to approve the

13  uncontested sale of the designation right to Dollar Tree. I

14  am satisfied that the proposed sale constitutes a reasonable

15  exercised of the debtors' business judgment, yields maximum

16  value for the debtors' estate and is in the best interest of

17  the debtors or creditors.

18       Based on the Shin declaration at Docket 671 in

19  support of the multiple asset purchase agreements as well as

20  the Tabloff declaration at 669 in support of the sale of the

21  designation rights, the debtors and their advisors, in

22  consultation with consultation parties, engaged in a robust

23  auction process. The sale process provided a full, fair and

24  reasonable opportunity for any person or entity to make a

25  higher or, otherwise, better offer to purchase the assets.

1   The proposed sale does represent the highest and best offer.

2   The purchaser is entitled to all the protections afforded

3   under the bankruptcy code.

4           So, I will approve the proposed sale order with a

5   few modifications to the form of order.  You are going to

6   have to bear with me because I kind of scribbled comments on

7   here.  So, I'm sure you are familiar, in the introductory

8   paragraph, there needs to be a couple of conforming edits

9   about dates and docket number for the Tabloff declaration and

10  that type of thing.

11          MR. KINNEY:  Yes, Your Honor.

12          THE COURT:  I had a lot of comments on the

13  evidence, but I note that the declarations were very helpful

14  and tracked very nicely to the form of order.

15          MR. KINNEY:  Thank you, Your Honor.

16          THE COURT:  On Paragraph 22 these trade fixtures

17  these are debtors. I don't have to -- what I am concerned

18  about here is any lienholders that were, you know, banning

19  free and clear of property that is not the debtors.

20          MR. KINNEY:  Correct, Your Honor. This is only

21  debtor property and it is subject to the lien of the

22  prepetition notes.  That is the only lien on these.

23          THE COURT:  So, they're consenting lienholders.

24          MR. KINNEY:  They're consenting.

25          THE COURT:  So, why don't you just tack onto the

1  end of that sentence something to the effect of consenting

2  lienholders.

3          MR. KINNEY:  We will make that change, Your Honor.

4          THE COURT:  Just out of an abundance of caution.

5          I think that is the only comment -- oh, I know,

6  Paragraph 29, the last sentence, what is this language about

7  a plan?  Why is it in here, the language about a plan?

8          MR. KINNEY:  Your Honor, its just to clarify that

9  a plan cannot affect this order and the relief granted in the

10  order. Its solely -- again, the sale will occur under this

11  order and the plan can't affect the rights of the purchaser

12  that are granted under the sale order.

13          THE COURT:  I understand what's being done.  I

14  don't love it, I will be honest, because to me orders speak

15  for themselves and then I will enter a confirmation order

16  that says this supersedes everything else.  If there is a

17  conflict between the plan and confirmation order the

18  confirmation order will stand.  So, I understand why its in

19  here, but I recommend to parties that they be vigilant when

20  they're looking at a plan.  If they have an issue with it,

21  they should raise it.

22          With that modification and the comments of the

23  United States Trustee if you will upload a clean and

24  blackline under certification of counsel, we can get it

25  entered.

1          MR. KINNEY:  Thank you, Your Honor.  We will do

2    that after the hearing.

3          MR. LEBLANC:  Your Honor, Andrew Leblanc again for

4    99 Cents.

5          What I would propose to do next, Your Honor, is to

6    cover the Ollie's transaction.  So, the objection there --

7    the one remaining objection is the American National

8    objection. My understanding is the others have been resolved.

9    My colleagues can talk to that if necessary.  And I know we

10   have submitted our evidence, Your Honor, and I know Ollie's

11   had submitted a declaration -- I'm sorry, not Ollie's.

12   American National had submitted a declaration. I know Ollie's

13   they are going to take the lead on responding to the

14   evidentiary submission and I will jump up as necessary at the

15   end and I will certainly take the lead on arguing our

16   position with respect to their objection.

17         THE COURT:  Can you all just give me a minute, I

18   want to pull up the correct papers.

19       (Pause)

20         THE COURT:  Okay.  Let me ask before we proceed

21   any further, is there any other party, other then American

22   National Insurance, who objects to the proposed sale of the

23   leases to Ollie's Bargain Outlet which is Docket 637?

24       (No verbal response)

25         THE COURT:  I hear no one. I am ready to proceed.

1          MR. LEBLANC:  Your Honor, happy to proceed however

2  you would propose.  What I think would make logical sense is

3  to the extent that American National wants to submit evidence

4  I would propose that that happen and then we can just do --

5  rather then doing openings, evidence, closing in an issue

6  like this I would propose we just deal with the evidence and

7  then we will turn to legal argument.

8          THE COURT:  Well, since it's their objection I

9  will let them proceed first and then they can proceed if you

10  want to make an opening statement or not it's your choice.

11          MR. FRASER:  Good morning, Your Honor. Simon

12  Fraser from Cozen O'Connor for American National.

13          My co-counsel, Marc Young, is here remotely. I

14  know also our declarant, Scott Webb, is available remotely

15  with permission from Chambers.  I will turn the podium over -

16  - virtually over to Mr. Young.

17          THE COURT:  All right.  Thank you.

18          Mr. Young.

19          MR. YOUNG:  Good morning, Your Honor.  Marc Young

20  on behalf of American National.

21          First let me thank you for allowing us to attend

22  remotely as well as Mr. Scott Webb.  I will represent to you

23  that Mr. Webb is in a separate office and apart in the

24  offices of American National.  He is alone.  In front of him

25  is a copy of his declaration and portions of the excerpted

1 lease that were attached to that declaration.

2          I would ask that, if we could, I have no objection

3 to proceeding as reflected by counsel with respect to putting

4 on evidence and then going into legal argument.

5          THE COURT:  Okay.

6          MR. YOUNG:  I would ask that, fi we could, since

7 the declarant is here, I do plan to present him and ask that

8 we stipulate to the admittance of his declaration and he laid

9 the underlying business records exception predicate for those

10 attachments. I would ask that as they are reflected in our

11 exhibit list, American Nationals exhibit list, that those two

12 be admitted into evidence by stipulation.

13          THE COURT:  Is there any objection to that

14 proposal?

15          MR. LUCIAN:  Good morning, Your Honor.  John

16 Lucian of Blank Rome for Ollie's.

17          Your Honor, their request is to admit the

18 declaration.  We would object to admission of the declaration

19 other then to authenticate Exhibits 1, 2, and 3 which I think

20 are the first six paragraphs of the declaration. I think that

21 may be what counsel is asking for and I need him to proceed

22 with direct exam of his witness for the balance.

23          THE COURT:  Mr. Young.

24          MR. YOUNG:  I was actually trying to economize

25 everyone's time and allow for the entire entry of the

1 declaration given that on the record counsel will be able to

2 cross-examine he can have an opportunity to examine the

3 particular statements made by the witness; otherwise, we are

4 going to go through the entirety of the declaration on the

5 record and I don't think that is an efficient use of our time

6 this morning.

7          MR. LUCIAN:  Your Honor, I think the problem is

8 the second half of the declaration is the declarant

9 interpreting the lease and offering an opinion about

10 (indiscernible) term.  Those may not get in on direct examine

11 either.  We can't (indiscernible) efficiency, but we can

12 stipulate to what we believe are improper inclusions in the

13 declaration, Your Honor.

14          THE COURT:  Mr. Young, let's proceed with your

15 witness.

16          MR. YOUNG:  All right.  Mr. Webb.

17          MR. WEBB:  Yes.

18          MR. YOUNG:  Can you please state, and you will be

19 sworn in here in a moment -- in fact, Your Honor, do you want

20 to swear him in first.

21          THE COURT:  Wait a minute, Mr. Young.  I'm sorry,

22 we need to take a minute.  Can you make sure we're in

23 compliance with the broadcast protocol with the exception of

24 Mr. Webb and Mr. Young.

25          UNIDENTIFIED SPEAKER:  For those on Zoom, anyone

1  who is audio only will now be moved to the waiting room.

2          UNIDENTIFEID SPEKAER:  I do have copies of the

3  exhibits for anyone who would like them passed out or if you

4  would like me to pass them out.

5          THE COURT:  I have Mr. Webb's declaration. Thank

6  you.

7              WILLIAM SCOTT WEBB, WITNESS, SWORN

8          THE CLERK:  Please state your full name and spell

9  your last name for the record.

10          THE WITNESS:  William Scott Webb, W-E-B-B.

11          THE CLERK:  Thank you.

12          MR. YOUNG:  Apologies, Your Honor.  Marc Young for

13  American National.

14          We did get a stipulation with respect to the

15  exhibits being admitted.  We can lay the foundation for

16  those.

17          MR. LUCIAN:  That's correct, Your Honor. No

18  objection to Exhibits 1 through 3, which I believe are the

19  (indiscernible).

20          THE COURT:  Okay.  Exhibits 1 through 3 are

21  admitted.

22      (Exhibits 1 through 3 received into evidence)

23          MR. YOUNG:  Thank you.

24                  DIRECT EXAMINATION

25  BY MR. YOUNG:

1  Q      Mr. Webb, please state your name for the record?

2  A      William Scott Webb.

3  Q      For the record, where are you testifying from today?

4  A      Galveston, Texas in the American National office

5  building.

6  Q      Who are you testifying on behalf of today?

7  A      American National Insurance Company.

8  Q      And if I say American National you understand that I am

9  referring to American National Insurance Company?

10 A      Yes.

11 Q      Okay.  Are you generally familiar with the substance

12 and nature of the proceeding today?

13 A      I am.

14 Q      What is your general understanding of this proceeding

15 with respect to American National?

16 A      Well, 99 Cents, through bankruptcy, has requested to

17 sell a portion of its assets and included in that is the

18 assets and the lease of our property that we own in Conroe,

19 Texas.

20 Q      We will talk a little bit more about that property in a

21 moment. I want to go over some of your background. Is

22 American National your employer?

23 A      Yes.

24 Q      And what is your job title?

25 A      Assistant vice president real estate.

1  Q     And what are your duties and responsibilities as

2  assistance vice president real estate?

3  A     Oversee a portion of the company's real estate holdings

4  and investments including mortgage loans and numerous

5  property types.  Also, I assist and/or direct junior analysts

6  through their job and I am an authorized signator for

7  documents for American National.

8  Q     How long have you been in real estate management in the

9  course of your career?

10 A     Over 25 years.

11 Q     And how -- during that time have you reviewed leases?

12 A     Yes.

13 Q     Have you negotiated leases?

14 A     I have.

15 Q     How many leases have you reviewed and negotiated over

16 the course of that 25 years?

17 A     I would have to say its hundreds.

18 Q     And you mentioned earlier property owned by American

19 National.  Are you referring to the non-residential real

20 property located at 1406 East Loop 336 West Conroe,

21 Montgomery County, Texas?

22 A     Yes.

23 Q     Now does that property have a common name that you

24 refer to it as?

25 A     Its Montgomery Plaza Shopping Center.

1  Q      And how would you generally describe that property?

2  A      It's a large shopping center with multiple anchors and

3  junior anchors.

4  Q      Is American National the sole owner of that property?

5  A      Yes.

6  Q      Is American National the only landlord?

7  A      Yes.

8  Q      Are there multiple tenants?

9  A      Yes, there are.

10 Q      Is there a common parking lot?

11 A      Yes.

12 Q      What are some of the tenants that are located at the

13 Montgomery Plaza Shopping Center?

14 A      There's (indiscernible) Academy, Big Lots, Spec's,

15 Petco.

16 Q      Are you aware if American National has attempted to

17 maintain the particular mix of tenants in its management of

18 the Montgomery Plaza Shopping Center?

19 A      Yes.  I mean we attempt to maintain a variety mix of

20 tenants and merchandisers that will hopefully, you know,

21 maximize the foot traffic to the center.

22 Q      Was there a purposeful selection in the tenants that

23 American National has selected or your predecessor in

24 interest selected in the Montgomery Plaza Shopping Center?

25 A      Well, I would say yes, it --

1          MR. LUCIAN:  Objection.

2          THE COURT:  I'm sorry, I didn't hear your

3    objection.

4          MR. LUCIAN:  Objection, foundation.

5          THE COURT:  Mr. Young.

6          MR. YOUNG: I mean I don't really know how to

7    respond to an objection on foundation. I am asking him

8    specifically his opinion as working in realty management as

9    he understands it. If counsel is suggesting that we're

10   construing that as an expert opinion I don't think that is

11   the case.  As has been testified, he's spent 25 years making

12   these decisions on behalf of American National. I think its

13   within his personal knowledge to state whether or not they

14   have maintained a particular mix of tenants.

15         MR. LUCIAN:  He can offer a lay opinion, Your

16   Honor, but (indiscernible) I want to be clear he's not being

17   offered as an expert.

18         THE COURT:  He's established a foundation to

19   answer the question.

20         Go ahead, Mr. Young.

21         MR. LEBLANC:  Your Honor, I apologize.  I think

22   the question that was asked was did you or the predecessor to

23   your ownership purposefully select -- I don't think he can

24   talk about the intention of his predecessor, of the people

25   that owned it prior to American National. That would be the

1  objection that I would make, Your Honor.

2            THE COURT:  All right.  Well, he can answer as to

3  him.

4            MR. LEBLANC:  As to American National, but not as

5  to the predecessor.

6  BY MR. YOUNG:

7  Q     Mr. Webb, do you understand the question?

8  A     Yes.

9  Q     And can you answer the question?

10  A     Yes.  We typically, in retail and shopping center

11  environments, try to purposefully place tenants in a mix that

12  will optimize, again, the foot traffic of the center and

13  also, obviously, income.

14  Q     In the course of your 25 years are you familiar with

15  restrictive use provisions?

16  A     Yes.

17  Q     And are there any restrictive use provisions that you

18  are aware of with respect to the Montgomery Plaza Shopping

19  Center?

20  A     Yes, there are.

21  Q     Is there joint participation by the tenants, and trash

22  removal and other maintenance on that property?

23  A     Yes.  That is part of the CAM charges.

24  Q     And would you describe this property, the Montgomery

25  Plaza Shopping Center, as your understanding in retail as a

1   shopping center?

2   A    Yes.

3   Q    Are you familiar with the lease between American

4   National and the 99 Cents store?

5   A    Yes.

6   Q    And as you heard, you know, virtually in the courtroom,

7   that was admitted into evidence as Exhibit 2.  How are you

8   familiar with the lease between American National and 99

9   Cents store?

10  A    I have reviewed it recently.

11  Q    Is that something that you would be responsible for in

12  the course of your title or your job with American National

13  in managing that lease?

14  A    Yes.

15  Q    You also testified earlier that there is a Big Lots

16  store that is also a tenant in the shopping center, is that

17  correct?

18  A    Yes.

19  Q    Now, are you familiar with the lease between American

20  National and Big Lots?

21  A    I am.

22  Q    And what has been tendered and pre-admitted as Exhibit

23  1 is that the lease between American National and Big Lots?

24  A    Yes.

25  Q    And how are you familiar with this lease?

1          MR. LEBLANC:  Your Honor, just a point -- I

2    apologize, point of clarification I believe the Big Lots

3    lease is Exhibit 3.

4          THE COURT:  Exhibit 1 is the tenant estoppel

5    certificate.

6          MR. LEBLANC:  Yes.  Thank you, Your Honor.

7          MR. YOUNG:  I was going off of our tendered

8    exhibit list and not how it was framed in the declaration.

9          MR. LUCIAN:  I apologize. I'm using the

10   declaration and that is Exhibit 3 in the declaration.

11         THE COURT:  Let's -- Mr. Young, let's all get on

12   the same page. Are you referring to your exhibit list?

13         MR. YOUNG:  Yes, Your Honor.  American National

14   filed an exhibit list --

15         THE COURT:  Yeah, I understand.

16         MR. YOUNG:  Let me --

17         THE COURT:  Its Docket 627.

18         MR. LUCIAN:  Your Honor, the confusion is we

19   admitted under the declarations that we were going off of.

20   They were 1, 2 and 3. I don't think matters the number as

21   long as we're on the same page.

22         THE COURT:  Right.  Could you bear with me a

23   second, I want to pull up your exhibit list so I have it in

24   front of me.

25         MR. YOUNG:  Your Honor?

1          THE COURT:  Yes.

2          MR. YOUNG:  I'm fine to use the declaration if

3 everything that was appended there was admitted.

4          THE COURT:  I don't think -- Exhibits 1, 2 and 3

5 were admitted, right?  So, I guess we should specify for the

6 record then Exhibit 1 is the tenant estoppel certificate.

7 Exhibit 2 is the lease.  Exhibit 3 is --

8          MR. LUCIAN:  2 is the 99 Cents lease and 3 is the

9 Big Lots.

10          MR. YOUNG:  All right. So, to clarify, I was

11 asking just a moment ago I was referring to Exhibit 1, but,

12 in fact, Exhibit 2 for the record is the 99 Cents lease.  Now

13 Exhibit 3 is the Big Lots lease.

14          You understand that change, Mr. Webb?

15          THE WITNESS:  Yes.

16          MR. YOUNG:  Can I proceed, Your Honor?

17          THE COURT:  Yes, please.

18 BY MR. YOUNG:

19 Q    Again, just to get back to what we were talking about

20 how are you familiar with the Big Lots lease between American

21 National and Big Lots?

22 A    I have reviewed it.

23 Q    Okay. Is this something -- is this lease something in

24 the course of your duties and responsibilities that you are

25 responsible for administering and managing on behalf of

1  American National?

2  A      Yes.

3  Q      And do you have signatory authority for American

4  National to enter into leases, amendments, and other legal

5  documents related to that?

6  A      Yes.

7  Q      And you said earlier you had reviewed this, are you

8  aware of any exclusive use provisions, as you understand them

9  in 25 years, as to what those are?

10              MR. LEBLANC:  Objection, Your Honor.  The document

11  speaks for itself and I think this is the point of the prior

12  objection which is everything that now follows in the

13  declaration is just the witness reading what is in the

14  document. I don't think Your Honor or any of the parties here

15  need that. I don't think there is any space for anything

16  beyond.

17              The documents are admitted.  They have the

18  provisions they have. I don't think we need this witness's

19  opinions about those provisions. I think this question gets

20  exactly to that.  He is defining it as a restrictive use

21  provision.  We will make an argument about what it is and

22  what it says.  That is what is relevant to the Court, not

23  this witness's testimony as to that issue.  So, I would

24  object, Your Honor.

25              THE COURT:  Mr. Young.

1        MR. YOUNG:  I fundamentally disagree.  This may be

2   the only opportunity for my client to offer evidence about

3   their understanding.  If this contract is ultimately

4   determined to be ambiguous this is our only opportunity to

5   offer that evidence; otherwise, that assignment, when my

6   client is in breach, we are going to be dealing and wrestling

7   with this issue.

8        So, while it may not be the best opportunity and

9   there hasn't been a determination of ambiguity when else will

10  my client have an opportunity to provide into the record, you

11  know, its evidence as to what it understands the contract it

12  has been longstanding with means.

13        MR. LEBLANC:  Two points, Your Honor.  The

14  contract with 99 Cents was signed initially in 1984.  The

15  contract with Big Lots was signed in 2009.  My recollection,

16  I have to just look, but I think American National --

17        MR. YOUNG:  I am going to object that is facts not

18  in evidence.  That is not when that lease was entered.  I

19  think, you know, Your Honor --

20        THE COURT:  All right.  I am going to allow him

21  some latitude.  There is no jury here. I can give this the

22  weight it deserves.

23        So, Mr. Young, you may proceed because we're

24  spending more time on objections then we are on actually

25  dealing with the issue. So, you may proceed.

1       MR. YOUNG:  Thank you, Your Honor.

2  BY MR. YOUNG:

3  Q     Getting back to exclusive use provisions, are you aware

4  of any exclusive use provisions in this lease, Mr. Webb?

5  A     Yes.  Again, we're on Exhibit 3?

6  Q     Exhibit 3, the Big Lots lease.

7  A     Yes. Its Section 4.

8  Q     Do you know if the lease distinguishes between what it

9  refers to as dollar stores and closeout stores?

10 A     Yes, it does.

11 Q     Does this lease, as you understand it specifically,

12 reference Ollie's?

13 A     Yes, it does.

14 Q     Was Ollie's open and operating for business in the

15 Montgomery Plaza Shopping Center on September 4th, 2009?

16 A     No, it was not.

17 Q     Was Ollie's open and operating for business in the

18 Montgomery Plaza Shopping Center as the successor of assign

19 of the 99 Cents store on September 4th, 2009?

20 A     No.

21 Q     In your 25 years of experience releases do you

22 understand Ollie's to be a dollar store?

23 A     No, I do not.

24       MR. LEBLANC:  Your Honor, I will just lodge an

25 objection for the record.

1              THE COURT:  Understood.

2    BY MR. YOUNG:

3    Q    Have you heard the term "closeout store?"

4    A    Yes.

5    Q    And based on your personal understanding what is a

6    closeout store?

7              MR. LEBLANC:  Same objection, Your Honor.

8              MR. LUCIAN:  Same objection, Your Honor.

9              THE COURT:  Understood.

10             THE WITNESS:  Usually, its synonymous to some

11   degree with liquidation of merchandise. It can largely be

12   name brands, bulk items, larger items typically would be sold

13   in a dollar store.

14   BY MR. YOUNG:

15   Q    Have you personally been into an Ollie's before?

16   A    I have.

17   Q    And would you consider Ollie's -- how would you

18   characterize Ollie's based on your 25 years of management?

19   A    As a closeout or liquidation store.

20   Q    And I want to actually turn back to Exhibit 3.  If you

21   would turn to page 8, please.

22   A    Okay

23   Q    If you would look at the second paragraph that begins

24   "So long as tenant is open and operating," do you see that?

25   A    I do.

1  Q     Can you please -- are you familiar with this sentence?

2  A     I am.

3  Q     Okay. Now, are you aware that debtors have contended

4  that they are accepted from any restriction on making this

5  assignment because they were a tenant in September of 2009?

6  A     Yes.

7  Q     What is your understanding of the terms of this lease

8  with respect to that?

9          MR. LEBLANC:  Objection, Your Honor.  He's now

10 asking him for a legal conclusion as to the ultimate issue.

11 I know you said you would give him latitude, but I don't know

12 how far that latitude goes.  This is a question for Your

13 Honor to decide.

14         MR. LUCIAN:  Same.

15         MR. YOUNG:  Again, Your Honor, if you ultimately

16 deem this contract to be ambiguous by virtue of our argument

17 what other forum are we going to have to enter this into

18 evidence.  If you deem it to be clear then you can disregard

19 this testimony.  I don't know when we are going to have

20 another opportunity and forum to put this into evidence.

21         MR. LUCIAN:  Your Honor, the witness did not

22 negotiate the lease. It's with a different entity that he

23 wasn't at, at the time it was entered into. This is just his

24 lay opinion of the interpretation of a lease.

25         THE COURT:  Yeah, I'm struggling, Mr. Young, to

1  see how this isn't an interpretation of the language here.

2        MR. YOUNG:  Again, Your Honor, I would -- we can

3  move forward, but, again, my client has come to an

4  understanding that they will be in breach if this is reached.

5  If this contract is deemed to be ambiguous then, again, when

6  will there be evidence offered as to the meaning of the

7  intention of the parties.

8        With regard to the argument about negotiated my

9  clients managed this lease for the -- the 99 Cents lease for

10  20 years and has managed this particular lease since they

11  took ownership of the property.

12        MR. LEBLANC:  Your Honor, Mr. Young has said a few

13  times if not now than when will I offer this. I presume, like

14  us, they will argue that they are not in breach of the Big

15  Lots lease and they will make their arguments there. I am

16  just confused as to that.  He is talking about the meaning of

17  a provision that this person didn't negotiate in respect of a

18  breach that is not before Your Honor.

19        So, where will he put that evidence in if and when

20  there's an allegation of a breach and their litigating that

21  issue there is what I would submit.  Your Honor, to be

22  responsive to the question that counsel has asked a few times

23  here if not here when, when that issue is actually before a

24  Court.

25        MR. YOUNG:  I am going to withdraw the question,

1  Your Honor.  I am going to withdraw the question. We are

2  spending more time on this then getting through this.

3  BY MR. YOUNG:

4  Q    I will ask you this, to counsel's point, Mr. Webb, is

5  it American Nationals position that if this lease is assigned

6  will it be in breach of the Big Lots lease?

7  A    Yes, it will.

8          MR. YOUNG:  I will pass the witness.

9                  CROSS-EXAMINATION

10 BY MR. LUCIAN:

11 Q    Good morning, Mr. Webb.  Can you hear me okay?

12 A    I can.  Good morning.

13 Q    My name is John Lucian. I am with Blank Rome. I

14 represent Ollie's. I have two questions for you, sir.

15      First, I want to be clear, your 25 years of experience

16 are in real estate management, not in retail operations,

17 correct?

18 A    That is correct.

19 Q    You have never worked for Ollie's, correct?

20 A    I have not.

21 Q    You never worked for Big Lots, Dollar General or Dollar

22 Tree, correct?

23 A    That is correct.

24 Q    And your testimony about having been in an Ollie's

25 store is just as a shopper, a consumer, correct?

1    A      That's correct.

2    Q      No specialized experience in Ollie's business

3    operations, correct?

4    A      Correct.

5    Q      You testified to your understanding of the Big Lots

6    lease here. I just want to clarify a couple of points that

7    you made.

8           You talked about dollar store versus closeout store.

9    Do you remember your testimony on that a few minutes ago?

10   A      Yes.

11   Q      Dollar General -- is Dollar General a dollar store in

12   your opinion?

13   A      Yes.

14   Q      And they're identified as such in the Big Lots lease as

15   a dollar store, correct?

16   A      Correct.

17   Q      Dollar Tree is also a dollar store?

18   A      Yes.

19   Q      You've been to Ollie's -- have you ever been to Dollar

20   General?

21   A      I have.

22              MR. LUCIAN:  I would like to mark, Your Honor, as

23   Ollie's Exhibit 1.  We're going to have a little bit of a

24   logistics issue here, but I have a solution on it because the

25   witness is not in the courtroom.  He may or may not need

1   this.  I will hand one to counsel who is here for the witness

2   and Your Honor.

3            MR. YOUNG:  I have not received this exhibit, Your

4   Honor.

5            MR. LUCIAN:  His co-counsel has it in the

6   courtroom, Your Honor.

7            MR. FRASER:  This is the first time I've seen it

8   also.

9            MR. YOUNG:  I didn't see this 24 hours in advance.

10           MR. LUCIAN:  Its for cross-examine.  I'm not

11   seeking admission of the document. Its based on his

12   testimony.

13           THE COURT:  Wait a minute. I don't even know what

14   it is.

15           MR. LUCIAN:  May -- I have a few questions, Your

16   Honor.

17   BY MR. LUCIAN:

18   Q    Have you ever been to Dollar Genera's website, Mr.

19   Webb?

20           MR. YOUNG:  I'm going to object.

21           THE COURT:  What is this exhibit?  I don't know

22   what this is.

23           MR. LUCIAN:  Your Honor, this exhibit is three

24   pages of a printout of Dollar General's website.  Three items

25   on the website I want to ask about.

1          MR. YOUNG:  Your Honor, I would like to see a copy

2   of that.

3          MR. LUCIAN:  His counsel has it here in the

4   courtroom.  Your Honor --

5          MR. FRASER:  This is the first time I have seen

6   it.  I have no idea what it is.

7          THE COURT:  First of all, let's get a copy of this

8   to Mr. Young.  We are going to have to take a break and Mr.

9   Young has got to get a copy of this.

10          MR. LUCIAN:  Your Honor, if we take a short

11   recess, we can email it to Mr. Young and (indiscernible).

12          MR. YOUNG:  Do you have any other exhibits? I

13   would suggest you go ahead and send them as well.

14          MR. LUCIAN:  I have one copy to -- we can email

15   those quickly, Your Honor.

16          THE COURT:  Okay.  Why don't we take a five-minute

17   break so that he can get this exhibit and we will come back

18   in the courtroom at 11:15.  We stand in recess.

19      (Recess taken at 11:09 a.m.)

20      (Proceedings resumed at 11:23 a.m.)

21          THE COURTROOM DEPUTY:  All rise.

22          THE COURT:  Okay. Please be seated.

23          Bear with me for a second, I'm logged out of my

24   computer.

25          Mr. Young, were you able to receive the document?

1        MR. YOUNG:  Yes, Your Honor. I am in receipt of

2  the documents.  I don't know how you would like to proceed on

3  my objections or I also -- since I'm not there I couldn't

4  approach counsel during the break and seek a stipulation with

5  respect to 1. I don't know if you would like us to do that or

6  just go straight to -- however, you would like to proceed,

7  Your Honor.

8        MR. LUCIAN:  Your Honor, I did speak with Mr.

9  Fraser is stipulating there was an exhibit you have from the

10 Ollie's website. My understanding was we could stipulate to

11 the -- counsel can represent -- you can represent that your

12 document was printed off of the Ollie's website.  I can

13 represent that the exhibit I handed before the break was

14 printed off of the Dollar General website.  That was my

15 understanding of the stipulation of Mr. Fraser on

16 (indiscernible)

17        MR. YOUNG:  Yeah, I would only add I'm agreeable

18 to that stipulation, and that is what I was going to suggest,

19 with the one caveat since I don't know where this document

20 came from with respect to Dollar General, this is the first

21 time I've seen it, and we haven't proffered anybody who has

22 laid a foundation for it. I am still willing to do that

23 stipulation if you will acknowledge that this document, when

24 it was produced, and that it was not produced or created in

25 or around September of 2009 when this lease was negotiated.

1          MR. LUCIAN:  They are print offs of Dollar

2    General's website this morning within the last hour.

3          THE COURT:  Okay.

4          MR. YOUNG:  Okay.  Then I am agreeable to the

5    Dollar General printouts and I object to the news articles

6    under 801.

7          THE COURT:  I don't have any news articles.

8          MR. LUCIAN:  We haven't gotten to anything else

9    yet. I sent him the other two.

10          MR. YOUNG:  Can we go ahead and have that -- can

11   you go ahead and present those to the Judge so we can have

12   that conversation?  I don't want to interrupt you if I can

13   avoid it.

14          MR. LUCIAN:  If I need them, I will use them.  I

15   don't know if I need them yet.

16          THE COURT:  Okay.

17          MR. LUCIAN:  (Inaudible).

18   BY MR. LUCIAN:

19   Q    Mr. Webb, did you speak with your counsel during the

20   recess?

21   A    I did not.

22   Q    Two quick questions before I get to the exhibit from

23   your declaration, so I'm clear on the lease.  The 99 Cents

24   store lease is Exhibit 2, it was entered into March 16th,

25   2004, on or about that date, correct?

1  A      Yes.

2  Q      In that lease the landlord was Weingarten, not American

3  National, correct?

4  A      That is correct.

5  Q      And you were never an employee of Weingarten, correct?

6  A      Correct.

7  Q      Same with the Big Lots lease.  That was entered into on

8  or about September 4th, 2009, approximately 15 years ago,

9  correct?

10 A      Correct.

11 Q      Also Weingarten, not American National correct?

12 A      Yes, that's correct.

13 Q      And you're not a lawyer, correct?

14 A      Correct.

15 Q      So I'm going to ask you -- back to Dollar General now.

16 You've been a Dollar General -- a Dollar General store

17 before, correct?

18 A      I have.

19 Q      And you're aware they sell items that cost more than a

20 dollar, correct?

21 A      Yes.

22 Q      Some items substantially more than a dollar, correct?

23 A      I have not personally seen or bought anything

24 substantially more from a Dollar General.

25 Q      Well, I can't show you because you're -- on the computer

1   screen, but if you can't see it, I'm holding up what I've

2   marked as Exhibit 1 for Ollie's I'll represent to you it's a

3   printout from Dollar General's website of (indiscernible) and

4   I have 3 items.

5         MR. YOUNG:  Can I -- I'm sorry to interrupt you,

6   Counsel.

7         But Your Honor, if I can drop this into the chat

8   feature, so he can --

9         MR. LUCIAN:  That would be great.

10        MR. YOUNG:  -- Mr. Webb can pull this up.  I don't

11  know if I can do that or the clerk can.

12        THE COURT:  Can you share screen?

13        (Court and court personnel confer)

14        MR. YOUNG:  I'm happy to share screen for opposing

15  --

16        THE COURT:  Okay.  That's very kind of you, Mr.

17  Young.  Okay.  You should be able to share screen now, sir.

18        MR. LUCIAN:  Those in attendance are waiting with

19  bated breath Your Honor (indiscernible)

20  BY MR. LUCIAN:

21  Q    Mr. Webb, can you see what is on the screen?

22  A    I can.

23  Q    This is an Air Flex all black, pedestal, oscillating

24  fan.  Do you see that?

25  A    I do.

1  Q    Does it surprise you that Dollar General sells an

2  oscillating fan?

3  Q    No, not completely.  No.

4          MR. LUCIAN:  Does it -- counsel could maybe --

5  Q    Does it surprise you that they sell an item that's

6  reflected on here for $27?

7          MR. YOUNG:  I'm going to -- I'm going to object to

8  relevance.  I don't know if the surprise -- to counsel's

9  earlier point, this is -- we've stipulated to its admittance,

10  it's speaks for itself.  I don't, you know --

11          MR. LUCIAN:  Well, Your Honor, he's testified that

12  -- his understanding of the distinction between a close-out

13  store and a dollar store, and so I think this is relevant to

14  examine briefly about his understanding and what facts he

15  considered in his of opinion distinction between the – I just

16  have like two more questions.

17          THE COURT:  I'll allow it, but yeah, keep it --

18  BY MR. LUCIAN:

19  Q    So does it surprise you, sir, that they sell an item

20  that costs $27?

21  A    Somewhat, yeah.

22          MR. LUCIAN:  Okay.  Could you -- Counsel, could

23  you kindly scroll down to the next one?  Thank you.

24  BY MR. LUCIAN:

25  Q    Here we have the second of three items:

1        A Bestway OGO steel pro pool, nine foot, for $75.  Do

2   you see that?

3   A    I do.

4   Q    Does it surprise you that Dollar General, a dollar

5   store, you testified to, sells an item, a pool, for $75?

6   A    Again, yes, it does.

7            MR. LUCIAN:  And please scroll down one more page.

8   Q    The third and final item is an electronics item, a blue

9   tooth powered speaker system for $40.  Do you see that?

10  A    Yes.

11  Q    Does it surprise you that a dollar store sells

12  electronics that cost $40?

13  A    Again, yes, a little bit.

14  Q    Thank you.  Counsel thank you for doing that I

15  appreciate that.

16       Just a few more questions for you, Mr. Webb.

17       Are you -- do you have any knowledge of how the

18  industry, the dollar discount, closeout industry groups

19  stores together?

20  A    I -- I can't say that -- that I do specifically, no.

21  Q    Would it surprise you if Ollie's was grouped with Dollar

22  General by industry analyst?

23  A    Yes, it would.

24            MR. LUCIAN:  Your Honor, may I approach with what

25  I'll mark as Exhibit 2?

1           MR. YOUNG:  Your --

2           MR. LUCIAN:  He can raise the objection

3   (indiscernible)

4           MR. YOUNG:  Well --

5           MR. LUCIAN:  Counsel, for the record, this is the

6   Bloomberg article (indiscernible) --

7           MR. YOUNG:  Yeah, I'm going to --

8           MR. LUCIAN:  -- (indiscernible)

9           MR. YOUNG:  I'm going to object to this, Your

10  Honor, as hearsay.  It's being offered by a declarant for the

11  matter -- truth of the matter asserted, who's not even here.

12          Moreover, it wasn't provided in advance.  I've had

13  no opportunity to really digest this, nor has the witness.

14  And he just conceded the point that he didn't have an

15  understanding.  So I'm going to object to allowing either of

16  these news articles in.

17          The declarant is not here to talk about it and we

18  haven't presented Mr. Webb as an expert in these matters on

19  dollar stores.  We've talked about as they were used in a

20  lease created more than ten years ago.

21          MR. LUCIAN:  Your Honor, first, I'm not moving

22  their admission I haven't done yet.  That objection is

23  premature. Second -- he's testified that his lay opinion

24  understanding of the distinction between the two and I'm

25  entitled to impeach him on that by asking him questions about

1   documents that are in front of them. Your Honor determines

2   the weight of that.  But I have not asked to move this into

3   evidence.  I can hand him my pen and ask him a question about

4   (indiscernible) for impeachment purposes.  And it goes to his

5   understanding, which is the opinion that he's (indiscernible)

6           MR. YOUNG:  This is an unauthenticated printout

7   from who knows where without the authors present.  I'm going

8   to maintain my objection, Your Honor.

9           THE COURT:  Yeah, I'm going to sustain the

10  objection.

11          MR. LUCIAN:  All right.  Then I'll move on.

12  BY MR. LUCIAN:

13  Q   Mr. Webb, then, to be clear, if industry analysts group

14  Ollie's with Dollar General, would you agree or disagree that

15  that's an appropriate grouping?

16  A   In certain aspects, possibly.

17          MR. LUCIAN:  Nothing further, Your Honor.

18          THE COURT:  Thank you.

19          Any redirect, Mr. Young?

20          MR. YOUNG:  Yeah, just very briefly, Your Honor,

21  since the questions that were asked regarded my witness'

22  understanding, Mr. Webb's understanding of what a "dollar

23  store" means.

24                    REDIRECT EXAMINATION

25  BY MR. YOUNG:

1  Q    I would just ask you this:  You've -- you were familiar

2  with "dollar stores" in or around 2009, as the term is used

3  in your experience with the lease.  Were you familiar with

4  how that term was used in 2009?

5  A    Yes.

6  Q    And what's your understanding of what has happened with

7  respect to dollar stores over the course of, you know, the

8  last ten or more years, in terms of pricing, if I need to be

9  more specific?

10  A    Well, I -- I think the overall economy and so forth has

11  expanded and -- and grown and gotten more expensive, to where

12  they cannot necessarily sell their items for a dollar anymore

13  and make a profit.

14         MR. LUCIAN:  Your Honor --

15  Q    And the --

16         MR. LUCIAN:  -- move to strike that testimony for

17  lack of foundation. He's a real estate management executive,

18  he's not a financial analyst and couldn't answer questions

19  about the industry when I crossed him.

20         MR. YOUNG:  Your Honor, I just asked what his

21  personal understanding was.  You can give it the weight that

22  you desire to.

23         THE COURT:  I'm going to sustain.

24         MR. YOUNG:  Fair enough.  Thank you, Your Honor.

25         THE COURT:  Thank you.

1          THE WITNESS:  Am I able to say anything more?

2          MR. LUCIAN:  No questions asked your honor

3 (Indiscernible)

4          THE COURT:  No.

5          MR. YOUNG:  Well, I haven't passed the witness, so

6 ...

7 BY MR. YOUNG:

8 Q    Based -- did you personally go into a Dollar General

9 store or a similar store in or around 2009?

10 A    I -- I most likely did, yeah, but I can't remember

11 specifically.

12 Q    And in or around that time, were, generally, items

13 priced at around a dollar or a couple of bucks?

14          MR. LUCIAN:  Objection.  He's testified he can't

15 remember.  This is most likely (indiscernible) speculation,

16 Your Honor (indiscernible)

17          MR. YOUNG:  If he can remember, he remembers; if

18 he can't, he can't.

19          THE WITNESS:  That's what dollar stores were known

20 for, as to be priced -- have prices on a majority of their

21 merchandise at a buck or -- or a little over.

22          MR. YOUNG:  Pass the witness, Your Honor.

23          THE COURT:  Okay.  No --

24          MR. LUCIAN:  (Indiscernible)

25          THE COURT:  Okay.  Okay.

1     (Witness excused)

2          THE COURT:  I'll hear argument.

3          MR. YOUNG:  Well, I would like to call --

4          THE COURT:  Oh, I'm sorry, Mr. Young.

5          MR. YOUNG:  I would like to call -- and I guess,

6  with respect to Ollie's witness list, they didn't proffer a

7  witness with respect to the statement of assurances.  I can

8  speak to those as they stand, since they've already been

9  entered.  I don't need to lay any foundation.

10          Well, I'm sorry.  I was looking at the witness

11  list and there's no one here to really speak to the statement

12  of assurances.  But I'll just speak to that in the record, as

13  it's stated in the record.

14          THE COURT:  Okay.

15          MR. YOUNG:  So now we're moving to argument.

16  Would you like me to proceed, Your Honor?

17          THE COURT:  Yes.  Bear with me one second.  Okay.

18          MR. YOUNG:  American National's objection before

19  the Court today embodies the very reason that Congress

20  created the shopping center exception under Section 365(b)(3)

21  and under 365(b)(4) of the Bankruptcy Code.

22          An assignment of the 99 Cent Store lease in the

23  Montgomery Plaza shopping center is in direct violation to

24  the Big Lots lease, another tenant in the shopping center;

25  and should, therefore, be foreclosed as a matter of law under

1  365(b)(3) of the Bankruptcy Code.

2          American National, as owner and landlord, as was

3  testified today, has worked to build a very specific tenant

4  mix and maintain that mix of commercial businesses.  The

5  leases in the Montgomery Shopping Center Plaza were

6  negotiated, agreed upon, the specific terms of those leases,

7  to include competing business restriction.  And consideration

8  agreed were based, among other things, on those terms.

9          To allow this assignment essentially allows a

10 competing store to come in an existing shopping center and

11 oust another tenant to the detriment of my client.  This is

12 precisely why 365(b)(3) was enacted.

13         As this Court, in In Re Three A's Holdings, LLC,

14 2007 WL 831662 (Bankr. D. Del.) stated, citing a Third

15 Circuit holding:

16         "The legislative intent behind the so-called

17 'Shopping Center Amendments' is clear:  to protect the rights

18 of lessors and the center's other tenants.  Congress

19 recognized that unlike the usual situation where a lease

20 assignment affects only the lessor, an assignment of a

21 shopping center lease to an outside party can have a

22 significant detrimental impact on others, in particular the

23 center's other tenants."

24         That's exactly, Your Honor, what's happening here.

25         Certainly, American National understands the

1  import of the sale to the estate.  But the legislative

2  history here is quite clear that -- and again, this is citing

3  another Delaware decision in the third -- or actually, a

4  Third Circuit, In Re Joshua Slocum Ltd., that recognizes that

5  the tenant mix a shopping center may be as important to the

6  lessor as the actual promised rental payments because certain

7  mixes will attract higher patronage of the stores in the

8  center and, thus, a higher rental for the landlord from those

9  stores that are subject to a percentage of gross receipts

10  rental agreement.

11         It is undisputed that Montgomery Plaza Shopping

12  Center is, indeed, under 365(b)(3) and (4), a shopping

13  center.  The question then becomes whether or not it violates

14  the Big Lots lease tenant and, frankly, the 99 Cent lease

15  tenant.

16         That takes us to a question of contractual

17  interpretation.  The contract provides that Texas substantive

18  law applies in this instance, Your Honor.

19         And I would ask that my co-counsel Simon Fraser

20  proffer to you and to debtors' counsel and, I guess, counsel

21  for Ollie's, as well, the case Coker v. Coker from the Texas

22  Supreme Court, dated 1983.  And I'd give him an opportunity

23  to do that before proceeding, Your Honor.

24         THE COURT:  Okay.

25      (Pause in proceedings)

1          MR. FRASER:  Would Your Honor like a copy?

2          THE COURT:  Yes, please.  Thank you.  Thank you.

3          MR. YOUNG:  Your Honor, and I would direct counsel

4  and yourself to Page 3 of Coker v. Coker, as reflected on the

5  document.  And I'll proceed at your -- when you're ready for

6  me to.

7          THE COURT:  Okay.

8          MR. YOUNG:  All right.  I'm in the first --

9          THE COURT:  Well, excuse me --

10          MR. YOUNG:  -- keynote section.

11          THE COURT:  -- one second.  Do you have any extra

12  copies of this opinion?

13          MR. FRASER:  I had, I think, seven copies, and I

14  handed them all out.

15          THE COURT:  Could you -- I was going to say, could

16  you share -- thank you.

17          UNIDENTIFIED:  Is one okay, Your Honor?

18          THE COURT:  Thank you.

19      (Participants confer)

20          THE COURT:  Thank you.

21          Okay, Mr. Young.

22          MR. YOUNG:  All right.  Thank you, Your Honor.

23          On Page 3, in the keynotes one, two, three, Texas

24  Supreme Court law is clear:

25          "In construing a written contract, the primary

1  concern of the court is to ascertain the true intentions of

2  the parties as expressed in the instrument."

3            To achieve -- moving on to Page 4:

4            "To achieve this objective, courts should examine

5  and consider the entire writing" --

6            Emphasis added.

7            "-- in an effort to harmonize and give effect to

8  all the provisions of the contract so that none will be

9  rendered meaningless."

10            It then proceeds:

11            "No single provision taken alone will be given

12  controlling effect; rather, all the provisions must be

13  considered with reference to the whole instrument."

14            So, if we take the argument of debtors, we would

15  render superfluous and meaningless an entire section of the

16  Big Lots lease, the 99 Cent exception.  If we take their

17  reading as stated, there is no need for a 99 Cent lease

18  exception because it would have already been provided for by

19  existing tenants.

20            It's very clear -- and before I proceed, I want to

21  -- I want to direct the Court's attention to Exhibit 3, Page

22  8.  That's the Big Lots lease.

23      (Pause in proceedings)

24            MR. YOUNG:  And this is where the language comes

25  in, Your Honor.  It states -- and this is the contention of

1  debtors with respect to this language, "So long as tenant is"

2  -- "as provided above" --

3          THE COURT:  But Mr. Young --

4          MR. YOUNG:  "-- except for tenants" --

5          THE COURT:  Mr. Young, you were cut off while you

6  were speaking. It froze. So, you need to start at so you need

7  to start at "so long again."

8          MR. YOUNG:  Okay.  Did you hear --

9          THE COURT:  I heard so long and then you froze.

10          MR. YOUNG:  Okay.  Yes, Your Honor.  I will

11  continue.  So, I am reading from page 8 of the Big Lots lease

12  which is admitted as Exhibit 3:

13          "So long as tenant is open and operating its

14  business on the premise for the initial permitted use, as

15  provided above, except for tenants and their successors and

16  assigns open and operating for business in the shopping

17  center as of the effective date of this lease no dollar store

18  operation in excess of 10,000 square feet of floor area or

19  closeout store competing business may be permitted in the

20  shopping center during the original term of its lease or any

21  option terms or extensions thereof."

22          The debtors would contend that this provision

23  except of tenants and their successors and assigns will

24  permit the assignment of anyone from 99 Cents store because

25  they were open and operating as of the date in 2009 when this

1   lease was formed; however, that would render meaningless the

2   entire reason to have a 99 Cents exception.  Moreover, it

3   doesn't matter because this next succeeding sentence trumps

4   this sentence.

5         I will continue: In addition to the foregoing, in

6   addition to, so no matter what is stated before, whether it's

7   a closeout store or a dollar store in excess of 10,000 square

8   feet in addition to the foregoing whether or not its except

9   for tenants a competing business shall include without

10  limitation.  In other words, without any limitations provided

11  by the proceeding section, the foregoing, the following

12  business operations. Then it enumerates a number of those

13  which includes expressly Ollie's Bargain Outlet.

14        So, you have, one, its undisputed that Ollie's was

15  not a tenant in September of 2009. Ollie's was not a

16  successor and assign of a tenant in 2009 and mind you, during

17  that time there were other assignees of other tenants that

18  that language is seeking to capture.  So, in addition to

19  without limitation Ollie's Bargain Outlet.  It is expressly

20  there.

21        Then we continue: "Notwithstanding the foregoing

22  there is a 99 Cents exception."  So, they do acknowledge that

23  you have a closeout operation and you have a dollar store

24  operation.  If I might, if you turn to page 9 of this

25  agreement, and I will come back to this and you will see why

1    I am going in this order, I hope, at the top of page 9 of the

2    Big Lots lease, the very first paragraph that starts

3    "Therefore, purposes of clarification."

4         "For purposes of clarification a dollar store

5    shall include by way of illustrative example without

6    limitation the following business operations, 99 Cents only,

7    Dollar Tree, and Dollar General."

8         Then it goes onto describe: "Dollar store shall

9    not be deemed a competing business unless that dollar store

10   occupies more then 10,000 square feet of floor area of the

11   shopping except for the 99 Cents exception."

12        Then it goes on later in that paragraph and it

13   states: "Further, a closeout store shall not include any

14   branded or private label fashion apparel" and then it goes on

15   to talk further about closeout stores.  So, clearly going

16   back to page 8, the lease was intended to describe two

17   distinct types of stores, dollar stores and closeout stores.

18   Then there was a second distinction of dollar stores in

19   excess of 10,000 square feet which takes us to the 99 Cents

20   exception which follows that same paragraph on page 8.

21        If 99 Cents is premised to a dollar store or

22   vacates its premises and landlord subsequently leases such

23   premises to a dollar store, replacement dollar store tenant

24   that any such event, such assignee, sublease, or replacement

25   dollar store tenant shall not be deemed a competing business

1  notwithstanding the fact that such premises are being

2  operated for the purpose of a dollar store and occupy more

3  then 10,000 square feet of floor are of the shopping center,

4  the 99 Cents exception.

5          There would be no point for a 99 Cents exception

6  fi we read this document the way debtor suggests.  In fact,

7  the controlling language here and the dispositive language is

8  the express not permitted, Ollie's Bargain Outlet. That is

9  the controlling. In addition to the foregoing its very clear,

10 its saying no matter what we just said this is included

11 without limitation.

12         Your Honor, as you heard testimony, my client

13 views that they will be in breach of this lease if this

14 assignment is, indeed, made.  They have testified that it

15 will disrupt the mix of tenants that are currently there

16 under 3643(d) and if you look further into this same Section

17 4 under use and operations of the Big Lots lease, what

18 happens when they are in breach is that Big Lots can remain

19 in place for up to a year paying half of the rent.

20         So, if the Court ultimately is inclined to say

21 that we have misinterpreted this contract we would ask for a

22 finding of fact and a conclusion of law from this Court that

23 my client is not in breach under these terms. Now we are not

24 conceding because we do believe that, as I have stated, that

25 in addition to is quite clear, but we would ask that the

1  Court make that rendering because, otherwise, American

2  National is going to bear the brunt of this assignment

3  effectively without recourse.

4       Sorry, Your Honor, I'm just looking through my

5  notes real quickly.

6       THE COURT: Take your time.

7       MR. YOUNG: I would also offer, under Texas -- and

8  I apologize, I don't have a copy of this, but I know that

9  debtors have filed a request for leave. If that is granted we

10  would ask that we have an opportunity -- we will be filing a

11  request for leave to either amend our objection to address

12  those issues or to file a response because we didn't have an

13  opportunity that was, obviously, before the hearing to

14  respond.

15       Under O'Connor v. O'Connor, 694 S.W. 2d 152 (1985)

16  Texas Appellate Court, generally where there are general

17  special provisions in a contract relating to the same thing

18  the special provisions control. Here, you have express

19  language saying in addition to whatever else Ollie's is not

20  permitted. So, therefore, American National believes its in

21  breach and, therefore, is opposed to the assignment of this

22  lease to Ollie's under 365(b)(3) and 365(b)(4).

23       Thank you, Your Honor.

24       THE COURT: Mr. Young, if this

25       UNIDENTIFIED SPEAKER: I'm sorry, Your Honor. I

1  think the phone might still be turned off if I am not

2  mistaken.  I think Zoom is (indiscernible).

3         THE COURT:  My question is assume that the Court

4  interprets the Big Lots lease to contradict Section 365,

5  tenant mix provision.  Which controls, the statute or the

6  contractual language?

7         MR. YOUNG:  I don't have case law or authority to

8  provide you, Your Honor, on this particular question. I am

9  happy to provide additional briefing, but I would say that

10  its an equitable remedy and so if you were to find under

11  365(b)(4) that it would supersede the contractual language,

12  because that is what its intended to do, its irrespective of

13  the contract if this is upsetting this balance.

14         Now, obviously, there is limits to that, I would

15  imagine, but I would think it would control.  We also, and I

16  know you didn't ask this question, Your Honor, but clearly we

17  view it to violate 365(b)(3) as well. So, we don't -- you

18  know, we think they are both hand in glove.

19         THE COURT:  Thank you.

20         MR. LEBLANC:  Good morning, Your Honor.  Andrew

21  Leblanc again on behalf of 99 Cents store.

22         Your Honor, I think, and I will concede that this

23  is a first for me, but I fundamentally disagree with the

24  party that they are breaching the contract. I think they are

25  just misreading the very contractual language that they just

1  walked you through. I will try to do so as well, Your Honor.

2          I will -- let me just begin, I haven't seen the

3  O'Connor v. O'Connor.  It wasn't among the note cases cited

4  in their objection, but O'Connor v. O'Connor itself, if you

5  just read on in the very case that he handed to you it says

6  after the -- it's the very next passage that says no single

7  provision taken alone will be giving controlling effect. The

8  next sentence says in harmonizing these provisions, terms

9  stated earlier in agreement must be favored over subsequent

10 terms.

11          So, let me use that as the jumping off point to

12 make the point, Your Honor, that I think the analysis here

13 begins and ends with the first sentence of the provision that

14 we have all been looking at. I am going to -- its -- this is

15 on page 8 of their Exhibit 3, the Big Lots lease.  Just to

16 reinforce, Your Honor, what I had said before, I think

17 counsel's right, it wasn't from 1984.  There is a reference

18 to 1984 in the 99 Cents only lease.  The lease looks like its

19 from 2005, but whenever it was it predates the Big Lots. So,

20 99 Cents store was a tenant in this -- operating under their

21 lease prior to Big Lots ever coming into existence as a

22 tenant.

23          What it says is, and this is the part that I

24 struggle with even understanding argument.  It says so long

25 as tenant is open and operating that is Big Lots and --

1          THE COURT:  I'm sorry.  Let me find the right

2     spot.

3          MR. LEBLANC:  Sure.  Your Honor, this is the

4     second paragraph that's on their Exhibit 3, second paragraph

5     on page 8 under use and operation.  Page 9 of the PDF, page 8

6     internally.  And, Your Honor, I will just tell you that I'm

7     actually using from our reply brief because the print is a

8     little bit bigger and my eyes are a little bit older.

9          So, what it says is as long as tenant is open and

10    operating its business in the devised premise for the initial

11    permitted use, as provided above, except for tenants and

12    their successors and assigns.  I am going to pause there but

13    it goes on to say open and operating for business in the

14    shopping center as of the effective date of this lease.  Then

15    it goes on from there.

16         To me, Your Honor, I think what he elided over was

17    the notion of successors and assigns. The suggestion is that

18    successors and assigns, as using that parenthetical, has to

19    be a successor and assign open and operating for business in

20    the shopping center as of the effective date of this lease. I

21    just think that is fundamentally wrong.  And I would

22    encourage them, if there is a litigation with Big Lots over

23    it, I would encourage them to adopt this argument to make the

24    point that if you read it the way that they are then you are

25    rendering surplusage, the parenthetical, that says and their

1   successors and assigns.  Why is that?  Because if we were

2   sitting here and -- if we had assigned the lease to Ollie's

3   in 2008 the tenant operating in the space in 2009, when the

4   Big Lots lease was executed, would be Ollie's.  So, Ollie's

5   would be the tenant in that sentence.

6           So, the and their successors and assigns would be

7   rendered surplusage.  Had Ollie's become a successor to 99

8   Cents prior to the entry into the Big Lots lease and Ollie's

9   would be the successor -- would be the tenant and, therefore,

10  would be captured by this language.  Your Honor, I think

11  they're misreading it and I think the way you harmonize this

12  and the 99 Cents exception is the following.  What the

13  counterparties to this agreement -- and the counterparties to

14  this lease do not include 99 Cents to be clear and do not

15  include Ollie's.  The counterparties to the lease that we are

16  looking at are Big Lots and the predecessor interest to

17  American National.

18          What they agreed is that if the lease is turned

19  back to the landlord the landlord will not go out and lease

20  it to another similar party.  That's the point, Your Honor.

21  They didn't put any limitation and I think the better reading

22  of this agreement is that they didn't put any limitation on

23  the ability of 99 Cents to assign it and particularly didn't

24  do so in a bankruptcy as we're trying to do here.  Instead,

25  they made clear that if this particular lease is turned back

1  to the landlord, the landlord is constrained.

2          So, in other words, the counterparty to that

3  contract is constrained.  And, Your Honor, I think that is

4  what -- I think -- to me, that is the better reading of this

5  language and this is the proceeding to use the

6  (indiscernible) language.  This comes earlier in the

7  contract.  Therefore, Your Honor, they are not in breach of

8  the Big Lots lease because the assignment that we are talking

9  about is by 99 Cents store to Ollie's. 99 Cents store is the

10 tenant and if you go through the language, Your Honor, what

11 it says is its -- there's a timing component of it but the 99

12 Cents lease has been extended through 2035.  So, as long as

13 its provided for through the term of the lease or any

14 extensions then they are not in breach of that agreement.

15          I think that is the answer to the question. The

16 focus on -- I am struggling to understand the focus on the

17 phrase in addition to the foregoing, which comes in the next

18 sentence because clearly in addition to the foregoing a

19 convening business challenge without limitation is an effort

20 to add words or more definition to what constitutes a

21 competing business.  It doesn't add to the prohibition. It

22 doesn't trump the language that comes before it.  So, I just

23 think, Your Honor, that they're misreading the contract.

24          THE COURT:  What do you think is the purpose for

25 the addition sentence?

1              MR. LEBLANC:  Your Honor, it adds definition to

2    what constitutes a competing business.  That the landlord --

3    again, this is what I think is critical, that the landlord

4    could not lease the space to subsequent to 99 Cents returning

5    its lease. It doesn't affect what 99 Cents can do because 99

6    Cents is free to assign its lease. This doesn't prohibit 99

7    Cents from assigning its lease because 99 Cents was a tenant

8    at the time that the Big Lots lease was entered into.  What

9    it precludes is the landlord, its counterparty, from if it

10   gets back the space from using that space in a way that is

11   inconsistent with this. It adds definition to what would

12   constitute a non-permitted use meaning who put a least to it.

13   That is a definition to what constitutes a competing

14   business.

15             I am going to leave to Ollie's counsel the

16   argument with respect to whether or not they constitute a

17   dollar store. I will leave that argument entirely to them

18   because I don't think that from our purposes, Your Honor, I

19   don't think you get past the first sentence.  The first

20   sentence is the one that makes clear that the tenants, we,

21   the 99 Cents store, can assign this lease and as long as we

22   are the ones assigning the lease then it doesn't implicate

23   the Big Lots lease in any respect; therefore, there is no

24   breach of the Big Lots lease.

25             Again, I would suggest that they make this

1  argument if and when Big Lots contends there is a breach of

2  this agreement.  Obviously, Your Honor, the answer to the

3  Court's question we believe the statutory language trumps the

4  contractual language and we think this lease is critical for

5  us to assume -- to assign, rather, Your Honor, under the

6  terms of the stalking horse bid that is before the Court and

7  we simply think that they are misreading the contract and

8  arguing that it's a breach.  We think if Your Honor simply

9  orders it and says your read of the contract is that it's in

10 compliance because you complied with the terms of the

11 contract, I don't know where -- I don't know what the issue

12 that they could possibly contend with.

13         They will have -- I'm sorry, if Big Lots wants to

14 come back and make that argument they can, but, Your Honor,

15 we don't think that is any issue for this Court and we

16 should, both Ollie's and we, should be able to move on with

17 Ollie's having paid us the (indiscernible) and with us

18 assigning them the lease.

19         Your Honor, I do -- I will repeat what I said at

20 the outset.  We are, just for the sake of good order, because

21 this is the only one that is objected to, going to ask the

22 Court at the end to enter a separate order with respect to

23 this lease.  We have talked with counsel to Ollie's and we

24 have agree that we are going to allocate a portion of the

25 purchase price to this particular lease. So, this lease will

1  have a $600,000 purchase price.

2          The rest of them will have the balance of the

3  purchase price, so the $14 million for the rest of them.  I

4  just wanted to put that on the record so Your Honor is aware

5  because we just want to make sure that for the sake of good

6  order that this lease is not tied up with -- that the

7  assumption and assignment and the sale of the other

8  properties are not tied up with this lease.

9          Your Honor, I am happy to answer any questions,

10  but I know Ollie's counsel is going to make their argument

11  with respect to their characterization, but happy to answer

12  any questions the Court may have.

13          MR. YOUNG:  Your Honor, I would like to respond to

14  counsel prior to Ollie's, just to keep these arguments if

15  possible.

16          MR. LEBLANC:  Your Honor, I suspect that Ollie's

17  is also going to argue --

18          THE COURT:  Yeah, I was going to say, Mr. Young,

19  you obviously will get the last word.  I'd like to hear what

20  Ollie's has to say, as well, so that you can address all of

21  it at once.

22          MR. LEBLANC:  And, Your Honor, with respect to it

23  being the last word, it is our motion.  I know it's their

24  objection, and I understood why Your Honor wanted to hear

25  from them first, but I do think it's our motion.

1            THE COURT:  Well, we'll see.  I may not want to

2   hear from any of you --

3            MR. LEBLANC:  Understood, Your Honor.

4            THE COURT:  -- so I appreciate that, but let's see

5   where we go.

6            MR. LUCIAN:  Thank you, John Lucian with Blank

7   Rome, for Ollie's.  For the sake of efficiency, I thought Mr.

8   LeBlanc made most of the points that we would make, so we'll

9   just adopt and join in his argument.

10           But I will address then solely, Your Honor, that

11  the issue of replacement dollar store tenant.  And of course,

12  that only comes up if Your Honor disagrees with the analysis

13  of the first sentence of the second paragraph before and

14  about what that parenthetical means.

15           But even if you were to, for argument purposes,

16  accept the landlord's interpretation of that, Your Honor,

17  there's still no breach here because Ollie's would meet the

18  definition.  There is an exception to the competing business,

19  Your Honor, I don't know a dozen lines down where it's says

20  notwithstanding -- so we have the first sentence that's so

21  long as, and the second sentence, which counsel focused on

22  the in addition to.

23           But then we have to look at the third sentence,

24  notwithstanding the foregoing.  And that sentence allows,

25  right, the assignment of a lease or sublease "to a dollar

1  store", to a Dollar or (inaudible) vacate its premises and

2  landlord subsequently leases such premises to a dollar store,

3  parens and quote, the replacement dollar store tenant.

4       So this is really talking about the landlord's

5  rights in the event that the debtor were to go dark and

6  leave, which is not the case here, Your Honor.

7       But again, even if somehow you agree with their

8  contorted interpretation of that, you still have this

9  exception for the replacement dollar store tenant.  It

10 doesn't define what a dollar store is.

11      So if we go to the next page, internal page nine,

12 PDF page ten, first full paragraph says, for purposes of

13 clarification, a dollar store shall include, by way of

14 illustrative example, without limitation -- important -- the

15 following business operations: one, 99 Cents only; two,

16 Dollar Tree; and three, Dollar General.

17      Doesn't provide any definition.  It doesn't say

18 dollar amount of sale, their items, what they are or what

19 they're not.  (Inaudible) counsel goes on and really

20 highlights the second half of that paragraph about the

21 closeout store definition.

22      But Your Honor, that's completely unrelated.

23 We'll look at that now.  It says further, "a closeout store"

24 shall not include any branded or private label fashion

25 apparel, including footwear, outlet closeout stores, such

1  stores to include, by way of illustrative example, without

2  limitation the following business operations:  Talbot's

3  Outlet, Nine West outlet, Nordstrom Rack, TJ Maxx, and Ross

4  Dress For Less.

5           This is a completely unrelated issue to a discount

6  dollar type store, Your Honor.  That's about outlet selling

7  clothes.  It then ends the paragraph with the parties

8  acknowledge and agree that branded or private label fashion

9  apparel, including footwear, outlet closeout stores, shall

10  not be deemed a competing business.

11          So that second half of that paragraph is talking

12  about clothing outlet stores not being a violation if a

13  Talbot's were to move in.  Importantly, Your Honor, nowhere

14  in there does it say a closeout store is prohibited or what

15  the definition of a closeout store even is.

16          So the landlord is drawing a distinction without a

17  difference in this paragraph because it doesn't say thou

18  shalt not lease to this type of entity.  Further, Your Honor,

19  the limited evidence we were able to get in today shows that

20  with Dollar General is not a store that sells things for

21  $0.99.  They sell things for $70.  They sell electronics,

22  they sell outdoor tools, they sell appliances, fans, those

23  sorts of things.  No wonder the industry groups them

24  together.  Thanks, Your Honor.

25          THE COURT:  Mr. Young.

1          MR. YOUNG:  Your Honor, I'll try to be quite

2    brief.  I'm going to address Ollie's points first.  It's a

3    fundamental misreading.  It also seeks to displace the entire

4    use provisions and the argument under 365 part D if we read

5    it his way.

6          There's clearly a distinction between closeout

7    stores, and as was admitted, Exhibit 4, Ollie's own website

8    holds itself out as a closeout store.  That's why it's

9    competing business with Big Lots.  That's why it was

10   expressly put in there.

11         In fact, it states here, Ollie's -- quoting from

12   this exhibit -- Ollie's is America's largest retailer of

13   closeout merchandise and excess inventory.  Moreover, Your

14   Honor, the statement of assurances reference closed out

15   store, used that language in those terms more than 37 times.

16   Not once did it describe itself as a dollar store.

17         I think we can dance around about the lack of

18   clarity as to dollar store and closeout, but there's clearly

19   a distinction.  There's clearly a distinction between

20   closeout store and dollar store and dollar store over 10,000

21   square feet.  But I'm shifting now to debtor's argument.

22         Debtor's argument wants us -- first of all, it's a

23   misreading of Coker v. Coker.  Coker v. Coker was talking

24   about a display section and earlier in the document of

25   paragraph five followed by paragraph eight later down.

1         That language comes into play whenever you've

2    already made a determination.  And I can provide an

3    additional briefing on canons of construction in Texas with

4    respect to when things are determined ambiguous or not and

5    when would use that doctrine.

6         But the point is, you don't need to here, because

7    on its plain terms, it says in addition to -- Meriam

8    Dictionary describes addition, a part added to the foregoing,

9    foregoing, the listed mention without limitation.  Without

10   any limitation.  We don't care if it's a closeout store, a

11   dollar store, whatever.  Ollie's will not be permitted here.

12   That's unequivocal.

13        And the misreading of -- the fundamental

14   misreading of debtor's counsel on this is they want you to

15   focus on that -- say that it renders superfluous except for

16   tenants.  Well, there were other tenants besides the 99 Cents

17   Store.  That language is not superfluous.

18        We have specific prevailing over general because

19   otherwise you're reading out the entire 99 Cents exception.

20   Why would we need a 99 Cents exception?  Big Lots came in,

21   they knew 99 Cents was there.  They saw this language.  Hey,

22   99 Cents can assign to everybody.

23        Well, that's not the case.  Otherwise you wouldn't

24   need a 99 Cents exception.  It was understood that you could

25   have a dollar store.  You could even have a dollar store over

1   10,000 square feet.  But you couldn't have more than one.

2   And you couldn't have a closeout store.  And that's secondary

3   to the fact that without limitation, Ollie's Bargain Outlet

4   is in that mix.

5          So, Your Honor, while they repeatedly told us that

6   American National is misreading the contract, at best, we've

7   got an ambiguity here because their reading would simply

8   negate the need for a 99 Cents exception.

9          THE COURT:  What do you make of the debtor's

10  counsel's argument with respect to the first sentence, the so

11  long as sentence and the effective date of the lease?

12         MR. YOUNG:  You know, Your Honor, there --

13  frequently tenants sublet or assign and make assignments.  Is

14  that the argument you're referring to, Your Honor?

15         THE COURT:  Yes.

16         MR. YOUNG:  Frequently assignments are made where

17  the tenant, by matter of law, is the paramount or holder of

18  that leasehold interest and the successors and assigns that

19  were present at that time, maybe somebody other than who

20  still holds that tenancy.

21         So I think it was clear that that language is

22  referring to tenants and their successors and assigns at that

23  time.  You know, by analogy, not perfect, but, for example,

24  Weingarten, you know, was the party here.  But American

25  National now holds that interest.

1        Our thought would be there may be an existing

2    tenant that, we'll just use Super Ten here -- well, it

3    obviously wouldn't be Super Ten.  That's expressly excluded.

4    I'll use Dollar General.

5        Dollar General may have been present.  They

6    already knew they were there, but they had assigned it to,

7    let's say, another dollar store.  You know, dollar store.

8    I'll just call it Dollar Store.  They were there instead, but

9    it's still the tenant holder.  Maybe they had sublet.  And

10   the tenant holder was still Dollar Store.

11       So I don't think it -- I don't think it renders

12   that language superfluous.  And again, to read it that way

13   would render the 99 Cents exception entirely superfluous.

14   There'd be no need for that language.  And to read it the way

15   Ollie's counsel suggests would require no distinction between

16   closeout stores and dollar stores.

17       THE COURT:  Thank you, Mr. Young.

18       MR. LEBLANC:  Your Honor, I think where counsel is

19   struggling is because the argument is just wrong.  If you

20   look at this language, except for tenants and their

21   successors and assigns, he even said it.  If you see there's

22   a Dollar General there, that's the tenant.  The tenant is not

23   a defined term.  There's a defined term tenant that begins so

24   long as tenant defined term.  That is Big Lots.

25       When you get subsequent to the except for tenants,

1  that is an undefined term.  And to be clear, a sublease is

2  not an assignment.  That's a sublease.  That's something

3  different.  So what does this permit?  So tenants and their

4  successors and assigns.

5          And Your Honor, we were a tenant at the time -- we

6  were open and operating for business in the shopping center

7  as of the effective date of this lease.  That means that it

8  covers us, and it covers our successors, and it covers our

9  assigns and Ollie's, if Your Honor allows the order to be

10  entered, will be our assignee of that lease.  I think that's

11  crystal clear, Your Honor.

12          Now, let's talk -- the 99 Cents exception.  He

13  says we're rendering that surplusage.  Well, I disagree with

14  that, Your Honor.  The first provision A does deal with a

15  assignments -- assignment leases or subleases of its premises

16  to a dollar store.  That does deal with 99 Cents.  That may

17  be -- that may be something that is unnecessary because you

18  already can assign pursuant to the first paragraph.

19          But that doesn't matter because if you look at the

20  next provision, B, this is what I was talking about, Your

21  Honor.  This is a contract between the landlord and the

22  tenant.  If 99 Cents Only store vacates its premises and the

23  landlord subsequently leases such premises to a dollar store,

24  a replacement dollar store, then in any event.

25          So what it means, Your Honor, what the 99 Cents

1   exception means is there was a tenancy in this building.  I

2   think it's 25,000 square feet, although that's -- I'm not

3   sure that's in the record, but it was an amount that the

4   landlord always had the ability to put a dollar store into,

5   even if we left, and it was the one leasing it.  That doesn't

6   say anything about our ability or any limitation on our

7   ability to lease this to Ollie's in this instance, Your

8   Honor.

9           So I just think it's a misreading of the

10  agreement.  There's no rational reason -- because if you

11  accept the premise that only -- that successors had to be

12  operating -- open and operating the business, and assignees

13  had to be operating the business, then you've rendered that

14  surplusage because they would be tenants at the time.  And

15  that's not the limitation.  That's just a misreading of it.

16          I think the good news for Big Lots -- or I'm sorry

17  for American National, is that we don't believe, and I think

18  Your Honor can find that they're not going to be in breach.

19  That is not violative.  The assignment of this lease does not

20  violate the Big Lots lease.  And I think Your Honor should so

21  find.  Thank you, Your Honor.

22          MR. YOUNG:  Just one quick note.  Counsel still

23  hasn't addressed in addition to.  And you know, you render

24  that superfluous too.  In addition to -- and then it

25  expressly provides.  It doesn't matter what preceded.

1   Whatever you've said, as a competing business, it's fine.

2   But on top of that language, Ollie's is a competing business.

3          Now, I don't -- you know, if contracts were so

4   clear as counsel might suggest, I guess we would be out of

5   the job.  But I just -- you're reading out completely in

6   addition to the forego foregoing.  And I don't -- I think

7   it's very clear that the parties never intended an Ollie's --

8   Big Lots and American National never intended an Ollie's

9   Bargain to go in there, whether it was as a result of an

10  assignment from an existing tenant or not.  They expressly

11  put that in there.

12         And this isn't the case of some non-exhaustive

13  list, you know, in addition to what you said.  This is

14  clearly in addition, no matter what, without limitation,

15  these things are competing businesses.  And Ollie's is named.

16  I don't see how you get around that.  Thank you, Your Honor.

17         THE COURT:  Thank you, Mr. Young.  Yes, please.

18         MR. LEBLANC:  Let me try to step through it very,

19  very slowly.  So, in addition to -- so let's just read more.

20  In addition to the foregoing, a competing business shall

21  include.  Okay, pausing there.  So what is that?  What does

22  the in addition to the foregoing mean?

23         Well, what's in the foregoing?  The foregoing says

24  no dollar store operation in excess of 10,000 square feet if

25  floor area or closeout store.  And that is defined as a

1  defined term, competing business.

2           So in addition to the foregoing, a competing

3  business shall include necessarily means that in addition to

4  the general description of no dollar store operation in

5  excess of 10,000 square feet of floor area or closeout store,

6  that these parties to this agreement are adding some specific

7  names to that list of what constitutes a competing business.

8           I don't think there's any lack of clarity.  The

9  problem for counsel is that makes zero difference in the

10 analysis of this because we are not -- that's not a

11 limitation that applies to us.  The limitation that applies

12 to us -- or I should say that limitation doesn't apply to us

13 because we were a tenant open and operating for business in

14 the shopping center as of the effective date of the lease.

15          If Your Honor permits the assignment of the lease

16 to Ollie's, then they are an assignee of a tenant open and

17 operating for business in the shopping center as of the

18 effective date of this lease.  Therefore, the rest of it

19 doesn't matter.

20          To make that point even clearer, if you go down

21 later, the parties agree, and this is what counsel for

22 Ollie's mentioned, that notwithstanding the foregoing, the

23 parties acknowledge that 99 Cents is an existing tenant in

24 the shopping center whose premises operate, I'm sorry, occupy

25 more than 10,000 square feet.

1        So if they are an assignee of us, then the rest of

2   that first sentence is not implicated.  And that's our point,

3   Your Honor.  And if you read it differently, then you are

4   rendering surplusage, and you are ignoring the parenthetical

5   that says and their successors and assigns.  And that's

6   where, Your Honor, we think it's simply wrong.

7        THE COURT:  You would just read out of the

8   agreement in your analysis, in addition to the foregoing?

9        MR. LEBLANC:  We're not reading it out, Your

10  Honor.  The addition -- look -- the question is what does in

11  addition to the foregoing do?  In addition to the foregoing

12  does not add any words to what is prohibited.  What it adds

13  is it adds names to what constitutes competing businesses.

14  But the question is, and so what does that mean?

15       THE COURT:  It identifies your competing

16  businesses, correct?

17       MR. LEBLANC:  I'm sorry, Your Honor.

18       THE COURT:  And so how do you reconcile that with

19  the first sentence?

20       MR. LEBLANC:  Right, Your Honor, what I would say

21  is that means that if the landlord wanted to lease the space

22  to somebody else, it could not do so if that person was

23  defined as a competing business.

24       So if the landlord wanted to lease this space to

25  Ollie's and the 99 Cents exception did not apply, that's the

1  argument that my colleague made, then the landlord could not

2  do that.

3          The problem with their argument, Your Honor, is

4  the first sentence, the provision that I am so focused on, is

5  an exception to the ability -- to the inability of the

6  landlord to lease it to a competing business.  It says, so

7  long as tenant is open and operating its business in the

8  devised premises for the initial permitted use, that is, so

9  long as Big Lots is there except for tenants, and tenants

10  therefore means 99 Cents store.

11          We all acknowledge 99 Cents store is a tenant open

12  and operating for business in the shopping center as of the

13  effective date -- and their successors and assigns.  We are

14  asking the Court to authorize us to assign it to Ollie's.

15          So that means we fall into the exception that

16  permits a competing business.  There is no preclusion for a

17  competing business when it is an assignee of us for that

18  reason.

19          So what you -- you can't alight over the

20  exception.  And that's the point, Your Honor, is the

21  exception.  It doesn't swallow the rule because, critically,

22  the landlord agreed with its tenant that it could not put a

23  competing business in.  And the in addition to the foregoing

24  language makes crystal clear that if the landlord had -- if

25  we handed this space back to them and the landlord wanted to

1 lease it to Ollie's, they agreed they couldn't do that.

2 Unless, again, Ollie's meet -- if Ollie's meets the 99 Cents

3 exception that comes later, then they can.

4          But because Ollie's is specifically defined there,

5 I think that would be a hard argument for the landlord to

6 make.  But it does not preclude us from assigning because we

7 were open and in operation there at the time of the 99 -- of

8 the Big Lots lease.  That's our point, Your Honor, is you

9 have to read that exception and all of the words of that

10 exception, and we fit squarely into the exception.

11          MR. YOUNG:  Just very briefly, Your Honor.

12          THE COURT:  Yes, go ahead, Mr. Young.

13          MR. YOUNG:  Counsel -- or debtor's missed the

14 salient point.  They're asking you to read out of this

15 essentially three things, and they say this exception

16 excludes them and precludes the enforcement of the second

17 sentence.

18          And I will be the first to say that I don't find

19 most leases crystal clear on anything.  But I'll say this.

20 What is clear here is that the parties intended that Ollie's

21 would never be in that shopping center.  And that's made

22 clear by this point.  Here's the first language they want to

23 read out: in addition to the forgot.

24          The second language they want to read out is

25 without limitation.  So in other words, without no dollar

1  store in excess of 10,000 square feet, without closeout

2  store, without the exception provided for tenants, without

3  limitation, the parties understood, hey, Ollie's is not

4  coming in here.  That's express language, and you're

5  rendering -- counsel is seeking or rather debtors are seeking

6  to render that language a nullity if it's determined

7  otherwise.  Thank you, Your Honor.

8            THE COURT:  Thank you.

9            MR. LEBLANC:  Your Honor, without limitation is

10  the grammatical equivalent of including but not limited to.

11  The second sentence is not an operative sentence.  It doesn't

12  preclude anything.  It clarifies the definition that is

13  created in the preceding sentence.

14            So in addition to the foregoing, competing

15  business shall include without limitation the following

16  business operations.  What I suspect the parties intended,

17  although in fairness, no one, including their witness knows,

18  is that including but not limited to the following specific

19  entities, those are competing businesses.  To which I say,

20  fine.  I'm not ignoring that in the least bit.

21            What does it matter if it's a competing business?

22  It matters so long as the tenant, capital T, is open and

23  operating its business in the demised premises.  No dollar

24  store operation -- well, let me just use the defined term.

25            So long as the tenant is operating, no competing

 1  business might be permitted in the shopping center except for

 2  tenants and their successors and assigns open and operating

 3  for business in the shopping center as of the effective date

 4  of this lease.

 5          THE COURT:  Tenants with a small T.

 6          MR. LEBLANC:  Tenants with a small T.  And

 7  successors -- and their successors and assignments.  And if

 8  you grant the motion, Ollie's will be our successor.  We were

 9  and continue to be a tenant operating in the business,

10  operating for business in the shopping center as the

11  effective date of this lease.

12          So the paragraph -- sentence two of this paragraph

13  is not operative.  I'm not ignoring it.  Without limitation

14  has no special purpose.  It just means including but not

15  limited to these specific ones.  And in addition to the

16  foregoing just says, in addition to that very limited

17  definition that precedes this, these are also competing

18  businesses.

19          And I say I don't care what the definition of

20  competing businesses is because if we fit in the exception,

21  then it doesn't matter.  Because -- and we fit in the

22  exception because except for tenants and their successors and

23  assigns.  That's what Ollie's would be if Your Honor grants

24  the motion.

25          MR. YOUNG:  I'm not ignoring it.  It's not

1  operative.

2           THE COURT:  I'm going to allow you gentlemen to

3  agree to disagree.  I don't think that -- I don't expect

4  we'll take a lunch break and you'll resolve this.

5           So with that said -- well, let me ask.  So parties

6  finish their arguments?

7           MR. LUCIAN:  With respect to this issue I think

8  you're asking me, Your Honor?

9           THE COURT:  Yeah.

10          MR. LEBLANC:  I certainly have.

11          THE COURT:  Mr. Young, you're complete?

12          MR. YOUNG:  Yeah, I think we've --

13          THE COURT:  I understand your arguments.  Why

14  don't we --

15          MALE VOICE:  (Inaudible).

16          THE COURT:  Why don't we take a break and resume

17  this after lunch?  So why don't we take a break until quarter

18  till 2:00?  Okay.  So we'll resume back at 1:45 and proceed

19  onward.  Okay, thank you.  We stand in recess.

20       (Recess taken at 12:26 p.m.)

21       (Proceedings resumed at 1:50 p.m.)

22          THE COURT:  Thank you, everyone.  Please be

23  seated.  We're back on the record in Number Holdings.

24          First of all, Counsel, let me thank you for your

25  thoughtful arguments this afternoon.  I also want to thank

1  you for giving me some time to digest your presentations from

2  this morning.

3          The current dispute is between the debtor and the

4  landlord American National Insurance regarding a shopping

5  center lease in Conroe, Texas.  The landlord asserts that the

6  assignment of the lease to Ollie's will disrupt the tenant

7  mix of the shopping center, and would cause a breach of the

8  landlord's lease with Big Lots under Section 365(b)(3) and

9  (b)(4).

10          The Third Circuit has held in Joshua Slocum, even

11  under the tightly-drawn definition of adequate assurance, in

12  the shopping center context, Congress did not envision

13  literal compliance with all lease provisions; however,

14  insubstantial disruptions in tenant mix, and other

15  insubstantial breaches in other leases and agreements, are

16  contemplated and allowed.

17          With that being said, here the lease between the

18  landlord and Big Lots states, so long as the tenant, Big

19  Lots, is open and operating its business in the demised

20  premise for the initial permitted use, except for tenants,

21  which would here include 99 Cents, and their successors and

22  assigns open and operating for business in a shopping center

23  as of the effective date of this lease, meaning the Big Lots

24  lease, no Dollar Store operation in excess of 10,000 square

25  feet of floor area or closeout store, a competing business,

1 may be permitted in the shopping center during the original

2 term of this lease, or any operation terms or extension

3 thereof.

4          The lease then specifically names Ollie's as a

5 competing business.

6          Here, 99 Cents was open and operating at the time

7 Big Lots entered into the lease with the landlord.

8 Additionally, the proposed sale to Ollie's would result in

9 Ollie's being a successor and assignee of 99 Cents.

10 Consequently, this proposed assignment to Ollie's does not

11 violate the use restriction in the Big Lots lease.

12          Although the Court agrees, if the leased premise

13 was returned to the landlord, the landlord could not lease

14 the premise to Ollie's without violating the use restriction,

15 here the debtors fall under the exception of successors and

16 assigns in the first sentence of the paragraph.  The lease

17 specifically permits 99 cents to have successors and assigns,

18 and there's no limiting language on who 99 Cents can assign

19 to, despite other provisions within the lease applicable in

20 other circumstances imposing restrictions on tenant mix.

21 Whether Ollie's is a dollar store akin to Dollar Tree or

22 Dollar General is an issue the Court does not need to address

23 because of this Court's interpretation of Section 4(a) of the

24 Big Lots lease.  Additionally, the Court is without

25 sufficient evidence to make that finding.

1          So I would ask the parties to please confer and

2   submit a form of order under certification of counsel.  I

3   would ask that you please circulate the proposed order to Mr.

4   Young, Ms. Sierra-Fox, the committee, and the lenders prior

5   to its submission.

6

7          MR. LEBLANC:  Your Honor, we -- Andrew LeBlanc of

8   Milbank -- we will absolutely do so.

9          THE COURT:  Okay.  So, with that, could we move on

10  to the other sale --

11         MR. LEBLANC:  Yes.

12         THE COURT:  -- on the --

13         MR. LEBLANC:  And, with that, you get the pleasure

14  of not having to hear from me anymore, and I'll turn the

15  podium over to Mr. Kinney, Your Honor.

16         THE COURT:  Okay.  Thank you.

17         MR. MINTZ:  Apologies, Your Honor, Joe Mintz,

18  counsel for Ollie's.

19         THE COURT:  Yes.

20         MR. MINTZ:  I wanted to read into the record the

21  terms of a settlement reached with the North Oaks landlord --

22         THE COURT:  Okay.

23         MR. MINTZ:  -- who had objected to the Ollie's

24  sale.

25         THE COURT:  Okay, I assumed we were going back to

1  the actual Ollie's order.  So you're going to do a separate

2  order with respect to American National, right?

3            MR. LEBLANC:  That's correct, Your Honor.  And

4  what we'll do is we're going to submit a separate order with

5  respect to American National and an order that covers the

6  other, I think it will be ten properties, three owned and

7  seven leased.

8            THE COURT:  Okay.

9            MR. LEBLANC:  And we'll have an APA -- I think

10 what we've agreed is, we'll have an APA separate for the

11 American National lease and a separate one for the others.

12           THE COURT:  Okay.

13           MR. LEBLANC:  And so that's -- we'll do that and

14 we'll do that under --

15           THE COURT:  Okay.

16           MR. LEBLANC:  -- certification of counsel, but

17 what Counsel is talking about is this is the -- this relates

18 to the other side.

19           THE COURT:  Right, and so we are going to hear

20 anyone who wants to be heard with respect to this before I

21 make a ruling as to the other leases.

22           MR. LEBLANC:  Thank you, Your Honor.  And what

23 Ollie's' counsel here is doing is just talking about an

24 agreement to resolve one of the objections that was filed, so

25 that -- that they've reached with them that withdraws --

1              THE COURT:  Mr. Meloro's objection?

2              MR. LEBLANC:  Yes.

3              THE COURT:  Yes.  Okay.

4              MR. YOUNG:  Your Honor, Mr. Young for American

5    National.

6              THE COURT:  Yes.

7              MR. YOUNG:  Might Mr. Webb be released at this

8    point then --

9              THE COURT:  Yes, certainly --

10             MR. YOUNG:  -- since you've made your --

11             THE COURT:  -- he is released, and, Mr. Young, you

12   also may be released, if you like.

13             MR. YOUNG:  All right.  Thank you, Your Honor.

14             THE COURT:  Thank you.  And, Mr. Webb --

15             MR. YOUNG:  And thank you for allowing us --

16             THE COURT:  -- thank you for your time today, I

17   appreciate it.

18             MR. YOUNG:  Yes.  Thank you for allowing us to

19   appear remotely.

20             MR. WEBB:  Thank you, Your Honor.

21             THE COURT:  Okay.

22             MR. MINTZ:  Good afternoon, Your Honor, again, Joe

23   Mintz on behalf of Ollie's, and I just wanted to read into

24   the record the terms of a settlement that was reached with

25   the North Oaks landlord.

1          North Oaks objected on adequate assurance grounds,

2    and the parties agreed to resolve the objection as follows.

3    The objection was obviously withdrawn, Your Honor.  No

4    security deposit or guarantee will be required from Ollie's,

5    and the landlord will not enforce its right of first refusal.

6    The parties have agreed in principle to certain modifications

7    of the applicable lease addendum and will work to enter into

8    a modification of the addendum within 30 days of closing.

9    And, if you'll permit me, Your Honor, the addendum shall be

10   modified as follows.

11         Paragraph 11-1 of the addendum will be amended and

12   restated as follows to read, "whose primary business will be

13   a general merchandise closeout retail store."

14         Paragraph 15 of the addendum, pursuant to use

15   restrictions, the parties have agreed to delete items 2, 5,

16   6, 7, and 13 of the first part of that paragraph.  Paragraph

17   15, use restrictions, item 11 will remain with the

18   modification that the removal of the words banquet hall and

19   bar --

20         THE COURT:  And what?

21         MR. MINTZ:  Banquet hall and bar.

22         THE COURT:  Oh, bar, b-a-r?

23         MR. MINTZ:  B-a-r.  And the addition of the

24   language, "to the extent that any such businesses share a

25   demising wall with the premises on any side."

1          And paragraph 15, use restrictions, the second

2   part of that paragraph, the parties have agreed to delete

3   paragraphs 4, 5, and 6.

4          THE COURT:  Okay.

5          MR. MINTZ:  Thank you, Your Honor.

6          THE COURT:  Okay.  Did anyone else wish to be

7   heard with respect to the Ollie's lease, or with respect to

8   the proposed form of order?

9          Now, I understand, is there a new order with

10  respect to the Ollie's leases and, if so, do you have a copy

11  of it?

12         MR. KINNEY:  Your Honor, Brian Kinney from

13  Milbank.  We do not currently have a copy of the order.  We

14  have basically to (indiscernible) out the existing order into

15  two --

16         THE COURT:  Okay.

17         MR. KINNEY:  -- and one will cover everything

18  except for the American National lease and one just covering

19  the American National lease.  And we will -- as Mr. LeBlanc

20  said, we will circulate both of those to all the parties and

21  then submit it on COC.

22         THE COURT:  Okay.  So what was the last order you

23  were operating under, was it 667?  That was filed today, so

24  that must be the one.

25         COUNSEL:  Yes.

1          THE COURT:  Okay.

2          MR. KINNEY:  Yes, Your Honor.  Sorry, I left my

3  agenda at the desk, so I didn't have --

4          THE COURT:  No, it's okay.

5          MR. KINNEY:  -- the number in front of me.  Yes,

6  667.

7          THE COURT:  Okay.  Well, I'm going to ask on the

8  record, just in an abundance of caution, is there anyone who

9  wanted to be heard with respect to Ollie's other than

10  American National, or has any comments on the proposed form

11  of order that is intended to be modified?

12          MS. SIERRA-FOX:  Good afternoon, Your Honor, Rosa

13  Sierra-Fox on behalf of the U.S. Trustee.  So while I was

14  sitting, listening to the presentation, I did have to make

15  some comments to all of the orders, and I think some of them

16  carry throughout.  So I don't know what the best way -- I

17  don't think they're necessarily objections, but they could

18  be, I don't know, if the parties have an issue with the

19  comments.  So I don't know what the best way to proceed with

20  that is.

21          MR. KINNEY:  Your Honor, Brian Kinney from

22  Milbank.  If I could suggest, we'll go through those comments

23  immediately after this hearing, Your Honor, and we will

24  obviously circulate the orders to Ms. Sierra-Fox.  If we

25  cannot -- if there's any that we cannot agree on, we would

1  seek to --

2          MS. SIERRA-FOX:  The accompanying (indiscernible)

3  --

4          MR. KINNEY:  Yeah, exactly, we would COC both the

5  competing language for Your Honor, but I can't imagine there

6  would be anything that we'd be unable to resolve, Your Honor.

7          THE COURT:  Okay.

8          MS. SIERRA-FOX:  That sounds good to the U.S.

9  Trustee, Your Honor, if that's good for you.

10          THE COURT:  Okay.  I have some comments on the

11  order, but, first of all, let me ask if there was anyone

12  else.

13      (No verbal response)

14          THE COURT:  Okay.  And let me just note for the

15  record that I'm prepared to approve the Ollie's sale with

16  respect to everyone except American, which will be a separate

17  order.  I'm satisfied that the sale constitutes a reasonable

18  exercise of the debtors' business judgment and yields maximum

19  value for the debtors' estates.

20          And I'm basing that on the Shin declaration at

21  Docket 671 in support of the sale.  That declaration makes

22  clear the debtors and their advisers engaged in a robust

23  auction process; the sale provided a full, fair, and

24  reasonable opportunity for parties to be heard and make

25  higher and better offers; and the debtors, in their business

1    judgment, determined that the stalking horse bid was the

2    highest or otherwise best bid.  The purchaser is a good faith

3    purchaser entitled to the protections of Section 363(m), and

4    the debtors have a sound justification for promptly

5    consummating this sale.

6           So I will approve -- well, let me put it this way,

7    I'll approve the sale and I will review the proposed form of

8    order when I receive it.

9           I had some comments on the order, but I need to

10   find my comments.  I'm working off of too many copies.  Bear

11   with me a second.

12        (Pause)

13          THE COURT:  One universal comment that I have is

14   -- and I'm looking at paragraph 4 -- all these orders have

15   the Court approving the APAs and some of these sales I don't

16   even have the APAs.  And I can tell you, since they were

17   filed at 5:00 p.m. yesterday, I haven't reviewed every APA.

18   So I would ask that you strike the first sentence and just

19   leave it where the sellers are authorized to execute and

20   deliver.  You're authorized to enter into these transactions,

21   but I'm not going to approve each document as I haven't seen

22   them or studied them.

23          And, again, I would ask the comment about FF&E, so

24   to include that in this, which is also at paragraph 4.

25          Bear with me a second, I don't have the correct

1   copy of the Ollie's lease that I wrote on -- I mean order.

2        (Pause)

3            THE COURT:  My apologies, Mr. Kinney.

4            MR. KINNEY:  No problem at all, Your Honor.  We

5   understand it's been a lot of paper.

6            THE COURT:  Well, and I really try to keep up with

7   your paper, but at some point I just start writing on your

8   paper, they're in different binders.  I think I had very few

9   comments, but I want to make sure I got them all because I

10  don't want to have to reach back out to parties once you --

11  so, in 4, you got the striking on the first sentence, and

12  then --

13           MR. KINNEY:  (Indiscernible) --

14           THE COURT:  Right.

15       (Pause)

16           THE COURT:  I think that was it.  I think those

17  were my comments.  Of course, I'll be very interested in

18  comments the United States Trustee has.  Many of my comments

19  had to do with the evidence, which you incorporated.

20       (Pause)

21           MR. MINTZ:  Your Honor, I just want to clarify one

22  thing.  Again, for the record, Joe Mintz on behalf of

23  Ollie's.  I just want to clarify something that was suggested

24  previously.  The parties signed the Ollie's APA that was

25  appended to the stalking horse motion and attached as an

1    exhibit to the proposed order.

2              THE COURT:  Right.

3              MR. MINTZ:  Since that agreement has already been

4    signed, it's our preference to use the two orders, like

5    Counsel indicated before, and have each order modify in

6    certain limited respects the existing asset purchase

7    agreement.  So we're not going to sign two separate APAs, one

8    to address the ten properties and another to address the one

9    property with respect to American National.  I just wanted to

10   make that one clarification.

11             THE COURT:  Okay.

12             MR. MINTZ:  Okay?

13             THE COURT:  I understand.

14             MR. MINTZ:  Thank you.

15             THE COURT:  It's probably less confusing.

16             MR. MINTZ:  It is.

17             THE COURT:  Too much paper, you can't find things.

18        (Pause)

19             MR. KINNEY:  Your Honor, I think that brings us to

20   the conclusion of the Ollie's portion of the sale motion,

21   unless -- unless anyone -- you don't?  Okay.  I just wanted

22   to make sure.

23             THE COURT:  I think I asked three times, so -- I

24   try to be cautious about that.

25             MR. KINNEY:  Your Honor, next we would propose

1  taking up --

2            THE COURT:  Oh, wait.

3            MR. MINTZ:  May we be excused, Your Honor, for

4  Ollie's --

5            THE COURT:  Certainly.  Yes, thank you.

6            MR. MINTZ:  Thank you, Your Honor.

7            THE COURT:  Anyone else who wants to leave, you're

8  more than welcome.

9        (Laughter)

10            THE COURT:  But you're also welcome to be here.  I

11  didn't mean it that way.

12        (Laughter)

13            MR. KINNEY:  Thank you, Your Honor.

14            THE COURT:  You're always welcome to our

15  courtroom, it is always open.

16            MR. KINNEY:  The next piece of this sale process

17  that we'd like to present, Your Honor, is the sale of the

18  debtors' own real property.  And, Your Honor, this was

19  pursuant to a notice of successful bidder filed at Docket

20  Number 641, and the form of order, the proposed form of order

21  was filed at Docket 649.

22            Your Honor, with respect to these assets, again,

23  these were debtors' own real property that result -- that

24  were included in the assets, subject to the bidding

25  procedures.  With respect to the owned real property, the

1   conclusion of the auction, outside of the owned real property

2   that was just approved to be sold to Ollie's pursuant to

3   their stalking horse bid, there were 28 purchasers for the

4   remaining 41 parcels of owned real property.

5          And in the aggregate --

6          THE COURT:  So 28 out of the 41?

7          MR. KINNEY:  So 28 buyers --

8          THE COURT:  Okay.

9          MR. KINNEY:  -- for 41 properties.  Certain buyers

10  wanted multiple properties --

11         THE COURT:  Gotcha.

12         MR. KINNEY:  And, in the aggregate, these netted

13  over $130 million in proceeds to the estates.

14         Your Honor, based on the testimony contained in

15  the Shin declaration, we believe that we've demonstrated that

16  this is -- that these are, by far, in the best interest of

17  the estate, these are the highest and best offers available

18  for these properties, and that the debtors have exercised

19  their sound business judgment in agreeing to sell these

20  assets to the successful bidders on the terms set forth in

21  the proposed order.  As such, we would ask the Court to

22  approve the sales, subject to any comments that Your Honor or

23  anyone else may have with respect to the order.

24         And just to be clear on the record, we are

25  agreeing, again, that we will review the comments from the

1  Office of the U.S. Trustee and, subsequent to this hearing,

2  in the event Your Honor is inclined to approve -- to grant

3  the relief requested, that we would circulate a revised order

4  under COC, assuming that we get to agreement on all the

5  comments and to not submit any disagreement to Your Honor

6  under COC as well.

7          THE COURT:  Okay.  So, I note this motion is

8  uncontested.  Does anyone want to be heard with respect to

9  the motion, Docket 641 -- well, that's the list of successful

10  bidders -- or the proposed form of order?  Ms. Thomas?

11          MS. THOMAS:  Your Honor, may I be heard?

12          THE COURT:  Yes.

13          MS. THOMAS:  Your Honor, for the record, Alexandra

14  Thomas with Choate, Hall & Stewart on behalf of BioLife

15  Plasma, LP.  BioLife is the tenant under Store Lease 137,

16  which is located in Victorville, California.  And, to be

17  clear, BioLife does not object to the proposed sale to RCB

18  Equities; however, to date, our client has not received any

19  written notice of assumption or assignment of their lease.

20  We've reviewed the notices of assumption and assignment filed

21  on the docket and our lease hasn't been included.  So we

22  would just ask that the debtors provide notice of the cure

23  costs and any adequate assurance that RCB Equities plans to

24  provide in connection with the assumption and assignment of

25  Lease 137.

1          MR. KINNEY:  Thank you.  Your Honor, to the extent

2    that we -- so --

3          THE COURT:  Is Lease 137 included?

4      (Pause)

5          MS. THOMAS:  And, Your Honor, if it's helpful, I'm

6    referring to Docket 641 at Schedule 1, and it's the lease

7    that's listed 12480A Amargosa Road.

8          THE COURT:  Thank you, Ms. Thomas.

9      (Pause)

10          THE COURT:  Ms. Thomas, we're just giving debtors'

11   counsel a moment to get the document.

12          MS. THOMAS:  Understood.

13          MR. KINNEY:  Your Honor, so this is a debtor-owned

14   property.  So --

15          MS. THOMAS:  Yes.

16          MR. KINNEY:  -- Ms. Thomas's client is the tenant

17   in this property.  So, if anything, they owe rent to the

18   estate, but we are happy to -- to the extent there is an

19   assumption and assignment of that lease, which I don't

20   believe has been noticed to date, if that is in fact noticed,

21   we will obviously submit any cure information, to the extent

22   applicable, but I don't believe that's ripe for today.

23          THE COURT:  Do you -- has that satisfied your

24   inquiry, Ms. Thomas?

25          MS. THOMAS:  Yes.  We just wanted to confirm that

1  to the extent there are any adequate assurance objections or

2  cure objections that the deadlines haven't run yet and that

3  we would receive notice of the assumption and assignment

4  before those deadlines passed.

5          MR. KINNEY:  To the extent that there's a proposed

6  assumption and assignment, there would be a period to get to

7  vote any proposed cure, as well as any proposed adequate

8  assurances.

9          THE COURT:  And I'm sure, if you have further

10 inquiry, you can reach out to Mr. Kinney.

11         MR. KINNEY:  Yes, yes.

12         THE COURT:  Okay.  Thank you, Ms. Thomas.

13         Is there anyone else who wishes to be heard with

14 respect to the debtor properties, the sale of the debtors'

15 property, or the proposed form of order?

16     (No verbal response)

17         THE COURT:  Okay, I hear no one; I see no hands on

18 Zoom.

19         Again, based on the record that has been made and

20 the resolution of all objections, I'm prepared to approve

21 this sale as well.

22         This is an uncontested sale of debtors'

23 properties, as identified at Docket 641, to the successful

24 bidders, and identified in the schedules attached to the

25 notice of successful bidders.  I'm satisfied, based on the

1   Shin declaration, that there was a robust auction, that the

2   sale provided a full and fair opportunity for parties to make

3   higher or otherwise better offers to purchase the property,

4   and I will enter the order when it's submitted.

5           I do have a couple of comments on the form of

6   order.  I want to make sure I have the right order, sorry.

7       (Pause)

8           THE COURT:  Many of these are just clean-up

9   comments in the introductory paragraph, the declaration

10  relied on docket numbers, that type of thing, but I do have a

11  question, this is more substantive, in (e), paragraph (e),

12  line 1, you need to strike "non-appealable."

13          MR. KINNEY:  Yes.

14          THE COURT:  Obviously, it's appealable, I don't --

15  it's successful, but it's appealable.

16          And (f), you're missing a docket number.

17          On page 8 -- I'm looking at 649-1, the blackline

18  -- or maybe it's not blackline -- it goes from paragraph (p)

19  to paragraph (a), and I think that that paragraph (a) is very

20  similar to paragraph (v).  You could probably modify and

21  strike the (a).

22          MR. KINNEY:  Yes.

23          THE COURT:  And I'd ask that you make the

24  conforming modification to paragraph 4 about approving

25  agreements and consenting lienholders.

1              In paragraph 13, I'm looking at page 20, about

2    eight lines up from the bottom it says "each and every

3    federal, state, and local government agency" --

4              MR. KINNEY:  Yes.

5              THE COURT:  -- change the word directed to

6    authorized, please.

7              MR. KINNEY:  Yes.

8              THE COURT:  And those are my only comments to the

9    order.

10             MR. KINNEY:  Thank you, Your Honor.

11             As discussed, we will make those comments.  We

12   will also review the comments from the United States Trustee,

13   and submit under certificate of counsel.

14             THE COURT:  Thank you.  One thing I did -- I was

15   reminded to ask is to please incorporate the related-to

16   docket number in the caption of the order because a lot of

17   these are titled very similarly and we want to make sure they

18   are linked to the correct documents.

19             MR. KINNEY:  We will, Your Honor, and we'll

20   include both the notice of successful bidder, as well as the

21   original sale motion itself.

22             THE COURT:  Perfect.  Thank you.

23             MR. KINNEY:  Your Honor, that brings us to the

24   last piece of today's puzzle.  Your Honor, our final piece

25   relates to the debtors' remaining leases that were not

1 subject to either the Dollar Tree designation or the Ollie's

2 stalking horse bid.

3           Your Honor, pursuant to the bidding procedures and

4 these leases, the debtor has marketed all the remaining

5 leases to buyers.  At Docket Number 639 -- I'm sorry, at

6 Docket Number 664 and 639 -- I was right, sorry about that --

7 639 and 664 --

8           THE COURT:  Okay.

9           MR. KINNEY:  -- we filed are notice of successful

10 bidders with respect to the leased properties.  The original

11 one was 639 and the amended one was done at 664.

12           And, with respect to the order, we filed a revised

13 form of proposed order at Docket Number 673, and this revised

14 -- the proposed form of order that had been filed earlier at

15 Docket Number 640.

16           Your Honor, this order and the notice of

17 successful bidders covers 13 parties, for an aggregate

18 purchase price of $2.4 million.  Again, as set forth in the

19 Shin declaration, we believe that this represents the highest

20 and best offers for these properties, and is -- the decision

21 to enter into the -- I will use the term APA, but here APA

22 means purchase agreement, assumption and assignment

23 agreement, and/or a lease termination agreement.

24           THE COURT:  Have they all been filed?

25           MR. KINNEY:  I believe so.

1          COUNSEL:  Yes.

2          MR. KINNEY:  Yes, I believe --

3          THE COURT:  Okay.

4          MR. KINNEY:  -- yes, they all in fact have been

5    filed.

6          THE COURT:  Okay.  It's a variety.

7          MR. KINNEY:  It is a variety because some of the

8    (indiscernible) are actually the landlords buying back their

9    leases.  And so, for those parties, we agreed they didn't

10   need to execute a full purchase agreement, we instead agreed

11   they could be based on the lease termination agreement.  And

12   some of the parties, as envisioned in the procedures, chose

13   to use an assumption and assignment agreement rather than a

14   true purchase agreement.

15          So it is a medley of defined terms, as the parties

16   decided to call them, all to have the same result of

17   providing for the assumption and assignment of the lease to

18   the purchaser.

19          Your Honor, under the bidding procedures we had

20   reserved a couple of issues from today's hearing, those are

21   both cure objections and adequate assurance objections.

22          Specifically, with respect to the adequate

23   assurance, we had provided in the bidding procedures that the

24   adequate assurance deadline would not be until next week and

25   parties would have until then to object.  And, obviously, if

1  an objection was lodged, we -- there is then a procedure to

2  resolve those objections.

3          We have received informal comments from counsel to

4  several landlords, including Ms. Roglen, who's here in court

5  today.  On that front, we had made certain edits already to

6  the order, and that was one of the reasons behind the filing

7  of the amended form of order.  We understand that Ms. Roglen

8  does not believe that that's sufficient to address her

9  issues.  We would propose to make one further modification to

10 address her issue, which I believe she still believes is

11 insufficient, but we would propose to add a very clear

12 paragraph to the order that, notwithstanding anything to the

13 contrary, nothing in here -- nothing in the order prejudices

14 the ability of any landlord to make an adequate assurance --

15 timely make an adequate assurance objection in accordance

16 with the bidding procedures, and for the Court to order

17 appropriate relief if such objection is upheld.

18         So we -- because that's always been the intent,

19 Your Honor, and we believed the order did it.  We acknowledge

20 it was not a model of clarity on this point.  And so, in

21 order to erase any doubt as to what effect this order would

22 have on the ability of landlords to raise the appropriate

23 adequate assurance objections, is to make it expressly clear

24 and governing above all else in the order that nothing in

25 here impairs their right to make those objections, nothing in

1   the order impairs Your Honor's right to grant the appropriate

2   relief upon sustaining such an objection.  And we have also

3   provided in the order and I think it's sufficient -- I'm

4   happy to add it again in another paragraph -- that we cannot

5   close any assignments of leases until either that objection

6   deadline has passed without objection or, if an objection is

7   filed, until it's resolved in the debtors' favor.

8           THE COURT:  I'm sure the landlords would like to

9   be heard.

10          MR. KINNEY:  I was going to say, there is one

11  other point that I would like to very quickly raise, Your

12  Honor.  There's also a provision in the order with respect to

13  percentage rent, and there was an objection filed -- an

14  informal objection raised with respect to that.  We're going

15  to work with the landlord there, we have two possible

16  resolutions, I think either of which may be acceptable to

17  both parties --

18          THE COURT:  Are only two objecting to percentage

19  rent?

20          MR. KINNEY:  I believe so.  I think it's just one

21  party, if I --

22          THE COURT:  Oh, okay.  So it's a one-off --

23          MR. KINNEY:  -- yes, but there are two possible --

24          THE COURT:  -- carveout or --

25          MR. KINNEY:  -- language -- that we just need to

1   discuss with the purchaser which -- and the landlord which

2   one of the two, we have two possible paths.  I think, from

3   the estate, either one works, we just need to find one that

4   works for both the landlord and the purchaser.  And, again,

5   we will submit that on certification of counsel once we get

6   to the -- a resolution of the matter.

7           And, with that, I will cede the podium.

8           THE COURT:  Okay.  Thank you.

9           MS. ROGLEN:  Good afternoon, Your Honor --

10          THE COURT:  Good afternoon.

11          MS. ROGLEN:  -- Laura Roglen of Ballard Spahr on

12   behalf of Ramage Enterprises, which is one of the landlords

13   that was listed in the notice of successful bidder filed at

14   Docket Number 639, and it's for Store Number 435, I believe,

15   which the successful bidder for that entity is identified as

16   TBI, Inc.

17          And, Your Honor, primarily, my issue is that these

18   leases that are proposed to be assumed and assigned are in a

19   different procedural posture right now than the other orders

20   Your Honor has agreed to enter today.  For the Dollar Tree

21   designation rights, that was approving the designation

22   rights, not the assumption and assignment of leases --

23          THE COURT:  Right.

24          MS. ROGLEN:  -- as well as the sale of other IP

25   assets to Dollar Tree.  And so there were no outstanding

1   ongoing objection deadlines or anything that would interfere

2   with the assumption and assignment of leases, that's going to

3   be subject to a separate process.

4          With respect to Ollie's, that's also in a

5   different procedural posture because that was a stalking

6   horse bid and adequate assurance information was provided

7   earlier.  The objection deadline had already passed, and Your

8   Honor already heard an objection and ruled on it today.

9          Now, we're here on leases where the successful

10  bidders were just identified last night and the adequate

11  assurance information was only provided last night, and

12  although there is an ongoing ability to object to that

13  adequate assurance information, the debtors are here seeking

14  entry of an order approving the assumption and assignment of

15  those leases today.

16         Now, certainly with respect to TBI, Inc. -- I of

17  course have not looked at all of the other APAs that are

18  subject to this proposed form of order, but the only thing

19  being sold here are the leases, it is only the assumption and

20  assignment of the leases.  So I don't think it's appropriate

21  to enter an order today approving the assumption and

22  assignment of leases, which is the only thing that would be

23  done today, when you've already heard that the sales will not

24  and cannot close until after the further objection period

25  passes.  And while some changes have been made to the order

1  to attempt to clarify that nothing cuts off landlord's

2  ability to object to adequate assurance of future

3  performance, which I think is everybody's intention here,

4  there's a lot of findings of fact and conclusions of law in

5  this order that directly relate to adequate assurance of

6  future performance, specific findings with respect to the

7  tenant's use of -- intended use of the premises, which the

8  Court has no information about that, we have no information

9  about what the intended use is.

10         And for those reasons, among others, I just am not

11  sure that entry of an order approving the assumption and

12  assignment of those leases today is appropriate and would

13  instead propose that we wait until after the expiration of

14  the May 30th objection deadline to then enter a much cleaner

15  order approving the assumption and assignment, to the extent

16  there's no objection, or, of course, if there is an objection

17  to the adequate assurance of future performance of one of the

18  assignees, then after that objection is adjudicated.

19         It's not clear to me what the procedural process

20  would be for, if the Court enters an order today approving

21  the assumption and assignment, then later there's an

22  objection that the Court were to sustain to the assumption

23  and assignment of the lease, is this order then rescinded

24  somehow, is there a subsequent order modifying it?  I'm not

25  really sure how that would work because it's an unusual

1  scenario.  You typically would not approve the assumption and

2  assignment of a lease before all of the objections were ruled

3  upon.

4          So that's our position today.  I can of course go

5  through the order and outline all of the issues and problems

6  that we've identified with the order so far, and I'm sure we

7  could craft language around each of them, but I think the

8  better course of action would be just to hold the entry of

9  the order for today.

10         Thank you, Your Honor.

11         THE COURT:  Thank you.

12         MR. HAZELTINE:  Good afternoon, Your Honor, Bill

13  Hazeltine on behalf of --

14         THE COURT:  Good afternoon.

15         MR. HAZELTINE:  -- Mira Mesa Shopping Center,

16  which is a landlord that is purchasing back its own lease,

17  and I'll be very brief.  I raised a few nits with debtors'

18  counsel last night, mostly the fact that they used

19  "purchaser" throughout the order, rather than "purchasers."

20  They have corrected some, and I've been informed that they're

21  going to go through and make the rest of the changes.

22         So, with that, we're fine with the order.

23         THE COURT:  Okay.  Thank you.

24         MS. TOPPER:  Good afternoon, Your Honor; for the

25  record, Paige Topper with Saul Ewing on behalf of Franklin

1  Family Partnership.  Franklin Family Partnership is one of

2  the landlords that debtors' counsel mentioned we were

3  discussing language in connection with the order on

4  percentage rent.  Franklin Family did file an objection to

5  the assumption and assignment notice on the cure issue and

6  there is a reservation of rights on potential objection to

7  adequate assurance of future performance, we understand that

8  those are adjourned to a later date.  We also understand from

9  debtors' counsel that the adequate assurance information will

10  go out today.  My client hasn't received it yet, but I

11  understand that that will be coming shortly.

12           As debtors' counsel represented, we have an issue

13  with the percentage rent because we have an obligation under

14  our lease in connection with, in addition to monthly rent

15  payments, a percentage based on the gross sales, and

16  specifically the language in the order, you know, we want to

17  make sure that that obligation is paid pre-closing for 2024.

18           So I think debtors' counsel is correct that we're

19  going to continue discussing and, you know, if the Court

20  enters the order today, we'll submit revised language,

21  subject to my client's approval, under certification of

22  counsel.

23           Thank you.

24           THE COURT:  Mr. Waxman?

25           MR. WAXMAN:  Good afternoon, Your Honor.  May it

1    please the Court, Jeff Waxman of Morris James on behalf of

2    Navins Fund, LLC.  They are a landlord and purchaser of a

3    lease, Your Honor.  With me today on the line is Patrick

4    Huffstickle of the Dykema law firm.

5            Your Honor, we -- first of all, I understand that

6    the lease rejection -- or lease termination agreement was not

7    docketed, but will be, is my understanding from the debtors.

8    So I just wanted to clear that up.

9            We provided certain comments and proposed form of

10   order to the debtors.  I understand that most of those

11   changes that we have proposed are going to be included in the

12   exhibit which specifically identifies the lease, the

13   location, the landlord as the purchaser, as well as some of

14   the other terms in there, the lease termination.  There's no

15   issue with that.

16           I do want to just put one important issue on the

17   record.  As I understand, the lenders are in court today,

18   they do not oppose the proposed sale of the lease or lease

19   termination.  That way, there's no issue with respect to any

20   proposed modification.

21           So, unless somebody has any comments from the

22   lenders, I think we are -- I think we're okay, Your Honor.

23           MS. VOLIN:  And Megan Volin, Proskauer Rose, on

24   behalf of the DIP agent, just confirming that we have no

25   issues there.

1          THE COURT:  Okay.  Thank you.

2          MR. WAXMAN:  Your Honor, that's our add, if I may

3   be excused?

4          THE COURT:  You are excused.  Thank you, Mr.

5   Waxman.

6          MR. WAXMAN:  Thank you, Your Honor.

7          THE COURT:  Mr. Ward?

8          MR. WARD:  Good afternoon, Your Honor, Matthew

9   Ward on behalf of Burlington Coat Factory, which is a

10  purchaser of one location.  Your Honor, my co-counsel from

11  the Jackson Walker firm Kristhy Peguero, is also on the

12  video.

13         Burlington Coat Factory prevailed at the auction

14  with respect to Store Number 279 in Tulare, California.  We

15  have been working with the Milbank team to incorporate our

16  comments to the order.  We're not quite there yet, but I'm

17  confident that we'll be able to get there.  There are a few

18  open items with respect to a cure amount.  We think that the

19  cure amount has been set, but to the extent, since cure

20  objections are due next week, if there's an unresolved cure

21  dispute, the way our bid is structured is we're putting in a

22  certain amount of cures and then on that the onus would be on

23  the debtors in excess of that.  And so we just wanted that to

24  be incorporated.  We have some language regarding use

25  restrictions and which use restrictions will be binding on us

1  in signage and the size of signage.

2          So nothing earth-shattering here that I don't

3  think we can work out, but we just wanted to reserve our

4  rights to do that.  I think what debtors' counsel proposed to

5  do with the U.S. Trustee's comments, which is incorporate the

6  comments and then submit them under a certification of

7  counsel.  And if for whatever reason we can't get to an

8  agreed form with the debtors, I suppose we could do competing

9  forms under certification of counsel, we're amicable to that

10 approach.

11         MR. KINNEY:  Your Honor, Brian Kinney of Milbank,

12 just one correction and then one response.

13         First of all, the cure objection deadline has

14 passed.  So all cure objections have been filed, it's the

15 adequate assurance --

16         MR. WARD:  Okay.

17         MR. KINNEY:  -- objection deadline that is next

18 week.

19         Secondly, obviously, we will work with counsel on

20 comments to the order.  We will also circulate that to the

21 affected landlords to make sure that they are comfortable

22 with the proposed changes as well.

23         MR. WARD:  Thank you for those clarifications.

24 So, unless my co-counsel has comments or Your Honor has

25 questions, I think that's it for Burlington.

1          THE COURT:  Okay.  Thank you.

2          MR. WARD:  Thanks, Your Honor.

3          THE COURT:  Does anyone else wish to be heard?

4     (No verbal response)

5          THE COURT:  So, Mr. Kinney, welcome back.  I am

6   concerned, when I read this, about timing and process, and I

7   was curious if this is one of those orders that should be

8   bifurcated because the way the timing works -- and there are

9   a lot of findings, substantial findings in this form of

10  order, and I was curious why this couldn't be addressed at

11  June 4.

12          MR. KINNEY:  So, Your Honor, there's two pieces.

13  First, we do have a requirement under our DIP milestones to

14  have a form of orders entered by tomorrow and closings by the

15  end of the month.

16          The second piece of it is monetary, is that if we

17  have this heard at the June 4th hearing, that's another

18  month's worth of rent that in the event that we are unable to

19  sell these that the estate would be left holding the burden

20  of.

21          THE COURT:  Well, I guess --

22     (Pause)

23          MR. KINNEY:  I'm sorry, Your Honor.

24          THE COURT:  No, take a minute, please.  I would

25  much rather the parties work this out.

1        (Pause)

2             THE COURT:  Would it be helpful if I left?  No, I

3   mean --

4        (Laughter)

5             COUNSEL:  Your Honor, I think we should keep the

6   momentum going.

7             THE COURT:  Okay.

8             COUNSEL:  Thank you, Your Honor.

9             MR. ROSSOW:  Your Honor, this is Jim Rossow on

10  Zoom.  I'm sorry for interrupting.  Can the Court hear me?

11            THE COURT:  Yes, I can, Mr. Rossow.

12            MR. ROSSOW:  Thank you.  Your Honor, I'm from

13  Rubin & Levin in Indianapolis, and I represent ALDI Inc.

14            And just to provide a little bit more context to

15  debtors' counsel in terms of the timing issues, one thing I

16  would point out is that ALDI is a successful bidder with

17  respect to two owned properties and one leased property, it's

18  all under one APA.  And so while the landlords may consider

19  this sort of separate, from the -- from ALDI's perspective,

20  we have one APA that deals with three transactions.  And as

21  counsel, debtors' counsel indicated, of course delay is an

22  issue because the cure costs might not necessarily be borne

23  by the debtor, it might be the assignee.

24            And so I certainly understand the valid concerns

25  raised by landlords, I know -- I personally don't see a

1   problem if the Court is reserving specific adequate assurance

2   issues.  I am optimistic that, for example, ALDI, that any

3   such issues would be resolved without having to have the

4   Court actually take evidence and have a contested hearing.

5           So while I understand the need for other landlords

6   to be protected, in our circumstance, if possible, we'd like

7   to press forward.  And to the extent the landlord in our

8   case, if they come forward, we'll be happy to address that,

9   but we don't want any additional delays in terms of being

10  able to close this, to keep sight of the economics of the

11  case.

12          THE COURT:  Okay.  Thank you, Mr. Rossow.

13          MS. MERSKY:  Your Honor, Rachel Mersky.  I can't

14  seem to get my video operating.  I think --

15          THE COURT:  We can hear you, Ms. Mersky.

16          MS. MERSKY:  I'm just -- I'm representing Kimco

17  Realty in connection with a Houston, Texas lease, Number

18  2802.  That lease was part of a rejection, but the landlord

19  has worked with the debtor consensually, as well as with the

20  proposed assignee, Burlington, and I note that we need that

21  Burlington property to be included in an order, I don't

22  think, as of right now, it is.  There may be a little

23  confusion because this was added and was not part of the

24  auction, but we want to clarify that Kimco consents to the

25  addition of its lease and the withdrawal of the rejection.

1            MR. KINNEY:  Your Honor, for this, because it was

2   not part of the auctioned assets, we would propose to file --

3   we'll file a separate notice of assignment and assumption

4   with respect to that lease.

5            THE COURT:  Okay.  Ms. Mersky, did you hear that?

6            MS. MERSKY:  Yes, thank you.  No problem, I just

7   wanted to make sure it didn't get overlooked in the larger

8   picture.

9            THE COURT:  Contact Mr. Kinney if you don't see

10  it.

11           MS. MERSKY:  Okay.  Thank you, Your Honor.

12           THE COURT:  Okay.  So did you have an opportunity

13  to confer and perhaps handle -- determine how to handle this?

14           MR. KINNEY:  Yes.  Your Honor, the issue for the

15  estate remains the need to have resolution prior to June 1st.

16  We are agreeable to carving out Ms. Roglen's client.

17           THE COURT:  Okay.  I mean, she is the sole

18  objector here today who is not pressing to go -- who is

19  disputing going forward.  And I am sympathetic to the

20  concerns raised by ALDI's counsel and others.

21           MR. KINNEY:  So, Your Honor, we will carve her

22  client out of the proposed order.  We will, for the avoidance

23  of doubt, add that paragraph anyway --

24           THE COURT:  I was going to say, yes, please.

25           MR. KINNEY:  -- just to clarify exactly what is

1  and what is not happening, that everything is subject to the

2  resolution of any adequate assurance objection that is in

3  fact filed.

4        THE COURT:  Yeah, you certainly want to avoid a

5  future Mr. Kinney issue.

6        MR. KINNEY:  Exactly.

7        THE COURT:  Let me ask, did anyone else wish to be

8  heard with respect to the sale or the proposed form of order?

9     (No verbal response)

10        THE COURT:  So I had comments on your order, but

11  then this morning you filed another order, which could I just

12  have a minute to look at?

13        MR. KINNEY:  Certainly, Your Honor.

14        THE COURT:  And whose comments are reflected on

15  this blackline?  These are partly landlord?

16        MR. KINNEY:  This is partly -- informal comments

17  we received from Ms. Roglen, as well as certain clean-up

18  changes from some of the purchasers as well.

19        THE COURT:  I see, and updated to reflect filings.

20  Okay.

21        MR. KINNEY:  And, Your Honor, I'm also informed

22  that the UCC's comments are also reflected in this -- in the

23  redline.

24     (Pause)

25        THE COURT:  Okay, I'm going to ask -- these are

1  kind of very similar comments because these are all very

2  similar orders --

3              MR. KINNEY:  Yes.

4              THE COURT:  -- but, in (e), I'm going to ask you

5  strike the "non-appealable."

6              MR. KINNEY:  Yes.

7              THE COURT:  When is the adequate assurance

8  deadline, next -- the 30th?

9              MR. KINNEY:  Next Thursday, yes, the 30th, Your

10  Honor.

11             THE COURT:  Okay.

12        (Pause)

13             THE COURT:  In this order, I don't know that this

14  is an issue, but take a look at (q) and (w) for similarity or

15  repetition.  They may be -- in 4, you'll address the two

16  comments that we talked about previously.

17             MR. KINNEY:  Yes, Your Honor.

18             THE COURT:  I appreciate the modifications to 7.

19        (Pause)

20             THE COURT:  Paragraph 13, general assignment,

21  again, change "directed" to "authorized."

22             And I think -- let me just double check -- take a

23  look at paragraph 18, direction to released interest, and I

24  think the end of that paragraph, starting at the bottom of

25  page 25 of the blackline, "each and every federal, state, and

1  local," do you see that?

2          MR. KINNEY:  Yes.

3          THE COURT:  I think that is duplicative of the

4  prior paragraph -- not the prior to this, but --

5          MR. KINNEY:  Correct.

6          THE COURT:  -- formerly paragraph 12, I don't know

7  what it is --

8          MR. KINNEY:  Correct, Your Honor, 12 is now 13.

9          THE COURT:  Yeah.

10          MR. KINNEY:  Yes.  So we'll strike it from the end

11  of --

12          THE COURT:  Yeah, whatever -- I'm sure by the time

13  you make changes, I don't know what's going to happen, but

14  those are my comments.

15          MR. KINNEY:  Thank you, Your Honor.

16          THE COURT:  So and then, obviously, you'll address

17  the issues that were raised on the record today.

18          And let me just note, I'm just going to

19  incorporate my comments from earlier based on the Shin

20  declaration with respect to this sale as well.

21          MR. KINNEY:  Your Honor, the one question that Ms.

22  Doyle (indiscernible) wanted me to ask you --

23          THE COURT:  She made you ask, yes.

24          MR. KINNEY:  -- is whether or not there's a time

25  by which you need the revised form of order.

1           THE COURT:  I was going to tell you.  So I have

2    limited staff tomorrow, and so is there a possibility that

3    you guys can get them to us by like 1:00?

4           MR. KINNEY:  By 1:00?  Certainly, Your Honor.

5           THE COURT:  And in fact I have some people who are

6    already off for holiday, so please let us know if there's a

7    reason you can't.

8           MR. KINNEY:  Your Honor, we'll endeavor to get

9    drafts turned immediately after the hearing.

10          THE COURT:  Okay.  Was there one other matter for

11   today --

12          MR. KINNEY:  There is, Your Honor.

13          THE COURT:  -- a Suri objection?

14          MR. KINNEY:  Yes, Your Honor.

15      (Pause)

16          MR. KINNEY:  So the rejection is going forward

17   with respect to Docket -- the objection of Suri Westover

18   Village, Inc., which was at Docket Number 324, their

19   objection.

20          THE COURT:  Is anyone here today on behalf of Suri

21   Westover Village?

22          MR. SURI:  I am here, ma'am.

23          THE COURT:  Okay.  You filed -- excuse me, sir --

24   you filed an objection and I wanted to give you an

25   opportunity to address that.

1          MR. SURI:  Yes, thank you for your time.  Yeah, I

2   mean, our main kind of issue is that, you know, rejecting

3   that is because we have quite a bit of financial pressure,

4   and this lease and this, you know, tenant was a significant

5   part of the shopping center, it was an anchor tenant when it

6   was first built and stuff, and their significant, I guess,

7   contribution to the financing and the thing of the operation.

8          THE COURT:  Sir, do you have anything further?

9   And, I'm sorry, did you state your name for the record?

10         MR. SURI:  My name is Parkash Suri.

11         THE COURT:  Okay.

12         MR. SURI:  I'm one of the owners.

13         THE COURT:  Okay, all right.  Thank you

14         Was there anything further, Mr. Suri?

15      (No verbal response)

16         THE COURT:  Okay.

17         MR. SURI:  No, that's it.

18         THE COURT:  I don't want to cut you off, sir.

19   Please feel free --

20         MR. SURI:  No, that's about it.  Yeah, it's just

21   the financial pressure.

22         THE COURT:  Okay.  Well, I'm going to let the

23   debtors respond to your objection, and then I'll rule.

24         MR. KINNEY:  Thank you, Your Honor, Brian Kinney

25   of Milbank on behalf of the company.

1        Your Honor, the location at issue here is a

2   location that the debtors closed as part of their initial

3   wave of store closings in April.  The debtors' estates are

4   receiving no benefit from this location at this point.  The

5   debtors have returned the keys and codes to the landlord, and

6   are no longer in occupancy of the location.  As such, under

7   360 -- excuse me, Section 365 of the Bankruptcy Code, the

8   debtors, in their reasonable business judgment, decided to

9   reject this location.  While it is unfortunate that the

10  shopping center's cash flows are going to be negatively

11  impacted by this rejection, however, the estate simply cannot

12  afford to carry the costs for a closed location when it's

13  receiving no benefits from that location.

14        THE COURT:  Mr. Suri, do you agree the debtors are

15  not in that location anymore?

16        MR. SURI:  Yeah, they're no longer there, yes.

17        THE COURT:  And you have access to the premise?

18        MR. SURI:  I do, yes.

19        THE COURT:  Okay.  Do you wish to be heard any

20  more on your objection?

21        MR. SURI:  I would.

22        THE COURT:  Okay.

23        MR. SURI:  I'm happy to, you know -- I know

24  there's a June 4th matter, if we could be -- then I could

25  have my lawyer.  I just kind of presented this at a very

1  short period of time.  I would appreciate that, if that's

2  possible.

3          MR. KINNEY:  Your Honor, we're happy -- if Your

4  Honor wishes to continue, we could; however, again, we do not

5  believe that there is any basis to object -- that there is no

6  valid objection to the rejection at this location.

7          THE COURT:  Yeah, Mr. Suri, I'm very sympathetic

8  to your position and I appreciate you participating in the

9  process; however, there is no basis in law to support your

10 objection.  The debtors, in their business judgment, have

11 determined to reject and they're entitled to do so, and have

12 noted there's no benefit to the bankruptcy estate here.

13         So, sir, I'm inclined to overrule your objection

14 for those reasons, and I would not be inclined to continue

15 this to another hearing.

16         MR. SURI:  If you're not inclined to, I guess so,

17 then I --

18         MR. KINNEY:  And, Your Honor, can I just note one

19 thing for the record?

20         THE COURT:  Yes.

21         MR. KINNEY:  Pursuant to the Bankruptcy Code, upon

22 the rejection, the landlord will have a claim for damages.

23 We have filed our bar date motion, so we expect to have a bar

24 date set in the near future.  The landlord will be mailed

25 notice of that bar date and is free to file a proof of claim

1  setting forth his damages from the rejection.

2          THE COURT:  Did you hear that, Mr. Suri?

3          MR. SURI:  I did, ma'am.  Thank you.

4          THE COURT:  Yes, so that a remedy available to

5  you.

6          MR. SURI:  Okay.

7          THE COURT:  Okay?  All right.

8          MR. SURI:  Yes, thank you.

9          THE COURT:  Thank you very much for your patience

10 today.

11         MR. SURI:  Yes.

12         MR. LEBLANC:  Your Honor, Andrew Leblanc again.

13 Your Honor, I think that concludes our agenda for today.

14         I did want to mention, Your Honor, we had the

15 occasion to bring a number of our summer associates who just

16 -- this is actually their first day of working at the firm.

17         THE COURT:  Oh --

18         MR. LEBLANC:  They've been with us --

19         THE COURT:  -- it's summer.

20         MR. LEBLANC:  -- for three days -- it is --

21 they've been with us for three days for orientation, but

22 started today, so a number of them came down here.  And we

23 appreciate Your Honor's time and it was good that they got to

24 see a hearing start to finish, and also to see the allure of

25 Bankruptcy Court that you can actually have something start,

1  finish, and conclude all in the course of a handful of hours.

2       So we thank you very much, Your Honor, for your

3  time and for your consideration of the matters before you.

4       THE COURT:  Certainly.  And let me, just before we

5  go, I want to make a couple of points.

6       One, I need a rejection order.  And I'll note that

7  the Court asks that you contain in the rejection orders the

8  language about consenting third parties when it includes

9  abandonment.

10      And I welcome the summer clerks, I hope you have a

11 great experience, and you're always welcome to come view

12 things in this court.  And I hope you also got to experience

13 a bit of the auction, if at all possible.

14      But I'd also like to congratulate the debtors on a

15 successful auction.  I know -- I can appreciate the

16 incredible amount of time and attention required to conduct

17 that auction, and to analyze the multiple sale transactions.

18 And so I just want to note, I appreciate that you were

19 drinking from a fire hose when you were submitting orders and

20 agendas and all up until the hearing, so my congratulations

21 to you.

22      And I appreciate the committee and lenders and the

23 landlords and everyone's participation, that's what makes

24 this process so special.

25      And thank you to Ms. Rosa Sierra-Fox for helping

Case 24-10719-JKS    Doc 758-1    Filed 05/30/24    Page 141 of 291

140

1   us keep our orders in form.  I appreciate everybody's time.

2            I hope you all have a great day.  We'll look

3   forward to receiving your orders tomorrow, and hopefully I

4   won't see any of you and that you have a good holiday, and

5   I'll see you on June 4th.

6            COUNSEL:  Thank you, Your Honor.

7            THE COURT:  We stand adjourned.

8        (Proceedings concluded at 2:57 p.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATION

2           We certify that the foregoing is a correct

3   transcript from the electronic sound recording of the

4   proceedings in the above-entitled matter to the best of our

5   knowledge and ability.

6

7   /s/ William J. Garling                    May 24, 2024

8   William J. Garling, CET-543

9   Certified Court Transcriptionist

10  For Reliable

11

12  /s/ Tracey J. Williams                    May 24, 2024

13  Tracey J. Williams, CET-914

14  Certified Court Transcriptionist

15  For Reliable

16

17  /s/ Mary Zajaczkowski                     May 24, 2024

18  Mary Zajaczkowski, CET-531

19  Certified Court Transcriptionist

20  For Reliable

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

# EXHIBIT 2

99¢ Only Stores 10/27/03

GBP
4/1/84
T-11892

## L E A S E   C O N T R A C T

THIS LEASE CONTRACT entered into by and between WEINGARTEN REALTY INVESTORS, a Texas limited partnership, with principal place of business in Houston, Harris County, Texas, hereinafter called "Landlord"; and 99 CENTS ONLY STORES TEXAS, INC., a Delaware corporation, hereinafter called "Tenant". Attached to this LEASE CONTRACT is an ADDENDUM which is annexed hereto and incorporated by reference herein and made a part hereof for all purposes.

### W I T N E S S E T H:

### ARTICLE I

### Premises

Section 1.01. Landlord hereby leases to Tenant, and Tenant hereby leases from Landlord the leased premises (the "Leased Premises"; and sometimes referred to as the "Premises") commonly known as TBD, Conroe, Texas 77304, being a portion of a one-story building which contains approximately 24,050 square feet of floor area, situated substantially in the location which is shown outlined or hatched on the plat designated Exhibit "A", which is annexed hereto and incorporated by reference herein and made a part hereof for all purposes, such building being located on part of the tract of property described in Exhibit "B", which is annexed hereto and incorporated by reference herein and made a part hereof for all purposes. The land described in Exhibit "B" (as may be reduced or increased from time to time as designated by Landlord, subject, however, to the restrictions set forth in this Lease) and any existing and future buildings, parking area, sidewalks, service area and other improvements now existing or hereafter erected thereon are sometimes herein referred to as the "Shopping Center". Landlord reserves the right to place in, under, or over the Leased Premises pipes, wires, lines, and facilities serving other areas of the Shopping Center provided such right is exercised in a manner which does not disrupt, impede, prevent or otherwise unreasonably interfere with Tenant's conduct of its business at the Leased Premises.

Section 1.02. The parties agree that the floor area of the Leased Premises is 24,050 square feet. In determining all other measurements used within this Lease, areas shall be measured from the exterior face of all exterior walls and the center of all partition walls which separate any other building or portion of a building located within the Shopping Center from any interior area. Walls separating a building or a portion of a building from a mall and corridor walls shall be deemed to be exterior walls of such building or portion of a building.

### ARTICLE II

### Construction Work

Section 2.01. The Leased Premises shall be constructed in accordance with the Construction Rider attached hereto and incorporated by reference herein for all purposes.

### ARTICLE III

### Term

Section 3.01. The term of this Lease shall commence on the date of this Lease, and the term of this Lease shall terminate on January 31, 2010, unless sooner terminated in accordance with the terms and conditions hereinafter set forth. At the request of Landlord from time to time made, Tenant will execute one or more memoranda or letters stating the commencement and termination dates of the Lease.

### ARTICLE IV

### Rental

Section 4.01. As "Minimum Rent", Tenant covenants and agrees to pay to Landlord in Houston, Harris County, Texas, at P.O. Box 200518, Houston, Texas 77216, or at such other address as Landlord may from time to time designate in writing, the sum of Fifteen Thousand Four Hundred Thirty-Two and

Store #2831

08/100 Dollars ($15,432.08) (based on $7.70 per square foot of floor area in the Leased Premises per annum) multiplied by the number of full calendar months in the term of this Lease [plus a pro rata portion thereof for any partial month occurring at the commencement of the term of this Lease if the Rent Commencement Date (as defined in the Addendum) be other than the first day of a calendar month], such sum to be payable in equal monthly installments per month. All such Minimum Rent payments shall be made on the first day of each calendar month, monthly in advance, for each and every month in the term of this Lease; provided, however, if the Rent Commencement Date does not occur on the first day of a calendar month, then Tenant will, in lieu of a full month's Minimum Rent, pay in advance a pro rata portion of such sum as Minimum Rent for such partial month.

Section 4.02.  All Minimum Rent and other sums ("Additional Rent") hereunder provided to be paid by Tenant shall be due and payable by Tenant without demand, deduction, abatement or off-set except as expressly provided herein. Failure by Tenant to timely pay Additional Rent may be treated by Landlord as a failure by Tenant to pay Minimum Rent. All Minimum Rent and all Additional Rent shall be prorated to exclude any periods prior to the Rent Commencement Date and all periods subsequent to the expiration or sooner termination of the term of this Lease pursuant to the terms of this Lease. Any amount of Minimum Rent or Additional Rent paid by Tenant with respect to periods subsequent to the expiration or sooner termination of the term of this Lease shall be refunded by Landlord to Tenant promptly following the expiration or sooner termination of the term of this Lease. If Landlord either (i) terminates the Lease or (ii) terminates Tenant's right to possession of the Leased Premises without terminating the Lease following an Event of Default, then all past due rent and other past due payments shall bear interest from the date due until paid at the lesser of (i) the rate of ten percent (10%) per annum, or (ii) the highest non-usurious rate per annum permitted by applicable law.

ARTICLE V

Utilities

Section 5.01.  Tenant will at its own cost and expense pay for all water, sanitary sewer, gas, electricity and other utilities used in the Leased Premises and will save and hold Landlord harmless from any charge or liability for same. Such payments shall be made directly to the supplier of any utility separately metered to the Leased Premises. Landlord shall provide at its expense separate meters for all of such utilities to the Leased Premises, and no services to any portion of the Common Area nor to any other leasable area in the Shopping Center shall be included in the utilities metered to the Tenant. With respect to utilities provided to the Common Area, the same shall be metered separately from any and all leasable areas. Tenant will, upon request of Landlord, from time to time during the term hereof, furnish to Landlord copies of Tenant's water and sanitary sewer bills.

Section 5.02.  No interruption or malfunction of any utility services (including, without limitation, interruption of such utilities as a result of the enactment or promulgation, regardless of the ultimate validity or enforceability thereof, of any federal, state or local law, statute, ordinance, decree, order, guideline or regulation now or hereafter enacted or promulgated by any governmental, quasi-governmental, regulatory or executive authority), unless caused by Landlord's intentional acts, shall constitute an eviction or disturbance of Tenant's use and possession of the Leased Premises or a breach by Landlord of any of its obligations hereunder or render Landlord liable for any damages (including, without limitation, consequential or special damages) or entitle Tenant to be relieved from any of its obligations hereunder (including the obligation to pay rent) or grant Tenant any right of off-set or recoupment. In the event of any such interruption of any such services, Landlord shall use reasonable, diligent and good faith efforts to cause such service to be timely restored in any circumstances in which such interruption is caused by Landlord's fault, and in all other cases shall cooperate with Tenant's efforts to obtain immediate restoration of such service.

ARTICLE VI

Use

Section 6.01.  Tenant may use the Leased Premises solely for the following purposes:  (a) for the retail sale of general merchandise, including beer and wine for off premises consumption (including, without limitation, all merchandise generally sold at a majority of 99¢ Only Stores locations from time to time), for business offices in connection therewith and such other uses related or incidental thereto, and (b) for any other retail use or purpose; provided that any such use set forth above (i) complies with all laws, federal, state or local, and with any applicable regulation of any government body, and (ii) does not: (x)

2

violate any existing exclusive use clauses granted to tenants in the Shopping Center, as set forth on Exhibit "F", annexed hereto and incorporated by reference herein and made a part hereof for all purposes, or (y) violate any future exclusive use clauses granted to tenants in the Shopping Center, provided Landlord complies with the requirements of Paragraph 10 of the Addendum, or (z) violate any existing prohibited uses or other restrictions that affect the Shopping Center, as set forth on Exhibit "G". Tenant will not use or permit use of the Leased Premises for any other purpose without the written consent of Landlord. Landlord agrees to fully cooperate with TENANT in obtaining a beer and wine sales permit, at Tenant's expense. So long as Tenant has not through its use of the Leased Premises violated an "exclusive" use granted by Landlord to another occupant of the Shopping Center which pursuant to the terms of this Lease is imposed on Tenant, Landlord shall indemnify and defend Tenant against any and all claims asserted by third parties claiming infringement of exclusivity in the Shopping Center.

Nothing in this Lease shall be construed as a covenant by Tenant of continuous operations and Tenant has no obligation under this LEASE to continuously operate its business in the Premises. Notwithstanding the foregoing, but subject to Force Majeure, within one hundred eighty (180) days from the date of this Lease, Tenant shall open for business for one (1) business day as a regular 99¢ Only Store that is substantially similar to a majority of the stores operated by Tenant and its parent, 99¢ Only Stores, a California corporation ("Parent"), as of the date of this Lease. Thereafter, if Tenant ceases conducting business in the Leased Premises for a period longer than one hundred twenty (120) consecutive days [other than for the remodeling thereof once every five (5) years, or as a result of a casualty or condemnation, or due to an event of Force Majeure], Landlord shall have the right (without obligation) at any time thereafter (so long as Tenant has not resumed conducting business in the Leased Premises) to terminate this lease by giving Tenant thirty (30) days' written notice ("Termination Notice"). Notwithstanding the foregoing, Landlord's Termination Notice shall be null and void and of no further force and effect if: (a) within said 30-day period, Tenant gives Landlord written notice ("Tenant's Notice") that Tenant intends to reopen the Leased Premises for business within ninety (90) days from Tenant's receipt of the Termination Notice, and (b) Tenant, or a permissible or permitted assignee or sublessee of Tenant who has complied in all respects with the terms of this Lease, actually re-opens for business in the Leased Premises within said 90-day period. If Tenant (or an assignee or sublessee of Tenant as stated above) fails to re-open for business in the Leased Premises within said 90-day period, then Landlord shall have the right to terminate the Lease at any time thereafter by giving Tenant ten (10) days' written notice (which notice may not be overridden). Upon such termination, neither Landlord nor Tenant shall have any further liability hereunder except for matters that accrued on or prior to the date of termination. Following a resumption of business in the Leased Premises, Tenant shall continue to have the right to cease doing business in the Leased Premises, and Landlord shall continue to have the right to terminate this Lease in the manner set forth above, but Tenant shall not have the right to override Landlord's termination unless, upon each such resumption of business in the Leased Premises, Tenant operates [subject to interruptions for the remodeling thereof once every five (5) years, or as a result of a casualty or condemnation, or due to an event of Force Majeure], for a period of at least two (2) years with no interruption in excess of one week.

Tenant, at its own expense, will comply with all Federal, State, municipal and other laws, codes, ordinances, rules and regulations (collectively, the "Law") applicable to the Leased Premises and the business conducted therein by Tenant when performing Tenant's work in the Leased Premises pursuant to the Construction Rider and throughout the term of this Lease. In addition, after the date Tenant opens for business in the Leased Premises, Tenant, at its own expense, will comply with all changes in the Law applicable to the Leased Premises and the business conducted therein by Tenant, but nothing in this paragraph modifies the repair and maintenance provisions of this Lease. In addition, Tenant, at its own expense will install, remove and alter such fixtures, equipment and facilities in, and make such alterations to, the Leased Premises as may be necessary to comply with the Law; will maintain the Leased Premises in a clean and sanitary condition including providing for the removal of garbage, trash and other waste; and will furnish and maintain not less than one fire extinguisher in the Leased Premises. Tenant will not engage in any activity or permit any nature of construction by Tenant or any other condition at the Leased Premises which would cause Landlord's fire and extended coverage insurance to be canceled, or the rate therefor increased (or at Landlord's option will upon demand pay any such increase, but Tenant's conduct of its business within the Premises in conformance with the provisions of this Lease shall be permitted without additional charge of any kind to Tenant); will comply with such safety recommendations and loss prevention and loss reduction recommendations as Landlord or Landlord's insurance carriers (or both) may, from time to time, request, but no such request shall require Tenant to make any improvements to the Premises nor will the same cause Tenant to change the manner or method of conducting its business so long as the same is in compliance with all applicable laws; will not conduct any auction or bankruptcy or fire or "lost-our-lease" or "going-out-of-business" or

3

similar sale; will not make any unlawful use of the Leased Premises or permit any unlawful use thereof; will not use any loudspeaker, phonograph, radio or sound amplifier heard outside the Leased Premises; and will not commit any act which is a nuisance.

Section 6.02.  Tenant shall be responsible, at its sole cost and expense, for the removal of its trash and rubbish.

Section 6.03.  Tenant hereby acknowledges and agrees that this Lease is in all respects subject to the following recorded documents (collectively, the "Recorded Documents"), as such documents may be amended from time to time:

1.    Easements, Covenants and Restrictions dated January 21, 1983, by and between Exeter Investment Company and Wal-Mart Properties, Inc., recorded on January 21, 1983, under Clerk's File No. 8303552 in the official Public Records of Real Property in Montgomery County, Texas; and

2.    First Amendment to Easements, Covenants & Restrictions dated January 31, 1983, by and between Exeter Investment Company and Wal-Mart Properties, Inc., recorded on February 4, 1983, under Clerk's File No. 8306046 in the official Public Records of Real Property in Montgomery County, Texas (the Easements, Covenants and Restrictions, as amended by the First Amendment to Easements, Covenants & Restrictions is hereinafter referred to as the "ECR"); and

3.    Restrictive Covenant Agreement dated July 25, 1979, by and between (i) Theo W. Pinson, III, Hallie Pinson Rutherford, Susan Pinson Jeffers, Harry C. Pinson, Elizabeth L. Pinson and Kathryn C. Pinson, acting through their Agent and Attorney-in-Fact, Frank C. Guthrie; Hallie C. Guthrie, Independent Executrix of the Estate of Hallie Robertson Crighton, Deceased; and Frank C. Guthrie, Guardian of the Person and Estate of Hallie Robertson Crighton, N.C.M., and (ii) Exeter Investment Company, which Agreement was recorded on August 7, 1979, Vol. 1148, Page 510 of Deed Records of Montgomery County, Texas.

Notwithstanding the foregoing, Landlord hereby agrees that it will not amend the Recorded Documents in any manner that materially and adversely restricts or modifies Tenant's rights under this Lease or increases Tenant's obligations under this Lease, without Tenant's prior written consent in each such instance.  This Section 6.03 shall be binding on Landlord and its successors and assigns, and inure to the benefit of Tenant and its permitted successors and assigns.

Section 6.04.  Landlord hereby represents and warrants to Tenant that Tenant's rights of use of the Leased Premises as described in this Lease, including (without limitation) the use clause set forth in this Lease, are permitted under all documents of record in the Official Public Records of Real Property of Montgomery County, Texas, without the consent of any person other than:  (a) Landlord, if the further consent of Landlord is expressly required pursuant to the terms of this Lease, or (b) any applicable governmental or quasi-governmental entity with respect to permits, licenses, consents and the like.

ARTICLE VII

Common Area

Section 7.01.  A.  Landlord will provide a "Common Area" (as hereinafter defined) in the Shopping Center and make necessary repairs thereto, and, except when prevented from doing so by causes beyond its control, Landlord will also provide lighting in the parking area in the Shopping Center from dusk until the later of (i) 10:00 o'clock P.M. or (ii) one-half hour after the closing hour of tenants occupying ninety percent (90%) of the floor area of all stores in the Shopping Center.  Tenant, its employees, customers and invitees shall have the non-exclusive use, along with others, of the Common Area.  Notwithstanding the foregoing, Landlord shall have the right to designate parking within the Common Area for use by Tenant and its employees.  If Landlord elects to institute such a program, Landlord will notify Tenant in advance, and thereafter, Tenant and its employees may have the non-exclusive use, along with other tenants and their employees, of only that available parking space from time to time specifically designated by Landlord for such use (and neither Tenant nor its employees shall use any other parking space in the Shopping Center), and (ii) to effectuate this provision, Tenant will, within ten (10) days after written request from Landlord, furnish to Landlord the automobile license numbers of any or all automobiles owned or used by Tenant or its employees. If Landlord elects to institute such a program, Landlord shall impose the same parking restrictions on the employees of all

4

other tenants and occupants of the Shopping Center (including, without limitation, the employees of Landlord) and shall enforce the same against such employees of others in the same manner as provided under this Lease with respect to Tenant's employees. In the event of the failure by Tenant's employees to park in the space specifically designated by Landlord from time to time for such use, Landlord shall have the right, at Landlord's option, to tow off any such automobile parked in violation of the terms hereof. Tenant agrees to indemnify and hold Landlord harmless from all claims, suits, actions, damages, liability and claims (including costs and expenses of defending against all the aforesaid with counsel of Tenant's selection) arising (or alleged to arise) as a result of any claim brought against Landlord by an employee of Tenant as a result of Landlord towing any vehicle owned or used by one of Tenant's employees when such vehicle is parked in violation of the provisions of this paragraph. The non-exclusive usage rights to the Common Area herein granted to Tenant shall constitute a non-exclusive license existing during the term of this Lease but not thereafter. Landlord shall have the right, from time to time, to establish, modify and enforce rules and regulations with respect to the Common Area and to police same. Subject to the provisions of the Addendum with respect to the Common Area and the Protected Area, Landlord shall have the right, from time to time, to change the arrangement, layout and/or size of the Common Area (but not the Protected Area), and to do and perform such other acts in the Common Area as Landlord shall, in its good faith judgment, determine to be advisable; provided, however, that Landlord shall at all times: (i) provide a Common Area for parking and other purposes commonly associated with retail shopping centers, and (ii) maintain compliance with all parking ratios required by all applicable governmental authorities. Landlord shall have no duty or obligation to prevent or attempt to prevent or terminate any usage of the Common Area or any other portion of the Shopping Center by picketers, public action groups or other persons advocating any cause, whether or not such usage is permitted under the Constitution and laws of the United States or State of Texas or other laws.

B.   For purposes of this Lease, the phrase "Common Area" includes the aforesaid customer's parking area, employees' parking area, service drives and service roads, traffic islands, landscaped areas, loading and service areas, sidewalks, roofs, gutters and downspouts, sprinkler risers serving all or any buildings located in the Shopping Center, electrical gutters serving all or any buildings located in the Shopping Center, and such other portion or portions of the Shopping Center (not leased or rented or held by Landlord for the purposes of being leased or rented to other tenants) as may from time to time be designated or treated by Landlord as part of the Common Area, as well as drainage facilities and lighting facilities servicing any one or more of the aforesaid areas.

Section 7.02.   Tenant will at all times keep all merchandise and displays within the Leased Premises and will not at any time display any merchandise or offer it for sale or (other than during essential loading or unloading operations on Tenant's Loading Dock (as depicted on Exhibit "A" attached to the Lease) permit it to be on adjacent sidewalks or at any other point outside the Leased Premises. Landlord shall enforce the same restriction against all other tenants and other occupants of the Shopping Center who are subject to such a restriction. Tenant will not in any other way use or obstruct such sidewalks or other area outside the Leased Premises, except as expressly permitted under this Lease.

Section 7.03.   Tenant will not load or unload any trucks or permit any trucks serving the Leased Premises, whether owned by Tenant or not, to be loaded or unloaded in the Shopping Center except on Tenant's Loading Dock.

Section 7.04.   Nothing in this Article or elsewhere in this Lease shall be construed as constituting the Common Area, or any part thereof, as part of the Leased Premises.

ARTICLE VIII

Assignment and Subletting

Section 8.01.   Except as set forth in the Addendum, Tenant shall not assign this Lease or sublease the Leased Premises or any part thereof or mortgage, pledge or hypothecate its leasehold interest or grant any concession or license within the Leased Premises or sublease any operating department therein, and any attempt to do any of the foregoing shall be void and of no effect.

Section 8.02.   If this Lease be assigned Landlord may nevertheless collect rent from the assignee, and apply the net amount collected to the rent payable hereunder, but no such transaction or collection of

5

GBP
4/1/84

rent or application thereof by Landlord shall be deemed a waiver of these provisions or a release of Tenant from the further performance by Tenant of its covenants, duties and obligations hereunder.

ARTICLE IX

Repair and Maintenance

Section 9.01.    Landlord, at its sole cost and expense, shall keep or cause to be kept in good order, repair and condition, and replace if so required, throughout the term of this Lease, the following: (a) the foundations of the Leased Premises; (b) the roof of the Leased Premises (inclusive of the roof membrane) in a water tight condition; (c) the floor slab of the Leased Premises; (d) all other structural portions of the Leased Premises; (e) all water, sewer, electric and gas connections to the building (exclusive of utility lines located within the boundaries of the Leased Premises); and (f) the fire sprinkler system within the building (except that Tenant shall be responsible for individual sprinkler drops and sprinkler heads, as well as monitoring). Items (a), (b), (c) and (d) directly above, may not be included in Common Area Operating Costs or otherwise charged to Tenant under this Lease. Landlord shall be responsible for the periodic maintenance of the items set forth in this paragraph, but shall not be obligated to commence particular repairs or replacement of specific items until Tenant has notified Landlord of a condition or circumstance necessitating such repair or replacement. Notwithstanding the foregoing provisions, if repair or replacement of the items described in this paragraph are necessitated by any breach by Tenant or its employees or agents of its obligations under this Lease or by the intentional misconduct of Tenant or its employees or agents (other than for matters within the scope of the damage and destruction provisions of this Lease), then (in any of such events) Landlord shall not be required to repair or replace such item(s). Further, Landlord shall not be required to maintain, repair or replace any alterations or additions to the existing structural elements of the Leased Premises (for example, but not by way of limitation, the Demising Wall) made by Tenant in connection with Tenant's Work (as defined in the Construction Rider).

Section 9.02.    Subject to the provisions of Section 9.01 and Articles XI and XIX, Tenant, at its sole cost and expense, shall maintain in good condition and repair all portions of the Leased Premises [exclusive of: (a) the foundations of the Leased Premises; (b) the roof of the Leased Premises (inclusive of the roof membrane) in a water right condition; (c) the floor slab of the Leased Premises; (d) all other structural portions of the Leased Premises; (e) all water, sewer, electric and gas connections to the building (exclusive of utility lines located within the boundaries of the Leased Premises); (f) the fire sprinkler system within the building (except that Tenant shall be responsible for individual sprinkler drops and sprinkler heads, as well as monitoring)], as well as all floor covering, heating and air conditioning equipment (whether any such equipment is roof mounted or otherwise affixed outside the Leased Premises), electrical equipment and fixtures, plumbing fixtures and equipment, wiring and plumbing lines (including that within walls or ceiling or under flooring or floor covering), doors, door frames, molding, trim, windows, window frames, closure devices and hardware. Tenant will also replace all broken or cracked plate glass and glass windows (unless caused by an event within the scope of Articles XI or XIX or by the intentional misconduct of Landlord or its employees). Tenant, not Landlord, shall be responsible for painting the exterior walls of the Leased Premises, so long as Landlord approves the paint color. Except for the initial work to be undertaken by Tenant as described in the Construction Rider, Tenant shall not make, or permit to be made, any penetration in the roof of the building of which the Leased Premises are a part without Landlord's prior written consent, which consent shall not be unreasonably withheld or delayed; however, Tenant shall be responsible for all rooftop flashing around the rooftop air conditioning unit. In the event that any such roof penetration is required in connection with any repairs, maintenance, renewals or replacements required to be made by Tenant hereunder, upon Tenant's written request, Landlord promptly shall designate two or more contractors whom Tenant may hire to perform such roof penetration at Tenant's cost.

If either Landlord or Tenant considers necessary any repairs, maintenance, or replacements to the Leased Premises required by the provisions of this Lease to be made or provided by the other, then such party shall request in writing that the other party make such repairs or perform such maintenance or provide such renewal or replacements to the Leased Premises, and, upon such party's failure or refusal to do so promptly (i.e. to commence such repair, maintenance or replacement within thirty (30) days following such written request and thereafter to complete the same with all due diligence in a reasonable amount of time, and in any event in case of an emergency, then immediately and irrespective of whether the party in a position to perform such maintenance, repair, or replacement shall have requested the obligated party to perform), the requesting party shall have the right (but shall not be obligated), either itself or through a third party contractor, to make such repair, perform such maintenance or provide such

6

replacement (the party obligated to perform such work hereby waiving any damage caused thereby including, without limitation, any damage caused by any such third party contractors engaged to perform such work); thereupon the party obligated to perform such work will, at the other party's election, on demand pay (or reimburse the other party for) the cost thereby incurred by the other party. For these purposes an "emergency" shall be deemed to exist if, in the good faith judgment of respectively, Landlord or Tenant, prompt action is needed in order to prevent death, bodily injury or: (a) in the case of Landlord, property damage to the structural portions of the Leased Premises, or (b) in the case of Tenant, material interference with the conduct of Tenant's business in the Leased Premises. Any such sum which Tenant becomes liable to pay to or reimburse Landlord for hereunder may be treated by Landlord as a portion of the rental due and owing by Tenant to Landlord with the next succeeding installment of Minimum Rent due hereunder, for purposes of determining Landlord's remedies in the event of any failure by Tenant to pay such sum to Landlord contemporaneous with the next succeeding installment of Minimum Rent due hereunder, and any such sum which Landlord becomes obligated to pay to or reimburse Tenant for hereunder may be deducted by Tenant from the next Minimum Rent and Additional Rent payment obligations due hereunder, subject to the limitation set forth below. If Landlord makes any such repairs, performs any such maintenance, or provides any such renewal or replacement to the Leased Premises, or undertakes to do so (or engages any third party contractors to do so), then except for the intentional misconduct or gross negligence of Landlord, its employees or its contractors, Landlord shall not be liable to Tenant for all loss or damage that may occur to Tenant's merchandise, fixtures or other property or to Tenant's business incident to such action by Landlord. If Tenant makes any such repairs, performs any such maintenance, or provides any such renewal or replacement to the Leased Premises, or undertakes to do so (or engages any third party contractors to do so), then except for the intentional misconduct or gross negligence of Tenant, its employees or its contractors, Tenant shall not be liable to Landlord for any loss or damage that may occur to the Leased Premises, the Shopping Center or the value of Landlord's tangible and intangible property interests located in or about the Shopping Center incident to such action by Tenant. Notwithstanding the other provisions of this paragraph: (a) the maximum amount that Tenant may deduct from the Minimum Rent and Additional Rent due under this Lease pursuant to this paragraph with respect to any single event of required repair, maintenance or replacement shall not exceed an amount equal to two (2) months of Minimum Rent at the rate at which Minimum Rent is payable as of the date of the making of such repair, maintenance or replacement, but such limitation shall not preclude Tenant from seeking recovery through legal action for all other amounts expended by Tenant pursuant to the provisions of this paragraph; and (b) Landlord shall not have any self-help action of either the nature described in this paragraph or otherwise if the alleged failure by Tenant to maintain, repair or replace some item or portion of the Premises pertains to a portion of the Premises solely located within the outer walls of the Premises and the same: (i) does not violate applicable law; (ii) does not pose the threat of injury or death to persons; and (iii) does not pose the threat of damage to the building of which the Leased Premises are a part.

Section 9.03.  Tenant will not commit waste. Upon termination of this Lease, Tenant will surrender and deliver up the Leased Premises to Landlord broom-clean and in the same condition in which they existed at the commencement of this Lease, excepting only ordinary wear and tear and damage or destruction within the scope of the provisions of Articles XI or XIX of this Lease. Upon termination of this Lease, Tenant will also surrender to Landlord all keys to the Leased Premises at the place stated herein for the payment of rent and inform Landlord, in writing, of all combinations on locks, safes and vaults, if any, at the Leased Premises.

Section 9.04.  Landlord, upon not less than 5 days prior written notice (except in the event of an emergency) will have a right to enter the Leased Premises during business hours only (except in the case of an emergency) to inspect the condition thereof, and, to the extent and only to the extent permitted pursuant to the provisions of Section 9.02 above: to make necessary repairs and improvements, or to repair or maintain pipes, wires, and other facilities serving other premises in the Shopping Center; provided however, such right shall not be exercised in a manner which would unreasonably interfere with Tenant's conduct of its business at the Leased Premises.

Section 9.05.  Should any mechanic's liens or other liens or affidavits claiming liens be filed against the Leased Premises or the Shopping Center or any portion thereof or interest therein, for any reason whatsoever by reason of acts or omissions taken by or at the direction of Tenant, including any contractor of Tenant or any such contractor's subcontractor or any laborer performing labor or materialman furnishing materials at or for the Leased Premises at the direction of Tenant, or by reason of any specially fabricated materials, whether or not placed at the Leased Premises, if ordered by or at the direction of Tenant, Tenant shall cause the same to be cancelled and discharged of record by

payment, bonding or otherwise, within thirty (30) days after notice by Landlord, or at such earlier time as is necessary to prevent the foreclosure thereof.

## ARTICLE X

### Additions and Fixtures

Section 10.01.  Except as set forth in the Addendum and except as set forth below, other than with respect to the original alterations which may be made by Tenant pursuant to the Construction Rider, Tenant will make no alterations or additions to the Leased Premises without the prior written consent of Landlord.  Tenant may, without Landlord's consent, make non-structural, interior alterations or additions whose costs, in the aggregate, do not exceed Twenty-Five Thousand and 00/100 Dollars ($25,000.00) per year; provided that, in doing so, Tenant shall comply with all Federal, State, municipal and other laws, codes, ordinances, rules and regulations applicable to work to be performed in the Leased Premises.  At such time as Tenant requests written consent of Landlord, if required, Tenant shall submit plans and specifications for such alterations or additions.  Following completion of any additions or alterations the cost of which equals or exceeds $25,000.00, upon written request of Landlord, Tenant will supply Landlord with the as-built plans and specifications for such alterations or additions.

Section 10.02.  Tenant shall remove "Removable Trade Fixtures", as hereinafter defined, (excluding, however, all components of the HVAC system; ducts, conduits, wiring and pipes; paneling or other wall covering; and floor covering), and, in addition to other applicable provisions of this Lease regarding such removal, the following shall apply:  (1) such removal must be made prior to the termination of the term of this Lease; (2) Tenant must not be in default of any obligation or covenant under this Lease at the time of such removal; and (3) such removal must be effected without damage to the Leased Premises or the building of which the Leased Premises are a part and Tenant must promptly repair all damage caused by such removal.  For the purposes hereof, the phrase "Removable Trade Fixtures" means the following: all of Tenant's signs, tables, chairs, desks, racks, merchandisers and displayers, standards, wall brackets, hang-rods, shelves, mirrors, marking equipment, cash registers and other business machines.  All plumbing and electrical wiring connections exposed as a result of the removal of Tenant's Removable Trade Fixtures shall be capped by Tenant in a safe and workmanlike manner.

Section 10.03.  Tenant shall pay the full amount of all taxes, assessments, impositions, levies, charges, excises, fees, licenses and other sums levied, assessed, charged or imposed by any governmental authority or other taxing authority upon all alterations, additions, fixtures (including Removable Trade Fixtures), inventory and other property installed or placed or permitted at the Leased Premises by Tenant.  Within thirty (30) days after notice from Landlord, Tenant shall furnish Landlord a true copy of receipts evidencing such payment received by Tenant from the governmental authority or other taxing authority assessing such charges.

Tenant will also pay all insurance premiums assessed or levied upon any alterations, additions, fixtures or property installed in the Leased Premises by the Tenant and all insurance related to Tenant's use, occupancy and operations within the Leased Premises and the Shopping Center, all to the extent of and subject to each and all of the provisions of the Addendum.

## ARTICLE XI

### Fire and Destruction of Premises

Section 11.01.  If at any time when twelve (12) full calendar months or more remain in the lease term, the Leased Premises should be destroyed or damaged by fire or other risk covered by Landlord's fire and extended coverage insurance, the extent of such damage is less than twenty-five percent (25%) of the then replacement cost of the Leased Premises above the foundation then, except for replacement or repair of the floor covering, Landlord will be obligated to repair and reconstruct the damaged portion of the Leased Premises to substantially the condition in which they existed at the time of Landlord's tender of possession of the Leased Premises to Tenant.  If the Leased Premises should be destroyed or damaged by fire or any other risk other than as provided in the immediately preceding sentence, then Landlord shall have the election to terminate this Lease or to repair and reconstruct the Leased Premises, and Landlord will notify Tenant of its election within thirty (30) days after receipt of written notice from Tenant of such damage or destruction. If Landlord does not elect to terminate by written notice delivered to Tenant within such period of time, then Landlord shall be deemed to have elected to repair and restore

the Leased Premises as described in this Section. If Landlord does elect within said period to terminate this Lease, then within thirty (30) days following receipt of said notice from Landlord, Tenant may elect to exercise any remaining option to extend the term of this Lease, and Landlord will thereafter repair and reconstruct the Leased Premises as described in this Section. If Tenant fails to timely exercise any remaining option to extend the term of this Lease, or if there are no remaining options to extend the term of this Lease, then Landlord's election to terminate the Lease shall be binding on Tenant. Upon such termination, neither Landlord nor Tenant shall have any further liability hereunder except for matters that accrued on or prior to the date of termination.

Section 11.02.    Notwithstanding that the Leased Premises may not be destroyed or damaged by fire or other risk, in the event that other buildings containing fifty percent (50%) or more of the ground floor building area of the Shopping Center shall be damaged or destroyed by fire or other risk, whether or not covered by Landlord's fire and extended coverage insurance, Landlord shall have the election to terminate this Lease or to continue this Lease in full force and effect, and Landlord will notify Tenant of Landlord's election within sixty (60) days after receipt of written notice by Landlord of such other damage or destruction; provided, however, that Landlord may make such election to terminate only if concurrent with such election by Landlord, Landlord terminates all other leases and occupancies of all tenants and occupants in the Shopping Center and delivers evidence thereof to Tenant. If Landlord elects to rebuild a retail shopping center similar in nature (but not necessarily in configuration) to the existing Shopping Center, then neither Landlord nor Landlord's successor in interest shall thereafter lease the Leased Premises (or space comparable to the Leased Premises) to any other person without first offering the same to Tenant on the exact same terms and conditions (including rent and remaining balance of the term of the Lease and options to extend the term of this Lease) as existed on the date of the damage and destruction event that gave rise to the Landlord's termination right. Assuming Tenant accepts Landlord's offer, Tenant shall not be required to open for business in the Leased Premises until the entire Shopping Center has been fully restored with buildings comprising not less than 75% of the square footage in existence as of the date of the damage and destruction event giving rise to such termination by the Landlord. The covenants contained in this paragraph shall expressly survive any termination of the leasehold estate evidenced and created hereby.

Section 11.03.    In any circumstances described above where Landlord is either obligated to repair and restore the Leased Premises, or where Landlord elects to repair and restore the Leased Premises, this Lease shall continue in full force and effect, and such repairs will be made by Landlord with all due diligence, subject to delays caused by governmental restrictions, strikes, lockouts, shortages of labor or material, acts of God, war or civil commotion, fire, unavoidable casualty, inclement weather or any other comparable cause beyond the control of Landlord (all of the aforesaid causes for delay being herein sometimes referred to as "Force Majeure"); provided, however, that Force Majeure shall not include Landlord's financial inability. Minimum Rent and all Additional Rent shall abate proportionately during the period and to the extent that the Leased Premises are unfit for use by Tenant and not actually used by Tenant in the conduct of its business. In addition, up to ten percent (10%) of the Minimum Rent payable per month shall be equitably abated (in an amount to be agreed upon in good faith by Landlord and Tenant), during a period and to the extent: (i) the Common Area is affected, either by damage to it or by its use for construction and repair, and such condition has a material and adverse impact on the Leased Premises; (ii) pedestrian and vehicular access to the Leased Premises, including the loading dock areas serving the Leased Premises, is materially and adversely affected; and (iii) visibility of Tenant's signs, including any pylon sign, is materially and adversely affected.

ARTICLE XII

Liability and Indemnity

Section 12.01.    Except only as to injury, death or property damage proximately caused by the sole negligence of Landlord for which Landlord is legally liable, or for the intentional misconduct of Landlord, Tenant agrees to indemnify and hold Landlord and Landlord's employees harmless from all losses, claims, suits, actions, damages, and liability (including costs and expenses of defending against all of the aforesaid) arising (or alleged to arise) from any act or omission of Tenant or Tenant's agents, employees, assignees, sublessees, or contractors or arising from any injury to or death of any person or persons or damage to or destruction of the property of any person or persons occurring in or about the Leased Premises or Tenant's Loading Dock, and Tenant assumes responsibility for the condition of the Leased Premises and Tenant's Loading Dock, and agrees to give Landlord written notice in the event of any damage, defect or disrepair therein. Tenant agrees to use and occupy the Leased Premises and place its fixtures, equipment, merchandise and other property therein at its own risk and hereby releases

9

GBP
4/1/84

Landlord and its agents from all claims for any damage or injury to the full extent permitted by law, except for damage to property or death or injury to person arising out of Landlord's breach of its obligations under this Lease or Landlord's intentional misconduct.

Section 12.02.   Tenant agrees to take out and maintain at all times during the lease term a policy of fire and extended coverage insurance on its alterations, additions, fixtures, equipment, merchandise, Removable Trade Fixtures and other property placed at the Leased Premises (including but not limited to, the rooftop HVAC unit and plate glass).   Such policy shall contain a full replacement cost endorsement.   In the event that Tenant sustains a loss by reason of fire or other casualty which is covered (or could have been covered) by a fire and extended coverage insurance policy, and such fire or casualty is caused in whole or in part by acts or omissions of Landlord, its agents, servants or employees, then Tenant agrees to look solely to its insurance proceeds (if any); and Tenant shall have no claim or right of recovery against Landlord, or the agents, servants or employees of Landlord; and no third party shall have any claim or right of recovery by way of subrogation or assignment or otherwise. To the extent that Tenant fails to take out or maintain the aforesaid fire and extended coverage insurance policy, such failure shall be a defense to any claim asserted by Tenant against Landlord by reason of any loss sustained by Tenant due to fire or other casualty, notwithstanding that such loss might have been proximately caused solely by the negligence of Landlord.   Such insurance policy shall contain a loss payable clause designating Tenant and Landlord as loss payees as their respective interests may appear. Tenant shall be responsible for the safety and personal well being of Tenant's employees, both within the Leased Premises and in the Common Area.   Tenant agrees that Landlord shall not be responsible or liable to Tenant for injury, death or damage or loss occasioned by the acts or omissions of persons occupying any other part of the Shopping Center or occasioned by the condition of the Shopping Center or property of any other occupant of any part of the Shopping Center or the acts or omissions of any other person or persons present at the Shopping Center who are not occupants of any part thereof, whether or not such persons are present with the knowledge or consent of Landlord. If at any time Tenant is a publicly held entity and has a net worth of not less than One Hundred Million Dollars ($100,000,000), Tenant may elect to self insure with respect to the property damage elements within the scope of this Section 12.02.

Section 12.03.   T enant w ill t ake o ut a nd m aintain, a t i ts o wn c ost a nd e xpense, c ommercial general liability insurance coverage in a minimum amount of $2,000,000 combined single limit, which commercial general liability policy shall include (i) coverage for bodily injury and death, property damage and p roducts l iability c overage; ( ii) contractual l iability c overage i nsuring t he o bligations o f Tenant under the terms of this Lease; and (iii) fire legal liability coverage with respect to the Leased Premises and the building of which they are a part in the amount of at least $25,000.00.   Such policy shall name Landlord (and any of its affiliates, subsidiaries, successors and assigns designated in writing by Landlord) and Tenant as the insureds.

If Tenant is engaged in any way in the sale of alcoholic beverages, either for consumption of alcoholic beverages on the premises or off the premises, Tenant will also maintain liquor liability insurance with the limits of not less than $1,000,000.00 each common cause and $1,000,000.00 aggregate. If written on a separate policy from the commercial general liability policy, such policy shall name Landlord (and any of its affiliates, subsidiaries, successors and assigns designated by Landlord) as an additional insured. Such policy shall contain a cross liability endorsement or severability provision.

Section 12.04.   The policies of insurance required to be maintained by Tenant under the terms of this Lease are referred to in this Section 12.04 in the singular as a "Required Policy" and in the plural as "Required Policies". All Required Policies shall be in a form and with a company as described in the Addendum and shall be endorsed so as to be non-cancellable with respect to Landlord and not subject to material change except upon thirty (30) days prior written notice to Landlord given in the manner set forth in Article XXIII, below. Tenant agrees to deliver to Landlord a duplicate original or certificate of each Required Policy upon tender of possession of the Leased Premises to Tenant and in the event Landlord shall have tendered such possession of the Leased Premises to Tenant but Tenant shall not have delivered a duplicate original or certificate of any Required Policy, then, at Landlord's election, Tenant shall not be permitted to enter into possession or occupy the Leased Premises until such time as such duplicate originals or certificates are so delivered to Landlord (but the Leased Premises shall be deemed "tendered" to Tenant for all other purposes under this Lease, including, without limitation, the commencement of the term of this Lease and accrual of rent).   At all times during the lease term (and prior thereto and subsequent thereto under the circumstances stated in the succeeding sentence), upon Landlord's written request, Tenant shall cause a duplicate original or a certificate of all Required Policies to be deposited with Landlord.  If Tenant fails to have a duplicate original or certificate of any

10

GBP
4/1/84

Required Policy on deposit with Landlord at any time during the lease term (and prior thereto in the event of any entry into possession by Tenant prior to the commencement date of the lease term or subsequent to the termination date hereof in the event of a holdover), and if within twenty (20) days after Landlord's written request for the same, it or they are not delivered to Landlord, then Landlord shall have the right (but no obligation) to take out and maintain such Required Policy, and if Landlord does so and gives notice thereof to Tenant, then Tenant shall be obligated to pay Landlord the amount of the premium applicable to such Required Policy within five (5) days following any such notice from Landlord. Any failure of Tenant to make such payment to Landlord may be treated by Landlord as a default by Tenant in the payment of Minimum Rent required to be paid by Tenant hereunder.

ARTICLES XIII and XIV - Intentionally Deleted

ARTICLE XV

Removal of Tenant's Property

Section 15.01.  In the event that Landlord shall have taken possession of the Leased Premises pursuant to the authority hereinafter granted in connection with an Event of Default or for any other lawful reason, Landlord shall have the right to keep in place and use all of the furniture, fixtures and equipment at the Leased Premises, including that which is owned by or leased to Tenant, at all times prior to any foreclosure thereon by Landlord or repossession thereof by any lessor thereof or third party having a lien thereon.  Landlord shall also have the right to remove from the Leased Premises and Shopping Center (without the necessity of obtaining a distress warrant, writ of sequestration or other legal process) all or any portion of such furniture, fixtures, equipment and other property located thereon and place same in storage at any premises within the county in which the Leased Premises are located or dispose o f sa me i n any manner acceptable t o Landlord; a nd i n s uch e vent, T enant s hall b e l iable t o Landlord for commercially reasonable costs incurred by Landlord in connection with such removal, storage and/or disposal. So long as the Tenant under this Lease is 99 Cents Only Stores Texas, Inc. [or 99¢ Only Stores, a California corporation (the "Parent"), or any other entity which is wholly owned by Parent o r w hich w holly owns P arent], b ut n ot t hereafter, Landlord h ereby waives t he b enefit o f any statute or rule of law (present or future) permitting the Landlord to change the locks on the Leased Premises or otherwise "lock out" Tenant in the event of an alleged default prior to the entry of the order of a court adjudicating Tenant to be in default under this Lease.

ARTICLE XVI

Default, Remedies and Determination of Damages

Section 16.01.  Each of the following acts or omissions of Tenant or occurrences shall constitute an "Event of Default":

(a)    Failure or refusal by Tenant to timely pay Minimum Rent, Additional Rent or any other sum within five (5) days after Landlord's written notice to Tenant that the same has not been paid following the date the same is due; provided, however, that Tenant shall be obligated to pay Landlord, as additional rent, Five Hundred and No/100 Dollars ($500.00) for each written notice in excess of two (2) that must be given to Tenant in any calendar year; or

(b)    Failure or refusal by Tenant to comply with the obligations of Tenant regarding (i) use of the Leased Premises pursuant to Article VI hereof or (ii) assignment of this Lease or subletting of the Leased Premises pursuant to Article VIII and the Addendum hereof within ten (10) days of written notice; or

(c)    Failure o r r efusal b y Tenant t o t imely perform o r o bserve a ny other c ovenant, d uty or obligation of Tenant under this Lease; provided, however, notwithstanding the occurrence of such Event of Default, Landlord shall not be entitled to exercise any of the remedies provided for in this Lease or by law unless such Event of Default continues beyond the expiration of thirty (30) days following written notice to Tenant of such Event of Default, which period of thirty (30) days shall be extended for such period as may reasonably be required to effect a cure of such matter provided that within said thirty (30) day period following written notice Tenant has commenced the cure of the same and, subject to Force Majeure, diligently pursues the same to completion; or

11

GBP
4/1/84

(d)    Intentional abandonment of the Leased Premises (Tenant is not obligated to conduct its business in the Leased Premises and failure to do so is agreed not to constitute abandonment by itself); or

(e)    The entry of a decree or order for relief by a court having jurisdiction over Tenant or any guarantor of Tenant's obligations hereunder in an involuntary case under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law, or appointing a receiver, liquidator, assignee, custodian, trustee, sequestrator (or similar official) of Tenant or any guarantor of Tenant's obligations hereunder or for any substantial part of either of said parties' property, or ordering the winding-up or liquidation of either of said parties' affairs, provided that such decree or order for relief is not dismissed and the case pertaining thereto is not dismissed within thirty (30) days after Tenant first receives notice of the same; or

(f)    The commencement by Tenant or any guarantor of Tenant's obligations hereunder of a voluntary case under the federal bankruptcy laws, as now constituted or hereafter amended, or any other applicable federal or state bankruptcy, insolvency or other similar law, or the consent by either of said parties to the appointment of a receiver, liquidator, assignee, trustee, custodian, sequestrator (or other similar official) of any substantial part of the property of Tenant or any guarantor of Tenant's obligations hereunder, or to the taking possession of any such property by any such functionary or the making of any assignment for the benefit of creditors by either Tenant or any guarantor of Tenant's obligations hereunder, or the failure of Tenant or any guarantor of Tenant's obligations hereunder generally to pay its debts as such debts become due, or the taking of corporate action by any corporate Tenant or any corporate guarantor of Tenant's obligations hereunder in furtherance of any of the foregoing.

Section 16.02.    This Lease and the term and estate hereby granted and the demise hereby made are subject to the limitation that if and whenever any Event of Default shall occur, after such notice, if any, as is provided in Section 16.01, Landlord may, at its option, in addition to all other rights and remedies given hereunder or by law or equity, do any one or more of the following:

(a)    Terminate this Lease or terminate Tenant's right to possession of the Leased Premises without terminating the Lease, in which event, Tenant shall immediately surrender possession of the Leased Premises to Landlord; or

(b)    Enter upon and take possession of the Leased Premises and expel or remove Tenant and any other occupant therefrom, with or without having terminated the Lease; or

(c)    Alter locks and other security devices at the Leased Premises as provided under Section 93.002 of the Texas Property Code; provided, however, that Landlord hereby agrees to waive such right for so long as the Tenant under this Lease is 99 Cents Only Stores Texas, Inc. (or Parent, or any other entity which is wholly owned by Parent or which wholly owns Parent], but not thereafter. In the event Landlord exercises its rights to alter the locks at the Leased Premises, Landlord shall only be required to provide Tenant with a new key during Landlord's regular business hours, provided that in no event shall Landlord be required to provide Tenant a new key until such time as Tenant cures all defaults under the Lease and, if required by Landlord, Tenant pays to Landlord as a Security Deposit an amount equal to twice the monthly Minimum Rent and Additional Rent due hereunder.

Exercise by Landlord of any one or more remedies hereunder granted or otherwise available shall not be deemed to be an acceptance of surrender of the Leased Premises by Tenant, whether by agreement or by operation of law, it being understood that such surrender can be effected only by the written agreement of Landlord and Tenant. All claims for trespass or damages by reason of such re-entry and/or repossession and/or alteration of locks or other security devices are hereby waived, as are all claims for trespass or damages by reason of any distress warrant, forcible detainer proceedings, sequestration proceedings or other legal process. So long as the Tenant under this Lease is 99 Cents Only Stores Texas, Inc. (or Parent, or any other entity which is wholly owned by Parent or which wholly owns Parent), Landlord hereby agrees that Landlord will not re-enter the Leased Premises except pursuant to a judgment obtained in forcible detainer proceedings or other legal proceedings.

Notwithstanding any provision to the contrary contained herein, upon the occurrence of an Event of Default in payment of rent, Landlord shall not be obligated to give any notice (written or oral) to

12

GBP
4/1/84

vacate the Leased Premises prior to Landlord's instituting proceedings in Forcible Entry or Detainer, Tenant hereby waiving (to the extent legally permissible) any and all notices to vacate, and/or demand for possession, required under statutory or common law, Tenant hereby agreeing that such proceedings in Forcible Entry or Detainer may be instituted by Landlord at any time a default in payment of rent remains uncured. Notwithstanding the prior provisions set forth in this paragraph, Landlord may not commence any such proceeding without first notifying Tenant of any such alleged default in writing as required by this Lease, and permitting the time specified by this Lease for Tenant's cure of such alleged default.

Section 16.03.    In the event Landlord elects to terminate the Lease by reason of an Event of Default, then (except as otherwise provided in the succeeding paragraph) notwithstanding such termination, Tenant shall be liable for and shall pay to Landlord, at Houston, Harris County, Texas, the sum of all rent and other indebtedness accrued to the date of such termination, plus, as damages, an amount equal to the present value (computed as of the date of any such termination using a discount factor equal to six percent [6 %] per annum) of the difference between the amount stated in (1) hereafter and the amount stated in (2) hereafter as follows: (1) the total Minimum Rent plus the Common Area Payment, Tax Payment and Insurance Payment  (using such sums, if any, for the year of such termination as the basis for determining the amount thereof which would have been due each year thereafter for the remaining portion of the lease term had it not been terminated), all such rent and other charges being computed for the remaining portion of the lease term (had such term not been terminated by Landlord prior to the date of expiration stated in Article III), and (2) the then fair market rental value of the Leased Premises for such period.

In the event Landlord elects to terminate this Lease by reason of an Event of Default, in lieu of exercising the rights of Landlord under the preceding paragraph, or in the event Landlord elects to terminate Tenant's right to possession of the Leased Premises without terminating this Lease, Landlord may instead hold Tenant liable for all rent and other indebtedness accrued to the date of such termination, plus such rent and other indebtedness as would otherwise have been required to be paid by Tenant to Landlord during the period following termination of the lease term (or Tenant's right to possession of the Leased Premises, as the case may be) measured from the date of such termination by Landlord until the date which would have been the date of expiration of the term as stated in Article III (had Landlord not elected to terminate the Lease or Tenant's right to possession on account of such Event of Default) diminished by any net sums thereafter received by Landlord through reletting the Leased Premises during said period (after deducting expenses incurred by Landlord as provided in the succeeding paragraph). Actions to collect amounts due by Tenant provided for in this paragraph of Section 16.03 may be brought from time to time by Landlord during the aforesaid period, on one or more occasions, without the necessity of Landlord's waiting until expiration of such period. If Landlord elects the remedy described in this paragraph, Landlord shall make a reasonable effort to relet the Leased Premises.  Landlord shall not in any event be required to give any preference or priority to the leasing of the Leased Premises over any other space that Landlord may have available in the Shopping Center.  Landlord shall not be required to:  (i) take any instruction or advice given by Tenant regarding reletting the Leased Premises; (ii) accept any proposed tenant unless such tenant has a credit worthiness acceptable to Landlord in its sole discretion; (iii) accept any proposed tenant unless such tenant leases the entire Leased Premises upon terms and conditions satisfactory to Landlord in its sole discretion (after giving consideration to all expenditures by Landlord for tenant improvements, broker's commissions and other leasing costs); or (iv) consent to any assignment or sublease for a period which extends beyond the expiration of the current term or which Landlord would not otherwise be required to consent to under the provisions of this Lease.  Tenant agrees that Landlord shall not be liable, nor shall Tenant's obligations hereunder be diminished, because of Landlord's failure to relet the Leased Premises or collect rent due with respect to such reletting, so long as Landlord makes a reasonable effort to relet the Leased Premises.

In all cases involving an Event of Default, Tenant shall also be liable for and shall pay to Landlord at Houston, Harris County, Texas, in addition to any sum provided to be paid above:  (i) the reasonable costs of removing and storing Tenant's or other occupant's property, the costs of repairing the Leased Premises, and all reasonable expenses incurred by Landlord in enforcing Landlord's remedies; and (ii) reasonable broker's fees incurred by Landlord in connection with reletting the whole or any part of the Leased Premises, and costs of altering, reconfiguring (but not out of the ordinary remodeling) or otherwise putting the Leased Premises into condition acceptable to a new tenant or tenants (the "Relet Costs"); provided, however, the addition of the Relet Costs set forth in (ii) above shall not increase Tenant's liability to Landlord beyond the liability for which Tenant would have been liable had the Leased Premises not been relet (hereinafter collectively referred to as the "Costs").

13

GBP
4/1/84

If Landlord receives any payments from the reletting of the Leased Premises, any such payments shall first be applied to the Costs. In no event shall Tenant be entitled to any excess of rent (or rent plus other sums) obtained by reletting over and above the rent herein reserved.

Section 16.04    In any action or proceeding to enforce any provision hereof which proceeds to final judgment in a court of law, the prevailing party shall be entitled to reasonable attorneys' fees.

Section 16.05.    In the event of any default by Landlord, Tenant's exclusive remedy (other than the self help rights described in Section 9.02) shall be an action for damages (Tenant hereby waiving the benefit of any laws granting it a lien upon the property of Landlord and/or upon rent due Landlord), but prior to any such action Tenant will give Landlord written notice specifying such default with particularity, and, provided Landlord commences the cure thereof within thirty (30) days (except in an emergency, in which event Landlord shall immediately commence such cure after notice thereof) from Tenant's written notice and thereafter diligently pursues the completion thereof, Landlord shall thereupon have a reasonable period to cure any such default. Unless and until Landlord fails so to commence to cure any default (within thirty (30) days except in the event of an emergency) after such notice or having so commenced thereafter fails to exercise reasonable diligence to complete such curing, Tenant s hall n ot h ave a ny remedy or cause o f action b y r eason t hereof; p rovided, h owever, t hat t he provisions of Section 9.02 permitting Tenant self help rights under certain circumstances shall prevail over any contrary or ambiguous provisions of this Section. All obligations of Landlord hereunder will be construed as independent covenants, not conditions; and all such obligations will be binding upon Landlord only during the period of its possession of the Shopping Center and not thereafter.

Section 16.06.    Tenant hereby acknowledges that late payment by Tenant to Landlord of rent or any other sums due under this Lease will cause Landlord to incur various expenses not contemplated by this Lease, the exact amount of which are presently difficult to ascertain. Accordingly, if any payment of Minimum Rent or any other sum due from Tenant under this Lease shall not be received by Landlord within the cure period provided in Section 16.01(a) above, then, in addition to such required payment, Tenant shall also pay to Landlord a "Late Charge" equal to five cents ($0.05) for each One Dollar ($1.00) so past due. Landlord and Tenant agree that such Late Charge represents a fair and reasonable estimate of the expenses that Landlord will incur by reason of such late payment by Tenant. Acceptance of such Late Charge by Landlord shall not constitute a waiver of Tenant's default with respect to any such past due amounts, nor prevent Landlord from exercising any other rights and remedies granted to Landlord under this Lease or at law or in equity. Such Late Charge shall constitute additional rental payable by Tenant under this Lease and is in addition to, and separate from, the Minimum Rent and other charges payable under this Lease by Tenant.

ARTICLE XVII

Non-Waiver

Section 17.01.    Neither acceptance of rent (or any portion thereof) or any other sums payable by Tenant hereunder (or any portion thereof) by Landlord nor failure by Landlord or Tenant to complain of any action, non-action or default of the other shall constitute a waiver as to any breach of any covenant or condition contained herein nor a waiver of any of either party's rights hereunder. Waiver by either party of any right for any default of the other shall not constitute a waiver of any right for either a prior or subsequent default of the same obligation or for any prior or subsequent default of any other obligation. Except as otherwise expressly provided in this Lease, no right or remedy of either p arty hereunder or covenant, duty or obligation of any party hereunder shall be deemed waived unless such waiver be in writing, signed by an authorized officer or other authorized representative of the party against whom such waiver may be asserted.

ARTICLE XVIII

Landlord-Tenant Relation

Section 18.01.    The relation created by this Lease Contract is that of landlord and tenant, and no other.

14

GBP
4/1/84

## ARTICLE XIX

### Eminent Domain

Section 19.01.   If there shall be taken during the term of this Lease all of the Leased Premises, by any authority having the power of eminent domain, then and in that event, the term of this Lease shall cease and terminate, and the date of such termination shall be the first to occur of: (a) either the date upon which possession shall be tendered to such authority by Landlord; or (b) the date upon which possession is taken by such authority; or (c) the date upon which any action taken or threatened by such authority materially interferes with Tenant's use and enjoyment of the Leased Premises for the purposes permitted under this Lease. If a lesser part of the Leased Premises should be so taken, or if any portion of the Protected Area is taken, or if the Pylon Sign of which Tenant has a right of use is taken and not replaced with a sign of the same or equivalent size and prominence (or to the maximum size and prominence approved by local governmental authorities, if local ordinances will not permit the same or equivalent size and prominence), then either Tenant or Landlord may elect to terminate this Lease, but if neither party elects to terminate this Lease, the Minimum Rent and Additional Rent shall be reduced in proportion to the area of the Leased Premises so taken or in proportion to the extent to which the conduct of Tenant's business is materially and adversely affected if no portion of the Leased Premises is taken but some portion of the Protected Area or the Common Area is taken or the said pylon sign is taken and not replaced.   When any such reduction in Minimum Rent and Additional Rent has been computed by Landlord, Landlord shall notify Tenant as to the amount of such Minimum Rent and Additional Rent and such sum shall be due and payable by Tenant to Landlord in accordance with the provisions of Article IV.   At the request of either party, the other party will execute a letter or other memorandum setting forth the amount of such Minimum Rent and Additional Rent payable by Tenant. If neither party has elected to terminate this Lease, then upon Landlord's collection of the entire sum due and payable by such authority to Landlord by way of compensation and damages, Landlord shall restore the remaining portion of the Leased Premises so as to constitute such portion an enclosed building, with such nature of building improvements and facilities as Landlord furnished to Tenant when Landlord delivered physical possession of the Leased Premises to Tenant.   Such restoration work shall be performed by Landlord within a reasonable period of time with reasonable allowances for Force Majeure.  Neither the restoration work, if any, by Landlord with respect to the Leased Premises nor the restoration work, if any, by Landlord with respect to any other portion of the Shopping Center shall constitute an eviction or disturbance of Tenant's use and possession of the Leased Premises or Shopping Center or a breach by Landlord of any of its obligations hereunder or render Landlord liable for damages or entitle Tenant to be relieved from any of its obligations hereunder (with the exception of the aforesaid proportionate reduction in Minimum Rent) or grant Tenant any right of off-set or recoupment.

Section 19.02.   Landlord and Tenant shall each have the right to pursue independent claims with the condemning authority to recover any compensation or damages to which they may be entitled under Texas eminent domain law.

Section 19.03.   If this Lease should be terminated under any provision of this Article, rental and other sums due and payable by Tenant hereunder shall be payable up to the date that possession is taken by the taking authority, and Landlord will refund to Tenant an equitable portion of any such rental and other sums paid in advance but not yet earned by such date.

Section 19.04.   In the event that any authority having the power of eminent domain requests that Landlord convey to such authority all or any portion of the Shopping Center or all or any portion of the Leased Premises, Landlord shall have the right to make a voluntary conveyance to such authority of all or any portion of the Shopping Center or all or any portion of the Leased Premises whether or not proceedings have been filed by such authority; and in the event of any such voluntary conveyance, it shall nevertheless for all purposes hereunder be deemed that there has been a taking by such authority of the property voluntarily conveyed by Landlord.   Accordingly, all of the provisions of Sections 19.01 and 19.02 and 19.03 hereof shall be applicable notwithstanding such voluntary conveyance.

## ARTICLE XX

### Holding Over

Section 20.01.   If Tenant does not vacate the Premises upon the expiration or earlier termination of the Lease, Tenant's occupancy of the Premises will be a "month-to-month" tenancy, subject to all of the terms of this LEASE applicable to a month-to-month tenancy, including the payment of all Minimum Rent

15

GBP
4/1/84

and Additional Rent, except that the Minimum Rent payable by Tenant shall be as follows:  (i)  during the first month of such month-to-month tenancy, 125% of the Minimum Rent in effect as of the expiration of the Lease Term, and (ii)  during each succeeding month of such month-to-month tenancy, 150% of the Minimum R ent i n effect a s o f the e xpiration of the Lease T erm.  T he above described tenancy from month-to-month may be terminated by either party upon thirty (30) days notice to the other.

Section 20.02.  Any rent due after notice has been given is to be calculated according to Section 20.01 on a prorata basis.  If upon notice of termination by Landlord, Tenant tenders rent in excess of the amount due and payable pursuant to the formula in Section 20.01, and Landlord accepts such payment, the acceptance of such payment will not operate as a waiver by Landlord of the notice of termination, unless such waiver is in writing and signed by Landlord.  Any such excess amounts tendered and accepted shall be promptly refunded by Landlord, after deducting therefrom any amounts owed Landlord.

## ARTICLE XXI

### Landlord's Mortgagee

Section 21.01.  Subject to the execution and recordation of a commercially reasonable form of non-disturbance agreement in favor of Tenant by the holder of any security interest prior in interest to the leasehold estate created and evidenced by this Lease, Tenant agrees that its interest under this Lease shall be subordinate to any mortgage, deed of trust or similar device now or hereafter placed upon the Leased Premises or all or any portion of the Shopping Center by Landlord if the mortgagee or beneficiary under said deed of trust or lender for whose benefit any other security device is created so elects, and, upon notice to Tenant of such election, Tenant will execute any instruments required to evidence such subordination.  Likewise, such mortgagee or beneficiary under said deed of trust or lender for whose benefit any other security device is created may elect, by notice to Tenant, to make this Lease superior to such mortgage or deed of trust or other security device; and in the event of any such election, Tenant will execute any instruments required to evidence such superiority.

Section 21.02.  For purposes of this Article, the term "Landlord's Mortgagee" means any party holding a mortgage or deed of trust on the Leased Premises or any part thereof or all or any portion of the Shopping Center (provided such portion includes the Leased Premises) who has given Tenant written notice that such party holds such lien or deed of trust together w ith notice of the post office address of such Landlord's Mortgagee.  A lien held by a Landlord's Mortgagee on the Leased Premises or any portion thereof or Shopping Center or any portion thereof is herein referred to as a "Landlord's Mortgage".

Section 21.03.  Landlord and Tenant shall execute and deliver to each other, at such time or times as either Landlord or Tenant may request, a certificate stating:

(a)     Whether or not the Lease is in full force and effect;

(b)     Whether or not the Lease has been modified or amended in any respect, and submitting copies of such modifications or amendments, if any;

(c)     Whether or not there are any existing defaults under this Lease to the knowledge of the party executing the certificate, and specifying the nature of such defaults, if any; and

(d)     Such other information as may be reasonably requested (but no covenants shall properly be included).

The aforesaid certificate(s) shall be delivered to Landlord or Tenant, as the case may be, promptly upon receipt of a written request therefor, but in no event more than fifteen (15) days following receipt of such request.  Any and all requested forms shall be transmitted by e-mail in MS Word or other agreed upon f ormat.  Failure b y e ither p arty t o t imely d eliver s uch c ertificate(s) s hall c onstitute a n E vent o f Default hereunder and entitle such party to exercise any remedies permitted under the terms of this Lease.

16

ARTICLE XXII

Additional Rent

Section 22.01.  In addition to and separate from the Minimum Rent, Tenant shall pay to Landlord as additional rent a "Common Area Payment", "Tax Payment", and "Insurance Payment" (as such quoted terms are defined in the Addendum).  For purposes of this Lease, the following terms shall have the hereinafter indicated meaning:

A.    The phrase "Common Area Operating Costs" shall mean, for each calendar year (or portion thereof) during the term of this Lease, except as modified by the Addendum, the aggregate of all costs, expenses and liabilities of every kind or nature paid or incurred by Landlord (to the extent that Landlord, in its good faith judgment, regards it as reasonably necessary or appropriate to provide the services and materials hereafter referred to and to pay and incur the costs, expenses and liabilities hereafter referred to) in connection with:  sweeping, cleaning, removing debris from, maintaining, restriping, repairing and resurfacing the Common Area; lighting the Common Area (including replacement of bulbs and ballasts, and painting, repairing and maintaining of light standards); providing project identification signs; providing signs and/or personnel for assisting in traffic control and management at the Common Area; constructing, operating and repairing and maintaining any on-site or off-site utilities necessary  for the operation of the Common Area; providing and maintaining planting and landscaping with respect to the Common Area; repairing and maintaining utility lines in the Common Area which do not exclusively serve one tenant; operating any loudspeakers or other equipment supplying music; utilities charges for any services to the Common Area; exterminating and pest control in and about the Common Area; periodic repainting of exterior walls, fascias and parapets of the buildings in the Shopping Center (including steam cleaning, sandblasting, filling holes and grafitti-removal procedures), exclusive of the Leased Premises (because Tenant is responsible for painting the exterior walls) and exclusive of any other premises, if any, whose exterior walls are painted by tenants; repairing, maintaining and replacing, if necessary, sprinklers and sprinkler risers serving the buildings in the Shopping Center and overhead canopies in the Common Area at the Shopping Center (including, without limitation, lighting and tile); repairing and maintaining sidewalks in the Common Area (including, without limitation, periodic steam cleaning thereof); all o ther costs a nd e xpenses of every kind or nature paid or incurred by Landlord relative to operating, managing and equipping the Common Area, except as restricted by the Addendum, plus an administrative fee not to exceed ten percent (10%) of the foregoing costs, exclusive of utilities (and insurance and taxes, as insurance and taxes are not included in Common Area Operating Costs).  Any Capital Item shall be amortized over its useful life, and Tenant shall be liable only for its pro rata share of that portion of the amortized cost which is applicable to the remaining Lease Term.  For purposes hereof, the term "Capital Item" shall mean any capital expenditure in excess of $10,000.00 that is ordinarily capitalized under generally accepted accounting principles consistently applied.

B.    The word "Taxes", as used herein, shall mean all taxes, assessments, impositions, levies, charges, excises, fees, licenses and other sums (whether now existing or hereafter arising, whether foreseen or unforeseen and whether under the present system of real estate taxation or some other system), levied, assessed, charged or imposed by any governmental authority or other taxing authority or which accrue on the Shopping Center for each calendar year (or portion thereof) during the term of this Lease, and all penalties, interest and other c harges (with respect to Taxes) payable by reason of a ny delay in or failure or refusal of Tenant to make timely payment as required under this Lease.  In no event shall the word "Taxes" be deemed to include any of Landlord's income taxes or the estate, inheritance, or gift taxes of any party "Landlord".  If there is presently in effect or hereafter adopted any nature of sales tax or use tax or other tax on rents or other sums received by Landlord under this Lease (herein referred to as "Rent Sales Tax"), then in addition to all rent and other payments to be made by Tenant as provided above, Tenant will also pay Landlord a sum equal to the amount of such Rent Sales Tax.  The term "Rent Sales Tax" shall not include any income taxes applicable to Landlord.  Tenant waives any rights it may have pursuant to statutory or common law to protest the appraised value of the Shopping Center or to appeal the same and all rights to receive notices of reappraisal as set forth in Sections 41.413 and 42.015 of the Texas Tax Code.

C.    The phrase "Insurance Premiums" shall mean the total annual insurance premiums actually paid on all fire and extended coverage insurance, boiler insurance, public liability and property damage insurance, rent insurance and other insurance which, from time to time, may at Landlord's election be carried by Landlord with respect to the Shopping Center (including but not limited to the insurance required to be carried by Landlord pursuant to the Addendum) during any applicable calendar

17

GBP
4/1/84

year (or portion thereof) occurring during the term of this Lease. Landlord shall have the right to have all or any part of such insurance written under a "blanket policy".

## ARTICLE XXIII

### Notice

Section 23.01.  Any notice which may or shall be given under the terms of this Lease shall be in writing and shall be either delivered by hand or sent by United States Registered or Certified Mail, adequate postage prepaid, or by commercial courier, if for Landlord to its General Counsel (or in the event of hand delivery to any person on whom service may be made), addressed to his attention, at 2600 Citadel Plaza Drive, Houston, Texas 77008, or P.O. Box 924133, Houston, Texas 77292-4133, if for Tenant, to it at 4000 E. Union Pacific Avenue, City of Commerce, California 90023; attention: Real Estate Department.  Either party's address may be changed from time to time by such party by giving notice as provided above, except that the Leased Premises may not be used by Tenant as the sole notice address and each party must specify a street address, not merely a post office box.  No change of address of either party shall be binding on the other party until notice of such change of address is given as herein provided.  A post office receipt for registration of such notice or signed return receipt shall be conclusive that such notice was delivered in due course of mail if mailed as provided above.  For purposes of the calculation of various time periods referred to herein, notice delivered by hand shall be deemed received when delivered to the place for giving notice to a party referred to above and notice mailed in the manner provided above shall be deemed completed upon the earlier to occur of (i) actual receipt as indicated on the signed return receipt, or (ii) three (3) days after posting as herein provided, or for courier on the date such courier notes the same has been delivered.  All notices to Landlord or Tenant pursuant to which Landlord or Tenant claims a default or Event of Default on the part of the other party must specify in the "re" line, in all capital letters: "NOTICE OF DEFAULT; [LANDLORD OR TENANT (as the case may be)] IS NOTIFIED OF A DEFAULT UNDER THE LEASE".  Finally, any written notice addressed as provided hereinabove, shall constitute sufficient notice for all purposes under this Lease.

## ARTICLE XXIV

### Tenant's Signs

Section 24.01.  Any interior sign which is not designed or reasonably calculated to be seen from outside the Leased Premises may be placed and displayed by Tenant, without Landlord's further consent, so long as such sign is professionally prepared and consistent with interior signs generally used in 99¢ Only Stores.  Tenant shall cause Tenant's exterior sign to be placed on a time clock and photoelectric cell device such that the electricity illuminating such sign shall keep Tenant's electric signs on from dusk until 11:00 o'clock P.M., every day during the lease term.

## ARTICLE XXV

### Terminology and Miscellaneous

Section 25.01.  With respect to terminology in this Lease, each number (singular or plural) shall include all numbers, and each gender (male, female or neuter) shall include all genders.  If any provision of this Lease shall ever be held to be invalid or unenforceable, such invalidity or unenforceability shall not affect any other provisions of the Lease, but such other provisions shall continue in full force and effect.

The titles of the Articles in this Lease shall have no effect and shall neither limit nor amplify the provisions of the Lease itself.  This Lease shall be binding upon and shall accrue to the benefit of Landlord, its successors and assigns, and Tenant, its successors and assigns (or heirs, executors, administrators and assigns, as the case may be); however, this clause does not constitute a consent by Landlord to any assignment by Tenant, but instead refers only to those instances in which an assignment by Tenant is hereafter made in strict compliance with Article VIII above, or in the case of a deceased natural person Tenant, refers to the instances previously referred to in this sentence and also circumstances in which title to Tenant's leasehold estate under this Lease passes, after the demise of Tenant, pursuant to Tenant's will or the laws of intestate succession.  The words "hereof," "herein," "hereunder," "hereinafter" and the like refer to this entire instrument, not just to the specific article, section or paragraph in which such words appear.

18

GBP
4/1/84

Section 25.02.    The remedies of each party hereunder shall be deemed cumulative and no remedy shall be deemed to be in exclusion of any other. Except as may be otherwise herein expressly provided, in all circumstances under this Lease where prior consent or permission of one party ("first party") is required before the other party ("second party") is authorized to take any particular type of action, such party shall act in a commercially reasonable manner unless as to the particular matter this Lease expressly states that the first party may grant or withhold its consent in its sole and exclusive determination.

Section 25.03.    With respect to all of the terms, covenants and conditions of this Lease, time is of the essence.

Section 25.04.    The obligation of Tenant to pay all rent and other sums hereunder provided to be paid by Tenant and the obligation of Tenant to perform Tenant's other covenants and duties hereunder constitute independent, unconditional obligations to be performed at all times provided for hereunder, save and except only when an abatement thereof or reduction therein is hereinabove expressly provided for and not otherwise. Tenant waives and relinquishes all rights which Tenant might have to claim any nature of lien against or withhold, or deduct from or off-set against any rent and other sums provided hereunder to be paid Landlord by Tenant except as expressly set forth in this Lease.

Section 25.05.    Under no circumstances whatsoever shall Landlord ever be liable hereunder for consequential damages or special damages other than in the event of the intentional misconduct of Landlord (which intentional conduct may not be "deemed" or "imputed"); and all liability of Landlord for damages for breach of any covenant, duty or obligation of Landlord hereunder may be satisfied only out of the interest of Landlord in the Shopping Center existing at the time any such liability is adjudicated in a proceeding as to which the judgment adjudicating such liability is non-appealable and not subject to further review. The term "Landlord" shall mean only the owner, for the time being of the Shopping Center, and in the event of the transfer by such owner of its interest in the Shopping Center, such owner shall thereupon be released and discharged from all covenants and obligations of Landlord thereafter accruing, but such covenants and obligations shall be binding during the lease term upon each new owner for the duration of such owner's ownership.

Section 25.06.    All monetary obligations of Landlord and Tenant (including, without limitation, any monetary obligation of Landlord or Tenant for damages for any breach of the respective covenants, duties or obligations of Landlord or Tenant hereunder) are performable exclusively in Conroe, Montgomery County, Texas, and Landlord and Tenant hereby submit to the exclusive jurisdiction of the State of Texas. This Lease shall be construed in accordance with the laws of the State of Texas, and Montgomery County, Texas, shall be the venue for any litigation arising from this Lease.

Section 25.07.    Tenant has inspected the Leased Premises and accepts them in their existing condition, on an "As-Is" basis, subject to performance by Landlord of its obligations under the Construction Rider, if any, attached hereto and other express provisions, if any of this Lease. Tenant hereby waives and relinquishes any right to assert, as either a claim or a defense, that Landlord is bound to perform or is liable for the non-performance of any implied covenant or implied duty of Landlord not expressly set forth herein. Tenant waives any implied warranty of Landlord that the Leased Premises are suitable for their intended commercial purpose. Tenant agrees to perform all of its Lease obligations (including without limitation, the obligation to pay rent), notwithstanding an alleged breach by Landlord of any such implied warranty. Tenant agrees that Landlord shall incur no liability to Tenant by reason of any defect in the Leased Premises, whether apparent or latent; provided, however, that this provision shall not constitute a waiver of any of Landlord's obligations or Tenant's rights under other provisions of this Lease.

Section 25.08.    If this Lease is executed by more than one person or entity as "Tenant", each such person or entity shall be jointly and severally liable hereunder. It is expressly understood that any one of the parties who have executed this Lease as "Tenant" (herein individually referred to as "Signatory") shall be empowered to execute any modification, amendment, exhibit, floor plan, or other document ("Future Instrument") and bind each of the Signatories who has executed this Lease regardless of whether each Signatory, in fact, executes such Future Instrument.

Section 25.09.    Upon written request, Tenant shall provide to Landlord, within fourteen (14) days of such request, a copy of its most recent financial statement including both a balance sheet and

19

GBP
4/1/84

income statement, unless Tenant is a publicly traded entity. Such request may be made by Landlord from time to time during the Lease Term, but not more often than annually.

Section 25.10.   Attached hereto as Exhibit "X" and incorporated herein by reference is a copy of the Lease Commission Agreement, if any, which pertains to this Lease.

## ARTICLE XXVI

### Tenant's Bankruptcy

Section 26.01.   Landlord and Tenant agree that if Tenant ever becomes the subject of a voluntary or involuntary bankruptcy, reorganization, composition, or other similar type proceeding under the Federal Bankruptcy Laws, as now enacted or hereafter amended, then "adequate protection" of Landlord's interest in the Leased Premises pursuant to the provisions of Sections 361 and 363 (or their successor sections) of the Bankruptcy Code, 11 U.S.C. Paragraph 101 et seq. (such Bankruptcy Code as amended from time to time being herein referred to as the "Bankruptcy Code") prior to assumption and/or assignment of the Lease by Tenant shall include, but not be limited to all (or any part) of the following: The continued payment by Tenant of all Minimum Rent and all other sums due and owing under this Lease; the performance of all other covenants and obligations under this Lease by Tenant;

Section 26.02.   Landlord and Tenant agree that if Tenant ever becomes the subject of a voluntary or involuntary bankruptcy, reorganization, composition or other similar type proceeding under the Federal Bankruptcy Laws, as now enacted or hereafter amended, then "adequate assurance of future performance" by Tenant and/or any assignee of Tenant pursuant to Bankruptcy Code Section 365 (or its successor section) will include (but not be limited to) payment of an additional, new security deposit in the amount of three (3) times the then-current monthly Minimum Rent payable hereunder.

Section 26.03.   Any person or entity to which this Lease is assigned pursuant to the provisions of the Bankruptcy Code (including notice to Landlord, entry of the Assignment Order by the Bankruptcy Court, and receipt by Landlord of the cure payment), shall be deemed without further act or deed to have assumed all of the obligations of Tenant arising under this Lease on and after the effective date of such assignment.   Any such assignee shall, upon demand by Landlord, execute and deliver to Landlord an instrument confirming such assumption of liability.

Section 26.04.   This is a lease of real property in a "shopping center" within the meaning of Section 365(b)(3) of the Bankruptcy Code.

Section 26.05.   Notwithstanding anything in this Lease to the contrary, all amounts payable by Tenant to or on behalf of Landlord under this Lease, whether or not expressly denominated as "rent", shall constitute "rent" for the purposes of Section 502(b)(6) of the Bankruptcy Code.   The foregoing shall not diminish Landlord's post-petition administrative claims as otherwise permitted under the Bankruptcy Code.

Section 26.06.   If this Lease is assigned to any person or entity pursuant to the provisions of the Bankruptcy Code, any and all monies or other considerations payable or otherwise to be delivered in connection with such assignment shall be paid or delivered to Landlord, shall be and remain the exclusive property of Landlord and shall not constitute property of Tenant or of the Estate of Tenant within the meaning of the Bankruptcy Code.   Any and all monies or other considerations constituting Landlord's property under the preceding sentence not paid or delivered to Landlord shall be held in trust by Tenant for the benefit of Landlord and shall be promptly paid to or turned over to Landlord.

Section 26.07.   If Tenant assumes this Lease and proposes to assign the same pursuant to the provisions of the Bankruptcy Code (the "Bankruptcy Code") to any person or entity who shall have made a bona fide offer to accept an assignment of this Lease on terms acceptable to the Tenant, then notice of such proposed offer/assignment, setting forth (i) the name and address of such person or entity, (ii) all of the terms and conditions of such offer, and (iii) the adequate assurance to be provided Landlord to assure such person's or entity's future performance under this Lease, including, without limitation, the assurance referred to in Section 365(b)(3) of the Bankruptcy Code, shall be given to Landlord by Tenant no later than twenty (20) days after receipt by Tenant, but in any event no later than ten (10) days prior to the date that Tenant shall make application to a court of competent jurisdiction for authority and approval to enter into such assumption and assignment, and Landlord shall thereupon (in addition to all other rights under the Bankruptcy Code) have the prior right and option, to be exercised

GBP
4/1/84

by notice to Tenant given at any time prior to the effective date of such proposed assignment, to accept an assignment of this Lease upon the same terms and conditions and for the same consideration, if any, as the bona fide offer made by such persons or entity, less any brokerage commissions which may be payable out of the consideration to be paid by such person for the assignment of this Lease.

Section 26.08.  Nothing contained herein shall diminish Landlord's rights under the Bankruptcy Code including but not limited to prior notice of any motions for assumptions and/or assignments of this Lease.

ARTICLE XXVII

Condition of Lease

Section 27.01.  The parties hereby acknowledge that the Leased Premises are currently occupied by a third party tenant.  In the event Landlord fails to regain possession of the Leased Premises from the third party tenant and so notify Tenant in writing on or before August 31, 2004, then either Landlord or Tenant may terminate this Lease Contract upon seven (7) days prior written notice to the other party. Notwithstanding the foregoing, should Tenant exercise its right of termination and Landlord thereafter reacquire possession of the premises and so notify Tenant before the expiration of the seven (7) day period, then Tenant's notice of termination shall be rendered null and void.

ARTICLE XXVIII

Entire Agreement

Section 28.01.   This instrument, consisting of twenty-two (22) pages and an Addendum, Construction Rider, Pylon Sign Rider, Exhibit "A", Exhibit "B", Exhibit "C", Exhibit "D", Exhibit "E-1", Exhibit "E-2", Exhibit "E-3", Exhibit "F", Exhibit "G", Exhibit "H", and Exhibit "X" constitutes the entire agreement between Landlord and Tenant; no prior written or prior or contemporaneous oral promises or representations shall be binding.  The submission of this Lease for examination by Tenant and/or execution thereof by Tenant does not constitute a reservation of or option for the Leased Premises and this Lease shall become effective only upon execution by all parties hereto and delivery of a fully executed counterpart hereof by Landlord to Tenant.  This Lease shall not be amended, changed or extended except by written instrument signed by both parties hereto.

EXECUTION PAGE FOLLOWS IMMEDIATELY

21

GBP
4/1/84

EXECUTED in multiple counterparts, each of which shall have the force and effect of an original, this the 16th day of _March_____, 2004. For purposes hereof, facsimile signatures shall be binding on the parties, provided that each party promptly delivers original documents to the other.

WEINGARTEN REALTY INVESTORS

By: _____
Sr. Vice President

"LANDLORD"

Approved:                              99 CENTS ONLY STORES TEXAS, INC.
                                       a Delaware corporation

_____          By: _____
Richard J. Frick                           Jeff Gold, its President

                                                          "TENANT"

Execution Page to Shopping Center Lease

22

## Addendum to Lease

This Addendum is attached to and made a part of that certain lease affecting premises commonly known as TBD, Conroe, Texas  77304, as more particularly described in said lease (defined in the said lease as the "Leased Premises" and referred to herein as the "Premises"), which lease is dated for reference purposes as of ___March 16___, 2004 (the "Lease") by and between Weingarten Realty Investors, with principal place of business in Houston, Harris County, Texas ("Landlord") and 99 Cents Only Stores Texas, Inc., a Delaware corporation ("Tenant"). Terms used in this Addendum shall have the same meaning as set forth in the Lease unless otherwise defined in this Addendum. If there is any contradiction or ambiguity between the terms, covenants and conditions set forth in the Lease and those set forth in this Addendum, the terms, covenants and conditions set forth in this Addendum shall govern and control.

1.       Guaranty. Each and all of the obligations of Tenant under the Lease shall be guaranteed by 99¢ Only Stores, a California corporation. Attached hereto as Exhibit "H" and incorporated herein is the form of Guaranty required to be executed and delivered to Landlord by 99 Cents Only Stores Texas, Inc., which Guaranty shall be delivered concurrent with the execution and delivery of this Lease.

2.       Tender. Landlord shall give Tenant not less than thirty (30) days' prior written notice of the date on which Landlord will tender possession of the Premises to Tenant free and clear of all other tenants and occupants, which notice shall represent to Tenant that (a) the Demising Wall has been completed, and (b) all asbestos abatement in the Premises, if required by law, has been completed.  Landlord hereby represents to Tenant that Tenant shall have (i) exclusive use of Tenant's Loading Dock (depicted on Exhibit "A"), and (ii) exclusive use of the existing utility services at the Leased Premises. If for any reason Landlord has not tendered possession of the Premises to Tenant on or before September 15, 2004, in the manner set forth above, then as Tenant's sole and exclusive remedy, Tenant is hereby granted one day of free rent (both Minimum Rent and all Additional Rent) for each day from September 15, 2004, to the date Landlord tenders possession of the Premises to Tenant in the manner set forth above, inclusive.

3.       Rent Commencement Date. Tenant's obligation to pay Minimum Rent and other charges under the Lease (all of which are referred to in the Lease as "Additional Rent") shall commence ninety (90) days after the date on which Landlord tenders possession of the Premises to Tenant in the manner set forth in Paragraph 2 directly above (the "Rent Commencement Date").

4.       Protected Area and Additional Provisions Regarding Common Area. Exhibit "A" to the Lease (the "Site Plan") shows the Shopping Center, a portion of which is marked "Protected Area" (the "Protected Area"). Landlord shall not change, or permit others to temporarily or permanently change, the size, location, nature and use of any of the Protected Area; nor the size (either horizontal or vertical dimensions) or location of structures within the perimeter of the Protected Area; nor any signs within the perimeter of the Protected Area or, subject to Landlord's limited right to reduce the number of parking spaces in the Shopping Center as a whole as set forth below, vehicle parking spaces in the Protected Area (including, without limitation, any changes to the striping, curbing, landscaping, or directional signage); nor change any portion of the Common Area located within the perimeter of the Protected Area, including (without limitation) conversion of any portion of the Common Area included in the Protected Area into leasable areas; nor take nor permit to be taken any action within the Protected Area which would limit, reduce or impede (i) the visibility of the Premises from adjoining areas of the Shopping Center or adjoining streets, or (ii) pedestrian or vehicular access to and from the Premises; nor change the character or design of the portion of the Shopping Center contained within the Protected Area without Tenant's prior written consent in each instance, which Tenant may withhold in its sole and absolute discretion, unless such change is required to comply with applicable law in which event Tenant's consent shall not be unreasonably withheld or delayed. Notwithstanding the foregoing, with respect to ingress and egress points from the Shopping Center, Landlord shall only be required to provide during the term of this Lease two (2) curb cuts from the Shopping Center to State Highway Loop 336 and two (2) curb cuts from the Shopping Center to Westview Blvd..

Within the balance of the Common Area of the Shopping Center, Landlord shall not take or permit any action to be taken which would limit, reduce or impede (i) the exclusive use by Tenant of Tenant's Loading Dock adjacent to the Premises, which is depicted on Exhibit "A" to the Lease, or (ii) the vehicular or pedestrian access to Tenant's Loading Dock; and Landlord shall not reduce or permit others to

1·

reduce the number of parking spaces within the Shopping Center (including the Protected Area) below a ratio of four (4) spaces for every one thousand (1,000) square feet of leasable space in the Shopping Center. Except as shown on Exhibits "F" and "G" to the Lease and as set forth in the Recorded Documents, Landlord represents and warrants to Tenant that there are no agreements or other arrangements made with neighboring property owners, other tenants of the Shopping Center, or other parties, that affect the Premises, the Common Area, or the Shopping Center, or portions thereof, which conflict with Tenant's rights or Landlord's obligations hereunder, including but not limited to: the use of vehicle parking spaces, the maintenance of asphalt, concrete, landscaping or other areas without structures, future development, utility services, security, vehicular or pedestrian access or egress, signage, drainage, advertising or Tenant's use of the Common Area. Notwithstanding any other provision of this Lease, Landlord may temporarily close any portion of the Common Area, but only as necessary to perform any acts in the Common Area as are necessary to meet Landlord's obligations: (i) under this Lease, (ii) under other leases in the Shopping Center, and (iii) to comply with Law; provided that (1) Landlord gives Tenant a minimum of ten (10) days written notice thereof, (2) Landlord takes all reasonable actions to avoid so doing during any of Tenant's peak business periods (October 1 - December 24, Fridays, Saturdays, Sundays, and the one week periods preceding and including Independence Day, Valentine's Day, Easter, and any Federal holiday), and (3) Landlord takes all reasonable actions to minimize any detrimental effects to Tenant's business operations at the Premises as a result of such closure. Landlord shall not permit any carnivals, fireworks stands, Christmas Tree sales, telephones, kiddy rides, vending machines, recycling centers or machines or any such or similar activities in the Protected Area at any time, except for the rights expressly granted Tenant under this Lease. Subject to the provisions of this Lease applicable to alterations, additions, and improvements of the Premises, Tenant may change Tenant's Loading Dock to facilitate Tenant's receipt of merchandise provided that Tenant obtains Landlord's prior written consent, which shall not be unreasonably withheld.

5.    Additional Provisions Regarding Common Area Maintenance.  Landlord shall maintain and operate the Common Area in good order, condition and repair, comparable with high quality shopping centers in the county in which the Premises is located. In no event shall Tenant have any responsibility for the payment of any marketing, advertising, or promotional expenses. Should Landlord utilize any affiliates of Landlord or any companies affiliated to Landlord (any such affiliate or affiliated company hereinafter referred to as "Landlord's Affiliate") to provide any item(s) of Common Area Operating Costs, the amounts charged by any such Landlord's Affiliate shall not exceed the amount which is customarily charged by unaffiliated professional providers of the same service(s) to shopping centers which are similar to the Shopping Center in the same geographic area as the Shopping Center. Tenant hereby acknowledges and agrees that Landlord utilizes its Affiliate, Weingarten Realty Management Company, to manage the Shopping Center.

        Notwithstanding anything to the contrary contained herein, Common Area Operating Costs shall not include the following

(i)    Supervision or management salaries or similar fees, except that Landlord may include in the Common Area Operating Costs charged to Tenant an amount equal to 10% of all other Common Area Operating Costs, exclusive of utilities (and taxes and insurance, as taxes and insurance are not included in Common Area Operating Costs);

(ii)   Security costs or other similar fees, unless Tenant expressly agrees thereto in writing;

(iii)  Depreciation of real property or improvements which form part of the Common Areas;

(iv)   Repairs, replacements or improvements made prior to the date hereof except for repairs replacements or improvements that were amortized over their useful lives;

(v)    Repairs arising from defects in the initial construction of the Shopping Center;

(vi)     Repairs necessitated by the negligence of Landlord and which are required to cure violations of laws in effect on the date hereof;

(vii)    Payments of principal and interest and amortization of indebtedness or any cost of financing or refinancing, depreciation or ground rent;

(viii)   Compensation paid to officers or executives of Landlord who are not directly involved in the management of the Shopping Center;

(ix)     Costs incurred by Landlord in connection with the leasing of space in the Shopping Center, including, without limitation, commissions and advertising and promotional expenses;

(x)      Legal fees, other than those incurred by Landlord in the filing, institution or prosecution of any application or proceeding filed or instituted by Landlord in order to reduce real property taxes;

(xi)     The cost of repairs or replacements incurred by reason of fire or other casualty or condemnation to the extent that either (1) Landlord is compensated therefor through proceeds of insurance or condemnation awards; or (2) Landlord failed to obtain insurance against fire or casualty as required under the terms of this Lease;

(xii)    The cost of initial construction or completion of the Common Area or any part of the Shopping Center;

(xiii)   Any portion of amounts paid to any firm or entity affiliated with Landlord for services or materials, to the extent such amount exceeds the then existing market rates for the same services or materials in the same geographic location;

(xiv)    Except as otherwise expressly provided in the Lease (including this Addendum), expenditures made by Landlord which are in the nature of capital improvements;

(xv)     Costs arising from any cleanup, repair or remediation of "Hazardous Materials" [as defined in Section 18(a)] to the extent that such action is attributable to the presence, use, generation, storage, release or disposal of Hazardous Materials on, under or in the Shopping Center (unless caused by the acts of Tenant or Tenant's agents, employees, contractors or sublessees);

(xvi)    Legal expenses incurred by Landlord in enforcing and/or negotiating the terms of any lease for space in the Shopping Center;

(xvii)   The cost of any work or service performed for, or facilities furnished to, any other tenant in the Shopping Center at such tenant's cost;

(xviii)  The amount of any judgement applicable to the operation, ownership or maintenance of the Shopping Center and all costs associated with the defense of such action;

(xix)    The amount of any rent paid by Landlord to a ground lessor;

(xx)     Any license, permit and inspection fees, consulting, legal and accounting fees or similar fees and other costs incurred by Landlord in connection with the ownership, operations and leasing of the Shopping Center;

(xxi)   The cost of rubbish removal for rubbish generated within the premises of all other tenants or occupants of space within the Shopping Center (except that Common Area Operating Costs shall include the cost of rubbish removal of rubbish generated within the Common Area);

(xxii)   The cost of maintaining the Common Area of any portion of the Shopping Center which is enclosed;

(xxiii)   The cost of funds borrowed by Landlord; and

(xxiv)   The entire amount of the costs charged by any of Landlord's Affiliates for any items of Common Area Operating Costs if Landlord fails to disclose to Tenant the use of such Landlord's Affiliate.

6.          Loading. See Paragraph 4 above.

7.          Common Area Operating Costs, Taxes and Insurance Premiums – Tenant's Share and Payment. Landlord shall take all reasonable actions to minimize (to the extent reasonably possible) the Common Area Operating Costs (and each component thereof). The foregoing sentence shall not in any way affect any of Landlord's obligations, including maintenance of the Common Areas as otherwise provided in the Lease.

At least 30 days prior to the Rent Commencement Date and on other occasions if Landlord so elects, during the Lease Term, Landlord shall provide a written notice to Tenant setting forth in reasonable detail Landlord's best estimate of all Common Area Operating Costs, Taxes and Insurance Premiums (which, taken together, are referred to in this Lease as the "Operating Expenses") for the ensuing calendar year (which may be based on the Actual Operating Expenses for the then current calendar year) and Tenant's share thereof, and such supporting documentation as Tenant may reasonably request ("Estimated Operating Expenses"). Subject to the other provisions of this Lease, Tenant shall thereafter pay on a monthly basis Tenant's pro rata share of the Estimated Operating Expenses (prorated for any fractional periods) with each subsequent monthly installment of Minimum Rent.

"Tenant's share" as applied to Common Area Operating Costs, Taxes and Insurance Premiums means a sum calculated by multiplying Common Area Operating Costs, Taxes and Insurance Premiums (as the case may be) by a fraction, the numerator of which is the ground floor area (in square feet) of the Leased Premises and the denominator of which is the aggregate leasable ground floor area (in square feet) in all buildings in the Shopping Center on the first day of January for the calendar year for which any calculation referred to in this Paragraph is being made. For any period less than twelve (12) full calendar months, a pro rata portion of the resulting product shall be calculated to determine Tenant's share. Notwithstanding the foregoing, Tenant's share shall never exceed twenty-five percent (25%).

If any third party tenant in the Shopping Center is (i) maintaining portions of the Common Area, and/or (ii) paying real estate taxes based on a separate rendering of said tenant's premises, and/or (iii) maintaining its own policies of insurance for the types of insurance identified in Article XXII, then as to Common Area Operating Costs and/or Taxes and/or Insurance Premiums (as the case may be), the term "Tenant's share" shall be amended by adjusting the denominator of the fraction referenced hereinabove by excluding therefrom the ground floor area (in square feet) of any premises in the Shopping Center leased to each such tenant.

Commencing on the Rent Commencement Date, Tenant shall pay to Landlord, along with its payment of Minimum Rent: (i) estimated Common Area Operating Costs in the amount of $1,503.13 per month (the "Common Area Payment"); estimated Taxes in the amount of $2,304.79 per month (the "Tax Payment"), and estimated Insurance Premiums in the amount of $240.50 per month (the "Insurance Payment"). Unless and until there is an increase in amounts paid by Landlord for Common Area Operating Costs, and/or Taxes and/or Insurance Premiums, Tenant shall pay its Common Area Payment, Tax Payment, and Insurance Payment monthly in advance for each and every month during the term of this Lease (charges for any partial month to be pro-rated).

Within ninety (90) days after the end of each calendar year during the Lease Term and within ninety (90) days of the expiration of the Lease Term, Landlord shall provide a written notice to Tenant setting forth in reasonable detail Landlord's calculation of all Operating Expenses for the prior calendar year and Tenant's share thereof, and such supporting documentation as Tenant may reasonably request in writing ("Actual Operating Expense Notice"). Landlord shall indicate the total amount of Estimated Operating Expensees paid by Tenant for such period on such Actual Operating Expense Notice, and Tenant shall pay (in a lump sum) any shortfall (if the Estimated Operating Expenses paid by Tenant were less than Tenant's pro-rata share of the Actual Operating Expenses for such period) as set forth in any such Actual Operating Expense Notice to Landlord within fifteen (15) days after receipt thereof, except that Tenant may object to any costs included therein which Tenant, in good faith and in reasonable detail, objects by written notice to Landlord within said 15-day period. If the Estimated Operating Expenses paid by Tenant exceed Tenant's pro-rata share of the Actual Operating Expenses for such period as set forth herein and in such Actual Operating Expense Notice, then such overpayment shall be credited to any of Tenant's subsequent payment obligations to Landlord under this Lease, if any, and if any credit remains unapplied as of the expiration or earlier termination of the Lease Term, then such amounts shall be paid in a lump sum to Tenant by Landlord within thirty (30) days. In the event that Landlord shall not provide Tenant with an Actual Operating Expense Notice within ninety (90) days after the end of the calendar year in question, Tenant shall not be required to continue paying its pro rata share of Operating Expenses (even though Tenant's share shall continue to accrue) until such time as Tenant has received a copy of said Actual Operating Expense Notice, at which time, Tenant shall, within thirty (30) days after receipt of a copy of said Actual Operating Expense Notice, subject to the foregoing, pay to Landlord any accrued, but unpaid amounts of Operating Expenses due and owing from Tenant. Notwithstanding the foregoing, for the last month of the term of this Lease, as the same may be extended, the maximum amount payable by Tenant for Operating Expenses shall be one-twelfth of the maximum amount payable by Tenant for the last month of the last full calendar year of the term of this Lease, as so extended.

8.     <u>Limitations on Common Area Operating Costs</u>. Notwithstanding anything herein to the contrary, Tenant's share of Common Area Operating Costs (estimated and actual) for the period from the Rent Commencement Date through the expiration of the first full calendar year thereafter (the "Base Year") shall not exceed the sum of $1,583.00 per month. For the first full calendar year following the Base Year, Tenant's share of Common Area Operating Costs (estimated and actual) shall not exceed an amount equal to the product of: (a) 12 times the average monthly Common Area Operating Costs payable by Tenant during the Base Year, multiplied by (b) 105%; thereafter, during each subsequent calendar year of the entire term of this Lease, including any extensions of the term of this Lease, the Common Area Operating Costs payable by Tenant (estimated and actual) shall not exceed 105% of the amount payable by Tenant with respect to the immediate prior calendar year, provided, however, that said five percent (5%) annual cap on Tenant's share of Common Area Operating Costs shall be compounded annually. For example, if Common Area Operating Costs increase by 3% during the first full calendar year following the Base Year, then Tenant's share of Common Area Operating Costs shall not exceed an amount equal to the product of: (a) 12 times the average monthly Common Area Operating Costs payable by Tenant during the Base Year, multiplied by (b) 103%. However, if Common Area Operating Costs increase by 8% during the second full calendar year following the Base Year, then Tenant's share of Common Area Operating Costs shall not exceed an amount equal to the product of: (a) 12 times the average monthly Common Area Operating Costs payable by Tenant during the first full calendar year following the Base Year, multiplied by (b) 107%. That is, the unused 2% during the first full calendar year following the Base Year may be carried forward and utilized to increase the 5% cap in a future calendar year. This limitation on Common Area Operating Costs shall exclude that portion of Common Area Operating Costs consisting of charges for utilities.

9.     <u>Audit and Cut Off on Operating Expenses Claims</u>. Landlord shall maintain at its headquarters in Houston, Texas, commercially reasonable and detailed records concerning all components of Operating Expenses for at least twenty four (24) months following the completion of each calendar year. Tenant shall have the right to audit such records, provided that such audit may not be conducted (i) during the months of January through April of any calendar year, or (ii) by a person or entity who is being compensated on a contingency fee basis. If any such audit reveals an overpayment of Operating Expenses by Tenant, Landlord shall promptly refund said overpayment to Tenant. In addition, if any such audit reveals errors in Landlord's favor exceeding three percent (3%), then Landlord shall also reimburse Tenant for the cost of the audit. If Landlord fails to bill Tenant for any amount included within Operating Expenses within 18 months after the cost or charge with respect to such amount was paid or incurred by Landlord, then Tenant

notwithstanding any other provision of this Lease shall have no obligation to pay its share or any portion of such component of Operating Expenses.

10.   Assignment and Subletting. Without the prior consent of Landlord: (a) so long as Tenant's parent corporation is a publicly traded company, Tenant may assign its interest in this Lease, or any portion thereof, or sublet the Premises, or any portion thereof, to its parent corporation, or to any entity owned or controlled, in whole or in part, by its parent corporation, by Tenant or by any entity owned directly or indirectly by its parent corporation; and (b) Tenant may assign or sublease its interest in the Lease or the Premises, or any portion thereof, to any regional or national retailer with 25 or more stores in operation as of the date of such assignment or subletting. Any assignment or subletting shall: (y) not conflict with the primary use of any then existing tenant in the Shopping Center who occupies at least 15,000 square feet of floor area, and (z) be subject to: (i) the use clause set forth in Section 6.01 of the Lease; (ii) compliance with law; (iii) and all of the other provisions of this Lease including, without limitation, the provisions of this paragraph pertaining to future agreements between Landlord and other parties pertaining to the "exclusive" use of portions of the Shopping Center for particular uses ("Permitted Assignments"). Notwithstanding the foregoing, in no event shall Tenant be permitted to use a series of one or more Permitted Assignments to "spin-off" this Lease to independent third parties. As an example of the foregoing, Tenant shall not assign this Lease to an affiliate corporation whose assets consist solely of this Lease and the rights granted herein and thereafter sell the stock of such affiliate corporation to an independent third party. The result of what would otherwise be two; independent Permitted Assignments would become a transfer of this Lease to an independent third party. Any such transfer is prohibited by the terms of this Paragraph 10. All other assignments and subleases of the Lease or Premises or any portion thereof shall be subject to Landlord's prior written consent which will not unreasonably be withheld or delayed.

Notwithstanding that the prior express written permission to any of the aforesaid transactions may have been obtained, or in the event of a Permitted Assignment, the following shall apply: (1) in the event of an assignment, contemporaneously with the granting of Landlord's aforesaid consent, or prior to the effective date of a Permitted Assignment, (1) Tenant shall cause the assignee to expressly assume in writing and agree to perform all of the covenants, duties, and obligations of Tenant hereunder, and such assignee shall be jointly and severally liable therefor along with Tenant and Guarantor; (2) a signed counterpart of all such instruments relative thereto executed by all parties to such transaction (with the exception of Landlord) shall be submitted by Tenant to Landlord within ten (10) days of execution of the same (it being understood that no such instrument other than evidence of a Permitted Assignment shall be effective without the written consent of Landlord); and (3) in any case where Landlord consents to an assignment or subletting or in the event of a Permitted Assignment, the undersigned Tenant and the Guarantor will nevertheless remain directly and primarily liable for the performance of all of the covenants, duties, and obligations of Tenant hereunder (including, without limitation, the obligation to pay all rent and other sums herein provided to be paid), and Landlord shall be permitted to enforce the provisions of this instrument against the undersigned Tenant, the Guarantor, and/or any assignee without demand upon or proceeding in any way against any other person.

Landlord has previously granted to the following respective tenants in the Shopping Center the following respective exclusives (and except as so stated Landlord represents and warrants to Tenant that it has not granted, and has no actual knowledge of any claim of, any exclusive right of use of any portion of the Shopping Center by any person): See Exhibit "F" attached hereto and incorporated herein for all purposes. So long as such respective leases have not terminated or expired, Tenant agrees that neither it nor any assignee nor sublessee of its interest under the Lease or in and to the Premises (hereinafter referred to collectively as the "Parties in Interest", and individually as a "Party in Interest") will violate such exclusives. Notwithstanding this paragraph, but subject to the conditions set forth below, Landlord acknowledges and agrees that the conduct by Tenant of its business as a retail general merchandise store under the name 99¢ Only Stores in a manner conducted in substantially all of its 99¢ Only Stores will not constitute a violation of this Lease or a violation of any such exclusive for purposes of Tenant's obligations under this Lease. Landlord's agreement is, in all respects, expressly conditioned on the following: (a) Tenant sales of pet food, pet supplies and/or pet grooming supplies must be within an area that does not exceed five hundred (500) square feet (in the aggregate); and (b) Tenant's sales of sporting goods, licensed sports apparel (e.g., "Houston Texans" ball caps, etc.) and footwear (i) must be within an area that is less than five

6

hundred (500) square feet (in the aggregate) of Tenant's display area (inclusive of allocable aisle space), and (ii) must be less than five percent (5%) of Tenant's gross sales. If Landlord grants any exclusive in the Shopping Center from and after the date of execution and delivery of this Lease, the same shall be binding on Tenant and its assigns or sublessees only if: (a) Tenant is given written notice of the same, detailing the name of the tenant, the portion of the Shopping Center such tenant is intended to occupy, the date of the lease, and the exact language of the lease granting such exclusive, such notice to be given promptly following such grant of such exclusive to such party; (b) the exclusive granted to such third party is for the primary use of such party's premises and not a secondary or incidental use; (c) the party in whose favor such exclusive is granted leases and occupies premises in the Shopping Center which consist of a ground floor area equal in size to not less than sixty-five percent (65%) of the ground floor area of Tenant's Premises leased pursuant to this Lease; and (d) such grant of such exclusive does not: (i) violate any of the Use Restrictions affecting the Shopping Center as described in Section 15 of this Addendum; (ii) purport to grant any exclusive use within the scope of the business operations of 99¢ Only Stores (i.e., the retail sale of general merchandise as its primary use) as the same may exist from time to time, and such grant of any such exclusive use must be made expressly subject to the right of 99¢ Only Stores to operate a general merchandise store within the Premises; or (iii) violate any exclusive use granted to Tenant pursuant to this Lease. Even if all of the foregoing conditions (a) through (d) inclusive are met, and thus the applicable future exclusive applies to Tenant's use of the Premises, nonetheless Tenant will not be in breach of its obligations under this Lease unless Tenant's primary use of the Premises, and not merely an incidental use of the Premises by Tenant, is within the scope of the future exclusive granted by Landlord in favor of a third party and which meets all of said conditions (a) through (d).

11.       Exclusive. So long as Tenant is open and operating its business in the Premises and the primary purpose of such business is a general merchandise retail store, and there has not occurred an "Event of Default" (as defined in Article XVI of the Lease), Landlord agrees that it will not, after the date hereof, directly lease space in the Shopping Center to any other tenant (i) whose primary business will be a general merchandise retail store, or (ii) who uses in its name and signage "99"; 98; "Dollar" (except for any use of the word "Dollar" by a retailer or service provider – e.g. 'Dollar Rent A Car' – the primary business of which is not the sale of general merchandise) or "99¢". This limitation shall not apply to present tenants (or their assignees or sublessees) whose leases may not prohibit such use. Tenant expressly acknowledges and agrees that the term "general merchandise retail store" does not apply to conventional grocery stores, drug stores, or stores such as Big Lots, Ross, Marshall's or T. J. Maxx. If, at any time during the term of the Lease, Tenant should cease operating its business at the Premises [except for temporary cessations of operations for remodeling once every five (5) years, or on account of condemnation or casualty, or by reasons of Force Majeure, as defined in the Lease], then the provisions of this Paragraph 11 limiting Landlord's right to lease space in the Shopping Center for the purpose set forth above shall be immediately rendered null and void. Further, in the event any third party shall commence any anti-trust or restraint of trade action or lawsuit as a result of this agreement, this provision shall be rendered null and void and Tenant shall indemnify and hold Landlord harmless for all costs and expenses incurred, including attorneys' fees, in defending such action.

12.       Options to Extend Term. Tenant shall have the right to extend the term of the Lease, on the terms and provisions set forth in this Lease for three (3) additional periods of five (5) years each (the "Extended Terms") following expiration of the initial term of this Lease by giving written notice of exercise to Landlord at least one hundred eighty (180) days prior to the expiration of the Initial Lease Term, or the then current Extended Term, as the case may be. If, as of the date of Landlord's receipt of any such notice of exercise, Landlord believes that Tenant is in default of the Lease, then: Landlord shall notify Tenant in writing of the existence of such claimed default, specifying in detail the nature of such default, regardless of whether or not Landlord has previously notified Tenant of such claimed default; and unless Tenant within the cure period provided herein for a monetary or a non-monetary default (as the case may be), cures the same (or, where applicable pursuant to this Lease, commences and diligently prosecutes the cure of the same), then Tenant's exercise shall be of no force or effect whatsoever. The Minimum Rent payable during each month of any such Extended Term shall increase from the Minimum Rent payable during the last month of the term of the Lease immediately preceding such Extended Term by an amount equal to: (a) 24,050 square feet, (b) multiplied by $0.50 (one-half dollar) per square foot, (c) divided by twelve (12). For example, the Minimum Rent during the First Extended Term, if any, would be $16,434.17 per month; the Minimum Rent during the Second Extended Term, if any,

7

would be $17,436.25 per month; and the Minimum Rent during the Third Extended Term, if any, would be $18,438.33 per month.

13.        Tax Payment Additional Limitations. The provisions of this paragraph apply to all Tax Payment obligations of Tenant under the Lease, including both Tax Payment obligations with respect to the Premises and Tenant's share of payment obligations pursuant to this Lease with respect to taxes affecting the Common Area. Under no circumstance shall Tenant be required to pay: (a) any amount which is the result of a new assessment district formed in which the Landlord and/or the owner of the Shopping Center voluntarily vote for or consent to the imposition of any levy (including without limitation, any bonded indebtedness) related to the construction or maintenance of facilities related to the development, re-development or capital construction or modification of any portion of the Shopping Center or the surrounding streets, other than a tax or assessment imposed as a result of a general city-wide election in which individual voters participate without reference to the portion of the city in which they reside; (b) income, profits, including gross profits, franchise, gift, estate, inheritance, succession, conveyance, transfer, sales, transaction, excise, capital or other tax assessments upon Landlord or the rent payable under this Lease (except for the Rent Sales Tax defined in the Lease Contract); (c) any property tax applicable to a so called "pad site" or "out parcel" which is separately assessed and paid for by the tenant(s) of said "pad site" or "out parcel", or land/improvements not within the boundaries of the Shopping Center; or (d) any interest, fine or penalty for late payment or nonpayment by Landlord of taxes (unless solely the result of Tenant's non-payment or delinquent payment of the Tax Payment obligations owed by Tenant pursuant to this Lease.

14.        Additional Provisions Regarding Insurance. During the Lease Term, Landlord shall maintain policies of fire and extended coverage insurance covering all buildings and improvements within the Shopping Center, in such amounts as Landlord's mortgagees shall require, or if no mortgagee exists, then in such amounts as are commercially reasonable for a shopping center of the size and quality of the Shopping Center. Such policies shall provide protection against all perils included within the classification of fire, extended coverage, vandalism, malicious mischief, special extended perils (all risk), sprinkler leakage and any other perils which Landlord deems reasonably necessary. Landlord shall not obtain insurance for Tenant's fixtures or equipment or building improvements installed by Tenant on the Premises. Tenant shall not do or permit anything to be done which invalidates any such insurance policies. During the Lease Term, Landlord shall maintain, in full force and effect, general public liability insurance, insuring against liability for injury or death to persons and loss of or damage to property occurring in, on or about the Shopping Center, in an amount equal to not less than $2,000,000.00 per occurrence. Such insurance shall also provide contractual coverage of Landlord's liability to Tenant under the indemnification provisions of this Lease and shall name Tenant as an additional insured. Landlord shall, upon Tenant's request, provide Tenant with a certificate(s) of insurance evidencing all coverage required by this Lease to be maintained by Landlord. All insurance required to be carried by Landlord or Tenant shall be with an insurance carrier admitted to do business in Texas having a Best rating of B+ or better. Landlord and Tenant acknowledge the insurance markets are rapidly changing and that insurance in the form and amounts described in this Lease may not be available in the future. If at any time during the Lease Term, Tenant is unable to maintain the insurance required under the Lease, Tenant shall nevertheless maintain insurance coverage which is customary and commercially reasonable in the insurance industry for Tenant's type of business, as that coverage may change from time to time. Landlord and Tenant each hereby, on behalf of themselves and all present and future insurance carriers, waive any and all rights of recovery against the other, or against the officers, employees, agents or representatives of the other, for loss of or damage to its property or the property of others under its control, if such loss or damage is covered by any insurance policy in force (whether or not described in this Lease) at the time of such loss or damage. Upon obtaining the required policies of insurance, Landlord and Tenant shall give notice to the insurance carriers of this mutual waiver of subrogation.

15.        Use Restrictions. Subject to leases in the Shopping Center which exist as of the date of this Lease, no portion of the Shopping Center may used for any of the following:

(1)    nude (or partially nude) bars, nightclubs or theaters of any kind
(2)    massage parlors
(3)    pornographic book stores,
(4)    escort services,

(5)  bail bonds or pawn shops,

(6)  the sale of used or second hand products of any kind; provided, however, that Landlord may lease space to high-end resale stores that sell "like new" merchandise and are fixtured in a first class manner.

(7)  tattoo parlors,

(8)  pornographic video stores,

(9)  any use of a questionable moral character,

(10)  indoor swap meets,

(11)  any movie theater; gymnasium (except that a health club may be located in the I-45 Area depicted on Exhibit "A"); bowling alley; library; church; auditorium; museum; automobile repair [except that an oil and/or lube and/or tune-up and/or discount tire business may be located on any pad in the Shopping Center but not on Pads 1 and 2 at the same time]; automobile sales; banquet facility; bar (except in connection with a restaurant); disco; nightclub; hotel; manufacturing; warehouse or other industrial use (except incidental to other permitted uses); entertainment facility (such as Chuck E Cheese, Discovery Zone, Tutor Time, or Leaps and Bounds); or trade or vocational school (except that trade or vocational schools may be located in the I-45 Area depicted on Exhibit "A") , or

(12)  any high volume buffet style restaurant; provided, however, that Landlord may lease to (i) one (1) such restaurant whose leased premises does not exceed 3,000 square feet (such as Home Town Buffet) in the area designated as "RED" on Exhibit "A"; and (ii) one or more of such restaurants whose leased premises does not exceed 7,500 square feet each in the area designated as "GREEN" on Exhibit "A".

16.    Alterations, Additions, and Improvements. Tenant's alterations and improvements to the Premises prior to opening the Premises to the public for the conduct of its business are governed by the provisions of the Construction Rider attached to and a part of this Lease. Tenant's subsequent alterations, additions and improvements are governed by the provisions of Section 10.01 of the Lease and this Addendum. All such alterations, additions, and improvements shall be done in a good and workmanlike manner, in conformity with all applicable laws and regulations.

Both with respect to any work performed by or at Tenant's direction in or about the Premises prior to Tenant opening the same to the public for business, and with respect to any subsequent alterations, additions or improvements made by Tenant or at Tenant's direction pursuant to the provisions of this paragraph, Tenant will pay when due all claims for labor and material furnished to the Premises. Tenant will give Landlord at least twenty (20) days' prior written notice of the commencement of any work on the Premises, regardless of whether Landlord's consent to such work is required. Landlord may elect to record and post notices of non-responsibility on the Premises.

17.    Additional Provisions Regarding Damage and Destruction. If the Shopping Center is totally destroyed, or more than 35% of the buildings in the Shopping Center are destroyed, whether or not insured against and whether or not the Premises are partially or totally destroyed, Tenant may elect to terminate this Lease by giving Landlord notice thereof within thirty (30) days following the date of such casualty, in which event this Lease shall cease and terminate as of the date of such casualty.

18.    Hazardous Materials.

(a)    As used in this Lease, the term "Hazardous Material" means any flammable items, explosives, radioactive materials, and any other substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "toxic substances" or similar term now or subsequently regulated under any applicable federal, state or local laws or regulations including, without limitation, petroleum-based products, paints, solvents,

9

lead, cyanide, DDT, printing inks, acids, pesticides, ammonia compounds and other chemical products, asbestos, PCBs, and similar compounds, and any other products and materials which are subsequently found to have adverse effects on the environment or the health and safety of persons.

(b)     Except as otherwise provided herein, Tenant shall not cause or permit any Hazardous Material to be generated, produced, brought upon, used, stored, treated or disposed of in or about the Premises, the Shopping Center or the property on which the Shopping Center is located by Tenant, its agents, employees, contractors, sublessees or invitees without the prior written consent of Landlord, which shall not be unreasonably withheld.  In addition, Tenant shall not cause or permit an underground storage tank to be installed under the Premises or the Shopping Center without the prior written consent of Landlord, which consent shall be in Landlord's sole and absolute discretion.  Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to store, use and dispose of, in the Premises, such Hazardous Materials which are incidental and customary to the operation of Tenant's business, or which Tenant sells as a matter of course at other 99¢ Only Stores, provided that Tenant shall comply with all applicable laws, rules and regulations in the storage, use and disposal of such Hazardous Materials.  Tenant shall indemnify and hold Landlord, its agents and employees, harmless from any and all costs, liabilities, claims, expenses, penalties, and damages of any kind including, but not limited to, attorneys' fees and the cost of any investigation, remediation, restoration, cleanup and/or abatement which is necessary as a result of Tenant's violation of this Section.

(c)     Landlord represents and warrants that, Landlord has not caused or permitted, and shall not cause or permit, any Hazardous Materials to be brought onto the Premises or the Shopping Center in violation of Law except as used by tenants in the ordinary course of their business and in compliance with all applicable laws for doing so.  Landlord shall indemnify and hold Tenant and Tenant's agents and employees harmless from any and all costs, liabilities, claims, expenses, penalties, and damages of any kind including, but not limited to, attorneys' fees and the cost of any investigation, remediation, restoration, cleanup and/or abatement which is necessary as a result of Landlord's violation of this Section. In addition, Landlord (i) shall be responsible (at no cost to Tenant) for the abatement of any Hazardous Materials from the Shopping Center for which Tenant is not responsible, including, without limitation, any migration of Hazardous Materials onto, upon or under the Premises which is not caused by Tenant; and (ii) shall indemnify and hold Tenant and Tenant's agents and employees harmless from any damage to Tenant's property and all other out of pocket expenses or claims by third parties, arising out of the existence of such Hazardous Materials.  In the event that Tenant closes its business in the Premises as a result of the existence of Hazardous Materials in the Premises or the work associated therewith, then, provided that the existence thereof is not caused by Tenant, then Tenant shall not be required to pay Minimum Rent or Tenant's share of Additional Rent until such abatement is complete.

(d)     The obligations under this paragraph shall survive the expiration or earlier termination of this LEASE.

19.     <u>Representations and Warranties and Survival</u>.  Landlord represents and warrants to Tenant: (a) it owns fee title to the Shopping Center; (b) upon execution and delivery of this Lease, the same will be binding on Landlord in accordance with its terms; (c) Landlord has no knowledge of: (i) any written notice from any governmental agency that the Premises are in violation of any law, regulation or code; and (ii) any claim in writing or oral from any governmental agency that the Premises or the Shopping Center are subject to any existing environmental condition or are contaminated by any "hazardous substance" in violation of any applicable state, federal or local law or regulation. Tenant represents and warrants to Landlord that upon execution of this Lease the same will be binding on Tenant in accordance with its terms. The foregoing and all other express representations and warranties of LANDLORD and TENANT set forth in this Lease shall survive the termination of this LEASE.

20.     <u>Confidentiality</u>.  The parties hereto shall keep this LEASE and all documents delivered pursuant to this LEASE strictly confidential, except as deemed reasonably necessary for bona fide lenders, prospective purchasers, governmental entities, accountants, legal advisers, etc. Landlord shall have the right to disclose Tenant's use clause, its exclusive use clause, and its Shopping Center use restrictions to prospective tenants in the Shopping Center.

21.       Brokers.  Each of the parties represents and warrants to the other that it has dealt with no broker in connection with this LEASE, and, insofar as it knows, no broker or other person is entitled to any commission or fee in connection with this LEASE, except that Tenant has dealt with MRH Retail, Inc. d/b/a Moody Rambin Interests (Ed James), whose brokerage commission, in accordance with a separate written agreement between Landlord and said broker, will be paid by Landlord.  Except for the brokerage arrangement expressly described in this paragraph (with respect to which Tenant will have no responsibility) each of the parties hereby indemnifies the other against any commission or fee such indemnifying party may have incurred in connection with this LEASE.

22.       Binding Arbitration; Waiver of Attorneys Fees.  The parties agree that all disputes arising out of or in connection with this Lease will be determined exclusively by binding arbitration, except for disputes involving the monthly payment of Minimum Rent and all Additional Rent due under this Lease (but not year-end adjustments of Operating Expenses). Any such arbitration shall be conducted before the closest office of Judicial Arbitration and Mediation Services ("JAMS") to the Premises as of the date such arbitration is brought. If JAMS is not in existence as of the date such dispute is brought, then the parties shall arbitrate the matter before the closest office of the American Arbitration Association. The arbitration shall be conducted in accordance with the rules (including rules pertaining to procedure and discovery) maintained by the arbitrator as of the commencement of such arbitration. The parties intend that to the maximum extent permitted under the law that such arbitration shall be the final and binding resolution of all matters brought before the arbitrator. EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS PARAGRAPH 22, THE PARTIES EXPRESSLY WAIVE THE RIGHT TO A JURY TRIAL TO THE MAXIMUM EXTENT PERMITTED UNDER THE LAW. The arbitrator may award such costs of enforcement, including arbitration fees and attorneys fees, as the arbitrator determines to be just and reasonable, to the prevailing party in such dispute. At the inception of the dispute each party shall deposit one-half of any required initial deposit required by the arbitrator with the arbitrator.

Landlord Initials: _____   Tenant Initials: _____

23.       Additional Provisions Regarding Signs.  Tenant will have the right to place a two-sided panel on two (2) of Landlord's existing pylon sign structures in the locations depicted on Exhibits "E-2" and "E-3" attached hereto and hereby incorporated herein. Landlord hereby approves (i) Tenant's fascia sign as shown on Exhibit "E-1", and (ii) the design of Tenant's pylon sign panels as shown on Exhibits "E-2" and "E-3", which exhibits are attached hereto and hereby incorporated herein, subject only to Tenant obtaining all necessary governmental permits. Landlord will assist Tenant (but without cost to Landlord) in Tenant's effort to obtain any required approvals from governmental agencies in connection with the signs set forth on Exhibits "E-1", "E-2" and "E-3". Tenant may periodically install banners (grand opening, etc.), pennants and other signage customarily used in connection with the operation of Tenant's stores, but if any such banner, pennant or other signage is to remain in place for longer than seven (7) consecutive days once in every quarter, then such signage shall be subject to Landlord's prior written consent. Between execution of this Lease and delivery of possession of the Premises to Tenant, Tenant may place temporary banners and/or signs on the Premises advertising that Tenant's business is 'coming soon' to that location. Any such sign may be in the proportion of the fascia sign shown on Exhibit "E-1" attached hereto. If Landlord erects any additional signs in the Common Area, Tenant shall have the right to use a portion of such additional signs (at its expense), such proportion (and the location of Tenant's panel on such additional sign(s)) to be proportional to the square footage of the Premises to the square footage of all other tenants in the Shopping Center using such new sign(s).]

24.       Additional Miscellaneous Provisions.  Neither party shall record this Lease. However, concurrent with the execution of this Lease, Landlord and Tenant shall execute a "Short Form" memorandum (mutually agreeable in form and content to both Landlord and Tenant) of this Lease which Tenant, at its expense, may then cause to be recorded in the Official Records of Montgomery County, Texas. This Lease may be executed in counterparts and, when all counterpart documents are executed, the counterparts shall constitute a single binding instrument.

25.       Construction Rider.  The Construction Rider attached to this Lease is a material element of the Lease.

In Witness Whereof, the parties have initialed this Addendum to Lease to confirm it is a part of the Lease executed as of the day and year first set forth in the Lease.

Landlord: _____    Tenant: _____

TBD, Conroe, Texas 77304

*MARCH 16, 2004*                **GUARANTY OF LEASE**

The undersigned, 99¢ ONLY STORES, a California corporation (the *"Parent Corporation"*), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby irrevocably and unconditionally guarantees for the benefit of **WEINGARTEN REALTY INVESTORS** (*"Landlord"*) each and all of the obligations of 99 Cents Only Stores Texas, Inc., a Delaware corporation (the *"Subsidiary Corporation"*) as tenant under that certain lease dated for reference purposes as of *MARCH 16*, 2004 by and between Landlord and Subsidiary Corporation, as tenant, with respect to certain premises located in the **Montgomery Plaza Shopping Center, TBD, Conroe, Texas 77304**, more fully described in **Exhibit "A"** attached hereto and hereby incorporated herein (the *"Lease"*).

1.    The obligations guaranteed by Parent Corporation shall include, without limitation, (a) the payment of all rent and other sums due and payable by the tenant under the Lease, and any extensions, renewals or modifications thereof, as and when the same become due, and (b) the performance by the tenant under the Lease, and any extensions, renewals or modifications thereof, off all of the covenants, terms and conditions of the Lease. This is a guaranty of payment and performance and not merely of collection.

2.    The obligations of Parent Corporation hereunder are independent of, and may exceed, the obligations of the Subsidiary Corporation. A separate action or actions may, at Landlord's option, be brought and prosecuted against Parent Corporation, whether or not any action is first or subsequently brought against the Subsidiary Corporation, or whether or not the Subsidiary Corporation is joined in any such action, and Parent Corporation may be joined in any action or proceeding commenced by Landlord against The Subsidiary Corporation arising out of, in connection with or based upon the Lease.

3.    Parent Corporation authorizes Landlord, without notice to or demand of Parent Corporation, and without affecting Parent Corporation's liability hereunder, from time to time to (a) consent to any extensions, accelerations or other changes in the time for any payment provided for in the Lease, consent to any other alteration of any covenant, term or condition of the Lease in any respect, or consent to any assignment, subletting or reassignment of the Lease; (b) take and hold security for any payment provided for in the Lease or for the performance of any covenant, term or condition of the Lease, or exchange, waive or release any such security; and (c) apply such security and direct the order or manner of sale thereof as Landlord in its discretion may determine. Notwithstanding any termination, renewal, extension or holding over of the Lease, this Guaranty shall continue until all of the covenants and obligations on the part of the Subsidiary Corporation performed have been fully and completely performed by the Subsidiary Corporation and Parent Corporation shall not be released of any obligation or liability hereunder so long as there is any claim against the Subsidiary Corporation arising out of the Lease that has not been settled or discharged in full.

4.    Parent Corporation waives any and all defenses to its obligations under this Guaranty, including without limitation, any right to (a) require Landlord to proceed against the Subsidiary Corporation or any other person or entity or pursue any other remedy in Landlord's power whatsoever; (b) complain of delay in the enforcement of Landlord's rights under the Lease; (c) require Landlord to proceed against or exhaust any security held from the Subsidiary Corporation or Parent Corporation, or (d) require Landlord to pursue any other remedy in Landlord's power that Parent Corporation cannot itself pursue and that would lighten its burden. Until the obligations of the Subsidiary Corporation under the Lease have been fully satisfied, Parent Corporation shall have no right of subrogation and waives any right to proceed against the Subsidiary Corporation for reimbursement, as well as any right to enforce any remedy which Landlord now has or may hereafter have against the Subsidiary Corporation and waives any benefit of, and any right to participate in any security now or hereafter held by Landlord. If any amount is paid to Parent Corporation on account of subrogation of its rights at a time when the Subsidiary Corporation's obligations under the Lease have not been paid in full, such amount shall be held in trust for Landlord. Parent Corporation waives any defense arising by reason of any disability or other defense of the Subsidiary Corporation or by reason of the cessation from any cause whatsoever of the liability of the Subsidiary Corporation. Parent Corporation waives all demands upon and notices to the Subsidiary Corporation and to Parent Corporation, including, without limitation, demands for performance, notices and nonperformance, notices of nonpayment and notices of acceptance of this Guaranty.

5.    The liability of Parent Corporation hereunder shall in no way be affected by, and this Guaranty shall remain in full force and effect notwithstanding, (a) the appointment of a receiver to

TBD, Conroe, Texas 77304

take possession of all or substantially all of the assets of the Subsidiary Corporation, or any assignment by the Subsidiary Corporation for the benefit of creditors, or any action taken or suffered by the Subsidiary Corporation under any insolvency, bankruptcy, reorganization, moratorium or other debtor relief act or statute, whether now existing or hereafter amended or enacted, or the disaffirmance of the Lease in any such action or otherwise, (b) the assignment or transfer of the Lease by the Subsidiary Corporation unless the Subsidiary Corporation is expressly released by Landlord from liability under the Lease, or (c) the cessation of the liability of the Subsidiary Corporation from any cause whatsoever other than by agreement of Landlord.

6.     The liability of Parent Corporation under this Guaranty shall continue until the expiration of all periods within which any amount at any time paid on account of the obligations guaranteed hereby may be required to be restored or returned by Landlord upon the bankruptcy, insolvency or reorganization of the Subsidiary Corporation, any other Parent Corporation or any other person.  If any amount at any time paid on account of the obligations guaranteed hereby is required to be restored or returned by Landlord as a result of any such bankruptcy, insolvency or reorganization, Parent Corporation shall be liable under this Guaranty with respect to such amount as if such amount was never paid.

7.     If at any time Landlord makes demand under this Guaranty, it shall send written notice of such demand, including particulars of the nature of the claim and the amount claimed to be due, to Parent Corporation at 4000 Union Pacific Avenue, City of Commerce, California 90023, Attention:  Real Estate Department, or such other address as Parent Corporation may notify Landlord, or it successor as landlord under the Lease, at the notice address specified in the Lease, from time to time.  Any notice to Parent Corporation shall be delivered either in person, by expedited courier, or by pre-paid certified or regular United States Mail with return receipt required.

8.     Neither this Guaranty nor either any rights of Landlord may be assigned in whole or in part to any person whatsoever other than: (a) the successor in interest as to both privity of estate and privity of contract to Landlord under the Lease; and/or (b) as collateral security, to any mortgagee of record of the real property described in **Exhibit "A"**, or any portion thereof if and only if said real property is owned by the landlord under the Lease; provided however, in either or both such instances that concurrent with any such assignment of any interest under this Guaranty the assignor shall notify the Parent Corporation in writing at the notice address specified in this Guaranty, or at such subsequent address as may be specified in accordance with the provisions of this Guaranty: (i) of the name and address of any such assignee; (ii) the interest assigned and the date of such assignment; and (iii) whether the assignee is a lender.  In no event shall Parent Corporation have the right to assign its obligations under this Guaranty.

9.     This Guaranty shall be governed and controlled by the laws of the State of California.

10.    Any claim, action, lawsuit, dispute or other proceeding commenced against Parent Corporation and/or arising out of or in relation to this Guaranty shall be commenced, and shall be prosecuted and maintained, if at all, as a reference proceeding pursuant to Section 638 of the California Code of Civil Procedure in the Superior Court in and for the County of Los Angeles, California. Any such action shall be referred to the closest office to the court in which such action is filed of Judicial Arbitration and Mediation Services, Inc. ("JAMS") or, if JAMS is no longer conducting reference proceedings in the State of California, then before the American Arbitration Association.  In either event, the arbitration conducted by JAMS or the American Arbitration Association pursuant to the reference proceeding shall be a mandatory, final and binding arbitration. The applicable rules of evidence, discovery and procedures then maintained by JAMS (or the American Arbitration Association if JAMS no longer conducts reference proceeding arbitrations in the State of California) for commercial disputes shall apply to any proceeding involving this Guaranty. The payment of fees, and the awarding of attorneys fees and costs of enforcement, shall also be determined by the then applicable rules of JAMS (or the American Arbitration Association if JAMS is then no longer conducting reference proceeding arbitrations in the State of California).

By entering into this Guaranty, the parties also recognize and agree that the mandatory, binding arbitration shall be before a single arbitrator, without a jury and without any right to trial by jury, and thus, by entering into this Guaranty, the parties are waiving the right to a jury trial for all matters that must be arbitrated under this Guaranty.  Each party acknowledges IT IS GIVING UP THE RIGHT TO A JURY TRIAL and further acknowledges that it has had the opportunity to consult with an attorney of its own selection prior to signing this Guaranty.

11.    In the event of any legal or equitable proceeding to enforce any of the terms or conditions of this Guaranty, or any alleged disputes, breaches, defaults or misrepresentations in

TBD, Conroe, Texas  77304

connection with any provision of this Guaranty, the prevailing party in such proceeding shall be entitled to recover its reasonable costs and expenses, including, without limitation, reasonable attorneys' fees and costs of defense paid or incurred in good faith.

12.    If any of the provisions of this Guaranty shall contravene or be held invalid under the laws of any jurisdiction, this Guaranty shall be construed as if not containing those provisions, and the rights and obligations of the parties hereto shall be construed and enforced accordingly.

13.    This Guaranty includes and sets forth the entire agreement between Parent Corporation and Landlord with respect to the subject matter of this Guaranty. This Guaranty may only be modified by a writing executed by Parent Corporation. It may not be modified by the Subsidiary Corporation.

In Witness Whereof, this Guaranty has been executed as of the day and year first set forth above.

"Parent Corporation"
99¢ Only Stores,
a California corporation

By: _____
         Jeff Gold, Its Senior Vice President

Each and all of the terms, covenants and conditions of the foregoing Guaranty are hereby accepted and agreed to including, without limitation, the provisions pertaining to mandatory and binding arbitration and waiver of jury trial set forth in the Guaranty. This Guaranty fully satisfies any obligation of the Subsidiary Corporation to provide a guaranty to Landlord under the Lease.

"Landlord"

**WEINGARTEN REALTY INVESTORS**

By: _____
         Sr. Vice President

## EXHIBIT "A"

## LEGAL DESCRIPTION

Being a 20.906 acre (910,649 square foot) tract of land in the W.S. Allen Survey, Abstract No. 2, Conroe, Montgomery County, Texas, and being the remainder of Unrestricted Reserve "A", all of Unrestricted Reserves "C" and "D" of a plat of Montgomery Park Subdivision as recorded in Cabinet C, Sheet 152-B of the Montgomery County Map Records and said 20.906 acre tract being more particularly described by metes and bounds as follows with all bearings based on said plat:

BEGINNING at a 3/4 inch iron pipe found marking the northeast corner of said Unrestricted Reserve "A", the southeast corner of a called 19.596 acre tract of land conveyed to Conroe Church of Christ, Inc. as recorded in Montgomery County Clerk's File Number 8911900, and being on the west right-of-way line of Interstate Highway 45, variable width, and being the northeast corner of the herein described tract;

THENCE South 22 degrees 46 minutes 31 seconds East, along the west right-of-way line of said Interstate Highway 45, a distance of 39.72 feet to a point marking an angle point in the herein described, from which a found "X" in concrete bears North 50 degrees 07 minutes East, 0.19 feet;

THENCE South 18 degrees 33 minutes 07 seconds East, continuing along the west right-of-way line of said Interstate Highway 45, a distance of 700.00 feet to a 3/4 inch iron pipe found marking an angle point in the herein described tract;

THENCE South 14 degrees 50 minutes 50 seconds East, continuing along the west right-of-way line of said Interstate Highway 45, a distance of 201.00 feet to a 5/8 inch iron rod with cap set marking an angle point in the herein described tract;

THENCE South 11 degrees 28 minutes 44 seconds West (Called South 11 degrees 30 minutes 15 seconds West), continuing along the west right-of-way line or said Interstate Highway 45, a distance of 467.08 feet (Called 466.84 feet), to a 5/8 inch iron rod found marking the southeast corner of the herein described tract and being on the north right-of-way line of State Highway Loop 336, variable width;

THENCE South 70 degrees 54 minutes 09 seconds West, along the north right-of-way line of said State Highway Loop 336, a distance of 194.12 feet to a point marking an angle point in the herein described tract, from which a found "X" in concrete bears South 41 degrees 08 minutes East, 0.25 feet;

THENCE South 66 degrees 21 minutes 53 seconds West, continuing along the north right-of-way line of said State Highway Loop 336, a distance of 118.55 feet to a 5/8 inch iron rod found marking an angle point in the herein described tract;

THENCE South 72 degrees 23 minutes 55 seconds West, continuing along the north right-of-way line of said State Highway Loop 336, a distance of 260.10 feet to a 3/4 inch iron pipe found marking the southwest corner of the herein described tract and being the southeast corner of a tract of land conveyed to Wal-Mart Stores, Inc. as recorded in Montgomery County Clerk's File Number 9115394;

THENCE North 16 degrees 08 minutes 59 seconds West, along the east line of said Wal-Mart Stores, Inc. tract, a distance of 30.70 feet to a point marking an angle point in the herein described tract, from which a found concrete nail bears North 29 degrees 40 minutes West, 0.31 feet;

THENCE South 73 degrees 51 minutes 01 seconds West, continuing along the east line of said Wal-Mart Stores, Inc. tract, a distance of 8.50 feet to an "X" in concrete found marking an angle point in the herein described tract;

THENCE North 16 degrees 09 minutes 38 seconds West (called North 16 degrees 08 minutes 59 seconds West), continuing along the east line of said Wal-Mart Stores, Inc. tract, a distance of 326.78 feet (called 326.45 feet), to a point marking an angle point in the herein described tract, from which a found 3/4 inch iron pipe bears South 01 degrees 57 minutes East, 0.15 feet;

THENCE North 73 degrees 41 minutes 06 seconds East, continuing along the east line of said Wal-Mart Stores, Inc. tract, a distance of 8.43 feet to a point in the herein described tract, from which a found 60d nail bears South 20 degrees 24 minutes East, 0.17 feet;

THENCE North 16 degrees 19 minutes 28 seconds West, continuing along the eastline of said Wal-Mart Stores, Inc. tract, a distance of 120.96 feet to a point marking an angle point in the herein described tract, from which a found "X" in concrete bears North 14 degrees 17 minutes East, 0.17 feet;

THENCE North 73 degrees 40 minutes 32 seconds East, continuing along the east line of said Wal-Mart Stores, Inc. tract, a distance of 11.20 feet to a point marking an angle point in the herein described tract, from which a found "X" in concrete bears North 06 degrees 11 minutes West, 0.13 feet;

THENCE North 16 degrees 19 minutes 28 seconds West, continuing along the east line of said Wal-Mart Stores, Inc. tract, a distance of 22.00 feet to a point marking an angle point in the herein described tract, from which a found "X" in concrete bears North 03 degrees 17 seconds West, 0.12 feet;

THENCE South 73 degrees 40 minutes 32 seconds West, continuing along the eastline of said Wal-Mart Stores, Inc. tract, a distance of 11.20 feet to an "X" in concrete found marking an angle point in the herein described tract;

THENCE North 16 degrees 19 minutes 28 seconds West, continuing along the eastline of said Wal-Mart Stores, Inc. tract, a distance of 102.50 feet to a 3/4 inch iron pipe found marking an angle point in the herein described tract and being the northeast corner of said Wal-Mart Stores, Inc. tract and being on the south line of Unrestricted Reserve "E" of Montgomery Park Subdivision as recorded in Cabinet D, Sheet 126-B of the Montgomery County Map Records;

THENCE North 73 degrees 41 minutes 06 seconds East, along the south line of said Unrestricted Reserve "E", a distance of 0.20 feet to a 3/4 inch iron pipe found marking an angle point in the herein described tract and being the southeast corner of said Unrestricted Reserve "E";

THENCE North 28 degrees 41 minutes 06 seconds East, along the east line of said Unrestricted Reserve "E", a distance of 169.71 feet to an "X" in concrete found marking an angle point in the herein described tract;

THENCE North 16 degrees 18 minutes 54 seconds West, continuing along the east line of said Unrestricted Reserve "E", a distance of 258.43 feet to a 3/4 inch iron pipe found marking an angle point in the herein described tract;

THENCE North 28 degrees 41 minutes 06 seconds East, continuing along the east line of said Unrestricted Reserve "E", a distance of 113.14 feet to an "X" in concrete found marking an angle point in the herein described tract;

THENCE North 16 degrees 18 minutes 54 seconds West, continuing along the east line of said Unrestricted Reserve "E", a distance of 260.41 feet to a 5/8 inch iron rod with cap set marking an angle point in the herein described tract;

THENCE North 28 degrees 41 minutes 06 seconds East, continuing along the east line of said Unrestricted Reserve "E", a distance of 87.13 feet to a 5/8 inch iron rod with cap set marking the northwest corner of the herein described tract and being on the south line of said Conroe Church of Christ tract;

THENCE North 73 degrees 41 minutes 06 seconds East, along the south line of said Conroe Church of Christ tract, a distance of 500.00 feet to the POINT OF BEGINNING and containing 20.906 acres (910,649 square feet) of land.

AND

TRACT ONE:

5.436 acres of land out of the W.S.. Allen Survey, Abstract 2, and being a part of Reserve "A", Montgomery Park Subdivision, as shown on plat thereof recorded in Cabinet C, Sheet 152 B, Plat Records of Montgomery County, the subject 5.436 acres being more particularly described by metes and bounds as follows:

BEGINNING at a 3/4-inch galvanized iron pipe set for corner on the Northerly right-of-way line of State Highway Loop 336, being the Southeasterly corner of Reserve "B" of said Montgomery Park Subdivision;

THENCE, N 16° 18' 54" W, with the Easterly line of Reserve "B", a distance of 150.40 feet to a 3/4-inch galvanized iron pipe set for the Northeasterly corner of said Reserve "B";

THENCE, S 73° 41' 06" W, with the Northeasterly line of Reserve "B", a distance of 150.00 feet to a 3/4 inch galvanized iron pipe set for the Northwesterly corner of Reserve "B", and being the most Westerly Southwest corner of Reserve "A";

THENCE, N 16° 18' 54" W, with the Westerly line of Reserve "A", a distance of 451.98 feet to a 3/4-inch galvanized iron pipe set for the Northwesterly corner of Reserve "A";

THENCE, N 73° 41' 06" E, with the Northerly line of Reserve "A", a distance of 434.80 feet to a 3/4-inch galvanized iron pipe set for corner;

THENCE, S 16° 19' 28" E, a distance of 102.50 feet to an "X" set in concrete for corner;

THENCE, N 73° 40' 32" E, a distance of 11.20 feet to an "X" set in concrete for corner;

THENCE, S 16° 19" 28" E, a distance of 22.00 feet to an "X" set in concrete for corner;

THENCE, S 73° 40' 32" W, a distance of 11.20 feet to an "X" set in concrete for corner;

THENCE, S 16° 19' 28" E, a distance of 120.96 feet to a 60d nail set for corner;

THENCE, S 73° 41' 06" W, a distance of 8.43 feet to a 3/4-inch galvanized iron pipe set for corner;

THENCE, S 16° 08' 59" E, a distance of 326.45 feet to an "X" set in concrete for corner;

THENCE, N 73° 51' 01" E, a distance of 8.50 feet to an "X" set in concrete for corner;

THENCE, S 16° 08' 59" E, a distance of 30.70 feet to a 3/4-inch galvanized iron pipe set for corner on the Northerly right-of-way line of State Highway Loop 336;

THENCE, S 72° 17' 40" W, with the Northerly line of State Highway Loop 336, a distance of 21.57 feet to a 3/4-inch galvanized iron pipe set for corner;

THENCE, S 73° 51' 10" W, with the Northerly line of State Highway Loop 336, a distance of 262.32 feet to the POINT OF BEGINNING and containing 5.436 acres of land.

AND

TRACT 2:

0.197 acre of land out of the W.S. Allen Survey, Abstract 2, and being a part of that certain 90.398-acre tract described in Deed Records of Montgomery County, Texas, in Volume 1115, Page 211, said 0.197-acre tract being more particularly described by metes and bounds as follows:

COMMENCING at a 3/4-inch galvanized iron pipe set for corner on the Northerly right-of-way line of State Highway Loop 336, and being the Southeasterly corner of Reserve "B", Montgomery Park Subdivision, as shown on plat thereof recorded in Cabinet C, Sheet 152 B, Plat Records of Montgomery County, Texas;

THENCE, N 16° 18' 54", with the Easterly line of Reserve "B", a distance of 150.40 feet to a 3/4-inch galvanized iron pipe set for the Northeasterly corner of Reserve "B";

THENCE, S 73° 41' 06" W, with the Northerly line of Reserve "B", a distance of 150.00 feet to a 3/4-inch galvanized iron pipe set for the true POINT OF BEGINNING for the herein described tract;

THENCE, S 73° 41' 06" W, a distance of 0.43 feet to a point for corner in a curve, from which the center of curvature bears N 72° 16' 07" E, 300.00 feet;

THENCE, in a Northwesterly direction along a curve to the right having a central angle of 00° 12' 00", a radius of 300.00 feet, an arc length of 1.05 feet to a point of reverse curve;

THENCE, in a Northwesterly direction along a curve to the left having a central angle of 05° 30' 03", a radius of 2,000.00 feet, an arc length of 192.02 feet to a point of tangency;

THENCE, N 23° 01' 56" W, a distance of 261.25 feet to a point for corner;

THENCE, N 73° 41' 06" E, a distance of 44.29 feet to a 3/4-inch galvanized iron pipe set for the most Westerly Northwest corner of Reserve "A", Montgomery Park Subdivision;

THENCE, S 16° 18' 54" E, with the Westerly line of Reserve "A", a distance of 451.98 feet to the POINT OF BEGINNING and containing 0.197 acre of land

AND

Being 0.516 acre of land in the W.S. Allen Survey, A-2, Montgomery County, Texas and being all of Unrestricted Reserve "B", Montgomery Park Subdivision, a subdivision, map of which is recorded in Cabinet C, Sheet 152-B and 153A, Montgomery County Map Records, said 0.516 acre being described more particularly as follows:

BEGINNING at a ½" iron rod found in the North Right of Way line of State Highway Loop 336, for the Southeast corner of the herein described tract, the Southwest corner of the Weingarten Realty Investors called Tract 1, 5.436 acres as described in instrument recorded under County Clerk's File Number 9847114, Montgomery County Real Property Records, same being the Southwest corner of Unrestricted Reserve "A", Montgomery Park Subdivision;

THENCE S. 73° 51' 10" W., along the North line of Loop 336, for a distance of 134.12 feet (plat call S. 73° 51' 10" W., 134 feet) to a ½" iron rod found for corner;

THENCE N. 77° 29' 32" W., continuing along the North line of Loop 336, for a distance of 18.18 feet, (plat call N. 78° 04' 14" W., 18.16 feet) to a "X" found scribed in concrete for the Southwest corner of the herein described tract, same being the Southeast corner of Montgomery Park Subdivision, Reserves E, F, G, H-1, H-2, I-1, I-2, & J, a subdivision, map of which is recorded in Cabinet D, Sheet 126-B, Montgomery County Map Records, said "X" being in the East right-of-way line of Westview Blvd. dedicated by plat recorded in Cabinet D, Sheet 126-B, Montgomery County Map Records;

THENCE N. 16° 21' 17" W., along the East Right of Way line of said Westview Blvd. for a distance of 141.23 feet, (plat call N. 16° 18' 54" W., 141.41 feet) to a ½" iron rod set with a cap stamped "Jeff Moon RPLS 4639" for the Northwest corner of the herein described tract, a Lower Northwest corner of said Unrestricted Reserve "A", the Lower Northwest corner of the said 5.436 acre tract, the Southeast corner of the Weingarten Realty Investors called Tract 2, 0.197

acre as described by instrument recorded under County Clerk's File Number 9847114, Montgomery County Real Property Records;

THENCE N. 73° 39' 39" E., along a Lower North line of the 5.436 acre tract, a Lower North line of Unrestricted Reserve "A", for a distance of 150.00 feet (plat call and 5.436 acre call N. 73° 41' 06" E 150.00 feet) to a 60d nail found inside a ¾" iron pipe for the Northeast corner of the herein described tract, an inside corner of Unrestricted Reserve "A", an inside corner of the 5.436 acre tract;

THENCE S. 16° 22' 15" E., along an inside line of Unrestricted Reserve "A", an inside line of the 5.436 acre tract for a distance of 150.45 feet (plat call S. 16° 18' 54" E, 150.39' and 5.436 acre call S. 16° 18' 54" E., 150.40 feet) to the POINT OF BEGINNING and containing in all 0.516 acre of land.

GBP-MAJ
Rev. 11/11/94

CONSTRUCTION RIDER

This Construction Rider is attached to and forms a part of that certain Lease Contract (the "Lease Contract") dated ___*March 16, 2004*___, 2004, between WEINGARTEN REALTY INVESTORS, as "Landlord" and 99 CENTS ONLY STORES TEXAS, INC., as "Tenant".

Section 1.01.    Tenant agrees that it has examined the Leased Premises and accepts the same in their present physical condition on an "AS-IS" basis without any nature of construction work performed by Landlord, except that prior to tendering possession of the Premises to Tenant, Landlord shall (i) build one demising wall (the "Demising Wall"), and (ii) have a site assessment and asbestos survey performed at the Leased Premises. Landlord hereby represents to Tenant that Tenant shall have (i) exclusive use of Tenant's Loading Dock (depicted on Exhibit "A"), and (ii) exclusive use of the existing utility services at the Leased Premises. In the event asbestos is found to be present in the Leased Premises, Landlord shall remediate all asbestos containing materials required by law to be remediated before tendering possession of the Leased Premises to Tenant. Additionally, such acceptance by Tenant includes, but is not limited to, the air conditioning and heating system, light fixtures, and floor covering. Any work, construction or installations desired by Tenant shall be the sole obligation and at the sole cost of Tenant and shall only be made with Landlord's prior written consent. Landlord or its agents have made no representations or promises with respect to the Leased Premises or the buildings of which the Leased Premises form a part except as set forth in the Lease of which this Construction Rider is a part.

Section 1.02.    Tenant may construct improvements at the Leased Premises only upon satisfying the following "conditions precedent": (i) that Landlord and Tenant shall have mutually agreed in writing upon plans and specifications to be utilized by Tenant ("Tenant's Plans"), and (ii) that Tenant has tendered to Landlord: a true copy of a "Building Permit" (meaning all required governmental, regulatory authority and other permits, consents and letters of utility availability) for the work of Tenant and its contractors, and certificates of all insurance required to be obtained by Tenant pursuant to the Lease Contract; provided, however, in the event that the Lease Contract is in full force and effect but Tenant has not provided Landlord with a Building Permit on or before July 1, 2004, Landlord may, in addition to other remedies which may then be available to Landlord, cancel and terminate the Lease Contract by notice to Tenant given at any time thereafter. Upon any such cancellation and termination by Landlord, Landlord and Tenant shall each respectively be released from all further liability under the Lease Contract, irrespective of what costs or expenses either of such parties shall have incurred prior to any such cancellation and termination.    On a best efforts basis, Tenant shall (i) apply for a Building Permit within five (5) business days after Landlord and Tenant have mutually agreed in writing on Tenant's Plans, and (ii) diligently pursue its issuance at the earliest possible time.  If Tenant is unable to obtain a Building Permit within sixty (60) days after Landlord and Tenant have mutually agreed in writing on Tenant's Plans, then Landlord shall have the right to pursue and obtain such Building Permit on Tenant's behalf, at Tenant's expense.

Landlord hereby agrees to review Tenant's plans and specifications and respond with comments, if any, within three (3) business days of receipt thereof.  If Landlord has not approved or responded with comments within said three (3) business day period, then Landlord will be deemed to have approved Tenant's plans and specifications. Landlord hereby represents to Tenant that, other than Landlord and applicable governmental or quasi-governmental entities, no other party (including adjoining property owners) has any right of review or approval of Tenant's plans and specifications.

Section 1.03.    Upon satisfaction of the conditions precedent set forth in Section 1.02, Tenant shall enter the Leased Premises and Tenant will perform such construction work and provide and install such materials as are provided in Tenant's plans and specifications (hereinafter referred to as Exhibit "C", but need not be attached to the Lease Contract) and "D", if any, attached to this Lease Contract (collectively, "Tenant's Work").  Tenant will also provide and install all

other interior work, trade equipment, furniture, fixtures and effects of every description necessary or appropriate for Tenant's business and all such items to be provided and installed by Tenant shall be new and modern and of first-class quality.  Subject to force majeure, in the event Tenant fails to commence construction on or before five (5) business days after the later of:  (i) the date on which Tenant receives its Building Permit, or (ii) the date on which Landlord tenders possession of the Leased Premises to Tenant having first performed all of the work required pursuant to this Construction Rider to be performed by Landlord prior to such tender, then such failure shall constitute a default under the Lease.

Section 1.04.  At all times while Tenant is constructing the improvements at the Leased Premises and installing its trade equipment, furniture and fixtures, Tenant shall not interfere with the conducting of business at the Shopping Center. Tenant shall comply with said reasonable requests of Landlord as Landlord might make for the purpose of avoiding such interference.  If at any time during the course of Tenant's work at the Leased Premises the storefront of the Leased Premises is not fully secure, Tenant shall construct a barricade of plywood or other material approved by Landlord to secure the Leased Premises and adjoining lease spaces.

Section 1.05.  In connection with any construction of improvements at the Leased Premises by Tenant, the following shall apply:

Tenant shall take out and maintain (or cause the contractor under its construction contract(s) to take out and maintain) Commercial General Liability insurance in a minimum amount of $2,000,000.00 combined single limit.  Said liability insurance shall name Landlord as an additional insured with Tenant (and shall contain a cross-liability endorsement) and shall be non-cancellable with respect to Landlord except upon thirty (30) days' notice to Landlord given in the same manner as provided in the Lease Contract (or, at the request of Landlord, shall be in the form of a separate liability policy in which Landlord alone is the named insured).  Tenant shall also take out and maintain (or cause the contractor under its construction contract(s) to take out and maintain) all builder's risk insurance to the full insurable value of improvements constructed and materials stored at the Leased Premises.  Said builder's risk insurance shall name Landlord as an additional insured and shall be non-cancellable with respect to Landlord.  Tenant shall take out (or cause contractor under its construction contract(s)) to take out and maintain Workers' Compensation and Employers Liability in a minimum amount of $500,000 bodily injury for each accident, $500,000 bodily injury by disease for each employee, and $500,000 bodily injury disease aggregate and provide a waiver of subrogation for the Tenant and Landlord.  Certificates of all such insurance shall be delivered by Tenant to Landlord within five (5) days following Tenant's entering into any such construction contract(s) (but in all events prior to Tenant or Tenant's general contractor commencing construction).

Section 1.06.  With respect to any labor performed or materials furnished by Tenant at the Leased Premises, the following shall apply:  All such labor shall be performed and materials furnished at Tenant's own cost, expense and risk.  Labor and materials used in the installation of Tenant's furniture and fixtures, and in any other work on the Leased Premises performed by Tenant, will be subject to Landlord's prior written approval.  Any such approval of Tenant's labor shall constitute a revocable license authorizing Tenant to permit such labor to enter upon the Shopping Center and Leased Premises prior to the commencement of the lease term for so long as Tenant's labor does not interfere with labor utilized by Landlord or any other tenant.  With respect to any contract for any such labor or materials, Tenant acts as a principal and not as the agent of Landlord.  Tenant agrees to indemnify and hold Landlord harmless from all claims (including costs and expenses of defending against such claims) arising or alleged to arise from any act or omission of Tenant or Tenant's agents, employees, contractors, subcontractors, laborers, materialmen or invitees or arising from any bodily injury or property damage occurring or alleged to have occurred incident to Tenant's work at the Leased Premises.  Tenant shall have no authority to place any lien upon the Leased Premises or any interest therein nor in any way to bind Landlord; and any attempt to do so shall be void and of no effect.  Landlord expressly disclaims liability for the cost of labor performed or materials furnished by Tenant.  If, because of any actual or alleged act or omission of Tenant, any lien, affidavit, charge or

order for the payment of money shall be filed against Landlord, the Leased Premises or any portion thereof or interest therein, whether or not such lien, affidavit, charge or order is valid or enforceable, Tenant shall, at its own cost and expense, cause same to be discharged of record by payment, bonding or otherwise no later than fifteen (15) days after notice to Tenant of the filing thereof, but in all events, prior to the foreclosure thereof.   All of Tenant's construction at the Leased Premises shall be performed in strict compliance with the working drawings, all applicable building codes and other legal requirements and in a good and workmanlike manner satisfactory to Landlord's Architect and in such manner as to not cause Landlord's fire and extended coverage insurance to be canceled or the rate therefor increased.   In the performance of such work, Tenant shall not interfere with or delay any work being done by Landlord's contractors.

Section 1.07.   All improvements constructed by Tenant at the Leased Premises (excepting only Removable Trade Fixtures installed by Tenant) shall, immediately upon such construction, become and remain the property of Landlord; and Tenant shall have no right, title or interest (including lien interest) therein, except only as Tenant under the provisions of the Lease Contract.   The aforesaid improvements, if constructed by Tenant, are not intended as any nature of rent or compensation to Landlord.

Section 1.08.   Tenant agrees that its construction at the Leased Premises will be completed in accordance with Exhibits "C" and "D" within one hundred (120) days after receipt of its Building Permit.   If Tenant shall not have so completed such construction by the expiration of said 120-day period (plus additional time if Tenant's failure so to complete is caused by governmental restrictions, strikes, lockouts, shortages of labor or material, acts of God, war or civil commotion, fire, unavoidable casualty, inclement weather or any cause beyond the reasonable control of Tenant), then such failure shall constitute a default under the Lease.

Section 1.09.   Upon completion of construction of such improvements, Tenant shall deliver to Landlord one (1) set of as-built plans for the Leased Premises.

Section 1.10.   Any work at the Leased Premises involving the sprinkler system (if any) serving the Leased Premises shall be performed by (i) Landlord or its contractors at Tenant's cost, or (ii) Tenant's contractor or subcontractor at Tenant's cost, provided that Tenant obtains Landlord's prior written consent to any such contractor or subcontractor. Tenant shall pay the cost of any such work (or reimburse Landlord therefor) within ten (10) days after delivery to Tenant of a statement therefor.

## PYLON SIGN RIDER

This Pylon Sign Rider is attached to and forms a part of that certain Lease Contract (the "Lease Contract") dated ___*March 16*___, 2004, between WEINGARTEN REALTY INVESTORS, as "Landlord," and 99 CENTS ONLY STORES TEXAS, INC., a Delaware corporation, as "Tenant."

Section 1.01.   Landlord hereby grants to Tenant the exclusive right during the term of this Lease to place a two-sided panel on two (2) of Landlord's existing pylon sign structures located in Landlord's Montgomery Plaza Shopping Center at Conroe, Texas 77304, provided that the then current local sign ordinances so permit and subject to the following conditions stated herein. The location of Tenant's signs are depicted on Exhibit's "E-2" and "E-3" attached to the Lease and incorporated herein for all purposes.

    (1)    Intentionally omitted.

    (2)    Provided that the conditions of the foregoing paragraph have been satisfied, then Tenant shall contract, at Tenant's sole cost and expense, with either _____ or _____ for the construction and installation of the signs on the pylon sign structures. Subject to Force Majeure, in the event Tenant fails to have such signs installed within six (6) months after opening for business in the Leased Premises, then such failure shall constitute a default under the Lease.

Section 1.02.   Tenant's right to maintain its signs on Landlord's pylon sign structures shall be subject to the following conditions:

    (1)    Tenant's signs have been installed according to the provisions set forth in Section 1.01 hereof,

    (2)    Tenant pays, within ten (10) days of receipt of any invoice therefor, (i) its pro rata portion of the costs of repairing, replacing and maintaining the sign structures and the costs of permits, insurance and/or taxes, if any, for such pylon sign structures and (ii) the costs to repair or replace Tenant's lamps, ballasts and/or electrical wiring (either of such costs [(i) or (ii)] shall be referred to herein as "Pylon Costs").

    (3)    Tenant pays, monthly in advance along with its payment of Minimum Rent, a "Utility Charge" representing Tenant's proportionate share of the utility costs for the two (2) pylon signs. Tenant's initial Utility Charge shall be the sum of <u>Forty and 00/100 Dollars ($40.00)</u> per month for both pylon signs, which amount shall be subject to adjustment from time to time thereafter.

    (4)    Tenant repairs or replaces any damage to its sign faces or "cans" within thirty (30) days of receipt of written notice from Landlord stating that any such sign is in need of repair or replacement. Landlord, in its sole discretion, shall determine when and to what extent the sign face needs to be replaced or repaired.

In the event Tenant should fail to timely pay its Utility Charges, its pro rata share of Pylon Costs, or fail to repair or replace its signs, as applicable, within the time provided hereinabove, such failure shall constitute a default under the Lease. If Tenant fails to cure any such default within the applicable notice and cure period, then in addition to all of Landlord's other rights and remedies under the Lease, Landlord shall have the right, at its option, to repair or replace such signs or remove same from the pylon sign structures. Tenant agrees to pay, upon demand, all costs and expenses incurred by Landlord in the repair, replacement or removal of Tenant's signs. In the event Landlord should elect to remove Tenant's sign(s) (whether in lieu of repairing or replacing or because of Tenant's failure to pay for such repair or replacement), then in addition to Tenant's being obligated to reimburse Landlord for all costs and expenses in connection therewith, Tenant's right to have its pylon signs maintained upon Landlord's pylon sign structures shall, upon such removal, become null and void.

INITIAL

Section 1.03. At the termination of the lease term or upon termination of Tenant's right to possession of the Leased Premises as provided in the Lease, Tenant shall remove the faces of such signs and the "can" portion of the signs shall become the property of Landlord. In the event Tenant fails to remove the sign faces within one (1) week after termination of the lease term or termination of Tenant's right to possession of the Leased Premises, Landlord shall have the right to remove such signs and Tenant shall reimburse Landlord for all costs and expenses of such removal which shall be in addition to any other sum which may be due and owing to Landlord at such time.

Section 1.04. Tenant agrees that if at any time Landlord shall remove Tenant's signs from Landlord's pylon sign structures in accordance with the terms of this Pylon Sign Rider, the disposal of such signs shall be at the discretion of Landlord, and Tenant agrees to hold Landlord harmless from any act arising out of such disposal, and further agrees that it shall have no cause of action against Landlord for any loss occasioned thereby.

Section 1.05. If there shall be taken during the term of the Lease so much of the Common Area such that removal of the pylon sign structures shall be required by the condemning authority, all sums awarded or agreed upon between Landlord and the condemning authority for the taking of the pylon sign structures and signs thereon, whether as damages or as compensation, will be the property of Landlord and Tenant will have no interest in any such award.



## EXHIBIT "A"

## SITE PLAN



The "Leased Premises" as shown hereon is for __99 CENTS ONLY STORES__ TEXAS, INC.
Subject to the terms of the Lease, any future construction by the Landlord
within the Shopping Center will not affect the validity of the Lease covering
the Leased Premises. Subject to the terms of the Lease, Landlord may elect
to change the location, size, layout, or other details of any buildings, or
Common Area in the Shopping Center and/or to construct other buildings in
the Shopping Center and such changes will not affect the validity of the
Lease covering the Leased Premises.

The post office address designated hereon, if any, is subject to change
at any time.

DATE: 02-19-2004
DATE: 03-11-2004

EXHIBIT "A"

MONTGOMERY PLAZA

| INITIAL | Floor No: AOO |
| | Unit No: POF |
| | Project No: 0165 |

Being a 20.906 acre (910,649 square foot) tract of land in the W.S. Allen Survey, Abstract No. 2, Conroe, Montgomery County, Texas, and being the remainder of Unrestricted Reserve "A", all of Unrestricted Reserves "C" and "D" of a plat of Montgomery Park Subdivision as recorded in Cabinet C, Sheet 152-B of the Montgomery County Map Records and said 20.906 acre tract being more particularly described by metes and bounds as follows with all bearings based on said plat:

BEGINNING at a 3/4 inch iron pipe found marking the northeast corner of said Unrestricted Reserve "A", the southeast corner of a called 19.596 acre tract of land conveyed to Conroe Church of Christ, Inc. as recorded in Montgomery County Clerk's File Number 8911900, and being on the west right-of-way line of Interstate Highway 45, variable width, and being the northeast corner of the herein described tract;

THENCE South 22 degrees 46 minutes 31 seconds East, along the west right-of-way line of said Interstate Highway 45, a distance of 39.72 feet to a point marking an angle point in the herein described, from which a found "X" in concrete bears North 50 degrees 07 minutes East, 0.19 feet;

THENCE South 18 degrees 33 minutes 07 seconds East, continuing along the west right-of-way line of said Interstate Highway 45, a distance of 700.00 feet to a 3/4 inch iron pipe found marking an angle point in the herein described tract;

THENCE South 14 degrees 50 minutes 50 seconds East, continuing along the west right-of-way line of said Interstate Highway 45, a distance of 201.00 feet to a 5/8 inch iron rod with cap set marking an angle point in the herein described tract;

THENCE South 11 degrees 28 minutes 44 seconds West (Called South 11 degrees 30 minutes 15 seconds West), continuing along the west right-of-way line or said Interstate Highway 45, a distance of 467.08 feet (Called 466.84 feet), to a 5/8 inch iron rod found marking the southeast corner of the herein described tract and being on the north right-of-way line of State Highway Loop 336, variable width;

THENCE South 70 degrees 54 minutes 09 seconds West, along the north right-of-way line of said State Highway Loop 336, a distance of 194.12 feet to a point marking an angle point in the herein described tract, from which a found "X" in concrete bears South 41 degrees 08 minutes East, 0.25 feet;

THENCE South 66 degrees 21 minutes 53 seconds West, continuing along the north right-of-way line of said State Highway Loop 336, a distance of 118.55 feet to a 5/8 inch iron rod found marking an angle point in the herein described tract;

THENCE South 72 degrees 23 minutes 55 seconds West, continuing along the north right-of-way line of said State Highway Loop 336, a distance of 260.10 feet to a 3/4 inch iron pipe found marking the southwest corner of the herein described tract and being the southeast corner of a tract of land conveyed to Wal-Mart Stores, Inc. as recorded in Montgomery County Clerk's File Number 9115394;

THENCE North 16 degrees 08 minutes 59 seconds West, along the east line of said Wal-Mart Stores, Inc. tract, a distance of 30.70 feet to a point marking an angle point in the herein described tract, from which a found concrete nail bears North 29 degrees 40 minutes West, 0.31 feet;

THENCE South 73 degrees 51 minutes 01 seconds West, continuing along the east line of said Wal-Mart Stores, Inc. tract, a distance of 8.50 feet to an "X" in concrete found marking an angle point in the herein described tract;

THENCE North 16 degrees 09 minutes 38 seconds West (called North 16 degrees 08 minutes 59 seconds West), continuing along the east line of said Wal-Mart Stores, Inc. tract, a distance of 326.78 feet (called 326.45 feet), to a point marking an angle point in the herein described tract, from which a found 3/4 inch iron pipe bears South 01 degrees 57 minutes East, 0.15 feet;

P0165 Montgomery Plaza SC
Exhibit "B"
Revised 12/2/02 CC/ji
Page 1 of 5



THENCE North 73 degrees 41 minutes 06 seconds East, continuing along the east line of said Wal-Mart Stores, Inc. tract, a distance of 8.43 feet to a point in the herein described tract, from which a found 60d nail bears South 20 degrees 24 minutes East, 0.17 feet;

THENCE North 16 degrees 19 minutes 28 seconds West, continuing along the eastline of said Wal-Mart Stores, Inc. tract, a distance of 120.96 feet to a point marking an angle point in the herein described tract, from which a found "X" in concrete bears North 14 degrees 17 minutes East, 0.17 feet;

THENCE North 73 degrees 40 minutes 32 seconds East, continuing along the east line of said Wal-Mart Stores, Inc. tract, a distance of 11.20 feet to a point marking an angle point in the herein described tract, from which a found "X" in concrete bears North 06 degrees 11 minutes West, 0.13 feet;

THENCE North 16 degrees 19 minutes 28 seconds West, continuing along the east line of said Wal-Mart Stores, Inc. tract, a distance of 22.00 feet to a point marking an angle point in the herein described tract, from which a found "X" in concrete bears North 03 degrees 17 seconds West, 0.12 feet;

THENCE South 73 degrees 40 minutes 32 seconds West, continuing along the eastline of said Wal-Mart Stores, Inc. tract, a distance of 11.20 feet to an "X" in concrete found marking an angle point in the herein described tract;

THENCE North 16 degrees 19 minutes 28 seconds West, continuing along the eastline of said Wal-Mart Stores, Inc. tract, a distance of 102.50 feet to a 3/4 inch iron pipe found marking an angle point in the herein described tract and being the northeast corner of said Wal-Mart Stores, Inc. tract and being on the south line of Unrestricted Reserve "E" of Montgomery Park Subdivision as recorded in Cabinet D, Sheet 126-B of the Montgomery County Map Records;

THENCE North 73 degrees 41 minutes 06 seconds East, along the south line of said Unrestricted Reserve "E", a distance of 0.20 feet to a 3/4 inch iron pipe found marking an angle point in the herein described tract and being the southeast corner of said Unrestricted Reserve "E";

THENCE North 28 degrees 41 minutes 06 seconds East, along the east line of said Unrestricted Reserve "E", a distance of 169.71 feet to an "X" in concrete found marking an angle point in the herein described tract;

THENCE North 16 degrees 18 minutes 54 seconds West, continuing along the east line of said Unrestricted Reserve "E", a distance of 258.43 feet to a 3/4 inch iron pipe found marking an angle point in the herein described tract;

THENCE North 28 degrees 41 minutes 06 seconds East, continuing along the east line of said Unrestricted Reserve "E", a distance of 1 13.14 feet to an "X" in concrete found marking an angle point in the herein described tract;

THENCE North 16 degrees 18 minutes 54 seconds West, continuing along the east line of said Unrestricted Reserve "E", a distance of 260.41 feet to a 5/8 inch iron rod with cap set marking an angle point in the herein described tract;

THENCE North 28 degrees 41 minutes 06 seconds East, continuing along the east line of said Unrestricted Reserve "E", a distance of 87.13 feet to a 5/8 inch iron rod with cap set marking the northwest corner of the herein described tract and being on the south line of said Conroe Church of Christ tract;

THENCE North 73 degrees 41 minutes 06 seconds East, along the south line of said Conroe Church of Christ tract, a distance of 500.00 feet to the POINT OF BEGINNING and containing 20.906 acres (910,649 square feet) of land.

AND

TRACT ONE:

5.436 acres of land out of the W.S.. Allen Survey, Abstract 2, and being a part of Reserve "A", Montgomery Park Subdivision, as shown on plat thereof recorded in Cabinet C, Sheet 152 B, Plat Records of Montgomery County, the subject 5.436 acres being more particularly described by metes and bounds as follows:

BEGINNING at a 3/4-inch galvanized iron pipe set for corner on the Northerly right-of-way line of State Highway Loop 336, being the Southeasterly corner of Reserve "B" of said Montgomery Park Subdivision;

THENCE, N 16° 18' 54" W, with the Easterly line of Reserve "B", a distance of 150.40 feet to a 3/4-inch galvanized iron pipe set for the Northeasterly corner of said Reserve "B";

THENCE, S 73° 41' 06" W, with the Northeasterly line of Reserve "B", a distance of 150.00 feet to a 3/4 inch galvanized iron pipe set for the Northwesterly corner of Reserve "B", and being the most Westerly Southwest corner of Reserve "A";

THENCE, N 16° 18' 54" W, with the Westerly line of Reserve "A", a distance of 451.98 feet to a 3/4-inch galvanized iron pipe set for the Northwesterly corner of Reserve "A";

THENCE, N 73° 41' 06" E, with the Northerly line of Reserve "A", a distance of 434.80 feet to a 3/4-inch galvanized iron pipe set for corner;

THENCE, S 16° 19' 28" E, a distance of 102.50 feet to an "X" set in concrete for corner;

THENCE, N 73° 40' 32" E, a distance of 11.20 feet to an "X" set in concrete for corner;

THENCE, S 16° 19" 28" E, a distance of 22.00 feet to an "X" set in concrete for corner;

THENCE, S 73° 40' 32" W, a distance of 11.20 feet to an "X" set in concrete for corner;

THENCE, S 16° 19' 28" E, a distance of 120.96 feet to a 60d nail set for corner;

THENCE, S 73° 41' 06" W, a distance of 8.43 feet to a 3/4-inch galvanized iron pipe set for corner;

THENCE, S 16° 08' 59" E, a distance of 326.45 feet to an "X" set in concrete for corner;

THENCE, N 73° 51' 01" E, a distance of 8.50 feet to an "X" set in concrete for corner;

THENCE, S 16° 08' 59" E, a distance of 30.70 feet to a 3/4-inch galvanized iron pipe set for corner on the Northerly right-of-way line of State Highway Loop 336;

THENCE, S 72° 17' 40" W, with the Northerly line of State Highway Loop 336, a distance of 21.57 feet to a 3/4-inch galvanized iron pipe set for corner;

THENCE, S 73° 51' 10" W, with the Northerly line of State Highway Loop 336, a distance of 262.32 feet to the POINT OF BEGINNING and containing 5.436 acres of land.

AND

TRACT 2:

0.197 acre of land out of the W.S. Allen Survey, Abstract 2, and being a part of that certain 90.398-acre tract described in Deed Records of Montgomery County, Texas, in Volume 1115, Page 211, said 0.197-acre tract being more particularly described by metes and bounds as follows:

P0165 Montgomery Plaza SC
Exhibit "B"
Revised 12/2/02 CC/ji
Page 3 of 5

COMMENCING at a 3/4-inch galvanized iron pipe set for corner on the Northerly right-of-way line of State Highway Loop 336,  and being the Southeasterly corner of Reserve "B", Montgomery Park Subdivision,  as shown on plat thereof recorded in Cabinet C,  Sheet 152 B, Plat Records of Montgomery County, Texas;

THENCE, N 16° 18' 54",  with the Easterly line of Reserve "B",  a distance of 150.40 feet to a 3/4-inch galvanized iron pipe set for the Northeasterly corner of Reserve "B";

THENCE, S 73° 41' 06" W,  with the Northerly line of Reserve "B",  a distance of 150.00 feet to a 3/4-inch galvanized iron pipe set for the true POINT OF BEGINNING for the herein described tract;

THENCE, S 73° 41' 06" W,  a distance of 0.43 feet to a point for corner in a curve, from which the center of curvature bears N 72° 16' 07" E,  300.00 feet;

THENCE,  in a Northwesterly direction along a curve to the right having a central angle of 00° 12' 00",  a radius of 300.00 feet, an arc length of 1.05 feet to a point of reverse curve;

THENCE,  in a Northwesterly direction along a curve to the left having a central angle of 05° 30' 03",  a radius of 2,000.00 feet,  an arc length of 192.02 feet to a point of tangency;

THENCE, N 23° 01' 56" W,  a distance of 261.25 feet to a point for corner;

THENCE, N 73° 41' 06" E,  a distance of 44.29 feet to a 3/4-inch galvanized iron pipe set for the most Westerly Northwest corner of Reserve "A",  Montgomery Park Subdivision;

THENCE, S 16° 18' 54" E,  with the Westerly line of Reserve "A",  a distance of 451.98 feet to the POINT OF BEGINNING and containing 0.197 acre of land

AND

Being 0.516 acre of land in the W.S. Allen Survey, A-2, Montgomery County, Texas and being all of Unrestricted Reserve "B", Montgomery Park Subdivision, a subdivision, map of which is recorded in Cabinet C, Sheet 152-B and 153A, Montgomery County Map Records, said 0.516 acre being described more particularly as follows:

BEGINNING at a ½" iron rod found in the North Right of Way line of State Highway Loop 336, for the Southeast corner of the herein described tract, the Southwest corner of the Weingarten Realty Investors called Tract 1, 5.436 acres as described in instrument recorded under County Clerk's File Number 9847114, Montgomery County Real Property Records, same being the Southwest corner of Unrestricted Reserve "A", Montgomery Park Subdivision;

THENCE S. 73° 51' 10" W., along the North line of Loop 336, for a distance of 134.12 feet (plat call S. 73° 51' 10" W., 134 feet) to a ½" iron rod found for corner;

THENCE N. 77° 29' 32" W., continuing along the North line of Loop 336, for a distance of 18.18 feet, (plat call N. 78° 04' 14" W., 18.16 feet) to a "X" found scribed in concrete for the Southwest corner of the herein described tract, same being the Southeast corner of Montgomery Park Subdivision, Reserves E, F, G, H-1, H-2, I-1, I-2, & J, a subdivision, map of which is recorded in Cabinet D, Sheet 126-B, Montgomery County Map Records, said "X" being in the East right-of-way line of Westview Blvd. dedicated by plat recorded in Cabinet D, Sheet 126-B, Montgomery County Map Records;

THENCE N. 16° 21' 17" W., along the East Right of Way line of said Westview Blvd. for a distance of 141.23 feet, (plat call N. 16° 18' 54" W., 141.41 feet) to a ½" iron rod set with a cap stamped "Jeff Moon RPLS 4639" for the Northwest corner of the herein described tract, a Lower Northwest corner of said Unrestricted Reserve "A", the Lower Northwest corner of the said 5.436 acre tract, the Southeast corner of the Weingarten Realty Investors called Tract 2, 0.197

acre as described by instrument recorded under County Clerk's File Number 9847114, Montgomery County Real Property Records;

THENCE N. 73° 39' 39" E., along a Lower North line of the 5.436 acre tract, a Lower North line of Unrestricted Reserve "A", for a distance of 150.00 feet (plat call and 5.436 acre call N. 73° 41' 06" E 150.00 feet) to a 60d nail found inside a ¾" iron pipe for the Northeast corner of the herein described tract, an inside corner of Unrestricted Reserve "A", an inside corner of the 5.436 acre tract;

THENCE S. 16° 22' 15" E., along an inside line of Unrestricted Reserve "A", an inside line of the 5.436 acre tract for a distance of 150.45 feet (plat call S. 16° 18' 54" E, 150.39' and 5.436 acre call S. 16° 18' 54" E., 150.40 feet) to the POINT OF BEGINNING and containing in all 0.516 acre of land.

EXHIBIT "B"

P0165 Montgomery Plaza SC
Exhibit "B"
Revised 12/2/02 CC/ji
Page 5 of 5

ÉXHIBIT "C"

PLANS AND SPECIFICATIONS

Need Not Be Attached



EXHIBIT "D"

Intentionally Omitted



EXCLUSIVE USE CLAUSES OF
EXISTING TENANTS OF
MONTGOMERY PLAZA SHOPPING CENTER


David M. Boeckman and David Awalt  d/b/a  Montgomery Vision Center

Landlord will not  directly lease space in the Shopping Center to any other tenant whose primary business will be  the operation of an optometrist's office selling prescription eyewear (hereinafter a "Competing Business")

The provisions of this Section shall not apply to present tenants (or their assignees or sublessees) whose leases may not prohibit the operation of a Competing Business, or any tenant, present or future, who may sell non-prescription eyewear .


Monarch Dental Associates, L.P.  d/b/a  Monarch Dental

Landlord will not directly lease space in the Shopping Center to any other tenant for the operation of a dental clinic (hereinafter a "Competing Business").  This limitation shall not apply to present tenants (or their assignees or sublessees) whose leases may not prohibit the operation of a Competing Business.


Philipello Investments, Inc.  d/b/a  Boardwalk

Landlord will not  directly lease space in the Shopping Center to any other tenant whose primary business will be the operation of a restaurant primarily serving pizza for on premises consumption. This limitation shall not apply to (i) present tenants (or their assignees or sublessees) whose leases may not prohibit such use or (ii) a full service Italian restaurant which may offer pizza on its menu or (iii) a restaurant primarily engaged in the preparation of pizza for off premises consumption or delivery.


Petco Southwest, L.P.  d/b/a  Petco

Landlord covenants and agrees that during the Initial Term and any Renewal Term, Tenant shall have the exclusive right to sell pet food, supplies, birds, small animals, reptiles, fish and grooming and veterinary services in the Shopping Center ("Competing Use").  This covenant shall run with the land on which the Shopping Center is located so long as the Premises are used as a pet food and supply store and so long as Tenant is not in default under the terms of the Lease.  After the date hereof, Landlord agrees not to lease to, nor to approve any sublease or assignment of lease that it has the unrestricted right to approve, for any Competing Use.

In no event shall the definition of "Competing Use" be deemed to include a third party who incidentally sells pet food, pet supplies and/or pet grooming supplies within an area not exceeding five hundred (500) square feet.



Store #2831

Exhibit "E-1" Page 1 of 1

Initials

I-45 & Loop 336, Conroe, TX

**EXHIBIT "E-1"**

**TENANT'S FASCIA SIGN**

## 99¢ Only Stores® Typical Front Elevation

This generally shows Tenant's intended alterations but Tenant will be permitted to make minor revisions thereto (including but not limited to required governmental entities).

Landlord to approve Colors



Option to Add (N) building sign facia tower

Option to Add (N) self illuminated channel letter sign 150sf or max per city

Option to Add (N) emergency only exit door(s) as needed

Option to paint or stucco in standard 99¢ Only White

Option to Add (N) store front and remove existing bulkhead (if any) with (N) 99¢ Only standard blue frames.

Option to Add (N) tile column Bases with 99¢ Only color Tiles and/or cover bulkhead with 99¢ Only tile.

Option to Add (N) awnings in 99¢ Only standard magenta or blue color with optional logos

I-45 & Loop 336, Conroe, TX

## EXHIBIT "E-2"

## PYLON SIGN 1





Location of Pylon Sign 1

---

Store #2831                    Exhibit "E-2" Page 1 of 1                    Initials

I-45 & Loop 336, Conroe, TX

## EXHIBIT "E-3"

## PYLON SIGN 2





Store #2831                    Exhibit "E-3" Page 1 of 1                    Initials

## EXCLUSIVE USE CLAUSES OF
## EXISTING TENANTS OF
## MONTGOMERY PLAZA SHOPPING CENTER

<u>Academy, Ltd.  d/b/a  Academy Sports & Outdoors</u>

7.5    Landlord, and its successors and assigns, shall not operate or permit under any circumstances to be operated within the Shopping Center any other store in the business of selling sporting goods, licensed sports apparel (e.g., "Houston Texans" ball caps, etc.) or footwear. The incidental sale of such items in connection with the overall business of another operator or tenant shall not be deemed a violation of this Paragraph 7.5. As used herein, "incidental sale" shall mean less than five percent (5%) of such operator's or tenant's gross sales and less than five hundred (500) square feet of such operator's or tenant's display area (inclusive of allocable aisle space). The foregoing exclusive against the sale of "footwear" shall not be construed to prohibit one (1) operator such as Larry's Shoes, Rack Room, Shoe Carnival, Famous Footwear or Payless ShoeSource or any other shoe store which, in Tenant's reasonable opinion, is comparable to the foregoing; provided, however, that the foregoing exception to the exclusive shall be limited to one (1) such operator within the Shopping Center. The foregoing exclusive shall not prohibit the operation of a "junior department store" within the Shopping Center such as TJ Maxx, Ross, Marshall's, Palais Royal or other similar store which, in Tenant's reasonable opinion, is comparable to the foregoing, and shall not apply to any "Existing Tenants" listed on <u>Exhibit H</u> attached hereto. Furthermore, Landlord agrees that, to the extent Landlord has a right to approve or consent to any use or change in use made by any Existing Tenant identified on <u>Exhibit H</u>, Landlord agrees that it shall not approve or consent to any use or change in use that violates the exclusive rights afforded Tenant under this Paragraph 7.5.

<u>Spec's Family Partners, Ltd.  d/b/a  Spec's Liquor</u>

Landlord agrees that it will not, after the date hereof, lease space in the Shopping Center to any other tenant whose primary business will be <u>the sale of distilled spirits for off-premises consumption</u> (hereinafter a "Competing Business").  The provisions of this Section 6.03.B. granting Tenant certain exclusive rights shall not apply to present tenants (or their assignees or sublessees) whose leases may not prohibit the operation of a Competing Business.

RESTRICTIONS ON USE
MONTGOMERY PLAZA SHOPPING CENTER

A.  TENANT LEASES

Petco Southwest, L.P.  d/b/a  Petco

       Tenant has entered into this Lease in reliance upon representations by Landlord that the Shopping Center described on Exhibit "A-1" is and will remain retail in character and, further, no part of the Shopping Center shown outlined in "Green" on Exhibit "A-2" shall be used as an auditorium, meeting hall, school (provided classes incidentally offered by retail tenants shall not be prohibited) or other place of public assembly, gymnasium or dance hall; for Bingo, or as a massage parlor (provided tanning or nail salons which offer massage therapy or a chiropractic office shall not be prohibited), video game arcade, bowling alley, skating rink, car wash, car repair or car rental agency, night club or adult book or adult video store.  The term "retail" shall include retail office uses typically found in retail shopping centers such as tax preparation offices, insurance sales offices and similar office uses.  The foregoing shall not apply to present tenants or their assigns whose leases may not prohibit any such uses.  In the event an existing tenant should request Landlord's consent to a change in use to a use which would violate the foregoing provisions, then provided Landlord has an unlimited and unrestricted right to withhold consent to such change of use without affecting the term of such existing lease or the rent to be paid thereunder, Landlord will not grant its consent to such change in use.  No restaurant shall be permitted in the Shopping Center within one hundred fifty (150) feet from the storefront of the Premises except those spaces currently being used as restaurants on the date hereof and the subsequent renewal or replacement of the tenants occupying said spaces and except for the operation of a restaurant within and incidental to a grocery store in the Shopping Center.

RENT-WAY TTIG, L.P.  d/b/a  HomeChoice Lease or Own #1271

       Landlord agrees that it will not lease space in the Shopping Center to any tenant whose business is of an adult, prurient nature such as illegitimate massage parlors or modeling studios, "head shops" or other stores primarily selling illegal drug related items, or any business whose primary business is the retail sale of pornographic materials.



EXHIBIT "G"

RESTRICTIONS ON USE
MONTGOMERY PLAZA SHOPPING CENTER

Academy, Ltd. d/b/a Academy Sports & Outdoors

7.4 Tenant shall not use the Premises and Landlord shall not lease or permit the use of space in the Shopping Center for the following: (i) any bowling alley; (ii) any arcade; (iii) any tavern or bar, except to the extent incidental to a restaurant operated primarily for on-premises consumption; (iv) any health club, spa or gymnasium, except a health club or spa not in excess of 5,000 square feet may be located in the permitted "health club" areas shown on Exhibit B; (v) any night club or discotheque; (vi) any second hand store; (vii) any mobile home park or trailer court (except that this provision shall not prohibit the temporary use of construction trailers); (viii) any dumping, disposing, incineration or reduction of garbage (exclusive of dumpsters located in the rear of any building); (ix) any fire sale, bankruptcy sale (unless pursuant to a court order) or auction house operation, (x) any central laundry or dry cleaning plant or laundromat (except that this prohibition shall not be applicable to on-site service provided solely for pickup and delivery by the ultimate consumer or to a dry cleaning plant that uses "Green Earth" or other environmentally safe cleaning solvents); (xi) any automobile, truck, trailer or R.V. sales, leasing, display or repair; (xii) any skating rink; (xiii) any living quarters, sleeping apartments or lodging rooms; (xiv) any mortuary; (xv) any pawn shop; (xvi) any bingo club; (xvii) any auction house; (xviii) any flea market; (xix) any restaurant within the "No Restaurant Area" shown on Exhibit B; provided, however, that (i) the total square footage of restaurant space within the Shopping Center shall not exceed 30,000 square feet, plus up to twenty (20) seats for a "deli" restaurant located in the "Allowed Health Club Area" shown on Exhibit B; (ii) there shall be no increase in the building area or restaurant area within either of the two (2) outparcels located on Interstate 45 so long as the outparcel in question is used as a restaurant in whole or in part; and (iii) the total square footage of any restaurant space within the "Northerly Existing Building Area" shown on Exhibit B attached hereto shall not exceed 5,000 square feet per restaurant or 7,500 square feet total; (xx) any movie theater; (xxi) any establishment selling or exhibiting pornographic materials; or (xxii) any use which is a public nuisance. The foregoing restriction against a "second hand store" shall not be construed to prohibit operations such as a Baubles and Beads, Half-Price Books, Wherehouse Music, Kid-to-Kid, a quality antique store or similar quality establishments commonly found in retail shopping centers. The foregoing restriction against "pornographic materials" shall not be construed to prohibit operations such as Blockbuster Video or Hollywood Video, which may offer sale and/or rental of movies designed for adult-only audiences, so long as such products are offered on an incidental basis only from an area in which minors are not allowed. Additionally, the provisions of this Paragraph 7.4 shall not be applicable to any currently-existing tenants or their assignees or sublessees, for the duration of the leases to which such existing tenants are a party, including all renewals and extensions thereof; provided, however, Landlord agrees that it will not amend any existing leases in a manner that would permit a tenant to violate any of the foregoing restrictions nor, to the extent Landlord has approval rights, will Landlord consent to any assignment or sublease to a party for a use that would violate any of the foregoing restrictions.

RESTRICTIONS ON USE
MONTGOMERY PLAZA SHOPPING CENTER

GFC TX, L.P., d/b/a Goody's Family Clothing #265

Landlord covenants and agrees (i) that it will during the Lease Term continuously operate the Shopping Center as a shopping center in a manner consistent with first-class shopping center practice; and (ii) that no portion of the Shopping Center shall be used for the following purposes: amusement park, carnival, sporting events, for any manufacturing purpose, for commercial or professional offices in excess of twenty-five percent (25%) of the gross leasable area of the Shopping Center (provided medical and dental offices and retail service offices such as tax preparers, insurance companies, banks and offices incidental to retail facilities shall be permitted and not included in the 25% limitation), for the sale of cars parked at the Shopping Center or the sale or repair of boats (new or used), for the sale of trailers or mobile homes, lumber yard (except in connection with a retail home improvement store such as Lowe's or Home Depot), off-track betting establishment, flea-market (except that an antique or craft mall shall be permitted), massage parlor (except that therapeutic massages offered in connection with a beauty salon or by a chiropractor shall be permitted), tattoo or body piercing facility, or for the operation of a business primarily engaged in the sale and display of obscene or pornographic materials. During the term hereof, Landlord shall maintain a parking ratio in the Shopping Center of 4.0 parking spaces for every 1,000 square feet of area leased or available for lease or occupancy in the Shopping Center.

In addition to the foregoing, in no event shall the area outlined in "Red" on Exhibit "A" be used for any of the following: a bowling alley, skating rink, bar (defined as a business which derives more than 50% of its revenue from the sale of alcoholic beverages), meeting hall, banquet facility, entertainment facility, disco or other dance hall, nightclub establishment, or repair of cars, video arcade or other game parlor, pool hall, billiard parlor, amusement center or health club (provided a personal trainer offering fitness classes in less than 5,000 square feet shall be permitted), or a non-retail use which is not normally found in similar shopping centers.

B.  RECORDED DOCUMENTS

Use Restrictions set forth in the Recorded Documents (as defined in Section 6.03 of the Lease) shall be binding on the Leased Premises.

TBD, Conroe, Texas  77304

## EXHIBIT "H"

## GUARANTY OF LEASE

The undersigned, 99¢ ONLY STORES, a California corporation (the *"Parent Corporation"*), for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, hereby irrevocably and unconditionally guarantees for the benefit of **WEINGARTEN REALTY INVESTORS** (*"Landlord"*) each and all of the obligations of 99 Cents Only Stores Texas, Inc., a Delaware c orporation ( the *"Subsidiary Corporation"*) a s t enant u nder t hat certain l ease d ated for reference purposes as of _____, 2004 by and between Landlord and Subsidiary Corporation, as tenant, with respect to certain premises located in the **Montgomery Plaza Shopping Center, TBD, Conroe, Texas  77304**, more fully described in **Exhibit "A"** attached hereto and hereby incorporated herein (the *"Lease"*).

1.    The obligations guaranteed by Parent Corporation shall include, without limitation, (a) the payment of all rent and other sums due and payable by the tenant under the Lease, and any extensions, renewals or modifications thereof, as and when the same become due, and (b) the performance by the tenant under the Lease, and any extensions, renewals or modifications thereof, off all of the covenants, terms and conditions of the Lease.  This is a guaranty of payment and performance and not merely of collection.

2.    The obligations of Parent Corporation hereunder are independent of, and may exceed, the obligations of the Subsidiary Corporation.  A separate action or actions may, at Landlord's option, be brought and prosecuted against Parent Corporation, whether or not any action is first or subsequently brought against the Subsidiary Corporation, or whether or not the Subsidiary Corporation i s joined i n a ny such action, and Parent Corporation m ay be joined i n a ny action or proceeding commenced by Landlord against The Subsidiary Corporation arising out of, in connection with or based upon the Lease.

3.    Parent Corporation authorizes Landlord, without notice to or demand of Parent Corporation, and without affecting Parent Corporation's liability hereunder, from time to time to (a) consent to any extensions, accelerations or other changes in the time for any payment provided for in the Lease, consent to any other alteration of any covenant, term or condition of the Lease in any respect, or consent to any assignment, subletting or reassignment of the Lease; (b) take and hold security for any payment provided for in the Lease or for the performance of any covenant, term or condition of the Lease, or exchange, waive or release any such security; and (c) apply such security and direct the order or manner of sale thereof as Landlord in its discretion may determine. Notwithstanding any termination, renewal, extension or holding over of the Lease, this Guaranty shall continue until all of the covenants and obligations on the part of the Subsidiary Corporation performed have been fully and completely performed by the Subsidiary Corporation and Parent Corporation shall not be released of any obligation or liability hereunder so long as there is any claim against the Subsidiary Corporation arising out of the Lease that has not been settled or discharged in full.

4.    Parent Corporation waives any and all defenses to its obligations under this Guaranty, including without limitation, any right to (a) require Landlord to proceed against the Subsidiary Corporation or any other person or entity or pursue any other remedy in Landlord's power whatsoever; (b) complain of delay in the enforcement of Landlord's rights under the Lease; (c) require Landlord to proceed against or exhaust any security held from the Subsidiary Corporation or Parent Corporation, or (d) require Landlord to pursue any other remedy in Landlord's power that Parent Corporation cannot itself pursue and that would lighten its burden.  Until the obligations of the Subsidiary Corporation under the Lease have been fully satisfied, Parent Corporation shall have no right of subrogation and waives any right to proceed against the Subsidiary Corporation for reimbursement, as well as any right to enforce any remedy which Landlord now has or may hereafter have against the Subsidiary Corporation and waives any benefit of, and any right to participate in any security now or hereafter held by Landlord.  If any amount is paid to Parent Corporation on account of subrogation of its rights at a time when the Subsidiary Corporation's obligations under the Lease have not been paid in full, such amount shall be held in trust for Landlord.  Parent Corporation waives any defense arising by reason of any disability or other defense of the Subsidiary Corporation or by reason of the cessation from any cause whatsoever of the liability of the Subsidiary Corporation.  Parent Corporation waives all demands upon and notices to the Subsidiary Corporation and to Parent Corporation, including, without limitation, demands for performance, notices and nonperformance, notices of nonpayment and notices of acceptance of this Guaranty.

TBD, Conroe, Texas 77304

5.    The liability of Parent Corporation hereunder shall in no way be affected by, and this Guaranty shall remain in full force and effect notwithstanding, (a) the appointment of a receiver to take possession of all or substantially all of the assets of the Subsidiary Corporation, or any assignment by the Subsidiary Corporation for the benefit of creditors, or any action taken or suffered by the Subsidiary Corporation under any insolvency, bankruptcy, reorganization, moratorium or other debtor relief act or statute, whether now existing or hereafter amended or enacted, or the disaffirmance of the Lease in any such action or otherwise, (b) the assignment or transfer of the Lease by the Subsidiary Corporation unless the Subsidiary Corporation is expressly released by Landlord from liability under the Lease, or (c) the cessation of the liability of the Subsidiary Corporation from any cause whatsoever other than by agreement of Landlord.

6.    The liability of Parent Corporation under this Guaranty shall continue until the expiration of all periods within which any amount at any time paid on account of the obligations guaranteed hereby may be required to be restored or returned by Landlord upon the bankruptcy, insolvency or reorganization of the Subsidiary Corporation, any other Parent Corporation or any other person. If any amount at any time paid on account of the obligations guaranteed hereby is required to be restored or returned by Landlord as a result of any such bankruptcy, insolvency or reorganization, Parent Corporation shall be liable under this Guaranty with respect to such amount as if such amount was never paid.

7.    If at any time Landlord makes demand under this Guaranty, it shall send written notice of such demand, including particulars of the nature of the claim and the amount claimed to be due, to Parent Corporation at 4000 Union Pacific Avenue, City of Commerce, California 90023, Attention: Real Estate Department, or such other address as Parent Corporation may notify Landlord, or it successor as landlord under the Lease, at the notice address specified in the Lease, from time to time. Any notice to Parent Corporation shall be delivered either in person, by expedited courier, or by pre-paid certified or regular United States Mail with return receipt required.

8.    Neither this Guaranty nor either any rights of Landlord may be assigned in whole or in part to any person whatsoever other than: (a) the successor in interest as to both privity of estate and privity of contract to Landlord under the Lease; and/or (b) as collateral security, to any mortgagee of record of the real property described in **Exhibit "A"**, or any portion thereof if and only if said real property is owned by the landlord under the Lease; provided however, in either or both such instances that concurrent with any such assignment of any interest under this Guaranty the assignor shall notify the Parent Corporation in writing at the notice address specified in this Guaranty, or at such subsequent address as may be specified in accordance with the provisions of this Guaranty: (i) of the name and address of any such assignee; (ii) the interest assigned and the date of such assignment; and (iii) whether the assignee is a lender. In no event shall Parent Corporation have the right to assign its obligations under this Guaranty.

9.    This Guaranty shall be governed and controlled by the laws of the State of California.

10.   Any claim, action, lawsuit, dispute or other proceeding commenced against Parent Corporation and/or arising out of or in relation to this Guaranty shall be commenced, and shall be prosecuted and maintained, if at all, as a reference proceeding pursuant to Section 638 of the California Code of Civil Procedure in the Superior Court in and for the County of Los Angeles, California. Any such action shall be referred to the closest office to the court in which such action is filed of Judicial Arbitration and Mediation Services, Inc. ("JAMS") or, if JAMS is no longer conducting reference proceedings in the State of California, then before the American Arbitration Association. In either event, the arbitration conducted by JAMS or the American Arbitration Association pursuant to the reference proceeding shall be a mandatory, final and binding arbitration. The applicable rules of evidence, discovery and procedures then maintained by JAMS (or the American Arbitration Association if JAMS no longer conducts reference proceeding arbitrations in the State of California) for commercial disputes shall apply to any proceeding involving this Guaranty. The payment of fees, and the awarding of attorneys fees and costs of enforcement, shall also be determined by the then applicable rules of JAMS (or the American Arbitration Association if JAMS is then no longer conducting reference proceeding arbitrations in the State of California).

By entering into this Guaranty, the parties also recognize and agree that the mandatory, binding arbitration shall be before a single arbitrator, without a jury and without any right to trial by jury, and thus, by entering into this Guaranty, the parties are waiving the right to a jury trial for all matters that must be arbitrated under this Guaranty. Each party acknowledges IT IS GIVING UP THE RIGHT TO A JURY TRIAL and further acknowledges that it has had the opportunity to consult with an attorney of its own selection prior to signing this Guaranty.

TBD, Conroe, Texas 77304

11.    In the event of any legal or equitable proceeding to enforce any of the terms or conditions of this Guaranty, or any alleged disputes, breaches, defaults or misrepresentations in connection with any provision of this Guaranty, the prevailing party in such proceeding shall be entitled to recover its reasonable costs and expenses, including, without limitation, reasonable attorneys' fees and costs of defense paid or incurred in good faith.

12.    If any of the provisions of this Guaranty shall contravene or be held invalid under the laws of any jurisdiction, this Guaranty shall be construed as if not containing those provisions, and the rights and obligations of the parties hereto shall be construed and enforced accordingly.

13.    This Guaranty includes and sets forth the entire agreement between Parent Corporation and Landlord with respect to the subject matter of this Guaranty.  This Guaranty may only be modified by a writing executed by Parent Corporation.  It may not be modified by the Subsidiary Corporation.

In Witness Whereof, this Guaranty has been executed as of the day and year first set forth above.

"Parent Corporation"
99¢ Only Stores,
a California corporation

By: _____
    Jeff Gold, Its Senior Vice President


Each and all of the terms, covenants and conditions of the foregoing Guaranty are hereby accepted and agreed to including, without limitation, the provisions pertaining to mandatory and binding arbitration and waiver of jury trial set forth in the Guaranty.  This Guaranty fully satisfies any obligation of the Subsidiary Corporation to provide a guaranty to Landlord under the Lease.

"Landlord"

**WEINGARTEN REALTY INVESTORS**


**By:** _____
      **Sr. Vice President**

## FIRST AMENDMENT TO LEASE

This FIRST AMENDMENT TO LEASE made and entered into this 10th day of August, 2006, by and between WEINGARTEN REALTY INVESTORS, hereinafter called "Landlord," and 99 CENTS ONLY STORES TEXAS, INC., hereinafter called "Tenant."

### W I T N E S S E T H:

WHEREAS, Landlord and Tenant entered into a Lease Contract dated March 16, 2004 ("Lease") for certain premises consisting of approximately 24,050 square feet of space located in Landlord's Montgomery Plaza Shopping Center, and known by street address as 1420 W. Loop 336, Suite 105, Conroe, Texas ("Leased Premises"); and

WHEREAS, Landlord and Tenant now desire to reduce the size of the Leased Premises and amend the Lease as hereinafter set forth;

NOW, THEREFORE, in consideration of the premises and the mutual covenants and conditions contained herein, the parties hereby agree as follows:

1.

The "Effective Date" of this First Amendment to Lease, as said term is used herein, shall be the date upon which Landlord commences construction of the "Recapture Area" (as hereinafter defined). Landlord will commence construction of the Recapture Area prior to September 11, 2006, and complete construction of the Recapture Area prior to the earlier of (i) 21 days after the "Construction Start-up Date" (as defined in the Construction Rider), and (ii) October 1, 2006.

2.

Commencing on the Effective Date, the total amount of rentable area which Landlord leases to Tenant and Tenant leases from Landlord is hereby reduced by the amount of 2,882 square feet (as shown on Exhibit "A" attached hereto as the "Recapture Area"), such that commencing on the Effective Date the Leased Premises as defined in paragraph 1 of the Lease shall be a portion of the building containing approximately 21,168 square feet of floor area, situated substantially as shown on Exhibit "A" and labeled "Revised Leased Premises". Exhibit "A", the latest revision of which is dated May 31, 2006, is attached hereto and replaces Exhibit "A" dated March 11,

Store #2831
08/10/06

Initials


2004 originally attached to the Lease.  Commencing on the Effective Date any reference in the Lease to "Leased Premises" shall be deemed to mean the Revised Leased Premises consisting of 21,168 square feet and any reference to Exhibit "A" shall mean the Exhibit "A" attached hereto.

3.

Commencing on the Effective Date, Tenant shall pay as rental in accordance with the terms and conditions of Article IV of the Lease the following which shall be in lieu of the amount presently set forth in Article IV of the Lease:

For the period commencing with the Effective Date and continuing through January 31, 2010, the sum of Thirteen Thousand Five Hundred Eighty-Two and 80/100 Dollars ($13,582.80) per month.

4.

Commencing on the Effective Date, the "Common Area Payment", as defined in Section 7 of the Addendum to Lease shall be One Thousand Three Hundred Twenty-Three and 00/100 Dollars ($1,323.00) per month, subject to adjustment as provided in Section 7 of the Addendum to Lease.

5.

Commencing on the Effective Date, the "Tax Payment", as defined in Section 7 of the Addendum to Lease shall be Two Thousand Twenty-Eight and 60/100 Dollars ($2,028.60) per month, subject to adjustment as provided in Section 7 of the Addendum to Lease.

6.

Commencing on the Effective Date, the "Insurance Payment", as defined in Section 7 of the Addendum of Lease shall be Two Hundred Eleven and 68/100 Dollars ($211.68) per month, subject to adjustment as provided in Section 7 of the Addendum to Lease.

7.

The last two sentences of Section 12 of the Addendum to Lease granting Tenant the right to extend the term of the Lease are hereby amended in their entirety to read as follows:

"The Minimum Rent payable during each month of any such Extended Term shall increase from the Minimum Rent payable during the last month of the term of the Lease immediately preceding such Extended Term by an amount equal to:  (a) 21,168 square feet, (b) multiplied by $0.50 (one-half dollar) per square foot, (c)

2

Initials

divided by twelve (12).  For example, the Minimum Rent during the First Extended Term, if any, would be $14,464.80 per month; the Minimum Rent during the Second Extended Term, if any, would be $15,346.80 per month; and the Minimum Rent during the Third Extended Term, if any, would be $16,228.80 per month."

8.

The Recapture Area shall be constructed in accordance with the Construction Rider attached hereto and incorporated by reference herein for all purposes.  The parties acknowledge that Tenant shall continue to operate its business in the Leased Premises during the period of Landlord's construction, subject to the following:  (a) Upon five (5) business days' prior notice to (i) Tenant and (ii) Mark P. Carroll, Director, Real Estate, 99¢ Only Stores, 23623 Colonial Parkway, Katy, Texas 77493 and markc@99only.com. Tenant shall remove all furniture, fixtures, equipment, inventory and signage (if applicable) from the Recapture Area; (b) Tenant agrees that it will cooperate with Landlord's contractors and will not interfere with Landlord's contractors during said construction period, and to the extent required for completion of Landlord's Work, will temporarily remove from that portion of the Leased Premises affected by Landlord's construction (the "Buffer Area", which is expected to be approximately six feet from all sides of the Recapture Area) as much of Tenant's furniture, fixtures, equipment, inventory and signage (if applicable) as may be necessary for Landlord's contractors to complete said work at the Leased Premises; (c) Landlord agrees it will take reasonable measures not to interrupt the operation of Tenant's business; however, Tenant acknowledges that Landlord's work will result in a certain measure of inconvenience to Tenant; and (iv) Landlord shall not be liable to Tenant for any diminished sales or loss of business, nor shall Tenant be entitled to any rent abatement or other compensation from Landlord.

9.

Landlord agrees to perform Landlord's Work in a safe, clean and good workmanlike manner. Landlord shall provide safety screening and/or barriers (e.g., sheets of plastic) and take other reasonable precautions when performing Landlord's Work to shield tenant's customers and employees from the prosecution of Landlord's Work. Landlord shall cause debris to be removed daily from the work site.  Landlord will not remove the East demising wall of the Recapture Area until the demising wall between the Recapture Area and the Revised Leased Premises has been completed.

3

Store #2831
08/10/06

Initials

10.

Landlord acknowledges that (i) Tenant will experience some disruption in its business operations due to Landlord's Work, and (ii) Tenant will have certain expenses associated with (a) removing all furniture, fixtures, equipment, inventory and signage (if applicable) from the Recapture Area and Buffer Area and (b) re-installing furniture, fixtures, equipment, inventory and signage (if applicable) on and in the area of the new demising wall. As consideration for the matters set forth in this Paragraph 10, Landlord will reimburse Tenant an amount equal to Twenty Thousand and No/100 Dollars ($20,000.00) within thirty (30) days after Landlord has completed Landlord's Work.

11.

The parties hereby acknowledge that this First Amendment to Lease is expressly conditioned upon Landlord entering into a lease contract with a third party tenant for the Recapture Area. In the event Landlord fails to enter into such lease contract and so notify Tenant in writing within sixty (60) days from the date hereof, then either Landlord or Tenant may terminate this First Amendment to Lease upon seven (7) days prior written notice to the other party. Notwithstanding the foregoing, should Tenant exercise its right of termination and Landlord thereafter enter into a lease contract for the Recapture Area and so notify Tenant before the expiration of the seven (7) day period, then Tenant's notice of termination shall be rendered null and void. In the event this First Amendment to Lease is terminated as provided in this Section 10, the underlying Lease Agreement shall nonetheless remain in full force and effect according to its terms as if the First Amendment to Lease had never been executed.

Tenant acknowledges and agrees that Landlord has fully performed all of its covenants, duties and obligations heretofore accruing under the Lease and does hereby release Landlord from any and all claims for non-performance with respect thereto.

EXCEPT as specifically provided to the contrary herein, all of the rest and remaining terms and conditions of the Lease shall remain in full force and effect. All defined terms used herein shall have the same meaning as when used in the Lease unless another meaning is clearly indicated.

Even though the Effective Date may occur on a date subsequent to the execution date of this instrument, the parties intend that each shall have vested rights immediately upon full execution hereof and that this

4

Initials

instrument shall be fully binding and in full force and effect from and after the execution hereof by Landlord and Tenant.

Weingarten Realty Investors (the "trust") is an unincorporated trust organized under the Texas Real Estate Investment Trust Act. Neither the shareholders of the trust, nor its trust managers, officers, employees or other agents are personally, corporately or individually liable for any debt, act, omission or obligation of the trust, and all persons having claims of any kind against the trust must look solely to the property of the trust for the enforcement of their rights.

THE SUBMISSION OF THIS DOCUMENT FOR EXAMINATION AND/OR EXECUTION HEREOF SHALL BECOME EFFECTIVE ONLY UPON EXECUTION BY ALL PARTIES HERETO AND DELIVERY OF A FULLY EXECUTED COUNTERPART BY LANDLORD TO THE OTHER PARTIES HERETO.

EXECUTED in multiple counterparts, each of which shall have the force and effect of an original on the day and year first written above.

WEINGARTEN REALTY INVESTORS

By: _____

Name: Jeffrey A. Tucker

Title: Sr. Vice President/General Counsel

LANDLORD

99 CENTS ONLY STORES TEXAS, INC.

By: _____

Richard J. Frick, Vice President

By: _____

Steven J. Horowitz,
Vice President – Property Development

TENANT

Store #2831
08/10/06

Initials

CONSENT OF GUARANTOR

99¢ ONLY STORES, Guarantor of the obligations of 99 CENTS ONLY STORES TEXAS, INC., by instrument dated March 16, 2004 hereby consents to the foregoing First Amendment to Lease.  Guarantor is granting its consent for the sole purpose of providing comfort to Landlord and such consent shall not be construed to create, or deemed to create, any right of consent not expressly granted or required in the Guaranty.  The terms and provisions of said Guaranty shall remain in full force and effect and shall apply to the Lease, as such Lease has been amended herein.

99¢ ONLY STORES, a California corporation

By: _____

Jeff Gold
President

GUARANTOR

Store #2831
08/10/06



The "Leased Premises" as shown hereon is for  99 CENTS ONLY STORES TEXAS, INC.
Subject to the terms of the Lease, any future construction by the Landlord
within the Shopping Center will not affect the validity of the Lease covering
the Leased Premises. Subject to the terms of the Lease , Landlord may elect
to change the location, size, layout, or other details of any buildings, or
Common Area in the Shopping Center and/or to construct other buildings in
the Shopping Center and such changes will not affect the validity of the
Lease covering the Leased Premises.

The post office address designated  hereon, if any, is subject to change
at any time.

DATE: 03-11-2005
REV.: 05-31-2006

EXHIBIT "A"

MONTGOMERY PLAZA

Floor No:
AOO
Unit No:
FOF
Project No:
0165
INITIAL

EXHIBIT "C"

<u>PLANS AND SPECIFICATIONS</u>

Need Not Be Attached



## CONSTRUCTION RIDER

This Construction Rider is attached to and forms a part of that certain First Amendment to Lease (the "First Amendment") dated March 16, 2006, between WEINGARTEN REALTY INVESTORS, as "Landlord" and 99 CENTS ONLY STORES TEXAS, INC., as "Tenant".

1.

### Landlord's Work

A.    Subject to the provisions of this Lease, Landlord will (i) construct a demising wall between the Recapture Area and the Revised Leased Premises, (ii) paint the demising wall to match existing walls, and (iii) tie the ceiling back into the demising wall, substantially in accordance with the "Final Plans and Specifications" (hereinafter identified) to be prepared by Landlord as hereinafter provided ("Landlord's Work"). Landlord will not remove the East demising wall of the Recapture Area until the demising wall between the Recapture Area and the Revised Leased Premises has been completed. If, as of the time of execution of the First Amendment, Landlord and Tenant have not agreed upon such Final Plans and Specifications for Landlord's Work, Landlord shall prepare and submit to Tenant for Tenant's approval such Final Plans and Specifications proposed by Landlord (hereinafter referred to as "Proposed Plans and Specifications") within thirty (30) days from the date of the First Amendment. Tenant shall cause the aforesaid Proposed Plans and Specifications to be examined and reviewed on Tenant's behalf for the purpose of determining their acceptability to Tenant. Tenant shall have the right to submit and recommend to Landlord modifications and revisions in the Proposed Plans and Specifications, which modifications and revisions (if any) shall be submitted to Landlord within seven (7) days from the date Landlord submits such Proposed Plans and Specifications to Tenant for Tenant's review and approval. Landlord shall have no obligation to modify the Proposed Plans and Specifications in the manner indicated by Tenant, but in the event that Landlord and Tenant shall not have agreed upon a mutually acceptable set of plans and specifications for Landlord's Work by the expiration of fifteen (15) days after the date Landlord originally submits the Proposed Plans and Specifications to Tenant (with such agreement evidenced in the manner hereafter referred to), then Landlord, in addition to all its other remedies permitted hereunder or by law, shall have the option to terminate the First Amendment at any time thereafter upon notice to Tenant as hereinafter provided, upon which termination the First Amendment shall be automatically null and void and of no further force or effect. If Landlord and Tenant have mutually agreed upon plans and specifications for Landlord's Work, said plans and specifications shall be designated Exhibit "C" and shall be signed or initialed by both Landlord and Tenant and dated (and shall thereupon constitute the "Final Plans and Specifications"), but need not be attached to the First Amendment.

B.    If said Final Plans and Specifications (Exhibit "C") are mutually agreed upon in writing by Landlord and Tenant (with such agreement evidenced in the manner hereinabove referred to) and Landlord does not exercise any right of Landlord to terminate the First Amendment, Landlord shall use good faith efforts to obtain all required permits and authorizations (collectively referred to herein as a "Building Permit") from appropriate governmental authorities for Landlord's Work provided for under Exhibit "C". In the event that the applicable governmental authorities involved decline to issue a Building Permit to Landlord on the basis of Exhibit "C", Landlord and Tenant will attempt to make mutually agreeable revisions to Exhibit "C" which will satisfy the requirements for issuance of a Building Permit, although neither Landlord nor Tenant shall be obligated to approve any such revisions.

If, within thirty (30) days after the denial of such "Building Permit", either Landlord and Tenant have not agreed in writing upon revisions to Exhibit "C", or Landlord and Tenant have agreed in writing upon revisions to Exhibit "C" but Landlord has not obtained said Building Permit within such thirty (30) day period, then either party shall have the right, at its option, to terminate the First Amendment at any time thereafter. Similarly, if Landlord has requested a Building Permit but such request has not been granted or denied within sixty (60) days after Landlord's request, then Landlord shall have the right, at its option, to terminate the First Amendment at any time thereafter upon notice to Tenant.

C.      For all purposes under the First Amendment, the "Construction Start-Up Date" shall mean the earliest date by which all the hereinafter stated circumstances shall have occurred (provided the First Amendment has not been cancelled for any reason herein provided): (i) Landlord and Tenant have agreed in writing upon Final Plans and Specifications for said improvements (Exhibit "C") and such agreement is evidenced in the manner hereinabove stated; and (ii) Landlord has obtained the necessary Building Permit.

D.      If the "Construction Start-Up Date" shall have occurred, Landlord shall complete Landlord's Work within twenty-one (21) days thereafter substantially in accordance with Exhibit "C" unless Landlord's failure so to complete is caused by governmental restrictions, strikes, lockouts, shortages of labor or material, acts of God, war or civil commotion, fire, unavoidable casualty, inclement weather or any cause beyond the reasonable control of Landlord (any one or more of the aforesaid reasons for Landlord's failure so to complete being herein referred to as "Excusable Delays"), in which event Landlord shall have a period of time equal to the total of all Excusable Delays in addition to the time specified above in which to complete such construction substantially in accordance with Exhibit "C".

2.

## Tenant's Work

Subject to the provisions of this Lease, Tenant will remove its furniture, fixtures, equipment, inventory and signage (if applicable) from the Recapture Area and Buffer Area until Landlord's Work has been completed. Thereafter, Tenant will reinstall its furniture, fixtures, equipment, inventory and signage (if applicable) in the Revised Leased Premises.

3.

In the event that the First Amendment is terminated pursuant to any provision of this Construction Rider, the underlying Lease shall nonetheless remain in full force and effect according to its terms as if the First Amendment had never been executed.

## SECOND AMENDMENT TO LEASE
## (2831 CONROE, TX)

THIS SECOND AMENDMENT TO LEASE (this "Second Amendment"), dated for reference purposes as October 10, 2022, is hereby entered into by and between AMERICAN NATIONAL INSURANCE COMPANY, a Texas corporation ("Landlord"), on the one hand, and 99 CENTS ONLY STORES TEXAS, INC., a Delaware corporation ("Tenant"), on the other hand, with reference to the following facts:

A.    Weingarten Realty Investors, a Texas limited partnership ("Original Landlord") and Tenant are parties to that certain Lease Contract and Addendum to Lease, both dated March 16, 2004 (collectively, the "Original Lease"), later amended by that certain First Amendment to Lease dated August 10, 2006 (the "First Amendment"), and by that certain Renewal Letter agreement and Option Rider both dated September 17, 2009 (the "Letter Amendment", and together with the Original Lease and First Amendment, collectively, the "Existing Lease"), pursuant to which Tenant currently leases premises commonly known as 1420 W. Loop 336, Suite 105, Conroe, Texas, (the "Premises"), as more particularly described in the Existing Lease. Any capitalized terms used but not defined in this Second Amendment shall have the meaning set forth in the Existing Lease.

B.    Landlord has succeeded to the interests of Original Landlord as described within the terms and provisions of the Existing Lease. Landlord and Tenant now desire to enter into this Second Amendment to extend the term of the Existing Lease and otherwise amend the Existing Lease as set forth hereinbelow.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant hereby agree as follows:

1.    Extension of Lease Term. Landlord and Tenant hereby (i) acknowledge that the current term of the Existing Lease is scheduled to expire January 31, 2025, and (ii) agree that notwithstanding any terms of the Existing Lease to the contrary, such term is hereby extended through April 30, 2035. As used herein, the "Second Extended Term" shall mean and refer to the period commencing on February 1, 2025, and continuing through (and including) April 30, 2035. All terms and conditions of the Existing Lease shall continue to apply during the Second Extended Term, except that the Minimum Rent payable during the Second Extended Term shall be as follows:

| Period of Second Extended Term | Annualized Minimum Rent | Monthly Minimum Rent |
|---|---|---|
| February 1, 2025 – April 30, 2030** | $202,577.76 | $16,881.48 |
| May 1, 2030 – April 30, 2035 | $222,899.04 | $18,574.92 |
| ** Subject to the provisions below in Paragraph 2. | | |

2.    <u>Abatement</u>. Notwithstanding anything to the contrary in the Existing Lease (as amended by this Second Amendment), Landlord hereby agrees to abate Base Rent for the months of February 2025, March 2025, and April 2025 (i.e., the first three (3) months of the Second Extended Term).

3.    <u>Right to Extend Lease Term</u>. Notwithstanding the extension of the term of the Existing Lease for the Second Extended Term in this Second Amendment, Tenant shall continue to have the right to further extend the term of the Existing Lease for two (2) consecutive periods of five (5) years each, pursuant to and in accordance with the terms and conditions set forth in the Option Rider attached to the Letter Amendment, except that (a) references therein to the "Primary Term" shall mean the Second Extended Term noted in this Second Amendment, (b) the first (1st) "Extension Term" shall commence immediately following the expiration of the Second Extended Term, and (c) subparagraph (b) of the Option Rider attached to the Letter Amendment shall no longer apply, and the Minimum Rent payable during each of the additional Extension Terms shall be as follows:

| Period | Annualized Base Rent | Monthly Base Rent |
|---|---|---|
| First Extension Term (May 1, 2035 – April 30, 2040) | $245,125.44 | $20,427.12 |
| Second Extension Term (May 1, 2040 – April 30, 2045) | $269,680.32 | $22,473.36 |

4.    <u>Allowance</u>. Provided Tenant is not, at the time of execution of this Second Amendment and/or at the time of commencement of the Second Extended Term, in default under any provisions of the Existing Lease beyond any applicable notice and cure period provided by the Existing Lease, including without limitation those provisions related to tenant improvements to the Premises, construction, and remodeling in the Premises, Landlord hereby agrees to provide Tenant with a fixed amount equal to Seventy-Five Thousand Dollars ($75,000) as a tenant allowance (the "<u>Allowance</u>"). Tenant acknowledges and agrees that the Allowance may be used solely for the purpose of funding Tenant's costs and expenses (both hard and soft costs) associated with the construction of improvements or alterations to the Premises by Tenant between the date of this Second Amendment and the end of the first year of the Second Extended Term (the "<u>Improvement Period</u>"), and for no other purpose. Following commencement of the Second Extended Term, Landlord agrees to pay the Allowance to Tenant within thirty (30) days of receipt of Tenant's written request therefor, which request shall include a certification by Tenant's Chief Real Estate Officer that Tenant has made, or will make, improvements or alterations to the Premises costing at least the amount of the Allowance during the Improvement Period, the construction of which shall be subject to and in accordance with the terms and conditions of the Lease, including Section 10.01 of Original Lease and Section 16 of the Addendum attached to the Original Lease. If Landlord fails to timely pay the Allowance and such failure is not cured within ten (10) business days after written notice from Tenant to Landlord, then Tenant shall have the right, in addition to any other remedies it may have at law or in equity, to deduct the unpaid amount of Allowance, together with interest thereon at the rate of ten percent (10%) per annum from the due date thereof until paid in full, from the rent due during the Second Extended Term until the Allowance and applicable interest thereon are fully recovered.

Page 2 of 4

5.      <u>Encumbrances</u>.  Landlord represents and warrants to Tenant that, as of the date of Landlord's execution and delivery of this Second Amendment, the real property of which the Premises is a part is not subject to any ground or other underlying lease of the land, and Landlord has no mortgages or deeds of trust which encumber the real property of which the Premises is a part.

6.      <u>Entire Agreement; No Further Modifications</u>.  The Existing Lease, as amended by this Second Amendment, contains the entire agreement between the parties with regard to Tenant's lease of the Premises.  Except as set forth in this Second Amendment, all the terms and provisions of the Existing Lease shall apply and shall remain unmodified and in full force and effect.  To the extent any provisions of this Second Amendment conflict with any provisions of the Existing Lease, the provisions of this Second Amendment shall prevail.

7.      <u>Counterpart Signatures</u>.  This Second Amendment may be executed in counterparts, each of which shall be deemed an original and all of which counterparts taken together shall constitute but one and the same instrument.  Any party may deliver its signature to this Second Amendment by telecopy or electronic mail and any party who receives an executed signature page from another party by telecopy or electronic mail may rely upon said signature as if it was a signed original. Additionally, each party hereby agree that (a) its authorized signatories may sign this Second Amendment via electronic signature (e.g., DocuSign or similar electronic signature technology), and (b) each party may rely on such electronic signatures as if they are original signatures.

8.      <u>Authority</u>.  Each party hereby represents and warrants that it has the full right and authority to execute and deliver this Second Amendment and each person signing on behalf of such representing party is authorized to do so.

9.      <u>Submission</u>.  Submission of this instrument for examination or signature by either party hereto shall not constitute an offer nor a representation or warranty of any kind by the other party, and this instrument shall not be effective as an amendment to the Existing Lease or otherwise unless and until the same is fully signed and delivered by both parties.

[SIGNATURES FOLLOW ON NEXT PAGE]

Second Amendment to Lease
2831 Conroe, TX
Final 10.10.2022 [SALC-LHM]
3565475.2 - 89079.C41

**IN WITNESS WHEREOF**, this Second Amendment has been executed and delivered as of the later date set forth below.

<u>LANDLORD</u>:

AMERICAN NATIONAL INSURANCE COMPANY,
a Texas corporation

By: _____

Name: _____

Title: _____

Date: _____

Anne M. LeMire
SVP & Chief Securities
Investment Officer

<u>TENANT</u>:

99 CENTS ONLY STORES TEXAS, INC.,
a Delaware corporation

By: _____

Mary L. Kasper
Vice President and Secretary

Date: ____10/26/2022_____

Page 4 of 4

**EXHIBIT 3**

# TABLE OF CONTENTS

**Section**

1. Definitions
   A. Common Areas
   B. Dates
   C. Exhibits
   D. Demised Premises
   E. Shopping Center

2. Demise

3. Term
   A. Original Term
   B. Option to Extend Term

4. Use and Operation

5. Rent
   A. Fixed Minimum Rent
   B. Utilities Charge and Exterior Lighting
   C. Percentage Rent
   D. Common Area Charges and Cap
   E. Real Estate Taxes
   F. Tenant Improvement Allowance
   G. Matters of Record

6. Alterations

7. Maintenance, Repairs and Initial Build Out

8. Signs

9. Fixtures

10. Governmental Regulations

11. Indemnification

12. Insurance
    A. Tenant
    B. Landlord

13. Fire Rebuilding and Altering

14. Force Majeure

15. Injunction

16. Warranty of Title by Landlord; Representations

17. Quiet Enjoyment

18. Mortgage and Estoppel Certificates

19. Default

20. Condemnation

21. Mutual Waiver of Subrogation

22. Assignment and Subletting

23. Surrender and Holdover

24. Notices

25.  Legality

26.  Binding Obligations

27.  No Recordation

28.  Real Estate Broker's Commission

29.  No Waiver, Laches or Accord and Satisfaction

30.  Hazardous Materials

31.  Titles and Entire Agreement

32.  Waiver of Claims

33.  Reasonable Consent

34.  Co-Tenancy

35.  No Presumption against Drafter

36.  Submission of Lease

37.  Interlineation

38.  Time of the Essence

39.  Tenant's Audit Rights

40.  Attorney Fees

41.  Waiver of Jury Trial

42.  Real Estate Investment Trust

43.  Prohibited Persons

44.  Independent Covenants

## LEASE AGREEMENT

This Lease Agreement ("Lease"), shall be made effective the 4ᵗʰ day of September, 2009, by and between Weingarten Realty Investors, a real estate investment trust ("Landlord"), whose mailing address is 2600 Citadel Plaza Drive, Suite 125, Houston, TX 77008, Attn: General Counsel, and PNS Stores, Inc., a California corporation, doing business as Big Lots ("Tenant"), whose mailing address is 300 Phillipi Road, Department 10061, Columbus, Ohio 43228-0512.

### WITNESSETH:

**1.   DEFINITIONS:**

For purposes of this Lease, these terms are defined as follows:

A.   Common Areas:  The term "Common Areas" as used herein shall mean the improved portion of the Shopping Center not occupied by building area as shown on the site plan, including, but not limited to, the parking areas, driveways, service driveways, service areas, sidewalks, any landscaped areas, Shopping Center signs, and parking lot lighting poles and light fixtures of the Shopping Center which shall be collectively referred to as Common Areas.  Expressly excluded from the definition of Common Areas are the roof and all structural portions of the Shopping Center.

Landlord shall maintain the Common Areas and Landlord agrees not to change such Common Areas in a manner which would materially, adversely impair the visibility of or accessibility to the Demised Premises.  Tenant shall comply with the reasonable rules and regulations which are prescribed from time to time by Landlord with respect to the Common Areas, provided, such rules and regulations do not adversely affect Tenant's business operation and do not conflict with the terms of this Lease.  Tenant, or any employees or agents of Tenant shall not fence, block, allow property to remain in or upon or otherwise obstruct the Common Areas; provided, however, Tenant shall be permitted to place one (1) drop/storage trailer in the receiving area of the Demised Premises in the area identified as "Drop/Storage Trailer" on Exhibit "A", and does not materially interfere with the business operations of the other tenants of the Shopping Center and/or the rear service drives of the Shopping Center, and (ii) does not violate any local codes/ordinances or restrictions currently in effect at the Shopping Center. Landlord shall not construct any buildings and shall not alter the parking field or the ingress and egress to the receiving area of the Demised Premises in the area identified as the "No Change Area" as crosshatched on Exhibit "A", attached hereto.

B.   Dates: Landlord and Tenant agree, upon the request of either party, to confirm in writing, the dates contained in this Section along with other key dates contained in this Lease following execution of this Lease.

1)   Landlord shall notify Tenant if and when construction progress and procedures shall permit any part of Tenant's Work (as defined below) to be done simultaneously with Landlord's Work, and upon such notice, Tenant shall have the right to enter upon the Demised Premises for such purposes. The date of such entry shall be the "Tenant Entrance Date" and shall not be construed as an acceptance of or possession of the Demised Premises by Tenant under the provisions of this Lease or as a waiver of any of the provisions hereof.  Tenant, its agents, employees, and contractors will not interfere with or delay Landlord's Work pursuant to Exhibit C.  Tenant hereby agrees to indemnify Landlord against any injury, and loss or damage which may occur to any person as a result of any of the Tenant's Work or installations made in the Demised Premises,

3

except for the negligence of Landlord, its employees, agents, or contractors. Prior to any early entry by Tenant, Tenant shall provide Landlord with proof of insurance coverages described in this Lease.

2)    The "Tenant Possession Date" shall be the later of (i) the date Landlord tenders possession of the Demised Premises to Tenant with all construction required to be performed by Landlord pursuant to Exhibit C ("Landlord's Work") Substantially Completed, or (ii) the date on which Tenant receives all permits from the applicable governing authority for its construction and signage at the Demised Premises. Tenant will submit its plans for permits within ninety (90) days of full execution of this Lease and thereafter, diligently pursue obtaining such permits. Landlord will cooperate fully with Tenant in obtaining said permits.. Landlord shall use the form shown on Exhibit E, which may be sent via facsimile, to deliver possession of the Demised Premises. Said form shall be executed by Tenant and returned to Landlord if possession has been given. Possession of the Demised Premises shall not be deemed to have been given to Tenant unless Landlord has Substantially Completed Landlord's Work and the Demised Premises complies with all laws, ordinances, regulations and building restrictions other than those which cannot be complied with until the completion of Tenant's Work. Any upgrades and/or alterations to the Shopping Center that are not part of the Demised Premises, but are required by the governing authority to be completed as a condition of Tenant obtaining a certificate of occupancy for the initial "Permitted Use" (as defined below) will be completed by Landlord at its sole expense. As of the mutual execution of this Lease, all provisions of this Lease shall be applicable except as to Tenant's obligations with regard to payments due hereunder which shall take effect as of the Rent Commencement Date.

"Substantial Completion" shall mean the date on which Landlord or its architect notifies Tenant in writing that Landlord has substantially completed Landlord's Work in the Demised Premises, with the exception of any Punch-List Items (as defined below). Within a reasonable period of time after Substantial Completion and Landlord's tender of possession of the Demised Premises to Tenant, Landlord and Tenant shall agree on a final punch-list of items to be completed (collectively, "Punch-List"). Landlord's contractor shall use reasonable efforts to complete or repair the items set forth on the Punch-List within thirty (30) days thereafter.

3)    The "Rent Commencement Date" shall be the earlier of (ii) the date which is one hundred twenty (120) days after the Tenant Possession Date; or (B) the date on which Tenant opens for business in the Demised Premises. Notwithstanding anything in this Section 1.B(3) to the contrary, the Rent Commencement Date will never be delayed beyond the date when Tenant opens for business within the Demised Premises.

4)    The "Term Commencement Date" shall be the earlier of (i) the date Tenant opens for business; or (ii) the Rent Commencement Date.

5)    Landlord anticipates tendering possession of the Demised Premises to Tenant with Landlord's Work Substantially Complete on or prior to November 15, 2009. Subject to Landlord and Tenant executing this Lease by September 4, 2009, if Landlord fails to tender possession of the Demised Premises to Tenant by January 2, 2010, then Tenant may terminate this Lease by written notice to Landlord. In no event shall Tenant be obligated to accept possession of the Demised Premises prior to November 15, 2009. Landlord and Tenant agree that, subject to "Force Majeure" [strikes (which are beyond the reasonable control of Landlord), fire or other casualty, acts of God, riots or war only] (as defined below), if Landlord fails to deliver possession of the Demised Premises to Tenant by January 2, 2010, the damages suffered by Tenant, though great and irreparable, are difficult or impossible to accurately ascertain. Therefore,

4

commencing upon January 3, 2010, and continuing for each and every day Landlord is delayed in delivering possession to Tenant on or prior to January 15, 2010, subject to Force Majeure, and without waiving any other remedy available to Tenant under this Lease, at law, or in equity, including the rights provided in Section 7 of this Lease, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $2,500.00 per day. Commencing upon January 16, 2010, and continuing for each and every day Landlord is delayed in delivering possession to Tenant, subject to Force Majeure, Landlord shall pay to Tenant, as liquidated damages and not a penalty, the sum of $5,000.00 per day. If Landlord shall fail to pay such liquidated damages within ten (10) days after receipt of an invoice therefore, Tenant shall have the right to deduct such amount with interest at the rate of two percent (2%) above the prime rate as established by the Chase Manhattan Bank of New York (or any successor thereto) annually, from the next installments(s) of Rent due under this Lease until such amount is recouped.

6)      Notwithstanding anything to the contrary, in the event Landlord does not deliver possession of the Demised Premises with Landlord's Work Substantially Completed by June 30, 2010, Tenant will not be required to accept possession until February 7, 2011. The period of time between July 1, 2010 and February 7, 2011 will be the "Optional Blackout Period". In the event Landlord offers possession during the Optional Blackout Period, and Tenant elects to accept possession of the Demised Premises in the Optional Blackout Period, then effective upon the date of such election, the liquidated damages, as provided in (and subject to) subparagraph 5 above, shall cease to accrue for periods subsequent to the date Tenant makes such election. In the event Landlord offers possession during the Optional Blackout Period, but Tenant elects not to accept possession of the Demised Premises during the Optional Blackout Period, no liquidated damages, as provided in (and subject to) subparagraph 5 above, shall accrue during such Optional Blackout Period. In addition, in the event Landlord has not offered delivery of possession to Tenant by February 7, 2011, then Tenant may terminate this Lease by delivery of a termination notice at any time after February 7, 2011, provided Landlord has not tendered delivery of possession of the Demised Premises to Tenant prior to the date Tenant sends the aforesaid termination notice.

7)      In the event Landlord offers possession of the Demised Premises during the Optional Blackout Period, and Tenant elects to accept possession in the Optional Blackout Period, unless Tenant opens for business, the Rent Commencement Date will not begin until the later of: (i) the later of ninety (90) days after delivery of possession of the Demised Premises by Landlord or ninety (90) days after Tenant has received all its construction permits and approvals; or (ii) February 7, 2011. Notwithstanding anything in this Section 1.B.7. to the contrary, the Rent Commencement Date will never be delayed beyond the date when Tenant opens for business within the Demised Premises.

C.      Exhibits: The following Exhibits are attached to and made a part of this Lease by reference hereto:

1)      Exhibit A -   Site Plan of Shopping Center

2)      Exhibit A – 1  Tennant's Drawing of the Demised Premises

3)      Exhibit B -   Legal Description of Shopping Center

4)      Exhibit C -   Landlord Work

5)    Exhibit C-1 - Plans and Specifications

6)    Exhibit D -   Tenant Building Sign Specifications

7)    Exhibit D – 1 Tenant Pylon Sign Location

8)    Exhibit E -   Delivery of Possession Letter

9)    Exhibit F -   Exclusive/Prohibited Use Provisions

10)   Exhibit G -   Remeasurement Rider

D.        Demised Premises:   The "Demised Premises" shall be the storeroom, indicated on Exhibit A, which storeroom shall have approximately 31,502 square feet of ground floor area with a minimum width of one hundred twenty (120) feet of frontage for the Demised Premises. Tenant's Drawing of the Demised Premises is attached hereto as Exhibit A-1 and is deemed approved by the parties hereto.  Within ninety (90) days after the Tenant Possession Date, Tenant shall have the opportunity, at Tenant's sole cost and expense, to have the Demised Premises remeasured by an architect or engineer of Tenant's choosing, for a determination of the Demised Premises exact square footage, measured in accordance with the BOMA standard, and provide the Landlord with written notice of its findings.  Tenant shall provide notice to Landlord prior to such remeasurement and afford Landlord the opportunity to be present during such remeasurement. Except as otherwise provided herein, should the findings of such remeasurement differ from the square footage of the Demised Premises by an amount greater than 100 square feet, then all aspects of Rent and Additional Rent shall be adjusted accordingly.  Upon performing such remeasurement, should the findings thereof differ from the square footage of the Demised Premises by an amount greater than 100 square feet, then the Landlord and Tenant shall complete the Remeasurement Rider attached hereto as Exhibit G and shall exchange such Remeasurement Rider with each other. Notwithstanding the foregoing, Tenant shall not be obligated to pay Rent or Additional Rent on any space in excess of 31,502 square feet (although said excess space shall be deemed a part of the Demised Premises) nor accept possession of any space under 27,000 square feet in size, and, if Tenant elects not to accept possession of such space that is under 27,000 square feet in size, Tenant shall terminate this Lease.

E.        Shopping Center:  Landlord's "Shopping Center" is described in Exhibit B attached hereto and made a part hereof, which said description encompasses the area shown on Exhibit A, the address of which is the Montgomery Plaza Shopping Center, I-45 @ Loop 336 West, 1400-1424 Loop 336 West, Conroe, Texas 77304.  Landlord represents that the gross leasable area of the Shopping Center as of the date of this Lease is approximately 300,000 square feet.

F.        Gross Sales:  The term "Gross Sales" shall mean (1) the aggregate gross amount of all sales made in or from the Demised Premises during any Lease Year or Partial Lease Year and (2) charges for all services rendered in or from the Demised Premises during any Lease Year or Partial Lease Year.  Such sales, charges, and receipts shall include those of Tenant and Tenant's sublessees. The following shall be deducted from Gross Sales to the extent same are included in the above computation:   (1) sales taxes, excise taxes and any similar tax specifically charged to and paid by customers and directly remitted to the taxing authority; (2) merchandise returned or exchanged at the Demised Premises; (3) income from stamp machines and public telephones; (4) bad debts on credit sales and bad checks;   (5) sales of merchandise to employees at a discount; (6) insurance proceeds; (7) non point-of-purchase, electronic-commerce transactions initiated at the Demised Premises and consummated on the internet; (8) credit card company finance or service charges;   (9) proceeds from vending machines located in the Demised Premises; and (10) merchandise transferred to a warehouse or another store of Tenant, provided such transfers are made solely for the convenient operation of Tenant's business and not for the purpose of depriving

6

Landlord of the benefit of a sale which would otherwise be made at, in, or from the Demised Premises. Tenant shall retain all Gross Sales records for three (3) years after preparation, and Landlord shall have the right to inspect all Gross Sales records at all reasonable times. Within fifteen (15) days after the end of each month of the Term and, within thirty (30) days after the end of each Lease Year, Tenant will deliver to Landlord a statement, certified by Tenant to be accurate and complete, setting forth the amount of Gross Sales made during such month (or Lease Year, as the case may be), itemized in reasonable detail.

## 2.   DEMISE:

Landlord, in consideration of the Rent and Additional Rent to be paid by Tenant and Tenant's covenants and undertakings hereinafter provided, hereby leases to Tenant, and Tenant hereby leases from Landlord, the Demised Premises together with all rights, privileges, benefits, rights-of-way and easements now or hereafter appurtenant or belonging thereto during the Term and for the use hereinafter provided. Landlord further grants to Tenant, its employees, agents, customers and invitees, a non-exclusive use of the Common Areas to be shared with the other tenants and occupants of the Shopping Center and their respective employees, agents, customers, and invitees.

## 3.   TERM:

A.   Original Term:  The original term of this Lease shall be for a period commencing on the Term Commencement Date as defined in Article 1.B(4) above and ending January 31, 2015 (the "Original Term"). Upon the expiration or earlier termination of this Lease, Landlord and Tenant shall be released from all liability, under this Lease, thereafter accruing, except as otherwise provided herein. The "Lease Year" shall be defined as each successive period of twelve (12) consecutive calendar months commencing on the first day of February of each year during the Term hereof. If the Term Commencement Date is other than February 1st of any year, the period between the Term Commencement Date and January 31st of the following year shall be a "Partial Lease Year." If this Lease is terminated on a date other than January 31st of any year, the period between the February 1st immediately preceding the termination date and the actual termination date shall be a "Partial Lease Year". Tenant's obligations to pay Rent and Additional Rent shall commence on the Rent Commencement Date. As used herein, "Term" shall mean the Original Term, any Option Terms, and any other extended period.

B.   Option to Extend Term:  Landlord hereby grants to Tenant the option to extend the Term of this Lease for three (3), five (5) year option terms, consecutively referred to as "First Option Term", "Second Option Term", and "Third Option Term" at the Fixed Minimum Rent as specified below. The First Option Term shall commence at the end of the Original Term of this Lease, the Second Option Term shall commence at the end of the First Option Term, and the Third Option Term shall commence at the end of the Second Option Term, each upon the same terms and conditions as contained in this Lease except as provided herein. If Tenant is then in possession of the Demised Premises and not in default of this Lease beyond any applicable notice and cure periods, Tenant may elect to exercise each option by giving the Landlord written notice at least six (6) full calendar months prior to the expiration of the immediately preceding Original Term or the previous Option Term as applicable.  Upon receipt of each such notice, this Lease will be extended for the period specified herein without the necessity for the execution of any further instrument and upon the same terms, conditions, covenants, and agreements as are contained in this Lease, except that the Fixed Minimum Rent for each Option Period will be as set forth herein. If Tenant neglects to exercise timely any Option Period, Tenant's right to exercise such Renewal Option shall be null and void and without further force and effect. Tenant acknowledges that a failure to properly exercise the First Option Term as provided hereinabove, shall render Tenant's options for the Second Option Term and Third Option Term null and void and without further force and effect; and a failure to properly exercise the Second Option Term as provided hereinabove,

7

shall render Tenant's options for the Third Option Term null and void and without further force and effect.

4.   **USE AND OPERATION**:

A.   **Permitted Uses.**  Subject to the ECR and Exhibit F, Tenant shall have the right to use and occupy the Demised Premises for the purpose of the sale of general merchandise, home and home office furniture, furniture accessories, appliances, toys, seasonal merchandise, furnishings, health and beauty products, food (including frozen food) ("Permitted Use"), and for any other lawful retail purpose subject only to existing restrictions and exclusive uses as described in this Lease.  Subject to the ECR and Exhibit F, Landlord represents and warrants to Tenant, as of the effective date of this Lease, that no exclusive covenants or restrictions granted to existing Shopping Center tenants shall restrict Tenant's use of the Demised Premises for the initial Permitted Use.  Landlord represents and warrants to Tenant that all exclusive use provisions granted by Landlord, or any predecessor of Landlord, to existing tenants in the Shopping Center are attached hereto and incorporated herein as Exhibit F.  Landlord agrees to indemnify, defend and hold harmless Tenant for any and all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation reasonable attorney fees and court costs) associated with a breach of the forgoing representations and warranties.

So long as Tenant is open and operating its business in the Demised Premises for the initial Permitted Use (as provided above), except for tenants (and their successors and assigns) open and operating for business in the Shopping Center as of the effective date of this Lease, no dollar store operation in excess of 10,000 square feet of floor area or closeout store ("Competing Business") may be permitted in the Shopping Center during the Original Term of this Lease or any Option Terms or extensions thereof. In addition to the foregoing, a "Competing Business" shall include, without limitation the following business operations: Marc's, Fred's, Super 10, Maxway, Mazel, Odd Job, Amazing Savings, Ocean State Job Lot, Grossman's Bargain Outlet, Greenbacks, Kings Discount, Building 19, National Wholesale Liquidators, and Ollies Bargain Outlet. Notwithstanding the foregoing, the parties acknowledge that 99 Cent Only is an existing tenant in the Shopping Center whose premises occupy more than 10,000 square feet.  If 99 Cent Only (a) assigns its lease, or subleases its premises, to a dollar store or (b) vacates its premises and Landlord subsequently leases such premises to a dollar store ("replacement dollar store tenant"), then in any such event, such assignee, sublessee or replacement dollar store tenant shall not be deemed a Competing Business notwithstanding the fact that such premises are being operated for the purpose of a dollar store and occupy more than 10,000 square feet of floor area of the Shopping Center ("99 Cent Exception").  If Tenant determines that Landlord has violated the provisions of this second grammatical paragraph of Section 4.A (as same pertains to a Competing Business only), Tenant shall give Landlord written notice of such violation ("Competing Business Violation"), and Landlord shall have thirty (30) days from receipt of the notice within which to cure the Competing Business Violation.  If such Competing Business Violation is not cured within such thirty (30) day period, then Tenant, as its exclusive remedy, shall have the right to pay, in lieu of the Rent stated in the Lease, an amount equal to fifty percent (50%) of the Rent otherwise payable under the terms of the Lease (hereinafter "Reduced Rent") until the Competing Business Violation has been cured. Nothing contained herein shall be deemed to reduce the amounts payable by Tenant as Additional Rent during any period that Tenant has the right to pay Reduced Rent.  Notwithstanding the terms of this paragraph, Tenant shall have no remedy for a violation hereof if another tenant or occupant of the Shopping Center violates a provision of its lease or license agreement regarding the use of its premises ("Rogue Tenant Violation"); provided Landlord, within thirty (30) days after receipt of written notice from Tenant advising Landlord of such Rogue Tenant Violation, commences and diligently pursues good faith efforts to enforce its rights under such lease or license agreement in order to cause Rogue Tenant Violation to cease; provided, further, if said violation does not cease within 365 days after Landlord's receipt of written notice from Tenant advising Landlord of such Rogue Tenant Violation, Tenant shall have the right to terminate the Lease at any time thereafter by delivering termination notice to Landlord while such Rogue Tenant

8

Violation continues; provided, however, such notice must be given, if at all, prior to the date Landlord cures such Rogue Tenant Violation.

For purposes of clarification, a "dollar store" shall include by way of illustrative example, without limitation, the following business operations: 99 Cent Only, Dollar Tree and Dollar General. Dollar stores shall not be deemed a Competing Business unless said dollar store occupies more than 10,000 square feet of floor area of the Shopping Center (except for the 99 Cent Exception). Tenant acknowledges that even in the event that 99 Cent Only (or its successors, assigns or replacements) is open and operating in the Shopping Center, Landlord may lease space to another dollar store and same shall not be deemed a Competing Business; provided such other dollar store does not occupy more than 10,000 square feet in the Shopping Center. Further, a "closeout store" shall not include any branded or private label fashion apparel (including footwear) outlet closeout stores, such stores to include by way of illustrative example, without limitation, the following business operations: Talbot's outlet, Nine West outlet, Nordstrom Rack, TJ Maxx and Ross Dress for Less. The parties acknowledge and agree that branded or private label fashion apparel (including footwear) outlet closeout stores shall not be deemed a Competing Business.

Tenant agrees when possible, to operate and open the Demised Premises for business at least between the hours of 10:00 A.M. and 6:00 P.M., Monday through Saturday, and between the hours of 11:00 A.M. and 6:00 P.M. on Sunday, of each week, except for state and federally recognized holidays or religious holidays and except for days on which the conducting of business shall be prohibited by governmental authority, during the Term of this Lease.

So long as Tenant has opened for business in the Demised Premises fully stocked, staffed and fixtured for at least one (1) day within one (1) year after the Tenant Possession Date, Tenant may close the Demised Premises, at any time thereafter, in Tenant's reasonable discretion; provided, however, that any such closing shall not relieve Tenant from any of its obligations hereunder. In the event that Tenant closes the Demised Premises under this Section and fails to reopen the Demised Premises within ninety (90) days thereafter, Landlord may terminate this Lease upon thirty (30) days' notice to Tenant, if Tenant (or a permitted assignee or subtenant of Tenant) has not reopened for business as of the date of the notice, in which event Tenant shall be released from all further liability hereunder.

Tenant agrees to keep the Demised Premises in a clean, neat, healthful, aesthetically pleasing, well-maintained and orderly condition and to keep the Demised Premises free of debris, trash, garbage, refuse (except that reasonable amounts may be kept temporarily in closed containers in places directed by Landlord), vermin, insects or pests by virtue of having regular pest extermination, loud or constant noises, and excessive vibrations. Tenant further agrees not to burn trash or garbage in the Shopping Center; commit waste in the Demised Premises or Shopping Center; cause or permit pipes, lines, conduits, fixtures or appliances in the Demised Premises to be ruined or damaged by freezing, excessive heat or lack of care, maintenance or repair.

Tenant shall be responsible, at its sole cost and expense, for the removal of its trash and rubbish. In the event Landlord has established or should establish a common trash and rubbish removal or disposal program at the Shopping Center, Tenant shall participate in such program.

The Demised Premises shall not be used in any manner or occupied for any purpose constituting a fire hazard or so as to increase the cost of Landlord's hazard insurance over the normal cost of such insurance, absent that use, for the type and location of the building of which the Demised Premises are a part.

Notwithstanding anything to the contrary contained in this Lease, Tenant shall have the right to (i) store shopping carts and baskets in the Common Areas immediately adjacent to the Demised Premises in the area identified as "Cart Area" on Exhibit "A"; and (ii) use the Common Areas on the sidewalk immediately adjacent to the Demised Premises for the periodic outdoor sale and display of merchandise (on the sidewalk in front of the Demised Premises), provided that (a) Tenant may not have more than eight (8) such

9

periodic outdoor sales per calendar year for a duration of not more than fourteen (14) consecutive days each, (b) such sales shall be subject to any applicable governmental laws relating to same, (c) no outdoor displays of merchandise may remain outside the Demised Premises during periods that Tenant is not open for business; (d) if any other tenant has a bona fide objection to such outdoor sales on the grounds that it violates such tenant's lease, then Tenant shall have no further right to use the sidewalk for sales purposes; (e) such use does not unreasonably interfere with pedestrian traffic; and (f) Tenant agrees to indemnify and hold Landlord harmless for all costs, claims and liabilities arising out of such use.

**B.     Prohibited Uses.**     Except for existing tenants, and their successors and assigns, Landlord shall not lease any space, or permit any use any where in the Shopping Center, and Tenant shall not use the Demised Premises or Common Areas, or any part thereof: (i) to conduct or advertise any auction, bankruptcy, fire, distress, liquidation, sheriff's or receiver's sale on or from the Demised Premises (unless pursuant to court order); (ii) for an auditorium, activity facility, or meeting hall; (iv) for any self storage facilities;; (iii) for any industrial type use (e.g., manufacturing, warehousing, processing, assembly, plating); (iv) to conduct any activity which may make void or voidable or increase the premium on any insurance coverage on the Shopping Center or parts thereof; (v) for the operation of a bath house, adult book or adult video store, or for the sale, rental or exhibition of pornographic material and/or display in storefront windows or in areas within the Demised Premises which are visible from outside of the Demised Premises, any sign, product or advertising material which is or is for pornographic or "adult" material; (vi) in a manner which is a public or private nuisance including any which creates undue noise, sound, vibration, litter or odor; (vii) for any establishment which features any form of "adult entertainment"; (viii) for a roller or skating rink, skateboard or other rink or arena, billiard parlor, bowling alley,; (ix) for lodging, including a hotel, motor inn, apartments or condominiums; (x) for vehicle, including automobile, truck, trailer, R.V. or boat dealer (or other similar enterprise), sales, leasing, display or repair [other than for retail office functions relating to such operations and provided that any rental cars are limited to not more than twelve (12) rental cars and same are parked outside the Restricted Areas]; (xi) for a funeral parlor or mortuary; (xii) for a mobile home or trailer court; (xiii) for any dumping, disposing, recycling, incineration or reduction on a large-scale commercial basis of refuse and recyclables (exclusive of collection in appropriately screened areas of refuse and recyclables resulting from normal day to day operations in the locations designated by Landlord from time to time); (xiv) for any separately demised newsstand; (xv) for an off-track betting business, bingo, lottery (other than incidental sales of lottery tickets) or similar "games of chance" sales or facility; (xvi) for the placement of any aerial or antenna on the roof or exterior walls of the Demised Premises, other than an aerial or antenna for Tenant's own use; (xvii) for the display of billboards or large advertisements whether free-standing , painted upon or affixed to the exterior of any structure; (xviii) for any astrology, palm reading, tarot card or other like service or facility; (xix) for the use of a "call center" or (xx) for the use as a "head shop" selling drug paraphernalia. All of the foregoing uses are sometimes collectively referred to herein as the **"Prohibited Uses"**.

Notwithstanding anything to the contrary provided above, Landlord may lease tenant space in the Shopping Center for the following uses, provided that space leased for any such uses shall not be located within the area identified as "Restricted Area" on Exhibit A of this Lease: (a) to sell so-called "Army and Navy", surplus or previously worn or used goods, as those terms are generally used at this time and from time to time hereafter; (b) for medical or health-oriented facilities or offices  (unless same occupies 2,000 square feet of floor area or less in the Restricted Area as shown on Exhibit A as space #28); (c) for automotive, tire, gasoline or oil service centers; (d) for governmental use or office or social service functions or facilities (unless same occupies 5,000 square feet of floor area or less in the Restricted Area); (e) for the operation of a massage parlor such as "Massage Envy"; (f) for a night club or discotheque, tavern, bar, cocktail lounge or restaurant; (g) for an amusement center, arcade, health spa, health club, exercise club, gymnasium or similar operation; (h) for a retail laundry or retail dry cleaning operation; (i) for a day care center or school; (j) for a pet shop or veterinary hospital, animal boarding, training or raising facility; (k) for vehicle leasing, provided, however, that vehicles available for lease shall not be parked or stored in the Restricted Area; or (j) for the display of

10

billboards or large advertisements whether free-standing, painted upon or affixed to the exterior of any structure, provided, however that the display of billboards or large advertisements shall no be placed in the No Change Area.

Notwithstanding anything to the contrary contained herein, the restrictions and Prohibited Uses as provided in this Section 4.B. shall not apply to any areas designated as "Unrestricted Area" on Exhibit "A" with the exception of Subsections (v), (vi), (vii), (xi), (xii), (xiii), or (xx).

## 5. RENT AND CONSTRUCTION ALLOWANCE:

From the Rent Commencement Date during the Term hereof, Tenant does hereby covenant and agree to pay to the Landlord in lawful money of the United States at the address of Landlord at P.O. Box 924133, Houston, Texas 77292-4133, or at such other place as Landlord may from time to time direct in writing, Fixed Minimum Rent (sometimes referred to as "Rent") along with all other charges due from Tenant to Landlord under this Lease ("Additional Rent"). The Rent and Additional Rent for any partial month shall be pro rated based on the actual number of days in such month.

A.    Fixed Minimum Rent: During the Original Term of this Lease, the sum of Two Hundred Twelve Thousand Six Hundred Thirty-eight and 50/100 Dollars ($212,638.50) per annum which shall be paid in equal monthly installments in advance on the first day of each and every month, in the amount of Seventeen Thousand Seven Hundred Nineteen and 88/100 Dollars ($17,719.88).

All the terms and conditions of this Lease shall apply during the Option Terms except that (1) each option to extend the Term shall terminate when exercised; (2) the Fixed Minimum Rent applicable for the First Option Term shall be the sum of Two Hundred Thirty-four Thousand Fifty-nine and 86/100 Dollars ($234,059.86) per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of Nineteen Thousand Five Hundred Four and 99/100 Dollars ($19,504.99). The Fixed Minimum Rent applicable for the Second Option Term shall be the sum of Two Hundred Fifty-seven Thousand Three Hundred Seventy-one and 34/100 Dollars ($257,371.34) per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of Twenty-One Thousand Four Hundred Forty-seven and 61/100 Dollars ($21,447.61). The Fixed Minimum Rent applicable for the Third Option Term shall be the sum of Two Hundred Eighty-two Thousand Eight Hundred Eighty-seven and 96/100 Dollars ($282,887.96) per Lease Year which shall be paid in equal monthly installments in advance on the first day of each and every month in the amount of Twenty-Three Thousand Five Hundred Seventy-four and 00/100 Dollars ($23,574.00).

B.    Utilities Charge: Landlord shall provide Tenant with access to all utilities necessary to conduct business in the Demised Premises. Landlord shall provide separate utility meters from local distribution company, which shall accurately reflect Tenant's usage. Tenant shall be solely responsible for and shall promptly pay for all direct   public utility and private services rendered or furnished to or for the benefit of Tenant and to the Demised Premises during the Term hereof including water, sewer, gas, electricity, telephone, and trash, based on the use of such utilities. Tenant shall at all times have the right, in its sole discretion, to select the particular utility providers for the Demised Premises so long as said utility is available to the Demised Premises.

Landlord and Tenant acknowledge and agree that, as of the date hereof, Landlord is not a utility supplier for any utilities serving the Demised Premises, but is providing separated utilities and separate meters as part of Landlord's Work in accordance with Exhibit C.  However, in the event Landlord should become a utility supplier for any utilities, and Tenant allows Landlord to supply any utilities as provided herein below, then Landlord shall provide Tenant with access to such

11

utilities necessary to conduct business in the Demised Premises. Tenant shall be solely responsible for and shall promptly pay for all public utility and private services rendered or furnished to or for the benefit of Tenant and to the Demised Premises during the Term hereof including water, sewer, gas, electricity, telephone, and trash, together with all applicable pass through taxes, levies, or other appropriate charges based on the use of such utilities. Landlord shall provide and maintain separate utility submeters for water/sewer, electricity, and gas, which shall accurately reflect Tenant's usage. All such meters shall be a type that is utility billing grade, with Ansi standard, and the water meter type shall comply with ANSI/AWWA Standard C700, latest revision. Each meter shall be tested on a minimum five (5) year frequency, unless otherwise requested by Tenant. If no problems are found during requested test, Tenant shall reimburse Landlord for the reasonable expense. Such meter shall have sealed register and a minimum of available characters to match up with respective tenants' use. The schedule for reading the meter shall reflect that of the master meter account from the public utility, and billing shall include a copy of the master meter invoice. In the event Tenant permits Landlord to supply any utility to Tenant, the rate charged for such service shall not exceed the lesser of (i) the bulk rate paid by Landlord, (ii) the applicable rate (consumer or bulk) which Tenant otherwise would pay as a direct customer of the public, municipal or other utility company providing such service. In the event any utility service to the Demised Premises provided by Landlord shall be interrupted for a period of more than twenty-four (24) consecutive hours as a result of the acts or negligence of Landlord, its agents, contractors or employees, or as a result of Landlord's failure or refusal to make repairs, then to the extent that Tenant cannot and does not conduct its business in the Demised Premises due to such interruption, Rent and Additional Rent shall abate upon the expiration of such twenty-four (24) hour period until such services are fully restored. Notwithstanding the foregoing, Tenant shall have the right, at any time and from time to time, to install and operate devices for check metering (monitoring) for utility supply and use. Installation shall be the cost and responsibility of the Tenant. The monitoring equipment can be installed at any time during the lease Term. Tenant reserves the right to leave monitoring equipment in place indefinitely. Landlord agrees to recalculate utilities and services based on findings by Tenant's monitoring data. Landlord shall provide Tenant written notice of such adjustment. In no event shall Tenant be charged an amount greater than the rate that would be charged by the utility company, if service were furnished directly to the Demised Premises.

C.      Intentionally Deleted.

D.      Common Area Charges and Cap:  Throughout the Term of this Lease, Landlord shall be responsible for the following:

(i)     operating, maintaining, refurbishing, repairing, replacing, improving and lighting the Common Areas and all other non-leasable areas and facilities located in the Shopping Center which are available for use in common by occupants of the Shopping Center and/or their customers and invitees;

(ii)    operating, maintaining, refurbishing, repairing, replacing, improving and lighting the service areas, garbage and refuse disposal facilities, Shopping Center maintenance and storage room, loading area and all other areas and facilities located in the Shopping Center which are used in the maintenance and operation of the Shopping Center;

(iii)   operating, maintaining, refurbishing, repairing, replacing, improving and lighting appropriate parking area entrances, exit and directional markers, Shopping Center signs, and other traffic control signs as are reasonably required to effect the site plan;

(iv)    providing security, lighting and policing, if necessary as reasonably determined by Landlord, and on-site and off-site traffic control in the Common Area only;

12

(v) maintaining all paved surfaces in a smooth condition, free of potholes (in the event of any potholes, Landlord shall repair same in a timely manner), with the type of material as originally used or a substitute equal in quality; restriping and repainting as required to keep same clearly visible and appropriately marked; and

(vi) cleaning, sweeping, and snow and ice removal as needed. Landlord agrees to deposit snow accumulation in an area that will not interfere with Tenant's store entrance and designated parking areas.

Landlord's costs shall be the expenses incurred by Landlord in performing the above enumerated items as well as those costs incurred refurbishing, repairing, maintaining, replacing, and improving (but less the amount of any insurance proceeds, or condemnation awards), lighting, line painting, landscaping, including irrigation thereof), and total compensation and benefits (including premiums for worker's compensation and other insurance) paid to or on behalf of on-site employees, to the extent such employees perform work in the maintenance of the Common Areas, all charges for water, sewer and other utilities used or consumed in the Common Areas, licenses and permit fees, and parking area levies, constructing, operating, repairing and maintaining any necessary on-site or off-site utilities, operating, repairing and maintaining any necessary on or off-site detention ponds, retention ponds, or other surface and storm water drainage facilities that serve the Shopping Center, utilities charges, repairing and maintaining utility lines which do not exclusively serve one tenant, overhead canopies, sprinklers and sprinkler risers in the Common Areas, sidewalks (including steam cleaning), exterminating and pest control in and about the Common Area (collectively, "Common Area Charges"). Notwithstanding anything to the contrary herein, excluded from such Common Area Charges shall be all capital expenditures (as defined by generally accepted accounting principles consistently applied), any depreciation of the Shopping Center, insurance deductibles, uninsured retentions, reserves and any administrative, management or related fees.

Subject to the CAM Cap (defined below), after the Rent Commencement Date, Tenant agrees to pay to Landlord a pro rata share of such Common Area Charges. Tenant's pro rata share of such Common Area Charges shall be the product obtained by multiplying said Common Area Charges by a fraction, the numerator of which is the leasable ground floor area (in square feet) of the Demised Premises and the denominator of which is the gross leasable area (in square feet) in all buildings of the Shopping Center. In calculating Tenant's pro rata share, the ground floor area (in square feet) leased to any Shopping Center tenant which is solely responsible for performance of all items included as part of Common Area Charges shall be deducted from the gross leasable area of the Shopping Center. In no event shall there be any duplication of expenses.

On the first day of each calendar month during that portion of the Term hereof falling within the first Lease Year, or Partial Lease Year as the case may be, Tenant shall pay to Landlord, in advance, as an estimated payment on account of Tenant's pro rata share of such Common Area Charges an amount equal to its estimated monthly pro rata share of Common Area Charges as reasonably determined by Landlord based on the Common Area Charges in the Shopping Center during the prior year.

After the first Lease Year, or Partial Lease Year as the case may be, Tenant shall continue to pay an estimated amount of Tenant's pro rata share of such Common Area Charges on the first day of each month in advance without demand and without any setoff or deduction (except as set forth herein). Such Common Area Charges may be adjusted and revised by Landlord after the end of each Lease Year or Partial Lease Year as the case may be, during the Term hereof on the basis of the actual Common Area Charges for the immediately preceding Lease Year. Upon Landlord's furnishing to Tenant a statement setting forth such

13

revised Common Area Charges, Tenant shall pay to Landlord such revised estimated share in equal monthly installments, each such installment to be a sum equal to one-twelfth (1/12th) of such revised estimated Common Area Charges in advance on the first day of each calendar month thereafter until the next succeeding revision in such estimate.

Within one hundred twenty (120) days following each Lease Year or Partial Lease Year, as the case may be, Landlord shall furnish to Tenant a written statement in reasonable detail showing the total Common Area Charges for such Lease Year or Partial Lease Year, the amount of Tenant's pro rata share thereof, and payments made by Tenant with respect thereto.  Upon request by Tenant, Landlord shall furnish copies of actual paid invoices and other documentation as Tenant may reasonably request for such Common Area Charges as stated herein.

If Tenant's pro rata share of such Common Area Charges exceeds Tenant's payment with respect to any Lease Year, or Partial Lease Year, as the case may be, Tenant shall pay to Landlord the deficiency within thirty (30) days after the date of the furnishing of the statement from Landlord; if Tenant's payments exceed Tenant's share of the Common Area Charges, and Tenant is not in default hereunder beyond any applicable notice and cure periods or otherwise indebted to Landlord, Landlord shall credit such excess against the next Rent payments due; provided, if such overpayment is for the last Lease Year, Landlord shall refund to Tenant the amount of such overpayment after Tenant has fully performed all of its obligations under this Lease, and has vacated the Demised Premises in accordance with the provisions of this Lease.  In the event Tenant is indebted to Landlord for any reason whatsoever, Landlord may deduct such amount owed from such overpayment.

Common Area Charges Cap:.  Notwithstanding anything to the contrary contained herein, Tenant's pro rata share of Common Area Charges shall be capped at (**$0.85**) per square foot of the Demised Premises for the first full Lease Year and Partial Lease Year of the Original Term.  Thereafter, Tenant's Common Area Charges during any Lease Year, shall not increase by more than three percent (3%)  per annum (on a cumulative basis) above that amount of Common Area Charges payable by Tenant for the previous Lease Year (the "CAM Cap").

"Cumulative Cap" allows the Landlord to carry forward unused increases when actual CAM costs rise at uneven rates.  For instance, If a CAM cap is 5 percent, but actual costs rise only three (3) percent in the first year, the additional two (2) percent could be applied to the second year so that if actual costs rose by seven (7) percent in that second year, the Landlord could recover the entire increase.

E.   Real Estate Taxes:  Landlord shall pay all real property taxes which may be levied or assessed by any lawful authority against the land and improvements in the Shopping Center or against Landlord in respect of the land and improvements in the Shopping Center (hereinafter referred to as "Real Estate Taxes").  Excluded from such Real Estate Taxes for Tenant shall be the amount of any special assessments or impositions.  Tenant shall pay to Landlord its pro rata share of Real Estate Taxes paid by Landlord.  Tenant's pro rata share of  such Real Estate Taxes shall be the product obtained by multiplying said Real Estate Taxes by a fraction, the numerator of which shall be the leasable ground floor area (in square feet) of the Demised Premises and the denominator of which shall be the gross leasable ground floor area (in square feet) of all buildings in the Shopping Center.  In calculating Tenant's pro rata share, the ground floor area area (the actual square footage of such space) leased to any Shopping Center tenant which is solely responsible for payment of Real Estate Taxes shall be deducted from the gross leasable area of the Shopping Center, and the taxes allocated to said tenant shall be deducted from the total Real Estate Taxes for the Shopping Center.  If the Rent Commencement Date or the expiration date of this Lease shall fall on a date other than the beginning (or ending, as the case may be) of a tax year, a proper apportionment of said Real Estate Taxes for the year shall be made.

14

Tenant shall pay to Landlord Tenant's pro rata share of Real Estate Taxes within thirty (30) days after Tenant's receipt of an invoice therefor specifically showing the amount of Real Estate Taxes levied or assessed against the Shopping Center and Tenant's pro rata share thereof along with a copy of the Real Estate Tax bill issued by the taxing authority. Landlord shall provide Tenant with copies of actual bills for Real Estate Taxes, documentation evidencing allocation of Real Estate Taxes to the Demised Premises and to all Shopping Center parcel(s) and other documentation as Tenant may reasonably request, promptly upon receipt of tax bills from taxing authorities. Tenant shall not be required to make more than two (2) such payments in any Lease Year or Partial Lease Year. Landlord represents that the Real Estate Taxes for the 2009 tax year is estimated to be approximately $0.98 per square foot per annum.

Interest and/or penalties for late payment shall not be included in determining Real Estate Taxes. Further, if a discount of said Real Estate Tax bills is received for prompt payment, Tenant's pro rata share of Real Estate Taxes shall be based upon the discounted amount. Tenant's pro rata share shall be reduced to the extent of abatements, refunds or rebates granted to Landlord.

In the event Landlord (or any affiliate of Landlord) no longer owns the Shopping Center, if Tenant deems any Real Estate Taxes payable by Tenant hereunder, or any part thereof, to be illegal or excessive, Tenant may contest the same by proper proceedings commenced at its own expense and in good faith. Landlord agrees to render to Tenant all assistance reasonably possible in connection therewith, including the joining in, and signing of, any protest or pleading which Tenant may deem it advisable to file. If such proceedings are resolved against Tenant, Tenant shall pay its pro rata share of all Real Estate Taxes, and all penalties and interest thereon, found to be due and owing. Tenant shall indemnify Landlord against any loss or damage by reason of such contest, including all costs and expenses thereof during the pendency of any such proceeding, and shall fully protect and preserve the title and rights to Landlord, as well as Tenant's leasehold estate in and to the Demised Premises.

In determining the amount, if any, payable by Tenant in accordance with this Section, the amount of Real Estate Taxes assessed against any buildings, additions to buildings or improvements constructed after the assessment day for Real Estate Taxes for the year of Term commencement which are not in replacement of buildings damaged or destroyed by fire or other casualty shall be deducted from the Real Estate Taxes for the Shopping Center, and the gross leasable area of any such new buildings, additions or improvements shall be deducted from the gross leasable area of the Shopping Center prior to computation of Tenant's pro rata share of any increase hereunder. Landlord shall use commercially reasonable efforts to cause any such new construction to be separately assessed.

Notwithstanding anything to the contrary contained herein, Tenant shall not be obligated to contribute toward an increase in Real Estate Taxes resulting from the sale, conveyance, change in ownership or other transfer of real property, buildings or other improvements or a reassessment resulting therefrom. This provision shall include, and Tenant shall not be obligated to contribute toward any increase in Real Estate Taxes resulting from a transaction which, in accordance with the applicable authority having jurisdiction, constitutes a sale, conveyance, change in ownership or other transfer. Notwithstanding the foregoing, this provision shall not apply to any sale, conveyance, change in ownership or other transfer by the Landlord identified herein to the first immediate successor in interest.

Tenant shall pay all taxes assessed against its trade fixtures, equipment, machinery, appliances, and other personal property, and any other license fees, occupational taxes, lease taxes, and other governmental charges arising in connection with this Lease or Tenant's use or occupancy of the Demised Premises or operation of its business.

15

F. <u>Tenant Improvement Allowance</u>: Landlord shall pay to Tenant an amount equal to Fifteen Dollars ($15.00) times the number of square feet of leasable ground floor area within the Demised Premises, as determined pursuant to Section 1.D. above ("Tenant Improvement Allowance") within thirty (30) days after the later to occur of : (a) Tenant opening for business in the Demised Premises, : (b) Tenant providing Landlord with all lien waivers from Tenant's contractors and subcontractors who have performed/supplied more than $5,000.00 worth of labor/materials for the Demised Premises: and (c) Tenant providing Landlord with a copy of the certificate of occupancy for the Demised Premises. For illustrative purposes only, if the total square footage of the Demised Premises were 31,502 square feet, then the amount of the Tenant Improvement Allowance paid to Tenant would equal $472,530.00 (i.e. $15.00 x 31,502 square feet). If said Tenant Improvement Allowance is not paid to Tenant by Landlord within thirty (30) days after the later to occur of (a), (b) and (c) above, Landlord shall, in addition, pay to Tenant interest on said amount at an annual rate of two percent (2%) above the prime rate established by the Chase Bank (or any successor thereto) from the due date to the date of payment, and Tenant may deduct such sum from subsequent installments of Rent hereunder until such sum is fully paid.

   Landlord and Tenant both agree that the Tenant Improvement Allowance shall not be used towards the purchase of inventory. Landlord and Tenant recognize and agree that to the extent that the Tenant Improvement Allowance is spent for the purpose of constructing or improving long term real property at the Demised Premises, then Landlord and Tenant agree that the Tenant Improvement Allowance shall be "qualified lessee construction allowance" as defined in Reg. Sec. 1.110-1(b) of the Internal Revenue Code. Landlord and Tenant agree to comply with the reporting requirements of Reg. Sec. 1.110-1(c) of the Internal Revenue Code.

G. <u>MOR</u>:   Landlord and Tenant acknowledge that Shopping Center and this Lease are subject to certain Easements, Covenants and Restrictions dated January 21, 1983, by and between Exeter Investment Company and Wal-Mart Properties, Inc. (as predecessor-in-interest to Landlord), under County Clerk's File No. 8303552 of the Real Property Records in Montgomery County, Texas, as amended (the "ECR"), and certain other matters of record (collectively, "MOR"), provided that Landlord has delivered to Tenant copies of all such MOR prior to the date of this Lease. To the extent that the MOR allocates Real Estate Taxes, utility expenses, insurance expenses, Common Area Charges and any other expenses or charges ("Charges") in connection with the Shopping Center (as defined in this Lease) or the shopping center (as defined in the MOR) differently than in the Lease, or to the extent the aforesaid Charges are calculated or defined differently than as in this Lease, the Lease shall control as between Landlord and Tenant.  In no event shall Tenant be obligated to pay more for Charges than as agreed to under this Lease, or to pay for any other expense or item which Tenant has not agreed to pay for pursuant to the terms of this Lease. Landlord agrees that any payments required be made under the MOR, or Charges in excess of what Tenant as agreed to pay under the Lease, are to be made by Landlord without reimbursement from Tenant. Landlord agrees to indemnify, defend and hold harmless Tenant from any and all demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation reasonable attorney fees and court costs) arising out of any violation by Tenant of the MOR to the extent it conflicts with the Lease as stated above and/or results in (i) Charges to Tenant that are more than as agreed to under this Lease or (ii) other expenses or items which Tenant has not agreed to pay for pursuant to the Lease. Landlord further agrees that it will, at all times and upon request of Tenant, use commercially reasonable efforts to enforce the maintenance obligations and casualty obligations of other owners under the MOR, and Landlord agrees not to consent to any uses prohibited by the MOR or this Lease in the Shopping Center.

**6.** **<u>ALTERATIONS</u>:**

Tenant shall have the right to make interior, non-structural changes, additions, and alterations inside the Demised Premises without consent from Landlord, provided that such work shall not affect the exterior or structural parts of the building of which they are a part; that such are done in good and workmanlike manner; that permits therefor from all public authorities, as required, are obtained and paid for; that all cost and expense arising from such undertaking as well as all damages occasioned in connection therewith shall be paid by Tenant; that all such changes shall at the end of this Term remain the property of Landlord, unless Landlord otherwise agrees in writing, and that Tenant shall promptly remove any mechanic's lien placed on the Demised Premises resulting therefrom.

7.    **MAINTENANCE, REPAIRS AND INITIAL BUILD OUT:**

Tenant agrees to make, at Tenant's sole cost and expense, all repairs (including replacements as required in Tenant's reasonable judgment) necessary to keep the interior portions of the Demised Premises in good order, repair and operation, except those which the Landlord is required to make pursuant to this Section 7 or Sections 13 and 20 of this Lease. The interior portions of the Demised Premises shall include (without limitation) each of the following: (i) interior faces of the exterior walls, (ii) ceilings, (iii) floor coverings, (iv) non structural portions of the storefront including doors, windows, window frames and plate glass, (v) heating, ventilating and air conditioning system (HVAC) exclusively serving the Demised Premises and (vi) the electrical, plumbing, sprinkler and other mechanical systems and equipment exclusively serving the Demised Premises, but only to the extent such electrical, plumbing, sprinkler and mechanical systems and equipment are located inside the interior surface of the exterior or demising walls of the Demised Premises and not located within the floor slab of the Demised Premises (except to the extent Tenant installs any electrical, plumbing, sprinkler and mechanical systems and equipment at the Demised Premises, in which event Tenant shall be responsible, at Tenant's sole cost and expense, for keeping same in good order, repair and operation, regardless of the location).

Landlord agrees, at Landlord's sole cost and expense, to make all repairs and replacements necessary to keep the exterior and structural portions of the Demised Premises in good order, repair and operation except those repairs and replacements the Tenant is required to make pursuant to this Section 7. The exterior and structural portions of the Demised Premises shall include (without limitation) each of the following: (i) exterior walls of the Demised Premises and exterior faces thereof, (ii) the roof, (iii) gutters, downspouts and roof drainage system; (iv) foundations and floor slabs; (v) all structural members of the building of which the Demised Premises is a part; (vi) canopy (if any), (vii) marquee lights or rear or side floodlights, (viii) electrical, plumbing, sprinkler and other mechanical systems and equipment (whether or not exclusively serving the Demised Premises) located outside the interior surface of the exterior or demising walls and/or within the floor slab of the Demised Premises (except to the extent Tenant installs any electrical, plumbing, sprinkler and mechanical systems and equipment at the Demised Premises, in which event Tenant shall be responsible, at Tenant's sole cost and expense, for keeping same in good order, repair and operation, regardless of the location).

Notwithstanding the foregoing, Landlord hereby expressly warrants to Tenant that all items constituting Landlord's Work (as provided on Exhibit "C") and required to be kept by Tenant in good order/repair, maintenance, and operation including, without limitation, all fire alarm and fire suppression systems as may be required by applicable law, will be in place at the Demised Premises and will be in good operating condition, as of the Tenant Possession Date. Tenant shall notify Landlord of any defects within ninety (90) days after the date Tenant opens for business by providing Landlord with written notice of such items not in operating condition. Landlord shall, within thirty (30) days from such notice, put such inoperative items listed on the punch list in operating condition, and, thereupon, Landlord's obligation under this warranty shall terminate. If Landlord fails to perform such work within such thirty (30) day period, Tenant shall have the right to perform such work and charge the Landlord the reasonable cost thereof. Should Landlord refuse to reimburse Tenant for such costs within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost from the next installment of Rent until such amount is recaptured in full.

If Landlord fails to commence and diligently complete the making of any repairs within thirty (30) days after receipt from Tenant of written notice of the need for such repairs (or such additional time to complete such repairs as is reasonably necessary if such repairs reasonably require more than thirty (30) days, provided Landlord has commenced and is diligently pursuing same to completion), Tenant shall have the right to perform such repairs and to charge Landlord the reasonable cost thereof. If the repair is necessary to end, mitigate, or avert an emergency and if Landlord, after receiving confirmation from Tenant of such necessity, fails to commence repair as soon as reasonably possible, Tenant may do so at Landlord's cost, without waiting thirty (30) days. Should Tenant perform repairs pursuant to this grammatical paragraph, Landlord shall and does hereby indemnify, defend and hold harmless Tenant for costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation reasonable attorney fees and court costs), warranties and obligations arising out of or in any way connected with such repair work; provided, however, that this indemnification shall not apply to injury, damage or death caused by the negligence of Tenant or Tenant's authorized representatives. In performing any such repairs pursuant to this grammatical paragraph, Tenant shall use reputable contractors and perform all such repairs in a first class and workmanlike manner. Should Landlord fail or refuse to reimburse Tenant the reasonable cost of any such repair work within thirty (30) days of receipt of an invoice therefor, Tenant shall have the right to deduct such cost from the next Rent payment(s) owing until such amount is recaptured in full.

Any reservation of a right by Landlord or Tenant to enter upon the Demised Premises and to make or perform any repairs, alterations, or other work, in, to, or about the Demised Premises which, in the first instance, is the other party's obligation pursuant to the Lease, shall not be deemed to: (i) impose any obligation on Landlord or Tenant to do so; (ii) render Landlord or Tenant liable to the other party or any third party for failure to do so; or (iii) relieve Landlord or Tenant from any obligation to indemnify the other party as otherwise provided elsewhere in the Lease.

8.    **SIGNS:**

Tenant, at its sole cost and expense, shall have the right to place, suffer or erect signs, awnings, canopies or decorations on the exterior walls of the Demised Premises; provided Tenant obtains Landlord's prior written approval for such signs, awnings, canopies or decorations, which approval shall not be unreasonably withheld, conditioned or delayed, except for typical signage used by Big Lots stores in the state where the Demised Premises is located as depicted in Exhibit D and approved by Landlord prior to or simultaneously with its execution of this Lease.    Tenant agrees to maintain such sign(s) in good condition and repair, save and defend Landlord free of all cost, expense, loss, or damage which may result from the erection, maintenance, and existence of the same. Notwithstanding anything to the contrary contained herein, Tenant shall be permitted to utilize its standard window signs, its pre-opening signs, building signs, and pylon sign panels as are used in a majority of Tenant's stores in the State where the Demised Premises is located.  Landlord covenants and warrants that it has approved Tenant's Sign Specifications attached hereto as part of Exhibit D prior to or simultaneously with its execution of this Lease.

Landlord shall ensure that Shopping Center pylons and/or monument signs ( collectively "Pylon") (i) are fit for Tenant's intended use including, without limitation, are properly wired, maintained and constructed; and (ii) conform to all requirements of any authorities having jurisdiction.

Landlord agrees that Tenant shall have the right to install and maintain its sign panels on the existing Pylons on the space as indicated on Exhibit D-1 attached hereto.  Landlord grants Tenant a right of first refusal, subject only to the rights currently granted to existing tenants in the Shopping Center, to occupy a proportionately sized panel, within a one-half (1/2) portion, on any Pylon at the Shopping Center which is subsequently constructed during the Term of this Lease.  Landlord shall notify Tenant in writing of such availability, and Tenant shall have thirty (30) days to accept the available Pylon space.  Tenant shall, at its own expense, obtain the necessary permits and comply with

18

applicable local codes and ordinances for Tenant's signs. Once Tenant's sign panels and/or Tenant's Pylon sign are installed, Tenant shall not be required to remove, replace, change, or alter such signs and Landlord shall not remove, replace or diminish the size of Tenant's signs, nor charge Tenant a separate fee to be on said Pylon sign(s).

During the Original Term, Option Terms or extensions of this Lease, Landlord shall not install any structure, sign or landscaping within the No Change Area or take any other action within the No Change Area which will materially obstruct or interfere with the visibility or legibility of Tenant's signs.

## 9.   FIXTURES:

Tenant agrees to furnish and install, at Tenant's expense, all trade fixtures or equipment required by Tenant. At the end of the Term, Tenant shall remove all removable trade fixtures or equipment, but shall repair any damage to the Demised Premises caused by or resulting from such removal, reasonable wear and tear excepted, and shall deliver the Demised Premises to Landlord in broom clean condition. Should Tenant have installed lighting fixtures, and/or HVAC equipment, the parties agree that they are not trade fixtures or equipment and they may not be removed since they became the property of the Landlord when affixed. For the benefit of Tenant's employees and customers, Tenant shall be entitled to place vending machines and equipment (including, but not limited to public telephones and stamp machines) in the Demised Premises and adjacent areas thereto. Tenant shall be responsible for maintaining said machines and equipment in good condition and shall indemnify Landlord for any liability arising from the use of said machines and equipment.

## 10.   GOVERNMENTAL REGULATIONS:

As of the Tenant Possession Date, Landlord agrees the Demised Premises shall conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord shall promptly cause it to conform at all times unless such is necessitated by changes, alterations or additions made by Tenant. Landlord shall provide Tenant with a complete set of "as built" drawings in the event they are required by local, state or federal code, or otherwise required pursuant to this Lease. Landlord agrees to make all repairs, alterations, additions, or replacements to the Demised Premises required by any law, statute, ordinance, order or regulation of any governmental authority; to keep the Demised Premises equipped with all fire and safety appliances, devices, equipment and applications so required, including, but not limited to, smoke and fire alarms, sprinkler system and ; to procure any licenses and permits required; and to comply with the orders and regulations of all governmental authorities, including all requirements as set forth in the Americans with Disabilities Act, as provided hereinbelow.

Notwithstanding any term or provision to the contrary contained in this Lease, the obligations of Landlord and Tenant with respect to changes in laws and ordinances, including but not limited changes to Title III of the Americans with Disabilities Act (collectively, the "Law"), as the same may be amended from time to time, shall be governed by this Section 10. From and after the Tenant Possession Date, Tenant shall be responsible for ensuring that the interior of the Demised Premises are in compliance with the Law at all times, and Tenant shall make, at Tenant's cost and expense, any and all alterations and additions to the interior of the Demised Premises (including any entrance and exit doors of the Demised Premises) that may be necessary from time to time to keep or bring the Demised Premises into compliance with the Law. Tenant shall indemnify and hold Landlord harmless from all claims, suits, actions, damages and liability (including costs and expenses of defending against the aforesaid) arising from Tenant's failure to discharge its responsibilities under this Section 10. From and after the Tenant Possession Date, Landlord shall be responsible for ensuring that the Common Area of the Shopping Center and the exterior and structural portions of the Demised Premises are in compliance with the Law at all times, and Landlord shall make, at Landlord's cost and expense, all alterations and additions to (a) the Common Area (both structural and non-structural) and (b) the exterior of the Demised Premises (but limited to the structural items for which Landlord has maintenance responsibilities under the Lease) that may be necessary from time to time to keep or bring the Common Area and the Demised

Premises into compliance with the Law.  Landlord shall indemnify and hold Tenant harmless from all claims, suits, actions, damages and liability (including costs and expenses of defending against the aforesaid) arising from Landlord's failure to discharge its responsibilities under this Section 10.

11.    **INDEMNIFICATION:**

Tenant, its successors and assigns, agrees to indemnify, defend and hold harmless Landlord from any liability for injury to or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises caused by the negligent acts or omissions to act or willful misconduct of Tenant or Tenant's employees, contractors and agents, or by the failure of Tenant, or Tenant's employees, assignees, sublessees, contractors and agents to fulfill Tenant's obligations hereunder. When a claim is caused by the joint negligence or willful misconduct of Tenant and Landlord or Tenant and a third party unrelated to Tenant, except Tenant's assignees, sublessees, contractors, agents or employees, Tenant's duty to indemnify, defend and hold harmless Landlord shall be in proportion to Tenant's allocable share of the joint negligence or willful misconduct.  Landlord, its successors and assigns, agrees to indemnify, defend and hold harmless Tenant from any liability for injury to, or death of any person or damage to personal property of every kind and nature arising from or in connection with the use and occupancy of the Demised Premises and Common Areas caused by defects therein, the negligent acts or omissions to act or willful misconduct of Landlord, or Landlord's employees, contractors and agents, or by the failure of Landlord, or Landlord's employees, contractors and agents, to fulfill Landlord's obligations hereunder.   When a claim is caused by the joint negligence or willful misconduct of Landlord and Tenant or Landlord and a third party unrelated to Landlord, except Landlord's agents or employees, Landlord's duty to indemnify, defend and hold harmless Tenant shall be in proportion to Landlord's allocable share of the joint negligence or willful misconduct.

Landlord and Tenant agree to notify their respective insurance carriers of the indemnity and hold harmless agreement contained in this Section.

The provisions of this Section 11 shall survive termination of this Lease.

12.    **INSURANCE:**

A.    Tenant:  Tenant agrees to carry at its own expense, throughout this Lease, commercial general liability insurance covering the Demised Premises and Tenant's use thereof which insurance shall include coverage for bodily injury and death and property damage, and shall include Landlord (and any of its affiliates, subsidiaries, successors and assigns designated by Landlord) as an additional insured, with minimums limits of the following:   One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and to deposit said certificate of insurance with Landlord prior to the Tenant Possession Date.

Tenant shall have the option to self-insure for all plate glass, inventory, equipment, fixtures and improvements.

B.    Landlord:  Landlord shall at all times carry insurance covering all improvements located in the Shopping Center, including the Demised Premises, except for Tenant's trade fixtures, furnishings and inventory against perils normally covered under special form "All Risk" insurance, including the perils of earthquake and flood, in an amount not less than eighty percent (80%) of the full replacement value of all the improvements located in the Shopping Center, including the Demised Premises and shall name Tenant as an additional insured as its interest may appear.   Landlord shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.

Landlord shall at all times carry commercial general liability insurance covering the Common Areas, which insurance shall include Tenant as an

additional insured, with minimum limits of the following: One Million Dollars ($1,000,000.00) each event combined single limit with a Two Million Dollar ($2,000,000.00) general total combined single limit, and shall provide Tenant with a certificate of insurance evidencing such coverage prior to the Tenant Possession Date.    Notwithstanding anything contained in this Lease to the contrary, Landlord shall be solely responsible for any and all deductibles and/or self-insured retentions.

Insurance carried by Landlord or Tenant may be carried under blanket insurance policies covering other properties so long as the limits of liability are not thereby reduced

In addition to the payment of Fixed Minimum Rent, Tenant shall, after the Rent Commencement Date, on an annual basis, pay Tenant's pro rata share of the premiums paid by Landlord for maintaining the commercial general liability insurance (but not umbrella or excess insurance) and casualty insurance policies referred to herein, for the Term hereof (the "Insurance Costs"). Upon Landlord's payment of its Insurance Costs, Landlord shall furnish Tenant with an invoice for Tenant's pro rata share thereof, as well as copies of such insurance premium bills, evidence that such have been paid by the Landlord, the type of insurance plan used and any other documentation reasonably requested by Tenant regarding the method of computing said premium and Insurance Costs, such documents herein referred to in the aggregate as ("Insurance Documentation"). Within thirty (30) days of Tenant's receipt of the required Insurance Documentation, Tenant shall pay Landlord, Tenant's pro rata share of the Insurance Costs paid by Landlord. Tenant's pro rata share of such Insurance Costs shall be the product obtained by multiplying said Insurance Costs by a fraction, the numerator of which is the leasable ground floor area (in square feet) of the Demised Premises and the denominator of which is the gross leasable area (in square feet) of all buildings in the Shopping Center.  Landlord covenants that there shall be no duplication of costs between this Section and any other Section of this Lease.   Landlord represents that Landlord's premiums for the insurance required to be carried by Landlord pursuant to this Section 12.B is estimated to be approximately $0.35 per square foot per annum for the 2009 calendar year.

In the event Landlord (or any affiliate of Landlord) no longer owns the Shopping Center, if Tenant is able to secure an "All Risk Property" insurance policy or policies with the same coverages and with adequate limits, similar deductible levels, and equivalent AM Best financial ratings as the policy or policies carried by Landlord, as described above at a lower cost than that obtained by Landlord, Landlord may either elect to use the policy or policies secured by Tenant or credit to Tenant the difference in the premium cost between Landlord's policy and that premium quote secured by Tenant.

In the event that the premiums on policies required to be carried by Landlord pursuant to this section are increased due to the use or occupancy of another tenant in the Shopping Center, such increase shall be deducted from the calculation stated above in the determination of Tenant's pro rata share of such insurance. Tenant shall not be responsible for any increase in the payments toward such insurance cost.

13.    **FIRE REBUILDING AND ALTERING:**

A.    If the Demised Premises, any permanent additions or leasehold improvements thereto, and/or any buildings or other improvements located within the Shopping Center shall be damaged, destroyed, or rendered untenantable, in whole or in part, by or as the result or consequence of fire or other casualty during the Term hereof, Landlord shall repair and restore the same to a condition substantially similar to the condition existing immediately prior to such casualty, but in compliance with all regulations by authority having jurisdiction as of the date of restoration. During any period of repair or casualty, the Rent and Additional Rent herein provided for in this Lease shall abate entirely in case the whole premises are

21

untenantable or if Tenant determines in good faith it cannot economically and does not conduct business from the undamaged portion of the Demised Premises. In the event of a casualty which damages only a portion of the Demised Premises and Tenant continues to operate in the remaining portion of the Demised Premises, Rent and Additional Rent shall be reduced based on the square footage of the Demised Premises which is not used by Tenant. Said abatement or reduction shall cease when the Demised Premises, or said portion of the Demised Premises (as the case may be), are restored to tenantable condition.

B.    Notwithstanding that the Demised Premises may not be destroyed or damaged by fire or other risk, in the event that other buildings containing fifty percent (50%) or more of the ground floor building area (in square feet) of the Shopping Center shall be damaged or destroyed by fire or other risk, whether or not covered by Landlord's fire and extended coverage insurance, Landlord shall have the election to terminate this Lease (provided that Landlord also terminates the leases of all similarly situated tenants in the Shopping Center) or to continue this Lease in full force and effect, and Landlord will notify Tenant of Landlord's election within sixty (60) days after such other damage or destruction.

C.    In the event the Demised Premises or a substantial portion of the Shopping Center, because of such damage or destruction, are not repaired and restored to tenantable condition within two hundred seventy (270) days from the date of such casualty, Tenant may, at its option, terminate this Lease by giving sixty (60) days prior written notice to Landlord and thereupon Tenant shall be released from all future liability and obligations under this Lease; provided, however, such notice must be given, if at all, prior to the date Landlord completes the required repairs.

D.    If the Demised Premises are damaged or destroyed during the last year of the Original Term or any Option Terms or extensions of this Lease, to the extent of more than one-third (1/3) of the ground floor area thereof, Landlord or Tenant shall have the right to terminate this Lease by written notice to the other party given within sixty (60) days following such casualty.

E.    In any circumstances described above where Landlord is either obligated to repair and restore the Demised Premises, or where Landlord elects to repair and restore the Demised Premises, this Lease shall continue in full force and effect, and such repairs will be made by Landlord within a reasonable time thereafter, subject to delays caused by Force Majeure.

**14.    FORCE MAJEURE:**

Whenever a period of time is provided in this Lease for Landlord or Tenant to do or perform any act or thing, Landlord or Tenant shall not be liable or responsible for any delays due to strikes, riots, lockouts, casualties, acts of God, war, governmental regulation or control, or other causes beyond the reasonable control of Landlord or Tenant (financial inability excepted), and in any such event said time period shall be extended for the amount of time Landlord or Tenant is so delayed (all of the aforesaid causes for delay being herein sometimes referred to as "Force Majeure"). This provision shall not apply to a delay in the initial delivery of possession of the Demised Premises except to the extent such a delay is caused by strikes (which are beyond the reasonable control of Landlord), fire or other casualty, acts of God, riots or war.

**15.    INJUNCTION:**

In addition to all other remedies, Tenant or Landlord is entitled to obtain a restraining order and/or injunction against all violations, actual, attempted or threatened of any covenant, condition, or provision of this Lease.

**16.    WARRANTY OF TITLE BY LANDLORD; REPRESENTATIONS:**

Landlord hereby warrants, represents, and covenants to Tenant that as of the date hereof to Landlord's knowledge:  (a) at the time of the execution by Landlord of this Lease,

22

Landlord is the sole owner in fee simple and absolute of the Demised Premises; (b) at the time of the execution by Landlord of this Lease, Landlord has good and marketable fee simple title to the Demised Premises free and clear of all liens and encumbrances except taxes not yet due and payable and other exceptions of title which have been approved in writing by Tenant; (c) Landlord does warrant and will defend the title of the Demised Premises, and will indemnify, defend and hold harmless Tenant against all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation reasonable attorney fees and court costs) which Tenant may suffer by reason of any lien, encumbrance, restriction or defect in the title or description of the Demised Premises not approved by Tenant; (d) Landlord has full right and power to execute this Lease and to lease the Demised Premises for the Term provided in this Lease; (e) the Demised Premises is properly zoned for Tenant's use and operation as set forth in this Lease, Landlord is not aware of any intent to change the current zoning, and construction of the Demised Premises complies with all local planning or zoning commission plans or orders; and (f) Landlord is not in default under any of the terms of any restriction, easement, covenant or agreement of record, and no notice has been received by Landlord or given by Landlord of any default under any restriction, easement, covenant or agreement of record that has not been cured, and there are no circumstances that with the passage of time or giving of notice would be a default by Landlord under any restriction, easement, covenant or agreement of record.

In case Landlord does not have the title and rights, or breaches the aforesaid representations, as provided in the first grammatical paragraph of this Section 16, and Tenant is dispossessed of the Demised Premises and provided Tenant shall have given written notice of same to Landlord, then to the extent Tenant cannot and does not conduct its business at the Demised Premises due to such dispossession, Rent and Additional Rent shall abate for each day that Tenant cannot and does not conduct business at the Demised Premises due to same. Tenant's abatement of Rent and Additional Rent shall continue until the earlier of: (i) the earlier of (a) the date upon which such violation is cured or (b) the date upon which Tenant conducts business at the Demised Premises; or (ii) the date which is six (6) full calendar months following the first month in which such abatement commenced. Within thirty (30) days after the expiration of such six (6) month period, Tenant shall elect either: (a) to terminate this Lease effective upon thirty (30) days notice to Landlord; or (b) to keep this Lease in effect and resume payment of full Rent and Additional Rent notwithstanding such violation. Time is of the essence with respect to the exercise of this option. In the event Tenant fails timely to give notice of termination, Tenant shall be deemed to have elected to resume payment of full Rent and Additional Rent and all rights under this second grammatical paragraph of this Section 16 shall be rendered null and void regardless of the breach of the aforesaid representations. Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation reasonable attorney fees and court costs) in any dispute made by any party claiming that Landlord does not have full right and power to execute this Lease, or arising out of a breach of the above representations, in the event Tenant is dispossessed of the Demised Premises.

Landlord covenants that Landlord shall not amend, modify or terminate any restriction, covenant or agreement of record, nor enter into any new or other restriction, covenant or agreement of record affecting the Shopping Center, nor permit any other entity to do so, without obtaining the prior written consent of Tenant, if said amendment, modification, termination or new agreement limits Tenant's rights or expands Tenant's obligations as set forth under this Lease. Landlord will defend, indemnify, and protect the Tenant from all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation reasonable attorney fees and court costs) in any dispute made by any party arising out of a breach of the above covenant.

17. **QUIET ENJOYMENT:**

Provided that Tenant is not in default under this Lease beyond applicable notice and cure periods, Landlord hereby covenants, warrants, and agrees that Tenant's use and enjoyment of the Demised Premises will not be disturbed during the Original Term of this Lease and any Option Terms or extensions. Tenant's covenant to pay Rent and

23

Additional Rent and Landlord's covenant of quiet enjoyment shall be dependent covenants.

18.   **MORTGAGE AND ESTOPPEL CERTIFICATES:**

Tenant accepts this Lease subject and subordinate to any recorded mortgage lien presently existing or hereafter created upon the Demised Premises or Shopping Center; provided, that as a condition to such subordination, Tenant and the holder of any mortgage lien shall enter into a mutually satisfactory subordination, non-disturbance, and attornment agreement which shall include a covenant by the mortgagee not to disturb the tenancy of Tenant, so long as Tenant is not in default of its obligations under this Lease beyond any applicable notice and cure periods. Landlord shall not be required to incur any cost or expense in connection with the obtaining of such agreement other than normal mail costs, and Landlord shall have no liability to Tenant arising out of the refusal of Landlord's mortgagee to execute any such agreement. If the interests of Landlord under this Lease shall be transferred by reason of foreclosure or other proceedings for enforcement of any first mortgage on the Demised Premises, Tenant shall be bound to the transferee, under the terms, covenants and conditions of this Lease for the balance of the Term remaining, including any options or extensions, with the same force and effect as if the transferee were Landlord under this Lease, and Tenant agrees to attorn to the transferee, including the first mortgagee under any such mortgage if it be the transferee, as its Landlord.

Upon request in writing from Landlord, Tenant agrees to execute, acknowledge, and deliver to Landlord, or to the holder of the mortgage lien on the Demised Premises, a certificate stating the following facts; provided that such facts are true and ascertainable: (i) this Lease constitutes the entire agreement between Landlord and Tenant, is unmodified (or if there has been a modification, that the Lease, as modified, is in full force and effect), and is in full force and effect; (ii) the dates to which the Rent, Common Area Charges and Additional Rent hereunder have been paid; (iii) the Tenant is occupying the Demised Premises; (iv) Tenant knows of no default under the Lease by the Landlord (or if there is a default, specifying the nature of such default) and there is no offset which Tenant has against Landlord; and (v) such other information as may be reasonably requested.

19.   **DEFAULT:**

A.   If Tenant shall be adjudicated a bankrupt, or if a trustee or receiver of Tenant's property be appointed, or if Tenant shall make an assignment for the benefit of creditors, or if default shall at any time be made by Tenant in the payment of the Rent reserved herein, or any installment thereof for more than ten(10) days after receipt by Tenant of written notice of such default from the Landlord or if there shall be default in the performance of any other covenant, agreement, condition, rule or regulation herein contained or hereafter established on the part of the Tenant for thirty (30) days after receipt by Tenant of written notice of such default from the Landlord (provided that if the default is of such a nature that it cannot reasonably be cured within thirty (30) days, Tenant shall be permitted such additional time to cure the default as is reasonably necessary, provided Tenant shall have commenced to cure such default during such thirty (30) day period and diligently complete same), this Lease, if the Landlord so elects, shall thereupon become null and void, and the Landlord shall have the right to reenter or repossess the Demised Premises, either by force, summary proceedings, surrender or otherwise, and dispossess and remove therefrom the Tenant or other occupants thereof and their effects, without being liable to any prosecution therefor. Neither bankruptcy, insolvency, an assignment for the benefit of creditors, nor the appointment of a receiver shall affect this Lease or permit its termination so long as the covenants on the part of the Tenant to be performed shall be performed by Tenant or some party claiming under Tenant. In such case, the Landlord may, as its option, relet the Demised Premises or any part thereof, as the agent of the Tenant, and the Tenant shall pay the Landlord the amount by which the rent reserved herein for the balance of the Term shall exceed the reasonable Rent value of the Demised Premises for the same period as the same becomes due. In

24

no event shall Landlord be entitled to accelerate any amount due under this Lease following a default by Tenant. Rather, such amount shall remain payable monthly as they would have come due under this Lease. Landlord shall be obligated to mitigate its damages by using commercially reasonable efforts to find a replacement tenant to lease the Demised Premises. All rights and remedies of Landlord herein created, or remedies otherwise existing at law or in equity are cumulative, and the exercise of one or more rights or remedies shall not preclude or waive the right of the Landlord to exercise any other remedy available to it under this Lease, at law, or in equity. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Landlord shall deem desirable.

B.      If Landlord shall fail to pay any taxes, assessments, insurance premiums, mortgage interest or amortization or any other charges accruing against the Demised Premises, or the Shopping Center of which the Demised Premises may be a part, or fail to perform any of the conditions or covenants hereof on its part to be performed, Tenant may give written notice of such default to Landlord and if Landlord shall not within thirty (30) days thereafter cure such default (or if the default cannot be cured within thirty (30) days, if Landlord shall not within such period commence such cure and thereafter diligently complete the same), then Tenant shall have the right, at its option, to cure such default and the amount expended by it therefor, may be deducted by Tenant from Rent thereafter to become due until such amount is recaptured in full. Tenant shall, upon request, submit to Landlord receipted bills showing payment of all the aforesaid items. It is further provided, however, that in the event of urgent situations which shall include, but not be limited to, defects and failures in the sprinkler systems, the Tenant shall promptly notify the Landlord, or its duly appointed agent, orally or by facsimile, and upon the failure of the Landlord to promptly correct, or take necessary steps to correct such urgency then Tenant shall have the right to correct the same and be reimbursed as hereinabove provided. In the event the Demised Premises shall be rendered untenantable by reason of Landlord's failure to perform any obligation described herein following any applicable notice and cure periods as provided under the terms of this Lease, including without limitation Landlord's failure to make repair, all Rent and Additional Rent due hereunder shall wholly abate until Landlord shall have satisfactorily performed such obligation; in addition, Tenant shall have the right to perform such obligations at the expense of Landlord as hereinabove provided. All rights and remedies of Tenant herein created, or remedies otherwise existing at law or in equity are cumulative, and the exercise of one or more rights or remedies shall not preclude or waive the right of the Tenant to exercise any other remedy available to it under this Lease, at law, or in equity. All such rights and remedies may be exercised and enforced concurrently and whenever and as often as Tenant shall deem desirable.

20.   **CONDEMNATION:**

A.   If the whole of the Demised Premises or the Shopping Center is acquired or condemned by, or transferred by any authority having the power of eminent domain, then and in that event, the Term shall cease and terminate, and the date of such termination shall be, at Landlord's election, either the date upon which possession shall be tendered to such authority by Landlord or the date upon which possession is taken by such authority.

B.   If a portion of the Demised Premises is acquired or condemned by, or transferred by any authority having the power of eminent domain and Tenant, in Tenant's reasonable business judgment, determines that the portion of the Demised Premises remaining after the taking will be insufficient to continue Tenant's business at substantially the same scope as existed prior to the taking, then Tenant may terminate this Lease by notice to Landlord effective as of the date possession of the Demised Premises is transferred to the condemning authority.

C.   Whether or not any portion of the Demised Premises may be taken by such authority, Landlord may nevertheless elect to terminate this Lease or to continue this Lease in effect

25

in the event any portion of any building in the Shopping Center or more than fifty percent (50%) of the Common Area of the Shopping Center be taken by such authority.

D.   In the event a taking occurs and this Lease is not terminated as provided above, then Landlord will promptly restore, at Landlord's sole cost and expense, the Demised Premises, if applicable, affected by the taking to a condition substantially comparable to their condition immediately preceding the taking, less the portion lost in the taking.   In such event, this Lease will continue in full force and effect, except that from and after the taking (a) Fixed Minimum Rent will be reduced in proportion to the reduction, if any, in the square footage of gross leaseable area in the Demised Premises as a result of the taking, and (b) Common Area Charges, Real Estate Taxes and Insurance will be adjusted to reflect the change in size, if any, of the Demised Premises, the Shopping Center and the improvements on the Shopping Center as a result of the taking.

E.   All sums awarded or agreed upon between Landlord and the condemning authority for the taking of the fee or the leasehold estate, whether as damages or as compensation, shall be the property of Landlord.   Tenant hereby assigns to Landlord all proceeds, whether by way of compensation or damages, for loss of the leasehold interest by reason of such taking. Any amounts specifically awarded or agreed upon by Tenant and the condemning authority for the taking of Tenant's removable trade fixtures and the unamortized cost of Tenant's leasehold improvements based upon straight line depreciation and a five (5) year amortization period shall be the property of Tenant. Further, Tenant shall have the right to pursue in Tenant's own name any separate remedy Tenant may have against the condemning authority for relocation expenses, loss of business, or other non-real estate related awards; provided, however, that Landlord shall not be liable to Tenant for any such amounts in connection with such takings and no amount shall decrease the amount of the award otherwise due Landlord for the taking of the fee simple interest in the Shopping Center. Landlord shall not be liable to Tenant for any such amounts in connection with such taking.

21.   **MUTUAL WAIVER OF SUBROGATION:**

Notwithstanding anything to the contrary contained in this Lease, Landlord and Tenant hereby release the other from any and all liability or responsibility to the other or anyone claiming through or under them by way of subrogation or otherwise for any loss or damage to property covered by insurance then in force, even if such loss is by fire or other casualty caused by the fault or negligence of the other party or anyone for whom such party may be responsible. Landlord and Tenant further agree, if necessary, to obtain applicable endorsements for said insurance policies required to effect the waiver of subrogation set forth herein.

Landlord and Tenant each shall indemnify, defend and hold harmless the other against any loss or expense resulting from failure to obtain such insurance subrogation waivers.

The provisions of this Section 21 will survive termination of this Lease.

22.   **ASSIGNMENT AND SUBLETTING:**

Tenant shall have the right at any time to sublet the Demised Premises or any part thereof or to assign this Lease without Landlord's consent; provided, that no such subletting or assignment shall relieve Tenant of any of its obligations hereunder.   Each sublease or assignment shall be subject and subordinate to the rights of Landlord under this Lease and to any renewal, amendment or modification thereof, to the rights of any first mortgage to which this Lease is subject or subordinate and to all renewals, modifications, consolidations and extensions thereof.   Any subletting or assignment shall not violate existing use restrictions and Prohibited Uses or violate any exclusive use granted to any existing tenant of the Shopping Center, provided said other tenant is not a Competing Business, and Landlord agrees to provide Tenant with copies of all tenant exclusives and restrictions at the Shopping Center within thirty (30) days after written request of Tenant. If Landlord fails to provide said exclusives and restrictions within said thirty (30) days, Tenant may proceed with said assignment or subletting regardless of any exclusives and restrictions granted to other tenants of the Shopping Center, subject to the terms of this

26

Lease and the Prohibited Uses, the ECR and the exclusives and restrictions described on Exhibit F.

In the event Tenant desires to assign or sublet all or a portion of the Demised Premises, Tenant shall notify Landlord at least 30 days in advance of its intent to assign or sublet ("Notice"). Upon receipt of the Notice, Landlord shall have the right to terminate this Lease by written notice to Tenant ("Termination Notice"), which said Termination Notice must be received by Tenant within sixty (60) days after Landlord's receipt of the Notice ("Recapture Right"). If Tenant does not receive the Termination Notice within sixty (60) days after Landlord's receipt of the Notice, Landlord's Recapture Right shall be deemed irrevocably waived, and otherwise null and void, with respect to the particular assignment or subletting that is the subject of the Notice, and Tenant shall be permitted to proceed with said assignment or subletting (but shall be under no obligation to do so). If Landlord timely exercises its Recapture Right, such termination shall be effective ninety (90) days after Tenant's receipt of the Termination Notice ("Termination Date"), and from and after such Termination Date, neither party shall have any further liability or obligation to the other under this Lease, except as otherwise expressly provided herein. Landlord shall have no Recapture Right with respect to a Related Party Assignment (defined below), and Tenant shall not be required to give Landlord Notice of a Related Party Assignment. Tenant may license or permit a portion or portions of the Demised Premises to be used for concessions, leased or licensed in connection with or as part of the operation of Tenant, and Landlord shall have no Recapture Right with respect to same, nor shall Tenant be required to provide Landlord Notice of same.

Notwithstanding anything contained in this Lease to the contrary, Tenant may assign this Lease or sublet the Demised Premises without notice to Landlord so long as such assignment or subletting is to a parent, subsidiary or other affiliate of Tenant, or is in connection with a merger or consolidation of the same or, is in connection with the sale of all or substantially all of the assets, stock, or an operating division of Tenant (collectively "Related Party Assignment"). The parties agree that the transfer, assignment or hypothecation of any stock or interest of Tenant shall not be deemed an assignment or transfer of this Lease or Tenant's interest in and to the Demised Premises within the meaning and provisions of this Section so long as the common stock of either Tenant or Tenant's parent is traded in the over-the-counter market or is listed on a national stock exchange. In no event shall Tenant be permitted to use a series of one or more Related Party Assignments to "spin-off" this Lease to independent third parties. As an example of the foregoing, Tenant shall not assign this Lease to an affiliate corporation whose assets consist solely of this Lease and the rights granted herein and thereafter sell the stock of such affiliate corporation to an independent third party. The result of what would otherwise be two (2) independent permitted transactions would become a transfer of this Lease to an independent third party in violation of this third grammatical paragraph of this Section 22.

23. **SURRENDER AND HOLDOVER:**

When the tenancy herein created terminates, Tenant agrees to surrender the Demised Premises to Landlord in broom clean condition, ordinary wear and tear and damage by fire and other casualty excepted. Tenant agrees to remove all of its trade fixtures with the exception of lighting fixtures and HVAC equipment whether or not attached to the Demised Premises.

If Tenant shall remain in possession of the Demised Premises after expiration of the Original Term or any Option Term, Tenant shall be deemed to be occupying the Demised Premises as a tenant from month-to-month, subject to all the covenants and obligations of this Lease, except that as liquidated damages by reason of such holding over, the monthly amounts payable by Tenant under this Lease shall be increased to one hundred twenty-five percent (125%) of the monthly amounts payable in the last month of the Term. Such month-to-month tenancy may be terminated by either party upon thirty (30) days notice to the other. Any rent due after notice has been given is to be calculated according to this Section prorated for any partial month of holdover. If Tenant tenders rent pursuant to the formula in this Section, and Landlord accepts such payment, the acceptance of such

payment will not operate as a waiver by Landlord of the notice of termination, unless such waiver is in writing and signed by Landlord.

24. **NOTICES:**

Whenever any demand, request, approval, consent or notice ("notice") shall or may be given by one party to the other, notice shall be addressed to the parties at their respective addresses as specified in the opening paragraph of this Lease and delivered by (i) a nationally recognized overnight express courier, or (ii) registered or certified mail return receipt requested, or (iii) via facsimile, provided a copy of said notice is sent in accordance with (i) or (ii),   within two (2) business days following facsimile transmission. For purposes of the calculation of various time periods referred to herein, notice delivered by nationally recognized overnight express courier shall be deemed received when delivered to the recipient's notice address and notice delivered by certified mail shall be deemed received when delivered to the recipient's notice address upon the earlier to occur of: (a) actual receipt as indicated on the signed return receipt; (b) the date of first attempted delivery; or (c) three (3) days after posting as herein provided.  Any written notice actually received by the addressee, shall constitute sufficient notice for all purposes under this Lease regardless of the delivery method. Either party may, at any time, change its notice address by giving the other party notice, in accordance with the above, stating the change and setting forth the new address.

25. **LEGALITY:**

Should any one or more of the clauses of this Lease be declared void or in violation of the law, this Lease shall remain in effect, exclusive of such clause or clauses, to the fullest extent of the law.  The terms of this Lease shall be interpreted under the substantive laws of the State where the Demised Premises is located, without regard to choice of law rules of that state.

Landlord represents it is an unincorporated trust organized under the Texas Real Estate Investment Trust Act, validly existing and in good standing under the laws of Texas. Tenant represents it is a corporation duly organized, validly existing and in good standing under the laws of California. Landlord and Tenant each represent and warrant to the other that the individual executing this Lease on their behalf are each duly authorized to so execute and deliver this Lease.

26. **BINDING OBLIGATIONS:**

This Lease and all rights and duties hereunder shall inure to the benefit of and shall be binding upon Landlord and Tenant and their respective personal representatives, administrators, executors, heirs, successors and assigns.

27. **NO RECORDATION:**

If requested by the Tenant, Landlord will execute a recordable memorandum of lease in form reasonably acceptable to Landlord.   Tenant may record such memorandum at its expense.  Tenant shall provide Landlord with a copy of such recorded memorandum of lease.

Neither party shall record this Lease.

28. **REAL ESTATE BROKER'S COMMISSION:**

Tenant and Landlord covenant and represent to each other that no parties are entitled to be paid a fee or commission in connection with the transaction contemplated by this Lease.  If any individual or entity shall assert a claim to a finder's fee or commission as a broker or a finder, then the party who is alleged to have retained such individual or entity shall defend, indemnify and hold harmless the other party from and against any such claim and all costs, expenses, liabilities and damages incurred in connection with such claim or any action or proceeding brought thereon.

28

**29.  NO WAIVER, LACHES OR ACCORD AND SATISFACTION:**

The waiver of any covenant or condition or the acquiesced breach thereof shall not be taken to constitute a waiver of any subsequent breach of such covenant or condition nor to justify or authorize the non-observance of the same or of any other covenant or condition hereof.  No payment by Tenant or receipt by Landlord of a lesser amount than the Rent herein stipulated shall be deemed to be other than on account of the earliest stipulated Rent nor shall any endorsement or statement on any check or any letter accompanying any check or payment as Rent be deemed an accord and satisfaction or waiver, and Landlord may accept such check or payment without waiver of the default or prejudice to Landlord's right to recover the balance of such Rent or pursue any remedy provided for in this Lease or available at law or in equity.

**30.  HAZARDOUS MATERIAL:**

Landlord represents and warrants that to Landlord's knowledge, the Demised Premises do not presently contain any Hazardous Materials which are above actionable levels and required to be remediated by applicable law.   "Hazardous Materials" means any hazardous or toxic substance, material or waste (including, without limitation, asbestos, pcb, mold, fungus, bacteria, etc.) which, now or in the future, is determined by any state, federal or local governmental authority to be capable of posing a risk of injury to health, safety, or property and/or the use and/or disposal of which is regulated by any governmental authority.  Upon discovery of any Hazardous Materials which are above actionable levels and required to be remediated by applicable law in, on, under or around the Demised Premises at any time during the Original Term of this Lease or any options or extensions thereof, which Hazardous Materials which are above actionable levels and required to be remediated by applicable law is determined to have been in existence on the Demised Premises prior to the Tenant Possession Date, or is determined to have been placed thereon by Landlord, Landlord's agents, contractors, or employees or a tenant or occupant of Landlord's, during the Original Term of this Lease or any options or extensions, Landlord shall promptly, at Landlord's sole cost and expense, remediate such Hazardous Material in compliance with all EPA, governmental laws and regulations, and Landlord shall indemnify, defend and hold harmless Tenant, except for the negligence or willful misconduct of Tenant, Tenant's agents, contractors or employees, with respect to all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation reasonable attorney fees and court costs) related to such Hazardous Materials.   If Landlord shall be required to remove any Hazardous Materials which are above actionable levels from the Demised Premises or perform work in the Demised Premises related to any such Hazardous Materials, and in the event Tenant is unable to conduct business during the removal process, all Rent and Additional Rent due under this Lease shall abate during the period of time necessary to complete such work.

Throughout the Original Term of this Lease or any Option Terms or extensions, Tenant shall not permit the presence, use, generation, release, discharge, storage, disposal, or transportation of any Hazardous Materials which are above actionable levels on, under, in, above, to, or from the Demised Premises other than in strict compliance with all applicable federal, state, and local laws, rules, regulations and orders.  Tenant shall indemnify Landlord, except for the negligence or willful misconduct of Landlord, Landlord's agents, contractors, or employees, with respect to all costs, demands, claims, causes of action, losses, liabilities, judgments, damages and expenses (including without limitation reasonable attorney fees and court costs) related to such Hazardous Materials, from any release of Hazardous Materials from the Demised Premises directly caused by Tenant while in possession, or elsewhere if caused by Tenant or persons acting under Tenant.  The within covenants shall survive the expiration or earlier termination of the Term or any extensions thereof.

**31.  TITLES AND ENTIRE AGREEMENT:**

All marginal titles are for reference and convenience only and do not form a part of this Lease.  This Lease and Exhibits, and Rider, if any, attached hereto and forming a part hereof, set forth all the covenants, promises, agreements, conditions, and understandings

between Landlord and Tenant concerning the Demised Premises. No subsequent alteration, amendment, change or addition to this Lease shall be binding upon Landlord or Tenant unless reduced to writing and signed by them.

## 32. WAIVER OF CLAIMS:

Notwithstanding anything to the contrary contained herein, in the event there is (i) a year-end adjustment; (ii) an adjustment resulting from an error in the calculation of any Rent payable by Tenant under the Lease; (iii) any other sum payable to Landlord pursuant to the terms of this Lease, including without limitation, Tenant's pro rata share of Common Area Charges, Insurance charges, Real Estate Taxes or any charges to Tenant for electrical and heating and air conditioning service, which results in an amount owed by Tenant, Landlord shall notify Tenant of any amount owed within one (1) year after the expiration of the Lease Year in which such payments or adjustments are applicable. If Landlord does not notify Tenant of such amount owed within said one (1) year period, Landlord's claim to such amount owed shall be deemed waived and discharged.

## 33. REASONABLE CONSENT:

Except as otherwise provided herein, if the consent, approval or permission of either party is required or desired by the other party hereunder, such party agrees that it shall not unreasonably or arbitrarily withhold or delay or condition such consent, approval or permission.

## 34. CO-TENANCY:

So long as Tenant is opening and operating its business in the Demised Premises for the Permitted Use, then in the event Academy (its successors, assigns or replacements) should cease operation (other than for reason of an "Excused Discontinuance" as hereinafter defined), then the following shall apply:

(A)     In the event that within twelve (12) months from the date of closing of Academy ("Co-Tenancy Cure Period"), at least sixty percent (60%) of the total square feet of ground floor area occupied by Academy ("Academy Space") is leased to another retail type tenant and such tenant is open for business, then no rights shall accrue to Tenant hereunder.

(B)     If, however, at least sixty percent (60%) of the Academy Space is not re-leased prior to the expiration of the Co-Tenancy Cure Period, then commencing on the day immediately following the expiration of the Co-Tenancy Cure Period, as its exclusive remedy, shall have the right to pay, in lieu of the Fixed Minimum Rent stated in the Lease, an amount equal to fifty percent (50%) of the Fixed Minimum Rent otherwise payable under the terms of the Lease (hereinafter "Substitute Rent") until at least sixty percent (60%) of the Academy Space is leased to another retail type tenant and such tenant is open for business; provided, however, the payment of such Substitute Rent shall not continue in effect for longer than twelve (12) months, and after twelve (12) months of the payment of Substitute Rent, Tenant must elect to either (i) terminate this Lease upon ninety (90) days' prior written notice to Landlord, or (ii) keep this Lease in effect and to again commence payment of Fixed Minimum Rent and all Additional Rent at the rates provided in this Lease. Time is of the essence. If Tenant fails to give Landlord written notice of termination within sixty (60) days after expiration of the twelve (12) month Substitute Rent period, Tenant will be deemed to have elected to keep this Lease in effect and recommence the payment of Fixed Minimum Rent and all Additional Rent at the rates provided in the Lease. Nothing contained herein shall be deemed to reduce the amounts payable by Tenant as Additional Rent during any period that Tenant has the right to pay Substitute Rent.

In the event Tenant terminates this Lease as provided herein, Tenant shall vacate the Demised Premises and remove only its merchandise and removable trade fixtures and repair any damage caused thereby on or before the expiration of the aforesaid ninety (90) day period (the "Co-Tenancy Effective Date of Termination"). In no event may Tenant remove the leasehold improvements made to the Demised Premises, including, but not limited to, the HVAC system and lighting fixtures. Upon the Co-Tenancy Effective Date

30

of Termination, this Lease shall terminate and the parties shall have no further obligations to one another pursuant to the Lease except for obligations which accrued prior to said Co-Tenancy Effective Date of Termination.

(C)     The term "Excused Discontinuances" as used hereinabove shall mean:  (1) fire or other casualty damage to the space occupied by Academy or its contents; (2) acts of God, such as flood, hurricane, tornado, earthquake; (3) strikes, lockouts, boycotts, picketing, or the threat of any of the foregoing, or any other situation or circumstances of a like nature commonly referred to as "labor difficulties" or "labor trouble"; (4) riot, insurrection, war, civil disturbance, demonstrations, or the threat of any of the foregoing.

## 35.   NO PRESUMPTION AGAINST DRAFTER:

Landlord and Tenant understand, agree and acknowledge that: (i) this Lease has been freely negotiated by both parties; and (ii) that, in any controversy, dispute, or contest over the meaning, interpretation, validity, or enforceability of this Lease or any of its terms or conditions there shall be no inference, presumption, or conclusion drawn whatsoever against either party by virtue of that party having drafted this Lease or any portion thereof.

## 36.   SUBMISSION OF LEASE:

The submission by Tenant to Landlord of this Lease shall have no binding force or effect, shall not constitute an option for the leasing of the Demised Premises, nor confer any rights or impose any obligations upon either party until the execution thereof by Landlord and Tenant and the delivery of a fully executed original counterpart thereof to Tenant.

If a party returns this Lease by facsimile machine, the signing party intends the copy of this authorized signature printed by the receiving facsimile machine to be its original signature.

## 37.   INTERLINEATION:

Whenever in this Lease any printed portion has been stricken, and initialed by both parties hereto, whether or not any relative provision has been added, this Lease shall be construed as if the material so stricken was never included herein and no inference shall be drawn from the material so stricken which would be inconsistent in any way with the construction or interpretation which would be appropriate if such material were never contained herein.

## 38.   TIME OF THE ESSENCE:

Time is of the essence of all conditions of this Lease in which time is an element.

## 39.   TENANT'S AUDIT RIGHTS:

If Tenant wishes to challenge the accuracy or validity of Real Estate Taxes, Common Area Charges, Insurance Costs, or any other sums or Additional Rent payable by Tenant to Landlord herein, or if Tenant is not satisfied with Landlord's written statement(s) with respect to Common Area Charges, Real Estate Taxes, Insurance Costs or any other Rent or Additional Rent charges payable pursuant to the terms of this Lease, or wishes to challenge the accuracy or validity of any items therein, it shall give Landlord notice of its dissatisfaction, and Tenant shall be entitled, upon thirty (30) days prior written notice to Landlord, to an audit of Landlord's books and records in accordance with generally accepted accounting principles to be made by Tenant's representatives, who shall not be compensated on a contingent fee basis. Tenant's inspection of a particular calendar year shall be conducted, if at all, within twenty four (24) months after the end of the calendar year in question; and Tenant shall have the right to inspect the records for a particular calendar year only one time.  If such audit reveals any overpayment by Tenant, the amount of such overpayment shall be promptly refunded to Tenant.  If such audit shows that any statement rendered by Landlord is overstated by more than five percent (5%),

31

Landlord shall pay to Tenant, in addition to any overpayment, the reasonable costs of such audit (but in no event more than $1,500.00). If any amount payable hereunder is not paid by Landlord within thirty (30) days after invoice therefor, Tenant may offset the amount thereof against the next Rent payments due from Tenant to Landlord hereunder until recaptured in full. Any overpayments not refunded to Landlord or Tenant in full prior to the end of the then current Original Term or Option Term shall be refunded to such party in cash prior to the end of that Original Term or Option Term, regardless of whether Tenant remains in possession of the Demised Premises thereafter. Provided Tenant's audit request complies with the terms of this Section 39, if Landlord refuses to allow said audit, until such time as Landlord allows such audit, Tenant shall be obligated to pay Landlord only Fifty Percent (50%) of such Common Area Charges, Real Estate Taxes, Insurance Costs or Additional Rent charges payable pursuant to the terms of this Lease as Tenant paid Landlord for the immediately preceding Lease Year. Tenant shall keep confidential any information obtained as a result of such audit.

**40.   ATTORNEYS FEES:**

In the event either Landlord or Tenant is required to enforce the provisions of this Lease, then the prevailing party shall be entitled to court costs and reasonable attorney's fees from the non-prevailing party. This provision applies to court costs and reasonable attorney's fees incurred in any trial and/or appellate courts, and which costs and fees shall be paid upon demand therefore. For purposes of this provision, "prevailing party" shall mean the party obtaining substantially all the relief sought on each and every issue upon which the suit is originally filed.

**41.   WAIVER OF JURY TRIAL:**

The parties hereto shall and they hereby do waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way connected with this Lease.

**42.   REAL ESTATE INVESTMENT TRUST:**

Weingarten Realty Investors (the "trust") is an unincorporated trust organized under the Texas Real Estate Investment Trust Act. Neither the shareholders of the trust, nor its trust managers, officers, employees or other agents are personally, corporately or individually liable for any debt, act, omission or obligation of the trust, and all persons having claims of any kind against the trust must look solely to the property of the trust for the enforcement of their rights.

**43.   PROHIBITED PERSONS:**

To the best of Tenant's knowledge, Tenant is currently in compliance with, and covenants to Landlord that Tenant shall at all times during the Term (including any extension thereof) remain in compliance with, the regulations of the Office of Foreign Assets Control ("OFAC") of the U.S. Department of Treasury (including those named on OFAC's Specially Designated Nationals and Blocked Persons List) and any statute, executive order (including, but not limited to, Executive Order 13224, dated September 24, 2001 and entitled "Blocking Property and Prohibiting Transactions with Persons Who Commit, Threaten to Commit, or Support Terrorism"), or other governmental, regulatory, or administrative action relating thereto.

**44.   INDEPENDENT COVENANTS:**

The obligation of Tenant to pay all rent and other sums hereunder provided to be paid by Tenant and the obligation of Tenant to perform Tenant's other covenants and duties hereunder constitute independent, unconditional obligations to be performed at all times provided for hereunder, except as otherwise provided in this Lease.

**IN TESTIMONY WHEREOF**, the Landlord and Tenant have caused this Lease to be signed as of the respective acknowledgment dates set forth below:

Signed and acknowledged in the presence of:

Witnesses As To Landlord:    **LANDLORD:  WEINGARTEN REALTY INVESTORS**
                                    **a Texas real estate investment trust**

By:_____

Title:_____
                Mark D. Stout
                Vice President /
                Associate General Counsel

KMB
Legal

KMB

Witnesses As To Tenant:    **TENANT:    PNS STORES, INC., a California**
                                  **corporation**

By:_____
          Charles W. Haubiel II

Title: Senior Vice President – Legal & Real Estate, General
       Counsel and Corporate Secretary

**Acknowledgements appear on immediately following page.**

33

**Landlord's Acknowledgement**

**STATE OF** *TEXAS*

**COUNTY OF** *HARRIS*

Before me, a Notary Public, in and for said State and County, personally appeared the above named Landlord, Weingarten Realty Investors  by, Mark D. Stout its Vice President who acknowledged that he/she did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him/her personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Houston, Texas this 4 day of September, 2009.

Tui Edwards
Notary Public

TERRI EDWARDS
Notary Public
STATE OF TEXAS
My Comm. Exp. 03-16-2013

**Tenant's Acknowledgement**

**STATE OF OHIO**

**COUNTY OF FRANKLIN**

Before me, a Notary Public, in and for said State and County, personally appeared the above named Tenant, **PNS Stores, Inc.**, by Charles W. Haubiel II, its Senior Vice President – Legal & Real Estate, General Counsel and Corporate Secretary who acknowledged that he did sign the foregoing instrument and that the same is the free act and deed of said corporation, and the free act and deed of him personally and as said officer.

IN WITNESS WHEREOF, I have hereunto set my hand and the official seal, at Columbus, Ohio, this / day of September 2009.

Notary Public

KARLENE YAMAMOTO
Notary Public, State of Ohio
My Commission Expires 2/20/2012

34



STATE HIGHWAY LOOP 336

NORTH

INTERSTATE HIGHWAY 45

"Leased Premises"
Approx.: 31,502 sf
1404 Loop 336 West
Conroe, Texas 77304

■ Cart Area

☐ Drop/Storage Trailer

▨ No Change Area

▦ Restricted Area

▨ Unrestricted Area

SPACE 28

The "Leased Premises" as shown hereon is for        **PNS Stores, Inc.**

Subject to the terms of the Lease, any future construction by the Landlord within the Shopping Center will not affect the validity of the Lease covering the Leased Premises. Subject to the terms of the Lease, with the exception of the "No Change Area", Landlord may elect to change the location, size, layout, or other details of any buildings, or Common Area in the Shopping Center and/or to construct other buildings in the Shopping Center and such changes will not affect the validity of the Lease covering the Leased Premises.

The post office address designated  hereon, if any, is subject to change at any time.

DATE: 04-06-2009
REV.: 08-03-2009

EXHIBIT "A"
MONTGOMERY PLAZA

| INITIAL | Floor No: A00 |
| | Unit No: A0A |
| PREPARED BY: EYA | Project No: 0165 |

# EXHIBIT A-1

## TENANT'S DRAWING OF DEMISED PREMISES



# EXHIBIT A-1

## TENANT'S DRAWING OF DEMISED PREMISES



# EXHIBIT A-1

## TENANT'S DRAWING OF DEMISED PREMISES



# EXHIBIT A- 1

## TENANT'S DRAWING OF DEMISED PREMISES



**EXHIBIT A- 1**

**TENANT'S DRAWING OF DEMISED PREMISES**



# EXHIBIT B

## LEGAL DESCRIPTION OF SHOPPING CENTER

Being a 20.906 acre (910,649 square foot) tract of land in the W.S. Allen Survey, Abstract No. 2, Conroe, Montgomery County, Texas, and being the remainder of Unrestricted Reserve "A", all of Unrestricted Reserves "C" and "D" of a plat of Montgomery Park Subdivision as recorded in Cabinet C, Sheet 152-B of the Montgomery County Map Records and said 20.906 acre tract being more particularly described by metes and bounds as follows with all bearings based on said plat:

BEGINNING at a 3/4 inch iron pipe found marking the northeast corner of said Unrestricted Reserve "A", the southeast corner of a called 19.596 acre tract of land conveyed to Conroe Church of Christ, Inc. as recorded in Montgomery County Clerk's File Number 8911900, and being on the west right-of-way line of Interstate Highway 45, variable width, and being the northeast corner of the herein described tract;

THENCE South 22 degrees 46 minutes 31 seconds East, along the west right-of-way line of said Interstate Highway 45, a distance of 39.72 feet to a point marking an angle point in the herein described, from which a found "X" in concrete bears North 50 degrees 07 minutes East, 0.19 feet;

THENCE South 18 degrees 33 minutes 07 seconds East, continuing along the west right-of-way line of said Interstate Highway 45, a distance of 700.00 feet to a 3/4 inch iron pipe found marking an angle point in the herein described tract;

THENCE South 14 degrees 50 minutes 50 seconds East, continuing along the west right-of-way line of said Interstate Highway 45, a distance of 201.00 feet to a 5/8 inch iron rod with cap set marking an angle point in the herein described tract;

THENCE South 11 degrees 28 minutes 44 seconds West (Called South 11 degrees 30 minutes 15 seconds West), continuing along the west right-of-way line or said Interstate Highway 45, a distance of 467.08 feet (Called 466.84 feet), to a 5/8 inch iron rod found marking the southeast corner of the herein described tract and being on the north right-of-way line of State Highway Loop 336, variable width;

THENCE South 70 degrees 54 minutes 09 seconds West, along the north right-of-way line of said State Highway Loop 336, a distance of 194.12 feet to a point marking an angle point in the herein described tract, from which a found "X" in concrete bears South 41 degrees 08 minutes East, 0.25 feet;

THENCE South 66 degrees 21 minutes 53 seconds West, continuing along the north right-of-way line of said State Highway Loop 336, a distance of 118.55 feet to a 5/8 inch iron rod found marking an angle point in the herein described tract;

THENCE South 72 degrees 23 minutes 55 seconds West, continuing along the north right-of-way line of said State Highway Loop 336, a distance of 260.10 feet to a 3/4 inch iron pipe found marking the southwest corner of the herein described tract and being the southeast corner of a tract of land conveyed to Wal-Mart Stores, Inc. as recorded in Montgomery County Clerk's File Number 9115394;

THENCE North 16 degrees 08 minutes 59 seconds West, along the east line of said Wal-Mart Stores, Inc. tract, a distance of 30.70 feet to a point marking an angle point in the herein described tract, from which a found concrete nail bears North 29 degrees 40 minutes West, 0.31 feet;

THENCE South 73 degrees 51 minutes 01 seconds West, continuing along the east line of said Wal-Mart Stores, Inc. tract, a distance of 8.50 feet to an "X" in concrete found marking an angle point in the herein described tract;

THENCE North 16 degrees 09 minutes 38 seconds West (called North 16 degrees 08 minutes 59 seconds West), continuing along the east line of said Wal-Mart Stores, Inc. tract, a distance of 326.78 feet (called 326.45 feet), to a point marking an angle point in the herein described tract, from which a found 3/4 inch iron pipe bears South 01 degrees 57 minutes East, 0.15 feet;

P0165 Montgomery Plaza SC
Exhibit "B"
Revised 12/2/02 CC/ji
Page 1 of 6



THENCE North 73 degrees 41 minutes 06 seconds East, continuing along the east line of said Wal-Mart Stores, Inc. tract, a distance of 8.43 feet to a point in the herein described tract, from which a found 60d nail bears South 20 degrees 24 minutes East, 0.17 feet;

THENCE North 16 degrees 19 minutes 28 seconds West, continuing along the eastline of said Wal-Mart Stores, Inc. tract, a distance of 120.96 feet to a point marking an angle point in the herein described tract, from which a found "X" in concrete bears North 14 degrees 17 minutes East, 0.17 feet;

THENCE North 73 degrees 40 minutes 32 seconds East, continuing along the east line of said Wal-Mart Stores, Inc. tract, a distance of 11.20 feet to a point marking an angle point in the herein described tract, from which a found "X" in concrete bears North 06 degrees 11 minutes West, 0.13 feet;

THENCE North 16 degrees 19 minutes 28 seconds West, continuing along the east line of said Wal-Mart Stores, Inc. tract, a distance of 22.00 feet to a point marking an angle point in the herein described tract, from which a found "X" in concrete bears North 03 degrees 17 seconds West, 0.12 feet;

THENCE South 73 degrees 40 minutes 32 seconds West, continuing along the eastline of said Wal-Mart Stores, Inc. tract, a distance of 11.20 feet to an "X" in concrete found marking an angle point in the herein described tract;

THENCE North 16 degrees 19 minutes 28 seconds West, continuing along the eastline of said Wal-Mart Stores, Inc. tract, a distance of 102.50 feet to a 3/4 inch iron pipe found marking an angle point in the herein described tract and being the northeast corner of said Wal-Mart Stores, Inc. tract and being on the south line of Unrestricted Reserve "E" of Montgomery Park Subdivision as recorded in Cabinet D, Sheet 126-B of the Montgomery County Map Records;

THENCE North 73 degrees 41 minutes 06 seconds East, along the south line of said Unrestricted Reserve "E", a distance of 0.20 feet to a 3/4 inch iron pipe found marking an angle point in the herein described tract and being the southeast corner of said Unrestricted Reserve "E";

THENCE North 28 degrees 41 minutes 06 seconds East, along the east line of said Unrestricted Reserve "E", a distance of 169.71 feet to an "X" in concrete found marking an angle point in the herein described tract;

THENCE North 16 degrees 18 minutes 54 seconds West, continuing along the east line of said Unrestricted Reserve "E", a distance of 258.43 feet to a 3/4 inch iron pipe found marking an angle point in the herein described tract;

THENCE North 28 degrees 41 minutes 06 seconds East, continuing along the east line of said Unrestricted Reserve "E", a distance of 113.14 feet to an "X" in concrete found marking an angle point in the herein described tract;

THENCE North 16 degrees 18 minutes 54 seconds West, continuing along the east line of said Unrestricted Reserve "E", a distance of 260.41 feet to a 5/8 inch iron rod with cap set marking an angle point in the herein described tract;

THENCE North 28 degrees 41 minutes 06 seconds East, continuing along the east line of said Unrestricted Reserve "E", a distance of 87.13 feet to a 5/8 inch iron rod with cap set marking the northwest corner of the herein described tract and being on the south line of said Conroe Church of Christ tract;

THENCE North 73 degrees 41 minutes 06 seconds East, along the south line of said Conroe Church of Christ tract, a distance of 500.00 feet to the POINT OF BEGINNING and containing 20.906 acres (910,649 square feet) of land.

SAVE AND EXCEPT:

Being a 0.0148 acre (646 square feet) parcel of land out of the William S. Allen Survey, Abstract No. 2, Montgomery County, Texas, being out of Reserve "D" Replat of Montgomery Park Subdivision, as recorded in Cabinet E, Sheet 125-B of the Montgomery County Map Records (M.C.M.R.) and out of a 20.906 acre tract conveyed to Weingarten Realty Investors, a Texas Real Estate Investment Trust, by deed dated June 9, 1953, as recorded under Clerk's File No. 9329980 of the Official Public Records of Real Property of Montgomery County (O.P.R.R.P.M.C.), said 0.0148 acre parcel being more particularly described as follows: (All bearings and coordinates are based on the Texas State Plane Coordinate System, Central Zone, North American Datum 1983 (1993 Adjustment), all distances and coordinates shown are surface and may be converted to grid by multiplying by a combined scale factor of 0.999970).

COMMENCING at an "X" in concrete found at the most southwesterly corner of Tract D-1 of said Reserve "D," and the northwesterly corner of Tract D-2 of said Reserve "D"; thence as follows:

SOUTH 80 degrees 22 minutes 32 seconds EAST, a distance of 155.32 feet along the common boundary of said Tract D-1 and said Tract D-2 to the southeast corner of said Tract D-1, and the northeast corner of said Tract D-2;

NORTH 09 degrees 50 minutes 45 seconds EAST, a distance of 138.61 feet along the easterly line of said Tract D-1 and the existing westerly right-of-way line of Interstate Highway 45 (IH 45) (width varies) to a Texas Department of Transportation (TxDOT) aluminum disk set on a 5/8-inch iron rod, and being the POINT OF BEGINNING of the herein described parcel, having a Texas State Plane Coordinate Value of $X = 3,827,524.29$, $Y = 10,119,089.69$;

1.) THENCE, NORTH 01 degrees 33 minutes 50 seconds WEST, a distance of 108.53 feet along the proposed west right-of-way line of IH 45 (width varies), same being the Access Denial Line to a Texas Department of Transportation (TxDOT) aluminum disk set on a 5/8-inch iron rod in the existing west right-of-way line of IH 45, and the north corner of the herein described parcel;

2.) THENCE, SOUTH 15 degrees 04 minutes 30 seconds EAST, a distance of 50.95 feet along said existing west right-of-way line of IH 45 and said easterly line of Tract D-1 to an angle point for an easterly corner of the herein described parcel;

3.) THENCE, SOUTH 09 degrees 50 minutes 45 seconds WEST, a distance of 60.17 feet along said existing west right-of-way line of IH 45 and said easterly line of Tract D-1 to the POINT OF BEGINNING, containing 0.0148 acre (646 square feet) of land.

AND

TRACT ONE:

5.436 acres of land out of the W.S.. Allen Survey, Abstract 2, and being a part of Reserve "A", Montgomery Park Subdivision, as shown on plat thereof recorded in Cabinet C, Sheet 152 B, Plat Records of Montgomery County, the subject 5.436 acres being more particularly described by metes and bounds as follows:

BEGINNING at a 3/4-inch galvanized iron pipe set for corner on the Northerly right-of-way line of State Highway Loop 336, being the Southeasterly corner of Reserve "B" of said Montgomery Park Subdivision;

THENCE, N 16° 18' 54" W, with the Easterly line of Reserve "B", a distance of 150.40 feet to a 3/4-inch galvanized iron pipe set for the Northeasterly corner of said Reserve "B";

THENCE, S 73° 41' 06" W, with the Northeasterly line of Reserve "B", a distance of 150.00 feet to a 3/4 inch galvanized iron pipe set for the Northwesterly corner of Reserve "B", and being the most Westerly Southwest corner of Reserve "A";

THENCE, N 16° 18' 54" W, with the Westerly line of Reserve "A", a distance of 451.98 feet to a 3/4-inch galvanized iron pipe set for the Northwesterly corner of Reserve "A";

THENCE, N 73° 41' 06" E, with the Northerly line of Reserve "A", a distance of 434.80 feet to a 3/4-inch galvanized iron pipe set for corner;

THENCE, S 16° 19' 28" E, a distance of 102.50 feet to an "X" set in concrete for corner;

THENCE, N 73° 40' 32" E, a distance of 11.20 feet to an "X" set in concrete for corner;

THENCE, S 16° 19" 28" E, a distance of 22.00 feet to an "X" set in concrete for corner;

THENCE, S 73° 40' 32" W, a distance of 11.20 feet to an "X" set in concrete for corner;

THENCE, S 16° 19' 28" E, a distance of 120.96 feet to a 60d nail set for corner;

THENCE, S 73° 41' 06" W, a distance of 8.43 feet to a 3/4-inch galvanized iron pipe set for corner;

THENCE, S 16° 08' 59" E, a distance of 326.45 feet to an "X" set in concrete for corner;

THENCE, N 73° 51' 01" E, a distance of 8.50 feet to an "X" set in concrete for corner;

THENCE, S 16° 08' 59" E, a distance of 30.70 feet to a 3/4-inch galvanized iron pipe set for corner on the Northerly right-of-way line of State Highway Loop 336;

THENCE, S 72° 17' 40" W, with the Northerly line of State Highway Loop 336, a distance of 21.57 feet to a 3/4-inch galvanized iron pipe set for corner;

THENCE, S 73° 51' 10" W, with the Northerly line of State Highway Loop 336, a distance of 262.32 feet to the POINT OF BEGINNING and containing 5.436 acres of land.

AND

TRACT 2:

0.197 acre of land out of the W.S. Allen Survey, Abstract 2, and being a part of that certain 90.398-acre tract described in Deed Records of Montgomery County, Texas, in Volume 1115, Page 211, said 0.197-acre tract being more particularly described by metes and bounds as

P0165 Montgomery Plaza SC
Exhibit "B"
Revised 12/2/02 CC/ji
Page 4 of 6

follows:

COMMENCING at a 3/4-inch galvanized iron pipe set for corner on the Northerly right-of-way line of State Highway Loop 336, and being the Southeasterly corner of Reserve "B", Montgomery Park Subdivision, as shown on plat thereof recorded in Cabinet C, Sheet 152 B, Plat Records of Montgomery County, Texas;

THENCE, N 16° 18' 54", with the Easterly line of Reserve "B", a distance of 150.40 feet to a 3/4-inch galvanized iron pipe set for the Northeasterly corner of Reserve "B";

THENCE, S 73° 41' 06" W, with the Northerly line of Reserve "B", a distance of 150.00 feet to a 3/4-inch galvanized iron pipe set for the true POINT OF BEGINNING for the herein described tract;

THENCE. S 73° 41' 06" W, a distance of 0.43 feet to a point for corner in a curve, from which the center of curvature bears N 72° 16' 07" E, 300.00 feet;

THENCE, in a Northwesterly direction along a curve to the right having a central angle of 00° 12' 00", a radius of 300.00 feet, an arc length of 1.05 feet to a point of reverse curve;

THENCE, in a Northwesterly direction along a curve to the left having a central angle of 05° 30' 03", a radius of 2,000.00 feet, an arc length of 192.02 feet to a point of tangency;

THENCE, N 23° 01' 56" W, a distance of 261.25 feet to a point for corner;

THENCE, N 73° 41' 06" E, a distance of 44.29 feet to a 3/4-inch galvanized iron pipe set for the most Westerly Northwest corner of Reserve "A", Montgomery Park Subdivision;

THENCE, S 16° 18' 54" E, with the Westerly line of Reserve "A", a distance of 451.98 feet to the POINT OF BEGINNING and containing 0.197 acre of land

AND

Being 0.516 acre of land in the W.S. Allen Survey, A-2, Montgomery County, Texas and being all of Unrestricted Reserve "B", Montgomery Park Subdivision, a subdivision, map of which is recorded in Cabinet C, Sheet 152-B and 153A, Montgomery County Map Records, said 0.516 acre being described more particularly as follows:

BEGINNING at a ½" iron rod found in the North Right of Way line of State Highway Loop 336, for the Southeast corner of the herein described tract, the Southwest corner of the Weingarten Realty Investors called Tract 1, 5.436 acres as described in instrument recorded under County Clerk's File Number 9847114, Montgomery County Real Property Records, same being the Southwest corner of Unrestricted Reserve "A", Montgomery Park Subdivision;

THENCE S. 73° 51' 10" W., along the North line of Loop 336, for a distance of 134.12 feet (plat call S. 73° 51' 10" W., 134 feet) to a ½" iron rod found for corner;

THENCE N. 77° 29' 32" W., continuing along the North line of Loop 336, for a distance of 18.18 feet, (plat call N. 78° 04' 14" W., 18.16 feet) to a "X" found scribed in concrete for the Southwest corner of the herein described tract, same being the Southeast corner of Montgomery Park Subdivision, Reserves E, F, G, H-1, H-2, I-1, I-2, & J, a subdivision, map of which is recorded in Cabinet D, Sheet 126-B, Montgomery County Map Records, said "X" being in the East right-of-way line of Westview Blvd. dedicated by plat recorded in Cabinet D, Sheet 126-B, Montgomery County Map Records;

THENCE N. 16° 21' 17" W., along the East Right of Way line of said Westview Blvd. for a distance of 141.23 feet, (plat call N. 16° 18' 54" W., 141.41 feet) to a ½" iron rod set with a cap stamped "Jeff Moon RPLS 4639" for the Northwest corner of the herein described tract, a Lower Northwest corner of said Unrestricted Reserve "A", the Lower Northwest corner of the said 5.436 acre tract, the Southeast corner of the Weingarten Realty Investors called Tract 2, 0.197

P0165 Montgomery Plaza SC
Exhibit "B"
Revised 12/2/02 CC/ji
Page 5 of 6

acre as described by instrument recorded under County Clerk's File Number 9847114, Montgomery County Real Property Records;

THENCE N. 73° 39' 39" E., along a Lower North line of the 5.436 acre tract, a Lower North line of Unrestricted Reserve "A", for a distance of 150.00 feet (plat call and 5.436 acre call N. 73° 41' 06" E 150.00 feet) to a 60d nail found inside a ¾" iron pipe for the Northeast corner of the herein described tract, an inside corner of Unrestricted Reserve "A", an inside corner of the 5.436 acre tract;

THENCE S. 16° 22' 15" E., along an inside line of Unrestricted Reserve "A", an inside line of the 5.436 acre tract for a distance of 150.45 feet (plat call S. 16° 18' 54" E, 150.39' and 5.436 acre call S. 16° 18' 54" E., 150.40 feet) to the POINT OF BEGINNING and containing in all 0.516 acre of land.

EXHIBIT "B"

P0165 Montgomery Plaza SC
Exhibit "B"
Revised 12/2/02 CC/ji
Page 6 of 6

# EXHIBIT C

## LANDLORD WORK

AMENDED CONSTRUCTION EXHIBIT "C" 4/08/2009
LANDLORD'S WORK
FORMER GOODY'S
CONROE, TX

### The following work is subject to the review of the Big Lots Director of Construction:

**STOREFRONT:** The exterior storefront shall have an "ANCHOR" type exterior facade acceptable to Tenant. Any work required to change existing storefront to satisfy tenant's acceptability is tenant's cost. Storefront/Exterior façade is existing.

ANY STRUCTURAL WORK WILL BE THE RESPONSIBILITY OF THE LANDLORD. (RD) 4-8-09

**GLASS:** The Landlord will replace all broken and damaged glass and remove all materials blocking or covering windows and glass doors on the exterior of the building.

**UTILITIES:** The Landlord will provide separate utilities and provide separate meters adequate for Tenant's intended use. The Tenant will have a minimum 600 amps for 480v service and will include all existing circuit panels, transformers, switch gear and connected throughout the demised premises to existing electrical supplies, lighting, HVAC and all other electrical supplied systems any changes to existing electrical system will be at tenants cost.

**PLUMBING, ELECTRICAL, SPRINKLER &: FIRE SYSTEMS:** All plumbing, electrical, mechanical, and sprinkler equipment to be in good working condition. Landlord to provide Tenant with sprinkler system certification stating the system has been inspected and is in good working and up to existing codes.

**INTERIOR LIGHTING:** Existing lighting will be in good working condition. Tenant to be responsible for replacement of light bulbs and ballasts.

**EXTERIOR LIGHTING:** All exterior lighting shall be operational and working including pole lights, entrance/exiting lighting, building lights, etc. All exterior parking lot lighting is to be on a separately metered house panel in the Landlord's name.

**FLOORING:** The Landlord will remove any hazardous materials from tiles, mastic, and any other flooring materials.

**ROOF:** The roof shall be professionally inspected and certified to be in good condition and free of leaks. Repairs per inspection shall be made prior to possession.

**RESTROOMS:** The existing restrooms will be in good working condition.

**RECEIVING AREA:** The Tenant shall have exclusive use of the dock area, which shall remain unobstructed.

**PARKING LOT:** Parking lot shall be good condition - paved, patched, sealed and striped – adequate for customer parking and Tenant's use.

**PESTS:** Prior to lease Commencement, Premises to be professionally inspected for pestilence and termites. The Tenant is to be provided with a certified report that the Demised Premises is pest free. Otherwise, the Landlord will make the space pest free.

master.xc

Tenant is responsible at Tenant's sole cost and expense, to coordinate with the City of Conroe, Texas, for the installation of the water meter at the Demised Premises.

| | |
|---|---|
| **SIGNAGE:** | To be approved and attached to the lease prior to lease execution. |
| | The Tenant will have the right to use its color and logo (see exhibit) on the building sign(s) at the maximum size per code and on the pylon(s). The Landlord is to ensure the existing pylon meets all codes and zoning ordinances in order for Tenant to place its panel on the pylon. Tenant to have marquee signage on the pylon (the former Goody's panels). |
| **DRAWINGS:** | The Landlord will provide the Tenant with "as built" drawings or a floor plan of the Demised Premises. If Landlord has access to these documents. Tenant acknowledges receipt of the JC Penney Drawings which are the only drawings in possession of Landlord. Goody's may have made some changes to the premises not reflected on the drawings. |
| **HAZ MATS:** | The Landlord will be responsible for the removal of any and all hazardous materials. |
| **POSSESSION DATE:** | All above work will be completed before the Tenant Possession Date. |

Landlord agrees the Demised Premises conforms to all requirements by authority having jurisdiction; if said Demised Premises do not conform, Landlord will promptly have them conform at all times unless such is necessitated by changes, alterations, or additions made by Tenant.



**EXHIBIT D**

**TENANT BUILDING SIGN SPECIFICATION**

**TENANT SIGN SPECIFICATION**

# BIG LOTS.

## LOGOS
## WITH
## SPECIFICATIONS
## for exterior signage

If you need additional information that is
not contained in this packet contact:

Sign Planning:
Mike Stiles 614-278-6805
Michael Neu 614-278-6868



02/2007

**EXHIBIT D**

**TENANT BUILDING SIGN SPECIFICATION**

**TENANT SIGN SPECIFICATION**

# BIG LOTS - THE LOGO

The logo can be used in either of the shown versions (stacked or horizontal)
with the stacked logo being the preferred version.
The logo proportions cannot be distorted nor colors changed.*

## Stacked Logo
This is the preferred way to present the logo.

File Name: BLst2C.eps

# BIG LOTS!
™

## Horizontal Logo

File Name: BLh2C.eps

# BIG!LOTS
™

 **BIG LOTS AND TRADE MARK**
100% BLACK

 **EXCLAMATION**
PANTONE 021 ORANGE
PROCESS MIX - 50% MAGENTA, 100% YELLOW

*See: Boxed Sign or Awning One Color.

**EXHIBIT D**

**TENANT BUILDING SIGN SPECIFICATION**

**TENANT SIGN SPECIFICATION**

# BOXED SIGN OR AWNING

To be used as pylon sign or a boxed sign.

## Boxed Stacked

This is the preferred way to present the logo.

File Name: BLst2C.eps

**BIG LOTS!** ™

## Boxed Horizontal

File Name: BLh2C.eps

**BIG LOTS** ™

| SIGN SPECIFICATIONS: | SIGN SPECIFICATIONS: |
|---|---|
| BIG LOTS AND TRADE MARK | EXCLAMATION |
| BLACK | MATCH TO PANTONE 021 ORANGE |

**EXHIBIT D**

**TENANT BUILDING SIGN SPECIFICATION**

**TENANT SIGN SPECIFICATION**

# BOXED SIGN OR AWNING WITH ONE COLOR

To be used as pylon sign or a boxed sign, when landlord requires that only one color be used. Color can be changed to the color required by shopping center (otherwise use color shown).

## Boxed Stacked

This is the preferred way to present the logo.



File Name: BLst1C.eps

## Boxed Horizontal

File Name: BLh1C.eps



**SIGN SPECIFICATIONS:**

**BIG LOTS, TRADE MARK & EXCLAMATION**

MATCH TO PANTONE 021 ORANGE

## EXHIBIT D

### TENANT BUILDING SIGN SPECIFICATION

### TENANT SIGN SPECIFICATION

## Stacked Logo
# INDIVIDUAL LED ILLUMINATED CHANNELED LETTERS

**This is the preferred way to present the sign.**    File Name: BLst1C.eps



### STANDARD SIZE CHARACTERISTICS

| Ⓐ | Ⓑ | Ⓒ | Ⓓ | Ⓔ | Ⓕ | Ⓖ |
|------|------|------|--------|--------|--------|------|
| 2'-6" | 2'-0" | 3'-9" | 7'-4" | 5'-0" | 11" | 4½" |
| 3'-0" | 2'-6" | 4'-8" | 9'-1" | 6'-2" | 13" | 5½" |
| 4'-0" | 3'-0" | 5'-8" | 10'-10" | 7'-4" | 17½" | 6½" |
| 4'-6" | 3'-6" | 6'-6" | 12'-10" | 8'-9" | 19½" | 7½" |
| 5'-0" | 4'-0" | 7'-0" | 14'-10" | 9'-7" | 21½" | 8½" |

**SIGN SPECIFICATIONS:**
**BIG LOTS**

CUSTOM FABRICATED 7" ALUMINUM CHANNELED
LETTERS FINISHED BLACK

FACES .150" ACRYSTEEL #2119 ORANGE WITH
2" ORANGE TRIM CAP RETAINERS

INTERNALLY ILLUMINATED WITH RED LED
LIGHTING SYSTEM
LED POWER SUPPLY, REMOTE MOUNTING
BEHIND WALL

**SIGN SPECIFICATIONS:**
**EXCLAMATION**

CUSTOM FABRICATED 7" ALUMINUM CHANNELED
LETTER FINISHED BLACK

FACES .150" ACRYSTEEL #2119 ORANGE WITH
OPAQUE WHITE VINYL OUTLINE AND WHITE
TRIM CAP RETAINER

INTERNALLY ILLUMINATED WITH RED LED
LIGHTING SYSTEM
LED POWER SUPPLY, REMOTE MOUNTING
BEHIND WALL

**NOTE:** Fabrication and installation per UL specifications.
Install in accordance with N.E.C..
All signage equipped with disconnect switches.

## EXHIBIT D

### TENANT BUILDING SIGN SPECIFICATION

### TENANT SIGN SPECIFICATION

# Horizontal Logo
# INDIVIDUAL LED ILLUMINATED
# CHANNELED LETTERS

File Name: BLh1C.eps



| STANDARD SIZE CHARACTERISTICS | | | | |
|---|---|---|---|---|
| Ⓐ | Ⓑ | Ⓒ | Ⓓ | Ⓔ |
| 2'-0" | 12'-3" | 2'-10" | 9" | 4½" |
| 2'-6" | 15'-1" | 3'-6" | 11" | 5½" |
| 3'-0" | 17'-9" | 4'-3" | 13" | 6½" |
| 3'-6" | 20'-7" | 4'-11" | 15½" | 7½" |
| 4'-0" | 23'-3" | 5'-8" | 17½" | 8½" |
| 4'-6" | 26'-1" | 6'-4" | 19½" | 9½" |
| 5'-0" | 28'-10" | 7'-0" | 21½" | 10½" |
| 6'-0" | 34'-4" | 8'-6" | 26" | 13" |

### SIGN SPECIFICATIONS:
### BIG LOTS

CUSTOM FABRICATED 7" ALUMINUM CHANNELED
LETTERS FINISHED BLACK

FACES .150" ACRYSTEEL #2119 ORANGE
WITH 2" ORANGE TRIM CAP RETAINERS

INTERNALLY ILLUMINATED WITH RED LED
LIGHTING SYSTEM
LED POWER SUPPLY, REMOTE MOUNTING
BEHIND WALL

### SIGN SPECIFICATIONS:
### EXCLAMATION

CUSTOM FABRICATED 7" ALUMINUM CHANNELED
LETTER FINISHED BLACK

FACES .150" ACRYSTEEL #2119 ORANGE WITH
OPAQUE WHITE VINYL OUTLINE AND WHITE
TRIM CAP RETAINER

INTERNALLY ILLUMINATED WITH RED LED
LIGHTING SYSTEM
LED POWER SUPPLY, REMOTE MOUNTING
BEHIND WALL

**NOTE:** Fabrication and installation per UL specifications.
Install in accordance with N.E.C.
All signage equipped with disconnect switches.

**EXHIBIT D**

**TENANT BUILDING SIGN SPECIFICATION**

**TENANT SIGN SPECIFICATION**

# DO NOT STRETCH LOGOS
# HORIZONTALLY OR VERTICALLY!

**BIG LOTS**

**BIG LOTS**

**BIG LOTS**

**BIG LOTS**

# DO NOT RE-TYPESET IN A
# "SIMILAR" FONT STYLE!

**BIG LOTS!**

**BIG LOTS!**

**BIG LOTS**

**EXHIBIT D - 1**

**TENANT PYLON PANEL LOCATION**

[Note:  The Big Lots' pylon panels will occupy those currently designated on this Exhibit D-1 as "Goody's Family Clothing".]

Pylon located at the corner of Loop 336 and I-45:

**EXHIBIT D - 1**

**TENANT PYLON PANEL LOCATION**



**EXHIBIT D - 1**

**TENANT PYLON PANEL LOCATION**

[Note:  The Big Lots' pylon panels will occupy those currently designated on this Exhibit D-1 as "Goody's Family Clothing".]

Pylon located at the corner of Loop 336 and I-45:

## EXHIBIT D - 1

## TENANT PYLON PANEL LOCATION



## EXHIBIT E

## DELIVERY OF POSSESSION LETTER

Date: _____

To:      _____(insert Tenant)
        via facsimile:  (614) 278-6546

From: _____ (insert Landlord, name of contact person and **LANDLORD'S FEDERAL TAXPAYER IDENTIFICATION NUMBER – RENT WILL NOT BE PAID WITHOUT SUCH INFORMATION)**

RE: _____ (insert Shopping Center, City/State of Demised Premises)

You are hereby notified that all work required of Landlord pursuant to the Lease dated _____ has been Substantially Completed.  Accordingly, possession of the Demised Premises is hereby delivered to Tenant.  You may pick up the keys at _____

_____.

If you have any questions, please feel free to contact me at _____.

Thank You.

LANDLORD:

**WEINGARTEN REALTY INVESTORS**
a Texas real estate investment trust

By:_____

Title:_____

TENANT:

**PNS STORES, INC., a California corporation**

By:_____

Title: _____

# EXHIBIT F

# EXCLUSIVE/PROHIBITED USE PROVISIONS

**99 Cents Only Stores Texas, Inc. (d/b/a 99¢ Only Stores)**
**Exclusive:**
Landlord shall not lease space in the Shopping Center to another tenant whose primary business is a general merchandise retail store or who uses in its name and signage "99"; "98"; "Dollar" (except for any use of the word Dollar by a retailer or service provider - e.g. "Dollar Rent A Car" - the primary business of which is not the sale of general merchandise) or "99¢". This limitation shall not apply to present tenants whose leases may not prohibit such use. Tenant agrees that the term "general merchandise retail store" does not apply to conventional grocery stores, drug stores, or stores such as Big Lots, Ross, Marshall's or TJ Maxx.
**Prohibited Uses:**
No portion of the Shopping Center may be used for any of the following: (1) nude (or partially nude) bars, nightclubs or theaters of any kind; (2) massage parlors; (3) pornographic book stores; (4) escort services, (5) bail bonds or pawn shops, (6) the sale of used or second hand products of any kind; provided, that Landlord may lease space to high end resale stores that sell "like new" merchandise and are fixtured in a first class manner; (7) tattoo parlors; (8) pornographic video stores; (9) any use of a questionable moral character; (10) indoor swap meets; (11) any movie theater; gymnasium (except a health club may be located in the I-45 Area depicted on Ex "A"), bowling alley; library; church; auditorium; museum; automobile repair (except that an oil and/or lube and/or tune-up and/or discount tire business may be located on any pad in the Shopping Center but not pads 1 and 2 at the same time); automobile sales; banquet facility; bar (except in connection with a restaurant); disco; nightclub; hotel; manufacturing; warehouse or other industrial use (except incidental to other permitted uses); entertainment facility (such as Chuck E Cheese, Discover Zone, Tutor Time, or Leaps and Bounds); or trade or vocational school (except that trade or vocational schools may be located in the I-45 Area depicted on Ex "A");or (12) any high volume buffet style restaurant; provided, however, that LL may lease to (i) one such restaurant whose LP does not exceed 3,000 s.f. in the area designated as "RED" on Ex "A"; and (ii) one or more of such restaurants whose LP does not exceed 7,500 s.f. each in the area designated as "GREEN" on Ex "A".

**Academy, Ltd. (d/b/a Academy Sports & Outdoors)**
**Exclusive:**
Landlord shall not lease space in the Shopping Center to another tenant whose primary business is the business of selling sporting goods, licensed sports apparel or footwear. The incidental sale of such items in connection with the overall business of another tenant shall not be deemed a violation of the Lease ["incidental" defined as the less than 5% of tenant's gross sales and less than 500 s.f. of tenant's display area (inclusive of allocable aisle space)]. The exclusive against the sale of footwear shall not be construed to prohibit tenants such as Larry's Shoes or Payless ShoeSource or any other shoe store which, in Tenant's reasonable opinion is comparable to the foregoing, provided, however, that the foregoing exception to the exclusive shall be limited to one (1) such shoe store within the Shopping Center. Additionally, the exclusive shall not be construed to prohibit the operation of a "junior department store" within the Shopping Center such as TJ Maxx, Ross, Marshall's, Palais Royal or other junior department stores which in Tenant's reasonable opinion, is comparable to the foregoing and shall not apply to existing tenants.

**Anna's Linens Inc. (d/b/a Anna's Linens)**
**Exclusive:**
Landlord will not lease space in the Shopping Center to Bed, Bath & Beyond, Linens & Things, or any other tenant whose primary business will be the retail sale of linens ("Competing Business"). A tenant whose primary business is the retail sale of linens means that more than 50% of such tenant's sales area (exclusive of adjoining aisle space) is devoted to blankets, bedspreads, comforters, sheets, towels and pillows. Exclusive does not apply to existing tenants (or their assignees or sublessees) whose leases do not prohibit such use.

**Conn Appliances, Inc. (d/b/a Conn's)**
**Prohibited Uses:**
Landlord agrees that it will not lease space to the west of the Leased Premises to any other tenant whose derives more than 35% of its revenue from the sale of alcoholic beverages. Limitation shall not apply to present tenants (or their assignees and sublessees) whose leases may not prohibit such use. Landlord agrees that, once it acquires title to the Yellow area, it will not lease any portion of the Yellow Area for the operation of a full service, sit-down restaurant whose food service is primarily served to the customers' tables by waiters or waitresses.

**Schneringer, Jesse O. (d/b/a Dr. Jesse Schneringer D.C., PA)**
**Exclusive:**
Landlord will not directly lease space in the Shopping Center to any other tenant whose primary business will be the operation of a chiropractic office (hereinafter a "Competing Business"). This limitation shall not apply to: (i) present tenants (or their assignees or sublessees) whose leases may not prohibit such use, or (ii) any tenant, present or future occupying 2,500 or more square feet of space.

**Juan J. Rodriguez and Rubi Rodriguez (d/b/a El Bosque)**

**Exclusive:**
Landlord agrees that it will not lease space in the Shopping Center to any other tenant whose primary business will be the operation of a Mexican-style restaurant ("Competing Business"). This limitation shall not apply to present tenants (or their assignees or sublessees) whose leases may not prohibit such use or any tenant, present or future, who may offer Mexican-style food as a menu item on an incidental basis and not as its primary business.

## NEW GFC TX, L.P. (d/b/a Goody's Family Clothing)
**Prohibited Uses:**
No portion of the Shopping Center may be used for: amusement park, carnival, sporting events, for any manufacturing purpose, for commercial or professional offices in excess of twenty-five percent (25%) of the gross leasable area of the Shopping Center (medical & dental offices and retail service offices such as tax preparers, insurance companies, banks and offices incidental to retail facilities shall be permitted and not included in the 25% limitation), for the sale of cars parked at the Shopping Center or the sale or repair of boats, sale of trailers or mobile homes, lumber yard (except in connection with a retail home improvement store such as Lowe's or Home Depot), off-track betting establishment, flea-market (antique or craft mall is permitted), massage parlor (beauty salon and chiropractor shall be permitted), tattoo or body piercing facility, or for the operation of a pornographic business. Also, no part of the Shopping Center outlined in "Red" may be used for: a bowling alley, skating rink, bar (defined as more than 50% alcoholic beverages), meeting hall, banquet facility, entertainment facility, disco or other dance hall, nightclub establishment, or repair of cars, video arcade or other game parlor, pool hall, billiard parlor, amusement center or health club (provided a personal trainer offering fitness classes in less than 5,000 square feet is not prohibited), or a non-retail use which is not normally found in similar shopping centers.

## Monarch Dental Associates, L.P. (d/b/a Monarch Dental)
**Exclusive:**
Landlord agrees it will not lease to a dental clinic. Exclusive does not apply to present tenants whose leases do not prohibit operation of same.

## David M. Boeckman and David Awalt (d/b/a Montgomery Vision Center)
**Exclusive:**
Landlord will not lease to any other tenant whose primary business is the operation of an optometrist's office selling prescription eyewear. Exclusive does not apply to present tenants or any tenant who may sell non-prescription eyewear.

## Rent-Way, Inc. (d/b/a Rent-A-Center)
**Prohibited Uses:**
Landlord agrees that it will not lease space in the Shopping Center to any tenant whose business is of an adult, prurient nature such as illegitimate massage parlors or modeling studios, "head shops" or other stores primarily selling illegal drug related items, or any business whose primary business is the retail sale of pornographic materials.

## Spec's Family Partners, Ltd. (d/b/a Spec's Liquor)
Landlord shall not lease space in the Shopping Center to any other tenant whose primary business is the sale of distilled spirits for off-premises consumption ("Competing Business") This limitation shall not apply to present tenants (or their assignees or sublessees) whose leases may not prohibit the operation of a Competing Business.

## Subway Real Estate Corp. (d/b/a Subway)
**Exclusive:**
Landlord will not directly lease space in the Shopping Center to any other tenant whose primary business will be the operation of a restaurant selling submarine or deli-style sandwiches, or to a tenant operating the business known as Pepperoni's Piazza (hereinafter "Competing Business"). This limitation shall not apply to (i) present tenants (or their assignees or sublessees) whose leases may not prohibit such use, or (ii) any tenant occupying 3,000 square feet or more of space in the Shopping Center.

**EXHIBIT G**

**REMEASUREMENT RIDER**

This Rider dated _____ ___, 200__ is attached to and made a part of the Lease dated
(the "Lease") by and between _____ ("Landlord"),
and PNS STORES, INC., a California corporation, ("Tenant").

    Notwithstanding anything in the Lease to the contrary, the following provisions shall apply:

1.    Demised Premises: (Section 1(D)) = _____.

2.    A.    Fixed Minimum Rent—Original Term (Section 5(A)):
    _____ annually; _____ per month.

3.    A.    Fixed Minimum Rent--First Option (Section 5(A)):
    _____ annually; _____per month.

4.    A.    Fixed Minimum Rent—Second Option (Section 5(A)):_____
    _____annually; _____per month.

5.    A.    Fixed Minimum Rent—Third Option (Section 5(A)):
    _____ annually;_____ _____per month.

**EXHIBIT 4**

~~Deleted~~

Inserted

Moved

**(3)** For the purposes of paragraph (1) of this <u>sub</u>section <u>and paragraph (2)(B) of subsection (f)</u>, adequate assurance of future performance of a lease of real property in a shopping center includes adequate assurance—

**(A)** of the source of rent and other consideration due under <u>such</u> ~~the~~ lease<u>, and in the case of an assignment, that the financial condition and operating performance of the proposed assignee and its guarantors, if any, shall be similar to the financial condition and operating performance of the debtor and its guarantors, if any, as of the time the debtor became the lessee under the lease</u>;

**(B)** that any percentage rent due under such lease will not decline substantially;

**(C)** that assumption or assignment of such lease <u>is subject to all the provisions thereof, including (but not limited to) provisions</u>, <span style="color:green">such as a radius, location, use, or exclusivity provision, and</span> will not breach ~~substantially~~ any <u>such</u> provision ~~, such as a radius, location, use, or exclusivity provision,~~ <u>contained</u> in any other lease, financing agreement, or master agreement relating to such shopping center; and

**(D)** that assumption or assignment of such lease will not disrupt ~~substantially~~ any tenant mix or balance in such shopping center.

11 U.S.C. § 365(b)(3)(A), (B), (C), and (D) (1979) ) compared with 11 U.S.C. § 365(b)(3)(A), (B), (C), and (D) (2022).

required payments in exceptionally large or complicated cases. The bill does not require the performance of obligations specified in section 365(b)(2), which relate to solvency and financial condition. The performance by the trustee of the debtor's obligations has no effect on the performance of the trustee's obligations under subsections (b) or (f) of section 365. The acceptance by the lessor of any payments made by the trustee as required by this subsection does not constitute a waiver or relinquishment of the lessor's rights under such lease or under the bankruptcy code.

A third problem occurs when shopping center leases are assumed or assigned and then used in ways which violate the use clause of the lease and disrupt the tenant mix. the bankruptcy code currently provides that when a shopping center lease is assumed or assigned, assurances must be given that the lease provisions will not be substantially breached and that the tenant mix will not be substantially disrupted. Unfortunately, courts have misapplied these provisions in ways which have deprived shopping centers and their tenants of the protections which Congress intended to provide them.

This bill would delete the word "substantially" from these provisions, thus requiring that any clause in the lease be adhered to. It is especially important that any use clause in the lease be strictly adhered to and that the tenant mix not be disrupted. The bankruptcy courts will still retain the flexibility to determine whether or not a proposed new use for the premises falls within any use clause of the lease and whether or not the new use would disrupt the tenant mix. This amendment requires strict compliance with the provisions of use clauses in shopping center leases and prohibits any changes in the use of the tenant's space not permitted by the use clause. This amendment is intended to stop courts from creating new leases by changing essential lease terms to facilitate assignments. It is intended to stop the practice of some courts to determine whether there has been a disruption by reference to the amount of space to be assigned as a percentage of the total area in the shopping center. This amendment is not intended to enforce requirements to operate under a specified trade name.

Other provisions of the bill would make minor and clarifying changes in the law. The bill provides that the trustee may not assume or reject a lease of nonresidential real property that has been terminated under applicable nonbankruptcy law prior to the order for relief. A lease that has terminated under applicable nonbankruptcy law is a lease that is unenforceable and no longer subject to reinstatement under the terms of the lease or applicable law.

The bill provides that nonresidential real property subject to a lease that has terminated by the expiration of its stated term is not property of the estate and that a proceeding or action by the landlord to regain possession of the property is not stayed. A lease that has terminated at the expiration of the stated term of such lease is a lease under which the lessee no longer has any renewal or extension rights.

The bill provides that lessors are permitted to require an assignee to provide a deposit or other security for the performance of the debtor's obligations substantially the same as the landlord would have required upon leasing the space to a similar tenant. This permits the landlord to get his usual, reasonable security deposit from an assignee tenant.

The bill requires the trustee to provide adequate assurance that an assignee of a shopping center lease has a financial condition and operating performance similar to that of the original tenant when the lease was executed. This is to insure that the assignee itself will not soon go into bankruptcy and will provide operating and advertising benefits to the other tenants similar to those provided by the original tenant when its lease was executed.

The bill also makes clear that the special shopping center protections contained in subsection (b)(3) apply to all assignments of shopping center leases, whether or not there has been a default of the lease. The bill also makes clear that a shopping center lease assumption or assignment is subject to all the provisions of the lease to be assumed or assigned and that the provisions of the lease to be assumed or assigned must not be breached, in addition to not breaching provisions of other leases, financing agreements or master agreements relating to the shopping center.

Approximately half of all U.S. retail trade is conducted in shopping centers. Retail merchants in shopping centers depend upon the operation of a carefully chosen mix of stores, all contributing to the success of the entire shopping center. If shopping center tenants especially major tenants, are not operating their stores, are not paying charges necessary for the upkeep of the shopping center or are using their space in ways not provided for in the lease and which disrupt the tenant mix, the financial health of all of the other merchants and of the shopping center itself can be threatened. This bill will reduce the likelihood that provisions of the bankruptcy code will themselves add to the economic distress of retail merchants in shopping centers.

I ask unanimous consent that an analysis of the amendments to the Bankruptcy Act of 1978 be printed in the RECORD.

There being no objection, the analysis was ordered to be printed in the RECORD, as follows:

ANALYSIS OF PROPOSED AMENDMENTS TO THE BANKRUPTCY ACT OF 1978

I. ABSTRACT

In amending the Code to comply with *Marathon* the failure to provide for bankruptcy court and Article III court abstention from certain state law claims could create a constitutional problem of a magnitude greater than that which the Bill is supposed to solve. *Marathon* held that the broad powers granted to bankruptcy judges under the Bankruptcy Act of 1978 were judicial powers and violated Article III of the Constitution. The present Bill attempts to cure the problem. However, if the Bill is amended to permit federal court adjudication of state law claims that could not otherwise have been brought in federal court, the amendments would give the district courts and bankruptcy judges powers beyond the scope of Article III. Therefore, in addition to the removal of the adjudication of state-created claims from the bankruptcy court to an Article III court, some form of mandatory abstention by the district court is necessary to avoid another serious Article III problem.

II. INTRODUCTION

In 1978, the Congress of the United States enacted the Bankruptcy Reform Act of 1978 (hereinafter "Code"). In June of 1982, the case of *Northern Pipeline Co. v. Marathon Pipe Line Co.*, 458 U.S. 50 (1982) (hereinafter "*Marathon*"), decided that the jurisdictional grant to the bankruptcy judges, contained in Section 241a of the Code (28 U.S.C. § 1471), consisted of judicial powers, and therefore violated Article III of the Constitution. In that case, *Northern Pipeline* filed a petition under Chapter 11 of the Code. Thereafter, in the bankruptcy court, Northern, the debtor, filed suit against Marathon which suit sought to recover damages on theories sounding in contract and tort. The causes of action pleaded and the remedies sought were based upon state law. The Supreme Court ruled that a bankruptcy judge could not adjudicate claims based upon state-created rights or causes of action. The six vote majority consisted of the plurality opinion of Justice Brennan (joined by Justices Marshall, Blackmun and Stevens) and the concurring opinion of Justice Rehnquist (joined by Justice O'Connor).

The plurality opinion found that the Code's jurisdictional grant unconstitutionally conveyed the essential attributes of Article III judicial power to bankruptcy judges.

The concurring opinion emphasized that its holding was restricted to the unconstitutionality of the jurisdictional grant to the bankruptcy judge of the power to adjudicate claims or causes of action based upon state law (see *Marathon*, C. J. Berger's dissent). The concurrence saw no need to decide the constitutionality of the jurisdictional grant of other Article III judicial powers. Accordingly, both the plurality and concurrence agreed that adjudication of causes of action based upon state law was a judicial power and that under the Constitution judicial power could only be exercised by an Article III court. The six-vote majority also concurred in the holding that the bankruptcy judge's power, as granted under the Code, impermissibly reduced the Code's