IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| NUMBER HOLDINGS, INC., *et al.*, | ) | Case No. 24-10719-JKS |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

ADMINISTRATIVE CLAIM OF GUERRA FAMILY PROPERTIES II, LLC,
AS SUCCESSOR IN INTEREST TO YUCCA DYNASTY, L.P., AGAINST
99 CENTS ONLY STORES, LLC

This Claim relates to the Debtor 99 Cents Only Stores, LLC, Case No. 24-10721-JKS.

Yucca Dynasty, L.P., entered into a lease (the "Lease") with 99 Cents Only Stores, LLC, which Lease was executed on January 14 and 27, 2014. A copy of the Lease is attached as Exhibit "A." As set forth in the attached Lease, the real property that was the subject of the Lease is 57980 29 Palms Highway, Suite C, Yucca Valley, California 92284.

As set forth in the Confirmation Agreement, a copy of which is attached as Exhibit "B," the "Rent Commencement Date" was October 26, 2016, and the initial term of the Lease was to expire on January 31, 2027.

As set forth in the recorded documents attached as Exhibit "C," ownership of the property was transferred from Yucca Dynasty, L.P., to The Guerra Family Trust Dated August 18, 2005, then to the current owner: Guerra Family Properties II, LLC.

The Debtor terminated the Lease as set forth in the *Order (I) Authorizing the Debtors to (A) Reject Certain Unexpired Leases and Executory Contracts Effective as of May 31, 2024, and (B) Abandon Certain Personal Property and (II) Granting Related Relief* [Docket No. 822].

According to the *Notice of Rejection of Certain Executory Contracts and/or Unexpired Leases (and Abandonment of Property Related Thereto)* [Docket No. 666], the rejection date is

-1-
ADMINISTRATIVE CLAIM

<u>May 31, 2024</u>, which is consistent with the fact that the property was returned to the Landlord as of May 31, 2024.

Guerra Family Properties II, LLC, as successor in interest to Yucca Dynasty, L.P., asserts an **Administrative Claim** for unpaid rent for the period May 1, 2024, through May 31, 2024, in the amount of $13,710.00.

Any legal questions and/or objection pertaining to this Administrative Claim may be directed to:

> John A. Moe, II
> Dentons US LLP
> 601 South Figueroa Street, Suite 2500
> Los Angeles, California 90017-5704
> 213 892 4905
> john.moe@dentons.com

The undersigned declares under penalty of perjury that the foregoing is true and correct under the laws of the United States.

Executed this 27th day of June 2024, at Vernon, California.

GUERRA FAMILY PROPERTIES II, LLC

By: _____
        Jose L. Guerra

Guerra Family Properties II, LLC
4618 Pacific Boulevard
Vernon, California 90058
Attn: Veronica Salinas
Telephone: 562 355 9388
E-mail: veronicas@floresdesigninc.com

127206086\V-1

# EXHIBIT A

# 99¢ ONLY STORES
## STANDARD MULTI-TENANT FORM LEASE
### (NWC OF 29 PALMS HWY. & BALSA AVE., YUCCA VALLEY, CA)

THIS LEASE (this "LEASE"), dated for reference purposes only as the 7th day of January, 2014, is made and executed by and between YUCCA DYNASTY L.P., a California limited partnership, having a taxpayer identification number of 80-0931591 (the "LANDLORD"), and 99 CENTS ONLY STORES LLC, a California limited liability company (the "TENANT"), who agree as follows:

## ARTICLE ONE: BASIC TERMS

This Article One contains the Basic Terms of this LEASE between the LANDLORD and TENANT named above. Other Articles, Sections and Paragraphs of this LEASE referred to in this Article One explain and define the Basic Terms and are to be read in conjunction with the Basic Terms. In the event of any conflict or contradiction between this Article One and such other Articles, Sections and Paragraphs of this LEASE, such other Articles, Sections and Paragraphs shall control and supersede the provisions of this Article One in regards to such conflict or contradiction.

Section 1.01   **Landlord's Address.**

3501 Hart Avenue
Rosemead, CA 91770
Telephone: (626) 673-6700
ATTN: Mario P. Chang

Section 1.02   **Tenant's Address.**

4000 East Union Pacific Avenue
Commerce, CA 90023
Telephone: (323) 980-8145
ATTN: Real Estate Department

With a copy to:

99 Cents Only Stores LLC
4000 East Union Pacific Avenue
Commerce, CA 90023
ATTN: General Counsel

Section 1.03   **Premises; Project; and Shopping Center.**

(a)   The demised premises (the "PREMISES") is part of the multi-tenant real property located at the northwest corner of 29 Palms Highway and Balsa Avenue in Yucca Valley, California (the "SHOPPING CENTER"), as depicted in Exhibit "A" (the "SITE PLAN"). More specifically, the PREMISES consists of a portion of that certain building (the "BUILDING") within the SHOPPING CENTER, which is shown on the SITE PLAN and labeled "Premises". The street address of the PREMISES is 57980 29 Palms Highway, Yucca Valley, California 92284. The PREMISES consists of approximately 18,000 square feet of ground floor retail space with the width of the front wall being no less than one hundred (100) feet. Upon satisfaction of the ACQUISITION CONTINGENCY (defined in Section 2.01(c)), LANDLORD shall own a portion of the SHOPPING CENTER, which portion of the SHOPPING CENTER to be acquired by LANDLORD (or if applicable, a LANDLORD AFFILIATE (defined below) upon satisfaction of the ACQUISITION CONTINGENCY is referred to in this LEASE as the "PROJECT" and is more specifically shown on the SITE PLAN. LANDLORD has provided a legal description of the PROJECT, which is attached hereto as Exhibit "C". If (i) any portions of the SHOPPING CENTER are now owned by an affiliate of LANDLORD (i.e., a party controlling, controlled by, or under common control with, LANDLORD) (a "LANDLORD AFFILIATE"), then such other acquired portions of the SHOPPING CENTER shall be deemed included in the term "PROJECT" for purposes of this LEASE (except where otherwise expressly noted), and (ii) if LANDLORD and/or a LANDLORD AFFILIATE hereafter acquires other portions of the SHOPPING CENTER not now owned by LANDLORD or a LANDLORD AFFILIATE, then such other acquired portions of the SHOPPING CENTER shall be deemed included in the term "PROJECT" for purposes of this LEASE (except where otherwise expressly noted). Notwithstanding that LANDLORD owns only a portion of the SHOPPING CENTER, all references in this Lease to "SHOPPING CENTER" shall mean the entire SHOPPING CENTER (except where otherwise expressly noted), and LANDLORD represents and warrants that through easement agreements or otherwise, LANDLORD has the power and authority to grant to TENANT, and does hereby grant to TENANT, the right to use all drive lanes, curb cuts, parking areas and other common areas of the entire SHOPPING CENTER in accordance with the terms of this LEASE throughout



the entire LEASE TERM. The SHOPPING CENTER includes the land, the buildings (including the BUILDING) and all other improvements located on the land, and the COMMON AREAS (as described in Section 4.05(a)).

(b)    Following completion of the LANDLORD'S WORK (as defined below), TENANT may, in its sole discretion and at its own cost and expense, cause the PREMISES to be remeasured and, in the event that upon such remeasurement it is found that the leasable square footage of the PREMISES is less than as set forth above in Section 1.03(a), then: (i) the BASE RENT and TENANT'S pro rata share of OPERATING EXPENSES (as defined in Section 4.06) shall be determined using the leasable square footage of the PREMISES so determined by such remeasurement; and (ii) the parties shall enter into a written amendment to this LEASE to confirm the leasable square footage so determined by such remeasurement and the adjustment to BASE RENT and TENANT'S pro rata share of OPERATING EXPENSES as a result thereof. Notwithstanding anything to the contrary in this LEASE, in the event that upon such remeasurement it is found that the leasable square footage of the PREMISES is more than as set forth above in Section 1.03(a), there shall not be any adjustment of BASE RENT or TENANT'S pro rata share (it being understood that in no event shall the leasable square footage of the PREMISES for purposes of determining the BASE RENT and TENANT'S pro rata share be greater than 18,000).

Section 1.04    **Lease Term.**  Approximately ten (10) years beginning on the DELIVERY DATE (as defined in Section 2.03) and ending on the January 31st first occurring after the tenth (10th) anniversary of the RENT COMMENCEMENT DATE (as defined in Section 3.02) (the "INITIAL LEASE TERM").  TENANT shall have the option to extend the LEASE TERM beyond the INITIAL LEASE TERM as set forth in Section 2.02. The INITIAL LEASE TERM plus all EXTENDED TERMS (as defined in Section 2.02) exercised by TENANT pursuant to Section 2.02 below shall hereinafter be referred to collectively as the "LEASE TERM".

Section 1.05    **Permitted Uses.**  The "PERMITTED USES" are (a) the retail sales of general merchandise, including, without limitation, food, beer and wine for off-premises consumption and all other products sold in 99¢ Only Stores retail stores from time to time, and/or (b) any other legal use which does not violate any EXISTING EXCLUSIVES (as defined in Section 5.07(b)) or EXISTING RESTRICTIONS (as defined in Section 5.07(b)), and for business offices and storage in connection with (a) or (b) above and such other uses related or incidental to (a) or (b) above, consistent with all laws, federal, state or local, and with any applicable regulation of any government body.

Section 1.06    **Prepaid Rent. INTENTIONALLY OMITTED**

Section 1.07    **Brokers.**  CBRE (Barbara Armendariz) is the broker for TENANT ("TENANT'S BROKER") and Marcus & Millichap (Pablo Rodriguez) is the broker for LANDLORD ("LANDLORD'S BROKER").  LANDLORD shall pay all commissions to TENANT'S BROKER and LANDLORD'S BROKER pursuant to a separate commission agreement.

Section 1.08    **Rent and Other Charges Payable by Tenant.**

(a)    **Base Rent.**  Beginning on the RENT COMMENCEMENT DATE, TENANT shall pay the applicable amounts set forth in Article Three as rent for the PREMISES (the "BASE RENT"). All references in this LEASE to "BASE RENT" shall mean monthly rent unless the reference is expressly to annualized BASE RENT in which event the reference shall mean the monthly BASE RENT in effect for such year multiplied by twelve (12). The BASE RENT shall be subject to adjustment during the EXTENDED TERMS in accordance with Section 3.01 below.

(b)    **Other Periodic Payments.**  (i) REAL PROPERTY TAXES (See Section 4.02); (ii) Utilities (See Section 4.03); (iii) INSURANCE COSTS (See Section 4.04); (iv) COMMON AREA COSTS (See Section 4.05); and (v) Maintenance, Repairs and Alterations (See Article Six).  LANDLORD represents and warrants that the PROJECT consists of approximately 66,000 square feet of ground floor retail space and TENANT'S initial pro rata share of OPERATING EXPENSES is therefore 27.3% (See Section 4.05).

Section 1.09    **Exhibits.**  The following exhibits are attached to and made a part of this LEASE:

| Exhibit "A" | Site Plan |
|---|---|
| Exhibit "B" | Work Letter |
| Exhibit "B-1" | Proposed Cart Retention Plan |
| Exhibit "C" | Legal Description of Project |
| Exhibit "D" | Proposed Signage |
| Exhibit "E" | Existing Exclusives and Existing Restrictions |



1     Exhibit "F"    Form of Non-Disturbance Agreement
2     Exhibit "G"    Form of Memorandum of Lease
3
4     Section 1.10    **Effective Date.**  As used in this LEASE, the "EFFECTIVE DATE" shall
5 mean and refer to the date on which this LEASE is signed and delivered by both LANDLORD
6 and TENANT.
7
8 **ARTICLE TWO: <u>LEASE TERM</u>**
9
10    Section 2.01  **Lease of Premises For Lease Term.**    LANDLORD leases the
11 PREMISES to TENANT and TENANT leases the PREMISES from LANDLORD for the
12 LEASE TERM.  The LEASE TERM is for the period stated in Section 1.04 above and shall
13 begin and end on the dates specified in Section 1.04 above, unless the beginning or end of the
14 LEASE TERM is changed under any provision of this LEASE; provided, however,
15 notwithstanding anything to the contrary contained in this LEASE, this LEASE is contingent
16 upon the following (which contingencies are for the sole benefit of TENANT, except as
17 otherwise expressly provided below in Section 2.01(c)):
18
19       (a)    TENANT'S receipt of (i) all applicable governmental approvals and
20 permits (other than permits/licenses for beer and wine) for the build-out, use and operation of the
21 PREMISES as contemplated by TENANT (including, without limitation, approval of final site
22 plan, final elevations and final signage plans) and approval of TENANT'S WORK (defined in
23 Section 3.04) and TENANT'S SIGNAGE (defined in Section 5.03) to the extent required under
24 any covenants, conditions or restrictions affecting the PROJECT, and (ii) LANDLORD'S
25 approval, to the extent required pursuant to the terms of this LEASE, of all work contemplated to
26 be done by TENANT pursuant to the "WORK LETTER" attached hereto as Exhibit "B";
27
28       (b)    LANDLORD'S delivery of all of the following to TENANT (collectively,
29 "LANDLORD'S DELIVERY OBLIGATIONS"): (i) copies of all documents affecting title to
30 the PROJECT and/or the PREMISES, which documents shall be subject to approval by
31 TENANT (the documents affecting title to the PREMISES approved by TENANT are referred to
32 herein as the "PERMITTED TITLE MATTERS"); (ii) final Site Plan approved by TENANT;
33 (iii) final elevation plans approved by TENANT; (iv) verbatim copies of all EXISTING
34 EXCLUSIVES AND EXISTING RESTRICTIONS and such EXISTING EXCLUSIVES AND
35 EXISTING RESTRICTIONS must be approved by TENANT; upon approval, such EXISTING
36 EXCLUSIVES AND EXISTING RESTRICTIONS shall be attached to this LEASE as
37 Exhibit "E" (provided, however, the foregoing delivery item shall not apply if the EXISTING
38 EXCLUSIVES AND EXISTING RESTRICTIONS are attached to this LEASE as Exhibit "E"
39 prior to execution); (v) final signage plans approved by TENANT; (vi) a signed and delivered
40 subordination and non-disturbance agreement from the holder of the EXISTING
41 ENCUMBRANCE (as defined in Section 11.01), in the form attached hereto as Exhibit "F" or
42 such other form reasonably acceptable to TENANT (the "NON-DISTURBANCE
43 AGREEMENT"), which NON-DISTURBANCE AGREEMENT shall be recorded by
44 LANDLORD in the Official Records of San Bernardino County, California (the "OFFICIAL
45 RECORDS"); (vii) a signed memorandum of this LEASE in the form attached hereto as Exhibit
46 "G" is recorded in the OFFICIAL RECORDS following satisfaction of the ACQUISITION
47 CONTINGENCY, subject and subordinate only to (A) the EXISTING ENCUMBRANCE for
48 which TENANT has received the NON-DISTURBANCE AGREEMENT, and (B) PERMITTED
49 TITLE MATTERS (the "MEMORANDUM OF LEASE"); and (viii) LANDLORD has given
50 TENANT at least thirty (30) days advance notice of both (A) the satisfaction of LANDLORD'S
51 DELIVERY OBLIGATIONS set forth above in items (i) – (vii), and (B) the date on which
52 DELIVERY (as defined in Section 2.03(a)) of the PREMISES will occur; and
53
54       (c)    LANDLORD or a LANDLORD AFFILIATE acquiring the PROJECT on
55 or before February 14, 2014 (the "ACQUISITION CONTINGENCY DEADLINE"), which
56 acquisition shall be evidenced by the recordation of a deed in the OFFICIAL RECORDS, and in
57 the event the foregoing contingency (hereinafter, the "ACQUISITION CONTINGENCY") is not
58 satisfied by the ACQUISITION CONTINGENCY DEADLINE, either party not then in default
59 under this LEASE may elect to terminate this LEASE by written notice delivered to the other
60 party prior to the satisfaction of the ACQUISITION CONTINGENCY (provided, however,
61 notwithstanding anything to the contrary in this LEASE, LANDLORD shall not have any right
62 to terminate this LEASE for failure of the ACQUISITION CONTINGENCY unless the
63 PURCHASE AGREEMENT (defined below) is terminated and neither LANDLORD nor any
64 LANDLORD AFFILIATE subsequently purchases the PROJECT after LANDLORD exercises
65 its right to terminate this LEASE).  LANDLORD represents and warrants to TENANT that, as of
66 the EFFECTIVE DATE, LANDLORD is a party to a written purchase and sale agreement
67 pursuant to which LANDLORD has the contractual right to acquire the PROJECT (such
68 agreement is referred to herein as the "PURCHASE AGREEMENT").  LANDLORD further
69 represents, warrants and covenants that:  (i) LANDLORD will not assign its rights under the
70 PURCHASE AGREEMENT to another party who is not a LANDLORD AFFILIATE and (in the
71 event a LANDLORD AFFILIATE takes title to the PROJECT upon closing under the
72 PURCHASE AGREEMENT, (A) LANDLORD and such LANDLORD AFFILIATE shall enter

1 into a written assignment and assumption agreement pursuant to which LANDLORD assigns this
2 LEASE to such LANDLORD AFFILIATE and such LANDLORD AFFILIATE assumes all of
3 the obligations of "LANDLORD" under this LEASE, and (B) LANDLORD shall cause such
4 LANDLORD AFFILIATE to sign, deliver and record a new MEMORANDUM OF
5 LEASE); (ii) LANDLORD will not terminate the PURCHASE AGREEMENT as a subterfuge
6 by LANDLORD to avoid its obligations under this LEASE; and (iii) LANDLORD will promptly
7 give TENANT written notice of satisfaction of the ACQUISITION CONTINGENCY, which
8 notice shall be accompanied by (A) a copy of the recorded deed, and (B) if the PROJECT is
9 acquired by a LANDLORD AFFILIATE, a copy of the assignment and assumption of this
10 LEASE entered into between LANDLORD and such LANDLORD AFFILIATE. The parties
11 shall sign and deliver the MEMORANDUM OF LEASE concurrently with their execution and
12 delivery of this LEASE and LANDLORD shall cause the MEMORANDUM OF LEASE (or the
13 new MEMORANDUM OF LEASE referenced hereinabove in the event a LANDLORD
14 AFFILIATE takes title to the PROJECT upon closing under the PURCHASE AGREEMENT) to
15 be recorded in the OFFICIAL RECORDS following satisfaction of the ACQUISITION
16 CONTINGENCY. In the event the PURCHASE AGREEMENT is terminated due to
17 LANDLORD'S election to not acquire the PROJECT or due to a default by SELLER, then this
18 LEASE shall automatically terminate and be of no further force or effect.
19
20        Section 2.02 **Right to Extend Lease Term.** TENANT shall have the right to extend
21 the LEASE TERM, on the terms and provisions set forth in this LEASE, for five (5) additional
22 periods of five (5) years each (each, an "EXTENDED TERM" and collectively, the
23 "EXTENDED TERMS") following expiration of the INITIAL LEASE TERM by giving written
24 notice of exercise to LANDLORD by no later than the date which is one hundred eighty (180)
25 days prior to the expiration of the INITIAL LEASE TERM, or the then current EXTENDED
26 TERM, as the case may be (such date is hereinafter referred to as the "OUTSIDE EXERCISE
27 DATE"); provided, however, if TENANT fails to timely deliver such notice of exercise, the
28 OUTSIDE EXERCISE DATE shall be extended to the date which is thirty (30) days after the
29 date on which TENANT receives a reminder notice from LANDLORD; provided further,
30 however, if and to the extent necessary, the fifth (5th) EXTENDED TERM shall be shortened to
31 reduce the LEASE TERM to the date immediately prior to the thirty-fifth (35th) anniversary of
32 the DELIVERY DATE (i.e., the fifth EXTENDED TERM shall be shortened as needed to
33 reduce the LEASE TERM to a period which is one day less than 35 years). Notwithstanding
34 anything to the contrary in Section 12.05, any notices of exercise delivered by TENANT
35 pursuant to this Section 2.02 shall be deemed duly served or delivered upon electronically
36 confirmed receipt of facsimile transmission or an electronic mail reply by LANDLORD'S
37 representative, provided that TENANT shall deliver a copy of any such notice of exercise by one
38 of the other methods set forth in Section 12.05 within one (1) business day after the facsimile
39 transmission or electronic mail of the same. All terms and conditions of this LEASE shall apply
40 during each of the EXTENDED TERMS, except that the BASE RENT during each such
41 EXTENDED TERM shall be subject to increase as set forth in Section 3.01.
42
43        Section 2.03 **Delivery of Premises.**
44
45        (a)    **Delivery Date.** Subject to Section 2.03(c), the term "DELIVERY DATE"
46 means the later of the following dates to occur: (i) the date on which LANDLORD delivers sole
47 and exclusive possession of the PREMISES to TENANT, free of all other occupancies, in the
48 condition specified in Section 6.01 and with each item of LANDLORD'S WORK fully
49 completed (hereinafter referred to as "DELIVER" or "DELIVERY"); or (ii) the date on which all
50 of the contingencies described above in Sections 2.01(a) and 2.01(b) are satisfied to TENANT'S
51 satisfaction (or otherwise waived in writing by TENANT).
52
53        (b)    **Anticipated Delivery Date; Outside Delivery Date.** The anticipated date
54 that LANDLORD will DELIVER the PREMISES to TENANT and satisfy LANDLORD'S
55 DELIVERY OBLIGATIONS is ten (10) business days after the ACQUISITION
56 CONTINGENCY is satisfied ("ANTICIPATED DELIVERY DATE"). If LANDLORD fails to
57 satisfy LANDLORD'S DELIVERY OBLIGATIONS and DELIVER the PREMISES to
58 TENANT by the date which is ten (10) days after the ANTICIPATED DELIVERY DATE (the
59 "INITIAL OUTSIDE DELIVERY DATE") (except for any delay which is directly caused by a
60 FORCE MAJEURE EVENT (as defined in Section 12.24)), then the FREE OCCUPANCY
61 PERIOD (as defined in Section 3.02) shall be extended by two (2) additional days for each day
62 past the INITIAL OUTSIDE DELIVERY DATE that satisfaction of LANDLORD'S
63 DELIVERY OBLIGATIONS and DELIVERY does not occur. In addition, if LANDLORD'S
64 failure to satisfy LANDLORD'S DELIVERY OBLIGATIONS and DELIVER the PREMISES
65 to TENANT continues beyond the date which is forty-five (45) days after the ANTICIPATED
66 DELIVERY DATE, then TENANT shall have the right, at its sole discretion and without waiver
67 of other rights or remedies available to TENANT, to: (i) terminate this LEASE by giving written
68 notice to LANDLORD at any time prior to the satisfaction of LANDLORD'S DELIVERY
69 OBLIGATIONS and DELIVERY of the PREMISES to TENANT, in which event LANDLORD
70 shall reimburse TENANT for TENANT'S reasonable costs and expenses (not to exceed
71 $75,000.00) incurred in connection with this LEASE; or (ii) if DELIVERY has failed to occur as
72 a result of LANDLORD'S failure to complete the LANDLORD'S WORK, then TENANT may

(but shall not be obligated to do so) complete the LANDLORD'S WORK, in which event TENANT shall be entitled to (A) deduct all amounts expended by TENANT in connection with completion of the LANDLORD'S WORK (collectively, "TENANT'S COSTS FOR LANDLORD'S WORK") from the next payments of rent due under this LEASE, and/or (B) require that LANDLORD reimburse TENANT for TENANT'S COSTS FOR LANDLORD'S WORK within thirty (30) days after TENANT'S written demand therefor (which demand shall be accompanied by reasonable support of such costs), in either case together with interest on TENANT'S COSTS FOR LANDLORD'S WORK at a per annum rate equal to the lesser of ten percent (10%) or the maximum rate allowed by law from the date such amounts are expended by TENANT through the date on which such amounts are reimbursed to TENANT or recovered by TENANT, as applicable.    If TENANT terminates this LEASE pursuant to this Section 2.03(b), LANDLORD shall immediately return to TENANT all prepaid rent and other sums (if any) paid by TENANT to LANDLORD.

(c)    **Delivery Blackout Period; Opening Blackout Period.**    If the DELIVERY DATE shall fall within the DELIVERY BLACKOUT PERIOD (as defined below in this Section 2.03(c)), then TENANT may, at TENANT'S sole election, delay the DELIVERY DATE to the first day following the DELIVERY BLACKOUT PERIOD by giving LANDLORD notice thereof.  As used in this Section 2.03(c), the "DELIVERY BLACKOUT PERIOD" shall mean and refer to the period commencing on October 15th and ending (and including) January 31st.  In addition, if the RENT COMMENCEMENT DATE falls within the OPENING BLACKOUT PERIOD (as defined below in this Section 2.03(c)), then, unless TENANT opens for business during the OPENING BLACKOUT PERIOD, the RENT COMMENCEMENT DATE shall be delayed to the first day following the OPENING BLACKOUT PERIOD.  As used in this Section 2.03(c), the "OPENING BLACKOUT PERIOD" shall mean any of the following periods: (i) fifteen (15) days prior to and including Thanksgiving; (ii) thirty (30) days prior to and including Christmas; (iii) fifteen (15) days prior to and including Easter; and (iv) fifteen (15) days prior to and including Memorial Day.

(d)    **Confirmation of Delivery Date and Rent Commencement Date.**  Within ten (10) business days after the actual DELIVERY DATE (i.e., the date on which both DELIVERY occurs and all of the contingencies set forth above in Sections 2.01(a) and 2.01(b) are fully satisfied (or otherwise waived in writing by TENANT)), LANDLORD shall send a written notice to TENANT memorializing such DELIVERY DATE and the RENT COMMENCEMENT DATE, and if TENANT does not object to such dates set forth in LANDLORD'S notice within thirty (30) days of receipt thereof, then such dates shall be deemed correct and such notice shall be attached to this LEASE and be incorporated herein; provided, however, in no event shall the RENT COMMENCEMENT DATE be sooner than the day following the last day of the FREE OCCUPANCY PERIOD, which period may be extended pursuant to Section 2.03(b).

Section 2.04  **Holding Over.**  If TENANT does not vacate the PREMISES upon the expiration or earlier termination of this LEASE and LANDLORD thereafter accepts rent from TENANT, TENANT'S occupancy of the PREMISES shall be a "month-to-month" tenancy, subject to all of the terms of this LEASE applicable to a month-to-month tenancy; except that in the event of a holdover without the express written consent of LANDLORD that continues for more than sixty (60) days, the monthly BASE RENT payable commencing as of the sixty-first (61st) day of such holdover and continuing throughout the remainder of such month-to-month tenancy shall increase, as liquidated damages to LANDLORD as a result of such holdover, to one hundred twenty-five percent (125%) of the monthly BASE RENT that was payable during the last full month prior to such holdover and TENANT shall be responsible for the payment of such increased BASE RENT and all other RENT payable under this LEASE during the remainder of such holdover.  BASE RENT shall not increase during the first sixty (60) days of any holdover

## ARTICLE THREE: <u>BASE RENT</u>

Section 3.01  **Time and Manner of Payment.**    Beginning on the RENT COMMENCEMENT DATE and continuing on the first day of each calendar month thereafter, TENANT shall pay LANDLORD the BASE RENT, in advance.  The BASE RENT shall be payable to LANDLORD at LANDLORD'S address or to such other party and/or address as LANDLORD may designate by written notice to TENANT at least ten (10) days prior to the effective date of such notice. BASE RENT for any partial month shall be prorated based on the actual number of days in the calendar month involved.  The BASE RENT obligations below assume (a) there are no structural defects in the BUILDING, (b) there will be sufficient electrical power and panels to permit operation of TENANT's store, and (c) all other utilities (gas, water, phone, data, sewer) are available at the PREMISES.  BASE RENT during the LEASE TERM shall be payable as set forth below:

| Period | Annualized Base Rental Rate per square foot | Annualized Base Rent | Monthly Base Rent |
|---|---|---|---|

Initials: 

| | | | |
|---|---|---|---|
| DURING FREE OCCUPANCY PERIOD | $0 | $0 | $0 |
| DATE IMMEDIATELY FOLLOWING EXPIRATION OF FREE OCCUPANCY PERIOD (I.E., RENT COMMENCEMENT DATE) THROUGH JANUARY 31ST FIRST OCCURRING AFTER THE FIFTH (5TH) ANNIVERSARY OF THE RENT COMMENCEMENT DATE | $8.50 | $153,000.00 | $12,750.00 |
| FEBRUARY 1ST FIRST OCCURRING AFTER THE FIFTH (5TH) ANNIVERSARY OF THE RENT COMMENCEMENT DATE THROUGH EXPIRATION OF THE INITIAL LEASE TERM | $9.14 | $164,520.00 | $13,710.00 |
| EXTENDED TERM 1 | $9.82 | $176,760.00 | $14,730.00 |
| EXTENDED TERM 2 | $10.56 | $190,080.00 | $15,840.00 |
| EXTENDED TERM 3 | $11.35 | $204,300.00 | $17,025.00 |
| EXTENDED TERM 4 | $12.20 | $219,600.00 | $18,300.00 |
| EXTENDED TERM 5 | $13.12 | $236,160.00 | $19,680.00 |

Section 3.02  **Rent Commencement Date.**  Subject to Section 2.03(c), the "RENT COMMENCEMENT DATE" shall be the first day following the end of the FREE OCCUPANCY PERIOD.  The term "FREE OCCUPANCY PERIOD" means the period beginning on the DELIVERY DATE and ending on the one hundred eightieth (180th) day following the DELIVERY DATE, provided, however, that such FREE OCCUPANCY PERIOD is subject to extension pursuant to the terms of Section 2.03 hereof.  TENANT shall not have any obligation to pay BASE RENT or ADDITIONAL RENT during the FREE OCCUPANCY PERIOD.

Section 3.03  **Termination; Advance Payments.**  Upon termination of this LEASE under Article Seven (Damage or Destruction), Article Eight (Condemnation) or any other termination not resulting from a DEFAULT (as defined in Section 10.01) by TENANT, and after TENANT has vacated the PREMISES in the manner required by this LEASE, LANDLORD shall immediately refund or credit to TENANT (or TENANT'S successor) the unused portion of any security deposit (if any), any advance rent or other advance payments made by TENANT to LANDLORD, any amounts paid for OPERATING EXPENSES or otherwise which apply to any time periods after the effective date of the termination of this LEASE and any and all reasonable out-of-pocket expenses incurred by TENANT in connection with this transaction.

Section 3.04  **Work Letter.**  The work letter attached to this LEASE as Exhibit "B" (the "WORK LETTER") sets forth certain work and improvements which may be constructed by TENANT with respect to the PREMISES prior to TENANT'S opening for business ("TENANT'S WORK").  TENANT shall pay for the cost of constructing TENANT'S WORK. Following the EFFECTIVE DATE, TENANT shall have the right to enter upon the PREMISES for the purpose of constructing TENANT'S WORK; provided, however, that prior to such entry, TENANT shall have obtained the policies of insurance required to be obtained by TENANT under Section 4.04(a) hereof.  TENANT'S entry upon the PREMISES pursuant to this paragraph shall not advance the DELIVERY DATE.  The WORK LETTER also sets forth certain work to be performed by LANDLORD ("LANDLORD'S WORK").  LANDLORD shall pay for the cost of LANDLORD'S WORK.  LANDLORD'S WORK shall be completed prior to the DELIVERY DATE.  LANDLORD and TENANT hereby agree to cooperate (including providing sufficient advance notice) with each other with respect to their respective work as set forth in this Section 3.04, so as not to unreasonably interfere with the other party's work and business operations.

## ARTICLE FOUR: <u>OTHER CHARGES PAYABLE BY TENANT</u>

Section 4.01  **Additional Rent.**  All charges payable by TENANT other than BASE RENT are called "ADDITIONAL RENT."  Unless this LEASE provides otherwise, TENANT shall pay all ADDITIONAL RENT then due with the next monthly installment of BASE RENT. The term "rent" or "RENT" shall mean BASE RENT and ADDITIONAL RENT.

Section 4.02  **Property Taxes.**

(a)  **Payment of Real Property Taxes.**

(i)  Subject to Sections 4.07 and 12.21, commencing on the RENT COMMENCEMENT DATE, TENANT shall reimburse LANDLORD for TENANT'S pro rata

share of all REAL PROPERTY TAXES (as defined in Section 4.02(b)), which are assessed against the tax parcel(s) on which the PREMISES is located. For purposes hereof, TENANT'S pro rata share of REAL PROPERTY TAXES for each such tax parcel on which the PREMISES is located shall be equal to the amount of REAL PROPERTY TAXES assessed against that particular tax parcel multiplied by a fraction, the numerator of which is the number of square feet of ground floor leasable square footage of the PREMISES which is located on said tax parcel and the denominator of which is the total leasable square footage of the buildings and improvements on the tax parcel(s) on which the PREMISES are located (including the leasable square footage of the PREMISES); provided, however, that in no event shall TENANT'S pro rata share of REAL PROPERTY TAXES so computed exceed the amount which TENANT would be required to pay if TENANT'S pro rata share were calculated as a portion of the total bill for all REAL PROPERTY TAXES affecting the PROJECT of which the PREMISES is a part, where the total of such tax bill were multiplied by a fraction, the numerator of which is the ground floor leasable square footage of the PREMISES and the denominator of which is the total leasable square footage of all space occupied or held out for lease in the PROJECT (including the leasable square footage of the PREMISES).

        (ii)    Notwithstanding anything to the contrary contained herein, if the PREMISES is on a separate tax parcel(s) and there are no other buildings contained thereon, LANDLORD shall provide TENANT with the tax bill for such tax parcel(s) at least twenty (20) days prior to the date such payment is due and, subject to Sections 4.07 and 12.21, and except as otherwise hereinafter provided, TENANT shall pay all REAL PROPERTY TAXES assessed against such tax parcel(s) during the LEASE TERM directly to the taxing authority before the date upon which penalties for late payment of taxes would begin to accrue thereon. If TENANT pays such REAL PROPERTY TAXES directly, then TENANT shall not be required to reimburse LANDLORD for any portion of the REAL PROPERTY TAXES assessed against the rest of the PROJECT. Notwithstanding the foregoing, LANDLORD shall pay the first and last tax bills issued during the LEASE TERM for such REAL PROPERTY TAXES if such tax bills cover a period of time prior to the RENT COMMENCEMENT DATE or a period of time following the expiration or earlier termination of the LEASE TERM, as the case may be, and, subject to Sections 4.07 and 12.21, TENANT shall reimburse LANDLORD for its share thereof, prorated on a daily basis. The payment of all REAL PROPERTY TAXES by TENANT hereunder shall include any fees, taxes or assessments against, or as a result of, any tenant improvements installed on the PREMISES by or for the benefit of TENANT.

      (b)    **Definition of "Real Property Taxes."**  As used in this LEASE, "REAL PROPERTY TAXES" shall mean all real property taxes due and applicable during the LEASE TERM which are assessed by any lawful authority against the PROJECT, less any rebates, credits or abatements which are granted or agreed upon by such lawful authority with respect to the PROJECT. In the event that a new special assessment district (the "NEW SPECIAL ASSESSMENT DISTRICT") is proposed or enacted during the LEASE TERM, LANDLORD shall, immediately upon receipt of notice thereof, notify TENANT of such NEW SPECIAL ASSESSMENT DISTRICT and shall either (i) assign to TENANT LANDLORD'S right to vote on, or contest, such NEW SPECIAL ASSESSMENT DISTRICT, or (ii) if LANDLORD cannot legally assign such rights to TENANT, vote on or contest such NEW SPECIAL ASSESSMENT DISTRICT, as TENANT shall direct. In no event shall LANDLORD voluntarily elect or vote in favor of any such NEW SPECIAL ASSESSMENT DISTRICT. Notwithstanding anything to the contrary in this LEASE, the term "REAL PROPERTY TAXES" shall not include any of the following: (A) any assessment for highway, street or traffic control improvements, sanitary or storm sewers, utilities or for other off-site improvements of any nature made in connection with the development or redevelopment of the SHOPPING CENTER or any agreement entered into by LANDLORD with any governmental authority in connection therewith; (B) income, profits (including gross profits), franchise, gift, estate, inheritance, succession, conveyance, transfer, sales, transaction, excise, capital or other tax assessments upon LANDLORD or the rent payable under this LEASE; (C) any property tax applicable to a so called "pad site" or "out parcel" which is separately assessed, or land/improvements not within the boundaries of the PROJECT; (D) any increase in REAL PROPERTY TAXES due to any sale or transfer of the PROJECT (or any portion thereof) during the entire LEASE TERM, or because there occurs a change of ownership or redevelopment of the PROJECT (or any portion thereof) during the entire LEASE TERM or from amendment or repeal of Proposition 13; (E) any interest, fine or penalty for late payment or nonpayment by LANDLORD of REAL PROPERTY TAXES; (F) any administrative charges or management fees; or (G) any costs to contest or challenge REAL PROPERTY TAXES which are unreasonable or which are in excess of the amounts recovered (and if the amount recovered is in excess of the reasonable costs to contest or challenge, TENANT shall be entitled to receive a pro rata share of the excess which relates to the LEASE TERM). LANDLORD shall be responsible for the payment of any documentary transfer or similar taxes assessed in connection with this LEASE.

      (c)    **Personal Property Taxes.**  TENANT shall pay all taxes charged against trade fixtures, furnishings, equipment or any other personal property belonging to TENANT. TENANT shall try to have personal property taxes assessed separately from the PROJECT. If any of TENANT'S personal property is taxed with the PROJECT, TENANT shall pay

LANDLORD the taxes for the personal property within fifteen (15) days after TENANT receives a written statement from LANDLORD for such personal property taxes.

(d)    **Right to Contest.**    TENANT shall have the right to contest, or to cause LANDLORD to contest, the REAL PROPERTY TAXES, and TENANT shall be entitled to its pro rata share of any refund obtained hereunder for any period of time during which TENANT was responsible for payment of REAL PROPERTY TAXES under this Section 4.02, less any reasonable out of pocket costs incurred by LANDLORD to collect said refund. LANDLORD shall, immediately upon receipt thereof, provide TENANT with copies of any notices from the county assessor's office of the county in which the PREMISES is located (including all notices of changes assessed value) in order to allow TENANT to review same and timely pursue TENANT'S rights, as provided for in this Section 4.02(d), to contest REAL PROPERTY TAXES.

Section 4.03    **Utilities.**    TENANT shall pay, directly to the appropriate supplier, the cost of all natural gas, heat, light, power, sewer service, telephone, water, refuse disposal and other utilities and services supplied to the PREMISES. LANDLORD represents to TENANT that no services or utilities provided to the PREMISES are or will be jointly metered with any other premises or with any services or utilities provided to the COMMON AREAS and that the COMMON AREAS will be separately metered from all portions of the SHOPPING CENTER premises leased to, occupied by, or held out for lease to any person. Accordingly, utilities serving the COMMON AREAS will not be jointly metered with any non-COMMON AREAS. In the event that utilities to the PREMISES shall be interrupted for more than twenty four (24) hours and TENANT'S operations in the PREMISES are materially adversely affected as a result thereof (and provided that such interruption is not caused by TENANT'S failure to pay its utilities bills or TENANT'S negligent acts), then the RENT shall abate proportionately to the degree of the adverse effect until such utilities are fully restored (and shall fully abate if TENANT is unable to operate for business, and does not operate from the PREMISES in TENANT'S sole but reasonable discretion). In the event that utilities to the PREMISES shall be interrupted for more than thirty (30) days and such interruption is not caused by TENANT'S failure to pay its utilities bills or TENANT'S negligent acts, then TENANT shall have the right to terminate this LEASE at any time thereafter, but prior to the date the utilities are fully restored, by giving written notice thereof to LANDLORD.

Section 4.04    **Insurance Policies.**

(a)    **Tenant's Insurance.**    During the LEASE TERM, TENANT shall maintain a policy of commercial general liability insurance (sometimes known as broad form comprehensive general liability insurance) insuring TENANT against liability for bodily injury, property damage (including loss of use of property) and personal injury arising out of the operation, use or occupancy of the PREMISES. TENANT shall include LANDLORD as an additional insured pursuant to an endorsement to such policy. The amount of such insurance shall be Two Million Dollars ($2,000,000.00) per occurrence. The liability insurance obtained by TENANT under this Section 4.04(a) shall: (i) be primary to any similar insurance carried by LANDLORD with respect to occurrences within the PREMISES (whereas LANDLORD'S liability insurance maintained pursuant to Section 4.04(b)(ii) shall be primary with respect to occurrences within the COMMON AREAS), and LANDLORD'S insurance shall be considered excess insurance only with respect to occurrences within the PREMISES; and (ii) include cross-liability coverage or contain cross-liability endorsements providing such coverage.

(b)    **Landlord's Insurance.**

(i)    <u>Property Insurance</u>.    During the LEASE TERM, LANDLORD shall maintain policies of special form casualty insurance covering all buildings and improvements within the PROJECT. The limits for such insurance shall be for the full replacement value of the property so insured, as such amount may be mutually agreeable to LANDLORD and TENANT from time to time. Such policy shall provide protection against all perils included within the classification of fire, extended coverage, vandalism, malicious mischief, special extended perils (all risk), sprinkler leakage and any other perils which LANDLORD deems reasonably necessary. Such insurance shall be carried with an insurance company with a Best rating of B+ or better and LANDLORD shall, upon TENANT'S request, provide TENANT with a certificate of insurance evidencing such coverage. LANDLORD shall not obtain insurance for TENANT'S fixtures or equipment or building improvements installed by TENANT on the PREMISES. TENANT shall not do or permit anything to be done which invalidates any such insurance policies. LANDLORD may maintain earthquake insurance and/or flood insurance at LANDLORD'S sole cost and expense and TENANT shall not be required to pay its pro rata share thereof.

(ii)    <u>Liability Insurance</u>.    During the LEASE TERM, LANDLORD shall maintain, in full force and effect, general public liability insurance, insuring against liability for injury or death to persons and loss of or damage to property occurring in, on or about the PROJECT, in an amount equal to not less than Two Million Dollars ($2,000,000.00) per

1 occurrence. Such insurance shall also name TENANT as an additional insured or include
2 TENANT as an additional insured pursuant to an endorsement to such policy. Such insurance
3 shall be with an insurance carrier having a Best rating of B+ or better. LANDLORD shall, upon
4 TENANT'S request, provide TENANT with a certificate of insurance evidencing such coverage.

6            (iii)    Payment of Premiums. LANDLORD shall pay all premiums for
7 the insurance policies described in Sections 4.04(b)(i) and 4.04(b)(ii) above. Subject to Section
8 12.21 below, TENANT shall, in accordance with Sections 4.06, as limited by Section 4.07,
9 reimburse LANDLORD for TENANT'S pro rata share of the following (collectively,
10 "INSURANCE COSTS"): (A) the insurance premiums for policies which LANDLORD is
11 obligated to maintain under Section 4.04(b)(i) above; and (B) the portion of the insurance
12 premiums for policies which LANDLORD is required to maintain pursuant to Section 4.04(b)(ii)
13 above which is allocable to the COMMON AREAS. Notwithstanding anything to the contrary
14 in this LEASE, in no event shall INSURANCE COSTS include any administrative charges or
15 management fees or costs for earthquake or flood insurance or any other insurance which
16 LANDLORD elects to maintain but is not required to maintain under this LEASE. Upon
17 LANDLORD'S request, TENANT shall deliver to LANDLORD a copy of any policy of
18 insurance (or certificate of insurance, at TENANT'S option) which TENANT is required to
19 maintain under this Section 4.04. Promptly following the renewal of any expiring policy
20 required to be carried by TENANT (but in no event later than three (3) business days after
21 expiration), TENANT shall deliver to LANDLORD a certificate of insurance, executed by an
22 authorized officer of the insurance company, showing that the insurance which TENANT is
23 required to maintain under this Section 4.04 is in full force and effect and containing such other
24 information which LANDLORD reasonably requires.

26      (c)     **General Insurance Provisions.**

28            (i)    If any insurance which TENANT is required to maintain under this
29 LEASE shall be cancelled by the carrier thereof, then TENANT shall deliver to LANDLORD a
30 copy of the insurance carrier's cancellation notice (by facsimile or electronic mail, followed by
31 paper mail) within three (3) business days after TENANT'S receipt thereof, together with
32 evidence of replacement coverage.

34            (ii)    If TENANT fails to deliver any policy of insurance (or certificate
35 or renewal) to LANDLORD required under this LEASE within thirty (30) days following written
36 request from LANDLORD for such evidence of insurance, LANDLORD may obtain such
37 insurance, in which case LANDLORD shall immediately notify TENANT and, subject to
38 Section 12.21 below, TENANT shall reimburse LANDLORD for the cost of such insurance
39 within fifteen (15) days after receipt of a statement that indicates the cost of such insurance.

41            (iii)    TENANT shall maintain all insurance required under this LEASE
42 with companies holding a "General Policy Rating" of B+ or better, as set forth in the most
43 current issue of "Best Key Rating Guide". LANDLORD and TENANT acknowledge the
44 insurance markets are rapidly changing and that insurance in the form and amounts described in
45 this Section 4.04 may not be available in the future. If at any time during the LEASE TERM,
46 TENANT is unable to maintain the insurance required under this LEASE, TENANT shall
47 nevertheless maintain insurance coverage which is customary and commercially reasonable in
48 the insurance industry for TENANT'S type of business, as that coverage may change from time
49 to time.

51            (iv)    Unless prohibited under any applicable insurance policies
52 maintained, LANDLORD and TENANT each hereby waive any and all rights of recovery
53 against the other, or against the officers, employees, agents or representatives of the other, for
54 loss of or damage to its property or the property of others under its control, if such loss or
55 damage is covered by any insurance policy in force (whether or not described in this LEASE) at
56 the time of such loss or damage or would have been covered if LANDLORD or TENANT, as
57 applicable, had complied with its obligations under this LEASE. Upon obtaining the required
58 policies of insurance, LANDLORD and TENANT shall give notice to the insurance carriers of
59 this mutual waiver of subrogation.

61 Section 4.05    **Common Areas; Use, Maintenance and Costs.**

63      (a)     **Common Areas.** As used in this LEASE, "COMMON AREAS" shall
64 collectively mean (i) all areas within the PROJECT which are not leased by or held for the
65 exclusive use of TENANT or other tenants, and (ii) any other land or property made available by
66 LANDLORD and/or pursuant to the DECLARATION (as defined below) (whether owned or not
67 by LANDLORD) for the benefit or convenience of tenants or occupants of the SHOPPING
68 CENTER and/or their employees, subtenants, customers and/or invitees, including (as
69 illustrations and not limitation) the following as depicted on the SITE PLAN or otherwise now or
70 hereafter existing at the SHOPPING CENTER: all parking areas (except as otherwise provided
71 for in the DECLARATION), driveways, truck service ways, delivery areas and loading areas
72 (except any loading area for the exclusive use of TENANT or any other tenants in the

SHOPPING CENTER), access roads, lobby areas, elevators, corridors, sidewalks and curbs; entrances and exits from the adjacent streets; traffic lights, traffic islands, landscaped and planted areas; meter rooms outside individual stores; fencing; lighting facilities; sprinkler system serving landscaped areas or buildings; sewage system outside tenants' stores; drainage improvements and/or drainage facilities, open space parcels, roofs, gutters and downspouts and the exterior of outside walls (excluding storefronts) of buildings; directional or safety signs, which are not leased by or held for the exclusive use of TENANT or other tenants or owners of the SHOPPING CENTER; provided, however, TENANT shall be permitted, at all times during the LEASE TERM, the exclusive use of the roof above the PREMISES for the installation of roof-mounted HVAC, refrigeration and/or telecommunication equipment necessary and/or incidental to TENANT'S use of the PREMISES and for any other legal use or purpose, provided that any work and installations on the roof shall be coordinated with LANDLORD as needed to preserve roof warranties. LANDLORD shall not temporarily or permanently change, or permit others to temporarily or permanently change, the size, location, nature and use of any of the COMMON AREAS, including vehicle parking spaces, or convert COMMON AREAS into leasable areas, or increase or decrease COMMON AREAS land and/or facilities without TENANT'S prior written consent, which, subject to the terms of Section 4.05(b), shall not be unreasonably withheld if such change is necessary to meet LANDLORD'S obligations hereunder.

(b)   **Protected Area.** A portion of the COMMON AREAS shown on the SITE PLAN is marked on said SITE PLAN as "Protected Area" (the "PROTECTED AREA"). Notwithstanding anything in this LEASE to the contrary, no changes (including, but not limited to, any new structures) may be made in the PROTECTED AREA without TENANT'S prior written consent in its sole discretion. Outside of the PROTECTED AREA, non-material changes may be made without TENANT'S prior written consent, but LANDLORD shall not perform or allow to be performed any work in the COMMON AREAS on the PROJECT, nor shall LANDLORD consent under the DECLARATION or otherwise to any work being performed in the COMMON AREAS not on the PROJECT, during the period from October 1 to January 3 of any year, nor during the fifteen (15) day periods ending on Easter, Valentine's Day, Memorial Day, Independence Day and Labor Day. For these purposes, non-material changes are those which: (x) do not impede, prevent, or otherwise create any adverse effect, to the ingress and egress (pedestrian and vehicular) to and from the PREMISES, or to the loading areas servicing the PREMISES, or between the PREMISES or the loading areas and the adjacent streets, nor between the PREMISES and any of the parking areas or other retail businesses in the SHOPPING CENTER; and (y) do not impair the visibility of the PREMISES or of any signs for the PREMISES or TENANT'S business operated therein (whether on the PREMISES or in the COMMON AREAS) from either adjoining streets or parking areas.

(i)   LANDLORD shall not: (A) permit the existence of any buildings at the PROJECT not shown on the SITE PLAN (nor shall LANDLORD consent under the DECLARATION or otherwise to the existence of any buildings elsewhere in the SHOPPING CENTER not shown on the SITE PLAN); (B) permit the height of the existing buildings in the PROJECT (or any architectural features or rooftop equipment) to be higher than they exist on the date of this LEASE (nor shall LANDLORD consent under the DECLARATION or otherwise to the height of the existing buildings elsewhere in the SHOPPING CENTER being higher than they exist on the date of this LEASE); (C) permit any future buildings in the PROJECT to be taller than the PREMISES (nor shall LANDLORD consent under the DECLARATION or otherwise to any future buildings in the SHOPPING CENTER being taller than the PREMISES); (D) build or allow to be built any buildings in the portions of the PROTECTED AREA which are not depicted on the SITE PLAN. LANDLORD may not alter the colors or design of the exterior of the PREMISES, nor shall LANDLORD make any change in the location of the front wall of any in-line buildings in the PROJECT without the prior written consent of the TENANT, which shall not be unreasonably withheld (nor shall LANDLORD consent under the DECLARATION or otherwise to any change in the location of the front wall of any in-line buildings elsewhere in the SHOPPING CENTER without the prior written consent of TENANT, which shall not be unreasonably withheld).

(ii)   Notwithstanding anything to the contrary in this LEASE, LANDLORD shall be permitted to develop one building (the "PAD BUILDING") within the area designated on the SITE PLAN as "Pad Building" (the "PAD BUILDING AREA"), subject to the following terms and conditions: (a) the total square footage of the PAD BUILDING shall not exceed 2,850 square feet; (b) the PAD BUILDING shall not be more than one story tall and the height of the OUTPARCEL BUILDING (including any architectural features and rooftop equipment thereon) shall not exceed twenty (20) feet, as measured from the finished grade immediately adjacent to the OUTPARCEL BUILDING; (c) construction of the PAD BUILDING shall be done in a good and workmanlike manner and in compliance with all applicable laws; (d) construction of the PAD BUILDING shall not reduce TENANT'S rights or increase TENANT'S obligations under this LEASE in any material respect; (e) the construction staging area for the construction of the PAD BUILDING shall be located entirely within a 20-foot setback area immediately adjacent to the PAD BUILDING AREA; (f) LANDLORD shall use best good faith efforts to minimize any detrimental effects to (i) the completion of

LANDLORD'S WORK and/or TENANT'S WORK, and (ii) TENANT'S business operations at the PREMISES due to the construction of the PAD BUILDING; and (g) following completion of the PAD BUILDING, TENANT'S pro rata share of the OPERATING EXPENSES shall be proportionately reduced to account for the increase in the total leasable square footage of the buildings contained within the PROJECT as a result of the addition of the PAD BUILDING thereto.

(iii)    LANDLORD represents and warrants to TENANT that there are no agreements or other arrangements made with neighboring property owners, other tenants of the SHOPPING CENTER, or other parties, that (A) affect the PREMISES, the COMMON AREAS, or the PROJECT, or portions thereof, or (B) conflict with TENANT'S rights or LANDLORD'S obligations hereunder, including but not limited to, the use of vehicle parking spaces, the maintenance of asphalt, concrete, landscaping or other areas without structures, future development, utility services, security, vehicular or pedestrian access or egress, signage, drainage, advertising or TENANT'S use of the PREMISES, the COMMON AREAS or the PROJECT, except that certain Amendment to and Restatement of Declaration of Covenants, Conditions, Restrictions and Reciprocal Easements and Grant of Easement recorded in the OFFICIAL RECORDS on August 4, 1993 as Instrument No. 93-336602 (the "DECLARATION"). LANDLORD represents and warrants that (1) it has provided copies of the DECLARATION to TENANT prior to the execution of this LEASE by TENANT, (2) the DECLARATION, as delivered to TENANT, has not been modified or amended, (3) LANDLORD has not granted its consent to any matter requiring its consent under the DECLARATION, (4) LANDLORD has not waived any provisions of the DECLARATION, (5) LANDLORD is not aware of any defaults, breaches or violations of any provisions of the DECLARATION, (6) LANDLORD is not in violation of any of the provisions of the DECLARATION, (7) the DECLARATION is a binding agreement in full force and effect, and (8) no provisions of the DECLARATION conflict with or interfere with LANDLORD'S obligations or TENANT'S rights under this LEASE and LANDLORD hereby assumes full responsibility for any and all such conflicting or interfering provisions. LANDLORD agrees that it shall not, without the prior written consent of TENANT, (x) waive any provisions of the DECLARATION, (y) grant its consent for any matter requiring LANDLORD'S consent under the DECLARATION, or (z) modify or amend any provision of the DECLARATION. In addition, LANDLORD shall enforce the provisions of the DECLARATION against all other tenants and/or occupants of the SHOPPING CENTER, including bringing suit and seeking injunctive relief. LANDLORD shall immediately send TENANT copies of all notices, requests for changes, consents, waivers or any material correspondence made or received under the DECLARATION. Upon TENANT'S request, LANDLORD shall take all reasonable actions to cooperate with TENANT in connection with any request by TENANT for modifications, consents, approvals, waivers or any other matter in connection with the DECLARATION.

(c)    **Use of Common Areas.** TENANT shall have the nonexclusive right (in common with other tenants) to use the COMMON AREAS for the purposes intended at no additional cost to TENANT, subject to such reasonable, and non-discriminatory rules and regulations as LANDLORD may establish from time to time which do not conflict with any express or implied terms of this LEASE. TENANT shall abide by such rules and regulations. Notwithstanding the provisions of Section 4.05(a) above, LANDLORD may temporarily close any COMMON AREAS, but only as necessary to perform any acts in the COMMON AREAS as are necessary to meet LANDLORD'S obligations hereunder; provided that (i) LANDLORD gives TENANT a minimum of ten (10) business days prior written notice thereof, (ii) LANDLORD takes all reasonable actions to avoid so doing during any of TENANT'S peak business periods (October 1 - January 3, Fridays, Saturdays, Sundays, and the fifteen (15) day periods preceding and including Independence Day, Valentine's Day, Easter, Labor Day, and any Federal holiday), and (iii) LANDLORD takes all reasonable actions to minimize any detrimental effects to TENANT'S business operations at the PREMISES as a result of such closure. LANDLORD shall not at any time permit any fairs, carnivals, or other seasonal or promotional events (e.g., fireworks stands, Christmas Tree sales, etc.), telephones, kiddy rides, vending machines, automated teller machines (ATMs), kiosks, recycling centers or machines or any such or similar activities in the PROTECTED AREA, provided that in no event shall the foregoing provision prohibit TENANT from installing telephones, kiddy rides, vending machines, ATMs, kiosks or other similar items in the PREMISES or other areas available for TENANT'S exclusive use pursuant to the express terms of this LEASE.

(d)    **Vehicle Parking.** TENANT and its invitees and customers shall be entitled to the nonexclusive use of all vehicle parking spaces in the SHOPPING CENTER for non-reserved parking without the payment of any additional rent by TENANT or charge to TENANT or its invitees or customers. All such vehicle parking spaces shall be available only for customers of tenants of the SHOPPING CENTER, the tenants of the SHOPPING CENTER and their employees. LANDLORD (at LANDLORD'S sole expense, and as not part of COMMON AREA COSTS) shall institute and enforce rules (such as time limits, no employee parking, etc.) regulating the use of the parking spaces to help insure that there is adequate parking available for TENANT'S customers at all times. If TENANT notifies LANDLORD that there is a recurring problem of a shortage of parking spaces for TENANT'S customers, then

LANDLORD agrees to use its best efforts to alleviate such parking problem. LANDLORD shall at all times maintain the parking areas in accordance with all applicable laws, regulations, ordinances, and codes, without variance, special use permit, or other form of relief, and the location of the parking areas relative to the PREMISES shall not be altered.

(e)    **Maintenance of Common Areas.**    LANDLORD shall maintain and operate (or cause to be maintained and operated) the COMMON AREAS in good order, condition and repair, comparable with high quality shopping centers in the county in which the PREMISES is located. Subject to Section 12.21, TENANT shall pay TENANT'S pro rata share (as set forth in Section 4.06 but subject to the limitations set forth in Section 4.07) of the reasonable "out of pocket" costs incurred by LANDLORD as necessary for the maintenance, operation and repair of the COMMON AREAS ("COMMON AREA COSTS"). COMMON AREA COSTS include, but are not limited to, the following: utilities for the COMMON AREAS; repairing, signs (lamps, ballasts, sign faces and cabinet) maintaining, painting, lighting (which shall be provided from at least, one hour before sunset and one hour after TENANT closes for business), cleaning parking areas, all as LANDLORD may reasonably deem necessary for the maintenance, operation, and repair of the COMMON AREAS.  In no event shall TENANT hereby have any responsibility for the payment of any marketing, advertising, or promotional expenses, including without limitation any merchant association fees. Further, if (x) as of the EFFECTIVE DATE a portion of the SHOPPING CENTER is enclosed, or (y) during the LEASE TERM, LANDLORD or a third party elects to enclose any portion of the SHOPPING CENTER, then, notwithstanding anything to the contrary contained herein, in no event shall TENANT be obligated to pay any portion of the costs attributable to maintaining such enclosed portion of the SHOPPING CENTER (by way of example only, the cost of air conditioning or lighting such enclosed portion of the SHOPPING CENTER).  If any portion of the COMMON AREAS for which TENANT is obligated to bear a portion of the repair expense cannot be repaired in an economical manner, the cost of any replacement shall be amortized over its useful life, and TENANT shall be liable only for its pro rata share of that portion of the amortized cost which is applicable to the remaining LEASE TERM.  LANDLORD shall not use any affiliates of LANDLORD or any companies affiliated with LANDLORD (any such affiliate or affiliated company hereinafter referred to as "LANDLORD'S AFFILIATE") to provide any item(s) of COMMON AREA COSTS.  LANDLORD shall, simultaneously with delivery to TENANT of a copy of the ESTIMATED OPERATING EXPENSES (as defined in Section 4.06), provide TENANT with written notice of the use of any such LANDLORD'S AFFILIATE.

Notwithstanding anything to the contrary contained in this LEASE, COMMON AREA COSTS shall not include any of the following:

(i)    Supervision or management salaries or similar fees;

(ii)    Security costs or other similar fees, unless TENANT expressly agrees thereto in writing in its sole and absolute discretion;

(iii)    Depreciation of real property or improvements which form part of the COMMON AREAS;

(iv)    Repairs, replacement or improvements made prior to the date hereof;

(v)    Repairs arising from defects in the initial construction of the PROJECT or the SHOPPING CENTER or in connection with any redevelopment thereof;

(vi)    Repairs necessitated by the negligence of LANDLORD and which are required to cure violations of laws in effect on the date hereof;

(vii)    Payments of principal and interest and amortization of indebtedness or any cost of financing or refinancing, depreciation or ground rent;

(viii)    Compensation paid to officers or executives of LANDLORD who are not directly involved in the management of the PROJECT;

(ix)    Costs incurred by LANDLORD in connection with the leasing of space in the PROJECT, including, without limitation, commissions and advertising and promotional expenses;

(x)    Legal fees, other than those reasonably incurred by LANDLORD in the filing, institution or prosecution of any application or proceeding filed or instituted by LANDLORD in order to reduce REAL PROPERTY TAXES;

(xi)    The cost of repairs or replacements incurred by reason of fire or other casualty or condemnation to the extent that either (A) LANDLORD is compensated

therefor through proceeds of insurance or condemnation awards; or (B) LANDLORD failed to obtain insurance against fire or casualty as required under the terms of this LEASE;

(xii)    The cost of initial construction or completion of the COMMON AREAS or any part of the PROJECT or the SHOPPING CENTER;

(xiii)    Expenditures made by LANDLORD which are in the nature of capital improvements;

(xiv)    Costs arising from any cleanup, repair or remediation of HAZARDOUS MATERIALS on, under, in or about the SHOPPING CENTER (unless caused by the acts TENANT or TENANT'S agents or employees);

(xv)    Legal expenses incurred by LANDLORD in enforcing and/or negotiating the terms of any lease for space in the PROJECT;

(xvi)    The cost of any work or service performed for, or facilities furnished to, any other tenant in the SHOPPING CENTER at such tenant's cost;

(xvii)    The amount of any judgment applicable to the operation, ownership or maintenance of any portion of the SHOPPING CENTER and all costs associated with the defense of such action;

(xviii)    The amount of any rent paid by LANDLORD to a ground lessor;

(xix)    Any license, permit and inspection fees, consulting, legal and accounting fees or similar fees, administrative costs, management fees and other costs incurred by LANDLORD in connection with the ownership, operation and leasing of the PROJECT;

(xx)    The cost of rubbish removal for rubbish generated within the premises of all other tenants or occupants of space within the SHOPPING CENTER (except that COMMON AREA COSTS shall include the cost of rubbish removal of rubbish generated within the COMMON AREA);

(xxi)    The cost of maintaining the common areas of any portion of the SHOPPING CENTER which is enclosed;

(xxii)    The cost of funds borrowed by LANDLORD;

(xxiii)    The entire amount of the costs charged by any of LANDLORD'S AFFILIATES for any services, materials or other items of COMMON AREA COSTS if LANDLORD fails to disclose to TENANT the use of such LANDLORD'S AFFILIATE, as required above in this Section 4.05(e);

(xxiv)    the replacing, repaving or maintenance of the parking lot and parking areas;

(xxv)    the repair, replacement or maintenance of any roof or roof membrane, any structural element, including, but not limited to, the slab and subsurface elements of any building in the SHOPPING CENTER, any fire sprinkler system, water, sewer and electrical connections to any buildings within the SHOPPING CENTER; and

(xxvi)    the cost to comply with any and all laws, regulations, ordinances and codes with respect to the COMMON AREAS (or any other portion of the SHOPPING CENTER).

(f)    **Loading.** TENANT shall be permitted, at all times, the exclusive use of (i) portions of the COMMON AREAS labeled and depicted as "TENANT'S LOADING AREAS" or "LOADING AREA" on the SITE PLAN, and (ii) other areas abutting the PREMISES (including the front of the PREMISES and/or sidewalks abutting the PREMISES), as necessary, for making deliveries of merchandise, storing shopping carts, operating vending machines, kiddy rides and pay telephones, installing courier boxes, installing bike racks, and otherwise as necessary or desirable for the smooth and ordinary operation of its business. Subject to the provisions of Section 6.05, as they apply to alterations, additions, and improvements of the PREMISES, TENANT may change TENANT'S LOADING AREAS to facilitate TENANT'S receipt of merchandise and/or the storage/use of shopping carts. LANDLORD shall not modify or alter TENANT'S LOADING AREAS or any access to it.

Section 4.06    **Operating Expenses - Tenant's Share and Payment.** For the purposes of this LEASE, the term "OPERATING EXPENSES" shall mean the sum of:    REAL PROPERTY TAXES (as defined and calculated in accordance with Section 4.02 above),

INSURANCE COSTS (as defined in Section 4.04), and COMMON AREA COSTS (as set forth in Section 4.05(e)). TENANT shall be responsible, subject to Sections 4.07 and 12.21 below, for the payment of its pro rata share of all OPERATING EXPENSES commencing on the RENT COMMENCEMENT DATE.

(a)    LANDLORD shall take all reasonable actions to minimize (to the extent reasonably possible) the OPERATING EXPENSES (and each component thereof).    The foregoing sentence shall not in any way affect any of LANDLORD'S obligations, including maintenance of the COMMON AREAS as otherwise provided in this LEASE. In furtherance of the foregoing, LANDLORD'S reasonable actions shall include, but not be limited to, soliciting multiple competitive bids and communicating with TENANT so that TENANT shall have the opportunity to assist LANDLORD in minimizing the COMMON AREA COSTS as set forth above.

(b)    Except as otherwise provided in this LEASE, TENANT's pro rata share shall be calculated by dividing the leasable square foot area of the ground floor of the PREMISES by the aggregate leasable square foot area of the PROJECT, as of the date on which the computation is made, but in no event shall TENANT'S pro rata share be greater than as is set out in Section 1.08(b). Any changes in the aggregate square footage of the PROJECT during the LEASE TERM shall be effective on the first day of the month after such change occurs. TENANT shall be responsible for only TENANT'S pro rata share (as set forth above) of all OPERATING EXPENSES which relate solely to the COMMON AREAS of the PROJECT or to the entire PROJECT. TENANT shall be responsible for all of any OPERATING EXPENSES which relate solely to the PREMISES and TENANT shall have no responsibility for any OPERATING EXPENSES relating solely to other tenants of the PROJECT or the SHOPPING CENTER or for services not offered to or benefiting TENANT.

(c)    At least thirty (30) days prior to the RENT COMMENCEMENT DATE and at least thirty (30) days prior to the start of each calendar year, and on other occasions if LANDLORD so elects, during the LEASE TERM, LANDLORD shall provide a written notice to TENANT setting forth in reasonable detail LANDLORD'S best estimate of all OPERATING EXPENSES for the ensuing calendar year (which may be based on the actual OPERATING EXPENSES for the then current calendar year) and TENANT'S pro rata share thereof, and such supporting documentation as TENANT may reasonably request ("ESTIMATED OPERATING EXPENSES"). Subject to Section 12.21 below, TENANT shall thereafter pay on a monthly basis (subject to the limitations in Section 4.07) TENANT'S pro rata share of the ESTIMATED OPERATING EXPENSES (prorated for any fractional periods) with each subsequent monthly installment of BASE RENT.

(d)    Within ninety (90) days after the end of each calendar year during the LEASE TERM and within ninety (90) days of the expiration of the LEASE TERM, LANDLORD shall provide a written notice to TENANT setting forth in reasonable detail LANDLORD'S calculation of all OPERATING EXPENSES for the prior calendar year and TENANT'S share thereof, and such supporting documentation as TENANT may reasonably request ("ACTUAL OPERATING EXPENSE NOTICE"), provided that LANDLORD shall include, without request by TENANT, copies of paid invoices to substantiate any single item of OPERATING EXPENSES set forth in the ACTUAL OPERATING EXPENSE NOTICE where the amount therefor exceeds Five Thousand Dollars ($5,000.00). LANDLORD shall indicate the total amount of ESTIMATED OPERATING EXPENSES paid by TENANT for such period on such ACTUAL OPERATING EXPENSE NOTICE, and TENANT shall pay (in a lump sum) any shortfall (if the ESTIMATED OPERATING EXPENSES paid by TENANT were less than TENANT's pro rata share of the actual OPERATING EXPENSES for such period) as set forth in any such ACTUAL OPERATING EXPENSE NOTICE to LANDLORD within fifteen (15) days after receipt thereof (without limitation or waiver of TENANT'S rights set forth in Section 4.08), except that TENANT may object to any costs included therein which TENANT, in good faith and in reasonable detail, objects by written notice to LANDLORD within said fifteen (15) day period. If the ESTIMATED OPERATING EXPENSES paid by TENANT exceed TENANT'S pro rata share of the actual OPERATING EXPENSES for such period as set forth in such ACTUAL OPERATING EXPENSE NOTICE, then such overpayment shall be credited to any of TENANT'S subsequent payment obligations to LANDLORD under this LEASE, if any, and if any credit remains unapplied as of the expiration or earlier termination of the LEASE TERM, then such amounts shall be paid in a lump sum to TENANT by LANDLORD within ten (10) days. In the event that LANDLORD shall not provide TENANT with an ACTUAL OPERATING EXPENSE NOTICE within ninety (90) days after the end of the calendar year in question, TENANT shall not be required to continue paying its pro rata share of OPERATING EXPENSES until such time as TENANT has received a copy of said ACTUAL OPERATING EXPENSE NOTICE, at which time, TENANT shall, within ten (10) business days after receipt of a copy of said ACTUAL OPERATING EXPENSE NOTICE, subject to the foregoing, pay to LANDLORD any amounts of OPERATING EXPENSES due and owing from TENANT.

Section 4.07 **Limitations on Operating Expenses.** Notwithstanding anything in this LEASE to the contrary, TENANT'S pro rata share of OPERATING EXPENSES (ESTIMATED and ACTUAL) for each calendar year during the LEASE TERM shall be subject to the following limitations:

(a)    TENANT'S pro rata share of OPERATING EXPENSES (ESTIMATED and ACTUAL) for the period from the RENT COMMENCEMENT DATE through the expiration of the first full calendar year thereafter (the "FIRST OPERATING EXPENSES LIMITATION PERIOD") shall be the lesser of:

(i) TENANT'S pro rata share of OPERATING EXPENSES, as calculated pursuant to the express provisions of this LEASE, or

(ii) Four and 80/100 Dollars ($4.80) per square foot of the ground floor building area of the PREMISES per year.

(b)    TENANT'S pro rata share of COMMON AREA COSTS (ESTIMATED and ACTUAL) (excluding utilities) for each calendar year after the FIRST OPERATING EXPENSES LIMITATION PERIOD shall not increase by more than three percent (3%) over TENANT'S pro rata share of COMMON AREA COSTS (ESTIMATED and ACTUAL) for the previous calendar year (non-cumulative).

Section 4.08 **Audit.** LANDLORD shall maintain, in a single location within 100 driving miles of the SHOPPING CENTER, commercially reasonable and detailed records concerning all components of OPERATING EXPENSES for at least twenty four (24) months following the completion of each calendar year. TENANT shall have the right to audit such records. If any such audit reveals an overpayment of OPERATING EXPENSES by TENANT, LANDLORD shall promptly refund said overpayment to TENANT. In addition, if any such audit reveals errors in LANDLORD'S favor exceeding three percent (3%) then LANDLORD shall also reimburse TENANT for the cost of the audit.

**ARTICLE FIVE: USE OF PREMISES**

Section 5.01 **Permitted Uses.** TENANT may use the PREMISES only for the PERMITTED USES. LANDLORD agrees to fully cooperate with TENANT in obtaining a beer and wine sales permit. LANDLORD shall indemnify and defend TENANT against any and all claims asserted by third parties claiming infringement of exclusivity or violation of any restrictions in the DECLARATION or otherwise affecting the PROJECT so long as TENANT is using the PREMISES only for one or more of the PERMITTED USES. Nothing in this Article or elsewhere in this LEASE shall be construed as a covenant by TENANT of continuous operations and TENANT shall have no obligation under this LEASE to continuously operate its business in the PREMISES during the LEASE TERM.

Section 5.02 **Manner of Use.** TENANT shall not cause or permit the PREMISES to be used in any way which constitutes a violation of any law, ordinance, or governmental regulation or order or which constitutes a nuisance or waste. TENANT shall obtain and pay for all permits required for TENANT'S occupancy of the PREMISES and, except as otherwise hereinafter provided, shall promptly take all actions necessary to comply with all applicable statutes, ordinances, rules, regulations, orders and requirements regulating the specific use by TENANT of the PREMISES as set forth in Section 1.05 above. Except for TENANT'S obligations set forth above, LANDLORD shall be responsible to comply, at LANDLORD'S sole cost and expense and not as part of the COMMON AREA COSTS, with all laws, regulations, codes and ordinances applicable to the PROJECT or any portion thereof (including, but not limited to, the COMMON AREAS). Without limiting the foregoing, and notwithstanding any other provision of this LEASE, if at any time during the LEASE TERM either the PREMISES or the PROJECT (including, but not limited to, the COMMON AREAS) is not in conformity with any present or future law or regulation relating to the use, occupation or reconstruction thereof (including, without limitation, the Americans with Disabilities Act, earthquake safety codes, fire sprinkler codes, and laws governing the presence or regulation of HAZARDOUS MATERIALS incorporated into the PREMISES or the PROJECT which were not placed there by TENANT) or is subject to any order of any governmental agency ordering any rebuilding, alteration or repair thereof, LANDLORD shall immediately, at its own cost and expense, and without any right of reimbursement from TENANT (unless the work is required because of TENANT'S particular use of the PREMISES (as distinguished from general retail use)), effect such alterations and repairs to the PREMISES or the PROJECT as may be necessary to comply with such laws, regulations, orders or requirements. All such alterations and repairs, if made to the PREMISES, or materially affecting the PREMISES, shall be made in accordance with the plans and specifications approved in writing by TENANT.

Section 5.03 **Signs.** TENANT may, to the maximum extent permitted by law, and at TENANT'S sole cost and expense except to the extent (if any) otherwise specifically provided in this LEASE: (a) install any signage on the exterior walls, storefront, facade and tower of the

PREMISES, including without limitation banners, pennants, copies of TENANT'S newspaper articles, and other signage customarily used in connection the operation of TENANT'S stores; (b) install panels in the second position on both sides of the monument sign as shown on Exhibit "D" attached hereto (provided that the logo, colors, elements and other features of TENANT'S signage on such sign panels are not required to be in accordance with Exhibit "D" and Exhibit "D" is simply for purposes of depicting the size and location of TENANT'S panels on such monument sign; (c) use all portions of any existing non-building signs and both sides of any other existing pylon, pole and monument signs in LANDLORD'S control as approved by LANDLORD, such approval not to be unreasonably withheld, conditioned or delayed; (d) install a panel (or other display) on both sides of any new non-building signage that is installed at or for the benefit of the PROJECT after the date of this LEASE (with the size of TENANT'S display area on such sign being not smaller than the sign area of the largest sign of any tenant in the SHOPPING CENTER, provided that TENANT pays its pro rata cost of such sign); and (e) place grand opening banners and other promotional materials on the PREMISES and in reasonable locations within the COMMON AREAS (collectively, the foregoing allowed signage is referred to as the "TENANT'S SIGNAGE"). TENANT'S permitted signage areas, whether on the PREMISES or otherwise, shall be of no less sign area than the sign area of the largest sign of any tenant in the SHOPPING CENTER. TENANT'S SIGNAGE shall be made, installed, and maintained in a professional manner. LANDLORD shall use reasonable efforts to obtain any required approvals from governmental agencies in connection with any signs desired to be installed by TENANT. LANDLORD shall not change any sign program or criteria filed with the local government without TENANT'S prior written consent. Any future changes in pylon, monument, or other signage located in COMMON AREAS owned or controlled by LANDLORD shall require TENANT'S written approval in its sole discretion, and to the extent LANDLORD has approval rights regarding changes in any signage located in COMMON AREAS not owned or controlled by LANDLORD, LANDLORD shall not approve without first obtaining TENANT'S written approval (which shall be in TENANT'S sole discretion). LANDLORD shall not erect, or permit to be erected, any sign anywhere within the COMMON AREAS owned or controlled by LANDLORD that is more prominent or larger than the signs advertising TENANT'S store nor shall LANDLORD consent to any such sign in the COMMON AREAS not owned or controlled by LANDLORD. For a period of up to sixty (60) days following the expiration or termination of the LEASE TERM, TENANT shall be permitted to place two signs (each not to exceed 20 square feet in area) in prominent places visible from the exterior of the PREMISES informing the public of TENANT'S relocation and other similar information. LANDLORD shall indemnify and defend TENANT against any and all claims asserted by third parties claiming that any of TENANT'S signage rights under this LEASE violate or are prohibited by any agreement pertaining to any portion of the SHOPPING CENTER and by which the PROJECT is bound.

Section 5.04   **Indemnity.**

(a)   **Tenant.** Except for losses, damages and claims arising out of the acts or omissions of LANDLORD or LANDLORD'S agents, contractors or employees or otherwise waived pursuant to Section 4.04(c)(iv), TENANT shall indemnify LANDLORD against and hold LANDLORD harmless from any and all costs, claims, demands or liability arising from:

(i)   TENANT'S use of the PREMISES;

(ii)   the conduct of TENANT'S business or anything else done by TENANT or permitted by TENANT to be done in or about the PREMISES;

(iii)   any DEFAULT by TENANT under this LEASE; or

(iv)   any misrepresentation or breach of warranty by TENANT under this LEASE.

TENANT shall defend LANDLORD against any such cost, claim or liability at TENANT'S expense with counsel reasonably acceptable to LANDLORD.

(b)   **Landlord.** Except for losses, damages and claims to the extent arising out of the acts or omissions of TENANT or TENANT'S agents, contractors or employees or otherwise waived pursuant to Section 4.04(c)(iv), LANDLORD shall indemnify TENANT against and hold TENANT harmless from any and all costs, claims, demands or liability arising from:

(i)   LANDLORD'S ownership or operation of the PREMISES and the PROJECT;

(ii)   the conduct of LANDLORD or anything else done by LANDLORD or permitted by LANDLORD to be done in or about the PREMISES or PROJECT;

Initials: 

          (iii)   any breach or default in the performance of LANDLORD'S obligations under this LEASE;

          (iv)   any misrepresentation or breach of warranty by LANDLORD under this LEASE; or

          (v)   actual or threatened violations of any laws governing or regulating HAZARDOUS MATERIALS within, upon, under, or adjacent to the PREMISES or the PROJECT or other damages, fines, penalties, acts, costs, claims, or liabilities incurred in connection therewith, including, without limitation, the cost of any investigation, remediation, restoration, cleanup and/or abatement.

        LANDLORD shall defend TENANT against any such cost, claim or liability at LANDLORD'S expense with counsel reasonably acceptable to TENANT.

        Section 5.05  **Landlord's Access.** LANDLORD or its agents may enter the PREMISES at reasonable times to inspect the PREMISES; or for any other purpose LANDLORD deems reasonably necessary. LANDLORD shall give TENANT reasonable prior notice (but in no event less than two (2) business days prior notice) of such entry, except in the case of an emergency.

        Section 5.06  **Quiet Possession.** So long as TENANT is not in DEFAULT under this LEASE, TENANT may occupy and enjoy the PREMISES for the full LEASE TERM, subject to the provisions of this LEASE.

        Section 5.07  **Exclusivity; Prohibited Uses; Co-Tenancy.**

        (a)   **Exclusivity.** TENANT shall have the exclusive right to operate a general merchandise store within the PROJECT, provided that the foregoing exclusive shall not apply to any merchandise discount stores being operated within the PROJECT upon the EFFECTIVE DATE, but if any existing tenant desires to change its use to a use which violates the foregoing exclusive and LANDLORD'S consent thereto is required, LANDLORD shall withhold consent. LANDLORD represents and warrants that there are no existing tenants of the PROJECT whose leases permit them to operate in violation of TENANT'S exclusive right without LANDLORD'S consent.

        (b)   **Existing Exclusives and Existing Restrictions.** LANDLORD represents and warrants that attached hereto as Exhibit "E" is a verbatim copy of all exclusive use provisions affecting the PROJECT (the "EXISTING EXCLUSIVES"), as well as a verbatim copy of all conditions, requirements, or restrictions contained in any document affecting title to, or any permit or approval applicable to, the PREMISES, which could restrict or affect TENANT'S use of the PREMISES (the "EXISTING RESTRICTIONS"). LANDLORD represents and warrants that, except as set forth in the list of EXISTING EXCLUSIVES and EXISTING RESTRICTIONS attached hereto as Exhibit "E," there are no exclusives or restrictions of any kind (including, but not limited to, in conditional use permits or recorded covenants and restrictions) which in any way now or hereafter will restrict or otherwise limit TENANT'S ability to sell any specific product or assortment of products which are now or may hereafter be sold as of the date of this LEASE at any of TENANT'S other locations. LANDLORD hereby represents and warrants that there shall not hereafter be any new such exclusives or restrictions entered into or otherwise permitted after the date of this LEASE which would restrict TENANT'S ability to sell any such products or assortment of products.

        (c)   **Prohibited Uses.** Without limitation of the PERMITTED USES under this LEASE, no portion of the PROJECT may be used for any of the following (the "PROHIBITED USES"):

        (i)   Any uses that are not consistent with first class shopping centers in the area of the PREMISES, which shall include, but not be limited to, any uses which include:

        (A)   nude (or partially nude) bars, nightclubs or theaters of any kind
        (B)   massage parlors
        (C)   adult book stores
        (D)   escort services
        (E)   bail bonds or pawn shops
        (F)   the sale of used or second hand products of any kind
        (G)   tattoo parlors
        (H)   adult video stores
        (I)   any use of a questionable moral character
        (J)   indoor swap meets
        (K)   liquor stores
        (L)   non-retail use (except incidental to other permitted uses)

| | | |
|---|---|---|
| (M) | movie theater | |
| (N) | gymnasium, gym, fitness club/center, health club/center, or athletic club/center | |
| (O) | bowling alley | |
| (P) | school | |
| (Q) | call center | |
| (R) | library | |
| (S) | church | |
| (T) | auditorium | |
| (U) | museum | |
| (V) | automobile repair | |
| (W) | automobile sales | |
| (X) | high volume restaurants (provided, however, this clause (X) shall not preclude (i) a high volume restaurant in the PAD BUILDING, or (ii) a REGIONAL OR NATIONAL CHAIN (as defined below) fast food operator such as *McDonalds, Burger King, Carl's Jr.*, or a similar operator at the PROJECT) (as used in this LEASE, a "REGIONAL OR NATIONAL CHAIN" shall be defined as a business operating regionally or nationally under the same trade name with at least twenty-five (25) operating stores) | |
| (Y) | banquet facility (provided, however, this clause (Y) shall not preclude a banquet facility in the PAD BUILDING) | |
| (Z) | bar (except as an incidental part of a REGIONAL OR NATIONAL CHAIN sit-down restaurant with no age restrictions within any part of the restaurant, such as *Chili's* or *Red Robin*), disco or nightclub | |
| (AA) | hotel | |
| (BB) | manufacturing, warehouse or other industrial use (except incidental to other permitted uses) | |
| (CC) | parking intensive uses requiring materially more parking spaces (at any particular time) than most other retail uses at the SHOPPING CENTER | |
| (DD) | entertainment facility (such as Chuck E Cheese, Discovery Zone, Tutor Time, or Leaps and Bounds) | |
| (EE) | any central laundry or dry cleaning plant which processes such laundry or dry cleaning on site | |
| (FF) | mortuary | |
| (GG) | veterinary hospital or animal raising or boarding facility | |
| (HH) | bingo parlor, off-track betting parlor or other gambling facility | |
| (II) | marijuana dispensary | |
| (JJ) | facility for the sale of drug paraphernalia | |
| (KK) | any use which is prohibited under the DECLARATION | |

(ii)    Any use which requires a zoning variance or conditional use permit.

(iii)    Any use which uses the terms "99," "98," "dollar," "cent," "cents," "penny," or any similar terms (whether "spelled out" or in numerical or symbolic form) in any manner as part of a trade name or logo or in any manner as a material portion of any signage or trade dress, specifically excluding, however, TENANT'S use of the PREMISES.

(d)    **Co-Tenancy.**  This LEASE shall be subject to the following co-tenancy requirements for the following retailer(s) (whether individually or collectively, the "ANCHOR TENANT"):

(i)    Stater Bros.

If at any time during the LEASE TERM, either (A) the above-designated ANCHOR TENANT or a REPLACEMENT ANCHOR (defined below) ceases to continuously operate its business within substantially all of its premises at the SHOPPING CENTER (as such premises are identified on the SITE PLAN), or (B) less than eighty percent (80%) of the remaining space in the SHOPPING CENTER (excluding the PREMISES) is occupied and open to the public for business (in either case, a "CO-TENANCY VIOLATION"), then the BASE RENT and all ADDITIONAL RENT shall be converted to the lesser of (x) two percent (2%) of monthly GROSS SALES (defined below), or (y) BASE RENT otherwise due (hereinafter "SUBSTITUTE RENT"), until such time as the CO-TENANCY VIOLATION is cured.  As used herein, a "REPLACEMENT ANCHOR" shall mean a replacement tenant similar to the applicable ANCHOR TENANT that, as reasonably determined by TENANT, and based on historical practice, can be reasonably expected to generate similar customer traffic as the ANCHOR TENANT being replaced.  SUBSTITUTE RENT shall be paid within twenty (20)

days after the expiration of the month in which the sales occurred.  Additionally, if such CO-TENANCY VIOLATION is not cured within twelve (12) months, then TENANT shall have the right to terminate this LEASE upon thirty (30) days written notice delivered to LANDLORD prior to such CO-TENANCY VIOLATION being cured.  If TENANT terminates this LEASE due to such CO-TENANCY VIOLATION not being cured within twelve (12) months, then LANDLORD shall reimburse TENANT for the unamortized portion of TENANT'S leasehold improvements costs (including, without limitation, TENANT'S WORK), which costs shall be amortized on a straight-line basis, without interest, over the useful life thereof (which shall, in no event, be deemed less than ten (10) years for purposes of this LEASE).  As used in this LEASE, the term "GROSS SALES" means gross sales from the PREMISES *minus* (I) cash refunds or credit for merchandise returned if the price of such merchandise was originally included in GROSS SALES, (II) the amount of sales taxes and excise taxes to the extent included in sales, (III) the amount of any governmental rebates, and (IV) the amount of sales representing uncollectible checks or uncollectible credit or charge accounts.  Merchandise transferred from the PREMISES to other stores of TENANT, or merchandise returned for credit to factories or jobbers shall not be included in determining GROSS SALES.

## ARTICLE SIX: CONDITION OF PREMISES; MAINTENANCE, REPAIRS AND ALTERATIONS

Section 6.01  **Condition of Premises.**  LANDLORD shall deliver the PREMISES to TENANT in a clean and good condition and with the LANDLORD'S WORK completed, as set forth in Section 3.04, and with all representations and warranties of LANDLORD set forth below, or elsewhere in this LEASE, true and correct.  LANDLORD represents and warrants to TENANT, as of the date of this LEASE, and again as of the DELIVERY DATE, that:

(a)    the PREMISES and the BUILDING, and the remainder of the PROJECT, in the state existing on the date of this LEASE and in the state existing on the DELIVERY DATE, but without regard to alterations or improvements made by TENANT or the specific use for which TENANT will occupy the PREMISES (as distinguished from general retail use):  (i) does not violate any covenants, restrictions, or other matters of record, or any applicable laws, regulations, orders or requirements (including without limitation any building or other code, regulation or ordinance in effect); (ii) is free from any and all structural defects and/or latent defects (and, without limiting the foregoing, LANDLORD shall, as soon as possible after receiving written notice thereof, cure any such defects); and (iii) has sufficient electrical power and panels to permit operation of TENANT'S store;

(b)    all other utilities (including, without limitation, natural gas, heat, light, power, sewer service, telephone, data, water, refuse disposal and other utilities and services supplied to the PREMISES) are available, with sufficient capacity, at the PREMISES; and

(c)    LANDLORD has disclosed to TENANT in writing any and all conditions, restrictions, or other matters of which LANDLORD is aware (after having made due investigation thereof), including, without limitation, any violations of law or code (or notices alleging any such violation), any environmental contamination, restrictions on utilities, exclusive use restrictions or other restrictions contained in any agreement, permit, instrument, or other matter affecting the PROJECT or any portion thereof, that could affect TENANT'S store design, permitting, construction or use as contemplated by this LEASE.

Without limiting TENANT'S other rights and remedies under this LEASE, in the event it is determined that any of the foregoing covenants or warranties have been violated, then it shall be the obligation of LANDLORD, after written notice from TENANT, to promptly, at LANDLORD'S sole cost and expense, rectify any such violation.

Section 6.02  **Exemption of Landlord from Liability.**  Except to the extent that same shall be the result of (a) the negligence or willful misconduct of LANDLORD or of LANDLORD'S agents, contractors or employees, or (b) LANDLORD'S failure to perform its obligations under the terms of this LEASE, or (c) any misrepresentations made by LANDLORD herein, LANDLORD shall not be liable for any damage or injury to the person, business (or any loss of income therefrom), goods, wares or property of TENANT, TENANT'S employees, invitees, clients, customers or any other person in or on the PREMISES, whether such damage or injury is caused by or results from:  (i) theft, fire, steam, electricity, water, gas or rain; (ii) the breakage, leakage, obstruction or other defects of pipes, sprinklers, wires, appliances, plumbing, air conditioning or lighting fixtures or any other cause; (iii) conditions arising in or about the PREMISES or upon other portions of the PROJECT, or from other sources or places or from new construction or repair of the PREMISES or the PROJECT; or (iv) any act or omission of any other tenant of the PROJECT.

Section 6.03  **Landlord's Maintenance Obligations.**  Except as provided in Article Seven (Damage or Destruction) and Article Eight (Condemnation), LANDLORD shall, at its sole cost and expense and therefore not as part of COMMON AREA COSTS, keep the foundations, roof, roof membrane (including all related flashings, gutters, downspouts, etc.), all

structural portions of the BUILDING (including foundations, the slab (including, without limitation, repair and replacement of floor coverings damaged by subterranean water infiltration due to slab damage), and compliance with earthquake code where such code exists under applicable law), the structural portions of the roof, the structural portions of the roof top sign and the existing COMMON AREAS signs and electrical service thereto, exterior walls (including, without limitation, exterior painting), fire sprinkler system (if any), including the fire monitoring system (provided that if the fire sprinkler system for the PREMISES is shared, TENANT shall pay its pro rata share of the monitoring costs), and utility connections to the BUILDING (water, sewer, electrical, phone, etc.) not installed by TENANT and any sewer backflow devices including required periodic testing of the same, and all other portions of the PROJECT and the BUILDING other than those specific areas described in Section 6.04, in good order, condition and repair. Except in the case of an emergency, LANDLORD shall obtain TENANT'S approval prior to performing any repairs or maintenance to the PREMISES which are required to be performed by LANDLORD pursuant to this LEASE, which approval shall not be unreasonably withheld so long as the same will not unreasonably interfere with TENANT'S business operations at the PREMISES. (If the fire sprinkler system is shared by TENANT and one or more other tenants, then TENANT shall pay its equitable share of the monitoring costs for such system.) LANDLORD shall make repairs under this Section 6.03 within a reasonable time after receipt of written notice from TENANT of the need for such repairs. LANDLORD represents and warrants to TENANT that, as of the DELIVERY DATE, the heating, ventilation, air conditioning, electrical, plumbing and other systems contained within or servicing the PREMISES shall be in good working condition and repair. If LANDLORD fails to commence to meet any obligation under this LEASE, including without limitation Sections 4.05 and 6.03, within a reasonable amount of time after TENANT'S notice thereof (not exceeding fifteen (15) days, except in the case of an emergency or dangerous condition, in which event no notice shall be required), or if once commenced, if LANDLORD shall fail to diligently and expeditiously prosecute the performance of such obligation(s) to completion, then TENANT may, but shall not be obligated to do so, and without waiving any other rights or remedies provided hereunder or by law, perform any portion of LANDLORD'S obligations and deduct all reasonable amounts expended in connection therewith from TENANT'S subsequent financial obligations to LANDLORD.

Section 6.04    **Tenant's Maintenance Obligations.**  Except as provided in Section 5.02, Section 6.03, Article Seven (Damage or Destruction) and Article Eight (Condemnation), TENANT shall perform normal maintenance required to keep all non-structural, interior portions of the PREMISES (and therefore excepting, without limitation, foundations, exterior walls, roofs, sidewalks, and other obligations of LANDLORD, but, notwithstanding anything in the foregoing to the contrary, including the storefront (including doors and plate glass)), in as good order, condition and repair as when received (excepting (a) ordinary wear and tear, (b) damage by fire or other casualty, and (c) repair, maintenance and restoration obligations which are the express obligation of LANDLORD under this LEASE or necessitated by the negligent acts or omissions of LANDLORD or its employees, contractors or agents). In addition, TENANT shall during the LEASE TERM, at its sole cost and expense, have all rubbish removed from the PREMISES. In no event shall OPERATING EXPENSES include any costs and expenses for any of the foregoing repair and maintenance items with respect to any portion of the SHOPPING CENTER (including other premises). TENANT shall fulfill all of TENANT'S obligations under this Section 6.04, except as otherwise provided, at TENANT'S expense. If TENANT fails to maintain, repair or replace the PREMISES as required by this Section 6.04, LANDLORD may, upon fifteen (15) days' prior notice to TENANT (except that no notice shall be required in the case of an emergency), enter the PREMISES and perform such maintenance or repair (including replacement, as needed) on behalf of TENANT; provided that TENANT has not begun such repairs prior to LANDLORD'S entry upon the PREMISES to perform such work. In the event that LANDLORD performs such work on behalf of TENANT, then, subject to Section 12.21, TENANT shall reimburse LANDLORD for reasonable costs incurred in performing such maintenance or repair for which TENANT is responsible promptly upon demand.

Section 6.05    **Alterations, Additions, and Improvements.**

(a)    TENANT shall have the right, during the LEASE TERM, to make: (i) (A) any alterations, additions or improvements (whether structural or non-structural) to the PREMISES which may be required to comply with applicable laws, rules or regulations which may now or hereafter be in effect, and (B) any non-structural alterations, additions, or improvements to the PREMISES, each without LANDLORD'S prior written consent; and (ii) any other alterations, additions, or improvements to the PREMISES with LANDLORD'S prior written consent, which consent shall not be unreasonably withheld, conditioned or delayed. In addition, TENANT, at TENANT'S election, shall have the right to install, at TENANT'S expense, a shopping cart retention system within the parking lot as more particularly set forth in the plan attached hereto as Exhibit "B-1", utilizing wires or other embedded objects as a means of perimeter control, provided that (1) TENANT shall repair any damage caused by such installation, and (2) if such system shall be located on property of any other owners of the SHOPPING CENTER (i.e., on property outside the PROJECT) (whether pursuant to the configuration set forth in Exhibit "B-1" or pursuant to changes thereto), then the prior approval

of such other owners shall be obtained by TENANT (and LANDLORD shall assist and cooperate with TENANT in connection with obtaining such approval, provided that LANDLORD shall not be required to bear any additional cost or expense in connection therewith). All alterations, additions, and improvements shall be done in a good and workmanlike manner, in conformity with all applicable laws and regulations. TENANT'S WORK, as set forth in Exhibit "B," is hereby consented to by LANDLORD. Upon completion of any such work and within a reasonable time after LANDLORD provides TENANT with a notice so requesting, TENANT shall provide LANDLORD with copies of "as built" plans, copies of all constructions contracts, and proof of payment for all labor and materials, to the extent that the same are available to TENANT.

(b)     TENANT shall pay, when due, all claims for labor or materials furnished to TENANT in connection with TENANT'S WORK and/or any other subsequent alterations or improvements made to the PREMISES by TENANT, which claims are or may be secured by any mechanic's or materialman's lien against the PREMISES. TENANT shall not suffer or permit any mechanic's or materialman's lien to be placed against the PREMISES with respect to TENANT'S WORK and/or any other subsequent alterations or improvements made to the PREMISES by TENANT, and in case of any such lien attaching to the PREMISES, TENANT shall cause it to be released and removed of record (by payment, statutory bond or other lawful means) within thirty (30) days after TENANT has notice of such lien.

(c)     TENANT shall give LANDLORD at least twenty (20) days' prior written notice of the commencement of any work on the PREMISES, regardless of whether LANDLORD'S consent to such work is required. LANDLORD may elect to record and post notices of non-responsibility on the PREMISES.

Section 6.06  **Condition upon Termination.**  Upon the termination of this LEASE, TENANT shall surrender the PREMISES to LANDLORD, broom clean and in at least the same condition as received, ordinary wear and tear and damage by casualty excepted. TENANT shall not be obligated to repair any damage which LANDLORD is required to repair under Article Seven or elsewhere under this LEASE. All alterations, additions and improvements shall become LANDLORD'S property and shall be surrendered to LANDLORD upon the expiration or earlier termination of this LEASE, except that TENANT may remove, at any time during the LEASE TERM, any of TENANT'S trade fixtures, machinery, equipment and/or personal property. TENANT shall repair, at TENANT'S expense, any damage to the PREMISES caused by the removal of any such trade fixtures, machinery, equipment and/or personal property.

**ARTICLE SEVEN:**  <u>**DAMAGE OR DESTRUCTION**</u>

Section 7.01  **Partial Damage to Premises.**

(a)     TENANT shall notify LANDLORD in writing immediately upon the occurrence of any damage to the PREMISES. If the PREMISES is only partially damaged (i.e., (i) less than twenty-five percent (25%) of the PREMISES is untenantable as a result of such damage or (ii) less than twenty-five percent (25%) of TENANT'S operations are materially impaired), and if such damage is covered by insurance required to be carried by LANDLORD hereunder or otherwise carried by LANDLORD, this LEASE shall remain in effect and LANDLORD shall repair the damage as soon as reasonably possible. LANDLORD may elect (but is not required) to repair any damage to TENANT'S fixtures, equipment, or improvements. Notwithstanding the foregoing, in the event that (A) twenty-five percent (25%) or more of the PREMISES is untenantable as a result of such casualty, or (B) twenty-five percent (25%) or more of TENANT'S operations in the PREMISES are materially impaired as a result of such casualty, or (C) in TENANT'S reasonable opinion, it would take more than one hundred twenty (120) days after the date of such casualty to restore the PREMISES and for TENANT to reopen for business therein, then TENANT shall have the right to terminate this LEASE, upon notice thereof to LANDLORD.

(b)     If the cause of the damage is not covered by the insurance policies which LANDLORD is obligated to maintain under Section 4.04(b) or otherwise carried by LANDLORD, and if the cost of repairing such damage is less than or equal to an amount equal to the BASE RENT payable by TENANT under the terms of this LEASE for the six (6) month period following the date of such damage and destruction (disregarding any abatement which TENANT may be entitled to under Section 7.04), then LANDLORD shall, subject to Section 7.01(a) above, repair such damage, in which case this LEASE shall remain in full force and effect. If the cost of repairing such damage exceeds an amount equal to the BASE RENT payable by TENANT under the terms of this LEASE for the six (6) month period following the date of such damage and destruction (disregarding any abatement which TENANT may be entitled to under Section 7.04 below), then LANDLORD may elect either to:

(i)     repair the damage as soon as reasonably possible, in which case this LEASE shall remain in full force and effect, or

Initials: 

(ii)    terminate this LEASE by notifying TENANT thereof within thirty (30) days after the date the damage occurred, in which event this LEASE shall terminate as of the earlier of the date which is thirty (30) days after LANDLORD delivers such termination notice or the date on which TENANT vacates the PREMISES (but in no event earlier than the date the damage occurred). Notwithstanding the foregoing, if LANDLORD elects to terminate this LEASE, TENANT may elect to continue this LEASE in full force and effect, in which case TENANT shall repair any damage to the PREMISES and any building in which the PREMISES is located. TENANT shall pay the cost of such repairs, except that upon satisfactory completion of such repairs, LANDLORD shall deliver to TENANT any insurance proceeds received by LANDLORD for the damage repaired by TENANT. TENANT shall give LANDLORD written notice of such election within ten (10) days after receiving LANDLORD'S termination notice, and in such event LANDLORD'S termination notice shall be null and void and LANDLORD shall have no responsibility to repair or replace TENANT'S trade fixtures, inventory, or other personal property, all of which shall be TENANT'S responsibility to handle as TENANT determines in TENANT'S sole discretion.

(c)    If the damage to the PREMISES occurs during the last six (6) months of the LEASE TERM (including any previously exercised option granted pursuant to Section 2.02 above) and such damage will require more than thirty (30) days to repair, or if, in the reasonable opinion of either party hereto, less than twelve (12) months of the LEASE TERM (including any previously exercised option granted pursuant to Section 2.02 above) would remain following completion of the repair of the PREMISES and such damage will require more than thirty (30) days to repair, then either LANDLORD or TENANT may elect to terminate this LEASE as of the date the damage occurred, regardless of the sufficiency of any insurance proceeds. The party electing to terminate this LEASE shall give written notification to the other party of such election within thirty (30) days after TENANT'S notice to LANDLORD of the occurrence of the damage. Notwithstanding anything to the contrary contained herein, in the event of any such damage or destruction to the PREMISES, if TENANT has not yet exercised one of its options to extend the LEASE TERM pursuant to Section 2.02 above, then TENANT shall have thirty (30) days following the date of such damage and destruction, to exercise any such option, in which event LANDLORD shall not be permitted to terminate this LEASE, and any notice from LANDLORD of its intention to terminate this LEASE prior to TENANT'S notice of its intention to exercise such option shall be null and void.

Section 7.02  **Substantial or Total Destruction.**  If the PREMISES is substantially or totally destroyed by any cause whatsoever, and regardless of whether LANDLORD receives any insurance proceeds, this LEASE shall terminate as of the date the destruction occurred. Notwithstanding the preceding sentence, but subject to Sections 7.01(a) and 7.01 (c) above, if the PREMISES can be rebuilt within one hundred twenty (120) days after the date of destruction, LANDLORD may elect to rebuild the PREMISES, in which case LANDLORD shall, at LANDLORD'S sole cost and expense, rebuild the PREMISES within said 120-day period and this LEASE shall remain in full force and effect. LANDLORD shall notify TENANT of such election within thirty (30) days after TENANT'S notice of the occurrence of total or substantial destruction. If LANDLORD elects to rebuild and thereafter fails to complete such rebuilding within said 120-day period, then TENANT may elect to terminate this LEASE by giving notice thereof to LANDLORD prior to LANDLORD completing such rebuilding.

Section 7.03  **Total Destruction of the Project or Partial Damage to the Shopping Center.**  Notwithstanding anything to the contrary herein contained, in the event of a total destruction of the PROJECT or a partial destruction of twenty-five (25%) or more of the SHOPPING CENTER in a location or manner that materially impacts (a) TENANT'S use and occupancy of the PREMISES (which shall include, without limitation, any impediment, prevention, or other adverse effect upon, the ingress and egress (pedestrian and vehicular) to and from the PREMISES, or to the loading areas servicing the PREMISES, or between the PREMISES or the loading areas and the adjacent streets, or between the PREMISES and any of the parking areas or other retail businesses in the SHOPPING CENTER), or (b) the visibility of the PREMISES or of any signs for the PREMISES or TENANT'S business operated therein (whether on the PREMISES or in the COMMON AREAS) from either adjoining streets or parking areas, or (c) TENANT'S business operations within the PREMISES, whether or not such destruction is insured against and whether or not the PREMISES are partially or totally destroyed, TENANT may elect to terminate this LEASE by giving LANDLORD notice thereof within thirty (30) days following the date of such casualty, in which event this LEASE shall cease and terminate as of the earlier of the date which is thirty (30) days after TENANT delivers such termination notice or the date on which TENANT vacates the PREMISES (but in no event earlier than the date the damage occurred).

Section 7.04  **Temporary Reduction of Rent.**  If the PREMISES is damaged or destroyed and LANDLORD or TENANT repairs or restores the PREMISES pursuant to the provisions of this Article Seven, any BASE RENT and ADDITIONAL RENT payable during the period of such damage, repair and/or restoration (including a reasonable time for TENANT to reopen the PREMISES) shall be reduced in proportion to the amount of square footage damaged

or destroyed. In the event that, in TENANT'S business judgment, it is impossible or impractical to operate its business in the PREMISES in the ordinary course in that portion of the PREMISES not so damaged or destroyed, then all BASE RENT and ADDITIONAL RENT shall abate until the PREMISES have been repaired and restored. In the event either LANDLORD or TENANT elects to terminate this LEASE pursuant to the provisions of this Article 7, any BASE RENT and ADDITIONAL RENT payable during the period from and after such damage until the effective date of such termination shall be reduced or otherwise abated in accordance with the foregoing provisions of this Section 7.04.

Section 7.05  **Landlord's Termination Right.**  Notwithstanding anything to the contrary in this LEASE, LANDLORD shall only be permitted to exercise its termination rights under this Article 7 if LANDLORD is also terminating the leases of all other similarly situated tenants occupying space in the PROJECT where LANDLORD has the right under such leases to so terminate the same.

## ARTICLE EIGHT: <u>CONDEMNATION</u>

LANDLORD represents and warrants to TENANT that, as of the date of this LEASE, LANDLORD is not aware of any threatened or pending CONDEMNATION (as defined below) of any portion of the SHOPPING CENTER.  If all or any portion of the PREMISES is taken under the power of eminent domain ("CONDEMNATION"), this LEASE shall terminate as to the part taken on the date the condemning authority takes title or possession (hereinafter referred to as the "CONDEMNATION DATE").  Upon the CONDEMNATION of more than twenty percent (20%) of the floor area of the BUILDING or the PREMISES, then TENANT may terminate this LEASE as of the CONDEMNATION DATE, by delivering written notice to LANDLORD within ten (10) days after receipt of written notice of such CONDEMNATION (or in the absence of such notice, within ten (10) days after the CONDEMNATION DATE). If, in TENANT'S judgment, TENANT'S use has been materially impaired by any CONDEMNATION hereunder then TENANT may terminate this LEASE by delivering written notice thereof to LANDLORD within ten (10) days after receipt of written notice of such CONDEMNATION (or in the absence of such notice, within ten (10) days after the CONDEMNATION DATE).  If TENANT does not terminate this LEASE as hereinabove provided, this LEASE shall remain in effect as to the portion of the PREMISES not taken, except that the BASE RENT and ADDITIONAL RENT shall be reduced in proportion to the reduction in the floor area of the PREMISES. Any award for the CONDEMNATION of all or any part of the PREMISES or the PROJECT shall be the property of LANDLORD; provided, however, that TENANT shall be entitled to any award for, or to bring an action for a separate award for, the following:

(a)  loss of or damage to TENANT'S trade fixtures, personal property and tenant improvements that have been paid for by TENANT;

(b)  the value of the leasehold estate (i.e., the leasehold bonus value);

(c)  relocation expenses incurred by TENANT as a result of such CONDEMNATION; and

(d)  loss of business and good will.

In the event that this LEASE is not terminated by reason of such CONDEMNATION, LANDLORD shall to the extent of award of damages received by LANDLORD in connection with such CONDEMNATION, repair any damage to the PREMISES caused by such CONDEMNATION.

## ARTICLE NINE: <u>ASSIGNMENT AND SUBLETTING</u>

During the LEASE TERM, TENANT shall have the right, without LANDLORD'S consent, to assign this LEASE or sublet all or part of the PREMISES for any of the PERMITTED USES.  In the event of any such assignment or subletting, TENANT shall not be released of liability under this LEASE; provided, however, TENANT shall be released from all liability under this LEASE in the event of an assignment of this LEASE to an assignee having a tangible, financial net worth in excess of One Hundred Million Dollars ($100,000,000.00), provided such assignee assumes TENANT'S obligations under this LEASE from TENANT arising from and after the date of the assignment. Promptly following any such assignment or subletting, TENANT shall notify LANDLORD of the name and address of such subtenant or assignee.  Any such subletting or assignment shall be subject to all of the terms of this LEASE, including, without limitation, any restrictions pertaining to the use of the PREMISES. LANDLORD agrees that in the event of any subletting to a subtenant having a tangible, financial net worth in excess of Twenty Five Million Dollars ($25,000,000), LANDLORD shall promptly, upon request, enter into a Non-Disturbance and Attornment Agreement in a form reasonably acceptable to LANDLORD and such subtenant. Additionally, without limitation or waiver of the foregoing provisions of this Article Nine, in no event shall an initial public equity or debt offering by TENANT nor the trading of any

equity or debt securities of TENANT on a public securities exchange be deemed an assignment or transfer of this LEASE nor shall such offering or trading be deemed to require the consent of LANDLORD.

**ARTICLE TEN: DEFAULTS; REMEDIES**

Section 10.01 **Defaults.** The occurrence of any of the following shall be deemed to be a "DEFAULT" under this LEASE:

(a)    TENANT'S failure to pay rent or any other charge due within five (5) business days following written notice from LANDLORD that such sum is past due;

(b)    TENANT'S failure to perform any of TENANT'S non-monetary obligations under this LEASE for a period of thirty (30) days after written notice from LANDLORD of such failure; provided that if more than thirty (30) days are required to complete such performance, TENANT shall not be in DEFAULT if TENANT commences such performance within the thirty (30) day period and thereafter diligently pursues its completion;

(c)    if TENANT makes a general assignment or general arrangement for the benefit of creditors;

(d)    if a petition for adjudication of bankruptcy or for reorganization or rearrangement is filed by or against TENANT and is not dismissed within sixty (60) days;

(e)    if a trustee or receiver is appointed to take possession of substantially all of TENANT'S assets located at the PREMISES or of TENANT'S interest in this LEASE and possession is not restored to TENANT within sixty (60) days; or

(f)    if substantially all of TENANT'S assets located at the PREMISES or of TENANT'S interest in this LEASE is subjected to attachment, execution or other judicial seizure which is not discharged within sixty (60) days.

All notices which are sent to TENANT pursuant to the terms of this LEASE which are prerequisite to a DEFAULT shall be ink signed and shall contain the words "**NOTICE OF DEFAULT**" in prominent, bold all cap letters in order to be effective.

Section 10.02 **Remedies.**    On the occurrence of any DEFAULT by TENANT, LANDLORD may, at any time thereafter, with or without notice or demand and without limiting LANDLORD in the exercise of any right or remedy which LANDLORD may have:

(a)    Terminate TENANT'S right to possession of the PREMISES by any lawful means, in which case this LEASE shall terminate and TENANT shall immediately surrender possession of the PREMISES to LANDLORD; provided, however, LANDLORD shall not have the right to terminate this LEASE due to a non-monetary DEFAULT by TENANT unless TENANT has failed to cure such non-monetary DEFAULT within thirty (30) days after a second written notice from LANDLORD specifying the non-monetary DEFAULT.  In such event, LANDLORD shall, subject to Section 12.21, be entitled to recover from TENANT all damages incurred by LANDLORD by reason of TENANT'S DEFAULT, including:

(i)    the worth at the time of the award of the unpaid BASE RENT, ADDITIONAL RENT and other charges which LANDLORD had earned at the time of the termination;

(ii)    the worth at the time of the award of the amount by which the unpaid BASE RENT, ADDITIONAL RENT and other charges which LANDLORD would have earned after termination until the time of the award exceeds the amount of such rental loss that TENANT proves LANDLORD could have reasonably avoided;

(iii)    the worth at the time of the award of the amount by which the unpaid BASE RENT, ADDITIONAL RENT and other charges which TENANT would have paid for the balance of the LEASE TERM after the time of award exceeds the amount of such rental loss that TENANT proves LANDLORD could have reasonably avoided; and

(iv)    any other amount necessary to compensate LANDLORD for all the detriment proximately caused by TENANT'S DEFAULT under this LEASE or which in the ordinary course of things would be likely to result therefrom, including, but not limited to, any costs or expenses LANDLORD incurs in maintaining or preserving the PREMISES after such DEFAULT, the cost of recovering possession of the PREMISES, expenses of reletting, including necessary renovation or alteration of the PREMISES, LANDLORD'S reasonable attorneys' fees incurred in connection therewith, and any real estate commission paid or payable.

As used in subparts (i) and (ii) above, the "worth at the time of the award" is computed by allowing interest on unpaid amounts at the rate of ten percent (10%) per annum, or such lesser amount as may then be the maximum lawful rate. As used in subpart (iii) above, the "worth at the time of the award" is computed by discounting such amount at the discount rate of the Federal Reserve Bank of San Francisco at the time of the award, plus one percent (1%).

(b)    Maintain TENANT'S right to possession, in which case this LEASE shall continue in effect whether or not TENANT has abandoned the PREMISES. In such event, LANDLORD shall be entitled to enforce all of LANDLORD'S rights and remedies under this LEASE, including the right to recover the rent as it becomes due (but LANDLORD shall have the obligation to use commercially reasonable efforts to mitigate its damages).

(c)    Notwithstanding any other provision of this LEASE, LANDLORD hereby waives the benefit of any statutory, decisional or other right or rule which would permit LANDLORD to obtain possession of the PREMISES prior to entry of a judgment of a court of competent jurisdiction (which may be a judgment obtained following any summary proceeding in unlawful detainer or otherwise) awarding possession of the PREMISES to LANDLORD.

(d)    Notwithstanding anything to the contrary contained herein, LANDLORD hereby waives any statutory right to a lien on any personal property or fixtures contained in the PREMISES that LANDLORD may have.

Section 10.03 **Landlord's Default**. In the event that LANDLORD shall fail to perform any obligation required to be performed by it as set forth in this LEASE, and such failure shall continue for a period of thirty (30) days after receipt of written notice from TENANT specifying such failure, then LANDLORD shall be in default hereunder, provided that, if the nature of LANDLORD'S obligation is such that more than thirty (30) days are required for performance, then LANDLORD shall not be in default if LANDLORD commences performance within such 30 day period and thereafter diligently prosecutes same to completion. In the event that LANDLORD shall be in default under the terms of this LEASE, then TENANT shall have the right, in addition to any other remedies it may have at law or in equity, to (a) remedy any default by LANDLORD under this LEASE and deduct from the next payments of rent due under this LEASE any amounts incurred by TENANT in so remedying any such default by LANDLORD, or (b) terminate this LEASE upon written notice thereof to LANDLORD.

Section 10.04 **Cumulative Remedies**. The exercise of any right or remedy hereunder by either party under this Article Ten shall not prevent such party from exercising any other right or remedy hereunder.

**ARTICLE ELEVEN: PROTECTION OF LENDERS**

Section 11.01 **Subordination**. LANDLORD shall have the right to subordinate this LEASE to any ground lease, deed of trust or mortgage encumbering the PREMISES, any advances made on the security thereof and any renewals, modifications, consolidations, replacements or extensions thereof, whenever made or recorded; provided that the holder of such encumbrance enters into a non-disturbance agreement with TENANT in a form which is reasonable and acceptable to TENANT. In the event that TENANT is provided with a non-disturbance agreement in a form reasonably acceptable to TENANT, then TENANT shall cooperate with LANDLORD and any lender which is acquiring a security interest in the PREMISES or this LEASE and shall execute such further commercially reasonable documents and assurances as such lender may reasonably require, provided that TENANT'S obligations under this LEASE shall not be increased in any material way (the performance of ministerial acts shall not be deemed material), nor shall TENANT'S rights under this LEASE be (a) reduced, diminished or limited, or (b) otherwise affected in any material way. TENANT'S right to quiet possession of the PREMISES during the LEASE TERM shall not be disturbed so long as TENANT is not in DEFAULT under this LEASE. LANDLORD shall, promptly following the EFFECTIVE DATE, and as a condition to the DELIVERY DATE, cause each and every holder of an existing ground lease, deed of trust or mortgage encumbering the PREMISES or the PROJECT to enter into a non-disturbance agreement with TENANT in the form attached hereto as Exhibit "F" or otherwise in a form reasonably acceptable to TENANT. LANDLORD represents and warrants to TENANT that, upon satisfaction of the ACQUISITION CONTINGENCY, LANDLORD shall not have any outstanding obligations which are secured by the real property of which the PREMISES is a part, except a deed of trust in favor of Cathay Bank (the "EXISTING ENCUMBRANCE").

Section 11.02 **Attornment**. If LANDLORD'S interest in the PREMISES is acquired by any ground lessor, beneficiary under a deed of trust, mortgagee, or purchaser at a foreclosure sale, TENANT shall attorn to the transferee of or successor to LANDLORD'S interest in the PREMISES and recognize such transferee or successor as LANDLORD under this LEASE, provided that TENANT was previously given a non-disturbance agreement in a form reasonably acceptable to TENANT in connection with such ground lease, deed of trust or mortgage, as the case may be.

Section 11.03 **Signing of Documents.** TENANT shall sign and deliver any commercially reasonable instrument or documents necessary or appropriate to evidence any such attornment or subordination or agreement to do so.

Section 11.04 **Estoppel Certificates.** Upon the written request of either party hereto, the other party shall execute, acknowledge and deliver to the requesting party a written statement certifying:

(a) that none of the terms or provisions of this LEASE have been changed (or if they have been changed, stating how they have been changed);

(b) that this LEASE has not been canceled or terminated;

(c) the last date of payment of the BASE RENT and other charges and the time period covered by such payment;

(d) that the requesting party is not, to the certifying party's actual knowledge, in default under this LEASE (or, if the requesting party is claimed to be in default, stating why); and

(e) that this LEASE is in full force and effect.

Such statement shall be delivered to the requesting party within thirty (30) days after receipt of such request. The requesting party may give any such statement to any prospective purchaser of the PREMISES (or of all or any part of TENANT's business or interest in the PREMISES or this LEASE, as the case may be) or encumbrancer of the PREMISES. Such purchaser or encumbrancer may rely conclusively upon such statement as true and correct.

## ARTICLE TWELVE: MISCELLANEOUS PROVISIONS

Section 12.01 **Non-Discrimination.** TENANT promises, and it is a condition to the continuance of this LEASE, that there will be no discrimination against, or segregation of, any person or group of persons on the basis of race, color, sex, creed, national origin or ancestry in the leasing, subleasing, transferring, occupancy of the PREMISES or any portion thereof.

Section 12.02 **Severability.** A determination by a court of competent jurisdiction that any provision of this LEASE or any part thereof is illegal or unenforceable shall not cancel or invalidate the remainder of such provision or this LEASE, which shall remain in full force and effect.

Section 12.03 **Interpretation.** The captions of the Articles or Sections of this LEASE are to assist the parties in reading this LEASE and are not a part of the terms or provisions of this LEASE. Whenever required by the context of this LEASE, the singular shall include the plural and the plural shall include the singular. The masculine, feminine and neuter genders shall each include the other. No provision of this Agreement is to be interpreted for or against either party because that party or that party's legal representative drafted such provision. As used in this LEASE, "business day" shall mean and refer to a day on which both federally-insured banks and governmental offices are all open for business.

Section 12.04 **Incorporation of Prior Agreements; Modifications.** This LEASE is the only agreement between the parties pertaining to the lease of the PREMISES and no other agreements are effective. All amendments to this LEASE shall be in writing and signed by all parties. Any other attempted amendment shall be void.

Section 12.05 **Notices.** All notices required or permitted under this LEASE shall be in writing and shall be personally delivered, sent by nationally recognized overnight carrier, or sent by certified mail, return receipt requested, postage prepaid. Notices to TENANT shall be delivered to the address specified in Section 1.02. Notices to LANDLORD shall be delivered to the address specified in Section 1.01. In addition, the parties may each designate, in writing, up to one (1) additional person at a time during the LEASE TERM to whom simultaneous notice shall be given by the other party. All notices shall be effective upon delivery. Either party may change its notice address, or the notice address for the additional person whom it has designated as hereinabove provided, upon written notice to the other party; provided, however, in no event shall either party be permitted to designate a post office box as its notice address and each party's notice address shall at all times be a physical address. Notwithstanding anything to the contrary contained herein, notices shall not be deemed delivered for purposes of this Section 12.05 if sent by facsimile, electronic mail or any other electronic means.

Section 12.06 **Waivers.** All waivers must be in writing and signed by the waiving party. LANDLORD'S failure to enforce any provision of this LEASE or its acceptance of rent shall not

be a waiver and shall not prevent LANDLORD from enforcing that provision or any other provision of this LEASE in the future.

Section 12.07 **No Recordation.** Neither party shall record this LEASE without prior written consent from the other party. However, either LANDLORD or TENANT may require that a "Short Form" memorandum of this LEASE executed by both parties be recorded. The party requiring such recording shall pay the applicable recording fees.

Section 12.08 **Binding Effect; Choice of Law.** This LEASE binds and inures to the benefit of any party who legally acquires any rights or interest in this LEASE from LANDLORD or TENANT. However, LANDLORD shall have no obligation to TENANT'S successor unless the rights or interests of TENANT'S successor are properly acquired in accordance with the terms of this LEASE. The laws of the state in which the PREMISES is located shall govern this LEASE.

Section 12.09 **Corporate Authority; Partnership Authority.** If LANDLORD or TENANT is a corporation, each person signing this LEASE on behalf of such party represents and warrants that he has full authority to do so (without the consent or approval of any other person or entity) and that this LEASE binds the corporation. If LANDLORD or TENANT is a partnership, each person or entity signing this LEASE for such party represents and warrants that he or it is a general partner of the partnership, that he or it has full authority to sign for the partnership (without the consent or approval of any other person or entity) and that this LEASE binds the partnership and all general partners of the partnership. If LANDLORD or TENANT is a limited liability company, each person or entity signing this LEASE for such party represents and warrants that he or it is a manager or authorized member of the company, that he or it has full authority to sign for the company (without the consent or approval of any other person or entity) and that this LEASE binds the company.

Section 12.10 **Execution of Lease.** This LEASE may be executed in counterparts and, when all counterpart documents are executed, the counterparts shall constitute a single binding instrument.

Section 12.11 **Survival.** All representations and warranties of LANDLORD and TENANT expressly set forth in this LEASE shall survive the termination of this LEASE.

Section 12.12 **Confidentiality.** The parties hereto shall keep this LEASE and all documents delivered pursuant to this LEASE strictly confidential, except as deemed reasonably necessary for bona fide lenders, prospective purchasers, governmental entities, accountants, legal advisers, etc.

Section 12.13 **Right of First Offer to Lease.** If LANDLORD determines to let (prior to the expiration of this LEASE) all or any part of any premises adjacent to the PREMISES (with a desire to market the property in question for lease, by the receipt of an unsolicited offer, or otherwise), LANDLORD shall notify TENANT of the terms on which LANDLORD is willing to lease (which shall be commercially reasonable). If TENANT, within ten (10) business days after receipt of LANDLORD'S notice, indicates in writing its agreement to lease the applicable property on the terms stated in LANDLORD'S notice, LANDLORD shall lease the applicable property to TENANT on the terms stated in the notice. If TENANT does not indicate its agreement within ten (10) business days, LANDLORD thereafter shall have the right to lease the applicable property to a third party on substantially the same terms stated in the notice (which shall not be for a price less than 90% of the price set forth in LANDLORD'S notice to TENANT). If LANDLORD does not lease the applicable property within one hundred twenty (120) days on substantially the same terms stated in the notice (which shall not be for a price of less than 90% of the original price specified in LANDLORD'S notice to TENANT), any further transaction shall be deemed a new determination by LANDLORD to lease the applicable property and the provisions of this Section shall be applicable.

Section 12.14 **Consent/Duty to Act Reasonably.** All requests for consent or approval required or permitted under this LEASE shall be made in writing and in reasonable detail and otherwise in the manner required for notices hereunder. No such requests for consent or approval shall be unreasonably refused, conditioned or delayed. Any refusal of any such request for consent or approval shall also be made in writing and otherwise in the manner required for notices hereunder and shall identify, in reasonable detail, the reasons for such refusal. Without affecting the generality of this Section 12.14, unless otherwise specifically stated in this LEASE, if any such request for consent or approval shall not be refused within ten (10) business days after the making thereof, then such consent or approval shall be deemed granted. LANDLORD and TENANT shall act reasonably and in good faith and take no action which might result in the frustration of the reasonable expectations of a sophisticated lessor or lessee concerning the benefits and use enjoyed under this LEASE.

Section 12.15 **Brokers.** Each of the parties represents and warrants to the other that it has dealt with no broker, other than as set forth in Section 1.07, in connection with this LEASE,

and, insofar as it knows, no other broker or other person is entitled to any commission or fee in connection with this LEASE. LANDLORD represents and warrants to TENANT that TENANT shall have no responsibility regarding any agreement made between LANDLORD and any broker and that TENANT shall have no responsibility for the payment of any commission or fee. Each of the parties hereby indemnifies the other against any commission or fee such indemnifying party may have incurred in connection with this LEASE (except TENANT shall not have any obligation to indemnify LANDLORD for any commission or fee which is LANDLORD'S responsibility to pay pursuant to the express terms of this LEASE).

Section 12.16 **Legal Proceedings.** If TENANT shall be in DEFAULT under this LEASE or if LANDLORD shall be in breach or default under this LEASE, such party (the "DEFAULTING PARTY") shall reimburse the other party (the "NONDEFAULTING PARTY") upon demand for any costs or expenses that the NONDEFAULTING PARTY reasonably incurs in connection with any breach or default of the DEFAULTING PARTY under this LEASE, whether or not suit is commenced or judgment entered. Such costs shall include actual legal fees and costs incurred for the negotiation of a settlement, enforcement of rights or otherwise. Furthermore, if any action for breach of or to enforce the provisions of this LEASE is commenced, the court in such action shall award to the prevailing party, a reasonable sum as attorneys' fees and costs. The losing party in such action shall pay such attorneys' fees and costs.

Section 12.17 **Tenant Allowance.** LANDLORD shall provide TENANT with a fixed amount of Ten Dollars ($10.00) per square foot of the PREMISES as a tenant improvement allowance ("TI ALLOWANCE"), which TI ALLOWANCE shall be paid to TENANT within thirty (30) days after TENANT'S demand. If the TI ALLOWANCE is not paid by LANDLORD within such 30-day period, then any amount unpaid may be deducted by TENANT from the BASE RENT and ADDITIONAL RENT due under this LEASE until the TI ALLOWANCE is fully recovered.

Section 12.18 **Successors and Assigns.** All agreements, covenants, rights and liabilities contained herein shall be binding upon and shall inure to the benefit of the respective parties hereto, and their several respective heirs, executors, administrators, successors and assigns.

Section 12.19 **Early Termination.** If, after the PREMISES has been open by the TENANT for twenty-four (24) months, TENANT'S GROSS SALES during any MEASURING PERIOD (defined below) are less than Four Million Five Hundred Thousand Dollars ($4,500,000.00), TENANT may terminate this LEASE upon not less than one hundred eighty (180) days advance written notice, and provided that such termination shall not be effective any sooner than the fifth (5th) anniversary, and no later than the sixth (6th) anniversary, of the DELIVERY DATE. The term "MEASURING PERIOD" means any consecutive twelve (12) calendar month period during the LEASE TERM, provided, however, that the first MEASURING PERIOD is the period commencing on the first day of the 25th month, and ending on the last day of the 36th month, of the LEASE TERM. A MEASURING PERIOD shall be tolled by the length of any of the following events: (a) any good faith discontinuance of business at the PREMISES occasioned by a FORCE MAJEURE EVENT; (b) cessation of operations not to exceed ninety (90) days in connection with a transfer of possession caused by a permitted assignment or sublet; (c) any discontinuance not to exceed sixty (60) days in connection with a remodeling; or (d) a period not to exceed five (5) days per year to conduct inventory. If TENANT terminates this LEASE pursuant to this Section 12.19, then TENANT shall, by no later than the effective date of such termination, reimburse LANDLORD for the unamortized portion of the leasing commissions incurred by LANDLORD for this LEASE and the unamortized portion of the TI ALLOWANCE (computed in each case over the INITIAL LEASE TERM on a straight-line basis, without interest).

Section 12.20 **Hazardous Materials.**

(a)     As used in this LEASE, the term "HAZARDOUS MATERIALS" means any flammable items, explosives, radioactive materials, and any other substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "toxic substances" or similar term now or subsequently regulated under any applicable federal, state or local laws or regulations including, without limitation, petroleum-based products, paints, solvents, lead, cyanide, DDT, printing inks, acids, pesticides, ammonia compounds and other chemical products, asbestos, PCBs, and similar compounds, and any other products and materials which are subsequently found to have adverse effects on the environment or the health and safety of persons.

(b)     Except as otherwise provided herein, TENANT shall not cause (or permit its agents, employees or contractors to cause) any HAZARDOUS MATERIAL to be generated, produced, brought upon, used, stored, treated or disposed of in or about the PREMISES, the PROJECT or the property on which the PROJECT is located, without the prior written consent of LANDLORD, which shall not be unreasonably withheld. In addition, TENANT shall not cause or permit an underground storage tank to be installed under the PREMISES or the

PROJECT without the prior written consent of LANDLORD, which consent shall be in LANDLORD'S sole and absolute discretion. Notwithstanding anything to the contrary contained herein, TENANT shall be permitted to store, use and dispose of, in the PREMISES, such HAZARDOUS MATERIALS which are incidental and customary to the operation of TENANT'S business, or which TENANT sells as a matter of course at other 99¢ Only Stores, provided that TENANT shall comply with all applicable laws, rules and regulations in the storage, use and disposal of such HAZARDOUS MATERIALS. TENANT shall indemnify and hold LANDLORD, its agents and employees, harmless from any and all costs, liabilities, claims, expenses, penalties, and damages of any kind, including, but not limited to, reasonable attorneys' fees and the cost of any investigation, remediation, restoration, cleanup and/or abatement which is necessary as a result of TENANT'S violation of this Section.

(c)    LANDLORD represents and warrants that (i) there are no HAZARDOUS MATERIALS in, on or about the PREMISES or the PROJECT, (ii) LANDLORD has not caused or permitted, and shall not cause or permit, any HAZARDOUS MATERIALS to be brought onto the PREMISES or the SHOPPING CENTER. LANDLORD shall indemnify and hold TENANT and TENANT'S agents and employees harmless from any and all costs, liabilities, claims, expenses, penalties, and damages of any kind including, but not limited to, attorneys' fees and the cost of any investigation, remediation, restoration, cleanup and/or abatement which is necessary as a result of LANDLORD'S violation of this Section. In addition, LANDLORD shall:  (A) be responsible (at no cost to TENANT) for the abatement of any HAZARDOUS MATERIALS from the PROJECT for which TENANT is not responsible under Section 12.20(b), including, without limitation, any migration of HAZARDOUS MATERIALS onto, upon or under the PREMISES which is not caused by TENANT; and (B) indemnify, defend (with counsel reasonably acceptable to TENANT) and hold TENANT and TENANT'S agents, employees, contractors and invitees harmless from any damage to TENANT'S and its agents', employees', contractors' and invitees' property and all other out of pocket expenses incurred by any of them (including, without limitation, reasonable attorneys' fees) and/ or claims against any of them by third parties, arising out of the existence of such HAZARDOUS MATERIALS. In the event that TENANT closes its business in the PREMISES as a result of the existence of HAZARDOUS MATERIALS in the PREMISES or the work associated therewith, then, provided that the existence thereof is not caused by TENANT, then TENANT shall not be required to pay BASE RENT or TENANT'S payment of ADDITIONAL RENT until such abatement is complete.

(d)    The obligations under this Section 12.20 shall survive the expiration or earlier termination of this LEASE.

Section 12.21 **Limitation on Payments by Tenant.**  Notwithstanding anything to the contrary contained in this LEASE, in no event shall TENANT be required to pay to LANDLORD any amounts which TENANT would otherwise be obligated to pay hereunder if LANDLORD notifies TENANT of such amounts more than twelve (12) months after LANDLORD had knowledge that the obligation for such amounts shall have accrued.

Section 12.22 **Sale of the Project.**  In the event that LANDLORD shall desire to sell or transfer all or any portion of the PROJECT during the LEASE TERM, LANDLORD shall first, at its sole cost and expense, record all rights of TENANT under this LEASE and any and all restrictions set forth in this LEASE with respect to the portion of the PROJECT being so sold or transferred, including, but not limited to, parking, access, signage, use of the COMMON AREAS, any restrictions on construction within the PROJECT and all restrictions on uses which apply to the PROJECT.  In addition, unless already covered by the DECLARATION, LANDLORD shall, upon such sale or transfer, enter into an agreement with such purchaser or transferee providing for the maintenance of the PROJECT, including, but not limited to, the responsibility for the maintenance of the COMMON AREAS thereon, if any, and for the maintenance of insurance therefor.

Section 12.23 **Right of First Refusal to Purchase.**  INTENTIONALLY OMITTED

Section 12.24 **Force Majeure.**  Other than for LANDLORD'S and TENANT'S obligations under this LEASE that can be performed by the payment of money , whenever a period of time is herein prescribed for action to be taken by either party hereto, such party shall not be liable or responsible for, and there shall be excluded from the computation of any such period of time, any delays due to any of the following events (a "FORCE MAJEURE EVENT"): (a) Acts of God, (b) strike or other such labor difficulties not caused by the negligent or willful act or omission of the party seeking relief due to a FORCE MAJEURE EVENT, its agents, employees, contractors, etc. and not specific to any labor issue existing only at the PREMISES, (c) extraordinary weather conditions greatly exceeding norms for the greater metropolitan area where the PREMISES are located, or (d) extraordinary scarcity of or inability to obtain supplies, parts or employees to furnish such services with no practical alternatives therefor.  The party seeking relief due to a FORCE MAJEURE EVENT shall provide the other party with written notice of the occurrence of the FORCE MAJEURE EVENT promptly after the occurrence

thereof, and shall comply with its respective obligation(s) as soon as the cause for the delay has been eliminated.

Section 12.25 **Interruption Event.** Notwithstanding the foregoing or anything to the contrary in this LEASE, in the event that: (a) TENANT is prevented from using the PREMISES or any portion thereof, or TENANT'S operations in the PREMISES are materially adversely affected, because of (i) the negligent acts of LANDLORD or its employees, agents or contractors, (ii) any construction, repair, maintenance or alteration performed by LANDLORD after the DELIVERY DATE, (iii) LANDLORD'S failure to perform any repair, maintenance or alteration required to be performed by LANDLORD under this LEASE, and/or (iv) the presence of HAZARDOUS MATERIALS (as defined in Section 12.20) in, on, or around the PROJECT in violation of applicable laws, regulations, ordinances, and codes which poses a material health risk to TENANT'S employees or customers at the PREMISES (each such set of circumstances as set forth in such clauses (i) - (iv) of this item (a) shall be referred to as an "INTERRUPTION EVENT"); (b) TENANT notifies LANDLORD of such INTERRUPTION EVENT in writing (the "INTERRUPTION NOTICE"); (c) such INTERRUPTION EVENT does not arise as a result of the negligent acts of TENANT or its employees, agents or contractors; (d) such INTERRUPTION EVENT is not caused by a fire or other casualty (in which event the provisions of Article Seven shall apply); and (e) such INTERRUPTION EVENT continues for more than twenty-four (24) hours after TENANT'S delivery of the INTERRUPTION NOTICE; then the RENT shall abate proportionately to the degree of the adverse effect on TENANT'S use of the PREMISES until such INTERRUPTION EVENT ceases to exist (and shall fully abate if TENANT is unable to operate for business from the PREMISES in TENANT'S sole but reasonable discretion). In the event that the INTERRUPTION EVENT continues for more than thirty (30) days after TENANT'S delivery of the INTERRUPTION NOTICE, then TENANT shall have the right to terminate this LEASE at any time thereafter but prior to the date the INTERRUPTION EVENT ceases to exist.

**[SIGNATURES FOLLOW ON NEXT PAGE]**

**99¢ ONLY STORES**
**STANDARD MULTI-TENANT FORM LEASE**
**(NWC OF 29 PALMS HWY. & BALSA AVE., YUCCA VALLEY, CA)**

[SIGNATURE PAGE]

IN WITNESS WHEREOF, LANDLORD and TENANT have executed this LEASE as of the respective dates set forth below.

**"LANDLORD":**       YUCCA DYNASTY L.P.,
                      a California limited partnership

                      By:    CBD Cerritos, Inc.,
                             a California corporation,
                             its general partner

                             By:    _____
                                    Name:  _____
                                    Its:   _____

                             By:    _____
                                    Name:  _____
                                    Its:   _____

                      Date:  ____1 / 27____, 2014


**"TENANT":**         99 CENTS ONLY STORES LLC,
                      a California limited liability company

                      By:    _____
                             Stéphane Gonthier, President
                             Chief Executive Officer

                      By:    _____
                             Jesse D. Allen, Vice President
                             Real Estate & Construction

                      Date:  __January 14__, 2014

99¢ ONLY STORES
STANDARD MULTI-TENANT FORM LEASE
(NWC OF 29 PALMS HWY. & BALSA AVE., YUCCA VALLEY, CA)

EXHIBIT "A"

SITE PLAN



[END EXHIBIT "A"]

Standard Multi-Tenant Lease/Yucca Valley, CA – 0390        EXHIBIT "A"        Initials: 
1-4-14 Final [OPFM-CMM]                                    Page 32 of 57

99¢ ONLY STORES
STANDARD MULTI-TENANT FORM LEASE
(NWC OF 29 PALMS HWY. & BALSA AVE., YUCCA VALLEY, CA)

EXHIBIT "B"

WORK LETTER

(A)    LANDLORD'S WORK.

IMMEDIATELY UPON EXECUTION OF THIS LEASE LANDLORD SHALL PROVIDE TENANT WITH "AS BUILT" DRAWINGS OF THE PREMISES. IF "AS BUILT" DRAWINGS OF THE PREMISES ARE NOT AVAILABLE, THEN IMMEDIATELY UPON EXECUTION OF THIS LEASE LANDLORD SHALL COOPERATE WITH TENANT IN OBTAINING SUCH DRAWINGS AS MAY HAVE BEEN FILED WITH THE CITY IN WHICH THE PREMISES ARE LOCATED. LANDLORD SHALL ALSO PERMIT TENANT IMMEDIATE ENTRY INTO THE PREMISES FOR PURPOSES OF EVALUATION OF THE PHYSICAL STRUCTURE AND MEASUREMENT.

LANDLORD, at its sole cost and expense, shall:

(i)    submit and receive TENANT'S approval for LANDLORD'S WORK;

(ii)    provide a hazardous materials report, which report shall be prepared by a qualified consultant possessing the applicable certifications and licenses necessary for the consultant to prepare the same and as otherwise required by law. If the hazardous materials report, which shall be completed by LANDLORD prior to DELIVERY, reveals that asbestos-containing materials ("ACM"), hazardous materials and/or mold is/are present in the PREMISES (including roof), then LANDLORD shall, at its sole cost and expense, undertake corrective measures as specified by TENANT to remove said materials and obtain a follow up report certifying that the PREMISES (including roof) is free of all hazardous materials, including all ACM and mold. Accordingly, a hazardous materials report certifying that the PREMISES is free of hazardous materials (including ACM and mold) shall be a condition for DELIVERY;

(iii)    provide a roof inspection report, which report shall be prepared by a qualified consultant possessing the applicable certifications and licenses necessary for the consultant to prepare the same and as otherwise required by law. If such roof inspection report, which shall be completed by LANDLORD prior to DELIVERY, reveals that the roof has an expected useful life of less than five (5) year or is not "water-tight," then LANDLORD shall, at its sole cost and expense, repair or replace the roof. Evidence of the repair or replacement and certification (by a qualified contractor (who shall possess the applicable certifications and licenses necessary and/or required by law for the contractor to perform such repair or replacement and provide such certification) that the roof has an expected useful life of at least five (5) years and is "water-tight" shall be a condition for DELIVERY;

(iv)    provide a slab moisture test, which test shall be performed by a qualified consultant possessing the applicable certifications and licenses necessary for the consultant to perform such test and as otherwise required by law. If such slab moisture test, which shall be completed by LANDLORD prior to DELIVERY, indicates that the slab has moisture content in excess of 5 lbs per one thousand square feet for twenty-four (24) hours using the calcium chloride method, then LANDLORD shall, at its sole cost and expense, undertake corrective measures as specified by TENANT to achieve the foregoing moisture content specifications. A post-mitigation report prepared by a qualified consultant (who shall possess the applicable certifications and licenses necessary and/or required by law for the consultant to prepare such report) shall be provided by LANDLORD and shall be a condition for DELIVERY;

(v)    install demising walls (to include a least six-inch (6") studs, sound bat insulation, one-half inch (1/2") plywood with wire mesh extended to the ceiling and five-eighths inch (5/8") inch drywall covering), one hour fire rated;

(vi)    provide all utilities in the PREMISES (not jointly metered with any other premises or any COMMON AREAS) in accordance with TENANT'S specifications, including electricity, water, gas, sewer, fire sprinklers and telephone;

(vii)    separate existing electrical service and provide the PREMISES with not less than 0.04 amps/square foot @ 277/480 V (or 0.08 amps/square foot @ 120/208 V), 3 phase, 4-wire electrical service with main disconnect and meter box;

(viii)   provide a smooth, level and even slab;

(ix)   reconfigure and separate the fire sprinkler, riser and monitoring system to independently serve the PREMISES;

(x)   provide space on the pylon, monument and directional signs for TENANT'S sign faces in accordance with Exhibit "D", which signs shall have power to illuminate TENANT'S sign faces;

(xi)   re-seal non-bumpy (all cracks sealed, broken and alligatored asphalt replaced) and re-stripe parking and COMMON AREAS, meeting current ADA requirements [LANDLORD hereby approves of TENANT installing zero curb face ramps along storefront sidewalk, cart collectors/corrals and anti-theft shopping cart systems in the parking lot, and LANDLORD agrees to coordinate its foregoing parking lot repairs and improvements with the installation of the aforementioned TENANT improvements];

(xii)   cause lighting in the COMMON AREAS to be not less than five (5) foot candles;

(xiii)   entire PREMISES and COMMON AREAS (including, but not limited to, parking lot and lighting) shall be in good working order and condition and in compliance with all building codes and laws (including in compliance with ADA);

(xiv)   provide new storefront with façade to include at least one hundred feet (100') of storefront and automatic doors in accordance with plans and specifications approved by TENANT;

(xv)   provide exclusive loading dock and loading area for the PREMISES in accordance with plans and specifications approved by TENANT;

(xvi)   install new HVAC unit(s) to exclusively serve the PREMISES, not less than one ton per 275 square feet of the PREMISES; and

(xvii)   deliver detailed Auto Cad plan for the BUILDING.

[EXHIBIT "B" CONTINUED ON FOLLOWING PAGE]

**EXHIBIT "B"**

**Continued from previous page**

(B)    **TENANT'S WORK.**

TENANT may, as TENANT may determine in TENANT'S reasonable discretion, completely build out the PREMISES in its normal and customary manner for a 99¢ Only Stores retail location.

TENANT'S WORK may, at TENANT'S discretion, include any of the following:

1.    Installing new floor covering.

2.    Adding, removing, or altering interior lighting.

3.    Installing cardboard baler.

4.    Installing alarm, phone, and PA systems.

5.    Installing fixtures, equipment, and inventory.

6.    Demolition of interior walls.

7.    Building new partition walls.

8.    Interior signage.

9.    Modifying storefront glass.

10.   Installing automatic door(s).

11.   Installing window displays.

12.   Modifying, removing, adding drop ceiling.

13.   Installing drinking fountain and mop sink.

14.   Neon lights on front of building.

15.   Interior patching.

16.   Interior & exterior painting.

17.   Install illuminated awnings on front of building.

18.   Loading facilities for TENANT'S regular deliveries via 45 and 48 foot semi-trucks, which may include new loading door(s), loading zone, loading dock, truck well, scissor lift, and/or ramp.

19.   Building high-profile building facia/sign tower.

20.   Electrical work.

21.   Removing landscaping planters, if any, in COMMON AREAS near the PREMISES.

22.   Any other work deemed reasonably necessary by TENANT for TENANT'S use of the PREMISES and/or the operation of a 99¢ Only Stores retail store (including, but not limited to, installation of zero curb face ramps along storefront sidewalk, cart collectors/corrals and anti-theft shopping cart systems in the parking lot, and the installation of roof-mounted HVAC, refrigeration and/or telecommunication equipment necessary and/or incidental to TENANT'S use of the PREMISES, provided that any work and installations on the roof shall be coordinated with LANDLORD as needed to preserve roof warranties.

**[END EXHIBIT "B"]**

99¢ ONLY STORES
STANDARD MULTI-TENANT FORM LEASE
(NWC OF 29 PALMS HWY. & BALSA AVE., YUCCA VALLEY, CA)

EXHIBIT "B-1"

PROPOSED CART RETENTION PLAN



[END EXHIBIT "B-1"]

EXHIBIT "B-1"
Page 36 of 57

 Initials:

**99¢ ONLY STORES**
**STANDARD MULTI-TENANT FORM LEASE**
**(NWC OF 29 PALMS HWY. & BALSA AVE., YUCCA VALLEY, CA)**

**EXHIBIT "C"**

**LEGAL DESCRIPTION OF PROJECT**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL A:

PARCEL 1 OF PARCEL MAP NO. 14239, IN THE TOWN OF YUCCA VALLEY, COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA, AS PER PLAT RECORDED IN BOOK 166 OF PARCEL MAPS, PAGES 70 THROUGH 73, INCLUSIVE, RECORDS OF SAID COUNTY.

PARCEL B:

THE NON-EXCLUSIVE EASEMENTS AS DEFINED IN THAT CERTAIN DECLARATION OF COVENANTS, RESTRICTIONS AND RECIPROCAL EASEMENTS RECORDED AUGUST 4, 1993, INSTRUMENT NO. 93-336602, OFFICIAL RECORDS.

[END EXHIBIT "C"]

EXHIBIT "C"
Page 37 of 57

Initials: 

99¢ ONLY STORES
STANDARD MULTI-TENANT FORM LEASE
(NWC OF 29 PALMS HWY. & BALSA AVE., YUCCA VALLEY, CA)

EXHIBIT "D"

LOCATION AND SIZE OF TENANT'S PANELS ON MONUMENT SIGN



[END EXHIBIT "D"]





99¢ ONLY STORES
STANDARD MULTI-TENANT FORM LEASE
(NWC OF 29 PALMS HWY. & BALSA AVE., YUCCA VALLEY, CA)

EXHIBIT "E"

EXISTING EXCLUSIVES and
EXISTING RESTRICTIONS
in the SHOPPING CENTER

## PURSUANT TO DECLARATION:

2.  **Use.**

    a.  **Commercial Purposes.** Buildings in the Shopping Center shall be used for commercial purposes of the type normally found in a retail shopping center including without limitation financial institutions, service shops, offices, and retail stores. No cafeteria, restaurant within 300 feet of the Wal-Mart building, the Penney building or the Stater Bros. building, theatre, bowling alley, health spa, billiard parlor, nightclub, bar or other place of recreation or amusement, or any business which derives 50% or more of its gross sales volume serving or selling alcoholic beverages shall occupy space within the Shopping Center without the written consent of Wal-Mart, Penney and Stater Bros. Without limiting the effect of any other provision in this Declaration, no restaurant in the Shopping Center shall be greater than 6,000 net leasable square feet and no restaurant in the Shopping Center shall include a bar area which (i) is greater than 25% of the net leasable square feet of the applicable restaurant or (ii) derives 50% or more of its gross sales volume serving or selling alcoholic beverages. Developer recognizes that said businesses may inconvenience Wal-Mart's, Penney's and Stater Bros.' customers and adversely affect Wal-Mart's, Penney's and Stater Bros.' businesses. The covenant and restriction established pursuant to this Section 2a is a Restrictive Covenant pursuant to the appropriate sections of California Civil Code.

## PURSUANT TO EXISTING LEASES:  NONE

[END EXHIBIT "E"]

**99¢ ONLY STORES**
**STANDARD MULTI-TENANT FORM LEASE**
**(NWC OF 29 PALMS HWY. & BALSA AVE., YUCCA VALLEY, CA)**

**EXHIBIT "F"**

**FORM OF NON-DISTURBANCE AGREEMENT**

**RECORDING REQUESTED BY**
**AND WHEN RECORDED RETURN TO:**

_____
_____
_____
_____

**SUBORDINATION, NONDISTURBANCE**
**AND ATTORNMENT AGREEMENT**

**NOTICE:**   **THIS SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT RESULTS IN THE LEASEHOLD ESTATE IN THE PROPERTY BECOMING SUBJECT TO AND OF LOWER PRIORITY THAN THE LIEN OF SOME OTHER OR LATER SECURITY INSTRUMENT.**

THIS SUBORDINATION, NONDISTURBANCE AND ATTORNMENT AGREEMENT ("Agreement") made to be effective as of the _____ day of _____, 20__, by and among _____, a _____ ("Lender"), _____, a _____ ("Borrower" or "Landlord"), and 99 CENTS ONLY STORES LLC, a California limited liability company ("Tenant");

**WITNESSETH**

WHEREAS, Lender is the owner and holder of a [DESCRIBE DEED OF TRUST] dated as of _____, 20__ (the "Deed of Trust"), covering the real property located at _____, and described in **EXHIBIT "A"**, attached hereto and made a part hereof for all purposes, and the buildings and improvements thereon (hereinafter collectively called the "Property"), which Deed of Trust was recorded on _____, 20__, as Document No. _____ in the Official Records of _____ County, California, securing the payment of a loan (the "Loan") made by Lender to Borrower pursuant to that certain loan agreement dated as of _____, 20__ ("Loan Agreement"), and that certain promissory note by Borrower in favor of Lender dated as of _____, 20__ ("Note") (with the Loan Agreement, Note, Deed of Trust and the other documents executed by Borrower in connection with the Loan being hereinafter sometimes referred to individually and collectively as "Loan Documents"); and

WHEREAS, Tenant is the holder of a leasehold estate pursuant to a lease dated _____, 20__ (as amended from time to time, the "Lease") covering a portion of the Property as more particularly described in the Lease ("Premises"); and

WHEREAS, Borrower (with such party and its successors and assigns occupying the position of landlord under the Lease being referred to collectively hereinafter as "Landlord") has assigned its rights as landlord under the Lease to Lender to facilitate repayment of the Loan and performance of its obligations under the Deed of Trust; and

WHEREAS, Tenant and Lender desire to confirm their understanding with respect to the Lease and the Deed of Trust;

NOW, THEREFORE, in consideration of the mutual covenants and agreements herein contained, Lender and Tenant hereby agree and covenant as follows:

1.     <u>SUBORDINATION</u>. Subject to the terms and conditions of this Agreement, the Lease is hereby made, and shall at all times continue to be, subject and subordinate in each and every respect, to the lien of the Deed of Trust and to any and all liens, interests and rights created thereby and to any and all increases, renewals, modifications, extensions, substitutions, replacements and/or consolidations of the Deed of Trust or the indebtedness or other obligations secured thereby.

2.     <u>NONDISTURBANCE</u>. So long as Tenant is not in default (beyond all applicable notice and cure periods given Tenant under the Lease in connection with such default) in the payment of rent or additional rent or in the performance of any of the terms, covenants or conditions of the Lease on Tenant's part to be performed, (a) Tenant's possession of the Premises and Tenant's rights and privileges under the Lease, or any extensions or renewals thereof, shall not be diminished or interfered with by Lender in the exercise of any of its rights under the Loan Documents or by any party who acquires the Property from Lender as a result of the exercise by Lender of any such rights, and (b) Tenant's occupancy of the Premises shall not be disturbed by Lender in the exercise of any of its rights under the Loan Documents during the term of the Lease or any extensions or renewals thereof or by any party who acquires the Property from Lender as a result of the exercise by Lender of any such rights. Lender will not join Tenant as a party defendant in any action or proceeding brought as a result of any default under the Deed of Trust or any other instrument evidencing or securing the Loan, unless the joinder is either required by law or is necessary to pursue its remedies under the Deed of Trust or such other Loan Documents.

3.     <u>ATTORNMENT</u>. If any proceedings are brought for the foreclosure of the Deed of Trust, or if the Property is sold pursuant to a trustee's sale under the Deed of Trust, or if Lender becomes owner of the Property by acceptance of a deed or assignment in lieu of foreclosure or otherwise, the Lease shall continue in full force and effect subject to the terms and conditions of this Agreement, and Tenant shall attorn to the Lender or purchaser, as the case may be, upon any such foreclosure sale or trustee's sale, or acceptance by Lender of a deed or assignment in lieu of foreclosure, and Tenant shall recognize Lender or such purchaser, as the case may be, as the Landlord under the Lease. Such attornment shall be effective and self-operative without the execution of any further instrument on the part of any of the parties hereto. Tenant agrees, however, to execute and deliver to Lender or such purchaser such commercially reasonable instruments or certificates which, in the reasonable judgment of Lender or such purchaser may be necessary or appropriate in any such foreclosure proceeding or otherwise to evidence such attornment, which form and substance shall be reasonably approved by Tenant, which approval shall not be unreasonably withheld, conditioned or delayed.

4.     <u>LENDER'S RIGHTS, REMEDIES AND LIABILITY AS A LANDLORD OR LENDER IN POSSESSION</u>. If Lender shall succeed to the interest of Landlord under the Lease in any manner, or if any purchaser acquires the Property upon any foreclosure of the Deed of Trust or any trustee's sale under the Deed of Trust, Lender or such purchaser, as the case may be, shall have the same remedies by entry, action or otherwise in the event of any default by Tenant (beyond all applicable notice and cure periods given Tenant under the Lease in connection with such default) in the payment of rent or additional rent or in the performance of any of the terms, covenants and conditions of the Lease on Tenant's part to be performed that Landlord had or would have had if Lender or such purchaser had not succeeded to the interest of Landlord. Following the date of any such succession to the interest of Landlord under the Lease (the "Date of Attornment"), Lender or such purchaser shall be bound to Tenant under all the terms, covenants, and conditions of the Lease, and Tenant shall, from and after the Date of Attornment, have the same remedies against Lender or such purchaser for the breach of an agreement contained in the Lease that Tenant might have had under the Lease against Landlord if Lender or such purchaser had not succeeded to the interest of Landlord, and Tenant shall be bound to Lender or such purchaser under all of the terms, covenants and conditions of the Lease. However, Lender or such purchaser shall not be:

(a)     liable for any act or omission of any prior landlord (including Landlord), except for Continuing Defaults (as hereinafter defined), in which case Lender shall have notice and cure rights set forth in Paragraph 6 below, calculated from the date Lender receives said notice of default. In no event shall Lender or such purchaser have any liability for damages,

whether direct, indirect, forseeable, consequential, exemplary or otherwise, as a result of any act or omission of any prior landlord (including Landlord), except to the extent such damages occurred as a result of any act or omission on the part of Lender or such other purchaser during such time as Lender or such purchaser succeeds to the interest of the prior landlord under the Lease; or

(b)    subject to offsets or defenses which Tenant might have against any prior landlord (including Landlord), except for those based on Continuing Defaults, so long as Tenant shall have provided Lender with notice of the Landlord's default that gave rise to such offset or defense and the opportunity to cure same, all in accordance with Paragraph 6 below; or

(c)    bound by any rent or additional rent or other sums which Tenant might have paid for more than the current month to any prior landlord (including Landlord), unless the same was paid to and received by Lender or such purchaser, and excluding Tenant's payment of estimates of Operating Expenses (as defined in the Lease) in accordance with, so long as such payment of Operating Expenses are made by Tenant in accordance with, the terms of the Lease; or

(d)    bound by any representation or warranty contained in the Lease or made by any party to Tenant, including, but not limited to, Landlord, except as to a breach of a representation or warranty which is of a continuing nature of which written notice from Tenant has been delivered pursuant to Paragraph 6, below and subject to Paragraph 4(a) above; or

(e)    bound by any amendment or modification of the Lease made without Lender's consent (which consent shall not be unreasonably withheld or conditioned, and shall be deemed granted if such consent is not given or denied in a written notice to Tenant delivered within thirty (30) calendar days after Tenant's written request to Lender for consent), to the extent Lender's consent is required for such Lease amendment under the Loan Documents; provided, however, notwithstanding the foregoing, in no event shall Lender's (or any purchaser's) consent be required for any amendment or modification of the Lease which simply memorializes Tenant's exercise of any early termination, extension, expansion or other right expressly set forth in the Lease on the date of this Agreement pursuant to and in accordance with the terms thereof and so long as Tenant's exercise of such rights are carried out in accordance with the terms and conditions of this Agreement; or

(f)    liable for any security deposit paid by Tenant to Landlord, unless the same was paid to and received by Lender or such purchaser.

As used in this Agreement, a "Continuing Default" is defined as a non-monetary default by the Landlord under the Lease that began prior to the Date of Attornment, is ongoing and continuing following the Date of Attornment, is susceptible to being cured, and for which Tenant provided Lender or such purchaser notice in accordance with Paragraph 6 below. Neither Lender (or such purchaser) nor any other party who from time to time shall be included in the definition of Lender hereunder, shall have any liability or responsibility under or pursuant to the terms of this Agreement or the Lease from the date such party ceases to own an interest in or to the Property, except, subject to Paragraph 4(a) above and Paragraph 6 below, for those liabilities or responsibilities that arose and accrued during such time as Lender or such other party owned the Property (but excluding liabilities or responsibilities arising from Tenant's breach of the Lease or this Agreement), unless such liabilities and/or responsibilities are expressly assumed by a successor to the interests of Lender (or such other owner of the Property) under the Lease in a written agreement delivered to Tenant. Tenant further acknowledges and agrees that neither Lender nor any purchaser of the Property at any foreclosure sale nor any grantee of the Property named in a deed-in-lieu of foreclosure, nor any heir, legal representative, successor, or assignee of Lender or of any such purchaser or grantee, has or shall have any personal liability for the obligations of Landlord under the Lease, except to the extent of the rents, security deposits, sales proceeds and insurance and condemnation proceeds actually received and the interest in the Property then owned by such party.

5.    NO WAIVER.  Nothing herein contained is intended, nor shall it be construed, to abridge or adversely affect any right or remedy of Landlord under the Lease in the event of any default by Tenant (beyond all applicable notice and cure periods given Tenant under the Lease in connection with such default) in the payment of rent or additional rent or in the performance of any of the terms, covenants or conditions of the Lease on Tenant's part to be performed.

6.    NOTICES. Tenant hereby acknowledges and agrees that:

(a)    From and after the date hereof, in the event of any act or omission of Landlord which would give Tenant the right, either immediately or after notice, the lapse of time, or both, to cancel or terminate the Lease, Tenant agrees that no notice of termination shall be effective until (i) Tenant has given written notice of such act or omission to Lender, and (ii) the expiration of thirty (30) days following such giving of notice to Lender in which time period Lender shall be entitled to cure any such acts or omissions of Landlord, or to begin the cure and thereafter diligently pursue the cure if such cure, by its nature, cannot reasonably be effected within such thirty (30) day period (but Lender's additional time to cure shall in no event exceed ninety (90) days).

(b)    With respect to any default which would give Tenant the right, either immediately or after notice, the lapse of time, or both, to cancel or terminate the Lease, Tenant shall send to the Lender a copy of any default notice or statement sent by Tenant to Landlord under the Lease, at the same time such default, notice or statement is sent to Landlord.

(c)    If Lender notifies Tenant of a default under the Deed of Trust and demands that Tenant pay its rent and all other sums due under the Lease to Lender, Tenant shall honor such demand and pay its rent and all of the sums due under the Lease directly to Lender or as otherwise required pursuant to such notice. Tenant may rely upon any notice, instruction, certificate, consent or other document from Lender and shall have no duty to Landlord to investigate the same or the circumstances under which the same was given. In connection therewith, Landlord, by its execution of this Agreement, hereby acknowledges and agrees that in the event of a default under the Deed of Trust, Tenant may pay all rents and all of the sums due under the Lease directly to Lender as provided hereinabove upon notice from Lender that Landlord is in default. If Tenant shall make rental payments to the Lender following receipt of notice that Landlord is in default, Landlord hereby waives any claims against Tenant for the amount of such payments made by Tenant to Lender.

7.    AMENDMENTS/SUCCESSORS. This Agreement may not be amended or modified orally or in any manner other than by an agreement in writing signed by the parties hereto or their respective successors in interest. This Agreement shall inure to the benefit of and be binding upon the parties hereto, their successors and permitted assigns, and any purchaser or purchasers at foreclosure of the Property, and their respective heirs, personal representatives, successors and assigns.

8.    NOTICE OF MORTGAGE. To the extent that the Lease shall entitle the Tenant to notice of any mortgage or deed of trust, this Agreement shall constitute such notice to the Tenant with respect to the Deed of Trust and to any and all modifications, renewals, extensions, replacements and/or consolidations of the Deed of Trust. Lender may, at its election, in its sole and absolute opinion and judgment, subordinate the lien of the Deed of Trust to the Lease and the leasehold interest created thereby, and make said lien subject to the Lease by providing Landlord and Tenant written notice of such election at any time prior to completion of a foreclosure of the Deed of Trust, whether judicial or through the power of sale contained in the Deed of Trust, or the acceptance of any assignment or deed in lieu of foreclosure. From and after delivery of such notice to Tenant, the lien of the Deed of Trust shall be subject and subordinate to the Lease and the leasehold estate created thereby.

9.    MULTIPLE COUNTERPARTS. This Agreement may be executed in several counterparts, and all so executed shall constitute one agreement, binding on all parties hereto, notwithstanding that all parties are not signatories to the original or the same counterpart.

10.    CAPTIONS. The captions, headings, and arrangements used in this Agreement are for convenience only and do not in any way affect, limit, amplify, or modify the terms and provisions hereof.

11.    PREVAILING PARTY. If any party commences any action against any other party based on this Agreement, the prevailing party shall be entitled to recover reasonable attorney fees, expenses, and costs of suit.

12.    RECORDATION.  Any party hereto shall be entitled to cause this Agreement to be recorded in the Official Records of the county in which the Property is located, the cost and expense for which shall be paid by the party causing this Agreement to be recorded.

[Signature page to follow]



IN WITNESS WHEREOF, the parties hereto have hereunto caused this Agreement to be duly executed as of the day and year first above written.

"Lender"

_____,
a _____

By:     _____  _____
Name:   _____
Title:  _____


"Landlord"

_____,
a _____

By:     _____  _____
Name:   _____
Title:  _____


"Tenant"

99 CENTS ONLY STORES LLC,
a California limited liability company

By:     _____
        Stéphane Gonthier, President
        Chief Executive Officer

By:     _____
        Jesse D. Allen, Vice President
        Real Estate & Construction


**[ALL SIGNATURES MUST BE ACKNOWLEDGED]**

STATE OF CALIFORNIA           )
                                          ) ss

COUNTY OF _____ )

On _____, before me, _____, a Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public

STATE OF CALIFORNIA           )
                                          ) ss

COUNTY OF _____ )

On _____, before me, _____, a Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public

STATE OF CALIFORNIA              )
                                     ) ss

COUNTY OF _____  )

On _____, before me, _____, a Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public

STATE OF CALIFORNIA              )
                                     ) ss

COUNTY OF _____  )

On _____, before me, _____, a Notary Public, personally appeared _____, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument, and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_____
Notary Public

**EXHIBIT "A"**
**LEGAL DESCRIPTION**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL A:


PARCEL 1 OF PARCEL MAP NO. 14239, IN THE TOWN OF YUCCA VALLEY, COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA, AS PER PLAT RECORDED IN BOOK 166 OF PARCEL MAPS, PAGES 70 THROUGH 73, INCLUSIVE, RECORDS OF SAID COUNTY.

PARCEL B:


THE NON-EXCLUSIVE EASEMENTS AS DEFINED IN THAT CERTAIN DECLARATION OF COVENANTS, RESTRICTIONS AND RECIPROCAL EASEMENTS RECORDED AUGUST 4, 1993, INSTRUMENT NO. 93-336602, OFFICIAL RECORDS.


[END EXHIBIT "F"]



99¢ ONLY STORES
STANDARD MULTI-TENANT FORM LEASE
(NWC OF 29 PALMS HWY. & BALSA AVE., YUCCA VALLEY, CA)

EXHIBIT "G"

FORM OF MEMORANDUM OF LEASE

RECORDING REQUESTED BY AND
WHEN RECORDED RETURN TO:

99¢ Only Stores
4000 East Union Pacific Avenue
Commerce, CA  90023
Attention:  Real Estate Department

THE AREA ABOVE IS RESERVED FOR RECORDER'S USE

## MEMORANDUM OF LEASE

This MEMORANDUM OF LEASE is made and executed as of the 7th day of January, 2014, by and between YUCCA DYNASTY L.P., a California limited partnership ("Landlord"), and 99 CENTS ONLY STORES LLC, a California limited liability company (the "Tenant"), with reference the following facts:

### WITNESSETH:

That in consideration of Ten Dollars ($10.00) and the rents, covenants, and conditions more particularly set forth in that certain 99¢ Only Stores Standard Multi-Tenant Form Lease dated as of January 7, 2014, by and between Landlord and Tenant (the "Lease"), the receipt and sufficiency of which are hereby acknowledged, Landlord and Tenant do hereby covenant, promise, and agree as follows:

1.      Landlord hereby leases to Tenant and Tenant hereby leases from Landlord, upon the terms and conditions set forth in the Lease (all of which are expressly incorporated herein by this reference), those certain premises (the "Premises") commonly known as 57980 29 Palms Highway, Yucca Valley, California 92284, which Premises are located on a portion of the shopping center more particularly described and depicted on Exhibit A attached hereto and incorporated herein by this reference. All capitalized terms used but not defined herein shall have the meaning as is given such terms in the Lease.

2.      Landlord and Tenant now desire to execute, acknowledge and deliver this Memorandum of Lease to be recorded in the Official Records of San Bernardino County, California (the "Official Records").

3.      The term of the Lease and the respective rights and obligations of Landlord and Tenant with respect to the Premises and/or under the Lease are set forth in the Lease, which rights and obligations include, among other things, the following:

a.      Common Areas:

"TENANT shall have the nonexclusive right (in common with other tenants) to use the COMMON AREAS for the purposes intended at no additional cost to TENANT, subject to such reasonable, and non-discriminatory rules and regulations as LANDLORD may establish from time to time which do not conflict with any express or implied terms of this LEASE.   TENANT shall abide by such rules and regulations. Notwithstanding the provisions of Section 4.05(a) above, LANDLORD may temporarily close any COMMON AREAS, but only as necessary to perform any acts in the COMMON AREAS as are necessary to meet LANDLORD'S obligations hereunder; provided that (i) LANDLORD gives TENANT a minimum of ten (10) business days prior written notice thereof, (ii) LANDLORD takes all reasonable actions to avoid so doing during any of TENANT'S peak business periods (October 1 - January 3,

Initials:

Fridays, Saturdays, Sundays, and the fifteen (15) day periods preceding and including Independence Day, Valentine's Day, Easter, Labor Day, and any Federal holiday), and (iii) LANDLORD takes all reasonable actions to minimize any detrimental effects to TENANT'S business operations at the PREMISES as a result of such closure. LANDLORD shall not at any time permit any fairs, carnivals, or other seasonal or promotional events (e.g., fireworks stands, Christmas Tree sales, etc.), telephones, kiddy rides, vending machines, automated teller machines (ATMs), kiosks, recycling centers or machines or any such or similar activities in the PROTECTED AREA, provided that in no event shall the foregoing provision prohibit TENANT from installing telephones, kiddy rides, vending machines, ATMs, kiosks or other similar items in the PREMISES or other areas available for TENANT'S exclusive use pursuant to the express terms of this LEASE."

"A portion of the COMMON AREAS shown on the SITE PLAN is marked on said SITE PLAN as "Protected Area" (the "PROTECTED AREA"). Notwithstanding anything in this LEASE to the contrary, no changes (including, but not limited to, any new structures) may be made in the PROTECTED AREA without TENANT'S prior written consent in its sole discretion. Outside of the PROTECTED AREA, non-material changes may be made without TENANT'S prior written consent, but LANDLORD shall not perform or allow to be performed any work in the COMMON AREAS on the PROJECT, nor shall LANDLORD consent under the DECLARATION or otherwise to any work being performed in the COMMON AREAS not on the PROJECT, during the period from October 1 to January 3 of any year, nor during the fifteen (15) day periods ending on Easter, Valentine's Day, Memorial Day, Independence Day and Labor Day. For these purposes, non-material changes are those which: (x) do not impede, prevent, or otherwise create any adverse effect, to the ingress and egress (pedestrian and vehicular) to and from the PREMISES, or to the loading areas servicing the PREMISES, or between the PREMISES or the loading areas and the adjacent streets, nor between the PREMISES and any of the parking areas or other retail businesses in the SHOPPING CENTER; and (y) do not impair the visibility of the PREMISES or of any signs for the PREMISES or TENANT'S business operated therein (whether on the PREMISES or in the COMMON AREAS) from either adjoining streets or parking areas."

"(i)    LANDLORD shall not: (A) permit the existence of any buildings at the PROJECT not shown on the SITE PLAN (nor shall LANDLORD consent under the DECLARATION or otherwise to the existence of any buildings elsewhere in the SHOPPING CENTER not shown on the SITE PLAN); (B) permit the height of the existing buildings in the PROJECT (or any architectural features or rooftop equipment) to be higher than they exist on the date of this LEASE (nor shall LANDLORD consent under the DECLARATION or otherwise to the height of the existing buildings elsewhere in the SHOPPING CENTER being higher than they exist on the date of this LEASE); (C) permit any future buildings in the PROJECT to be taller than the PREMISES (nor shall LANDLORD consent under the DECLARATION or otherwise to any future buildings in the SHOPPING CENTER being taller than the PREMISES); (D) build or allow to be built any buildings in the portions of the PROTECTED AREA which are not depicted on the SITE PLAN. LANDLORD may not alter the colors or design of the exterior of the PREMISES, nor shall LANDLORD make any change in the location of the front wall of any in-line buildings in the PROJECT without the prior written consent of the TENANT, which shall not be unreasonably withheld (nor shall LANDLORD consent under the DECLARATION or otherwise to any change in the location of the front wall of any in-line buildings elsewhere in the SHOPPING CENTER without the prior written consent of TENANT, which shall not be unreasonably withheld).

(ii)    Notwithstanding anything to the contrary in this LEASE, LANDLORD shall be permitted to develop one building (the "PAD BUILDING") within the area designated on the SITE PLAN as "Pad Building" (the "PAD BUILDING AREA"), subject to the following terms and conditions: (a) the total square footage of the PAD BUILDING shall not exceed 2,850 square feet; (b) the PAD BUILDING shall not be more than one story tall and the height of the OUTPARCEL BUILDING (including any architectural features and rooftop equipment thereon) shall not exceed twenty (20) feet, as measured from the finished grade immediately adjacent to the OUTPARCEL BUILDING; (c) construction of the PAD BUILDING shall be done in a good and workmanlike manner and in compliance with all applicable laws; (d) construction of the PAD

BUILDING shall not reduce TENANT'S rights or increase TENANT'S obligations under this LEASE in any material respect; (e) the construction staging area for the construction of the PAD BUILDING shall be located entirely within a 20-foot setback area immediately adjacent to the PAD BUILDING AREA; (f) LANDLORD shall use best good faith efforts to minimize any detrimental effects to (i) the completion of LANDLORD'S WORK and/or TENANT'S WORK, and (ii) TENANT'S business operations at the PREMISES due to the construction of the PAD BUILDING; and (g) following completion of the PAD BUILDING, TENANT'S pro rata share of the OPERATING EXPENSES shall be proportionately reduced to account for the increase in the total leasable square footage of the buildings contained within the PROJECT as a result of the addition of the PAD BUILDING thereto."

b.    Exclusivity:

"TENANT shall have the exclusive right to operate a general merchandise store within the PROJECT, provided that the foregoing exclusive shall not apply to any merchandise discount stores being operated within the PROJECT upon the EFFECTIVE DATE, but if any existing tenant desires to change its use to a use which violates the foregoing exclusive and LANDLORD'S consent thereto is required, LANDLORD shall withhold consent. LANDLORD represents and warrants that there are no existing tenants of the PROJECT whose leases permit them to operate in violation of TENANT'S exclusive right without LANDLORD'S consent."

c.    Prohibited Uses:

"Without limitation of the PERMITTED USES under this LEASE, no portion of the PROJECT may be used for any of the following (the "PROHIBITED USES"):

(i)    Any uses that are not consistent with first class shopping centers in the area of the PREMISES, which shall include, but not be limited to, any uses which include:

| | |
|---|---|
| (A) | nude (or partially nude) bars, nightclubs or theaters of any kind |
| (B) | massage parlors |
| (C) | adult book stores |
| (D) | escort services |
| (E) | bail bonds or pawn shops |
| (F) | the sale of used or second hand products of any kind |
| (G) | tattoo parlors |
| (H) | adult video stores |
| (I) | any use of a questionable moral character |
| (J) | indoor swap meets |
| (K) | liquor stores |
| (L) | non-retail use (except incidental to other permitted uses) |
| (M) | movie theater |
| (N) | gymnasium, gym, fitness club/center, health club/center, or athletic club/center |
| (O) | bowling alley |
| (P) | school |
| (Q) | call center |
| (R) | library |
| (S) | church |
| (T) | auditorium |
| (U) | museum |
| (V) | automobile repair |
| (W) | automobile sales |
| (X) | high volume restaurants (provided, however, this clause (X) shall not preclude (i) a high volume restaurant in the PAD BUILDING, or (ii) a REGIONAL OR NATIONAL CHAIN (as defined below) fast food operator such as *McDonalds, Burger King, Carl's Jr.*, or a similar operator at the PROJECT) (as used in this LEASE, a "REGIONAL OR NATIONAL CHAIN" shall be defined as a business operating regionally or nationally under the same trade name with at least twenty-five (25) operating stores) |

| | |
|---|---|
| (Y) | banquet facility (provided, however, this clause (Y) shall not preclude a banquet facility in the PAD BUILDING) |
| (Z) | bar (except as an incidental part of a REGIONAL OR NATIONAL CHAIN sit-down restaurant with no age restrictions within any part of the restaurant, such as *Chili's* or *Red Robin*), disco or nightclub |
| (AA) | hotel |
| (BB) | manufacturing, warehouse or other industrial use (except incidental to other permitted uses) |
| (CC) | parking intensive uses requiring materially more parking spaces (at any particular time) than most other retail uses at the SHOPPING CENTER |
| (DD) | entertainment facility (such as Chuck E Cheese, Discovery Zone, Tutor Time, or Leaps and Bounds) |
| (EE) | any central laundry or dry cleaning plant which processes such laundry or dry cleaning on site |
| (FF) | mortuary |
| (GG) | veterinary hospital or animal raising or boarding facility |
| (HH) | bingo parlor, off-track betting parlor or other gambling facility |
| (II) | marijuana dispensary |
| (JJ) | facility for the sale of drug paraphernalia |
| (KK) | any use which is prohibited under the DECLARATION |

(ii)     Any use which requires a zoning variance or conditional use permit.

(iii)     Any use which uses the terms "99," "98," "dollar," "cent," "cents," "penny," or any similar terms (whether "spelled out" or in numerical or symbolic form) in any manner as part of a trade name or logo or in any manner as a material portion of any signage or trade dress, specifically excluding, however, TENANT'S use of the PREMISES."

4.     Anyone interested in the Lease or the Premises is instructed to contact Landlord and/or Tenant at the following addresses:

Landlord:     3501 Hart Avenue
Rosemead, CA 91770
Telephone: (626) 673-6700
Attention: Mario P. Chang

Tenant:     c/o 99¢ Only Stores
4000 East Union Pacific Avenue
Commerce, California 90023
Telephone: (323) 980-8145
Attention: Real Estate Department

5.     This Memorandum of Lease is executed solely for purposes of recordation in the Official Records in order to give notice of the provisions of the Lease, and this Memorandum of Lease shall not be deemed or construed in any way whatsoever to define, limit or modify the Lease or any provision thereof or the respective rights or obligations of the parties thereunder.

6.     This Memorandum of Lease may be executed in counterparts, each of which shall be an original, but such counterparts shall together constitute but one and the same instrument.

**[SIGNATURES FOLLOW ON NEXT PAGE]**



**99¢ ONLY STORES**
**STANDARD MULTI-TENANT FORM LEASE**
**(NWC OF 29 PALMS HWY. & BALSA AVE., YUCCA VALLEY, CA)**

[SIGNATURE PAGE]

IN WITNESS WHEREOF, LANDLORD and TENANT have executed this MEMORANDUM OF LEASE effective as of the date first written above.

**"LANDLORD":**     YUCCA DYNASTY L.P.,
a California limited partnership

By:     CBD Cerritos, Inc.,
a California corporation,
its general partner

By:     _____
Name: _____
Its:     _____

By:     _____
Name: _____
Its:     _____

**"TENANT":**     99 CENTS ONLY STORES LLC,
a California limited liability company

By:     _____
Stèphane Gonthier, President
Chief Executive Officer

By:     _____
Jesse D. Allen, Vice President
Real Estate & Construction

## ACKNOWLEDGMENT

STATE OF CALIFORNIA        )
                              ) SS.

COUNTY OF _____  )

      On _____, 2014, before me, _____, a notary public, personally appeared _____ who proved to me on the basis of satisfactory evidence to be the person whose name is subscribed to the within instrument and acknowledged to me that he executed the same in his authorized capacity, and that by his signature on the instrument the person, or the entity upon behalf of which the person acted, executed the instrument.

      I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

      WITNESS my hand and official seal.


_____
NOTARY PUBLIC
State of California

**ACKNOWLEDGMENT**

STATE OF CALIFORNIA       )
                                     ) SS.

COUNTY OF LOS ANGELES  )

       On _____, 2014, before me, _____, a notary public, personally appeared Stèphane Gonthier and Jesse D. Allen who proved to me on the basis of satisfactory evidence to be the persons whose names are subscribed to the within instrument and acknowledged to me that they executed the same in their authorized capacities, and that by their signatures on the instrument the persons, or the entity upon behalf of which the persons acted, executed the instrument.

       I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

       WITNESS my hand and official seal.


_____
NOTARY PUBLIC
State of California

**99¢ ONLY STORES**
**STANDARD MULTI-TENANT FORM LEASE**
**(NWC OF 29 PALMS HWY. & BALSA AVE., YUCCA VALLEY, CA)**

**EXHIBIT A TO MEMORANDUM OF LEASE**

**Legal Description of Project**

THE LAND REFERRED TO HEREIN BELOW IS SITUATED IN THE COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA, AND IS DESCRIBED AS FOLLOWS:

PARCEL A:

PARCEL 1 OF PARCEL MAP NO. 14239, IN THE TOWN OF YUCCA VALLEY, COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA, AS PER PLAT RECORDED IN BOOK 166 OF PARCEL MAPS, PAGES 70 THROUGH 73, INCLUSIVE, RECORDS OF SAID COUNTY.

PARCEL B:

THE NON-EXCLUSIVE EASEMENTS AS DEFINED IN THAT CERTAIN DECLARATION OF COVENANTS, RESTRICTIONS AND RECIPROCAL EASEMENTS RECORDED AUGUST 4, 1993, INSTRUMENT NO. 93-336602, OFFICIAL RECORDS.

[Continued on next page]





[END EXHIBIT "G"]



# EXHIBIT B

## CONFIRMATION AGREEMENT

This CONFIRMATION AGREEMENT (this "**Confirmation**") is dated as of May 22, 2015, and is made by and between YUCCA DYNASTY L.P., a California limited partnership ("**Landlord**"), and 99 CENTS ONLY STORES LLC, a California limited liability company ("**Tenant**"), with reference to the following facts:

A.    Landlord and Tenant entered into that certain Standard Multi-Tenant Form Lease dated January 7, 2014 (the "**Lease**"), pursuant to which Landlord leases to Tenant, and Tenant leases from Landlord, those certain premises commonly known as 57980 29 Palms Highway, Yucca Valley, California.

B.    Landlord and Tenant desire to enter into this Confirmation to confirm, among other things, the Delivery Date and the Rent Commencement Date.

C.    Any capitalized terms used but not defined in this Confirmation shall have the meaning given to such terms in the Lease.

NOW, THEREFORE, in consideration of the mutual covenants contained herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.    <u>Confirmation of Dates</u>.    Landlord and Tenant hereby confirm that: (a) the "Anticipated Delivery Date" under the Lease was February 6, 2014, and the "Initial Outside Delivery Date" under the Lease was February 16, 2014; (b) the "**Delivery Date**" under the Lease **shall be deemed to have occurred on November 10, 2014** (and Tenant hereby waives the provisions of Section 2.03(c) of the Lease with respect to the "Delivery Blackout Period"); (c) pursuant to Section 3.02 of the Lease, the "**Free Occupancy Period**" under the Lease **commenced on November 10, 2014, and will expire on October 25, 2016; and (d) the "Rent Commencement Date" under the Lease shall be October 26, 2016, and the "Initial Lease Term" shall expire January 31, 2027** (unless earlier terminated pursuant to, and in accordance with, the terms of the Lease).

2.    <u>Confirmation of Sums Owed for Landlord's Work</u>.    Additionally, Landlord and Tenant hereby confirm that: (a) Tenant properly exercised its right to perform certain portions of Landlord's Work pursuant to Section 2.03(b)(ii) of the Lease, and (b) the total "Tenant's Costs for Landlord's Work" under Section 2.03(b)(ii) of the Lease were Three Hundred Eighty-Two Thousand Seven Hundred Twenty-Seven and No/100 Dollars ($382,727.00), and Tenant has provided Landlord with reasonable evidence of such costs.  Furthermore, in accordance with Section 2.03(b)(ii) of the Lease, if the entire balance of Tenant's Costs for Landlord's Work is not reimbursed by Landlord to Tenant within thirty (30) days after the date of mutual execution and delivery of this Confirmation (the "**Effective Date**"), then (i) pursuant to Section 2.03(b)(ii) of the Lease, interest shall accrue on the unpaid balance at a rate equal to the lesser of ten percent (10%) per annum, or the highest rate permitted by law, commencing on the Effective Date and continuing until the date such amounts are reimbursed to Tenant or recovered by Tenant in full, and (ii) Landlord may make periodic partial payments of Tenant's Costs for Landlord's Work, but if any unpaid balance of Tenant's Costs for Landlord's Work (or any accrued interest

Page 1 of 2



thereon) remains as of the "Rent Commencement Date" under the Lease, Tenant shall be entitled (pursuant to Section 2.03(b)(ii) of the Lease) to offset the unpaid balance of Tenant's Costs for Landlord's Work, and any accrued interest thereon, against the next payments of rent due under the Lease, commencing as of the Rent Commencement Date, and continuing until the date such amounts are reimbursed to, or recovered by, Tenant in full.

3.  Rental Payment Address; Landlord Contact Information. Unless and until otherwise directed by written notice from Landlord, Landlord hereby directs Tenant to make its rental payments payable under the Lease payable to Yucca Dynasty L.P. and to deliver such rental payments to 3501 Hart Avenue, Rosemead, CA 91770, Attn: Mario P. Chang. Additionally, should Tenant have any questions or need to discuss matters related to the Lease, Landlord hereby directs Tenant to contact Stanley Huang at (626) 374-4727 or via email at stanonly@hotmail.com, unless and until otherwise directed by written notice from Landlord.

4.  Counterparts Signatures. This Confirmation may be executed in counterparts, each of which shall be deemed an original and all of which counterparts taken together shall constitute but one and the same instrument. Any party may deliver its signature to this Confirmation by telecopy or electronic mail and any party who receives an executed signature page from another party by telecopy or electronic mail may rely upon said signature as if it was a signed original.

**IN WITNESS WHEREOF**, this Confirmation has been executed as of the day and year first above written.

**LANDLORD:**

YUCCA DYNASTY L.P.,
a California limited partnership

By:   CBD Investment, Inc.,
      a California corporation,
      its general partner

By:   _____
      Mario P. Chang, President

Date:   _____, 2015

**TENANT:**

99 CENTS ONLY STORES LLC,
a California limited liability company

By: _____
    Doug Digison, Senior Director Construction

Date:   _____7/1_____, 2015

Confirmation Agreement
0390 Yucca Valley, CA
5/22/2015 [GP&M-LHM]
1861007.2 - 89079.321

# EXHIBIT C

RECORDING REQUESTED BY

FATCOLA/RESALE

AND WHEN RECORDED MAIL DOCUMENT TO:

MAIL TAX STATEMENTS TO:

NAME Jose L. Guerra & Lidia O. Guerra

STREET ADDRESS 8006 Danvers Street

CITY, STATE & ZIP CODE Downey, CA 90240

Electronically Recorded in Official Records, County of San Bernardino    5/12/2016 12:11 PM SG



BOB DUTTON
ASSESSOR - RECORDER - CLERK
691 First American

Doc #: 2016-0185065



| | | |
|---|---|---|
| Titles: | 1 | Pages: 4 |
| Fees | | 24.00 |
| Taxes | | 7150.00 |
| Other | | .00 |
| PAID | | 7174.00 |

SPACE ABOVE FOR RECORDER'S USE ONLY

Grant Deed
Title of Document

THIS AREA FOR RECORDER'S USE ONLY

THIS COVER SHEET ADDED TO PROVIDE ADEQUATE SPACE FOR RECORDING INFORMATION
($3.00 Additional Recording Fee Applies)

MAIL TAX STATEMENTS TO THE ABOVE ADDRESS:

FATCOLA/RESALE

RECORDING REQUESTED BY:
First American Title Company

AND WHEN RECORDED MAIL TO:

Jose L. Guerra
Lidia O. Guerra
8006 Danvers Street
Downey, CA 90240

THIS SPACE FOR RECORDER'S USE ONLY:

| Title Order No.: 5105806 | Escrow No.: 16-70855-RZ |
|---|---|

## GRANT DEED

THE UNDERSIGNED GRANTOR(S) DECLARE(S)

DOCUMENTARY TRANSFER TAX is $7,150.00

[X] computed on full value of property conveyed, or
[ ] computed on full value less value of liens or encumbrances remaining at time of sale.
[ ] Unincorporated area   [X] City of Yucca Valley AND

FOR A VALUABLE CONSIDERATION, receipt of which is hereby acknowledged,

Yucca Dynasty L.P., a California limited partnership

hereby GRANT(s) to:

Jose L. Guerra and Lidia O. Guerra, as Trustees of the Guerra Family Trust dated August 18, 2005

the following described real property in the City of Yucca Valley, County of San Bernardino, State of California, described as:
LEGAL DESCRIPTION ATTACHED HERETO AS EXHIBIT "A" AND MADE A PART HEREOF
Also Known as:  57980 Twentynine Palms Highway, Yucca Valley, CA

APN: 0601-402-08-0-000 & 0601-402-09-0-000

DATE:  February 26, 2016

PLEASE SEE PAGE TWO FOR GRANTOR'S SIGNATURE.

MAIL TAX STATEMENTS TO PARTY SHOWN BELOW; IF NO PARTY SHOWN, MAIL AS DIRECTED ABOVE:

GRANT DEED - PAGE TWO

GRANTOR'S SIGNATURE:

Yucca Dynasty L.P., a California Limited Partnership

By: _M___ Chen___

Name: _MARIO CHANG_

Its: _General Partner_

| A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document. |
| --- |

STATE OF CALIFORNIA )
)SS
COUNTY OF _LOS ANGELES_ )

On _MARCH 1st, 2016_ before me, _KELVIN CHANG_, a
Notary Public personally appeared, _MARIO PANCHI CHANG_

who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the within instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

_signature_
Notary Public

KELVIN CHANG
Commission No.2096026
NOTARY PUBLIC-CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires JANUARY 6, 2019

Order Number: 5105006
Page Number: 12

Exhibit "A"

**LEGAL DESCRIPTION**

Real property in the Town of Yucca Valley, County of San Bernardino, State of California, described as follows:

PARCEL "A":

PARCEL 1 OF PARCEL MAP NO. 14239, IN THE TOWN OF YUCCA VALLEY, COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA, AS PER PLAT RECORDED IN BOOK 166 OF PARCEL MAPS, PAGES 70 THROUGH 73, INCLUSIVE, RECORDS OF SAID COUNTY.

PARCEL "B":

THE NON-EXCLUSIVE EASEMENTS AS DEFINED IN THAT CERTAIN DECLARATION OF COVENANTS, CONDITIONS, RESTRICTIONS AND RECIPROCAL EASEMENTS RECORDED APRIL 23, 1992, INSTRUMENT NO. 92-173414, OFFICIAL RECORDS, AND AS AMENDED BY THE AMENDMENT TO AND RESTATEMENT OF DECLARATION OF COVENANTS, CONDITIONS, RESTRICTIONS AND RECIPROCAL EASEMENTS AND GRANT OF EASEMENTS RECORDED AUGUST 4, 1993, INSTRUMENT NO. 93-336602, OFFICIAL RECORDS.

APN: 0601-402-08-0-000 and 0601-402-09-0-000

RECORDING REQUESTED BY
William H. Keller, Attorney

AND WHEN RECORDED MAIL TO
AND MAIL TAX STATEMENTS TO

Jose L. Guerra
Lidia O. Guerra
8006 Danvers Street
Downey, California 90240

Recorded in Official Records, County of San Bernardino

BOB DUTTON
ASSESSOR – RECORDER – CLERK

R Regular Mail

4/26/2017
1:57 PM
EM
SAN

Doc#:  2017 – 0171657



| Titles: | 1 | Pages: | 3 |
|---|---|---|---|
| Fees | | | 21.00 |
| Taxes | | | 0.00 |
| Other | | | 6.00 |
| PAID | | | $27.00 |

Space above line for Recorder's Use

APN: 0601-402-08-0-000 and 0601-402-09-0-000          NO TAX DUE

## TRUST TRANSFER DEED

The undersigned Grantors declare under the penalty of perjury that the following is true and correct:

Documentary transfer tax is NONE. Not pursuant to a sale. No consideration. A transfer into a revocable living trust. Rev. & Tax Code Section 11930.

_____ Unincorporated area    X    City of Yucca Valley, CA

This is a transfer into a revocable trust excusable from reassessment under Rev. & Tax Code Section 62(d).

FOR NO CONSIDERATION, GRANTOR Jose L. Guerra and Lidia O. Guerra, as Trustees of the Guerra Family Trust dated August 18, 2005 hereby

GRANT TO Jose L. Guerra and Lidia O. Guerra, Trustees of the Guerra Family Trust, as amended and restated in 2014, that real property in the City of Yucca Valley, County of San Bernardino, State of California, described on Exhibit A attached hereto.

Commonly known as: 57980 Twentynine Palms Highway, Yucca Valley, CA

Dated: 3/23/2017

Jose L. Guerra, Trustee, Guerra Family Trust Dated August 18, 2005

Lidia O. Guerra, Trustee, Guerra Family Trust Dated August 18, 2005

Mail tax statements to: same address as above.

## ACKNOWLEDGMENT

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA       )
                             ) ss

COUNTY OF LOS ANGELES      )

On March 23, 2017, before me, W. H. Keller, Notary Public, personally appeared Jose L. Guerra and Lidia O. Guerra, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

**I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.**

WITNESS my hand and official seal.

Signature _____ (Seal)

RECORDING REQUESTED BY AND AFTER
RECORDING MAIL DOCUMENT TO:

JONATHAN MARQUIT, ESQ.
MARQUIT LAW PC
16216 KITTRIDGE STREET
VAN NUYS, CA 91406


MAIL TAX STATEMENT TO:

GUERRA FAMILY PROPERTIES II, LLC
4618 PACIFIC BLVD.
VERNON, CA 90058
ATTN: VERONICA SALINAS



Recorded in Official Records
San Bernardino County

Assessor-Recorder-County Clerk
DOC # 2024-0092629

04/22/2024     Titles: 1  Pages: 4
11:19 AM
SAN             Fees:      $31.00
                Taxes:      $0.00
J9545           CA SB2 Fee: $75.00
                Total:     $106.00

## GRANT DEED

**APNs:  0601-402-08-0-000 and 0601-402-09-0-000**

**DECLARATION OF EXEMPTION FROM GOV'T CODE § 27388.1 FEE**
Transfer is exempt from fee per GC § 27388.1(a)(2):
[ ] Recorded concurrently "in connection with" transfer subject to DTT
[ ] Recorded concurrently "in connection with" a transfer of residential dwelling to an owner-occupier
Transfer is exempt from fee per GC 27388.1(a)(1):
[ ] Not related to real property
[ ] Fee cap of $225.00 reached

The undersigned Grantors declare under penalty of perjury that the following is true and correct:

**DOCUMENTARY TRANSFER TAX OF: $0***
Parcel Nos: 0601-402-08-0-000 and 0601-0402-09-0-000
[ ] Unincorporated Area          [ x ] City of Yucca Valley
[ ] Computed on full value of property conveyed, or
[ ] Computed on full value less value of liens or encumbrances remaining at time of sale.

**\*THE UNDERSIGNED GRANTORS DECLARE THE DOCUMENTARY TRANSFER TAX IS
ZERO DOLLARS ($0).** "The grantors and the grantees in this conveyance are comprised of the same
parties who continue to hold the same proportionate interest in the property, R & T 11925(d)."

For a valuable consideration, receipt of which is hereby acknowledged, **Jose L. Guerra and Lidia
O. Guerra, Trustees of the Guerra Family Trust dated August 18, 2005, as amended and
restated in 2014 (who acquired title as Jose L. Guerra and Lidia O. Guerra, Trustees of the
Guerra Family Trust, as amended and restated in 2014),** hereby grant to **Guerra Family
Properties II, LLC, a California limited liability company,** all of their right, title and interest in
and to the following described real property situated in the City of Yucca Valley, County of San
Bernardino, State of California:

      See Exhibit "A" attached hereto
      APNs: 0601-402-08-0-000 and 0601-402-09-0-000
      Commonly known as: 57980 Twentynine Palms Highway, Yucca Valley, California

**GRANTORS:**

JOSE L. GUERRA AND LIDIA O. GUERRA,
TRUSTEES OF THE GUERRA FAMILY TRUST
DATED AUGUST 18, 2005, AS AMENDED
AND RESTATED IN 2014

_____     DATE  2/28/2024
JOSE L. GUERRA, TRUSTEE

_____     DATE  2-28-2024
LIDIA O. GUERRA, TRUSTEE

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA

COUNTY OF _Los Angeles_

On _FEB 28, 2024_, before me, _Lupe Larios Davila_, a Notary Public, personally appeared JOSE L. GUERRA, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Lupe L Davila_

LUPE LARIOS DAVILA
Notary Public - California
Los Angeles County
Commission # 2463953
My Comm. Expires Oct 20, 2027

A notary public or other officer completing this certificate verifies only the identity of the individual who signed the document to which this certificate is attached, and not the truthfulness, accuracy, or validity of that document.

STATE OF CALIFORNIA

COUNTY OF _Los Angeles_

On _Feb 28, 2024_, before me, _Lupe Larios Davila_, a Notary Public, personally appeared LIDIA O. GUERRA, who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Lupe L Davila_

LUPE LARIOS DAVILA
Notary Public - California
Los Angeles County
Commission # 2463953
My Comm. Expires Oct 20, 2027

**LEGAL DESCRIPTION**

**EXHIBIT "A"**

Real property in the Town of Yucca Valley, County of San Bernardino, State of California, described as follows:

PARCEL "A":

PARCEL 1 OF PARCEL MAP NO. 14239, IN THE TOWN OF YUCCA VALLEY, COUNTY OF SAN BERNARDINO, STATE OF CALIFORNIA, AS PER PLAT RECORDED IN BOOK 166 OF PARCEL MAPS, PAGES 70 THROUGH 73, INCLUSIVE, RECORDS OF SAID COUNTY.

PARCEL "B":

THE NON-EXCLUSIVE EASEMENTS AS DEFINED IN THAT CERTAIN DECLARATION OF COVENANTS, CONDITIONS, RESTRICTIONS AND RECIPROCAL EASEMENTS RECORDED APRIL 23, 1992, INSTRUMENT NO. 92-173414, OFFICIAL RECORDS, AND AS AMENDED BY THE AMENDMENT TO AND RESTATEMENT OF DECLARATION OF COVENANTS, CONDITIONS, RESTRICTIONS AND RECIPROCAL EASEMENTS AND GRANT OF EASEMENTS RECORDED AUGUST 4, 1993, INSTRUMENT NO. 93-336602, OFFICIAL RECORDS.

APNs: 0601-402-08-0-000 and 0601-402-09-0-000
Commonly known as: 57980 Twentynine Palms Highway, Yucca Valley, California 92284