IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| NUMBER HOLDINGS, INC. *et al.*[1] | § | Case No. 24-10719 (JKS) |
| | § | |
| *Debtors*. | § | (Jointly Administered) |
| | § | |
| | § | **Hearing Date: Dec. 20, 2024 at 9:00am (ET)** |
| | § | **Related to D.I. 1317** |

**MP2 ENERGY NE LLC D/B/A SHELL ENERGY SOLUTIONS' FIRST AMENDED RESPONSE TO DEBTORS' EIGHTH OMNIBUS OBJECTION (SUBSTANTIVE) TO RECLASSIFIED CLAIMS PURSUANT TO SECTION 502 OF THE BANKRUPTCY CODE, BANKRUPTCY RULE 3007, AND LOCAL RULE 3007-1**

MP2 Energy NE LLC d/b/a Shell Energy Solutions ("SES") hereby amends its response (the "Response") to the Debtors' *Eighth Omnibus Objection (Substantive) to Reclassified Claims Pursuant to Section 502 of the Bankruptcy Code, Bankruptcy Rule 3007, and Local Rule 3007-1* (D.I. 1317) (the "Objection"), and in support its Response respectfully shows the Court as follows:

**PRELIMINARY STATEMENT**

1.      The Debtors seek to reclassify SES's administrative priority claim under § 503(b)(9) by arguing the electrical energy SES delivered to the Debtors within twenty days before it filed for bankruptcy relief is not a good. By its Objection, the Debtors essentially ask the Court to interject itself into and rewrite an energy sales agreement that SES and 99 Cents Only Stores, LLC freely entered and have been operating under since 2010. Moreover, under California's statutory retail energy scheme, SES is a non-utility energy service provider that did not deliver electrical energy to the Debtors; SES simply sold it to the Debtors in agreed, specified quantities.

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: (i) Number Holdings, Inc. (1463); (ii) 99 Cents Only Stores LLC (1605); (iii) 99 Cents Only Stores Texas, Inc. (1229); (iv) 99 Cents PropCo LLC (7843); (v) 99 Cents HoldCo LLC (3987); and (vi) Bargain Wholesale LLC (8030). The Debtors' mailing address is 10105 E. Via Linda, Ste. 103 PMB 1207, Scottsdale, AZ 85258.

**SUMMARY OF THE ARGUMENT**

2.     In the parties' agreement, the Debtors contractually admitted the electrical energy SES supplied is a commodity, which not only falls within the definition of goods under the UCC, under the common law and plain meaning, there is little disagreement, under circumstances not relevant here, among courts that electrical energy constitutes a "good." The bankruptcy court decisions holding otherwise are distinguishable.

3.     Beyond the Debtors' contractual admission that electrical energy is a good, it qualifies under the UCC definition, which bankruptcy courts have adopted to analyze this issue under section 503(b)(9). The express language requires only that the thing be moveable at the time of identification to a contract for sale to be classified a "good," an element satisfied by the electrical energy SES provided to the Debtors. To the extent a more stringent standard applies, under California's Direct Access Program, an appreciable period exists between when a specified quantity of electrical energy is identified to SES's contract with the Debtors, delivered to the utility distribution company, and then delivered and consumed by the Debtors.

4.     By intentionally failing to define "good" in the Bankruptcy Code, the term should be construed broadly and not interpreted simply to limit priorities to as few creditors as possible. Notwithstanding, as shown below, the circumstances when applied to the statutory requirements and totality of circumstances here support that SES's provision of electrical energy is indeed a good.

**PROCEDURAL HISTORY**

1.     On April 8, 2024 (the "Petition Date"), Debtor 99 Cents Stores Only, LLC (the "Debtor") joined its affiliates in bankruptcy (collectively, the "Debtors") by filing its voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

2.      On July 8, 2024, SES filed a proof of claim in the total amount of its unpaid invoices for its pre-petition sale and scheduling of electrical energy totaling $2,501,727.58 (the "Claim"). Claim No. 1872.

3.      On September 28, 2024, the Debtors filed their *Eighth Omnibus Objection (Substantive) to Reclassified Claims Pursuant to Section 502 of the Bankruptcy Code, Bankruptcy Rule 3007, and Local Rule 3007-1* (D.I. 1317-2) (the "Objection"), which seeks to reclassify the entirety of SES's Claim as a general unsecured claim. The Omnibus hearing for this Objection was originally set to occur on October 29, 2024.

4.      On October 24, 2024, SES filed the *Emergency Motion of MP2 Energy NE LLC d/b/a Shell Energy Solutions for Enlargement of Time to File a Response to Debtors' Eighth Omnibus Objection (Substantive) to Reclassified Claims Pursuant to Section 502 of the Bankruptcy Code, Bankruptcy Rule 3007, and Local Rule 3007-1* (D.I. 1408) (the "Emergency Motion"), which included *MP2 Energy NE LLC d/b/a Shell Energy Solutions' Response to Debtor's Eighth Omnibus Objection (Substantive) to Reclassified Claims Pursuant to Section 502 of the Bankruptcy Code, Bankruptcy Rule 3007, and Local Rule 3007-1* (D.I. 1408-1) (the "Response"). The omnibus hearing on the Debtors' Objection was originally set for October 29, 2024 (D.I. 1297).

5.      On October 25, 2024, the Debtors filed the *Notice of Agenda for Hearing Scheduled for October 29, 2024, at 11:00 a.m. (Eastern Time)* (D.I. 1412), adjourning both the Objection, as to certain claims, and SES's Emergency Motion to the omnibus hearing scheduled for November 26, 2024 (D.I. 1297).

6.      On November 7, 2024, the Debtors filed the *Certification of Counsel Regarding Order Sustaining Debtors' Eighth Omnibus Objection (Substantive) to Reclassified and Reduced*

*& Reclassified Claims Pursuant to Section 502 of the Bankruptcy Code, Bankruptcy Rule 3007,*

*and Local Rule 3007-1* (D.I. 1463), acknowledging the Debtors' receipt of SES's "formal"

Response to the Objection and removing SES from the revised proposed order.[2]

7.      By agreement, the parties adjourned both Debtors' Objection and SES's Emergency

Motion to the omnibus hearing set for December 20, 2024, at 9:00 a.m. (ET) (D.I. 1393).

## FACTUAL BACKGROUND

### I.      The Unique Framework of the California Legislature's Direct Access Program.

8.      The California legislature created a program to be governed by the California

Public Utilities Commission ("CPUC") for retail end-use customers to register for an opportunity

to purchase fixed quantities of electrical energy directly from a competitive non-utility provider,

referred to as an electric service provider ("ESP"), instead of the regulated investor-owned utility

("IOU"), electrical corporation, or utility distribution company ("UDC") (collectively, "Direct

Access" and/or "DA"). *See* CAL. PUB. UTIL. CODE §§ 330(d),(f), 331(c) (defining "Direct

Transaction" as "a contract between any one or more electric generators, marketers, or brokers of

electric power and one or more retail customers providing for the purchase and sale of electric

power or any ancillary services.") 394(a); Order Denying Rehearing of Decision 21-06-033, Cal.

P.U.C. (Dec. 15, 2022).

9.      The roles of the various participants in Direct Access are similarly defined by

statute or rule, as ESPs, such as SES, are not able to contract directly with a retail end-use customer

except through Direct Access. An ESP's role is defined as an "entity that offers electrical service

to customers within the service territory of an electrical corporation," referring to a UDC or IOU.

---

[2] On December 4, 2024, the Debtors filed a *Certification of Counsel Regarding Order Sustaining Eighth Omnibus Objection (Substantive) to Reclassified Claims Pursuant to Section 502 of the Bankruptcy Code, Bankruptcy Rule 3007, and Local Rule 3007-1 as to Symphony Talent, LLC's Claim* (D.I. 1550), which again acknowledges the Debtors' receipt of SES's "formal" Response regarding the Objection.

*See* CAL. PUB. UTIL. CODE § 394(a). As was expressly contemplated by the California legislature, under Direct Access, the UDC continues to provide the transmission and distribution services to the DA consumer under the control of the California Independent System Operator ("CAISO"). *See* CAL. PUB. UTIL. CODE § 330(f), (k)(1) (outlining one of the objectives of the DA program is to "separate monopoly utility transmission functions from competitive [electrical energy] generation functions, through development of independent, third-party control of transmission access and pricing.").

10.     In the wake of the 2001 energy crisis, California placed a cap on the amount of load, usage or consumption, that can be served by ESPs and limited new enrollment to non-residential customers. *See* Order Denying Rehearing of Decision 21-06-033; CAL. PUB. UTIL. CODE § 365.1(a)-(c).  Due to the load cap, qualified retail end-use customers interested in Direct Access must provide six-months' notice as well as enter an annual lottery with each applicable UDC. *See* CAL. PUB. UTIL. COMM. 2022 ENERGY DIVISION DIRECT ACCESS ANNUAL STATUS REPORT 1-2; CAL. PUB. UTIL. CODE § 365.1(b). As load becomes available, registrants will be notified of their acceptance into Direct Access based on their respective lottery number. *See id.* According to the CPUC, the Direct Access Program is at capacity, as demand exceeded the load, or usage measured in kilowatts, permitted under the regulatory utility service area caps.[3]

## II.     The Debtor and SES Execute the Energy Sales Agreement Pursuant to the Direct Access Program.

11.     On June 29, 2010, pursuant to the DA program, the Debtor, as an end-use consumer-buyer, and SES, as a California retail seller, entered into an Energy Sales Agreement (the "ESA") which provides the framework for the sale and scheduling of a *certain quantity of energy* to be

---

[3] Cal. Pub. Util. Comm., *Direct Access Program*, https://www.cpuc.ca.gov/consumer-support/consumer-programs-and-services/electrical-energy-and-energy-efficiency/community-choice-aggregation-and-direct-access-/direct-access/learn-more-about-costs-and-rates (last visited December 9, 2024).

received at delivery point for a fixed price. *See* Exhibit A-1, ESA §§ 1.4, 2.1. The Confirmation

Transaction or Confirmation Agreement contemplated under the ESA provides the economic terms

of the parties' agreement including, at a minimum, a delivery term, contract price, delivery point,

and contract quantity ("Confirmation Transaction"). *See id.* § 1.3(a).

12.     The ESA provisions establish that SES only sells and schedules a certain quantity

of electrical energy ***to be delivered or transmitted by the UDC*** located in that service territory

based on the economic terms of the Confirmation Transactions. *See id.* § 1.4 ("Buyer shall obtain

and maintain all equipment and services related to its facility necessary or required to enable Buyer

to buy and receive Energy, hereunder, including but not limited to UDC-approved interval

meter(s). . . Seller shall not be responsible for and cannot control UDC's operations and Seller has

no liability whatsoever under this ESA or any Transactions hereunder for Buyer's failure to receive

Energy from or through its UDC's distribution system."), § 2.2 ("Seller shall provide Buyer a credit

equal to the CAISO Charge for Energy delivery over a transmission path to Buyer for any

transmission Buyer's UDC provides Buyer and which is made available to Seller for scheduling

Buyer's Energy."), § 4.1(". . . ***Seller is not selling Buyer load-shaped Energy***. If Buyer uses more

or less than the Contract Quantity of Energy bought from Seller, Buyer shall be obligated to satisfy

the shortfall or oversupply created by its usage pattern, and such obligation shall survive

termination of this ESA.") (emphasis added).

13.     Section 2.1 of the ESA, which defines the parties' obligations, states:

> For each Transaction Seller shall sell and cause to be scheduled, and
> Buyer shall buy and receive, the Contract Quantity of Energy at the
> Delivery Point, and Buyer shall pay Seller the Contract Price and all
> Related Charges. Seller shall be responsible for any costs or charges
> imposed on or associated with Energy or Energy delivery to the
> Delivery Point. Buyer shall be responsible for any costs or charges
> imposed on or associated with Energy or its receipt at and from the
> Delivery Point and all Related Charges.

14. Section 2.2 further clarifies that a "Delivery Point" does not refer to the Buyer's meters. *See id.* §2.2 ("The Parties shall be responsible for system losses and loss changes relating to transmission of Energy as follows: for Seller to the Delivery Point (***which shall not be to Buyer's meter(s)***; for Buyer at and from the Delivery Point.") (emphasis added).

15. The Debtor agreed that SES is not a utility or a provider of last resort. Section 11.8 of the ESA provides that "Seller is not a "utility" as such term is used in 11 U.S.C. §366" and "Seller is not a provider of last resort or UDC." *Id.* §11.8. The ESA reflects the agreement that the Confirmation Transactions constitute "forward contracts" within the meaning of the Bankruptcy Code and that SES is a "forward contract merchant" within the meaning of the Bankruptcy Code. *See id.* §11.6. The Confirmation Transactions memorialize economic terms governing the sale and scheduling of energy, namely that there is a fixed quantity to be scheduled for delivery through the specified UDC to the provided delivery points. *See* Exhibit A-1, Confirmation Transactions.

16. Through the ESA and Confirmation Transactions, before the Petition Date, the Debtors purchased electrical energy from SES for over 200 of its retail stores in California. Pursuant to the regulatory and contractual requirements, each day, SES will prepare a supply plan report for submission to CAISO reflecting the next day's forecasted usage based on fixed quantities provided in the contracts it holds with customers. *See* CASIO, Fifth Replacement Electronic Tariff, Section 31 – Day-Ahead Market as of Jun 1, 2024 (June 18, 2024). Then, as detailed above, SES will schedule the contracted for-quantity of electrical energy with the applicable UDC for transmission and delivery to the delivery point.

17. Due to the SES' limited involvement in only scheduling the contracted-for quantity of electrical energy, SES does not have access to any actual usage or consumption by the Debtors in real-time as the Debtors' meters correspond with the UDC. *See* ESA § 1.4.  SES will base its

invoices to the Debtors on what was scheduled and given to the UDC. *See id.* §§ 2.1, 4.3, 4.4 Art. 6. At a later date, SES will receive actual usage or consumption date from the Debtors' meters to reconcile with the scheduled amounts. *See id.*

18.     SES is further required to report and reconcile the actual usage or consumption, in the form of Settlement Quality Meter Data, or "Meter Data gathered, edited, validated, and stored in a settlement-ready format, for Settlement and auditing purposes," with the scheduled usage previously reported to CAISO. *See* CASIO, Fifth Replacement Electronic Tariff, Appendix A (Oct. 1, 2024) (defining "Settlement" as the "[process of financial settlement for products and services purchased and sold undertaken by the CAISO under Section 11 as supplemented by Section 29. Each Settlement will involve a price and a quantity."); CASIO, Fifth Replacement Electronic Tariff, Section 11 – California ISO Settlements and Billing as of Nov 1, 2024 (Nov. 11, 2024).

### III.    SES's Claim

19.     On July 8, 2024, SES filed a proof of claim in the total amount of its unpaid invoices for its pre-petition sale and scheduling of electrical energy totaling $2,501,727.58 (the "Claim"). Claim No. 1872. A true and correct copy of SES's Claim with the corresponding exhibits is attached hereto as **Exhibit A**. Exhibit 1 to the Claim includes redacted copies of the Energy Sales Agreement entered into between SES and the Debtor as well as the Confirmation Transactions.

20.     In its Claim, SES asserted that $464,805.93 of the total Claim amount is a priority administrative expense pursuant to 11 U.S.C. 503(b)(9), with the remaining amount of $2,036,921.65 classified as a general unsecured claim. However, as expressly reserved in Exhibit 2 to the Claim, SES now amends the amount entitled to priority status under section 503(b)(9) from $464,805.93 to **$371,524.68**. *See* Exhibit A-2.[4] A true and correct copy of SES's amended

---

[4] The value shown on the Claim was utilized to preserve SES's priority claim based on estimates from the summary billed invoices available at the time. *See* Exhibit A-2.

amount of $371,524.68 entitled to administrative priority status under section 503(b)(9) is attached hereto as **Exhibit B**.

21.     Accordingly, **$371,524.68** of SES's claim is entitled to priority status under 11 U.S.C. § 503(b)(9).

## ARGUMENT AND AUTHORITIES

5.     SES is entitled to an administrative priority claim for the value of the goods it delivered to the debtor within the 20-day window preceding the filing of the Debtors' bankruptcy petition. *See* 11 U.S.C. § 503(b)(9). For the Court to allow SES administrative priority, SES must establish: (1) it sold goods to the debtor; (2) the goods were received by the debtor within the twenty days before filing; and (3) the goods were sold to the debtor in the ordinary course of business. *See In re PMC Mktg. Corp.*, 517 B.R. 386, 391 (B.A.P. 1st Cir. 2014) (citing *In re NE Opco, Inc.*, 501 B.R. 233, 240-41 (Bankr. D. Del. 2013).

6.     The Debtors do not dispute that they received SES's electrical energy within twenty days before the Petition Date. Nor do Debtors dispute that they received the electrical energy in the ordinary course of business. Rather, Debtors' sole basis for objection is to reclassify $371,524.68 of SES's Claim as general unsecured because "according to documentation filed with the proof of claim, the claim is for services or other non-goods, which do not qualify for 503(b)(9)." D.I. 1317-2, at 19.

7.     Since the addition of Section 503(b)(9) to the Bankruptcy Code in 2005, there has been an ongoing debate as to whether electrical energy is a good or a service for purposes of Section 503(b)(9). *See In re Pilgrim's Pride Corp.*, 421 B.R. 231 (Bankr. N.D. Tex. 2009); *In re Erving Industries, Inc.*, 432 B.R. 354 (Bankr. D. Mass. 2010); *In re NE Opco, Inc.*, 501 B.R. 233 (Bankr. D. Del. 2013); *In re Escalera Res. Co.*, 563 B.R. 336 (Bankr. D. Col. 2017); *In re N. Pac.*

*Canners & Packers Inc.*, 628 B.R. 337 (Bankr. D. Or. 2021). The decisions, taken together as whole, support the finding that the electrical energy SES supplied to the Debtor is a "good," and as such, SES is entitled to administrative priority treatment for $371,524.68 of the Claim.

8.      In sum, SES is entitled to an administrative priority claim under section 503(b)(9) claim because: 1) under the UCC, plain meaning, and other legal constructs, electrical energy is a good; 2) the broad definition of goods in bankruptcy and non-bankruptcy contexts and the reality of how the Debtors received electrical energy from SES – in fixed, scheduled quantities pursuant to the parties' contractual relationship and California's unique statutory framework – support the conclusion that the energy is a good; 3) under the facts set forth in prior bankruptcy court decisions, including this court in *NE Opco*, a brightline rule that electrical energy is not a good fails to provide for case-by-case analysis of the factors enounced therein; and 4) a sweeping determination that electrical energy is a "service" despite the clear language of SES' agreements would undermine the parties' arms-length bargain,[5] frustrate their purpose, and contradicts SES's status as a forward contract merchant of a commodity and retailer in the commercial market.

9.      Although certain courts have held that electrical energy is by its nature not a good, those holdings are not binding precedent on the Court because neither the Supreme Court, the U.S. Court of Appeals for the Third Circuit, nor the District Court of Delaware have addressed the meaning of "goods" under Section 503(b)(9). Moreover, as discussed in detail below, the holdings from *NE Opco* and *North Pacific Canners* are distinguishable.

## I.      ELECTRICAL ENERGY IS A GOOD UNDER THE UCC, PLAIN MEANING, AND OTHER CONSTRUCTS.

10.      The Bankruptcy Code does not define "good." As a result, most bankruptcy courts faced with the issue of whether electrical energy is a "good" have turned to the Uniform

---

[5] The Debtors applied for the CA Direct Access lottery system and agreed to this electrical energy sales model.

Commercial Code (the "UCC") for guidance. The UCC defines "goods" as all things "which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Article 8) and things in action." U.C.C. § 2-105(1) (AM. L. INST. & UNIF. L. COMM'N 1997) Goods must be both existing and identified before any interest in them can pass. *Id*. § 2–105(2).

11.     To date, six Bankruptcy Court decisions from the District of Colorado,[6] the District of Massachusetts,[7] the District of Montana,[8] the Western District of Wisconsin,[9] and the District of Puerto Rico[10] have found electricity to be a good, qualifying for priority claims treatment. By contrast, five Bankruptcy Court decisions, from the Eastern District of Kentucky,[11] the District of Delaware,[12] the Northern District of Texas,[13] the Southern District of New York,[14] and the District of Oregon[15] have found that it is a service and does not qualify.

A.     Electrical Energy is a Good According to the Majority Approach.

12.     In *Erving Industries*, the Bankruptcy Court for the District of Massachusetts determined that "electricity easily falls within the (UCC's) definition" of "goods" for purposes of Section 503(b)(9) under established criteria. *See* 432 B.R. at 365. The *Erving Industries* court first considered that, "although its ultimate nature may be mystifying to most, electricity *is* tangible and *does* possess physical properties." *Id*. at 369 (emphasis in original). Electrical energy possesses physical properties, is a movable thing, and can be created, measured, and stored, in contrast to

---

[6] *In re Escalera Res. Co.*, 563 B.R. 336 (Bankr. D. Col. 2017).
[7] *In re Erving Indust., Inc.*, 432 B.R. 354 (Bankr. D. Mass. 2010).
[8] *In re S. Mont. Elec. Generation & Transmission Coop., Inc*., No. 11-62031-11, 2013 WL 85162 (Bankr. D. Mon. Jan. 8, 2013).
[9] *In re Grede Foundries, Inc*., 435 B.R. 593 (Bankr. W.D. Wis. 2010), *aff'd sub nom. GFI Wis., Inc.*, 440 B.R.791.
[10] *In re Wometco De P.R., Inc.*, No. 15-02264, 2016 WL 155393 (Bankr. D.P.R. Jan. 12, 2016).
[11] *In re Samaritan Alliance, LLC*, No. 07-50735; 2008 WL 2520107 (Bankr. E.D. Ken. 2008).
[12] *In re NE Opco, Inc*., 501 B.R. 233 (Bankr. D. Del. 2013).
[13] *In re Pilgrim's Pride Corp*., 421 B.R. 231 (Bankr. N.D. Tex. 2009).
[14] *In re Sears Holdings Corp.*, No. 18-23538, 2023 WL 3470475 (Bankr. S.D.N.Y. May 15, 2023).
[15] *In re N. Pac. Canners & Packers Inc*., 628 B.R. 337 (Bankr. D. Or. 2021).

intellectual property. *Id*. Electrical energy is also "not merely a medium of delivery, but *the thing* the customer seeks to purchase." *Id*. at 368 (emphasis in original).

13.    Secondly, as to mobility at the time of identification to the contract, the court noted that electrical energy is metered before it is consumed. *Id*. at 370. "Electricity is identifiable because it can be measured at the point it passes through the meter, and it remains in motion until it reaches the product to be electrified." *Id*. Therefore, nothing in the Article 2's definition of goods requires that, for something to be a good, it remain moveable for any predetermined amount of time. *Id*. at 370. The *Erving Industries* court explained:

> The notion that electricity is consumed at the time it is identified by the meter (and is therefore no longer movable) is inconsistent with the fact that electricity does not simply reach a customer's meter and simultaneously cease to exist. Instead, it **passes through** the meter. At the time the electricity is identified to the contract, it is literally moving, **and** it remains movable for some period of time thereafter.

*Id*. (emphasis added).

14.    Beyond rejecting the debtor's argument that 503(b)(9) properly includes only goods that are capable of being "stockpiled" by debtors and reclaimed by creditors on statutory interpretation grounds, the court also noted that electricity is stockpiled regularly, citing the growing industrial battery cell business that is already valued in the billions. *Id*. at 370. The court concluded that because electricity is movable at the time of identification to the contract, the purchased electricity constitutes a *good* under 11 U.S.C. § 503(b)(9) and the creditor's claim is based on **the sale of electricity, not the provision of services**. *Id*. at 374.

15.    Similarly, in affirming the Bankruptcy Court's holding that electrical energy is a good, not a service, the District Court of Wisconsin discussed the difficulty in understanding the nature of electrical energy:

> For the purpose of determining administrative priority under the Bankruptcy Code, the meaning of "goods" under the UCC should not depend on quantum physics,

how fast electrons are moving at a particular time or even where a debtor's meter is located on an electrical circuit. Rather, determining whether a particular thing qualifies as a good and deserves administrative priority should be a straightforward assessment, taking into consideration the nature and common understanding of the thing, but also considering its similarities to goods that fall undisputedly under the UCC and would receive administrative priority under § 503(b)(9). . . . I agree with those courts concluding that *electricity is movable, tangible and consumable, that it has physical properties, that it is bought and sold in the marketplace and thus, that is qualifies as a good* for purposes of the UCC and Bankruptcy Code.

*GFI Wisconsin*, 440 B.R. at 799-801 (emphasis added).

16.     *Erving Industries* and *GFI Wisconsin* were decided before *NE Opco*. Following *NE Opco*, the Bankruptcy Court for the District of Puerto Rico reached the same conclusion as *Erving Industries* that electricity is a "good" when applying the UCC's definition. *In re Wometco de Puerto Rico Inc.*, No. 15-02264, 2016 BL 8198, (Bankr. D.P.R. Jan. 12, 2016). The court was persuaded by the *Erving Industries* criteria, holding that electrical energy is tangible, possesses physical properties, is identifiable, and therefore, pursuant to the UCC's definition, "a thing is a 'good' as long as it is moveable at the time of identification to a contract for sale, *regardless of whether it remains moveable for eternity or for an infinitesimal amount of time thereafter*." *Id.* at \*2 (emphasis added).

17.     In 2017, the Bankruptcy Court for the District of Colorado utilized expert analysis in determining that electrical energy is a good, not a service.[16] *See Escalera Resources*, 563 B.R. at 343. Dr. Kolitch demonstrated that electrical energy produced by a generator travels through conductive wires to be applied to a useful purpose at an energy-consuming device, and to do so, the electrical energy must move—and therefore be *movable*—from the generator to the energy-consuming device. *Id.* at 345. Dr. Kolitch noted that the supply of electrical energy to a customer

---

[16] The court distinguished "electricity," the catchall term used to describe the constellation of physical properties and effects, from "electrical energy," the proper term to describe the electricity provided by a utility company to a customer. The creditor's expert, Dr. Kolitch, testified: "[w]hat we're talking about is the transfer of electrical energy from the source to the customer."

is measurable. *Id*. Dr. Kolitch thus opined that electrical energy passing from a utility company to a customer is identifiable and electrical energy transferred to the customer is by its fundamental nature moving—and therefore movable—at all times, including when it passes through the customer's electricity meter. *Id*.

18.    Judge McNamara proceeded to conduct an exhaustive analysis of statutory interpretation to determine the meaning of the word "good" in the absence of a definition under the Bankruptcy Code before determining whether electrical energy is a good. *Id*. He noted that electricity has been treated as a "good" under other areas of the law such as antitrust, labor law, energy regulation, torts, and international treaties. *See id.*

19.    Fundamentally, and as applied to these facts, SES is a retail seller, the Debtor was a purchaser, and the electrical energy provided by SES to the Debtors was a good. Accordingly, in reaching their holdings, *North Pacific Canners* and *NE Opco*, discussed *infra*, depart from the majority of other courts that applied the UCC definition of "goods" to electrical energy and concluded it is a good.

B.    The Cases from Outside Delaware Holding Electrical Energy is a Service Contain Limited Reasoning.

20.    Recently, the U.S. District Court for the District of Oregon affirmed the Bankruptcy Court's finding that Pacific Power & Light, a public utility, was not entitled to § 503(b)(9) priority on the basis that electricity is not a good, but rather a service. *See Pacificorp v. N. Pac. Canners & Packers, Inc*., No. 6:21-cv-00863-AA, 2023 WL 1765691, at **4-5 (D. Or. Feb. 3, 2023). The District Court placed great weight on the expert testimony presented by the debtor's expert in the Bankruptcy Court, who reported that "[e]lectricity travels near the speed of light, and electricity meters operate at a much slower speed than that," and "though all widely used forms of electric

meters do measure the amount of electricity that passed through them, they only do so after the electricity was consumed." *Id*. at *2.

21.     Thus, the court found that, because all widely used forms of electric meters are incapable of identifying the amount of electricity to be consumed before consumption, electricity does not comport with the UCC's definition of "goods" requiring that the goods be movable at the time of identification to the contract for sale. *Id*. at **4-5. The District Court found that the identification of electrical energy "is impossible until, at the earliest, the quantity of electricity delivered is registered and displayed on the meter," and by that time, the electrical energy has already been consumed and is, thus, no longer "movable." *Id*.

22.     In the prior decision from this court holding electrical energy is not a good, the court held that there must be a period between which the electricity is identifiable that must be "meaningful." *NE Opco,* 501 B.R. 233, at 250. The court bluntly held "that is not the case with electrical energy." *Id*. In distinguishing electrical energy from other similar things commonly considered goods, such as water and gas, the court seemingly added an arbitrary element to the definition. *Id*.

23.     Based on the reasoning from *NE Opco* and *North Pacific Canners*, it appears conceivable, if not predictable, that decisions finding that electrical energy is not a good on the basis that, because of its speed, it is consumed before the meters can register it, will become obsolete as the technology upon which these decisions are based similarly becomes obsolete. It is doubtful that Congress intended for a "good" to be subject to different classification based on the technology of the day.

24.     Unsurprisingly, courts that have resolved the doubt in favor of debtors almost uniformly cite the "equal distribution aim" guiding the Bankruptcy Code. *See, e.g., N. Pac.*

*Canners & Packers Inc.*, 628 B.R. 337 at 344. Those courts rely not on scientific analysis or plain meaning but seek to limit the pool of creditors entitled to priority claims. Section 503(b)(9), like other provisions, should be interpreted to accord with the principles of equal treatment of like claims. In any event, Bankruptcy Code provisions should not be read so narrowly as to conflict with their plain meaning, and courts should not ascribe meanings to words in the absence of ambiguity.

25.     Moreover, there *is* a meaningful time between identification of the electrical energy to the Confirmation Transactions and consumption by the Debtor, as SES identified the contracted-for quantities of electrical energy to the CAISO the day prior to its delivery to the Debtor, as outlined above.

C.      <u>Under Plain Meaning and Other Constructs, Electrical Energy is a Good.</u>

26.     Unless the statutory text and context of the Bankruptcy Code leads to an entirely contrary understanding, the ordinary meaning of the term "goods" should prevail whether the question arises in bankruptcy or not. *In re Escalera Res. Co.,* 563 B.R. 336, 348 (Bankr. D. Col. 2017). Thus, although every Bankruptcy Court decision construing Section 503(b)(9) has looked outside of bankruptcy for a definitional analog and all have seized on the UCC, a state law statutory scheme, as the main source for defining "goods" under the Bankruptcy Code, the Court should also consider plain meaning. *Id.*

27.     Plain meaning may be ascertained by examining typical usage of words. Reference to dictionaries published near the time of statutory enactment often is helpful, at least as a starting place. *Clark v. Rameker*, 573 U.S. 122, 134 S.Ct. 2242 (2014) (utilizing dictionaries to interpret the words "funds" and "retirement" in Bankruptcy Code). One of the more prominent United States dictionaries defines "goods" as "*commodities*; wares" or "portable personal

property." AMERICAN HERITAGE DICTIONARY OF THE ENGLISH LANGUAGE 756 (Houghton Mifflin Harcourt 4th ed. 2000) (emphasis added).[17]

28.     In any event, when it drafted section 503(b)(9), Congress intentionally selected a categorically generic word, "goods," and further elected to leave the term undefined. The judiciary should not impose its own limits or exclusions where Congress did not do so, and the Court need not determine what Congress intended. It can look at the word's plain meaning to conclude that "goods" means things that have value, are produced for sale, and includes commodities.

29.     First, there should be no dispute that electrical energy is most definitely a "thing that has value." In this case, the value of the electrical energy supplied during the relevant time period, which the Debtor agreed to pay, was $371,524.68. SES produced the electrical energy for sale and sold it to the Debtor (albeit the Debtor failed to pay for the electrical energy). Further, the electrical energy had value in that it was critical to operate the Debtor's respective storefronts that consumed the electrical energy.

30.     Electrical energy is a "commodity." *See Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 800 (6th Cir. 2012). Futures contracts for electrical energy are regulated by the Commodity Futures Trading Commission. *DiPlacido v. Commodity Futures Trading Comm'n*, 364 Fed.App'x. 657 (2d Cir. 2009).

31.     To the extent that tangibility is a necessary element of "goods," electrical energy is tangible. It indisputably exists physically. It can be seen under certain conditions, can be heard humming through powerlines. As anyone who has been electrocuted can attest, electrical energy

---

[17] The main British counterpart is quite similar. "Goods" are "[t]hings that are produced for sale; commodities and manufactured items to be bought and sold; merchandise, wares" or "[p]ersonal property, possessions; *esp.* movable property." OXFORD ENGLISH DICTIONARY, https://www.oed.com (last visited Dec. 9, 2024). For a legal definition, Black's Law Dictionary defines "goods" as "[t]angible or movable personal property other than money. . . . The sale of goods is governed by Article 2 of the UCC" or "[t]hings that have value, whether tangible or not." Bryan A. Garner, BLACK'S LAW DICTIONARY at 714 (Thompson Reuters 8th ed. 1999).

can certainly be felt. In short, electrical energy is perceptible to the senses. It can be measured and quantified and therefore tangible.

32.    Moreover, it is worth noting that the great majority of courts in non-bankruptcy applications consider electrical energy to be "goods" for purposes of UCC Section 2-105.[18] In the special context of personal injury cases involving power lines (before metering and delivery of electrical energy), some states exclude application of the UCC holding that stray electrical current in overhead power lines is not "goods."[19] However, such state courts frequently have distinguished such results and clarified that electrical energy metered and delivered to a customer constitutes "goods" under the UCC.

33.    Accordingly, under common parlance, plain meaning, and even common sense, there should not be any doubt that electrical energy falls within the vast universe of "goods" under typical usage definitions. Therefore, because the Bankruptcy Code does not define the term, the Court should consider it broadly. In any event, because courts across the nation have considered the issue and reached opposition conclusions, SES would show the Court that the better interpretations support a finding that electrical energy is a good rather than a service.

## II.    THE UNIQUE CALIFORNIA FRAMEWORK AND CONTRACT SUPPORT THE CONCLUSION THAT SES'S ELECTRICAL ENERGY IS A GOOD.

34.    Considering the unique facts combined with the salient authority from bankruptcy and non-bankruptcy courts, as well as the unique statutory framework in California and the parties'

---

[18] Case law from California, Indiana, Michigan, Ohio, Pennsylvania, Texas, and Utah support the pro-"goods" approach. *See, e.g., Puget Sound Energy, Inc. v. Pac. Gas & Elec. Co. (In re Pac. Gas & Elec. Co.)*, 271 B.R. 626, 639-40 (N.D. Cal. 2002); *Helvey v. Wabash Cnty. REMC*, 278 N.E.2d 608, 610 (Ind. Ct. App. 1972); *Detroit Edison Co. v. Dep't of Treasury*, 844 N.W.2d 198, 207 (Mich. Ct. App. 2014); *Cincinnati Gas & Elec. Co. v. Goebel*, 502 N.E.2d 713, 715 (Ohio Mun. Ct. 1986); *Bellotti v. Duquesne Light Co.*, No. 86-9965, 1987 WL 258084 (Pa. Ct. Com. Pl. Apr. 16, 1987); *Grant v. Sw. Elec. Power Co.*, 20 S.W.3d 764, 771 (Tex. App.—Texarkana 2000), *aff'd in part, rev'd in part*, 73 S.W.3d 211 (Tex. 2002); *Enron Power Mktg., Inc. v. Nev. Power Co. (In re Enron Corp.)*, No. 01–16034 (AJG), 2004 WL 2290486, at *2 (S.D.N.Y. Oct. 12, 2004).⸴
[19] *See Williams v. Detroit Edison Co.*, 63 Mich. App. 559, 234 N.W.2d 702, 705 (1975).

contract, the totality of the circumstances support the finding that the electrical energy at issue here is a good. Certain factors relevant to the facts of the current situation cited by *NE Opco* that bankruptcy courts consider in determining whether electrical energy qualifies as a good under Section 503(b)(9) include:

- Is electrical energy moveable at the time it is identified by passing through the meter or is it consumed simultaneously with identification?

- Is electrical energy "comparable" with other things that are goods under the U.C.C.?

- Should the nature of the parties' relationship, e.g., is the claimant acting as a "public utility," determine whether electrical energy is a good or a service?

- Should section 503(b)(9) be strictly construed because it provides an otherwise unsecured creditor with an administrative expense claim and, if so, to what extent?

501 B.R. at 249.

However, Judge Sontchi found the first factor to be dispositive and made his determination based thereon. The following is an analysis of certain factors utilized by Judge Sontchi in *NE Opco* as applied to the facts of this case.

A.    <u>Is electricity moveable at the time it is identified by passing through the meter or is it consumed simultaneously with identification</u>?

35.    In analyzing *Erving Industries*, *GFI Wisconsin*, and *Great Atlantic & Pacific Tea Co.* cases, *NE Opco* identified two problems: (1) "it is not necessarily true that there is a period, infinitesimal or not, between identification and use;" and (2) that "is simply the wrong approach." *Id.* at 250. The court begins with the proposition that "every element of the definition of a good matters, including that it must be movable at the time of identification." *Id.* In distinguishing between a good and service, the court states "[a] service is not movable property but, rather, it is performed and consumed simultaneously." *Id.* After reciting the holdings

in *Pilgrim's Pride, Erving Industries*, and *GFI Wisconsin*, the court imposed a new and additional requirement to achieve "goods" status under UCC Section 2-105:

> [I]n order for electricity to be a good, there must be a period between when electricity is identifiable and consumed. But, in order to do justice to the term as it has developed over 1,000 years, ***the period between identification and consumption must be meaningful***. This is not the case with electricity.

*Id.* (emphasis in original).

36.     The court then held that the remarkably fast movement of electrical energy disqualifies it as a "good" under the "plain meaning" of the UCC Section 2–105 and Section 503(b)(9) because there would be no *meaningful* period between identification and consumption. *Id*. at 251 at 256.[20] Yet, the court's analysis fails to appreciate the other ways in which electricity may be "identified" prior to consumption.

37.     In this situation, SES satisfies *NE Opco's* definition because there is a meaningful period between identification and consumption. ***On a daily basis***, SES will report to CAISO the ***contracted-for quantities*** of electrical energy SES will schedule with the applicable UDC for delivery to the Debtors' the next day based on the economic terms in the Confirmation Transactions. Thus, the electrical energy is "identified" nearly a day before it is delivered by the UDC to the Debtors for consumption the next day. Moreover, as SES does not deliver or transmit the electrical energy to the Debtors, the ESA contains a title/risk of loss provision in the ESA which expressly specifies that SES only assumes risk of loss for delivery until it reaches the "Delivery Point" (which is not the Debtors' meter maintained by the UDC but the physical address specified in the Confirmation Transactions) after that the Debtors' assumes the risk of loss. This process is

---

[20] The court calculated (based upon the speed of light) that electrical energy travels "1 mile in 8.024 microseconds." *Id.* at 251 n.69.

overwhelmingly similar to any tangible good that is made by a manufacturer, scheduled for delivery, and thereafter delivered by a third-party service to the consumer.

38.    The court's determination that electrical energy cannot be a good fails to consider the unique nature of the present circumstances and unilaterally forecloses further discussion on the issue. Despite deciding the issue based on this factor, the court considered "the other approaches that courts have identified as relevant to determining whether electricity is a good" but prefaces its analysis by stating "[a]ll of these factors are either neutral or support the Court's holding that electricity is not a good." *NE Opco,* 501 B.R. at 251.

39.    Under these facts, the other factors are not neutral and do not support the *NE Opco* holding.

B.    <u>Is electrical energy comparable with other things that are goods under the UCC?</u>

40.    Although *GFI Wisconsin* found that "there is no principled distinction to be made between natural gas, water, or electricity," *NE Opco* disagreed for purposes of section 503(b)(9). Primarily, the court stated that natural gas and water are "clearly goods under the plain meaning of the U.C.C." *Id.* Water was determined to be comparable to the Black's Law Dictionary definition of "mineral" which is expressly included in the Article 2's definition of a good, while natural gas was already included in the same "once it has been removed from realty." *Id.* at 251-52.

41.    First, other commodities commonly considered goods, such as water and gas, also pass through pipes and are metered, like electrical energy. Thus, notwithstanding *NE Opco's* "no meaningful delay between identification and consumption" requirement, electrical energy has the same characteristics. Water and gas also move quickly, albeit not nearly as quickly as electrical energy. However, if water or gas were to move as quickly it is doubtful they would be transformed to non-goods.

42.    The court further determined that "[u]nlike electricity, both water and natural gas can be identified well before consumption." *Id.* at 252. ("Water that passes through a meter may be stored either in a tank or in the pipes for an indefinite period of time. Indeed, that water could be bled from the tanks and pipes, transferred to another location and used or sold. Theoretically, it could even be returned to the water company. The same is true of natural gas. Natural gas can be stored in a tank for an indefinite period before being transported, used, sold or returned to the gas company.").

43.    Frankly, the court's analysis is semantics. Similar to natural gas and water, electrical energy can be returned, for example to the power grid, if not consumed.

C.    Should the nature of the parties' relationship, e.g., is the claimant acting as a "public utility," determine whether electricity is a good or a service?

44.    On this factor, *NE Opco* considered the fact that "electricity can be bought and sold at a wholesale level." *Id.* at 255. However, the court only contemplated the following relationships:

> "The buyer is not an end user but, rather, sells the electricity to another wholesaler or a consumer. If one makes the good/service determination based on the parties' relationship, then the electric current could travel from origination to use, starting as a good and ending as a service. Indeed, since section 366 is unique to the Bankruptcy Code, whether the wholesaler providing electricity to the consumer is delivering a good or a service might depend on whether the consumer is in bankruptcy."

*Id.* at 255-56.

45.    On this point, the court fails to consider SES' contractual arrangement, which is only allowed pursuant to California statute and contemplates directly contracting with the end-user in a wholesale energy arrangement without having to be responsible for delivery or transmission (specifically, the service aspect). SES's agreement with the applicable UDC is limited to a notification that the end user has requested service from SES as an ESP; its substantive agreements are with the end-user. As *NE Opco* failed to contemplate this statutory relationship, the situation is

one of first impression under 503(b)(9). In any event, based on its limited analysis, the court concluded that the "problems with this approach are self-evident. The proper course is to determine whether electricity, in and of itself, is a good." *Id.* at 256.

46.     Furthermore, a utility can be the seller of goods, not just services under 11 U.S.C. § 366, as courts have roundly rejected the relevance of section 366 to the section 503(b)(9) "goods" versus services "determination." *In re PMC Mktg. Corp.,* 517 B.R. at 393.[21] Thus, even though SES is definitively not a utility, even if so, it would still be a seller of goods.

D.     <u>Should section 503(b)(9) be strictly construed because it provides an otherwise unsecured creditor with an administrative expense claim and, if so, to what extent</u>?

47.     On this factor, *NE Opco* found that section 503(b)(9) should neither be "strictly construed," nor "loosely construed;" instead, "[t]he court should simply apply the law as written and not put a judicially created obstacle in the path of an administrative expense claimant." *Id.* at 256.

48.     Despite its best intentions, the court indeed created an obstacle by creating new requirements for a thing to be classified a good under section 503(b)(9). One of the cases the court relied on, *Pilgrim's Pride*, attempted to determine the legislative intent behind the UCC definition and merely seems to guess that the intent was to exclude electrical energy without any citation to actual sources. *See* 421 B.R. at 239. Notably, *NE Opco* also fails to acknowledge that the great majority of UCC decisions (over decades) have determined that metered and delivered electrical

---

[21] *See, e.g., GFI Wis., Inc.,* 440 B.R. at 801 ("Just because a seller of goods may also be a utility that is entitled to the protection of § 366 . . . does not mean it is prohibited from allowance of a § 503(b)(9) administrative expense claim...." ; *accord In re NE Opco, Inc.,* 501 B.R. at 255 (noting "there are things such as natural gas that are specifically identified in the [UCC] as goods but which are services under [§] 366"); *In re Erving Indus., Inc.,* 432 B.R. at 364 n. 15 (concluding that even if the court were to determine that the claimant is a utility, that characterization would not foreclose a claim under § 503(b)(9)); *In re Plastech Engineered Prods., Inc.,* 397 B.R. at 839 (concluding that natural gas is a "good" recoverable under § 503(b)(9), regardless of whether creditor was entitled to protections under § 366); *In re Pilgrim's Pride Corp.,* 421 B.E. at 241 (holding that nothing in § 366 forecloses gas providers from asserting priority claim under § 503(b)(9)).

energy are "goods." Not only does the court seem to mix-and-match products liability overhead transmission cases plus minority law from New York, it appears *NE Opco* and *Pilgrim's Pride* mistakenly cited some holdings that are the opposite of the actual rulings.

49.     For example, both *Pilgrim's Pride* and *NE Opco* cite the Ohio case of *Cincinnati Gas & Elec. v. Goebel*, 502 N.E.2d 713 (Ohio Mun. Ct. 1986), in support of the proposition that "courts have held that electricity does not fall within the UCC's definition of 'goods.'" *Pilgrim's Pride*, 421 B.R. at 240; *see NE Opco*, 501 B.R. at 248 n.61 (same). However, the *Cincinnati Gas & Elec.* Municipal Court simply made no such ruling. In *Cincinnati Gas & Elec.*, an electric utility sued its customer for breach of contract in connection with the supply of electrical energy and sought to apply the UCC. *See* 502 N.E.2d at 714. The holding expressly states that electrical energy, as is contemplated in the current situation, is a good under the UCC:

> We distinguish electricity in its raw state from metered amounts passing through utility-owned conduits and into the homes of consumers. The latter-described form of electricity is "goods" as defined in the Uniform Commercial Code.

*Id*. at 715.

50.     Thus, in the context of this case, where SES provided electrical energy to the Debtor that was metered, delivered, and used – all undisputed – *Cincinatti Gas & Elec*. strongly support a determination that such electrical energy is "goods" under the UCC 2-105 definition. Similarly, the courts in *Pilgrim's Pride* and *NE Opco* both cite Michigan case law for the proposition that electrical energy is not "goods." *Pilgrim's Pride*, 421 B.R. at 240; *NE Opco*, 501 B.R. at 248 n.61 (both citing *Williams v. Detroit Edison Co.*, 234 N.W.2d 702 (Mich. Ct. App. 1975)).  Although that is the holding of *Williams* (an overhead electric transmission wire products liability case), both *Pilgrim's Pride* and *NE Opco* fail to acknowledge that a subsequent Michigan case clarified that

24

electrical energy becomes a "finished good" when it "reaches its customers' meters. *Detroit Edison Co. v. Dep't of Treasury*, 844 N.W.2d 198, at 207 (Mich. Ct. App. 2014).

51.     SES did not provide a service to the Debtors under any definition. For a court to hold otherwise, it would essentially rewrite the contract between the parties and conflict with California's Direct Access Program regulated by the CPUC and created by the California legislature. Again, the new requirement for "goods" announced in *NE Opco* that the period between identification and consumption must be "meaningful," which is unnecessary and, more importantly, fails to focus on the proper inquiry—the nature of electrical energy and whether it is movable at the time of identification rather than an arbitrary time interval.

## III.     THE DEBTORS SHOULD BE EQUITABLY ESTOPPED FROM ARGUING ELECTRICAL ENERGY IS NOT A GOOD BECAUSE SUCH ARGUMENT DENIES THE NATURE OF THE PARTIES' RELATIONSHIP AND AGREEMENT.

52.     The ESA establishes that SES is a retail seller of goods and not a utility. The agreements contemplate sales transactions of products and related products. Specifically, SES shall "sell and cause to be scheduled" and the Debtor shall "buy and receive" the "Contract Quantity of Energy at the Delivery Point." Exhibit A-1, ESA § 2.1. The ESA places the burden on the Debtor, pursuant to the DA Program, to maintain its status with the UDC as a DA customer. *Id.* at § 1.4. The ESA absolves SES from any liability whatsoever from the Debtor's failure to receive electrical energy from the applicable UDC distribution system. *Id*. Accordingly, the entities providing the "service" of delivering predetermined quantities of electrical energy to the Debtor were the UDCs, not SES.

53.     Moreover, the parties expressly agreed they are forward contract merchants under the Bankruptcy Code. *See id*. § 11.6. The Bankruptcy Code defines a forward contract merchant as a "person whose business consists in whole or in part of entering into forward contracts as or

with merchants in a ***commodity***, as defined in section 761(8) of this title, ***or any similar good***, article, service, right or interest which is presently or in the future becomes the subject of dealing in the forward contract trade." *See* 11 U.S.C. § 101(26).  In turn, a forward contract is defined as "a contract (other than a commodity contract) for the purchase, sale or transfer of a commodity, as defined in section 761(8) of this title, or any similar good. . . which is presently or in the future becomes the subject of dealing in the forward contract trade. . ." *Id*. § 101(25).

54.    Having agreed and admitted that SES is a forward contract merchant and that the ESA, including the Confirm Transactions, is a forward contract, the Debtors should be equitably estopped from taking the opposite position now. Equitable estoppel consists of two essential elements: inducement and reliance. *See In re Mowry*, 263 B.R. 499 (Bankr. W.D. an. 2001). The inducement may be by words or conduct; the acts that are induced may be by commission or forbearance, provided that a change in condition results which causes disadvantage to the one induced. *Id*.

55.    These are sophisticated parties whose agreements are memorialized in the ESA. The documents could not more clearly establish that SES is the seller of a product, a good, and not a service provider. Moreover, they expressly agreed they are forward contract merchants under the Bankruptcy Code for the sake of obtaining the benefits of that classification. The Debtors' position now completely turns their agreement on its head to the direct disadvantage of SES. SES's damages are the amounts subject to priority § 503(b)(9) treatment, which the Debtors now seek relegated to general unsecured status. The Debtors should be precluded from taking this position.

56.    Accordingly, with due consideration for all established legal precedent, combined with the plain language of the ESA and Confirmation Transactions, including SES's obligations

thereunder, SES's Claim and supporting documentation clearly reflect that its claim is for goods which qualify for priority under 11 U.S.C. § 503(b)(9).

## **RESERVATION OF RIGHTS**

57.    SES expressly reserves any and all other rights, objections, claims, and/or causes of action it may assert against Debtors, including without limitation, the right to assert additional claims or administrative expenses against Debtors and their estates and to amend, modify, or supplement this request.

58.    Except as expressly stated herein, in no way does SES intend to alter, amend, or otherwise abrogate SES's Claim concerning pre-petition charges by the filing of this Response.

## **CONCLUSION**

SES respectfully requests that the Court (i) overrule Debtors' Objection to SES's Claim (Cl. No. 1872); (ii) allow $371,524.68 of SES's Claim for administrative priority pursuant to 11 U.S.C. § 503(b)(9), with the remaining portion to be allowed as a general unsecured claim; and (iii) grant any additional relief, at law or in equity, to which SES may be entitled.

Dated: December 9, 2024
Wilmington, Delaware

**HOGAN ♦ MCDANIEL**

*/s/ Garvan F. McDaniel*
Garvan F. McDaniel (DE Bar No. 4167)
1311 Delaware Avenue
Wilmington, DE, 19806
Telephone: 302-656-7540
Facsimile: 302-656-7599
Email: gfmcdaniel@dkhogan.com

-and-

**COKINOS | YOUNG**
Craig E. Power *(admitted pro hac vice)*
Texas Bar No. 16210500
cpower@cokinoslaw.com
Tres Gibbs, III *(admitted pro hac vice)*
Texas Bar No. 24083068

tgibbs@cokinoslaw.com
Emma P. Myles *(admitted pro hac vice)*
Texas Bar No. 24137075
emyles@cokinoslaw.com
1221 Lamar Street, 16th Floor
Houston, Texas 77010-3039
Tel.: (713) 535-5500
Fax: (713) 535-5533

*Counsel for MP2 Energy NE LLC d/b/a
Shell Energy Solutions*