## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
|  | Case No. 24-10719 (JKS) |
| NUMBER HOLDINGS, INC., *et al*, [1] | (Jointly Administered) |
| Debtors. | **Re:  D.I. Nos. 1535 & 1534** |
|  | **Hearing Date: December 20, 2024, at 10:00 a.m. (ET)** |
|  | **Obj. Deadline: December 13, 2024, at 4:00 p.m. (ET) (Extended for U.S. Trustee)** |

**UNITED STATES TRUSTEE'S OBJECTION TO DEBTORS' MOTION FOR ENTRY OF AN ORDER (I) APPROVING THE DISCLOSURE STATEMENT ON AN INTERIM BASIS FOR SOLICITATION PURPOSES ONLY; (II) ESTABLISHING PROCEDURES FOR SOLICITATION AND TABULATION OF VOTES TO ACCEPT OR REJECT THE PLAN; (III) APPROVING THE FORM OF BALLOTS AND SOLICITATION PACKAGE; (IV) ESTABLISHING THE VOTING RECORD DATE; (V) SCHEDULING A COMBINED HEARING FOR FINAL APPROVAL OF THE ADEQUACY OF INFORMATION IN THE DISCLOSURE STATEMENT AND CONFIRMATION OF THE PLAN; AND (VI) GRANTING RELATED RELIEF**

Andrew R. Vara, the United States Trustee for Region Three (the "U.S. Trustee"), through his undersigned counsel, hereby objects (this "Objection")[2] to The *Debtors' Motion For Entry Of An Order (I) Approving The Disclosure Statement On An Interim Basis For Solicitation Purposes*

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: (i) Number Holdings, Inc. (1463); (ii) 99 Cents HoldCo LLC (3987); (iii) 99 Cents Only Stores LLC (1605); (iv) 99 Cents Only Stores Texas, Inc. (1229); (v) 99 Cents PropCo LLC (7843); and (vi) Bargain Wholesale LLC (8030).  The Debtors' mailing address is 10105 E Via Linda, Ste 103 PMB 1207, Scottsdale, AZ 85258.

[2] The U.S. Trustee, as of the filing of this Objection, has received amended documents reflecting revisions to the Solicitation Procedures Order, Disclosure Statement, and Plan. The U.S Trustee has not had sufficient time to consider the revisions in advance of the Objection Deadline as extended for the U.S. Trustee, but remains in discussion with Debtors, their professionals, and will continue reviewing the revisions. To the extent these revisions resolve any of the arguments raised herein, the U.S. Trustee will inform the Debtors and not raise said issue(s) at the hearing as applicable.

*Only; (II) Establishing Procedures For Solicitation And Tabulation Of Votes To Accept Or Reject The Plan; (III) Approving The Form Of Ballots And Solicitation Package; (IV) Establishing The Voting Record Date; (V) Scheduling A Combined Hearing For Final Approval Of The Adequacy Of Information In The Disclosure Statement And Confirmation Of The Plan; And (VI) Granting Related Relief* [D.I. 1535] (the "<u>Motion</u>"), and in support of this Objection respectfully states:

## <u>PRELIMINARY STATEMENT</u>

1.     The U.S. Trustee objects to the Motion because the Disclosure Statement contains inadequate information as to (i) the Plan's framework, (ii) any justification for the Debtors' release of preference claims against only certain similarly situated creditors, and (iii) the parties who will be released or will be giving releases under the Plan. As a gating issue, the Disclosure Statement is not even clear regarding whether the plan the Debtors propose is liquidating or reorganizing, and obviously cannot be approved until that is clarified.

2.     The U.S. Trustee also objects to the Disclosure Statement and Solicitation Procedures for proposing a procedure whereby Third-Party Releases are extracted non-consensually from voting creditors by imposing the releases on them if they vote to accept the Plan or if they reject the Plan but do not opt out of the releases.  The Court should not authorize the Debtors to solicit votes and waste estate resources in support of a nonconfirmable Plan.

## <u>JURISDICTION AND STANDING</u>

3.     This Court has jurisdiction to hear and determine the Motion and this Objection pursuant to: (i) 28 U.S.C. § 1334; (ii) applicable order(s) of the United States District Court of the District of Delaware issued pursuant to 28 U.S.C. § 157(a); and (iii) 28 U.S.C. § 157(b)(2).

4.     Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of chapter 11 cases filed in this judicial district. The duty is part of the U.S.

Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and interpreted by the Courts. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

5.      Pursuant to 28 U.S.C. § 586(a)(3)(B), the U.S. Trustee has the duty to monitor plans and disclosure statements filed in chapter 11 cases and to comment on such plans and disclosure statements.

6.      The U.S. Trustee has standing to be heard on the Motion pursuant to 11 U.S.C. § 307. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest).

## BACKGROUND[3]

### The Chapter 11 Cases

7.      Between April 7 and April 8, 2024, the above-captioned Debtors filed voluntary chapter 11 petitions for relied in this Court.

8.      On April 19, 2024, the U.S. Trustee appointed an official committee of unsecured creditors. [D.I. 203].

9.      Since the Petition Date, the Debtors have sold their inventory at their retail locations through "Going Out of Business Sales," and the Debtors have sold remaining assets like real estate and intellectual property.

---

[3] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

**The Motion**

10.     At the end of November 2024, the Debtors filed the Motion.  In the Motion, the Debtors request, among other things, interim approval of the Disclosure Statement [D.I. 1534] and approval of procedures for the solicitation and tabulation of votes on the Plan [D.I. 1533].

*The Disclosure Statement*

11.     The Disclosure Statement appears to provide that the Plan is a liquidating Plan wherein a Liquidating Trust will be established for the benefit of certain stakeholders. *See* Disclosure Statement at Art. V.

*The Solicitation Procedures*

12.     The Solicitation Procedures provide that the Debtors will send holders of claims in Class 5 (general unsecured claims) a ballot that appears to give the option to "opt out" of the Plan's releases, only if the creditor votes to reject the Plan, but provides that if you vote to accept the Plan, you will be deemed to have granted the releases contained in the Plan.

**PLEASE READ THE VOTING INFORMATION AND
INSTRUCTIONS ABOVE BEFORE COMPLETING THIS BALLOT.**

**Item 1. Class Vote.** The undersigned, the holder of a Class 5 Claim, as of the Voting Record Date of December 11, 2024, hereby votes, in the amount set forth below, as follows (**check one box**):

☐ Accept the Plan

OR

☐ Reject the Plan.

Voting Amount of Claim:[3] $ _____

**Item 2. Important Information Regarding the Releases.**

**AS A HOLDER OF A CLAIM IN CLASS 5 UNDER THE PLAN THAT SUBMITS A VOTE TO ACCEPT THE PLAN, YOU ARE DEEMED TO PROVIDE THE RELEASE CONTAINED IN SECTION X.B OF THE PLAN. IF YOU VOTE TO REJECT THE PLAN WITHOUT CHECKING THE OPT OUT BOX OR OBJECTING, YOU ARE ALSO DEEMED TO PROVIDE SUCH RELEASES.**

Mot. Ex. 2 c.

13.     The "Opt-Out" box appears after several paragraphs of definitions related to the release provisions.

> 4.     **"Representatives"** means, with respect to any Entity, such Entity's successor, predecessor, officer, director, partner, limited partner, general partner, shareholder, manager, management company, investment manager, Affiliate, employee, agent, attorney, advisor, investment banker, financial advisor, accountant or other professional of such Entity on or after the Petition Date, in each case, solely in their respective capacities as such.

> The undersigned holder of the General Unsecured Claim in Class 5 set forth in Item 1 elects to:
>
> ☐ Opt Out of the Release by Holders of Claims.

*Id.*

**<u>The Plan</u>**

14.     The Plan was also filed in late-November 2024, and it contains several provisions relating to releases as detailed below.

5

15.     The Plan defines "Released Parties" as

collectively and individually, and, in each case, solely in their capacity as such, means: (a) the Debtors; (b) the Estates, (c) the Creditors' Committee and its members, (d) the DIP Agent and the DIP Lenders, (e) the Prepetition ABL Agent and the Prepetition Lenders, (f) the Prepetition FILO Agent, (g) the Senior Notes Agent, (h) Holders of the Senior Notes, (i) ***all Holders of Claims who grant the releases provided by the Plan***, and (j) the Representatives of each of the parties enumerated in the preceding clauses (a)-(i); ***provided that any Entity that objects to Confirmation of, or votes to reject, the Plan and any of such Entity's Representatives shall not be a Released Party***.

Plan Art. I, § 96 (emphasis added)

16.     The Plan, in turn, defines "Releasing Parties" as

collectively and individually, and, in each case, solely in their capacity as such: (a) the Debtors; (b) the Estates, (c) the Creditors' Committee and its members, (d) the DIP Agent and the DIP Lenders, (e) the Prepetition ABL Agent and the Prepetition Lenders, (f) the Prepetition FILO Agent, (g) the Senior Notes Agent, (h) the members of the Ad Hoc Group of Senior Noteholders, and (i) the Representatives of each of the parties enumerated in the preceding clauses (a)-(h); ***provided that any Entity that objects to Confirmation of, or votes to reject, the Plan and any of such Entity's Representatives shall not be a Released Party***.

Plan Art. I, § 97 (emphasis added).

17.     The Plan defines "Representatives" as

with respect to any Entity, such Entity's successor, predecessor, officer, director, partner, limited partner, general partner, shareholder, manager, management company, investment manager, Affiliate, employee, agent, attorney, advisor, investment banker, financial advisor, accountant or other professional of such Entity on or after the Petition Date, in each case, solely in their respective capacities as such.

Plan Art. I, § 98.

18.     The Plan contains a substantive release provision titled "Release by Holders of

Claims" ("Third-Party Release"), which provides:

Without limiting any other applicable provisions of the Plan, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including the services of the Released Parties to facilitate the resolution of these cases, ***each (i) Releasing Party and (ii) Holder of a Claim that (a) voted***

*in favor of the Plan, or enters into a settlement with the Debtors with respect to their Claim and its treatment under the Plan or (b) votes to reject the Plan and does not opt out of the release contained in this Section X.B.2 by checking the opt-out box on the Ballot and returning it in accordance with the instructions set forth thereon, indicating that such Holder opts not to grant the releases provided in the Plan, shall be deemed to forever and irrevocably release*, waive and discharge all claims or Causes of Action that such Holder has, had or may have against any Released Party based on or relating to, or in any manner arising from, in whole or in part, any of the Debtors, the Estates, the Debtors' chapter 11 cases, or the negotiation, consideration, formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Disclosure Statement, or any other transaction proposed or consummated connection with these cases, including the Plan, the Disclosure Statement, the DIP Agreement, the Final DIP Order, the Asset Sales, the Sale Order, the Notes Settlement and any other transaction implemented pursuant to or consistent with the foregoing, any Distributions, any contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken in connection with the Plan or the obligations assumed hereunder. The foregoing provisions of this Section X.B.2 shall not affect: (a) the liability of any Released Party that is the result of any act or omission determined in a Final Order to have constituted gross negligence, fraud or willful misconduct; or (b) any rights to enforce the Plan or any contracts, instruments, releases, agreements or documents entered into or delivered in connection with the Plan.

Plan Art. X, § B2 (emphasis added).

19.    The Plan also contains an injunction to enforce the Third-Party Release, among other things:

C. Injunction

Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective Representatives, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.

Except as expressly provided in the Plan, the Confirmation Order, or another Final Order of the Bankruptcy Court or as agreed to by the Debtors, the Post-Confirmation Debtors, and/or the Liquidating Trust, and a holder of a Claim or Interest, all Persons and Entities who have held, hold, or may hold Claims, Interests, or Causes of Action that have been released, discharged, or are subject to exculpation pursuant this Section X of the Plan (the "Released and Exculpated Claims") are permanently enjoined, on and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Liquidating Trust, the Liquidating Trustee, the Post-Confirmation Debtors, the Exculpated limitation, any prejudgment attachment), collecting, or otherwise recovering by any

manner or means, whether directly or indirectly, any judgment, award, decree, or order on account of or in connection with or respect to any such Claims, Interests, or Causes of Action; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind on account of or in connection with or respect to any such Claims, Interests, or Causes of Action; (iv) asserting any right of setoff (except to the extent exercised prepetition), directly or indirectly, against any obligation due from the Debtors, the Liquidating Trust or the Post-Confirmation Debtors, or against property or interests in property of any of the Debtors, Liquidating Trust, or the Post-Confirmation Debtors except as contemplated or allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

The benefit of the injunctions in this Section X.C shall extend to any successors of the Released Parties, and their respective property and interests in property.

Plan Art. X, § C.

20.     The Plan also provides that "[t]he Debtors release and discharge all Avoidance Actions of the Debtors under section 547 of the Bankruptcy Code with respect to: (i) creditors that vote in favor to accept the Plan; and (ii) parties who are not entitled to vote pursuant to the Plan." Plan, Art. IV., § G.

## OBJECTION

### A.     The Disclosure Statement Does Not Contain Adequate Information.

21.     Section 1125 of the Bankruptcy Code provides that a disclosure statement must contain "adequate information" describing a confirmable plan.  11 U.S.C. § 1125; *see also In re Quigley Co.*, 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007).  The Bankruptcy Code defines "adequate information" as:

> Information of a kind, and in sufficient detail, as far as is reasonably practicable in light of the nature and history of the debtor and the condition of the debtor's books and records, including a discussion of the potential material Federal tax consequences of the plan to the debtor, any successor to the debtor, and a hypothetical investor typical of the holders of claims or interests in the case, that ***would enable such a hypothetical reasonable investor of the relevant class to make an informed judgment about the plan*** . . . .

11 U.S.C. § 1125(a)(1) (emphasis added); *see also Momentum Mfg. Corp. v. Employee Creditors Comm. (In re Momentum Mfg. Corp.)*, 25 F.3d 1132, 1136 (2d Cir. 1994); *Kunica v. St. Jean Fin., Inc.*, 233 B.R. 46, 54 (S.D.N.Y. 1999).

22.     The disclosure statement requirement of section 1125 of the Bankruptcy Code is "crucial to the effective functioning of the federal bankruptcy system[;] . . . the importance of full and honest disclosure cannot be overstated." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996) (citing *Oneida Motor Freight, Inc. v. United Jersey Bank (In re Oneida Motor Freight, Inc.*), 848 F.2d 414 (3d Cir. 1988)).

23.     The "adequate information" requirement is designed to help creditors in their negotiations with Debtors over the plan. *See Century Glove, Inc. v. First Am. Bank*, 860 F.2d 94 (3d Cir. 1988). Section 1129(a)(2) conditions confirmation upon compliance with applicable Code provisions. The disclosure requirement of section 1125 is one of those provisions. *See* 11 U.S.C. 1129(a)(2); *In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000).

24.     To be approved, a disclosure statement must include sufficient information to apprise creditors of the risks and financial consequences of the proposed plan. *See In re McLean Indus.*, 87 B.R. 830, 834 (Bankr. S.D.N.Y. 1987) ("substantial financial information with respect to the ramifications of any proposed plan will have to be provided to, and digested by, the creditors and other parties in interest in order to arrive at an informed decision concerning the acceptance or rejection of a proposed plan"); *In re Duratech Indus.*, 241 B.R. 291, 298 (Bankr. E.D.N.Y.), aff'd, 241 B.R. 283 (E.D.N.Y. 1999) (the purpose of the disclosure statement is to give creditors enough information so that they can make an informed choice of whether to approve or reject the debtor's plan).

25.     Section 1125 of the Bankruptcy Code is geared towards more disclosure rather than less.  *See In re Crowthers McCall Pattern, Inc.*, 120 B.R. 279, 300 (Bankr. S.D.N.Y. 1990).  The "adequate information" requirement merely establishes a floor, and not a ceiling for disclosure to voting creditors.  *In re Adelphia Commc'ns Corp.*, 352 B.R. 592, 596 (Bankr. S.D.N.Y. 2006) (citing *Century Glove, Inc. v. First Am. Bank of New York*, 860 F.2d 94, at 100 (3d Cir. 1988).

26.     "Adequate information" under section 1125 is "determined by the facts and circumstances of each case."  *See Oneida*, 848 F.2d at 417 (citing H.R. Rep. No. 595, 97th Cong., 2d Sess. 266 (1977)).

27.     Here, even for purposes of interim approval, the Disclosure Statement does not contain enough information to enable Class 5 (general unsecured creditors) to vote on the Plan because it contains ambiguous information as to whether this is a liquidating plan or a plan of reorganization. The Plan refers to the establishment of a Liquidation Trust which suggests that this is a liquidation Plan, but it also provides that the Plan discharges and terminates all claims and interest pursuant to section 1141(d) of the Bankruptcy Code. *See* Plan, Art. IV. Before any solicitation of the Plan, the Debtors should amend their Disclosure Statement and Plan to clarify the end objective of the Plan proposed.

28.     Moreover, the Plan defines the Released Parties to include "all Holders of Claims who grant the releases provided by the Plan."  The Third-Party Release deems all Holders of Claims who vote to accept the Plan as granting the release and those who vote to reject the plan but do not opt out as granting the release—in either case, with no exception for those who object. But the definitions of Releasing Parties and Released Parties contain provisos stating that those parties who object to confirmation or vote to reject the Plan are not a Released Party. Gauging the import of these provisos in the context of the definitions in which they sit is difficult.  In the case

of the Releasing Parties definition, the proviso makes little sense unless there is a typo in it which is meant to read "Releasing Party," i.e. a party does not give a release if it rejects the Plan or objects to confirmation. Otherwise, as written, a claim holder who rejects the plan, objects to the plan, but fails to opt out is deemed to grant the release but would not be a Released Party. In the case of Released Parties definition, the proviso that those who object to confirmation or vote to reject the Plan are not beneficiaries of the Debtor Release or the Third-Party Release makes it impossible for parties to know who is included as a Released Party. This framework poses adequacy of information issues. Parties considering whether to "opt-out" or not will not know who they are releasing because the deadline to vote, opt out, and object to confirmation of the Plan are all the same.

29.     Additionally, the Disclosure Statement does not explain the Debtors' release and discharge of all avoidance actions under section 547 of the Code against creditors that vote to accept the Plan and parties who are not entitled to vote on the Plan. Specifically, the relevant provision appears to treat similarly-situated creditors differently based on how they vote.

30.     For these reasons, the U.S. Trustee submits that the Disclosure Statement should not be approved in its present state because it does not contain adequate information.

**B.     The Plan is Not Confirmable Because It Proposes Non-Consensual Third-Party Releases.**

31.     If a plan is patently unconfirmable on its face, the application to approve the disclosure statement must be denied. *See In re Quigley Co.,* 377 B.R. 110, 115 (Bankr. S.D.N.Y. 2007) *(*citing *In re Beyond.com Corp.*, 289 B.R. 138, 140 (Bankr. N.D. Cal. 2003)); *In re 266 Washington Assocs.*, 141 B.R. 275, 288 (Bankr. E.D.N.Y.) *aff'd*, 147 B.R. 827 (E.D.N.Y. 1992); *In re Filex, Inc.*, 116 B.R. 37, 41 (Bankr. S.D.N.Y. 1990)).

32.    The Plan is unconfirmable for two separate and independent reasons.[4] *First*, the Plan proposes non-consensual third-party releases that are not authorized under the Bankruptcy Code.  *Second*, the Plan includes an injunction to enforce the third-party releases that is not supported by any authority.

**A.    *The Plan Proposes Unauthorized, Non-Consensual Third-Party Releases***

**i.    State Contract Law Applies, Not Federal Law**

33.    The Supreme Court has definitively held that non-consensual third-party releases are not authorized under the Bankruptcy Code.  *Harrington v. Purdue Pharma L.P.,* 603 U.S. __, 144 S. Ct. 2071, 2082-88 (2024).  The Supreme Court in *Purdue* did not address whether consensual non-debtor releases can be included in a chapter 11 plan and confirmation order.

34.    Whether parties have reached an agreement—including an agreement to release one's claims against another (*i.e.*, not to sue)—is governed by state law. The only exception is if there is federal law that preempts applicable state contract law in some specific context. *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, 'state law must govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72 (1965)).

35.    No such exception applies here.  There is no federal law generally governing when or whether the non-debtor Releasing Parties have agreed to release the non-debtor Released Parties. No Bankruptcy Code provision addresses how to determine whether one non-debtor has agreed to extinguish its direct claims against another non-debtor.   And no Code provision

---

[4]  The U.S. Trustee might assert additional objections to confirmation of the Debtors' Plan. This objection is limited to adequacy of disclosure objections and objections that should be addressed prior to solicitation of the Debtors' Plan.  The U.S. Trustee reserves all of his objections to confirmation.

authorizes courts, as part of an order confirming a chapter 11 plan or otherwise, to "deem" a non-debtor to have consented to an agreement to release claims against other non-debtors where consent would not otherwise be found to exist as a matter of state law. Nor does 11 U.S.C. § 105(a) itself confer any power to override state law. Rather, section 105(a) "serves only to carry out authorities expressly conferred elsewhere in the code." *Purdue*, 144 S. Ct. at 2082 n.2 (quotation marks omitted). Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do equity." *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted). Accordingly, any authority to include third-party releases in a plan must derive from some other source of law. Thus, the Bankruptcy Code does not change the state-law definition of consent as applicable to claims among non-debtor parties.[5]

36.    As courts have recognized, because the Bankruptcy Code does not govern relationships between claim holders and non-debtor third-parties, state-law contract principles serve as controlling authority when considering whether a release is consensual. *See, e.g.*, *Patterson v. Mahwah Bergen Ret. Grp., Inc.*, 636 B.R. 641, 684-85 (E.D. Va. 2022) (describing bankruptcy courts in the District of New Jersey as "look[ing] to the principles of contract law

---

[5]  Indeed, even as to a debtor, it is well settled that whether parties have entered a valid settlement agreement is governed by state law. *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *De La Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law."). That is because "the basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Travelers Cas. & Sur. Co. of America v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 450-451 (2007) (quotation marks omitted); *Butner v. United States*, 440 U.S. 48 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.").

rather than the bankruptcy court's confirmation authority to conclude that the validity of the releases requires affirmative consent"); *In re Smallhold, Inc.*, No. 24-10267, 2024 WL 4296938, at *11 (Bankr. D. Del. Sept. 25, 2024) (requiring "some sort of affirmative expression of consent that would be sufficient as a matter of contract law"); *In re SunEdison, Inc.,* 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor consents to a third-party release."); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 506 (Bankr. D.N.J. 1997) (explaining that a third-party release "is no different from any other settlement or contract" and thus "the validity of the release . . . hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order") (internal quotation marks omitted) (alterations in original).   As one court recently held, because "nothing in the bankruptcy code contemplates (much less authorizes it)' … any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent." *In re Tonawanda Coke Corp.*, No. BK 18-12156 CLB, 2024 WL 4024385, at *2 (Bankr. W.D.N.Y. Aug. 27, 2024) (quoting *Purdue*, 144 S. Ct. at 2086). Accordingly, "any such consensual agreement would be governed by state law." *Id.*

37.     Here, the Debtors do not meet the state-law burden of establishing that the Releasing Parties will affirmatively agree to release their property rights in a manner sufficient to demonstrate consent under state law.

### ii.   Under State Law, Silence Is Not Acceptance

38.     The "general rule of contracts is that silence cannot manifest consent." *Patterson,* 636 B.R. at 686 *see also, e.g.*, *McGurn v. Bell Microproducts, Inc.*, 284 F.3d 86, 90 (1st Cir. 2002) (recognizing "general rule" that "silence in response to an offer . . . does not constitute acceptance of the offer").   Moreover, "[o]rdinarily an offeror does not have power to cause the silence of the offeree to operate as acceptance." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981);

*accord* 1 CORBIN ON CONTRACTS § 3.19 (2018); 4 WILLISTON ON CONTRACTS § 6:67 (4th ed.);

*Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1227 (9th Cir. 2022) ("[T]he offeror cannot prescribe

conditions so as to turn silence into acceptance."). Instead, under state law, an agreement to release

claims—like any other contract—generally requires a manifestation of assent to that agreement.

*See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 17(1) ("[T]he formation of a contract requires

a bargain in which there is manifestation of mutual assent to the exchange and a consideration.").

Consent cannot be imputed or "deemed" based on a party's failure to object—rather, consent must

be affirmatively shown to exist. *See, e.g., id.*; RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt.

a.

39.    There are only very limited exceptions to that principle. "[T]he exceptional cases

where silence is acceptance fall into two main classes: those where the offeree silently takes

offered benefits, and those where one party relies on the other party's manifestation of intention

that silence may operate as acceptance. Even in those cases the contract may be unenforceable

under the Statute of Frauds." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

40.    But absent such extraordinary circumstances, "[t]he mere receipt of an unsolicited

offer does not impair the offeree's freedom of action or inaction or impose on him any duty to

speak." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). *Id.* And "[t]he mere fact that

an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege

to remain silent without accepting." *Id.* § 69, cmt. c (1981); *see also Patterson*, 636 B.R. at 686

(explaining how contract law does not support deeming consent based upon a failure to opt out).

41.    Delaware common law, as a point of reference, is in accord. *See, e.g., Hornberger

Mgmt. Co. v. Haws & Tingle Gen. Contractors, Inc.*, 768 A.2d 983, 991 (Del. Super. Ct. 2000)

(quoting RESTATEMENT (SECOND) OF CONTRACTS § 69 (1981)). Absent limited exceptions not

triggered here, silence and inaction are not assent to an offer. *See Urban Green Techs., LLC v. Sustainable Strategies 2050 LLC*, No. N136-12-115, 2017 WL 527565, at *3 (Del. Super. Ct. Feb. 8, 2017); *see also Patterson*, 636 B.R. at 686 (contract law does not support consent by failure to opt out). For the reasons discussed below, none of those exceptions apply here.

### iii. Third-Party Releases Cannot Be Imposed Based on a Procedural Default Theory

42.     Applicable state contract law cannot be disregarded on a default theory, previously applied by some courts, under which creditors who remain silent are held to have forfeited their rights against non-debtors if they received notice of the non-debtor release but failed to object, just as they would forfeit their right to object to a debtor's plan if they failed timely to do so. *See, e.g., In re Arsenal Intermediate Holdings, LLC*, No. 23-10097, 2023 WL 2655592 (Bankr. D. Del. Mar. 27, 2023), *abrogated by In re Smallhold, Inc.*, 2024 WL 4296938, at *8-*11; *In re DBSD North America, Inc.*, 419 B.R. 179, 218-19 (Bankr. S.D.N.Y. 2009), *aff'd on other grounds*, 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *rev'd in part and aff'd in part*, 634 F.3d 79 (2d Cir. 2011). These courts had reasoned that so long as the creditors received notice of a proposed non-debtor release and were informed of the consequences if they did not opt out or object to that release, there is no unfairness or deprivation of due process from binding them to the release. *Cf. Smallhold*, 2024 WL 4296938, at *1 (describing this reasoning as having treated a mere "failure to opt out" as "allow[ing] entry of the third-party release to be entered by default").

43.     After *Purdue*, however, it is now clear that imposition of a nonconsensual non-debtor release is not available relief through a debtor's chapter 11 plan. *See Purdue,* 144 S. Ct. at 2082-88 & n.1; *see also Smallhold, Inc.*, 2024 WL 4296938, at *2 ("After *Purdue Pharma*, a third-party release is no longer an ordinary plan provision that can properly be entered by 'default' in the absence of an objection."). It is therefore "no longer appropriate to require creditors to object

or else be subject to (or be deemed to 'consent' to) such a third-party release." *Smallhold, Inc.*, 2024 WL 4296938, at *10.

44.     As explained in *Smallhold*, the Supreme Court's *Purdue* decision rejected a fundamental premise of the decisions which had imputed consent for non-debtor releases on a procedural default theory—that a bankruptcy proceeding legally could lead to the destruction of creditors' rights against non-debtors, so they had best pay attention lest they risk losing those rights. *Smallhold, Inc.*, 2024 WL 4296938, at *1-2; *see also id*. at *10 ("The possibility that a plan might be confirmed that provided a nonconsensual release was sufficient to impose on the creditor the duty to speak up if it objected to what the debtor was proposing.").  The courts that relied on this procedural-default theory had reasoned that non-debtor releases were no different from any other plan provision to which creditors had to object or risk forfeiture of their rights, because pre-*Purdue* a chapter 11 plan could permissibly include nonconsensual, non-debtor releases under certain circumstances. *Id*. at *10.  As the *Smallhold* court explained, however, under the default theory, a plan's opt-out provision functions not as a method to secure consent, but rather serves as "an administrative shortcut to relieve those creditors of the burden of having to file a formal plan objection." *Id*. at *2; *see also id*. at *9 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way.  It may be more accurate to say that the counterparty forfeits its objection on account of its default.").

45.     But "[u]nder established principles," courts may enter relief against a party who procedurally defaults by not responding "only after satisfying themselves that the relief the plaintiff seeks is relief that is at least potentially available to the plaintiff in litigation" that is actually contested. *Id*. at *2; *see also id*. at *13 ("[T]he obligation of a party served with pleadings to appear and protect its rights is limited to those circumstances in which it would be appropriate

for a court to enter a default judgment if a litigant failed to do so."). "[After *Purdue*], that is no longer the case in the context of a third-party release." *Id*. at *13. A third-party release is not "an ordinary plan provision that can properly be entered by 'default' in the absence of an objection." *Id*. "It is unlike the listed cure amount where one can properly impose on a creditor the duty to object, and in the absence of such an objection bind the creditor to the judgment." *Id*. That is because, unlike for a creditor's claims against the debtor, the Bankruptcy Code affords no affirmative authority to order a release of claims against third parties. The *Smallhold* court provided an illustration that makes obvious why, even with clear notice, a mere failure to object or opt out of a proposed release does not constitute the manifestation of assent necessary to constitute consent under state law:

> Consider, for example, a plan of reorganization that provided that each creditor who failed to check an "opt out" box on a ballot was required to make a $100 contribution to the college education fund for the children of the CEO of the debtor. Just as in the case of Party A's letter to Party B, no court would find that in these circumstances, a creditor that never returned a ballot could properly be subject to a legally enforceable obligation to make the $100 contribution.

*Id*. at *2 (footnote omitted). None of the cases that allow imposing of a non-debtor release based merely on a creditor's failure to object or opt out "provide[] any limiting principle that would distinguish the third-party release from the college education fund plan. And after *Purdue Pharma*, there is none." *Id*.

46.     Because *Purdue* establishes that a *non*consensual third-party release is "*per se* unlawful," it follows that a third-party release "is not the kind of provision that would be imposed on a creditor on account of that creditor's default." *Id*. at *2. Rather, absent an affirmative showing of consent, a court lacks any power to approve the non-debtor release. And besides the now-discredited default theory, there is "no other justification for treating the failure to 'opt-out'

as 'consent' to the release [that] can withstand analytic scrutiny." *Id*. Because a chapter 11 plan cannot permissibly impose non-debtor releases without the affirmative consent of the releasing parties, a release cannot be imposed based on their mere failure to respond regarding the non-debtor release. Rather, an "*affirmative expression of consent* that would be sufficient as a matter of contract law" is required. *Id*. at *11 (emphasis added).[6]

47.     Here, the Debtors propose that the Third-Party Release in the Plan, which benefits numerous non-debtors that are Released Parties further bind (i) any Holder of a Claim that (a) voted in favor of the Plan, or enters into a settlement with the Debtors with respect to their Claim and its treatment under the Plan or (b) votes to reject the Plan and does not opt out of the release contained in this Section X.B.2 by checking the opt-out box on the Ballot and returning it in accordance with the instructions set forth thereon. Plan Art. X, § B2. In neither case has there been the affirmative, knowing, and voluntary consent required by state law.

### iv. Voting to Accept a Plan Is Not Consent to Release Non-Debtors

48.     The Debtors propose that the non-debtor releases in the Plan bind all parties who vote to accept the Plan. Because the Plan forces non-debtor releases on these parties without their affirmative consent, the releases are non-consensual and cannot be approved under *Purdue*.

49.     The Plan's conflation of voting for the Plan with acceptance of the Third-Party Release is inconsistent with state law. Voting for a plan does not reflect the unambiguous assent necessary to find consent to a release. *See, e.g., In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007) ("[A] consensual release cannot be based solely on a vote in favor of a plan."); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 507 (Bankr. D.N.J. 1997) (holding that, because consensual

---

[6] For those reasons, the *Smallhold* court expressly disapproved of its prior decision in Arsenal, which had relied on the procedural default theory. *See id*. at *8 ("On the central question presented, the Court concludes that its decision in *Arsenal* does not survive *Purdue Pharma*.").

releases are premised on the party's agreement to the release, "it is not enough for a creditor to abstain from voting for a plan, or even to simply vote 'yes' as to a plan").

50.     Voting on a chapter 11 plan is governed by the Bankruptcy Code, and voter support only reflects approval of the plan's treatment of the voters' claims *against the debtor*.  Because impaired creditors have a federal right under the Bankruptcy Code to vote on a chapter 11 plan, *see* 11 U.S.C. § 1126(a), merely exercising that right does not manifest consent to release claims against non-debtors.  People voting on the chapter 11 plan have not "manifest[ed] [an] intention that silence may operate as acceptance" of an offer to release claims against non-debtors. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.  Nor are they "silently tak[ing] offered benefits" from the released non-debtors, such that consent may be inferred.  *Id.*  And because the plan's distributions are not contingent on agreeing to the non-debtor release, one cannot infer consent from the acceptance of those distributions. *See Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279, 1286 (9th Cir. 2017) (holding customer did not retain any benefits such that a failure to opt out of arbitration indicated consent when the warranty applied regardless of the failure to opt out). Further, acceptance of a "benefit" — distributions under the plan — that the offeror had no right to refuse the offeree does not manifest acceptance of the offer. *See Railroad Mgmt. Co., L.L.C. v. CFS La. Midstream Co.*, 428 F.3d 214, 223 (5th Cir. 2005) ("In the absence of any evidence that Strong had the right to exclude CFS from the property in question or that CFS accepted any service or thing of value from Strong, no reasonable jury could conclude that CFS's failure to remove its pipeline upon Strong's demand constituted consent to a contract.").

51.     As explained in *Arrowmill*, a voluntary release arises only "because the *creditor agrees*" to it.  211 B.R. at 507 (emphasis in original).  Because "a creditor's approval of the plan cannot be deemed an act of assent having significance beyond the confines of the bankruptcy

proceedings," "it is not enough for a creditor . . . to simply vote 'yes' as to a plan." *Id*. (quotation marks omitted); *accord Congoleum Corp.*, 362 B.R. at 194; *In re Digital Impact, Inc*., 223 B.R. 1, 14 (Bankr. N.D. Okla. 1998).  Rather, a creditor must "unambiguously manifest[] assent to the release of the nondebtor from liability on its debt." *Arrowmill*, 211 B.R. at 507.

52.     Further, a plan is presented as a package deal—a person votes yes or no on the entire plan, not particular aspects of it—and a person should not be compelled to accept a non-debtor release as a condition of receiving the benefits of a plan.  That is not true consent.  For those who believe the plan is the best way to maximize the return of their money from the debtor, requiring them to vote "no" on the Plan—thus raising the possibility that the Plan may not be able to be confirmed and they thus cannot receive the economic benefit under the Plan—to reject the nondebtor release would be penalizing them for exercising their right to vote in favor of the Plan. That an offeree is penalized unless an "offer" is accepted "preclude[es] an inference of assent." *Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1230-31 (9th Cir. 2022).  And as Judge Goldblatt recognized in *Smallhold*, courts should not force everyone who votes to accept a plan to grant a non-debtor release because, "[i]n addition to (and perhaps more problematic than) the issue of 'coercion' is the concern that such a practice discourages creditors from voting and may distort the voting process, which is intended to provide a valuable signal about the extent of creditor support, within each voting class, for the plan's treatment of creditors' allowed claims." *In re Smallhold, Inc.,* 2024 WL 4296938, at *7.

53.     In addition, the Bankruptcy Code guarantees that a creditor may not be required to accept in a chapter 11 plan less than it would receive in a chapter 7 liquidation. *See* 11 U.S.C. § 1129(a)(7)(A). But a chapter 7 liquidation could not require a release of non-debtors as a condition of receiving a distribution (because it does not involve a plan).  Requiring a non-debtor

release as a condition of receiving a distribution under a chapter 11 plan, absent the individual creditor's consent, is thus inconsistent with Bankruptcy Code section 1129(a)(7)(A).

54.     Hence, voting for a plan does not reflect actual and knowing consent, particularly in the context of "an immensely complicated plan" where "it would be difficult for any layperson to comprehend all of its details."  *In re Congoleum Corp.*, 362 B.R. at 194.

### v. Voting to Reject a Plan Without Opting Out Is Not Consent to Release Non-Debtors

55.     The Plan also imposes non-debtor releases on those who vote to reject the Plan but do not opt out.

56.     But an affirmative agreement — something more than the failure to opt out or failure to object — is required for a non-debtor release to be consensual. *See In re Tonawanda Coke Corp.,* 2024 WL 4024385, at *2; *Patterson*, 636 B.R. at 686. Failing to "opt out" of, or object to, an offer is not a manifestation of consent unless one of the exceptions to the rule that silence is not consent applies, such as conduct by the offeree that manifests an intention that silence means acceptance or taking the offered benefits. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). For example, the *Patterson* court, in applying black-letter contract principles to opt-out releases in a chapter 11 plan, found that contract law does not support consent by failure to opt-out. *Patterson*, 636 B.R. at 686. "Whether the Court labels these 'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent." *Id.* at 688.

57.     The Ninth Circuit's decision in *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279 (9th Cir. 2017), cited with approval by the Third Circuit in *Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-18 (3d Cir. 2017), illustrates the point.  In *Norcia*, a consumer bought a Samsung phone from a Verizon Wireless store and signed the Verizon Wireless Customer

Agreement. *Norcia*, 845 F.3d at 1282. Among the contents of the phone's box was a Samsung "Product Safety & Warranty Information" brochure that contained an arbitration provision, which "stated that purchasers could opt out of the arbitration agreement by providing notice to Samsung within 30 calendar days of purchase, either through email or by calling a toll-free telephone number." *Id*. It also stated that opting out would not affect the warranty coverage. *See id*. The customer did not take any steps to opt out. *See id*. When the customer later sued Samsung, Samsung argued that the arbitration provision applied. *See id*. at 1282-83.

58.     As an initial matter, the *Norcia* court rejected the argument that the customer agreed to the arbitration provision by signing his contract with Verizon: "The Customer Agreement is an agreement between Verizon Wireless and its customer. Samsung is not a signatory." 845 F.3d at 1290. That is even more true in the context of a chapter 11 plan. Not only are the non-debtor Released Parties not signatories to it, a chapter 11 plan is a creature of the Bankruptcy Code specifically for determining how the debtor will pay its creditors, not for resolving claims between non-debtors. As the Ninth Circuit has explained, "[w]hen a bankruptcy court discharges the debtor, it does so by operation of the bankruptcy laws, not by consent of the creditors. … [T]he payment which effects a discharge is not consideration for any promise by the creditors, much less for one to release non-party obligators." *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1085 (9th Cir. 2020) (quotation marks omitted).

59.     The Ninth Circuit in *Norcia* further held that the customer's failure to opt out did not constitute consent to arbitrate. Unsurprisingly — because there was no applicable federal law — the court applied the "general rule," applicable under California law, that "silence or inaction does not constitute acceptance of an offer." 845 F.3d at 1284 (quotation marks omitted); *accord Southern Cal. Acoustics Co. v. C.V. Holder, Inc.*, 456 P.2d 975, 978 (Cal. 1969). The customer did

not agree to arbitrate because he did not "sign the brochure or otherwise act in a manner that would show his intent to use his silence, or failure to opt out, as a means of accepting the arbitration agreement." *Norcia*, 845 F.3d at 1285 (quotation marks omitted). This was true, even though the customer *did* take action to accept the offered contract from Verizon Wireless. "Samsung's offer to arbitrate all disputes with [the customer] cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that silence will be taken as consent, unless an exception to this general rule applies." *Id.* at 1286 (quotation marks and citation omitted).

60.     The Ninth Circuit explained that there are two exceptions to this rule—when the offeree has a duty to respond or when the offeree retains the offered benefits—but held neither exception applied. *See Norcia*, 845 F.3d at 1284-85. There was no state law imposing a duty on the customer to act in response to the offer, the parties did not have a prior course of dealing that might impose such a duty, and the customer did not retain any benefits by failing to act given that the warranty applied whether or not he opted out of the arbitration provision. *See id*. at 1286.

61.     Here, too, claim holders who vote to reject the plan but fail to opt out have not signed an agreement to release the non-debtor releasees nor acted in any other manner to suggest that their silence manifests an intention to accept an offer to release the non-debtors.

62.     It is implausible to suggest that a party returning a ballot rejecting the plan but neglecting to opt out of the third-party release is evidencing consent to the third-party release.  Not only is there no "mutual agreement" as to the Plan, much less the third-party release, the creditor has expressly stated its rejection of the Plan.  As the court in *Chassix Holdings, Inc.* reasoned, "a creditor who votes to reject a plan should also be presumed to have rejected the proposed third-party releases that are set forth in the plan. ***The additional 'opt out' requirement, in the context***

24

*of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor.*" 533 B.R. 64, 79 (Bankr. S.D.N.Y. 2015) (emphasis added).

63.     Whether or not a creditor votes to accept or reject the Plan, such creditors may not have understood the solicitation package and may not have possessed the time or financial resources to engage counsel, never imagining that their rights against non-debtors could be extinguished through the bankruptcy of these Debtors. "[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Norcia*, 845 F.3d at 1285 (quotation marks omitted).

### vi.  *Smallhold*'s Conclusion that Voting Plus a Failure to Opt Out Equals Consent to a Non-Debtor Release Is Incorrect.

64.     *Smallhold's* conclusion that voting to reject a plan plus a failure to opt out equals consent to a non-debtor release is incorrect.

65.     The U.S. Trustee recognizes that Judge Goldblatt in *Smallhold* found that, in at least some circumstances, the act of voting on a debtor's plan (whether to accept or reject it) combined with a failure to exercise an opt-out option can constitute consent to a non-debtor release.  *See Smallhold,* 2024 WL 4296938, at *14.  The *Smallhold* decision, however, although stating it was applying "ordinary contract principles," 2024 WL 4296938, at *3, failed to faithfully apply those principles to the question of when silence can constitute consent.  For the reasons discussed above, contract principles do not support imputing consent for a third-party release based merely upon a creditor's neglect to exercise an opt-out option and that remains true even when that option is conspicuous or well-advertised.

66.     In *Smallhold*, Judge Goldblatt reasoned that consent to a non-debtor release could be understood to exist because the act of voting on a debtor's plan is an "affirmative step" taken

after being told that failing to opt out would bind the voter to the non-debtor release. *Smallhold,* 2024 WL 4296938, at *14. But while voting is certainly an "affirmative step" with respect to the debtor's plan, it is not a "*manifestation of intention* that silence may operate as acceptance" of a third-party release. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981) (emphasis added). The bankruptcy exists to resolve debtor's liabilities, not those of third parties. And because, as noted above, *supra* ¶¶ 39-42, creditors have no affirmative obligation to act even as to the Debtors' plan, they certainly can have no duty to respond to an offer to release non-debtors of liabilities that exist outside the bankruptcy case entirely. Further, because impaired creditors have a federal right under the Bankruptcy Code to vote on a chapter 11 plan, 11 U.S.C. § 1126(a), merely exercising that right does not manifest consent to release claims against non-debtors. Thus, the act of voting on a plan without taking an additional step to opt out is still merely silence with respect to the non-debtor release.

67.     As explained by the Restatement, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction"—in this case, the freedom to vote on a chapter 11 plan—"or impose on him any duty to speak," such as by checking an opt out box or returning an opt out form. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). Voting on a plan while failing to opt out thus cannot be equated with affirmative conduct manifesting consent to the non-debtor release. Just like the hypothetical creditors in *Smallhold* could not be forced to contribute $100 to a college fund to benefit the debtor's CEO's children merely because they failed to return a ballot with an "opt out" box, *Smallhold,* 2024 WL 4296938, at *2, creditors who cast such a ballot should not be forced to make such a contribution merely because they failed to check that "opt out" box. State law affords no basis to conclude that consent to release *third-party* claims (which are governed by *nonbankruptcy* law) can properly be inferred from a party's

26

mere failure to check an opt-out box on a ballot expressing views about the proposed treatment of a creditor's claims against the *debtor* (governed by *bankruptcy* law). *See supra* ¶¶ 34-42. As a result, the "general proposition" that *Smallhold* recognized continues to apply: "creditors must *affirmatively express consent to the release* in order to be bound by it." *Id.* at *8 (emphasis added); *accord* at *10 ("[I]t is no longer appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release.").

68.     Notably, the Ninth and Second Circuit cases cited by *Smallhold* do not support its conclusion that the act of voting on a chapter 11 plan while remaining silent regarding the non-debtor release constitutes consent. *Smallhold*, 2024 WL 4296938, at *14 n.60 (citing *Berman v. Freedom Fin. Network*, 30 F.4th 849, 856 (9th Cir. 2022); *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017)). Those cases emphasize the importance of notice as one prerequisite to consent, recognizing that "an offeree, *regardless of apparent manifestation of his consent*, is not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious." *Meyer*, 868 F.3d at 74 (internal quotation marks omitted; emphasis added). Those cases thus concern the requirements for when someone can be deemed on "inquiry notice" of terms they did not read. *See Berman*, 30 F.4th at 856; *Meyer*, 868 F.3d at 75. But while notice of a contractual term is certainly a necessary precondition to finding consent, notice is not alone sufficient. *See, e.g., Meyer*, 868 F.3d at 74; *Norcia*, 845 F.3d at 1284; RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). Whether there has been sufficient notice of an offer is a distinct question from whether there has been a manifestation of an intent to accept that offer, particularly where the offer—*i.e.*, the proposed third-party release—amounts to a side agreement governed by nonbankruptcy law and benefiting distinct parties. As explained above, for that side agreement to be valid, there must also be a manifestation of consent to that

agreement.  *See, e.g., Berman*, 30 F.4th at 85; *Norcia*, 845 F.3d at 1284; RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

### vii. There Was Insufficient Notice of the Non-Debtor Releases for There to Be Consent

69.     Failure to return the release opt-out ballot/form is not consent because—whether they are asked to vote or not—claimants have no reason to expect that an offer to contract with non-debtors will be included in the plan solicitation.  As the Third Circuit has explained, there can be no presumption that someone has agreed to contractual provisions of which they are "on notice," unless "there is a reasonable basis to conclude that consumers will have understood the document contained a bilateral agreement."  *See Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-118 (3d Cir. 2017).  *See also Norcia*, 845 F.3d at 1289 ("[N]o contract is formed when the writing does not appear to be a contract and the terms are not called to the attention of the recipient.") (quotation marks omitted).

### viii. Rule 23's Opt-Out Rule Is Legally Irrelevant Because Congress Has Not Included Anything Like That in the Bankruptcy Code

70.     In *Smallhold*, Judge Goldblatt raised the issue of whether opt outs could constitute consent because, under Federal Rule of Civil Procedure 23, a court-approved class action settlement may bind class members who do not opt out of the class action.  *See Smallhold, Inc.*, 2024 WL 4296938, at *15.  That analogy to class-action procedure is inapt.  Rule 23, incorporated by Bankruptcy Rule 7023 only for adversary proceedings, is irrelevant.  This is not an adversary proceeding to which Bankruptcy Rule 7023 applies and no one has sought class treatment here.  Fed. R. Bankr. P. 7023.  Thus, by their own terms, neither Rule 23 nor Bankruptcy Rule 7023 applies.

71.     And Congress has not seen fit to enact a Code provision authorizing imposing non-debtor releases in chapter 11 plans on those who fail to opt out.  Importantly, "people who fail to respond to class action notices are bound because that is the legal consequence that the Rule specifies, and not on the theory that their inaction is the equivalent of an affirmative joinder in an action." *In re Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015).  By contrast, in the context of non-debtor releases imposed via a chapter 11 plan, "[t]here is no rule that specifies an 'opt out' mechanism or a 'deemed consent' mechanism." *Id.*  Absent a duly enacted statute or federal rule of procedure, a court cannot unilaterally transplant Rule 23(b)(3)'s class-action "opt out" procedure to bankruptcy proceedings to confirm a chapter 11 plan.

72.     Further, a rule of procedure, including Bankruptcy Rule 7023, cannot modify or abridge state law regarding what constitutes consent to a release.  28 U.S.C. § 2075.  That follows from the fact that no provision in the Code authorizes treatment of creditors' claims against non-debtors as a class action.  There is no federal class action statute that preempts state contract law, which (as discussed above) requires affirmative consent.

73.     Indeed, as the court found in *Patterson*, "the comparison to class action litigation highlights the impropriety of finding releases consensual based merely on a failure to opt out" because in class actions, unlike chapter 11 plan confirmations, "courts must ensure that the class action complies with the unique requirements of Rule 23 of the Federal Rules of Civil Procedure."[7] 636 B.R. at 686.

---

[7] Further, "in the class action context there is a public policy that favors the consolidation of similar cases and that justifies the imposition of a rule that binds class members who have not affirmatively opted out."  *In re Chassix Holdings, Inc.*, 533 B.R. 64, 78 (Bankr. S.D.N.Y. 2015).  By contrast, in the context of non-debtor releases imposed via a chapter 11 plan, there is no "general 'public policy' in favor of making third party releases applicable to as many creditors as possible."  *Id.*

74.    Federal class actions may proceed only after a court certifies that the class meets a series of rigorous procedural requirements designed to ensure the appropriateness and fairness of class-wide litigation.  For any class to be certified, Rule 23(a) requires a court to find: (1) commonality ("questions of law or fact common to the class"); (2) typicality (named parties' claims or defenses "are typical . . . of the class"); and (3) adequacy of representation (representatives "will fairly and adequately protect the interests of the class").  *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 613 (1997) (quoting Fed. R. Civ. P. 23); *see id.* at 621 (noting that these standards protect against the variability of equitable justice).

75.    Once those threshold showings are made, Rule 23(b) then requires that one of three further predicates satisfied.  Speaking generally, Rule 23(b)(1) authorizes class treatment where "individual adjudications would be impossible or unworkable," while Rule 23(b)(2) authorizes class actions where "the relief sought must perforce affect the entire class at once."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011).  Rule 23(b)(3), in turn, authorizes class treatment only where a court finds both that "the questions of law or fact common to class members predominate over any questions affecting only individual members" and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  Opt-out procedures are only available in class actions under Rule 23(b)(3)— and not those under Rule 23(b)(1) and 23(b)(2).  *See Wal-Mart Stores*, 564 U.S. at 362 (explaining that "unlike (b)(1) and (b)(2) classes, the (b)(3) class is not mandatory").)

76.    Class action procedures also entail additional procedural safeguards.  A class must be specifically defined to identify the class members and the class claims.  Fed. R. Civ. P. 23(c)(1)(B).  Moreover, the court must appoint class counsel that can best "represent the interests of the class."  Fed. R. Civ. P. 23(g). And for classes certified under Rule 23(b)(3), class members

must receive "the best notice practicable" that must "clearly and concisely state in plain, easily understood language:" the nature of the action, who the class is, what their claims or defenses are; their right to appear in the action through an attorney; their right to exclude themselves from the action; how and when to exclude themselves; and the binding nature of the judgment if they do not.  In other words, the Federal Rules of Civil Procedure set objective procedural protections before a class can be certified and potential members bound.

77.     Further, "any class settlement that would bind absent class members requires court approval." *Patterson*, 636 B.R. at 686 (citing Fed. R. Civ. P. 23(e)).  And approval may only be granted if, after a hearing, the court finds the settlement is "'fair, reasonable, and adequate' taking into account whether '(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate; and (D) the proposal treats class members equitably relative to each other.'"  *Id*. at 687 (quoting Fed. R. Civ. P. 23(e)(2)).  "The inquiry appropriate under Rule 23(e) . . . protects unnamed class members from unjust or unfair settlements affecting their rights." *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 623 (1997).

78.     "None of these protections exist in the context of a non-debtor release in a bankruptcy action." *Patterson*, 636 B.R. at 686.   "[N]o party litigates on behalf of the absent releasing party." *Id*.; *see also In re Smallhold, Inc.*, No. 14-10267, 2024 WL 4296938, at *12 n.53 (Sept. 25, 2024) ("[I]n the class action context, a class is only certified after a court makes a factual finding that the named representative is an appropriate representative of the unnamed class members. In the plan context, there is no named plaintiff, found by the court to be an adequate representative, whose actions may presumptively bind others.").  And "[n]o party with a typical claim has a duty to ensure that he fairly and adequately represents the best interests of the absent

releasing party." *Patterson*, 636 B.R. at 686.  "Moreover, the absent releasing party does not enjoy

counsel that will represent his best interests in his stead."[8] *Id*.

79.     Finally, in a class action, members that fail to opt out have claims litigated on their

behalf, and they may receive whatever proceeds are won in that litigation.  Under a chapter 11 plan

with non-debtor releases, although the releasing creditors may receive a distribution under the plan

for their claims against a debtor, they lose their claims against the released non-debtors and any

corresponding compensation forever if they fail to take affirmative action to opt out or object.

Indeed, if a mere failure to opt out constitutes consent to a non-debtor release in bankruptcy, "then

no court carries an obligation to ensure the fairness, reasonableness and adequacy of the relief

afforded the absent releasing parties." *Patterson*, 636 B.R. at 687.

80.     Notably, state law also provides class-action procedures, with similar procedural

protections to federal class actions, in which unnamed class members are bound by a court-

approved class settlement unless they opt out.  *See, e.g.,* Del. Super. Ct. R. Civ. P. 23.  But outside

of that class-action context, ordinary contract principles apply as discussed above, and a person

cannot force a contract on someone else by deeming silence, such as a failure to "opt out," to be

consent, except in narrow circumstances inapplicable here.

81.     In sum, there will be no affirmative consent to Third-Party Releases given by the

numerous persons and entities on whom such releases will be imposed.  Such releases are therefore

non-consensual.

---

[8] Although the official committee of unsecured creditors owes a fiduciary duty to the creditor body as a whole, it does not owe a duty to any individual creditor or any specific group of creditors, and the diverse body of creditors to whom it owes duties often has conflicting interests.  *See In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 717, 722 (Bankr. S.D.N.Y. 1992) (fiduciary duty of individual members of an official committee "extends to the class as a whole, not to its individual members").  Further, the committee's duties relate only to claims against the debtor, not claims against non-debtors.

**C.      The Plan Cannot Be Confirmed Because There Is No Authority for the Injunction Against Bringing Claims Against Non-Debtors**

82.     This Court also may not approve the injunction enforcing the release by barring claims against non-debtors.  *Purdue* clearly stands for the proposition that non-consensual third-party releases and injunctions are generally not permitted by the Bankruptcy Code. *See Purdue Pharma L.P.*, 144 S. Ct. at 2088. As the *Purdue* court noted, the Bankruptcy Code allows courts to issue an injunction in support of a non-consensual, third-party release in exactly one context: asbestos-related bankruptcies, and these cases are not asbestos-related. *See id.* at 2085 (citing 11 U.S.C. § 524(e)).

83.     Even if non-debtor releases are consensual, there is no Code provision that authorizes chapter 11 plans or confirmation orders to include injunctions to enforce them. Further, such an injunction is not warranted by the traditional factors that support injunctive relief. Parties seeking an injunction "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also Purdue Pharma*, 144 S. Ct. at 2085 (noting that an injunction is an "extraordinary remedy"); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("An injunction should issue only where the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.'") (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919)); *Fechter v. HMW Indus., Inc.*, 879 F.2d 1111, 1119 (3d Cir. 1989) ("We have long followed the

33

principle that equitable remedies are available once legal remedies are found to be inadequate.")
(citing *Weinberger*).

84.     The Debtors have made no attempt to show that any of these factors are met.  Nor
could they.  If the release is truly consensual, there is no threatened litigation and no need for an
injunction to prevent irreparable harm to either the estates or the released parties. A consensual
release may serve as an affirmative defense in any ensuing, post-effective date litigation between
the third party releasees and releasors, but there is no reason for this Court to be involved with the
post-effective date enforcement of those releases. Moreover, this injunction essentially precludes
any party deemed to consent to this release from raising any issue with respect to the effectiveness
or enforceability of the release (such as mistake or lack of capacity) under applicable non-
bankruptcy law.

85.     Similarly, there is no statutory authority in the Bankruptcy Code that justifies an
injunction to enforce the proposed exculpation, and the Debtors have shown no need for an
injunction to prevent "irreparable harm" to either the estates or the released parties.

## RESERVATION OF RIGHTS

86.     The U.S. Trustee leaves the Debtors to their burden of proof and reserves any and
all rights, remedies and obligations to, among other things, (i) complement, supplement, augment,
alter or modify this Objection, (ii) assert any objection, (iii) file any appropriate motion, (iv)
conduct any and all discovery as may be deemed necessary or as may be required, and (v) assert
such other grounds as may become apparent upon further factual discovery.

**[Continued on next page – space intentionally left blank]**

**WHEREFORE**, the U.S. Trustee respectfully requests that the Court enter an order: (i) denying approval of the Motion; and (ii) granting such other and further relief as the Court deems just and equitable.

Dated: December 13, 2024                       Respectfully submitted,

                                               **ANDREW R. VARA**
                                               **UNITED STATES TRUSTEE**
                                               **REGIONS 3 AND 9**

                                       By:  */s/Rosa Sierra-Fox*
                                               Trial Attorney
                                               United States Department of Justice
                                               Office of the United States Trustee
                                               J. Caleb Boggs Federal Building
                                               844 N. King Street, Room 2207, Lockbox 35
                                               Wilmington, DE 19801
                                               Telephone: (302) 573-6491
                                               Email: rosa.sierra-fox@usdoj.gov

## CERTIFICATE OF SERVICE

I, Rosa Sierra-Fox, hereby attest that on December 13, 2024, I caused to be served a copy of this *United States Trustee's Objection to Debtors' Motion for Entry of an Order (I) Approving the Disclosure Statement on an Interim Basis for Solicitation Purposes Only; (II) Establishing Procedures for Solicitation and Tabulation of Votes to Accept or Reject the Plan; (III) Approving the Form of Ballots and Solicitation Package; (IV) Establishing the Voting Record Date; (V) Scheduling a Combined Hearing for Final Approval of the Adequacy of Information in the Disclosure Statement and Confirmation of the Plan; and (VI) Granting Related Relief* by electronic service on the registered parties via the Court's CM/ECF system and upon the following parties in the manner indicated:

Robert J. Dehney, Sr., Esq.
(rdehney@morrisnichols.com)
Matthew O. Talmo, Esq.
(mtalmo@ morrisnichols.com)
Jonathan M. Weyand, Esq.
(jweyand@ morrisnichols.com)
Casey B. Sawyer, Esq.
(csawyer@ morrisnichols.com)
Morris, Nichols, Arsht & Tunnell LLP
1201 N. Market Street, 16th Floor
Wilmington, DE 19801
(Counsel to Debtors)
***Via Email***

Dennis F. Dunne, Esq.
(ddunne@milbank.com)
Michael W. Price, Esq.
(mprice@milbank.com)
Lauren C. Doyle, Esq.
(ldoyle@milbank.com)
Brian Kinney, Esq.
(bkinney@milbank.com)
Milbank LLP
55 Hudson Yards
New York, NY 10001
(Counsel to Debtors)
***Via Email***

Bradford J. Sandler, Esq.
(bsandler@pszjlaw.com)
Steven W. Golden, Esq.
(sgolden@pszjlaw.com)
Colin R. Robinson, Esq.
(crobinson@pszjlaw.com)
Pachulski Stang Ziehl & Jones LLP
919 N. Market Street, 17th Floor
Wilmington, DE 19801
(Counsel to Official Committee of Unsecured Creditors)
***Via Email***

Robert J. Feinstein, Esq.
(rfeinstein@pszjlaw.com)
Pachulski Stang Ziehl & Jones LLP
780 Third Avenue, 34th Floor
New York, NY 10017
(Counsel to Official Committee of Unsecured Creditors)
***Via Email***

*/s/ Rosa Sierra-Fox, Esq.*
Rosa Sierra-Fox, Esq.