## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | Chapter 11 |
| NUMBER HOLDINGS, INC., *et al*, [1] | Case No. 24-10719 (JKS) |
| Debtors. | (Jointly Administered) |
|  | **Re:  D.I. Nos. 1613 & 1613-1** |
|  | **Hearing Date: Jan. 24, 2025, at 10:00 a.m. (ET)** |
|  | **UST Obj. Deadline: Jan. 20, 2025, at 4:00 p.m. (ET)** |

### UNITED STATES TRUSTEE'S OBJECTION TO CONFIRMATION OF JOINT CHAPTER 11 PLAN OF NUMBER HOLDINGS, INC., AND ITS DEBTOR AFFILIATES

Andrew R. Vara, the United States Trustee for Region Three (the "U.S. Trustee"), through his undersigned counsel, hereby objects (this "Objection") to the *Joint Chapter 11 Plan of Number Holdings, Inc., and Its Debtor Affiliates* [D.I. 1613-1] (the "Plan"),[2] and in support of this Objection respectfully states:

### PRELIMINARY STATEMENT

1.      The Court should deny confirmation for the following separate and independent reasons:

    (a)      **The Plan proposes non-consensual third-party releases that are not authorized by the Bankruptcy Code and which run afoul of applicable United States Supreme Court precedent.** The Debtors seek to impose the third-party releases on all creditors who return a properly completed ballot but fail to "opt out" of the Plan's third-party release provisions. But a

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: (i) Number Holdings, Inc. (1463); (ii) 99 Cents HoldCo LLC (3987); (iii) 99 Cents Only Stores LLC (1605); (iv) 99 Cents Only Stores Texas, Inc. (1229); (v) 99 Cents PropCo LLC (7843); and (vi) Bargain Wholesale LLC (8030).  The Debtors' mailing address is 10105 E Via Linda, Ste 103 PMB 1207, Scottsdale, AZ 85258.

[2] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Plan.

creditor's failure to opt out – whether they vote to accept or reject the Plan – does not constitute the affirmative "consent" required for the releases to be effective under applicable state law.

(b)     **The Plan also includes an unauthorized injunction enforcing the third-party release and exculpation provisions.** An injunction barring creditors' claims against third parties is only permissible in asbestos cases, and these are not asbestos cases. The plan injunction cannot be improved and underscores the problematic nature of the Plan's third-party releases.

(c)     **The Plan's statutory fees provisions are insufficient.** Section 1930(a)(6) requires the payment of quarterly fees on all "disbursements" made by or on behalf of the Debtors until entry of the final decree closing these chapter 11 cases, regardless of who makes the disbursements, when they are made or for what purpose. Yet the Plan's statutory fees provisions fail to require the liquidating trust to be established pursuant to the plan to file post-confirmation reports and pay quarterly fees on post-confirmation disbursements. This is against the weight of case law interpreting and applying section 1930(a)(6).

(d)     **The Plan is not a global settlement.** Section 1123(b) of the Bankruptcy Code clearly defines the scope of a plan's "settlement" provisions, which are limited to the settlement of claims held by the Debtors and their estates. The Debtors cannot use the Plan to impose a "global settlement" on third parties pursuant to Bankruptcy Rule 9019, and in any event the Debtors have not met their burden for approval of a settlement thereunder.

2.      Accordingly, and for the reasons set forth in more detail herein, the Court should not confirm the Plan in its current form.

## JURISDICTION AND STANDING

3.      This Court has jurisdiction to hear and determine confirmation of the Plan and this Objection pursuant to: (i) 28 U.S.C. § 1334; (ii) applicable order(s) of the United States District Court of the District of Delaware issued pursuant to 28 U.S.C. § 157(a); and (iii) 28 U.S.C. § 157(b)(2).

4.      Pursuant to 28 U.S.C. § 586, the U.S. Trustee is charged with overseeing the administration of chapter 11 cases filed in this judicial district. The duty is part of the U.S. Trustee's overarching responsibility to enforce the bankruptcy laws as written by Congress and

interpreted by the Courts. *See Morgenstern v. Revco D.S., Inc. (In re Revco D.S., Inc.)*, 898 F.2d 498, 500 (6th Cir. 1990) (describing the U.S. Trustee as a "watchdog").

5.　　Pursuant to 28 U.S.C. § 586(a)(3)(B), the U.S. Trustee has the duty to monitor plans and disclosure statements filed in chapter 11 cases and to comment on such plans and disclosure statements.

6.　　The U.S. Trustee has standing to be heard on this Objection pursuant to 11 U.S.C. § 307. *See United States Trustee v. Columbia Gas Sys., Inc. (In re Columbia Gas Sys., Inc.)*, 33 F.3d 294, 295-96 (3d Cir. 1994) (noting that U.S. Trustee has "public interest standing" under 11 U.S.C. § 307, which goes beyond mere pecuniary interest).

## **BACKGROUND**

### A.　**The Chapter 11 Cases**

7.　　Between April 7 and April 8, 2024 (the "Petition Dates"), the above-captioned debtors and debtors in possession (collectively, the "Debtors") each filed a voluntary petition for relief pursuant to chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.*, (the "Bankruptcy Code"), in the United States Bankruptcy Court for the District of Delaware (this "Court"), thereby commencing the above-captioned chapter 11 cases (the "Chapter 11 Cases").

8.　　The Debtors continue to manage and operate their business as debtors in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

9.　　On April 19, 2024, the U.S. Trustee appointed an official committee of unsecured creditors (the "Committee"). D.I. 203.

10.　　Since the Petition Dates, the Debtors have sold their inventory at their retail locations through "Going Out of Business Sales." The Debtors have also sold their remaining non-inventory assets including real estate and intellectual property.

3

**B.**    **Relevant Plan Provisions**

11.    The Plan is a liquidating Plan wherein a Liquidating Trust will be established for the benefit of certain stakeholders. There will also be one or more Post-Confirmation Debtor(s). *See* Disclosure Statement at Art. V.

12.    The Plan includes the following provisions relevant to this Objection:

**i.**    **The Third-Party Release Provisions**

13.    Article X.B.2 of the Plan, entitled "Releases by Holders of Claims," provides as follows (the "Third-Party Release(s)"):

> Without limiting any other applicable provisions of the Plan, as of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, including the services of the Released Parties to facilitate the resolution of these cases, to the fullest extent permitted by law, *each (i) Holder of a Claim that returns a Ballot in accordance with the instructions set forth thereon or enters into a settlement with the Debtors with respect to their Claim and its treatment under the Plan, and does not opt-out of the release contained in this Section X.B.2 by checking the opt-out box on the Ballot indicating that such Holder opts not to grant the releases provided in the Plan and (ii) Releasing Party, shall be deemed to forever and irrevocably release*, waive and discharge all claims or causes of action that such Holder has, had or may have against any Released Party based on or relating to, or in any manner arising from, in whole or in part, any of the Debtors, the Estates, the Debtors' chapter 11 cases, or the negotiation, consideration, formulation, preparation, dissemination, implementation, Confirmation or consummation of the Plan, the Disclosure Statement, or any other transaction proposed or consummated connection with these cases, including the Plan, the Disclosure Statement, the DIP Agreement, the Final DIP Order, the Asset Sales, the Sale Order, the Notes Settlement and any other transaction implemented pursuant to or consistent with the foregoing, any Distributions, any contract, instrument, release or other agreement or document created or entered into or any other act taken or omitted to be taken in connection with the Plan or the obligations assumed hereunder. The foregoing provisions of this Section X.B.2 shall not affect: (a) the liability of any Released Party that is the result of any act or omission determined in a Final Order to have constituted gross negligence, fraud or willful misconduct; or (b) any rights to enforce the Plan or any contracts, the Plan.
>
> Nothing in this Plan discharges, releases, precludes, or enjoins: (a) any liability to any governmental unit that is not a Claim; (b) any Claim of a governmental unit arising after the Effective Date; (iii) any police or regulatory liability to a governmental unit on the part of any Entity as the owner or operator of property after the Effective Date; or (iv) any liability to a governmental unit on the part of

any Entity other than the Debtors. Nothing in this Plan shall enjoin or otherwise bar a governmental unit from asserting or enforcing, outside this Court, any liability described in the preceding sentence. Nothing in this Plan divests any tribunal of any jurisdiction it may have to adjudicate any defense based on this Plan provision.

Plan, Art. X.B.2 (emphasis modified).

14.     The Plan defines "Released Parties" to include:

collectively and individually, and, in each case, solely in their capacity as such, means: (a) the Debtors; (b) the Estates, (c) the Creditors' Committee and its members, (d) the DIP Agent and the DIP Lenders, (e) the Prepetition ABL Agent and the Prepetition Lenders, (f) the Prepetition FILO Agent, (g) the Senior Notes Agent, (h) Holders of the Senior Notes, (i) *all Holders of Claims who grant the releases provided by the Plan*, and (j) the Representatives of each of the parties enumerated in the preceding clauses (a)-(i); *provided that any Entity that objects to the releases provided by the Plan and any of such Entity's Representatives shall not be a Released Party*.

*Id.* at Art. I, Item 96 (emphasis added).

15.     The Plan defines "Releasing Parties" to include:

collectively and individually, and, in each case, solely in their capacity as such: (a) the Estates, (b) the Creditors' Committee and its members, (c) the DIP Agent and the DIP Lenders, (d) the Prepetition ABL Agent and the Prepetition Lenders, (e) the Prepetition FILO Agent, (f) the Senior Notes Agent, (g) the members of the Ad Hoc Group of Senior Noteholders, and (h) the Representatives of each of the parties enumerated in the preceding clauses (a)-(g).

*Id.* at Art. I, Item 97.

16.     The Plan defines "Representatives" to include:

with respect to any Entity, such Entity's successor, predecessor, officer, director, partner, limited partner, general partner, shareholder, manager, management company, investment manager, Affiliate, employee, agent, attorney, advisor, investment banker, financial advisor, accountant or other professional of such Entity on or after the Petition Date, in each case, solely in their respective capacities as such.

*Id.* at Art. I, Item 98.

17.     The Plan also includes an injunction provision to enforce, among other things, the

Third-Party Releases (the "Plan Injunction"):

Upon entry of the Confirmation Order, all holders of Claims and Interests and other parties in interest, along with their respective Representatives, shall be enjoined from taking any actions to interfere with the implementation or Consummation of the Plan.

Except as expressly provided in the Plan, the Confirmation Order, or another Final Order of the Bankruptcy Court or as agreed to by the Debtors, the Post-Confirmation Debtors, and/or the Liquidating Trust, and a holder of a Claim or Interest, all Persons and Entities who have held, hold, or may hold Claims, Interests, or causes of action that have been released, discharged, or are subject to exculpation pursuant this Section X of the Plan (the "Released and Exculpated Claims") are permanently enjoined, on and after the Effective Date, from taking any of the following actions against, as applicable, the Debtors, the Liquidating Trust, the Liquidating Trustee, the Post-Confirmation Debtors, the Exculpated Parties, the Released Parties, and/or the Plan Administrator: (i) commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including, without limitation, any proceeding in a judicial, arbitral, administrative or other forum) on account of or in connection with or respect to any such Claims, Interests, or causes of action; (ii) enforcing, levying, attaching (including, without limitation, any prejudgment attachment), collecting, or otherwise recovering by any manner or means, whether directly or indirectly, any judgment, award, decree, or order on account of or in connection with or respect to any such Claims, Interests, or causes of action; (iii) creating, perfecting, or otherwise enforcing in any manner, directly or indirectly, any encumbrance of any kind on account of or in connection with or respect to any such Claims, Interests, or causes of action; (iv) asserting any right of setoff (except to the extent exercised prepetition), directly or indirectly, against any obligation due from the Debtors, the Liquidating Trust or the Post-Confirmation Debtors, or against property or interests in property of any of the Debtors, Liquidating Trust, or the Post-Confirmation Debtors except as contemplated or allowed by the Plan; and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.

The benefit of the injunctions in this Section X.C shall extend to any successors of the Released Parties, and their respective property and interests in property.

*Id.* at Art. X.C.

### ii.    The Statutory Fees Provision

18.    Article II.A of the Plan provides as follows with respect to the payment of U.S.

Trustee quarterly fees (the "Statutory Fees Provision"):

On or before the Effective Date, all fees due and payable pursuant to section 1930 of Title 28 of the U.S. Code, together with the statutory rate of interest set forth in section 3717 of Title 31 of the U.S. Code to the extent applicable ("Quarterly Fees")

shall be paid. After the Effective Date, the Debtors or the Post-Confirmation Debtors, as applicable, shall be liable to pay any and all Quarterly Fees when due and payable. The Debtors shall file all monthly operating reports due prior to the Effective Date when they become due, using UST Form 11-MOR. After the Effective Date, the Plan Administrator shall cause each Post-Confirmation Debtor to file with the Bankruptcy Court separate UST Form 11-PCR reports when they become due. Notwithstanding the substantive consolidation of the Debtors called for in the Plan, each and every one of the Debtors and the Post-Confirmation Debtors shall remain obligated to pay Quarterly Fees to the Office of the U.S. Trustee until the earliest of that particular Debtor's case being closed, dismissed, or converted to a case under Chapter 7 of the Bankruptcy Code. The U.S. Trustee shall not be required to file any Administrative Claim in the case, and shall not be treated as providing any release under the Plan.

*Id.* at Art. II.A.1.C.

19.     Pursuant to the Statutory Fees Provision, the Liquidating Trustee would not be liable for the payment of Quarterly Fees. Nor would the Liquidating Trustee be required to file UST Form 11-PCR reports.

### iii.     Plan as Global Settlement

20.     The Plan includes a provision that treats the entire Plan as a settlement of claims (the "9019 Provision"):

Pursuant to section 1123 of the Bankruptcy Code and Bankruptcy Rule 9019, in consideration of the Distributions and other benefits provided under the Plan, the provisions of the Plan, including the releases set forth in Section X.B, shall constitute a good-faith compromise and settlement of all Claims, Interests, disputes and controversies relating to the rights of Holders of Claims and Interests. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval, as of the Effective Date, of such compromise and settlement. The entry of the Confirmation Order shall also constitute the Bankruptcy Court's determination that such compromise and settlement is in the best interests of the Debtors, their Estates, creditors and all other parties in interest, and is fair, equitable and within the range of reasonableness. If the Effective Date does not occur, the settlements set forth in this Plan shall be deemed to have been withdrawn without prejudice to the respective positions of the parties.

*Id.* at Art. IV.F.

**OBJECTION**

I.    **The Plan is Unconfirmable Because it Contains Non-Consensual Third-Party Releases.**

21.    The Court should not confirm the Plan because the proposed Third-Party Releases are not authorized under the Bankruptcy Code and run afoul of applicable Supreme Court precedent.

A.    **State Contract Law Determines Whether the Third-Party Releases are Consensual.**

22.    The Supreme Court has definitively held that non-consensual third-party releases are not authorized under the Bankruptcy Code. *Harrington v. Purdue Pharma L.P.,* 603 U.S. __, 144 S. Ct. 2071, 2082-88 (2024). The Supreme Court in *Purdue* did not address whether consensual non-debtor releases can be included in a chapter 11 plan and confirmation order.

23.    The foundation of a consensual release is an agreement between the parties. Whether parties have reached an agreement—including an agreement to release one's claims against another (*i.e.*, not to sue)—is governed by state law. The only exception is if there is federal law that preempts applicable state contract law in some specific context. *See, e.g., Shady Grove Orthopedic Assocs. v. Allstate Ins. Co.*, 559 U.S. 393, 416 (2010) (plurality) ("For where neither the Constitution, a treaty, nor a statute provides the rule of decision or authorizes a federal court to supply one, 'state law must govern because there can be no other law.'") (quoting *Hanna v. Plumer*, 380 U.S. 460, 471-72 (1965)).

24.    No such exception applies here. There is no federal law generally governing when or whether the non-debtor Releasing Parties have agreed to release the non-debtor Released Parties. No Bankruptcy Code provision addresses how to determine whether one non-debtor has agreed to extinguish its direct claims against another non-debtor. And no Code provision authorizes courts, as part of an order confirming a chapter 11 plan or otherwise, to "deem" a non-

8

debtor to have consented to an agreement to release claims against other non-debtors where consent would not otherwise be found to exist as a matter of state law. Nor does 11 U.S.C. § 105(a) itself confer any power to override state law. Rather, section 105(a) "serves only to carry out authorities expressly conferred elsewhere in the code." *Purdue*, 144 S. Ct. at 2082 n.2 (quotation marks omitted). Bankruptcy courts cannot "create substantive rights that are otherwise unavailable under applicable law," nor do they possess a "roving commission to do equity." *In re Dairy Mart Convenience Stores, Inc.*, 351 F.3d 86, 92 (2d Cir. 2003) (quotation omitted). Accordingly, any authority to include third-party releases in a plan must derive from some other source of law. Thus, the Bankruptcy Code does not change the state-law definition of consent as applicable to claims among non-debtor parties.[3]

25.     As courts have recognized, because the Bankruptcy Code does not govern relationships between claim holders and non-debtor third-parties, state-law contract principles serve as controlling authority when considering whether a release is consensual. *See, e.g.*, *Patterson v. Mahwah Bergen Ret. Grp., Inc.*, 636 B.R. 641, 684-85 (E.D. Va. 2022) (describing bankruptcy courts in the District of New Jersey as "look[ing] to the principles of contract law rather than the bankruptcy court's confirmation authority to conclude that the validity of the releases requires affirmative consent"); *In re Smallhold, Inc.*, No. 24-10267, 2024 WL 4296938,

---

[3] Indeed, even as to a debtor, it is well settled that whether parties have entered a valid settlement agreement is governed by state law. *See Houston v. Holder (In re Omni Video, Inc.)*, 60 F.3d 230, 232 (5th Cir. 1995) ("Federal bankruptcy law fails to address the validity of settlements and this gap should be filled by state law."); *De La Fuente v. Wells Fargo Bank, N.A. (In re De La Fuente)*, 409 B.R. 842, 845 (Bankr. S.D. Tex. 2009) ("Where the United States is not a party, it is well established that settlement agreements in pending bankruptcy cases are considered contract matters governed by state law."). That is because "the basic federal rule in bankruptcy is that state law governs the substance of claims, Congress having generally left the determination of property rights in the assets of a bankrupt's estate to state law." *Travelers Cas. & Sur. Co. of America v. Pacific Gas & Elec. Co.*, 549 U.S. 443, 450-451 (2007) (quotation marks omitted); *Butner v. United States*, 440 U.S. 48 (1979) ("Congress has generally left the determination of property rights in the assets of a bankrupt's estate to state law.").

at *11 (Bankr. D. Del. Sept. 25, 2024) (requiring "some sort of affirmative expression of consent that would be sufficient as a matter of contract law"); *In re SunEdison, Inc.,* 576 B.R. 453, 458 (Bankr. S.D.N.Y. 2017) ("Courts generally apply contract principles in deciding whether a creditor consents to a third-party release."); *In re Arrowmill Dev. Corp.*, 211 B.R. 497, 506 (Bankr. D.N.J. 1997) (explaining that a third-party release "is no different from any other settlement or contract" and thus "the validity of the release . . . hinge[s] upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order") (internal quotation marks omitted) (alterations in original).   As one court recently held, because "nothing in the bankruptcy code contemplates (much less authorizes it)' … any proposal for a non-debtor release is an ancillary offer that becomes a contract upon acceptance and consent." *In re Tonawanda Coke Corp.*, No. BK 18-12156 CLB, 2024 WL 4024385, at *2 (Bankr. W.D.N.Y. Aug. 27, 2024) (quoting *Purdue*, 144 S. Ct. at 2086). Accordingly, "any such consensual agreement would be governed by state law." *Id.*

26.     Here, the Debtors do not meet the state-law burden of establishing that the Releasing Parties will affirmatively agree to release their property rights in a manner sufficient to demonstrate consent under state law.

## B.     Under Applicable State Law, Silence is Not Acceptance.

27.     The "general rule of contracts is that silence cannot manifest consent." *Patterson,* 636 B.R. at 686; *see also, e.g.*, *McGurn v. Bell Microproducts, Inc.*, 284 F.3d 86, 90 (1st Cir. 2002) (recognizing "general rule" that "silence in response to an offer . . . does not constitute acceptance of the offer").   Moreover, "[o]rdinarily an offeror does not have power to cause the silence of the offeree to operate as acceptance." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981); *accord* 1 CORBIN ON CONTRACTS § 3.19 (2018); 4 WILLISTON ON CONTRACTS § 6:67 (4th ed.); *Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1227 (9th Cir. 2022) ("[T]he offeror cannot prescribe

conditions so as to turn silence into acceptance."). Instead, under state law, an agreement to release claims—like any other contract—generally requires a manifestation of assent to that agreement. *See, e.g.*, RESTATEMENT (SECOND) OF CONTRACTS § 17(1) ("[T]he formation of a contract requires a bargain in which there is manifestation of mutual assent to the exchange and a consideration."). Consent cannot be imputed or "deemed" based on a party's failure to object—rather, consent must be affirmatively shown to exist. *See, e.g.*, *id.*; RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a.

28.     There are only very limited exceptions to that principle. "[T]he exceptional cases where silence is acceptance fall into two main classes: those where the offeree silently takes offered benefits, and those where one party relies on the other party's manifestation of intention that silence may operate as acceptance. Even in those cases the contract may be unenforceable under the Statute of Frauds." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

29.     But absent such extraordinary circumstances, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction or impose on him any duty to speak." RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). *Id.* And "[t]he mere fact that an offeror states that silence will constitute acceptance does not deprive the offeree of his privilege to remain silent without accepting." *Id.* § 69, cmt. c (1981); *see also Patterson*, 636 B.R. at 686 (explaining how contract law does not support deeming consent based upon a failure to opt out).

30.     Delaware common law, as a point of reference, is in accord. *See, e.g., Hornberger Mgmt. Co. v. Haws & Tingle Gen. Contractors, Inc.*, 768 A.2d 983, 991 (Del. Super. Ct. 2000) (quoting RESTATEMENT (SECOND) OF CONTRACTS § 69 (1981)). Absent limited exceptions not triggered here, silence and inaction are not assent to an offer. *See Urban Green Techs., LLC v. Sustainable Strategies 2050 LLC*, No. N136-12-115, 2017 WL 527565, at *3 (Del. Super. Ct. Feb.

8, 2017); *see also Patterson*, 636 B.R. at 686 (contract law does not support consent by failure to opt out).  For the reasons discussed below, none of those exceptions apply here.

> **C.    Third-Party Releases Cannot Be Imposed Based on a Procedural Default Theory.**

31.    Applicable state contract law cannot be disregarded on a default theory, previously applied by some courts, under which creditors who remain silent are held to have forfeited their rights against non-debtors if they received notice of the non-debtor release but failed to object, just as they would forfeit their right to object to a debtor's plan if they failed timely to do so. *See, e.g., In re Arsenal Intermediate Holdings, LLC*, No. 23-10097, 2023 WL 2655592 (Bankr. D. Del. Mar. 27, 2023), *abrogated by In re Smallhold, Inc.*, 2024 WL 4296938, at *8-*11; *In re DBSD North America, Inc.*, 419 B.R. 179, 218-19 (Bankr. S.D.N.Y. 2009), *aff'd on other grounds*, 2010 WL 1223109 (S.D.N.Y. Mar. 24, 2010), *rev'd in part and aff'd in part*, 634 F.3d 79 (2d Cir. 2011). These courts had reasoned that so long as the creditors received notice of a proposed non-debtor release and were informed of the consequences if they did not opt out or object to that release, there is no unfairness or deprivation of due process from binding them to the release.  *Cf. Smallhold*, 2024 WL 4296938, at *1 (describing this reasoning as having treated a mere "failure to opt out" as "allow[ing] entry of the third-party release to be entered by default").

32.    After *Purdue*, however, it is now clear that imposition of a nonconsensual non-debtor release is not available relief through a debtor's chapter 11 plan.  *See Purdue,* 144 S. Ct. at 2082-88 & n.1; *see also Smallhold, Inc.*, 2024 WL 4296938, at *2 ("After *Purdue Pharma*, a third-party release is no longer an ordinary plan provision that can properly be entered by 'default' in the absence of an objection.").  It is therefore "no longer appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release." *Smallhold, Inc.*, 2024 WL 4296938, at *10.

33.     As explained in *Smallhold*, the Supreme Court's *Purdue* decision rejected a fundamental premise of the decisions which had imputed consent for non-debtor releases on a procedural default theory—that a bankruptcy proceeding legally could lead to the destruction of creditors' rights against non-debtors, so they had best pay attention lest they risk losing those rights.  *Smallhold, Inc.*, 2024 WL 4296938, at *1-2; *see also id*. at *10 ("The possibility that a plan might be confirmed that provided a nonconsensual release was sufficient to impose on the creditor the duty to speak up if it objected to what the debtor was proposing.").  The courts that relied on this procedural-default theory had reasoned that non-debtor releases were no different from any other plan provision to which creditors had to object or risk forfeiture of their rights, because pre-*Purdue* a chapter 11 plan could permissibly include nonconsensual, non-debtor releases under certain circumstances.  *Id*. at *10.  As the *Smallhold* court explained, however, under the default theory, a plan's opt-out provision functions not as a method to secure consent, but rather serves as "an administrative shortcut to relieve those creditors of the burden of having to file a formal plan objection."  *Id*. at *2; *see also id*. at *9 ("In this context, the word 'consent' is used in a shorthand, and somewhat imprecise, way.  It may be more accurate to say that the counterparty forfeits its objection on account of its default.").

34.     But "[u]nder established principles," courts may enter relief against a party who procedurally defaults by not responding "only after satisfying themselves that the relief the plaintiff seeks is relief that is at least potentially available to the plaintiff in litigation" that is actually contested.  *Id*. at *2; *see also id*. at *13 ("[T]he obligation of a party served with pleadings to appear and protect its rights is limited to those circumstances in which it would be appropriate for a court to enter a default judgment if a litigant failed to do so.").  "[After *Purdue*], that is no longer the case in the context of a third-party release."  *Id*. at *13.  A third-party release is not "an

ordinary plan provision that can properly be entered by 'default' in the absence of an objection."

*Id*. "It is unlike the listed cure amount where one can properly impose on a creditor the duty to

object, and in the absence of such an objection bind the creditor to the judgment." *Id*.    That is

because, unlike for a creditor's claims against the debtor, the Bankruptcy Code affords no

affirmative authority to order a release of claims against third parties.  The *Smallhold* court

provided an illustration that makes obvious why, even with clear notice, a mere failure to object

or opt out of a proposed release does not constitute the manifestation of assent necessary to

constitute consent under state law:

> Consider, for example, a plan of reorganization that provided that
> each creditor who failed to check an "opt out" box on a ballot was
> required to make a $100 contribution to the college education fund
> for the children of the CEO of the debtor.  Just as in the case of Party
> A's letter to Party B, no court would find that in these circumstances,
> a creditor that never returned a ballot could properly be subject to a
> legally enforceable obligation to make the $100 contribution.

*Id*. at *2 (footnote omitted). None of the cases that allow imposing of a non-debtor release based

merely on a creditor's failure to object or opt out "provide[] any limiting principle that would

distinguish the third-party release from the college education fund plan. And after *Purdue Pharma*,

there is none." *Id*.

35.    Because *Purdue* establishes that a *non*consensual third-party release is "*per

se* unlawful," it follows that a third-party release "is not the kind of provision that would be

imposed on a creditor on account of that creditor's default." *Id*. at *2. Rather, absent an affirmative

showing of consent, a court lacks any power to approve the non-debtor release.  And besides the

now-discredited default theory, there is "no other justification for treating the failure to 'opt-out'

as 'consent' to the release [that] can withstand analytic scrutiny." *Id*.  Because a chapter 11 plan

cannot permissibly impose non-debtor releases without the affirmative consent of the releasing

parties, a release cannot be imposed based on their mere failure to respond regarding the non-

14

debtor release.  Rather, an "*affirmative expression of consent* that would be sufficient as a matter of contract law" is required.  *Id*. at *11 (emphasis added).[4]

36.     Here, the Debtors propose that the Third-Party Releases in the Plan, which benefit numerous non-debtors that are Released Parties, bind, among others, "any Holder of a Claim that returns a Ballot in accordance with the instructions set forth thereon or enters into a settlement with the Debtors with respect to their Claim and its treatment under the Plan" who fails to opt out of the Third-Party Releases. Plan, Art. X.B.2.  This appears to include both Holders of Claims who vote to accept the Plan and those who vote to reject the Plan. But in neither case has there been the affirmative, knowing, and voluntary consent required by state law.

### D.     Failing to Opt Out Does Not Provide the Required Affirmative Consent.

37.     The Debtors propose that the Third-Party Releases bind all parties who return a properly completed Ballot but fail to opt out. But an affirmative agreement — something more than the failure to opt out or failure to object — is required for a non-debtor release to be consensual. *See In re Tonawanda Coke Corp.,* 2024 WL 4024385, at *2; *Patterson*, 636 B.R. at 686. Failing to "opt out" of, or object to, an offer is not a manifestation of consent unless one of the exceptions to the rule that silence is not consent applies, such as conduct by the offeree that manifests an intention that silence means acceptance or taking the offered benefits. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). For example, the *Patterson* court, in applying black-letter contract principles to opt-out releases in a chapter 11 plan, found that contract law does not support consent by failure to opt-out. *Patterson*, 636 B.R. at 686. "Whether the Court labels these

---

[4]  For those reasons, the *Smallhold* court expressly disapproved of its prior decision in *Arsenal*, which had relied on the procedural default theory.  *See id*. at *8 ("On the central question presented, the Court concludes that its decision in *Arsenal* does not survive *Purdue Pharma*.").

'nonconsensual' or based on 'implied consent' matters not, because in either case there is a lack of sufficient affirmation of consent." *Id.* at 688.

38.    The Ninth Circuit's decision in *Norcia v. Samsung Telecomms. Am., LLC*, 845 F.3d 1279 (9th Cir. 2017), cited with approval by the Third Circuit in *Noble v. Samsung Elec. Am., Inc.*, 682 F. App'x 113, 117-18 (3d Cir. 2017), illustrates the point.  In *Norcia*, a consumer bought a Samsung phone from a Verizon Wireless store and signed the Verizon Wireless Customer Agreement. *Norcia*, 845 F.3d at 1282. Among the contents of the phone's box was a Samsung "Product Safety & Warranty Information" brochure that contained an arbitration provision, which "stated that purchasers could opt out of the arbitration agreement by providing notice to Samsung within 30 calendar days of purchase, either through email or by calling a toll-free telephone number." *Id*. It also stated that opting out would not affect the warranty coverage. *See id*. The customer did not take any steps to opt out. *See id*. When the customer later sued Samsung, Samsung argued that the arbitration provision applied. *See id*. at 1282-83.

39.    As an initial matter, the *Norcia* court rejected the argument that the customer agreed to the arbitration provision by signing his contract with Verizon: "The Customer Agreement is an agreement between Verizon Wireless and its customer. Samsung is not a signatory." 845 F.3d at 1290. That is even more true in the context of a chapter 11 plan. Not only are the non-debtor Released Parties not signatories to it, a chapter 11 plan is a creature of the Bankruptcy Code specifically for determining how the debtor will pay its creditors, not for resolving claims between non-debtors. As the Ninth Circuit has explained, "[w]hen a bankruptcy court discharges the debtor, it does so by operation of the bankruptcy laws, not by consent of the creditors. … [T]he payment which effects a discharge is not consideration for any promise by the creditors, much less for one

to release non-party obligators." *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1085 (9th Cir. 2020) (quotation marks omitted).

40.     The Ninth Circuit in *Norcia* further held that the customer's failure to opt out did not constitute consent to arbitrate. Unsurprisingly — because there was no applicable federal law — the court applied the "general rule," applicable under California law, that "silence or inaction does not constitute acceptance of an offer." 845 F.3d at 1284 (quotation marks omitted); *accord Southern Cal. Acoustics Co. v. C.V. Holder, Inc.*, 456 P.2d 975, 978 (Cal. 1969). The customer did not agree to arbitrate because he did not "sign the brochure or otherwise act in a manner that would show his intent to use his silence, or failure to opt out, as a means of accepting the arbitration agreement." *Norcia*, 845 F.3d at 1285 (quotation marks omitted). This was true, even though the customer *did* take action to accept the offered contract from Verizon Wireless. "Samsung's offer to arbitrate all disputes with [the customer] cannot be turned into an agreement because the person to whom it is made or sent makes no reply, even though the offer states that silence will be taken as consent, unless an exception to this general rule applies." *Id.* at 1286 (quotation marks and citation omitted).

41.     The Ninth Circuit explained that there are two exceptions to this rule—when the offeree has a duty to respond or when the offeree retains the offered benefits—but held neither exception applied. *See Norcia*, 845 F.3d at 1284-85. There was no state law imposing a duty on the customer to act in response to the offer, the parties did not have a prior course of dealing that might impose such a duty, and the customer did not retain any benefits by failing to act given that the warranty applied whether or not he opted out of the arbitration provision. *See id*. at 1286.

42.     Here, too, claim holders who vote to reject the plan but fail to opt out have not signed an agreement to release the non-debtor releasees nor acted in any other manner to suggest that their silence manifests an intention to accept an offer to release the non-debtors.

43.     It is implausible to suggest that a party returning a ballot rejecting the plan but neglecting to opt out of the third-party release is evidencing consent to the third-party release.  Not only is there no "mutual agreement" as to the Plan, much less the third-party release, the creditor has expressly stated its rejection of the Plan.  As the court in *Chassix Holdings, Inc.* reasoned, "a creditor who votes to reject a plan should also be presumed to have rejected the proposed third-party releases that are set forth in the plan. ***The additional 'opt out' requirement, in the context of this case, would have been little more than a Court-endorsed trap for the careless or inattentive creditor.***" 533 B.R. 64, 79 (Bankr. S.D.N.Y. 2015) (emphasis added).

44.     Whether or not a creditor votes to accept or reject the Plan, such creditors may not have understood the solicitation package and may not have possessed the time or financial resources to engage counsel, never imagining that their rights against non-debtors could be extinguished through the bankruptcy of these Debtors. "[A]n offeree, regardless of apparent manifestation of his consent, is not bound by inconspicuous contractual provisions of which he was unaware, contained in a document whose contractual nature is not obvious." *Norcia*, 845 F.3d at 1285 (quotation marks omitted).

> **E.    Voting to Accept the Plan Without Opting Out is Not Consent to the Third-Party Releases.**

45.     Voting for a plan without checking an opt-out box does not constitute the affirmative consent necessary to reflect acceptance of an offer to enter a contract to release claims against non-debtors. See RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

46.    As an initial matter, merely voting to approve a plan is not an expression of consent to a non-debtor release. *See, e.g.*, *In re Congoleum Corp.*, 362 B.R. 167, 194 (Bankr. D.N.J. 2007) ("[A] consensual release cannot be based solely on a vote in favor of a plan."); *In re Arrowmill Dev. Corp.*, 211 B.R. at 507 (reaching same conclusion). As explained in *Arrowmill*, a voluntary release arises only "because the creditor agrees" to it. 211 B.R. at 507 (emphasis omitted). There is nothing in the Code that authorizes treating a vote to accept a chapter 11 plan as consent to a third-party release. Instead, the "validity of th[at] release" necessarily "hinges upon principles of straight contract law or quasi-contract law rather than upon the bankruptcy court's confirmation order." *Id.* (citation and alterations omitted). Because "a creditor's approval of the plan cannot be deemed an act of assent having significance beyond the confines of the bankruptcy proceedings," "it is not enough for a creditor . . . to simply vote 'yes' as to a plan" in order to destroy its rights under nonbankruptcy law. *Id.* (quotation marks omitted); *accord Congoleum Corp.*, 362 B.R. at 194; *In re Digital Impact, Inc.*, 223 B.R. 1, 14 (Bankr. N.D. Okla. 1998). Rather, a creditor must "unambiguously manifest[] assent to the release of the nondebtor from liability on its debt." *Arrowmill*, 211 B.R. at 507.

47.    Because merely voting to approve a plan does not manifest consent to a non-debtor release, such a vote plus a failure to opt out is still nothing more than silence with respect to the offer to release claims against non-debtors. Voting to accept a plan but remaining silent about a non-debtor release by failing to check an opt-out box does not fit within any of the exceptions to the rule that silence is not acceptance of an offer.

48.    Creditors who vote for a plan without opting out of a non-debtor release are not "silently tak[ing] offered benefits" from the released non-debtors, such that consent may be inferred. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981). The only benefits

received by the creditors are distributions from the debtor's chapter 11 plan. Thus, "[e]ssentially, creditors are being asked to give releases to third parties for no consideration." *Tonawanda Coke Corp.*, 662 B.R. at 222. Because creditors are entitled to whatever distributions the Plan allocates them regardless of whether they opt out of the non-debtor releases, consent to the non-debtor release cannot be inferred from mere acceptance of the benefits of the debtor's plan. *See Norcia*, 845 F.3d at 1286 (explaining that customer's failure to opt out did not imply his consent where warranty applied regardless, meaning that customer did not thereby obtain any additional benefit). Further, non-debtors have no right to prevent a debtor's creditors from receiving distributions under the debtor's chapter 11 plan, and thus acceptance of those distributions does not manifest acceptance of an offer to release non-debtors. *See Railroad Mgmt. Co., L.L.C. v. CFS La. Midstream Co.*, 428 F.3d 214, 223 (5th Cir. 2005) ("In the absence of any evidence that Strong had the right to exclude CFS from the property in question or that CFS accepted any service or thing of value from Strong, no reasonable jury could conclude that CFS's failure to remove its pipeline upon Strong's demand constituted consent to a contract.").

49.    Nor does voting to approve a chapter 11 plan while remaining silent about a non-debtor release "manifest [an] intention that silence may operate as acceptance" of an offer to release claims against non-debtors. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a. Because impaired creditors have a federal right under the Bankruptcy Code to vote on a chapter 11 plan, 11 U.S.C. § 1126(a), merely exercising that right does not manifest consent to release claims against non-debtors. Rather, voting on a chapter 11 plan is governed by the Bankruptcy Code, and a favorable vote reflects only approval of the plan's treatment of the voters' claims against the debtor.

50.     And as in *Norcia*, creditors have no state law duty to respond to an offer to release

non-debtors such that their silence can be understood as consent, nor have they any prior course

of dealing with the released non-debtors that would impose such a duty. *See Norcia*, 845 F.3d at

1285-86. Nor do creditors have any affirmative obligation to act on a plan, either to vote or to opt

out. *See, e.g.*, 11 U.S.C. § 1126(a) (providing that creditors "may" vote on a plan); *SunEdison,*

*Inc.*, 576 B.R. at 460–61 (recognizing that creditors have no duty to speak regarding a plan that

would allow a court to infer consent to third-party releases from silence). A claimant's vote in

favor of a plan while remaining silent regarding a non-debtor release thus does not fit within the

exception to the general rule that consent cannot be inferred from silence.

51.     Hence, voting for a plan without opting out does not reflect actual and knowing

consent, particularly in the context of "an immensely complicated plan" where "it would be

difficult for any layperson to comprehend all of its details." *In re Congoleum Corp.*, 362 B.R. at

194.

**F.     Voting to Reject the Plan Without Opting Out is Not Consent to the Third-Party Releases.**

52.     The Plan also imposes Third-Party Releases on those who vote to reject the Plan

but fail to opt out. But for the same reasons articulated in <u>Section I.E</u>, these releases are also

prohibited. It is implausible to suggest that a party returning a ballot rejecting the Plan but

neglecting to opt out of the Third-Party Releases is evidencing consent to such releases. Not only

is there no "mutual agreement" as to the Plan, much less the Third-Party Releases, the creditor has

expressly stated its rejection of the Plan. As the court in *In re Chassix Holdings, Inc.*, reasoned,

"[A] creditor who votes to reject a plan should also be presumed to have rejected the proposed

third-party releases that are set forth in the plan. The additional 'opt out' requirement, in the context

of this case, would have been little more than a Court-endorsed trap for the careless or inattentive

creditor." 533 B.R. at 79 (emphasis omitted).

G.     **The *Smallhold* Court's Conclusion That Voting Plus a Failure to Opt Out Equals Consent to a Non-Debtor Release is Incorrect.**

53.     The U.S. Trustee recognizes that Judge Goldblatt in *Smallhold* found that, in at least

some circumstances, the act of voting on a debtor's plan (whether to accept or reject it) combined

with a failure to exercise an opt-out option can constitute consent to a non-debtor release.  *See*

*Smallhold,* 2024 WL 4296938, at *14.  The *Smallhold* decision, however, although stating it was

applying "ordinary contract principles," 2024 WL 4296938, at *3, failed to faithfully apply those

principles to the question of when silence can constitute consent.  For the reasons discussed above,

contract principles do not support imputing consent for a third-party release based merely upon a

creditor's neglect to exercise an opt-out option and that remains true even when that option is

conspicuous or well-advertised.

54.     In *Smallhold*, Judge Goldblatt reasoned that consent to a non-debtor release could

be understood to exist because the act of voting on a debtor's plan is an "affirmative step" taken

after being told that failing to opt out would bind the voter to the non-debtor release.  *Smallhold,*

2024 WL 4296938, at *14.  But while voting is certainly an "affirmative step" with respect to the

debtor's plan, it is not a "*manifestation of intention* that silence may operate as acceptance" of a

third-party release. RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981) (emphasis added).

The bankruptcy exists to resolve debtor's liabilities, not those of third parties.  And because, as

noted above, *supra* ¶¶ 39-42, creditors have no affirmative obligation to act even as to the Debtors'

plan, they certainly can have no duty to respond to an offer to release non-debtors of liabilities that

exist outside the bankruptcy case entirely.  Further, because impaired creditors have a federal right

under the Bankruptcy Code to vote on a chapter 11 plan, 11 U.S.C. § 1126(a), merely exercising

that right does not manifest consent to release claims against non-debtors.  Thus, the act of voting on a plan without taking an additional step to opt out is still merely silence with respect to the non-debtor release.

55.    As explained by the Restatement, "[t]he mere receipt of an unsolicited offer does not impair the offeree's freedom of action or inaction"—in this case, the freedom to vote on a chapter 11 plan—"or impose on him any duty to speak," such as by checking an opt out box or returning an opt out form.  RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).  Voting on a plan while failing to opt out thus cannot be equated with affirmative conduct manifesting consent to the non-debtor release.  Just like the hypothetical creditors in *Smallhold* could not be forced to contribute $100 to a college fund to benefit the debtor's CEO's children merely because they failed to return a ballot with an "opt out" box, *Smallhold*, 2024 WL 4296938, at *2, creditors who cast such a ballot should not be forced to make such a contribution merely because they failed to check that "opt out" box.  State law affords no basis to conclude that consent to release *third-party* claims (which are governed by *nonbankruptcy* law) can properly be inferred from a party's mere failure to check an opt-out box on a ballot expressing views about the proposed treatment of a creditor's claims against the *debtor* (governed by *bankruptcy* law).  *See supra* ¶¶ 34-42.  As a result, the "general proposition" that *Smallhold* recognized continues to apply: "creditors must *affirmatively express consent to the release* in order to be bound by it."  *Id.* at *8 (emphasis added); *accord* at *10 ("[I]t is no longer appropriate to require creditors to object or else be subject to (or be deemed to 'consent' to) such a third-party release.").

56.    Notably, the Ninth and Second Circuit cases cited by *Smallhold* do not support its conclusion that the act of voting on a chapter 11 plan while remaining silent regarding the non-debtor release constitutes consent.  *Smallhold,* 2024 WL 4296938, at *14 n.60 (citing *Berman v.*

*Freedom Fin. Network*, 30 F.4th 849, 856 (9th Cir. 2022); *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017)).  Those cases emphasize the importance of notice as one prerequisite to consent, recognizing that "an offeree, *regardless of apparent manifestation of his consent*, is not bound by inconspicuous contractual provisions of which he is unaware, contained in a document whose contractual nature is not obvious." *Meyer*, 868 F.3d at 74 (internal quotation marks omitted; emphasis added).  Those cases thus concern the requirements for when someone can be deemed on "inquiry notice" of terms they did not read.  *See Berman*, 30 F.4th at 856; *Meyer*, 868 F.3d at 75.  But while notice of a contractual term is certainly a necessary precondition to finding consent, notice is not alone sufficient.  *See, e.g., Meyer*, 868 F.3d at 74; *Norcia*, 845 F.3d at 1284; RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).  Whether there has been sufficient notice of an offer is a distinct question from whether there has been a manifestation of an intent to accept that offer, particularly where the offer—*i.e.*, the proposed third-party release—amounts to a side agreement governed by nonbankruptcy law and benefiting distinct parties.  As explained above, for that side agreement to be valid, there must also be a manifestation of consent to that agreement.  *See, e.g., Berman*, 30 F.4th at 85; *Norcia*, 845 F.3d at 1284; RESTATEMENT (SECOND) OF CONTRACTS § 69 cmt. a (1981).

### H. The Debtors Failed to Provide Sufficient Notice of the Third-Party Releases for the Court to "Deem" Creditors to Have Consented.

57.    Failure to return the release opt-out ballot/form is not consent because—whether they are asked to vote or not—claimants have no reason to expect that an offer to contract with non-debtors will be included in the plan solicitation.  As the Third Circuit has explained, there can be no presumption that someone has agreed to contractual provisions of which they are "on notice," unless "there is a reasonable basis to conclude that consumers will have understood the document contained a bilateral agreement." *See Noble*, 682 F. App'x at 117-118. *See also Norcia*, 845 F.3d

at 1289 ("[N]o contract is formed when the writing does not appear to be a contract and the terms are not called to the attention of the recipient.") (quotation marks omitted).

> **I.    The Opt-Out Procedures Under Federal Rule of Civil Procedure 23 are Legally Irrelevant Because Congress Has Not Included Any Similar Procedures in the Bankruptcy Code.**

58.    In *Smallhold*, Judge Goldblatt raised the issue of whether opt outs could constitute consent because, under Federal Rule of Civil Procedure 23, a court-approved class action settlement may bind class members who do not opt out of the class action.  *See Smallhold, Inc.*, 2024 WL 4296938, at *15.  That analogy to class-action procedure is inapt.  Rule 23, incorporated by Bankruptcy Rule 7023 only for adversary proceedings, is irrelevant.  This is not an adversary proceeding to which Bankruptcy Rule 7023 applies and no one has sought class treatment here. Fed. R. Bankr. P. 7023.  Thus, by their own terms, neither Rule 23 nor Bankruptcy Rule 7023 applies.

59.    And Congress has not seen fit to enact a Code provision authorizing imposing non-debtor releases in chapter 11 plans on those who fail to opt out.  Importantly, "people who fail to respond to class action notices are bound because that is the legal consequence that the Rule specifies, and not on the theory that their inaction is the equivalent of an affirmative joinder in an action." *In re Chassix Holdings, Inc.*, 533 B.R. at 78.  By contrast, in the context of non-debtor releases imposed via a chapter 11 plan, "[t]here is no rule that specifies an 'opt out' mechanism or a 'deemed consent' mechanism." *Id.*  Absent a duly enacted statute or federal rule of procedure, a court cannot unilaterally transplant Rule 23(b)(3)'s class-action "opt out" procedure to bankruptcy proceedings to confirm a chapter 11 plan.

60.    Further, a rule of procedure, including Bankruptcy Rule 7023, cannot modify or abridge state law regarding what constitutes consent to a release.  28 U.S.C. § 2075.  That follows from the fact that no provision in the Code authorizes treatment of creditors' claims against non-

debtors as a class action.  There is no federal class action statute that preempts state contract law, which (as discussed above) requires affirmative consent.

61.     Indeed, as the court found in *Patterson*, "the comparison to class action litigation highlights the impropriety of finding releases consensual based merely on a failure to opt out" because in class actions, unlike chapter 11 plan confirmations, "courts must ensure that the class action complies with the unique requirements of Rule 23 of the Federal Rules of Civil Procedure."[5] 636 B.R. at 686.

62.     Federal class actions may proceed only after a court certifies that the class meets a series of rigorous procedural requirements designed to ensure the appropriateness and fairness of class-wide litigation.  For any class to be certified, Rule 23(a) requires a court to find: (1) commonality ("questions of law or fact common to the class"); (2) typicality (named parties' claims or defenses "are typical . . . of the class"); and (3) adequacy of representation (representatives "will fairly and adequately protect the interests of the class").  *Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 613 (1997) (quoting Fed. R. Civ. P. 23); *see id.* at 621 (noting that these standards protect against the variability of equitable justice).

63.     Once those threshold showings are made, Rule 23(b) then requires that one of three further predicates satisfied.  Speaking generally, Rule 23(b)(1) authorizes class treatment where "individual adjudications would be impossible or unworkable," while Rule 23(b)(2) authorizes class actions where "the relief sought must perforce affect the entire class at once."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 362 (2011).  Rule 23(b)(3), in turn, authorizes class treatment

---

[5] Further, "in the class action context there is a public policy that favors the consolidation of similar cases and that justifies the imposition of a rule that binds class members who have not affirmatively opted out." *In re Chassix Holdings, Inc.*, 533 B.R. at 78.  By contrast, in the context of non-debtor releases imposed via a chapter 11 plan, there is no "general 'public policy' in favor of making third party releases applicable to as many creditors as possible."  *Id.*

only where a court finds both that "the questions of law or fact common to class members predominate over any questions affecting only individual members" and "that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). Opt-out procedures are only available in class actions under Rule 23(b)(3)— and not those under Rule 23(b)(1) and 23(b)(2). *See Wal-Mart Stores*, 564 U.S. at 362 (explaining that "unlike (b)(1) and (b)(2) classes, the (b)(3) class is not mandatory").)

64.     Class action procedures also entail additional procedural safeguards. A class must be specifically defined to identify the class members and the class claims. Fed. R. Civ. P. 23(c)(1)(B). Moreover, the court must appoint class counsel that can best "represent the interests of the class." Fed. R. Civ. P. 23(g). And for classes certified under Rule 23(b)(3), class members must receive "the best notice practicable" that must "clearly and concisely state in plain, easily understood language:" the nature of the action, who the class is, what their claims or defenses are; their right to appear in the action through an attorney; their right to exclude themselves from the action; how and when to exclude themselves; and the binding nature of the judgment if they do not. In other words, the Federal Rules of Civil Procedure set objective procedural protections before a class can be certified and potential members bound.

65.     Further, "any class settlement that would bind absent class members requires court approval." *Patterson*, 636 B.R. at 686 (citing Fed. R. Civ. P. 23(e)). And approval may only be granted if, after a hearing, the court finds the settlement is "'fair, reasonable, and adequate' taking into account whether '(A) the class representatives and class counsel have adequately represented the class; (B) the proposal was negotiated at arm's length; (C) the relief provided for the class is adequate; and (D) the proposal treats class members equitably relative to each other.'" *Id*. at 687 (quoting Fed. R. Civ. P. 23(e)(2)). "The inquiry appropriate under Rule 23(e) . . . protects unnamed

class members from unjust or unfair settlements affecting their rights." *Amchem Prod., Inc. v. Windsor*, 521 U.S. at 623.

66.    "None of these protections exist in the context of a non-debtor release in a bankruptcy action." *Patterson*, 636 B.R. at 686.   "[N]o party litigates on behalf of the absent releasing party."  *Id.*; *see also In re Smallhold, Inc.*, 2024 WL 4296938, at *12 n.53 ("[I]n the class action context, a class is only certified after a court makes a factual finding that the named representative is an appropriate representative of the unnamed class members. In the plan context, there is no named plaintiff, found by the court to be an adequate representative, whose actions may presumptively bind others.").   And "[n]o party with a typical claim has a duty to ensure that he fairly and adequately represents the best interests of the absent releasing party."  *Patterson*, 636 B.R. at 686.   "Moreover, the absent releasing party does not enjoy counsel that will represent his best interests in his stead."[6]  *Id*.

67.    Finally, in a class action, members that fail to opt out have claims litigated on their behalf, and they may receive whatever proceeds are won in that litigation.  Under a chapter 11 plan with non-debtor releases, although the releasing creditors may receive a distribution under the plan for their claims against a debtor, they lose their claims against the released non-debtors and any corresponding compensation forever if they fail to take affirmative action to opt out or object. Indeed, if a mere failure to opt out constitutes consent to a non-debtor release in bankruptcy, "then

---

[6] Although the official committee of unsecured creditors owes a fiduciary duty to the creditor body as a whole, it does not owe a duty to any individual creditor or any specific group of creditors, and the diverse body of creditors to whom it owes duties often has conflicting interests.  *See In re Drexel Burnham Lambert Grp., Inc.*, 138 B.R. 717, 722 (Bankr. S.D.N.Y. 1992) (fiduciary duty of individual members of an official committee "extends to the class as a whole, not to its individual members").  Further, the committee's duties relate only to claims against the debtor, not claims against non-debtors.

no court carries an obligation to ensure the fairness, reasonableness and adequacy of the relief afforded the absent releasing parties." *Patterson*, 636 B.R. at 687.

68.     Notably, state law also provides class-action procedures, with similar procedural protections to federal class actions, in which unnamed class members are bound by a court-approved class settlement unless they opt out. *See, e.g.,* Del. Super. Ct. R. Civ. P. 23.  But outside of that class-action context, ordinary contract principles apply as discussed above, and a person cannot force a contract on someone else by deeming silence, such as a failure to "opt out," to be consent, except in narrow circumstances inapplicable here.

69.     In sum, there will be no affirmative consent to Third-Party Releases given by the numerous persons and entities on whom such releases will be imposed.  Such releases are therefore non-consensual and render the Plan unconfirmable.

## II.    The Plan is Unconfirmable Because There is No Legal Authority Supporting the Plan Injunction.

70.     The Court may not confirm the Plan for the separate and independent reason that the Plan Injunction enforces the Third-Party Releases by barring claims against non-debtors as well as the exculpation provision.  *Purdue* clearly stands for the proposition that non-consensual third-party releases and injunctions are generally not permitted by the Bankruptcy Code. *See Purdue Pharma L.P.*, 144 S. Ct. at 2088. As the *Purdue* court noted, the Bankruptcy Code allows courts to issue an injunction in support of a non-consensual, third-party release in exactly one context: asbestos-related bankruptcies, and these cases are not asbestos-related. *See id.* at 2085 (citing 11 U.S.C. § 524(e)).

71.     Even if non-debtor releases are consensual, there is no Code provision that authorizes chapter 11 plans or confirmation orders to include injunctions to enforce them. Further, such an injunction is not warranted by the traditional factors that support injunctive relief. Parties

seeking an injunction "must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction." *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006); *see also Purdue Pharma*, 144 S. Ct. at 2085 (noting that an injunction is an "extraordinary remedy"); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("An injunction should issue only where the intervention of a court of equity 'is essential in order effectually to protect property rights against injuries otherwise irremediable.'") (quoting *Cavanaugh v. Looney*, 248 U.S. 453, 456 (1919)); *Fechter v. HMW Indus., Inc.*, 879 F.2d 1111, 1119 (3d Cir. 1989) ("We have long followed the principle that equitable remedies are available once legal remedies are found to be inadequate.") (citing *Weinberger*).

72.    The Debtors have made no attempt to show that any of these factors are met. Nor could they. If the release is truly consensual, there is no threatened litigation and no need for an injunction to prevent irreparable harm to either the estates or the released parties. A consensual release may serve as an affirmative defense in any ensuing, post-effective date litigation between the third party releasees and releasors, but there is no reason for this Court to be involved with the post-effective date enforcement of those releases. Moreover, this injunction essentially precludes any party deemed to consent to this release from raising any issue with respect to the effectiveness or enforceability of the release (such as mistake or lack of capacity) under applicable non-bankruptcy law.

73.     Similarly, there is no statutory authority in the Bankruptcy Code that justifies an injunction to enforce the proposed exculpation, and the Debtors have shown no need for an injunction to prevent "irreparable harm" to either the estates or the released parties.

## III.   The Plan is Unconfirmable Because the Statutory Fees Provision Fails to Comply with Applicable Law.

74.     The Plan cannot be confirmed for the separate and independent reason that the Statutory Fees Provision violates 28 U.S.C. § 1930(a)(6).  Specifically, the Plan fails to include language specifying that the Liquidating Trust that will be established under the Plan shall file separate UST Form 11 post-confirmation reports and pay quarterly fees after the Effective Date. In effect, the provision would exclude all post-confirmation distributions or expenditures made by the Liquidating Trust from the "disbursements" made in the Chapter 11 Cases for purposes of calculating the statutorily mandated fees that must be paid in each Debtor's case every quarter. Such a result is contrary to the language and intent of section 1930(a)(6), as well as the overwhelming weight of case law interpreting section 1930(a)(6).  For the following reasons, confirmation of the Plan should be denied absent satisfactory revisions.

### A.     The Term "Disbursements" in section 1930(a)(6) Includes All Cash Payments Made in a Chapter 11 Case on a Quarterly Basis.

75.     Section 1930(a)(6) provides in relevant part that "a quarterly fee shall be paid to the United States trustee . . . in each case under chapter 11 . . . for each quarter (including any fraction thereof) until the case is converted or dismissed . . . ," and that the fee is to be calculated on "disbursements" made in the case during the applicable quarter.  28 U.S.C. § 1930(a)(6). Payment of quarterly fees is mandatory in every chapter 11 case from the quarter in which the petition is filed until the quarter in which the case is closed by final decree.  *See, e.g., Genesis Health Ventures, Inc. v. Stapleton (In re Genesis Health Ventures, Inc.)*, 402 F.3d 416, 418 (3d

31

Cir. 2005); *United States Trustee v. Gryphon at the Stone Mansion*, 166 F.3d 552, 554 (3d Cir. 1999).

76.     As it is not defined in the Bankruptcy Code, the term "disbursements" in section 1930(a)(6) must be given its "'ordinary, contemporary, common meaning.'" *Genesis*, 402 F.3d at 421 (quoting *Perrin v. United States*, 444 U.S. 37, 42 (1979)).  In interpreting section 1930(a)(6), the Third Circuit has held that "'[d]isburse' is defined as 'to expend' or 'to pay out.'" *Id.* (quoting Websters' Third New International Dictionary 644 (1976)).  More recently, other Circuit Courts of Appeals have acknowledged that, as used in section 1930(a)(6), the term "disbursement" means "money paid out." *See, e.g.*, *In re Buffets, L.L.C.*, 979 F.3d 366, 373 (5th Cir. 2020) ("A disbursement is money paid out.") (citing Merriam-Webster Dictionary (2016)); *Cranberry Growers Coop. v. Layng (In re Cranberry Growers Coop.)*, 930 F.3d 844, 850 (7th Cir. 2019) ("The dictionary definition of 'disbursement' is '[m]oney paid out; expenditure.") (quoting The American Heritage Dictionary of the English Language (5th ed. 2018)) (alteration in original).

77.     As "disbursement" means "money paid out," section 1930(a)(6) quarterly fees are calculated upon payments of money during a quarter in a chapter 11 case.   This is consistent with the interpretation that United States Circuit Courts of Appeals, including the Third Circuit, have given the term "moneys disbursed" for purposes of determining a trustee's commission under 11 U.S.C. § 326(a).  *See*, *e.g.*, *Tamm v. U.S. Tr. (In re Hokulani Square, Inc.)*, 776 F.3d 1083, 1086 (9th Cir. 2015) (holding that, because "'disburse' means to 'pay out,'" trustees may only calculate their commission on transactions using "some form of generally accepted medium of exchange") (quoting Black's Law Dictionary 561 (10th ed. 2014)); *Staiano v. Cain (In re Lan Assocs. XI, L.P.)*, 192 F.3d 109, 118-19 (3d Cir. 1999) (holding that trustees may only calculate their commission

"on moneys actually disbursed" and not on transfers of "property and other types of consideration" such as credit bids).

78.     As such, all post-confirmation payments of money in the Debtors' cases should be included as "disbursements" for purposes of section 1930(a)(6).  Because the statutory fee provision will prevent that from happening, the Plan should not be confirmed unless revised.

**B.      Courts Broadly Construe the Term "Disbursements" in Section 1930(a)(6) to Include All Cash Payments Made in a Chapter 11 Case on a Quarterly Basis, Regardless of the Payor, Purpose or Source of the Payments.**

79.     Section 1930(a)(6) contains relatively few material terms.  It requires a "fee" to be "paid to the United States trustee" every quarter "in each case under title 11" based on "disbursements."  See 28 U.S.C. § 1930(a)(6).  Congress did not specify the entity that must make the disbursements in question, the purpose for which the disbursements must be made, or the source from which the disbursements must originate.  *See id.*  Congress did not specify the entity that must make the disbursements in question, the purpose for which the disbursements must be made, or the source from which the disbursements must originate.  Although Congress could have placed such limitations on the section 1930(a)(6) disbursements as "by the debtor," "in payment of the debtor's expenses," or "from estate funds," it made the policy determination not to do so.

80.     As a result, United States Circuit Courts of Appeals, including the Third Circuit, broadly interpret "disbursements" to include all payments made in a chapter 11 case during a quarter, regardless of <u>who made the payment</u>.  *See, e.g.*, *Cranberry Growers*, 930 F.3d at 850-53 (holding that "disbursements" include a debtor's customers' direct payment of the debtor's revolving line of credit); *Genesis*, 402 F.3d at 422 (holding that the quarterly fee owed in a debtor's case is calculated on all "[p]ayments made on behalf of [the] debtor, whether directly or indirectly").

81.    Similarly, United States Circuit Courts of Appeals broadly interpret "disbursements" to include all payments made in a chapter 11 case during a quarter, regardless of the purpose for which the payment was made.  *See, e.g.*, *Cranberry Growers*, 930 F.3d at 850-53; *Cash Cow Servs. of Fla. LLC v. U.S. Tr. (In re Cash Cow Servs. of Fla. LLC)*, 296 F.3d 1261, 1265 (11th Cir. 2002), *cert. denied*, 537 U.S. 1161 (2003) (holding that "disbursements" include consumer loans made by the debtor); *Walton v. Jamko, Inc. (In re Jamko Inc.)*, 240 F.3d 1312, 1316 (11th Cir. 2001) (holding that "disbursements" include "all disbursements made during the entire process," including but not limited to "ordinary operating expenses" and "payments made to creditors").

82.    Additionally, United States Circuit Courts of Appeals broadly interpret "disbursements" to include all payments made in a chapter 11 case during a quarter, regardless of the source of the payment.  *See, e.g.*, *Cash Cow*, 296 F.3d at 1265 (holding that "disbursements" for purposes of section 1930(a)(6) are not "limit[ed] . . . to only 'payments' or capital flowing from the bankruptcy estate"); *Robiner v. Danny's Mkts., Inc.*, 266 F.3d 523, 526 (6th Cir. 2001) ("Congress contemplated that disbursements will encompass all payments to third parties directly attributable to the existence of the bankruptcy proceeding . . . .  In other words, the technical source of the payments . . . is apparently inconsequential."); *Jamko*, 240 F.3d at 1313, 1316 (holding that all payments "made during the entire process" are included in calculating the quarterly fees, "from whatever source"); *Tighe v. Celebrity Home Entm't, Inc. (In re Celebrity Home Entm't, Inc.)*, 210 F.3d 995, 998 (9th Cir. 2000) (holding that, although disbursements include all payments from the bankruptcy estate, "that does not [mean] that disbursements are limited to payments from a bankruptcy estate").

83.     Under the foregoing authority, every payment made in a chapter 11 case during a quarter—regardless of who makes the payment, why the payment is made, or what the source of the payment may be—must be included in calculating quarterly "disbursements" for purposes of section 1930(a)(6).

### C.      Payments Made by Post-Confirmation Trusts Constitute "Disbursements."

84.     Courts have routinely rejected the argument that a liquidation trust is not responsible for paying post-confirmation quarterly fees.   For example, in *U.S. Trustee v. Hudson Oil Co. (In re Hudson Oil Co.)*, 210 B.R. 380, 383 (D. Kan. 1997), the district court "reject[ed] the argument that . . . the liquidating trust established under the confirmed plan has no responsibility for the fees imposed" under section 1930(a)(6). *Id.* at 383.  Although reversed for other reasons, the district court noted that the bankruptcy court had also rejected the liquidating trust's argument because, among other reasons, "the trust [was a] liquidating and disbursing agent for the debtors" and was "subject to continuing bankruptcy court supervision." *Id.* at 384, n.3.

85.     Similarly, in *In re Atna Resources, Inc.*, 576 B.R. 214 (Bankr. D. Colo. 2017), the bankruptcy court was presented with "a liquidating trustee, whose sole existence flow[ed] from the debtors and their assets, liabilities, and confirmation of their Chapter 11 bankruptcy cases, [who sought] to avoid payment of post-confirmation [quarterly] fees[.]" *Id.* at. 216.  The court held that the liquidating trust was liable for payment of post-confirmation quarterly fees under the language of section 1930(a)(6) and the provisions of the debtors' plan, "even without an express provision requiring the Trust to pay the statutory fee." *Id.* at 218-20.

86.     Likewise, in *In re CSC Industries, Inc.*, 226 B.R. 402 (Bankr. N.D. Ohio 1998), the bankruptcy court held that "the Liquidation Trustee [was] responsible to pay post-confirmation quarterly fees out of the Liquidation Trust" because "Congress intend[ed] such fees be paid by Chapter 11 debtors prior to conversion or dismissal," and "the Liquidation Trust ha[d] essentially

stepped into the shoes of the original debtor and [was] therefore liable for any such fees which may be imposed" post-confirmation. *Id.* at 404.

87.     And in *In re Home Centers, Inc.*, 232 B.R. 680 (Bankr. N.D. Ohio 1997), the debtor "turned over all of its tangible and intangible assets" to a liquidating trust that was created to make distributions required by the plan. *Id.* at 683. The bankruptcy court held that, since (as here) the liquidating trust "was created solely to collect and liquidate the assets of the Debtor in order to disburse the funds to the creditors," the court "c[ould] find no other meaningful interpretation" of section 1930(a)(6) other than to hold that the liquidating trust was responsible for paying post-confirmation quarterly fees. *Id.* at 683-84.

88.     The Debtors may cite Judge Sontchi's decision in *In re Paragon Offshore, PLC*, 629 B.R. 227 (Bankr. D. Del. 2021), in support of an argument that disbursements from the Liquidating Trust do not count as disbursements for quarterly fee purposes. However, reliance on *Paragon* would not be appropriate in this case. As an initial matter, *Paragon* was based on a concern that the U.S. Trustee was somehow "double-dipping" in that case. *See id.* at 228, 232. There is no such concern here, because no quarterly fee will be—or possibly could be—paid on the non-cash assets when they are transferred to any Liquidation Trust. Rather, the U.S. Trustee seeks only to ensure that the fee mandated by Congress is properly paid on all disbursements made in the Chapter 11 Cases. *See* 28 U.S.C. § 586(a)(3)(D) (requiring the U.S. Trustee to "tak[e] such action as [he] deems appropriate to ensure that all . . . fees required to be [paid] under" titles 11 and 28 are paid). Quarterly fees will only be incurred once—albeit when the proceeds of non-cash assets are ultimately paid by any Liquidating Trust that is created, not when they are transferred to such Liquidating Trust. Furthermore, to the extent Paragon suggested that non-cash transfers can

be included as "disbursements" for purposes of section 1930(a)(6) (*see id.* at 231-32), it was simply wrong; only payments of money are included in calculating the statutorily mandated quarterly fee.

89.     In light of the foregoing, the post-confirmation payments of the Liquidating Trust, along with those of the Debtors, must be included in calculating the quarterly fee mandated by section 1930(a)(6).  In order to calculate such quarterly fees, the post-confirmation entities under the Plan – the post-confirmation Debtors, and the Liquidating Trust – must file post-confirmation quarterly reports disclosing their disbursements.  *See* 28 U.S.C. § 589b and 28 C.F.R. § 58.8 (2020).  As the statutory fee provision does not address the reporting and fee obligations of the Liquidating Trust, the Plan cannot be confirmed.

## IV.    The Plan is Unconfirmable Because a Plan is Not a Global Settlement.

90.     Section 1123(b) of the Bankruptcy Code allows a plan proponent to "provide for [] the settlement or adjustment of any claim or interest *belonging to the debtor or to the estate*." 11 U.S.C. § 1123(b)(3)(A) (emphasis added).  Thus, section 1123(b)(3) only allows a debtor to settle claims it has against others; it does not allow a debtor to settle claims other parties may have against it.  *See Varela v. Dynamic Brokers, Inc. (In re Dynamic Brokers, Inc.)*, 293 B.R. 409, 496 (B.A.P. 9th Cir. 2003) ("The only reference in [section 1123(b)] to adjustments of claims is the authorization for a plan to provide for 'the settlement or adjustment of any claim or interest belonging to the debtor or to the estate.'  It is significant that there is no parallel authorization regarding claims against the estate.") (cleaned up).  The resolution of claims against the Debtor is governed by sections 1129 and 1141.

91.     Section 1123(b)(3)(A) also does not authorize a plan proponent to "settle" claims that a debtor's creditors hold against either the Debtor or non-debtor parties, as appears to be the intent of sections 4.1 and 9.2(b) of the Plan.

92.     Calling the Plan a "settlement" does not supplant the legal standards governing confirmation of a plan.  In addition, while a plan may incorporate one or more negotiated settlements, a plan is not itself a settlement.  Sending a plan to impaired creditors for a vote is not the same thing as parties negotiating a settlement among themselves.

93.     A "settlement" is "an agreement ending a dispute or lawsuit."  BLACK'S LAW DICTIONARY (10th ed. 2014).  An "agreement" is "a mutual understanding between two or more persons about their relative rights and duties regarding past or future performances; a manifestation of mutual assent by two or more persons."  *Id.*

94.     Approval of settlements is governed by Federal Rule of Bankruptcy Procedure 9019, which provides that, "[o]n motion by the trustee [or chapter 11 debtor in possession] and after notice and a hearing, the court may approve a compromise or settlement."  But, because a "settlement" requires an agreement between the settling parties, Rule 9019 governs only parties that have entered into an express settlement agreement; it is not a blanket provision allowing general "settlements" to be unilaterally imposed upon broad swaths of claimants that have no formal agreement with any party to "settle" their claims.

95.     The decision of whether to approve a settlement under Rule 9019 is left to the sound discretion of the bankruptcy court, which "must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'"  *In re Washington Mutual, Inc.*, 442 B.R. 314, 338 (Bankr. D. Del. 2011) (quoting *In re Louise's, Inc.*, 211 B.R. 798, 801 (D. Del. 1997)).[7]  In contrast, plans are subject to the many requirements of Code sections 1123 and 1129.

---

[7] The standard for approval of a settlement under Rule 9019 is guided by the following criteria: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors."  *Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996) (citations omitted).

96.     What may be permissible under a negotiated settlement agreement that is considered "fair, reasonable, and in the best interest of the estate" outside of the plan context is different from what may be permissible under a plan.

97.     Simply put, the Debtor cannot sidestep the law applicable to confirmation of plans by describing the entire Plan as constituting some undocumented settlement.  The Plan cannot be confirmed as long as it contains any language suggesting that the Plan itself, the distributions thereunder, or any release of claims between non-debtors, is a "settlement" for purposes of section 1123(b)(3)(A) or Rule 9019.

**V.      The Court Should Not Waive the Rule 3020 Stay.**

98.     The U.S. Trustee objects to the request to shorten the 14-day stay imposed by Federal Rule of Bankruptcy Procedure 3020(e), which provides that "[a]n order confirming a plan is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  Fed. R. Bankr. P. 3020(e).  The Committee Notes explain that subsection (e) was "added to provide sufficient time for a party to request a stay pending appeal of an order confirming a plan under chapter 9 or chapter 11 of the Code before the plan is implemented and an appeal becomes moot."  *Id.*  The Debtors have presented no exigencies that would justify departing from the Rule's imposition of an automatic 14-day stay and impeding the ability to obtain appellate review.

**RESERVATION OF RIGHTS**

99.     The U.S. Trustee leaves the Debtors to their burden of proof and reserves any and all rights, remedies and obligations to, among other things, (i) complement, supplement, augment, alter or modify this Objection, (ii) assert any objection, (iii) file any appropriate motion, (iv) conduct any and all discovery as may be deemed necessary or as may be required, and (v) assert such other grounds as may become apparent upon further factual discovery.

**WHEREFORE**, the U.S. Trustee respectfully requests that the Court enter an order: (i) denying confirmation of the Plan; and (ii) granting such other and further relief as the Court deems just and equitable.

Dated: January 20, 2025                          Respectfully submitted,

                                                 **ANDREW R. VARA**
                                                 **UNITED STATES TRUSTEE**
                                                 **REGIONS 3 AND 9**

                                        By: */s/ Malcolm M. Bates*
                                             Malcolm M. Bates
                                             Trial Attorney
                                             United States Department of Justice
                                             Office of the United States Trustee
                                             J. Caleb Boggs Federal Building
                                             844 N. King Street, Room 2207, Lockbox 35
                                             Wilmington, DE 19801
                                             Telephone: (302) 573-6491
                                             Email:   Malcolm.M.Bates@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I, Malcolm M. Bates, hereby certify that on January 20, 2025, I caused to be served a copy of this Objection by electronic service on the registered parties via the Court's CM/ECF system and courtesy copies were sent via email.

Dated: January 20, 2025

*/s/ Malcolm M. Bates*
Malcolm M. Bates