## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| | ) | |
| In re: | ) | Chapter 11 |
| | ) | |
| NUMBER HOLDINGS, INC. *et al.*,[1] | ) | Case No. 24-10719 (JKS) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | **Re: D.I. 1685** |
| | ) | |
| | ) | |

## DEBTORS' MEMORANDUM OF LAW
## IN SUPPORT OF CONFIRMATION OF JOINT CHAPTER 11 PLAN
## <u>OF NUMBER HOLDINGS, INC., AND ITS DEBTOR AFFILIATES</u>

---

[1] The Debtors in these Chapter 11 Cases, along with the last four digits of each Debtor's federal tax identification number, as applicable, are: (i) Number Holdings, Inc. (1463); (ii) 99 Cents Only Stores LLC (1605); (iii) 99 Cents Only Stores Texas, Inc. (1229); (iv) 99 Cents PropCo LLC (7843); (v) 99 Cents HoldCo LLC (3987); and (vi) Bargain Wholesale LLC (8030).  The Debtors' mailing address is 10105 E Via Linda, Ste 103 PMB 1207, Scottsdale, AZ 85258.

# TABLE OF CONTENTS

**Page**

Preliminary Statement ................................................................................................. 1

Background .................................................................................................................. 3

I.      Procedural History ........................................................................................... 3

II.     The Solicitation Process .................................................................................. 5

III.    The Voting Results .......................................................................................... 5

IV.    Confirmation Objections ................................................................................. 5

Argument ..................................................................................................................... 7

I.      THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE ..................................................................................... 7

    A.     The Plan Complies with the Applicable Provisions of Section 1129(a)(1) of the Bankruptcy Code ............................................................. 7

          1.     The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code .......................................... 8

          2.     The Plan Satisfies Section 1123(a) of the Bankruptcy Code ................... 12

               a.     Designation of Classes of Claims and Interests (§ 1123(a)(1)) ................................................................. 12

               b.     Specification of Unimpaired Classes (§ 1123(a)(2)) .................... 12

               c.     Treatment of Impaired Classes (§ 1123(a)(3)) ............................. 12

               d.     Equal Treatment within Classes (§ 1123(a)(4)) ........................... 13

               e.     Means for Implementation (§ 1123(a)(5)) .................................... 13

               f.     Issuance of Non-Voting Equity Securities (§ 1123(a)(6)) ............ 14

               g.     Directors and Officers (§ 1123(a)(7)) ......................................... 14

           3.     The Plan Also Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code .................................. 15

               a.     The Plan's Release, Exculpation, and Injunction Provisions are Consistent with Section 1123(b) of the Bankruptcy Code ................................................................. 16

                    (i)     The Debtor Releases are Appropriate ............................... 16

                    (ii)    The Third-Party Releases are Appropriate ....................... 19

                    (iii)   The Exculpation Provision is Appropriate ....................... 22

                    (iv)   The Injunction Provision is Appropriate .......................... 24

    B.     The Plan Complies with Section 1129(a)(2) of the Bankruptcy Code ................. 24

|  |  | 1. | The Debtors Complied with Section 1125 of the Bankruptcy Code ........ 25 |
|  |  | 2. | The Debtors Complied with Section 1126 of the Bankruptcy Code ........ 28 |
|  | C. | The Plan Complies with Section 1129(a)(3) of the Bankruptcy Code ................. 29 |
|  | D. | The Plan Complies with Section 1129(a)(4) of the Bankruptcy Code ................. 30 |
|  | E. | The Plan Complies with Section 1129(a)(5) of the Bankruptcy Code ................. 31 |
|  | F. | Section 1129(a)(6) of the Bankruptcy Code Does Not Apply to the Plan........... 32 |
|  | G. | The Plan Complies with Section 1129(a)(7) of the Bankruptcy Code ................. 32 |
|  | H. | The Plan Does Not Satisfy Section 1129(a)(8) of the Bankruptcy Code ............. 34 |
|  | I. | The Plan Complies with Section 1129(a)(9) of the Bankruptcy Code ................. 34 |
|  | J. | The Plan Complies with Section 1129(a)(10) of the Bankruptcy Code .............. 35 |
|  | K. | The Plan Complies with Section 1129(a)(11) of the Bankruptcy Code .............. 35 |
|  | L. | The Plan Provides for the Payment of Statutory Fees Pursuant to Section 1129(a)(12) of the Bankruptcy Code ...................................................... 36 |
|  | M. | Sections 1129(a)(13)-(16) of the Bankruptcy Code are Inapplicable .................. 36 |
|  | N. | The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code........................................................................ 37 |
|  |  | 1. | The Plan Does Not Discriminate Unfairly ................................................. 37 |
|  |  | 2. | The Plan is Fair and Equitable ................................................................. 38 |
|  | O. | The Plan Complies with Section 1129(c) Because the Plan is the Only Plan Filed in these Chapter 11 Cases ....................................................... 39 |
|  | P. | The Plan Complies with the Other Applicable Provisions of Section 1129 ......... 39 |
| II. | THE UST OBJECTION SHOULD BE OVERRULED ................................................... 39 |
|  | A. | The Third-Party Releases are Consensual and Comply with Applicable Law ...................................................................................................... 40 |
|  | B. | The Injunction Provision is Necessary and Customary ....................................... 46 |
|  | C. | The Plan's Statutory Fees Provision Complies with 28 U.S.C. § 1930................ 46 |
|  | D. | The Comprehensive Settlement Underlying the Plan is Appropriate and Should be Approved ............................................................................ 47 |
| III. | CAUSE EXISTS TO WAIVE THE STAY OF THE CONFIRMATION ORDER ......... 48 |
| IV. | RESERVATION OF RIGHTS WITH RESPECT TO CONFIRMATION OBJECTIONS ........................................................................................................ 49 |
| V. | CONCLUSION............................................................................................................... 49 |

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*In re Affiliated Foods, Inc.*,
  249 B.R. 770 (Bankr. W.D. Mo. 2000)...................................................................32

*In re Aleris Int'l, Inc.*,
  2010 WL 3492664 (Bankr. D. Del. May 13, 2010)..........................................8, 17

*In re Armstrong World Indus., Inc.*,
  348 B.R. 111 (D. Del. 2006)........................................................................37

*In re Armstrong World Indus., Inc.*,
  348 B.R. 136 (D. Del. 2006)..........................................................................8

*In re Autobacs Strauss, Inc.*,
  473 B.R. 525 (Bankr. D. Del. 2012) .............................................................25

*Azar v. THGH Liquidating LLC (In re THGH Liquidating LLC)*,
  2020 WL 5409002 (D. Del. Sept. 9, 2020)....................................................30

*Bank of Am. Nat'l. Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship*,
  526 U.S. 434 (1999)....................................................................................33

*In re Basic Fun, Inc.*,
  No. 24-11432 (CTG) (Bankr. D. Del. Sep. 24, 2024)....................................45

*In re Bowflex Inc.*,
  No. 24-12364 (ABA) (Bankr. D. N.J. Aug. 18, 2024)...................................22

*Bruce Energy Ctr. Ltd. v. Orfa Corp. of Am. (In re Orfa Corp. of Phila.)*,
  129 B.R. 404 (Bankr. E.D. Pa. 1991) ...........................................................9

*In re Buttonwood Partners, Ltd.*,
  111 B.R. 57 (Bankr. S.D.N.Y. 1990) ...........................................................37

*In re Conseco, Inc.*,
  301 B.R. 525 (Bankr. N.D. Ill. 2003) ...........................................................21

*In re Cypresswood Land Partners, I*,
  409 B.R. 396 (Bankr. S.D. Tex. 2009) .........................................................33

*In re Diamond Sports Grp., LLC*,
  No. 23-90116 (CML) (Bankr. S.D. Tex. Oct. 8, 2024) ..................................45

*In re Ebix, Inc.*,
  No. 23-80004 (SWE) (Bankr. N.D. Tex. Aug. 2, 2024) ........................................................43

*In re Emerge Energy Servs. LP*,
  2019 WL 7634308 (Bankr. D. Del. Dec. 5, 2019) .................................................................20

*In re Exide Techs.*,
  607 F.3d 957 (3d Cir. 2010) ...................................................................................................45

*In re Ferretti*,
  128 B.R. 16 (Bankr. D.N.H. 1991) .........................................................................................25

*In re Finlay Enterprises, Inc.*,
  2010 WL 6580628 (Bankr. S.D.N.Y. June 29, 2010) ............................................................35

*In re Fisker, Inc.*,
  No. 24-11390 (TMH) (Bankr. D. Del. Oct. 16, 2024) .....................................................22, 47

*In re FTX Trading LTD.*,
  Case No. 22-11068 (JTD) (Bankr. D. Del. Aug. 23, 2024) ....................................................45

*In re FTX Trading LTD.*,
  Case No. 22-11068 (JTD) (Bankr. D. Del. Oct. 8, 2024) [Docket No. 26404] .................22, 48

*In re G-1 Holdings Inc.*,
  420 B.R. 216 (Bankr. D.N.J. 2009) ..........................................................................................8

*In re Genco Shipping & Trading Ltd.*,
  513 B.R. 233 (Bankr. S.D.N.Y. 2014) ....................................................................................20

*In re Genesis Health Ventures, Inc.*,
  266 B.R. 591 (Bankr. D. Del. 2001) .......................................................................................10

*In re Gigamonster*,
  No. 23-10051 (JKS) (Bankr. D. Del. Aug. 27, 2024) .............................................................41

*In re Global Eagle Entertainment*,
  Case No. 20-11835 (JTD) (Bankr. D. Del. Jan. 29, 2021) [Docket No. 753] ........................48

*Harrington v. Purdue Pharma L.P.*,
  603 U.S. 204, 144 S. Ct. 2071 (2024) ............................................................................. *passim*

*In re Indianapolis Downs, LLC*,
  486 B.R. 286 (Bankr. D. Del. 2013) ................................................................16, 17, 20, 23

*In re Invitae Corp.*,
  No. 24-11362 (MBK) (Bankr. D.N.J. Aug. 2, 2024) ..............................................................22

*In re Johns-Manville Corp.*,
  68 B.R. 618 (Bankr. S.D.N.Y. 1986), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom.*, *Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988) ....................................................8, 37

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*,
  337 F.3d 314 (3d Cir. 2003)..........................................................................25

*In re LaVie Care Centers, LLC*,
  No. 24-55507 (PMB), 2024 WL 4988600 (Bankr. N.D. Ga. Dec. 5, 2024)...............21, 44, 45

*In re Lisanti Foods, Inc.*,
  241 Fed. Appx. 1 (3d Cir. 2007) ....................................................................10

*In re Lisanti Foods, Inc.*,
  329 B.R. 491 (D.N.J. 2005) ...........................................................................26

*In re Lumio Holdings, Inc.*,
  No. 24-11916 (JKS) (Bankr. D. Del. Jan. 3, 2025).........................................41, 46

*In re Mallinckrodt PLC*,
  639 B.R. 837 (Bankr. D. Del. 2022) ...............................................................42

*In re Mallinckrodt PLC*,
  Case No. 20-12522 (JTD) (Bankr. D. Del. Feb. 18, 2022) [Docket No. 6510]......................48

*In re Monroe Well Serv., Inc.*,
  80 B.R. 324 (Bankr. E.D. Pa. 1987) ...............................................................26

*In re MVK Farmco LLC*,
  Case No. 23-11721 (LSS) (Bankr. D. Del. Mar. 29, 2024) [Docket No. 858] ......................48

*In re Number Holdings, Inc.*,
  No. 24-10719 (JKS) (Bankr. D. Del. Dec. 20, 2024) [Docket No. 1617] ..............................6

*In re Nutritional Sourcing Corp.*,
  398 B.R. 816 (Bankr. D. Del. 2008) .................................................................7

*Oneida Motor Freight, Inc. v. United Jersey Bank*,
  848 F.2d 414 (3d Cir. 1988)...........................................................................25

*In re Owens Corning*,
  419 F.3d 195 (3d Cir. 2005)............................................................................9

*Phillips Petroleum Co. v. Shutts*,
  472 U.S. 797 (1985)................................................................................21, 43

*In re Phoenix Petroleum Co.*,
278 B.R. 385 (Bankr. E.D. Pa. 2001) ..................................................................26

*In re PPI Enters. (U.S.), Inc.*,
228 B.R. 339 (Bankr. D. Del. 1998) ...................................................................29

*In re Presperse Corp.*,
No. 24-18921 (MBK) (Bankr. D.N.J. Sep. 25, 2024) ...........................................45

*In re PWS Holding Corp.*,
228 F.3d 224 (3d Cir. 2000) .........................................................................17, 23

*In re Robertshaw US Holding Corp.*,
Case No. 24-90052 (CML) (Bankr. S.D. Tex. Aug. 16, 2024) ..............................22

*In re Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*,
81 F.3d 355 (3d Cir. 1996) .................................................................................25

*In re Sam Ash Music Corp.*,
No. 24-14727 (SLM) (Bankr D.N.J. Aug. 15, 2024) ............................................22

*In re Seaplane Debtor 1 Inc.*,
No. 24- 10703 (CTG) (Bankr. D. Del. Oct. 28, 2024) ..........................................45

*In re SiO2 Medical Products, Inc.*,
Case No. 23-10366 (JTD) (Bankr. D. Del. July 17, 2023) [Docket No. 466] ........48

*In re Smallhold, Inc.*,
No. 14-10267 (CTG), 2024 WL 4296938 (Bankr. D. Del. Sep. 25, 2024) ............44

*In re Stone & Webster, Inc.*,
286 B.R. 532 (Bankr. D. Del. 2002) .....................................................................9

*In re Sunpower Corp.*,
No. 24-11649 (CTG) (Bankr. D. Del. Oct. 15, 2024) ...........................................45

*In re TCI 2 Holdings, LLC*,
428 B.R. 117 (Bankr. D.N.J. 2010) ................................................................8, 38

*In re Trans Max Techs., Inc.*,
349 B.R. 80 (Bankr. D. Nev. 2006) ......................................................................39

*In re Tribune Co.*,
464 B.R. 126 (Bankr. D. Del. 2011), *modified*, 464 B.R. 208 (Bankr. D. Del.
2011) ...............................................................................................................16, 18

*U.S. Bank Nat'l Ass'n v. Wilmington Trust Co. (In re Spansion, Inc.)*,
426 B.R. 114 (Bankr. D. Del. 2010) .........................................................16, 17, 20

*In re Washington Mut., Inc.*,
    442 B.R. 314 (Bankr. D. Del. 2011) ........................................................16, 17, 20

*Wellness Int'l Network, Ltd. v. Sharif*,
    575 U.S. 665 (2015) ........................................................................................42

*In re Wesco Aircraft Holdings, Inc.*,
    No. 23-90611 (MI) (Bankr. S.D. Tex. Dec. 16, 2024)..............................42, 43, 45

*In re Wheel Pros, LLC*,
    No. 24-11939 (JTD) (Bankr. D. Del. Oct. 15, 2024) ..............................22

*In re Zelienople Inv. Corp.*,
    No. 13-22522-CMB, 2015 WL 1887337 (Bankr. W.D. Pa. Apr. 24, 2015)..........45

*In re Zenith Elecs. Corp.*,
    241 B.R. 92 (Bankr. D. Del. 1999) ........................................................20, 29, 38

**Statutes**

11 U.S.C. § 105.......................................................................................................9

11 U.S.C. § 521.....................................................................................................28

11 U.S.C. § 524(e).................................................................................................23

11 U.S.C. § 547................................................................................................14, 17

11 U.S.C. § 1107(a).................................................................................................3

11 U.S.C. § 1108.....................................................................................................3

11 U.S.C. § 1114...................................................................................................36

11 U.S.C. § 1122.............................................................................................*passim*

11 U.S.C. § 1122(a).................................................................................................8

11 U.S.C. § 1123..............................................................................................8, 24

11 U.S.C. § 1123(a)............................................................................................7, 12

11 U.S.C. § 1123(a)(1)..........................................................................................12

11 U.S.C. § 1123(a)(2)..........................................................................................12

11 U.S.C. § 1123(a)(3)..........................................................................................12

11 U.S.C. § 1123(a)(4)..........................................................................................13

11 U.S.C. § 1123(a)(5)................................................................................................13, 14

11 U.S.C. § 1123(a)(5)(C) .................................................................................................12

11 U.S.C. § 1123(a)(6) .......................................................................................................14

11 U.S.C. § 1123(a)(7)...................................................................................................14, 15

11 U.S.C. § 1123(b)......................................................................................................15, 16, 40

11 U.S.C. § 1123(b)(1)-(3) .................................................................................................15

11 U.S.C. § 1123(b)(3) .........................................................................................................7

11 U.S.C. § 1123(b)(3)(A)...................................................................................................16

11 U.S.C. § 1123(b)(6) .........................................................................................................15

11 U.S.C. § 1125...................................................................................................24, 25, 26, 27

11 U.S.C. § 1125(a)(1)...........................................................................................................25

11 U.S.C. § 1125(b) ...............................................................................................................25

11 U.S.C. § 1126.....................................................................................................5, 24, 25, 28

11 U.S.C. § 1126(f)................................................................................................................28

11 U.S.C. § 1126(g) ...............................................................................................................28

11 U.S.C. § 1129..........................................................................................................1, 7, 39

11 U.S.C. § 1129(a) .........................................................................................................24, 37

11 U.S.C. § 1129(a)(1).....................................................................................................7, 8, 24

11 U.S.C. § 1129(a)(2).........................................................................................................24, 29

11 U.S.C. § 1129(a)(3).........................................................................................................29, 30

11 U.S.C. § 1129(a)(4).........................................................................................................30, 31

11 U.S.C. § 1129(a)(5)...........................................................................................................31

11 U.S.C. § 1129(a)(6)...........................................................................................................32

11 U.S.C. § 1129(a)(7).........................................................................................................32, 34

11 U.S.C. § 1129(a)(8).........................................................................................................34, 37

11 U.S.C. § 1129(a)(9) ............................................................................................34, 35

11 U.S.C. § 1129(a)(9)(C) ..............................................................................................35

11 U.S.C. § 1129(a)(10) ..................................................................................................35

11 U.S.C. § 1129(a)(11) ............................................................................................35, 36

11 U.S.C. § 1129(a)(12) ..................................................................................................36

11 U.S.C. § 1129(a)(13) ..................................................................................................36

11 U.S.C. § 1129(a)(13)-(16) ..........................................................................................36

11 U.S.C. § 1129(a)(16) ..................................................................................................37

11 U.S.C. § 1129(b) ..........................................................................................34, 37, 38

11 U.S.C. § 1129(b)(1) ............................................................................................37, 47

11 U.S.C. § 1129(b)(2)(B) ..............................................................................................38

11 U.S.C. § 1129(b)(2)(B)(ii) ..........................................................................................38

11 U.S.C. § 1129(b)(2)(C) ..............................................................................................38

11 U.S.C. § 1129(b)(2)(C)(ii) ..........................................................................................38

11 U.S.C. § 1129(c) ..........................................................................................................39

28 U.S.C. § 1930 ......................................................................................................7, 36, 46

28 U.S.C. § 1930(a)(6) ..............................................................................................40, 46

Securities Act of 1933 ......................................................................................................39

**Other Authorities**

Fed. R. Bankr. P. 1007 ....................................................................................................28

Fed. R. Bankr. P. 3001(e) ................................................................................................29

Fed. R. Bankr. P. 3020 ....................................................................................................40

Fed. R. Bankr. P. 3020(e) ..........................................................................................7, 48

Fed. R. Bankr. P. 9019 ....................................................................................................47

H.R. Rep. No. 95-595, 95th Cong. 1st Sess. 412 (1977), *reprinted in* 1978
    U.S.C.C.A.N. 5963 ..........................................................................................7, 24, 43

S. Rep. No. 95-989, 95th Cong. 2nd Sess. 126 (1978), *reprinted in* 1978
U.S.C.C.A.N. 5787 ....................................................................................................................7

1.      The above captioned debtors and debtors in possession (collectively, the "Debtors" and, together with their non-Debtor affiliates, the "Company"), hereby submit this memorandum of law in support of confirmation of the *Joint Chapter 11 Plan of Number Holdings, Inc., and its Debtor Affiliates* filed on January 21, 2025 [Docket No. 1685] (as modified, amended, or supplemented from time to time, the "Plan")[1] pursuant to section 1129 of title 11 of the United States Code (as amended, the "Bankruptcy Code").  In further support of the confirmation of the Plan, the Debtors rely upon, and incorporate herein by reference, (i) the *Declaration of Christopher J. Wells in Support of Confirmation of the Joint Chapter 11 Plan of Number Holdings, Inc., and its Debtor Affiliates* [Docket No. 1687] (the "Wells Declaration") filed contemporaneously herewith; (ii) the *Declaration of Craig Johnson of Kroll Restructuring Administration LLC Regarding the Solicitation of Votes and Tabulation of Ballots Cast on the Joint Chapter 11 Plan of Number Holdings, Inc., and its Debtor Affiliates* [Docket No. 1684] (the "Voting Declaration"); and (iii) the *Declaration of Christopher J. Wells in Support of the Chapter 11 Petitions and First Day Motions of Number Holdings, Inc. and its Affiliated Debtors and Debtors in Possession* [Docket No. 18] (the "First Day Declaration"), and respectfully represent as follows:

## Preliminary Statement

2.      After months of evaluating potential strategic alternatives for stabilizing their business and maximizing value for their stakeholders, the Debtors commenced these Chapter 11 Cases with the goal of effectuating a value maximizing wind-down of their business.  By August 2024, the Debtors, with the assistance of their advisors, successfully completed the closing of their

---

[1]    Capitalized terms used but not otherwise defined herein have the meanings ascribed to them in the Plan or in the order approving the Disclosure Statement on an interim basis (the "Interim Approval and Procedures Order"), as appropriate.

371 stores and the sale of their inventory, FF&E, and real estate interests, generating over $300 million in sale proceeds.

3.      Following the completion of the sale process, the Debtors began an exhaustive claims reconciliation process, working to resolve over 650 filed proofs of claim.  The Debtors filed 13 omnibus claims objections, resulting in the reduction of liabilities of over $635 million in Claims against the Estates.

4.      Beginning in the fall of 2024, the Debtors, the Official Committee of Unsecured Creditors (the "Creditors' Committee"), and certain of the Debtors' key stakeholders, including the Ad Hoc Group of Senior Noteholders (the "Ad Hoc Group"), engaged in extensive arms'-length, good faith discussions regarding the terms of the Plan.  These discussions resulted in a settlement (the "Notes Settlement"), approved by the Court on November 27, 2024 [Docket No. 1529], which resolved disputes over the allocation of certain sale proceeds and, crucial to confirmation of the Plan, secured the Creditors' Committee's and the Ad Hoc Group's support for the Plan.

5.      As set forth in the Voting Declaration, the Plan has the support of the holders of 100% in amount and 100% in number of Class 4 Senior Notes Claims and 83.88% in amount and 91.16% in number of Class 5 General Unsecured Claims.  *See* Voting Declaration Exhibit A.

6.      The Debtors received a number of formal and informal objections, responses, and reservations of rights with respect to the Plan.[2]  As of the date hereof, the Debtors have been able to resolve all but one of the formal and informal objections and responses received through certain

---

[2]     Of these, the Debtors resolved objections and reservations of rights filed by (i) Safety National Corporation ("Safety National") [Docket No. 1673] and (ii) certain personal injury claimants ("Certain Personal Injury Claimants") [Docket No. 1680]; and (iii) informal comments received from (a) the United States Attorney's Office for the District of Delaware (the "USAO"); (b) certain of the Debtors' former landlords; (c) the Texas Taxing Authorities (as defined in the proposed Confirmation Order); (d) Rolling Frito-Lay Sales, LP; and (e) Wilmington Trust, National Association.

modifications of the language in the Plan and/or the proposed Confirmation Order.  A further amended Plan and proposed form of Confirmation Order will be filed contemporaneously herewith.  The remaining outstanding objection is that of the United States Trustee for the District of Delaware (the "U.S. Trustee") [Docket No. 1679] (the "UST Objection").  The Debtors' response to the UST Objection is set forth below, and the Debtors believe this objection should not be an impediment to the confirmation of the Plan and should nonetheless be overruled.

7.      As discussed in detail below, the Plan complies with the confirmation requirements of the Bankruptcy Code and all applicable law and should be confirmed.

## Background

### I.      Procedural History

8.      On April 7, 2024 (the "Petition Date"),[3] the Debtors commenced the Chapter 11 Cases by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.  The Debtors are authorized to continue operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  The Chapter 11 Cases have been consolidated for procedural purposes only and are being administered jointly.  On April 19, 2024, the U.S. Trustee appointed the Creditors' Committee.  No trustee or examiner has been appointed in the Chapter 11 Cases.

9.      On November 27, 2024, the Debtors filed their initial plan and related disclosure statement [Docket Nos. 1533 & 1534], as well as a motion seeking approval of the adequacy of the Disclosure Statement on an interim basis and of the solicitation procedures (the "Solicitation Procedures Motion") [Docket No. 1535].  On December 19, 2024, the Debtors filed a revised plan and disclosure statement (the "Revised Disclosure Statement") [Docket Nos. 1605 & 1606].  On

---

[3]     Certain of the Debtors' voluntary petitions were filed on the docket shortly after midnight (ET) on April 8, 2024.

December 20, 2024, following the hearing to consider the Solicitation Procedures Motion (the "Disclosure Statement Hearing"), the Court entered the Interim Approval and Procedures Order which, among other things, approved the adequacy of the Revised Disclosure Statement on an interim basis for solicitation purposes only and set certain dates and deadlines related to the confirmation of the Plan [Docket No. 1612]. Shortly thereafter, the Debtors filed the solicitation version of the Plan and the Revised Disclosure Statement (the "Disclosure Statement") [Docket No. 1613].

10.     The deadline for all holders of Claims entitled to vote on the Plan to cast their Ballots was January 17, 2025, at 4:00 p.m. (prevailing Eastern Time) (the "Voting Deadline"), which was extended to Monday, January 20, 2025 at 11:59 a.m. (prevailing Eastern Time) for certain parties.[4] The deadline to file objections to confirmation of the Plan and final approval of the Disclosure Statement was also January 17, 2025, at 4:00 p.m. (prevailing Eastern Time) (the "Objection Deadline"), which was extended to Monday, January 20, 2025 at 11:59 p.m. (prevailing Eastern Time) for certain parties. The hearing to consider approval of the Disclosure Statement on a final basis and confirmation of the Plan is scheduled for January 24, 2025, at 10:00˚a.m. (prevailing Eastern Time) (the "Combined Hearing"). Concurrently with the filing of this memorandum, the Debtors have submitted a proposed order confirming the Plan (the "Confirmation Order").

---

[4]     The Voting Deadline was extended to January 20, 2025, at 11:59 a.m. (prevailing Eastern Time), by mutual agreement with the parties, for (i) New Carrot Farms, LLC, (ii) Yacoel 2021 Partners, LP and Katy Mission, LLC, (iii) Masters Advanced Remediation Services, LLC, and (iv) OCM 99 Holdings LLC. The Voting Deadline was also extended for certain claimants in Class 5 who were served the Solicitation Package electronically on January 16, 2025. *See Affidavit of Service of Solicitation Materials* [D.I. 1678].

## II.     The Solicitation Process

11.     Shortly following entry of the Interim Approval and Procedures Order, the Debtors directed their voting agent, Kroll Restructuring Administration LLC ("Kroll" or the "Voting Agent") to commence the solicitation of votes on the Plan, as required by section 1126 of the Bankruptcy Code.   Kroll distributed copies of the Combined Hearing Notice, the Plan, the Disclosure Statement, the Interim Approval and Procedures Order, an appropriate Ballot, and other related materials (collectively, the "Solicitation Package") to the holders of Claims in Classes 4 and 5 (the "Voting Classes") and a copy of the Notice of Non-Voting Status to the holders of Claims in other Classes (the "Non-Voting Classes").   *See Affidavit of Service of Solicitation Materials* [D.I. 1675] (the "Solicitation Affidavit").   Kroll also published the Publication Notice in the *Los Angeles Times* on December 26, 2024.   *See Certificate of Publication* [Docket No.˚1646] (the "Publication Affidavit").

## III.     The Voting Results

12.     The Voting Declaration shows the following results of voting on the Plan:

| Class | Class Description | Number Accepting % | Number Rejecting % | Amount Accepting % | Amount Rejecting % | Class Voting Result |
|-------|------------------|--------------------|--------------------|--------------------|--------------------|---------------------|
| 4 | Senior Notes Claims | 23 | 0 | $302,016,000.00 | $0.00 | ACCEPT |
|   |   | 100% | 0% | 100% | 0% |   |
| 5 | General Unsecured Claims | 330 | 32 | $172,656,428.02 | $33,169,263.80 | ACCEPT |
|   |   | 91.16% | 8.84% | 83.88% | 16.12% |   |

## IV.     Confirmation Objections

13.     As noted, the Debtors received a number of formal and informal objections, responses, and reservations of rights with respect to the Plan.   Specifically, objections and a reservation of rights were filed by (i) the U.S. Trustee, (ii) Safety National, and (iii) Certain

Personal Injury Claimants; and (iv) informal comments were received from (a) the USAO; (b) certain of the Debtors' former landlords; (c) the Texas Taxing Authorities (as defined in the proposed Confirmation Order); (d) Rolling Frito-Lay Sales, LP; and (e) Wilmington Trust, National Association.  The Debtors have been working diligently with these parties to address their respective concerns and believe that all objections and comments other than the UST Objection have been, or will be, resolved prior to the Combined Hearing through modifications to the Plan or the inclusion of certain language in the Confirmation Order.

14.    For the reasons summarized herein and discussed in further detail below, the Debtors respectfully request that the Court overrule the UST Objection and confirm the Plan. *First*, the proposed third-party releases are consensual; the opt-out mechanism has already been approved by this Court in connection with this Plan[5] and under the circumstances of these cases, over the prior objection of the U.S. Trustee.  Moreover, the UST Objection wrongly ignores that (i) *Purdue* settled that consensual third-party releases are and may be included in chapter 11 plans and (ii) that an opt-out mechanism for obtaining consent has been approved post-*Purdue* by many courts in this District, including this Court, and across many jurisdictions.  *Second*, in connection with the Court's prior approval of the opt-out mechanics for obtaining consensual third-party releases in these cases, the Court also overruled the U.S. Trustee's prior objection to the injunction provision, which is consistent with injunction provisions routinely approved in this District. Indeed, the U.S. Trustee has acknowledged that its objection to the injunction provision stands and

---

5    *See* Disclosure Statement Hr'g. Tr. 31:23–15, 32:1–2, *In re Number Holdings, Inc.*, No. 24-10719 (JKS) (Bankr. D. Del. Dec. 20, 2024) [D.I. 1617] ("99 Cents Disclosure Statement Hr'g Tr.") (Judge Stickles holding that "under these circumstances, the opt-out remains a valid mechanism for the [Debtors] to obtain the release through the [P]lan and do so on a consensual basis because the parties here are given the opportunity to opt out.").

falls with the approval of the Third-Party Releases (as defined herein).[6]  If the Court finds that the release and exculpation provisions of the Plan are appropriate, then the Court should approve the injunction provision, which serves to enforce these appropriate Plan provisions.  *Third*, the Plan's statutory fees provision complies with 28 U.S.C. § 1930.   *Fourth*, the global settlement memorialized in the Plan is a settlement of estate causes of action and is consistent with section 1123(b)(3) of the Bankruptcy Code.  *Fifth*, the irreparable harm that will be caused to the Debtors if the Effective Date does not occur prior to the end of the Company's fiscal year on January 31, 2025, justifies a waiver of the Bankruptcy Rule 3020(e) stay.  For all these reasons, the Debtors submit that the Court should overrule the UST Objection and confirm the Plan.

<u>**Argument**</u>

**I.    THE PLAN SATISFIES THE REQUIREMENTS OF SECTION 1129 OF THE BANKRUPTCY CODE**

**A.    The Plan Complies with the Applicable Provisions of Section 1129(a)(1) of the Bankruptcy Code**

15.    Bankruptcy Code section 1129(a)(1) requires that a chapter 11 plan must "compl[y] with the applicable provisions" of the Bankruptcy Code.   The legislative history of section 1129(a)(1) explains that this requirement refers primarily to sections 1122 and 1123(a) of the Bankruptcy Code, which govern, respectively, the classification of claims and interests and the contents of a chapter 11 plan.  *See* S. Rep. No. 95-989, 95th Cong. 2nd Sess. 126 (1978), *reprinted in* 1978 U.S.C.C.A.N. 5787, 5913; H.R. Rep. No. 95-595, 95th Cong. 1st Sess. 412 (1977), *reprinted in* 1978 U.S.C.C.A.N. 5963, 6368; *see also In re Nutritional Sourcing Corp.*, 398 B.R. 816, 824 (Bankr. D. Del. 2008) ("As confirmed by legislative history, 11 U.S.C. § 1129(a)(1),

---

[6]    *See* 99 Cents Disclosure Statement Hr'g. Tr. 19:5–8 (Rosa Sierra-Fox for the U.S. Trustee stating that "that [the U.S. Trustee's injunction argument] in our view, flows from the general objection.  If the release isn't consensual then an injunction to enforce a non-consensual release should also not stand.").

which provides that the plan must 'compl[y] with the applicable provisions of this title,' requires that a plan comply with 11 U.S.C. §§ 1122 and 1123."); *In re TCI 2 Holdings, LLC*, 428 B.R. 117, 132 (Bankr. D.N.J. 2010) ("The legislative history reflects that 'the applicable provisions of chapter 11 [refers to] . . .section 1122 and 1123, governing classification and contents of plan.'"); *In re G-1 Holdings Inc.*, 420 B.R. 216, 258 (Bankr. D.N.J. 2009) (reviewing a plan to determine whether it "complies with other applicable provisions of § 1129(a)(1), including §§ 1122 and 1123"); *In re Johns-Manville Corp.*, 68 B.R. 618, 629 (Bankr. S.D.N.Y. 1986) (stating that "[o]bjections to confirmation raised under § 1129(a)(1) generally involve the failure of a plan to conform to the requirements of § 1122(a) or § 1123."), *aff'd in part, rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom.*, *Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir. 1988). As demonstrated below, the Plan complies with the requirements of sections 1122 and 1123 of the Bankruptcy Code.

## 1. The Plan Satisfies the Classification Requirements of Section 1122 of the Bankruptcy Code

16.    Section 1122(a) of the Bankruptcy Code provides, in pertinent part, that "a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class." *See In re Armstrong World Indus., Inc.*, 348 B.R. 136, 160 (D. Del. 2006) (holding that section 1122(a) of the Bankruptcy Code was satisfied where similar claims were classified together); *In re Aleris Int'l, Inc.*, 2010 WL 3492664, at *12 (Bankr. D. Del. May 13, 2010) (same and further noting that section 1122(a) is satisfied where a plan "does not propose a classification scheme to create an impaired consenting class" or manipulate class voting). Thus, for the Plan to satisfy Bankruptcy Code section 1122, Claims and Interests placed in each Class must be substantially similar to one another.

17.     In accordance with this requirement, the Plan places Claims and Interests in eight different classes based upon their legal nature and entitlements, taking into account the relative priority among various Claims and Interests.  *See* Plan, Section II.B.  Further, each Class consists of substantially similar Claims or Interests, as applicable.  To the extent that the Plan places similar Claims and Interests in different classes, valid business, legal and factual reasons justify such separate classification.  Accordingly, the classification of Claims and Interests in the Plan satisfies the requirements of section 1122 of the Bankruptcy Code.

18.     For purposes of voting on and making Distributions under the Plan, the Estates are deemed merged and consolidated, so that a holder of a Claim that may be asserted against more than one Debtor will be entitled to a single Distribution as if such holder had a single Claim against the consolidated Estate.  *See* Plan, Section II.

19.     It is well established that bankruptcy courts may use their equitable powers under section 105 of the Bankruptcy Code to substantively consolidate cases of related debtors for plan purposes.  *See, e.g.*, *In re Stone & Webster, Inc.*, 286 B.R. 532, 539 (Bankr. D. Del. 2002); *Bruce Energy Ctr. Ltd. v. Orfa Corp. of Am. (In re Orfa Corp. of Phila.)*, 129 B.R. 404, 413–14 (Bankr. E.D. Pa. 1991) ("[T]he court's power to substantively consolidate cases is derived from its general equitable powers under 11 U.S.C. § 105.").

20.     In the Third Circuit, absent consent, a proponent of substantive consolidation is required to show that "(i) prepetition, the debtors disregarded separateness so significantly their creditors relied on the breakdown of entity borders and treated them as one legal entity or (ii) postpetition their assets and liabilities are so scrambled that separating them is prohibitive and hurts all creditors." *In re Owens Corning*, 419 F.3d 195, 211 (3d Cir. 2005).

21.     With respect to the first element, to determine that substantive consolidation is appropriate, courts looked at the factual record to determine whether the debtors (a) have the same officers, same directors and shareholders; (b) conduct the same general business operations under very similar names; (c) conduct intercompany transactions without the usual corporate formalities; (d) do not charge each other for all services which they rendered to one another; and (e) move profits between and among the debtor entities. *In re Lisanti Foods, Inc.*, 241 Fed. Appx. 1, 2–3 (3d Cir. 2007). The courts have also noted that substantive consolidation may be appropriate where debtors are viewed as a single entity for the purposes of obtaining secured credit, and trade creditors view the debtors as a single entity when extending credit terms. *Id*. at 3.

22.     A deemed consolidation, as provided for under the Plan, has been found to be appropriate where "(1) there is a substantial identity between the entities to be consolidated; and (2) consolidation is necessary to avoid some harm or to realize some benefit." *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 618–19 (Bankr. D. Del. 2001) (citations omitted) (upholding deemed consolidation and merger of the debtors in part because the debtor entities operated as business units without the formality of separate corporate entities, the debtor entities shared a central cash management system, the debt held by the Secured Lenders was secured by substantially all of the debtor entities, and the deemed consolidation would achieve substantial benefit to creditors).

23.     As shown by the overwhelming acceptance of the Plan by the creditors entitled to vote, the Debtors' creditors have accepted the deemed substantive consolidation of the Estates for Plan purposes. None of the parties in interest that filed objections to the confirmation of the Plan objected to the deemed consolidation of the Estates.

24.     But even if no consent could be shown, the proposed deemed consolidation would still satisfy the standards articulated in the Third Circuit. *First*, the Debtors behaved, and their

creditors treated them, as a single legal entity prior to the Petition Date.  99 Cents Only Stores LLC was the principal operating company within the corporate enterprise, overseeing a majority of the Company's retail stores and distribution centers.  *See* First Day Declaration ¶ 35.  No other Debtor, with the exception of 99 Cents Only Stores Texas, Inc., which was the principal operator of the Company's Texas operations, had any active business or operations.  *See* First Day Declaration ¶ 36.  *Second*, the Debtors believe that third parties with whom they transacted business prior to the Petition Date treated them as a single entity.  *See* Wells Declaration ¶ 8.  This is evident from, among other things, the Debtors' various prepetition credit facilities under which all Debtors, other than the non-operational Debtors 99 Cents PropCo LLC, 99 Cents HoldCo LLC, and Bargain Wholesale LLC, were co-liable.  *See id.*; *see also* First Day Declaration ¶ 42.

25.     *Third*, the deemed consolidation provided for in the Plan will not harm any of the Debtors' creditors and will in fact result in substantial benefits to all Estates.  Indeed, the proposed consolidation avoids the cost of segregating the assets and liabilities of each Estate, thereby avoiding further dilution to creditor recoveries as a result of increased professional fees, especially where as here, the recovery for unsecured creditors is based on a global settlement between the Debtors, the Ad Hoc Group, and the Creditors' Committee of potential estate causes of action, providing for a pot recovery for all unsecured creditors, that may not have been possible absent the settlement.  *See* Wells Declaration ¶ 9.  Disentangling the affairs of the Debtors would not only be overly burdensome and cost inefficient, but would not provide any attendant benefit to the Debtors' stakeholders.  *Id*.  For these reasons, the Plan proposes to make Distributions on a consolidated basis, rather than attempt to allocate distributions on a Debtor-by-Debtor basis.

26.     Accordingly, the Debtors submit that the proposed deemed consolidation of the Estates for Plan purposes is in the best interest of the Debtors, their Estates, and their creditors, and complies with section 1122 of the Bankruptcy Code.[7]

**2.     The Plan Satisfies Section 1123(a) of the Bankruptcy Code**

a.     **Designation of Classes of Claims and Interests (§ 1123(a)(1))**

27.     Section 1123(a)(1) of the Bankruptcy Code provides that each plan must "designate. . . classes of claims, other than claims of a kind specified in section 507(a)(2), 507(a)(3), or 507(a)(8) of this title, and classes of interests."  In compliance with this requirement, the Plan designates Classes of Claims (other than Claims that do not need to be classified, such as Administrative Claims, Priority Tax Claims, and DIP Claims) and Interests.  *See* Plan, Section˚II.B.

b.     **Specification of Unimpaired Classes (§ 1123(a)(2))**

28.     Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any class of claims or interests that is not impaired under the plan."  The Plan satisfies this requirement by identifying Class 1 (Other Priority Claims), Class 2 (Other Secured Claims), and Class˚3 (Prepetition ABL Claims) as Unimpaired under the Plan.  *See* Plan, Section II.C.

c.     **Treatment of Impaired Classes (§ 1123(a)(3))**

29.     Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the treatment of any class of claims or interests that is impaired under the plan."  The Plan meets this requirement by specifying the treatment of the Impaired Classes of Claims and Interests: Class 4

---

[7]     In addition, the Bankruptcy Code contemplates that consolidation may be used to effectuate a chapter 11 plan. *See* 11 U.S.C. § 1123(a)(5)(C) ("[n]otwithstanding any otherwise applicable nonbankruptcy law, a plan shall . . . provide adequate means for the plan's implementation, such as . . . consolidation of the debtor with one or more persons . . .").

(Senior Notes Claims), Class 5 (General Unsecured Claims), Class 6 (Intercompany Claims), Class°7 (Intercompany Interests), and Class 8 (Equity Interests). *See* Plan, Section II.C.

d.      **Equal Treatment within Classes (§ 1123(a)(4))**

30.    Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." The Plan satisfies this requirement because each holder of an Allowed Claim and Interest, as applicable, in the same Class will receive the same treatment as all other holders of Allowed Claims and Interests in that Class, except to the extent any holder has agreed to a different treatment. *See* Plan, Section II.C.

e.      **Means for Implementation (§ 1123(a)(5))**

31.    Section 1123(a)(5) of the Bankruptcy Code requires that the Plan provide "adequate means" for its implementation. The Plan satisfies this requirement by setting forth the following means for its implementation: (i) the appointment of a Plan Administrator to administer the Post-Confirmation Debtors' Retained Assets, implement the Plan, and wind down the business and affairs of the Post-Confirmation Debtors, including the power to (a) sell, dispose, liquidate, receive, hold, invest, supervise, protect, and abandon the Post-Confirmation Debtors Retained Assets; (b) make Distributions under the Plan; (c) maintain bank accounts in the name of any Post-Confirmation Debtor; (d) employ professionals; (e) pay Wind-Down Expenses; and (f) dissolve the Debtors or Post-Confirmation Debtors; (ii) the establishment of a Liquidating Trust, the vesting of the Liquidating Trust Assets in the Liquidating Trust, and appointment of a Liquidating Trustee with the authority to (a) investigate, review, reconcile, allow, object to, compromise, and settle Administrative Claims, Priority Tax Claims, Other Priority Claims, Other Secured Claims, and General Unsecured Claims and (b) file tax returns for the Liquidating Trust;

13

(iii) the preservation of certain Causes of Action; (iv) the continuance of the Debtors' Insurance Contracts; (v) the comprehensive settlement of all Claims, Interests, disputes and controversies; (vi) the release and discharge of all Avoidance Actions under section 547 of the Bankruptcy Code; (vii) the cancellation, release, and surrender of documents, instruments, Liens, and securities, except as otherwise provided in the Plan; (viii) the authorization, approval, and if applicable, ratification, of all acts or actions contemplated by the Plan or reasonably necessary to consummate the transactions contemplated by the Plan; (ix) the resignation of the managers, directors, and officers of the Debtors; and (x) the authorization of the Plan Administrator or Liquidating Trustee to close the Chapter 11 Cases  *See* Plan, Section IV.  The Plan thus satisfies section 1123(a)(5) of the Bankruptcy Code.

### f.  Issuance of Non-Voting Equity Securities (§ 1123(a)(6))

32.    Section 1123(a)(6) of the Bankruptcy Code requires that a reorganized debtor's constituent documents prohibit the issuance of non-voting equity securities.  Section IV.A of the Plan provides that the organizational documents of the Post-Confirmation Debtors will prohibit the issuance of any non-voting equity securities to the extent required by Bankruptcy Code section 1123(a)(6).  Accordingly, the Plan satisfies section 1123(a)(6) of the Bankruptcy Code.

### g.  Directors and Officers (§ 1123(a)(7))

33.    Section 1123(a)(7) of the Bankruptcy Code requires that plan provisions with respect to the manner of selection of any director, officer, or trustee, or any successor thereto, be "consistent with the interests of creditors and equity security holders and with public policy." Section IV.M of the Plan provides that, on the Effective Date, all managers, directors, and officers of the Debtors will be deemed to have resigned.  Sections IV.B-C of the Plan provide that the Plan Administrator will act as sole officer, director and/or manager of the Post-Confirmation Debtors,

14

and the Liquidating Trustee will be selected by the Creditors' Committee. As set forth in the Plan and the Plan Supplement, the Liquidating Trustee and the Plan Administrator is META Advisors LLC. The Plan thus satisfies the requirements of section 1123(a)(7) of the Bankruptcy Code.

### 3. The Plan Also Complies with the Discretionary Provisions of Section 1123(b) of the Bankruptcy Code

34. Section 1123(b) of the Bankruptcy Code identifies various discretionary provisions that may be included in a chapter 11 plan, provided they are "not inconsistent with" any applicable provisions of the Bankruptcy Code. *See* 11 U.S.C. § 1123(b)(6). Among other things, section 1123(b) provides that a plan may: (i) impair or leave unimpaired any class of claims or interests; (ii) provide for the assumption or rejection of executory contracts and unexpired leases; and (iii) provide for the settlement or adjustment of any claim or interest belonging to the debtor or the estates. *See* 11 U.S.C. § 1123(b)(1)-(3).

35. As permitted by section 1123(b), the Plan provides for (i) the impairment or unimpairment of Classes of Claims and Interests;[8] (ii) the assumption and rejection of Executory Contracts or Unexpired Leases;[9] (iii) the compromise and settlement of all Claims, Interests, disputes, and controversies relating to the rights of Holders of Claims and Interests;[10] and (iv) the establishment of the Liquidating Trust to make distributions in accordance with the Plan, Confirmation Order, Liquidating Trust Agreement, and certain tax regulations.[11]

36. As discussed in greater detail below, the Plan also contains certain release, exculpation, and injunction provisions that are consistent with the Bankruptcy Code and applicable caselaw.

---

[8] *See* Plan, Section II.B.

[9] *See* Plan, Section V.

[10] *See* Plan, Section IV.F.

[11] *See* Plan, Section IV.C.

a.     **The Plan's Release, Exculpation, and Injunction Provisions are Consistent with Section 1123(b) of the Bankruptcy Code**

37.     Section 1123(b)(3)(A) of the Bankruptcy Code provides that a plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." A debtor may release claims under section 1123(b)(3)(A) "if the release is a valid exercise of the debtor's business judgment, is fair, reasonable, and in the best interests of the estate." *U.S. Bank Nat'l Ass'n v. Wilmington Trust Co.* (*In re Spansion, Inc.*), 426 B.R. 114, 143 (Bankr. D. Del. 2010); *see also In re Washington Mut., Inc.*, 442 B.R. 314, 327 (Bankr. D. Del. 2011) ("In making its evaluation [whether to approve a settlement], the court must determine whether 'the compromise is fair, reasonable, and in the best interest of the estate.'"). A court's evaluation of the propriety of a debtor's release "is often dictated by the specific facts of the case." *In re Washington Mut.*, 442 B.R. at 345; *In re Tribune Co.*, 464 B.R. 126, 186 (Bankr. D. Del. 2011), *modified*, 464 B.R. 208 (Bankr. D. Del. 2011) (same); *In re Indianapolis Downs, LLC*, 486 B.R. 286, 303 (Bankr. D. Del. 2013) (courts evaluating a debtor's releases weigh "the equities of the particular case after a fact-specific review"). As demonstrated below, the Plan's release, exculpation, and injunction provisions are fair, reasonable, and in the best interests of the Debtors and their Estates, and appropriate under the circumstances of these Chapter 11 Cases.

(i)     **The Debtor Releases are Appropriate**

38.     Section X.B.1 of the Plan provides for releases by the Debtors (the "Debtor Releases") of certain claims against the Released Parties, which include (in ease case, solely in their capacity as such): (a) the Creditors' Committee and its members, (b) the DIP Agent and the DIP Lenders, (c) the Prepetition ABL Agent and the Prepetition Lenders, (d) the Prepetition FILO Agent, (e) the Senior Notes Agent, (f) Holders of the Senior Notes, (g) all Holders of Claims who grant the releases provided by the Plan, and (h) the Representatives of each of the parties

16

enumerated in the foregoing (as well as the Debtors' and the Estates' Representatives).  If any of the foregoing Entities objects to the releases provided in the Plan, such Entity and its Representatives will not be Released Parties.  Furthermore, the Debtors are releasing all of their Avoidance Actions under section 547 of the Bankruptcy Code.  *See* Plan, Section IV.G.

39.     Courts in this district consider the following factors to determine whether releases in a chapter 11 plan are appropriate: (a) whether there is an identity of interest between the debtor and the third party, such that a suit against the non-debtor is, in essence, a suit against the debtor or will deplete assets of the estate; (b) whether the non-debtor has made a substantial contribution; (c) the essential nature of the release to the extent that, without the release, there is little likelihood of success; (d) an agreement by a substantial majority of creditors to support the release, specifically if the impacted class or classes "overwhelmingly" vote to accept the plan; and (e) whether there is a provision in the plan for payment of all or substantially all of the claims of the class or classes affected by the release.  *See In re Indianapolis Downs*, 486 B.R. at 303 (*citing In re Zenith Elecs. Corp.*, 241 B.R. 92, 110 (Bankr. D. Del. 1999)); *see also In re Spansion*, 426 B.R. at 143 n.47.  Importantly, a court need not find that all of these factors apply to approve a debtor's release of claims against non-debtors.  *See, e.g., In re Washington Mut.*, 442 B.R. at 346. Rather, such factors are "helpful in weighing the equities of the particular case after a fact-specific review." *In re Indianapolis Downs*, 486 B.R. at 303.

40.     Further, courts in the Third Circuit have held that, "[w]here such releases are an active part of the plan negotiation and formulation process, it is a valid exercise of the debtor's business judgment to include a settlement of any claims a debtor might own against third parties as a discretionary provision of a plan."  *In re Aleris Int'l, Inc.*, 2010 WL 3492664, at *20; *see also In re PWS Holding Corp.*, 228 F.3d 224, 242 (3d Cir. 2000) (affirming debtor's release of claims

against equity sponsor in connection with leverage privatization transaction where the claims had "negative value" to the estate because they were not likely to produce recoveries and were costly to the estate).

41.     *First*, there is an identity of interests between the Debtors and the Released Parties. Each of the Released Parties, as stakeholders and key participants in the Chapter 11 Cases, share a common goal with the Debtors in seeing the Plan succeed.  *See In re Tribune Co.*, 464 B.R. at 187 (noting the existence of an identity of interest between the debtors and the settling parties where such parties "share the common goal of confirming the DCL Plan and implementing the DCL Plan Settlement).

42.     *Second*, the Released Parties have made a substantial contribution to the Chapter 11 Cases, which include, among other things, negotiating, formulating, and executing the Plan, as well as providing other material support to the Debtors.  The DIP Lenders provided the Debtors with $35.5 million in new money postpetition financing facilitating the Debtors' smooth transition into chapter 11 and the runway to execute an efficient wind-down of their business, which included the store closing sales and sale of their various real estate and other property interests.  Further, some of the Released Parties, such as the Creditors' Committee, played an active role throughout the duration of the Chapter 11 Cases, including in negotiating a Notes Settlement which paved the way for formulating a Plan that has garnered support from the Debtors' key stakeholders.  As part of the Notes Settlement, the Holders of the Senior Notes have agreed to limit their recovery to the Notes Distribution and to waive any distribution on account of any deficiency claims.

43.     *Third*, the Debtor Releases are essential to the orderly wind-down of the Chapter 11 Cases.  Without such releases, and the active participation of the Released Parties in these Chapter 11 Cases, none of the value-maximizing transactions that have been consummated over

18

the past nearly ten months would have been possible. Certain key stakeholders notably went to great lengths to negotiate settlements, draft a chapter 11 plan, and even forgo part of their own recoveries. These stakeholders had to make considerable contributions and concessions in taking these steps toward formulating the Plan. The consideration for this support is the Debtor Releases.

44.     *Fourth,* the holders of Claims in the Voting Classes have overwhelmingly voted in favor of the Plan. *See* Voting Declaration Exhibit A.

45.     *Finally*, the Debtor Releases, like all elements of the Plan, were negotiated by sophisticated parties represented by able counsel and are the result of arm's-length negotiations. The Debtor Releases provide the Released Parties with a level of finality that is key to an orderly and value-maximizing wind-down of the Estates, a result which would be impossible without the contributions and significant concessions of the Released Parties. Accordingly, the Debtor Releases are fair and equitable, in the best interest of the Estates, and should be approved.

(ii)     <b>The Third-Party Releases are Appropriate</b>

46.     Section X.B.2 of the Plan contains releases of the Released Parties by certain holders of Claims (the "<u>Third-Party Releases</u>"). Specifically, the Third-Party Releases are being granted by each (i) holder of a Claim that returns a Ballot or enters into a settlement with the Debtors with respect to their Claim and does not opt-out of the Third-Party Release by checking the opt-out box on their Ballot and (ii) the other Releasing Parties, which include (a) the Estates, (b) the Creditors' Committee and its members, (c) the DIP Agent and the DIP Lenders, (d) the Prepetition ABL Agent and the Prepetition Lenders, (e) the Prepetition FILO Agent, (f) the Senior Notes Agent, (g) the members of the Ad Hoc Group of Senior Noteholders, and (h) the Representatives of each of the parties enumerated in the preceding clauses (a)-(g).

19

47.     Notwithstanding the Supreme Court's recent decision in *Purdue*,[12] nothing has changed the longstanding precedent permitting consensual third-party releases.  Courts in the Third Circuit have long recognized that a chapter 11 plan may include a release of non-debtors by other non-debtors when such release is consensual.  *See In re Emerge Energy Servs. LP*, 2019 WL 7634308, * 17-18 (Bankr. D. Del. Dec. 5, 2019); *Indianapolis Downs*, 486 B.R. at 305; *In re Spansion*, 426 B.R. at144 (stating that "a third party release may be included in a plan if the release is consensual"); *In re Washington Mut.*, 442 B.R. at 351–52 (noting that consensual third-party releases are permissible); *In re Zenith Elecs. Corp.*, 241 B.R. at 111 (approving releases by creditors that voted in favor of the plan).  The determination as to whether a third-party release is consensual depends on the particular circumstances of a particular case.  *See Indianapolis Downs*, 486 B.R. at 306; *see also* 99 Cents Disclosure Statement Hr'g. Tr. 31:14–15 (Judge Stickles noting "[w]hether an opt-out is appropriate is analyzed on a case-by-case basis").

48.     In the Third Circuit, a third-party release is consensual where the releasing parties have received sufficient notice (including an explanation of the consequences of granting the release), had the opportunity to opt out of the release, and failed to do so.  *See Indianapolis Downs*, 486 B.R. at 306 (approving consensual third party releases by "impaired creditors who abstained from voting on the Plan, or who voted to reject the Plan and did not otherwise opt out of the releases" and who were provided detailed instructions on how to opt out, and had the opportunity to do so by marking their ballots); *In re Genco Shipping & Trading Ltd.*, 513 B.R. 233, 271 (Bankr. S.D.N.Y. 2014) (finding third party release consensual with respect to parties that had the "ability to 'check the box' on the Plan ballots" which includes "those parties who voted in favor of the

---

[12]    The Supreme Court expressly stated: "Nothing in what we have said should be construed to call into question *consensual* third-party releases offered in connection with a [chapter 11] plan . . . [n]or do we have occasion today to express a view on what qualifies as a consensual release.  *Harrington v. Purdue Pharma L.P.*, 603 U.S. 204, 144 S. Ct. 2071, 2087–88 (2024) (emphasis in original).

Plan and those who voted to reject the Plan but failed to opt out from granting the release provisions"). This is consistent with the majority view that an opt-out mechanism—which requires an affirmative act, and where a failure to has clearly defined consequences—is sufficient for garnering consent to third-party releases.[13] This mechanism is consistent with other examples in American jurisprudence where a failure to act constitutes consent. For example, the Supreme Court has found that opt out mechanism, when accompanied by sufficient notice, procures the consent of parties to be joined to a class settlement. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 813–14 (1985) (rejecting contention that plaintiffs could only give consent by affirmatively opting into the class). There is no reason such a principle should not also apply in bankruptcy.

49. Here, creditors who submit a Ballot are required to check the opt-out box thereon to indicate that they opt not to grant the Third-Party Releases. *See* Plan, Section X.B.2. The Ballots were distributed to the holders of Claims entitled to vote with timely, sufficient, appropriate, and adequate notice, including the explanation that such creditors would grant the Third-Party Releases if they did not opt out by checking the opt-out box on the Ballots they submitted. *See* Interim Approval and Procedures Order, Exhibit 2. The text describing the Third-Party Releases was printed in bold type in the Ballots, Plan, and Disclosure Statement. Creditors had the opportunity to opt-out of the Third-Party Releases whether they voted to accept or reject the Plan. Further, no members of the Non-Voting Classes (unless they are a Releasing Party that does not object to the releases) or members of the Voting Classes who do not vote are giving a

---

[13]   *See, e.g., In re LaVie Care Centers, LLC,* No. 24-55507 (PMB), 2024 WL 4988600, at *15 (Bankr. N.D. Ga. Dec. 5, 2024) ("[I]f a creditor gets materials in a bankruptcy case, and the materials say if you do not take an action, you will be bound by the consensual release, you must do something. You cannot simply ignore it. If you do, you may be 'deemed' to consent to the release. Or you may have waived those rights. Or you may be estopped from enforcing them"); *In re Conseco, Inc.*, 301 B.R. 525, 528 (Bankr. N.D. Ill. 2003) (finding consensual third-party release included in plan of reorganization that bound "only those creditors who agreed to be bound, either by voting for the Plan or by choosing not to opt out of the release").

release.  As this Court held at the Disclosure Statement Hearing, "under these circumstances, the opt-out remains a valid mechanism for the [Debtors] to obtain the release through the [P]lan and do so on a consensual basis because the parties here are given the opportunity to opt out." 99 Cents Disclosure Statement Hr'g. Tr. 31:23–15, 32:1–2.  Thus, the Third-Party Releases are fully consensual and consistent with the law in this Circuit.

50.    Moreover, the Third-Party Releases are an integral and necessary part of the Plan. As described above, the Released Parties have provided significant contribution and support to the Chapter 11 Cases and the Plan.  In addition, the Third-Party Releases are narrowly tailored as they do not provide a blanket immunity and provide a carve-out for acts or omissions that constitute gross negligence, fraud, or willful misconduct, as determined by a Final Order.  *See* Plan, Section˚X.B.2.

51.    Accordingly, the Third-Party Releases are consensual, appropriate, and narrowly tailored to the circumstances of these Chapter 11 Cases, and should therefore be approved.[14]

### (iii)    The Exculpation Provision is Appropriate

52.    Section X.A of the Plan provides exculpation to certain parties from liability in connection with the administration of the Chapter 11 Cases and related transactions, except for liability resulting from (i) failure to perform or pay obligations under the Plan and (ii) acts or omissions that constitute gross negligence, fraud, or willful misconduct as determined by a Final Order (the "Exculpation Provision").  The Exculpated Parties are: (a) the Debtors, (b) the

---

[14]    Courts have continued to approve third-party releases in chapter 11 plans where consent was obtained through an opt-out mechanism in cases decided post-*Purdue*.  *See, e.g., In re Fisker, Inc.*, No. 24-11390 (TMH) (Bankr. D. Del. Oct. 16, 2024); *In re Wheel Pros, LLC*, No. 24-11939 (JTD) (Bankr. D. Del. Oct. 15, 2024); *In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del. Oct. 8, 2024); *In re Sam Ash Music Corp.*, No. 24-14727 (SLM) (Bankr D.N.J. Aug. 15, 2024); *In re Robertshaw US Holding Corp.*, Case No. 24-90052 (CML) (Bankr. S.D. Tex. Aug. 16, 2024); *In re Invitae Corp.*, No. 24-11362 (MBK) (Bankr. D.N.J. Aug. 2, 2024); *In re Bowflex Inc.*, No. 24-12364 (ABA) (Bankr. D. N.J. Aug. 18, 2024).

Creditors' Committee and its members, and (c) the Debtors' directors, managers, and officers (who served in such capacity during the period between the Petition Date and the Effective Date), (d) the Professionals retained by the Debtors in the Chapter 11 Cases solely in their capacities as such, except for those retained pursuant to the Ordinary Course Professionals Order, and (e) the professionals retained by the Creditors' Committee, solely in their respective capacities as such. *See* Plan, Section I.A.46.

53.     The Third Circuit assesses the appropriateness of exculpation provisions in light of the particular circumstances of each case.  *See In re PWS Holding Corp*., 228 F.3d at 247 (rejecting any "*per se* rule barring any provision in a [chapter 11] plan limiting the liability of third parties[,]" including exculpation, by virtue of section 524(e) of the Bankruptcy Code); *see also In re Indianapolis Downs*, 486 B.R. at 306 (concluding that exculpation provisions are appropriate for estate fiduciaries, committees and their members and a debtor's directors and officers).

54.     Unlike the Third-Party Releases, the Exculpation Provision does not affect the liability of the Exculpated Parties *per se*, but rather establishes a standard of care in any hypothetical future litigation against the Exculpated Parties for acts arising out of the Debtors' chapter 11 cases.  *See, e.g.*, *In re PWS Holding Corp.*, 228 F.3d at 245–46 (holding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans, [and] does not affect the liability of these parties, but rather states the standard of liability under the Code.").

55.     *First*, the Exculpation Provision is appropriate because the Exculpated Parties have participated in the Chapter 11 Cases in good faith, made substantial contributions to the Debtors' efforts to maximize value of their Estates, and will participate in the successful implementation of the Plan.  *Second*, the Exculpation Provision is narrowly tailored to protect the Exculpated Parties only from inappropriate litigation related to acts or omissions in connection with the administration

of these Chapter 11 Cases and related transactions and does not protect them from actions determined by a Final Order to have constituted gross negligence, fraud, or willful misconduct. For these reasons, the Exculpation Provision is appropriate and should be approved.

**(iv)    The Injunction Provision is Appropriate**

56.    Section X.C of the Plan enjoins all holders of Claims and Interests and other parties in interest, along with their respective Representatives, from any action to interfere with the implementation of the Plan (the "<u>Injunction Provision</u>").  The Injunction Provision is a key provision of the Plan because it enforces the Debtor Releases, Third-Party Releases, and Exculpation Provision by enjoining entities from taking any actions against the Debtors, the Liquidating Trust, the Liquidating Trustee, the Post-Confirmation Debtors, the Exculpated Parties, the Released Parties, and the Plan Administrator, as applicable.  Therefore, to the extent the Court finds the releases and Exculpation Provision are appropriate, the Injunction Provision is also appropriate and should be approved.

57.    Accordingly, the Plan complies with the requirements of sections 1122 and 1123 of the Bankruptcy Code (as well as with the other applicable provisions of the Bankruptcy Code) and thus satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

**B.    The Plan Complies with Section 1129(a)(2) of the Bankruptcy Code**

58.    Section 1129(a)(2) of the Bankruptcy Code requires that the proponent of a chapter 11 plan comply with the applicable provisions of the Bankruptcy Code.  The legislative history of section 1129(a)(2) indicates that its principal purpose is to ensure that the proponent complies with the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.  *See* H.R. Rep. No. 95-595, at 412 (1977) ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125

regarding disclosure.").  As discussed below, the Debtors, as the proponents of the Plan, have

complied with the disclosure and solicitation requirements of sections 1125 and 1126 of the

Bankruptcy Code.

### 1. The Debtors Complied with Section 1125 of the Bankruptcy Code

59.    Section 1125 of the Bankruptcy Code requires that, to be approved by the court, a

disclosure statement must contain "adequate information".  *See* 11 U.S.C. § 1125(b).  "Adequate

information" is defined by the Bankruptcy Code as:

> [I]nformation of a kind, and in sufficient detail, as far as is reasonably
> practicable in light of the nature and history of the debtor and the condition
> of the debtor's books and records, including a discussion of the potential
> material Federal tax consequences of the plan to the debtor, any successor
> to the debtor, and a hypothetical investor typical of the holders of claims or
> interests in the case, that would enable such a hypothetical investor of the
> relevant class to make an informed judgment about the plan . . . .

11 U.S.C. § 1125(a)(1).

60.    The primary purpose of a disclosure statement is to provide all material and

sufficiently detailed information that creditors and interest holders affected by the proposed plan

need to make an informed decision regarding whether to vote for or against the plan.  *See, e.g.,*

*Krystal Cadillac-Oldsmobile GMC Truck, Inc. v. Gen. Motors Corp.*, 337 F.3d 314, 322 (3d Cir.

2003); *Century Glove, Inc. v. First Am. Bank of N.Y.*, 860 F.2d 94, 100 (3d Cir. 1988); *In re Ryan*

*Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 362 (3d Cir. 1996); *In re Autobacs*

*Strauss, Inc.*, 473 B.R. 525, 584 (Bankr. D. Del. 2012).  Essentially, a disclosure statement "must

clearly and succinctly inform the average unsecured creditor what it is going to get, when it is

going to get it, and what contingencies there are to getting its distribution."  *In re Ferretti*, 128

B.R. 16, 19 (Bankr. D.N.H. 1991).

61.    "Adequate information" is a flexible standard, based on the facts and circumstances

of each case.  See 11 U.S.C. § 1125(a)(1); *see also Oneida Motor Freight, Inc. v. United Jersey*

*Bank*, 848 F.2d 414, 417 (3d Cir. 1988) ("From the legislative history of § 1125 we discern that adequate information will be determined by the facts and circumstances of each case."); *In re Monroe Well Serv., Inc.*, 80 B.R. 324, 330 (Bankr. E.D. Pa. 1987) (noting that the adequate information standard "is flexible on a case-by-case basis, [and] governs the disclosure that must be provided in all reorganization cases, whether involving a public or private corporation, or a partnership or an individual debtor.").

62.    Courts within the Third Circuit acknowledge that determining what constitutes "adequate information" for the purpose of satisfying section 1125 of the Bankruptcy Code is within the broad discretion of the court. *See, e.g., In re Monroe Well Serv.*, 80 B.R. at 331 ("It is clear that Congress intended for bankruptcy judges to exercise a great deal of discretion when considering the 'adequacy of information' provided by a disclosure statement."); *In re Phoenix Petroleum Co.*, 278 B.R. 385, 393 (Bankr. E.D. Pa. 2001) ("The general language of the statute and its surrounding legislative history make clear that '[t]he determination of what is adequate information is subjective and made on a case-by-case basis. This determination is largely within the discretion of the bankruptcy court.'"); *In re Lisanti Foods, Inc.*, 329 B.R. 491, 507 (D.N.J. 2005) ("Case law points out that [the adequate information standard] is an intentionally flexible standard as adequacy is determined on a case-by-case basis.").

63.    By entering the Interim Approval and Procedures Order, this Court has already determined that the Revised Disclosure Statement contained adequate information within the meaning of section 1125 of the Bankruptcy Code for purposes of soliciting votes on the Plan.

64.    Indeed, the Disclosure Statement contains adequate information, as required by section 1125, so that creditors entitled to vote are able to make an informed decision with respect to voting to accept or reject the Plan. The Disclosure Statement is detailed and comprehensive and

contains (i) an introduction, including an overview of the Plan, information about solicitation and voting procedures, and estimated recoveries of Claims and Interests under the Plan;[15] (ii) an overview of the Debtors' corporate history, business, and capital structure;[16] (iii) an overview of the events leading to the commencement of the Chapter 11 Cases;[17] (iv) a detailed description of the events during the Chapter 11 Cases;[18] (v) a summary of the Plan;[19] (vi) the statutory requirements for confirmation and consummation of the Plan;[20] (vii) the risks associated with the Plan;[21] (viii) a description of U.S. federal income tax law consequences of the Plan;[22] and (ix) a liquidation analysis.[23]

65.    As set forth in the Solicitation Affidavit, in compliance with the Interim Approval and Procedures Order, the Debtors caused the Voting Agent to distribute the Solicitation Packages, including the Disclosure Statement, to the holders of Claims in the Voting Classes.  And as set forth in the Publication Affidavit, the Publication Notice was published in the *Los Angeles Times*. The Solicitation Affidavit demonstrates that (i) the Solicitation Packages and related notices were served in accordance with the Interim Approval and Procedures Order and (ii) the Debtors solicited votes on the Plan only following interim approval and transmittal of the Disclosure Statement.

66.    Based on the foregoing, the Debtors submit that they have complied in all respects with the disclosure requirements of section 1125 of the Bankruptcy Code and the Interim Approval

---

[15]   *See* Disclosure Statement, Section I.

[16]   *See* Disclosure Statement, Section II.

[17]   *See* Disclosure Statement, Section III.

[18]   *See* Disclosure Statement, Section IV.

[19]   *See* Disclosure Statement, Section V.

[20]   *See* Disclosure Statement, Section VI.

[21]   *See* Disclosure Statement, Section VII.

[22]   *See* Disclosure Statement, Section VIII.

[23]   *See* Disclosure Statement, Exhibit C.

and Procedures Order, and therefore request that the Court approve the Disclosure Statement on a final basis.

### 2.    The Debtors Complied with Section 1126 of the Bankruptcy Code

67.    Section 1126 of the Bankruptcy Code specifies the requirements for acceptance of a chapter 11 plan.  Pursuant to section 1126, only holders of claims and interests that are impaired and will receive or retain property under a plan on account of such claims or interests (to the extent allowed) may vote to accept or reject a plan.  *See* 11 U.S.C. § 1126.  Holders of claims or interests in classes that are not impaired under a plan are conclusively presumed to have accepted the plan, and solicitation of votes from the holders of claims or interests in such classes is not required.  *See* 11 U.S.C. § 1126(f).  Furthermore, if the plan provides that the holders of claims or interests in a class do not receive or retain any property under the plan on account of such claims or interests, such class is deemed to have rejected a plan, and solicitation of votes from the holders of claims or interests in such classes is likewise not required.  *See* 11 U.S.C. § 1126(g).

68.    As set forth in the Solicitation Affidavit, in compliance with section 1126, the Debtors solicited acceptances or rejections of the Plan from the members of the Voting Classes (*i.e.*, Class 4 and Class 5), the only Impaired Classes entitled to vote under the Plan.  The Debtors did not solicit votes from the holders of Claims and Interests, as applicable, in Classes 1, 2, 3, 6, 7, and 8 because the holders of such Claims and Interests either (i) are Unimpaired and are conclusively presumed to have accepted the Plan, or (ii) will receive no distribution under the Plan and are deemed to have rejected the Plan.

69.    In accordance with the Interim Approval and Procedures Order, the Solicitation Packages with Ballots were distributed to (i) all persons and entities identified in the Debtors' Schedules of Assets and Liabilities (including all amendments thereto, the "Schedules") pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rule 1007 as holding liquidated,

non-contingent, and undisputed Claims in the Voting Classes in an amount greater than zero dollars, (ii) all persons and entities that timely filed Proofs of Claim asserting Claims in the Voting Classes, as reflected on the Claims Register maintained by the Voting Agent, where such Proofs of Claim assert dollar amounts greater than zero, in each case, only to the extent that the Claim has not been disallowed or expunged before the Voting Record Date, and (iii) transferees of any creditors described in clauses (i) or (ii) above, but only to the extent that (a) all actions necessary to effect the transfer of the Claim pursuant to Bankruptcy Rule 3001(e) have been completed by the Voting Record Date (including, without limitation, the passage of any applicable objection period) or (b) the transferee files, no later than the Voting Record Date, the documentation required by Bankruptcy Rule 3001(e) to evidence the transfer and a sworn statement of the transferor supporting the validity of the transfer.  In addition, the Combined Hearing Notice was served on the parties listed in the Core/2002 Service List and the Master Mailing Service List.  *See* Solicitation Affidavit.

70.     Accordingly, the Plan complies with the requirements of section 1129(a)(2) of the Bankruptcy Code.

### C.     The Plan Complies with Section 1129(a)(3) of the Bankruptcy Code

71.     Section 1129(a)(3) of the Bankruptcy Code requires that a chapter 11 plan be "proposed in good faith and not by any means forbidden by law."  In the Third Circuit, the "good faith" requirement means that a "plan be 'proposed with honesty, good intentions, and a basis for expecting that a reorganization can be effected with results consistent with the objectives and purposes of the Bankruptcy Code.'"  *In re Zenith Elecs. Corp.*, 241 B.R. at 107 (*quoting In re Sound Radio, Inc.*, 93 B.R. 849, 853 (Bankr. D.N.J. 1988)); *see also In re PPI Enters. (U.S.), Inc.*, 228 B.R. 339, 347 (Bankr. D. Del. 1998) ("[C]ourts have held a plan is to be considered in good faith 'if there is a reasonable likelihood that the plan will achieve a result consistent with the

29

standards prescribed under the Code.'"). Courts in this Circuit also consider the totality of the circumstances surrounding a plan to determine if it has been proposed in good faith. *See Azar v. THGH Liquidating LLC (In re THGH Liquidating LLC)*, 2020 WL 5409002, at *6 (D. Del. Sept. 9, 2020) ("[G]ood faith [under section 1129(a)(3)] is to be determined by the totality of the circumstances.") (internal citations omitted).

72.     The Debtors have proposed the Plan in consultation with the Debtors' board of directors, management, legal, and financial advisors. The Plan is the culmination and the direct result of the Debtors' extensive, arms'-length negotiations with their key creditor constituencies, such as the Creditors' Committee and the Ad Hoc Group, regarding the plan structure and confirmation timeline that would maximize the value of the Estates. The Debtors believe the Plan represents the best and, indeed, the only available option for creditors and thus was proposed with the legitimate purposes of maximizing distributions to holders of Claims entitled to distributions under the Plan in accordance with the priority scheme set forth in the Bankruptcy Code. Accordingly, the Plan has been proposed in good faith and not by any means forbidden by law and, thus, satisfies section 1129(a)(3).

### D.     The Plan Complies with Section 1129(a)(4) of the Bankruptcy Code

73.     Under section 1129(a)(4) of the Bankruptcy Code, the Court must find that "[a]ny payment made or to be made by the proponent . . . for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case" be approved by the Court or subject to the Court's approval, as reasonable.

74.     The Debtors submit that the only category of Claims that falls within the ambit of Section 1129(a)(4) in these cases is the Fee Claims. All Fee Claims will only be paid after they are approved by this Court, and Professionals must file their final requests for payment of their Fee Claims no later than twenty-five (25) days after the Effective Date with objections due twenty-

one (21) days thereafter, thereby providing an adequate period of time for interested parties to review and, if necessary, object to the Fee Claims. *See* Plan, Section II.A.1.e. Moreover, Section II.A.1.d provides that on or before the Effective Date, the Debtors will establish and fund the Professional Fee Reserve with Cash equal to the aggregate of the estimated Fee Claims. Accordingly, the Debtors submit that the Plan satisfies the requirements of section 1129(a)(4).

  **E.  The Plan Complies with Section 1129(a)(5) of the Bankruptcy Code**

  75.  Section 1129(a)(5) of the Bankruptcy Code requires: (a) that the proponent of a plan disclose the identity and affiliations of the proposed directors, officers, or voting trustees of the debtors, an affiliate of a debtor participating in a joint plan with a debtor, or a successor to the debtor under the plan; (b) that the appointment or continuance of such individuals be consistent with the interests of creditors and equity security holders and with public policy; and (c) that there be disclosure of the identity and nature of the compensation of any insiders to be retained or employed by the reorganized debtors.

  76.  Section IV.M of the Plan provides that, on the Effective Date, all of the Debtors' managers, directors, and officers will be deemed to have resigned and the Plan Administrator will be the sole manager and sole officer of the Post-Confirmation Debtors. Section IV.C.2 of the Plan provides that the Plan Administrator and Liquidating Trustee will be selected by the Creditors' Committee and their identities and nature of compensation will be identified in the Plan Supplement. *See Notice of Filing of Plan Supplement with Respect to the Joint Chapter 11 Plan of Number Holdings, Inc., and its Debtor Affiliates* [Docket No. 1663]. The powers, rights, and responsibilities of the Liquidating Trustee are specified in the Liquidating Trust Agreement. Accordingly, the Debtors submit that the Plan satisfies the requirements of section 1129(a)(5) of the Bankruptcy Code.

**F.      Section 1129(a)(6) of the Bankruptcy Code Does Not Apply to the Plan**

77.      Section 1129(a)(6) of the Bankruptcy Code permits confirmation only if any regulatory commission that has or will have jurisdiction over the debtor after confirmation has approved any rate change provided for in the plan.  This section is not applicable to the Plan.

**G.      The Plan Complies with Section 1129(a)(7) of the Bankruptcy Code**

78.      Section 1129(a)(7) of the Bankruptcy Code, commonly known as the "best interests test," provides, in relevant part:

> With respect to each impaired class of claims or interests—
>
> each holder of a claim or interest of such class—
>
>> i. has accepted the plan; or
>>
>> ii. will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of [the Bankruptcy Code] on such date . . . .

79.      The best interests test is usually satisfied by the filing of a liquidating analysis that compares the estimated recoveries by creditors under the proposed plan with recoveries the same creditors would receive in a hypothetical chapter 7 liquidation of that debtor's estate on the effective date of the plan.  *See In re Affiliated Foods, Inc.*, 249 B.R. 770, 787 (Bankr. W.D. Mo. 2000) ("Under the best interests of creditors test, a Chapter 11 plan can be confirmed over the objection of a holder of a claim or interest that is impaired by the plan only if the holder of the impaired claim or interest 'will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date.'").

80.    This "best interests of creditors" test must be applied to each holder of an Impaired

Claim or Interest that voted to reject the Plan, regardless of whether the Class in which such Claim

or Interest is placed, as a whole, accepts the Plan.  *See Bank of Am. Nat'l. Trust & Sav. Ass'n v.*

*203 N. LaSalle St. P'ship*, 526 U.S. 434, 441 n.13 (1999) ("The 'best interests' test applies to

individual creditors holding impaired claims, even if the class as a whole votes to accept the

plan."); *In re Cypresswood Land Partners, I*, 409 B.R. 396, 428 (Bankr. S.D. Tex. 2009) ("This

provision is known as the 'best-interest-of-creditors-test' because it ensures that reorganization is

in the best interest of individual claimholders who have not voted in favor of the plan.").

81.    As set forth in the liquidation analysis attached to the Disclosure Statement (the

"Liquidation Analysis"), subject to the assumptions and limitations described therein, the Plan

provides all holders of Claims and Interests with a recovery (if any) that is not less than they would

have received in a chapter 7 liquidation.  A table summarizing the midpoint estimated recoveries

under the Plan and the midpoint projected recoveries under a chapter 7 liquidation is provided

below.

| Class | Claim | Estimated Recovery (Chapter 11 Plan) | Projected Recovery (Liquidation Analysis) |
|-------|-------|--------------------------------------|-------------------------------------------|
| 1 | Other Priority Claims | 100% | 100% |
| 2 | Other Secured Claims | 100% | 100% |
| 3 | Prepetition ABL Claims | 100% | 100% |
| 4 | Senior Notes Claims[24] | 14.9% | 14.9% |
| 5 | General Unsecured Claims | 1.3% | 0.7% |
| 6 | Intercompany Claims | 0% | 0% |
| 7 | Intercompany Interests | 0% | 0% |
| 8 | Equity Interests | 0% | 0% |

---

[24]    As set forth in the Liquidation Analysis, the percentage recoveries for Class 4 Senior Notes Claims are calculated
prior to the payment of applicable fees and expenses pursuant to the Notes Settlement.

82.     Accordingly, the Debtors submit that section 1129(a)(7) of the Bankruptcy Code is satisfied.

**H.      The Plan Does Not Satisfy Section 1129(a)(8) of the Bankruptcy Code**

83.     Section 1129(a)(8) of the Bankruptcy Code requires that each class of impaired claims or interests must accept the plan.   Here, Class 6 (Intercompany Claims), Class 7 (Intercompany Interests), and Class 8 (Equity Interests) are impaired, and the holders of Claims and Interests in these Classes are deemed to reject the Plan.

84.     However, section 1129(b) of the Bankruptcy Code provides that "if all of the applicable requirements of subsection (a) of this section other than paragraph (8) are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to each class of claims or interests that is impaired under, and has not accepted, the plan."  As demonstrated below, the Plan meets the "cramdown" requirements of section 1129(b) and, thus, may be confirmed despite non-compliance with section 1129(a)(8) of the Bankruptcy Code.

**I.      The Plan Complies with Section 1129(a)(9) of the Bankruptcy Code**

85.     Section 1129(a)(9) of the Bankruptcy Code requires that, "[e]xcept to the extent that the holder of a particular claim has agreed to a different treatment of such claim," a plan must provide for (i) all holders of allowed administrative expense claims payment in full, in cash, on the effective date of the plan and (ii) all holders of allowed priority claims payment in full in cash either on the effective date of the plan or (depending on the specific type of claim) over time with interest.

86.     The Plan provides that, except to the extent that the holder of an Allowed Administrative Claim agrees to less favorable treatment, holders of such Claims (including Fee

Claims, Notes Settlement Expenses, Senior Notes Agent Fees, and DIP Claims) will be paid the full unpaid amount of such Claims in Cash. *See* Plan, Section II.A.1. The Plan also provides that the holders of Allowed Priority Tax Claims will be paid in accordance with the requirements of section 1129(a)(9)(C). *See* Plan, Section II.A.2. Holders of Class 1 (Allowed Other Priority Claims) will be paid in full in Cash or receive other treatment rendering such Claim Unimpaired, except to the extent that a holder of such Claim agrees to less favorable treatment. *See* Plan, Section II.C.1. In each case, section 1129(a)(9) will be satisfied.

**J.      The Plan Complies with Section 1129(a)(10) of the Bankruptcy Code**

87.      Section 1129(a)(10) of the Bankruptcy Code requires that, "at least one class of claims that is impaired under the plan has accepted the plan, determined without including any acceptance of the plan by any insider." As set forth in the Voting Declaration, each of the Impaired Classes eligible to vote on the Plan (Class 4 and Class 5) accepted the Plan by the requisite amount and number of votes, without counting votes of any insider. *See* Voting Declaration Exhibit A. The Plan thus satisfies the requirements of section 1129(a)(10) of the Bankruptcy Code.

**K.      The Plan Complies with Section 1129(a)(11) of the Bankruptcy Code**

88.      Section 1129(a)(11) of the Bankruptcy Code requires that the Court determine that the Plan is feasible. Specifically, section 1129(a)(11) of the Bankruptcy Code requires a finding that the plan "is not likely to be followed by the liquidation, or the need for further financial reorganization, of the debtor or any successor to the debtor under the plan, unless such liquidation or reorganization is proposed in the plan."

89.      In the context of a liquidating plan, feasibility is established by demonstrating that the debtor is able to satisfy the conditions precedent to the effective date and has sufficient funds to meet its post-confirmation obligations to pay for the costs of consummating the Plan and closing the cases. *See In re Finlay Enterprises, Inc.*, 2010 WL 6580628, at *7 (Bankr. S.D.N.Y. June 29,

2010).  As set forth in the Wells Declaration, (a) the conditions precedent to the Effective Date are reasonably likely to be satisfied and (b) the various reserves proposed to be established under the Plan, including the Professional Fee Reserve, the Disputed Claims Reserve, the Wind-Down Reserve, and proceeds of the Liquidating Trust Assets will provide sufficient funds to administer and consummate the Plan and to close the Chapter 11 Cases.  *See* Wells Declaration ¶ 23.

90.    Accordingly, the Plan satisfies the feasibility requirements of section 1129(a)(11) of the Bankruptcy Code.

**L.    The Plan Provides for the Payment of Statutory Fees Pursuant to Section 1129(a)(12) of the Bankruptcy Code**

91.    Section 1129(a)(12) of the Bankruptcy Code requires that, as a condition precedent to the confirmation of a chapter 11 plan, "[a]ll fees payable under section 1930 of title 28, as determined by the court at the hearing on confirmation of the plan, have been paid or the plan provides for the payment of all such fees on the effective date of the plan."  Section II.A.1.c of the Plan provides that on or before the Effective Date, fees due and payable pursuant to section 1930 of title 28, together with the statutory rate of interest set forth in section 3717 of title 31 to the extent applicable will be paid by the Debtors, and after the Effective Date, by the Post-Confirmation Debtors.    Accordingly, the Plan satisfies the requirements of section 1129(a)(12) of the Bankruptcy Code.

**M.    Sections 1129(a)(13)-(16) of the Bankruptcy Code are Inapplicable**

92.    Section 1129(a)(13) of the Bankruptcy Code requires chapter 11 plans to continue all "retiree benefits" (as defined in section 1114 of the Bankruptcy Code).  The Debtors have no obligations to pay such "retiree benefits" and, accordingly, section 1129(a)(13) of the Bankruptcy Code is inapplicable to the Plan. Sections 1129(a)(14) and 1129(a)(15) are inapplicable to the Plan because none of the Debtors is an "individual."  Section 1129(a)(16) of the Bankruptcy Code is

also inapplicable because the Plan does not provide for any property transfers by a corporation or trust that is not a moneyed, business, or commercial corporation or trust. 11 U.S.C. § 1129(a)(16).

N.  **The Plan Satisfies the "Cram Down" Requirements of Section 1129(b) of the Bankruptcy Code**

93.  Section 1129(b)(1) provides that if, as here, all applicable requirements of Bankruptcy Code section 1129(a) are met, other than the requirements of section 1129(a)(8), the plan may nevertheless be confirmed so long as the requirements of Bankruptcy Code section 1129(b) are satisfied.  Under section 1129(b) of the Bankruptcy Code, the court may "cram down" a plan over the vote of an impaired class or classes of claims or interests rejecting or deemed to reject a plan so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to such dissenting class or classes.

1.  **The Plan Does Not Discriminate Unfairly**

94.  Section 1129(b)(1) ensures that a plan does not unfairly discriminate against a dissenting class with respect to the value it will receive under a plan when compared to the value given to other similarly situated classes.  *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 121 (D. Del. 2006) (noting that the "hallmarks of the various tests have been whether there is a reasonable basis for the discrimination, and whether the debtor can confirm and consummate a plan without the proposed discrimination") (*citing In re Lernout & Hauspie Speech Prod., N.V.*, 301 B.R. 651, 660 (Bankr. D. Del. 2003), *aff'd*, 308 B.R. 672 (D. Del. 2004)).

95.  Section 1129(b)(1) of the Bankruptcy Code is intended to prevent a plan proponent from "segregat[ing] two similar claims or groups of claims into separate classes and provide disparate treatment for those classes." *Johns-Manville*, 68 B.R. at 636; *see also In re Buttonwood Partners, Ltd.*, 111 B.R. 57, 63 (Bankr. S.D.N.Y. 1990) ("for discriminatory treatment of claims to be fair, four tests must be satisfied: (i) there is a reasonable basis for discriminating, (ii) the

debtor cannot consummate the plan without discrimination, (iii) the discrimination is proposed in good faith, and (iv) the degree of discrimination is in direct proportion to its rationale"); *In re Zenith Elecs. Corp.*, 241 B.R. at 105 (explaining that "[w]here a class of creditors or shareholders has not accepted a plan. . . , the court shall nonetheless confirm the plan if it 'does not discriminate unfairly and is fair and equitable'"); *In re TCI 2 Holdings, LLC*, 428 B.R. at 157 (citing *In re Armstrong World Indus., Inc.*, 348 B.R. at 121).

96.    The Plan does not discriminate unfairly (or at all) with respect to any of the Classes deemed to reject the Plan because the Claims and Interests in each such Class are legally distinct from the Claims and Interests in all other Classes.  All similarly situated Claims and Interests will receive substantially similar treatment under the Plan.

### 2.    The Plan is Fair and Equitable

97.    Section 1129(b) sets forth the requirements of the "fair and equitable" test with respect to impaired dissenting claims or interests.  Specifically, sections 1129(b)(2)(B)(ii) and (b)(2)(C)(ii) of the Bankruptcy Code codify the "absolute priority rule" with respect to unsecured claims and interests,  To be "fair and equitable" with respect to holders of unsecured claims, section 1129(b)(2)(B) of the Bankruptcy Code requires a plan to provide either (a) that each holder of the non-accepting class will receive or retain on account of such claim property of a value equal to the allowed amount of such claim, or (b) that a holder of a claim or interest that is junior to the claims of the non-accepting class will not receive or retain any property under the plan.  To be "fair and equitable" as to holders of interests, section 1129(b)(2)(C) of the Bankruptcy Code requires a plan to provide either (a) that each holder of an equity interest will receive or retain under the plan property of a value equal to the greatest of the fixed liquidation preference to which such holder is entitled, the fixed redemption price to which such holder is entitled or the value of the interest, or

(b) that a holder of an interest that is junior to the nonaccepting class will not receive or retain any property under the plan.

98.     Here, the "fair and equitable" requirement is satisfied as to the holders of Class 5 (General Unsecured Claims), Class 6 (Intercompany Claims), and Class 7 (Intercompany Interests) because no Claims or Interests junior to such Class will receive or retain any property under the Plan on account of such junior Claims or Interests.  The Plan also satisfies the corollary to the absolute priority rule as no holder of a Claim or Interest is receiving more than a 100 percent recovery under the Plan.  *See In re Trans Max Techs., Inc.,* 349 B.R. 80, 89 (Bankr. D. Nev. 2006) ("One component of [the] fair and equitable treatment is that a plan may not pay a premium to a senior class.").

**O.     The Plan Complies with Section 1129(c) Because the Plan is the Only Plan Filed in these Chapter 11 Cases**

99.     Section 1129(c) of the Bankruptcy Code provides that a bankruptcy court may confirm only one plan.  The Plan is the only plan that has been filed in these Chapter 11 Cases. Accordingly, the requirements of section 1129(c) of the Bankruptcy Code have been satisfied.

**P.     The Plan Complies with the Other Applicable Provisions of Section 1129**

100.     The Plan satisfies the remaining provisions of section 1129 of the Bankruptcy Code. The purpose of the Plan is not to avoid taxes or the application of section 5 of the Securities Act. No governmental unit or any other party has requested that the Court decline to confirm the Plan on such grounds.

**II.     THE UST OBJECTION SHOULD BE OVERRULED**

101.     The UST Objection is the only remaining objection to the confirmation of the Plan. While the Debtors continue their efforts toward consensual resolution of the concerns raised by

the U.S. Trustee prior to the Combined Hearing, to the extent the Debtors are unable to reach a resolution of these concerns, the Debtors request that the UST Objection be overruled.

102.     The U.S. Trustee raises four objections to confirmation, alleging that: (i) the Third-Party Releases are not authorized by the Bankruptcy Code and run afoul of applicable Supreme Court precedent as they are not consensual; (ii) the Plan injunction barring claims against third parties is not authorized; (iii) the Plan's statutory fees provision is insufficient to satisfy 28 U.S.C. § 1930(a)(6); and (iv) the scope of the global settlement memorialized in the Plan is inconsistent with section 1123(b) of the Bankruptcy Code.  *See* UST Obj. ¶ 1.  The U.S. Trustee also alleges that no exigency justifies waiver of the stay of the Confirmation Order imposed by Bankruptcy Rule 3020.  *Id.* at ¶ 98.  The reasons why each of these arguments fail are addressed in turn.

**A.     The Third-Party Releases are Consensual and Comply with Applicable Law**

103.     The U.S. Trustee objects to the proposed Third-Party Releases and the Injunction Provision enforcing such releases.  *See* UST Obj. ¶¶ 21–73.  For the reasons discussed below, these objections should be overruled.

104.     First, the UST Objection merely rehashes the issues with respect to the propriety of an opt-out mechanism to obtain consensual Third-Party Releases it previously made in the *U.S. Trustee's Objection to the Solicitation Procedures Motion* [Docket No. 1581], which were not only already addressed in the *Debtors' Reply in Support of the Disclosure Statement Motion* [Docket No. 1592] (the "Disclosure Statement Reply"), which is incorporated herein by reference, ***but actually ruled on*** by the Court at the Disclosure Statement Hearing. *See* 99 Cents Disclosure Statement Hr'g Tr. 31:14–15 (stating that, contrary the U.S. Trustee's arguments, opt-out releases are not *per se* improper after *Purdue* and that "whether an opt-out is appropriate is analyzed on a case-by-case basis.").

105.    Specifically addressing why the opt-out mechanism is appropriate under the circumstances of these cases, the Court stated:

> Here, the released [third parties] parties are narrowly tailored and the parties from whom the releases are sough are limited.  Holders in Class 4 and 5 who affirmatively vote to accept or reject can opt out of the third party release, and parties who are not entitled to vote on the plan, all of the non-voting classes or holders in Class 4 or 5 who don't vote at all, whether they fail to vote or they don't return a ballot, they're not getting [*sic* granting] a third party release.  So, under these circumstances, the opt-out remains a valid mechanism for the debtor to obtain the release through the plan and do so on a consensual basis because the parties here are given the opportunity to opt out.

*See* 99 Cents Disclosure Statement Hr'g Tr. 31:16-32:2.  The Debtors and other parties in interest have relied on this ruling in soliciting votes on the Plan.  As this Court noted in *Gigamonster*, no one can contest that the opt-out procedure was approved and it would be unfair to revisit this at this stage.  *See* Hr'g Tr. 65:7-13, *In re Gigamonster*, No. 23-10051 (JKS) (Bankr. D. Del. Aug. 27, 2024) ("The noticing process to obtain consent to the release has occurred.  With this backdrop and at this juncture of the case . . . its unfair, its inequitable, and prejudicial to revisit the procedural mechanism for obtaining consent especially since *Purdue* is silent on what constitutes consent.").[25]

106.    Second, putting aside that the Court's above ruling should be the law of the case, the U.S. Trustee's argument on this issue stands or falls on whether state contract law is applicable to the appropriateness of an opt-out mechanism in this context.  *See* UST Obj. ¶¶ 21-26.  It is clear that federal, not state, law generally governs the repercussions of a party's inaction in a chapter 11 case, including failure to respond to a properly served notice.  For example, the Supreme Court

---

[25]    To the extent the U.S. Trustee argues that the Court's recent decision regarding the use of opt-out mechanisms in *In re Lumio*, Case No. 24-11916 (JKS) (Bankr. D. Del. Jan. 3, 2025), somehow warrants revisiting the Court's previous decision in these Chapter 11 Cases, the Debtors disagree and believe that the decision in *Lumio* that opt-out releases should be evaluated on a case-by-case basis is entirely consistent with the Court's previous decision to approve the use of opt-out mechanisms for Classes 4 and 5.  In *Lumio*, the Court declined to approve the use of an opt-out mechanism with respect to non-voting parties.  *See* Hr'g Tr. 24:1–14, *In re Lumio*, Case No. 24-11916 (JKS) (Bankr. D. Del. Jan. 3, 2025).  By contrast, here, the opt-out procedure is only being used with respect to those creditors who actually vote on the Plan.

has evaluated whether a party has consented to a "non-core" matter being adjudicated by a bankruptcy court by looking to federal law, holding that a party waives its right to have "noncore" claims heard by an Article III court when it fails to object.  *See Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, 683 (2015) ("Nothing in the Constitution requires that consent to adjudication by a bankruptcy court be express.").  The Supreme Court noted that, consistent with its own prior rulings, "implied" consent—rather than only "express" consent—accords with constitutional standards.  *Id.* (agreeing that a constitutional right "'is substantially honored' by permitting waiver based on 'actions rather than words'" (quoting *Roell v. Withrow*, 538 U.S. 580, 589–90 (2003) (consent to proceedings before a magistrate judge need not be express and may be inferred from conduct during litigation))).  Similarly, both before and after *Purdue*, bankruptcy courts have evaluated consent to third-party releases under the same principle.[26]

107.    Outside of the bankruptcy context, federal courts also look to federal law when evaluating whether an opt-out mechanism, when accompanied by sufficient notice, results in consent.  *See, e. g., Phillips Petrol. Co. v. Shutts*, 472 U.S. 797, 813–14 (1985) (joining parties to a class settlement).  After considering this issue under federal law and rules of federal procedure,

---

[26]    *See In re Mallinckrodt PLC*, 639 B.R. 837, 879 (Bankr. D. Del. 2022) (approving opt-out mechanism for a third-party release, explaining that "[w]ithin the bankruptcy system, Debtors send out bar date notices and if claimants fail to file a proof of claim by a certain time, they lose the right to assert a claim.  Additionally, if a claim objection is filed and the claimant fails to respond, the claim is disallowed.  There is no reason why this principle should not be applied in the same manner to properly noticed releases within a plan of reorganization."); Hr'g Tr. 80:21–25; 81: 1–7, *Extraction Oil & Gas, Inc.*, No. 20-11548 (Bankr. D. Del. Dec. 22, 2020) [Docket No. 1534] ("I have repeatedly ruled that you can imply consent by failing to opt out or respond to a plan, either through a ballot or on the docket, that calls for a release.  I don't believe this is necessarily a contractual point ...as much as it is a point of notice under the Bankruptcy Code and the Bankruptcy Rules, because it's the plan that serves as the mechanism to have the release take effect and, thus, it's really the rules, the Federal Rules of Bankruptcy Procedure that figure out whether someone has achieved proper notice and has, by not responding, given their implied consent."); Confirmation Hr'g Tr. 105:4–12, *In re Wesco Aircraft Holdings, Inc*., No. 23-90611 (MI) (Bankr. S.D. Tex. Dec. 16, 2024) ("A sues B. B gets served. B doesn't respond. B is ordered to pay money to A.  That's what courts do. Here the obligation to opt out was sent out. It was sent out to everybody.  Those that it didn't get sent to appropriately will be excluded because [of] the due process clause.  There's simply nothing forbidden or inconsistent about that. Do we need to comply with state law?  There's no requirement we comply with state law. Federal law can allow for consequences as a result of default.") (approving opt-out third-party release structure).

the Supreme Court held that the Due Process Clause of the Fourteenth Amendment was satisfied

by appropriate notice of the ability to opt out. *See id.* There is no reason that a different standard

should apply in the bankruptcy context, particularly as bankruptcy implicates uniquely federal

interests that make application of federal law all the more appropriate.

108.   Perhaps chief among these federal interests is the equal treatment of creditors. *See*

H.R. REP. NO. 95-595, at 177–78, *as reprinted in* 1978 U.S.C.C.A.N. 6138 (acknowledging "the

prime bankruptcy policy of equality of distribution among creditors of the debtor"). This interest

is best served by evaluating consent under federal law. The purpose of the uniform federal

bankruptcy laws is to apply a single set of rules to diverse creditors.[27] Requiring analysis under

state law necessarily introduces divergent rules, which at least one bankruptcy court has

recognized as a serious challenge: "[S]ome states might permit [opt-out consent], some states

might not permit it. Where does that leave the bankruptcy court? I don't know." Confirmation

Hr'g Tr. 105:16–18, *In re Wesco Aircraft Holdings, Inc.*, No. 23-90611 (MI) (Bankr. S.D. Tex.

Dec. 16, 2024); *see also id.* at 101:9–14 (approving third-party releases with opt-out mechanism

subject to the "limitation . . . [that the] confirmation order make clear that we're not overriding the

due process clause.").

109.   The decisions finding that state law should instead apply to this question are,

accordingly, misguided. They reason that granting a third-party release is akin to the formation of

a contract between non-debtors and conclude that whether such a contract has been validly formed

should be evaluated under state law. *See, e.g.*, Confirmation Ruling Tr. 14:20–23, ECF No. 851,

*In re Ebix, Inc.*, No. 23-80004 (SWE) (Bankr. N.D. Tex. Aug. 2, 2024) (opining that the court is

---

[27] *See* U.S. Const., art. I, § 8, cl. 4 ("The Congress shall have power . . . [t]o establish . . . uniform Laws on the subject of Bankruptcies throughout the United States . . . ."); THOMAS H. JACKSON, THE LOGIC AND LIMITS OF BANKRUPTCY LAW 12–13 (Beard Books 2001) (1986) ("Bankruptcy provides a way to make . . . diverse individuals act as one, by imposing a *collective* and *compulsory* proceeding on them.").

being asked "to compel non-debtors to enter into a contract via a deemed release" that should "be formed consistent with the principles of contract law"); *In re Smallhold, Inc.*, No. 14-10267 (CTG), 2024 WL 4296938, at *13 (Bankr. D. Del. Sep. 25, 2024) (agreeing that "releases [are] only appropriate in circumstances in which, following a contract model, there was evidence of an agreement to grant the release").[28]  But it is not at all apparent (nor do courts unanimously find) that the effectiveness of a third-party release hinges on whether an enforceable contract has been formed.  *See In re LaVie Care Centers, LLC*, No. 24-55507 (PMB), 2024 WL 4988600, at *14 (Bankr. N.D. Ga. Dec. 5, 2024) ("the basis for the enforcement of consensual releases has not . . . been described anywhere as a 'contract' for them").

110.    Looking to state law raises more issues than it settles.   There is no satisfying answer to a number of questions—*which* state law should apply; how fully must that law be incorporated into the analysis of whether consent has been obtained (for example, must consideration be exchanged in connection with granting a release); do the releasing parties in fact receive an "offer" from the non-debtor parties being released that they may determine whether to accept?   *See LaVie Care Centers, LLC*, 2024 WL 4988600, at *14 (while recognizing certain objections to the application of federal law, noting that "assessing [such releases] based on state contract law is no better").   Indeed, the difficulty in identifying which state law should apply has led advocates of this position to rely, instead of on any particular state's law, on principles set out in the

---

[28]    While the Debtors disagree with the determination in *Smallhold* that state law contact theory is the appropriate means for evaluating the grant of a third-party release in the chapter 11 context, it is critical to note that *Smallhold* determined that a vote (for or against) the Plan "coupled with conspicuous notice of the opt-out mechanism, suffices as consent to the third-party releases under general contract principles."  *Smallhold*, 2024 WL 4296938, at *14.

Restatement of Contracts[29]—which "itself is not the law anywhere."   *LaVie*, 2024 WL 4988600, at *14.   State law, accordingly, should not apply.[30]

111.    The cases that look to state contract law fail to recognize the critical distinction between a private contract and one bearing the imprimatur of the federal government.   Chapter 11 plans are creatures of federal law, designed to solve the collective action problem inherent in a multi-party reorganization or liquidation process.   They reflect a policy of the United States Congress to encourage rehabilitation of debtors and the efficient administration of insolvency proceedings.[31]   A chapter 11 plan has the force of a federal court order because it has been closely evaluated and approved by a bankruptcy court under well-defined statutory standards; once confirmed and consummated, it is a document invested with federal power.

112.    Lastly, contrary to the sweeping assertions made in the UST Objection, *Purdue* does not change the permissibility of a consensual third-party release, as has been recognized by this Court and many others.   The Supreme Court in *Purdue* drew careful attention to the fact that

---

[29]    *See, e.g.*, *LaVie*, 2024 WL 4988600, at *8 (noting that the U.S. Trustee's objection made "numerous cites to the *Restatement of Contracts*"); U.S. Trustee's Obj. to Disclosure Statement and Chapter 11 Plan 16–18, ECF No. 218, *In re Basic Fun, Inc.*, No. 24-11432 (CTG) (Bankr. D. Del. Sep. 24, 2024); U.S. Trustee's Obj. to Confirmation 16–17, ECF No. 23610, *In re FTX Trading Ltd.*, No. 22-11068 (JTD) (Bankr. D. Del. Aug. 23, 2024); U.S. Trustee's Obj. to Confirmation 11–12, 14–20, ECF No. 581, *In re Seaplane Debtor 1 Inc.*, No. 24-10703 (CTG) (Bankr. D. Del. Oct. 28, 2024); U.S. Trustee's Obj. to Debtor's Disclosure Statement 16, 18, ECF No. 66, *In re Presperse Corp.*, No. 24-18921 (MBK) (Bankr. D.N.J. Sep. 25, 2024); U.S. Trustee's Obj. to Debtors' Disclosure Statement 12, 14–15, 19–20, ECF No. 2515, *In re Diamond Sports Grp., LLC*, No. 23-90116 (CML) (Bankr. S.D. Tex. Oct. 8, 2024); U.S. Trustee's Obj. to Confirmation 22, ECF No. 787, *In re Sunpower Corp.*, No. 24-11649 (CTG) (Bankr. D. Del. Oct. 15, 2024).

[30]    *See* Confirmation Hr'g Tr. 105:10–11, *In re Wesco Aircraft Holdings, Inc.*, No. 23-90611 (MI) ("Do we need to comply with state law?   There's no requirement we comply with state law.") (approving opt-out mechanism for third-party release).

[31]    *E.g.*, *In re Exide Techs.*, 607 F.3d 957, 962 (3d Cir. 2010) ("The policy behind Chapter 11 of the Bankruptcy Code is the 'ultimate rehabilitation of the debtor.'" (quoting *Nicholas v. United States*, 384 U.S. 678, 687 (1966))); *In re Zelienople Inv. Corp.*, No. 13-22522-CMB, 2015 WL 1887337, at *2 (Bankr. W.D. Pa. Apr. 24, 2015) (same).

it was *not* passing judgment on "what qualifies as a consensual release", *see* 603 U.S. at 226, a conclusion this Court has directly endorsed.[32]

113.    Based on this Court's ruling following careful consideration of these precise issues, and the application of federal law to the question of whether a third-party release within a chapter 11 plan is consensual, this portion of the UST Objection should be overruled.

**B.      The Injunction Provision is Necessary and Customary**

114.    For the reasons set forth in the Disclosure Statement Reply and this memorandum, the Injunction Provision enforcing the Third-Party Release merely provides practical support for the appropriately granted releases and should be approved.

**C.      The Plan's Statutory Fees Provision Complies with 28 U.S.C. § 1930**

115.    The U.S. Trustee objects to provision of Section II.A.1.c. of the Plan regarding the payment of the statutory fees.  The U.S. Trustee argues that it is inconsistent with 28 U.S.C. § 1930(a)(6), which requires that quarterly fees must be paid on all "disbursements" until a chapter 11 case is converted or closed.  *See* UST Obj. ¶ 1(c).

116.    In fact, in full compliance with 28 U.S.C. § 1930(a)(6), Section II.A.1.c.  of the Plan states that the Debtors and Post-Confirmation Debtors will remain obligated to pay Quarterly Fees to the U.S. Trustee "until the earliest of that particular Debtor's case being closed, dismissed, or converted to a [chapter 7] case."  *See* Plan, Section II.A.1.c.  To the extent the U.S. Trustee is concerned that the Post-Confirmation Debtors may not have sufficient funds to comply with this obligation, the revised Plan filed contemporaneously with this memorandum, includes additional clarifying language to the effect that "[a]fter the Effective Date, to the extent that the Post-

---

[32]    *See* Disclosure Statement Hr'g Tr. 24:1–4, *In re Lumio Holdings, Inc.*, No. 24-11916 (JKS) (Bankr. D. Del. Jan. 3, 2025) ("[I]n light of [*Purdue*], there's no prohibition on the use of opt-out releases, but . . . whether an opt-out is appropriate is subject to a case-by-case analysis.") (requiring opt-in releases for, *inter alia*, creditors who are receiving no recovery and are not entitled to vote).

Confirmation Debtors' funds on hand are insufficient to satisfy the Quarterly Fees, the Liquidating Trust shall cause such funds to be transferred from the Liquidating Trust Assets to the Post-Confirmation Debtors to satisfy the Quarterly Fees."

117.    As to the U.S. Trustee objecting to the fact that there is no provision in the Plan requiring the Liquidating Trust to pay the Quarterly Fees, this matter does not need to be addressed at this time and all parties' rights should be reserved with respect thereto.  For the reasons stated above, this portion of the US Trustee Objection should be overruled.

**D.    The Comprehensive Settlement Underlying the Plan is Appropriate and Should be Approved**

118.    The U.S. Trustee also asserts that the Plan is unconfirmable because it purports to constitute a comprehensive settlement.  *See* UST Obj. ¶¶ 90–97.[33]  That is mere semantics.  The comprehensive settlement underlying the Plan has already been approved by the Court under Bankruptcy Rule 9019 [Docket No. 1529], and the Plan simply incorporates that fact.

119.    The Plan's global settlement language reflects the fact that the Plan and the distributions thereunder were largely made possible due to the fact that the Debtors, the Ad Hoc Group, and the Creditors' Committee agreed to settle certain estate causes of action to assure a recovery for unsecured creditors.  Absent that settlement, there may have been no Plan and no recoveries for unsecured creditors.

120.    As to the U.S. Trustee's assertion that the Debtors have no right to compromise creditors' claims against them, it borders on absurd.  Every single chapter 11 plan does just that.  *See* 11 U.S.C. § 1129(b)(1).  Plans approved in this District have routinely included similar language.  *See, e.g., In re Fisker Inc.*, Case No. 24-11390 (TMH) (Bankr. D. Del Oct. 16, 2024)

---

[33]    The UST Objection refers to non-existent "sections 4.2 and 9.2(b) of the Plan."  UST Obj. ¶ 91.  The Debtors assume that it is, in fact, referring to Articles IV.F and X.B.2.

[Docket No. 722]; *In re FTX Trading LTD.*, Case No. 22-11068 (JTD) (Bankr. D. Del. Oct. 8, 2024) [Docket No. 26404]; *In re MVK Farmco LLC*, Case No. 23-11721 (LSS) (Bankr. D. Del. Mar. 29, 2024) [Docket No. 858]; *In re Mallinckrodt PLC,* Case No. 20-12522 (JTD) (Bankr. D. Del. Feb. 18, 2022) [Docket No. 6510]*; In re SiO2 Medical Products, Inc.*, Case No. 23-10366 (JTD) (Bankr. D. Del. July 17, 2023) [Docket No. 466]; *In re Global Eagle Entertainment*, Case No. 20-11835 (JTD) (Bankr. D. Del. Jan. 29, 2021) [Docket No. 753].  Accordingly, the Debtors have to assume that this objection is merely an unartfully repackaged objection to the Third-Party Releases.  That objection is already addressed above.

### III.    CAUSE EXISTS TO WAIVE THE STAY OF THE CONFIRMATION ORDER

121.    Bankruptcy Rule 3020(e) provides that a confirmation order "is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise."  The Debtors respectfully submit that cause exists to waive the stay of the Confirmation Order so that such order may be effective immediately upon its entry.  A stay of the Confirmation Order will delay the implementation of the Plan, extending the time that the Debtors must remain in chapter 11. Contrary to the contention of the U.S. Trustee, an exigency does exist warranting such a waiver. The Debtors' fiscal year ends on January 31, 2025 and failure of the Plan to go effective by such date, will cause unnecessary negative financial and tax consequences to the Debtors that will only harm their stakeholders.  *See* Wells Declaration ¶ 31.  Based on the foregoing, the Debtors respectfully request a waiver of the 14-day stay of an order confirming a chapter 11 plan under Bankruptcy Rule 3020(e).

## IV.    RESERVATION OF RIGHTS WITH RESPECT TO CONFIRMATION OBJECTIONS

122.    The omission of a response in this memorandum to an objection should not be taken as a waiver of the Debtors' arguments.    The Debtors reserve the right to supplement the memorandum with arguments at the Combined Hearing.

## V.    CONCLUSION

123.    For the reasons set forth herein, the Debtors respectfully request that the Court (i) overrule the UST Objection, (ii) confirm the Plan by entering the proposed Confirmation Order, and (iii) grant such other and further relief as is just and proper.

[*Remainder of page intentionally left blank*]

Dated: January 21, 2025
Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

*/s/ Casey B. Sawyer*
Robert J. Dehney, Sr. (No. 3578)
Matthew O. Talmo (No. 6333)
Jonathan M. Weyand (No. 6959)
Casey B. Sawyer (No. 7260)
1201 N. Market Street, 16th Floor
P.O. Box 1347
Wilmington, Delaware 19899-1347
Telephone:    (302) 658-9200
Facsimile:    (302) 658-3989
Email:        rdehney@morrisnichols.com
              mtalmo@morrisnichols.com
              jweyand@morrisnichols.com
              ewilliamson@morrisnichols.com

- and -

**MILBANK LLP**

Dennis F. Dunne, Esq. (admitted *pro hac vice*)
Michael W. Price, Esq. (admitted *pro hac vice*)
Lauren C. Doyle, Esq.  (admitted *pro hac vice*)
Brian Kinney, Esq.  (admitted *pro hac vice*)
55 Hudson Yards
New York, New York 10001
Telephone:    (212) 530-5000
Facsimile:    (212) 530-5219
Email:        ddunne@milbank.com
              mprice@milbank.com
              ldoyle@milbank.com
              bkinney@milbank.com

*Co-Counsel for Debtors in Possession*